## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CAIRN ENERGY PLC and
CAIRN UK HOLDINGS LIMITED,

50 Lothian Road
Edinburgh, EH3 9BY
Scotland, United Kingdom

          Petitioners,

  v.

THE REPUBLIC OF INDIA,

Central Authority
The Ministry of Law and Justice
Department of Legal Affairs
Room No. 439-A, 4th Floor A-Wing,
Shastri Bhavan
New Delhi 110 001
India

-and-

Secretary
Department of Economic Affairs
Ministry of Finance
North Block
Raisina Hill
New Delhi 110 001
India

          Respondent.

Case No. _____

## PETITION TO CONFIRM
## <u>FOREIGN ARBITRATION AWARD</u>

Pursuant to the United Nations Convention on the Recognition and Enforcement of Foreign

Arbitral Awards (the "New York Convention"), as codified by the Federal Arbitration Act

("FAA"), 9 U.S.C. §§ 201–208, Petitioners Cairn Energy PLC ("Cairn Energy") and Cairn UK

Holdings Limited ("CUHL," and together with Cairn Energy "Petitioners"), hereby move for the confirmation of the December 21, 2020 arbitral award (the "Award") entered in favor of Petitioners and against the Republic of India (the "Respondent" or "India") in a proceeding pursuant to The Arbitration Rules Of The United Nations Commission On International Trade Law, 1976 (the "UNCITRAL Arbitration Rules") and under the Agreement between the Government of the United Kingdom of Great Britain and Northern Ireland and the Government of the Republic of India for the Promotion and Protection of Investments (the "UK-India BIT" or the "BIT").  The Award against India should be recognized and a money judgment should be entered in Petitioners' favor against India in the amount of the Award and for such other relief as the Court deems just and proper.

## INTRODUCTION

1.      This is an action under the New York Convention to confirm an arbitral award arising from an investment dispute regarding a retroactive tax assessment by India.  The underlying dispute arose from Respondent's series of unlawful and harassing fiscal measures targeting Petitioners in this case—two U.K.-based entities who invested and conducted commercial oil and natural gas exploration and production activities in India for over two decades, contributing over $3 billion to the Indian economy.  Respondent retroactively applied an amendment to the Indian taxation laws regarding capital gains (the "2012 Amendment") to revive tax reviews and initiate sham investigations into an eight-year old transaction that restructured Petitioners' corporate organization to consolidate its Indian assets and list the company holding those assets on the Bombay Stock Exchange.  Almost overnight, Respondent's purported investigations into years-old and previously fully disclosed transactions led to the assessment of taxes amounting to over $4 billion.  Respondent enforced these unlawful tax demands, boldly and unilaterally seizing

Petitioners' shares in their publicly traded Indian subsidiary and withholding hundreds of millions of dollars in tax returns due to Petitioners.

2.     Petitioners commenced an arbitration (the "Arbitration") to reverse the unjustified fiscal measures on several grounds, including that Respondent failed to treat their investment fairly and equitably, thus breaching the UK-India BIT.  The Tribunal agreed, finding that Respondent's retroactive application of the 2012 Amendment failed to adequately balance Petitioners' protected interest of "legal certainty/stability/predictability" with Respondent's power to regulate, as such application lacked any specific justification and thus deprived Petitioners of their ability to plan their activities in consideration of the legal consequences of their conduct.  The Tribunal thus ordered Respondent to unwind the measures taken against Petitioners, including compensating them for the monetary loss suffered as a result of Respondent's enforcement of its unlawful tax demand against Petitioners' various assets in India.

3.     Petitioners now seek to confirm this final and binding Award under the New York Convention and commence enforcement proceedings to recover the losses caused by Respondent's unfair and inequitable treatment of their investments.

## **PARTIES**

4.     Petitioner Cairn Energy is a company organized under the laws of the United Kingdom and located at 50 Lothian Road, Edinburgh, EH3 9BY, Scotland, United Kingdom.

5.     Petitioner CUHL is a company organized under the laws of the United Kingdom and located at 50 Lothian Road, Edinburgh, EH3 9BY, Scotland, United Kingdom.

6.     Petitioners were claimants in an arbitration proceeding administered by the Permanent Court of Arbitration ("PCA"), Case No. 2016-7, against Respondent.

7.     Respondent India is a foreign state within the meaning of the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1330, 1332, 1391(f), 1441(d), and 1602–1611 ("FSIA").

## JURISDICTION AND VENUE

8.     This is a proceeding to recognize a foreign arbitral award, governed by the New York Convention. The Arbitration was seated, and the Award was rendered, at the Hague, in the Netherlands.  The Award is attached to the accompanying Declaration of Mark McNeill ("McNeill Decl.") as Exhibit A and certified as a true and correct copy by the McNeill Declaration.

9.     The Court has subject matter jurisdiction over this action pursuant to Section 202 of the FAA, which provides, in relevant part, that "[a]n arbitration agreement or arbitral award arising out of a legal relationship, whether contractual or not, which is considered as commercial, including a transaction, contract, or agreement described in section 2 of this title, falls under the Convention[;]" and Section 203, which provides that "[a]n action or proceeding falling under the [New York] Convention shall be deemed to arise under the laws and treaties of the United States;" and, consequently, under 28 U.S.C. § 1331.  The Award at issue arose out of Petitioners' investment in India, a legal relationship that is commercial in nature, and therefore meets the criteria under the FAA.

10.     The Court also has subject matter jurisdiction over this action pursuant to Section 1605(a)(1) of the FSIA, which grants federal district courts subject matter jurisdiction over foreign states in cases "in which the foreign state has waived its immunity either explicitly or by implication."  India has waived its immunity from suit under Section 1605(a)(1) by signing the New York Convention, and thus waiving immunity in relation to an action to enforce an award in the United States.  *See Tatneft v. Ukraine*, 771 F. App'x 9, 10 (D.C. Cir. 2019) (recognizing holding that "a sovereign, by signing the New York Convention, waives its immunity from

arbitration-enforcement actions in other signatory states").  Further, India is not immune pursuant to Section 1605(a)(6)(B) because this is an action "to confirm an award made pursuant to … an agreement to arbitrate" and "the … award is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards," namely the New York Convention.  *See Belize Bank Ltd. v. Gov't of Belize*, 191 F. Supp. 3d 26, 33 (D.D.C. 2016) ("The New York Convention is exactly the sort of treaty Congress intended to include in the arbitration exception [under 28 U.S.C. §1605(a)(6)]." (internal citations omitted)).

11.     This Court may exercise personal jurisdiction over the Respondent pursuant to 28 U.S.C. § 1330(b).

12.     Venue is proper in this court under 9 U.S.C. § 204 and 28 U.S.C. § 1391(f)(4), which allows a civil action against "a foreign state or political subdivision thereof" to be brought in the United States District Court for the District of Columbia.

## FACTUAL BACKGROUND

## I.     THE UNDERLYING INVESTMENT DISPUTE

### A.     The UK-India BIT

13.     On March 14, 1994, the Government of the United Kingdom and India entered into an Agreement "for the Promotion and Protection of Investment," known as a bilateral investment treaty.  The UK-India BIT, attached to the accompanying McNeill Decl. as Exhibit B and certified as a true and correct copy by the McNeill Declaration, at 1.[1]

---

[1]  The UK-India BIT is available on India's official website at https://dea.gov.in/sites/default/files/United%20Kingdom.pdf.

14.     The express purpose of the UK-India BIT is to "create conditions favourable for fostering greater investment by investors of one State in the territory of the other State." *Id.* at 1.

15.     The UK-India BIT is applicable to "all investments made by investors of either Contracting Party in the territory of the other Contracting Party." *Id.*, Art. 2. "Investment" is defined as "every kind of asset established or acquired, including changes in the form of such investment, in accordance with the national laws of the Contracting Party in whose territory the investment is made," including "shares in and stock and debentures of a company and any other similar forms of interest in a company" or "rightful claims to money or to any performance under contract having a financial value." *Id.*, Art. 1(b) & 1(b)(i), (iii).

16.     Under the BIT, the United Kingdom and India agreed to "encourage and create favourable conditions for investors" from the other country "to make investments on its territory. *Id.*, Art. 3(1). Further, the countries promised that "[i]nvestments of investors of each Contracting Party shall at all times be accorded fair and equitable treatment and shall enjoy full protection and security in the territory of the other." *Id.*, Art. 3(2) (the "Fair and Equitable Treatment provision" or "FET"). The UK-India BIT protects qualified investments from being "nationalised, expropriated or subjected to [equivalent] measures," *id.*, Art. 5(i), and granted investors "unrestricted transfer of their investments and returns," *id.*, Art. 7.

17.     The UK-India BIT also provides a mechanism for settling disputes between an investor and the state where it made its investment. *See id.*, Art. 9. The BIT provides that a disagreement not settled through amicable negotiations or international conciliation may be referred to arbitration, and further lays out the procedure and requirements of such arbitration. *Id.*, Art. 9(3).

18.     Pursuant to this Article, the UK and India consented to arbitrate "[a]ny dispute between an investor of one Contracting Party and the other Contracting Party in relation to an investment of the former."  *Id.*, Art. 9(1).

19.     Under the treaty, "[t]he decision of the arbitral tribunal shall be final and binding and the parties shall abide by and comply with the terms of its award."  *Id.*, Art. 9(3)(c)(v).

20.     As explained below, and as the Award establishes, Petitioners are protected "investors" under Article 1(c) of the UK-India BIT with the right to commence arbitration against Respondent.

21.     Further, the Tribunal concluded that Petitioners' holdings in India qualify as "investment[s]" under Article 1(b) of the UK-India BIT and were covered under the treaty, and that it had "subject-matter jurisdiction as set out in Article 9 of the BIT."  McNeill Decl., Exhibit A ¶ 729 (Award).

**B.     Petitioners' Investments in India**

22.     Cairn Energy began its investment activities in India 25 years ago when, in 1996, it acquired an Australian company with an interest in a Production Sharing Contract ("PSC") for the Ravva oil and gas field, through a newly incorporated Australian subsidiary.  *Id.* ¶¶ 18–19.

23.     Following this acquisition, Cairn Energy restructured its holdings with underlying assets in India multiple times through transactions that involved transfers of shares of companies holding Indian assets among Cairn Energy's non-Indian subsidiaries.  *Id.* ¶¶ 20, 22, 24.

24.     At the time of these transactions, the transfer of shares or other interest in a non-Indian company holding, directly or indirectly, with assets located in India was considered an "indirect transfer."  *Id.* ¶ 889.  In each instance, Cairn disclosed the transaction to the Indian Government, which was fully aware of the nature of the transactions and provided all the necessary approvals.  *Id.* ¶¶ 21–22, 24.  Respondent never indicated that any tax liabilities accrued as a result

of any of these transactions, although they involved transfers of shares of Cairn Energy's non-Indian companies and never sought to assess capital gains tax on any of these transactions. *Id.*

25.     By 2006, Cairn Energy's investment in India increased so that it held operations and assets in India through nine UK incorporated subsidiaries (the "9 Subsidiaries"), which subsequently held between them a further 18 subsidiaries incorporated in different jurisdictions around the world. *Id.* ¶ 25.  Cairn Energy's Indian assets included 12 PSCs, interests in various joint operating agreements, three processing plants, 12 platforms, 250 kilometers of pipelines, several active drilling programs, and considerable reserves of oil and gas. *Id.*

26.     In the course of its decades of oil and natural gas exploration and production in India, Petitioners contributed more than $3 billion in tax and other revenue to India. *Id.* ¶ 26.  Through its exploration activities, Petitioners discovered three oil fields, including "the largest onshore discovery in India [in] over two decades." *Id.* ¶ 23.  These fields account for "roughly one quarter of India's entire domestic oil production." *Id.*

C.     **The 2006 Transactions**

27.     Then, in 2006, Cairn Energy—who held its worldwide assets outside of India—decided to consolidate its Indian assets under an Indian holding company, and offer the shares of that company for public sale through an initial public offering ("IPO") on the Bombay Stock Exchange ("BSE"). *Id.* ¶¶ 27–29.[2]

28.     To effect this consolidation, Cairn Energy incorporated CUHL (the second claimant in the Arbitration) in Scotland, and transferred its shares in the 9 Subsidiaries holding Indian assets to CUHL in exchange for shares in CUHL. *Id.* ¶¶ 34–35; *see also id.* ¶ 1028.  Cairn

---

[2]   We refer herein to the series of transactions resulting in the consolidation as the "2006 Transactions."

Energy separated its non-Indian assets, which were consolidated in a separate holding company. *Id.* ¶ 32.

29.     CUHL then incorporated Cairn India Holdings Limited ("CIHL") in Jersey and transferred its shares in the 9 Subsidiaries to CIHL in exchange for CIHL shares. *Id.* ¶¶ 36–37.

30.     Finally, Cairn India Limited ("CIL"), the company to be listed on the BSE, was formed and incorporated in India as a wholly-owned subsidiary of CUHL. *Id.* ¶ 38.

31.     A series of transactions followed, with the purpose of transferring the holding company housing all of Petitioners' Indian assets (CIHL) to CIL (the "CIHL Acquisition") in a manner complying with Indian securities regulations. CIL acquired shares in CIHL in exchange for cash and shares in CIL. *Id.* ¶¶ 43, 56, 76.

32.     In structuring the 2006 Transactions, Petitioners rejected their "Plan B," which included a "merger route" through two layers of Mauritian companies. *Id.* ¶¶ 1530–1531. The "Plan B" would have mitigated Cairn's tax implications and would have benefitted from the Double Taxation Avoidance Agreement between India and Mauritius, which allowed future capital gains to be taxed in the country of residence of the seller. *Id.* Because the seller in Plan B would be one of the Mauritian companies, no capital gains tax would accrue since the capital gains tax rate in Mauritius is zero. *Id.* By rejecting this route, which the Tribunal found "is suggestive of a desire to avoid any imputation that Cairn was not compliant with Indian tax law," CUHL knowingly crystallized a structure pursuant to which it would eventually have to pay Indian capital gains tax on future sales of CIL shares. *Id.* ¶ 1538.

**D.    Respondent Was Fully Aware of Cairn's Corporate Reorganization through the 2006 Transactions Since at Least the December 2006 IPO**

33.    The 2006 Transactions had been fully disclosed to all relevant government bodies since at least the time of the IPO in December 2006 without Respondent ever raising an issue of taxability.

34.    Further, in the months prior to the IPO, Cairn Energy liaised with the various governmental offices in India to obtain necessary regulatory approvals for the listing of CIL on the BSE, including: (a) approval of the transaction from the Foreign Investment Promotion Board ("FIPB"), under the Ministry of Finance, required because the reorganization involved a share allotment for consideration other than cash; (b) the Reserve Bank of India ("RBI"), required because the reorganization involved an investment by an Indian company in a foreign company by way of a share swap; and (c) the Securities and Exchange Board of India ("SEBI"), necessary for the listing on the BSE.  *Id.* ¶ 44.

35.    In presentations and applications to these governmental bodies, Cairn Energy disclosed in detail the nature of the transactions, making clear that the 2006 Transactions involved indirect transfers of shares.  *Id.* ¶¶ 45–51, 55.  In particular:

a.    In June 2006, Petitioners met with SEBI to provide a description of the planned transaction.  The presentation explained that CIL would acquire CIHL through an exchange of its shares and cash from the IPO proceeds.  *Id.* ¶ 45.

b.    Around the same time, Petitioners' tax advisors and underwriters met separately with the FIPB and RBI to explain the proposed restructuring and IPO, including that part of the transaction would take place through a share swap between CUHL and CIL for the remaining shares in CIHL.  *Id.* ¶ 46.

c.  In particular, CUHL's FIPB application, submitted on August 10, 2006, described the 2006 Transactions in detail, "including the fact that it involved the indirect transfer of assets located in India." *Id.* ¶¶ 47–53, 1199.  The cover letter to the FIPB application specified that CUHL sought its permission "for the investment by way of share exchange, full details of which are in the accompanying proposal." *Id.* ¶ 47.  The FIPB application was also annexed to CUHL's application to the RBI. *Id.* ¶ 49.

d.  On August 29, 2006, FIPB requested more information on the planned transactions, in particular the "precise number of shares involved in the proposed share exchange between CUHL and CIL." *Id.* ¶ 48.

e.  Meeting minutes with the FIPB reflected that the application sought approval for:

> issuing and allotting equity shares aggregating to up to 70% of its post IPO equity capital, to Cairn UK Holdings Limited, in exchange for shares (up to 70%) of Cairn India Holdings Limited held by Cairn UK Holdings Limited.  Subsequent to the completion of the IPO, CIL would require the balance equity shares (at least 10%) of CIHL from CUHL, for a cash consideration under automatic route.

*Id.* ¶ 51.

f.  According to the agenda of that meeting, the Secretary of the Department of Revenue was scheduled to attend the meeting and received the minutes of the meeting.  *Id.* ¶ 52.

36.  FIPB approved the reorganization on September 21, 2006.  *Id.* ¶ 53.  The RBI approved the transaction on October 10, 2006, noting that the FIPB "ha[d] considered the entire proposal and approved the share swap transaction between [CUHL], [CIHL], and [CIL]." *Id.* ¶ 54. At no point did the Indian Government even suggest that any capital gains tax accrued as a result of these transactions, although Petitioners provided enough information in relation to these

approvals to allow the Indian Government to "understand that an indirect transfer had taken place." *Id.* ¶¶ 1199–1200; *see also id.* ¶ 1177.

37.    Further, on October 12, 2006, Petitioners filed a draft red herring prospectus with SEBI in accordance with its regulations. *Id.* ¶ 55. The prospectus set out in detail the proposed corporate reorganization and the plans for the IPO. *Id.*

38.    The Indian Government also reviewed the 2006 Transactions several times between 2007 and 2013 without raising any issue regarding the accrual of any tax as a result of the reorganization. In 2007, CIL was subjected to a transfer pricing assessment by India's Income Tax Department ("ITD"). *Id.* ¶¶ 79, 1188–1189. This type of assessment is required under the Income Tax Act of 1961 ("ITA 1961") when Indian taxpayers enter into an international transaction to ensure, *inter alia*, that India does not lose any tax revenues as a result of a multinational group intentionally allocating its profits to low-tax jurisdictions via non-arms' length pricing." *Id.* In connection with this assessment, CIL provided the ITD with forms detailing CIL's investment in CIHL and explaining the nature of the transaction. *Id.* ¶ 80.

39.    The ITD requested further information about the arm's length price of the 2006 Transaction in 2009. *Id.* ¶¶ 81, 1190–1192. CIL attended hearings and submitted additional, detailed information regarding the pricing of CIL shares and the 2006 Transaction. *Id.* A decision was reached in 2010, finding "no adverse inference … in respect of the arm's length price in respect of 'international transactions' entered into by the assessee during the year." *Id.* ¶ 82. No tax was imposed in connection to the assessment and there was no finding or suggestion that CUHL was liable for capital gains tax for the CIHL acquisition. *Id.* ¶ 83.

40.    Between 2009 and 2010, CUHL sold many of its shares in CIL to third parties, including two large sales to Vedanta Limited ("Vedanta") and Petronas International Corporation

Ltd. ("Petronas")  *Id.* ¶¶ 84–91, 1195.  Those transactions involved the off-market sale of shares in CIL, an Indian company, and so the capital gains deriving therefrom were taxable under Indian law.  *Id.* ¶¶ 85, 89, 1195.  On both occasions, CUHL applied for a withholding certificate seeking a reduced long-term capital gains tax rate, and those applications contained "information on how it had acquired CIL's shares, including the consideration it had given for them (*i.e.*, cash and exchange of shares in CIHL.)."  *Id.* ¶¶ 1195–1197; *see also id.* ¶¶ 86, 90.  Nevertheless, after assessing the Vedanta and Petronas transactions, the ITD did not suggest that CUHL was liable to pay capital gains tax for the CIHL Acquisition.  *Id.* ¶¶ 87, 91.

41.    At the date of the Arbitration, CUHL held only 9.82% of the issued shares of CIL. *Id.* ¶ 93.

42.    As explained in more detail below, it is not surprising that the Indian Government, faced with the broad and comprehensive disclosures of the CIHL Acquisition, never suggested it gave rise to any capital gains tax liability, as indirect share transfers were not taxable under Indian tax law at the time of the 2006 Transactions and the subsequent disclosures.

   **E.    Capital Gains Tax in India and the 2012 Amendment**

43.    A capital gains tax was introduced in India in 1947 pursuant to the Income Tax and Excess Profits Tax (Amendment) Act.  *Id.* ¶ 94.  India's tax framework was restructured in 1961, when the ITA 1961 was enacted.  *Id.* ¶¶ 95–96.

44.    In the ITA 1961, capital gains tax is addressed in Section 9(1)(i), which provides:

   **9.**(1) The following incomes shall be deemed to accrue or arise in India: -

   (i) through or from any business connection in India, or through or from any property in India, or through or from any asset or source of income in India, or *through the transfer of a capital asset situate in India*.

*Id.* ¶ 96 (emphasis added).

45.     In 2007, the ITD attempted, for the first time, to tax an indirect transfer of capital assets situated in India. *Id.* ¶ 103.  The Supreme Court of India rejected this attempt in 2012, in *Vodafone International Holdings B.V. v. Union of India & Anr.* [2012] 6 SCC 613.  *See generally id.* ¶¶ 103–112, 120–122.  The Supreme Court found that Section 9(1)(i) of the ITA did not authorize the taxation of indirect transfers (*i.e.*, the transfer by non-residents of shares in non-Indian companies which indirectly held assets in India). *See id.* ¶ 1204 .  Until it attempted in 2007 to assess taxes against Vodafone International Holdings B.V.*,* India had never taxed an indirect transfer by a non-resident since the ITA 1961 was enacted.

46.     In 2009 and 2010, the Indian Ministry of Finance proposed two direct tax code bills that, if enacted, would have taxed the indirect transfer of a capital asset situated in India.  *See generally id.* ¶¶ 113–119.  Then, the Indian Parliament's Standing Committee on Finance (the "Standing Committee") recognized that the ITA 1961 "does not contain a provision analogous" to the bills the Ministry of Finance was trying to pass. *Id.* ¶ 118.

47.     Following the ruling by the Indian Supreme Court in the *Vodafone* case, which rejected the arguments of the ITD , the ITA 1961 was amended in the 2012 Amendment to include, retroactively, in the scope of capital gains tax indirect transfers of capital assets by non-residents . *Id.* ¶¶ 123–124.  The 2012 Amendment provided:

> 'Explanation 4.—For the removal of doubts, it is hereby clarified that the expression "through" shall mean and include and shall be deemed to have always meant and included "by means of", "in consequence of" or "by reason of".
>
> Explanation 5.—For the removal of doubts, it is hereby clarified that an asset or a capital asset being any share or interest in a company or entity registered or incorporated outside India shall be deemed to be and shall always be deemed to have been situate in India, if the share or interest derives, directly or indirectly, its value substantially from the assets located in India'.

*Id.* ¶ 124 (quoting the Finance Act 2012 [Act No. 23 of 2012]).

48.     The 2012 Amendment raised concerns in the business community and prompted additional discussions and clarifications from the Indian government. *Id.* ¶¶ 126–134. The Central Board of Direct Taxes issued a circular indicating that it will not be reopening cases where assessments have been completed before April 2012 on account of the 2012 Amendment. *Id.* ¶ 131.

**F.     Respondent's Unlawful Fiscal Measures Applying the 2012 Amendment to Petitioners**

49.     In November 2013, Cairn Energy held only 10% of CIL, and CIL publicly announced that it was contemplating a buy-back of its shares of CIL. *Id.* ¶¶ 146-147. The buy-back program was officially announced on January 14, 2014. *Id.* ¶ 148. Public speculation arose that "the share buyback may present [Petitioners] with an opportunity to exit from Cairn India." *Id.* ¶ 148.

50.     The announcement triggered a series of sham investigations and requests from the Indian Government, seeking any grounds retroactively to make a claim for taxes in relation to the 2006 Transactions. The very next day after the buy-back announcement, on January 15, 2014, the ITD conducted an unscheduled, "urgent" survey of CIL's premises to review files relating to the 2006 Transactions—seven years after they were conducted. *Id.* ¶ 149. A 125-page "interim report" was issued just a day later, on January 16, 2014. *Id.* ¶154. Less than a week later, on January 21, 2014, the ITD notified CIHL that the "investigation" found cause to believe that CUHL underreported its taxes in relation to the 2006 Transactions, and requested that CUHL file a tax return for that year within 30 days. *Id.* ¶ 155.

51.     The following day, on January 22, 2014, the ITD summoned CUHL's "Principal Officer" to appear in person to provide information on the 2006 Transactions, and specifically the CIHL Acquisition. *Id.* ¶ 156.

52.     But on the same day, without waiting for CUHL's response and the requested tax return, the ITD issued an order notifying CUHL that the January 15, 2014 survey unearthed evidence that CUHL had failed to report short term capital gain arising out of the 2006 Transactions.  *Id.* ¶ 157.  The order froze CUHL's remaining shares in CIL and any dividends payable by CIL to CUHL.  *See id.* ¶¶ 157–158.

53.     As the Indian Government has long been in possession of documents describing the 2006 Transactions and CIHL Acquisition, *see supra* ¶¶ 33–42, it was clear then that the investigation was a sham and predetermined hunt through Cairn's financial history to serve as a pretext for a tax claim based on the retroactive application of the 2012 Amendment.

54.     In March 2014, Petitioners received notices informing them that certain income for Assessment Year 2007–2008 has escaped assessment and requiring it to file a tax return for that year within 30 days.  McNeill Decl. Ex. A ¶¶ 159–160.  Both Cairn Energy and CUHL responded to the notices and challenged the propriety of the efforts to retroactively impose a tax assessment.  *Id.* ¶¶ 161–162.  In the months to follow, Petitioners received additional notices for hearings and information and engaged in further correspondence with the ITD, challenging the propriety of the retroactive tax assessment.  *Id.* ¶¶ 163, 166, 168.

55.     On March 9, 2015, the ITD issued a draft assessment order (the "DAO"), concluding that CUHL failed to report capital tax gains on the CIHL Acquisition, and imposed a tax in the amount of approximately $1.6 billion.  *Id.* ¶¶ 171, 1023(i).  CUHL submitted its objections to the DAO on April 6, 2015.  *Id.* ¶ 175.

56.     On March 11, 2015, Petitioners served a Notice of Dispute to Respondent, arguing that India had violated its obligations under the UK-India BIT.  *Id.* ¶ 172.  On September 22, 2015, Petitioners filed their Notice of Arbitration under the BIT.  *Id.* ¶ 179.

57.    The investigation culminated on January 25, 2016, when Respondent issued a Final Assessment Order (the "FAO"), confirming the DAO with slight modifications, and a notice of demand for CUHL to pay approximately $4.4 billion.  *See id.* ¶¶ 185–186, 1277 & Section VII.A.3.a.  In the DAO and the FAO, the ITD makes false accusations of concealment of income based on allegedly newly found documents, although those documents, and the nature of the 2006 Transactions more generally, have been known to Respondent since at least the time of the IPO in December 2006.  *See supra* ¶¶ 33–42.

58.    Although the ITA 1961 did not provide for the assessment of a capital gains tax at the time of the 2006 Transactions, both the DAO and the FAO relied exclusively on the 2012 Amendment as the basis for taxation, were rife with inaccuracies, and distorted the way in which the 2006 Transactions were recorded in CUHL and CIL's books in order to find that the transfer yielded a multi-billion dollar tax liability.  *See, e.g.*, McNeill Decl. Ex. A ¶ 908.

59.    CUHL received further notices requiring it to show cause as to why an order imposing penalties for the alleged concealment of income derived in 2007-2008 as a result of the 2006 Transactions should not be entered.  *Id.* ¶ 188.

60.    Petitioners appealed the FAO before the Income Tax Appellate Tribunal (the "ITAT").  *Id.* ¶ 190.

61.    Despite the pending challenges and arbitration, on March 8, 2016, ITD officials expressed an intent to immediately start liquidating CUHL's shares in CIL unless CUHL agreed to pay the principal of the disputed tax demand and to withdraw its claims in arbitration.  *Id.* ¶ 192.  An official notice from the ITD followed.  *Id.* ¶ 194.

62.    In October 2016, Respondent garnished CIL dividends to CUHL and used the proceeds to pay part of the tax demand.  *Id.* ¶ 196.

63.     Petitioners made a Request for Interim Measures ("RIM") to stop Respondent from pursuing enforcement measures against CUHL's shares in CIL. *Id.* ¶ 195.  Respondent represented that it would "take no steps to purport to transfer, sell, encumber or in any other way dispose of the shares during the pendency of the[] arbitral proceedings, without giving [CUHL] three months' written notice of its intentions to do so." *Id.*

64.     On March 9, 2017, the ITAT issued an order finding that "it would be unfair to impose interest on CUHL's tax debt because the tax had arisen out of the 2012 Amendment (which the ITAT described as having "retrospective" application) … because CUHL could not have 'visualize[d]' its liability to pay the tax in advance in the year in which the transaction occurred (i.e., 2006)." *Id.* ¶ 1201.  The ITAT order thus relieved CUHL from the obligation to pay interest on the unpaid taxes for the period from 2006 until the issuance of the FAO. *Id.*

65.     Despite the ITAT's decision, the ITD sent additional letters and notices in March and June 2017 demanding payment of the tax due. *See id.* ¶¶ 198–199, 202, 203.  The ITD then started attaching CUHL's movable property in April 2017, and in August 2017, it issued an order "prohibiting and restraining CUHL from making any transfer of the shares in CIL/VIL[3] and/or from receiving any dividends on those shares." *Id.* ¶ 200.  Respondent further garnished the refunds Petitioners were owed in relation to the sale of CIL shares to Vedanta and Petronas. *Id.* ¶¶ 204, 1023(f)(iii), 1835–1836.

66.     These actions led to Petitioners' renewal of their RIM, which the Tribunal denied on June 15, 2017. *Id.* ¶¶ 198, 201.

---

[3]  CIL now bears the name of Vedanta Limited and was referred to by the Tribunal as "CIL/VIL." *Id.* n. 349.

67.     On September 29, 2017, Respondent issued an additional lump sum penalty against CUHL for approximately $1.6 billion. *Id.* ¶ 204.

68.     Respondent then decided to liquidate CUHL's holdings of CIL shares in an apparent effort to thwart Petitioners' ability to collect on any damages award.  Respondent forced the sale of 98.72% of CUHL's shares in CIL (which had since merged into Vedanta pursuant to a scheme of arrangement under Indian law in 2017), as well as 736,503,056 of CUHL's redeemable preference shares in Vedanta (received as part of the terms of the above-mentioned scheme of arrangement). *Id.* ¶ 205.

## II.     THE ARBITRATION

69.     Under Article 9 of the UK-India BIT, a dispute may be referred to arbitration if it is unable to be settled amicably thought negation or international conciliation.

70.     Petitioners initiated the Arbitration on September 22, 2015, by filing a Notice of Arbitration pursuant to Article 9(3)(c) of the UK-India BIT and Article 3(1) of the UNCITRAL Arbitration Rules. *Id.* ¶ 208.

71.     The members of the Tribunal were appointed as provided under Article 9 of the UK-India BIT. *Id.* ¶¶ 10–13.  Petitioners appointed Mr. Stanimir Alexandrov, and Respondent (despite having originally missed the deadline to do so) appointed Mr. J. Christopher Thomas, QC, as arbitrators. *Id.* ¶¶ 10–11.  The co-arbitrators appointed Mr. Laurent Lévy as the Presiding Arbitrator. *Id.* ¶ 12.

72.     The parties failed to reach an agreement regarding the seat of the Arbitration, so the Tribunal chose the Hague, in the Netherlands. *Id.* ¶ 222.

73.     Respondent was present at and represented by counsel throughout the Arbitration.

74.     The Tribunal then received briefing and evidence from the parties on issues of jurisdiction and merits.

75.     Throughout the proceedings, the Tribunal found, Respondent "made numerous unsolicited submissions and additional document requests outside of the agreed-upon procedure that added to the cost and length of proceedings." *Id.* ¶ 2022.  Respondent delayed the proceedings, baselessly seeking to stay the arbitration and refusing to address any procedural issues, such as bifurcation and the setting of a procedural schedule, while its request for a stay was pending.  *See id.* ¶¶ 227–236, 243–246, 251.  Respondent filed letters to "register[] [their] 'strongest possible protest'," challenging the Tribunal's orders, including as to procedural matters such as hearing agendas and discovery decisions.  *See, e.g.*, *id.* ¶¶ 272, 373, 442.

76.     The Tribunal consistently allowed Respondent the opportunity to be heard, and met its requests, regardless of how unreasonable, with flexibility.   *Id.* ¶ 656. This included modifications to hearing agendas, *id.* ¶ 246, and the granting of numerous extensions sought by Respondent, *id.* ¶¶ 252, 258, 280, 340, 358, 411, 432, 436, 438, 458, 460, 464, 506, 555.

77.     Petitioners' position in the Arbitration was that Respondent breached its obligations under UK-India BIT by retroactively applying capital gains tax on the 2006 Transactions and by attaching and enforcing against CUHL's assets to satisfy the tax obligations alleged to arise out of the tax demand.  In particular, Petitioners argued that Respondent had:

   a.  "[F]ailed to 'create favourable conditions' for the [Petitioners'] investment and to accord the [Petitioners] and their investment 'fair and equitable treatment' as required by Article 3 of the Treaty ('FET');"

   b.  "[U]nlawfully expropriated CUHL's investment in CIL without providing fair and equitable compensation, and subjected the [Petitioners'] investment to measures having an effect equivalent to expropriation in violation of Article 5 of the Treaty;" and

   c.  "[V]iolated the [Petitioners'] right under Article 7 of the Treaty to 'the unrestricted transfer of their investments and returns' by depriving CUHL of the ability to sell its remaining CIL shares and to repatriate the proceeds, as well as the dividends that have accrued in respect of such shares."

*Id.* ¶ 626; *see also id.* ¶ 875.

78.     Respondent challenged the Tribunal's jurisdiction over the dispute and the admissibility of the claims.  Respondent also argued that Petitioners' claims should be dismissed in their entirety as to merits, claiming that (1) the share transfers in the CIHL Acquisition were taxable in 2006 irrespective of the 2012 Amendment as a "tax avoidant transaction;" and (2) the 2012 Amendment did not breach the UK-India BIT because it was not retroactive, but clarificatory, and even if it was retroactive, such taxation is lawful in India.  *Id.* ¶ 876.

79.     The Tribunal held an evidentiary hearing, in which Respondent was present and represented by counsel, from August 20 to 31, 2018 in the Hague.  *Id.* ¶ 491. In total, the Tribunal received tens of thousands of pages of briefing and evidence from the parties over a three year period.  Seeking to address Respondent's various complaints in a comprehensive and adequate fashion, the Tribunal allowed the Parties to submit lists of procedural objections and reservations after the evidentiary hearing, which it readdressed in the Award.  *See id.* ¶¶ 657–662.

## III.     THE ARBITRAL AWARD

80.     The Tribunal issued a 568-page, 2032-paragraph unanimous Award in Petitioners' favor on December 21, 2020.  The Tribunal found that it had jurisdiction over the dispute because it arose under the UK-India BIT, and decided that Respondent has breached its obligations under the UK-India BIT Fair and Equitable Treatment provision by applying the 2012 Amendment to Petitioners and undertaking enforcement actions against their assets.

### A.     The Tribunal Rejected Respondent's Jurisdictional Challenge and Ruled That Petitioners' Claims Were Admissible

81.     As an initial matter, Respondent contested the jurisdiction of the Tribunal and the admissibility of the Petitioners' claims.  *Id.* ¶ 634.  Specifically, Respondent argued that the Tribunal lacked jurisdiction because: (1) Petitioners have not made an investment under the UK-

India BIT and Indian law, specifically taking issue with the indirect nature of Cairn Energy's investment and the legality of CUHL's; (2) the dispute is outside of the UK-India BIT because it concerns "returns" and not "investments;" (3) tax disputes are excluded from the scope of the UK-India BIT; and (4) Petitioners' claims are premature.  *Id.* ¶ 634.

82.     The Tribunal rejected Respondent's arguments, finding that it had jurisdiction over the dispute, for the following reasons.

        1.     <u>Petitioners Made an Investment Under the UK-India BIT and Indian Law</u>

83.     The Tribunal found that Petitioners made an investment, as defined under the UK-India BIT.

84.     As to Cairn Energy, the Tribunal found that it made an "investment" under Article 1(b) of the UK-India BIT as it owned, either directly or indirectly, shares in companies and rights in PSCs, which qualify as "claims to money or to performance under a contract."  As the Tribunal noted, nothing in the BIT excluded indirect ownership from its scope.  *Id.* ¶¶ 703–706, 726.  Further, Petitioners' investments were found to also "satisfy the economic concept of investment," as recognized in the jurisprudence of investment treaty tribunals, as they made a "substantial contribution of capital and other resources" to acquire these assets and in doing so "assumed a considerable risk in the expectation of profit."  *Id.* ¶ 706.  Respondent does not dispute the fact that Petitioners' activities "contributed to the development of the Indian economy."  *Id.*

85.     As to CUHL, which at the time of the Notice of Arbitration owned about $1 billion worth of common shares in CIL, an Indian company, *id.* ¶¶ 703–706, Respondent argued that, since the 2006 Transactions through which CUHL acquired its Indian assets was unlawful, the dispute is outside of the Tribunal's jurisdiction.  *Id.* ¶¶ 708–714.

86.     The Tribunal rejected Respondent's argument, noting that it is well established that the jurisdictional inquiry must consider the dispute and investment as a whole and so the fact that

"one of the Claimants may have been established in the process of the alteration of the form of that investment" does not alter the Claimants' overall investment.  *Id.* ¶ 712.  Further, the Tribunal recognized that Respondent's legality defense—premised on an alleged violation of Indian securities regulations known as the SEBI DIP Guidelines—would in any event not render Petitioners' investment unlawful or invalid, but only give rise to sanctions.  *Id.* ¶ 713.

### 2.    Respondent's Attempt to Distinguish Between Investments and Returns Is Baseless

87.    The Tribunal rejected Respondent's argument that the dispute relates solely to taxation measures imposed on "returns" on the investment and not on the investments themselves, and thus falls outside of the UK-India BIT.  *Id.* ¶ 751–753.

88.    The Tribunal found that the fact that the measures were imposed on "returns" does not mean they are not investment-related, as "it is not disputed that investments are made in the expectation of a financial gain" and that the tax measures nevertheless "interfered … with the exercise of one of the fundamental attributes of the Claimant's investment."  *Id.* ¶ 752.  Further, the use of the term "returns" as separate from "investments" in the BIT "does not suggest the intention to establish a mutually exclusive dichotomy between the protection of investments and that of returns."  *Id.* ¶ 757.

89.    The Tribunal further explained that under the Fair and Equitable Treatment provision of the treaty, it would be hard to argue that a measure that unfairly interferes with the investor's ability to generate or collect returns from the investment does not also constitute an unfair treatment of the investment itself.  *Id.* ¶ 760.

90.    The Tribunal concluded that because the BIT expressly protects the repatriation of both investment and returns, the interpretation of the UK-India BIT Respondent proposes, therefore, would "defy logic." *Id.*

91.     Indeed, the purpose of the UK-India BIT is to "create conditions favourable for fostering greater investment by investors of one State in the territory of the Other State."  In light of this aim, it makes little sense not to protect returns on investors' investments in the state since investments are made for the purpose of generating returns.  *Id.* ¶ 761.  Based on the reasons above, the Tribunal thus found that the BIT protects both returns and investments.  *Id.* ¶ 762.

3.     The Instant Tax-Related Investment Dispute Falls Squarely within the Scope of the UK-India BIT

92.     The Tribunal also rejected Respondent's claim that the dispute falls outside the subject matter of the UK-India BIT, finding that "there is no doubt that this dispute relates to an investment" and thus falls within the scope of the BIT.  *See id.* ¶ 746.  As the Tribunal recognized, the dispute "arises out of taxation measures imposed by India on a reorganisation of [an investment protected by the BIT]."  *Id.* ¶ 747.

93.     The Tribunal explained that Article 1(b) of the UK-India BIT explicitly considers such internal reorganization to be a qualifying investment under the treaty.  *Id.*  Further, even if the BIT would not specifically include the reorganization in its definition, investment treaty jurisprudence support the holistic treatment of an investment for jurisdictional purposes and rejects the consideration of acts in "complete isolation from the others."  *Id.* ¶ 748 (quoting *Holiday Inns, Occidental Petroleum and others v. Kingdom of Morocco*, ICSID Case No. ARB/72/1, Decision on Jurisdiction (May 12, 1974)).

94.     The Tribunal also rejected Respondent's argument that the Tribunal lacks jurisdiction because tax disputes are excluded from the scope of the UK-India BIT.

95.     To start with, the Tribunal clarified that this is not a tax dispute, but a tax-related investment dispute, as it concerns "violations of an investment treaty resulting from certain sovereign measures taken by the Respondent in the field of taxation, also referred to as fiscal

measures." *Id.* ¶ 793.  This is not, as the Tribunal notes, a dispute regarding the taxability of a specific transaction.  *Id.*

96.    Nevertheless, the Tribunal proceeded by analyzing the arbitration agreement in Article 9 of the UK-India BIT.  *Id.* ¶ 796.  The Tribunal noted that Article 9 is a "broad jurisdictional clause" and nothing in Article 9 "suggests that tax-related investment disputes fall outside the scope of the Tribunal's jurisdiction." *Id.* ¶ 797.

97.    Looking more broadly at the entirety of the treaty, the Tribunal found no express language barring tax disputes and that "[i]nterpreting the BIT as to exclude tax-related measures from its scope of application" would not be in line with the treaty's purpose.  *Id.* ¶ 798.  Furthermore, the BIT includes a narrow tax-related exception in Article 4, and thus the United Kingdom and India would have expressly included a more broad exception if such limit on the scope of the BIT was intended.  *Id.* ¶¶ 799–800, 806(c).

98.    The Tribunal finally rejected India's argument that tax matters are exclusively regulated by the UK-India Double Taxation Avoidance Agreement ("UK-India DTAA") pursuant to Article 30 of the Vienna Convention on the Laws of Treaties.[4]  *Id.* ¶ 802.  The Tribunal decided as such for the following reasons:

---

[4]   Article 30 of the Vienna Convention on the Laws of Treaties states, in relevant part:

1.  Subject to Article 103 of the Charter of the United Nations, the rights and obligations of States parties to successive treaties relating to the same subject-matter shall be determined in accordance with the following paragraphs.

2.  When a treaty specifies that it is subject to, or that it is not to be considered as incompatible with, an earlier or later treaty, the provisions of that other treaty prevail.

3.  When all the parties to the earlier treaty are parties also to the later treaty but the earlier treaty is not terminated or suspended in operation under article 59,

a.  As opposed to the BIT, the UK-India DTAA provides rules for the avoidance of double taxation and prevention of fiscal evasion applicable to residents of each contracting state.  *Id.* ¶ 803.  Therefore, the two treaties do not relate to the same subject matter and Article 30 does not apply.

b.  Even if Article 30 applied, the UK-India DTAA predates the BIT, and therefore the BIT would derogate from the UK-India DTAA, and not vice versa as the Respondent seems to suggest.  *Id.* ¶ 804.

c.  Even if Article 30 applied, the BIT never specified that it is subject to the DTAA and does not expressly specify that the BIT should be considered to be incompatible with the DTAAs signed by the Host State.  *Id.* ¶ 806.

4.  <u>Tax-Related Investment Disputes Are Arbitrable</u>

99.    The Tribunal also rejected Respondent's argument that the dispute is not arbitrable as a matter of international public policy, as well as under Dutch law, due to its subject matter.

100.    Bearing in mind that the dispute is not a tax dispute, but a tax-related investment dispute, the Tribunal analyzed this question under both Dutch law and as a matter of international public policy.

101.    ***Dutch Law.***  The Tribunal found that, "even if tax disputes are not arbitrable under Dutch law, this has no bearing on the arbitrability of tax-related investment disputes, especially when Dutch taxes are not at stake."  *Id.* ¶ 826.  The Tribunal reasoned that the public policy rationale for keeping tax disputes in domestic courts are not applicable to disputes related to violations of investment treaties by fiscal measures.  *Id.*  Indeed, a verdict of the Tribunal against Respondent would not lead to the invalidation of the 2012 Amendment or have any effect on

---

the earlier treaty applies only to the extent that its provisions are compatible with those of the later treaty.

India's tax laws, but would only make a determination regarding the host State's treatment of individual investors and would be binding only on Petitioners. *Id.* ¶ 825.

102.    Further, the Tribunal reviewed evidence showing that the Netherlands considered fiscal measures to fall within the scope of its BIT with India. *Id.* ¶ 827.

103.    ***International Public Policy.***  The Tribunal rejected Respondent's argument that tax disputes are not arbitrable as a matter of international public policy because the dispute at hand is a tax-related investment dispute, and not a tax matter. *Id.* ¶ 829.  Since the evidence Respondent set forth narrowly addressed sovereign concerns about global organization's interferences into tax matter, Respondent failed to make a showing that under international public policy tax-related investment disputes are not arbitrable. *See id.* ¶ 830.

### 5.    Petitioners' Claims Were Mature

104.    Finally, the Tribunal found that Petitioners' claims were ripe for resolution, as the UK-India BIT does not contain a requirement of exhaustion of local remedies.[5]  *Id.*  ¶ 857. Respondent's argument related to Petitioners' alleged failure to challenge India's measures before domestic fora thus goes toward the merits of the case, and not the jurisdiction.

105.    In conclusion, the Tribunal thus found that it had jurisdiction over the dispute. *Id.* ¶ 2032(1).

### B.    The Tribunal Finds in Petitioners' Favor on the Merits

106.    The Tribunal found that the retroactive imposition of capital gain tax on the CIHL Acquisition on the basis of the 2012 Amendment to the ITA 1961 and related enforcement actions were a breach of Respondent's obligations under the UK-India BIT, rejecting Respondent's

---

[5]   The present dispute is ripe under the BIT because the FAO is a binding sovereign act that Respondent has enforced, causing Petitioners' concrete injury capable of being assessed as a breach. *id.*

argument that the CIHL Acquisition would have been taxable even without the 2012 Amendment and that it violated Indian securities law.

107.    In so finding, the Tribunal emphasized that the retroactive application of the 2012 Amendment deprived Petitioners of their ability to plan their activities in consideration of the legal consequences of their conduct and lacked a specific public purpose to justify it. *Id.* ¶ 1816.  Since the principle of legal certainty is a core element of the FET standard, and Respondent failed to set forth any public purpose that would justify the retroactive application of the 2012 Amendment, the Tribunal found that Respondent failed to treat Petitioners fairly and thus breached the UK-India BIT.

1.    Respondent Breached the UK-India BIT by Treating Petitioners in a
Grossly Unfair Manner

108.    The Tribunal found that the fiscal measures Respondent took against Petitioners violated the UK-India BIT's Fair and Equitable Treatment standard by failing to treat Petitioners' investment fairly and equitably.[6] *Id.* ¶¶ 1826, 2032(2).

109.    The Tribunal explained that the UK-India BIT protects Petitioners' interest of "legal certainty / stability / predictability" and such interest can be encroached upon only in the presence of a specific purpose that would justify the retroactive application of the 2012 Amendment. *Id.* ¶ 1816.

110.    Legal certainty is a core principle of the FET standard in the UK-India BIT "and of the rule of law more generally." *Id.*   Unjustified retroactivity, as the Tribunal has noted, is generally seen "'not so much [as] something opposed to a rule of law, [but] as something opposed to the rule of law', and 'shocks, or at least surprises, a sense of juridical propriety.'" *Id.*

---

[6]   The Tribunal stated that in light of this decision it did not "need to address [Petitioners'] remaining claims." *id.* ¶¶ 1825; 2032(2).

111.     The Tribunal found that Respondent has no justification for enacting retroactive tax legislation and applying it to Petitioners.  *Id.*

112.     Respondent argued that it was justified in doing so due to the "emerging economic reality that resulted from the proliferation of multinational corporations and their utilisation of so-called tax havens."  *Id.* ¶ 1809.  The Tribunal rejected this justification since it did not justify the *retroactive* application of the legislation.  *Id.* ¶ 1810.

113.     Another justification the Tribunal rejected was the need to "combat tax avoidance." *Id.* ¶ 1811.  The FAO did not tax the Petitioners on a theory of tax avoidance, and the Tribunal found no evidence that the 2012 Amendment was enacted to sanction Petitioners for their specific abuse or that Petitioners engaged in tax avoidance.  *Id.* ¶ 1812.  Nor has Respondent proved a case of systemic abuse by foreign investors.  *Id.* ¶ 1813.

114.     Having rejected Respondent's attempts to justify the retroactive application of the 2012 Amendment, the Tribunal found that the retroactive taxation of the CIHL Acquisition was "grossly unfair" and thus Respondent breached its obligation under Article 3(2) of the UK-India BIT to accord to Petitioners' investment fair and equitable treatment.  *Id.* ¶ 1816.

        2.     <u>The Tribunal Rejected Respondent's Arguments that the Taxation of the CIHL Acquisition Was Proper Even in the Absence of the 2012 Amendment</u>

115.     ***The pre-2012 Amendment version of Section 9(1)(i) of the ITA 1961 did not, and could not by way of interpretation, extend to indirect transfers of capital assets situate[d] in India.***  The Tribunal found that there is "no evidence of an intent that the fourth limb of Section 9(1)(i) should bear a meaning other than its natural meaning, either in 1946, 1956, or 1961."  *Id.* ¶ 1107.  The opposite is true, as the Tribunal noted that "the record suggests that indirect transfers by non-residents were not discussed in the relevant parliamentary debates at that time" and that there is no "evidence of such intent in the ITA … itself" either—but to the contrary, the 2012

Amendment's text is unequivocal as it "purports to apply as to the entry into force of the ITA 1961." *Id.* ¶¶ 1107, 1253.  The record abounds with evidence supporting the Tribunal's finding, including:

    a.   The Indian Finance Minister at the time himself suggested that the 2012 Amendment was not merely clarificatory, but sought to have "retrospective effect since 1962 to assert the government's right to levy tax on merge and acquisition (M&A) deals involving overseas companies with business assets in India. … This retrospective agreement was not merely to check the erosion of revenues in present cases, but also to prevent the outgo of revenues in old cases." *Id.* ¶ 1108.

    b.   In 2009 and again in 2010, the Parliament considered new direct tax codes that would tax indirect transfers by non-residents.  *Id.* ¶ 1112.  As the Standing Committee noted that these tax codes—which sought "*to tax* income of a non-resident, arising from indirect transfer of capital asset, situated in India"—were novel and lacked an analogous provision in the ITA, the Tribunal concluded that indirect transfers were not previously taxed under the ITA.  *Id.* ¶ 1120–1121.

    c.   The opinions of a number of special committees mandated to review the proposed amendments to the ITA 1961 is consistent with a finding that the 2012 Amendment was seeking to impose a new tax.  The Shom Committee, for example, in no uncertain terms, found that the 2012 Amendment was not "clarificatory in nature and, instead, would tend to widen the tax base." *Id.* ¶ 1129.  The Committee thus recommended to apply this provision prospectively.  *Id.*  The Tax Administration Reform Commission described the 2012 Amendment as a "retrospective

amendment" introduced to counter the *Vodafone* case in what they called an "overnight change" in the interpretation of Section 9(1)(i).  *Id.* ¶ 1130.

d.  The tax advice received by Petitioners at the time of the 2006 Transactions further confirms that, in 2006, Section 9(1)(i) was not seen as imposing a tax on indirect transfers.  *See generally id.* ¶ 1141–1168.

e.  "[T]he absence of any attempt by the ITD to tax indirect transfers prior to 2007 (including the 2006 Transactions, which … were widely disclosed to the ITD in several occasions), is compelling evidence that, prior to the 2012 Amendment, Section 9(1)(i) did not tax indirect transfers and the ITD recognised this to be the case." *Id.* ¶ 1177.  Respondent failed to show that the ITD had a practice of taxing indirect transfers under Section 9(1)(i) prior to 2007.  *Id.* ¶ 1183.

f.  ITAT's March 9, 2017 Order, *see supra* ¶ 64, also supports a finding that the 2006 Transactions were not taxable at the time when they were concluded, but any applicable tax solely derives from the retroactive application of the 2012 Amendment.  *See* McNeill Decl. Ex. A ¶¶ 1201, 1203.  The ITAT refused to allow a penalty on CUHL, recognizing that the tax burden imposed on Petitioners on the basis of the 2012 Amendment "could not have been visualised in the year of [the 2006 Transactions] because in that year Section 9(1)(i) did not tax indirect transfers. *Id.* ¶ 1203.

g.  Further support is found in the Supreme Court of India's 2012 decision in *Vodafone International Holdings B.V. v. Union of India & Anr.* [2012] 6 SCC 613.  In *Vodafone*, the Supreme Court "arrived at the unequivocal finding that 'Section 9(1)(i) cannot by a process of interpretation be extended to cover indirect transfers

of capital assets/property situate in India.  To do so, would amount to changing the content and ambit of Section 9(1)(i).  We cannot re-write Section 9(1)(i).'"  *Id.* ¶ 1204.

h.   The timing of the ITD's assessment against CUHL "further confirms that indirect transfers were not taxable when the CIHL Acquisition took place."  *Id.* ¶ 1186.  The Tribunal found that "[t]he ITD was aware, or could not have failed to become aware, of Cairn's corporate reorganisation at the very least from October 2007.  Indeed, between October 2007 and January 2014, the ITD analysed the CIHL Acquisition in detail no less than three times," without even suggesting that the transactions gave rise to capital gains tax.  *Id.* ¶ 1187–1199.

116.   ***Respondent's additional defenses were baseless.***   Because it found that the 2012 Amendment retroactively applies to the 2006 Transactions, *see id.* ¶¶ 1252–1259, the Tribunal then considered—and rejected—Respondent's defenses to Petitioners' claims of breach of the UK-India BIT, namely: (1) that the taxes imposed on Petitioners are justified even outside of the 2012 Amendments because they are tax avoidant transactions; (2) that the 2006 Transactions are taxable under Section 2(47)(vi); and (3) that the 2006 Transactions breached Indian securities and exchange laws.

117.   The Tribunal rejected Respondent's tax avoidance defense, claiming that the taxes imposed on Petitioners are justified even outside of the 2012 Amendments because they were tax avoidant transactions.  *Id.* ¶ 1261.  The Tribunal engaged in a detailed analysis of Indian law, seeking to trace the development of Indian law on the distinction between legitimate tax planning and tax avoidance.  *See id.* ¶ 1298–1424.  The Tribunal noted that "prior to the 2012 Amendment, the indirect transfer of an Indian asset effected through the transfer of shares of a foreign holding

company could not in itself amount to the avoidance of capital gains tax in India[ as] [i]ndirect transfers were simply not taxable at the time." *Id.* ¶ 1428.  In this context, Respondent failed to show that the 2006 Transactions were "structured in such a way as to avoid some other applicable tax, or *abusively structured* with the purpose of benefitting from the tax treatment of indirect transfers when they would have otherwise been taxable in India." *Id.*

118.    Respondent put forth six additional theories of how Petitioners allegedly avoided taxes other than those imposed under the 2012 Amendment.  *See id.* ¶ 1145 *et seq.*  The Tribunal rejected Respondent's theories, some because, even if the Tribunal had agreed with Respondent that the transactions were structured to avoid capital gains, the tax to be imposed would have been roughly half of what was actually imposed, and thus the defense would not preclude the Tribunal from assessing the fairness of the FAO, *id.* ¶¶ 1197, 1569, others because they lacked any evidentiary support, *id.* ¶ 1574, or merely amounted to tax planning, and not tax avoidance, *id.* ¶ 1583; *see also id.* ¶¶ 1587–1588, 1590; *see also id.* ¶ 2032(7).

119.    The Tribunal specifically found that Petitioners' choices when structuring the 2006 Transactions, including their rejection of a Plan B which would avoid any capital gains tax, *see supra* ¶ 32, was "suggestive of a desire to avoid any imputation that Cairn was not compliant with Indian tax law."  McNeill Decl. Ex. A ¶ 1538.  The Tribunal found that Petitioners' structuring choices vis-à-vis the 2006 Transactions were "a more clearly tax-compliant" option, than other choices suggested by their tax advisors.  *Id.*

120.    Notably, the Tribunal pointed out the dissonance of Respondent's arguments. Respondent conceded that the Plan B structure which would have allowed Petitioners to avoid capital gain tax altogether would have been considered to be lawful and legitimate tax planning,

and yet claimed that Petitioners' chosen tax structure that exposed it to higher taxes would be a tax-avoidant transaction.  *Id.* ¶ 1540.

121.    The Tribunal also rejected Respondent's Section 2(47)(vi) defense, finding that the 2006 Transactions would not have been taxable under this Section.  According to Respondent, Section 2(47)(vi) of the ITA 1961 contemplated the taxation of indirect transfers by defining the word "transfer" as "any transaction … which has the effect of transferring, or enabling the enjoyment of, any immovable property."  *Id.* ¶ 1593.  Specifically, the Tribunal found that:

   a.   Respondent failed to identify any instances in which the ITD has sought to tax the transfer of shares in companies indirectly holding interests in PSCs, *id.* ¶ 1633;

   b.   The defense lacks credibility because Respondent never raised it before the Arbitration, *id.* ¶ 1634;

   c.   Respondent's interpretation of Section 2(47)(vi) and 269UA(d) (defining "immovable property") is not supported by the record and these provisions cannot be applied to an indirect transfer of rights in PSCs, *id.* ¶ 1635.

122.    The Tribunal further rejected Respondent's argument that the 2006 Transactions breached Indian securities and exchange laws.  The Tribunal reiterated that a violation of Indian securities law would not render the investment unlawful or invalid, but only subject Cairn Energy and CUHL to sanctions, and thus would not deprive it of jurisdiction over the matter.  *Id.* ¶¶ 1660–1661.  The Tribunal further found that a purported violation of securities law would not have relevance on the merits of the claim, as it would not qualify as tax avoidance and that in any event, the record indicates that there was no such violation.  *Id.* ¶¶ 1662–1666.

123.    The Tribunal also rejected Respondent's defense that Petitioners failed to prove an "international wrong" by not challenging the fiscal measures before the Indian judiciary.  *Id.*

¶ 1818.  In so doing, the Tribunal noted that Petitioners have challenged the measures imposed at various stages in the proceedings, *see supra* ¶¶ 50–68; McNeill Decl. Ex. A ¶ 1820 (Award), and that the FAO and related enforcement measures have had "tangible consequences on [Petitioners'] investments[ as] … Respondent has forcibly sold virtually all of CUHL's shares in CIL[] and has garnished CUHL's dividends to pay off the tax demand," *id.*

### 3.   The Tribunal's Grant of Relief

124.    After finding that Respondent has breached Article 3(2) of the UK-India BIT, the Tribunal proceeded to analyzing Petitioners' request for relief.  *See id.* ¶ 1826.

125.    The Tribunal "declare[d] that the tax demand against [Petitioners] … as set forth in the FAO … is inconsistent with the [UK-India] BIT and [Petitioners]" and relieved Petitioners from "any obligation to pay it."   *Id.* ¶¶ 1877; 2032(5).   The Tribunal further ordered that Respondent "withdraw the [d]emand [under the FAO] permanently and refrain from seeking to recover the alleged tax liability or any interest and/or penalties arising from [it]."  *Id.*

126.    The Tribunal then proceeded to calculate the monetary loss Petitioners suffered as a result of Respondent's "enforcement of its internationally unlawful tax demand against [Petitioners'] various assets in India."  *Id.* ¶ 1878.

127.    For the loss of the CIL shares that India has seized and sold in enforcement of its tax demand under the FAO, the Tribunal ordered the Respondent to compensate Petitioners "US\$ 984,228,274.00 … plus a 6-month margin of 1.375%, compounded semiannually on the net proceeds" with the interest accruing starting on different dates depending on when the losses were incurred.  *See id.* ¶ 2032(3)(a).

128.    A return of the withheld tax refund related to the CIL share sale to Vedanta, *see supra* ¶ 40, totaling \$240,645,158.81 "plus interest at a rate of US\$ 6- month LIBOR plus a 6-

month margin of 1.375%, compounded semiannually from 30 June 2017 until full payment thereof." *See* McNeill Decl. Ex. A ¶ 2032(3)(b).

129.    A return of the withheld tax refund related to the CIL share sale to Petronas, *see supra* ¶ 40, totaling $7,946,710.55 "plus interest at a rate of US$ 6- month LIBOR plus a 6-month margin of 1.375%, compounded semiannually from 30 June 2017 until full payment thereof." *See id.* ¶ 2032(3)(c).

130.    In relation to the above, the Tribunal chose to apply a pre-award and post-award interest rate that would "compensate the [Petitioners] for the value that they would have realised" by alleviating their "borrowing costs," namely a rate of "US$ 6-month LIBOR plus a six-month margin of 1.375%." *See id.* ¶¶ 1945-1951, 1966.

131.    Lastly, the Tribunal ordered Respondent to pay $2,005,700.42 as reimbursement of Petitioners' costs of arbitration and $20,389,413.97 towards Petitioners' legal representation in connection with the Arbitration. *Id.* ¶ 2032(8).

**REQUEST FOR THE**
**<u>RECOGNITION AND CONFIRMATION OF THE AWARD</u>**

132.    Petitioners repeat and re-allege paragraphs 1 through 131.

133.    The parties' agreement to arbitrate is found in Article 9 of the UK-India BIT, which constitutes a valid "agreement in writing" for purposes of Article II of the New York Convention.

134.    The Award was made in the Netherlands, a party to the New York Convention. The United Kingdom, India, and the United States are also parties to the New York Convention. *See* New York Convention, Art. I.

135.    The Award arose from a legal relationship between Petitioners and Respondent that is commercial within the meaning of Section 202 of the FAA, and the relationship is not "entirely between citizens of the United States."

136.   The Award is final and binding within the meaning of the New York Convention and Section 207 of the FAA and is therefore binding on the parties and subject to recognition and enforcement in the United States pursuant to the New York Convention and the FAA.

137.   The Award is final pursuant to Article 9(c)(v) of the UK-India BIT which provides that "[t]he decision of the arbitral tribunal shall be final and binding and the parties shall abide by and comply with the terms of its award" and Article 34 of the UNCITRAL Arbitration Rules, which provides that "[a]ll awards shall be made in writing and shall be final and binding on the parties."

138.   The FAA and the New York Convention make recognition and enforcement mandatory except where any of certain narrow defenses are proven.  *See* New York Convention, Arts. III & V; 9 U.S.C. § 207 (the "court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention"); *see also Thai-Law Lignite (Thailand) Co., Ltd. v. Gov't of Law People's Democratic Republic*, 864 F.3d 172, 178–179 (2d Cir. 2017).  None of the defenses to the enforcement of an arbitral award is applicable here.

139.   None of the grounds for "refusal or deferral of recognition or enforcement" of the Award under Article V of the New York Convention is applicable here.

140.   This petition is timely because it is filed within three years after the issuance of the Award.  *See* 9 U.S.C. § 207.

141.   Petitioners are thus entitled to immediate confirmation, recognition and enforcement of the Award pursuant to Section 907 of the FAA and Article III of the New York Convention, and entry of judgment in favor of Petitioners and against Respondent in the full

amount of the Award, with the interest and costs as provided therein accruing through the date of this Court's judgment.

## **PRAYER FOR RELIEF**

WHEREFORE, Petitioners respectfully request that this Court, pursuant to Article III of the New York Convention and Section 207 of the FAA:

a)     Enter an order recognizing and confirming the Award;

b)     Enter judgment for Petitioners and against Respondent in an amount equal to the full amount of damages and interest under the Award, as follows:

     a.   US$ 984,228,274.00 for the net proceeds that would have been earned from the planned 2014 sale of CIL shares, plus interest at a rate of US$ 6-month LIBOR plus a 6-month margin of 1.375%, compounded semiannually on the net proceeds, from the following dates and until full payment thereof:

         i.   For US$ 64,708,741.00 in lost net proceeds incurred in January 2014, pre-award interest from January 31, 2014;

         ii.   For US$ 303,352,155.00 in lost net proceeds incurred in February 2014, pre-award interest from February 28, 2014;

         iii.   For US$ 313,076,958.00 in lost net proceeds incurred in March 2014, pre-award interest from March 31, 2014;

         iv.   For US$ 191,695,557.00 in lost net proceeds incurred in April 2014, pre-award interest from April 30, 2014;

         v.   For US$ 111,394,863.00 in lost net proceeds incurred in May 2014, pre-award interest from May 31, 2014;

     b.   US$ 240,645,158.81 for the withheld tax refund due with respect to the  share sales to Vedanta, plus interest at a rate of US$ 6- month LIBOR plus a 6-month margin of 1.375%, compounded semiannually from June 30, 2017 until full payment thereof;

     c.   US$ 7,946,710.55 for the withheld tax refund due with respect to the share sales to Petronas, plus interest at a rate of US$ 6-month LIBOR plus a 6-month margin of 1.375%, compounded semiannually from June 30, 2017 until full payment thereof;

     d.   US$ 2,005,700.42 as reimbursement for the Arbitration costs; and

     e.   US$ 20,389,413.97 towards their legal costs incurred in the Arbitration.

c)     Direct that post-judgment interest shall accrue at a rate of US\$ 6-month LIBOR plus a 6-month margin of 1.375%, compounded semiannually starting on the date of the entry of judgment.

d)     Grant attorney's fees and costs in relation to the instant confirmation proceeding;

e)     Grant such other relief as the Court may deem just and proper.

Dated: February 12, 2021                      Respectfully submitted,

                                        QUINN EMANUEL URQUHART & SULLIVAN, LLP

                                        Mark McNeill (pro hac vice to be filed)
                                        Dennis H. Hranitzky
                                        Debra O'Groman (pro hac vice to be filed)
                                        dennishranitzky@quinnemanuel.com
                                        markmcneill@quinnemanuel.com
                                        debraogorman@quinnemanuel.com
                                        51 Madison Avenue, 22nd Floor
                                        New York, NY 10010
                                        212-849-7000 Main Office Number
                                        212-849-7100 FAX

                                        Florentina Dragulescu Field
                                        DC Bar No. 1531549
                                        florentinafield@quinnemanuel.com
                                        1300 I Street NW, Suite 900
                                        Washington, District of Columbia 20005
                                        202-538-8000 Main Office Number
                                        202-538-8100 FAX

                                        *Counsel for Petitioners Cairn Energy PLC and Cairn UK Holdings Limited*