# EXHIBIT A

**PCA CASE NO. 2016-7**

**In The Matter Of An Arbitration Before A Tribunal Constituted In Accordance With The Agreement Between The Government Of The United Kingdom Of Great Britain And Northern Ireland And The Government Of The Republic Of India For The Promotion And Protection Of Investments**

**-and-**

**The Arbitration Rules Of The United Nations Commission On International Trade Law, 1976 (the "UNCITRAL Arbitration Rules")**

**-between-**

**CAIRN ENERGY PLC
CAIRN UK HOLDINGS LIMITED**

*Claimants*

**-and-**

**The Republic of India**

*Respondent*

_____

# Award
_____

*The Arbitral Tribunal*

Mr Laurent Lévy (Presiding Arbitrator)
Mr Stanimir A. Alexandrov
Mr J. Christopher Thomas QC

*Secretary of the Tribunal*

Ms Sabina Sacco

*Assistant to the Tribunal*

Mr David Khachvani

*Registry*

Permanent Court of Arbitration

21 December 2020

*[Page Intentionally Left Blank]*

**TABLE OF CONTENTS**

I.   INTRODUCTION.................................................................................................. 1

   A. THE CLAIMANTS................................................................................................ 1

   B. THE RESPONDENT............................................................................................ 3

   C. THE TRIBUNAL ................................................................................................ 4

II.  THE FACTS ..................................................................................................... 5

   A. THE PETROLEUM INDUSTRY IN INDIA............................................................. 5

   B. THE CLAIMANTS' INVESTMENTS IN INDIA ..................................................... 6

     1. Cairn's acquisition of Command Petroleum ............................................. 6

     2. Cairn's expansion in India ........................................................................ 8

     3. Cairn's 2006 corporate restructuring ....................................................... 9

       a. Initial steps of the restructuring ...................................................... 10

       b. The transfer of Cairn's Indian assets to CIL .................................. 15

         (i)   Step 1: CIL acquires 21.8 per cent of CIHL.......................... 19

         (ii)  Step 2: CIL acquires the remaining 78.2 per cent of CIHL.... 22

       c. The transfer pricing assessment by the ITD .................................... 26

     4. Cairn's divestments of its shareholding in CIL....................................... 27

       a. The Petronas transaction ................................................................ 28

       b. The Vedanta transaction.................................................................. 28

       c. Other divestments............................................................................ 30

   C. EVOLUTION OF THE LEGAL FRAMEWORK RELEVANT TO CAPITAL GAINS TAX IN INDIA .......... 30

     1. Background to the Income Tax Act 1961 ................................................. 30

     2. The *Vodafone* case – Part 1.................................................................... 32

     3. The Direct Tax Code Bills of 2009 and 2010 ......................................... 36

     4. The *Vodafone* case – Part 2.................................................................... 38

     5. The 2012 Amendment.............................................................................. 39

     6. Further clarifications to the 2012 Amendment ....................................... 40

     7. The BJP assumes power ......................................................................... 41

     8. Further legislative changes .................................................................... 42

   D. THE ITD'S INVESTIGATION INTO THE CIHL ACQUISITION ....................... 43

   E. THE FINAL ASSESSMENT ORDER AND ENFORCEMENT MEASURES........... 52

III. PROCEDURAL HISTORY ............................................................................. 56

   A. COMMENCEMENT OF THE PROCEEDINGS .................................................. 57

     1. Constitution of the Tribunal.................................................................... 57

     2. First procedural hearing; procedural calendar; seat of the arbitration; the Claimants' request for interim measures ....................................................................... 57

   B. THE RESPONDENT'S APPLICATIONS FOR A STAY AND BIFURCATION OF THE PROCEEDINGS; TIMETABLE FOR THE WRITTEN PHASE ................................................. 60

   C. THE CLAIMANTS' REQUEST FOR THE RELEASE OF DIVIDENDS FROM CIL; RENEWED RIM ..... 68

   D. TRANSPARENCY, CONFIDENTIALITY, AND DOCUMENT SHARING........... 80

   E. DOCUMENT PRODUCTION ........................................................................... 82

1. Unscheduled document production requests..........................................................82

    a. The Claimants' Document Requests No. 1 and 2 ............................................ 82

    b. The Respondent's request for documents from the *Vedanta* arbitration ...................... 85

    c. The Tribunal's decision on the Parties' unscheduled document requests .................... 85

2. Scheduled document production requests.............................................................86

F. RESCHEDULING OF THE WRITTEN PHASE AND THE EVIDENTIARY HEARING ........................... 89

G. PROCEDURAL STEPS PRECEDING THE EVIDENTIARY HEARING ................................................ 93

1. Allegations of breach of confidentiality ................................................................. 94

2. Compliance with PO5 on document production ................................................... 94

3. Compliance with PO8 on document production ................................................ 100

4. The Respondent's protest against PO11 and its Additional Document Request .............. 103

5. Other procedural steps prior to the Evidentiary Hearing .................................... 104

H. THE EVIDENTIARY HEARING ................................................................................... 106

1. Hearing organization.......................................................................................... 106

2. Pre-hearing applications..................................................................................... 107

3. The Evidentiary Hearing .................................................................................... 110

I. POST-HEARING ISSUES ......................................................................................... 111

1. Organization of procedural steps following the Evidentiary Hearing................ 112

2. The Respondent's procedural requests in connection with Mr Salve ................ 114

3. Filing of additional documentary evidence......................................................... 117

4. Production of the FIPB file ................................................................................ 118

5. Request for disclosure of Appendices V and VI of the Project Sapphire Presentation...... 119

6. Confidential submissions pursuant to PO6 ........................................................ 121

7. Written and oral post-hearing submissions; updated prayers for relief; procedural reservations............................................................................................................. 121

8. Updates on the enforcement of the tax assessment by the Respondent ............ 125

9. Applications relating to proceedings before the Delhi High Court.................... 126

J. FINAL PROCEDURAL STEPS ................................................................................... 131

IV. **OVERVIEW OF THE PARTIES' POSITIONS AND REQUESTS FOR RELIEF**......... 135

A. OVERVIEW OF THE CLAIMANTS' POSITION AND REQUEST FOR RELIEF ................................. 135

B. OVERVIEW OF THE RESPONDENT'S POSITION ....................................................... 143

V. **PRELIMINARY MATTERS** ........................................................................... 149

A. SEAT OF THE ARBITRATION ................................................................................. 149

B. APPLICABLE LAW ............................................................................................. 150

C. THE RESPONDENT'S PROCEDURAL OBJECTIONS AND RESERVATIONS .................................. 152

VI. **JURISDICTION AND ADMISSIBILITY** ...................................................... 154

A. LEGAL FRAMEWORK FOR JURISDICTION AND ADMISSIBILITY................................................ 154

B. UNDISPUTED JURISDICTIONAL REQUIREMENTS....................................................... 156

C. THE RESPONDENT'S OBJECTIONS TO JURISDICTION AND ADMISSIBILITY ............................. 156

1. Have the Claimants made an "investment" as defined in the BIT? .................... 157

    a. The Respondent's position ............................................................................ 157

    b. The Claimants' position ................................................................................ 160

    c. The Tribunal's analysis ................................................................................ 164

(i) Have the Claimants made an investment in India? ............................................ 164
(ii) Have the Claimants made an investment in accordance with Indian law? .......... 165
(iii) Is Cairn Energy's indirect investment protected by the BIT? ............................ 167
2. Do the Claimants' claims fall outside the scope of protection of the BIT? ..................... 170
a. The Respondent's position ............................................................................................ 170
b. The Claimants' position ................................................................................................ 171
c. The Tribunal's analysis ................................................................................................. 173
3. Are tax-related investment disputes excluded from the scope of the BIT? ...................... 177
a. The Respondent's position ............................................................................................ 177
b. The Claimants' position ................................................................................................ 182
c. The Tribunal's analysis ................................................................................................. 185
(i) Have the Contracting Parties consented to submit tax-related investment disputes to arbitration under Article 9 of the BIT? ..................................................... 186
(ii) Are tax-related investment disputes arbitrable? ................................................. 192
(1) Are tax-related investment disputes arbitrable under Dutch law? ............... 194
(2) Are tax-related investment disputes arbitrable as a matter of international public policy? ................................................................................................ 195
4. Maturity of the claims ...................................................................................................... 197
a. The Respondent's position ............................................................................................ 197
b. The Claimants' position ................................................................................................ 199
c. The Tribunal's analysis ................................................................................................. 201

**VII.  LIABILITY ......................................................................................................................... 205**

A. FAIR AND EQUITABLE TREATMENT (ARTICLE 3(2)) ............................................................. 207
1. The Claimants' position ................................................................................................... 207
a. The FET standard .......................................................................................................... 207
b. The FAO taxed the Claimants retroactively in breach of the FET standard ................ 210
(i) The 2012 Amendment fundamentally changed Indian tax law on a retroactive basis, and was not merely clarificatory ................................................................. 210
(ii) The FAO was based on the 2012 Amendment ..................................................... 215
(iii) The Respondent has breached Article 3(2) of the BIT ......................................... 217
(1) The Respondent's calculation of the alleged capital gains has no rational basis 217
(2) The retroactive application of the 2012 Amendment to the Claimants is unfair and inequitable .............................................................................................. 219
(3) The enactment and application of the 2012 Amendment to the Claimants was arbitrary, discriminatory and inconsistent with obligations of good faith .... 224
c. The Respondent's tax abuse defence fails .................................................................... 227
d. The Respondent's immovable property defence also fails ............................................ 229
2. The Respondent's position ............................................................................................... 229
a. Cairn's 2006 corporate reorganization was tax abusive/tax avoidant ......................... 230
b. The transactions are taxable under Section 2(47)(vi) of the ITA ................................. 231
c. The 2012 Amendment is merely clarificatory .............................................................. 232
d. Even if retroactive, the 2012 Amendment does not breach FET ................................. 235
(i) The FET standard ................................................................................................. 236

(ii)  Neither the 2012 Amendment nor its application to the Claimants breaches FET 239

    (1)  Relevance of Indian law ............................................................. 240

    (2)  There has been no breach of the Claimants' legitimate expectations ........... 245

    (3)  There has been no breach of the "residual elements" of the FET standard .. 250

3. The Tribunal's analysis ................................................................... 256

  a.  The challenged measures .......................................................... 258

    (i)  Did the 2006 Transactions give rise to any capital gains? Which alleged capital gains were taxed? ................................................................. 262

    (ii)  What were the grounds for taxation invoked by the fiscal measures imposed? ... 269

  b.  Substantive and temporal effect of the 2012 Amendment ............................ 275

    (i)  Terminology: "retroactive", "retrospective" and "clarificatory" legislation ........ 278

    (ii)  Did the 2012 Amendment expand the scope of Section 9(1)(i), or did it clarify it? 285

      (1)  The ITA 1961's original intent .................................................. 287

      (2)  The evolution of the legislative debates......................................... 290

      (3)  The opinions of special tax committees.......................................... 294

      (4)  The subsequent clarifications and amendments to the 2012 Amendment .... 297

      (5)  The tax advice received by the Claimants ....................................... 299

      (6)  The ITD's practice prior to the 2012 Amendment............................... 311

      (7)  The timing of the ITD's assessment against CUHL ............................. 317

      (8)  The ITAT's Order of 9 March 2017 .............................................. 322

      (9)  The Supreme Court's decision in Vodafone ..................................... 323

    (iii)  What was the temporal effect of the 2012 Amendment? ........................... 339

  c.  The Respondent's tax avoidance defence .......................................... 341

    (i)  Terminology ................................................................. 342

    (ii)  Is the Respondent estopped from bringing this defence, or is it otherwise inadmissible? ................................................................. 344

      (1)  The Claimants' position......................................................... 344

      (2)  The Respondent's position...................................................... 344

      (3)  The Tribunal's analysis......................................................... 347

    (iii)  Nature of the Tribunal's task .................................................. 350

    (iv)  Legal standard ............................................................... 351

      (1)  The Claimants' position......................................................... 351

      (2)  The Respondent's position...................................................... 353

      (3)  The Tribunal's analysis......................................................... 356

    (v)  Were the 2006 Transactions tax avoidant?........................................ 386

      (1)  Avoidance of capital gains tax on a direct divestment of Cairn's Indian assets (Direct Transfer Theory)........................................................ 394

      (2)  Avoidance of capital gains tax on shares offered for sale under Plans A or B (Tax Planning Theory).......................................................... 411

      (3)  Inflation of the cost basis of CIL's shares (Cost Basis Theory) ................. 437

      (4)  Avoidance of tax leakage (Tax Leakage Theory)................................ 438

      (5)  Avoidance of UK corporation tax................................................ 441

      (6)  Avoidance of UK stamp duty ................................................... 442

d. The Respondent's 2(47)(vi) defence ............................................................. 443
   (i)   The Respondent's position ................................................................. 443
   (ii)  The Claimants' position ..................................................................... 448
   (iii) The Tribunal's analysis ...................................................................... 452
        (1)  Is the Respondent estopped from bringing this defence, or is it otherwise
             inadmissible? ........................................................................... 452
        (2)  Does the Respondent's immovable property defence have merit? .............. 453
e. Did the 2006 Transactions breach Indian securities and exchange laws? ................... 458
   (i)   The Respondent's position ................................................................. 458
   (ii)  The Claimants' position ..................................................................... 460
   (iii) The Tribunal's analysis ...................................................................... 462
f. Did the 2012 Amendment and its application to the Claimants breach FET? ............ 466
   (i)   The FET standard ............................................................................. 467
        (1)  Relevance of Indian constitutional law .......................................... 467
        (2)  Is the FET standard equivalent to the minimum standard of treatment in
             customary international law? ........................................................ 475
        (3)  General contours of the FET standard ............................................ 477
        (4)  The FET standard in the context of retroactive taxation............................. 484
        (5)  The FET standard in the context of indirect transfers................................. 505
   (ii)  Did the retroactive taxation of the CIHL Acquisition breach the BIT's FET
         standard?........................................................................................ 506
g. Have the Claimants proved an international wrong? .................................. 509
B. THE CLAIMANTS' REMAINING CLAIMS ..................................................................... 511

VIII. REPARATION ................................................................................................ 512

A. THE CLAIMANTS' POSITION ...................................................................................... 512
B. THE RESPONDENT'S POSITION ................................................................................. 519
C. THE TRIBUNAL'S ANALYSIS ..................................................................................... 522
   1. Applicable legal principles ................................................................................ 522
   2. The Respondent's general objection ................................................................. 523
   3. The Claimants' requests for relief .................................................................... 524
      a. Withdrawal of the tax demand ..................................................................... 525
      b. Proceeds from the sale of CIL shares ........................................................... 527
         (i)   Did the Claimants have the possibility to regain possession or control of their
               assets?.................................................................................... 527
         (ii)  Mitigation ................................................................................... 528
         (iii) Valuation of the CIL shares ............................................................ 532
      c. Compensation for tax refunds ..................................................................... 535
      d. UK corporation tax....................................................................................... 538
      e. Request for an award net of Indian taxes ..................................................... 541
      f. Interest ........................................................................................................ 542
         (i)   Compensation for the value of the CIL shares ..................................... 543
               (1)  Interest rate ......................................................................... 543
               (2)  Compounding........................................................................ 545
               (3)  Dies a quo and dies ad quem ................................................. 546

(ii) Interest applicable to the tax refunds ....................................................... 547

    (1) Interest rate ......................................................................................... 547

    (2) Compounding ...................................................................................... 548

    (3) Dies a quo and dies ad quem ............................................................. 548

**IX.  COSTS** ........................................................................................................ **549**

  A. THE CLAIMANTS' POSITION ........................................................................ 549

    1. Allocation of costs .................................................................................. 549

    2. Reasonableness of costs ......................................................................... 551

  B. THE RESPONDENT'S POSITION .................................................................... 553

    1. Allocation of costs .................................................................................. 553

    2. Reasonableness of costs ......................................................................... 557

  C. QUANTIFICATION OF ARBITRATION COSTS ................................................. 559

    1. Cost advances ......................................................................................... 559

    2. Tribunal and administrative costs .......................................................... 559

    3. The Claimants' statement of costs ......................................................... 560

    4. The Respondent's statement of costs ..................................................... 560

  D. THE TRIBUNAL'S ANALYSIS ...................................................................... 561

    1. Key legal provisions .............................................................................. 561

    2. Allocation of costs of arbitration ........................................................... 562

**X.  DECISION** .................................................................................................... **566**

PCA Case No. 2016-7
Award of 21 December 2020
Page vii of xii

## LIST OF ABBREVIATIONS

| | |
|---|---|
| 9 Subsidiaries | The nine UK incorporated subsidiaries through which Cairn Energy held operations and assets in India |
| 27 Subsidiaries | The further 18 subsidiaries held by the 9 Subsidiaries, together with the 9 Subsidiaries |
| 2002 Task Force | 2002 Task Force on Direct Taxes |
| 2006 Transactions | The transactions undertaken in 2006 by the Claimants in and around the time of their corporate reorganisation and the listing of CIL on the BSE, specifically, Cairn's pre-IPO corporate reorganisation and post-IPO transactions |
| 2012 Amendment **or** 2012 Clarification | Amendment made in 2012 to Section 9(1)(i) of the Income Tax Act 1961 |
| AAR | Authority for Advanced Rulings |
| ACIT | Assistant Commissioner of Income Tax Circle 1(2)(1), International Taxation, New Delhi |
| Actual Scenario | What happened in reality |
| Addendum | Addendum to the Second Terms of Appointment of the Confidentiality Expert |
| Additional Document Request | Respondent's application for document production of 29 November 2017 |
| Amarchand | Amarchand & Mangaldas & Suresh A Shroff & Co. |
| Application for Bifurcation | Application for bifurcation filed by the Respondent on 6 October 2016 |
| AT-XX | The Tribunal's communications to the Parties |
| Authorised Persons | List of persons to whom the Restricted Documents may be disclosed |
| BIT **or** Treaty **or** UK-India BIT | Agreement between the Government of the United Kingdom of Great Britain and Northern Ireland and the Government of the Republic of India for the Promotion and Protection of Investments, entered into force 6 January 1995 |
| BJP | Bharatiya Janata Party |
| Brown Documents | Evidence related to Ms Janice Brown filed in the Delhi High Court Proceedings |
| BSE | Bombay Stock Exchange |
| But For Scenario | Situation which would, in all probability, have existed if the act had not been committed |
| Buy-Back Programme | CIL's plan to buy back its shares, formally announced 14 January 2014 |
| Cairn | The Cairn group of companies |
| Cairn Energy Holdings | Cairn Energy Holdings Ltd |
| Cairn Energy India | Cairn Energy India Pty Limited |
| Cairn Energy **or** CEP | Cairn Energy PLC |
| Cairn's corporate reorganisation | Cairn's 2006 pre-IPO corporate reorganisation |
| CBDT | Central Board of Direct Taxes |
| CCom-XX | Claimants' communications to the Tribunal |
| CEA | Cairn Energy Australia Pty Limited |

| CEA Loan | Loan account from Cairn Energy used by CEA to acquire 100% of Command Petroleum |
|---|---|
| CEGHBV | Cairn Energy Group Holdings BV |
| CEHL | Cairn Energy Hydrocarbons Ltd |
| CEHL Debt | Debt of £29,780,710 assigned by Cairn Energy to CUHL, owed to Cairn Energy by CEHL |
| CGP | CGP Investments |
| CIHL | Cairn India Holdings Limited |
| CIHL Acquisition | The transaction taxed by the Respondent (i.e., the transfer of the shares in CIHL from CUHL to CIL) |
| CIL | Cairn India Limited |
| CIL/VIL **or** VIL | Vedanta Limited |
| Claimants | Cairn Energy PLC and Cairn UK Holdings Limited, collectively |
| Claimants' Document Request No. 1 | Claimants' request for documents concerning the FIPB's review and approval of CUHL's application of 10 August 2006 |
| Claimants' Document Request No. 2 | Claimants' request for documents relating to the proceedings conducted by the Standing Committee on the preparation of the Standing Committee Report |
| Claimants' Original Request on Dividends | Claimants' request of 12 May 2017 that the Tribunal order the Respondent to confirm that all dividends can be paid to CUHL without further delay |
| Claimants' Publication Application | Claimants' request that the Tribunal issue a ruling finding that PO2 and PO16 are fit for publication |
| Claimants' Updated Request for Relief | Final request for relief submitted by the Claimants on 14 December 2018 |
| Closing Hearing | Hearing on closing submissions held in Paris on 19 and 20 December 2018 |
| CNHBV | Cairn Energy Netherlands Holdings BV |
| Command Petroleum | Command Petroleum Limited |
| Confidentiality Expert | Dr Dirk Pulkowski, PCA Senior Legal Counsel designated to act as confidentiality expert |
| Cost Basis Theory | Respondent's theory that the 2006 Transactions had been abusively structured so as to inflate the cost basis of CIL's shares so that less tax would be payable on future sales of CIL shares |
| CRL | Cairn Resources Limited |
| CUHL | Cairn UK Holdings Limited |
| Damodaran Committee | Committee for Reforming the Regulatory Environment for Doing Business in India, chaired by Mr Damodaran |
| DAO | 9 March 2015 draft assessment order issued by ITD against CUHL |
| Daylight Loan | The "daylight overdraft" (i.e., a loan repayable in one day) obtained by Cairn Energy from Citibank |
| Demand | Tax demand against the Claimants in respect of AY 2007-2008, as set forth in the FAO |
| DIP | Disclosure and Investor Protection |

| Direct Transfer Theory | Respondent's argument that the 2006 Transactions were, in substance, a transfer / divestment of Cairn's underlying oil and gas assets in India |
|---|---|
| Dividend Migration Scenario | Respondent's argument that had CUHL provided an alternative security to the tax authorities, such as a bank guarantee, CIL could have remitted the dividends to CUHL before receipt of the notice under Section 226(3) of the ITA dated 16 June 2017 |
| DRP | The Dispute Resolution Panel |
| DRP Ruling | 31 December 2015 ruling of the Dispute Resolution Panel |
| DTAA | Double Taxation Avoidance Agreement |
| DTC 2009 | Direct Tax Code Bill of 2009 |
| DTC 2010 | Direct Tax Code Bill of 2010 |
| DTC 2013 | Direct Tax Code Bill of 2013 |
| Dutch Arbitration Act | Code of Civil Procedure of The Netherlands |
| ECHR | European Convention on Human Rights |
| ECtHR | European Court of Human Rights |
| FAO | Final Assessment Order issued 25 January 2016 |
| FET | Fair and equitable treatment |
| FIPB | Foreign Investment Promotion Board |
| FIPB Application | Application submitted by CUHL (together with CIL) to the FIPB on 10 August 2006 |
| First CIHL Acquisition | CIL's acquisition of the first tranche of CIHL shares (16.5 per cent) from CUHL |
| First Report of the Confidentiality Expert | Report of the Confidentiality Expert issued 20 December 2017 |
| First ToA of the Confidentiality Expert | Terms of Appointment of the Confidentiality Expert issued 28 November 2017 |
| Fourth CIHL Acquisition | CIL's acquisition of the remaining 24.3 per cent of CIHL from CUHL |
| Frozen Shares | CUHL's 184,175,764 equity shares in CIL provisionally frozen by the Section 281B Order |
| GAAR | General Anti-Avoidance Rule |
| HEL | Hutchison Essar Ltd |
| Hutchison | Hutchison Telecommunications International Ltd. |
| IBA Rules | IBA Rules on the Taking of Evidence |
| ICIJ | International Consortium of Investigative Journalists |
| India Hold Co. | Single UK holding company in which all of Cairn's Indian shareholdings and underlying assets were consolidated |
| Indian Sub | Indian subsidiary company |
| IPO | Initial public offering |
| ITA 1961 **or** ITA | Income Tax Act 1961 |
| ITAT | The Income Tax Appellate Tribunal |
| ITAT Order | 9 March 2017 order issued by the Income Tax Appellate Tribunal |
| ITD | Income Tax Department |
| JOAs | Joint operating agreements |
| Joint Statement | Joint statement produced by the Claimants' and Respondent's valuation experts of 28 November 2018 |

| Law Commission | Law Commission of India |
|---|---|
| Legal Costs | Costs of legal representation and assistance referred to in Article 38(e) of the UNCITRAL Rules |
| Lock-In Requirement | Requirement that the promoter retain the 20 per cent shareholding for three years before it could sell it |
| MFN | Most-favoured nation |
| Minimum Promoter Contribution **or** MPC | The 20 per cent of the post-IPO share capital of the Indian entity in which Cairn Energy was required to acquire in cash |
| MoF | Ministry of Finance of India |
| MST **or** Minimum Standard of Treatment | Customary international law minimum standard of treatment |
| NELP | New Exploration Licensing Policy |
| Notice of Demand | Notice of demand issued by ITD and received by CUHL on 4 February 2016 |
| ONGC | India's Oil and Natural Gas Commission |
| Parliament | Parliament of India |
| Penalty Order | Penalty order issued by the Respondent against CUHL on 29 September 2017 |
| Petronas | Petronas International Corporation Ltd. |
| PO1 | Procedural Order No. 1 |
| PO2 | Procedural Order No. 2 |
| PO3 | Procedural Order No. 3 |
| PO4 | Procedural Order No. 4 |
| PO5 | Procedural Order No. 5 |
| PO6 | Procedural Order No. 6 |
| PO7 | Procedural Order No. 7 |
| PO8 | Procedural Order No. 8 |
| PO9 | Procedural Order No. 9 |
| PO10 | Procedural Order No. 10 |
| PO11 | Procedural Order No. 11 |
| PO12 | Procedural Order No. 12 |
| PO13 | Procedural Order No. 13 |
| PO14 | Procedural Order No. 14 |
| PO15 | Procedural Order No. 15 |
| PO16 | Procedural Order No. 16 |
| PO17 | Procedural Order No. 17 |
| PO18 | Procedural Order No. 18 |
| PO19 | Procedural Order No. 19 |
| President of the Tribunal **or** President | Mr Laurent Lévy, the Presiding Arbitrator |
| Project Sapphire Presentation | Document containing the slides of a presentation made by ABN Amro Rothschild at a board meeting of Cairn Energy PLC on 4 April 2005 |
| PSCs | Production sharing contracts |
| RBI | Reserve Bank of India |
| RCom-XX | Respondent's communications to the Tribunal |
| Renewed RIM | Claimants' renewed request for interim measures of 6 May 2017 |

| Request for *Vedanta* documents | The Respondent's document production request of 17 December 2016 |
|---|---|
| Respondent | Republic of India |
| Respondent's Confidentiality Application | Application of the Respondent that PO2 and PO16 remain confidential and not be disclosed to the Delhi High Court |
| Respondent's Updated Request for Relief | Updated request for relief submitted by the Respondent on 14 December 2018 |
| Restricted Documents | The documents produced in response to the Claimants' Document Request No. 2 that are subject to confidentiality protections |
| RIM | Request for interim measures issued by the Claimants on 13 April 2016 |
| RIM Hearing | Hearing in London on 12 June 2017 on the Renewed RIM |
| Rothschild | NM Rothschild & Co |
| SEBI | Securities and Exchange Board of India |
| Second CIHL Acquisition | CIL's purchase of an additional 5.3% of shares in CIHL from CUHL |
| Section 131 Notice | 22 January 2014 summoning of CUHL by ITD to provide information on the CIHL Acquisition |
| Section 148 Notice | 21 January 2014 notification by ITD to CUHL regarding the escapement of assessment for income chargeable to tax |
| Section 274 Notice | Section 274 Notice received by CUHL on 4 February 2016 |
| Section 281B Order | 22 January 2014 order issued by the Deputy Director of Income Tax |
| Share Purchase Deed | Share Purchase Deed dated 12 October 2006 |
| Share Sale Migration Scenario | Respondent's argument that had CUHL provided an alternative security to the tax authorities, such as a bank guarantee, it would have been able to obtain an authorisation to sell its shares in CIL despite the Section 281B Order |
| Shares | The Claimants' equity shares in CIL |
| Shell | Shell India Production Development BV |
| Shome Committee | Committee led by Dr Parthasarathi Shome to examine the implications of the 2012 Amendment |
| SOCO BVI | SOCO Australia Limited |
| SSE | Substantial Shareholding Exemption |
| SSPA | Subscription and Share Purchase Agreement dated 15 September 2006 (and amended on 5 October 2006) |
| Standing Committee | Standing Committee on Finance |
| Standing Committee Report | Official report of the Standing Committee on the DTC 2010 |
| Statutory Rate | The statutory rate applied to tax refunds in India (0.5% per month, in INR terms, without compounding) |
| Stay Application | Application for a stay of the proceeding filed by the Respondent on 6 June 2016 |
| Supreme Court | Supreme Court of India |
| TARC | Tax Administration Reform Commission |
| TARC Report | First Report of the Tax Administration Reform Commission |

| | |
|---|---|
| Tata | Tata Cellular Industries |
| Tax Leakage Theory | Respondent's theory that by planning to collapse all of the holding structure between CIL and the oil and gas assets into CIL, the Claimants avoided paying the full amount of Indian tax on dividends that would have been otherwise applicable |
| Tax Planning Theory | Respondent's argument that the Claimants chose an unnecessarily complex and artificial structure to consolidate the oil and gas assets under CIL with the dominant purpose of avoiding taxes |
| Third CIHL Acquisition | CIL's acquisition of 135,267,264 shares in CIHL from CUHL |
| Thomson WS | Witness statement of Mr Simon Thomson |
| ToA | Terms of Appointment |
| TPO | Transfer Pricing Officer |
| UK-India DTAA | Double Taxation Avoidance Agreement between the UK and India |
| UNCITRAL Rules | United Nations Commission on International Trade Law Arbitration Rules 1976 |
| VCLT | Vienna Convention on the Law of Treaties |
| Vedanta | Vedanta Resources Plc |
| *Vedanta* arbitration | Arbitration initiated by Vedanta against the Respondent |
| VEL | Vodafone Essar Ltd |
| Venice Commission | European Commission for Democracy through Law |
| Vodafone | Vodafone International Holdings BV |
| VWAP | Volume weighted average price |
| Withheld Appendices | Appendices V and VI not filed with the Claimants' new version of the Project Sapphire Presentation |

## I.   INTRODUCTION

1.   The present dispute arises out of tax measures applied by the Government of India to certain transactions undertaken in 2006 by the Claimants (the "2006 Transactions") in and around the time of their corporate reorganisation and the listing of a newly incorporated subsidiary, Cairn India Limited ("CIL"), on the Bombay Stock Exchange (the "BSE").

2.   The tax measures were applied to certain share transfers following an amendment made in 2012 to Section 9(1)(i) of the Income Tax Act 1961 (the "ITA 1961" or "ITA") (the "2012 Amendment"). The Claimants maintain that the corporate reorganisation and the initial public offering (the "IPO") were at all times conducted with due adherence to the then-applicable Indian tax laws, and that by applying retroactively the 2012 Amendment to the 2006 Transactions, and subsequently taking enforcement measures against Cairn's investments, the Respondent breached its obligations under the Agreement between the Government of the United Kingdom of Great Britain and Northern Ireland and the Government of the Republic of India for the Promotion and Protection of Investments (the "UK-India BIT", the "Treaty", or the "BIT"). Cairn claims that the Respondent's actions have caused them significant damage.

3.   The Respondent denies that the 2012 Amendment and the tax measures applied to the 2006 share transfers breaches the UK-India BIT. To the contrary, the Respondent argues that these transactions were taxable under Indian law even without the 2012 Amendment. In particular, the Respondent contends that the Supreme Court of India took an unduly formalistic approach to the "source" rule embodied in Section 9(1)(i) of the ITA (when it should have taken a purposive approach consistent with long-standing authority dating back at least to the 1940 decision of the Judicial Committee of the Privy Council in the *Rhodesia Metals* case) and, moreover, that the Claimants' corporate reorganisation and IPO were merely an elaborate guise to avoid paying tax in the first instance, and were in any event taxable in India in accordance with other provisions of Indian law. Accordingly, the Respondent alleges that Cairn owes approximately US$ 1.6 billion in capital gains tax and additional amounts accrued in interest and penalties following the Claimants' corporate restructuring. Consequently, the Government of India has taken certain enforcement measures against the Claimants and has proceeded with the forced sale of the Claimants' remaining assets in India.

## A.   The Claimants

4.   The claimants in this arbitration are Cairn Energy PLC ("Cairn Energy" or "CEP") and Cairn UK Holdings Limited ("CUHL", collectively, the "Claimants").[1]

5.   Cairn Energy is an oil and gas exploration and production company that is incorporated in Scotland, United Kingdom, and is listed on the London Stock Exchange. Its registered office is:

---

[1]   Throughout this Award, the Tribunal will refer to the Cairn group as "Cairn".

Cairn Energy PLC
50 Lothian Road
Edinburgh, EH3 9BY
Scotland, United Kingdom

6.     CUHL is a wholly-owned subsidiary of Cairn Energy and is incorporated in Scotland, United Kingdom. Its registered office is:

Cairn UK Holdings Limited
50 Lothian Road
Edinburgh, EH3 9BY
Scotland, United Kingdom

7.     The Claimants are represented in this arbitration by:

Mr Mark S. McNeill
Partner
Quinn Emanuel Urquhart & Sullivan, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
United States of America
Email: markmcneill@quinnemanuel.com

Mr Arvind P. Datar
No. E-61 Anna Nagar East
Chennai 600 102
Tamil Nadu
India
Email: adatar007@gmail.com

Ms Niti Dixit
Partner
S&R Associates
Advocates
64 Okhla Industrial Estate, Phase III
New Delhi 110 020
India
Email: ndixit@snrlaw.in

Mr Uday Walia
Partner
Platinum Partners
Plot 1 & 2, Block E, The Mira
Mathura Road, Ishwar Nagar,
New Delhi 110 065
India
Email: uday.walia@touchstonepartners.com

Mr Paul Hally
Partner

Shepherd and Wedderburn LLP
1 Exchange Crescent
Conference Square
Edinburgh, EH3 8UL
Scotland, United Kingdom
Email: paul.hally@shepwedd.co.uk

Mr Maarten Drop
Advocaat | Partner
Cleber N.V.
Herengracht 450
1017 CA Amsterdam
The Netherlands
Email: drop@cleber.nl

**B.    The Respondent**

8.    The respondent in this arbitration is the Republic of India (the "Respondent"). For the purposes of this arbitration, the Respondent's contact details are:

Mr Rasmi Ranjan Das
Joint Secretary (FT&TR-I)
Central Board of Direct Taxes
Department of Revenue
Ministry of Finance
Government of India
Room No. 803, 8th Floor,
C Wing, Hudco Vishala Building,
Bhikaji Cama Place,
New Delhi 110066
Tel: + 911126108402
Email: jsfttr1@nic.in

Mr Chetan P. S. Rao
Additional Commissioner of Income-tax (OSD) (FT&TR-I)
Room No. 903, C Wing
Hudco Vishala Building
Bhikaji Cama Place
New Delhi 110066, India
Email: chetan.rao@gov.in

Mr Ashish Chandra
Deputy Commissioner of Income-tax (OSD) (FT&TR-I)
C Wing
Hudco Vishala Building
Bhikaji Cama Place
New Delhi 110066, India
Email: ashish.chandra@gov.in

9.    The Respondent is represented in this arbitration by:

Mr Salim Moollan, QC
Essex Court Chambers
19 Duxton Hill
Singapore 089602
Email: smoollan@essexcourt.net

Professor Chester Brown
7 Wentworth Selborne Chambers,
7 /180 Phillip Street,
Sydney NSW 2000, Australia
Email: cbrown@essexcourt.net

Mr Shreyas Jayasimha
Mr Mysore Prasanna
Mr Krishnan Shakkottai
Ms Bhavya Chengappa
Aarna Law LLP
No. 5, Second Main Road, Vyalikaval,
Bangalore 560003, India
Emails: shreyas.jayasimha@aarnalaw.com
        mysore.prasanna@aarnalaw.com
        krishnan.shakkottai@aarnalaw.com
        bhavya.chengappa@aarnalaw.com

## C.    The Tribunal

10.    In accordance with Article 9 of the UK-India BIT, on 2 April 2015, the Claimants
       informed the Respondent that they had appointed Mr Stanimir Alexandrov, a national
       of Bulgaria, as arbitrator. Mr Alexandrov accepted his appointment on 1 April 2015. Mr
       Alexandrov's contact details are as follows:

       Stanimir Alexandrov
       Stanimir A Alexandrov PLLC
       1501 K Street N.W.
       Suite C-072
       Washington D.C. 20005
       Tel:    +1 202 736 8186
       Email: salexandrov@salexandrovlaw.com

11.    As the Respondent did not appoint an arbitrator within the time limit set out in Article
       9 of the UK-India BIT, on 12 August 2015 and in accordance with Article 9(3)(c)(ii) of
       the UK India-BIT, the Claimants requested the President of the International Court of
       Justice, H.E. Judge Ronny Abraham, to act as appointing authority. Ultimately, on 9
       November 2015, the Respondent informed the Claimants that it had appointed Mr J.
       Christopher Thomas, QC, a national of Canada, as arbitrator. Mr Thomas accepted his
       appointment on 20 November 2015. Mr Thomas's contact details are as follows:

       Mr J. Christopher Thomas, QC
       Suite 1200, Waterfront Centre

> 200 Burrard Street
> P.O. Box 46800
> Vancouver
> British Columbia
> Canada V7X-1T2
> Email: jcthomas@thomas.ca

12.    On 13 January 2016, in accordance with Article 9 of the UK-India BIT, the co-arbitrators notified the Parties that they had appointed Mr Laurent Lévy, a national of Switzerland and Brazil, as the Presiding Arbitrator in this matter. Mr Lévy confirmed that he accepted his appointment that same day. Mr Lévy's contact details are:

> Mr Laurent Lévy
> 3-5 Rue du Conseil-Général
> Case Postale 552
> CH-1211 Genève 4
> Switzerland
> Tel.:    +41 22 809 6200
> Fax:    +41 22 809 6201
> Email: laurent.levy@lk-k.com

13.    With the consent of the Parties, the Tribunal appointed Ms Sabina Sacco, a national of Chile, Italy, and El Salvador, as Secretary of the Tribunal. Her contact details are:

> Ms Sabina Sacco
> 3-5 Rue du Conseil-Général
> Case Postale 552
> CH-1211 Genève 4
> Switzerland
> Tel.:    +41 22 809 6200
> Fax:    +41 22 809 6201
> Email: sabina.sacco@lk-k.com

## II.    THE FACTS

### A.    The petroleum industry in India

14.    Prior to the 1990s, the hydrocarbon industry in India was under state control. Despite efforts by India's Oil and Natural Gas Commission ("ONGC"), there was limited investment and technical expertise committed to developing India's domestic petroleum industry. As a result, India was predominantly dependent on imported petroleum.[2]

---

[2]    Claimants' Statement of Claim ("C-SoC"), ¶ 51, citing Petroleum Federation of India (PetroFed), Paper on Review of E&P Licensing Policy (undated) [excerpt] presented 19 September 2005 ("2005 PetroFed Paper"), Exh. C-148, ¶¶ 5.1-5.4.7; see generally P.K. Kaul et al, First Report, Committee to Examine all Aspects of ONGC's Existing Organisational Structure and the Need for its Restructuring, September 1992, [excerpt], Exh. C-147, pp. 8, 10; NoA ¶ 13. The Respondent has not contested the Claimants' account of the development of the petroleum industry in India.

15. The 1990 Persian Gulf crisis increased the cost of oil significantly. Combined with high levels of public spending and debt, this created a major financial crisis in India in 1991. The International Monetary Fund granted loan assistance to India on the condition that the Government of India instigate major reforms. Assisted by the World Bank, India undertook structural changes to prepare it to become a free market economy open to foreign investment. As a part of this liberalisation programme, in the 1990s India implemented a series of reforms to deregulate and de-license the petroleum sector. [3]

16. A major element of these reforms included the development of a legal structure designed to attract foreign investment and expertise into the oil and gas sector. This was achieved predominantly by increasing the ONGC's ability to enter into ventures with foreign investors to increase production from the existing fields and fund further exploration. [4]

17. Throughout the 1990s, India continued with its attempts to attract foreign investment in the oil and gas sector. In 1997, the Indian Government instituted the New Exploration Licensing Policy ("NELP"), which opened up additional blocks for exploration by multinational companies and put private companies on a more competitive footing with the two national oil companies, ONGC and Oil India Limited. The NELP fostered greater foreign participation by instituting a process for competitive bidding and allowing greater foreign investment in production sharing contracts ("PSCs"). [5]

## B. The Claimants' investments in India

### 1. Cairn's acquisition of Command Petroleum

18. Cairn began oil and gas exploration and development activities in India in 1996, with the acquisition of Command Petroleum Limited ("Command Petroleum"), an Australian company that held interests in a 1994 PSC for the Ravva oil and gas field. Command Petroleum was also involved in a venture with ONGC and other foreign investors. [6]

19. To purchase Command Petroleum, Cairn Energy incorporated Cairn Energy Australia Pty Limited ("CEA") in Australia. CEA acquired 100% of Command Petroleum using a loan account from CEP (the "CEA Loan"). CEA also acquired SOCO Australia Limited ("SOCO BVI") (incorporated in the British Virgin Islands), which held approximately 31 per cent of Command Petroleum. [7]

20. Once it had acquired Command Petroleum, between 1996 and 1997 CEP restructured its holdings through a series of intra-group share transfers, as follows:

---

[3]   C-SoC, ¶ 53, citing World Bank Group, Independent Evaluation Group: Structural Adjustment in India dated 27 May 2016, Exh. C-218 and 2005 PetroFed Paper, Exh. C-148, ¶¶ 5.4.1-5.4.2.

[4]   *Id.*, ¶ 54, citing 2005 PetroFed Paper, Exh. C-148, ¶¶ 7.1.3-7.1.13.

[5]   *Id.*, ¶ 55, citing 2005 PetroFed Paper, Exh. C-148, ¶¶ 8.1.1, 8.4.1-8.12.4.

[6]   *Id.*, ¶ 56; First Witness Statement of Ms Janice M. Brown ("Brown WS1"), ¶ 24; Respondent's Rejoinder ("R-Rejoinder"), ¶ 132. As a general matter, the Respondent does not dispute the Claimants' account of its investments in India prior to 2006. According to the Respondent, "the purported history of CEP's investment in the oil and gas sector in India covered at great length in the SOC is of merely historical interest: it has no bearing on the issues at the heart of this dispute." Respondent's Statement of Defence ("R-SoD"), p. 14 n. 22.

[7]   Brown WS1, ¶ 24.

a. CEP incorporated two wholly owned subsidiaries, Cairn Energy Holdings Limited ("Cairn Energy Holdings") in the UK and Cairn Energy Group Holdings BV ("CEGHBV") in the Netherlands.

b. CEP then transferred to Cairn Energy Holdings its interest in the CEA Loan, its shares in CEA, and its shares in CEGHBV in consideration for the issue of shares in Cairn Energy Holdings.

c. Cairn Energy Holdings then transferred its interest in the CEA Loan and the shares in CEA to CEGHBV in exchange for the issue of shares in CEGHBV.

d. CEGHBV then cancelled the CEA Loan in consideration for the issue of further shares in CEA. As a result, by September 1997, CEGHBV owned the entirety of the Command Petroleum assets through its shareholding of CEA.

e. In January 2001, a new parent company entity, Cairn Energy Netherlands Holdings BV ("CNHBV"), was inserted within the Cairn corporate group above CEGHBV. This required Cairn Energy Holdings to transfer the entire share capital of CEGHBV to CNHBV in consideration for an issue of shares by CNHBV.[8]

21. The Claimants note that, "[i]n total, the transaction involved five transfers of share capital in non-Indian companies – entities incorporated in Australia, the UK, the Netherlands, and the British Virgin Islands – all of which derived substantial value, directly or indirectly, from their underlying assets in India."[9] They further note (and the Respondent does not dispute) that the Indian Government was "fully aware of this change in foreign control in connection with one of the most important PSCs in the Indian oil and gas sector, the Ravva concession."[10] The Under-Secretary of India's Ministry of Petroleum and Natural Gas signed an amendment to the Ravva PSC to reflect Command Petroleum's acquisition by CEP and its resulting name change, and the Government accepted a new parent company guarantee by a company of the Cairn group in relation to liabilities under the Ravva PSC.[11] However, the Claimants allege that "India did not indicate that any tax liabilities had accrued to any member of the Cairn corporate group as a result of the transfers of shares of the non-Indian corporations involved which derived substantial value from Indian interests."[12] In particular, Ms

---

[8] *Id.*, ¶ 25, citing Cairn Energy Holding, Certificate of Incorporation of a Private Company Limited Company dated 14 October 1996, Exh. CWS-Brown-4; Issuance of Registered Shares by CEGHBV to Cairn Energy Holdings dated 30 December 1996, Exh. CWS-Brown-7, p. 1; Statutory Declaration by Hew Ralph Dundas on behalf of Cairn Energy dated 22 January 1997, Exh. CWS-Brown-9, pp. 2-3; Issuance of Registered Shares by CEGHBV to Cairn Energy Holdings dated 30 December 1996, Exh. CWS-Brown-7, pp. 1-2; Deed of Contribution of Shares in CNHBV between Cairn Energy Holdings, Cairn Energy and Netherlands Holdings BV, Holland Sea Search Holding NV and CEGHBV dated 18 January 2001, Exh. CWS-Brown-22, pp. 2-3.

[9] C-SoC, ¶ 57; Brown WS1, ¶ 26.

[10] Brown WS1, ¶ 27.

[11] *Ibid.*, citing Addendum to the Production Sharing Contract dated 31 July 1998, Exh. CWS-Brown-14, pp. 2-3; Guarantee by Cairn Energy Asia Limited to Cairn Energy India Limited dated 23 July 1998, Exh. CWS-Brown-13.

[12] C-SoC, ¶ 59.

Brown testifies that "[t]he Indian Income Tax Department […] never once sought to assess capital gains tax on any of these transactions."[13]

## 2.    Cairn's expansion in India

22.    From their acquisition of Command Petroleum in India in 1996 up until their 2006 corporate reorganisation, Cairn developed numerous other interests in India. Beginning in 1998, through a series of transactions with Shell India Production Development BV ("Shell"), a Dutch company, Cairn acquired a 100 per cent interest in, and became the operator of, a PSC in Rajasthan.[14] This interest was ultimately held by two Cairn subsidiaries, Cairn Energy India Pty Limited, an entity incorporated in Australia ("Cairn Energy India") and Cairn Energy Hydrocarbons Limited, an entity incorporated in Scotland ("CEHL"). These transactions required three assignments of the relevant PSC, which in turn required the prior consent of the Government of India.[15] The Claimants allege that, in connection with securing India's consent to its acquisition of the Rajasthan PSC, it disclosed its India-related corporate structure to the Indian Government, but the Government "never once suggested that Cairn owed or was in default for not having paid capital gains tax on transfers of shares in non-Indian corporations with underlying Indian assets."[16]

23.    Through its exploration activities, in 2004 Cairn discovered the Mangala oil field in Rajasthan, "the largest onshore discovery in India [in] over two decades,"[17] followed by the Aishwariya and Bhagyan fields, also in Rajasthan. The Claimants affirm, and the Respondent does not dispute, that "these Rajasthan fields currently account for roughly one quarter of India's entire domestic oil production."[18]

24.    In December 2004, Cairn sold interests in two PSCs to the ONGC for approximately US$ 135 million. Cairn entities also acquired interests in certain minor exploration assets from ONGC. According to the Claimants, these transactions also required detailed disclosures to the Government of India to secure the Government's consent to the assignment of the relevant PSCs.[19] According to the Claimants, "[o]nce again, the disclosures about the Cairn group structure that were scrutinised by the Government of India reflected that Cairn then indirectly held its significant underlying Indian assets", but "[a]t no time did India ever suggest that the Cairn corporate group had failed to settle

---

[13]   Brown WS1, ¶ 28.

[14]   *Id*., ¶ 29; R-Rejoinder, ¶ 132.

[15]   Brown WS1, ¶¶ 29-30.

[16]   C-SoC, ¶ 62.

[17]   Brown WS1, ¶ 31, citing Vedanta Limited ("VIL"): Oil & Gas Operations dated 30 March 2016, Exh. CWS-Brown-117; "Prime Minister dedicates Mangala Oil Field to Nation" (Government of India, 29 August 2009), Exh. CWS-Brown-80.

[18]   *Ibid*., citing "Signing of MoU to develop Natural Gas Infrastructure in Rajasthan" (Government of India, 9 September 2015), Exh. CWS-Brown-114; and VIL: Oil & Gas Operations dated 30 March 2016, Exh. CWS-Brown-117.

[19]   *Ibid*.

any capital gains tax liabilities in connection with the Command Acquisition and Reorganisation."[20]

25.   By 2006, CEP held operations and assets in India through nine UK incorporated subsidiaries (the "9 Subsidiaries"), which subsequently held between them a further 18 subsidiaries (together, the "27 Subsidiaries") incorporated in different jurisdictions around the world.[21] These interests included 12 PSCs, (three entered into before the NELP regime, and seven under that regime),[22] interests in various joint operating agreements ("JOAs") with ONGC and other parties in respect of PSCs in the Cambay Basin, Rajasthan, and the Krishna-Godavari Basin,[23] three processing plants, 12 platforms, 250 kilometres of pipelines, several active drilling programmes, and considerable reserves of oil and gas.[24]

26.   According to the Claimants, "[i]n the course of its decades of oil and natural gas exploration and production in India, Cairn contributed more than US\$ 3 billion in tax and other revenue to India."[25]

### 3.   Cairn's 2006 corporate restructuring

27.   According to the Claimants' witness, Ms Janice Brown, "[b]y 2006, the Cairn Energy group's remarkable success in India raised the possibility of gathering all Indian operations and assets under a single entity and offering shares to the public. The resulting capital increase would allow further investment in Rajasthan and other locations in India. CEP's Board considered two primary options for accomplishing this goal: gathering its Indian assets and operations under a UK company and listing on the London Stock Exchange, or incorporating a holding company in India and offering shares for public sale on the Bombay Stock Exchange (the 'BSE')."[26]

---

[20]   C-SoC, ¶ 65.

[21]   *Id*., ¶ 74; Brown WS1, ¶ 43; R-SoD, ¶ 14.

[22]   C-SoC, p. 22 n. 64; Letter from DSP Merrill Lynch Limited, ABN AMRO Securities (India) Private Limited and JM Morgan Stanley Private Limited to SEBI dated 12 October 2006 (enclosing CIL's Draft Red Herring Prospectus dated 12 October 2006 "DRHP"), Exh. CWS-Brown-70, p. 56.

[23]   C-SoC, ¶ 66; DRHP, Exh. CWS-Brown-70, pp. 71, 84; R-Rejoinder, ¶ 132.

[24]   Claimants' Notice of Arbitration ("C-NoA"), ¶ 21.

[25]   C-SoC, ¶ 66; Brown WS1, ¶ 31, citing Cairn Energy, Corporate Responsibility Report 2005 [excerpt], Exh. CWS-Brown-38, p. 36; Cairn Energy, Corporate Responsibility Report 2006 [excerpt], Exh. CWS-Brown-43, p. 44; Cairn Energy, Corporate Responsibility Report 2007 [excerpt], Exh. CWS-Brown-77, p. 35; Cairn Energy, Corporate Responsibility Report 2008 [excerpt], Exh. CWS-Brown-78, p. 21; Cairn Energy, Corporate Responsibility Report 2009 [excerpt], Exh. CWS-Brown-79, p. 125; Cairn Energy, Corporate Responsibility Report 2010, Exh. CWS-Brown-85, pp. 127-128; Cairn Energy, Corporate Responsibility Report 2011 [excerpt], Exh. CWS-Brown-94, p. 52.

[26]   Brown WS1, ¶ 40.

28.   On 8 March 2006, a committee of CEP's Board of Directors decided to proceed with the India option.[27] The reasons for this decision, and the process that Cairn underwent to arrive to determine the form that this reorganisation would take, are discussed below in Section II.B.3.b. For present purposes, the Tribunal will record the steps that Cairn took to reorganise its Indian assets.

29.   On 20 April 2006, at its annual general meeting, CEP announced to its shareholders its plan to reorganise its Indian assets and operations under an Indian holding company that would be publicly listed in India after launching an IPO.[28]

30.   Cairn's India reorganisation was composed of three main elements: (i) the incorporation of an Indian subsidiary, (ii) the consolidation of Cairn's Indian assets under that Indian subsidiary, and (iii) listing that subsidiary in the Indian stock exchanges and launching the IPO. As discussed further below, the Claimants allege that they structured this reorganisation under the guidance of experienced advisors, and that the specific structure that was ultimately adopted was dictated by the following Indian legal requirements:[29]

   a.   The corporate entity under which all 27 Subsidiaries would be consolidated needed to be incorporated in India, since only Indian companies could list on Indian stock exchanges.

   b.   As promoter of the IPO, CEP was required to acquire in cash 20 per cent of the post-IPO share capital of the Indian entity (the "Minimum Promoter Contribution" or "MPC"). This requirement could only be fulfilled in cash because a share exchange would have substantially delayed the IPO.

   c.   Cairn was required to retain its Minimum Promoter Contribution for three years before being able to sell it, and to retain any additional shareholding for at least one year.

31.   The Claimants allege that, on this basis, Cairn structured its Indian reorganisation as summarised below.

   **a.   Initial steps of the restructuring**

32.   In April 2006, CEP initiated the separation of its Indian and non-Indian assets and operations with the incorporation of Cairn Resources Limited ("CRL"), a Scottish entity wholly owned by CEP. CEP subsequently transferred to CRL the various subsidiaries holding its non-Indian assets and operations in exchange for issues of its shares.[30]

---

[27]   Brown WS1, ¶ 42, citing Cairn Energy Board Committee Meeting Minutes dated 8 March 2006, Exh. CWS-Brown-45, p. 5; see also Cairn Energy, Annual Report & Accounts 2005 [excerpt], Exh. CWS-Brown-37, p. 2.

[28]   Brown WS1, ¶ 44, citing "Annual General Meeting Statement" (Cairn Energy, 20 April 2006), Exh. CWS-Brown-48, p. 1.

[29]   C-SoC, ¶¶ 76-84; Brown WS1, ¶¶ 47-48.

[30]   Brown WS1, ¶ 58.

33.     In May and June 2006, CEP gradually consolidated all of the 27 Subsidiaries (nine of which were held directly by CEP and 18 of which were held indirectly). All 27 Subsidiaries were incorporated outside of India, and collectively held virtually all of the group's assets and operations in India. This consolidation process involved the transfer of shares in non-Indian companies with underlying assets in India.[31]

34.     On 26 June 2006, CEP incorporated CUHL (the second Claimant in this arbitration) in Scotland as a wholly-owned subsidiary.[32]

35.     On 30 June 2006, CEP transferred the entire issued share capital of the 9 Subsidiaries it held directly to CUHL in exchange for an issuance of 221,444,034 ordinary shares (at £1 each) in CUHL.[33] As a result, CUHL became the direct and indirect owner of the 27 Subsidiaries.[34] According to Ms Brown, the value of the 27 Subsidiaries was reflected in CUHL's accounts at the nominal value of the share certificates tendered by CUHL in consideration, pursuant to the international accounting principles prevailing at the time.[35] (This assumes importance in the later taxation of the transaction.) The Claimants note that this transaction involved nine separate transfers of interests in non-Indian companies with underlying assets in India.[36] This transaction is illustrated in the diagram below:[37]

---

[31]   Brown WS1, ¶ 59, citing Share Exchange Agreement between Cairn Energy and CUHL dated 30 June 2006, Exh. CWS-Brown-54.

[32]   *Id.*, ¶ 60, citing CUHL, Certificate of Incorporation of a Private Company dated 26 June 2006, Exh. CWS-Brown-52.

[33]   C-SoC, ¶ 90; Brown WS1, ¶ 60; R-SoD, ¶ 15(c); Share Exchange Agreement between Cairn Energy and CUHL dated 30 June 2006, Exh. CWS-Brown-54. According to the Schedule of that agreement, the 9 Subsidiaries that were transferred to CUHL were Cairn Energy Holdings Ltd; Cairn Energy Hydrocarbons Limited; Cairn Petroleum India Limited; Cairn Energy Discovery Limited; Cairn Energy Gujarat Block 1 Limited; Cairn Exploration (No. 2) Ltd; Cairn Exploration (No. 4) Ltd; Cairn Exploration (No. 6) Ltd; and Cairn Exploration (No. 7) Limited.

[34]   *Ibid.* The 18 subsidiaries held indirectly were: Cairn Energy Netherlands Holdings BV; Cairn Energy Group Holdings BV; Cairn Energy Australia Pty Limited; Cairn Energy India Holdings BV; CEH Australia Limited; CEH Australia Pty Ltd; Cairn Energy Asia Pty Limited; Cairn Energy Investments Australia Pty Ltd; Wessington Investments Pty Limited; Sydney Oil Company Pty Ltd; Command Petroleum Limited (PPL56) Ltd; Cairn Energy India Pty Ltd; Cairn Energy India West Holding BV; Cairn Energy India West BV; Cairn Energy Cambay Holding BV; Cairn Energy Cambay BV; Cairn Energy Gujarat Holding BV; and Cairn Energy Gujarat BV. See also R-SoD, p. 9 n. 24.

[35]   Brown WS1, ¶ 60.

[36]   C-SoC, ¶ 91; Brown WS1, ¶ 61.

[37]   Diagram taken from R-SoD, ¶ 15(c).



*CEP UK = Cairn Energy Plc

36.     On 2 August 2006, CUHL incorporated Cairn India Holdings Limited ("CIHL") in Jersey,[38] as a wholly-owned subsidiary.[39]

37.     On 7 August 2006, CUHL transferred the 9 Subsidiaries (and as a result, its holdings in all 27 Subsidiaries) to CIHL in exchange for shares in CIHL.[40] In exchange for the 27 Subsidiaries, CIHL issued 221,444,032 shares (one again at a value of £1 each) to CUHL, and Juris Limited and Lively Limited (each holders of one share in CIHL), transferred their CIHL shares to CUHL.[41] The Claimants again note that this involved transfers by non-residents in non-Indian companies with underlying assets in India.[42] This transaction is illustrated in the following diagram:[43]



38.     On 21 August 2006, CIL was incorporated in India as a wholly-owned subsidiary of CUHL.[44] At that point in time, CUHL held 50,000 shares in the Indian company, which were valued at INR 500,000 (approximately US$ 10,752 at that time).[45]

---

[38]   Brown WS1, ¶ 62, citing CIHL, Certificate of Incorporation of a Limited Company dated 2 August 2006, Exh. CWS-Brown-55.

[39]   With the exception of two shares, as explained in the following paragraph.

[40]   Brown WS1, ¶ 62, citing Share Exchange Agreement between CUHL and CIHL dated 7 August 2006, Exh. CWS-Brown-56.

[41]   See Share Exchange Agreement between CUHL and CIHL dated 7 August 2006, Exh. CWS-Brown-56.

[42]   C-SoC, ¶ 93; R-SoD, ¶ 15(e).

[43]   Diagram taken from R-SoD, ¶ 15(e).

[44]   Brown WS1, ¶ 64, citing CIL, Certificate of Incorporation dated 21 August 2006, Exh. CWS-Brown-57.

[45]   *Id.*, ¶ 64 n. 57, citing CIL Prospectus dated 22 December 2006 [without annexures], Exh. CWS-Brown-75, p. 26  n. 23.

39.    The corporate structure of Cairn's holdings in India at that point can be illustrated as follows:[46]



**Corporate Structure as of 21 August 2006**

40.    On 1 September 2006, pursuant to a debt conversion agreement between CEP, CUHL, CIHL, and CEHL, CEP assigned to CUHL a debt of £29,780,710[47] owed to it by CEHL (the "CEHL Debt"). In consideration for that debt, CUHL issued 29,780,710 shares (at £1 each) to CEP. In other words, CEP obtained shares in CUHL paid for in kind (through the assignment of the CEHL Debt), and now CUHL had an account payable of £29,780,710 against CEHL. (This is noted because the Respondent (and its witness, Mr Puri), have placed much emphasis on it for the calculation of the alleged capital gain.[48] The debt conversion agreement was later cited in the Final Assessment Order ("FAO").)[49] This transaction is illustrated in the following diagram:[50]

---

[46]    Diagram taken from Brown WS1, ¶ 64.

[47]    This debt was originally US$ denominated; R-SoD ¶ 15 (g)(i).

[48]    R-SoD, ¶ 18(a), citing First Witness Statement of Mr Sanjay Puri dated 3 February 2017 ("Puri WS1"), ¶¶ 50-51.

[49]    Final Assessment Order dated 25 January 2016 ("FAO"), Exh. C-70, ¶ 6.1.6; C-SoC, ¶ 94 ("As part of the transaction, on 1 September 2006, Cairn Energy, through a debt conversion agreement, assigned an intra-company debt owed to it by its subsidiary, CEHL, to CUHL. In exchange, CUHL issued 29,780,710 shares to Cairn Energy. The value of this debt was reflected in CUHL's accounts at the nominal value of the share certificates tendered by CUHL in consideration pursuant to the international accounting principles prevailing at the time. CUHL then assigned this debt to CIHL, which issued 29,780,710 shares to CUHL as consideration for the assignment of the debt. As a result, the total shareholding of CIHL was 251,224,744 shares, which at that time was held by CUHL. This debt was subsequently capitalised into shares in CEHL. See Debt Conversion Agreement among Cairn Energy, CUHL, CIHL and CEHL dated 1 September 2006, Exh. CWS-Brown-59".).

[50]    Diagram taken from R-SoD, ¶ 15(g).



41.    Immediately after this, CUHL assigned the CEHL Debt to CIHL in return for the issuance of 29,780,710 ordinary £1 shares in CIHL.[51] In other words, CUHL obtained shares in CIHL which it paid for in kind (through the assignment of the CEHL Debt), and now CIHL now had an account payable of £29,780,710 against CEHL. This transaction is illustrated in the following diagram:[52]



42.    As a result, by 1 September 2006, CIHL had acquired the 9 Subsidiaries and the CEHL Debt, and CUHL was the owner of 251,224,744 shares of £1 shares each in CIHL,[53] as illustrated in the following diagram:[54]

---

[51]    R-SoD, ¶ 15(g)(iii).

[52]    Diagram taken from R-SoD, ¶ 15(g).

[53]    221,444,032 shares issued by CIHL when CUHL transferred the 9 Subsidiaries, plus 2 shares transferred at that time by Juris Limited and Lively Limited, plus 29,780,710 shares issued by CIHL in exchange for the CEHL Debt.

[54]    Diagram taken from R-SoD, ¶ 15(h).



**b.    The transfer of Cairn's Indian assets to CIL**

43.    The final step in the reorganisation was the transfer of all Cairn's Indian assets to CIL, the Indian subsidiary. This was to be implemented by transferring CIHL from CUHL to CIL in a series of incremental steps. Specifically, the plan was that CIL would acquire 20% of CIHL in cash prior to the IPO, and after the IPO it would acquire the remainder of CIHL's shares, partly with cash (obtained through the IPO) and partly through a share exchange.[55]

44.    In parallel, Cairn and/or its advisors liaised with the various governmental offices in India to obtain the necessary regulatory approvals for the IPO.[56] These approvals included:

a.    Approvals by the Foreign Investment Promotion Board ("FIPB"), an inter-ministerial group led by the Ministry of Finance ("MoF"). Ms Brown explains that "[a]t that time, foreign investment in oil and natural gas exploration enjoyed automatic approval under the Foreign Exchange Management Act ("FEMA"). However, [...] because the Cairn corporate group's reorganisation involved a share allotment for consideration other than cash, [Cairn] submitted the full details of the proposed transaction to FIPB for the necessary approval".[57]

b.    Approvals by the Reserve Bank of India ("RBI"). According to Ms Brown, "[a]t the time of the transaction, RBI regulations allowed an Indian company to invest in foreign joint ventures or subsidiaries as long as its total financial commitment outside of India did not exceed 200 per cent of its net worth."[58] As the

---

[55]    Brown WS1, ¶ 55.

[56]    *Id.*, ¶ 65.

[57]    *Id.*, ¶ 49, referring to RSM, Phase I Plan C – Concept Paper dated 11 May 2006 [without annexures], Exh. CWS-Brown-49, p. 15.

[58]    *Id.*, ¶ 50.

reorganisation involved an investment by an Indian company in a foreign company by way of a share swap, CEP's advisers recommended that it obtain RBI approval. This approval could only be granted after receiving FIPB approval.

c.    Approvals by the Securities and Exchange Board of India ("SEBI") (which regulates the Indian securities market, including the BSE.

45.    In particular, in June 2006, Cairn met with SEBI to provide it with a description of the planned transaction. According to the Claimants, the presentation to SEBI explained that CIL would acquire CIHL through an exchange of its shares and cash from the IPO proceeds.[59] This point is addressed in Section II.B.3.b(ii) below.

46.    Also around this time, Cairn's tax advisors, the accounting firm RSM, and underwriters met separately with the FIPB and the RBI to explain the proposed restructuring and IPO.[60] The Claimants allege that, in doing so, they explained that a part of the transaction would take place through a share swap between CUHL and CIL for the remaining shares in CIHL.[61] According to Ms Brown, "[b]y the end of June, [Cairn] had secured indications from both regulatory bodies that the planned reorganisation and IPO as proposed would be compliant with their regulations."[62]

47.    On 10 August 2006, CUHL (together with CIL, the IPO promoters) submitted its application to the FIPB (the "FIPB Application").[63] According to the Claimants, "[t]his application provided all relevant details regarding the planned reorganisation and the listing of CIL on the Indian stock exchanges (which now included the National Stock Exchange ('NSE') in addition to the BSE)."[64] The cover letter to that application specified that:

> The investment in CIL, an oil and gas exploration and production company will be partly in cash and partly in shares. The cash element will be approved under the automatic route. This application is therefore to obtain the FIPB's permission for the investment by way of share exchange, full details of which are in the accompanying proposal.[65]

48.    By letter of 29 August 2006, the FIPB requested more information from CUHL on the planned transactions (in particular, the precise number of shares involved in the proposed share exchange between CUHL and CIL).[66]

---

[59]    *Id.*, ¶ 65; Cairn Energy, Presentation to SEBI dated 27 June 2006, Exh. CWS-Brown-53.

[60]    Brown, WS1, ¶ 66.

[61]    *Ibid.*

[62]    *Ibid*.

[63]    *Id.*, ¶ 67; Letter from CUHL to the MoF dated 10 August 2006 enclosing CUHL's FIPB Application, Exh. C-1.

[64]    C-SoC, ¶ 97; Brown WS1, ¶¶ 67-71; Letter from CUHL to the MoF dated 10 August 2006 enclosing CUHL's FIPB Application, Exh. C-1.

[65]    Letter from CUHL to the MoF dated 10 August 2006 enclosing CUHL's FIPB Application, Exh. C-1, p. 1.

[66]    Brown WS1, ¶ 72; Letter from the MoF to CUHL dated 29 August 2006, Exh. CWS-Brown-58.

49.   On 5 September 2006, CUHL submitted its application to the RBI. According to the Claimants, this application also included a detailed description of the restructuring and the IPO, and annexed the FIPB Application.[67]

50.   In parallel and to comply with RBI regulations for overseas direct investments by Indian companies, CUHL also obtained an independent valuation of CIHL carried out by NM Rothschild & Co. ("Rothschild"). The purpose of such a valuation was to demonstrate that the consideration that CIL would pay for CIHL would not be disproportionate to CIL's ultimate value. On 18 September 2006, Rothschild issued a certificate valuing CIHL at between US$ 6 billion and US$ 7.2 billion.[68]

51.   The FIPB considered CUHL's application at its meeting of 8 September 2006.[69] The minutes of that meeting note that "approval has been sought" for the following:

> Approval for Cairn India Limited for issuing and allotting equity shares aggregating to up to 70% of its post IPO equity capital, to Cairn UK Holdings Limited, in exchange for shares (up to 70%) of Cairn India Holdings Limited held by Cairn UK Holdings Limited.
>
> Subsequent to the completion of the IPO, CIL would require the balance equity shares (at least 10%) of CIHL from CUHL, for a cash consideration under automatic route.[70]

52.   CEP was not invited to send a representative to the meeting, but received a copy of the agenda, which the Claimants claim listed Cairn's application for review and noted that the Secretary for the Department of Revenue was scheduled to attend.[71] The Respondent denies that the Secretary for the Department of Revenue attended the meeting.[72] In any case, the record suggests that the Department of Revenue did receive the minutes of the meeting.[73]

53.   After this meeting, the FIPB recommended the application for consideration and approval by the Minister of Finance.[74] On 21 September 2006, FIPB approved the final steps of Cairn's corporate reorganisation.[75]

---

[67]   C-SoC, ¶ 106; Brown WS1, ¶ 74; Letter from RSM to the RBI dated 5 September 2006, Exh. CWS-Brown-61.

[68]   Brown WS1, ¶ 75; Letter from Rothschild to CIL dated 18 September 2006, Exh. CWS-Brown-66, p. 4.

[69]   FIPB, Excerpt of Minutes of the 84th Meeting held on 8 September 2006, Exh. C-162.

[70]   *Id*., p. 10.

[71]   C-SoC, ¶¶ 108-109, citing Government of India, Meeting of the FIPB dated 4 September 2006, Exh. CWS-Brown-60, pp. 1-2.

[72]   Transcript, Evidentiary Hearing, Day 4, 5:23-6:3 (Mr Moollan), Day 10, 41:8-10, 23-25; 42:1-14 (Mr R. Kumar).

[73]   Transcript, Evidentiary Hearing, Day 3, 229:10-11 (Mr McNeill), Day 4, 3: 4-7 (Mr McNeill, citing RCom-22).

[74]   FIPB, Excerpt of Minutes of the 84th Meeting held on 8 September 2006, Exh. C-162.

[75]   Brown WS1, ¶ 77, citing Letter from the MoF to CUHL dated 21 September 2006, Exh. C-3.

54.     Also in September 2006, Cairn sent two letters to the RBI to enquire on the status of its application.[76] The RBI responded on 18 September 2006 saying that "[a]s the proposals envisage[d] investments in the oil exploration sector, [it was] examining the matter in consultation with the Government of India."[77] Ms Brown testifies that she met with the RBI in early October 2006 "to explain the assets that CIL was intended to hold following the IPO as well as the projected timeframes of the transaction."[78] She also sent, on behalf of CIL, a letter dated 6 October 2006 providing this information in writing.[79] In that letter, Ms Brown indicated to the RBI that Cairn understood that the RBI had "received a clarification from the Ministry of Finance of their having considered our transaction structure in its entirety while giving the FIPB approval."[80] The RBI approved the transaction on 10 October 2006, noting that "the Foreign Investment Promotion Board (FIPB) ha[d] considered the entire proposal and approved the share swap transaction between Cairn UK Holdings Ltd (CUHL), Cairn India Holdings Ltd (CIHL) and Cairn India Ltd. (CIL) which follows the first two legs of the proposed transaction, vide its approval letter dated September 21, 2006."[81]

55.     On 12 October 2006, Cairn filed a draft red herring prospectus with SEBI in accordance with its regulations. According to the Claimants, this document (which was made available to the public), set out the full details of Cairn's corporate reorganisation in India and the IPO.[82]

56.     Having obtained the necessary approvals, the last stage in Cairn's reorganisation proceeded in two steps:

    a.      Step 1: Pursuant to a Subscription and Share Purchase Agreement dated 15 September 2006 (the "SSPA"),[83] CIL acquired 21.8 per cent of CIHL from CUHL, for cash consideration.[84]

    b.      Step 2: After the IPO bidding period closed, and once the IPO price range had been set, CIL acquired the remaining 78.2 per cent of CIHL from CUHL, partly through a share exchange and partly for cash consideration. This step took place

---

[76]    *Id.*, ¶¶ 78, 62; Letter from Cairn Energy to the RBI dated 15 September 2006, Exh. CWS-Brown-64.

[77]    Letter from the RBI to RSM dated 18 September 2006, Exh. CWS-Brown-65.

[78]    Brown WS1, ¶ 78.

[79]    *Ibid.*; Letter from CIL to the RBI dated 6 October 2006, Exh. CWS-Brown-67.

[80]    Letter from CIL to the RBI dated 6 October 2006, Exh. CWS-Brown-67.

[81]    Brown WS1, ¶ 78; Letter from RBI to Citibank India dated 10 October 2006, Exh. CWS-Brown-68.

[82]    Brown WS1, ¶ 79; Letter from DSP Merrill Lynch Limited, ABN AMRO Securities (India) Private Limited and JM Morgan Stanley Private Limited to SEBI dated 12 October 2006 (enclosing CIL DRHP), Exh. CWS-Brown-70, p. 96.

[83]    Brown WS1, ¶ 82; Subscription and Share Purchase Agreement between Cairn Energy, CUHL, CIL, and CIHL dated 15 September 2006 (and amended on 5 October 2006) ("SSPA"), Exh. C-6.

[84]    Brown WS1, ¶ 82; R-SoD, ¶ 15(i). At that time, CIHL had an authorized share capital of £300,000,000 divided into 300,000,000 ordinary shares of £1 each. See SSPA, Exh. C-6, Recital A.

pursuant to the Share Purchase Deed dated 12 October 2006 (the "Share Purchase Deed").[85]

#### (i)   <u>Step 1</u>: CIL acquires 21.8 per cent of CIHL

57.   The Claimants allege that the sequence of transactions required for Step 1 (and in particular, the flow of funds involved) was dictated by the need to comply with SEBI regulations.[86] CUHL, (together with CEP, the promoter of the IPO), was required to invest a MPC of 20 per cent of the estimated post-IPO share capital in CIL,[87] which amounted to over US$ 1 billion.[88] The MPC needed to be fulfilled in cash, because a share swap was only permitted if the IPO was to occur three years after the acquisition of the MPC,[89] a timing that was not suitable to Cairn.[90] The promoter was also required to retain the 20 per cent shareholding for three years before it could sell it (the "Lock-In Requirement"), and retain any additional shareholding for at least one year.[91]

58.   To meet the MPC requirement, CEP obtained a "daylight overdraft" (i.e., a loan repayable in one day) from Citibank (the "Daylight Loan").[92] Because CEP's articles of association imposed a maximum borrowing limit, this loan had to be taken in two tranches.[93] CEP then loaned these funds to CUHL via intercompany loan.[94]

59.   On 12 October 2006, CUHL in turn used the funds from the Daylight Loan to subscribe for shares in CIL.[95] The Tribunal understands that this involved payment of the shares subscribed under the SSPA of 15 September 2006. Indeed, according to the SSPA, CUHL had agreed to subscribe in cash for 365,028,898 CIL shares.[96] The Share

---

[85]   Brown WS1, ¶ 82; Share Purchase Deed between Cairn Energy, CUHL, CIL, and CIHL dated 12 October 2006 ("Share Purchase Deed"), Exh. C-7.

[86]   C-SoC, ¶¶ 76-77.

[87]   Brown WS1, ¶ 48, referring to RSM, Plan C – Concept Paper dated 19 May 2006 [without annexures], Exh. CWS-Brown-50, p. 19. See also DIP Guidelines, Exh. C-111, Clause 4.1.1 [extract] (providing that in a public issue by an unlisted company, the promoter is to contribute not less than 20 per cent of the post-issue capital).

[88]   Brown WS1, ¶ 83.

[89]   SoC ¶ 77; Brown WS1, ¶ 48(ii), referring to RSM, Plan C – Concept Paper dated 19 May 2006 [without annexures], Exh. CWS-Brown-50, p. 19.

[90]   Second Witness Statement of Ms Janice M. Brown ("Brown WS2"), ¶ 53.

[91]   Id., ¶ 48(iii); RSM, Plan C – Concept Paper dated 19 May 2006 [without annexures], Exh. CWS-Brown-50, p. 20.

[92]   Brown WS1, ¶ 83; Letter from Royal Bank of Scotland to Cairn Energy dated 12 September 2006, Exh. CWS-Brown-63.

[93]   Brown WS1, ¶ 83.

[94]   Letter from Royal Bank of Scotland to Cairn Energy dated 12 September 2006, Exh. CWS-Brown-63.

[95]   Brown WS1, ¶ 84, citing SSPA, Exh. C-6; Brown WS2, ¶ 82.

[96]   SSPA, Exh. C-6, Recital D, Sections 2.1 and 3.1. The subscription was to take place on the Subscription Date, which was scheduled to take place on 19 September 2006 or any other date agreed by the parties (Section 1.1). Given what followed, the Tribunal understands that the Subscription Date ended up being 12 October 2006.

Purchase Deed confirmed that, as on that date, CUHL had subscribed and paid for 365,078,892 shares in CIL (the remaining six shares being held at that date by six different individuals, including Ms Brown).[97] The Tribunal understands that these six shares were thereafter transferred to CUHL.[98]

60.     On that same day, CIL used the proceeds it received from CUHL's share subscription (specifically, INR 50,373,987,924) to acquire the first tranche of CIHL shares (16.5 per cent) from CUHL (the "First CIHL Acquisition").[99] This allowed CUHL to repay this tranche of the Daylight Loan.[100] The First CIHL Acquisition is one of the transactions subject to the taxation measures at issue in this arbitration.

61.     As a result of these two transactions (CUHL's subscription of shares issued by CIL, and CIL's purchase of CIHL shares from CUHL), the cash provided by the Daylight Loan (INR 50,373,987,924) entered and exited India on the same day. The Claimants note in this respect that "the first transfer that the Indian Income Tax Department has alleged to be a taxable event involves taxation of the return of these borrowed funds (infused solely as a result of Indian securities law requirements)."[101] As shall be seen, the Parties dispute whether this transaction meets the MPC requirement and SEBI regulations more generally.[102]

62.     On 22 November 2006, CUHL paid an additional share premium of INR 17,554,239,705 to CIL for the shares it had subscribed for in October. This was to ensure that the price paid by CUHL for its shares in CIL was not less than the highest price per share at which the CIL shares were to be marketed in the IPO.[103] The Tribunal understands that CUHL obtained these funds through the second tranche of the Daylight Loan.[104]

63.     On that same date, CIL used the funds obtained through CUHL's subscription of shares in order to purchase from CUHL an additional 5.3% of shares in CIHL, specifically a further 13,390,789 shares at a price of INR 17,554,239,705 (the "Second CIHL

---

[97]   Share Purchase Deed, Exh. C-7, Recital G.

[98]   The Respondent does not dispute that, eventually, CUHL held all 365,028,898 CIL shares that it agreed to subscribe per the SSPA. See, e.g., R-SoD, ¶ 15(i); FAO, Exh. C-70, ¶ 7.1.3.

[99]   C-SoC, ¶ 116; Brown WS1, ¶ 84; R-SoD, ¶ 15(i). According to the SSPA, CIL agreed to purchase a first tranche of 45,703,161 CIHL Shares from CUHL, at a price of 55,484,392,496 (SSPA, Exh. C-6, Recital E and Section 4). The Tribunal notes however that, according to the Share Purchase Deed, CIL ended up acquiring only 41,493,659 shares in CIHL (Share Purchase Deed, Exh. C-7, Recital G). According to Ms Brown's testimony (Brown WS1, p. 25 n. 84) and as recorded in the FAO, the total price paid for these shares was INR 50,373,987,924 (FAO, Exh. C-70, ¶ 7.1.3).

[100]  Brown WS1, p. 25 n. 81.

[101]  C-SoC, ¶ 116.

[102]  See Section VII.A.3.e below.

[103]  Brown WS1, ¶ 85; CIL Red Herring Prospectus dated 27 November 2006 [without annexures], Exh. CWS-Brown-72, p. 28; SSPA, Exh. C-6, Clauses 5.1 and 5.2.

[104]  Brown WS2, ¶ 82; see also Brown WS1, ¶ 86 (stating that "the second transfer that the Indian Income Tax Department has alleged to be a taxable event likewise involves taxation of the return of borrowed funds injected to comply with Indian law.").

Acquisition").[105] This allowed CUHL to repay the second tranche of the Daylight Loan.[106] Once again, the Parties dispute whether this transaction meets the MPC requirement and SEBI regulations generally.[107]

64.   The Second CIHL Acquisition brought CIL's total holdings in CIHL to 21.8%.[108] This acquisition is also one of the transactions subject to the taxation measures at issue in this arbitration.

65.   Once the IPO price range was set, CUHL was required to pay an additional share premium to ensure that it did not acquire the CIL shares at less than the higher end of the price range.[109] Accordingly, on 8 December 2006, CUHL paid a further additional share premium of INR 1,427,262,991.18 to CIL, in respect of the 365,028,898 shares issued by CIL on 12 October 2006.[110]

66.   The following diagram illustrates the ownership structure of Cairn's Indian assets at this point in time:[111]

---

[105]   Brown, WS1, ¶ 86; SSPA, Exh. C-6, Recital F and Section 6; Share Purchase Deed, Exh. C-7, Recital B; FAO, Exh. C-70, ¶ 7.1.3. The Tribunal notes that, according to the SSPA, this second tranche of CIHL shares was envisaged to comprise 9,181,287 shares. However, as noted in the Share Purchase Deed, CIL ended up acquiring 13,390,789 in this second tranche, as reflected also in the FAO.

[106]   Brown WS1, ¶ 86; Brown, WS2, ¶ 82.

[107]   See Section VII.A.3.e below.

[108]   Brown WS1, ¶ 83.

[109]   Id., ¶ 85.

[110]   Id., p. 26 n. 87; SSPA, Exh. C-6, Clauses 7.1-7.2.

[111]   Diagram taken from Brown WS1, ¶ 87.

**Corporate Ownership Structure as of November 2006**



(ii)    **Step 2: CIL acquires the remaining 78.2 per cent of CIHL**

67.    The bidding period for CIL's IPO opened on 11 December 2006, and ran through 15 December 2006.[112] Shortly thereafter, CIL acquired the remaining 78.2% shareholding in CIHL also in two tranches.[113]

68.    On 20 December 2006, CIL acquired 53.9 per cent of CIHL through a share swap with CUHL. More specifically, CIL acquired 135,267,264 shares in CIHL from CUHL, for which it issued 861,748,893 of its own shares to CUHL in consideration (the "Third CIHL Acquisition").[114] The Third CIHL Acquisition is one of the transactions subject to the taxation measures at issue in this arbitration.

69.    According to the Respondent, "[t]he value of the CIL shares so transferred was INR 160 per share. This value was fixed by the price achieved for CIL's shares in the IPO brought in the Indian Capital Market for General Persons on 29 December 2006. This was the

---

[112]    Brown WS1, ¶ 90; CIL, Annual Report and Financial Statements 2006, Exh. C-5, p. 50.

[113]    Brown WS1, ¶ 88.

[114]    C-SoC, ¶ 121; Brown WS1, ¶ 88, p. 27 n. 88; R-SoD, ¶ 15(i)(v); Share Purchase Deed, Exh. C-7, Recital L, Sections 4.1(A), 5.1; FAO, Exh. C-70, ¶ 9.1.3. The Tribunal notes that there is a slight discrepancy in the record as to the number of CIL shares issued that is not material to the outcome of this case. For the sake of completeness, the Tribunal notes that the Claimants refer to the issuance of 861,748,893 CIL shares, the Respondent refers to 861,864,893 CIL shares, and the FAO refers to 861,764,893 CIL shares.

value declared, for instance, to the Transfer Pricing Officer in Form 3CEB filed on 30 October 2007. Accordingly, the total consideration for the third tranche of shares was INR 137,882,382,880[.]"[115] The Claimants have not disputed this value, and indeed accept that the Income Tax Department ("ITD") confirmed that the cost basis of the CIL shares INR 160 per share (noting however that, depending on the date, that value was INR 190 per share).[116]

70.     The share swap between CIL and CUHL can be illustrated as follows:[117]



**Share Swap Between CIL and CUHL (20 December 2006)**

71.     On 29 December 2006, following completion of CIL's pre-IPO placement and IPO, CIL acquired the remaining 24.3 per cent of CIHL from CUHL for cash consideration, using a portion of the proceeds from the IPO (the "Fourth CIHL Acquisition").[118] Specifically, CIL acquired 61,073,032 shares in CIHL for a consideration of INR 61,008,099,631.[119] The Fourth CIHL Acquisition is one of the transactions subject to the taxation measures at issue in this arbitration.

---

[115]    R-SoD, ¶ 15(i)(v), citing Form No. 3CEB dated 30 October 2007, Exh. C-4.

[116]    Claimants' Updated Reply ("C-Updated Reply"), ¶¶ 402-406; Claimants' Post-Hearing Brief ("C-PHB"), ¶ 560, citing CUHL, Annexure 3 to Application for Withholding Certificate under Section 197 of the ITA 1961 dated 19 October 2009, Exh. CWS-Brown-83; CUHL, Petition to the High Court of Delhi dated 27 September 2012, Exh. CWS-Brown-107, p. 171 of the bundle; *Cairn UK Holdings Limited v. Director of Income Tax* [2012] Writ Petition Index Volume - II (High Court of Delhi, 27 September 2012), Exh. C-318, p. 203 of the bundle; Order under Section 197 of the ITA 1961 dated 3 June 2011, Exh. CWS-Brown-95.

[117]    Diagram taken from Brown WS1, ¶ 89.

[118]    C-SoC, ¶ 121; Brown WS1, ¶ 88, p. 27 n. 89; R-SoD, ¶ 15(vi); Share Purchase Deed, Exh. C-7, Recital A, Sections 4.1(B), 6.1, 6.3; FAO, Exh. C-70, ¶ 7.1.3.

[119]    Brown WS1, p. 27 n. 89.

72.    The Fourth CIHL Acquisition can be illustrated as follows:[120]

## Cash Acquisition of CIHL Shares by CIL (29 December 2006)



73.    Following the IPO and the Third and Fourth CIHL Acquisitions:

a.    CIHL was a wholly-owned subsidiary of CIL, and

b.    CIL in turn was 69 per cent owned by CUHL, with the remaining 31 per cent of CIL shares held by the public.[121]

c.    Following the IPO, CIL became one of India's top 25 listed companies by market capitalisation.[122]

---

[120]    Diagram taken from Brown WS1, ¶ 89.

[121]    Brown WS1, p. 28 n. 91 (According to Ms Brown, "[t]hese percentages account for the exercise of the Green Shoe Option, under a stabilisation agreement dated 12 October 2006, by the underwriter, DSP Merrill Lynch. Pursuant to this agreement, CIL issued an additional 13,085,041 shares to CUHL on 2 February 2007 as part of the underwriter's efforts to stabilise the initial price of CIL shares".). See CIL Prospectus dated 22 December 2006, Exh. CWS-Brown-75, pp. 6-8.

[122]    Brown WS1, ¶ 90; "Cairn IPO opens today; co to be among top 25", The Economic Times, 10 December 2006, Exh. CWS-Brown-73.

74.   The IPO raised nearly US$ 1.98 billion.[123] The Claimants assert that these funds were distributed as follows:

    a.   "US$ 600 million was for the account of CIL, and was earmarked to fund further exploration and development activities in Rajasthan and elsewhere in India."[124] The Tribunal understands that these US$ 600 million remained in CIL and were used to fund its normal operations, as well as further exploration and development activities.

    b.   "Approximately US$1.35 billion went to CUHL and then to CEP, which returned roughly US$940 million to its shareholders and used the remaining funds for its on-going business and operations."[125] The Tribunal understands that CUHL received those US$ 1.35 billion as consideration for the sale of CIHL. In turn, the Tribunal understands that CEP distributed US$ 940 million to its shareholders as dividends,[126] retaining approximately US$ 440 million to fund its business operations.[127]

75.   It is CIL's acquisition of CIHL from CUHL (performed in four stages, through the First to Fourth CIHL Acquisitions) that is the subject of the tax measures at issue in this arbitration. The Tribunal will refer to these four acquisitions jointly as the "CIHL Acquisition."

76.   According to the Respondent, "by the conclusion of the 2006 Transactions, CUHL had:

    a.   Acquired the shares in CIHL at a cost of £251,224,744 (INR 21,783,697,552 at an average conversion rate of INR 86.7139);

    b.   Transferred those shares to CIL in return for a total consideration in cash and shares of INR 266,818,710,140; and

    c.   Thereby achieved a short-term capital gain of INR 245,035,012,588 (i.e., approximately US$ 3.6 billion)."[128]

---

[123]   Brown WS1, ¶ 93; Cairn Energy, Annual Report & Accounts 2006, Exh. CWS-Brown-42, p. 32 ("The total proceeds raised in the flotation were $1.98bn with $751.8m pre IPO placing funds included in net cash at the year end.").

[124]   C-SoC, ¶ 124; Brown WS1, ¶ 91; Cairn Energy, Annual Report & Accounts 2006, Exh. CWS-Brown-42, p. 32 ("Cairn India has retained $600m, with the remainder of the proceeds currently being held to fund Cairn's ongoing business held by its wholly owned subsidiary Capricorn. This provides financial flexibility to support the growth of Capricorn, with the aim of creating and realising further value for shareholders in the future.").

[125]   C-SoC, ¶ 124; Brown WS1, ¶ 91; Cairn Energy, Annual Report & Accounts 2006, Exh. CWS-Brown-42, p. 32.

[126]   Cairn Energy, Annual Report & Accounts 2006, Exh. CWS-Brown-42, p. 32 ("On 27 February 2007, the Company announced the proposed return of £481m (approximately $940m) of this cash to shareholders of Cairn Energy (equivalent to £3 per share).").

[127]   Brown WS1, ¶ 91.

[128]   R-SoD, ¶ 16, citing FAO, Exh. C-70, Section 12.

77.     As discussed in Section VII.A.1.b(iii)(1) below, the Claimants dispute this, arguing that no capital gain was made.

78.     The Claimants acknowledge that, through the sale of 31% of CIL shares to the public in the IPO, they made an "exceptional gain of US$ 1.537 billion."[129] Ms Brown explains that "[t]his exceptional gain of US$ 1.537 billion reflects how CEP recorded in its consolidated group accounts its 69 per cent portion of the US$ 1.98 billion in proceeds from the IPO, offset by the historical net book value of those assets now attributable to minority shareholders."[130] However, this capital gain has not been the subject of any taxation measures by the Respondent. It is undisputed that, pursuant to Indian law, capital gains made through a fresh issue of shares in an IPO are not chargeable to tax.[131]

### c.     The transfer pricing assessment by the ITD

79.     During the course of 2007, CIL was subjected to a transfer pricing assessment by the ITD. As the Claimants explain (and the Respondent does not dispute) that the ITA 1961 requires Indian taxpayers who entered into an international transaction in the previous year to file a report on that transaction with the Transfer Pricing Officer ("TPO") in the Office of the Additional Commissioner of Income Tax. The task of the TPO is to ensure that the transaction has been carried out at arm's length pricing,[132] and more specifically, "to ensure that India does not lose any tax revenues as a result of a multinational group intentionally allocating its profits to low-tax jurisdictions via non-arms' length pricing."[133]

80.     On 30 October 2007, CIL (through its chartered accountants, BSR & Co.), filed a Form 3CEB with the ITD providing details of the international transactions in which CIL had been involved in during 2006, including the transactions related to the CIHL Acquisition.[134] Specifically, the form reflected CIL's investment in CIHL for a total amount paid or payable of INR 289,083,710,140, with the following explanation:

> During the year assessee [i.e., CIL] has acquired 272,389,192 ordinary shares of £1 each, in Cairn India Holdings Limited out of which 251,224,744 shares has been acquired from its holding company Cairn UK Holdings UK for total purchase consideration of Rs 266,818,710,140 for

---

[129]   Brown WS1, ¶¶ 92-93; Cairn Energy, Annual Report and Accounts 2007, Exh. CWS-Brown-76, p. 29. ("Reflecting that the proceeds were not chargeable to tax in the consolidated group accounts also indicated that they were not chargeable to tax on the accounts of any individual subsidiary.").

[130]   Brown WS1, ¶ 93.

[131]   C-SoC, ¶ 126; Brown WS1, ¶ 93; Cairn Energy, Annual Report and Accounts 2007, Exh. CWS-Brown-76, p. 29 (stating that "The Group made an exceptional gain of $1,537.0m on the disposal of 31% of Cairn India through the IPO […]. These gains are not chargeable to tax."). Ms Brown explains that "[r]eflecting that the proceeds were not chargeable to tax in the consolidated group accounts also indicated that they were not chargeable to tax on the accounts of any individual subsidiary." Brown WS1, p. 29 n. 95; Claimants' Answers to the Tribunal's Questions, ¶ 32; Respondent's Answers to the Tribunal's Questions, ¶ 93.

[132]   C-SoC, ¶ 128; R-SoD, ¶ 30(d).

[133]   Brown WS1, ¶ 96.

[134]   Form No. 3CEB dated 30 October 2007, Exh. C-4. The form also referred to other transactions deemed international, including certain expenses.

which it has issued 861,764,893 shares shares [*sic*] at Rs 160 each to Cairn UK Holdings Limited by way of share swap arrangement for acquiring 135,267,264 ordinary shares of Cairn India Holdings Limited. The said transaction does not impact P&L account and is in accordance with the provisions of Foreign Exchange Management Act (FEMA) and CCI guidelines. Thus, the transaction is considered to be at arm's length.

81.     On 29 December 2009, the ITD requested CIL to provide detailed information regarding the arm's length price of its international transactions during the fiscal year 2006-2007.[135] During the course of 2010, CIL representatives attended hearings with the ITD and submitted "detailed information about the pricing of the CIL shares and underlying CIHL assets and the process of their acquisition by CUHL", including certain key documents prepared during the course of the restructuring, such as the FIPB and RBI approvals, the Rothschild valuation and the final CIL prospectus.[136]

82.     The TPO issued its order on 5 October 2010, holding that "no adverse inference is drawn in respect of the arm's length price in respect of 'international transactions' entered into by the assessee during the year."[137]

83.     The Claimants allege, and the Respondent has not disputed, that the TPO communicated this finding to the assessing officer, who reviewed the TPO's determination and the evidence submitted by CIL, and then closed the assessment, without imposing any tax on CIL in connection with the assessment.[138] It is also undisputed that between 2006 and 2010, the ITD never suggested to CIL or CUHL that CUHL was liable to pay capital gains tax for the CIHL Acquisition.[139]

### 4.     Cairn's divestments of its shareholding in CIL

84.     Between 2009 and 2010, CUHL sold much of its shareholding in CIL to third parties. The most important transactions were two off-market share sales: one to Petronas International Corporation Ltd. ("Petronas") in 2009, and another to a subsidiary of Vedanta Resources Plc ("Vedanta") in 2010.[140]

---

[135]   Notice under Section 92CA(2) and 92D(3) of the ITA 1961 to CIL dated 29 December 2009, Exh. C-146.

[136]   Brown WS1, ¶ 97; Letter from CIL to the Additional Commissioner of Income Tax dated 3 September 2010 [without annexures], Exh. CWS-Brown-88 (enclosing the CIL Prospectus, the Rothschild valuations dated 18 September 2006 and 19 December 2006, the RBI approval dated 10 October 2006 and the FIPB approval dated 10 October 2006); Letter from CIL to the Additional Commissioner of Income Tax dated 20 September 2010 [without annexures], Exh. CWS-Brown-89 (discussing a hearing held on 3 September 2010 and providing details on the CIHL Acquisition); Letter from CIL to the Additional Commissioner of Income Tax dated 29 September 2010 [without annexures], Exh. CWS-Brown-90 (enclosing the brokers' reports referred to in the Rothschild valuation).

[137]   Order under Section 92 CA(3) of the ITA 1961 dated 5 October 2010, Exh. C-8.

[138]   C-SoC, ¶ 130; Brown WS1, ¶ 99; R-SoD, ¶ 30(d).

[139]   C-SoC, ¶ 130; Brown WS1, ¶ 100. The Respondent has not disputed this.

[140]   Brown WS1, ¶¶ 102, 104.

### a.    The Petronas transaction

85.    In October 2009, CUHL sold 2.3 per cent of CIL's issued share capital to Petronas.[141] This transaction involved the off-market sale of shares in an Indian company, and it is undisputed that any capital gains deriving from this transaction were taxable in India. The ITD considered this to be a short-term capital gain, and applied a rate of 20%, with the result that CUHL paid approximately INR 820 million (approximately US$ 17.8 million) in short term capital gains tax for this transaction.[142]

86.    In its application to ITD for a withholding certificate, CUHL had argued that long-term capital gains tax at a rate of 10 per cent (rather than 20 per cent) should apply.[143] To support this argument, CUHL had provided information on how it had acquired CIL's shares, including the consideration it had given for them (i.e., cash and exchange of shares in CIHL).[144] However, the ITD rejected this request, and CUHL contested the ITD's decision before the Indian courts.[145] The Delhi High Court ultimately agreed that the ITD should have applied a 10 per cent rate, and that CUHL had a right to a rebate of half the US$ 17.8 million withheld.[146] The Claimants allege that, to date, CUHL has not been paid this rebate.[147]

87.    The Parties dispute the role of the ITD in reviewing this transaction. It is however undisputed that, when assessing the Petronas transaction, the ITD did not suggest that CUHL was liable to pay capital gains tax for the CIHL Acquisition.[148]

### b.    The Vedanta transaction

88.    In August 2010, CEP and CUHL entered into a share purchase agreement with Twin Star Energy Holdings Ltd. (then THL Aluminium Limited), a subsidiary of Vedanta for

---

[141]    NoA, ¶ 28. Ms Brown explains that "[t]he transaction was made pursuant to an agreement providing for a transfer of 43,600,000 shares to Petronas for consideration of INR 11,141,823,040 or approximately US$ 241,426,379." Brown WS1, p. 32 n. 100, referring to Heads of Agreement between Cairn Energy and Petronas International Corporation Ltd dated 14 October 2009, Exh. CWS-Brown-81; *Cairn UK Holdings Limited v. Director of Income-Tax* [2013] Writ Petition (Civil) No. 6752/2012 dated 7 October 2013, Exh. CWS-Brown-108, ¶ 3.

[142]    Brown WS1; ¶ 103. Order under Section 197 of the ITA 1961 dated 23 October 2009, Exh. CWS-Brown-84; National Securities Depository Limited, Quarterly Statement of TDS under Section 200(3) of ITA 1961 dated 11 January 2010, Exh. CWS-Brown-86 (showing payment by Petronas International Corporation Limited of INR 819,899,863 in assessment year 2010-2011).

[143]    Brown WS1; ¶ 103.

[144]    *Ibid.*; CUHL, Application for Withholding Certificate under Section 197 of the ITA 1961 dated 19 October 2009 [without annexures], Exh. CWS-Brown-82 (enclosing the FIPB approval granted to CUHL and the certificate issued by the Statutory Auditor certifying CIL's value); CUHL, Annexure 3 to Application for Withholding Certificate under Section 197 of the ITA 1961 dated 19 October 2009, Exh. CWS-Brown-83.

[145]    Brown WS1; ¶ 103; CUHL, Petition to the High Court of Delhi dated 27 September 2012, Exh. CWS-Brown-107.

[146]    Brown WS1, ¶ 103; *Cairn UK Holdings Limited v. Director of Income-Tax* [2013], Decision on Writ Petition (Civil) No. 6752/2012 dated 7 October 2013, Exh. CWS-Brown-108.

[147]    C-SoC, ¶ 135; Brown WS1, ¶ 103; C-Updated Reply, ¶ 204.

[148]    C-SoC, ¶ 135; Brown WS1, ¶ 103. The Respondent does not dispute this.

the sale of 51 per cent of CIL's share capital.[149] Since the sale was potentially for a controlling interest in CIL, it required approval from the Indian Government, which was granted in July 2011.[150]

89.    The sale was completed in December 2011. CUHL ultimately sold 40 per cent of CIL's issued share capital, as follows:

   a.    38.5 per cent of the shares were sold in an off-market transaction, in two tranches: the first for approximately 10 per cent of the fully diluted equity share capital of CIL (191,920,207 shares), and the second for 28.5 per cent (546,953,379 shares).[151]

   b.    Approximately 1.5 per cent of the shares (29,907,241 shares) were sold on market.[152]

90.    It is undisputed that any capital gains made through the off-market portion of the sale would be subject to capital gains tax in India, as they involved the private sale of shares in an Indian company.[153] As with the Petronas transaction, CUHL applied for a tax withholding certificate in which it requested the application of a 10 per cent tax rate.[154] Once again, the ITD rejected this request, and applied a tax rate of 20 per cent.[155] On this basis, Vedanta withheld approximately INR 26.7 billion (about US$ 536 million).

91.    Once again, the Parties dispute the ITD's role in reviewing this transaction. It is however undisputed that, when assessing the Vedanta transaction, the ITD did not suggest that CUHL was liable to pay capital gains tax for the CIHL Acquisition.[156]

---

[149]    Brown WS1, ¶ 104; Share Purchase Deed relating to the shares of CIL between Cairn Energy, CUHL, THL Aluminium Limited, Vedanta dated 15 August 2010, Exh. CWS-Brown-87, Background, Recital A.

[150]    Brown WS1, ¶ 104; Letter from Cairn Energy to the Ministry of Petroleum and Natural Gas dated 23 November 2010, Exh. CWS-Brown-93; Facsimile from the Government of India to Cairn Energy, CIL, Cairn Energy India, CEHL, and Vedanta dated 26 July 2011, Exh. CWS-Brown-97.

[151]    Brown WS1, ¶ 104; Amendment Deed among Cairn Energy, CUHL, Twin Star Energy Holdings Ltd., and Vedanta dated 27 June 2011, Exh. CWS-Brown-96; Letter from CUHL to the Assistant Director of Income-tax dated 14 December 2011, Exh. CWS-Brown-105.

[152]    Brown WS1, ¶ 104; DSP Merrill Lynch Limited, Contract Note – Form AA dated 9 December 2011, Exh. CWS-Brown-104.

[153]    Brown WS1, ¶ 105. With respect to the remaining 1.5 per cent, the Tribunal understands that, because the shares were sold in the Bombay Stock Exchange and had been held for over 12 months, they were exempt from capital gains tax. See Form No. 15CB dated 7 December 2011, Exh. CWS-Brown-103 (stating "[t]he remittance being sale proceeds of sale of shares at the Bombay Stock Exchange. The shares sold were held for over 12 months and therefore the gain is LTCG [Long Term Capital Gain] which is exempt from Tax.").

[154]    Brown WS1, ¶ 105; CUHL, Application for Withholding Certificate under Section 197 of the ITA 1961 dated 4 October 2010, Exh. CWS-Brown-91 [Without Annexures]; Annexure 4, CUHL, Application for Withholding Certificate under Section 197 of the ITA 1961 dated 4 October 2010, Exh. CWS-Brown-92.

[155]    Order under Section 197 of the ITA 1961 dated 3 June 2011, Exh. CWS-Brown-95 (Withholding Certificate).

[156]    C-SoC, ¶ 138; Brown WS1, ¶ 105. The Respondent has not disputed this.

### c.   Other divestments

92.   In June and September 2012, and in January 2014, CUHL sold additional shares in CIL in on-market transactions, amounting to 3.5%, 8%, and 2.5%, respectively, of the issued share capital of CIL. CUHL paid an aggregate amount of INR 79 million as securities transaction tax in accordance with applicable Indian law.[157]

93.   On the date of the Notice of Arbitration (22 September 2015), CUHL held 9.82 per cent of the issued share capital of CIL.[158] According to the Claimants, in January 2014 (when the ITD issued its attachment order) those shares were valued at approximately US$ 1 billion. However, by the date of the Notice of Arbitration, the value of the shares had decreased by almost 60% (according to the Claimants, largely as a result of the decline in the global price for oil) to approximately US$ 400 million.[159]

## C.   Evolution of the legal framework relevant to capital gains tax in India

### 1.   Background to the Income Tax Act 1961

94.   A capital gains tax was introduced in India in 1947 pursuant to the Income Tax and Excess Profits Tax (Amendment) Act. This tax was applied to non-residents by amending the scope of the "deeming fiction" in Section 42(1) of the Income Tax Act 1922, according to which certain income that accrued, arose, or was received outside of India would be deemed to accrue, arise, or be received in India. Specifically, this deeming fiction now encompassed gains arising or accruing "through or from the sale, exchange or transfer of a capital asset in the taxable territories."[160]

95.   In 1956, the Government appointed the first Law Commission of India (the "Law Commission") to restructure and simplify the Income Tax Act. The Law Commission found that Section 42(1) was ambiguous, and made the following recommendation:

> The words 'sale […] of a capital asset in the taxable territories' in the existing section 42(1) are slightly ambiguous, since 'in the taxable territories' can be read either with 'sale' or with 'capital asset'. To remove this ambiguity, the word 'situate' has been added after 'capital asset.'[161]

96.   The ITA 1961 adopted the Law Commission's recommendations. Section 9(1)(i) of the ITA 1961, which was the law in force at the time of Cairn's 2006 restructuring and of the CIHL Acquisition, provided as follows:

---

[157]   NoA, ¶ 30. The Claimants have not provided evidence of these sales, but the Respondent has not disputed them.

[158]   NoA, ¶ 31. The Tribunal understands that this amounts to 184,125,764 shares in CIL. First Expert Report of Mr Richard Boulton QC ("Boulton ER1"), ¶ 1.4; First Expert Report of Mr Jostein Kristensen ("Kristensen ER1"), ¶ 2.6.

[159]   NoA, ¶ 31.

[160]   Income Tax Act 1922, Section 42(1) [excerpt], Exh. C-104, as amended by Income Tax and Excess Profits Tax (Amendment) Act 1947 (Act No. XXII of 1947), Section 12B.

[161]   Law Commission of India, 12th Report, Income-Tax Act, 1922 (26 September 1958), Exh. C-132, p. 331.

**Income deemed to accrue or arise in India.**

**9.** (1) The following incomes shall be deemed to accrue or arise in India :–

(i)   all income accruing or arising, whether directly or indirectly, through or from any business connection in India, or through or from any property in India, or through or from any asset or source of income in India, or through the transfer of a capital asset situate in India.[162]

97.   In 2002, the Indian Government constituted a Task Force on Direct Taxes (the "2002 Task Force"), which was tasked with, among other objectives, "(i) [the] [r]ationalisation and simplification of the direct taxes with a view to minimising exemptions, removing anomalies and improving equity".[163] The 2002 Task Force indicated that its approach "ha[d] been influenced by the recognition that in the recent past economies have increased their tax revenue-to-GDP ratio not by increasing tax rates but by simplifying tax structures, widening the tax base and improving tax administration."[164] It noted that it had "examined best tax practices in the world, deliberated on ways to reduce costs of tax administration and extensively debated means of empowering Central Board of Direct Taxes (CBDT) to fulfill its function effectively."[165] With respect to the taxation of non-residents, the 2002 Task Force stated:

> Non-residents are taxed only on Indian-sourced income and on income received, accruing or arising in India.
>
> Nonresidents may also be taxed on income deemed to accrue or arise in India through a business connection, through or from any asset or source of income in India, or through the transfer of a capital asset situated in India (including a share in a company incorporated in India).[166]

98.   It is undisputed that the 2002 Task Force "made no mention of the possibility of enacting a tax on indirect transfers of Indian assets through the sale of shares in foreign companies."[167]

99.   The 2002 Task Force recommended the creation of a Working Group led by the Director General of Income Tax for International Taxation to examine various issues related to the taxation of non-residents. The Working Group issued its "Report on Non Resident Taxation" in January 2003. It is undisputed that the report "limited its general anti-abuse recommendations to the introduction of Controlled Foreign Corporation regulations, consistent with the UK and the US models, and provided the recognition of income and creditable tax at the parent company level to prevent companies from accumulating profits in low-tax jurisdictions", and "did not refer to taxation of income of non-residents

---

[162]   Excerpt of ITA 1961, Section 9, Exh. C-43.

[163]   Task Force on Direct Taxes, Report of the Task Force on Direct Taxes (December 2002), Exh. C-133, p. 22.

[164]   *Ibid.*

[165]   *Ibid.*

[166]   *Id.*, p. 56.

[167]   C-SoC, ¶ 167.

arising through indirect transfer of shares as an avenue for combatting tax avoidance."[168] It is also undisputed that, in the context of Section 9(1)(i) of the ITA 1961, the report suggested that the term "business connection" be amended to include an "agency PE" (permanent establishment), and that the provision should be amended "to deem that the income in respect of artistes [*sic*] and sportspersons shall accrue in India if the income earned is in respect of personal activities performed in India";[169] it did not issue comments or suggest an amendment of the last limb of Section 9(1)(i) of the ITA.[170]

100.    In 2003, the OECD updated its Model Convention on Income and Capital. The updated Model Convention included for the first time a provision contemplating the taxation of capital gains arising from transfers of shares in offshore companies by non-residents. Pursuant to Article 13(4), these are taxable only where 50 per cent of the value of the offshore company ultimately derives from immovable property located in the taxing State, as follows:

> Gains derived by a resident of a Contracting State from the alienation of shares deriving more than 50 per cent of their value directly or indirectly from immovable property situated in the other Contracting State may be taxed in that other State.[171]

101.    By the date of the Statement of Claim, only a few OECD States (namely Australia, Canada, Japan, and the United Kingdom) had adopted a similar provision in their legislation or tax treaties.[172] According to the Claimants, "in all such countries, this new tax was applied on a prospective basis only".[173]

### 2.    The *Vodafone* case – Part 1

102.    It is necessary to now turn to a separate legal proceeding also involving a claim to tax a transaction which effected an indirect transfer of Indian capital assets under Section 9(1)(i) of the ITA, because that matter went up to the Supreme Court of India (the "Supreme Court"). This case was the first time that the fourth limb of Section 9(1)(i) was ever subjected to judicial consideration since the ITA's enactment in 1961. The Supreme Court's decision and steps taken thereafter by the Parliament of India ("Parliament") are highly relevant facts for the instant case. As shall be seen, the Supreme Court rejected the ITD's attempt to tax an indirect transfer of capital assets situated in India. This led Parliament to quickly enact what has been referred to by the Claimants as the "Retroactive Amendment" and by the Respondent as the "2012 Clarification" and this amendment to the ITA formed the legal basis for the ITD's FAO levied in connection with Cairn's reorganisation culminating in the IPO which is said to have generated a taxable capital gain.

---

[168]    *Id.*, ¶ 170, citing Working Group, Report on Non Resident Taxation (2003), Exh. C-134, ¶ 3.3.2.

[169]    Working Group, Report on Non Resident Taxation (2003), Exh. C-134, ¶¶ 4.4.1-4.4.2. The Respondent has not disputed the Claimants characterization of the Working Group's Report.

[170]    C-SoC, ¶ 172.

[171]    OECD Model Convention, Exh. Gardiner-10, Article 13(4).

[172]    First Expert Report of Mr John Gardiner QC ("Gardiner ER1"), ¶ 68.

[173]    C-SoC, ¶ 177.

103.   In 2007, Hutchison Telecommunications International Ltd. ("Hutchison"), a company incorporated in the Cayman Islands, sold a single share in CGP Investments ("CGP"), another company incorporated in the Cayman Islands, to Vodafone International Holdings BV ("Vodafone"), a company incorporated in the Netherlands, for approximately US\$ 11.1 billion.[174] CGP held various subsidiaries in Mauritius, which, together with certain Indian entities, ultimately held a 67 per cent stake in Hutchison Essar Ltd. ("HEL").[175] As the Claimants note, "the transaction was a sale by a non-resident of an interest in a non-Indian company (which indirectly derived value from its underlying Indian assets)".[176] Hutchison realised a capital gain before tax of approximately US\$ 9.5 billion from the sale of the share.[177]

104.   In March 2007, the ITD sought information from HEL regarding the transaction.[178] On 6 August of that year, it issued HEL (then called Vodafone Essar Ltd, "VEL"), a notice to show cause, specifically to explain why it should not be treated as a representative assessee of Vodafone.[179]

105.   On 19 September 2007, the ITD issued Vodafone, as purchaser in the Hutchison-Vodafone transaction, a notice to show cause as to "why it should not be treated as an assessee-in-default for failure to withhold tax" from the consideration paid to Hutchison for the acquisition of CGP.[180]

106.   On 3 December 2008, the Bombay High Court declined to exercise its jurisdiction in a challenge to the show cause notice.[181] The matter was taken to the Supreme Court, which directed the ITD to determine the jurisdictional challenge, reserving Vodafone's right to challenge any decision before the Bombay High Court, leaving all questions of law open.[182]

107.   On 30 October 2009, the ITD issued Vodafone a second notice to show cause, to which Vodafone replied on 28 January 2010. On 31 May 2010, the ITD upheld its jurisdiction.[183]

---

[174]   *Id.*, ¶ 179; *Vodafone International Holdings B.V. v. Union of India & Anr.* [2012] 6 SCC 613, Exh. C-59, ¶¶ 14-21.

[175]   *Vodafone International Holdings B.V. v. Union of India & Anr.* [2012] 6 SCC 613, Exh. C-59, ¶ 80.

[176]   C-SoC, ¶ 179; *Vodafone International Holdings B.V. v. Union of India & Anr.* [2012] 6 SCC 613, Exh. C-59, ¶ 2.

[177]   C-Updated Reply, ¶ 133.

[178]   *Vodafone International Holdings B.V. v. Union of India & Anr.* [2010], Judgment on Writ Petition No. 1325/2010, Exh. C-161, ¶ 32.

[179]   *Id.*, ¶ 47.

[180]   *Id.*, ¶ 48.

[181]   *Id.*, ¶ 49.

[182]   *Id.*, ¶ 50.

[183]   *Ibid.*

108.    Also on 31 May 2010, the ITD issued Vodafone another notice to show cause as to "why it should not be treated as an agent/representative assessee of [Hutchison]",[184] and alleging its failure to withhold capital gains tax from its payment to Hutchison for the acquisition of CGP.[185] According to the ITD, Section 9(1)(i) of the ITA was a "look through" provision, and covered income that derived indirectly from the transfer of a capital asset, even if the transfer took place abroad.[186]

109.    As discussed in Section II.C.4 below, Vodafone challenged this notice and the ITD's assertion of jurisdiction to tax the offshore transaction before the Bombay High Court, and later before the Supreme Court.[187] Its main argument was that the transaction concerned the sale of a share in a company incorporated in the Cayman Islands. As this share was a capital asset situated *outside* of India, it contended, no income had accrued or arisen, or could be deemed to have accrued or arisen *in* India under Section 9(1)(i) of the ITA, even if the company, the share of which was sold, had capital assets situated in India. In response, the ITD argued that the real object of the transaction was an indirect transfer of rights in HEL held by Hutchison, which resulted in an accrual or deemed accrual of income for Hutchison from a source of income in India.[188]

110.    The parties diverge as to whether this was the first time the ITD sought to tax indirect transfers of Indian capital assets by non-residents.[189] The Claimants allege that high-ranking officials of the Central Board of Direct Taxes ("CBDT") publicly acknowledged that the ITD's tax of the capital gains arising from the Hutchison-Vodafone transaction was a "test case".[190]

111.    The *Vodafone* case attracted considerable international attention. The following evidence and allegations arise from the record:

a.    The *Economic Times* on 5 February 2010 reported that the then British Prime Minister, Gordon Brown, had written to Prime Minister Singh in relation to the *Vodafone* case. According to the article, Mr Brown had stated that taxing cross-border deals such as Vodafone's could "create uncertainty for foreign investors and affect the country's investment climate".[191]

---

[184]    *Id.*, ¶ 51.

[185]    *Vodafone International Holdings B.V. v. Union of India & Anr.*, [2012] 6 SCC 613, Exh. C-59, ¶ 35.

[186]    *Id.*, ¶ 69.

[187]    *Id.*, ¶¶ 53, 92.

[188]    C-SoC, ¶ 196; *Vodafone International Holdings B.V. v. Union of India & Anr.* [2012] 6 SCC 613, Exh. C-59, ¶ 2.

[189]    In the document production phase the Claimants requested that the Respondent provide evidence of cases in which the ITD had sought to tax transfers of assets situated outside India (PO8, Annex A, Request No. 23). The Respondents did not produce any evidence of such cases.

[190]    C-SoC, ¶ 181, citing "More Vodafone-like deals under CBDT lens" (The Hindu, 9 September 2010), Exh. C-206.

[191]    "Gordon Brown writes to Manmohan on Vodafone", Economic Times, 5 February 2010, Exh. C-101.

b.   On 5 February 2010 Indian Prime Minister Singh responded to Prime Minister Brown's letter assuring him that Vodafone would "have the full protection of the law" and indicating his understanding that "there is no retrospective application of taxation and a recent court judgment has affirmed this position". Prime Minister Singh also provided his assurance that the Government of India was "fully committed to providing a transparent and growth oriented environment for profitable international investment".[192]

c.   Acting chairman Sudhir Chandra of the CBDT was quoted as saying "This (Vodafone case) is a test case, we will look at similar cases" in an article published in *The Hindu* on 9 September 2010. The article also said:

> The government will look into more cross-border mergers involving Indian assets, like the Vodafone-Hutchison deal, after the Bombay High Court rejected the UK-based Vodafone's petition against the imposition of tax by authorities here. […] Recently, London listed Vedanta Group has signed a deal to acquire UK-based Carin Energy's Indian arm for USD 8.43 billion. Chandra said, "(Income Tax) Department's position stands vindicated. It is a clear cut case of deliberate non-compliance to law on misplaced legal advice."

> Tax authorities had slapped a notice on Vodafone over its acquisition of Hong Kong's Hutchison Telecommunications, involving its Indian telecom JV Hutch Essar, for over USD 11 billion in 2007.

> They said that in this case the buyer, Vodafone, was liable to pay capital gains tax even if it failed to deduct it at source, that is, while making payment to Hutch for the deal that happened overseas. Vodafone challenged the notice.

> […]

> Although he did not name the companies or deals that could be investigated, Chandra said, "There are already some cases under investigation.[193]

112.   After the *Vodafone* decision was issued, the United States, the United Kingdom and the European Union issued the following joint statement, which was cited by the Minister of State in the MoF Shri S. S. Palanimanickam:

> Indian Revenue Authorities have asserted the unprecedented view that India is entitled to capital gains on transactions taking place wholly outside India and that they have imposed retroactive taxing jurisdiction in transactions involving the transfer of shares in a company not resident in India, in which both the buyer and seller are also nonresidents of India.[194]

---

[192]   Letter from Prime Minister Singh to Prime Minister Brown dated 5 February 2010, Exh. C-163.

[193]   "More Vodafone-like deals under CBDT lens" (The Hindu, 9 September 2010), Exh. C-86.

[194]   Rajya Sabha Written Answers dated 1 March 2011, Exh. C-118.

### 3.     The Direct Tax Code Bills of 2009 and 2010

113.   While the ITD was seeking to tax the Hutchison-Vodafone transaction, the MoF was proposing amendments to the country's tax laws. In August 2009, the MoF introduced in Parliament a Direct Tax Code Bill (the "DTC 2009"), which included a provision that taxed "the transfer, directly or indirectly, of a capital asset situate in India".[195] Specifically, Clause 5(1) of the DTC 2009 provided:

> (1) The income shall be deemed to accrue in India, if it accrues, whether directly or indirectly, through or from […] (d) the transfer, directly or indirectly, of a capital asset situate in India.[196]

114.   According to the Claimants, the DTC 2009 also incorporated a General Anti-Avoidance Rule ("GAAR") granting the ITD the statutory power to "look through" a transaction to determine whether it lacked commercial substance and was primarily intended to avoid tax in India.[197]

115.   The DTC 2009 was not enacted into law. It was subsequently revised based on suggestions from stakeholders and replaced by the Direct Tax Code Bill of 2010 (the "DTC 2010"), introduced in Parliament by the Finance Minister in August 2010. Proposed Clause 5(1) of the DTC 2010 provided as follows:

> The income shall be deemed to accrue in India, if it accrues, whether directly or indirectly, through or from: […] (d) the transfer of a capital asset situated in India.[198]

116.   Clause 5(4)(g) then specified as follows:

> The income deemed to accrue in India under sub-section (1) shall, in the case of a non-resident, not include the following, namely: — […] (g) income from transfer, outside India, of any share or interest in a foreign company unless at any time in twelve months preceding the transfer, the fair market value of the assets in India, owned, directly or indirectly, by the company, represent at least fifty per cent of the fair market value of all assets owned by the company.[199]

117.   In other words, the DTC 2010 proposed to tax the "transfer, outside India, of any share or interest in a foreign company" if "the fair market value of the assets in India, owned, directly or indirectly, by the company, represent at least fifty per cent of the fair market value of all assets owned by the company". [200] Clause 5(6) of the DTC 2010 proposed a formula for calculating the income that would be taxable in such an indirect transfer, as follows:

---

[195]   Excerpt of Department of Revenue, DTC 2009, MoF (2009), Exh. C-54, Clause 5(1).

[196]   *Ibid.*

[197]   C-SoC, ¶ 187, citing Excerpt of Department of Revenue, DTC 2009, MoF (2009), Exh. C-129, Clause 112.

[198]   Excerpt of Department of Revenue, DTC 2010, MoF (2010), Exh. C-55, Clause 5(1).

[199]   *Id.*, Clause 5(4)(g).

[200]   *Ibid.*

Where the income of a non-resident, in respect of transfer, outside India, of any share or interest in a foreign company, is deemed to accrue in India under clause (d) of sub-section [5](1), it shall be computed in accordance with the following formula –

A x B / C where

A = Income from the transfer computed in accordance with provisions of this Code as if the transfer was effected in India;

B = fair market value of the assets in India, owned, directly or indirectly, by the company;

C = fair market value of all assets owned by the company.[201]

118.  Parliament referred the DTC 2010 to the Standing Committee on Finance ("Standing Committee") on 9 September 2010. In its official report on the DTC 2010 (the DTC 2010, Forty-Ninth Report, or "Standing Committee Report"), the Standing Committee noted that "Clause 5(1)(d) read with Clause 5(4)(g) and Clause 5(6) seek to tax income of a non-resident, arising from indirect transfer of capital asset, situated in India."[202] The Standing Committee Report noted in this respect that the "IT Act does not contain a provision analogous to clause 5(4)(g) and Clause 5(6) of the DTC, 2010."[203] The Standing Committee recommended that there be certain exemptions added to this provision, as well as clarifications in relation to the criteria for computing the fair market value of assets situated in India. In particular, it recommended that "exception may also be provided to intra group restructuring outside India, when the Code itself provides exemption from capital gains in cases of business reorganization through Clause 47(1)(g) and Clause 47(1)(h) of the Code."[204]

119.  The Standing Committee also explained that the DTC 2010 proposed to introduce GAAR principles for the first time to combat tax avoidance, specifically "to prevent a tax payer from using legal construction or transactions to gain undue fiscal advantage."[205] The Standing Committee noted however that this had raised serious concerns among stakeholders, and recommended that "the Ministry and the CBDT should seek to bring greater clarity and preciseness to the scope of the provisions", so that "widely worded and […] subjective" concepts such as "misuse or abuse of DTC provisions", "manner applied for the arrangements not for bona fide business purpose", and "lacks commercial substance", would "need to be more specifically defined to avoid undue discretion to tax authorities."[206] In the Standing Committee's view, "the onus should rest on the tax authority invoking GAAR and this should not be shifted to the

---

[201]  *Id.*, Clause 5(6).

[202]  Standing Committee on Finance, 49th Report, DTC 2010 (3 March 2012) ("Standing Committee Report"), Exh. C-57 (resubmitted), p. 70.

[203]  *Id.*, p. 69.

[204]  *Id.*, p. 70.

[205]  *Id.*, p. 297.

[206]  *Id.*, p. 298.

taxpayer."[207] The Standing Committee specifically recommended that "[t]he provisions to deter tax avoidance should not be end up penalizing tax-payers who have genuine reasons for entering into a bonafide transaction",[208] and that "[i]t would also be fair to apply GAAR provisions prospectively so that it is not made applicable to existing arrangements/transactions. Alternatively, suitable grandfathering provisions may be made to protect the interest of the tax- payers who have entered into structures / arrangements under the existing law." [209]

### 4.    The *Vodafone* case – Part 2

120.    On 8 September 2010, the Bombay High Court issued its decision in *Vodafone*, dismissing Vodafone's petition and confirming the ITD's jurisdiction. Specifically, it found that the transaction had involved the transfer of "put" and "call" options between two Indian entities, which could be considered "assets situate in India".[210] On this basis, it found that "the transaction in question had a significant nexus with India", as the essence of the transaction was a change in the controlling interest in HEL which constituted a source of income in India.[211] Accordingly, the ITD had jurisdiction to assess capital gains tax in respect of the transaction.[212] Vodafone appealed to the Supreme Court.

121.    On 20 January 2012, the Supreme Court issued a decision in Vodafone's favour, in which all three judges concurred in the result[213] finding that Section 9(1)(i) was not a "look through" provision; i.e., that it did not allow the ITD to "look through" the transfer of a share in a foreign company so as to tax the indirect transfer of underlying assets in India.[214] The Supreme Court also found on the facts of that case that the Hutchison-Vodafone transaction had not been a sham or tax avoidant transaction, and thus was not subject to tax under the "look at" doctrine.[215]

122.    The Claimants maintain (and the Respondent has not disputed) that the ITD applied for a review of the *Vodafone* decision, but its application was dismissed by the Supreme Court on 20 March 2012.[216]

---

[207]    *Ibid.*

[208]    *Id.*, p. 299.

[209]    *Ibid.*

[210]    *Vodafone International Holdings B.V. v. Union of India & Anr.* [2010], Judgment on Writ Petition No. 1325/2010, Exh. C-161, ¶¶ 133-139.

[211]    *Id.*, ¶ 144.

[212]    *Ibid.*

[213]    Two judgments were issued, the first by Kapadia, C.J.I. with whom Kumar, J. agreed. A separate opinion was authored by Radhakrishnan, J. who agreed with the Chief Justice's Reasons for Judgment. However, no reciprocal statement approving Radhakrishnan, J.'s reasons for judgment in whole or in part was made in the majority's judgment.

[214]    *Vodafone International Holdings B.V. v. Union of India & Anr.* [2012] 6 SCC 613, Exh. C-59, ¶ 71. See also *Id.*, ¶ 174 (Separate opinion of Justice Radhakrishnan).

[215]    *Id.*, ¶ 90.

[216]    C-SoC, ¶ 202.

### 5.    The 2012 Amendment

123.    On 16 March 2012, the MoF introduced in Parliament the Finance Bill 2012, which *inter alia* amended Section 9(1)(i) by way of certain "Explanations", which had the effect of including in the scope of this provision indirect transfers of capital assets by non-residents.[217]

124.    The Finance Act 2012 received assent on 28 May 2012, and introduced into law the amendment to Section 9(1)(i) made in the bill.[218] The 2012 Amendment was passed with retroactive effect as of 1 April 1962, and provided as follows:

> Amendment of section 9.
>
> 4. In section 9 of the Income-tax Act, in sub-section (1),—
>
> (a) in clause (i), after Explanation 3, the following Explanations shall be inserted and shall be deemed to have been inserted with effect from the 1st day of April, 1962, namely:—
>
> 'Explanation 4.—For the removal of doubts, it is hereby clarified that the expression "through" shall mean and include and shall be deemed to have always meant and included "by means of", "in consequence of" or "by reason of".
>
> Explanation 5.—For the removal of doubts, it is hereby clarified that an asset or a capital asset being any share or interest in a company or entity registered or incorporated outside India shall be deemed to be and shall always be deemed to have been situated in India, if the share or interest derives, directly or indirectly, its value substantially from the assets located in India'.[219]

125.    The Parties dispute whether the amendments merely clarified the existing law, or whether they introduced a new retroactive measure.[220]

126.    The 2012 Amendment raised concerns and uncertainty amongst the business community.[221] To address the business community's concerns, three different committees were formed to examine the 2012 Amendment.

---

[217]    Lok Sabha, Fifteenth Series, Vol. XXIII, Tenth Session, 2011/1933 (Saka), 16 March 2012, Exh. C-120, p. 47; Ernst & Young, International Tax Alert: India's Union Budget 2012-2013 released, 21 March 2012, Exh. C-216, p. 1.

[218]    The Claimants refer to this as the "Retroactive Amendment" (See e.g. C-NoA, ¶ 11), while the Respondent refers to it as the "2012 Clarification" (See e.g. R-SoD, ¶ 8(d)). The Tribunal will refer to it as the "2012 Amendment". The choice of this term is meant to be as objective as possible: the Tribunal refers to it as an "amendment" because it involved the passing of a new law; at this stage it will not add a value judgment on whether that new law was clarificatory or retroactive in nature.

[219]    Finance Act 2012 [Act No. 23 of 2012], Exh. C-53.

[220]    See e.g., C-NoA, ¶¶ 32-41; C-SoC, ¶¶ 203-244, 294-319; C-Updated Reply. ¶¶ 8-9, 423-473; R-SoD, ¶¶ 8(d), 113-148; R-Rejoinder, ¶¶ 502-505.

[221]    See, e.g., "Decision to amend IT Act retrospectively 'capricious', says economist Raghuram Rajun" (The Economic Times, 12 April 2012), Exh. C-207 (noting that "several global organisations, including

127. On 30 July 2012, the Prime Minister appointed a special tax expert committee (the "Shome Committee") to examine the implications of the 2012 Amendment. The committee was led by Dr Parthasarathi Shome, an advisor to the Finance Minister. The Shome Committee issued its draft report on 1 October 2012.[222]

128. In August 2012, in response to the World Bank's *Doing Business Report* which had ranked India at the bottom of certain indices, the Ministry of Corporate Affairs established the Committee for Reforming the Regulatory Environment for Doing Business in India (the "Damodaran Committee"). The Committee was chaired by Mr Damodaran, the former Chairman of SEBI, and included representatives from the federal government, state governments, public sector enterprises, and regulatory bodies.[223] The Committee addressed a number of issues, including that of retroactive taxation.[224]

129. In May 2014, an expert group (consisting of Dr Parthasarathi Shome and former government officials) which had been tasked with "address[ing] the thus-far missing elements of best practices in tax administration in a comprehensive manner"[225] released the "First Report of the Tax Administration Reform Commission" (the "TARC Report"). Amongst many of its observations, the committee indicated a series of "major fault lines in the tax administration", and commented on the 2012 Amendment.[226]

### 6.   Further clarifications to the 2012 Amendment

130. The Government issued new clarifications to the 2012 Amendment in the subsequent months and years. At the same time, it continued its tax reform efforts.

131. In May 2012, the CBDT issued a circular indicating that "in case[s] where assessment proceedings have been completed [...], before the first day of April, 2012, and no notice for reassessment has been issued prior to that date, [...] such cases shall not be reopened."[227]

132. In April 2014, the MoF proposed a revised Direct Tax Code Bill (the "DTC 2013"). The DTC 2013 revised Clause 5(4)(g) of the DTC 2010 to clarify instances in which income

---

International Chamber of Commerce (ICC), BIAC (which represents OECD's business community) have written to Prime Minister Manmohan Singh, Finance Minister Pranab Mukherjee and others, expressing concern over the government's proposed move").

[222] Expert Committee, Draft Report on Retrospective Amendments Relating to Indirect Transfer (2012), Exh. C-56.

[223] Committee for Reforming the Regulatory Environment for Doing Business in India, Report of the Committee for Reforming the Regulatory Environment for Doing Business in India (2 September 2013), Exh. C-136.

[224] *Id.*, pp. 76-77.

[225] C-SoC, ¶ 235; Tax Administration Reform Commission, First Report of the Tax Administration Reform Commission, *Tax Administration Reform in India: Spirit, Purpose and Empowerment*, 30 May 2014 ("TARC Report"), Exh. C-137, p. ii.

[226] *Id.*, pp. 6, 249.

[227] CBDT Circular dated 29 May 2012, Exh. C-33.

from an indirect transfer of capital assets situated in India would be deemed to accrue in India. In particular, Clause 5(2) provided:

> [A]n asset or a capital asset, being any share of, or interest in, a company or entity registered or incorporated outside India shall be deemed to be situated in India, if the share or interest derives, directly or indirectly, its value substantially from the assets (whether tangible or intangible) located in India.[228]

133. The DTC 2013 also provided that shares in foreign companies would be deemed to be situated in India if only 20 per cent of the company's value (rather than 50 per cent, as the DTC 2010 proposed) was attributable to assets in India.[229] Clause 5(3) provided:

> The share or interest, referred to in sub-section (2), shall be deemed to derive its value substantially from the assets (whether tangible or intangible) located in India, if on the specified date, the value of such assets, (i) exceeds the amount as may be prescribed; or (ii) represent at least twenty per cent of the fair market value of all the assets owned by the company or entity, as the case may be.[230]

134. The DTC 2013 was not enacted into law.

### 7.   The BJP assumes power

135. Following the general election in 2014, the Bharatiya Janata Party (the "BJP") assumed power in India. The BJP's election manifesto criticised the preceding government for having unleashed "tax terrorism" and "uncertainty", which "negatively impact[ed] the investment climate".[231]

136. In his first budget speech in July 2014, the new Finance Minister, Arun Jaitley, proposed that a CBDT-supervised "High Level Committee" be implemented to scrutinise fresh cases that had arisen following the 2012 Amendments. After stating that, "[t]his Government will not ordinarily bring about any change retrospectively which creates a fresh liability", he announced that "henceforth, all fresh cases arising out of the retrospective amendments of 2012 in respect of indirect transfers and coming to the notice of the Assessing Officers will be scrutinized by a High Level Committee to be constituted by the CBDT before any action is initiated in such cases."[232]

137. On 28 August 2014, the CBDT established the abovementioned High Level Committee, directing assessing officers that in cases where no notice had been issued or proceedings commenced, no action should be taken without its prior approval.[233]

---

[228]   Department of Revenue, DTC 2013, MoF (2013), Exh. C-130, Clause 5(2).

[229]   *Id.*, Clauses 5(3).

[230]   *Ibid.*

[231]   Bharatiya Janata Party Election Manifesto 2014, Exh. C-217, p. 27.

[232]   Budget 2014-2015 speech of Arun Jaitley, Minister of Finance of 10 July 2014, Exh. C-35; C-SoC, ¶ 302.

[233]   CBDT Circular dated 28 August 2014, Exh. C-143.

138.    In a live interview on Indian television on 7 November 2014 (which also featured the former Finance Minister, Mr Chidambaram), the Finance Minister admitted that it was not on his immediate agenda to repeal the 2012 Amendment, but insisted that his government had taken a "policy decision that as far as this government is concerned […] even though there is a sovereign power of retrospective taxation, we are not going to exercise that power."[234]

139.    On 13 January 2015, Mr Jaitley was quoted in *The Indian Express* as saying the 2012 Amendment had "scared away investors from India", and that "the government ha[d] no intention of using the retrospective tax provision".[235]

140.    This view was confirmed by Prime Minister Narendra Modi on 14 February 2016. The Prime Minister was quoted in the *Financial Times* as saying that the government "will not resort to retrospective taxation; we are making our tax regime transparent, stable and predictable".[236]

### 8.    Further legislative changes

141.    In February 2015, Finance Minister Jaitley introduced a new 2015 Finance Bill which would "clean[] up" certain "ambiguities" in Section 9(1)(i).[237] For example, the bill defined "substantially" in Section 9(1)(i) to mean that at least 20 per cent of value of the foreign company was attributable to assets in India (as opposed to 50 per cent proposed under the DTC Bill 2010). The 2015 Finance Bill also proposed the insertion of further explanations to Section 9(1)(i) which clarified the situations in which indirect transfers of capital assets situated in India could be taxed, and which would apply only prospectively.[238]

142.    The Finance Act 2015 introduced Explanations 6 and 7 (on a prospective basis), clarifying *inter alia* that Explanation 5 would only apply to those share transfers which were valued above Rs. 10 crores or the company derived not less than 50% of its value from Indian assets,[239] or to cases in which the transferor held the right to manage or control the company which directly or indirectly held the Indian assets.[240]

---

[234]    "The Clash of the Titans" (Headlines Today, 7 November 2014) [unofficial transcript], Exh. C-209.

[235]    "Jaitley promises to attract investors 'scared away' by previous regime" (The Indian Express, 13 January 2015), Exh. C-37; C-SoC, ¶ 244.

[236]    "Modi to refresh 'Make in India' Manufacturing Drive" (The Financial Times, 14 February 2016), Exh. C-223.

[237]    Budget Speech 2015-2016 – Speech of Arun Jaitley – Minister of Finance, 28 February 2015, Exh. C-36, ¶ 114.

[238]    Finance Bill, 2015, Exh. C-131, Sections 5-7.

[239]    ITA 1961, Exh. C-569, Section 9(1)(i), p. 57:

    "*Explanation 6.*—For the purposes of this clause, it is hereby declared that— (a) the share or interest, referred to in Explanation 5, shall be deemed to derive its value substantially from the assets (whether tangible or intangible) located in India, if, on the specified date, the value of such assets— (i) exceeds the amount of ten crore rupees; and (ii) represents at least fifty per cent. of the value of all the assets owned by the company or entity, as the case may be; […]."

[240]    ITA 1961, Exh. C-569, Section 9(1)(i), p. 58:

143.    In March 2015, the CBDT issued a circular clarifying that the 2012 Amendment did not apply to a dividend declared by a foreign company with substantial assets in India.[241]

144.    In 2016, the Government introduced a method for computing the value of the underlying assets, as well as several exemptions to the tax on indirect transfers.[242]

145.    In May 2016, the Government proposed a methodology for calculating gains.[243]

## D.    The ITD's investigation into the CIHL Acquisition

146.    By late 2013, Cairn held approximately 10 per cent of the shares of CIL. According to Ms Brown, "[p]rompted by a downward trend in the Indian economy, as well as global macroeconomic uncertainty, CEP decided that it was the appropriate time to monetise that shareholding."[244] It had been reported in the press that CIL was planning to use its significant cash reserves to buy back some of its shares, and Cairn's management decided to participate in such a buy-back programme, should one be offered.[245]

---

"*Explanation 7.*—For the purposes of this clause,—

(a) no income shall be deemed to accrue or arise to a non-resident from transfer, outside India, of any share of, or interest in, a company or an entity, registered or incorporated outside India, referred to in the Explanation 5,—

(i) if such company or entity directly owns the assets situated in India and the transferor (whether individually or along with its associated enterprises), at any time in the twelve months preceding the date of transfer, neither holds the right of management or control in relation to such company or entity, nor holds voting power or share capital or interest exceeding five per cent. of the total voting power or total share capital or total interest, as the case may be, of such company or entity; or

(ii) if such company or entity indirectly owns the assets situated in India and the transferor (whether individually or along with its associated enterprises), at any time in the twelve months preceding the date of transfer, neither holds the right of management or control in relation to such company or entity, nor holds any right in, or in relation to, such company or entity which would entitle him to the right of management or control in the company or entity that directly owns the assets situated in India, nor holds such percentage of voting power or share capital or interest in such company or entity which results in holding of (either individually or along with associated enterprises) a voting power or share capital or interest exceeding five per cent. of the total voting power or total share capital or total interest, as the case may be, of the company or entity that directly owns the assets situated in India;

(b) in a case where all the assets owned, directly or indirectly, by a company or, as the case may be, an entity referred to in the Explanation 5, are not located in India, the income of the non-resident transferor, from transfer outside India of a share of, or interest in, such company or entity, deemed to accrue or arise in India under this clause, shall be only such part of the income as is reasonably attributable to assets located in India and determined in such manner as may be prescribed;

(c) associated enterprise shall have the meaning assigned to it in section 92A; […]"

[241]    CBDT Circular dated 26 March 2015, Exh. C-144, ¶ 6.

[242]    ITA 1961, Section 2(14), Exh. C-106. See ITA 1961, Section 2(47), Exh. C-42; ITA 1961, Section 9(1)(i) as amended in 2016, Exh. C-53, Explanations 4-5.

[243]    CBDT Circular dated 23 May 2016, Exh. C-145.

[244]    Brown WS1, ¶ 108.

[245]    *Ibid.*; "Cairn India plans buyback" (The Financial Times, 26 November 2013), Exh. CWS-Brown-111; Jann Brown Paper for Cairn Energy Board Meeting dated 19 November 2013, Exh. CWS-Brown-109; Cairn Energy Board Minutes dated 19 November 2013, Exh. CWS-Brown-110.

147.  On 26 November 2013, CIL publicly announced that it was contemplating a buy-back of its shares.[246] On 4 December 2013, CEP's board approved the company's participation in any buy-back programme.[247] As explained by Ms Brown:

> To benefit from a tax exemption under UK law,[248] Cairn Energy was required to sell its entire shareholding within 12 months of its holding dropping below 10 per cent. Given that Cairn Energy did not expect to be able to dispose of its entire remaining stake through the buyback programme, the board also authorised the sale of any residual shareholding through on-market transactions, such that all of our shares in CIL would be sold. Based on market considerations, Cairn Energy expected to sell most of its shares in CIL through the buyback programme (approximately 6-7 per cent of CIL's shares) by March 2014 and its remaining shares by May 2014.[249]

148.  On 14 January 2014, CIL formally announced its intention to buy back shares with up to 14.98 per cent of its total paid-up share capital and free reserves, at a maximum price of INR 335 per share (the "Buy-Back Programme"). The Buy-Back Programme was scheduled to open on 23 January 2014.[250] That same day, the *Economic Times* published an article entitled, "Cairn India's Rs 5,725 crore share buyback starts on January 23", which noted that "[t]he purchase may include a part of the 10.3 per cent stake held by former promoter Cairn Energy Plc." The article quoted an analyst stating that "Cairn Energy is a known seller for a long time and the share buyback may present it with an opportunity to exit from Cairn India".[251]

149.  On 15 January 2014, the Investigation Wing of the Income Tax Authority in New Delhi, led by Mr Sanjay Kumar, conducted an unscheduled survey of CIL's premises in Gurgaon, to review the files relating to the 2006 restructuring.[252] The Claimants maintain that the visit was triggered by CIL's announcement of the buy-back, and "was plainly an excuse to initiate tax proceedings against CUHL based on the Retroactive Amendment more than seven years after the 2006 restructuring and to block Cairn from selling its investment."[253] The Respondent states that the timing was merely coincidental and that the case against CIL had been under consideration for months. According to the Respondent "[t]he purpose of the survey was twofold: (a) to seek

---

[246]  Brown WS1, ¶ 109; "Board proposes Buyback of Equity Shares" (CIL, 26 November 2013), Exh. CWS-Brown-112.

[247]  Brown WS1, ¶ 109; Cairn Energy Board Minutes dated 4 December 2013, Exh. CWS-Brown-113.

[248]  Ms Brown explains that this tax relief was due to the Substantial Shareholding Exemption available to Cairn Energy under UK tax law, by virtue of which the sale of CUHL shares in CIL would not have incurred taxes in the UK. Brown WS1, p. 36 n. 115; Cairn Energy, Paper by Jann Brown for Cairn Energy Board Meeting dated 19 November 2013, Exh. CWS-Brown-109, p. 2.

[249]  Brown WS1, ¶ 109; Cairn Energy Board Minutes dated 4 December 2013, Exh. CWS-Brown-113;

[250]  Brown WS1, ¶ 110; "Public Announcement of Share Buyback" (CIL, 14 January 2014), Exh. C-84.

[251]  "Cairn India's Rs 5,725 crore share buyback starts on January 23" (The Economic Times, 14 January 2014), Exh. C-87.

[252]  Brown WS1, ¶ 110.

[253]  C-SoC, ¶ 248.

information relating to the failure of CUHL to disclose the write-off of an investment of INR 149,527,800,000 (INR 14,952.78 crores) in the Financial Year 2012-13; and (b) to obtain further information relating to the *prima facie* case of taxability that Mr Kumar believed to exist based on his study of the financials of CIL for the Financial Year 2006-2007".[254]

150. Mr Sanjay Kumar, the Investigation Officer who conducted the initial investigation, testified that his investigation was prompted by information discovered on the "Offshore Leaks Database" published by the International Consortium of Investigative Journalists ( "ICIJ"). The database provides a "comprehensive list of offshore companies and the beneficial owners behind them". Mr Kumar said that he studied the database and profiled cases that in his opinion fell within the jurisdiction of Delhi, Unit IV-2 of the ITD, and which raised suspicions of undisclosed income. Mr Kumar found the name of Mr Sundeep Lakshmilal Bhandari, who was named as the Chairman of the Corporate Advisory Board of CIL, on this list. Mr Kumar further explains in his witness statement:

> I decided to follow up on that lead [finding Mr Sundeep Lakshmilal Bhandari's name] by looking through the Balance Sheets of CIL for the year 2012-2013, which were available in the public domain, so as to gain a basic understanding of the nature of the business of the company. In doing so, I discovered that CIL had accounted for a massive write-off of an investment of Rs. 149,527,800,000 (this amount being also referred to as "INR 14,952 crores") in the context of a corporate reorganization conducted by CIL in 2013. Coming from a background in the analysis of transfer pricing, I queried whether the initial purchase was correctly valued, given perhaps that an inflated value was used which was subsequently required to be written off. In pursuing this matter, I decided to look at the Balance Sheets and Annual Reports of CIL and CEP, CIL's original holding company and, at the time, minority shareholder, in previous years (i.e. from 2013 backwards), to determine the nature of the transactions by which CIL acquired its assets.[255]

151. Mr Kumar testified that in July 2013[256] he located the "relevant transaction documents […] and discovered that CUHL had not filed a tax return for the Assessment Year 2007-08" and accordingly "no tax had been paid, nor had the transaction been disclosed to the relevant Assessing Officer." He explains:

> [T]he transaction seemed to involve the sale of Indian oil and gas assets held by the Cairn Energy group, headed by CEP, through an Indian IPO, merely routed through a network of offshore companies. None of the offshore companies, including CIHL, which was incorporated for the purpose of the 2006 Transactions, seemed to have any business or assets of their own, and as such, all shareholding in CIL seemed to derive its value from underlying Indian assets. Having thus studied the financials of CIL, CUHL and CEP for the Financial Year 2006-2007 and thereafter, including

---

[254] R-SoD, ¶ 47; First Witness Statement of Mr Sanjay Kumar ("Kumar WS1"), ¶ 19. See also Survey Report in the Case of Cairn Group submitted on 24 February 2016, Exh. CWS-Puri-1, p. 1.

[255] R-SoD, ¶¶ 43-44; Kumar WS1, ¶ 13.

[256] R-SoD, ¶ 45; Kumar WS1, ¶ 12.

in particular the Draft Red Herring Prospectus issued by CUHL in relation to the IPO of CIL shares, and having checked internally that CUHL had not filed a tax return for the Assessment Year 2007-08, I was of the opinion that there arose strong reasons to believe that certain income had escaped assessment in relation to the sale of Indian assets. This was *prima facie* within the scope of Section 9 of the ITA, which is the provision in the ITA which defines what income is deemed to accrue or arise in India.[257]

152.   At this time, Mr Kumar "formally requested permission to carry out a survey at the two office premises of CIL under s. 133A of the ITA."[258] On 13 January 2014, Mr Kumar drafted a "satisfaction note" to his immediate superior, the Additional Director of Income Tax (Investigation), in which he recorded his reasons for believing that certain income had escaped assessment. Mr Kumar indicates that two issues warranted investigation: (1) the first was "in relation to the failure of CUHL to disclose the write-off of an investment of INR 149,527,800,000 (INR 14,952.78 crores) in the Financial Year 2012-13"; and (2) the second was "in relation to the *prima facie* case of taxability that [he] believed to exist based on my study of the financials of CIL for the Financial Year 2006-2007".[259] Also on 13 January 2014, the Additional Director of Income Tax (Investigation)-Unit IV granted his approval for the survey and ordered Mr Kumar to seek a second approval by the Additional Director of Income Tax (Investigation)-Faridabad.[260]

153.   By 15 January 2014, Mr Kumar had received the second approval required to conduct the search. On that same day, Mr Kumar led the unscheduled survey of CIL's offices in Gurgaon discussed at paragraph 149 above.[261]

154.   On 16 January 2014, Mr Kumar submitted a 125-page interim report in relation to the survey proceedings carried at CIL's offices in Gurgaon.[262]

155.   On 21 January 2014, the ITD notified CUHL pursuant to Section 148 of ITA 1961 (the "Section 148 Notice") that it had "reason to believe that [CUHL's] income chargeable to tax for the Assessment Year 2007 – 2008 has escaped assessment within the meaning of section 147 of the [ITA] 1961." It thus "propose[d] to assess/re-assess the income/re-compute the loss/depreciation allowance for said assessment year" and required CUHL to file a return for the Assessment Year 2007-08 within 30 days.[263]

---

[257]   R-SoD, ¶ 45; Kumar WS1, ¶ 14.

[258]   Kumar WS1, ¶ 15.

[259]   *Ibid*.

[260]   *Id*., ¶ 16.

[261]   *Ibid*.

[262]   Interim Report from the Office of the Deputy Director of Income Tax dated 16 January 2014, Exh. RWS-Kumar-5, ss. 10, 11, 13; Survey Report in the Case of Cairn Group submitted on 24 February 2016, Exh. RWS-Puri-1.

[263]   Letter from the Deputy Director of Income Tax to CUHL dated 21 January 2014, Exh. C-9. By letter of that same date, the ITD provided its reasons for issue of notice under Section 148 of the ITA 1961. Letter from the Income Tax Department to CUHL dated 21 January 2014; Exh. C-20. The Tribunal notes that the Claimants have stated that they only received this letter on 25 July 2014. C-SoC, Annex C, p. 5.

156. On 22 January 2014, invoking Section 131 of ITA 1961, the ITD summoned CUHL's "Principal Officer" or an authorised representative to appear in person before the Deputy Director of Income Tax in New Delhi eight business days after the date of the summons in order to provide information on the CIHL Acquisition (the "Section 131 Notice").[264]

157. Also on 22 January 2014, the Deputy Director of Income Tax issued an order pursuant to Section 281B of ITA 1961 (the "Section 281B Order") notifying CUHL that, during the survey of 15 January 2014, the ITD had found evidence that CUHL had failed to report a short term capital gain of INR 245,035,012,588 based on its 2006 sale of 251,224,744 shares of CIHL to CIL. The order provisionally froze CUHL's remaining 184,175,764 equity shares in CIL (the "Frozen Shares"), as well as any dividends payable by CIL to CUHL.[265] Specifically:

   a. The Deputy Director of Income Tax stated that, "[d]uring the course of survey proceedings, it was found" that CIL had purchased 251,224,744 shares in CIHL from CUHL, for a sum of INR 266,818,710,140.[266] As CUHL had acquired these shares for INR 21,783,697,552, it was "evident" that this amount exceeded the book value of the CIHL shares "by a sum of [INR] 254,225,134,287/ which is represented by Goodwill in the consolidated financial statements, clearly indicating that substantial gains or to be more precise 'short term capital gains' have accrued to the assessee company [CUHL]."[267] The Order noted that, according to CUHL's financial statements, "no tax has been paid on these gains in any tax jurisdiction including India and United Kingdom".[268]

   b. The Deputy Director of Income Tax then invoked Explanation 5 to Section 9(1)(i) of the ITA 1961 as basis for taxing this capital gain. The Deputy Director of Income Tax stated that, during the survey operations, the ITD had obtained the Rothschild valuation report prepared for the 2006 reorganisation and IPO, and that this report "ma[de] it amply clear that all the assets of [CIHL] and its subsidiaries [were] located in India alone."[269] The Deputy Director of Income Tax also cited statements by CIL's CEO and CFO, affirming that during 2006, the assets of CIHL's subsidiary companies "derived [their] value directly or indirectly, substantially from the assets i.e. oil and gas rights / reserves located in India."[270] As a result, the Deputy Director of Income Tax concluded that "it is evident that the shares of [CIHL] which were acquired by [CIL] from the assessee company [CUHL] derive [their] value solely from the assets located in India and therefore in accordance with the provisions of Explanation 5 to Section 9(1)(i) of the [ITA]

---

[264] Summons to Assessees/Witness under Section 131 of the ITA 1961 dated 22 January 2014, Exh. C-10.

[265] Order under S. 281B of the ITA 1961 dated 22 January 2014, Exh. C-11.

[266] *Id*., ¶ 3.

[267] *Id*., ¶¶ 6-7.

[268] *Id*., ¶¶ 7.

[269] *Id*., ¶¶ 11.3.

[270] *Id*., ¶ 11.4.

shall be deemed to have been situated in India and consequently any gains arising from [the] transfer of such shares is chargeable to tax under the [ITA 1961]."[271]

c.   The Deputy Director of Income Tax noted further that CUHL's shares in CIL were being frozen to prevent their sale in CIL's Buy-Back Programme:

> During the course of the survey proceedings, it was noticed that as on 31.12.2013, [CUHL] was holding 196,174,600 shares of [CIL]. During the course of survey action it was also noticed that on 14.01.2014, CIL has made a public announcement for Buy Back of its shares. The date of opening of the Buy Back of shares as per the public announcement is 23.01.2014. […] Possibility of [CUHL] selling off its shares in [CIL] in this buy back cannot be ruled out. [272]

158.   In view of the above, the Deputy Director of Income Tax concluded that "for the purpose of protecting the interests of the revenue and in terms of the provisions of section 281B of the Act, it is necessary to attach provisionally" CUHL's 196,174,000 shares in CIL, as well as any receivables from CIL. The Deputy Director of Income Tax thus made the following order:[273]

> (A) As per provisions of schedule II, para-26, the principal officer of Cairn India Limited is directed not to do/permit any transfer of these shares to anybody.

> (B) So far as the receivables by Cairn UK Holdings Ltd in the books of Cairn India Limited are concerned the Principal Officer of Cairn India Limited is directed not to remit/pay any amount to Cairn UK Holdings Ltd.

> (C) It is ordered that the assessee or its nominee or any other person on behalf of the assessee is prohibited and restrained from creating a charge on or part with the possession (by way of sale, mortgage, gift, exchange or any other mode of transfer, whatsoever) of the properties mentioned in [the] schedule below, without prior sanction of the undersigned. Any such charge or transfer, shall be void as against any claim in respect of any income tax of other sum payable by the assessee as a result of completion of the assessment proceedings[.]

159.   Both CEP and CUHL received additional notices from the ITD in March 2014. Specifically, on 29 March 2014, CEP received a notice pursuant to Section 148 of ITA 1961, informing it that certain income for the assessment year 2007-2008 had "escaped assessment" and requiring CEP to file a tax return for its income chargeable to tax for that year within 30 days.[274]

160.   On 31 March 2014, CUHL received a notice pursuant to Section 201 of ITA 1961, informing it that, during the survey of CIL's offices, the Investigation Wing had found

---

[271]   *Id.*, ¶ 12.

[272]   *Id.*, ¶¶ 13-14.

[273]   *Id.*, ¶ 16.

[274]   Notice under Section 148 of the ITA 1961 to Cairn Energy dated 29 March 2014, Exh. C-12.

evidence of dividends paid by CUHL to CEP between 2007 and 2012, which the ITD believed were chargeable to tax in India.[275] The ITD again indicated that the tax arose from Section 9(1)(i), as amended by the 2012 Amendment.[276] The ITD requested CUHL to show cause as to why it should not be deemed to be an assessee in default for failing to deduct tax at source.[277]

161. On 2 April 2014, CUHL responded to its Section 148 Notice, challenging the ITD's jurisdiction and submitting that the Section 148 Notice and the Section 281B Order were issued on the basis of Explanation 5 and that such retrospective application was "unconstitutional".[278] However, it complied with the notice and filed a tax return for the financial year 2007/2008, indicating a "nil" income.[279]

162. On 12 May 2014, CEP responded to its Section 148 Notice, challenging the ITD's jurisdiction, arguing that the application of the 2012 Amendment was unconstitutional[280] and providing tax returns on a without prejudice basis.[281]

163. In the weeks that followed, CUHL and CEP received notices from the ITD requesting them to provide information and/or appear at hearings in relation to the tax consequences of the CIHL Acquisition. The Parties exchanged significant correspondence in this respect, with the Claimants seeking several extensions to reply.[282]

164. On 18 July 2014, the ITD extended by six months the Section 281B Order, in respect of CUHL's 184,175,764 equity shares in CIL and any other receivables, including any dividends.[283]

165. By letter of 25 July 2014, the ITD wrote to CEP to provide the reasons for reopening the assessment proceedings under Section 148 of the ITA 1961.[284] The Claimants also

---

[275] Letter from the Deputy Director of Income Tax to CUHL dated 29 March 2014, Exh. C-13.

[276] *Id.*, ¶ 2.

[277] *Id.*, ¶ 4.

[278] Letter from CUHL to the Deputy Director of Income Tax dated 2 April 2014, Exh. C-14.

[279] CUHL Tax Return for Assessment Year 2007-2008 dated 3 April 2014, Exh. C-169; Puri WS1, ¶ 66.

[280] Letter from Cairn Energy to Deputy Director of Income Tax dated 12 May 2014, Exh. C-15.

[281] Cairn Energy Tax Return for Assessment Year 2007-2008 submitted 12 May 2014, Exh. C-172.

[282] Letter from Deputy Director of Income Tax to CUHL dated 7 May 2014, Exh. C-171; Letter from CUHL to the Deputy Director of Income Tax dated 15 May 2015, Exh. C-173; Letter from the Deputy Director of Income Tax to Cairn Energy dated 5 June 2014, Exh. C-16; Notice under Section 143(2) of the ITA 1961 to Cairn Energy dated 6 June 2014, Exh. C-17; Letter from the Deputy Director of Income Tax to CUHL dated 6 June 2014, Exh. C-174; Letter from Cairn Energy to the Deputy Director of Income Tax dated 10 June 2014, Exh. C-175; Letter from CUHL to the Deputy Director of Income Tax dated 10 June 2014, Exh. C-176.

[283] Letter from Deputy Director of Income Tax to CUHL dated 18 July 2014, Exh. C-18.

[284] Letter from the Income Tax Department to CUHL dated 21 January 2014; Exh. C-20; Letter from the Deputy Director of Income Tax to Cairn Energy dated 25 July 2014, Exh. C-19.

assert that it was only on that date that they received the ITD's letter to CUHL of 21 January 2014 providing the reasons for reopening assessment proceedings.[285]

166. During the months of September and October, CUHL and CEP received additional notices requesting representatives to appear for hearings to provide details of the CIHL Acquisition.[286] The Claimants requested several extensions to reply.[287]

167. On 16 October 2014, both CEP and CUHL responded to their respective Section 148 and 142(1) Notices.[288] CEP argued, *inter alia*, that dividends paid to CEP fell outside of India's jurisdiction, and that CEP stated that the facts sought by the ITD had been within the knowledge of the Indian authorities since 2006-2007. [289] In turn, CUHL argued, *inter alia*, that the facts sought by the ITD had been within the knowledge of the Indian authorities since 2006-2007. In particular, CUHL emphasised that the details of all relevant share transfers were reported in its FIPB Application dated 10 August 2006, in Form 3CEB filed by CIL with the ITD and in a Transfer Pricing Report filed by CIL. According to CUHL, the Transfer Pricing Order issued on 5 October 2010 confirmed that the relevant transactions were "at arm's length". CUHL also argued that the ITD's calculation of the alleged gain confused tax and financial accounting principles.[290]

168. Between November 2014 and February 2015, the ITD and the Claimants exchanged further correspondence on the disputed transactions.[291]

169. On 16 January 2015, the Section 281B Order was extended again, to 30 April 2015 in respect of CUHL's 184,175,764 equity shares in CIL and any other receivables, including any dividends.[292]

---

[285] *Ibid*.

[286] Letter from the Deputy Director of Income Tax to Cairn Energy dated 11 September 2014, Exh. C-177; Letter from the Deputy Director of Income Tax to CUHL dated 11 September 2014, Exh. C-23; Letter from the Deputy Director of Income Tax to CUHL dated 8 October 2014, Exh. C-180; Letter from the Deputy Director of Income Tax to Cairn Energy dated 8 October 2014, Exh. C-181.

[287] Letter from CUHL to the Deputy Director of Income Tax dated 23 September 2014, Exh. C-178; Letter from Cairn Energy to the Deputy Director of Income Tax dated 23 September 2014, Exh. C-179; Letter from CUHL to the Deputy Director of Income Tax dated 13 October 2014, Exh. C-182; Letter from Cairn Energy to the Deputy Director of Income Tax dated 13 October 2014, Exh. C-183.

[288] Letter from Cairn Energy to the Deputy Director of Income Tax dated 16 October 2014, Exh. C-25; Letter from CUHL to the Deputy Director of Income Tax dated 16 October 2014, Exh. C-26.

[289] Letter from Cairn Energy to the Deputy Director of Income Tax dated 16 October 2014, Exh. C-25.

[290] Letter from CUHL to the Deputy Director of Income Tax dated 16 October 2014, Exh. C-26.

[291] Letter from the Income Tax Authority to CUHL dated 19 November 2014, Exh. C-28; Letter from the Deputy Director of Income Tax to Cairn Energy dated 19 November 2014, Exh. C-27; Letter from Cairn Energy to the Deputy Director of Income Tax dated 15 December 2014, Exh. C-186; Letter from CUHL to the Deputy Director of Income Tax dated 15 December 2014, Exh. C-187; Letter from Cairn Energy to the Deputy Director of Income Tax dated 15 January 2015, Exh. C-188; Letter from CUHL to the Deputy Director of Income Tax dated 15 January 2015, Exh. C-189; Letter from Cairn Energy to the Deputy Director of Income Tax dated 10 February 2015, Exh. C-190; Letter from CUHL to the Deputy Director of Income Tax dated 10 February 2015, Exh. C-191.

[292] Letter from Deputy Commissioner of Income Tax to CUHL dated 16 January 2015, Exh. C-29.

170.    On 19 February 2015, the ITD rejected CUHL's objections to the Section 148 Notice dated 21 January 2014, emphasising that it relied on the 2012 Amendment as the source of its authority in the proceedings.[293]

171.    On 9 March 2015, the ITD issued a draft assessment order (the "DAO") against CUHL in respect of fiscal year 2006/2007 in the amount of INR 102,473,642,264.[294] The content of the DAO is discussed in Section VII.A.3.a below.

172.    On 11 March 2015, the Claimants served a Notice of Dispute to India, arguing that India had violated its obligations under the UK-India BIT.[295]

173.    On 16 March 2015, CEP received a Disposal of Objections Notice in respect of the issues raised in the Section 148 Notice, rejecting all objections raised by CEP and indicating that proceedings would continue.[296]

174.    On 30 March 2015, CEP filed a submission in respect of proceedings under Sections 147 and 148. It noted that Circular No. 4/2015 provided that dividend income was not taxable, and requested that the proceedings be dropped immediately.[297] On that same day, CEP received a notice under Section 148 stating that Circular No. 4/2015 clarified the application of the 2012 Amendment and that assessment proceedings in the case of CEP for Assessment Year 2007-2008 had been dropped.[298]

175.    On 6 April 2015, CUHL submitted its objections to the DAO before the relevant domestic mechanism, the Dispute Resolution Panel ("DRP"). CUHL filed its objections without prejudice to the present arbitration proceedings, noting that the Claimants had filed a Notice of Dispute on India on 11 March 2015. In its objections, CUHL raised many substantive objections to the DAO, including its reliance on the 2012 Amendment. CUHL also noted the failure of the DAO to appreciate the difference between tax and financial accounting in respect of the calculation of the alleged gain.[299]

176.    Also on 6 April 2015, the Section 281B Order dated 22 January 2014 was extended again in respect of CUHL's 184,175,764 equity shares in CIL and any other receivables, including any dividends, to 20 January 2016.[300]

---

[293]    Disposal of Objections in Respect of the Issue of Notice under Section 148 of the ITA 1961 to CUHL dated 19 February 2015, Exh. C-30.

[294]    DAO to CUHL, 9 March 2015, Exh. C-31.

[295]    Letter from Cairn Energy to the Republic of India, 11 March 2015, Exh. C-39.

[296]    Letter from the Income Tax Authority to Cairn Energy dated 16 March 2015, Exh. C-192.

[297]    Letter from Cairn Energy to the Income Tax Authority dated 30 March 2015, Exh. C-194.

[298]    Letter from the Income Tax Authority to Cairn Energy dated 30 March 2015, Exh. C-193.

[299]    Detailed Submission from CUHL to the Deputy Commissioner of Income Tax dated 6 April 2015, Exh. C-63.

[300]    Letter from Deputy Commissioner of Income Tax to CUHL dated 6 April 2015, Exh. C-32.

177.    On 7 August 2015, the DRP issued a Notice under Section 144C(11) setting a hearing before the DRP on 7 September 2015.[301]

178.    On 3 September 2015, CUHL requested that the DRP suspend the DRP proceedings pending the resolution of these arbitral proceedings in order that this Tribunal might make a full and final determination on the matters in dispute.[302]

179.    On 22 September 2015, the Claimants filed their Notice of Arbitration under the BIT.

180.    CUHL challenged the DAO through the DRP, the mechanism available for raising objections of this nature, on 29 September 2015 and 6 November 2015.[303] During the month of November, CUHL made further submissions and provided further evidence to the DRP.[304]

181.    On 3 December 2015, the Deputy Commissioner of Income Tax, New Delhi commented on CUHL's objections to the DAO.[305]

182.    On 31 December 2015, the DRP rejected all of CUHL's objections raised during the review of the assessment proceedings and confirmed the DAO (the "DRP Ruling").[306]

183.    On 14 January 2016, the Section 281B Order dated 22 January 2014 was extended again in respect of CUHL's 184,175,764 equity shares in CIL and any other receivables, including any dividends, to 31 March 2016.[307]

184.    On 20 January 2016, CUHL received a request for information regarding its 184,175,764 equity shares in CIL,[308] which it provided on 22 January 2016.[309]

**E.    The Final Assessment Order and enforcement measures**

185.    On 25 January 2016, the Respondent issued a FAO under Sections 148, 143(3), and 144C(13) of the ITA, confirming the DAO.[310] The content of the FAO is discussed at Section VII.A.3.a below.

---

[301]    Letter from the DRP to CUHL dated 7 August 2016, Exh. C-195.

[302]    Letter from CUHL to the DRP dated 3 September 2015 [without enclosure], Exh. C-65.

[303]    Detailed Submission from CUHL to the DRP dated 29 September 2015, Exh. C-66; Additional Submission from CUHL to the Deputy Commissioner of Income Tax Filing dated 6 November 2015, Exh. C-68.

[304]    Letter from CUHL to the DRP dated 6 November 2015, Exh. C-197; Letter from CUHL to the DRP dated 16 November 2016, Exh. C-198.

[305]    Letter from the Office of the Deputy Commissioner of Income Tax dated 3 December 2015, Exh. C-199.

[306]    Directions of the DRP under Section 144C(5) of the ITA 1961 dated 31 December 2015, Exh. C-69.

[307]    Letter from Deputy Commissioner of Income Tax to CUHL dated 14 January 2016, Exh. C-200.

[308]    Letter from the Deputy Commissioner of Income Tax to CUHL dated 20 January 2016, Exh. C-201.

[309]    Letter from CUHL to the Deputy Commissioner of Income Tax dated 22 January 2016, Exh. C-202.

[310]    FAO, Exh. C-70.

186.  Along with the FAO, the ITD also issued a notice of demand under Section 156 of the ITA 1961 (the "Notice of Demand"), which was received by CUHL on 4 February 2016. It provided 30 days from the date of service (5 March 2016) for CUHL to pay INR 291,025,144,030, or approximately US$ 4.4 billion at that time.[311] This included interest under Sections 234A and 234B of the ITA 1961 that had allegedly accrued at a rate of two per cent per month on the US$ 1.6 billion principal.[312]

187.  The Parties dispute the extent to which the Claimants cooperated with the authorities in the lead up to the DAO and the FAO. The Claimants maintain they were fully cooperative and supplied all requested information.[313] The Respondent maintains that the Claimants were not cooperative, took a long time to respond, and did not submit the appropriate requested information.[314]

188.  On 4 February 2016, CUHL received a Section 274 Notice (the "Section 274 Notice") requiring it to "show cause as to why an order imposing a penalty" for allegedly concealing the particulars of income or furnishing inaccurate particulars of income in the assessment year 2007-2008 "should not be made under Section 271(1)(c) of the ITA 1961."[315] Statutorily available penalties under this provision, which the Respondent has the authority to invoke, would, according to the Claimants, increase the overall tax claim by billions of dollars.[316]

189.  On 14 February 2016, Cairn reiterated its request that the Respondent refrain from taking any prejudicial enforcement actions against Cairn and the remaining portion of its investment during the pendency of these arbitration proceedings. On 15 February 2016, CUHL made an application directly to the Assessing Officer, requesting a stay of recovery proceedings and requesting that the Assessing Officer hold the demand in abeyance pending the outcome of this arbitration.[317]

190.  On 23 February 2016, representatives of CUHL and the Assessing Officer met to discuss the penalty proceedings. At this time CUHL submitted a further application for such proceedings to be stayed or dropped entirely. According to the Claimants, the Assessing Officer explained that the ITD would consider staying the penalty proceedings if CUHL filed an appeal before the Income Tax Appellate Tribunal (the "ITAT"), which CUHL did, "expressly without prejudice to these arbitration proceedings and Cairn's rights, claims, and remedies therein."[318]

---

[311]  Notice of Demand under Section 156 dated 25 January 2016, Exh. C-71.

[312]  *Ibid*.

[313]  C-SoC, ¶ 249; Brown WS1, Sections III-VIII.

[314]  R-SoD, ¶ 53(a); ITAT Order of 9 March 2017, *Cairn UK Holdings Ltd v. D.C.I.T.*, ITA No. 1669/Del/2016, Exh. C-228, p. 18.

[315]  Notice under Section 274 read with Section 271(1)(c) to CUHL dated 25 January 2016, Exh. C-72.

[316]  C-SoC, ¶ 283.

[317]  Letter from CUHL to the Deputy Commissioner of Income Tax dated 15 February 2016, Exh. C-73.

[318]  C-SoC, ¶ 285; Letter from CUHL to the ITAT dated 4 April 2016 [without annexures], Exh. C-77 [without enclosures].

191.   On 3 March 2016, Mr Sanjay Puri, Commissioner of Income Tax and a witness for the Respondent in this arbitration, sent a letter to the Joint Commissioner of Income Tax, copying CUHL, referring to the Finance Minister's budget speech of 29 February 2016 in which an offer was made of a "one time scheme of Dispute Resolution" for past cases which were "ongoing under the retrospective amendment". The offer indicated that interest and penalty fees incurred would be dropped subject to the assessee's withdrawing from any pending case before "any court or tribunal". The letter stipulated that the Claimant, being a party to the present arbitration, should have "some time to consider the offer" and stated that a deadline of 30 June 2016 was accordingly set before the tax demand of 25 January 2016 could be pursued.[319]

192.   On 8 March 2016, Cairn representatives met with the ITD. The Claimants assert that, during this meeting, the ITD officials indicated that, after 30 June 2016, the Department would immediately start liquidating CUHL's shares in CIL unless CUHL agreed to pay the entire principal of the disputed tax demand and withdraw its claims in the arbitration.[320] The Respondent has not disputed this.

193.   On 30 March 2016, CUHL lodged an appeal against the FAO with the ITAT, without prejudice to the arbitral proceedings.[321] On 4 April 2016, CUHL formally notified the ITAT by letter regarding its appeal.[322]

194.   On 5 April 2016, CUHL received a notice from the ITD, dated 31 March 2016, reiterating the Department's intent to pursue its tax demand after 30 June 2016 and stating that CUHL remained prohibited from transferring CUHL's shares in CIL or receiving any dividend in respect thereof.[323]

195.   As discussed in Section III below, on 13 April 2016 the Claimants filed a request for interim measures ("RIM"), noting that they would withdraw this request if the Respondent undertook not to pursue any further enforcement measures against the Claimants' shares in CIL.[324] After several exchanges between the Parties and a proposal from the President, on 11 May 2016 the Respondent undertook that it would "take no steps to purport to transfer, sell, encumber or in any other way dispose of the shares during the pendency of these arbitral proceedings, without giving [CUHL] three months' written notice of its intention to do so."[325]

196.   On 12 October 2016, CUHL wrote to the Assistant Commissioner of Income Tax Circle 1(2)(1), International Taxation, New Delhi (the "ACIT") seeking confirmation that CIL

---

[319]   Letter from the Commissioner of the Income Tax to the Joint Commissioner of Income Tax dated 3 March 2016, Exh. C-75.

[320]   C-SoC, ¶ 290; First Witness Statement of Mr James Smith ("Smith WS1"), ¶ 9.

[321]   ITAT Appeal Acknowledgment Receipt, 30 March 2016, Exh. C-204; CUHL Submission to the ITAT dated 29 March 2016, Exh. C-203 (filed on 30 March 2016).

[322]   Letter from CUHL to the ITAT dated 4 April 2016, Exh. C-77.

[323]   Letter from the Deputy Commissioner of Income Tax to CUHL dated 31 March 2016, Exh. C-76.

[324]   Claimants' letter of 13 April 2016 (CCom-8).

[325]   The Respondent's letter of 11 May 2016 (RCom-10).

would be able to release any outstanding dividends owed to CUHL.[326] By letter of 30 December 2016, the ACIT indicated that the provisional attachment on the CIL dividends had expired on 31 March 2016, and that no attachment remained in force; as a result of which "[t]he decision to release the dividend to CUHL is an internal matter between two companies and the same may be dealt accordingly."[327] As discussed in Section III below, the Respondent maintained this position throughout the arbitration and refused to offer written confirmation to CIL that the dividends could be released to CUHL. The Claimants' sought, unsuccessfully, to have CIL (which had by then been merged with Vedanta Limited ("CIL/VIL" or "VIL"))[328] release the dividends to CUHL. The Claimants sought relief from the Tribunal in this regard, and on 9 June 2017 the Tribunal issued Procedural Order No. 7 ("PO7") addressing the Parties' requests for relief on this matter. The Tribunal understands that the Claimants were ultimately unable to obtain the release of the dividends, which were garnished by the Respondent and used to pay part of the tax demand.[329]

197.   On 9 March 2017, the ITAT issued its order (the "ITAT Order"). While it upheld the tax demand under Section 9(1)(i) as interpreted by Explanation 5, it also overturned the imposition of interest under Sections 234A and 234B of the ITA. The ITAT indicated that the Claimants "could not have visualize[d] its liability for payment of advance in the year of transaction therefore, there cannot be any interest payable by the assessee u/s 234A and 234B of the Act [...]. [W]e are of the opinion that assessee cannot be burdened with interest u/s 234A and 234B of the Act on tax liability arising out of retrospective amendment [with effect from] 01.04.1962 in the provision of section 9(1) of the Income Tax Act".[330]

198.   On 14 March 2017, the Office of the ACIT issued a letter to CUHL demanding payment of the tax due, as confirmed by the ITAT, by 15 June 2017, failing which recovery proceedings would be initiated under the ITA.[331] As discussed in Section III below (Procedural History), this letter caused the Claimants to renew their RIM.

199.   On 31 March 2017, the ITD sent to CUHL a new notice demanding payment within 30 days of service and warning that, if payment was not received, proceedings for the recovery of the tax demand would ensue.[332]

---

[326]   Letter from CUHL to the Assistant Commissioner of Income Tax of 12 October 2016) (Annex B to CCom-61).

[327]   Letter from the Office of the Assistant Commissioner of Income Tax, Circle 1(2)(1), International Taxation, New Delhi, of 30 December 2016, to the Commissioner of Income Tax, International Taxation-1, New Delhi, attached to RCom-60.

[328]   The Tribunal understands that the merger became effective on 11 April 2017, as per the Claimants' letter of 19 April 2017 (uninvited) (CCom-96), n. 1. Accordingly, after this date the Tribunal referred to this entity as "CIL/VIL", or simply "VIL", as appropriate.

[329]   See e.g. the Respondent's letter of 18 September 2018 (RCom-276); the Respondent's letter of 27 November 2018 (RCom-317); the Respondent's letter of 18 January 2019 (RCom-355).

[330]   ITAT Order of 9 March 2017, *Cairn UK Holdings Ltd v. D.C.I.T.*, ITA No. 1669/Del/2016, Exh. C-228, ¶ 41.

[331]   Notice of Demand (Annex B of CCom-82).

[332]   Notice of Demand of 31 March 2017, attached to CCom-92 of 12 April 2017.

200. On 26 April 2017, the Tax Recovery Officer issued a warrant attaching CUHL's movable property.[333] On 18 August 2017, the Tax Recovery Officer issued an order prohibiting and restraining CUHL from making any transfer of the shares in CIL/VIL and/or from receiving any dividends on those shares.[334]

201. On 15 June 2017, the Tribunal denied the Claimants' renewed RIM (the "Renewed RIM") and related applications.[335]

202. On 16 June 2017, the ITD issued a Tax Recovery Certificate and a Notice of Demand in accordance with Rule 2 of the Schedule II to the ITA, requiring payment to be made within 15 days, failing which recover proceedings would be commenced. The Tribunal understands that CUHL did not pay, and recovery proceedings were thus commenced.

203. On 16 June 2017, the ITD issued a notice to CIL/VIL under Section 226(3) of the ITA, requiring CIL/VIL to pay to the ITD any amount due from CIL/VIL to CUHL or held by CIL/VIL for or on account of CUHL up to the outstanding tax liability of CIHL, including all future liabilities. According to the Respondent, "[CIL/VIL] was notified that if it discharged any liability to CUHL after receipt of this notice, it would become personally liable to the ITD to the extent of the liability so discharged. [CIL/VIL] has thereafter paid the outstanding dividend amounts to the ITD".[336] The Claimants have not disputed this.

204. On 29 September 2017, the Respondent issued a lump sum Penalty Order against CUHL for approximately US\$ 1.6 billion (the "Penalty Order").

205. In the months that followed, the Respondent engaged in the forced sale of 27,019,548 of CUHL's shares in CIL/VIL.[337] By 27 November 2018, the Respondent had sold a total of 181,764,297 shares, i.e., 98.72% of CUHL's shareholding in CIL/VIL, as well as 736,503,056 of CUHL's redeemable preference shares in CIL/VIL.[338]

## III.  PROCEDURAL HISTORY

206. The present proceedings were complex, with numerous issues arising simultaneously and applications briefed and decided in parallel. By the end of the arbitration, the Claimants had submitted 314 communications to the Tribunal (including procedural letters and applications, identified as "CCom-XX"), while the Respondent had submitted 405 communications to the Tribunal (including procedural letters and

---

[333]  Warrant of Attachment of Movable Property dated 26 July 2017, Exh. C-383.

[334]  Vedanta was also prohibited and restrained from permitting any such transfer of shares or making such payment of dividends, Prohibitory Order where Property Consists of Shares in a Corporation dated 18 August 2017; Exh. C-384; R-Rejoinder, ¶ 919 et al.

[335]  See Section III.C below.

[336]  R-Rejoinder, ¶ 919 et al; Notice of Demand under Section 226(3) of ITA 1961 dated 16 June 2017, Exh. C-326.

[337]  The Claimants' latter of 11 July 2018 (CCom-183); the Claimants' letter of 7 September 2018 (CCom-220); the Respondent's letter of 9 September 2018 (RCom-274).

[338]  The Respondent's letter of 27 November 2018 (RCom-317); Letter from the Tax Recovery Officer to VIL dated 12 October 2018, Exh. C-658.

applications, identified as "RCom-XX"). In response to these applications and correspondence, the Tribunal issued 19 Procedural Orders and 345 communications to the Parties (some giving directions, and others ruling on discrete issues, all identified as "AT-XX").

207. In the pages that follow, the Tribunal has attempted to present a faithful portrayal of the various procedural incidents and applications that were raised during these proceedings. The Tribunal sets out the main procedural steps in chronological order; however, given the proliferation of parallel applications, it has made certain parentheses in the chronology to address specific applications.

## A.      Commencement of the proceedings

### 1.      Constitution of the Tribunal

208. On 22 December 2015, the Claimants filed a Notice of Arbitration pursuant to Article 9(3)(c) of the UK-India BIT and Article 3(1) of the United Nations Commission on International Trade Law Arbitration Rules 1976 (the "UNCITRAL Rules").

209. In accordance with Article 9 of the UK-India BIT, on 2 April 2015 the Claimants informed the Respondent that they had appointed Mr Stanimir Alexandrov, a national of Bulgaria, as arbitrator. Mr Alexandrov accepted his appointment on 1 April 2015.

210. As the Respondent did not appoint an arbitrator within the time limit set out in Article 9 of the UK-India BIT, on 12 August 2015 and in accordance with Article 9(3)(c)(ii) of the UK India-BIT, the Claimants requested the President of the International Court of Justice, H.E. Judge Ronny Abraham, to act as appointing authority. Ultimately, on 9 November 2015, the Respondent informed the Claimants that it had appointed Mr J. Christopher Thomas, QC, a national of Canada, as arbitrator. Mr Thomas accepted his appointment on 20 November 2015.

211. On 13 January 2016, in accordance with Article 9 of the UK-India BIT, the co-arbitrators notified the Parties that they had appointed Mr Laurent Lévy, a national of Switzerland and Brazil, as Presiding Arbitrator in this matter (the "President of the Tribunal" or the "President"). Mr Lévy confirmed that he accepted his appointment that same day.

212. On 16 February 2016, the President of the Tribunal confirmed that the Tribunal had been duly constituted and invited the Parties' views on certain organisational and procedural matters including: (i) determining the seat of the arbitration, and (ii) the date for the first procedural hearing. The Claimants and the Respondent submitted their comments on 4 and 16 March 2016, respectively.

### 2.      First procedural hearing; procedural calendar; seat of the arbitration; the Claimants' request for interim measures

213. Between 11 and 18 April 2016, the Parties and the Tribunal exchanged correspondence with respect to the organisation of the proceedings.

214.  In particular, on 12 April 2016 (AT-5), the Tribunal circulated the following documents: (i) the draft Terms of Appointment of the Tribunal ("ToA"), (ii) draft Procedural Order No. 1 ("PO1") setting out the Tribunal's proposed procedural rules for the arbitration, and (iii) the CV of the proposed Secretary of the Tribunal, Ms Sabina Sacco, a lawyer of Chilean, Italian, and Salvadoran nationality, from the President's firm. The Tribunal requested the Parties to submit their respective comments on the drafts at or before noon CET Friday 15 April 2016, which the Parties subsequently did.[339] The Tribunal also invited the Parties to formulate by the same time limit their comments and suggestions about the agenda for the case management hearing scheduled for 18 April 2016.

215.  During this period, on 11 April 2016 (RCom-4), the Respondent announced its intention to make an application for a stay of the proceedings. By letter of 15 April 2016 (CCom-10), the Claimants objected to any such application.

216.  By letter of 13 April 2016 (CCom-8), the Claimants filed a request for interim measures of protection (RIM), in which they invited the Respondent to undertake not to pursue any further enforcement measures against the Claimants' equity shares (the "Shares") in CIL during the pendency of the arbitration. The Claimants stated that, upon such an undertaking by the Respondent, they would withdraw their RIM.[340] The Claimants further represented that "Cairn will not seek the release of [CUHL's shares in CIL] in this arbitration so long as India agrees to retain them without selling them pending a decision by this Tribunal as to their rightful disposition."[341] In the absence of such an undertaking, the Claimants made a series of requests for relief from the Tribunal.[342]

217.  By email of 14 April 2016 (AT-6), the Tribunal invited the Respondent to comment, and noted that in any event the RIM would be addressed during the procedural hearing scheduled for 18 April 2016, where it would give both sides an opportunity to make short submissions on that matter.

218.  The first procedural hearing was held on 18 April 2016 in Paris. The following participants attended the hearing:

**Tribunal**
Mr Laurent Lévy (Presiding Arbitrator)
Mr Stanimir Alexandrov (via teleconference) (Co-arbitrator)
Mr J. Christopher Thomas QC (via teleconference) (Co-arbitrator)
Ms Sabina Sacco (Secretary of the Tribunal)

**Claimants**
Mr Mark McNeill (Shearman & Sterling LLP)
Ms Natalia Mikolajczyk (Shearman & Sterling LLP)
Mr Wesley H. Pang (Shearman & Sterling LLP)

---

[339]  Claimants' letter of 15 April 2016 (CCom-10); Respondent's email of 15 April 2016 (RCom-5); Respondent's letter of 13 June 2016 (RCom-20); Claimants' email of 22 June 2016 (CCom-27).

[340]  Claimants' Request for Interim Measures ("C-RIM") attached to Claimants' letter of 13 April 2016 (CCom-8), ¶ 76.

[341]  *Id.*, ¶ 2.

[342]  See the C-RIM, ¶ 77.

Mr Robert L. Nelson Jr. (Shearman & Sterling LLP) (via teleconference)
Mr James Smith (CFO, Cairn Energy PLC)
Mr Duncan Holland (Group Legal Manager, Cairn Energy PLC)
Ms Kathryn Anderson (Cairn Energy PLC)

**Respondent**
Mr Salim Moollan QC (Essex Court Chambers)
Professor Chester Brown (Essex Court Chambers)
Mr Shreyas Jayasimha (Aarna Law)
Mr Mysore R. Prasanna (Aarna Law)
Mr Sanjay Puri (Commissioner of Income Tax, International Taxation, Department of Income Tax)

219.   During the first procedural hearing, the Parties discussed, *inter alia*, the following matters:

a.   The Respondent's application on the applicable transparency regime for the present arbitration;

b.   The Respondent's intention to file an application for a stay and the relevant briefing schedule. At this juncture, the Respondent also indicated that it intended to wait until the Claimants filed their Statement of Claim before formulating its objections to jurisdiction and admissibility, and proposed that whether those objections should be heard in a preliminary bifurcated phase should be determined thereafter; and

c.   The Claimants' RIM. In particular, the President proposed language for a possible undertaking by the Respondent.[343]

220.   On 21 April 2016 (AT-7), the Tribunal wrote to the Parties to follow up on various matters discussed during the first procedural hearing. With respect to the question of bifurcation, the Tribunal recorded the agreement reached at the procedural hearing as follows:

> If, once the Respondent has received the Claimants' Statement of Claim, the Respondent wishes to raise objections to jurisdiction and/or admissibility, it may file a request for bifurcation and should do so as soon as reasonably possible, failing which the Respondent will submit its Statement of Defense in full. If the Respondent does request a bifurcation, the Tribunal would then allow the Claimants to comment and will ultimately make a decision.[344]

221.   With respect to the date of filing for the Respondent's Statement of Defence, the Tribunal advised that it would set a time limit for the Respondent's full Statement of Defence unless the Parties reached an agreement. The Tribunal noted that the Respondent requested such deadline be set for November or December 2016, while the Claimants requested that it be set no later than October 2016.

---

[343]   Transcript, First Procedural Hearing, 56:6-16 (President Lévy).

[344]   Tribunal's email of 21 April 2016 (AT-7).

222.  By letter of 6 May 2016 (AT-8), the Tribunal informed the Parties that, in view of the Parties' failure to reach an agreement, it had chosen The Hague, the Netherlands, as the seat of the arbitration.

223.  Following a proposal by the President at the first procedural hearing[345] and exchanges between the Parties, on 11 May 2016 (RCom-10) the Respondent represented that "[t]he Income Tax Department of the Department of Revenue of the Government of India hereby confirms the following:

> Having taken due note of the Claimants' representation in their Request for Interim Measures dated 13 April 2016 not to attempt or purport to transfer, sell, encumber, or in any way dispose of the shares during the pendency of these arbitral proceedings, the Income Tax Department of India (which is solely responsible for pursuit and enforcement of the assessment) confirms and represents that with respect to the tax demand at issue in the present arbitral proceedings (i.e. the tax demand against Cairn UK Holdings Ltd for Assessment Year 2007-08), it will take no steps to purport to transfer, sell, encumber or in any other way dispose of the shares during the pendency of these arbitral proceedings, without giving Cairn UK Holdings Ltd three months' written notice of its intention to do so.[346]

224.  The Respondent stated that this confirmation was made in the understanding that the Claimants' representation made in their RIM[347] held good and requested confirmation of that from the Claimants. It also stated that, in light of this confirmation, there could be no further basis for the RIM, and requested the Claimants to confirm its withdrawal.

225.  In light of the Respondent's undertaking, on 16 May 2016 (CCom-14), the Claimants suspended their RIM, but reserved the right to renew it or seek other measures of protection should such need arise. The Claimants further confirmed that CUHL's shares in CIL would not be disposed of or transferred during these arbitration proceedings without India's prior consent.[348]

226.  On 27 May 2016 (CCom-20), the Claimants requested the Tribunal to order the Respondent to produce two categories of documents, which are addressed in Section III.E below.

**B.     The Respondent's applications for a stay and bifurcation of the proceedings; timetable for the written phase**

227.  On 6 June 2016 (RCom-18), the Respondent filed an application for a stay of the present proceedings (the Respondent's "Stay Application"). Essentially, the Respondent argued that this arbitration should be stayed pending the determination of another arbitration initiated by Vedanta against the Respondent (the "*Vedanta* arbitration"), and pending the determination of any cross-litigation between Cairn and Vedanta and/or its

---

[345]   Transcript, First Procedural Hearing, 56:6-16 (President Lévy).

[346]   The Respondent's letter of 11 May 2016 (RCom-10).

[347]   RCom-10, referring to C-RIM, ¶ 2.

[348]   Claimants' letter of 16 May 2016 (CCom-14).

subsidiary CIL.[349] According to the Respondent, this arbitration and the *Vedanta* arbitration constitute "parallel arbitration proceedings" that "are based on identical issues of fact and law",[350] and the links between the two cases create a risk of irreparable harm to India which requires adequate coordination, preferably in the form of a stay of these proceedings in favour of the *Vedanta* arbitration. The procedural history related to the Stay Application is summarised in Procedural Order No. 3 ("PO3"); despite this, the Tribunal has summarised the most important procedural steps in the paragraphs that follow.

228.   On 22 June 2016, following an invitation from the Tribunal to provide comments on the draft versions of the ToA and draft PO1, the Claimants requested that the Tribunal fix a date for the Respondent to file its full Statement of Defence.[351]

229.   On 28 June 2016 (RCom-24), the Respondent requested that the Tribunal maintain its decision not to set a date for the filing of a full Statement of Defence until such time as the Tribunal had made a determination on the Respondent's Stay Application and potential application for bifurcation of the proceedings. The Respondent reiterated arguments made at the procedural hearing, namely that the setting of a date for the filing of a full Statement of Defence would "potentially undermine and pre-empt the Respondent's Stay Application; and would also remove any possible efficiencies that might be gained by bifurcated proceedings following the application for bifurcation which the Respondent has indicated it proposes to make".[352]

230.   Also on 28 June 2016, the Claimants filed their Statement of Claim.

231.   By letter of 1 July 2016 (AT-20), the Tribunal determined that the proceedings would not be suspended pending its decision on the Stay Application. Should that application be rejected, the Tribunal fixed the time limit for the filing of the Respondent's Statement of Defence for 11 November 2016, noting that the Parties should then consult with a view on agreeing on the remainder of the procedural calendar. The Tribunal also indicated that if the Respondent wished to raise objections to jurisdiction and/or admissibility in a bifurcated proceeding, it should make an application for bifurcation as soon as reasonably possible, failing which it would have to submit its Statement of Defence in full.

232.   Also on 8 July 2016, the Tribunal circulated the ToA for signature. Both Parties and the Tribunal executed the ToA by 19 August 2016. In the ToA, the Parties agreed to the appointment of Ms Sabina Sacco as Secretary to the Tribunal.

---

[349]   The Tribunal notes at this juncture that CIL was formerly controlled by CUHL, who sold the majority of its shares in CIL to Vedanta in [2011]. At the time of this Award, CIL now bears the name of Vedanta Limited ("VIL").

[350]   Respondent's Application for a Stay of the Proceedings, ¶ 2.

[351]   CCom-27. The procedural calendar circulated with Procedural Order No.1 of 12 August 2016 set a filing date for the Statement of Defence of 11 November 2016.

[352]   RCom-24, ¶ 3.

233. Also on 8 July 2016 (RCom-27), the Respondent indicated that it would await the Tribunal's decision on its Stay Application before filing any application for bifurcation. The Claimants objected to this (CCom-35), and requested the Tribunal to "reject the Respondent's proposal to delay notification of any preliminary objections and any bifurcation request until after the Tribunal issues a decision on its stay application, and […] encourage the Respondent to comply with its commitment made at the [procedural] hearing to raise those issues straightaway."[353]

234. Separately, in its correspondence of 8 July 2016 (RCom-27), the Respondent requested a hearing on its Stay Application. Following an invitation from the Tribunal to comment, on 18 July 2016 (CCom-35), the Claimants provided their comments, *inter alia*, indicating that they saw "no need for an in-person hearing"[354] and were "concerned about the delay that it may cause to these proceedings, in particular to the filing of the Respondent's Statement of Defence".[355]

235. On 19 July 2016, the Tribunal invited the Respondent to comment on the matters raised in the Claimants' letter, and in particular to substantiate its request for a hearing on the Stay Application.[356] The Respondent provided such comments on 25 July 2016 (RCom-32), responding: (i) that it had only promised to inform the Tribunal and the Claimants "straightaway"[357] if it did not wish to raise objections to jurisdiction and admissibility, or whether bifurcation appeared inappropriate, (ii) in view of the formulation of Article 21(3) of the UNCITRAL Rules, it had no obligation to file any jurisdictional objections or file an application for bifurcation prior to the submission of its Statement of Defence, and (iii) given the Respondent's view that the proceedings should be stayed, it argued that it was "perfectly legitimate"[358] for it to await the Tribunal's decision on its Stay Application before filing its foreshadowed application for bifurcation.[359]

236. On 29 July 2016 (CCom-36), the Claimants objected to the Respondent's request for a hearing on the Stay Application; this objection notwithstanding, they proposed that if the Tribunal decided that a hearing should be held, the Parties should use "any such hearing to address questions of bifurcation, even if India insists on briefing its objections later."[360] The Claimants clarified that "[t]he Respondent would only need to be willing to identify those objections it believes warrant bifurcated treatment."[361] The Claimants added that this "would allow the Tribunal and the Parties to address in a single hearing two threshold procedural questions, the resolution of which will dispose of the stay

---

[353] Claimants' letter of 18 July 2016 (CCom-35).

[354] *Ibid*.

[355] *Ibid*

[356] Arbitral Tribunal's unnumbered email to the Parties of 19 July 2016.

[357] RCom-32, ¶ 2

[358] *Id*., ¶ 5.

[359] *Id.*

[360] CCom-36, p. 2.

[361] *Ibid.*

application and set a path towards resolving the Respondent's jurisdictional objections."[362]

237.    On 4 August 2016 (AT-25), the Tribunal issued directions to the Parties regarding the next procedural steps in relation to the Stay Application and the Respondent's potential application for bifurcation.[363] In its letter, the Tribunal granted the Respondent's request for a hearing on its Stay Application, which was scheduled for 7 October 2016.

238.    Regarding the timing for an application on bifurcation, the Tribunal noted that, pursuant to Article 21(3) of the UNCITRAL Rules, "[a] plea that the arbitral tribunal does not have jurisdiction shall be raised not later than in the statement of defence or, with respect to a counter-claim, in the reply to the counter-claim."[364] That being said, the Tribunal observed that Article 15(1) of the UNCITRAL Rules granted the Tribunal wide discretion to conduct the proceedings as it considered appropriate. In this context, the Tribunal determined that the Parties' submissions did not in fact call for a revision of its previous directions on this matter. Thus the Tribunal reiterated its direction as contained in its email of 21 April 2016 and letter of 1 July 2016, that "if the Respondent wishes to raise objections to jurisdiction and/or admissibility to the Claimants' claim, it may file a request for bifurcation and should do so as soon as reasonably possible, failing which the Respondent shall submit its Statement of Defence in full."[365] The Tribunal added that "when ruling on a request for bifurcation, it [would] take into consideration whether it was timely made."[366]

239.    On 8 August 2016 (RCom-36), the Respondent rejected the Claimants' proposal that it should identify its preliminary objections prior to the hearing on the Stay Application or include a discussion on bifurcation during that hearing, arguing that either "(i) the Respondent would have filed an application for bifurcation before the date of the hearing, in which case, procedural directions can be issued by the Tribunal in writing in the usual way; or (ii) the Respondent would not have filed an application for bifurcation before that date, in which case it would not be appropriate for the Tribunal to require the Respondent to identify objections to jurisdiction in advance of its Statement of Defence given the terms of Article 21 of the UNCITRAL Rules".[367]

240.    On 12 August 2016, the Tribunal circulated the signed ToA and issued PO1, which set out the procedural rules to be applied in this arbitration and a partial procedural calendar.

241.    Also on 12 August 2016, the Tribunal issued Procedural Order No. 2 ("PO2") ruling on transparency and confidentiality. As discussed in Section III.E below, this did not put an end to the Parties' exchanges on these matters, which evolved into a discussion on

---

[362]    *Ibid.*

[363]    As addressed in Respondent's unnumbered email to the Tribunal of 8 July 2016 and unnumbered letter of 25 July 2016, and in the Claimants' unnumbered letters of 18 and 29 July 2016.

[364]    AT-25, p. 2 citing UNCITRAL Rules, Article 21(3).

[365]    *Id.*, p. 3.

[366]    *Ibid.*

[367]    RCom-36, ¶ 3.

document sharing between the *Cairn* and *Vedanta* arbitrations. The procedural history related to the Parties' applications on transparency, confidentiality, and document sharing is summarised in Section III.D below.

242. On 28 August 2016 (AT-28), the Tribunal invited the Parties to confirm: (i) certain logistical arrangements pertaining to the hearing on the Respondent's Stay Application, and (ii) whether the Parties wished to add any items to the agenda. The Tribunal also noted that the Claimants had suggested that the hearing also be used to discuss the issue of bifurcation,[368] and the Respondent's objection to the same (RCom-36). In this regard, the Tribunal informed that given the content of Article 21(3) of the UNCITRAL Rules, it must accept the Respondent's objection on this issue of bifurcation. The Parties submitted their comments on 31 August 2016 (CCom-41; the Respondent's unnumbered email).

243. By email of 2 September 2016 (AT-30), the Tribunal confirmed the agenda for the hearing on the Stay Application, which included two items requested by the Claimants[369] pertaining to (i) a discussion of the procedural calendar, including blocking dates for an evidentiary hearing, and (ii) addressing any outstanding issues regarding the Respondent's response to the Claimants' Document Request No. 2 (discussed in Section III.E.1.a below).

244. On 16 September 2016 (RCom-38), the Respondent *inter alia* (i) objected to the inclusion of these items, (ii) indicated that, should the Tribunal decline the Respondent's Stay Application, it intended to apply for a bifurcation of the proceedings, and (iii) should the Tribunal require the presentation of a full memorial on admissibility, jurisdiction, and merits, it was unlikely to meet the time limit currently fixed by the Tribunal.

245. At the Tribunal's invitation of 2 September 2016 (AT-30), the Claimants provided their comments on 21 September 2016 (CCom-44). The Claimants, *inter alia*, expressed no objection to the Tribunal's agenda for the hearing, but argued that "had the Respondent been more forthcoming about its plans in respect of bifurcation, as it was invited to do, a parallel briefing and combined hearing could have been organised to address both applications"[370] and, as a result, "any request by the Respondent for a separate hearing on bifurcation should receive little sympathy, and in no circumstance should it provide an excuse for the late filing of the Statement of Defence."[371] By email of 23 September 2016, the Tribunal invited the Respondent to comment, which the Respondent did on 26 September 2016 (RCom-40).

246. By letter of 28 September 2016 (AT-34), after hearing the Parties, the Tribunal eliminated from the agenda for the hearing a broad discussion of the procedural calendar, but confirmed that it would include a discussion of the dates for an evidentiary

---

[368]  Claimants' unnumbered letter of 4 August 2016.

[369]  Claimants' email of 31 August 2016 (CCom-41).

[370]  CCom-44, p. 4.

[371]  *Ibid.*

hearing, noting that this item could not be delayed any longer. The Tribunal also reiterated its directions of 21 April, 1 July, and 4 August 2016.

247.    On 6 October 2016, on the eve of the hearing scheduled for the Respondent's Stay Application, the Respondent filed its application for bifurcation (the "Application for Bifurcation"). The Respondent also proposed a briefing schedule for that application consisting of two rounds and requested a hearing on that application. The procedural history related to the Application for Bifurcation is summarised in Procedural Order No. 4 ("PO4"); despite this, the Tribunal has summarised the most important steps in the paragraphs that follow.

248.    Also on 6 October 2016 (RCom-45), the Respondent requested an extension to file its Statement of Defence.

249.    On 7 October 2016, the Parties and the Tribunal held a hearing to address the Respondent's Stay Application, as well as certain procedural matters, including the determination of dates for the evidentiary hearing. The hearing took place in Geneva, with the Parties and the President participating in person, and the co-arbitrators participating via telephone conference. The following persons attended the hearing:

**Tribunal**
Mr Laurent Lévy (Presiding Arbitrator)
Mr Stanimir Alexandrov (Co-arbitrator) (via teleconference)
Mr J. Christopher Thomas QC (Co-arbitrator) (via teleconference)
Ms Sabina Sacco (Secretary of the Tribunal)

**Claimants**
Mr Mark McNeill (Shearman & Sterling LLP)
Mr Wesley H. Pang (Shearman & Sterling LLP)
Mr Robert L. Nelson Jr. (Shearman & Sterling LLP)
Ms Niti Dixit (S&R Associates)
Mr Uday Walia (S&R Associates)
Mr James Smith (CFO, Cairn Energy PLC)
Mr Duncan Holland (Group Legal Manager, Cairn Energy PLC)
Ms Kathryn Anderson (Cairn Energy PLC)

**Respondent**
Mr Salim Moollan QC (Essex Court Chambers)
Professor Chester Brown (Essex Court Chambers)
Mr Adam Board (Essex Court Chambers)
Mr Shreyas Jayasimha (Aarna Law)
Mr Mysore R. Prasanna (Aarna Law)
Mr Mihir Naniwadekar (Aarna Law)
Mr Raag Yadava (Aarna Law)
Mr Dinesh Antil (Under Secretary, Foreign Tax & Tax Research Division, Central Board of Direct Taxes, Department of Revenue, Ministry of Finance)

**Court Reporter**
Mrs Audrey Shirley (Briault Reporting Services)

250.   On 11 October 2016, the Tribunal circulated to the Parties the transcript of the hearing of 7 October 2016.

251.   By letter of 17 October 2016 (CCom-49), the Claimants objected to a hearing on the Respondent's Application for Bifurcation, arguing that "the Respondent has been tactically withholding its Bifurcation Application, notwithstanding repeated urgings by the Tribunal and the Claimants",[372] and that "[h]ad the Respondent done so, the issue could have been briefed and decided long ago, or it could have been addressed in a combined hearing on 7 October 2016, as the Claimants proposed."[373]

252.   On 3 November 2016 (AT-37), after considering the circumstances described above and in the exercise of its discretion under Article 15(1) of the UNCITRAL Rules, the Tribunal denied the Respondent's request for a hearing on its Application for Bifurcation. However, it agreed that the application would be briefed in two rounds, with the first round to take place before the filing of the Respondent's Statement of Defence, and the second round to take place thereafter. The Tribunal also invited the Parties to consult and agree on two timetable proposals, one for a bifurcated proceeding, and one for a non-bifurcated proceeding. In that same letter, the Tribunal granted the Respondent an extension to file its Statement of Defence to 16 January 2017.

253.   On 9 November 2016, the Claimants filed their Response to the Respondent's Application for Bifurcation.

254.   On 23 November 2016 and 24 November 2016, the Claimants and the Respondent provided their respective calendar proposals (CCom-56, RCom-53).

255.   On 8 December 2016, the Tribunal issued its determination on the procedural timetable that would apply to the arbitration from the submission of the Respondent's Statement of Defence (scheduled for 16 January 2017) until the Hearing on the Merits scheduled for 15-26 January 2018 (both for non-bifurcated proceedings and bifurcated proceedings) (AT-41).

256.   On 17 December 2016 (RCom-59), the Respondent requested the Tribunal to order the Claimants to "produce all documents, including but not limited to letters, electronic communications, file notes, memoranda, internal correspondence and any other records, however made, evidencing any and all exchanges between the Cairn Claimants and the Vedanta Claimant relating to the two arbitrations from 31 March 2015 onwards".[374] The procedural history related to this request is summarised in Section III.E.1.b below.

---

[372]   CCom-49, p. 1.

[373]   *Id.*, pp. 1-2.

[374]   RCom-59, ¶ 8(b) (Respondent's emphasis omitted).

257. On 20 December 2016 (CCom-61), the Claimants informed the Tribunal of certain exchanges with the ITD[375] with respect to the release by CIL of dividends owed to CUHL, which are addressed in more detail in Section III.C below.

258. On 9 January 2017 (RCom-61), the Respondent requested a further extension of the time limit to file its Statement of Defence. After hearing both Parties,[376] by letter of 20 January 2020 (AT-42) the Tribunal granted the requested extension until 3 February 2017 and set out a revised procedural calendar (attached as Annex A to that letter).

259. On 12 January 2017 (CCom-65), the Claimants submitted a proposed procedural calendar for non-bifurcated proceedings. The Respondent provided its comments on 16 January 2017 (RCom-63).

260. On 4 February 2017, the Respondent filed its Statement of Defence.

261. By email of 14 February 2017 (CCom-71), and pursuant to the Tribunal's directions at paragraph 3 of AT-42, the Claimants on behalf of the Parties provided the Tribunal with jointly proposed amendments to the procedural calendar for bifurcated proceedings.

262. On 15 February 2017 (RCom-67), and as reiterated by communications of 2, 13, and 17 March 2017, the Respondent requested a second hearing on its Stay Application. The Claimants objected to this second hearing by letter of 7 March 2017 (CCom-79) and submitted their response to these further submissions on the Stay and Bifurcation Applications on 23 March 2017 (CCom-87).

263. On 19 February 2017, the Respondent filed its Reply to the Claimants' Response to its Application for Bifurcation.

264. On 21 February 2017, the Claimants filed a request for relief in relation to the release of dividends owed to CUHL by CIL. During the months that followed, the Parties and the Tribunal exchanged correspondence on this matter, as well as on the status of the Respondent's enforcement of the tax demand against CUHL and the Claimants' RIM; this is addressed in Section III.C below.

265. On 6 March 2017, the Claimants filed their Rejoinder on the Respondent's Application for Bifurcation.

266. By letter of 27 March 2017, the Tribunal informed the Parties that the Respondent's request for a second hearing on its Stay Application was denied, that the Stay Application was also denied, that a decision with the Tribunal's reasoning would follow shortly, and that the Tribunal would thereafter address the Respondent's Application for Bifurcation.

---

[375] The Parties have referred to the Income Tax Authority and Income Tax Department interchangeably. In order to avoid confusion with the Income Tax Act (defined herein as "ITA"), the Tribunal will use the acronym "ITD" to refer to the Income Tax Department or Authority, unless it is quoting the Parties.

[376] Claimants' letter of 12 January 2017 with its comments on this request, and to the Respondents' reply of 16 January 2017.

267. On 31 March 2017, the Tribunal issued PO3 which set out the Tribunal's reasons for denying the Respondent's Stay Application. These reasons included, *inter alia*, the Tribunal's conclusion that a stay would cause significant prejudice to the Claimants, while it would not alleviate in any significant manner the harms alleged by the Respondent, in particular the harm of conflicting decisions between the *Cairn* and *Vedanta* arbitrations.

268. On 3 April 2017, the Parties exchanged the scheduled document production requests. The procedural history related to these requests is described in Procedural Order No. 8 ("PO8") and the correspondence that followed and summarised in Section III.E.2 below.

269. On 19 April 2017, the Tribunal issued PO4 in which it denied the Respondent's Application for Bifurcation and set forth its reasons for doing so. The Tribunal confirmed that the procedural calendar for non-bifurcated proceedings attached to the Tribunal's letter of 20 January 2017 (and reattached as Annex A to PO4) would apply to the remainder of the arbitration.

270. On 8 May 2017 (AT-72), the Tribunal requested both Parties to submit updated lists of their respective representatives that should be included in future correspondence, and asked that throughout the proceedings, at such times when a representative was added or removed from the list, that the respective Party provide an updated list, which the Parties subsequently did.[377]

271. On 18 May 2017, the Tribunal issued Procedural Order No. 5 ("PO5"), which addressed the Parties' Unscheduled Document Requests, and Procedural Order No. 6 ("PO6"), which set out certain enhanced confidentiality protections to be applied to any documents produced in response to the Claimants' Document Request No. 2. The procedural history of these applications is summarised in those orders; despite this, the Tribunal summarises the most important steps, as well as the related ensuing correspondence, in Section III.E.1 below.

272. On 12 June 2017 (RCom-128), the Respondent registered "the strongest possible protest"[378] to the reasoning and decisions of the Tribunal in PO3, PO4, and PO5.

273. On 14 June 2017, the Tribunal invited the Claimants to comment on RCom-128[379] within three business days of filing their Statement of Reply.

## C.    The Claimants' request for the release of dividends from CIL; Renewed RIM

274. In parallel with the Respondent's Applications for a Stay and Bifurcation, the Parties and the Tribunal were addressing the Claimants' application for the release of dividends from CIL to CUHL (mentioned at paragraph 264 above), and the RIM, which the

---

[377] See for example, the Claimants' email of 6 June 2017 (CCom-109); the Respondent's email of 19 July 2017 (RCom-144); the Claimants' email of 20 July 2017 (CCom-128); the Respondent's email of 6 September 2017 (RCom-157); the Respondent's email of 12 December 2018 (RCom-327); the Claimants' email of 14 May 2019 (CCom-290).

[378] RCom-128, ¶ 21.

[379] And also on RCom-129, through which the Respondent objected to Procedural Order No. 7, addressed in Section III.F below.

Claimants renewed on 6 May 2017 (CCom-99). The detailed procedural history of these applications is discussed in PO7, and Procedural Order No. 9 of 10 August 2017 ("PO9"). The Tribunal has nonetheless summarised the most important procedural steps below.

275. On 20 December 2016 (CCom-61), the Claimants informed the Tribunal that on 12 October 2016 CUHL had written to the ACIT seeking confirmation that CIL would be able to release any outstanding dividends owed to CUHL, but that CUHL had not received any reliable confirmation.[380] As a result, the Claimants requested the Respondent to confirm whether CIL could release those dividends and CUHL could repatriate them. If no such confirmation was received by 28 December 2016, the Claimants stated that they would ask the Tribunal to direct the Respondent to provide such confirmation. The Claimants added that, if the dividends were no longer restricted and the relevant transfers could be executed, the Claimants would "naturally withdraw their claims in this arbitration relating to those dividends."[381]

276. On 6 January 2017 (RCom-60), the Respondent submitted a letter from the Office of the ACIT dated 30 December 2016, to the Commissioner of Income Tax, International Taxation-1, New Delhi, which stated that:

> [T]he provisional attachment order u/s 281B on dividend expired on 31 March 2016 and as on date there is no attachment in force. The decision to release the dividend to CUHL is an internal matter between two companies and the same may be dealt accordingly.[382]

277. In light of this letter, the Respondent requested the Claimants to confirm by 9 January 2017 that they would "withdraw all consequent claims in this arbitration as stated in their letter dated 20 December 2016."[383]

278. By letter of 21 February 2017 (CCom-73), the Claimants indicated that they had forwarded the ACIT letter of 30 December 2016 to CIL, asking it to release the dividends, but that CIL had refused to do so, alleging that this letter was internal government correspondence that was neither addressed nor copied to CIL, and that it required the certainty of a written confirmation from the ITD before it would act. The Claimants understood that the ITD had advised CIL to make a formal written request for clearance and to await a response from the ITD to release the dividends; however, in meetings between Cairn's representatives and the ITD, the ITD had informed Cairn that no written confirmation would be given to CIL in this regard. The Claimants argued that this position was at odds with the Respondent's assertions in its Statement of Defence, in particular with the witness statement of Mr Sanjay Puri, that there was no

---

[380] CCom-61, p. 2 and Annex B thereto (Letter from CUHL to the Assistant Commissioner of Income Tax of 12 October 2016).

[381] *Ibid*.

[382] Letter from the Office of the Assistant Commissioner of Income Tax, Circle 1(2)(1), International Taxation, New Delhi, of 30 December 2016, to the Commissioner of Income Tax, International Taxation-1, New Delhi, attached to RCom-60.

[383] RCom-60.

impediment for CIL to release the dividends to CUHL.[384] In light of the Respondent's "inconsistent messages"[385] on this matter, the Claimants requested the Tribunal to "invite the Respondent to procure that the [ITD] send a letter to CIL confirming that CIL is not prohibited from releasing the dividends to CUHL. In the alternative, we ask that the Respondent procure that the [ITD] address a similar letter to Cairn indicating that it is intended to be shared with CIL."[386] The Claimants reiterated that once CIL had received this confirmation and the dividends had been released to CUHL, they would make the appropriate adjustments to their claims.[387]

279.    On 22 February 2017 (AT-46), the Tribunal invited the Respondent to confirm its position on the matter by 1 March 2017, giving special attention to the Claimants' request for relief.

280.    By email of 6 March 2017 (RCom-73), after requesting and receiving an extension, the Respondent submitted its comments. The Respondent stated *inter alia* that "the payment of CUHL dividends [was] a matter between the company (CIL) and its shareholder (i.e. CUHL) and therefore the Office of the [ACIT] ha[d] no role to play."[388] As a result, the ITD was not in a position to issue any correspondence to CIL with respect to the payment of CUHL dividends."[389] The Respondent further argued that the Tribunal had no jurisdiction over the relationship between India and its assessees, including CIL, nor did it have jurisdiction to order the Respondent to write to CIL to confirm that CIL was not prohibited from releasing the dividends to CUHL.[390]

281.    On 7 March 2017, the Tribunal noted that, at this juncture and given the content of the Respondent's email of 6 March 2017, it did not see a need for its intervention. Nonetheless, it invited the Claimants to comment on the Respondent's communication and to seek further clarification from the Respondent if they so wished.[391]

282.    By letter of 9 March 2017 (CCom-81), the Claimants insisted that they required the Respondent to directly inform CIL that it could release the dividends, "because CIL continues to be under direct orders from the Indian Income Tax Authority to withhold the dividends."[392] The Claimants explained that "[i]n January 2014, the Income Tax Authority formally directed CIL 'not to remit/pay' the dividends to CUHL, which direction has never been clearly rescinded."[393] The Claimants also alleged that "the Income Tax Authority has more recently 'informally advised' CIL not to remit the

---

[384]   CCom-73, p. 1-2, referring to Puri WS, ¶¶ 100, 104.

[385]   *Id.*, p. 2.

[386]   *Ibid.*

[387]   *Id.*, pp. 2-3.

[388]   RCom-73, ¶ 2.

[389]   *Ibid.*

[390]   *Ibid.*

[391]   Tribunal's unnumbered email of 7 March 2020.

[392]   CCom-81, p. 1.

[393]   *Ibid.*

dividends until CIL receives a specific government 'response' authorising any such transfer."[394] On this basis, the Claimants argued that "it is difficult to accept in good faith India's representation to this Tribunal that the disposition of the dividends is strictly 'a matter between' CIL and CUHL with 'no role to play' for India, when the Income Tax Authority has specifically instructed CIL (off the record) that it must withhold the dividends until further notice."[395] However, the Claimants noted that CIL had indicated that it might be willing to accept formal written confirmation by India to this Tribunal that the dividends were legally unrestricted. As a result, in the absence of any reasoned objections by the Respondent, the Claimants indicated that they intended to send to CIL on Friday 10 March 2017 (i) the Respondent's email of 6 March 2017, together with the appended ACIT letter of 1 March 2017, and (ii) an excerpted and redacted copy of the witness statement of Mr Sanjay Puri, in which Mr Puri confirmed the status of the dividends (which the Claimants attached as Annex C to their letter).[396]

283. That same day (AT-51), the Tribunal invited the Respondent to comment on the Claimants' letter without delay on or before 14 March 2017, noting that in the meantime it would be preferable if the Claimants did not unilaterally send their intended letter to CIL, in order to avoid aggravating the dispute. The Tribunal also entreated the Parties "to cooperate in this matter", stating that it was "confident that the Respondent may be in a position to assist the Claimant albeit possibly without writing to CIL itself."[397]

284. By letter of 15 March 2017 (RCom-78), the Respondent argued that the Claimants' latest request was "entirely contrived",[398] noting that the Claimants had to date shared documentation from these proceedings with Vedanta as it suited them, but now purported to give the Respondent 24 hours to raise any reasoned objections to share these two documents (identified in paragraph 282 above) with CIL (which was now controlled by Vedanta). As to the merits of the Claimants' request, the Respondent noted that it had long advocated for a coordinated document sharing regime to be put in place between the *Cairn* and *Vedanta* arbitrations; that the treatment of these two documents should follow the general treatment to be put in place once the Tribunal ruled on this document sharing regime, and that until then there was no reason to treat these documents any differently solely because it was expedient for the Claimants to share them with Vedanta.

285. On 16 March 2017 (CCom-84), the Claimants (i) stated that they believed that the proposed disclosures were consistent with the confidentiality protections in PO2, (ii) clarified that the proposed disclosure was to CIL and not Vedanta, in CUHL's capacity as shareholder of CIL, (iii) that such disclosure was "entirely separate from the merits of this arbitration, and is unrelated to ongoing discussions about the exchange of arbitration documents between the *Cairn* and *Vedanta* arbitrations", as a result of which "[t]he Respondent's reference to its proposed document disclosure regime in this

---

[394]  *Id*., referring to an email from CIL to Cairn dated 16 February 2017 (Annex A to CCom-81).

[395]  CCom-81, p. 2.

[396]  *Ibid*.

[397]  AT-51.

[398]  RCom-78, ¶ 2.

arbitration is misconceived",[399] and (iv) emphasised the importance of the release of the dividends to Cairn, noting that CIL would soon cease to exist as a separate entity due to its forthcoming merger with VIL, "leaving Cairn a limited window of opportunity to secure CIL's commitment to release the dividends".[400] On this basis, the Claimants informed the Tribunal and the Respondent that they intended to provide the documents identified at paragraph 282 above to CIL that week, and that they would request that CIL maintain those documents in strict confidence, in compliance with PO2.

286.   That same day (RCom-79), the Respondent reiterated its position that this issue should be treated together with the general question of document sharing between the *Cairn* and *Vedanta* claimants and transparency/confidentiality of this arbitration, and that there was no basis for the Claimants' unilateral disclosure of such documents. The Respondent further requested that if the Claimants had already shared these documents with CIL, that this be made known immediately to the Tribunal and to the Respondent.

287.   On that same date (AT-54), the Tribunal invited the Claimants to confirm within 24 hours if they had already transmitted to CIL the documents identified in paragraph 282 above and, if so, what assurances they had requested or obtained from CIL that the documents would be kept confidential. The Tribunal also invited the Respondent, within the same time limit, to state any good cause that should keep the Tribunal from allowing the Claimants to communicate the documents to CIL, assuming that leave was in fact needed. The Tribunal added that it saw no reason to deny a limited exception to PO2 in the circumstances.

288.   On 17 March 2017 (CCom-85), the Claimants confirmed that the documents listed in paragraph 282 above had not been transmitted to CIL, and indicated that they had notified CIL that "any documents that are permitted to be disclosed to them, as authorised by this Tribunal, shall be maintained as confidential and shall not be disclosed to any third party (save where required by law or regulation – e.g., where required by the Indian Income Tax Authority – or through disclosure to professional advisers bound by duties of confidentiality)."[401]

289.   On that same date (RCom-81), the Respondent noted that its position as set out in its email of 16 March 2017 remained unchanged, and that it was clear that the Claimants' purported requests were not genuine given the Claimants' past conduct. However, for the sake of cooperation, it stated that it was prepared to accept the communication of the ACIT letter of 1 March 2017, even in advance of the Tribunal's ruling on document sharing. That said, it objected to the communication of Mr Puri's Witness Statement, whether redacted or not, in advance of that ruling, arguing that such a disclosure would be "particularly intrusive" and there could be "no legitimate reason" to communicate it.[402]

---

[399]   CCom-84.

[400]   *Ibid.*

[401]   CCom-85.

[402]   RCom-81.

290.  On 22 March 2017 (AT-56), after noting the Parties' latest arguments and representations, the Tribunal issued the following directions: (i) it allowed the Claimants to provide CIL with a copy of the ITD's letter of 1 March 2017, emphasising that the document was subject to confidentiality obligations, but that they should refrain from disclosing Mr Puri's Witness Statement, (ii) if despite this CUHL did not obtain the release of the dividends, the Claimants should inform the Tribunal and provide a redacted version of Mr Puri's Witness Statement for the Respondent's comment, which the Respondent should provide within three business days, (iii) if there was no agreement on the scope of the redactions the Tribunal would then make a determination, and (iv) the Claimants could then submit the final redacted witness statement to CIL, emphasising that the document is subject to confidentiality obligations in this arbitration.

291.  While this exchange regarding the release of dividends was ongoing, the Parties also exchanged correspondence in relation to the status of the Respondent's tax demand and the enforcement proceedings related to such tax demand. Specifically:

   a.  On 14 March 2017 (CCom-83), the Claimants informed the Tribunal that on 9 March 2017 the ITAT had issued its order on the appeal initiated by CUHL against the tax assessment at issue in this dispute, confirming the Respondent's principal tax demand against CUHL, but partially granting CUHL's appeal on matters of interest and penalty.[403] It also attached a letter from the ACIT to CUHL dated 14 March 2017, in which the ACIT stated that "[i]n view of this order, where the tax demand has been confirmed by the Hon'ble ITAT, you are requested to pay the same on or before 15.06.2017, failing which recovery proceedings will be initiated as per the Income Tax Act, 1961."[404] The Claimants urged the Respondent to confirm immediately whether the ACIT letter of 14 March 2017 was intended to provide the three-month notice before it commenced enforcement proceedings, in accordance with its undertaking of 11 May 2016. They also stated that "[t]o the extent that India's letter constitutes said notice, the Claimants will have no choice but to reinstate their RIM, as they indicated they would do were India to seek to enforce against the shares."[405]

   b.  On 17 March 2017 (RCom-78), the Respondent made certain submissions regarding the implications of the ITAT Order. For present purposes, it suffices to say that the Respondent submitted that the ITAT Order upheld CUHL's liability to capital gains tax.

292.  At the Claimants' insistence (CCom-86) and the Tribunal's invitation (AT-55), on 23 March 2017 (RCom-82) the Respondent (i) reiterated that the ITAT Order had confirmed CUHL's capital gains tax liability, (ii) stated that, as a result, the ITD "ha[d]

---

[403]  Claimants' letter to the Tribunal of 14 March 2017 (CCom-83), referring to the ITAT Order of 9 March 2017, attached as Annex A to CCom-83.

[404]  Letter from the ACIT, Circle 1(2)(1), International Taxation to CUHL of 14 March 2017, attached as Annex B to the Claimants' letter of 14 March 2017 (CCom-83).

[405]  CCom-83, p. 3.

no remaining discretion not to enforce the tax demand against the assessee (CUHL)",[406] and (iii) confirmed that the ACIT letter of 14 March 2017 "is indeed to be treated as a notice for purposes of the Respondent's letter dated 11 May 2016."[407] The Respondent explained that "this is because the [ITD] [is] duty bound as a matter of Indian law to proceed to recover tax amounts found due and owing by a taxpayer, as is the case under the ITAT Order."[408] The Respondent added however that the Claimants could appeal the ITAT Order and apply for a stay of execution from the High Court, noting that "[i]f they do so, and obtain relief from the Court, the [ITD] will of course abide by the decision of the Court", but "[i]f they choose not to do so, the [ITD] have no discretion not to enforce the Order."[409] The Respondent thus requested the Tribunal to invite the Claimants to state by 24 March 2017 "(a) whether it has initiated any appeal against the ITAT Order; (b) if not, whether they intend to appeal the ITAT Order; and (c) if not, why not."[410]

293.  By email of 3 April 2017 (AT-60), the Tribunal invited the Claimants to state whether they had appealed the ITAT Order, but rejected the Respondent's request that the Claimants be ordered to indicate in advance if they intended to seek relief before the Indian courts or their reasons for doing so, considering that the request did not state the legal basis for which such relief would be predicated.

294.  On 4 April 2017 (RCom-87), the Respondent reiterated its requests, arguing that the legal basis for them was found in Article 15(1) of the UNCITRAL Rules, and the duty not to aggravate the dispute. By email of 5 April 2017 (AT-61), the Tribunal invited the Claimants to comment on this renewed request.

295.  On 7 April 2017 (CCom-90), the Claimants confirmed that they had not filed an appeal against the ITAT Order. As to whether they intended to do so, they stated that "Cairn [was] still in the process of weighing its options, and should not be compelled by India to make a rushed decision and to provide its reasons."[411]

296.  On 12 April 2017 (CCom-92), the Claimants informed the Tribunal that they had received an appeal effect order dated 31 March 2017 demanding payment within 30 days of service and warning that, if payment was not received, proceedings for the recovery of the tax demand would ensue.

297.  At the Claimants' request (CCom-92) and the Tribunal's invitation (AT-64), on 18 April 2017 (RCom-91), the Respondent explained that the demand notice sent on 31 March 2017 was a standard proforma, and that there was "no intention to violate the undertaking given by the Respondent in its letter dated 11 May 2016."[412] The

---

[406]  RCom-82, ¶ 2.

[407]  *Ibid.*

[408]  *Ibid.*

[409]  *Id.*, ¶ 4.

[410]  *Ibid.*

[411]  CCom-90, p. 1.

[412]  RCom-91.

Respondent added that, "[p]ursuant to that letter, CUHL has already been notified on 14 March 2017 to pay the tax demand by 15 June 2017, failing which recovery action would ensue."[413]

298.   On 19 April 2017 (CCom-96), the Claimants wrote to the Tribunal to update it on the status of the dividends payable from CIL (which had by now been merged with VIL[414]) to CUHL and to request urgent relief in this regard. Specifically, the Claimants requested the Tribunal to "to invite the Respondent as a matter of urgency to confirm in writing directly to VIL (with copies of such confirmation to the Claimants and the Tribunal) that all dividends – both the dividends declared by CIL with respect to the period from 2013-2016 and those resulting from the merger between CIL and VIL – can be released to CUHL without further delay," and to "provide a full and accurate account of what it has been telling CIL/VIL in private meetings in respect of the dividends, and to explain how it reconciles those communications with its representations to this Tribunal that CIL/VIL is free to release the dividends."[415]

299.   On 26 April 2017 (RCom-96), the Respondent responded to the Claimants' letter of 19 April 2017, reiterating its position that there was no basis for the Claimants' request for urgent relief, and stating that the ITD "categorically den[ied] having attempted to inhibit the release of the dividends or having advised CIL in this matter, formally or 'informally', after 31 March 2016 (when the provisional attachment order under section 281B expired)."[416] On 27 April 2017 (RCom-97), the Respondent clarified that "there was no message or advice given by the Hon'ble Revenue Secretary to CIL/Vedanta Limited to hold the dividends payable to CUHL."[417]

300.   By email of 1 May 2017 (AT-69), the Tribunal invited the Claimants to state if they had anything to add or amend to their request for relief of 19 April 2017. It also invited the Respondent to state whether it would have any objection to the Claimants disclosing RCom-96 and RCom-97 to VIL.

301.   By letter of 2 May 2017 (CCom-98), the Claimants stated that they had difficulty reconciling the Respondent's statements denying any meeting or communication between the ITD and CIL/VIL. In support of this, they submitted a witness statement of Cairn's CEO, Mr Simon Thomson (the "Thomson WS"), in which he testified that VIL had "confirmed to Cairn that it met with the Revenue Secretary on 10 April 2017, and that at this meeting, the Revenue Secretary instructed CIL/VIL not to remit payment pending approval from the Income Tax Authorities."[418] The Claimants also submitted

---

[413]   *Ibid.*

[414]   The Tribunal understands that the merger became effective on 11 April 2017, as per the Claimants' letter of 19 April 2017 (uninvited) (CCom-96), n. 1.

[415]   CCom-96, p. 3.

[416]   RCom-96.

[417]   RCom-97.

[418]   CCom-98, p. 1.

documentary evidence which purportedly confirmed Mr Thomson's statements.[419] The Claimants acknowledged that this evidence originated from CIL/VIL, but argued that CIL/VIL had repeatedly indicated its desire to discharge its obligation to CUHL, and that they were unaware of any motivation for CIL/VIL to falsely report meetings with and instructions from the Income Tax Authorities. The Claimants also argued that the problem would be exacerbated because, as a result of the merger between CIL and VIL, CUHL was due to receive redeemable preference shares in VIL worth approximately US$ 115 million, raising the total amount payable from VIL to CUHL to approximately US$ 220 million, "with the likely result that the Indian Government will move to garnish all of those outstanding payments as soon as it is legally entitled to do so."[420] Given the latest developments, the Claimants argued that "it seems highly unlikely that the disclosure of RCom-96 and 97 will persuade CIL/VIL to disobey the directions they say they have received from senior officers of the Government of India", and as a result they reiterated their request for relief made on 19 April 2017 through CCom-96.[421]

302.   On 3 May 2017 (AT-70), the Tribunal granted leave to the Respondent to respond to the Claimants' letter of 2 May 2017, and invited it to confirm its final position on whether CIL/VIL could release immediately the dividends to CUHL. The Tribunal also invited both Parties to state whether they would have any objection to communicating, or having the other side communicate, to CIL/VIL the content of the forthcoming Order (or letter from the Tribunal) on this matter.

303.   On 6 May 2017 (CCom-99), the Claimants renewed their RIM, which as noted above had been originally filed on 13 April 2016[422] and had been suspended on 16 May 2016, following an undertaking from the Respondent.[423] In their Renewed RIM, the Claimants updated their request for relief[424] and further stated that "the procedural burden of

---

[419]   Specifically, the Claimants attached electronic text messages between Simon Thomson and Tarun Jain dated 4 to 11 April 2017 (Exh. CWS-Thomson-1); an email from Simon Thomson to Duncan Holland of 11 April 2017 (Exh. CWS-Thomson-2); letter from VIL to CUHL of 18 April 2017 (Annex A to CCom-96); and email from Navin Jain to Kathryn Anderson of 16 February 2017 (Annex A to CCom-80).

[420]   CCom-98, p. 2.

[421]   Claimants' letter to the Tribunal of 2 May 2017 (CCom-98).

[422]   CCom-14.

[423]   RCom-10.

[424]   CCom-99, p. 13 (requesting the Tribunal to:

a) ORDER India to refrain during the pendency of these arbitration proceedings from initiating the sale of Cairn's 184,125,764 equity shares in Vedanta Limited, or enforcing against any other assets that Cairn may have, or come to have, in India (including dividends, redeemable preference shares and the redemption proceeds arising therefrom, tax refunds, and other amounts payable to it);

b) ORDER India to refrain from taking any other steps that might undermine the procedural integrity or the orderly progression of these arbitral proceedings and/or that might aggravate or exacerbate the dispute between the Parties, or render ineffective any ultimate relief to be granted by the Tribunal during the pendency of these arbitration proceedings;

c) RECOMMEND any further measures or relief that the Tribunal deems appropriate in the circumstances in order to preserve Cairn's rights during the pendency of these arbitration proceedings; and

d) ORDER that India pay the costs associated with this request for interim measures of protection.")

briefing and deciding this RIM could be avoided entirely if the Respondent undertakes to delay the initiation of recovery procedures against CUHL pending the conclusion of this arbitration."[425] If the Respondent did not immediately make such an undertaking of its own accord, the Claimants asked the Tribunal to request the Respondent to do so, or at least to provide any legal authority establishing that it did not have discretion as to the timing of enforcement.

304.    On 8 May 2017 (AT-71), the Tribunal invited the Respondent to comment with urgent priority on the Claimants' communication, and in particular to state whether it would be willing to delay the initiation of recovery proceedings against CUHL pending the conclusion of this arbitration, as proposed by the Claimants, by Friday 12 May 2017.

305.    On 8 May 2017 (CCom-100), the Claimants confirmed that they had no objection to communicating, or having the Respondent communicate, to CIL/VIL the content of the forthcoming decision by the Tribunal concerning the release of the outstanding dividends held by CIL/VIL to CUHL. In the event that the Respondent was to communicate this decision, the Claimants asked that they be copied on such correspondence.

306.    On 9 May 2017 (RCom-101), the Respondent provided comments, *inter alia*, to CCom-98 and CCom-99. The Respondent requested a hearing on the Renewed RIM and submitted comments on the dividends.

307.    By letter of 12 May 2017 (CCom-101), the Claimants commented on the Respondent's email of 9 May 2017 and reaffirmed, with more urgency, their request that the Tribunal order the Respondent "to confirm immediately in writing directly to VIL (with copies of such confirmation to the Claimants and the Tribunal) that all dividends – both the dividends declared by CIL with respect to the period from 2013-2016 and those resulting from the merger between CIL and VIL – can be paid to CUHL without further delay. In the alternative, the Claimants request that the Tribunal issue an order memorialising the Respondent's numerous representations that the dividends can be released and finding that the Respondent is bound by these representations and does not seek to restrain the payment of dividends to CUHL or the transfer of any such funds outside of India."[426] (The Claimants' requests for relief in CCom-101 are hereinafter referred to as the "Claimants' Original Request on Dividends"). The Claimants also stated that they did not believe that a hearing on the Renewed RIM was required, but should the Tribunal determine to hold one, they requested it to "temporarily order India not to initiate recovery proceedings or otherwise enforce against any assets of, or due to, the Claimants from 15 June 2017 until such time as the Tribunal rules on the RIM."[427]

308.    On 15 May 2017 (AT-75), the Tribunal noted that the Claimants' applications regarding the release of dividends and the Renewed RIM required a prompt ruling from the Tribunal and issued directions on how they would be briefed and heard. Specifically, the Tribunal outlined two alternative briefing schedules, depending on whether the

---

[425]  CCom-99, cover email.

[426]  CCom-101, p. 3.

[427]  *Id.*, pp. 3-4.

Respondent would be willing to defer the enforcement of CUHL's shares in CIL/VIL until 15 September 2017, and proposed a hearing date to hear the Renewed RIM. After hearing from both Parties (CCom-103 and RCom-103),[428] on 18 May 2017 (AT-77) the Tribunal confirmed that a hearing to hear the Renewed RIM (the "RIM Hearing") would take place in London on 12 June 2017.

309.   On 22 and 30 May 2017 (RCom-108 and RCom-111, respectively), the Respondent lodged a formal protest to the Tribunal's directions, raising certain procedural objections and requests for clarification. At the Tribunal's invitation, on 25 May 2017 (CCom-105) the Claimants provided their comments. On 1 June 2017 (AT-81), the Tribunal updated its procedural directions.

310.   On 26 May 2017 (RCom-109), the Respondent submitted its response to the Renewed RIM. The Claimants filed their reply on 31 May 2017 (CCom-107), and the Respondent filed its rejoinder on 8 June 2017 (RCom-117).

311.   On 2 June 2017 (AT-82), the Tribunal invited the Parties to consult and cooperate with respect to the format and organisation of the RIM Hearing. The Parties provided their comments on 9 and 10 June 2017 (RCom-119 and CCom-112, respectively).

312.   On 5 June 2017 (RCom-113), the Respondent indicated that it had not addressed the Claimants' Original Request on Dividends in its response to the Renewed RIM and that it would do so by 8 June 2017. By email of 6 June 2017 (CCom-110), the Claimants argued that this was inaccurate, as the Respondent's response to the Renewed RIM expressly mentioned the Claimants' Original Request on Dividends, and thus the Respondent had already exercised its opportunity to respond to it. Despite this allegation, on 6 June 2017, the Tribunal granted the Respondent the opportunity to make further comments on the Claimants' Original Request on Dividends, which the Respondent exercised on 8 June 2017 (RCom-118).

313.   On 9 June 2017 (RCom-119), the Respondent confirmed that it wished to cross-examine Mr Thomson at the RIM Hearing. Separately on that same day (RCom-120), the Respondent filed a statement from the Office of the Honourable Revenue Secretary rebutting Mr Thomson's witness statement, and noted that the Honourable Revenue Secretary would not be available to be examined at the RIM Hearing due to other commitments.

314.   Also on 9 June 2017, the Tribunal issued PO7 ruling on part of the Claimants' Original Request on Dividends. In particular, PO7 memorialised India's representations made in this arbitration concerning the issue of release of dividends by CIL/VIL and allowed the relevant parts of the order to be shared with CIL/VIL.

315.   On 12 June 2017 (RCom-129), the Respondent objected to PO7 and requested that the Tribunal stay its implementation before it had put in place safeguards to ensure the confidentiality of the order. On 14 June 2017, the Tribunal invited the Claimants to comment on RCom-129 within three business days of the filing of their Statement of Reply.

---

[428]   CCom-103 and RCom-103, both of 17 May 2017.

316.   After exchanging several communications concerning the organisation and logistics of the hearing,[429] the Parties and the Tribunal held a hearing on the Renewed RIM on 12 June 2017, in London, UK. The following persons participated at the hearing:

**Tribunal**
Mr Laurent Lévy (Presiding Arbitrator)
Mr Stanimir Alexandrov (Co-arbitrator)
Mr J. Christopher Thomas QC (Co-arbitrator)
Ms Sabina Sacco (Secretary of the Tribunal)

**Claimants**
Mr Harish Salve SA (Blackstone Chambers)
Ms Ritin Rai (Blackstone Chambers)
Mr James Smith (CFO Cairn)
Mr Duncan Holland (Group Legal Manager, Cairn Energy PLC)
Ms Claire Busby (Legal Department, Cairn Energy PLC)
Mr Robert L. Nelson Jr. (Shearman & Sterling LLP)
Mr Mark McNeill (Shearman & Sterling LLP)
Mr Wesley H. Pang (Shearman & Sterling LLP)
Mr Robert L. Nelson Jr. (Shearman & Sterling LLP)
Ms Natalia Mikolajczyk (Shearman & Sterling LLP)
Ms Niti Dixit (S&R Associates)
Mr Uday Walia (S&R Associates)
Mr Alastair Brown (Shepherd and Wedderburn)

**Respondent**
Mr Salim Moollan QC (Essex Court Chambers)
Professor Chester Brown (7 Wentworth Selborne Chambers)[430]

317.   On 15 June 2017 (AT-85), the Tribunal informed the Parties that it denied the Renewed RIM and related applications of the Claimants[431] and indicated that the reasons for the Tribunal's decision would follow.

318.   On 10 August 2017, the Tribunal issued PO9 which provided its reasons for the decisions conveyed in AT-85.

---

[429]   See, e.g., Claimants' email to the Tribunal of 12 June 2017 (CCom-114); the Respondent's email to the Tribunal of 12 June 2017 (RCom-131).

[430]   In the absence of an official list of participants, the individuals listed here are those participants that feature in the transcripts of the RIM Hearing.

[431]   Specifically, the Tribunal denied the following requests for relief from the Claimants: (i) the Claimants' Renewed RIM, as articulated in CCom-99 and memorialised at note 424 above, as amended during the RIM Hearing to include an order to prevent the Respondent from garnishing any dividends owed by CIL/VIL to CUHL; (ii) the Claimants' request that the Tribunal issue a temporary order regarding their Renewed RIM and the garnishment of dividends, and (iii) any outstanding prayers for relief in connection with the Claimants' Original Request on Dividends (as formulated in CCom-101) that were not addressed in PO7. See, AT-85.

## D.    Transparency, confidentiality, and document sharing

319.    In parallel with the Respondent's applications for a stay and bifurcation, and the Claimants' applications for the release of dividends and Renewed RIM, the Parties had also been briefing the Respondent's applications for transparency, confidentiality, and document sharing.

320.    As anticipated in paragraph 219 above, from the initiation of this arbitration the Respondent requested the Tribunal to put in place a transparency regime.[432] In line with its arguments in its Stay Application, the Respondent argued that the coexistence of the *Cairn* and *Vedanta* arbitrations (which it characterised as parallel proceedings dealing with essentially the same issues under the same treaty) created the risk of inconsistent decisions. The Respondent further argued that the Claimants and Vedanta were actively cooperating to avoid any coordination and sharing of information between the two sets of proceedings, but keeping this Tribunal in the dark.[433] In order to mitigate these alleged risks and harms, the Respondent first proposed the adoption of a transparency regime.[434]

321.    The Claimants objected to the adoption of a transparency regime, arguing *inter alia* that the Respondent had visibility over both proceedings, and that "[t]here is nothing barring India from seeking leave from this Tribunal to introduce into evidence in this proceeding relevant information which has been obtained in the *Vedanta* arbitration."[435] The Claimants also made some requests with respect to confidentiality.[436]

322.    On 8 August 2016, the Tribunal issued PO2 ruling on transparency and confidentiality. For the reasons given in that decision, it rejected a full transparency regime, but allowed for the publication of certain documents, subject to possible redaction, on the PCA's website.[437] As to the risk of inconsistent decisions between the *Cairn* and *Vedanta* arbitrations, the Tribunal concluded it would be better mitigated by document sharing between the two proceedings than by transparency.[438]

323.    In the weeks that followed the issuance of PO2, the Parties exchanged correspondence on the sharing of documents. The Claimants confirmed that they supported and encouraged the sharing of information between the two arbitrations, consented to the submission of key pleadings and procedural orders from the *Cairn* arbitration into the *Vedanta* arbitration, and urged the Respondent to take the necessary measures to adduce pleadings and evidence from the *Vedanta* arbitration into the *Cairn* arbitration. The

---

[432]    Transcript, First Procedural Hearing, 56:6-16 (President Lévy).

[433]    See, e.g., Respondent's Submission on Transparency of 27 May 2016, ¶ 2; Respondent's Stay Application of 6 June 2016, ¶ 10; Respondent's Reply to the Claimants' Response on the Stay Application of 28 July 2016, ¶¶ 12, 17.

[434]    See, e.g., Respondent's Submission on Transparency of 27 May 2016. The Parties' correspondence regarding this application is summarized in Procedural Order No. 2 of 8 August 2016.

[435]    Claimants' Submission on Transparency and Confidentiality of 8 June 2016, ¶ 15.

[436]    *Id.*, ¶¶ 12, 29-30.

[437]    PO2, ¶ 57.

[438]    *Id.*, ¶ 55.

Respondent, for its part, argued that it could not submit documents from the *Vedanta* arbitration because the *Vedanta* tribunal had not ruled on the issue of transparency, and argued that the submission of documents from the *Cairn* arbitration into the *Vedanta* arbitration required an amendment of the transparency and confidentiality regime set out in PO2. By contrast, the Claimants contended that no such amendment was necessary to implement document disclosures between both tribunals (an application and consent being sufficient).[439]

324.   In its letter 2 of 3 November 2016 (AT-36), referring to its reasoning in PO2, the Tribunal agreed with the Claimants that putting in place a regime to allow the flow of documents and information between two arbitrations did not require an amendment to the transparency regime. The Tribunal stated that, in its view, "a less ambitious solution that would be easier to implement would be for all parties (Cairn, the Respondent and Vedanta) to agree to a form of document sharing that is limited to the tribunals and parties in the two arbitrations. That solution should ensure the proper confidentiality of any sensitive documents vis-à-vis the rest of the world. This proposal could then be submitted to both tribunals."[440] The Tribunal thus invited the Parties "to consult with Vedanta so that at the minimum, they can seek to agree on a document sharing regime that meets with all Parties' consent or, absent Vedanta's consent, with Cairn and the Respondent's consent."[441] The Tribunal indicated that if the Parties failed to reach an agreement, it would rule on this matter.

325.   In the months that followed, the Parties exchanged correspondence regarding the Tribunal's invitation to consult with Vedanta regarding possible enhanced forms of coordination between both arbitrations, including the issue of document sharing.[442] For present purposes, it suffices to record that (i) both Parties confirmed that Vedanta had been uncooperative regarding the Tribunal's coordination proposals (CCom-59 and RCom-59),[443] and as a result, the Parties' efforts to agree with Vedanta on any enhanced forms of coordination – including a document sharing regime agreed upon with Vedanta – failed, (ii) that said, both the Claimants and the Respondent in the *Cairn* arbitration confirmed their willingness to share documents with the *Vedanta* arbitration, even absent Vedanta's consent,[444] and (iii) the Parties disagreed however, as to the exact manner in which these documents should be exchanged.[445]

---

[439]   The Parties' correspondence on these matters is summarized in the Tribunal's Letter 2 of 3 November 2016 (AT-36), pp. 3-5.

[440]   *Id*., p. 6.

[441]   *Ibid*. As noted in Procedural Order No. 3, this invitation was made in the context of the Tribunal's earlier invitation to the Parties to consult with Vedanta with respect to enhanced forms of coordination between both arbitrations.

[442]   See, e.g., Claimants' letters of 11 November 2016 (CCom-54), 23 November 2016 (CCom-56), and 8 December 2016 (CCom-59); Claimants' email of 15 December 2016 (CCom-60); Claimants' letters of 9 January 2017 (CCom-64), and 22 February 2017 (CCom-74); Respondent's letters of 15 November 2016 (RCom-51) and 30 November 2016 (RCom-54), email of 9 December 2016 (RCom-58), letter of 17 December 2016 (RCom-59), and first letter of 15 February 2017 (RCom-67).

[443]   CCom-59, p. 1; RCom-59, ¶ 2.

[444]   *Ibid*.; RCom-54; RCom-67.

[445]   RCom-59, ¶ 3; CCom-59, pp. 1-2; CCom-64, pp. 13-16; RCom-67, ¶ 11(a)-(d); CCom-74, p. 2.

326.   On 23 May 2017 (AT-79), the Tribunal circulated a draft procedural order which contained a proposed document sharing regime and invited the Parties' comments. On 21 July 2017 (CCom-129), the Claimants confirmed their agreement with the draft, while on 29 July 2017 (RCom-149), the Respondent stated that it had no objections but reiterated its request for full transparency and "reserve[d] the right to produce documents from the *Vedanta* arbitration, including but not limited to, where this [was] reasonably necessary to protect the Respondent's legal rights".[446]

327.   On 4 September 2017, the Tribunal issued Procedural Order No. 10 ("PO10"), which specifically addressed the manner in which documents from this arbitration may be submitted into the arbitration between Vedanta and the Respondent, as well as the manner in which documents from the *Vedanta* arbitration may be submitted in this arbitration. In PO10, the Tribunal observed that the Parties had consented and agreed to the production of any pleadings, procedural orders, awards, or other documents[447] from the record of this arbitration into the *Vedanta* arbitration, and to the production of any documents from the *Vedanta* arbitration into this arbitration, subject to considerations of relevance and the possibility to redact confidential or sensitive information, and subject to the Tribunal's control, as specified in PO10.

## E.   Document production

328.   In parallel with the applications discussed in the preceding sections, the Parties exchanged scheduled and unscheduled document production requests. The procedural history of these requests is addressed in the numerous orders and letters issued by the Tribunal in this respect. The Tribunal nonetheless summarises the most important steps below.

### 1.   Unscheduled document production requests

329.   As indicated above, both Parties made certain unscheduled document requests at the beginning of the proceedings.

#### a.   The Claimants' Document Requests No. 1 and 2

330.   On 27 May 2016 (CCom-20), the Claimants requested the Tribunal to order Respondent to produce two categories of documents:

   a.   "Documents concerning the Foreign Investment Promotion Board's ('FIPB's') review and approval of CUHL's application of 10 August 2006 […]" ("Claimants' Document Request No. 1").[448]

   b.   "Documents relating to the proceedings conducted by the Standing Committee on Finance, 2011-2012 ('Standing Committee'), on the preparation of its 49th report

---

[446]   RCom-149, ¶ 4.

[447]   The term "other documents" includes any document in the record of this arbitration, including correspondence and evidence such as fact exhibits, legal exhibits, witness statements and expert reports.

[448]   CCom-20, p. 1.

on the Direct Tax Code Bill ('Standing Committee Report') […]" ("Claimants' Document Request No. 2").[449]

331. The Respondent commented on these requests on 10 and 20 June 2016 (RCom-19 and RCom-22, respectively).

    a.    Together with RCom-22, the Respondent produced one document responsive to Document Request No. 1. By letter of 1 July 2016 (RCom-25), it confirmed that further searches at the Department of Revenue had not yielded any other documents responsive to this request. By email of 4 July 2016, the Claimants confirmed that they had no further comments.

    b.    As for Document Request No. 2, the Respondent objected to this on three grounds: (i) legal impediment or privilege under Article 9(2)(b) of the IBA Rules on the Taking of Evidence (the "IBA Rules"), (ii) special political or institutional sensitivity, including deliberative process privilege, under Article 9(2)(f) of the IBA Rules, and (iii) unreasonable burden under Article 9(2)(c) of the IBA Rules. At that stage, the Respondent did not object to the relevance or materiality of the documents sought.

332. By letter of 24 June 2016 (AT-17), the Tribunal denied the Respondent's objection under Article 9(2)(c) of the IBA Rules, but accepted that a rule of privilege analogous to deliberative process privilege could apply under Articles 9(2)(b) or (f) of the IBA Rules, subject to certain specifications in order to adapt it to the needs and specificities of international investment arbitration. The Tribunal concluded that, to determine whether the Respondent could assert privilege, it would undertake a balancing exercise that required weighing the compelling nature of the Respondent's asserted sensitivities against the Claimants' need for the disclosure of these documents. The Tribunal further noted that "the burden of establishing the validity of claims to privilege is on the party asserting the privilege, in this case the Respondent", and thus instructed the Respondent to carry out a document-by-document review of the documents responsive to this request, and to submit a privilege log indicating, *inter alia*, "why the Respondent's need for confidentiality of the document outweighs the Claimants' need for disclosure of the document."[450]

333. The Respondent submitted its original privilege log on 5 September 2016 (RCom-37).

334. The Claimants provided their comments on 14 September 2016 (CCom-43), and requested: (i) the production of nine specified documents, (ii) that the Respondent be ordered to amend the remaining entries of its privilege log, in order to provide a meaningful description of the content of the document and a revised explanation as to how the need for confidentiality outweighed the need for disclosure, (iii) that the Respondent be ordered to include in its privilege log any documents missing from it or confirm that they would be produced, and (iv) that the Claimants be granted leave to seek adverse inferences should the Respondent fail to comply with these orders.

---

[449]   *Id.*, p. 2.

[450]   AT-17, p. 13.

335.   By letter of 21 September 2016 (AT-32), the Tribunal deferred its decision on (i) and (iv), invited the Respondent to provide an amended privilege log, and requested the Respondent to clarify who would have access to any documents produced, and if they were to be disclosed to the Tribunal only, whether they could be examined by a confidentiality expert, or relied upon or cited by the Tribunal in its Award.

336.   The Respondent submitted its revised privilege log on 15 November 2016 (RCom-52). In subsequent correspondence,[451] the Respondent clarified the disclosure limitations that had been communicated to it by the Speaker of the Lok Sabha. Specifically, it explained that the Speaker had only authorised the documents to be shared with the Tribunal, but not counsel or a confidentiality expert, but confirmed that "the Tribunal may rely on and cite the documents in any orders, decisions, or awards."[452]

337.   The Claimants submitted their comments to the Respondent's revised privilege log on 21 December 2016 (CCom-62). In particular, the Claimants (i) objected to the Respondent's proposed disclosure limitations, which they submitted were arbitrary and contrary to their due process rights, (ii) confirmed their request for the production of the nine documents that they had identified in the Respondent's original privilege log and requested the Tribunal to ignore the Respondent's revised objections in their respect, and (iii) accepted the Respondent's objections for all remaining documents save two.

338.   By letter of 22 February 2017 (AT-47), the Tribunal informed the Parties that, after undertaking the balancing exercise referred to in AT-17 and AT-32, it had decided that, for certain documents sought, the Claimants' need for disclosure outweighed the Respondent's assertion of privilege, and thus the Tribunal would order their production. The Tribunal added that any such production would be subject to enhanced confidentiality protections in order to protect the Lok Sabha's expectation of confidentiality (including limiting disclosure to a list of authorised persons), and circulated a draft confidentiality order for the Parties' comments.

339.   On 1 March 2017 (CCom-75), the Claimants submitted their comments on the draft confidentiality order and provided their list of authorised persons. They noted that they agreed in principle with the terms proposed, but also suggested certain changes.

340.   After several requests for extensions, the Respondent submitted its comments to the draft confidentiality order on 27 March 2017 (RCom-83). Essentially, the Respondent agreed with the terms proposed by the Tribunal and objected to the Claimants' proposals.

341.   By letter of 27 April 2017 (AT-67), the Tribunal ruled on the disputed issues, and requested the Respondent to provide a list of its authorised persons.

342.   By letter of 8 May 2017 (AT-73), the Tribunal reiterated its request to the Respondent for a list of its authorised persons, noting that if that list was not provided by 15 May

---

[451]   Respondent's emails of 15 November 2016 (RCom-52), 30 November 2016 (unnumbered), 30 November 2016 (RCom-54), and 5 December 2016 (RCom-56).

[452]   Respondent's unnumbered email of 30 November 2016.

2017, the Tribunal would proceed to issue the confidentiality order and would designate as authorised persons the individuals named in the Respondent's mailing list.

343. On 18 May 2017 (RCom-105), the Respondent provided its list of authorised persons.

### b. The Respondent's request for documents from the *Vedanta* arbitration

344. On 17 December 2016 (RCom-59), the Respondent requested the Tribunal to order the Claimants to "produce all documents, including but not limited to letters, electronic communications, file notes, memoranda, internal correspondence and any other records, however made, evidencing any and all exchanges between the *Cairn* Claimants and the *Vedanta* Claimant […] relating to the two arbitrations from 31 March 2015 onwards"[453] (the Respondent's "Request for *Vedanta* documents").

345. By letter of 9 January 2017 (CCom-64), the Claimants objected to the Respondent's document request, which they characterised as "unjustified, lacking in any relevance to this case or materiality to its outcome, grossly overbroad and procedurally inappropriate."[454]

346. The Respondent replied to the Claimants' objections on 15 February 2016 (RCom-67), arguing *inter alia* that the documents requested were material and relevant because Cairn was "seeking to hide behind Vedanta to justify its failure to put in place or agree to coordination measures as encouraged by the Tribunal, and avoid the consequence of that refusal (i.e. a stay of the present proceedings)."[455]

347. In their letter of 22 February 2017 (CCom-74), the Claimants reiterated that "there [we]re no documents responsive to the Respondent's request", asserted that "Cairn and Vedanta ha[d] never strategically coordinated, let alone discussed, their respective arbitration strategies", and that the Claimants had "complied with all applicable procedural rules related to the present arbitration, including those pertaining to confidentiality."[456] They nonetheless submitted that, had such coordination existed, it would not have been improper, and the documents sought would have had no relevance or materiality to the outcome of this arbitration.

### c. The Tribunal's decision on the Parties' unscheduled document requests

348. On 18 May 2017, the Tribunal issued PO5 which contained the Tribunal's reasoning and decision on both the Claimants' Document Request No. 2 and the Respondent's request for documents from the *Vedanta* arbitration.

349. On that same day, the Tribunal issued PO6 setting out the confidentiality protections to be applied to any documents produced in response to the Claimants' Document Request No. 2 ("Restricted Documents"), including by allowing limited disclosure to a list of specifically authorised persons ("Authorised Persons").

---

[453] RCom-59, ¶ 8(b).

[454] CCom-64, p. 20.

[455] RCom-67, ¶ 9(a).

[456] CCom-74, p. 2.

350. The Parties' compliance with these orders is addressed in Section III.G.2 below.

### 2.   Scheduled document production requests

351. On 3 April 2017, the Parties exchanged scheduled document requests.

352. Pursuant to the procedural calendar, the Parties were due to produce any documents which they voluntarily agreed to produce and/or make reasoned objections to the opposing Party's document requests within two weeks from the date of the requests, i.e., on 14 April 2017. However, on 14 April 2017, the Respondent informed the Tribunal that that day was "a public holiday on account of Good Friday and it [would] revert after seeking instructions on Monday, 17 April 2017".[457]

353. On 18 April 2017 (RCom-93), the Respondent wrote to the Tribunal to request a two-week extension in the first instance to respond to the Claimants' document requests, while noting that further time could be required given the breadth of the Claimants' document requests.

354. On 19 April 2017 (CCom-95), the Claimants objected to the Respondent's request for an extension. At the same time, the Claimants stated that they saw no reason to delay the submission of their own responses to the Respondent's document requests. They therefore submitted their responses and objections to the Respondent's document requests, as well as their voluntary production of documents.

355. On 20 April 2017 (AT-66), the Tribunal ruled on the Respondent's request for an extension. It noted that the Respondent had already had two weeks to assess the Claimants' document production requests and, while it understood that there might be logistical difficulties in locating documents and assessing them for relevance and privilege, this was unlikely to be discovered long after the issuance of the procedural calendar and only shortly before the term for the Parties to state their objections to certain requested documents. It also noted that a two-week extension would seriously jeopardise the procedural calendar. To minimise this, the Tribunal issued a number of directions (AT-66).

356. On 24 April 2017 (RCom-95), the Respondent informed the Tribunal that "its search for documents responsive to the Claimants' document requests ha[d] begun", noting that this had "involved notifying relevant offices in a number of government departments which are located throughout India and which are considered likely to be in possession of certain documents."[458] It added that once any responsive documents were located, it would "swiftly respond with any objections / its agreement to produce."[459] The Respondent argued that "[t]he principal logistical difficulties evidently lie in the process of identifying and locating these documents", and reiterated its complaints with respect to the breadth of the Claimants' document requests, noting that many documents were archived or were spread out in various government departments across the country.[460]

---

[457]   The Respondent's unnumbered email to the Tribunal of 14 April 2017.

[458]   RCom-95, ¶ 3.

[459]   *Ibid.*

[460]   *Id.*, ¶¶ 3-4.

As a result, the Respondent requested a further extension of three weeks to respond to the Claimants' document requests.

357.   On 25 April 2017 (CCom-97), the Claimants objected to the Respondent's new request for an extension. The Claimants argued *inter alia* that the Respondent had by now had over three weeks to assess the Claimants' requests, that the Respondent had ignored the Tribunal's directions of 20 April 2017, that many of the Claimants' requests should be easily accessible or already gathered for the preparation of the Respondent's own case, and as a result there was "simply no reason why the Claimants must be deprived of available documentary evidence in preparing their next submission, due 23 June 2017."[461] The Claimants therefore requested the Tribunal to "(i) require the Respondent to state any objections it may have to the Claimants' document requests by this Friday, 28 April 2017, after which any objections the Respondent has failed to raise will be deemed to be waived; and (ii) reiterate that the Respondent must begin producing documents which are accessible and to which it does not object immediately on a rolling basis."[462]

358.   On 28 April 2017 (AT-68), the Tribunal ruled on the Respondent's new request for an extension. It noted that, as a result of this new request for an extension, the Respondent had *de facto* obtained the two-week extension that had already been denied, and directed the Respondent to submit its responses to the Claimants' document requests by 1 May 2017 or the next business day.

359.   On 3 May 2017 (RCom-98), the Respondent submitted its Reply to the Claimants' Objections to the Respondent's document requests. Also on 3 May 2017 (RCom-99), the Respondent wrote to request the Tribunal to reconsider its directions of 28 April 2017, and to request a new extension of an additional 4 weeks (i.e., until 30 May 2017) to respond to the Claimants' document requests.

360.   On 4 May 2017, the Claimants objected to the Respondent's new request for an extension. The Claimants noted that all the Respondent needed to do at this point was to provide its objections to the Claimants' document requests, and that the Respondent's search for the documents "need not delay this initial step, since the production of documents to which the Respondent does not object can occur on a rolling basis, as the documents become available."[463] They therefore requested that "the Respondent be required to (a) provide its responses and objections to the Claimants' document requests by Monday, 8 May 2017, failing which the Respondent will be deemed to have waived any objections as to the relevance and materiality of the categories of documents requested; and (b) begin producing documents to which it does not object on a rolling basis as they become available thereafter."[464]

361.   On 8 May 2017, the Respondent reiterated its concerns regarding the breadth of the Claimants' document requests, the time needed to comply, and due process, and argued

---

[461]   CCom-97, pp. 1-2.

[462]   *Id.*, p. 2.

[463]   Claimants' unnumbered email of 4 May 2017.

[464]   *Ibid.*

that the Claimants' proposal was simplistic, as the Respondent's task required "at least an initial review of the categories of documents requested, particularly in order to ascertain issues such as the actual relevance or materiality of the documents in the Respondent's possession (as opposed to the generic relevance of the category of documents sought ex facie the request), privilege, confidentiality and political sensitivity."[465] Given the breadth of the Claimants' requests, the Respondent contended that such a review could not possibly take place in the timeframe suggested by the Claimants. However, in order to progress matters and without prejudice to the points raised in RCom-99, the Respondent agreed to provide its "preliminary objections in respect of each of the categories of documents sought by the Claimants' Redfern Schedule, without sight of the actual documents", noting that it would "provide its final objections once it has sight of the relevant documents."[466] The Respondent added that "[o]n confirmation by the Tribunal / Claimants' counsel regarding this course of action, the Respondent will submit the Redfern Schedule with its 'Preliminary Objections to Document Requests' within 24 hours."[467]

362.  On 10 May 2017 (AT-74), the Tribunal noted that the Respondent had represented that it was unable to comply with the original time limit to submit its responses to the Claimants' document requests, scheduled for 14 April 2017 (despite the Respondent's original agreement with that time limit), that over three weeks from the original time limit had elapsed, and that the Respondent had not yet submitted its responses. The Tribunal invited the Claimants to comment on the Respondent's latest proposal, but indicated that the delays in the Respondent's responses would "inevitably have an impact on the timing in which the Tribunal [would] be able to issue a document production order and it [was] unclear how much ripple effect this may produce on the subsequent time limits, including the time limit for the Reply and the Rejoinder."[468]

363.  On 15 May 2017 (RCom-102), the Respondent submitted its "Preliminary Objections to the Document Requests". It specified that "these preliminary objections have been made out only on the basis of objections as to relevance and materiality which are apparent from the formation of the generic categories of documents requested, without having actual sight of the relevant documents", that its responses were "without prejudice to any objections (whether pertaining to claims of relevance and materiality, privilege, confidentiality, political sensitivity or otherwise) which become apparent once sight is had of specific documents", and that "[s]uch objections will be taken, if appropriate, after the Respondent has had such sight."[469]

364.  On 16 May 2017 (AT-76), the Tribunal issued revised directions in view of the changed circumstances, as well as the Respondent's explanations regarding the asserted impossibility of obtaining many of the requested documents within the agreed timeframe. Specifically, the Tribunal (i) accepted to consider the Respondent's "preliminary objections" to the Claimants' document requests, noting for the record that

---

[465]  Respondent's unnumbered email of 8 May 2017, ¶ 3.

[466]  *Id*., ¶ 5.

[467]  *Ibid*.

[468]  AT-74.

[469]  RCom-102.

these objections had been submitted one month after they were originally due (i.e., 14 April 2017), (ii) directed the Claimants to submit their rebuttals and requests to produce on the basis of these preliminary objections within two weeks, (iii) indicated that it would make a preliminary ruling on the basis of these preliminary objections and requests to produce, (iv) directed the Respondent to submit any specific objections it may have to any documents for which the Tribunal has ordered production within one week from the Tribunal's order, specifying that these objections could only refer to claims of relevance and materiality, privilege, confidentiality, political sensitivity, or others which become apparent once the Respondent has had sight of specific documents, (v) if the Respondent raised such an objection, the Claimants would have one week to comment, and either confirm or withdraw their request for production, (vi) on this basis, the Tribunal would issue a final ruling, and (vii) the Respondent would produce documents on a rolling basis as soon as they become available.

365.   On 30 May 2017 (CCom-106), the Claimants submitted their reply to the Respondent's preliminary objections to the Claimants' document requests.

366.   During the first weeks of June 2017, the Parties and the Tribunal devoted considerable time to the Claimants' Original Request on Dividends and their Renewed RIM,[470] as well as to the hearing which took place on 12 June 2017 to address both matters (see *supra* Section III.C).

367.   Between 21 and 28 June 2017, the Tribunal and the Parties exchanged correspondence on the effect that the delays in the document production phase had on the remainder of the procedural calendar, addressed in Section III.F below.

368.   On 28 June 2017, the Tribunal issued PO8 which ruled on the Parties' document requests, noting that, with respect to the Claimants' document requests, the ruling was preliminary and subject to further steps, as set out in AT-76. The Tribunal further noted that PO8 addressed neither the Respondent's objections in its correspondence of 21 June and 23 June 2017,[471] nor the Claimants' reservations in their letter of 24 June 2017 (CCom-118), which would be addressed after receiving the Claimants' comments to the Respondent's correspondence of 21 and 23 June 2017.

369.   The Tribunal addresses subsequent issues arising from the Parties' compliance with PO8 in Section III.G.3 below.

## F.   Rescheduling of the written phase and the Evidentiary Hearing

370.   As explained above, the exchanges between the Parties with respect to document production were taking place in parallel with the briefing of the Claimants' Renewed RIM. These parallel proceedings had an effect on the procedural timetable, as recounted below.

---

[470]   As these terms are defined in AT-81 and in Procedural Order No. 7 of 9 June 2017.

[471]   With the exception of the Respondent's contention that the Tribunal has failed to acknowledge the Claimants' failure to produce the documents requested by the Respondent in its Request 1(b), which is addressed in this Order.

371. On 21 June 2017 (RCom-137), the Respondent wrote to the Tribunal with respect to the next procedural steps in the arbitration. In addition to reiterating the difficulties it was undergoing in the collection and review of documentation in response to the Claimants' document requests, the Respondent submitted that the proceedings were now "behind schedule", largely as a result of the Claimants' Renewed RIM.[472] It therefore queried whether the scheduled dates for the next written submissions and for the evidentiary hearing could be kept. The Respondent noted in particular that, while the document production process was far from concluded, the Claimants appeared to be ready to file their Statement of Reply on 23 June 2017, as scheduled. The Respondent submitted that "[i]t is ultimately the Claimants' decision whether they wish to go ahead and serve a Reply in circumstances where document production is not complete", but that, for its part, it would "not accept a later refiling or supplementing of that Reply to deal with documents produced after the Reply has been filed", nor would it "accept that the time to file its rejoinder should start to run at any time before the Claimants' document production is complete, with the time allocated for it to file its Rejoinder being calculated from the time on which such production is completed" (adding that either scenario would be "contrary to due process").[473] In light of these considerations, the Respondent formally requested the Tribunal to "engage with both parties […] so as to put in place a realistic and fair procedural timetable", and to state its availability for a hearing after June 2018.[474]

372. That same day, the Tribunal issued directions in response to the Respondent's communication (AT-87). In particular, the Tribunal invited the Claimants to confirm if they wished to extend the time limit to file their Reply until the document production phase has been finalised. If they did so confirm, it invited the Parties to consult with a view on agreeing on a revised procedural calendar. If the Claimants did not wish to extend the filing date of their Reply, the Tribunal confirmed that, in the meantime, its indication at footnote 1 of the procedural calendar at Annex A to PO4[475] still stood. The Tribunal gave further instructions for the briefing of the Respondent's comments on procedure.

373. On 23 June 2017 (RCom-139), the Respondent issued a formal protest to the Tribunal's directions in AT-87. The Respondent argued that the Tribunal had (i) "failed to engage with the serious procedural issues highlighted by the Respondent" in RCom-137, (ii) appeared to be blaming the Respondent for the delays in the schedule, and (iii) "continue[d] to be driven by an overriding mantra that the January 2018 hearing date must be preserved at all costs."[476] The Respondent objected in particular to the Tribunal's confirmation that the Tribunal's indication at footnote 1 of the procedural calendar at Annex A to PO4 still stood. The Respondent also argued that the Tribunal's

---

[472] RCom-137, ¶ 2.

[473] *Id.*, ¶¶ 6-7.

[474] *Id.*, ¶ 10.

[475] PO4, Annex A, p. 2 n. 1 ("Should there be a delay in the production of documents phase, the Tribunal may need to allow for the Claimants to provide comments on any documents that are not timely produced. If this becomes necessary, the Tribunal will then decide how to make up subsequently for that loss of time in a way that the hearing dates are not jeopardized. In doing so, the Tribunal will take into consideration all the circumstances, especially the cause for the delay.").

[476] RCom-139, ¶ 2.

directions in AT-87 failed to acknowledge the Claimants' failure to produce the documents requested by the Respondent in Document Request 1(b).

374.    On 23 June 2017 (CCom-117), the Claimants confirmed that they did not wish to extend the time period to file their Statement of Reply.

375.    On 24 June 2017, the Claimants filed their Statement of Reply. In the cover letter accompanying this submission (CCom-118), the Claimants "reserve[d] their rights to: (i) provide comments on any documents that are produced in accordance with footnote 1 of the current Procedural Calendar; (ii) make any Confidential Submission pursuant to Procedural Order No. 6 once disputes over redactions are resolved and any further required production has been made; and (iii) seek adverse inferences in respect of any documents the Respondent fails to produce in whole or in part."[477]

376.    On 26 June 2017 (AT-88), the Tribunal invited the Claimants to include with their comments to RCom-137 any comments they might have on RCom-139, and in particular to the Respondent's objection to footnote 1 of Annex A to PO4.

377.    As noted above, on 28 June 2017 the Tribunal issued PO8, ruling on the Parties' document requests. The Tribunal noted that PO8 addressed neither the Respondent's objections in RCom-137 and RCom-139,[478] nor the Claimants' reservations in CCom-118, which would be addressed subsequently.

378.    On 30 June 2017 (CCom-120), the Claimants submitted their comments on RCom-137 and RCom-139, reiterating "in the strongest possible terms their position that the long-agreed procedural calendar, including the hearing dates in January 2018, must be maintained".[479]

379.    On that same day (CCom-121), the Claimants submitted their comments on RCom-128 (in which the Respondent objected to PO3, PO4, and PO5), and on RCom-129 (in which the Respondent objected to PO7). On 10 July 2017 (AT-91), the Tribunal allowed the Respondent to submit further comments.

380.    On 10 July 2017 (RCom-142),[480] the Respondent replied to CCom-120, *inter alia* requesting the Tribunal to ensure that the Respondent had sufficient time to "prepare and file a full rejoinder on the basis of the entire record".[481] The Respondent stated that "this issue raises fundamental due process concerns and cannot simply be ignored on the basis of convenience of hearing dates".[482] The Respondent requested the Tribunal

---

[477]   CCom-118, p. 2.

[478]   With the exception of the Respondent's contention that the Tribunal has failed to acknowledge the Claimants' failure to produce the documents requested by the Respondent in its Request 1(b), which the Tribunal addressed in PO8.

[479]   CCom-120, p. 3.

[480]   In AT-91 of 6 July 2017, despite noting that both Parties had already submitted their positions on this matter, the Tribunal allowed the Respondent to submit additional comments, and the Claimants to rejoin.

[481]   RCom-142, ¶ 5.

[482]   *Ibid.*

to communicate its availability for hearings from June 2018 onwards, or to state why it would not communicate such availability.

381. The Claimants submitted their rejoinder comments on 18 July 2018 (CCom-127), requesting the Tribunal to determine that the Respondent had "failed to establish new and compelling circumstances justifying a significant amendment to the agreed procedural calendar", and as such there was "no need for the parties and the Tribunal to indicate their availability for alternative hearing dates".[483]

382. By email of 26 July 2017 (AT-94), the Tribunal informed the Parties that the Secretary of the Tribunal, Ms Sabina Sacco, had gone on maternity leave. Subject to the Parties' approval, the Tribunal advised that it intended to appoint Mr David Khachvani, a lawyer of Georgian nationality from the President's firm, as Assistant to the Tribunal and acting Secretary, starting immediately. Subject to the Parties' objections, Mr Khachvani would take over Ms Sacco's functions during her maternity leave and, depending on the needs of the case, assist the Tribunal in discrete matters after her return. A copy of Mr Khachvani's CV and statement of independence and confidentiality was circulated to the Parties. Neither Party raised any objection.

383. Following further communications from the Parties,[484] on 28 July 2017 (AT-95) (and without attempting at this juncture to determine whether the Respondent's due process concerns were warranted), the Tribunal indicated that it was available for a hearing on the separate weeks of 12 March and 23 April 2018. The Tribunal invited the Parties to comment on a potential postponement to such dates, requested the Respondent to indicate which of its procedural reservations would be cured with such a postponement, and invited the Parties to confer and propose a draft procedural calendar (under the assumption that such a postponement would take place). The Tribunal indicated that, upon receipt of the Parties' comments and proposals, it would decide whether or not to postpone the Evidentiary Hearing, noting that the central issue that would drive this decision was "whether this adjustment could alleviate various concerns raised by the Respondent while still meeting the Claimants' desire to have the hearing held as soon as is reasonably possible."[485]

384. On 4 August 2017 (CCom-131), the Claimants objected to a possible postponement of the Evidentiary Hearing. The Claimants insisted on the need to resolve this dispute expeditiously and submitted that the Respondent was not affected by any material delay that could not be accommodated within the existing procedural calendar. The Claimants further argued that the Respondent had deliberately refused to produce documents, and should not be rewarded for this behaviour by moving the hearing dates, especially since the Claimants "overwhelmingly prefer[red] to protect the existing hearing dates" irrespective of whether the Respondent had completed its document production.[486] In any event, the Claimants indicated that some of their witnesses were not available during the alternative time blocks offered by the Tribunal. In light of these objections, the

---

[483]  CCom-127, ¶ 9.

[484]  Respondent's email of 20 July 2017 (RCom-145); Tribunal's email of 21 July 2017 (AT-93); Claimants' email of 21 July 2017 (CCom-130); Respondent's letter of 21 July 2017 (RCom-146).

[485]  AT-95, p. 4.

[486]  CCom-131, ¶ 2.

Claimants proposed two alternative procedural calendars, one which preserved the hearing dates and another that proposed to use them to address jurisdiction and admissibility, with the hearing on the merits to take place in March 2018.

385.   On 8 August 2017 (RCom-150), the Respondent submitted its comments on the procedural calendar, the postponement of the Evidentiary Hearing and the Claimants' objections. The Respondent argued *inter alia* that the Claimants were "desperate[ly] attempt[ing] to railroad the proceedings to a premature and unfair hearing",[487] indicated which of its procedural reservations would be addressed by a postponement of the Evidentiary Hearing, and objected to the Claimants' proposed procedural calendars. The Respondent indicated that, in any event, it was not available for a hearing before June 2018, and attached a proposed revised calendar assuming a two-week hearing in June or July 2018.

386.   In the weeks that followed, the Parties and the Tribunal continued to exchange correspondence on this matter, with the Tribunal proposing alternative dates and inquiring as to the Parties' availability.[488]

387.   On 4 September 2017 (AT-102), the Tribunal informed the Parties that, despite its view that the Parties were fully able to present their positions under the current procedural calendar, "in order to streamline the proceedings with a view to gain both Parties' full support to the expeditious resolution of this dispute and in reliance on Counsel's representations on behalf of the Parties that a postponement will achieve that goal", the Tribunal was minded to postpone the hearing to the weeks of 20 and 27 August 2018.[489] The Tribunal invited the Parties, on the assumption that the hearing would be postponed, to confer and propose an amended procedural calendar.

388.   On 14 September 2017 (CCom-135), the Claimants circulated the Parties' joint calendar proposal.

389.   On 19 September 2017 (AT-104), the Tribunal confirmed to the Parties that the Evidentiary Hearing would be postponed to 20 to 31 August 2018 and circulated a revised procedural calendar.

### G.   Procedural steps preceding the Evidentiary Hearing

390.   In the months that preceded the Evidentiary Hearing, the Parties filed their second round of written submissions, exchanged correspondence related to the production of documents ordered under PO5 and PO8, and raised other procedural matters. At the same time, the Tribunal ruled on certain pending procedural applications. The following subsections summarise the steps taken in these various matters.

---

[487]   RCom-150, p. 2.

[488]   See, e.g., Claimants' letter of 11 August 2017 (CCom-132); Respondent's email of 13 August 2017 (RCom-151); Tribunal's letter of 14 August 2017 (AT-99); Respondent's letter of 17 August 2017 (RCom-152); Claimants' unnumbered email of 18 August 2017; Respondent's email of 21 August 2017 (RCom-154); Claimants' email of 21 August 2017 (CCom-134); Tribunal's email of 22 August 2017 (AT-101); Respondent's letter of 28 August 2017 (RCom-156).

[489]   AT-102, p. 3.

### 1.   Allegations of breach of confidentiality

391.   By letter of 14 June 2017 (RCom-133), the Respondent informed the Tribunal that the Claimants had released confidential information pertaining to the present proceedings to Indian and foreign media and on public online databases, such conduct being in disregard of the confidentiality/transparency regime established under PO2.

392.   Following exchanges between the Parties,[490] on 29 June 2017 (CCom-119), the Claimants denied that they had breached PO2, and argued that it was the Respondent who had breached its confidentiality obligations.

393.   On 14 August 2017 (AT-100), the Tribunal ruled on these allegations, dismissing both Parties' requests for relief.

### 2.   Compliance with PO5 on document production

394.   As noted in Section III.E.1.c above, on 18 May 2017, the Tribunal issued PO5, in which it ordered the production of certain documents responsive to the Claimants' Document Request No. 2. That same day, the Tribunal issued PO6, setting out confidentiality protections to be applied to any Restricted Documents produced in response to this request.

395.   On 12 June 2017 (RCom-127), the Respondent confirmed that, pursuant to paragraph 44(a) of PO5, it would produce to the Claimants documents responsive to the Claimants' Document Request No. 2 the following day at the RIM hearing. On 14 June 2017 (RCom-134), the Respondent confirmed that it had done so.

396.   On 19 June 2017 (CCom-116), the Claimants confirmed receipt of the documents, but asserted that many of them had been heavily redacted, reserved their right to object to such redactions, and requested the Respondent to submit a redaction log as set out in PO6.

397.   On 21 June 2017 (RCom-138), the Respondent submitted its redaction log.

398.   At the Tribunal's invitation, on 3 July 2017 (CCom-122) the Claimants submitted their comments and objections to the Respondent's redaction log.

399.   On 5 July 2017 (AT-90), the Tribunal invited the Respondent to respond by 10 July 2017. The Tribunal further noted that PO6 did not set out the procedure to settle disagreements on redactions. The Tribunal indicated that its preference was not to review the documents directly, but for the Parties to agree to the designation of a confidentiality expert to review full versions of the unredacted documents, and who would then submit a report to the Tribunal as to whether the Respondent's redactions complied with PO6. If the Parties agreed on this course of action, the Tribunal proposed to designate an official of the PCA Registry, which under paragraph 6(b) of PO6 would be considered an Authorised Person and thus already have access to Restricted

---

[490]   Including, in particular, Respondent's letter of 14 June 2017 (RCom-133); Claimants' letter of 15 June 2017 (CCom-115); Respondent's email of 20 June 2017 (RCom-136); Claimants' letter of 29 June 2017 (CCom-119); Respondent's letter of 26 July 2017 (RCom-147).

Documents (as defined in PO6). On 10 July 2017 (CCom-123), the Claimants confirmed that they would agree to such an arrangement.

400.   On 27 July 2017 (RCom-148), the Respondent commented on the Claimants' objections to its redaction log. The Respondent also noted that, while it agreed with the Tribunal's proposal to appoint a confidentiality expert, it did not agree on appointing an official of the PCA Registry, and proposed instead to appoint an Indian jurist with knowledge of international arbitration and Indian parliamentary privilege. The Respondent also proposed that the procedural calendar be amended to allow for such a review.

401.   On 28 July 2017 (AT-96), the Tribunal acknowledged the Parties' agreement to designate a confidentiality expert and invited the Claimants to comment on the Respondent's proposal as to the qualifications of such an expert.

402.   On 16 August 2017 (CCom-133), the Claimants objected to the Respondent's proposal, arguing that it would amount to "India choosing its own judge and violates basic principles of neutrality."[491]

403.   On 21 September 2017 (AT-105), the Tribunal invited the Parties to confer and propose, preferably jointly, such arbitral institution(s) or person(s) that they agreed to appoint as the confidentiality expert.

404.   On 5 October 2017 (CCom-136), the Claimants informed the Tribunal that both Parties had agreed to appoint an official of the PCA Registry as a confidentiality expert to review the Respondent's redactions to the Restricted Documents.

405.   On 9 October 2017 (AT-108), the Tribunal confirmed to the Parties that the PCA had agreed to act as confidentiality expert and invited the Parties to confer and agree on the relevant terms of appointment. During the weeks that followed, the Parties, the Tribunal and the PCA discussed the terms of appointment of the confidentiality expert.[492]

406.   On 28 November 2017, the PCA informed the Parties that it had designated Dr Dirk Pulkowski, a PCA Senior Legal Counsel, to act as confidentiality expert (the "Confidentiality Expert"). On that same day (AT-118), the Tribunal issued the Terms of Appointment of the Confidentiality Expert ("First ToA of the Confidentiality

---

[491]   CCom-113, ¶ 2.

[492]   See, e.g., Claimants' email of 17 October 2017 (CCom-139); Claimants' email of 20 October 2017 (CCom-141), attaching proposed Terms of Appointment; Respondent's unnumbered email of 30 October 2017; Tribunal's letter of 31 October 2017 (AT-111); PCA's email of 1 November 2017; Tribunal's email to the Parties of 1 November 2017 (AT-113); Claimants' email of 1 November 2017 (CCom-145); Respondent's email of 1 November 2017 (RCom-168); Tribunal's email of 2 November 2017 (AT-114); Respondent's email of 3 November 2017 (RCom-169); PCA's email of 3 November 2017; Claimants' email of 3 November 2017 (CCom-146); Respondent's email of 7 November 2017 (RCom-172); Claimants' email of 7 November 2017 (CCom-149); the PCA's email of 9 November 2017; Respondent's email of 10 November 2017 (RCom-173); Respondent's email of 14 November 2017 (RCom-174); Respondent's email of 15 November 2017 (RCom-175); PCA's email of 15 November 2017; Respondent's email to the Tribunal of 20 November 2017 (RCom-176).

Expert")[493] and circulated Dr Pulkowski's undertaking and biography. In accordance with its First ToA, the Confidentiality Expert was to review the Respondent's redactions to the Restricted Documents, and "consider the Respondent's justifications for redacting each document to determine whether the redactions are in compliance with para. 9(b) of Procedural Order No. 6, or such other standard that the Tribunal may adopt for future Review Documents."[494]

407.   On 1 December 2017 (RCom-181), the Respondent confirmed to the Tribunal that it had dispatched the relevant documents to the Confidentiality Expert.

408.   The Confidentiality Expert issued his report on 20 December 2017 ("First Report of the Confidentiality Expert"). In that First Report, he concluded that "most of the redacted passages in the English language in the Review Documents do not contain any information that relates directly or indirectly to, or could have an impact on, taxation of capital gains on the sale by non-residents of shares in a foreign company holding Indian assets", with the possible exception of "two lines of text on page 434 of Review Document A-16, which may inadvertently have been redacted."[495] The Confidentiality Expert also provided a brief description of the passages subject to redaction.

409.   On 21 December 2017 (AT-124), the Tribunal granted both Parties leave to comment on the Confidentiality Expert's conclusions that some redaction might have been inadvertent, and whether it would be opportune for the Respondent to produce an unredacted copy of such document without awaiting the forthcoming exchanges between the Parties scheduled for 4 January 2018. On 5 January 2018 (RCom-185), the Respondent confirmed that the two lines on page 434 of Document A-16 had been inadvertently redacted and provided the Claimants with a corrected version of that page.

410.   On 4 January 2018 (CCom-156), the Claimants indicated that they accepted the Confidentiality Expert's First Report, but submitted that it raised or left unresolved two issues on which the Claimants sought relief:

   a.   First, the unredacted pages from Document B1-B4 did not identify the specific speakers, making it difficult to understand the discussion. Accordingly, the Claimants requested the Tribunal to invite the Respondent to specifically identify the speakers in these pages.

   b.   Second, the Claimants noted that the unredacted portions of Document A16 contained a tabular description of the suggestions of various stakeholders on the DTC 2010, with the full comments contained in annexures that had not been produced. The Claimants thus requested that the Respondent be invited to confirm

---

[493]   The Tribunal notes that Dr Dirk Pulkowski was designated as confidentiality expert a second time later in these proceedings pursuant to different terms of appointment, which is the reason why terms of appointment discussed in this paragraph bear the indication "First". The First ToA of the Confidentiality Expert were later clarified by the Tribunal in its letter of 12 December 2017 (AT-121), following correspondence from the Claimants (CCom-150) and the Respondent (RCom-180) on 29 and 30 November 2017.

[494]   AT-118, ¶ 5(b).

[495]   Confidentiality Expert's Report of 20 December 2017, p. 4.

that these annexures were missing from Document A16, and if so, to produce those annexures.

411.   Following an invitation from the Tribunal communicated on 8 January 2018 (AT-124), and after requesting several extensions to seek instructions from the Speaker of the Lok Sabha,[496] the Respondent submitted its comments on point (b) above on 5 February 2018 (RCom-191). Specifically, the Respondent confirmed that Annexures III, VI, VII, XV, XVI referred to in Document A-16 were not a part of the redacted portion of that document, but asserted that, despite its best efforts, it had been unable to trace those documents. In any event, it reiterated that summaries of those annexures were contained in Document A-16. As to point (a) above, the Respondent indicated that it was still seeking instructions.

412.   On 13 February 2018 (CCom-162), the Claimants provided their comments on the Respondent's explanations and specified their requests for relief:

   a.   With respect to the identification of speaker names on Documents B1-B4, the Claimants noted that the documents already stated what stakeholders had spoken each day; their request was "that the Respondent indicate to which of the identified speakers the various snippets of unredacted text are attributable".[497] As a result, they argued that permission from the Speaker of the Lok Sabha should not be necessary to identify each speaker.

   b.   With respect to the Annexures to Document A-16, the Claimants requested the Respondent to provide a full account of its search efforts, in the absence of which the Claimants would request the Tribunal to draw an adverse inference (specifically, that those annexures would have shown that "the private sector overwhelmingly disfavoured Clauses 5 and 47 of the proposed legislation, and considered them to be inappropriate innovations that expanded India's tax net to reach income that had not been taxable under the Income Tax Act 1961.")[498]

413.   Following an invitation from the Tribunal on 14 February 2018 (AT-131), the Respondent responded on 26 February 2018 (RCom-196):

   a.   With respect to Documents B1-B4, the Respondent stated that "the Speaker of the Lok Sabha […] ha[d] denied disclosure of speaker names in Document B1-B4"; that, as a result, it was "unable to disclose the names of the speakers in the unredacted portions of Document B1-B4", and, consequently, "neither the representatives of the Respondent nor the Respondent's counsel team would themselves be in a position to disclose the speaker names in the face of this

---

[496]   See, e.g., Respondent's email of 12 January 2018 (RCom-187); Claimants' email dated 23 January 2018 (CCom-157); Tribunal's email of 24 January 2018 (AT-128); Respondent's email of 25 January 2018 (RCom-188); Claimants' unnumbered email dated 25 January 2018; Tribunal's email dated 26 January 2018 (AT-129); the Respondent's email of 30 January 2018 (RCom-189).

[497]   CCom-162.

[498]   Ibid.

direction from the Speaker of the Lok Sabha, given the very real risk of Parliamentary contempt proceedings[.]"[499]

b.   With respect to the annexures to Document A-16, the Respondent asserted that "every reasonable search for the requested documents […] ha[d] been made and the documents not found", and that it had "received a confirmation from the office of Speaker of the Lok Sabha that these annexures [were] not available with their office." [500] In any event, it added that "the summaries of the said annexures [were] contained in document A-16, and that the requested documents would not have shed any further light on matters relevant to these proceedings."[501]

414.   At the Tribunal's invitation on 28 February 2018 (AT-134), in the weeks that followed the Parties continued to exchange correspondence on these matters.[502]

415.   On 5 April 2018, the Claimants informed the Tribunal that "[g]iven the advanced stage of the proceedings and the real possibility that continued debate on this issue could disrupt the procedural calendar", they had decided to withdraw their request for the annexures to Document A-16, but did so "without prejudice to their position that the Respondent ha[d] failed to perform a reasonable search for the requested annexures."[503] On 11 April 2018 (CCom-169), the Claimants clarified that they were not presently seeking a ruling on adverse inference, but reserved their rights in this regard. By contrast, the Claimants did not withdraw their request for the identification of the speakers in the unredacted portions of Documents B1-B4.

416.   The Respondent submitted further comments on 17 April 2018 (RCom-205), indicating that its position remained unchanged, and it was thus unable to disclose the names of the speakers of the unredacted text in Documents B1-B4. The Respondent explained that "the Speaker of the Lok Sabha has denied disclosure of speaker names in Documents B1-B4 since this would now entail disclosure of the positions taken by the speakers which is completely different from simply providing a list of speakers (as provided in the privilege log) to which consent was earlier provided." The Respondent also reiterated that "the text of Documents B1-B4 pertains to verbatim proceedings before the Standing Committee of Parliament and hence are protected by parliamentary privilege under the Constitution of India and are thus to be excluded from evidence under Art. 9(2)(b) of the [IBA Rules]."[504]

---

[499]   RCom-196.

[500]   *Ibid*.

[501]   *Ibid*.

[502]   See, e.g., Claimants' email of 2 March 2018 (CCom-165); Tribunal's email of 6 March 2018 (AT-136); Respondent's email of 14 March 2018 (RCom-198); Tribunal's email of 14 March 2918 (AT-138); Claimants' email of 21 March 2018 (CCom-167); Tribunal's email of 23 March 2018 (AT-142).

[503]   Claimants' unnumbered email of 5 April 2018.

[504]   RCom-205, ¶ 5.

417.   At the Tribunal's invitation on 18 April 2018 (AT-146), in the weeks that followed the Parties continued to exchange correspondence on this matter.[505] In that correspondence, the Claimants confirmed that they maintained their request that the Respondent be ordered to identify the speakers of the unredacted portions of Documents B1-B4.[506]

418.   On 18 May 2018 (AT-154), the Tribunal requested the Respondent to transmit a letter to the Hon. Speaker of the Lok Sabha, in which the Tribunal requested the Hon. Speaker to allow the disclosure of the names of the speakers in Documents B1-B4.

419.   On 18 June 2018 (AT-162), after enquiring on the status of its request to the Speaker of the Lok Sabha and receiving an update from the Respondent,[507] the Tribunal indicated that, considering the time pressure imposed by the upcoming hearing, if it received no answer by 2 July 2018, it would rule on the Claimants' request for relief.

420.   On 22 June 2018 (CCom-179), the Claimants reiterated their position and requested that the Tribunal "clarify that the Respondent [was] under an obligation to produce the speaker names in Documents B1 to B4 and determine that its failure to do so [would] put it in violation of the Tribunal's production orders in this regard."[508]

421.   At the Tribunal's invitation on 18 June 2018 (AT-162), on 2 July 2018 (RCom-221), the Respondent indicated that, after having duly considered the Tribunal's request, the Hon. Speaker of the Lok Sabha had conveyed that "it may not be possible for the Hon'ble Speaker to waive the parliamentary privileges that cover and protect the verbatim proceedings before the Standing Committees of Parliament", and "consequently, it may not be possible […] to grant the Tribunal's request in this connection."[509] The Respondent thus reiterated that "the names of person[s] in connection with the statements contained in the Document B1-B4 set may not be disclosed".[510]

422.   On 10 July 2018, the Tribunal issued Procedural Order No. 12 ("PO12") in which it held that the Respondent was under an obligation to identify the speakers' names in the unredacted portions of Documents B-1-B-4 and explained its reasons for this decision. The Tribunal ordered the Respondent to identify the names within one week of PO12 being issued and determined that the Respondent's failure to do this would put it in violation of the Tribunal's production order in this respect.

423.   On 17 July 2018 (RCom-227), the Respondent indicated that PO12 had been forwarded to the Speaker of the Lok Sabha for further directions and requested an extension of one week to respond to the Tribunal's directions. On 24 July 2018 (RCom-231), the

---

[505]   See, e.g., Claimants' email of 27 April 2018 (CCom-170); Tribunal's email of 30 April 2018 (AT-148); Respondent's email of 12 May 2018 (RCom-210); Tribunal's email of 15 May 2018 (AT-152); Claimants' email of 17 May 2018 (CCom-173).

[506]   CCom-173.

[507]   Tribunal's email of 8 June 2018 (AT-160) and Respondent's email of 14 June 2018 (RCom-217).

[508]   CCom-179.

[509]   RCom-221.

[510]   Ibid.

Respondent requested a further extension of time, until 3 August 2018, to respond to the Tribunal's directions in PO12.

424. On 4 August 2018 (CCom-196), the Claimants requested that the Respondent be directed to disclose the speakers' names without further delay.

425. On 5 August 2018 (RCom-240), the Respondent confirmed to the Tribunal that it had received permission from the Speaker of the Lok Sabha to identify the speakers of the unredacted text in Documents B1-B4 for limited circulation in accordance with PO6, and had disclosed the speakers' names to the Claimants' Authorised Persons in accordance with PO6 and PO12.

426. On 11 August 2018 (CCom-205-Confidential), the Claimants filed a confidential submission pursuant to PO6. At the Tribunal's invitation of 15 August 2018 (AT-190-Confidential), on 4 September 2018 the Respondent did not object to the admissibility of the Claimants' submission and commented on the briefing schedule for future confidential submissions (RCom-273). In light of these comments, on 7 September 2018 (AT-195-Confidential) the Tribunal admitted CCom-205 and its exhibits into the record and issued instructions for further briefing.

### 3. Compliance with PO8 on document production

427. As noted in Section III.E.2 above, on 28 June 2017, the Tribunal issued PO8 ruling on the Parties' scheduled document requests. Among other directions, PO8 ordered the Respondent to submit specific objections on the Claimants' document requests within one week from the order and likewise ordered the Claimants to produce documents responsive to the Respondent's requests within two weeks from the order.

428. On 5 July 2017 (RCom-141), the Respondent indicated that it would not be able to comply with the time limit set out in PO8 and requested an extension. Following an invitation to comment from the Tribunal on 6 July 2017 (AT-91), the Claimants objected to the Respondent's request on 12 July 2017 (CCom-124). On 19 July 2017 (RCom-143), the Respondent commented on the Claimants' objection, indicating that it was not yet in a position to produce a schedule indicating when the Claimants could expect to receive documents pursuant to PO8 and its objections to document requests (if any).

429. On 13 July 2017 (CCom-125), the Claimants produced documents responsive to the Respondent's requests pursuant to PO8. The following day (CCom-126), the Claimants provided a log of excluded and redacted documents from their production of documents of the previous day.

430. On 18 August 2017 (RCom-153), the Respondent provided its additional responses to the Claimants' document requests, together with a privilege log. On 21 August 2018 (RCom-155), the Respondent submitted a revised and updated privilege log.

431. On 4 September 2017, the Tribunal issued PO10, which addressed the sharing of documents between this arbitration and the *Vedanta* arbitration (discussed in Section III.D above).

432.   As noted above, on 19 September 2017 (AT-104), the Tribunal issued a revised procedural calendar. Pursuant to this calendar, the Respondent was to complete the document production ordered in PO8 by 29 September 2017.

433.   On 25 September 2017 (RCom-158), the Respondent sought clarification from the Tribunal in relation to certain sections of PO8. The Tribunal provided such clarification on the following day (AT-106).

434.   On 1 October 2017 (Claimants' unnumbered email), the Claimants indicated that the Respondent had yet to complete its document production, and requested that the Respondent produce the documents without further delay. The following day (Respondent's unnumbered email), the Respondent informed that it had been unable to complete its document production and would obtain further instructions on the matter.

435.   On 3 October 2017 (AT-107), the Tribunal addressed the Parties' correspondence of 1 and 2 October 2017, *inter alia*, granting leave to the Claimants to respond to the Respondent's requested extension of time. That same day (RCom-159), the Respondent provided a further update, a redaction log in relation to certain of the document requests, and comments on the Tribunal's correspondence of earlier that day.

436.   On 12 October 2017 (RCom-161), following an extension granted by the Tribunal, the Respondent confirmed that it had completed its search in response to the Claimants' document production requests.

437.   On 13 October 2017 (CCom-137), the Claimants wrote to the Tribunal asserting that the Respondent had refused to engage in the *inter partes* procedure envisaged by the amended procedural calendar set out in AT-104 to resolve questions or concerns regarding document production, and proposed that this procedure be delayed by one week to permit an *inter partes* resolution. On the same date (RCom-162), the Respondent criticised the Claimants for involving the Tribunal in this matter and contended that it was the Claimants who failed to engage in the *inter partes* procedure. The Respondent also noted that if the Tribunal were "minded to extend the timelines by a week, then the same should apply to all stages until the final written pleadings".[511] The Claimants provided further comments on 15 October 2017 (CCom-138).

438.   On 16 October 2017 (AT-109), the Tribunal expressed its concern over the Parties' engagement in "a controversy that [was] not likely to foster the efficiency of the Proceedings".[512] In order to allow the Parties "to achieve as much procedural progress as possible without the Tribunal's intervention", [513] the Tribunal granted a one-week extension for filing any applications regarding deficiencies in document production.

439.   On 20 October 2017, each Party filed an application alleging a deficient document production by the other (CCom-140 and RCom-164). At the Tribunal's invitation, the Claimants filed their response on 27 October 2017 (CCom-142), while the Respondent

---

[511]   RCom-162.

[512]   AT-109.

[513]   *Ibid*.

filed its response on 28 October 2017 (RCom-165), i.e., one day after the date previously set by the Tribunal.

440.  On 31 October 2017 (AT-110), the Tribunal acknowledged receipt of the Parties' submissions, expressed its understanding that there would be "no further exchange of comments between the Parties on their respective applications on deficient document production and that it [was] now for the Tribunal to decide on the matter",[514] and invited the Parties to indicate whether they required a second round by 1 November 2017. On that date, both Parties indicated that they envisaged an opportunity to exchange a further reply submission (CCom-144 and RCom-166). On 1 November 2017 (AT-112), the Tribunal acknowledged the Parties' positions and invited them to file their reply submissions by 6 November 2017.

441.  On 1 November 2017 (RCom-167), the Respondent requested the Tribunal to (i) expressly acknowledge the mistake in its communication of 31 October 2017, (ii) expressly note the delay of one week caused by the Claimants in the filing of their application on deficient document production, and (iii) grant an extension so that the Respondent could file its reply submission on 7 November 2017. The Respondent further reserved its right "to ask for a hearing on the issue of document production given the manner in which this question has developed procedurally, and the central relevance of the documents requested".[515] On 2 November 2017 (AT-115), for the reasons contained in its correspondence, the Tribunal denied the Respondent's requests.

442.  By email of 4 November 2017 (RCom-170), the Respondent reiterated its objections to the Tribunal's directions with respect to the timing of the reply submissions. The Claimants commented on these objections on that same day (CCom-147).

443.  On 6 November 2017 (CCom-148 and RCom-171), the Parties exchanged their reply submissions on their applications regarding alleged deficiencies on document production.

444.  On 16 November 2017, the Tribunal issued Procedural Order No. 11 ("PO11") with its decision on the Parties' applications on alleged deficiencies in the production of documents pursuant to PO8, and ordered each Party to comply with their outstanding document production obligations as specified in PO11 by 29 November 2017.

445.  On 29 November 2017 (CCom-151), the Claimants produced documents responsive to the Respondent's requests.

446.  On 30 November 2017 (RCom-179), the Respondent provided an update on its efforts to identify and produce responsive documents in accordance with PO11. On that same date (RCom-178), the Respondent updated its list of Authorised Persons pursuant to PO6.

---

[514]   AT-110.

[515]   RCom-167.

### 4.   The Respondent's protest against PO11 and its Additional Document Request

447.   Also on 29 November 2017 (RCom-177), the Respondent formally registered its protest against the reasoning and decisions of the Tribunal in PO11, which it argued "creates yet another violation of the Respondent's due process rights", and filed a formal application for document production for certain categories of documents that had been denied in PO11 (the Respondent's "Additional Document Request").[516]

448.   At the Tribunal's invitation on 7 December 2017 (AT-120), the Claimants submitted comments on RCom-177 and on the Respondent's Additional Document Request on 11 and 19 December 2017 (CCom-152 and CCom-153, respectively). The Claimants also objected to the Respondent's "attempt to exclude from its production of 30 November 2017 [as detailed in the Respondent's privilege log] a draft dated 9 February 2015 of the Draft Assessment Order […] eventually issued against the CUHL".[517]

449.   On 12 December 2017 (AT-122), the Tribunal addressed the Respondent's protest against PO11. The Tribunal explained the reasons for its decisions on the Parties' applications on document production and expressed the hope that such explanations would reassure the Parties and, more specifically, remove the Respondent's doubts about the Tribunal's even-handedness.

450.   At the Tribunal's invitation on 20 December 2017 (AT-123), on 4 January 2018 (RCom-186), the Respondent submitted its reply to the Claimants' objections on its Additional Document Request, and reserved its right "to request an oral hearing in person if the Tribunal would otherwise be minded to dismiss the [Additional Document Request]".[518] On that same date (RCom-184), the Respondent commented on the Claimants' objection to its assertion of privilege on the draft DAO.

451.   On 17 January 2018 (AT-126), the Tribunal ruled on the Respondent's Additional Document Request, granting certain requests and denying others.

452.   On 22 January 2018 (AT-127), the Tribunal determined that the Respondent had not established that it could withhold the internal DAO from production and ordered the Respondent to produce it by 29 January 2018.

453.   On 23 January 2018 (CCom-158 and CCom-159), the Claimants provided their response to AT-126, and produced certain documents to the Respondent.

454.   On 30 January 2018 (RCom-190), the Respondent requested the Tribunal to review its decision on the draft DAO and to deny the Claimants' request for disclosure of that document. On 7 February 2018 (CCom-161), the Claimants opposed the Respondent's request.

---

[516]   RCom-177.

[517]   CCom-153.

[518]   RCom-186, ¶ 27.

455.   On 12 February 2018 (AT-130), for the reasons contained in its letter, the Tribunal rejected the Respondent's request for reconsideration of AT-127 and ordered the Respondent to produce the internal DAO by 13 February 2018.

456.   On 13 February 2017 (RCom-192), the Respondent produced the internal DAO and, *inter alia*, requested the Tribunal to direct the Claimants to refrain from using the document in any proceedings other than this arbitration. At the Tribunal's invitation on 14 February 2018 (AT-132), the Claimants confirmed that they would refrain from using the internal draft assessment order other than in this arbitration on 19 February 2018 (CCom-163).

### 5.     Other procedural steps prior to the Evidentiary Hearing

457.   On 21 December 2017, pursuant to the revised procedural calendar set out in AT-104, the Claimants filed an updated Reply.

458.   On 25 February 2018 (RCom-195), the Respondent requested an extension until 28 March 2018 for the filing of its Rejoinder. The Claimants did not raise an objection,[519] and on 28 February 2018 (AT-135), the Tribunal granted the request, issuing the Parties an amended procedural calendar reflecting the new dates for the Parties' next submissions.

459.   On 12 March 2018 (AT-137), the President of the Tribunal made a disclosure, to which neither Party raised any objection.

460.   On 19 March 2018 (RCom-198), the Respondent sought a further extension for the submission of its Rejoinder (until 9 April 2018). Following an invitation from the Tribunal to comment on 20 March 2018 (AT-139), the Claimants expressed their concern that the Respondent's request was not adequately justified on 21 March 2019 (CCom-166). On 22 March 2018 (AT-141), the Tribunal granted the Respondent the requested extension, noting however that the Claimants would have the opportunity to claim redress if they should suffer any harm from the delay.

461.   On 10 April 2018, the Respondent filed its Rejoinder to the Claimants' Updated Reply.

462.   On 20 April 2018, the Respondent submitted a revised version of its Rejoinder which corrected certain typographical errors.

463.   On 2 May 2018 (CCom-171), the Claimants requested the production of the partial award on jurisdiction and admissibility and related documents from the *Vedanta* arbitration. The following day (RCom-208), the Respondent submitted comments on the request.

464.   On 7 May 2018 (CCom-172), the Claimants sought an extension for the submission of their Rejoinder on Jurisdiction until 28 May 2018, to which the Respondent raised no objection on the following day (RCom-209). The Tribunal granted the extension on 9 May 2018 (AT-151).

---

[519]   Tribunal's email of 26 February 2017 (AT-133); Claimants' email of 27 February 2017 (CCom-164).

465.  On 28 May 2018, in accordance with the Tribunal's instructions, the Claimants filed their Rejoinder on Jurisdiction.

466.  On 25 June 2018 (RCom-218), the Respondent objected to the Claimants' Rejoinder on Jurisdiction, arguing *inter alia* that the Claimants had "misused their Rejoinder on Jurisdiction and Admissibility to introduce evidence and arguments on the merits".[520] However, the Respondent indicated that it was prepared to allow the Claimants' Rejoinder to remain as it was, provided that the Respondent be allowed to adduce certain responsive documents, and that the Tribunal order the Claimants to lift the redactions on certain exhibits. That same day (AT-164), the Tribunal invited the Claimants to comment, and to indicate whether they consented to the redactions being lifted. The Tribunal additionally requested the Respondent to clarify a certain aspect of its request for relief, which the Respondent clarified the following day (RCom-219).

467.  On 2 July 2018 (CCom-181), the Claimants provided their comments and raised claims of privilege. The following day (AT-165), the Tribunal, *inter alia*, requested the Claimants to substantiate their privilege claims. On 6 July 2018 (CCom-182), the Claimants provided their response to the Tribunal's enquiry. On 12 July 2018 (RCom-223), the Respondent submitted its comments.

468.  On 11 July 2018 (CCom-183), the Claimants wrote to "update the Tribunal on significant recent events in respect of Cairn's shareholding in Vedanta Limited",[521] namely that the previous week the Claimants had been informed by the Tax Recovery Officer that the ITD had sold part of CUHL's shareholding in CIL/VIL, and that the first of such sales appeared to have taken place in May 2018, without any update to the Tribunal by the Respondent. The Claimants expressed various concerns in relation to these sales and requested the Tribunal to invite the Respondent to account for its actions. The Claimants also requested leave to submit an updated quantum report once the full impact of the Respondent's actions could be assessed. The Respondent responded on 12 July 2018 (RCom-222) and agreed with the submission of updated quantum reports. On 13 July 2018 (AT-168), the Tribunal took note of the Parties' submissions and invited them to consult on the procedure for updated quantum reports.[522]

469.  On 14 July 2018 (RCom-224), the Respondent provided an update regarding the Claimants' request for documents related to the *Vedanta* arbitration, and indicated that it was "making an urgent application to the Singapore High Court for declarations as to the legal status of the Vedanta investment arbitration regarding transparency and confidentiality and authorising the Respondent to produce the full record (redacted if necessary and appropriate) of the Vedanta Jurisdictional Hearing into the Cairn arbitration".[523] On 17 July 2018 (CCom-187), the Claimants indicated they had no further comments but reserved their right to comment at a later stage.

---

[520]  RCom-218, ¶ 5.

[521]  CCom-183, ¶ 1.

[522]  Tribunal's email of 13 July 2018 (AT-168).

[523]  RCom-224, ¶ 5.

470.   On 24 July 2018 (AT-174), the Tribunal addressed the Parties' submissions on the Respondent's objection to the Claimants' Rejoinder on Jurisdiction and issues of privilege, and issued directions (requesting the Parties, *inter alia*, to address points of law related to issues of privilege in relation to five documents).

471.   On 25 July 2018 (CCom-191), the Claimants submitted their response to the Tribunal's request, and the Respondent provided its comments on 30 and 31 July 2018 (RCom-234 and RCom-235). Further comments were submitted by the Claimants and the Respondent on 5 and 6 August 2018 respectively (CCom-197 and RCom-242).

472.   On 13 August 2018 (AT-186), the Tribunal ruled on the Respondent's outstanding requests, the remaining request having been resolved by the Parties.

473.   On 16 August 2018 (RCom-256), the Respondent refiled complete, legible copies of three exhibits that had been produced by the Claimants to the Respondent on 7 and 13 August 2018.[524]

## H.   The Evidentiary Hearing

### 1.   Hearing organization

474.   On 21 March 2018 (AT-140), the Tribunal confirmed that the Evidentiary Hearing would be held at the Peace Palace in The Hague.

475.   On 21 June 2018 (AT-163), the Tribunal issued instructions to the Parties with respect to the organisation of the Evidentiary Hearing, invited the Parties to consult on its sequence and logistics and submit joint or separate proposals, and indicated that any outstanding matters would be addressed at a pre-hearing telephone conference, which would be conducted by the President only on behalf of the Tribunal, subject to the Parties' agreement.

476.   On 29 and 30 June 2018 (CCom-180 and RCom-220, respectively), the Claimants and the Respondent identified the witnesses and experts they wished to call for cross-examination, indicated their consent for the pre-hearing telephone conference to be conducted by the President on behalf of the Tribunal, and indicated their availabilities for such conference.

477.   On 5 July 2018 (AT-166), after considering the Parties' availabilities, the Tribunal fixed the pre-hearing telephone conference call for 20 July 2018 at 3:30 pm CET.

478.   In the weeks that followed, the Parties exchanged extensive correspondence with respect to the organisation of the Evidentiary Hearing and the manner in which the pre-hearing telephone conference was to be held. In summary, while the Parties were able to agree on a number of issues, substantial differences remained. To resolve these differences, the Respondent requested that the pre-hearing conference take place in-person with the President representing the Tribunal. The Claimants, for their part, submitted that an in-

---

[524]   The refiled exhibits were: Exh. R-269; Exh. R-270; Exh. R-100AA.

person hearing was not necessary, and that any outstanding differences could be resolved by the Tribunal's addressing the Parties' separate proposals.[525]

479.   On 17 July 2018 (AT-170), the Tribunal determined that an in-person hearing was not necessary to resolve the Parties' disagreements on hearing organisation. The Tribunal proposed instead a pre-hearing telephone conference conducted by the President only on behalf of the Tribunal on 20 or 24 July 2018, or a telephone conference attended by the full Tribunal on 24 July 2018. After further exchanges between the Parties,[526] the pre-hearing telephone conference was scheduled for 20 July 2018.

480.   On 19 July 2018 (AT-172), the Tribunal circulated a draft of Procedural Order No. 13 ("PO13") for the Parties' review, to be used as a basis for discussion during the pre-hearing conference. On 19 and 20 July 2018, the Respondent and the Claimants submitted their comments (RCom-230 and CCom-189, respectively).

481.   The pre-hearing telephone conference took place on 20 July 2018, with the attendance of the Parties, the President of the Tribunal, the Tribunal's Secretary, and counsel for the PCA. The conference was devoted to discussing the organisation of the hearing on the basis of the draft Order circulated by the Tribunal and the Parties' latest proposals. Mr McNeill and Mr Reich addressed the Tribunal for the Claimants, and Mr Moollan addressed the Tribunal for the Respondent.

482.   On 23 July 2018 (AT-173), the Tribunal issued PO13 addressing the organisation of the Evidentiary Hearing. A corrected version of PO13 was circulated on 25 July 2018 (AT-175).

### 2.   Pre-hearing applications

483.   In the weeks preceding the Evidentiary Hearing, the Parties raised a number of procedural matters related to the hearing, the submission of evidence, and the withdrawal of counsel. The Tribunal summarises the main procedural incidents below.

484.   <u>Withdrawal of Mr Salve</u>. On 15 July 2018 (CCom-185), the Claimants requested that Mr Harish Salve SA be removed from the Claimants' list of counsel. On 3 August 2018 (RCom-238), the Respondent argued that the Claimants' change of "Lead Indian Counsel five weeks before the hearing [was] a very significant development and one which the Respondent […] submit[ted] should lead to adverse inferences being drawn against the Claimants' case".[527] On 6 August 2018 (AT-181), the Tribunal expressed its preference, in light of the limited time available at the hearing, for the Claimants to comment on this point in writing two weeks after the hearing, after which both Parties could submit their final comments in their post-hearing briefs, or closing oral

---

[525]   See, e.g., Claimants' unnumbered email of 11 July 2018; Respondent's unnumbered email of 13 July 2018; Respondent's letter of 14 July 2018 (RCom-224); Claimants' letter of 14 July 2018 (CCom-184); Tribunal's unnumbered email of 14 July 2018; Respondent's email of 15 July 2018 (RCom-226); Claimants' email of 17 July 2018 (CCom-186); Respondent's letter of 18 July 2018 (RCom-228); Claimants' email of 18 July 2018 (CCom-188).

[526]   See, e.g., Respondent's letter of 18 July 2018 (RCom-228); Claimants' email of 18 July 2018 (CCom-188); Respondent's email of 18 July 2018 (RCom-229); Tribunal's email of 18 July 2018 (AT-171).

[527]   RCom-238, ¶ 1.

submissions. That same day (RCom-243), the Respondent submitted comments on the Tribunal's correspondence of earlier that day.

485.   Request to file new factual and legal exhibits. On 2 August 2018 (RCom-237), the Respondent applied for leave to introduce new factual and legal exhibits into the record, requested guidance on the use of documents in the public domain during the hearing, and requested that their witness, Mr Puri, be allowed to have access to or use demonstrative exhibits during his examination. That same day (CCom-194), the Claimants refiled certain exhibits in a corrected form and sought leave to introduce additional legal and factual exhibits to the record. On 3 August 2018 (AT-179), the Tribunal noted the various procedural requests and invited the Parties to consult on these matters and to revert to the Tribunal. After several exchanges between the Parties and updates to the Tribunal,[528] on 10 August 2018 (AT-184), the Tribunal issued directions on these procedural requests, including on the requests to documents in the public domain. In the days that followed, the Parties and the Tribunal continued to exchange correspondence regarding these procedural requests, in particular with respect to the filing of new or corrected exhibits and documents in the public domain.[529]

486.   Updated quantum reports. On 3 August 2018 (CCom-195) and pursuant to PO13,[530] the Claimants filed the Third Witness Statement of Ms Janice M. Brown, and the Third Expert Report of Mr Richard Boulton. On 17 August 2018 (RCom-258), the Respondent argued that the issues raised in Mr Boulton's Third Expert report could not "fairly be dealt with at the hearing and, to the extent that they must be dealt with at all, must necessarily be adjourned"[531] to be addressed in post-hearing briefs or in separate written or oral submissions. The Respondent also made a number of specific objections to the admissibility of Mr Boulton's Third Report, arguing that certain sections should be struck from the record. The Claimants rejected the Respondent's objections the following day (CCom-209), arguing *inter alia* that the need for Mr Boulton's updated report was as a consequence of the Respondent's failure to agree to the experts meeting and preparing a joint report to narrow the areas of disagreement, and that no sections of

---

[528]   Respondent's email of 5 August 2018 (RCom-241); Respondent's email of 6 August 2018 (RCom-244); Respondent's letter to of 7 August 2018 (RCom-246); Respondent's email of 8 August 2018 (RCom-248); Claimants' letter of 8 August 2018 (CCom-200); Claimants' email of 8 August 2018 (CCom-202).

[529]   Claimants' communications of 11 August 2018 (CCom-203 and CCom-204); Respondent's communications of 11 August 2018 (RCom-251, RCom-252, RCom-252A and RCom-252B); Tribunal's email of 11 August 2018 (AT-185); Respondent's email of 13 August 2018 (RCom-253); Claimants' email of 14 August 2018 (CCom-207); Claimants' email of 15 August 2018 (CCom-208);   Respondent's email of 15 August 2018 (RCom-254); Tribunal's email of 15 August 2018 (AT-189); Respondent's email of 16 August 2018 (RCom-257); Tribunal's email of 16 August 2018 (AT-192).

[530]   In PO13, in order to allow Ms Brown to address new arguments or evidence proffered by the Respondent after the date of Ms Brown's latest witness statement, while ensuring that the Respondent had sufficient time to prepare its cross-examination, the Tribunal invited the Claimants to file a short supplemental witness statement from Ms Brown, on or before 3 August 2018, in which she should include any new direct testimony she wished to add to the record (PO13, ¶¶ 29(a)(ii)). In addition, the Parties agreed that on or before 3 August 2018, the Claimants would submit an updated quantum report from Mr Boulton, which would take into account the recent sale of CIL (now VIL) shares, as well as some errors pointed out by Mr Kristensen, and that Mr Kristensen would have the right to respond, preferably in writing before the hearing; otherwise during his presentation at the hearing. (PO13, ¶ 29(b)(ii)).

[531]   RCom-258.

his Third Report should be struck from the record. During the Evidentiary Hearing, the Tribunal decided that the examination of the quantum experts would be deferred to after the hearing and proposed a procedure for that matter. Following the hearing, the Parties reached an agreement on an alternative procedure, which was subsequently laid out in Procedural Order No. 14 ("PO14") of 20 September 2018, and discussed in Section III.I.1 below.

487.   Hearing sequence. On 7 August 2018 (CCom-199), the Claimants indicated that they wished to make a change to the order of cross-examination at the hearing. That same day (RCom-247), the Respondent requested that the previously agreed hearing schedule be maintained. Following further comments from the Claimants and the Respondent,[532] on 9 August 2018 (AT-183), the Tribunal confirmed that the original hearing sequence agreed by the Parties as reflected in Annex A of PO13 would be maintained.

488.   Production of the Appendices of the Project Sapphire Presentation. At the Respondent's request, on 13 August 2018 (CCom-206), the Claimants filed a new version of Exhibit CWS-Brown-139A (the "Project Sapphire Presentation"[533]) with appendices, with the exception of Appendices V and VI, which the Claimants withheld on grounds of legal privilege. On 16 August 2018 (RCom-255), the Respondent objected to the privilege claim and requested the Tribunal order production of these documents. Following further correspondence between the Parties and the Tribunal[534] and submissions from the Parties during the hearing, the Tribunal determined that it would not order the Claimants to disclose those appendices, but proposed that they could be examined by a confidentiality expert, to which the Parties agreed. The Parties decided to engage Dr Dirk Pulkowski from the PCA as confidentiality expert for this purpose and undertook to draft his Terms of Appointment.[535] The next procedural steps related to this application are discussed in Section III.I.5 below.

489.   President's disclosure. On 13 August 2018 (AT-187), the President of the Tribunal made a disclosure, to which neither Party raised an objection.

490.   Respondent's new request for production of documents. On 18 August 2018 (RCom-260) the Respondent wrote to "put on the record serious inadequacies in the Claimants' disclosures, and to seek immediate remedial action in that respect."[536] In particular, the Respondent requested the Tribunal to order the Claimants, as a matter of urgency, to produce documents inter alia related to the reasons (and in particular tax reasons)

---

[532]   Claimants' email of 8 August 2018 (CCom-201); Respondent's email of 9 August 2018 (RCom-250).

[533]   The Project Sapphire Presentation is a document containing the slides of a presentation made by ABN Amro Rothschild at a board meeting of Cairn Energy on 4 April 2005. The Claimants submitted this document without appendices as Exh. CWS-Brown-139, together with Brown WS2. It was the Claimants' position (which the Respondent disputed) that this document was presented to Cairn's board without appendices.

[534]   See, e.g., Tribunal's letter of 16 August 2018 (AT-191); Claimants' letter of 18 August 2018 (CCom-201); Respondent's email of 18 August 2018 (RCom-261); Respondent's email of 23 August 2018 (RCom-267).

[535]   PO14, ¶ 60.

[536]   RCom-260, ¶ 1.

underlying the structure of the 2006 Transactions,[537] to conduct further searches for these documents, and to provide a complete privilege log if privilege claims were raised. The Respondent also requested the Tribunal to draw adverse inferences from the matters discussed in its letter. At the Tribunal's invitation on 18 August 2018 (Tribunal's unnumbered email), the Claimants commented on this request on 19 August 2018 (CCom-211). At the beginning of the Evidentiary Hearing on 20 August 2018, the Respondent withdrew its request for a ruling after the Claimants confirmed to the Tribunal that it had and was still searching for relevant documents sought.[538] The Claimants confirmed that the ongoing search specifically included presentations to CEP's Board on 8 March 2006 and "documents relating to the Board meeting".[539]

### 3.    The Evidentiary Hearing

491.    The Evidentiary Hearing took place at The Hague from 20 to 31 August 2018, with the participation of the following persons:

**Tribunal**
Mr Laurent Lévy (President)
Mr Stanimir Alexandrov (Co-arbitrator)
Mr J. Christopher Thomas QC (Co-arbitrator)
Ms Sabina Sacco (Secretary of the Tribunal)

**Claimants**
Mr Mark McNeill (Shearman & Sterling LLP)
Mr Jeremy Sharpe (Shearman & Sterling LLP)
Mr Daniel Reich (Shearman & Sterling LLP)
Mr Daniel Purisch (Shearman & Sterling LLP)
Mr Tsegaye Laurendeau (Shearman & Sterling LLP)
Ms Trisha Mitra (Shearman & Sterling LLP)
Ms Arianna Rosato (Shearman & Sterling LLP)
Ms Martina Reynolds (Shearman & Sterling LLP)
Mr Arvind Datar (Chambers of Arvind Datar)
Mr Paul Hally (Shepherd & Wedderburn LLP)
Ms Niti Dixit (S&R Associates)
Mr Uday Walia (S&R Associates)
Mr Niek Peters (Cleber N.V.)
Ms Kathryn Anderson (Cairn Energy PLC)
Mr Duncan Holland (Group Legal Manager, Cairn Energy PLC)
Mr Simon Thomson (Cairn Energy PLC)
Mr Tim McClean (FTI Consulting Group Inc.)
Mr Noel Matthews (FTI Consulting Group Inc.)

---

[537]    *Id*., ¶ 13(a) (specifically, the Respondent requested production of "all documentary evidence (in whatever form) already identified by them recording, evidencing or otherwise relevant to (i) the manner in which the Claimants structured the 2006 Transaction […]; (ii) the reasons why the 2006 Transaction was structured as it was, including (without limitation) any and all tax reasons and (iii) all advice which the Claimants received regarding the tax implications of all structures considered by them (whether pursued or not) for the 2006 Transaction.").

[538]    Transcript, Evidentiary Hearing, Day 1, 22:2-4. See also Transcript, Evidentiary Hearing, Day 1, 10-21.

[539]    *Id.*, 21:22-23.

Mr Hiren Bhatt (KPMG India)
Mr Prashant Maheshwari (KPMG India)
Ms Janice Brown (SOCO International PLC)
Mr James Smith (CFO, Cairn Energy PLC)
Mr John Gardiner QC (11 New Square)
Mr Richard Boulton QC (One Essex Court)

**Respondent**
Mr Salim Moollan QC (Essex Court Chambers)
Mr Gourab Banerji SA (Essex Court Chambers)
Professor Chester Brown (7 Wentworth Selbourne Chambers)
Mr Shreyas Jayasimha (Aarna Law)
Ms Jessica Wells (Essex Court Chambers)
Mr Mihir Naniwadekar (Aarna Law)
Mr Chetan Rao (Additional Commissioner of Income Tax (OSD) (FT&TR-I))
Dr Luther M. Rangreji (Embassy of India in the Netherlands)
Ms Mrinalini Kaur Sapra (Embassy of India in the Nettherlands)
Ms Kamala Naganand (Aarna Law)
Ms Niyati Gandhi (Aarna Law)
Ms Radha Raghavan (Aarna Law)
Mr Krishnan Shakkottai (Aarna Law)
Ms Bhavya Chengappa (Aarna Law)
Ms Shreya Gupta (Oxera Consulting LLP)
Mr Balázs Csullag (Oxera Consulting LLP)
Mr Sanjay Puri (Commissioner of Income Tax, International Taxation, Department of
    Income Tax)
Mr Sanjay Kumar (Joint Commissioner of Income Tax)
Mr Rohit Kumar (Deputy Commissioner of Income Tax (OSD (FT&TR-I))
Mr Jostein Kristensen (Oxera Consulting LLP)
Professor David Rosenbloom (Caplin & Drysdale)
Mr Gautam Bhatia
Mr Abhimanyu George Jain
Mr Victor Jaramillo

**Court Reporter**
Ms Karen McKendry (Opus 2 International)

**Interpreter**
Dr Kanta Rani (on 27 and 28 August 2018) (Gandhi Centre, The Hague)

## I.    Post-hearing issues

492.   After the Evidentiary Hearing, the Parties and the Tribunal exchanged extensive
       correspondence related to new and pending procedural applications. In the sections that
       follow, the Tribunal has attempted to summarise in separate sub-sections the main
       procedural steps with respect to each application, some of which were occurring in
       parallel.

### 1.    Organization of procedural steps following the Evidentiary Hearing

493.    On 4 September 2018 (RCom-272), the Respondent applied to include into the record typed up notes of "the remaining points which the Respondent wished to make in rebuttal but did not have time to make".[540] These points were then submitted at paragraphs 1 to 6 of the Respondent's letter.

494.    On 7 September 2018 (CCom-220), the Claimants objected to RCom-272, which they characterised as an "unauthorised merits submission", and requested it to be stricken from the record.[541] The Claimants also informed the Tribunal that the Respondent had continued to sell CUHL's shares in CIL/VIL.

495.    On 7 September 2018 (AT-194), the Tribunal circulated a proposed agenda for the procedural conference to be held by telephone on 11 September 2018.

496.    On 9 September 2018 (RCom-274), the Respondent submitted comments on (a) the completion of its rebuttal submission, (b) the next procedural steps, including the pending procedure with respect to quantum experts, and (c) the Claimants' complaint with respect to the sale of CIL/VIL shares.

497.    On 11 September 2018 (CCom-222), prior to the procedural conference, the Claimants submitted comments to AT-194 and RCom-274 and attached an updated list of exhibits. The Claimants also commented on the pending procedure with respect to quantum experts, and advised that their quantum expert, Mr Boulton, intended to submit a letter to the Tribunal to update his Third Report in light of recent developments with respect to the UK capital gains tax claim.

498.    On 11 September 2018, the Parties and the Tribunal held a telephone conference to discuss post-hearing steps. Mr McNeill addressed the Tribunal for the Claimants, and Mr Moollan addressed the Tribunal on behalf of the Respondent.

499.    On 20 September 2018, the Tribunal issued PO14 which addressed procedural matters arising before, during, and after the Evidentiary Hearing. In particular, in PO14 the Tribunal:

a.    Denied the Respondent's request to include into the record its typed up notes of "remaining points" that it had not had time to address during the Evidentiary Hearing, concluding that to grant the relief requested would be "procedurally improper and raise serious equality and due process concerns";[542]

b.    Reflected the Parties' agreement on the procedure whereby the quantum experts would update their expert reports in light of recent enforcement actions taken by the Respondent and other factors (which included a possible hearing reserved for 6 November 2018);

---

[540]    RCom-272, p. 1.

[541]    CCom-220.

[542]    PO14, ¶ 25.

c.  Determined the procedure and cut-off dates to submit new legal authorities and documents in the public domain;

d.  Determined the procedure for post-hearing submissions. Specifically, the Tribunal determined that there would be one round of post-hearing briefs, to be filed on 30 November 2018, which would then be followed by oral closing submissions to take place on 19 and 20 December 2018 in Paris, subject to the Parties' availabilities;

e.  Indicated that it would send the Parties a list of questions to address in their post-hearing submissions by 8 October 2018;

f.  Set out the briefing schedule for the Parties' confidential submissions pursuant to PO6;

g.  Addressed the procedure for the filing of cost submissions and statements;

h.  Noted the latest developments informed by the Parties in respect of new enforcement measures by the Respondent (specifically, the sale of CIL/VIL shares), and requested the Respondent to maintain the Tribunal updated of future measures; and

i.  Addressed the procedure for the appointment of a confidentiality expert to review the Claimants' privilege claims over Appendices V and VI of the Project Sapphire Presentation.

500.  On 21 September 2018 (AT-198), after a request from the Respondent and hearing the Claimants,[543] the Tribunal revised the directions it had given in PO14 for the procedure to update the quantum expert reports. That same day (CCom-226), the Claimants filed an update to Mr Boulton's Third Expert Report. The Respondent filed Mr Kristensen's Third Expert Report on 28 September 2018 (RCom-281).

501.  On 25 September 2018 (RCom-279), the Respondent lodged a formal due process reservation in regard to section III.A of PO14, which section denied the Respondent's application to complete its rebuttal submissions. Following an invitation by the Tribunal on 8 October 2018 (AT-205), the Claimants denied that there had been any due process violation on 10 October 2018 (CCom-231). Following further comments by the Parties,[544] on 20 November 2018 (AT-238) the Tribunal confirmed its decision in PO14. On 21 November 2018 (RCom-309), the Respondent indicated that it maintained its position and reservations in full.

502.  On 1 October 2018 (AT-199), after receiving comments from the Parties,[545] the Tribunal noted *inter alia* that both Parties were available to hold a hearing on closing submissions

---

[543]  Respondent's email of 21 September 2018 (RCom-277); Claimants' letter of 21 September 2018 (CCom-226).

[544]  Respondent's letter of 25 October 2018 (RCom-292); Claimants' letter of 3 November 2018 (CCom-243).

[545]  Respondent's and the Claimants' correspondence of 25 and 26 September 2018 (RCom-280 and CCom-228, respectively).

on the dates proposed in PO14, and confirmed the directions set out in PO14 for the filing of new legal authorities and documents in the public domain.

503.   On 5 October 2018 (AT-204), after a request from the Respondent to which the Claimants did not object,[546] the Tribunal revised the dates for the filing of supplemental documents and legal authorities to 12 and 25 October 2018.

504.   By letter of 10 October 2018 (RCom-286), the Respondent requested the Tribunal to declare that the Claimants could not make submissions in their post-hearing briefs or closing arguments on certain issues that it contended had not been pleaded earlier in the proceedings (namely, discrimination in enforcement of the tax assessment). The Respondent also commented on the procedural status of a table it had handed out during the Evidentiary Hearing in connection with Exh. RK-13. On 11 October 2018 (AT-210), the Tribunal invited the Claimants to comment on this point, as well as on a similar argument raised by the Respondent during the Evidentiary Hearing (namely, whether the Claimants had pleaded reasonableness and discrimination as part of their fair and equitable treatment/expropriation claims). The Claimants provided their comments on 19 October 2018 (CCom-237), arguing *inter alia* that they had pleaded reasonableness and discrimination as part of their substantive claims. Following further correspondence from the Parties,[547] on 15 November 2018 (AT-232), the Tribunal addressed the Parties' requests concerning the admissibility of the allegedly novel arguments and evidence.

505.   On 11 October 2018 (AT-212), the Tribunal provided a list of questions to the Parties to be addressed in their post-hearing briefs or oral closing submissions.

506.   On 23 October 2018 (Claimants' unnumbered email), the Claimants wrote on behalf of both Parties to (i) inform the Tribunal that they were jointly of the view that a hearing on quantum issues was not necessary,[548] and (ii) request an extension of the time limit to file supplementary documents. The following day (AT-216), the Tribunal vacated the quantum hearing and granted the requested extension.

507.   On 29 October 2018 (Claimants' unnumbered email), the Claimants indicated that the quantum experts had met and expected to issue a joint expert report the following week. The joint expert report was eventually submitted on 29 November 2018 (CCom-257 on behalf of both Parties).

### 2.   The Respondent's procedural requests in connection with Mr Salve

508.   As discussed in paragraph 484 above, on 3 August 2018 (RCom-238), the Respondent had requested the Tribunal to draw adverse inferences as a result of Mr Harish Salve SA's withdrawal as counsel for the Claimants. In AT-181, the Tribunal invited the

---

[546]   Respondent's email of 4 October 2018 (RCom-282); Claimants' email of 4 October 2018 (CCom-229). The Claimants did object however to the Respondent's "repeated baseless attacks on [the Claimants'] motives and good faith in this arbitration" on 4 October 2018 (CCom-229).

[547]   See, e.g.,  Respondent's email of 30  2018 (RCom-295); Claimants' email of 30 October 2018 (CCom-239); Claimants' email of 1 November 2018 (CCom-242); Respondent's email of 2 November 2018 (RCom-300); Respondent's email of 13 November 2018 (RCom-304).

[548]   The Parties had previously exchanged correspondence on this point. See, e.g., Claimants' email of 19 October 2018 (CCom-236); Respondent's email of 19 October 2018 (RCom-291).

Claimants to comment on this request in writing two weeks after the Evidentiary Hearing, after which both Parties could submit their final comments in their post-hearing briefs or oral closing submissions.

509.   On 12 September 2018 (CCom-223), the Claimants provided their comments, requesting the Tribunal to dismiss the Respondent's request.

510.   On 14 September 2018 (RCom-275), the Respondent sought leave to respond to the Claimants' communication, indicating that such response would include an update regarding the Respondent's efforts to obtain certain documentation from the *Vedanta* proceedings as pertaining to statements made by Mr Salve in those proceedings.

511.   On 17 September 2018 (CCom-224), the Claimants opposed any effort by the Respondent to introduce documents obtained in the *Vedanta* proceedings.

512.   On 19 September 2018 (AT-196), the Tribunal confirmed its directions in AT-181 with respect to the manner in which the Parties could comment on the significance of Mr Salve's withdrawal from the proceedings. The Tribunal also noted the Claimants' objection to the Respondent's intention to introduce documents from the *Vedanta* arbitration, and invited the Respondent to comment. The Tribunal further recalled that PO10 permitted document sharing between the present proceedings and the *Vedanta* proceedings and thus invited both Parties to comment on the applicability of PO10 to the present stage of proceedings.

513.   On 25 September 2018, both Parties submitted their comments to AT-196 (RCom-278 and CCom-227). In particular, in RCom-278 the Respondent (i) indicated that it would keep the Tribunal updated on its efforts to obtain documents from the *Vedanta* arbitration and would submit them if permission was obtained, (ii) requested the Tribunal to order the Claimants to produce the correspondence between the Claimants and Mr Salve regarding the circumstances of and reasons for his departure, (iii) maintained its request for the Tribunal to draw adverse inferences from Mr Salve's departure, and (iv) noted that it "w[ould] specifically request that the Tribunal hold and declare, as part of its final award, that it is not open to the Claimants to renege on the concession made by it through Counsel as to the constitutionality of the 2012 Clarification."[549]

514.   On 4 October 2018 (AT-202), the Tribunal invited the Claimants to comment on the Respondent's request for production of the correspondence with Mr Salve related to his departure, and invited the Parties to make any additional comments in their post-hearing briefs without limiting their discretion to do so orally at the hearing on closing submissions. The Tribunal also invited the Parties to provide further comments on the Respondent's intention to submit documents from the *Vedanta* arbitration. The Parties submitted further comments on this matter on 11 October 2018 (CCom-232 and RCom-287, respectively).

515.   On 22 October 2018 (AT-213), the Tribunal addressed (a) the Respondent's intention to produce documents from the *Vedanta* arbitration into this proceeding, and (b) the

---

[549]   RCom-278, ¶¶ 20-21.

Respondent's request for the production of the correspondence between the Claimants and Mr Salve in relation to his departure.

a.   With respect to (a), the Tribunal confirmed that, pursuant to PO10, the Respondent could not introduce documents from the *Vedanta* arbitration without a formal application and the Tribunal's authorisation. Despite the fact that the Respondent had not yet made a formal application in this respect, for reasons of procedural efficiency the Tribunal ruled on the Respondent's foreshadowed future application, denying it for the reasons given in AT-213.[550]

b.   With respect to (b), the Tribunal noted that the Claimants objected to the request for production but had nonetheless represented that they fully "confirm[] that Mr Salve was dismissed due to his lack of availability to prepare for the August hearing."[551] In light of this representation, the Tribunal invited the Respondent to confirm whether it maintained its request for production of the correspondence between the Claimants and Mr Salve on the reasons for his departure and, if it did, if it requested the intervention of Dr Pulkowski as confidentiality expert.

516.   On 25 October 2018 (RCom-293), the Respondent confirmed that it did indeed maintain its request for production, but clarified that it did not request Dr Pulkowski's intervention; rather, it insisted that it was for the Tribunal to determine whether there had been any waiver of privilege.

517.   On 6 November 2018 (AT-224), the Tribunal dismissed the Respondent's document production requests in relation to documents pertaining to Mr Salve's departure from the Claimants' counsel team and explained its reasons for doing so.[552]

518.   On 15 November 2018 (RCom-306), the Respondent submitted a formal protest against AT-224.

519.   Following an invitation from the Tribunal on 16 November 2018 (AT-234), the Claimants provided comments on 23 November 2018 (CCom-253). On 30 November 2018 (RCom-318), the Respondent responded to the Claimants' comment and maintained "its application that inferences adverse to the Claimants be drawn from [the] dismissal [of Mr Salve]".[553]

---

[550]   The Tribunal's reasons included, *inter alia*, its conclusion that PO10 was no longer appropriate at this stage of the proceedings; lack of sufficient relevance or materiality of the documents, and reasons of fairness and proportionality. See AT-213, pp. 10-12.

[551]   AT-213, citing CCom-232, ¶ 15.

[552]   The Tribunal concluded in particular that the documents sought were not material to the outcome of the dispute. In light of this, and noting the Claimants' representation and their willingness to have it verified by Dr Pulkowski, the Tribunal thus dismisses the Respondent's production request. It being unnecessary to do so, the Tribunal made no finding as to whether the Claimants had waived privilege over the documents sought. AT-224, pp. 7-8.

[553]   Respondent's email of 30 November 2018 (RCom-318).

520. During December 2018, the Parties continued to exchange correspondence on this matter.[554]

521. On 13 December 2018 (AT-263), the Tribunal conveyed that it considered that this matter had been sufficiently briefed. However, given that the Respondent had made four submissions on the matter, and the Claimants had made three, the Tribunal gave the Claimants the opportunity to provide further comments if they so wished. The Tribunal reiterated its directions previously made and invited the Parties to refrain from making uninvited submissions without first seeking leave from the Tribunal.

522. That same day (CCom-268), the Claimants confirmed they had no further comments to make on the matter.

### 3.   Filing of additional documentary evidence

523. On 12 October 2018 (CCom-233), pursuant to PO14 and AT-204, the Claimants filed their first round of additional legal authorities and certain documents in the public domain. Due to technical difficulties and after agreeing on an extension with the Claimants, the Respondent filed its first round of additional legal authorities and documents in the public domain on 15 October 2018 (RCom-289 and RCom-290).

524. On 6 November 2018 (CCom-246 and RCom-302), the Parties filed their respective second rounds of supplementary legal authorities and documents in the public domain.

525. In the weeks that followed, the Parties exchanged significant correspondence on the admissibility of some of the additional documents filed. The Tribunal summarises the main exchanges below.

526. Together with RCom-302, the Respondent objected to the admissibility of certain documents filed by the Claimants, arguing that they were neither documents in the public domain nor legal authorities, as required by paragraph 36(b) of PO14. After hearing the Claimants on this point,[555] on 21 November 2018 (AT-240) the Tribunal provisionally ruled that two of the Claimants' new documents, Exhibits C-615 and C-616, should be struck from the record. Following a request for reconsideration from the Claimants and further comments from the Respondent,[556] on 26 February 2019 (AT-286), the Tribunal confirmed that exhibits C-615 and C-616 were permanently struck from the record.

527. On 16 November 2018 (RCom-308), the Respondent objected to the second round of additional legal authorities and documents in the public domain filed by the Claimants, arguing that this was "the latest instalment in a consistent pattern of abuse by the

---

[554] See, e.g., Claimants' email of 10 October 2018 (CCom-264); Respondent's letter of 12 December 2018 (RCom-328); Claimants' email of 12 December 2018 (CCom-266); Respondent's email of 13 December 2018 (RCom-330).

[555] Tribunal's email of 20 November 2018 (AT-239); Claimants' email of 20 November 2018 (CCom-250).

[556] Claimants' email of 13 December 2018 (CCom-267); Tribunal's email of 13 December 2018 (AT-264); Respondent's email of 14 December 2018 (RCom-332); Respondent's email of 16 January 2019 (RCom-352).

Claimants of the Tribunal's procedural orders to gain an unfair advantage at every juncture of the proceedings".[557] The Respondent *inter alia* reserved its right to file additional responsive authorities, noted that "the mass of authorities served at this late stage" by the Claimants could affect its ability to meet the time limit for its post-hearing brief, and noted that it would only learn how these documents were relied upon when it received the Claimants' post-hearing brief. The Respondent maintained "its position and its due process reservations in full", and reiterated that "the Tribunal's mandate cannot be constrained by the Claimants' consistent tactical approach to these proceedings, and that it is incumbent on the Tribunal to ensure a level playing field in this arbitration going forward".[558]

528.  Following further exchanges between the Parties and the Tribunal,[559] on 30 November 2018 (AT-253) the Tribunal confirmed that the legal authorities listed in the table provided in CCom-250 could be admitted into the record. The Tribunal also took note of and addressed the Respondent's procedural reservations at RCom-308.

### 4.   Production of the FIPB file

529.  On 12 October 2018 (RCom-288), following the Tribunal's directions during the Evidentiary Hearing, the Respondent produced the entire file relating to the FIPB's meeting of 8 September 2006, albeit with certain redactions. Following an invitation from the Tribunal (Tribunal's unnumbered email of 15 October 2018), on 22 October 2018 (CCom-238) the Claimants submitted their comments, objecting to the manner in which the documents had been redacted.

530.  On 31 October 2018 (RCom-298), the Respondent replied to the Claimants' comments, rejecting the Claimants' objections but nonetheless lifting certain redactions, and requesting certain submissions from the Claimants to be struck from the record.

531.  On 5 November 2018 (AT-222), the Tribunal invited the Claimants to confirm whether they were satisfied with the redactions that had been lifted. The Tribunal further confirmed that the Claimants' submissions on the substance of the documents produced would remain in the record and clarified that "[i]n all other instances where documents produced have been produced late, the Tribunal has allowed the requesting party to make submissions on those documents outside of the parties' scheduled submissions, and there [was] no reason to make an exception [in this instance]".[560]

532.  On 8 November 2018 (CCom-248), the Claimants indicated that they would not "press the issue further", except with regard to the Respondent's suggestion that the integrity of the file might have been affected by its removal to the Central Bureau of Investment in 2012, and requested the Respondent to indicate whether any of the redacted text shed light on the circumstances and timing of the file's alleged removal and apparent return

---

[557]  RCom-308, ¶ 5.

[558]  *Ibid.*

[559]  Claimants' email of 20 November 2018 (CCom-250); Respondent's email of 21 November 2018 (RCom-311); Tribunal's email of 22 November 2018 (AT-241); Claimants' email of 27 November 2018 (CCom-256).

[560]  AT-222.

to the FIPB's archives and, if so, to disclose such text or provide a log justifying its non-disclosure.

533.  By letter of 15 November 2018 (RCom-305), the Respondent (i) confirmed that the file produced was complete and thus there was no factual basis for the Claimants' request, and (ii) argued that the Tribunal's decision in AT-222 not to strike the Claimants submissions on the substance of the documents produced amounted to "disparate treatment […] by the Tribunal" and reserved "its rights with respect to this further due process violation".[561]

534.  On 21 November 2018 (CCom-251), the Claimants commented on RCom-305 and withdrew their request in relation to the FIPB file. On 22 November 2018 (RCom-313), the Respondent took note of this withdrawal and maintained its position and reservations with respect to its argument of disparate treatment by the Tribunal.

535.  On 23 November 2018 (AT-244), the Tribunal (i) conveyed its understanding that the Claimants had withdrawn all outstanding requests in relation to the FIPB file, and (ii) confirmed that, after considering both Parties' positions and the reasons set out in AT-222, it confirmed its various rulings in that letter.

###  5.  Request for disclosure of Appendices V and VI of the Project Sapphire Presentation

536.  As discussed in Section III.H.2 above, prior to the Evidentiary Hearing, the Claimants filed a new version of the Project Sapphire Presentation (Exhibit CWS-Brown-139A) with appendices, with the exception of Appendices V and VI (the "Withheld Appendices"), which the Claimants withheld on the grounds of legal privilege. The Respondent objected to the Claimants' privilege claim. After hearing the Parties, the Tribunal determined that it would not order the Claimants to disclose the Withheld Appendices, and proposed that they could be examined by a confidentiality expert, to which the Parties agreed. The Parties decided to engage Dr Dirk Pulkowski from the PCA as confidentiality expert for this purpose and undertook to draft his Terms of Appointment.[562]

537.  As reflected in the Parties' correspondence during the month of October 2018,[563] the Parties disagreed on the terms of Dr Pulkowski's appointment, especially on the scope of his task. They thus requested the Tribunal's intervention, providing their respective drafts of an addendum to the Second Terms of Appointment of the Confidentiality Expert (the "Addendum").

538.  On 26 October 2018 (AT-218), the Tribunal determined the scope of the Confidentiality Expert's task, revised the Addendum, and requested final comments from the Parties.

---

[561]  RCom-305.

[562]  PO14, ¶ 60.

[563]  Respondent's correspondence of 10 October 2018 (RCom-285) and the Claimants' email of 17 October 2018 (CCom-235); the latter pursuant to the Tribunal's invitation of 11 October 2018 (AT-211).

539.  In the days that followed, the Parties and the Tribunal continued to exchange correspondence on this matter.[564] At the Tribunal's request, the Confidentiality Expert provided his comments on 1 November 2018. On 5 November 2018 (AT-221), the Tribunal issued the Addendum in its agreed form, and provided the Parties' further comments[565] separately to the Confidentiality Expert.

540.  On 12 November 2018, the Confidentiality Expert issued his Second Report.

541.  On 13 November 2018 (CCom-249), the Claimants took note of the Confidentiality Expert's conclusions and recommendations. In particular, they stated that they did not agree that they had waived privilege over any of the material in Appendix VI. However, they were "willing to file a partially redacted version of that appendix prepared in accordance with the Confidentiality Expert's recommendations, namely: (i) disclosing the first paragraph of Appendix VI; (ii) disclosing those elements of Appendix VI that are substantively restated in Appendix III, Slide 16; and (iii) otherwise maintaining the privileged character of the document."[566]

542.  On 22 November 2018 (RCom-314), the Respondent submitted that some of the Confidentiality Expert's observations (in particular, on inadvertent disclosure and cherry picking) "appear[ed] to be based on a misapprehension of the parties' contentions and/or the relevant principles of English law", took note of the Claimants' position, and maintained that Appendices V and VI should be disclosed in their entirety.[567]

543.  After several exchanges between the Parties and the Tribunal,[568] on 3 December 2018 (AT-257) the Tribunal determined that it would treat the Respondent's request in RCom-314 as a matter of some urgency and set out an expedited briefing schedule for this matter. In accordance with this schedule, the Claimants submitted further comments on 10 December 2018 (CCom-265), and the Respondent did the same on 12 December 2018 (RCom-329).

544.  Separately, at the Respondent's request, on 3 December 2018 (CCom-260), the Claimants produced a redacted version of Appendix VI, in accordance with the Confidentiality Expert's recommendations.

545.  On 17 December 2018, the Tribunal issued Procedural Order No. 15 ("PO15") in which it denied the Respondent's application for a full disclosure of the Withheld Appendices.

---

[564]  Respondent's emails of 31 October 2018 (RCom-296, RCom-297); Claimants' emails of 1 November 2018 (CCom-240, CCom-241); Respondent's letter of 2 November 2018 (RCom-299); Tribunal's email of 2 November 2018 (AT-220); Tribunal's email of 5 November 2018 (AT-221); Claimants' letter of 8 November 2018 (CCom-247).

[565]  RCom-299 and CCom-247.

[566]  CCom-249.

[567]  RCom-314.

[568]  See, e.g., Tribunal's email of 26 November 2018 (AT-248); Respondent's email of 27 November 2018 (RCom-316); Tribunal's email of 28 November 2018 (AT-250); Respondent's email of 30 November 2018 (RCom-319);  Tribunal's email of 30 November 2018 (AT-255); Claimants' email of 2 December 2018 (CCom-259); Respondent's email of 3 December 2018 (RCom-322); Claimants' email of 3 December 2018 (CCom-260).

546. By letter of 18 January 2019 (RCom-354), the Respondent maintained its position and made a formal reservation to the Tribunal's ruling in PO15. Following an invitation from the Tribunal (AT-276 of 21 January 2019), the Claimants submitted their comments on this procedural reservation on 28 January 2019 (CCom-283).

547. On 1 February 2019 (AT-280), the Tribunal acknowledged the Parties' submissions and indicated that it did not expect further submissions from the Parties on this matter, unless either Party wished to comment further, in which case it should first seek leave from the Tribunal.

### 6. Confidential submissions pursuant to PO6

548. On 22 November 2018 (RCom-312), the Respondent filed its confidential submission in response to CCom-205. On 28 November 2018 (AT-251), and after noting that the Claimants did not object to its admission,[569] the Tribunal admitted this submission into the record and invited the Parties to make simultaneous submissions seven days after filing their post-hearing briefs, i.e., on 14 December 2018.

549. On 23 November 2018 (CCom-252), the Claimants submitted an updated list of Authorised Persons pursuant to section III of PO6.[570]

550. On 14 December 2018 (RCom-336), the Respondent indicated that it had no further submissions to make on the Restricted Documents, but reserved its right to reply to any further submissions made by the Claimants. On that same day, the Claimants filed its second confidential submission pursuant to PO6 (CCom-270).

551. On 17 December 2018 (AT-269), the Tribunal acknowledged receipt of these communications and invited the Parties to make any further submissions in writing after the Closing Hearing, on or before 18 January 2019. It also indicated that, if the Parties intended to make oral submissions on the Restricted Documents during the Closing Hearing, the procedure set out in paragraph 9(g) of PO6 would apply.

552. On 18 January 2019 (RCom-356), the Respondent replied to CCom-270. On that same date (CCom-278), the Claimants indicated that they had no further comments to make, either in reply to RCom-336 or RCom-356. The Tribunal took note of these communications on 21 January 2019 (AT-277), noting its understanding that the Parties had no further comments to make on this matter.

### 7. Written and oral post-hearing submissions; updated prayers for relief; procedural reservations

553. On 7 November 2018 (AT-227), the Tribunal invited the Parties to submit (i) their updated prayers for relief, which would replace all previous prayers for relief, and (ii)

---

[569] Pursuant to PO14, ¶ 46(a), the Respondent was to "file its confidential submission in response to CCom-205 three weeks prior to the Parties' post-hearing briefs (i.e., on or before 9 November 2018)." However, following an invitation from the Tribunal (AT-243 of 22 November 2018), on 27 November 2018 the Claimants indicated that they did not object to the admission of this submission (CCom-255).

[570] Claimants' email of 23 November 2018 (CCom-252).

an updated list of the procedural reservations and objections they wished to maintain as of that date. The Tribunal confirmed these directions on 23 November 2018 (AT-246) and reformulated them on December 2018 (AT-262).

554.   During the month of November 2018, the Parties exchanged correspondence on the page limit and timing of their post-hearing briefs.[571] After hearing both Parties, on 26 November 2018 (AT-247), the Tribunal extended the time limit to file post-hearing briefs to 5 December 2018; and on 4 December 2018 (AT-258), the Tribunal granted the Respondent's request to extend the page limit of the post-hearing briefs.

555.   After a further request for an extension from the Respondent, which the Tribunal granted, and subsequent agreements between the Parties,[572] on 7 December 2018 the Parties submitted their respective post-hearing briefs, as well as their responses to the Tribunal's questions (CCom-262, and RCom-326).

556.   On 14 December 2018 (CCom-269), following further exchanges of correspondence,[573] the Claimants provided the Tribunal with their updated prayers for relief and confirmed that they had no outstanding procedural reservations or objections. On the same day (RCom-334), the Respondent submitted its respective list and prayers for relief, made certain submissions in connection with the Tribunal's directions in AT-227, AT-246, and AT-262, and reserved its rights, noting in particular that it maintained any reservation previously made, regardless of whether it was restated in the list.

557.   On 17 December 2018 (AT-267), the Tribunal acknowledged the Parties' submissions, and indicated that the Parties could address each other's prayers for relief and reservations in writing on or before 18 January 2019.

558.   On 17 December 2018 (AT-271), after consulting the Parties,[574] the Tribunal issued directions on the organisation of the then-upcoming hearing on closing submissions (the "Closing Hearing").

559.   Also on 17 December 2018 (RCom-339), the Respondent informed the Tribunal that, as the Claimants "[had] continued to seek to cast doubt on the authenticity of Exhibit RK-

---

[571]   Respondent's letter of 16 November 2018 (RCom-308); Tribunal's email of 20 November 2018 (AT-239); Respondent's email of 21 November 2018 (RCom-311); Tribunal's email of 22 November 2018 (AT-241); Claimants' email of 25 November 2018 (CCom-254); Respondent's email of 26 November 2018 (RCom-315); Respondent's email to of 1 December 2018 (RCom-320); Claimants' email of 1 December 2018 (CCom-258); Respondent's email of 2 December 2018 (RCom-321).

[572]   See, e.g., Respondent's email of 4 December 2018 (RCom-324); Tribunal's email of 4 December 2018 (AT-259); Respondent's email of 7 December 2018 (RCom-325).

[573]   Respondent's email of 21 November 2018 (RCom-309); Tribunal's email of 23 November 2018 (AT-246); Respondent's email of 3 December 2018 (RCom-323); Tribunal's email of 3 December 2018 (AT-256); Claimants' email of 8 December 2018 (CCom-263); Tribunal's email of 11 December 2018 (AT-262).

[574]   See, e.g., Claimants' email of 16 December 2018 (CCom-271); Claimants' email of 17 December 2018 (CCom-272); Respondent's email of 16 December 2018 (RCom-337); Respondent's email of 17 December 2018 (RCom-338).

13", it intended to produce the original of that exhibit at the Closing Hearing for the Tribunal's inspection, as it had anticipated in its post-hearing brief.[575]

560.  On 18 December 2018, the Parties submitted to the Tribunal electronic copies of their demonstrative exhibits and further correspondence in relation to the use of slides at the Closing Hearing.[576]

561.  The Closing Hearing took place in Paris on 19 and 20 December 2018, with the participation of the following persons:

**Tribunal**
Mr Laurent Lévy (Presiding Arbitrator)
Mr Stanimir Alexandrov (Co-arbitrator)
Mr J. Christopher Thomas QC (Co-arbitrator)
Mr David Khachvani (Assistant to the Tribunal)

**Claimants**
Mr Mark McNeill (Shearman & Sterling LLP)
Mr Jeremy Sharpe (Shearman & Sterling LLP)
Mr Daniel Reich (Shearman & Sterling LLP)
Mr Daniel Purisch (Shearman & Sterling LLP)
Ms Trisha Mitra (Shearman & Sterling LLP
Ms Arianna Rosato (Shearman & Sterling LLP)
Mr Stefan Savatic (Shearman & Sterling LLP)
Mr Arvind Datar (Chambers of Arvind Datar)
Mr Paul Hally (Shepherd & Wedderburn LLP)
Ms Niti Dixit (S&R Associates)
Mr Uday Walia (S&R Associates)
Ms Kathryn Anderson (Cairn Energy PLC)
Mr Duncan Holland (Cairn Energy PLC)
Mr James Smith (Cairn Energy PLC)

**Respondent**
Mr Salim Moollan QC (Essex Court Chambers)
Professor Chester Brown (7 Wentworth Selborne Chambers)
Mr Shreyas Jayasimha (Aarna Law)
Ms Madhooja Mulay (Aarna Law)
Mr Krishnan Shakkottai (Aarna Law)
Mr Narmdeshwar Singh (Aarna Law)
Mr Sanjay Puri (Commissioner of Income Tax, International Taxation, Department of Income Tax)
Dr Prabhakant (Commissioner of Income Tax, International Taxation, Department of Income Tax)
Mr Pankaj Jindal (Additional Commissioner of Income Tax (CIT (IT)-1))
Mr Chetan P. S. Rao (Additional Commissioner of Income Tax (OSD) (FT&TR-I))

---

[575]  Respondent's email to the Tribunal of 17 December 2018 (RCom-339).

[576]  Claimants' emails of 18 December 2018 (CCom-273 and CCom-274); Respondent's emails to the Tribunal of 18 December 2018 (RCom-340, RCom-341, and RCom-342).

Mr Rohit Kumar (Deputy Commissioner of Income Tax (OSD) (FT&TR-I))
Mrs Rini Handa (Income Tax Department)
Dr R.J.R. Kasibhatla (Department of Legal Affairs, Ministry of Law & Justice)
Ms Shravan Kumar Yammanur
Mr J Premanand

**Court Reporter**
Ms Karen McKendry (Opus 2 International)

562.    On 18 January 2019, the Parties submitted their comments on their updated requests for relief and procedural reservations. In particular, the Parties made the following submissions:

   a.    The Claimants (CCom-279) indicated that they had no comments on the Respondent's prayers for relief, but objected to the Respondent's "mechanical approach" taken in RCom-334 to listing its procedural reservations and objections, which the Claimants argued led the Respondent to include "many reservations that have been overtaken by events, which there is no colourable basis to maintain."[577] Consequently, the Claimants argued that the Respondent's list failed to identify with clarity its remaining procedural objections. Separately, the Claimants provided specific comments on the Respondent's list of objections and reservations at RCom-334.

   b.    The Respondent (RCom-357) submitted an updated, non-exhaustive list of the reservations that it had lodged in the proceedings and reiterated that it was not withdrawing any reservation previously made. The Respondent confirmed its prayer for relief submitted in RCom-334 and confirmed an objection made at the Evidentiary Hearing against the Claimants' claim in respect of an alleged "loss of exemption from UK corporate tax" and reiterated in the Claimants' post-hearing brief, which the Respondent argued was a new claim and had not been pleaded prior to the Evidentiary Hearing.

563.    On 28 January 2019 (RCom-359), the Respondent responded to CCom-279, noting that it rejected CCom-279 in full. At the Tribunal's invitation,[578] on 8 February 2019 (CCom-285), the Claimants confirmed that they had no further comments on RCom-359.

564.    On 26 February 2019 (AT-285), the Tribunal took note of the Parties' updated prayers for relief, of the Respondent's updated list of procedural reservations, of the Respondent's position on AT-227 and AT-247, and of the Claimants' comments on that issue. The Tribunal also addressed the following points:

   a.    The Tribunal elaborated on the reasons for requesting these updated prayers and lists of reservations (as directed in AT-227 and AT-247 and clarified in AT-262). The Tribunal also added its view that the instructions treated the Parties with

---

[577]    CCom-279.

[578]    Tribunal's email of 1 February 2019 (AT-281).

equality, allowing them a full opportunity to present their case. For the reasons set out in its letter, the Tribunal reformulated its previous directions to state that "[a]ny prayers or reservations not included in these lists may be disregarded".[579]

b. As to the Respondent's objection to Claimants' claim in respect of an alleged "loss of exemption from UK corporate tax", the Tribunal conveyed its understanding that, at that juncture, the Respondent objected to the admissibility of this claim, and invited the Claimants to comment on this objection.

565. On 12 March 2018 (CCom-289), the Claimants commented on the Respondent's objection to the Claimants' claim in respect of an alleged loss of exemption from UK corporate tax, arguing that the Respondent's objections should be rejected.

### 8. Updates on the enforcement of the tax assessment by the Respondent

566. While these applications were ongoing, the Respondent continued to enforce the tax assessment by selling CUHL's shares in CIL/VIL.[580] The Parties updated the Tribunal on these enforcement measures as follows.

567. On 7 September 2018 (CCom-220), the Claimants informed the Tribunal that the Respondent had engaged in new sales of shares in CIL/VIL, and requested the Respondent to provide full details on the status of CUHL's remaining shares in CIL/VIL and the Respondent's intentions with respect to those shares.

568. By email of 9 September 2018 (RCom-274), the Respondent noted that such sales were "entirely in keeping with the Tribunal's dismissal of the Claimants' misconceived request for interim measures, and with the Claimants' failure to ever approach the Indian Courts to seek a stay of enforcement."[581] That being said, it committed to provide an update on those sales by 17 October 2018.

569. On 11 September 2018 (CCom-222), the Claimants expressed their view that the Respondent should provide that update expeditiously.

570. On 18 September 2018 (RCom-276), the Respondent provided an update on the sale of the CIL/VIL shares.

571. In PO14 of 20 September 2018, the Tribunal instructed the Respondent to continue updating the Claimants and the Tribunal as to the status of the sale of CIL/VIL shares.[582]

572. On 27 November 2018 (RCom-317), the Respondent provided an update on the status of the sale of CIL/VIL shares.

---

[579] *Ibid.*

[580] Although by then, CIL had merged into VIL, the Tribunal will continue to refer to it as "CIL/VIL" to avoid confusion.

[581] RCom-274, Part C.

[582] See the Tribunal's directions at ¶ 53 of PO14.

573.  On 4 December 2018 (CCom-261), the Claimants provided their comments on this update, to which the Respondent responded on 14 December 2018 (RCom-333) following an invitation to do so from the Tribunal (AT-260).[583]

574.  On 17 December 2018 (AT-266), the Tribunal invited the Parties to make any further submissions on the matter, preferably in writing, after the Closing Hearing, on or before 18 January 2019.

575.  On 18 January 2019, the Claimants provided their further comments (CCom-277A), and the Respondent provided a status update on the sale of the CIL/VIL shares (RCom-355).

576.  Further to the Tribunal's directions of 21 January 2019 (AT-276), on 25 January 2019 (CCom-281) and 29 January 2019, the Claimants submitted a response to the Respondent's update (CCom-281A).

577.  On 1 February 2019 (AT-278), the Tribunal invited the Respondent to comment on the Claimants' response by 12 February 2019 and the Claimants to submit rejoinder comments within two weeks thereafter. Despite this invitation, the Parties did not submit further comments on this matter.

### 9.    Applications relating to proceedings before the Delhi High Court

578.  On 15 December 2018 (RCom-335), the Respondent applied for permission to adduce certain materials from the present proceedings in the appeal against the ITAT Order filed by the ITD before the Delhi High Court.[584] Specifically, the Respondent requested permission to adduce evidence related to Ms Janice Brown filed by the Claimants in this arbitration (the "Brown Documents")[585] in the Delhi High Court proceedings. The Respondent stated that the Brown Documents "relate[d]" to a hearing in the Delhi High Court proceedings scheduled for 9 January 2019.[586] The Respondent clarified that it was "seeking the Tribunal's permission to adduce this material before the Delhi High Court *ex abundanti cautela*, noting that Dutch law, as the law of the seat, does not impose any requirement of confidentiality".[587] The Respondent also submitted that the disclosure of this material for the purposes of court proceedings would not constitute "publication" of the Documents for purposes of paragraph 59(c) of PO2,[588] and alternatively requested

---

[583]  Tribunal's email to the Parties of 5 December 2018 (AT-260).

[584]  To recall, the ITAT Order (Exh. C-228) was issued on 9 March 2017, and both Parties appealed it.

[585]  Specifically, the Respondent requested permission to adduce the following documents in the Delhi High Court (a total of 263 documents): (i) Ms Janice Brown's three witness statements, (ii) all of the exhibits attached to those witness statements, (iii) the pages of the transcript of the Evidentiary Hearing recording Ms Brown's oral testimony, and (iv) documents used during Ms Brown's cross-examination.

[586]  The Parties later corrected this indication, noting that the hearing was scheduled for 7 January. See CCom-276 and RCom-346.

[587]  RCom-335, ¶ 4.

[588]  At ¶ 59(c) of PO2, the Tribunal ordered "that neither Party shall make public, in part or in whole, any other document submitted, produced or created in connection with this proceeding, including but not limited to procedural correspondence, the Notice of Dispute, the Notice of Arbitration, the Statement of Claim, the Statement of Defence, any other written submissions by the Parties, any transcripts of hearings, any and all witness statements, expert reports, or documentary exhibits."

for a limited variation of that paragraph to allow the use of the Documents before the Delhi High Court. The Respondent emphasised that it was prepared to work with the Claimants to find ways to ensure that the Documents were kept confidential in the Delhi High Court proceedings (such as keeping the documents and written submissions under seal and the court proceedings to be held *in camera*).[589]

579.  The Claimants objected to this request on 28 December 2018 (CCom-275). Essentially, the Claimants argued that the applicable procedural framework did not permit the disclosure of the Brown Documents in other proceedings, and that a variation from the regime adopted in PO2 was not justified in this instance. The Claimants also contended that there was no urgency to the Respondent's application, that the application was unsupported by compelling reasons, and that the application was overbroad, one-sided, an abuse of process, and sought to sidestep the normal operation of the Respondent's sovereign powers.

580.  After further submissions from the Parties,[590] on 6 January 2019 (AT-272), the Tribunal provisionally ruled that "para. 59(2) [*sic*] of PO2 prevent[ed] the Parties from disclosing to any third party (including a court of law) any materials or evidence adduced in this arbitration without express consent from the other Party or an order of the Tribunal derogating from PO2".[591] The Tribunal indicated that it would reconsider this provisional ruling after the Claimants had an opportunity to respond to RCom-345. The Tribunal further noted that it considered the Respondent's application premature and, for reasons of procedural economy, it would preferable for it first to apply to the Delhi High Court for its permission to admit the Brown Documents, without adducing them, and only once the Delhi High Court had declared that they are admissible, seek this Tribunal's permission to adduce them.

581.  In the weeks that followed, the Parties and the Tribunal continued to exchange correspondence on this matter.[592] In particular, the Respondent indicated that the hearing before the Delhi High Court on the ITD's amendment application had been adjourned to 15 March 2019,[593] and that Respondent's counsel had been instructed that "– as a matter of Indian procedure – there [would] be no need to apply to the Delhi High Court for the introduction of the abuse documents until after the ITD's amendment application has been determined, i.e. until after 15 March 2019."[594] As a result, and

---

[589]  RCom-335, ¶ 5.

[590]  Respondent's letter of 4 January 2019 (RCom-345); Claimants' email of 6 January 2019 (CCom-277); Respondent's email of 6 January 2019 (RCom-347).

[591]  AT-272 (the reference to PO2, ¶ 59(2) should be to PO2, ¶ 59(c)).

[592]  Respondent's email of 9 January 2019 (RCom-349); Tribunal's email of 10 January 2019 (AT-273); Respondent's emails of 11 January 2019 (RCom-350 and RCom-351); Tribunal's email of 16 January 2019 (AT-274); Claimants' email of 25 January 2019 (CCom-280); Respondent's letter of 28 January 2019 (RCom-360); Claimants' email of 29 January 2019 (CCom-284); Respondent's email of 1 February 2019 (RCom-361); Tribunal's emails of 1 February 2019 (AT-279 and AT-279A); Claimants' unnumbered email of 8 February 2019; Tribunal's unnumbered email of 10 February 2019; Respondent's email of 11 February 2019 (RCom-362).

[593]  RCom-349.

[594]  RCom-351.

bearing in mind the Tribunal's comments on prematurity, the Respondent formally withdrew its application "for now".[595] The Claimants expressed their concern at this turn of events, and requested the Respondent to "confirm that the ITD [would] not file documents obtained in the arbitration in the domestic tax proceedings, absent leave of the Tribunal."[596] The Parties separately exchanged submissions on the admissibility of certain comments made by the Respondent in RCom-345.

582.    On 11 February 2019 (CCom-286), in light of the Respondent's refusal to confirm that it would comply with the Tribunal's provisional ruling in AT-272, the Claimants requested the Tribunal *inter alia* to finally declare that "the Parties may not disclose to any third party (including a court of law) any materials or evidence adduced in this arbitration without express consent from the other Party or an order of the Tribunal derogating from this requirement, and order the Parties not to do so"; and to find that "the Respondent had not established a basis for derogating from its confidentiality obligations with respect to the use of the 263 documents listed in the index attached to RCom-335 in its domestic tax proceedings, and order the Respondent not to do so."[597] The Claimants also requested the Tribunal to admit into the record an Annex containing their response to the alleged merits submissions made by the Respondent in RCom-345.

583.    At the Tribunal's invitation, in the weeks that followed, the Parties exchanged correspondence on the Claimants' application.[598] In particular, the Claimants amended their request for relief,[599] and the Respondent requested the Tribunal to dismiss them.[600]

584.    On 18 March 2019, the Tribunal issued Procedural Order No. 16 ("PO16"), in which it:[601]

a.    Admitted Annex A to the Claimants' application into the record as the Claimants' response to RCom-345;

b.    "Finally declare[d] that the Parties may not disclose to anybody external to the arbitral procedure (whether or not under seal) any materials or evidence adduced, created or produced in this arbitration without express consent from the other Party or an order of the Tribunal derogating from this requirement, and orders the Parties not to do so";

---

[595]    RCom-351.

[596]    CCom-280.

[597]    Claimants' letter of 11 February 2019 (CCom-286), ¶ 18.

[598]    Tribunal's email of 13 February 2019 (AT-282); Respondent's email of 19 February 2019 (RCom-363); Tribunal's email of 21 February 2019 (AT-283); Respondent's letter of 22 February 2019 (RCom-365); Claimants' letter of 1 March 2019 (CCom-288); Respondent's email 4 March 2019 (RCom-367); Tribunal's email of 5 March 2019 (AT-287); Respondent's letter of 6 March 2019 (RCom-368).

[599]    CCom-288.

[600]    RCom-368.

[601]    PO16, ¶ 66.

    c.    Reserved the Tribunal's decision as to whether the Respondent had established a basis for derogating from PO2 with respect to the Brown Documents in the domestic tax proceedings; and

    d.    Allowed the Respondent to submit a copy of PO16, as well as a copy of PO2, to the Delhi High Court.

585.    On 24 May 2019 (RCom-369), the Respondent noted its disagreement with the Tribunal's rulings in PO16 and reserved its rights, but indicated that it "remain[ed] committed to finding a suitable procedural solution to the current situation."[602] The Respondent explained that the Tribunal's rulings were in contradiction with the procedure it would need to follow before the Delhi High Court, and noted that it might need to apply to the Tribunal prior to obtaining permission from the Delhi High Court to admit the Brown Documents. The Respondent further applied for an order that PO2 and PO16 should remain confidential, and in any event, not be disclosed by the Claimants to the Delhi High Court, until the Respondent applied for admission of the Brown Documents to the Delhi High Court (the "Respondent's Confidentiality Application").

586.    At the Tribunal's invitation,[603] on 31 May 2019 (CCom-291) the Claimants objected to the Respondent's Confidentiality Application, and made submissions with respect to the confidentiality regime to be applied to PO2 and PO16, including with respect to their publication on the PCA's website.

587.    At the Tribunal's invitation, the Parties and the Tribunal continued to exchange correspondence on the Respondent's Confidentiality Application.[604] In addition to making submissions on the Respondent's application, the Claimants separately requested the Tribunal "to issue a ruling under ¶ 59(b) of PO 2, finding that POs 2 and 16 do not contain any information requiring redaction and are fit for publication on the PCA website" (the Claimants' Publication Application"). [605]

588.    On 3 July 2019 (AT-299), the Tribunal indicated that it would rule on the Parties' applications separately. The Tribunal also put in place a separate briefing schedule for the Claimants' Publication Application.

589.    On 8 July 2019 (AT-302), the Tribunal issued Procedural Order No. 17 ("PO17"), in which it denied the Respondent's Confidentiality Application and gave further directions with respect to the disclosure of PO2 and PO16 to the Delhi High Court.

---

[602]   RCom-369, p. 1.

[603]   Tribunal's email of 27 May 2019 (AT-291).

[604]   See, e.g., Tribunal's email of 4 June 2019 (AT-292); Respondent's letter of 13 June 2019 (RCom-371); Claimants' email of 6 June 2019 (CCom-292); Tribunal's email of 6 June 2019 (AT-294); Respondent's letter of 13 June 2019 (RCom-371); Tribunal's email of 18 June 2019 (AT-295); Claimants' email of 19 June 2019 (CCom-294); Tribunal's email of 21 June 2019 (AT-296); Respondent's email of 24 June 2019 (RCom-372); Tribunal's email of 25 June 2019 (AT-297); Claimants' email of 1 July 2019 (CCom-295).

[605]   CCom-294.

590.   On 16 July 2019 (RCom-377), the Respondent provided its comments on the Claimants' Publication Application, stating that while it continued to oppose the publication of PO2 and PO16 on the PCA's website, this question "ha[d] been rendered entirely academic as a result of the Tribunal's ruling in PO 17" because "the Claimants' only aim had always been to put PO 2 and PO 16 before the Delhi High Court".[606] At the same time, the Respondent expressed its "strongest disagreement" with PO17, and noted that "it cannot be right that this Tribunal would condone a path which would deprive a superior court of record of directly relevant evidence".[607]

591.   At the Tribunal's invitation (AT-303), on 23 July 2019 (CCom-297) the Claimants responded to the Respondent's comments on PO17 (RCom-377), rejecting the Respondent's contention that "upholding the confidentiality regime, that it agreed to, somehow constitutes a suppression of evidence."[608]

592.   On 6 August 2019 (AT-305), the Tribunal granted the Respondent leave to provide a factual update on the Delhi High Court proceedings.

593.   On 7 August 2019 (RCom-380), after having been granted leave from the Tribunal,[609] the Respondent informed the Tribunal that on 19 July 2019, the Delhi High Court had adjourned the hearing for the ITD's amendment application to 3 December 2019 at the request of CUHL's counsel. At the Tribunal's invitation (AT-306), the Claimants commented on the Respondent's update on 13 August 2019 (CCom-298), explaining that the request for adjournment was made due to the unavailability of CUHL's counsel and with the prior consent of the counsel for the ITD.

594.   On 9 August 2019 (AT-307), the Tribunal issued Procedural Order No. 18 ("PO18"), ruling on the Claimants' Publication Application, and declaring that PO2 and PO16 may be published on the PCA's website.

595.   By email of 13 August 2019 (RCom-381), the Respondent marked its "strongest disagreement"[610] with PO18. Following the Tribunal's invitation to comment,[611] on 21 August 2019 (CCom-299), the Claimants "rest[ed] on their response in CCom-297".[612]

596.   On 16 August 2019, the PCA confirmed that, following the incorporation of the Parties' respective revisions, the basic details of the case, along with PO2 and PO16, would be published on the PCA's website by the end of the day.

---

[606]   RCom-377, ¶ 6.

[607]   RCom-377, ¶ 4.

[608]   CCom-297.

[609]   Respondent's email of 5 August 2019 (RCom-378); Tribunal's email of 5 August 209 (AT-305); Respondent's email of 6 August 2019 (RCom-379).

[610]   RCom-381, p. 1.

[611]   Tribunal's email of 15 August 2019 (AT-309).

[612]   CCom-299, p. 1.

597. Separately, in light of previous submissions made by the Parties,[613] on 9 August 2019 (AT-308) the Tribunal invited the Respondent to confirm whether its request for the Tribunal to endorse a draft email to be sent by the Claimants to ITALaw, requesting the deletion of PO2 and PO16 from their website, was still in place. On 13 August 2019 (RCom-382), the Respondent confirmed that it was no longer formally maintaining its request since it has been rendered redundant by PO17 and PO18, but reiterated that it maintained its "formal protest and reservation"[614] with respect to those Orders.

## J.    Final procedural steps

598. On 15 February 2019 (CCom-287), the Claimants enquired whether the Tribunal may soon be in a position to indicate to the Parties when it expected to issue the final award. The Respondent commented on this request on 20 February 2019, submitting that the Tribunal should "take the time it requires to deliver an award commensurate with the heavy briefings and submissions made."[615] On 9 March 2019, the Tribunal informed the Parties that "it was unable at this stage to provide an indication of when it expect[ed] to issue its award", but it anticipated that it was "unlikely that the award [would] be rendered in 2019".[616]

599. On 5 August 2019 (AT-304), and after consulting the Parties,[617] the Tribunal established a procedure for the Parties' uninvited submissions or procedural applications.

600. On 6 September 2019 (CCom-300, CCom-300 (*bis*)), following correspondence between counsel in this respect,[618] the Claimants informed the Tribunal and the Respondent of a change in its counsel. On 9 September 2019 (AT-313), the Tribunal confirmed receipt and requested the Claimants to clarify certain issues regarding this change. On 12 September 2019 (AT-314), each Member of the Tribunal confirmed his continued impartiality and independence and provided further disclosures to the Parties in light of the Claimants' change in counsel.

601. On 20 September 2019 (CCom-301), the Claimants requested that the Tribunal set a timetable for the Parties' submissions on costs pursuant to PO14. After receiving correspondence from both Parties on this request,[619] on 15 October 2019 (AT-317), the Tribunal set a timetable for the Parties' submissions on costs and informed the Parties of its progress in the drafting of the Award.

---

[613]   RCom-369; RCom-371; CCom-291.

[614]   RCom-382.

[615]   Respondent's email of 20 February 2019 (RCom-364).

[616]   Tribunal's email of 9 March 2019 (AT-288).

[617]   Tribunal's email of 25 June 2019 (AT-297); Respondent's email of 4 July 2019 (RCom-375), and Claimants' email of 5 July 2019 (CCom-296).

[618]   Respondent's unnumbered email to the Claimants of 28 August 2019; Claimants' unnumbered email to the Respondent of 28 August 2019.

[619]   Respondent's email of 23 September 2019 (RCom-384); Tribunal's email of 23 September 2019 (AT-315); Claimants' email of 28 September 2019 (CCom-302); Tribunal's email of 10 October 2019 (AT-316); Respondent's email of 11 October 2019 (RCom-385).

602. Also on 15 October 2019 (CCom-303), the Claimants informed the Tribunal that, because Cairn Energy was required to inform the market of all material events, absent any objections, it intended to disclose publicly the anticipated timing of the Award.

603. On 16 October 2019 (RCom-386), the Respondent objected to the Claimants' proposed course of action. On the same day (AT-318), the Tribunal invited the Claimants to comment on the Respondent's objection, and added that "[t]o avoid any misunderstanding, the Tribunal did not intend firmly to commit to a specific Award-release date, nor is it yet in a position to do so."[620] On the same day (CCom-304), the Claimants provide further explanations for their intended disclosure, and proposed that, unless the Tribunal requested them to do otherwise prior to the following morning UK time, the Claimants would make an announcement to the London Stock Exchange as to the expected timing of the Award. On the same day (RCom-387), the Respondent objected again to the Claimants' intended disclosure, and requested the Tribunal "to immediately order that the Claimants may not make the threatened disclosure until such time as the Tribunal has had the opportunity to consider" the Claimants' reply and the Respondent's rejoinder.[621]

604. Following further submissions from the Parties on this matter,[622] on 24 October 2019 (AT-322), the Tribunal issued Procedural Order No. 19 ("PO19") which authorised Cairn Energy to disclose publicly that the "Tribunal has indicated that it 'expects to be in a position to issue the Award in the summer of 2020', but has clarified that '[t]o avoid any misunderstanding, the Tribunal did not intend firmly to commit to a specific Award-release date, nor is it yet in a position to do so.'"[623]

605. On 14 January 2020 (RCom-391), and with the Tribunal's leave,[624] the Respondent informed the Tribunal that the Delhi High Court, through a consent order, had admitted the ITD's amended memorandum of appeal after "orally reject[ing] the submission of counsel for [CUHL] that the tax abuse issue was being introduced for the first time in appeal and could not be relied on by the ITD to defend the tax demand".[625] The Respondent claimed that this development "vindicate[d]" its position because it stood "in stark contrast to the Claimants' position throughout this arbitration that the Claimants' tax abuse was a purported 'after thought', and that the Delhi High Court would never accept it as a basis for defending the tax demand."[626]

---

[620]  AT-318.

[621]  RCom-387.

[622]  Tribunal's emails of 17 October 2019 (AT-319 and AT-320); Claimants' email of 17 October 2019 (CCom-306); Tribunal's email of 18 October 2019 (AT-321); Respondent's email of 21 October 2019 (RCom-388).

[623]  PO19, ¶ 37(a).

[624]  Respondent's email of 7 January 2020 (RCom-390); Tribunal's email of 9 January 2020 (AT-323).

[625]  RCom-391.

[626]  RCom-391.

606.   At the Tribunal's invitation,[627] on 30 January 2020 (CCom-308), the Claimants provided comments on the hearing before the Delhi High Court, denying that the Delhi High Court's consent order represented "a victory and a vindication"[628] of the Respondent's allegations because it was merely a procedural ruling, not one on the substantive question of whether tax avoidance had been raised in the FAO. With the Tribunal's leave,[629] the Respondent replied to the Claimants' comments on 3 February 2020 (RCom-395). On 11 February 2020 (AT-328), the Tribunal noted that the Claimants did not submit a rejoinder to RCom-395 despite the Tribunal's invitation to do so, and stated that "[u]nless either party makes a reasoned request otherwise or new developments ensue, the Tribunal considers the briefing on this matter to be closed."[630]

607.   On 31 January 2020 (AT-326), the Tribunal noted the Parties' agreed amendments to the timetable for submissions on costs (RCom-393).

608.   On 8 February 2020, after having separately received the Parties' respective submissions on costs on 7 February 2020, the PCA simultaneously transmitted them to the Parties and the Tribunal.

609.   On 24 February 2020, after having received the Claimants' and Respondent's responsive submissions on costs on 21 and 22 February 2020, respectively, the PCA simultaneously transmitted them to the Parties and the Tribunal.

610.   On 2 March 2020, after having separately received the Claimants' and Respondent's respective reply submissions on costs on 28 February 2020, the PCA simultaneously transmitted them to the Parties and the Tribunal.

611.   After communications between the Parties and the Tribunal on the adequacy of the submissions on costs,[631] on 26 March 2020 (AT-332), the Tribunal granted the Respondent's request for the Parties to submit rejoinder submissions on costs. Following the Tribunal's invitation, on 10 April 2020 (CCom-310), the Parties agreed on a deadline of 28 April 2020 for the submission of their rejoinder submissions on costs, which the Tribunal confirmed on 14 April 2020 (AT-333).

612.   On 29 April 2020, after having received the Respondent's 28 April 2020 rejoinder submission on costs, the PCA transmitted it to the Parties and to the Tribunal. The PCA further informed the Parties and the Tribunal that the Claimants had separately advised that they had no further comments to make in respect of costs, all of which the Tribunal took note of the next day (AT-334).

---

[627]   Tribunal's email of 9 January 2020 (AT-323); Claimants' email of 28 January 2020 (CCom-307); Tribunal's email of 29 January 2020 (AT-324).

[628]   CCom-308, p. 1.

[629]   Respondent's email of 31 January 2020 (RCom-394); Tribunal's email of 31 January 2020 (AT-327).

[630]   AT-328.

[631]   Respondent's email of 4 March 2020 (RCom-396); Tribunal's email of 5 March 2020 (AT-330); Claimants' email of 13 March 2020 (CCom-309); Respondent's email of 16 March 2020 (RCom-397); Tribunal's email of 16 March 2020 (AT-331).

613.   On 16 June 2020 (RCom-398), the Respondent informed the Tribunal that, in a decision issued on 11 June 2020, an ICSID *ad hoc* committee had annulled the award in *Eiser Infrastructure Ltd and Energia Solar Luxembourg SARL v. Kingdom of Spain* (ICSID Case No ARB/13/36), and asserted that the Claimants could therefore no longer rely on this award to any extent. At the Tribunal's invitation,[632] on 19 June 2020 (CCom-311), the Claimants responded to the Respondent's comments. On 23 June 2020 (RCom-400), with the Tribunal's leave,[633] the Respondent provided further comments. On 24 June 2020 (AT-337), the Tribunal took note of the Parties' comments on the possibility of the Tribunal's relying on the *Eiser* award.

614.   On 9 July 2020 (RCom-401), the Respondent requested advance notice of the delivery of the Award, noting that this would allow the Parties to provide an updated statement of costs.

615.   On 13 July 2020 (AT-338), the Tribunal invited the Claimants to comment on RCom-401, and informed the Parties that it "d[id] not expect significant delays and hope[d] to remain reasonably within the lead-time that it had anticipated, i.e. a release of the Award after the end of the summer."[634] The Tribunal also noted that should the Respondent wish to update its submissions on costs, it should seek to do so before the end of September.

616.   On 14 July 2020 (CCom-312), recalling PO19 and Cairn Energy's obligations as a publicly listed company, the Claimants requested permission to make a further public disclosure regarding the anticipated issuance of the Award. By invitation of the Tribunal,[635] on 17 July 2020 (RCom-402), the Respondent commented on the Claimants' proposed disclosure to the London Stock Exchange. On 20 July 2020 (AT-340), after noting that the Respondent did not formally object to the Claimants' request, the Tribunal granted the Claimants' request for the same reasons given in PO19.

617.   On 23 September 2020 (RCom-403), the Respondent requested leave to file a supplementary quantum-only final costs update prior to the issuance of the Award. On 28 September 2020 (CCom-313), at the Tribunal's invitation,[636] the Claimants stated that they would not object to the Respondent's request, but strictly on the condition that it did not cause any delay to the issuance of the Award. The Claimants also confirmed that they had no further update to their costs, save for the supplementary deposit paid in August 2020. On 30 September 2020 (AT-342), the Tribunal confirmed that the Respondent could submit its updated statement on costs on 9 October 2020, and took note of the Claimants' position.

618.   On 9 October 2020 (RCom-404), the Respondent submitted an updated schedule of costs, inclusive of costs incurred up until the end of April 2020 and the deposit payments

---

[632]   Tribunal's email of 16 June 2020 (AT-335).

[633]   Respondent's email of 20 June 2020 (RCom-399); Tribunal's email of 22 June 2020 (AT-399).

[634]   AT-338.

[635]   Tribunal's email of 15 July 2020 (AT-339).

[636]   Tribunal's email of 24 September 2020 (AT-341).

made to the PCA. The Respondent's submission also corrected errors in its previous schedule of cost regarding the calculation of its counsels' legal fees.

619. On 14 October 2020 (AT-343), the Tribunal acknowledged receipt of RCom-404 and asked the Respondent to submit a revised schedule of costs by 19 October 2020 expressing amounts in EUR, GBP, or US$ using the conventional method for those currencies, i.e., by separating every three digits of a figure with a comma. The Tribunal also asked the Respondent to express all total amounts claimed (including those in INR) in letters to avoid misunderstandings. The Tribunal also indicated that the Claimants would then be able to submit any comments by 23 October 2020.

620. On 20 October 2020 (AT-344), the Tribunal acknowledged receipt of the Respondent's revised schedule of costs on 19 October 2020 (RCom-405). Also on 20 October 2020 (CCom-314), the Claimants confirmed that they have no comments on RCom-405.

621. On 28 October 2020 (AT-345), the Tribunal confirmed receipt of CCom-314, noted its understanding that the Claimants had no comments on the Respondent's revised schedule of costs, and pursuant to Article 29 of the UNCITRAL Rules declared the hearings closed.

## IV.   OVERVIEW OF THE PARTIES' POSITIONS AND REQUESTS FOR RELIEF

622. This section provides an overview of the Parties' positions. The Parties' detailed positions are summarised in the analysis of each claim or defence, in Sections VI.C and VII.A below.

623. The Parties have referred to the transactions at issue with several names, most often as the "2006 Transactions". For the sake of clarity, the Tribunal will use the following terms: when referring to Cairn's 2006 pre-IPO corporate reorganisation, it will refer to "Cairn's corporate reorganisation". When referring to the transactions that made up Cairn's pre-IPO corporate reorganisation and post-IPO transactions, it will refer to the "2006 Transactions".[637] When referring specifically to the transaction taxed by the Respondent, i.e., the transfer of the shares in CIHL from CUHL to CIL, it will refer to it as the "CIHL Acquisition".

## A.   Overview of the Claimants' position and request for relief

624. The Claimants allege that, by imposing certain fiscal measures in relation to the 2006 Transactions, the Respondent has breached its obligations under the Treaty.

625. According to the Claimants, the main facts on which their case is based are the following:

    a.   Until 2012, Section 9(1)(i) did not tax indirect transfers (i.e., the transfer by non-residents of shares in non-Indian companies which indirectly held assets in India), and the law was settled in this respect. This was confirmed by the Supreme Court judgment in *Vodafone* in 2012.

---

[637]   The Tribunal also understands that this is how the Parties have referred to them. See e.g. C-Updated Reply, p. 2 n. 3; R-SoD, ¶¶ 5, 14 *et seq.*

b.   In 2006, the Indian Government approved the 2006 Transactions without ever hinting at any latent or hidden taxation. According to the Claimants, it was evident from the various documents submitted to the Government prior to the IPO (in particular, the FIPB Application) that the reorganisation would involve indirect transfers. According to the Claimants, the Government's silence is confirmation that the law was settled in this respect, i.e., that it was clear to all branches of the Indian Government that Section 9(1)(i) did not tax indirect transfers of capital assets situated in India.

c.   One year later, the ITD attempted to change the settled interpretation of Section 9(1)(i). For the first time in the law's history, the ITD sought to apply that provision to impose capital gains tax on an indirect transfer by a non-resident, namely, the Hutchison-Vodafone transaction. According to the Claimants, high-ranking officials of the CBDT publicly acknowledged that the ITD's attempt to tax the capital gains arising from the Hutchison-Vodafone sale was a "test case".[638] As noted earlier, Vodafone successfully challenged this attempt before the Indian courts.

d.   In 2009 and again in 2010, the MoF unsuccessfully sought to change Section 9(1)(i) of the ITA 1961 through the introduction of tax bills with indirect taxation provisions. According to the Claimants, the Standing Committee and numerous stakeholders recognised that these provisions departed from settled law.

e.   In January 2012, ruling on the *Vodafone* case, the Supreme Court unanimously rejected the ITD's effort to "reinterpret" Section 9(1)(i).

f.   A few months thereafter, the Indian Parliament enacted the 2012 Amendment, effectively overturning the Supreme Court's decision in *Vodafone*, amending Section 9(1)(i) – with retroactive effect – to cover indirect transfers by non-residents. Contrary to the Respondent's contention, the 2012 Amendment was not a mere clarification of existing law; rather, it imposed a new tax burden that did not previously exist. The Indian Government has since narrowed down the 2012 Amendment's scope to apply exclusively to the Claimants and a few other (mainly foreign) firms, exempting closed assessments and foreign institutional investors entirely from the Amendment's reach.

g.   It was only in 2014, more than seven years after Cairn's corporate reorganisation, that the ITD first attempted to tax the CIHL Acquisition. During the course of CIL's 2014 Buy-Back Programme, in which CUHL was to participate, the ITD notified CUHL that it had found information indicating that CUHL had failed to report capital gains taxable in India arising from the CIHL Acquisition, and issued an order attaching CUHL's equity shares in CIL (worth approximately US$ 1 billion at the time).[639] This was followed by an assessment procedure that culminated with the FAO in January 2016, together with a Notice of Demand for

---

[638]   C-SoC, ¶ 181, citing "More Vodafone-like deals under CBDT lens" (The Hindu, 9 September 2010), Exh. C-206.

[639]   *Id.*, ¶ 30.

a principal amount of capital gains tax of US$ 1.6 billion, plus applicable interest and penalties which raised the amount payable to approximately US$ 4.4 billion (as of the date of the Claimants' Statement of Claim).[640]

h.   Since then, the Respondent has forcibly sold approximately 99% of CUHL's shares in CIL,[641] and refused to allow CIL to distribute dividends to CUHL.

626.   According to the Claimants, the Respondent's application of the 2012 Amendment to the CIHL Acquisition and related measures constitute manifest breaches of the UK-India BIT, and the Claimants must be fully compensated for the losses flowing from those breaches.[642] In particular, the Claimants argue that the Respondent has:[643]

a.   "[F]ailed to 'create favourable conditions' for the Claimants' investment and to accord the Claimants and their investment 'fair and equitable treatment' as required by Article 3 of the Treaty ('FET');"

b.   "[U]nlawfully expropriated CUHL's investment in CIL without providing fair and equitable compensation, and subjected the Claimants' investment to measures having an effect equivalent to expropriation in violation of Article 5 of the Treaty;" and

c.   "[V]iolated the Claimants' right under Article 7 of the Treaty to 'the unrestricted transfer of their investments and returns' by depriving CUHL of the ability to sell its remaining CIL shares and to repatriate the proceeds, as well as the dividends that have accrued in respect of such shares."

627.   The Claimants contend, in particular, that:

a.   The CIHL Acquisition did not give rise to any capital gains, and the ITD has arbitrarily misapplied basic taxation principles;

b.   Even if the CIHL Acquisition had given rise to capital gains, those gains were not taxable under Indian law as it stood in 2006. The retroactive application of the 2012 Amendment to that transaction is unfair, inequitable, and contrary to the rule of law;

c.   The Respondent has applied its fiscal measures arbitrarily, in a discriminatory fashion, and in bad faith.[644]

628.   Indeed, according to the Claimants, "certain facts in this case suggest that the breaches of the treaty standards and international law were particularly egregious, as they reflect

---

[640]   *Id.*, ¶ 37.

[641]   C-PHB, ¶ 237.

[642]   *Id.*, ¶¶ 40-41.

[643]   *Id.*, ¶ 296.

[644]   C-PHB, ¶ 4.

a high level of bad faith on the part of the government, particularly in its specific treatment of Cairn", including:[645]

a.   "[T]he Respondent's knowingly false presentation of its retroactive change to its 50-year old settled tax law as a mere 'clarification' of existing law;"

b.   The ITD's "sham 'investigation' into Cairn, which in reality amounted to a pre-determined hunt through Cairn's financial history for any transaction to which it could apply the Retroactive Amendment;"

c.   The ITD's "decision to apply the Retroactive Amendment to intra-group share transfers from 2006, which resulted in no real gains and had been fully disclosed to all relevant government bodies without anyone raising an issue of taxability;"

d.   The ITD's "urgent survey at CIL's offices in January 2014 (where it falsely claims to have 'found' documents long held in its files) to manufacture a pretence for blocking CUHL's share sale on 23 January 2014;"

e.   "[T]he issuance of notices and information requests to CUHL on 21/22 January 2014, followed by its pre-determination of Cairn's tax liability and attachment of CUHL's shares on 22 January before CUHL had any opportunity to respond;"

f.   "[T]he many false and unsubstantiated accusations in the FAO made against CUHL, including that CUHL deliberately falsified its FIPB application by concealing that the final exchange with CIL was for cash;"

g.   "[T]he shocking disproportionality of the tax assessment, now potentially amounting to more than US \$7 billion (with interest and penalties), several times larger than the entire market valuation of Cairn Energy;"

h.   "[T]he decision to pursue CUHL for penalties and interest, despite its own tax appellate tribunal having ruled that CUHL could not have 'visualised' the Retroactive Amendment;"

i.   "[T]he Respondent's false and constantly evolving accusations that Cairn engaged in deliberate tax abuse, despite the absence of any basis in the tax assessment, and its belated attempt to inject similar claims into the High Court proceedings;" and

j.   "[T]he Respondent's recent decision to liquidate CUHL's holdings of CIL/VIL shares shortly before this dispute is resolved, to thwart the Claimants' ability to collect on any damages award."

629.   The Claimants categorically reject the Respondent's tax avoidance and immovable property defences. According to the Claimants, the basis for the ITD's tax demand against CUHL is the 2012 Amendment, and not that Cairn's corporate reorganisation was an unlawful tax avoidance scheme, or was taxable as an indirect transfer of immovable property under Section 2(47)(vi) of the ITA, as the Respondent contends. Indeed, the Claimants assert that these are "*post hoc* arguments that have been invented

---

[645]   *Ibid.*

by the Respondent for this arbitration" that "[do not] even form any part of the actual measure that is challenged in this case", and have been raised to distract attention from the core issue of retroactivity.[646] The Claimants further allege that the lack of seriousness of the Respondent's tax avoidance theory is evidenced by the fact that it keeps changing.

630.    The Claimants also reject all of the Respondent's preliminary objections. Accordingly, they submit that the Tribunal has jurisdiction to hear their claims, all of which are admissible.

631.    The Claimants submit that they are entitled to be compensated for all the losses flowing from the breaches listed at paragraph 626 above. In their Statement of Claim, the Claimants request the following relief:

> For the reasons set out above, the Claimants respectfully request that the Arbitral Tribunal render an award in the Claimants' favour and:
>
> a)    DECLARE that India has failed to uphold its obligations under the Treaty and international law, and in particular, that it has:
>
>       (i)    failed to create favourable conditions for and accord the Claimants and their investments fair and equitable treatment, in violation of Article 3(2) of the Treaty;
>
>       (ii)   expropriated the Claimants' investments in violation of Article 5 of the Treaty, by illegally attaching CUHL's equity shares in CIL as well as any receivables by CUHL from CIL, and by preventing Claimants from selling the Shares;
>
>       (iii)  unlawfully restricted the Claimants' right to freely transfer funds in connection with their investments, in violation of Article 7 of the Treaty;
>
> b)    ORDER India to withdraw its unlawful tax demand against the Claimants and guarantee that it will not seek to recover the alleged tax liability or any interest and/or penalties arising from this alleged liability;
>
> c)    ORDER India to compensate the Claimants in an amount equal to the total harm suffered by the Claimants as a result of its breaches of the Treaty – an amount not less than US$ 1,052,394,295 – to be paid in a freely convertible currency acceptable to the Claimants, plus interest accruing from the date of India's breaches of its international obligations under the Treaty and international law until full payment of the award is made, as well as an amount equivalent to any tax incurred in respect of the compensation due to the Claimants;
>
> d)    GRANT any other relief that the Tribunal may deem just and proper; and,

---

[646]   Transcript, Evidentiary Hearing, Day 1, 37:2-11 (Mr McNeill).

e)   ORDER the Respondent to pay the Claimants' costs in connection with these arbitration proceedings, in accordance with Article 9(3)(c)(vii) of the Treaty and Article 38 of the 1976 UNCITRAL Rules.

In the alternative, should the Tribunal determine not to order India to refrain from enforcing its unlawful tax demand in the manner set out in Paragraph c) above, the Claimants respectfully request that the Arbitral Tribunal render an award in the Claimants' favour and:

f)   GRANT all relief requested by the Claimants in Paragraphs a), d), and e) above; and

g)   ORDER India to compensate the Claimants in an amount equal to the total harm suffered by the Claimants as a result of its breaches of the Treaty – no less than US$ 5,584,394,295 – to be paid in a freely convertible currency acceptable to the Claimants, plus any additional interest and/or penalties derived from India's unlawful tax demand; interest accruing from the date of India's breaches of its international obligations under the Treaty and international law until full payment of the award is made; as well as an amount equivalent to any tax incurred in respect of the compensation due to the Claimants.

The Claimants fully reserve their right to revise, update, amend, and supplement this Statement of Claim.[647]

632.   The Claimants updated their request for relief in their Reply.[648]

633.   At the Tribunal's request, the Claimants submitted their final request for relief on 14 December 2018, as follows ("Claimants' Updated Request for Relief"):[649]

For the reasons set out in the Claimants' submissions, the Claimants respectfully request that the Arbitral Tribunal render an award in the Claimants' favour and:

1.   DECLARE that it has jurisdiction over the Claimants' claims and that the Claimants' claims are admissible;

2.   DECLARE that the Respondent has failed to uphold its obligations under the UK-India Bilateral Investment Treaty ("Treaty") and international law, and in particular, that it has:

a)   failed to encourage and create favourable conditions for the Claimants' investments in violation of Article 3(1) of the Treaty,

b)   failed to accord the Claimants' investments fair and equitable treatment in violation of Article 3(2) of the Treaty;

---

[647]   C-SoC, ¶¶ 448-450.

[648]   Claimants' letter of 14 December 2018 (CCom-269).

[649]   *Ibid* (emphasis omitted). To preserve the Claimants' full prayer for relief, the Tribunal has included the Claimants' footnotes, but notes that, given the formatting of this Award, the numbering of those footnotes has changed. The original numbering of the footnotes is included in the footnotes themselves.

    c)   unlawfully expropriated the Claimants' investments or subjected them to measures having effect equivalent to expropriation, in violation of Article 5(1) of the Treaty; and,

    d)   breached the Claimants' right to the unrestricted transfer of their investments or returns in violation of Article 7 of the Treaty;

3.   ORDER the Respondent to compensate the Claimants in an amount equal to the total harm suffered by the Claimants as a result of its breaches of the Treaty, in the following amounts:[650]

    a)   US$ 984,228,273 for the net proceeds that would have been earned from the planned 2014 sale of CIL shares, plus US$ 230,868,360 for the loss of the exemption from UK corporation tax that would have been available on the net proceeds if they had been received in 2014,[651] plus pre-award interest on the net proceeds from the following dates:[652]

        (i)   For the US$ 64,708,741 / INR 4,049,953,454 in lost net proceeds incurred in January 2014, pre-award interest from 31 January 2014;

        (ii)   For the US$ 303,352,155 / INR 18,855,870,450 in lost net proceeds incurred in February 2014, pre-award interest from 28 February 2014;

        (iii)   For the US$ 313,076,958 / INR 19,110,209,298 in lost net proceeds incurred in March 2014, pre-award interest from 31 March 2014;

        (iv)   For the US$ 191,695,557 / INR 11,590,076,641 in lost net proceeds incurred in April 2014, pre-award interest from 30 April 2014;

        (v)   For the US$ 111,394,863 / INR 6,675,894,425 in lost net proceeds incurred in May 2014, pre-award interest from 31 May 2014;

---

[650] *Id.*, p. 2 n. 1 ("The Claimants reserve the right to update the nature and value of their claimed losses.").

[651] *Id.*, pp. 2-3 n. 2 ("As explained in Section XI of the Claimants' Post-Hearing Brief, receipt of the sale proceeds in 2014 would have been exempt from UK tax under the Substantial Shareholding Exemption. That exemption is no longer available as a direct result of the measures at issue, which legally prevented the Claimants from selling their shares at a time when the exemption applied. Instead, the Claimants will now be required to pay UK corporation tax at 19%. The Respondent has never disputed this, and its expert, Mr Kristensen, agrees that it is 'reasonable' to seek reimbursement of such tax where incurred. See Second Expert Report of Jostein Kristensen, ¶ 3.32. The Claimants therefore quantify the damages due to the loss of exemption from UK corporation tax as the additional amount required to allow them to receive the net proceeds of US$ 984,228,273 without further tax due, as they would have but for the Respondent's breach. Using the formula in Section XI of the Claimants' Post-Hearing Brief, that additional amount is US$ 230,868,360. The Claimants do not seek to hold the Respondent liable for UK corporation tax on pre-award interest or the tax refunds.")

[652] *Id.*, p. 3 n. 3 ("These figures are taken from Mr Boulton's Appendix 8-1, tabs on 'Pre-Award interest' and 'Alternative' interest calculation. Note that the INR equivalents from Mr Boulton's data are included here to assist with calculation of interest amounts at the Statutory Rate.").

b) The US$ equivalent of INR 17,694,496,971 (converted on the date of the award) for the withheld tax refund due with respect to AY 2012-13 (i.e. share sales to Vedanta), plus pre-award interest from 30 June 2017; and

c) The US$ equivalent of INR 584,316,952 (converted on the date of the award) for the withheld tax refund due with respect to AY 2010-11 (i.e. share sales to Petronas), plus pre-award interest from 30 June 2017;

4. ORDER the Respondent to pay pre-award interest at:

a) a rate consistent with the statutory rate applied to tax refunds in India (0.5% per month, in INR terms, without compounding) (the "Statutory Rate"); or,

b) in the alternative, (i) in respect of the lost net proceeds under Paragraph 3(a), at a rate consistent with the interest rate the Claimants pay on their debt (USD 1-month LIBOR plus a monthly margin of 0.23%, compounded monthly); and (ii) in respect of the tax refunds under Paragraphs 3(b) and (c), at the Statutory Rate;

5. ORDER the Respondent to pay post-award interest at the same rate(s) as in Paragraph 4;

6. DECLARE that the tax demand against the Claimants in respect of AY 2007-08, as set forth in the FAO (the "Demand"), is inconsistent with the Treaty and the Claimants are relieved from any obligation to pay it, and ORDER the Respondent to neutralise the continuing effect of the Demand, either by:

a) permanently withdrawing the Demand, and refraining from seeking to recover further the alleged tax liability or any interest and/or penalties arising from this alleged liability through any other means; or (at the Respondent's option[653]),

b) paying an amount equal to the amount due on the Demand outstanding as of the date of the award, and any amounts that may subsequently become due thereon (whether for interest, penalties, or otherwise), by way of offset against the Demand, such that the monetary award in the Claimants' favour has the effect of fully satisfying and extinguishing the Demand, leaving no amount due from the Claimants, and further complying with the terms of Paragraph 7 below;

7. DECLARE that the Respondent is liable to compensate the Claimants for UK corporation tax paid by the Claimants on amounts awarded

---

[653] *Id*., p. 4 n. 4 ("The Claimants are content to allow the Respondent to choose the manner in which the Demand is neutralised (i.e. either through withdrawing it or through an offset), so long as provision is made to ensure that an offset, if chosen, does not leave the Claimants shouldering a burdensome tax liability in the UK. Accordingly, the latter option (b) is made contingent on compliance with the terms of Paragraph 7.").

under Paragraph 6(b) (which arise solely as a result of the Demand and would not otherwise have been payable by the Claimants),[654] and ORDER the Respondent to pay into an escrow account held with a UK financial institution (or another account acceptable to the Claimants), an amount necessary to meet the estimated UK corporation tax due (calculated as the amount awarded under Paragraph 6(b) multiplied by 0.2346 (or, should the then-prevailing UK corporation tax rate be other than 19%, a multiple calculated as x / (100 - x), where x is the then-prevailing percentage rate of UK corporation tax), which may be used for the sole purpose of funding payments to meet UK corporation tax on amounts awarded under Paragraph 6(b), with any amounts remaining in the escrow account to be returned to the Respondent upon the earlier of (i) confirmation by the UK tax authorities that amounts awarded pursuant to Paragraph 6(b) are not subject to UK corporation tax; or (ii) 31 December of the calendar year following payment of the corresponding amount awarded under Paragraph 6(b) (being the date by which the UK tax liability would be due to be paid);

8.  DECLARE that the award of damages has been calculated on a net-of-Indian-tax basis, and that, accordingly, India may not deduct taxes in respect of payment thereof;

9.  REJECT the Respondent's submissions in their entirety and, in particular, DECLARE that the Respondent's arguments on unlawful tax avoidance and Section 2(47)(vi) of the Indian Income Tax Act are not grounds for the Demand and, in any event, are not substantiated on the merits;

10. GRANT any other relief that the Tribunal may deem just and proper; and,

11. ORDER the Respondent to pay the Claimants' costs of arbitration and legal representation in connection with these arbitration proceedings, in accordance with Article 9(3)(c)(vii) of the Treaty and Article 40 of the 1976 UNCITRAL Rules.

## B.    Overview of the Respondent's position

634.   As an initial matter, the Respondent contests the jurisdiction of the Tribunal and the admissibility of the claims. Specifically, the Respondent argues that:

a.    The Claimants' claims are premature and, as a result, they are inadmissible;

---

[654]  *Id*., p. 4 n. 5 ("As explained in Section XI of the Claimants' Post-Hearing Brief, the possible application of UK corporation tax to an award offsetting the outstanding tax demand in India could have the effect of effectively wiping out the Claimants' compensation for their losses. To ensure that the Claimants are put in the position they would occupy but for the imposition of the measures at issue, the Claimants seek compensation for this liability if imposed. Likewise, to ensure that the Claimants are not overcompensated if the UK tax authorities agree not to impose this tax, the Claimants are proposing an escrow mechanism, allowing the funds to be used to meet any UK tax payments arising under Paragraph 7 but returned to the Respondent to the extent they are not necessary for this purpose.").

b.    Tax disputes are excluded from the scope of the BIT and not arbitrable. As a result, the Tribunal lacks jurisdiction over the Claimants' claims;

c.    The dispute falls outside the scope of protection of the BIT, because it concerns "returns" rather than "investments". Accordingly, the Claimants' claims are outside the scope of the Tribunal's jurisdiction. Even if the Tribunal considers that the claims concern "investments", the Tribunal nonetheless lacks jurisdiction over the Claimants' claims for breach of Article 7, as that claim only concerns the Claimants' capital gains. Even if the Tribunal has jurisdiction under Article 9, Articles 3 and 5 are not available to the Claimants, and Article 7 is inapplicable.

d.    The Claimants have not made an investment as defined in the BIT. Specifically, CUHL has not made an investment in accordance with Indian law, and CEP's indirect investment is not protected by the Treaty. Consequently, the Tribunal lacks jurisdiction.

635.   As to the merits, the Respondent submits that the Claimants' claims should be dismissed in their entirety. According to the Respondent, "[t]he Claimants' claim is an opportunistic attempt to profit from an abusive series of transactions in 2006", which the Respondent labels the "2006 Transactions".[655] Contrary to the Claimants' contention, the 2006 Transactions were not a mere corporate reorganisation, but the implementation of a strategy whereby CEP commenced the divestment of its Indian assets in combination with an IPO. The Respondent asserts that the 2006 Transactions were "evidently structured as to avoid paying tax", as there was "no other commercial rationale for the complex structure which was adopted."[656]

636.   The Respondent submits that, of the three (for the Respondent, four) BIT provisions invoked by the Claimants, only one of them, specifically its fair ane equitable treatment ("FET") claim brought under Article 3(2) of the BIT, "merits any serious consideration":

a.    With respect to the Claimants' claim under Article 3(1), the Respondent submits that the Claimants seek to conflate this provision with Article 3(2) to argue that the hortatory words in Article 3(1) (to the extent they have any binding effect) apply post-investment as part of Article 3(2). The Respondent denies that Article 3(1) has any binding effect and, even if it did, it applies only pre-investment. Accordingly, India could not have breached Article 3(1).[657]

b.    With respect to the Claimants' claim under Article 3(2), the Respondent argues that "the FET standard […] cannot be turned into a regulatory or legislative freeze on the Respondent whether by reference to Article 3(1) or otherwise as contended by the Claimants. Rather, the legitimacy of the Respondent's impugned taxation

---

[655]   R-SoD, ¶ 5. Note from the Tribunal: The Tribunal understands that, through the term "2006 Transactions", the Respondent is referring to Cairn's entire 2006 corporate reorganization and IPO, which the Respondent also refers to as "the 2006 IPO and Divestment Restructure".

[656]   *Id.*, ¶ 5.

[657]   *Id.*, ¶ 6(a).

of the Claimants' capital gains is to be assessed by reference to well-established principles regarding the FET standard, including the principle that the investor must take the legislative and regulatory framework of the State in which it invests (including, in the present case, the longstanding practice of Parliament and of the Supreme Court regarding the validity and legitimacy of retrospective clarifications to tax legislation) as it finds it, and that (in the absence of specific representations to the contrary) its legitimate expectations must objectively be based on the same."[658]

c.   With respect to the Claimants' expropriation claim brought under Article 5, the Respondent submits that India's tax measures fall within the scope of its police powers under customary international law and as such cannot amount to an expropriation under Article 5. This is because the tax measures at issue were non-discriminatory regulatory acts of general application adopted by India in good faith in the pursuance of one of its core functions as a sovereign State: the adoption and implementation of taxation measures. The Respondent argues that, under international law, such measures fall under the police powers of the State and as such cannot be characterised as an expropriation, nor do they give rise to compensation.[659] In any event, the Respondent argues that the Claimants' expropriation claim is wholly dependent on its FET claim, because "[i]f the taxation of the Claimants' capital gains is legitimate […] then so is the asset freeze put in place by the Respondent in the implementation thereof pursuant to express and clear provisions of the Respondent's tax legislation."[660] Thus, if there is no breach of Article 3(2), there can be no breach of Article 5. In addition, in its Statement of Defence the Respondent argued that there has been no expropriation as "the Claimants have never been deprived of their shares (and need never be deprived of them if they settle their tax liability through alternate means)", and the Claimants have always been "free to provide a bank guarantee in an equivalent amount in order to free their shares."[661] In its Rejoinder, the Respondent argued rather that "[t]here has been no expropriation in fact", as "[t]here was no seizure or appropriation of the Claimants' investment, nor any neutralisation or destruction of the value and enjoyment of the investment", and "[t]he regular application of ordinary tax law has never been considered to amount to expropriation."[662]

d.   Finally, the Respondent contends that the Claimants' claim under Article 7 is "a makeweight claim which is devoid of merit".[663] The tax measures in question are not obstructing the repatriation of any investment or return; the Respondent is

---

[658]   *Ibid* (footnote omitted).

[659]   *Id.*, ¶¶ 6(b), 287-290.

[660]   *Id.*, ¶ 6(b).

[661]   *Ibid.*, referring to the letter from Assistant Commissioner of Income Tax, Circle 1(2)(1), International Taxation, New Delhi to the Commissioner of Income Tax, International Taxation-1, New Delhi, dated 31 January 2017, Exh. R-84.

[662]   R-Rejoinder, ¶ 851(b).

[663]   R-SoD, ¶ 6(c).

simply exercising its jurisdiction to detain the Claimants' remaining assets in India to ensure that the Claimants will pay their tax debts.[664] Even if a claim could be brought under Article 7, again it would be wholly dependent on the FET claim.

637. Accordingly, the Respondent submits that the Claimants' claim is essentially an FET claim, which has been presented in a simplistic manner. For the Respondent, the Claimants' case rests on the mistaken premise that, prior to 2012, the transfer of shares in a foreign company (i.e., a company incorporated outside of India) was never taxable in India. According to the Claimants, the 2012 Amendment (which, as already noted, the Respondent refers to as the "2012 Clarification") was thus not a clarification at all, but a "disingenuous sham" which reversed existing law to the Claimants' detriment.[665] Accordingly, in the Claimants' view India's attempt to tax the 2006 Transactions breaches the FET standard.

638. The Respondent denies that there has been a breach of FET (or, for that matter, of any other BIT standard). Essentially, the Respondent argues that (i) as a matter of Indian law, the 2006 Transactions were taxable in 2006 irrespective of the 2012 Clarification, and (ii) in any event, the 2012 Clarification did not give rise to a breach of the UK-India BIT.[666]

639. The Respondent's primary argument on the merits is that, as a matter of Indian law, the 2006 Transactions were taxable irrespective of the 2012 Clarification. This is for two reasons:

a. <u>First</u>, because the 2006 Transactions were tax avoidant. The Respondent argues that "[t]he Indian Courts have long developed a 'look at' doctrine which mandates the taxation of tax avoidant schemes, including schemes seeking to use foreign corporations, which have no economic substance, to avoid the payment of taxes in India", and that "Indian law has long permitted taxation where a transaction has a strong economic nexus with India, and all that exists to sever this connection is a layering of paper entities with no economic substance."[667] The *Vodafone* decision did not alter this position.[668] Here, "the Respondent's tax authorities have expressly taken the (correct) position that the 2006 Transactions at issue in this case constitute an abusive tax avoidant scheme", and as a result are "assessable to Indian capital gains tax quite irrespective of the 2012 Clarification."[669] Contrary to what happened in *Vodafone*, the Claimants filed their claim before this Tribunal even prior to the issuance of the FAO, and "thus seek to escape the normal operation of the Indian legal system, including factual inquiry into the taxability of their transaction as an illegitimate tax avoidance scheme under Indian law."[670]

---

[664]  *Id.*, ¶¶ 6(c), 333-340.

[665]  *Id.*, ¶ 7.

[666]  *Id.*, ¶ 9; R-Rejoinder, ¶¶ 26, 29.

[667]  R-SoD, ¶ 8(a).

[668]  *Ibid*.

[669]  *Id.*, ¶ 9(a).

[670]  *Id.*, ¶ 8(c).

Indeed, the Respondent's primary position, as formulated in its jurisdictional objections, is that this claim is premature.[671]

b.   Second, the 2006 Transactions were taxable under Section 2(47)(vi) of the ITA 1961, because they involved the indirect transfer of underlying immovable property, which includes natural resources assets (oil fields) over which the Claimants have rights.[672]

640.   Even if Respondent's tax assessment was dependent on the 2012 Clarification, the Respondent submits that the 2012 Clarification did not give rise to a breach of the UK-India BIT. The Respondent's argument is two-tiered:

a.   First, the Respondent argues that the 2012 Clarification was clarificatory in nature. The text of Section 9(1)(i) of the ITA 1961 (the fourth limb of which had never been judicially considered prior to *Vodafone*[673]) required an interpretation to adjust it to the changing economic and commercial context, in particular, to address aggressive tax avoidant investment structures in which Indian assets were placed in shell companies outside of India. "It was never the case that capital gains on transfers of foreign shares were *ipso facto* not taxable. Rather, the question has always been whether the nexus of the transaction with India, and/or the tax avoidant character of the transaction, were such as to attract Indian taxation."[674] The Supreme Court took one particular view in *Vodafone* which, the Respondent asserts, contradicted the view of other Indian courts. The Indian courts, in contrast to the Supreme Court in *Vodafone*, had previously taken a "purposive" approach to Section 9(1)(i).[675] Parliament disagreed with the formalistic approach taken by the Supreme Court, and thus clarified the "true intent" of Section 9(1)(i) of the ITA in the context of these new business practices.[676] "The 2012 Clarification simply made clear that modern aggressive tax avoidant practices, where investors

---

[671]   *Id.*, ¶ 10.

[672]   R-SoD, ¶ 145; R-Rejoinder, ¶¶ 378-404.

[673]   Respondent's Post-Hearing Brief ("R-PHB"), ¶ 5(a).

[674]   R-SoD, ¶ 8(d).

[675]   R-PHB, ¶ 92 ("Until the decision in *Vodafone*, there was no authority whatsoever on the meaning or scope of the relevant limb of section 9(1)(i), and the decisions which did exist on the other three limbs thereof all held that section 9(1)(i) enshrined a broad deeming provision of wide ambit. By its very nature, the provision is one which should be read purposively looking at the economic substance of the transaction; not a provision to be read narrowly and formalistically as the Supreme Court ended up doing. In other words, as the Respondent pointed out in its prior submissions, there was no case which held that the fourth limb of section 9(1)(i) (which applies to the transfer of assets 'situate in India') had to be applied by reference to the formal situs of the relevant asset, applying formal conflict of law principles. Rather, the authorities suggested that the language of the fourth limb of section 9(1)(i) fell to be interpreted not in a formalistic manner, but keeping in view the deeming nature of the provision. The provision was a broad source rule, and all other limbs of that provision had been interpreted in a flexible manner, looking at practical realities ('as a practical hard matter of fact', to use the wording used in many of the leading authorities) and looking at economic substance rather than being constrained by legal formalism. Therefore, the words of the fourth limb also fell to be interpreted in a flexible manner, to identify what a practical person would consider as the source of income: not simply by looking at private international law rules on the situs of assets.").

[676]   R-SoD, ¶ 8(d) (emphasis omitted).

profited from Indian assets, but sought to avoid the payment of tax, fell within the scope of Section 9 of the ITA."[677]

b.  Even if the 2012 Clarification was retroactive, it is "valid and binding applying the longstanding constitutional, legislative and legal framework in which the Claimants have invested."[678] Parliament has the constitutional prerogative to clarify the law's true intent.[679] The legal framework in which the Claimants invested in 1996 is one in which "Parliament, not the Supreme Court, has the final say on the interpretation of its statutes (including in a great number of cases its tax statutes) through retrospective clarification where required, subject only to basic constitutional protections contained, in particular, in Articles 14 and 19 of the Constitution of India."[680]

641. The Respondent emphasises that the Claimants have chosen not to challenge the constitutionality of the 2012 Clarification, and "[i]n the absence of such a challenge, the Clarification must be taken by this Tribunal for what it is: a legislative act validly passed by the Respondent's Parliament, which is valid and binding on the Claimants in accordance with a constitutional, legislative and judicial framework which was firmly and transparently in place at the time the Claimants purportedly made their investment in India."[681] If the Tribunal assumes jurisdiction despite the Respondent's objection that the claims are premature: "it cannot be correct – on the merits – that the Tribunal must somehow substitute itself to the entire Indian judicial system and (i) rule on the – heavily factual – question of whether the taxed transactions are assessable to Indian capital gains tax as a tax avoidant scheme under the Indian law 'look at' doctrine, in circumstances where that question is currently being considered by the [ITAT] and can be subjected to consideration by higher judicial authorities up to the Supreme Court; and (ii) rule on the validity of the 2012 Clarification in circumstances where the Claimants have decided not to avail themselves of their right of constitutional redress under Article 14 of the Constitution of India."[682]

642. For these reasons, in its Statement of Defence the Respondent requested the following relief:

The Respondent asks the Tribunal to adjudge and declare that:

a.  It does not have jurisdiction over the Claimants' claims and / or the Claimants' claims are inadmissible; and / or

b.  The Claimants' claims are dismissed; and / or

---

[677]  *Ibid* (emphasis omitted).

[678]  *Id.*, ¶ 9(b).

[679]  *Id.*, ¶ 8(d) (emphasis omitted).

[680]  *Ibid*.

[681]  *Id.*, ¶ 8(e) (emphasis omitted).

[682]  *Id.*, ¶ 10.

    c.   The Claimants shall bear its own legal and other costs, the Respondent's legal and other costs, and the costs of the arbitration; and /or

    d.   Any other relief that the Tribunal deems appropriate.

The Respondent reserves the right to amend, supplement and update its prayer for relief.[683]

643.    The Respondent updated its request for relief in its Rejoinder.[684]

644.    At the Tribunal's request, the Respondent submitted its updated request for relief on 14 December 2018, as follows (the "Respondent's Updated Request for Relief"):[685]

    1.   The Respondent asks the Tribunal to adjudge and declare that:

    •   It does not have jurisdiction over the Claimants' claims and / or that the Claimants' claims are inadmissible;

    •   The Claimants' claims are dismissed in their entirety;

    •   The Claimants shall bear their own legal and other costs, the Respondent's legal and other costs, and the costs of the arbitration, in accordance with Article 9(3)(c)(vii) of the BIT and Article 38 of the UNCITRAL Rules of 1976; and

    •   The Respondent shall be awarded any other relief as the Tribunal deems appropriate.

    2.   The Respondent reserves the right to amend, supplement and update its prayer for relief.

    3.   All reservations previously made are maintained.

## V.   PRELIMINARY MATTERS

## A.   Seat of the arbitration

645.    The Treaty does not determine the place (or seat) of the arbitration, and the Parties failed to agree on a seat. Accordingly, pursuant to Article 16 of the UNCITRAL Rules, it fell to the Tribunal to determine the place, having regard to the circumstances of the arbitration.

646.    In their Notice of Arbitration, the Claimants proposed that The Hague, the Netherlands, be chosen as the place of the arbitration.[686] The Respondent favoured Singapore as the

---

[683]  *Id*., ¶¶ 362-363.

[684]  R-Rejoinder, ¶ 951,

[685]  RCom-334.

[686]  NoA, ¶ 103; see also Claimants' letter of 18 February 2016 (CCom-2); Claimants' letter of 25 March 2016 (CCom-5); Claimants' letter of 15 April 2016 (CCom-9); Claimants' letter of 29 April 2016 (CCom-11).

place of the arbitration, with The Hague being its alternative choice.[687] After considering the Parties' positions and the circumstances of the present arbitration, the Tribunal determined that the "seat" of the arbitration would be The Hague, the Netherlands.[688]

## B.  Applicable law

647.  Unlike the Claimants, as will be discussed below, the Respondent expressly devoted attention to the question of the law applicable in this arbitration. The Respondent submits that the proper approach to applicable law in an investment claim is to consider a mosaic of applicable laws, depending on the legal nature of the relationship.[689] As explained by Professor Zachary Douglas QC:

> A diverse range of legal relationships arises in an investment dispute and this necessitates the application of several different applicable laws by an investment treaty tribunal. The investor is often a corporate entity established under a municipal law of one contracting state, whereas its investment is a bundle of rights acquired pursuant to the municipal law of a different contracting state. The acts of the state that is host to the investment might attract its international responsibility upon a breach of the minimum standards of treatment in the investment treaty in accordance with international law. If the investment treaty tribunal has jurisdiction over contractual claims, and the investor has a contract with an emanation of the host state, then its contractual rights fall to be determined by the law governing the contract. The investment treaty regime thus summons the image of a mosaic of applicable laws, unlike the position in classical international regimes where public international law might be destined to play an exclusive role, and questions of municipal law might be treated as questions of fact.[690]

648.  As a result, the Respondent submits that "whilst the interpretation of the terms of the BIT may be a matter of international law, the application of those terms to the facts of this case will depend upon Indian law",[691] and that "on the principal issues to be decided by the Tribunal, the Tribunal must have due regard to the content and application of Indian law".[692] The Claimants have not disputed this, at least not expressly.

649.  As a general matter, the Tribunal agrees with the Respondent's approach. While an international treaty is by definition international law and its interpretation is governed by international law, it is not the only law relevant to the Tribunal's inquiry. As Professor Jan Paulsson has stated, "[a]n international treaty may provide for the

---

[687]  Respondent's email of 16 March 2016 (RCom-1); Respondent's email of 1 April 2016 (RCom-2); Respondent's email of 11 April 2016 (RCom-4); Respondent's email of 27 April 2016 (RCom-7).

[688]  Tribunal's letter of 6 May 2016 (AT-8).

[689]  R-SoD, ¶ 64.

[690]  Zachary Douglas, *The International Law of Investment Claims* (Cambridge University Press, 2009), RLA-63, p. 40 (footnotes omitted).

[691]  R-SoD. ¶ 65.

[692]  *Id.*, ¶ 67.

protection of contracts, property, or other private-law rights, but international law does not define such rights; one must look to national law."[693]

650.  It is common ground that the Tribunal's jurisdiction and the admissibility of the Claimants' claims is subject to international law. However, to determine whether it has jurisdiction over the claims or whether the claims are admissible, the Tribunal may need to determine other questions, each of which will be subject to its proper law. For instance, to determine whether the Claimants have validly made an investment in India (a requirement for the Tribunal's jurisdiction), the Tribunal will need to determine whether the asset in question was "established or acquired, including changes in the form of such investment, in accordance with the national laws of the Contracting Party in whose territory the investment is made";[694] in this case, in accordance with Indian law.

651.  Similarly, the question of whether the Respondent has breached its obligations under the Treaty is one that must be primarily answered by applying international law, and in particular, the terms of the Treaty. Indeed, Article 9(3)(c)(iii) of the Treaty states that "[t]he arbitral award shall be made in accordance with the provisions of this Agreement".[695] It is undisputed that the interpretation of the Treaty and the content of the Respondent's obligations under the Treaty are governed by international law. However, to determine whether the Respondent has breached the Treaty, the Tribunal may need to apply Indian law. This is particularly so as the Treaty states that "[s]ubject to the provisions of this Agreement, all investments shall be governed by the laws in force in the territory of the Contracting Party in which such investments are made."[696]

652.  For instance, the interpretation and content of the Respondent's obligation to accord FET to the Claimants' investments under Article 3(2) of the BIT is a question of international law. However, to determine whether the Respondent has breached this obligation, the Tribunal may need to assess certain questions of Indian law. By way of example, whether the 2006 Transactions were tax abusive and therefore taxable in India, or whether indirect transfers were taxable in India prior to the 2012 Amendment, are both questions that need to be answered by applying Indian law. Only once the Tribunal has assessed these questions under their proper law will it be able to determine – applying the Treaty and international law – whether the Respondent has upheld its obligation to grant FET to the Claimants' investments.

653.  The Tribunal has thus applied international law or Indian law to the various questions before it, depending on the nature of the question.

654.  The Tribunal further notes that the Parties dispute the relevance of customary international law and Indian constitutional law to determine the content of the Respondent's BIT obligations, as well as the sources of international law that the

---

[693]  Jan Paulsson, *Indirect Expropriation: Is the Right to Regulate at Risk*? (International Centre for Settlement of Investment Disputes, Organisation for Economic Cooperation and Development and United Nations Conference on Trade and Development, 2005), RLA-111, ¶ 8.

[694]  UK-India BIT, CLA-1, Article 1(b).

[695]  *Id.*, Article 9(3)(c)(iii).

[696]  *Id.*, Article 11(1).

Tribunal may rely on. The Tribunal addresses these matters in the relevant sections of its analysis.

## C.     The Respondent's procedural objections and reservations

655.    As is reflected in the procedural history of this arbitration (Section III above), the Respondent has objected to several of the Tribunal's procedural orders and directions, has raised numerous due process concerns, and has consistently reserved its rights and maintained all its previous reservations.

656.    The Tribunal has at all times sought to conduct itself in the spirit of Article 15 of the UNCITRAL Rules. In particular, it has constantly endeavoured to treat the Parties with equality and to give them a full opportunity of presenting their case at any stage of the proceedings, and believes it has done so. With these principles in mind, the Tribunal considered each Party's procedural applications and issued reasoned decisions. Further, the Tribunal granted the Respondent numerous extensions to submit its Statement of Defence and to complete various procedural steps related to document production.

657.    The Tribunal has sought to deal with the Respondent's objections and reservations in a comprehensive and adequate fashion. In particular, as described in Section III.I.7 above, after the Evidentiary Hearing the Tribunal requested the Parties to submit updated lists of all of the procedural reservations and objections that they wished to maintain.[697] As explained in AT-285, the Tribunal considered that the lists were necessary to maintain the efficiency of the proceedings, in order to ensure that the Tribunal would not miss any request or reservation from the Parties and would thus address it, if it deemed it necessary to do so. The Tribunal explained that, while it "ha[d] attempted to address each procedural request or reservation as thoroughly and swiftly as possible, it cannot be excluded that it may have somehow missed a particular prayer or reservation, in particular in a case of this magnitude and complexity".[698] The Tribunal further noted that these instructions treated the Parties with equality, allowing them a full opportunity to present their case.[699] For the reasons set out in its letter AT-285, the Tribunal reformulated its previous directions to state that "[a]ny prayers or reservations not included in these lists may be disregarded."[700]

658.    As noted in Section III.I.7 above, the Claimants indicated that they had no procedural objections or reservations to make. For its part, the Respondent submitted its list of objections and reservations by cover of RCom-334, which it updated through RCom-357.[701] The Claimants commented upon RCom-334 in their CCom-279.[702]

---

[697]    Tribunal's email of 7 November 2018 (AT-227); and Tribunal's email of 26 November 2018 (AT-247); as later clarified in Tribunal's email of 11 December 2018 (AT-262); and Tribunal's email of 26 February 2019 (AT-285).

[698]    Tribunal's email of 26 February 2019 (AT-285).

[699]    *Ibid.*

[700]    *Ibid*.

[701]    Respondent's email of 14 December 2018 (RCom-334); Respondent's email of 18 January 2019 (RCom-357).

[702]    Claimants' email of 18 January 2019 (CCom-279).

659. The Tribunal has reviewed anew the Respondent's procedural objections and reservations and has the following comments.

660. First, the Tribunal notes that the Respondent has listed among its procedural reservations its numerous reservations of rights. The Tribunal observes that: a reservation of rights, if valid, implies that the party reserves a right to make an application, submission, or complaint in the future, before the Tribunal or another court. If and when the Respondent exercised the rights it purported to reserve during the proceedings, the Tribunal addressed them and either granted appropriate relief to the Respondent or denied the merits of the right claimed to be reserved. However, the Respondent has reserved many rights that it did not exercise in the arbitration. Absent a specific request for relief, the Tribunal refrains from commenting on whether the Respondent validly holds the rights it claims to be reserving, and cannot prevent the Respondent from exercising those rights, if they exist, in the appropriate forum.

661. Second and consequently, the Tribunal can only comment on the Respondent's procedural objections or complaints made with respect to the Tribunal's procedural orders and decisions. As noted in AT-285, the Tribunal attempted to address each procedural request or objection as thoroughly and swiftly as possible; however, for the sake of completeness, it has reviewed those decisions while making this Award. It notes at the outset that many of the Respondent's complaints included in those lists were superseded by later events.[703] As to the remaining objections, while the Tribunal does not consider it appropriate to enter into a debate with the Parties as to the reasoning of each decision, the Tribunal has ensured that, in reaching such decision, it did not fail to treat the Parties with equality and due process, or unreasonably prevented them from presenting their case. The Tribunal's conclusion is that it complied at all times with Article 15 of the UNCITRAL Rules.

662. Third and finally, the Tribunal has deemed it appropriate to reserve its decision on some of the Respondent's procedural applications and address them in this Award, should their resolution become necessary, namely:

   a.   The Respondent's request that adverse inferences be drawn from Mr Salve SA's departure from this arbitration (addressed in Section VII.A.3.f(i)(1) below);

   b.   The Respondent's argument that the Claimants' arguments on unreasonableness or discrimination on enforcement had not been pleaded until the Evidentiary Hearing (addressed in Section VII.A.3.g below);[704] and

---

[703] For instance, the Respondent noted in RCom-334 (point 9) that, in RCom-108 of 22 May 2017, it had "lodge[d] a formal protest" against the Tribunal's decision in AT-75 that the issues of enforcement and release of dividends were matters of urgency to be decided few days before the RIM hearing, *inter alia* because it would purportedly prejudice the urgency criteria required under the RIM. However, as set out in Section III.C above, the Tribunal ruled on the Claimants' Original Request on Dividends through PO7, and separately denied the RIM through AT-85, providing its reasons in PO9.

[704] To the extent that the Respondent's objection related to arguments made by the Claimants at the Evidentiary Hearing, the Tribunal ruled on it in AT-232 of 15 November 2018, holding that these arguments "f[e]ll within the scope of permissible pleading" (AT-232, p.5). The Respondent's objection remains open with respect to arguments made by the Claimants after the Evidentiary Hearing. Accordingly, the Tribunal will address this objection in this Award if the Claimants' arguments on unreasonableness and discrimination on enforcement become relevant to the Tribunal's analysis.

c.   The Respondent's argument that the Claimants' claim in respect of an alleged "loss of exemption from UK corporate tax" was also raised for the first time at the Evidentiary Hearing (addressed in Section VIII.C.3.d below).

## VI.   JURISDICTION AND ADMISSIBILITY

663.   The Tribunal will first set out the legal framework that governs its jurisdiction and the admissibility of the claims (Section A). It will then assess *ex officio* the requirements for jurisdiction and admissibility over which there is no objection (Section B), before turning to the Respondent's objections to jurisdiction and admissibility (Section C).

## A.   Legal framework for jurisdiction and admissibility

664.   The Claimants assert that the Tribunal has jurisdiction on the basis of Article 9 of the UK-India BIT, which reads as follows:

### ARTICLE 9

### Settlement of Disputes between an Investor and a Host State

(1) Any dispute between an investor of one Contracting Party and the other Contracting Party in relation to an investment of the former under this Agreement shall, as far as possible, be settled amicably through negotiations between the parties to the dispute.

(2) Any dispute which has not been amicably settled within a period of six months from written notification of a claim may be submitted to international conciliation under the Conciliation Rules of the United Nations Commission on International Trade Law, if the parties to the dispute so agree.

(3) Where the dispute is not referred to international conciliation, or where it is so referred but conciliation proceedings are terminated other than by the signing of a settlement agreement, the dispute may be referred to arbitration as follows:

(a)   if the Contracting Party of the investor and the other Contracting Party are both parties to the Convention on the Settlement of Investment Disputes between States and Nationals of other States, 1965, and the investor consents in writing to submit the dispute to the International Centre for the Settlement of Investment Disputes such a dispute shall be referred to the Centre;

or

(b)   if both parties to the dispute so agree under the Additional Facility for the Administration of Conciliation, Arbitration and Fact-Finding Proceedings;

or

(c) to an *ad hoc* arbitral tribunal by either party to the dispute in accordance with the Arbitration Rules of the United Nations Commission on International Trade Law, 1976. In respect of such arbitral proceedings, the following shall apply:

(i) The Arbitral Tribunal shall consist of three arbitrators. Each party shall select an arbitrator. These two arbitrators shall appoint by mutual agreement a third arbitrator, the Chairman, who shall be a national of a third State. The arbitrators shall be appointed within two months from the date when one of the parties to the dispute informs the other of its intention to submit the dispute to arbitration within the period of the six months mentioned earlier in paragraph (2) of this Article;

(ii) If the necessary appointments are not made within the period specified in sub-paragraph (c)(i), either party may, in the absence of any other agreement, request the President of the International Court of Justice to make the necessary appointment;

(iii) The arbitral award shall be made in accordance with the provisions of this Agreement;

(iv) The tribunal shall reach its decision by a majority of votes;

(v) The decision of the arbitral tribunal shall be final and binding and the parties shall abide by and comply with the terms of its award;

(vi) The arbitral tribunal shall state the basis of its decision and give reasons upon the request of either party;

(vii) Each party concerned shall bear the cost of its own arbitrator and its representation in the arbitral proceedings. The cost of the Chairman in discharging his arbitral function and the remaining costs of the tribunal shall be borne equally by the parties concerned. The tribunal may, however, in its decision direct that a higher proportion of costs shall be borne by one of the two parties, and this award shall be binding on both parties.[705]

665. It is common ground that the Tribunal's jurisdiction is governed by international law, in particular by the terms of the UK-India BIT, which is the instrument of the Parties' consent. As discussed in Section V.B above (Preliminary Matters – Applicable Law), this is subject to the Tribunal having to determine incidental issues that may be subject to domestic law, for instance, the law of the host State or the mandatory procedural rules of the seat of the arbitration.

---

[705] UK-India BIT, CLA-1, Article 9 (footnote omitted).

666.   It is also undisputed that the interpretation of the UK-India BIT is governed by customary international law principles of treaty interpretation, as codified in the Vienna Convention on the Law of Treaties ("VCLT").

667.   The Parties have not made express submissions on the law applicable to the admissibility of the claims. Given that admissibility "concern[s] the existence, scope and exercise of adjudicative power by the arbitral tribunal",[706] the Tribunal considers that it should be governed by the law that governs the source of that adjudicative power, i.e., international law in general and the BIT in particular,[707] with the same caveat made above with respect to the resolution of incidental matters that may be governed by municipal law.

## B.   Undisputed jurisdictional requirements

668.   It is undisputed that the Tribunal has jurisdiction *ratione personae*. The Claimants are companies incorporated in Scotland, United Kingdom, and thus qualify as "investors" under Article 1(c) of the BIT. The Respondent is the Republic of India, a Contracting Party to the BIT.

669.   It is also common ground that the dispute arose after the BIT's entry into force. Hence, the Tribunal has jurisdiction *ratione temporis*.

670.   Finally, it is undisputed that more than six months passed between the Claimants' Notice of Dispute and their Notice of Arbitration, without the dispute having been settled amicably.[708]

## C.   The Respondent's objections to jurisdiction and admissibility

671.   The Respondent contests the jurisdiction of the Tribunal and the admissibility of the claims. It argues in particular that (i) the Claimants have not made an investment as defined in the BIT, (ii) the dispute falls outside the scope of protection of the BIT, because it concerns returns rather than investments, (iii) tax-related disputes are excluded from the scope of the BIT and are in any event not arbitrable, and (iv) the claims are premature because the Claimants failed to submit certain questions of municipal law to Indian courts. While this is not the order in which the Respondent presents its preliminary objections,[709] the Tribunal will first address the Respondent's objections to jurisdiction in the order it has considered most efficient, and only then its objection to admissibility.

---

[706]   Zachary Douglas, *International Law of Investment Claims* (Cambridge University Press 2009), ¶ 131. The Tribunal notes that the Parties have cited to other sections of Professor Douglas's treatise (e.g., RLA-63, RLA-387), but not this one.

[707]   Professor Douglas, cited above, is of the same view. See Zachary Douglas, *International Law of Investment Claims* (Cambridge University Press, 2009), p. 74 ("Rule 6. The law applicable to an issue relating to the jurisdiction of the tribunal and admissibility of claims and counterclaims is the investment treaty and, where relevant, the ICSID Convention."). The Tribunal notes that the Parties have cited other sections of Professor Douglas's treatise (e.g., RLA-63, RLA-387), but not this one.

[708]   UK-India BIT, CLA-1, Article 9(1)-9(3).

[709]   See R-PHB, ¶ 42.

672.  The Claimants oppose the Respondent's objections. They contend that a number of these objections do not properly relate to jurisdiction or admissibility or are belated. In any event, they submit that none of the objections is meritorious.

673.  The Parties do not dispute that the Tribunal has the competence to rule on its own jurisdiction pursuant to Article 1052(1) of the Code of Civil Procedure of The Netherlands[710] (the "Dutch Arbitration Act") and Article 21(1) of the UNCITRAL Rules.[711] The Tribunal will thus address each of the Respondent's objections to jurisdiction and admissibility.

### 1.    Have the Claimants made an "investment" as defined in the BIT?

674.  The Parties dispute whether the Claimants have made an "investment" as defined in Article 1(b) of the BIT.

### a.    The Respondent's position

675.  The Respondent contends that Cairn's Indian assets do not qualify as an "investment" under the BIT. Its argument is two-pronged. First, it argues that CUHL's purported investment was not made in accordance with Indian law (as required by Article 1(b) of the BIT), because CUHL was established and acquired shares in CIL as part of the 2006 Transactions, which were structured as an abusive tax-avoidant scheme in violation of the then applicable laws and regulations. Second, it contends that the BIT's definition of investment at Article 1(b) does not include indirect investments, and as such, Cairn Energy's assets in India are not protected under the BIT.

676.  According to the Respondent, the creation and utilisation of CUHL in the 2006 Transactions was "bound up with, and part and parcel of, an aggressive tax abusive avoidance scheme which also in all likelihood flouted the rules of SEBI."[712] The entirety of CUHL's holdings in India accordingly came about in direct violation of Indian tax law. This means that CUHL never had a lawful investment in India within the meaning of Article 1(b) of the BIT, which requires that an investment be established "in accordance with the national laws of the Contracting Party in whose territory the investment is made".[713] When a BIT contains such a legality clause in the definition of investment, the legality of the investment is an issue of jurisdiction. Therefore, the Claimants' abuse of India's tax law places CUHL's alleged investment outside the Tribunal's jurisdiction. The Respondent summarises its argument as follows:

> [E]ven though Cairn Energy made its purported investment in India in 1996 (and not in 2006), the restructuring that took place as part of the 2006 Transactions and by which CUHL acquired Cairn's assets in India,

---

[710]  Dutch Arbitration Act, Article 1052(1) ("The arbitral tribunal shall have the power to decide on its own jurisdiction" (Unofficial translation)).

[711]  UNCITRAL Rules, Article 21(1) ("The arbitral tribunal shall have the power to rule on objections that it has no jurisdiction, including any objections with respect to the existence or validity of the arbitration clause or of the separate arbitration agreement").

[712]  R-PHB, ¶ 78.

[713]  UK-India BIT, CLA-1, Article 1(b).

culminating in CUHL's acquisition of CIL shares, undeniably occurred in 2006. Given that the 2006 Transactions were infected by illegality, including that the capital gains which were made by the Claimants in the 2006 Transactions were chargeable to tax on multiple bases (with no capital gains tax being paid), CUHL's acquisition of the CIL shares was not in accordance with Indian law.[714]

677.  The Respondent contends further that there is nothing circular in its jurisdictional objection. While it is true that the issue of taxability of the 2006 Transactions is central to the merits of the Claimants' claims, the same issue is also jurisdictional in nature as it pertains to the legality of the CUHL's alleged investment. The jurisprudence of investment treaty tribunals overwhelmingly confirms the view that the legality of the investment is a jurisdictional question.[715]

678.  The practice of investment treaty tribunals further demonstrates that the issue of the legality of an investment should be resolved under the law of the host State.[716] In this respect, the language of Article 1(b) of the BIT, which requires investments to be established "in accordance with the national laws of the [host State]"[717] operates as a *renvoi* to the municipal law of India. Several investment treaty tribunals have held that the subject-matter scope of the legality provision covers (i) non-trivial violations of the host State's legal order, (ii) violations of the host State's foreign investment regime, and (iii) fraud – for instance to secure an investment. The temporal scope of the legality requirement is in turn limited to the establishment of the investment.[718]

679.  According to the Respondent, the Claimants' conscious and covert structuring of the 2006 Transactions with the specific intent to defy the letter and spirit of India's income tax law constitutes an abusive tax avoidance and clearly falls under the temporal and subject-matter scope of the BIT's legality provision. Even if the 2006 Transactions were not tax abusive (which the Respondent denies), and they would have been taxable as a result of the operation of Section 2(47)(vi) of the ITA, "the fact that CUHL's existence came about immediately prior to the transaction on which the capital gains tax has been levied (the sale of CIHL's shares by CUHL to CIL) is irrelevant given that CUHL was established as part and parcel of an overall pre-ordained structure."[719]

680.  Furthermore, the Claimants' document production has revealed that the structure of the 2006 Transactions involved a potential violation of the SEBI Disclosure and Investor Protection ("DIP") Guidelines. In particular, the exchange of emails from 9 September

---

[714]  R-PHB, ¶ 77.

[715]  *Phoenix Action Ltd v. Czech Republic*, ICSID Case No. ARB/06/5, Award, 15 April 2009, RLA-214; *Plama Consortium Ltd v. Bulgaria*, ICSID Case No. ARB/03/24, Award, 27 August 2008, ¶¶ 138-146; *Anderson v. Costa Rica*, ICSID Case No. ARB(AF)/07/3, Award, 19 May 2010, RLA-215, ¶ 58.

[716]  *Fraport AG Frankfurt Airport Services Worldwide v. Republic of the Philippines*, ICSID Case No. ARB/03/25, Award, 16 August 2007, CLA-177, ¶ 394.

[717]  UK-India BIT, CLA-1, Article 1(b).

[718]  *Quiborax SA v. Bolivia*, ICSID Case No. ARB/06/2, Decision on Jurisdiction, 27 September 2012, RLA-217, ¶ 266; *Metal-Tech Ltd v. Uzbekistan*, ICSID Case No. ARB/10/3, Award, 4 October 2013, RLA-218.

[719]  R-Rejoinder, ¶ 125(b).

2006 shows the Claimants' advisor Paul Hally pointing out that he had been "charged by Cairn to ensure that the cash will not get stuck in India."[720] In a subsequent email, Ms Janice Brown stated that the Daylight Loan was the only acceptable option, although this was, in the Respondent's submission, a potential breach of SEBI Guideline 4.61, which provides that the promoters of a company cannot meet the Minimum Promoter Contribution requirement with securities acquired by consideration other than cash. The Respondent asserts that "[t]his matter is currently under review by SEBI, and potentially constitutes a further violation of Indian law", placing CUHL's alleged investment outside the definition of Article 1(b) of the BIT.[721]

681.   In response to the Claimants' argument that, irrespective of the illegal conduct of the second claimant CUHL, Cairn Energy would still have made a valid investment in India, the Respondent raises an additional jurisdictional objection, contending that Cairn Energy's investment is an indirect investment and is thus outside the scope of the BIT. Cairn Energy's interests in India consisted of an indirect acquisition of Command Petroleum, an Australian company, which was involved in a joint venture with ONGC and held interests in a PSC for the Ravva oil and gas field in India, as well as other two PSCs.

682.   According to the Respondent, the BIT does not expressly protect investments established or acquired indirectly. This is in contrast with other BITs which do refer to investments made "directly or indirectly".[722] A good faith interpretation of the BIT's definition of investment under Article 31(1) of the VCLT leads to the conclusion that indirect investments are excluded from the Treaty's protection. In particular, Article 5(3) of the BIT provides that compensation for the expropriation of assets of a company shall be made to the shareholders of that company who are the nationals of the other contracting state of the BIT. Were it the case that any "assets" held by the investor indirectly via its locally incorporated subsidiaries were already afforded treaty protection as indirect investments, then the inclusion of Article 5(3) in the BIT would serve no purpose. Thus, the *effet utile* doctrine of treaty interpretation supports the Respondent's view that indirect investments are not covered under the BIT.

683.   The object and purpose of the BIT, which is the creation of conditions for a flow of capital between the two contracting states, does not dictate otherwise. As the *Noble Ventures v. Romania* tribunal held, "it is not permissible, as is too often done regarding BITs, to interpret clauses exclusively in favour of investors".[723] Instead, BITs should be interpreted even-handedly under the VCLT rules of treaty interpretation. When interpreted under such rules, the definition of investment under Article 1(b) of the BIT covers only direct investments. Therefore, Cairn Energy's indirect interests in India cannot qualify as investments and are not a proper basis for this Tribunal's jurisdiction.

---

[720]   Email trail from Ashish Patil to Jann Brown and others with subject "Re: RBI and Daylight" dated 9 September 2006, Exh. R-100A.

[721]   R-Rejoinder, ¶ 125(c).

[722]   E.g., US-Uruguay BIT, RLA-219, Article 1.

[723]   *Noble Ventures, Inc. v. Romania*, ICSID Case No. ARB/01/11, Award, 12 October 2005, CLA-183, ¶ 52.

684.  As for the Claimants' contention that the Respondent's jurisdictional objection is belated, the Respondent alleges that the violations of Indian law became apparent only after the Claimants' document production on 23 January 2018, which was after the filing of the Statement of Defence. The Respondent requests the Tribunal to use its discretion (which was made express under Article 23(3) of the 2010 UNCITRAL Rules, but was always implicit under Article 21(3) of the 1976 UNCITRAL Rules) to admit the jurisdictional objection.[724]

685.  For these reasons, the Respondent contends that the Claimants' interests in India do not qualify as an investment under the BIT, as they have been acquired illegally and held indirectly. This places the present dispute outside the scope of the BIT and of the Tribunal's jurisdiction.

###### b.    The Claimants' position

686.  The Claimants submit that the Respondent's legality objection falls outside the temporal and subject-matter scope of Article 1(b) of the BIT, and thus does not pertain to jurisdiction. Instead, it is an argument on the merits, which the Tribunal should consider and dismiss as such.

687.  The Claimants note that the Respondent does not appear to challenge the long-standing jurisprudence of investment treaty tribunals according to which the temporal scope of legality provisions, such as the one contained in Article 1(b) of the BIT, is limited to the establishment or acquisition of an investment. Although India has attempted to expand the scope of the legality requirement in its 2016 Model BIT, by excluding investments "constituted, organised and <u>operated</u>" illegally,[725] so far, no country has accepted to include such language in their treaties with India. The Respondent purports to fulfil the temporal requirement of Article 1(b) of the BIT by limiting its legality objection to CUHL, which was created in 2006. For the Claimants, this attempt fails for two reasons.

688.  First, the Cairn group established and acquired its investment in India much earlier than the 2006 Transactions. Namely, in 1996, it purchased Command Petroleum and in subsequent years acquired interests in PSCs and JOAs in Rajasthan and the Krishna-Godavari basin, in which it invested capital, technology, and expertise to develop the oil and gas fields. It is undisputed that the Claimants' rights and interests in PSCs and JOAs in India constitute "business concessions conferred by law or under contract, including concessions to search for and extract oil and other minerals"[726] under Article 1(b)(v) of the BIT, and that the Claimants' 184,125,764 equity shares in CIL constitute "shares in […] a company"[727] under Article 1(b)(ii). The 2006 Transactions were a mere restructuring of pre-existing investments, which the Respondent has never previously challenged as unlawful.

689.  Second, in any event, the 2006 Transactions proceeded in two parts. First, CUHL obtained shares in 27 Indian subsidiaries, which in turn held underlying Indian assets. It

---

[724]  R-Rejoinder, ¶ 126.

[725]  Indian Model BIPA, 2016, CLA-324, Article 1.4 (emphasis added by the Claimants in C-PHB, ¶ 683).

[726]  C-PHB, ¶ 607, citing UK-India BIT, CLA-1, Article 1(b)(v).

[727]  *Ibid.*, citing UK-India BIT, CLA-1, Article 1(b)(ii).

then transferred those shares to CIHL in return for CIHL's shares; and thereafter transferred the CIHL shares to CIL for a mix of CIL shares and cash. It is only the last stage of the transaction that the Respondent challenges as tax avoidant. That stage does not, however, represent the establishment and acquisition of CUHL's investment in India. The Respondent has never asserted that CUHL's initial acquisition of 27 Indian subsidiaries was illegal.

690.    According to the Claimants, the Respondent's objection also falls outside the subject-matter scope of Article 1(b) of the BIT. Investment treaty tribunals have routinely found that legality provisions do not apply to trivial violations of the host State's municipal law.[728] To come within the scope of a legality provision, the alleged violation must pertain to the foreign investment regime or otherwise affect the validity of the acquisition of the investment itself. The allegation that the 2006 Transactions were tax avoidant does not relate to India's foreign investment regime; nor could the alleged violations of tax and securities law render the 2006 Transactions void *ab initio* or illegal *per se*. Instead, were these violations to be proven, they would render the transaction taxable.

691.    The object and purpose of the 2006 Transactions was to raise money to fund downstream investments into the operating subsidiaries and to realise value for Cairn's shareholders. These are legitimate objectives, which had been disclosed to India's regulatory authorities. Whether or not the 2006 Transactions were taxable cannot be conflated with the question of their legality. When an alleged violation of domestic law does not render an investment illegal or invalid, the investment should not be considered to fall outside the scope of the treaty's protection and the alleged violation should be considered on the merits. This was the view adopted by the tribunals in *Inmaris v. Ukraine*[729] and *Alpha Projektholding v. Ukraine*,[730] which found that registration defects did not render the investments illegal or void, since this was not the consequence envisaged by the applicable municipal law.

692.    In addition, according to *Kim v. Uzbekistan*, the principle of proportionality should guide the Tribunal when balancing the treaty's object of promoting investment protection with the harsh consequence of denying the application of the treaty on the basis of illegality.[731] Where the investor's alleged illegal conduct is not intentional or grossly negligent, denying the treaty's protection altogether appears to be a disproportionately punitive decision. In the present case, the following factors militate against such a harsh outcome.

---

[728]  *Saba Fakes v. Republic of Turkey*, ICSID Case No. ARB/07/20, Award, 14 July 2010, CLA-311, ¶ 119; *Vladislav Kim and Others v. Republic of Uzbekistan*, ICSID Case No. ARB/13/6, Decision on Jurisdiction, 8 March 2017, RLA-354, ¶ 376.

[729]  *Inmaris Perestroika Sailing Maritime Services GMBH v. Ukraine*, ICSID Case No. ARB/08/8, Decision on Jurisdiction, 8 March 2010, CLA-296, ¶ 145.

[730]  *Alpha Projektholding GMBH v. Ukraine*, ICSID Case No. ARB/07/16, Award, 8 November 2010, CLA-246, ¶ 294.

[731]  *Vladislav Kim and Others v. Republic of Uzbekistan*, ICSID Case No. ARB/13/6, Decision on Jurisdiction, 8 March 2017, RLA-354, ¶ 407.

693.   First, the alleged tax avoidance was not widespread. Throughout the many years of their operations in India, the Claimants have never been found to have failed to comply with the ITA prior to the 2012 Amendment. In the present case, any violations of the ITA can well be remedied by upholding India's tax demand.

694.   Second, when assessing the severity of the alleged illegality, the Tribunal should consider the investor's intent and the clarity of the applicable legislation. Here, the Claimants exercised due diligence and contemporaneously sought advice from multiple experts and advisors in India and abroad, who unanimously agreed that the indirect transfers contemplated by the 2006 Transactions were not taxable. The Respondent's own organ, the ITAT, concluded that CUHL "could not have visualize[d] its liability for payment", [732] which arose as a result of the 2012 Amendment. The Claimants' alleged failure to pay taxes on the 2006 Transactions was thus far from negligent, let alone intentional.

695.   Third and in any event, the Claimants contemporaneously disclosed the details of the 2006 Transactions to multiple organs and agencies of the Respondent, including SEBI, the MoF, RBI, FIPB, TPO, and the Income Tax Authority. [733] In fact, the Respondent approved the transfer of interests in at least some of the PSCs to Cairn. Yet, the Respondent never raised the issue of illegality until this arbitration. India is thus estopped under international law from now denying the Treaty's protection to the Claimants. In the words of the tribunal in *Kardassopoulos v. Georgia,* by failing to object in time, the host State "created a legitimate expectation for Claimant that his investment was, indeed, made in accordance with [domestic] law and, in the event of breach, would be entitled to treaty protection". [734] Similarly, in *Fraport v. The Philippines (I)*, the tribunal reasoned that "[p]rinciples of fairness should require a tribunal to hold a government estopped from raising violations of its own law as a jurisdictional defence when it knowingly overlooked them and endorsed an investment which was not in compliance with its law." [735]

696.   The Claimants further oppose the Respondent's recent jurisdictional objection concerning the indirect nature of Cairn Energy's investment. Pursuant to Article 21(3) of the 1976 UNCITRAL Rules, a jurisdictional objection "shall be raised not later than in the statement of defence". The rule is categorical and contains no room for exceptions. The Respondent's argument that this rule is tempered by the Tribunal's discretion to admit late objections is based on the language of Article 23(2) of the 2010 UNCITRAL Rules, which clearly do not apply here.

697.   Even if the Tribunal had discretion to admit new objections, it should not exercise it in favour of the Respondent, since the Respondent's delay in raising the objection is not justified. The Respondent was fully aware of the indirect nature of Cairn Energy's

---

[732]   ITAT Order, *Cairn UK Holdings Ltd v. D.C.I.T.*, ITA No. 1669/Del/2016, 9 March 2017, Exh. C-228, ¶ 41.

[733]   Claimants' Reply ("C-Reply"), ¶ 72; Claimants' Rejoinder ("C-Rejoinder"), ¶ 263.

[734]   *Ioannis Kardassopoulos v. Georgia*, ICSID Case No. ARB/05/18, Decision on Jurisdiction, 6 July 2007, CLA-292, ¶ 192.

[735]   *Fraport AG Frankfurt Airport Services Worldwide v. Republic of the Philippines*, ICSID Case No. ARB/03/25, Award, 16 August 2007, CLA-177, ¶ 346.

investment from the outset of this arbitration. The Claimants made this clear as early as in the Notice of Dispute, where they even included a demonstrative chart of Cairn group's shareholding structure.[736] This was repeated in the Notice of Arbitration.[737] This case thus differs from *Paushok v. Mongolia*, where the tribunal allowed a belated jurisdictional objection because the basis for the objection "could not have been identified by reading either the Notice of Arbitration or the Statement of Claim".[738] The Respondent's further argument that the delay resulted from the Claimants' belated disclosure of information on the issue of compliance with the SEBI Guidelines is nonsensical, since the issue of legality is evidently distinct from that of directness of the investment.

698.   The Claimants thus contend that the Tribunal should deny the Respondent's attempt to introduce a belated jurisdictional objection, which would prejudice the Claimants, who have not had a chance to request documents on this contentious issue of treaty interpretation.

699.   In any event, the Claimants submit that the Respondent's belated objection is unsubstantiated. Investment treaty tribunals have routinely held that broad definitions of investment, such as the one contained in Article 1 of the BIT encompass investments made both directly and through interposed companies.[739] This is in line with the ordinary meaning of the provision, which refers to "every kind of asset […] including changes in the form of such investment",[740] as well as the object and purpose of the BIT, which is "to create conditions favourable for fostering greater investment".[741]

700.   India's BIT practice also defeats the Respondent's argument that the compensation-for-expropriation provision contained in Article 5(3) of the BIT would be rendered superfluous if indirect investments were protected under the BIT. For example, the India-Switzerland BIT expressly extends to indirect investments, and also contains a provision that accords shareholders the right to claim compensation for expropriation of the subsidiary's assets almost in identical terms as Article 5(3) of the present BIT.

701.   In sum, the Claimants submit that the Respondent has failed to show that the Claimants' investment was illegal or that Cairn Energy's indirect investment is excluded from the BIT's scope of protection.

---

[736]   Claimants' Notice of Dispute ("C-NoD"), ¶¶ 53-54, 71.

[737]   C-NoA, ¶¶ 95-96.

[738]   *Sergei Paushok, CJSC Golden East Company and CJSC Vostokneftegaz Company v. Government of Mongolia*, UNCITRAL, Award on Jurisdiction and Liability, 28 April 2011, RLA-189, ¶ 425.

[739]   *Siemens AG v. Argentine Republic*, ICSID Case No. ARB/02/8, Decision on Jurisdiction, 3 August 2004, CLA-286, ¶ 137; *Ioannis Kardassopoulos v. Republic of Georgia*, ICSID Case No. ARB/05/18, Decision on Jurisdiction, 6 July 2007, CLA-292, ¶¶ 121-124; *Mobil Corporation and others v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/07/27, Decision on Jurisdiction, 10 June 2010, CLA-298, ¶ 165; *Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A. v. Argentine Republic*, ICSID Case No. ARB/09/1, Decision on Jurisdiction, 21 December 2012, RLA-353, ¶ 230.

[740]   UK-India BIT, CLA-1, Article 1(b).

[741]   UK-India BIT, CLA-1, Preamble.

####    c.    The Tribunal's analysis

702.    Under the same heading, the Respondent has incorporated two separate (allegedly) jurisdictional defences. The first concerns whether CUHL has made an investment in accordance with Indian law (Section (ii) below). The second relates to the indirect nature of Cairn Energy's shareholding in the Claimants' Indian subsidiary, CIL (now VIL) (Section (iii) below). While they both relate to whether the Claimants' Indian assets qualify as investments under the BIT, they are conceptually distinct. The Tribunal thus addresses these defences separately. Prior to addressing the Respondent's objections, the Tribunal will first address the more basic question of whether the Claimants' Indian assets otherwise satisfy the BIT's definition of investment (Section (i) below).

####    (i)    Have the Claimants made an investment in India?

703.    The term "investment" is defined in Article 1(b) of the BIT as:

> every kind of asset established or acquired, including changes in the form of such investment, in accordance with the national laws of the Contracting Party in whose territory the investment is made […]

704.    The definition is followed by a non-exhaustive list of the categories of assets that qualify as an investment, among them being: "shares in and stock and debentures of a company and any other similar forms of interest in a company", "rightful claims to money or to any performance under contract having a financial value", and "business concessions conferred by law or under contract, including concessions to search for and extract oil and other minerals".[742]

705.    It is undisputed that Cairn Energy acquired Command Petroleum in 1996, and that it obtained (directly or through its subsidiaries) further development and production rights in the following decade.[743] Cairn Energy thus owned, either directly or indirectly, shares in companies and rights in PSCs. The Respondent does not dispute that these shares and rights qualify as claims to money or to performance under a contract, or as business concessions conferred by law or contract. Over time, and in particular during the 2006 reorganisation, these investments changed form, but remained in the form of shares, claims to money or business concessions. On the date of the Notice of Arbitration, CUHL owned common shares in VIL (formerly CIL) worth approximately US$ 1 billion. It is thus undisputed that the Claimants thus held an investment under the definition of the BIT, subject to the Respondent's objections dealt with in this section, namely that this investment was not made in accordance with Indian law or is an indirect investment that does not benefit from treaty protection.

706.    To the extent that it is relevant here, the Claimants' assets also satisfy the economic concept of investment. It is undisputed that in order to acquire these assets, the Claimants made a substantial contribution of capital and other resources over a significant period, and in doing so, they assumed a considerable risk in the expectation of profit. Nor does the Respondent dispute that the Claimants' activities contributed to

---

[742]    UK-India BIT, CLA-1, Article 1(b) (ii), (iii) and (v).

[743]    C-SoC, ¶¶ 48 *et seq*., Brown WS1, Section III.A.

the development of the Indian economy. The Claimants' assets therefore meet the economic criteria of an investment as recognised in the jurisprudence of investment treaty tribunals.[744]

707.    The Tribunal now turns to the Respondent's objections, namely, that the Claimants have not made an investment in accordance with Indian law (ii), and that Cairn Energy's investment is not protected under the BIT because it is indirect (iii).

### (ii)   Have the Claimants made an investment in accordance with Indian law?

708.    As set out above, Article 1(b) of the BIT defines the term "investment" as:

> [E]very kind of asset established or acquired, including changes in the form of such investment, *in accordance with the national laws of the Contracting Party in whose territory the investment is made* […].[745]

709.    The Parties agree that the italicised part of this provision contains a requirement of legality, which entails that assets "established or acquired" in violation of the municipal law of the host State will not be protected as investments under the BIT, and cannot thus form a basis for the Tribunal's jurisdiction. The Parties also agree that not every type of illegal act by an investor will render the investment unlawful for purposes of this provision. Instead, as the text of the provision makes clear, the investor's conduct should relate, both temporally and in terms of subject-matter, to the acquisition or establishment of the investment.[746] In other words, to trigger this provision the illegality must be committed at the time of the establishment or acquisition of the investment, and must be of such a nature that it is capable of rendering unlawful the transaction(s) through which the investment is acquired or established. Examples include corruption and fraud in securing the investment or profits,[747] as well as violations of the rules governing the establishment and authorisation of foreign investment.[748]

710.    Violations of municipal law that do not meet these requirements do not place the investment outside the scope of application of the BIT or the treaty tribunal's jurisdiction. Instead, it will be for the treaty tribunal to examine the effects of such violations on the merits of the claims. Indeed, pursuant to Article 9 of the BIT, the Tribunal is competent to resolve "any dispute […] in relation to an investment". Once the investment has been established or acquired lawfully, a dispute regarding a

---

[744]   *Salini Costruttori S.P.A. and Italstrade S.P.A. v. Kingdom of Morocco*, ICSID Case No. ARB/00/4, Decision on Jurisdiction, 16 July 2001, ¶ 52; *Joy Mining Machinery Limited v. Arab Republic of Egypt*, ICSID Case No. ARB/03/11, Award on Jurisdiction, 30 July 2004, ¶ 53; *Saba Fakes v. Republic of Turkey*, ICSID Case No. ARB/07/20, Award, 14 July 2010, CLA-311, ¶ 110.

[745]   UK-India BIT, CLA-1, Article 1(b) (emphasis added).

[746]   *Quiborax SA v. Plurinational State of Bolivia*, ICSID Case No. ARB/06/2, Decision on Jurisdiction, 27 September 2012, RLA-217, ¶ 266; *Metal-Tech Ltd v. Republic of Uzbekistan*, ICSID Case No. ARB/10/3, Award, 4 October 2013, RLA-218, ¶ 164.

[747]   *Inceysa Vallisoletana v. Republic of El Salvador*, ICSID Case No. ARB/03/26, Award, 2 August 2006, CLA-182, ¶¶ 236-238; *Plama Consortium Limited v. Republic of Bulgaria*, ICSID Case No. ARB/03/24, Award, 27 August 2008, RLA-159, ¶¶ 133-135.

[748]   *Saba Fakes v. Republic of Turkey*, ICSID Case No. ARB/07/20, Award, 14 July 2010, CLA-311, ¶ 119.

subsequent allegedly unlawful conduct by the investor or the investment is by definition an investment-related dispute and thus falls within the Tribunal's jurisdiction.

711.   Pursuant to Article 9 of the BIT, the subject-matter scope of the Tribunal's jurisdiction extends to "any dispute […] in relation to an investment". As explained above, the Respondent does not dispute that Cairn Energy made an investment in India when, in 1996, it acquired Command Petroleum and subsequently various assets, including PSCs and JOAs in Rajasthan and the Krishna-Godavari basin. The Respondent does not allege that any of these acquisitive transactions were unlawful. As further elaborated in Section VI.C.2 below, the present dispute relates to this lawful investment, which changed form over time. This finding suffices to conclude that this dispute falls within the scope of the Tribunal's jurisdiction.

712.   The Respondent nonetheless proposes to dissect the Claimants' investment in parts. It argues that, as far as CUHL is concerned, it only acquired its assets during the 2006 Transactions. For the Respondent, this entails that the Tribunal should examine the legality of the 2006 Transactions as a jurisdictional question, at least with respect to CUHL's claims. The Tribunal is not convinced. It is well established that the jurisdictional inquiry as to whether a dispute relates to an investment should proceed by looking at the investment as a whole.[749] That the present dispute relates to the Claimants' overall investment is not altered by the fact that one of the Claimants may have been established in the process of the alteration of the form of that investment. The language of the BIT is unequivocal that an investment includes "changes in the form of such investment". The assessment might have been different had the different Claimants in this arbitration presented different claims. However, the legal dispute over which this Tribunal is seized does not differ by claimant. CUHL does not present claims that are separate or unrelated to the remaining overall investment that had been in place since 1996. As both Claimants' claims relate to Cairn Energy's original investment, which has changed form over time, these claims fall within the subject-matter scope of the Tribunal's jurisdiction (subject to the Respondent's argument that Cairn Energy's investment is outside of the scope of the BIT because it is indirect, which the Tribunal addresses in sub-section (b) below).

713.   In any event, the Respondent's legality defence is not capable of rendering the Claimants' investment unlawful or invalid. Indeed, even if it were assumed, for the sake of argument, that the Claimants engaged in an abusive tax avoidance during the 2006 Transactions, this would not affect the Claimants' title over their shares and other assets comprising their investment; it would instead result in the Claimants' liability to pay relevant taxes and penalties. Further, as discussed in Section VII.A.3.e below, while a violation of the SEBI DIP Guidelines could give rise to severe sanctions being imposed on the issuer or the intermediary, they would not involve the cancellation of CUHL's shares in CIL, nor would they render their subscription invalid or voidable. While these alleged illegalities could be relevant, and perhaps even fatal, to the merits of the

---

[749]   See, e.g., *Holiday Inns, Occidental Petroleum and others v. Kingdom of Morocco*, ICSID Case No. ARB/72/1, Decision on Jurisdiction, 12 May 1974, excerpt quoted in Pierre Lalive, "The First 'World Bank' Arbitration ( Holiday Inns v. Morocco) — Some Legal Problems", British Yearbook of International Law, Volume 51, Issue 1, 1980, Pages 123–162, p. 159, and *Inmaris Perestroika Sailing Maritime Services GmbH and others v. Ukraine*, ICSID Case No. ARB/08/8, Decision on Jurisdiction, 8 March 2010, CLA-296, ¶ 92 (quoted at ¶ 749 below).

Claimants' claims, they would not place the present dispute outside of the Tribunal's jurisdiction.

714. By consenting to submit any investment-related dispute to the jurisdiction of the Tribunal under Article 9 of the BIT, the Parties have vested this Tribunal with the power to resolve any incidental issues, including the issue of whether the Claimants complied with Indian law when structuring and carrying out the 2006 Transactions. The Tribunal will discharge this mandate in the liability Section of this Award below. Consequently, to the extent that the Respondent's illegality objection goes to the Tribunal's jurisdiction, it is dismissed.

### (iii)   Is Cairn Energy's indirect investment protected by the BIT?

715. It is common ground between the Parties that the BIT is silent as to whether it protects indirect investments. In particular, the BIT's definition of the term "investment" does not specify whether it encompasses direct investments only, or whether indirect investments are also captured under the definition. Consequently, to establish whether the BIT covers indirect investments, the Tribunal must resort to the VCLT's rules of treaty interpretation, starting with the ordinary meaning of the terms of this Treaty in their context and in the light of the Treaty's object and purpose.[750]

716. Article 1(b) of the BIT defines investment as "every kind of asset *established or acquired*".[751] According to their ordinary meaning, the terms "established" or "acquired" allow for both the direct and indirect establishment or acquisition of an asset. Indeed, investment tribunals have routinely refused to read an exclusion of indirect investments into investment treaties that contain no express language to this effect. For instance, the tribunal in *Siemens v. Argentina* reasoned that "a literal reading" of the term investment "does not support the allegation that the definition of investment excludes indirect investments."[752] Absent clear wording restricting the definition of investment to assets established or acquired directly, the Tribunal is compelled to conclude that, in accordance with its ordinary meaning, the BIT protects investments made both directly and indirectly.

717. This is consistent with economic reality. As the tribunal in *Deutsche Telecom v. India* pointed out:

> Investments are often made indirectly. It is indeed not unusual for investors to structure their foreign investments through several corporations for a variety of legal and regulatory reasons.[753]

718. To restrict the BIT's scope of application only to assets that are established or acquired directly by the investor would require the investor to hold title to each and every asset

---

[750]   VCLT, RLA-58, Article 31.

[751]   UK-India BIT, CLA-1, Article 1(b) (emphasis added).

[752]   *Siemens AG v. Argentine Republic,* ICSID Case No. ARB/02/8, Decision on Jurisdiction, 3 August 2004, CLA-286, ¶ 137.

[753]   *Deutsche Telekom v. India*, PCA Case No. 2014-10, Interim Award, 13 December 2017, Exhibit CLA-368, ¶ 142.

in the host State. It is of course free to States to stipulate such a requirement in their treaty, but this would require express language to qualify the ordinary meaning of ownership and control. Reading in such a requirement in the absence of treaty text would tend to negate treaty protection for investments made with any sort of corporate structure. Such a restrictive reading would not be consonant with commercial reality and simply cannot be read into the BIT.

719.    The relevant context of the BIT's provisions does not suggest a different outcome. The Respondent relies on Article 5(3) of the BIT, which guarantees compensation for expropriation for the shareholders of the expropriated company as follows:

> Where a Contracting Party expropriates the assets of a company which is incorporated or constituted under the law in force in any part of its own territory, and in which investors of the other Contracting Party own shares, it shall ensure that the provisions of paragraph (1) of this Article are applied to the extent necessary to guarantee prompt, adequate and effective compensation in respect of their investment to such investors of the other Contracting Party who are owners of those shares.

720.    According to the Respondent, this provision would be rendered superfluous if indirect investments were in any event protected under the BIT.

721.    The Tribunal is not convinced. Article 5(3) provides that when a local subsidiary's assets are expropriated, the shareholder investor can claim compensation for the expropriated assets directly. In the absence of such a provision, such compensation would ordinarily be paid out to the subsidiary company whose assets have been expropriated. The shareholder investor might in turn only be entitled to claim for the loss incurred as a result of any diminution of the value of the shares.[754]

722.    Thus, the function of Article 5(3) is to specify a direct cause of action for the shareholders to claim compensation for the expropriated assets of the subsidiary. This neither confirms nor negates the otherwise existing indirect cause of action available to the shareholders to claim for the loss that the host State's conduct may have generated to their shares. Claiming such loss is indeed different from being directly entitled to claim compensation for the assets of a subsidiary. In the former case, compensation might not fully reflect the value of the subsidiary's expropriated assets, since the loss of an asset by a subsidiary may not always translate into the same amount of loss of value for the shares.

723.    In support of its position, India points to paragraph 607 of the *RosInvest v. Russia* award, where the tribunal interpreted Article 5(2) of the applicable BIT (the equivalent provision to Article 5(3) in the UK-India BIT) as follows:

---

[754]   See, *GAMI Investments, Inc. v. The Government of the United Mexican States*, UNCITRAL (NAFTA), Award, 15 November 2004, CLA-185; *Elettronica Sicula S.p.A.(ELSI)*, Judgment, I.C.J. Reports, 20 July 1989, CLA-138; *CMS Transmission Company v. Argentine Republic*, ICSID Case No. ARB/01/8, Award, 12 May 2005, CLA-46.

[Article 5(2)] expressly clarified that also shareholders, be they majority or minority shareholders, also have a claim for protection under Article 5 if expropriatory measures falling under paragraph (1) are taken "only" against the company and not' directly against the shareholders themselves.[755]

724. The Tribunal is not persuaded. Nowhere did the *RosInvest* tribunal suggest that the presence of this provision in the applicable investment treaty negates the otherwise existing right for the shareholders to claim for indirect loss. Quite to the contrary, in the following paragraph the tribunal clarified that, "even without express provisions such as Article 5(2), the recent jurisprudence from investment arbitration tribunals considering other investment treaties has confirmed the ability for shareholders to claim for measures taken against the company in which they hold shares and has been developed to the point accepting that minority shareholders have made claims for indirect damage."[756]

725. The Tribunal concludes that Article 5(3) of the BIT allows a shareholder investor to claim on behalf of the subsidiary for the expropriation of the subsidiary's assets. This provision has its utility even if indirect investments are covered under the BIT, because it allows shareholders to claim for the losses suffered by the subsidiary, and not only the loss of the value of their shares. This provision does not prevent shareholders from bringing a claim for the loss that they have suffered as an indirect result of the host State's measures against the local subsidiary.

726. In view of the above, the Tribunal concludes that the context of the BIT, as reflected in its other provisions, does not suggest excluding indirect investments from the Treaty's scope of application.

727. As to the object and purpose of the BIT, the Preamble provides that, when offering the reciprocal protection of investments, the Contracting Parties recognised the need for the "stimulation of individual business initiative and […] increase [of] prosperity in both States".[757] This goal is promoted by direct and indirect investments alike. Excluding indirect investments would leave beyond the reach of the BIT a vast number of investments that, although made through interposed subsidiaries, might well contribute to the economic prosperity of the Contracting Parties. It is therefore not in line with the BITs object and purpose to interpret its silence on the issue of indirect investments as excluding such investments from the scope of the Treaty's protection.

728. The tribunal in *Guaracachi v. Bolivia* adopted a similar reasoning. It interpreted the term investment to "naturally include 'indirect investments' through the acquisition of shares in a company",[758] adding that, "given that the purpose of the BIT is to promote and

---

[755]  *RosInvestCo UK Ltd. v. Russian Federation*, SCC Arbitration No. V079/2005, Final Award, 12 September 2010, CLA-166, ¶ 607.

[756]  *Id.*, ¶ 608.

[757]  UK-India BIT, CLA-1, Preamble.

[758]  *Guaracachi America, Inc. and Rurelec Plc. v. The Plurinational State of Bolivia*, UNCITRAL, PCA Case No. 2011-17, Award, 31 January 2014, CLA-314, ¶ 352.

protect foreign investment, [it] would require clear language in order to exclude coverage of indirect investments".[759]

729. For these reasons, the Tribunal concludes that the indirect investment made by Cairn Energy is covered under the BIT. As a result, the present dispute relates to an investment as defined under the BIT and is thus within the Tribunal's subject-matter jurisdiction as set out in Article 9 of the BIT. The Respondent's objection with respect to the indirect nature of Cairn Energy's investment is therefore denied. As the Tribunal has denied this objection on its merits, it does not need to determine whether the Respondent raised this objection belatedly.

## 2.   Do the Claimants' claims fall outside the scope of protection of the BIT?

730. The Parties disagree on whether the Claimants' claims fall under the scope of protection of the BIT, and whether the present dispute falls within the subject-matter scope of the Tribunal's jurisdiction.

### a.   The Respondent's position

731. The Respondent submits that the present dispute falls outside of the scope of the Tribunal's jurisdiction under Article 9 of the BIT "because it concerns 'returns' and not 'investments'."[760] The Respondent's alternative argument is that, while it "accepts […] that Article 9 of the BIT may reasonably be interpreted as including disputes about 'returns' […] in light of the deliberate distinction between 'investments' and 'returns' throughout the substantive protections in the BIT, […] the Tribunal can under Article 9 of the BIT exercise jurisdiction over disputes concerning 'returns', but only to the extent that the claim concerns provisions that provide for substantive protection over 'returns' (namely, claims under Article 4(2) and Article 7 of the BIT.)."[761] In other words, even if the dispute is found also to relate to an investment, all the substantive provisions of the BIT on which the Claimants rely apply only to investments and not to returns, with the result that the conduct that the Claimants impugn is not capable of constituting a treaty violation and is thus outside of the Tribunal's jurisdiction.

732. The Respondent contends that the BIT expressly distinguishes between "investments" and "returns", which are two separately defined terms. The vast majority of the substantive provisions of the BIT refer only to "investments" and not to "returns", with the isolated exceptions of Articles 4(2) and 7. The Respondent's treaty practice shows that, when it wishes to extend the treaty protection to "returns" as opposed to "investments", it does so expressly. It would thus contravene the established principles of treaty interpretation, such as good faith and *effet utile*, if the Tribunal did not give effect to this clear distinction between the two treaty terms.

733. In addition, the Respondent points out that, pursuant to Article 2 of the BIT, the Treaty "shall apply to all investments made by the investors of either Contracting Party in the territory of the other Contracting Party, whether made before or after the coming into

---

[759]   *Id.*, ¶ 353.

[760]   R-PHB, ¶ 70.

[761]   R-PHB, ¶ 72.

force of this Agreement". The provision does not refer to "returns", which entails that they are not within the Treaty's purview. Article 2 is far from being merely a temporal scope provision as suggested by the Claimants. Instead, it also defines the subject-matter scope of the application of the BIT and is therefore central in defining the Tribunal's jurisdiction.

734. Although the Respondent acknowledges that Article 9 vests the Tribunal with jurisdiction over "any dispute […] in relation to an investment", it argues that its scope must nonetheless be restricted by the scope of the BIT and a dispute "must find a basis in the protections provided by the BIT."[762]

735. For the Respondent, the Claimants' reliance on *Achmea v. Slovak Republic*, where the tribunal reasoned that returns were an integral part of the investment, is inapposite, since in that case the applicable treaty did not contain two separate definitions for "investment" and "returns".

736. In the present case, the Claimants' interests that have been allegedly affected by the impugned measures are returns and not investments. In particular, India's taxation measures at issue applied to the gains earned by the Claimants through the divestment of their investments in India. Capital gains are clearly included in the definition of "returns" under Article 1(e) of the BIT. The Claimants seek to circumvent this restriction by attempting to confuse the Respondent's initial tax measures, which concerned only their returns, and the subsequent enforcement measures against the Claimants' remaining assets, such as shares, which "were not the assets impacted by the measure".[763]

737. Had the Claimants reinvested their returns in the territory of India or had their capital gains existed as assets acquired in accordance with the laws of India, one could possibly argue that they would come under the definition of investment in the BIT. However, the Claimants received their capital gains outside India and they have never existed in the form of assets in India. They do not therefore qualify as investments and the dispute concerning the measures applicable to such capital gains is outside the Tribunal's jurisdiction under Article 9 of the BIT. In the alternative, even if such dispute were to come under the broad language of Article 9, the Claimants' claims are under Articles 3 and 5 of the BIT, which only apply to investments and not returns: these avenues are "not open to the Claimants, and should be dismissed on that basis."[764]

### b.   The Claimants' position

738. The Claimants submit that the present dispute falls squarely within the scope of the dispute resolution provision of Article 9 of the BIT, which provides that "any dispute […] in relation to an investment" is subject to arbitration. The Respondent ignores this broad language by suggesting that the dispute concerning the treatment of the Claimants' capital gains, shares and other assets does not relate to an investment.

---

[762]   R-Rejoinder, ¶ 113.

[763]   *Id.*, ¶ 117.

[764]   *Id.*, ¶ 122.

739.   The Claimants acknowledge that the BIT contains separate definitions for "investment" and "returns". The former is defined as "any kind of asset" including "shares" and "claims to money". The latter means "the monetary amounts yielded from an investment", including "capital gains". However, the Respondent does not argue that the returns from an investment do not relate to that investment. Hence, a dispute that arises out of the treatment of returns relates to the investment from which those returns are yielded and thus comes under the scope of the Tribunal's jurisdiction pursuant to the broad language of Article 9 of the BIT.

740.   According to the Claimants, both the UK and India well understand how to draft narrow dispute resolution clauses, as they have done in their other treaties. In particular, some of the BITs separately concluded by the UK and India contain dispute resolution clauses that confer jurisdiction, for instance, only on disputes on expropriation,[765] or on the amount of compensation for expropriation,[766] or contain other exceptions, such as defined limitation periods and "loss or damage" restrictions.[767]

741.   The Respondent's argument that most substantive provisions refer to investments rather than returns is beside the point. It does not matter how many times the treaty refers to returns, given that returns on investments clearly relate to investments. As the tribunal in *Siemens v. Argentina* held, "[i]f a matter is dealt with in a provision of the Treaty and not specifically mentioned under other provisions, it does not necessarily follow that the other provisions should be considered to exclude the matter".[768]

742.   The Claimants deny that returns are protected only under limited substantive standards which specifically refer to them, i.e., Articles 4(2) and 7, as the Respondent suggests. This would mean that investors would have no protection against unlawful expropriation or the unfair and inequitable treatment of returns on their investments. The Respondent has offered no justification for such a narrow reading of the BIT, which is a treaty aiming at "Promotion and Protection of Investments". The fact that the Contracting Parties considered it necessary to refer specifically to the term "returns" in Articles 4 and 7 of the BIT does not mean that they excluded returns, which are closely linked to investments, from other standards of treatment, particularly given the breadth of the language of Article 9 and the object and purpose of the BIT.

---

[765]   Chester Brown, Audley Sheppard, *United Kingdom* in Chester Brown (ed), *Commentaries on Selected Model Investment Treaties* (Oxford University Press, 2013), CLA-59A, n. 393 (citing "various formulations in UK-China IPPA (1986), Art 7; UK-Hungary IPPA (1987) Art. 8; UK-Poland IPPA (1987), Art 8; UK-USSR IPPA (1989) Art 8; UK-Czechoslovakia IPPA (1990) Art 8").

[766]   Agreement between the Government of the United Kingdom of Great Britain and Northern Ireland and the Government of the Hungarian People's Republic for the Promotion and Reciprocal Protection of Investments, signed on 9 March 1987, CLA-271.

[767]   Agreement between the Government of the Republic of India and the Government of the United Arab Emirates on the Promotion and Protection of Investments signed on 12 December 2003, CLA-113, Article 10(8); Agreement between the Government of the Republic of India and the Government of the Republic of Slovenia on the Mutual Promotion and Protection of Investments, signed on 14 June 2011, CLA-282, Article 11(1).

[768]   *Siemens AG v. Argentine Republic*, ICSID Case No. ARB/02/8, Decision on Jurisdiction, 3 August 2004, CLA-286, ¶ 140.

743. Finally, the Claimants submit that the definition of the term "investment' in Article 1 of the BIT is also broad and includes "every kind of assets", including "shares" and "claims to money". The Claimants' claims relate to both their investments and returns on those investments. In particular, the FET claim relates to the treatment of a restructuring of investments in advance of the IPO. The expropriation claim concerns India's seizure of the CIL shares and tax refunds. The claim under Article 7 of the BIT (repatriation of returns) relates to the Respondent's interference with the sale of CIL shares and repatriation of the sale proceeds.

744. In sum, the Claimants contend that the Respondent has failed to establish that the Claimants' right to submit to arbitration "any dispute […] in relation to an investment" implicitly excludes disputes concerning the "returns" on those investments.[769]

### c.   The Tribunal's analysis

745. Pursuant to Article 9 of the BIT, the subject-matter scope of the Tribunal's jurisdiction extends to "any dispute […] in relation to an investment". The term "investment" is in turn defined in Article 1(b) of the BIT as (meaning):

> every kind of asset established or acquired, including changes in the form of such investment, in accordance with the national laws of the Contracting Party in whose territory the investment is made […]

746. For the Tribunal to establish subject-matter jurisdiction, it suffices for this dispute to be "in relation to an investment". In the Tribunal's view, there is no doubt that this dispute relates to an investment, for the following reasons.

747. First, as discussed in Section VI.C.1 above, the Tribunal has found that the Claimants hold an investment protected by the BIT. The present dispute arises out of taxation measures imposed by India on a reorganisation of that investment, specifically, on capital gains allegedly made by CUHL when transferring shares in CIHL to CIL, another company of the group. In other words, the disputed measures were imposed on the economic consequences of a transaction relating to part of the Claimants' investment, and more specifically on an internal reorganisation of that investment (which Article 1(b) of the BIT expressly considers as a qualifying investment).

748. Second, even if the BIT did not specifically include in its definition of investment changes in the form of the investment, it is well established in investment treaty jurisprudence that, for the purposes of the jurisdictional inquiry, the investment should be considered holistically. For instance, the tribunal in *Holiday Inns v. Morocco* opined that related investment activities should not be viewed in isolation:

> [I]nvestment is accomplished by a number of juridical acts of all sorts. It would not be consonant either with economic reality or with the intention

---

[769] C-Rejoinder, ¶ 225.

of the parties to consider each of these acts in complete isolation from the others.[770]

749.   Similarly, the *Inmaris v. Ukraine* tribunal held that "[f]or purposes of this Tribunal's jurisdiction […] the Tribunal need only determine the existence of a covered investment in the transaction as a whole."[771]

750.   Accordingly, it is clear to the Tribunal that the present dispute relates to an investment.

751.   The Respondent argues however that the disputed taxation measures were imposed on "returns" of the investment and, as a result, the present dispute relates to the Claimants' returns rather than their investment. Since Article 9 of the BIT confers jurisdiction only over investment-related disputes, the Respondent submits that the present dispute is not within the Tribunal's jurisdiction.

752.   Article 1(e) defines "returns" as "the monetary amounts yielded by an investment such as profit, interest, capital gains, dividends, royalties and fees". The Respondent is thus undoubtedly right that the taxation measures were imposed on assets defined as "returns" under the BIT. However, this does not mean that the dispute does not "relate" to an investment. It is not controversial that investments are made in the expectation of a financial gain, and this expectation is one of the fundamental attributes of an investment. The Claimants' investments indisputably include shares, and as the Respondent itself acknowledges, "[a] share is a bundle of rights, including (inter alia) rights to any dividends declared by the company and rights in any capital distributions whether made on a liquidation or otherwise."[772] The dispute thus relates to measures that interfered, lawfully or not, with the exercise of one of the fundamental attributes of the Claimants' investment.

753.   The fact that the BIT defines "returns" separately from "investment" does not in itself mean that the two concepts are mutually exclusive. It is common ground that the BIT should be interpreted pursuant to the treaty interpretation rules of the VCLT.[773] Article 31(1) of the VCLT sets out the primary means of treaty interpretation in the following terms:

> A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose.

---

[770]   *Holiday Inns, Occidental Petroleum and others v. Kingdom of Morocco*, ICSID Case No. ARB/72/1, Decision on Jurisdiction, 12 May 1974, excerpt quoted in Pierre Lalive, "The First 'World Bank' Arbitration ( Holiday Inns v. Morocco) — Some Legal Problems", British Yearbook of International Law, Volume 51, Issue 1, 1980, Pages 123–162, p. 159.

[771]   *Inmaris Perestroika Sailing Maritime Services GmbH and others v. Ukraine*, ICSID Case No. ARB/08/8, Decision on Jurisdiction, 8 March 2010, CLA-296, ¶ 92.

[772]   R-PHB, ¶ 87.

[773]   While India is not a party to the VCLT, its main provisions concerning the interpretation of treaties are considered to be part of customary international law. India has itself relied on the VCLT in its submissions. See e.g. R-PHB, ¶ 56.

754.  While the BIT defines "investment" and "returns" separately, it does not juxtapose one term against the other, so as to suggest that something that relates to an investment may not at the same time relate to returns or *vice versa*. There is no language in the BIT or, most importantly, in its dispute resolution provision, that could be interpreted to exclude disputes related to returns from the scope of a treaty tribunal's jurisdiction, provided that such a dispute also relates to an investment. Quite to the contrary, the definition of the term "returns" itself refers to the term "investment", of which returns are a yield. This is quite logical, since returns are the *raison d'être* of investments.

755.  In other words, whether or not the present dispute relates to returns is irrelevant to the jurisdictional enquiry. What matters is that it unquestionably relates to an investment. Indeed, the fact that the dispute may be related also (and perhaps more directly) to what the BIT defines as returns by no means excludes that it also relates to an investment, since returns and investments are themselves closely intertwined. As the tribunal in *ConocoPhillips v. Venezuela* observed, "there is no single way of drafting definitions" in a treaty.[774] Some treaties are more detailed than others. That the UK-India BIT contains a separate definition of "returns" does not alter the broad definition of the term "investment".

756.  The Respondent contends in the alternative that, in light of the distinction between "investments" and "returns" throughout the substantive protections in the BIT, Article 9 of the BIT only allows the Tribunal to exercise jurisdiction over disputes concerning returns if the claim concerns the breach of provisions that provide for substantive protection over returns (namely, Article 4(2) and Article 7 of the BIT). The Tribunal is not persuaded. Article 9 of the BIT contains a broad jurisdictional clause vesting the Tribunal with the competence to resolve any dispute related to an investment. Unlike many other investment treaties, it does not require the dispute to relate to a violation of one or more substantive provisions of the BIT. Therefore, whether or not the impugned measures are capable of engaging a violation of the substantive provisions of the BIT is not a question that needs to be answered as part of the jurisdictional analysis.

757.  Even if one were to interpret Article 9 as implicitly restricting the Tribunal's jurisdiction only to disputes relating to a violation of one or more substantive provisions of the BIT, the Tribunal still has jurisdiction over Claimants' claims. The relevant test (articulated by Judge Higgins in the *Oil Platforms* case[775]) requires accepting the facts *pro tem* and determining whether they are capable of constituting a breach of the treaty. Here, the Tribunal finds that the facts alleged by the Claimants, if proven, would be capable of constituting violations of the various standards of treatment in the BIT invoked by the Claimants. The fact that some of the fiscal measures imposed by the Respondent were directed to the Claimants' returns does not exclude the possibility that these standards might have been breached. Simply because certain substantive standards of protection such as FET and non-expropriation refer to investments and do not specifically mention returns does not mean that returns are excluded from their scope of application. As the

---

[774]  *ConocoPhillips Petrozuata B.V. and others v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/07/30, Decision on Jurisdiction and Merits, 3 September 2013, ¶ 284.

[775]  *Oil Platforms* (*Islamic Republic of Iran v. United States of America*), Preliminary Objection, Separate Opinion of Judge Higgins, I.C.J. Reports 547, 6 November 2003, ¶¶ 29-32.

tribunal in *Siemens v. Argentina* pointed out, "[i]f a matter is dealt with in a provision of the Treaty and not specifically mentioned under other provisions, it does not necessarily follow that the other provisions should be considered to exclude the matter".[776] Further, given the close connection between investments and returns, a measure that unfairly interferes with an investor's ability to collect returns from its investment may very well constitute, at the same time, an unfair treatment of that investment.

758.  It is true that Articles 4(2) and 7 of the BIT specifically refer to returns. However, the drafting of these provisions does not suggest the intention to establish a mutually exclusive dichotomy between the protection of investments and that of returns. Indeed, Article 4(2) guarantees a most-favoured-nation treatment for "investors of the other Contracting Party, including in respect of returns on their investments".[777] The use of the word "including" suggests the exemplary character of what follows, i.e., that it illustrates as an example what preceded it in the sentence. In other words, the fact that the clause specifically refers to returns does not necessarily exclude investments.

759.  As to Article 7, this provision contains specific guarantees in respect of the repatriation of funds from the host State, including the specific guarantees related to the convertibility and transferability of both investments and returns.[778] These specific guarantees may not necessarily follow from, or be covered by, the requirement of fair treatment of investments. It is therefore understandable that the Contracting Parties specifically provided for repatriation guarantees both in respect of investments and returns, so as to prevent this provision from being interpreted as excluding returns.

760.  Conversely, more general guarantees – such as FET – do not require such specificity. If a particular measure unfairly interferes with the investor's ability to generate or collect returns from the investment, it would be difficult to argue that such a measure cannot also constitute an unfair treatment of the investment. To accept a mutually exclusive regime for the protection of investments and returns, as proposed by the Respondent, would lead to absurd results. It would allow a State to argue that a measure that arbitrarily confiscates profits yielded from an investment would not constitute an unfair and inequitable treatment of that investment, since "profits" are defined as "returns" in the BIT. Moreover, in the same scenario, an investor would be precluded from claiming indirect expropriation even though it would be holding an asset that generates no profits. As discussed above, there is no support for such an interpretation in the text of the relevant provisions or in their context. More generally, it would defy logic to include in the BIT provisions expressly protecting the repatriation of both investment and returns if returns were not protected assets under the BIT just as investments are.

---

[776]  *Siemens AG v. Argentine Republic*, ICSID Case No. ARB/02/8, Decision on Jurisdiction, 3 August 2004, CLA-286, ¶ 140.

[777]  UK-India BIT, CLA-1, Article 4(2).

[778]  *Id.,* Article 7 provides: "Each Contracting Party shall in respect of investments grant to investors of the other Contracting Party the unrestricted transfer of their investments and returns. Transfers shall be effected without delay in the convertible currency in which the capital was originally invested or in any other convertible currency agreed by the investor and the Contracting Party concerned. Unless otherwise agreed by the investor transfers shall be made at the rate of exchange applicable on the date of transfer pursuant to the exchange regulations in force."

761.   Finally, when interpreting treaty terms pursuant to the VCLT, in addition to the ordinary meaning of the provisions and their context, the Tribunal must also take into account the object and purpose of the Treaty. The preamble of the BIT is unequivocal in that the objective of the Treaty is "to create conditions favourable for fostering greater investment by investors of one State in the territory of the Other State".[779] In light of this aim, it would make little sense for the Contracting Parties to have offered a comprehensive set of protections to investments without extending them to the returns generated by such investments. After all, investments are made precisely to generate returns. If the host State were allowed to expropriate or unfairly interfere with an investor's ability to earn or collect returns from the investment, investors would be hardly induced to make investments in reliance on the BIT.

762.   For the foregoing reasons, the Tribunal finds that the present dispute relates to an investment and is thus within the subject-matter scope of its jurisdiction in accordance with Article 9 of the BIT. Neither the ordinary meaning of Article 9, nor its context, nor the object and purpose of the BIT, mandate excluding the present dispute from the subject-matter scope of the Tribunal's jurisdiction. The Respondent's objection is thus denied.

### 3.   Are tax-related investment disputes excluded from the scope of the BIT?

763.   The Parties disagree on whether the present dispute, which involves matters related to the Respondent's exercise of its sovereign authority in the field of taxation, may be submitted to arbitration under the BIT or is otherwise arbitrable pursuant to the applicable mandatory laws and international public policy.

### a.   The Respondent's position

764.   The Respondent submits that "tax disputes are not capable of being resolved by arbitration under the BIT in light of an implied exception to the scope of application of the BIT, and of the fact that the Respondent and the United Kingdom have in fact specifically agreed that tax disputes should be settled in accordance with the procedure prescribed in the contemporaneous [double taxation avoidance agreements]."[780] As a result, the Respondent contends that the present claims, which amount to a general and wide-ranging challenge to India's tax legislation and policy, are excluded from the scope of the BIT and are not arbitrable.[781] The basis of the Claimants' challenge, according to India, is that the 2012 Amendment should not have been introduced. This is a challenge to the Respondent's general fiscal authority, and as such cannot be subject to arbitration under the BIT.

765.   According to the Respondent, this interpretation is consistent with:

   a.   The Respondent's consistent state practice in relation to investment agreements;

---

[779]   *Id.*, Preamble, ¶ 2.

[780]   R-SoD, ¶ 212.

[781]   R-Rejoinder, ¶ 73.

b.     The practice of the Contracting States (in particular, through the negotiation of the Double Taxation Avoidance Agreement between the UK and India (the "UK-India DTAA")); and

c.     The domestic laws of the Contracting Parties and the law of the seat.[782]

766.   In reliance on the negotiating history of its other treaties, the Respondent contends that it has been its consistent policy to consider taxation matters to be outside the scope of its BITs and instead to be governed under its double taxation avoidance agreements ("DTAAs").[783] According to the Respondent, "the *travaux préparatoires* of India's subsequent BITs are a supplementary means of interpretation [in accordance with Article 32 of the VCLT] and are relevant to the circumstances of conclusion of the India – UK BIT because they give direct insight into the Respondent's negotiating position for, and its understanding of, the correct interpretation of the India – UK BIT."[784]

767.   The Respondent acknowledges that "there is no express exclusion of 'taxation' under the BIT", but contends that this "is of no moment, because at issue here is the existence of general limits to the scope of protection of investment treaties which exist even if they are not made explicit."[785] The fact that in more recent BITs, like the one with the UAE, India may have expressly excluded taxation, does not mean that in older BITs, like the one with the UK, it did not intend to do so. The Claimants' argument that, because the BIT was concluded after the DTAA with the UK, the Contracting Parties could have easily included an express exclusion in respect of taxation matters in the BIT is meritless, as these two mechanisms were always intended to operate in two completely different spheres.

768.   India also rejects the Claimants' argument that, since Article 4(3)(b) of the BIT specifically excludes taxation measures from the most-favoured nation ("MFN") treatment provision, such measures are not excluded for the purposes of other substantive provisions of the BIT. The Respondent points out that the National Treatment and MFN standards do not themselves set applicable standards of treatment, but they rather require that investors and investments be accorded treatment not less favourable than that which is accorded to other investors (either domestic investors and/or investors from third States), for instance under other standards of protection that are guaranteed under other BITs. The Respondent adds in this regard that "there is no rule of customary international law which precludes or restricts States from adopting certain types of taxation measures", and "[i]t is also accepted that taxation measures are within the police powers of States, which means that taxation is not a form of

---

[782]   *Ibid.*

[783]   Telefax message from PJ Nayak, Department of Economic Affairs, to K Rana, Ambassador to Germany (22 July 1994) RLA-359; Letter from A Mishra, Director, Foreign Investment to Joint Secretary, Foreign Trade and Investment (14 August 1998) RLA-360; Note 5, India's Consolidated Interpretative Statements, Department of Economic Affairs, Investment Division (8 February 2016), available at indiabusiness.nic.in, RLA-361; Article 2, Joint Interpretative Notes on the India-Bangladesh BIT (4 October 2017) RLA-362.

[784]   R-PHB, ¶ 56.

[785]   R-SoD, ¶ 213.

compensable expropriation."[786]According to India, the exclusion at Article 4(3)(b) is designed to prevent the usage of the MFN provision to "bring in India's DTAAs specifically, and tax-related matters generally, through the back door."[787]

769. Regardless of the terms of the Treaty, the Respondent's case is that "there are general limitations on the scope of the protection of investment treaties which are to be implied if not explicitly contained in the text of the Treaty."[788] According to the Respondent, "[t]his implied limitation is consistent with and flows from:

    a. The widespread and longstanding consensus amongst States that customary international law imposes few, if any, restrictions on the right of a State to set and enforce tax laws; and

    b. The generally accepted position […] that the standards of treatment contained in BITs, such as FET, are generally designed to mirror the level of protection found in customary international law."[789]

770. Consequently, Article 9 of the BIT must be logically limited to disputes within the scope of those protections and cannot encompass disputes concerning the exercise of the Respondent's taxation authority.[790]

771. According to the Respondent, it is consistent with transnational public policy that certain taxation disputes are not arbitrable, including disputes concerning non-discriminatory measures of general application, such as the measure at issue here. States have the right to define the tax base, for instance, by determining that capital gains tax is applicable to non-residents on the basis of the source rule, as is the case in India, and have exclusive competence to determine how that source rule is to be framed. According to the Respondent, the source rule "is subject only to relief from double taxation (of which there is none in this case, since CUHL has never paid tax anywhere in the world on the extraordinary capital gains it made in 2006)."[791] The wide network of double taxation treaties demonstrates that States are free to define their source rules without any external interference; otherwise there would have been uniform source rules across countries and no need for double taxation conventions.

772. This is supported by the terms of the UK-India DTAA, which does not provide for arbitration, but rather for a mutual agreement procedure involving consultations between the taxation authorities of the two States. The Respondent points specifically to Article 27(1) of the DTAA, which provides that if a taxpayer resident in one of the Contracting States considers that the actions of one or both of the Contracting States results or will result in "taxation not in accordance with [the DTAA]", that taxpayer may

---

[786] R-PHB, ¶ 63.

[787] R-Rejoinder, ¶ 81.

[788] *Id.*, ¶ 77.

[789] *Ibid.*

[790] *Id.*, ¶¶ 77-78.

[791] R-SoD, ¶ 214.

"present his case to the competent authority of the Contracting State of which he is a resident."[792] Under Article 27(2), the relevant competent authority shall then endeavour, "if the objection appears to it to be justified and if it is not itself able to arrive at an appropriate solution, to resolve the case by mutual agreement with the competent authority of the other Contracting State, with a view to the avoidance of taxation not in accordance with the [DTAA]."[793] Where this is the case, Article 27(3) provides that "[t]he competent authorities of the Contracting States shall endeavour to resolve by mutual agreement any difficulties or doubts arising as to the interpretation or application of the [DTAA]."[794]

773. According to the Respondent, "[i]t follows that the advancement of [tax] claims under the BIT is incompatible with the DTAA, in which the Respondent and the United Kingdom seek to ensure the 'avoidance of double taxation and the prevention of fiscal evasion with respect to taxes on income and capital gains'."[795] Given that the UK and India consciously excluded arbitration from the DTAA, "it would be anomalous to conclude that tax measures can nonetheless be arbitrated under the BIT concluded in 1994."[796] If there were no implied exclusion of tax measures from the dispute resolution provisions of the BIT, the dispute resolution process under the DTAA (which is premised on there being no available arbitration mechanism) would be rendered meaningless. "It can hardly be contended that *only* those tax disputes which otherwise fell under the DTAA should be excluded from BIT arbitration. The better reading of the BIT is that it did not intend to deal with the adjudication of tax measures at all."[797]

774. According to the Respondent, multiple international sources of transnational public policy support the position that tax disputes are generally not arbitrable. In particular, India refers to the European Commission's proposed arbitration directive of 1976, which never came into force, precisely because of the member States' "fear of losing sovereignty in tax matters".[798] Similarly, a 1984 OECD report accepting compulsory arbitration for tax matters "would represent an unacceptable surrender of fiscal sovereignty."[799] Although the OECD 2016 Multilateral Convention to Implement Tax Treaty Related Measures to Prevent Base Erosion and Profit Shifting contains provisions relating to the arbitration of tax disputes, Article 18 provides that arbitration

---

[792]   UK-India DTAA, RLA-45, Article 27(1).

[793]   *Id*., Article 27(2).

[794]   *Id*., Article 27(3).

[795]   R-SoD, ¶ 215.

[796]   *Ibid*.

[797]   *Ibid* (emphasis in original).

[798]   Sriram Govind and Laura Turcan, "The Changing Contours of Dispute Resolution in the International Tax World" (2017) 72 Bulletin for International Taxation No. ¾ (IBFD, 2017), RLA-185, p. 5 n. 37.

[799]   Transfer Pricing and Multinational Enterprises – Three Taxation Issues, Report of the OECD Committee on Fiscal Affairs (1984), RLA-184, ¶ 115(c).

provisions contained in Part VI do not apply automatically when a State becomes a party to the Convention, but rather it should separately notify its agreement to arbitrate.[800]

775. According to the Respondent, taxation matters are not arbitrable under Indian law, which is the law of the State where the Tribunal's eventual award is most likely to be enforced, or under the law of The Netherlands, which is the law of the seat of this arbitration. The UNCITRAL Notes on Organizing Arbitral Proceedings confirm that both of these laws are relevant and should be taken into account by arbitral tribunals acting under the UNCITRAL Arbitration Rules.[801]

776. With respect to position under Indian law, the Respondent contends that the ITA establishes a detailed procedure for challenges to tax demands, and as Section 293 of the ITA makes clear, this is an exclusive method of challenging tax demands. Further, "[a] dispute between the Respondent and a taxpayer concerning the Respondent's ability to impose taxation measures is, in the Respondent's submission, not a 'matter arising from' the commercial relationships described in the UNCITRAL Model Law, and is therefore outside the scope of the Arbitration and Conciliation Act of 1996."[802]

777. The position is similar under Dutch law. Pursuant to Article 1020(3) of the Dutch Arbitration Act, "the arbitration agreement shall not serve to determine legal consequences of which the parties cannot freely dispose."[803] The legislative history of this provision confirms that disputes that can create legal consequences for one or more third parties (*erga omnes* effect)[804] or that can affect legal certainty[805] cannot be subject to arbitration. The Dutch Supreme Court recently confirmed[806] its longstanding jurisprudence[807] that tax disputes pertain to the exclusive competence of Dutch tax courts and are therefore not arbitrable.

778. In sum, India has never agreed to subject its general fiscal measures to international arbitration and tax disputes are not arbitrable as a matter of public policy. The Tribunal should therefore decline jurisdiction on the Claimants' wide-ranging challenge to India's fiscal sovereignty.

---

[800] OECD, *Multilateral Convention to Implement Tax Treaty Related Measures to Prevent Base Erosion and Profit Shifting*, Part VI, dated 24 November 2016, CLA-284, Article 18.

[801] UNCITRAL Notes on Organizing Arbitral Proceedings (2016), RLA-197, ¶ 144.

[802] SoD, ¶¶ 219.

[803] Dutch Arbitration Act, RLA-72, Article 1020(3).

[804] Parliamentary History Dutch Arbitration Act, Explanatory Notes II, 2012-2013, 33611, 3, RLA-202, pp. 3-4.

[805] Dutch Supreme Court 10 November 2006, ECLI:NL:2006AY4033, NJ 2007/561 (Spee c.s. and Groenselect/Van den Boogaard), consideration 3.5, RLA-73.

[806] Dutch Supreme Court 16 June 2017, ECLI:NL:HR:2017:1103, NJ 2017, 264 (Rederij Volendam-Marken Express B.V. / Gemeente Waterland), consideration 3.5, RLA-203.

[807] Dutch Supreme Court 21 April 2006, ECLI:NL:HR:2006:AU4548, NJ 2006, 271 (Abacus), consideration 3.4.3, RLA-80.

### b.   The Claimants' position

779.   The Claimants point out that the BIT contains no language excluding tax related disputes from the scope of arbitral jurisdiction or the Treaty itself. Instead, Article 9(1) of the BIT provides for the submission to arbitration of "[a]ny dispute [...] in relation to an investment".[808] The Respondent asks the Tribunal to read the exclusion of taxation related disputes into a freely negotiated treaty. The Claimants submit that there is no basis for such an interpretation.

780.   A contextual reading of the BIT's terms unequivocally belies the Respondent's argument on arbitrability of the tax measures. In particular, Article 4(3)(b) contains a limited exclusion for tax-related measures in respect of the National Treatment and MFN provisions. If the Contracting States had intended to exclude tax-related measures from the coverage of other substantive standards on which the Claimants presently rely, they would have done so unequivocally, as they did in Article 4(3)(b).

781.   Dissatisfied with the text of the BIT, the Respondent ignores the hierarchy of the rules of treaty interpretation and proposes to reach a different interpretation in reliance on sources that barely qualify as secondary means of treaty interpretation. In particular, India relies on its own treaty practice and domestic law. Investment treaty tribunals recognise that "BIT practice" has a limited value in treaty interpretation, given the significant variations between the choices of language in different BITs.[809] Here, India purports to rely on incomplete excerpts of its own positions in relation to its other BITs. Besides being of limited significance for the interpretation of the UK-India BIT, these sources hardly support India's position.[810] Each of the BITs that the Respondent cites, specifically those concluded with Germany, the Netherlands, and Mauritius, in fact incorporate a limited tax carve-out for National Treatment and MFN treatment. So does India's 2003 Model BIT. This belies India's contention that it viewed taxation as inherently not arbitrable.

782.   The Respondent's reliance on the negotiating history of the Germany-India BIT is equally misguided. The Respondent in particular refers to a telefax from Mr Nayak of the Department of Economic Affairs of India to the German Ambassador, where he mentions that India has taken a strong view that "tax matters are inherently specialized matters which should be the subject of separate bilateral Agreements and ought not to form part of an Investment Protection Agreement."[811] However, it omits the next sentence from the same telefax, in which Mr Nayak proposed a broad carveout to be included in the treaty as follows: "Such treatment shall also not relate to any other domestic arrangement or legislation relating wholly or mainly to taxation".[812] This

---

[808]   UK-India BIT, CLA-1, Article 9(1).

[809]   *Aguas del Tunari, S.A. v. Republic of Bolivia*, ICSID Case No. ARB/02/3, Decision on Respondent's Objections to Jurisdiction, 21 October 2005, RLA-62, ¶ 314.

[810]   R-Rejoinder, ¶ 85.

[811]   Telefax from P.J. Nayak, Department of Economic Affairs, to K Rana, Ambassador to Germany dated 5 July 1995, RLA-359, p. 34.

[812]   *Ibid*.

broad language was never incorporated in the final text of the treaty, as (so the Claimants argue) most likely Germany never agreed to it. This, according to the Claimants, shows that India knew how to draft and negotiate a comprehensive exclusion for taxation measures, had this been a mutual intent of the treaty-making parties.

783. According to the Claimants, similar events unfolded in the negotiating history of the Netherlands-India BIT, where India again expressed its opposition to "taxation measures to come within the purview of the Bilateral Investment Protection Agreement",[813] but only achieved a limited carve-out from National Treatment and MFN treatment. When the Dutch foreign ministry transmitted the BIT for ratification, it confirmed that "[a]ll other provisions of this treaty are applicable in relation to fiscal measures."[814]

784. That Article 2(3) of the India-UAE BIT includes a broad exception for taxation measures, stating that "the provisions of this Agreement shall not apply to any matter relating to taxation" further shows that India can well draft a taxation carve out when such a carve-out is intended and is mutually acceptable to both parties of a treaty.

785. India's attempt to rely on its 2016 Interpretative Statement for Indian BITs is also unavailing. India reports to have sent this statement, which proposes reading a fiscal carve-out into the BITs which have none, to 25 of its BIT partners, but received a favourable answer only from Bangladesh. As the *Daimler v. Argentina* tribunal highlighted, a State may not establish an original intention of the treaty-making parties by a *post hoc* unilateral interpretative note.[815]

786. The Claimants further submit that the arbitration laws of England & Wales, the Netherlands, and India do not support the proposition that tax-related disputes under an international treaty are not arbitrable. For the position of the law of England & Wales, the Tribunal need look no further than the Court of Appeal's decision in *Ecuador v. OEPC*, where the court highlighted that the object and purpose of the BIT is "to provide effective protection for investors" and the courts must "resolve uncertainties in its interpretation in favor of the investor".[816] While the court recognised that the dispute "involved a matter of taxation", it rejected Ecuador's jurisdictional objection as the matter did not fall under the express tax carve-out of the applicable BIT. For the Claimants, it is obvious from the court's analysis that it did not consider taxation matters to be generally not arbitrable.

787. The position is similar under Dutch law. The case law and academic commentary of Dutch law on which the Respondent relies are inapposite, as they do not relate to treaty arbitration; they concern appeals by Dutch taxpayers of Dutch tax assessments before

---

[813]   Telefax from P.J. Nayak, Department of Economic Affairs, to I.P. Khosla, Ambassador the Netherlands dated 26 October 1994, RLA-359, p. 2.

[814]   Letter from the Minister of Foreign Affairs of the Netherlands dated 4 June 1996, RLA-359, p. 2.

[815]   *Daimler Financial Services AG v. Argentine Republic*, ICSID Case No. ARB/05/1, Award, 22 August 2012, CLA-159, ¶ 272.

[816]   *Republic of Ecuador v. Occidental Exploration & Production Company*, [2007] EWCA Civ 656, 4 July 2007, CLA-291, ¶ 28.

Dutch administrative courts.[817] The Respondent argues that disputes involving issues of public order are not arbitrable as they produce *erga omnes* effects. The Dutch court pronounced this principle in the context of a domestic tax dispute, not involving an international treaty between two other states and having no relation to the enforcement of Dutch tax law. Here, the Claimants seek to vindicate their rights under the BIT, which provides that the eventual award will be binding only upon the parties to the dispute.[818] It does not therefore produce any *erga omnes* legal consequences and no issue of arbitrability arises.

788.   The Claimants further argue that the Respondent's attempt to rely on the arbitrability provisions of Indian arbitration law is misplaced. Indian law does not govern this arbitration. The Respondent's argument that the eventual award is likely to be enforced in India and thus Indian law should be taken into account amounts to a threat that India will breach its obligation under the BIT to comply with the award by relying on its own domestic law. It is a cardinal principle of international law that a State cannot escape responsibility on the international plane by invoking its own laws.[819]

789.   Finally, the Respondent's argument that there is a transnational public policy rule against arbitrability of tax disputes is unsupported by evidence. States routinely agree to arbitrate tax-related investment disputes and they do arbitrate such disputes often without even raising the issue of arbitrability.[820] The Respondent refers to the EU Member States' "reluctance" to accept a 1976 directive mandating the binding arbitration of tax disputes. It fails to mention, however, that this directive was adopted as a convention in 1995 and now applies in every EU Member State.[821]

790.   Similarly, the Respondent refers to a 1984 OECD Report which noted that the need for compulsory arbitration of tax disputes had not been demonstrated.[822] What it omits to note is that a more recent 2015 OECD Report in fact recognises that "mandatory binding arbitration is the best way of ensuring that tax treaty disputes are effectively resolved."[823]

---

[817]   C-Rejoinder, ¶ 181.

[818]   UK-India BIT, CLA-1, Article 9(3)(c)(v).

[819]   VCLT, RLA-58, Article 27.

[820]   *Burlington Resources Inc. v. Republic of Ecuador*, ICSID Case No. ARB/08/5, Decision on Jurisdiction, 2 June 2010, RLA-164, ¶ 181; *Link Trading v. Department for Customs Control of Republic of Moldova*, UNCITRAL, Award on Jurisdiction, 16 February 2001, RLA-188, p. 10; *Mamidoil Jetoil Greek Petroleum Products Societe S.A. v. Republic of Albania*, ICSID Case No. ARB/11/24, Award, 30 March 2015, CLA-150; *Yuri Bogdanov and Yulia Bogdanova v. Republic of Moldova*, SCC Arbitration No. V (091/2012), Final Award, 16 April 2013, CLA-154, ¶ 167.

[821]   Convention 90/436/EEC on the elimination of double taxation in connection with the adjustment of profits of associated enterprises was signed in 1990 and entered into effect on 1 January 1995, Official Journal of the European Communities L 225/10 of 20/08/1990, CLA-274.

[822]   Transfer Pricing and Multinational Enterprises – Three Taxation Issues, Report of the OECD Committee on Fiscal Affairs (1984), RLA-184, ¶ 115(c).

[823]   OECD, Making Dispute Resolution Mechanisms More Effective, Action 14 - 2015 Final Report, OECD/G20, (2015), CLA-327, ¶ 62.

791.    In sum, the Claimants argue that the UK-India BIT clearly allows for the arbitration of tax disputes, except for MFN and National Treatment claims. The Claimants here do not make MFN or National Treatment claims. Their claims thus are arbitrable under the BIT. The Respondent has failed to articulate why this Tribunal should ignore the Treaty terms in favour of a construction based on a distorted representation of "BIT practice", domestic laws governing domestic tax matters, or an alleged "transnational public policy" discernible from the States' purported reluctance to arbitrate tax-related investment disputes.[824]

### c.    The Tribunal's analysis

792.    The Respondent's objection is two-pronged. First, India argues that taxation measures are outside the scope of application of the BIT, with the result that the present dispute falls outside the subject-matter scope of the Tribunal's jurisdiction. Second, India contends that taxation disputes are not arbitrable, either as a matter of international public policy, Indian law or Dutch law. These are two distinct self-standing objections. According to the first, the Contracting Parties to the BIT have not consented to submit disputes arising from tax measures to arbitration. According to the second, even if the Contracting Parties have so consented, this consent is invalid, as the dispute is not capable of being resolved by arbitration as a matter of certain mandatory rules of law. The Tribunal will therefore address these two objections separately.

793.    Before doing so, however, it merits clarifying that the present dispute is a tax-related investment dispute, not a tax dispute. More precisely, this dispute concerns alleged violations of an investment treaty resulting from certain sovereign measures taken by the Respondent in the field of taxation, also referred to as fiscal measures. This type of dispute must be distinguished from tax disputes proper, which are disputes concerning the taxability (including the tax-amount) of a specific transaction. The distinction is significant. In a tax dispute, the question is whether and how a particular transaction is taxable under the applicable (municipal) law or, possibly laws of several countries if the transaction is international. In tax-related investment disputes, on the other hand, the tribunal is tasked with determining whether the respondent State has breached substantive standards of treatment under the investment treaty through the exercise of its authority in the field of taxation, and whether liability arises as a result. The issue at stake is thus not a matter of domestic tax law; it is rather whether the fiscal measures taken by the State, valid or not under its own tax laws, violate international law.

794.    Investment treaty tribunals are tasked with scrutinising State measures in different fields of sovereign activity for their compliance with the treaty standards. This cannot equate with the task of resolving the underlying dispute under the relevant municipal law. By way of example, when an investment treaty tribunal scrutinises investigative, prosecutorial, or judicial measures taken by the respondent State within the framework of domestic criminal proceedings, it does not resolve the underlying criminal dispute by determining the guilt or innocence of the individual concerned; it looks at such measures from the prism of a potential treaty violation. Thus, the Tribunal's task here is to determine whether the way India taxed the 2006 Transactions, including by applying

---

[824]    C-Rejoinder, ¶ 210.

the 2012 Amendment, fell short of the substantive standards of treatment guaranteed under the BIT.

795.  Having clarified this matter, the Tribunal will now consider whether (i) the UK and India, as Contracting Parties to the BIT, have consented to submit tax-related investment disputes to arbitration, and (ii) whether such disputes are capable of being resolved by arbitration under the relevant mandatory laws.

### (i)   Have the Contracting Parties consented to submit tax-related investment disputes to arbitration under Article 9 of the BIT?

796.  As set out above, pursuant to Article 9 of the BIT the UK and India consented to arbitrate "[a]ny dispute between an investor of one Contracting Party and the other Contracting Party in relation to an investment of the former".[825] Once again, the Tribunal will interpret this provision in accordance with the VCLT.

797.  Turning first to the ordinary meaning of this provision, the Tribunal notes that Article 9 is a broad jurisdictional clause. Nothing in the ordinary meaning of the language of Article 9 of the BIT suggests that tax-related investment disputes fall outside the scope of the Tribunal's jurisdiction. In particular, it does not contain any explicit exclusion for tax-related investment disputes.

798.  Nor is such an interpretation supported by the object and purpose of the BIT, which is "to create conditions favourable for fostering greater investment" and to "stimulat[e] […] individual business initiative and […] increase prosperity in both States".[826] Indeed, guarantees of fairness of the taxation regime are in line with the objective of encouraging more foreign investment. Interpreting the BIT so as to exclude tax-related measures from its scope of application, without having express language to that effect, would not be in line with the treaty's object and purpose.

799.  A contextual interpretation further supports the view that tax-related investment disputes and, in general, tax-related measures, are within the scope of the BIT. In particular, Article 4 of the BIT, which contains the National Treatment and the MFN clauses, excludes from the scope of those provisions "any treatment, preference or privilege resulting from […] any international agreement or arrangement relating wholly or mainly to taxation or any domestic legislation relating wholly or mainly to taxation."[827] The presence of this limited tax-related exception in the BIT belies India's argument that "arbitration of tax disputes was entirely unthinkable and not in the contemplation of the state parties" to the BIT.[828]

800.  Indeed, if, as the Respondent suggests, "the entire idea of tax arbitration [were] beyond the contemplation of the contracting parties", and if "tax disputes [were] outside the

---

[825]   UK-India BIT, CLA-1, Article 9.

[826]   *Id.*, Preamble.

[827]   *Id.*, Article 4(3).

[828]   R-Rejoinder, ¶ 85.

BIT's scope",[829] there would be no need to exclude such matters specifically from the National Treatment and the MFN protections. It is a well-established rule of treaty interpretation that treaty terms should be interpreted so as to give them, as opposed to deprive them of, a meaning.[830] The Respondent's interpretation either deprives Article 4(3) of the BIT of any effective meaning, or implies rewriting its language to the effect that the provision would be read to exclude all tax matters from the BIT as a whole. Neither interpretation is acceptable under the applicable rules of treaty interpretation.

801.   India further argues that, since tax matters are regulated by another international treaty, the UK-India DTAA, the BIT should be read so as to exclude such matters from its scope. This argument appears to imply that the UK-India DTAA derogates from the BIT pursuant to Article 30 of the VCLT ("Application Of Successive Treaties Relating To The Same Subject-Matter"), which provides in relevant part:

> 1.   Subject to Article 103 of the Charter of the United Nations, the rights and obligations of States parties to successive treaties relating to the same subject-matter shall be determined in accordance with the following paragraphs.
>
> 2.   When a treaty specifies that it is subject to, or that it is not to be considered as incompatible with, an earlier or later treaty, the provisions of that other treaty prevail.
>
> 3.   When all the parties to the earlier treaty are parties also to the later treaty but the earlier treaty is not terminated or suspended in operation under article 59, the earlier treaty applies only to the extent that its provisions are compatible with those of the later treaty.[831]

802.   The Tribunal is not persuaded that this provision can be invoked to argue that the UK-India DTAA derogates from the BIT, for the following reasons.

803.   First, by its own terms, this provision is inapplicable here. The UK-India DTAA and the BIT govern different subject-matters: the former provides rules for "the avoidance of double taxation and the prevention of fiscal evasion with respect to taxes on income and capital gains" applicable to residents of each contracting State,[832] while in the latter, each Contracting Party agrees to treat the investments in its territory made by nationals of the other Contracting Party in accordance with certain standards of treatment. Article 30 of the VCLT is unequivocal in that the conflict rules contained therein apply only to

---

[829]   Transcript, Evidentiary Hearing, Day 1, 248:16-19.

[830]   *Asian Agricultural Products Ltd (AAPL) v. Sri Lanka*, ICSID Case No. ARB/87/3, Award, 27 June 1990, CLA-54, ¶ 40, ("Nothing is better settled, as a canon of interpretation in all systems of law, than that a clause must be so interpreted as to give it a meaning rather than so as to deprive it of meaning […] This is simply an application of the more wider legal principle of '*effectiveness*' which requires favouring the interpretation that gives to each treaty provision 'effet utile'.").

[831]   VCLT, RLA-58, Articles 30(1)-30(3).

[832]   UK-India DTAA, RLA-45, Preamble, Article 1(1).

treaties "relating to the same subject-matter".[833] Two treaties that operate in two separate spheres cannot derogate from each other.

804.  Even assuming *arguendo* that the two treaties governed the same subject-matter, the UK-India DTAA predates the BIT. It cannot therefore be considered as a later treaty for the purposes of Article 30(3) of the VCLT. To the contrary, were Article 30(3) to apply to the DTAA and the BIT, this provision would mandate that the BIT would derogate from the UK-India DTAA, and not *vice versa*, as the Respondent appears to argue.

805.  The only provision that could potentially be relevant (again, assuming *arguendo* that the two treaties related to the same subject-matter) is Article 30(2) of the VCLT. According to this provision, "[w]hen a treaty specifies that it is subject to, or that it is not to be considered as incompatible with, an earlier or later treaty, the provisions of that other treaty prevail."[834] Article 4(3) of the BIT specifies that the National Treatment and the MFN protections "shall not be construed so as to oblige one Contracting Party to extend to the investors of the other the benefit of any treatment, preference or privilege resulting from […] any international agreement or arrangement relating wholly or mainly to taxation".[835] The Respondent appears to be arguing that this provision of the BIT gives precedence to the UK-India DTAA over the BIT, and thus the UK-India DTAA should govern any "treatment" provided by India to UK investors in tax matters.

806.  The Tribunal is not persuaded. Article 4(3) of the BIT cannot be read to have the effect envisaged by Article 30(2) of the VCLT for at least three independent reasons:

a.  Article 4(3) of the BIT does not "subject" the BIT to double taxation agreements such as the UK-India DTAA. Rather, it contains a specific carve-out limited to the National Treatment and MFN provisions. In other words, Article 4(3) does not specify that the BIT is subject to the UK-India DTAA; it merely limits the scope of application of the National Treatment and MFN provisions by excluding "any treatment, preference or privilege resulting from" tax-related treaties.

b.  While Article 4(3) does refer among others to the DTAAs signed by the host State, it does not expressly specify that the BIT should be considered to be incompatible with those DTAAs, as Article 30(2) requires. Nor could such an incompatibility be implicitly read into this provision: Article 27(1) of the UK-India DTAA provides for a dispute resolution mechanism for situations in which "a resident of a Contracting State considers that the actions of one or both of the Contracting States result or will result for him in taxation not in accordance with this Convention."[836] It does not purport to provide a dispute resolution mechanism for situations in which an investor of one of the Contracting States considers that the host State has violated his rights as an investor, especially the BIT.

---

[833]  Article 30(1) of the VCLT provides "Subject to Article 103 of the Charter of the United Nations, the rights and obligations of States Parties to successive treaties relating to the same subject matter shall be determined in accordance with the following paragraphs."

[834]  VCLT, RLA-58, Article 30(2).

[835]  UK-India BIT, CLA-1, Article 4(3)(b).

[836]  UK-India DTAA, RLA-45, Article 27(1).

c.   More importantly, by its very nature Article 4(3) cannot be read as mandating that all tax matters be governed by the relevant DTAAs to the exclusion of the BIT. Article 4(3) provides a tax carve-out only with respect to the National Treatment and MFN provisions contained at Articles 4(1) and 4(2). These provisions allow investors of a Contracting Party to benefit from treatment no less favourable than that afforded to investors of the host State or third States. By their very nature, Articles 4(1) and 4(2) cannot be referring to treatment that is already available to UK investors in India (or Indian investors in the UK) absent the National Treatment and MFN protections, such as the guarantees provided in the UK-India DTAA. In turn, the effect of Article 4(3) is to exclude from the scope of the National Treatment and MFN protections any treatment, preference or privilege afforded to investors of the host State or third States resulting from tax-related agreements. This means that, as a result of the tax carve-out in Article 4(3), UK investors in India (and Indian investors in the UK) cannot complain if they receive less favourable treatment in tax matters than that provided in tax-related agreements for investors of the host State or of third States. This exclusion can only be referring to tax-related agreements between India and third States that are not the UK, because any "treatment" afforded by the UK-India DTAA is available to UK investors in India (and Indian investors in the UK) without needing to rely on the BIT's National Treatment and MFN provisions. In other words, Article 4(3) of the BIT cannot exclude from the scope of application of the National Treatment and MFN provisions treatment that these provisions were not intended to provide in the first place. This would entail depriving Article 4(3) of any meaningful effect. Instead Article 4(3) of the BIT can only be read to carve out any more favourable treatment that domestic or third State investors receive under the host State's taxation agreements with third States.

807.   The Tribunal thus concludes that, to the extent that the Respondent is invoking Article 30 of the VCLT, the UK-India DTAA cannot derogate from the BIT.

808.   Alternatively, the Respondent's argument may be understood as relying on the UK-India DTAA to determine the relevant context for interpreting the provisions of the BIT, as mandated by Article 31(3) of the VCLT.[837] The Respondent has argued that the two treaties were negotiated and entered into contemporaneously, and appears to be suggesting that they should be interpreted together, as a whole, or that the Tribunal should look at the provisions of the DTAA for assistance in interpreting the BIT. Once again, the Tribunal is not convinced.

a.   First, the UK-India DTAA does not qualify as a "subsequent agreement between the parties regarding the interpretation of the treaty or the application of its provisions", or as "subsequent practice in the application of the treaty which

---

[837]   Article 31(3) of the VCLT provides: "There shall be taken into account, together with the context:

(a)   any subsequent agreement between the parties regarding the interpretation of the treaty or the application of its provisions;

(b) any subsequent practice in the application of the treaty which establishes the agreement of the parties regarding its interpretation;

(c) any relevant rules of international law applicable in the relations between the parties."

establishes the agreement of the parties regarding its interpretation" pursuant to Articles 31(3)(a)-31(3)(b) of the VCLT.[838] Not only does the UK-India DTAA predate the BIT; nowhere does it purport to interpret the BIT or its application, nor does it establish an agreement of the Contracting Parties with respect to its interpretation.

b.   Second, Article 31(3)(c) of the VCLT mandates that the "relevant rules of international law applicable in the relations between the parties" must be taken into account when identifying the context of the terms of a treaty.[839] The UK-India DTAA indisputably contains rules of international law applicable between the Parties to the BIT. However, India fails to point to any *relevant* rule in the former that would suggest that the latter should be interpreted so as to exclude tax-related measures from its scope. As mentioned at paragraph 806.b above, the two treaties are not incompatible. It is perfectly possible for a tax-related measure to be governed under a double taxation regime, such as the one provided in the UK-India DTAA, and at the same time be arbitrary, discriminatory or otherwise contrary to the BIT. Nothing in the UK-India DTAA suggests that the BIT, as a whole, or its dispute resolution mechanism in particular, is not applicable to tax-related measures.

809.   For these reasons, when interpreted pursuant to the primary means of treaty interpretation, neither the BIT in general nor its dispute resolution provision in particular contains an exclusion for tax-related investment disputes. This interpretation is neither "ambiguous" nor "obscure",[840] nor "[l]eads to a result which is manifestly absurd or unreasonable."[841] As a result, the Tribunal does not need to inquire whether any secondary sources of treaty interpretation would suggest otherwise. It will nevertheless address this point for the sake of completeness, because it was an important part of the Respondent's case.

810.   Article 32 of the VCLT ("Supplementary Means of Interpretation") provides:

> Recourse may be had to supplementary means of interpretation, including the preparatory work of the treaty and the circumstances of its conclusion, in order to confirm the meaning resulting from the application of article 31, or to determine the meaning when the interpretation according to article 31:
>
> (a) Leaves the meaning ambiguous or obscure; or
>
> (b) Leads to a result which is manifestly absurd or unreasonable.[842]

---

[838]   VCLT, RLA-58, Articles 31(3)(a)-31(3)(b).

[839]   VCLT, RLA-58, Article 31(3)(c).

[840]   VCLT, RLA-58, Article 32(a).

[841]   VCLT, RLA-58, Article 32(b).

[842]   VCLT, RLA-58, Article 32.

811.   India relies on several documents, which it argues should be considered to be supplementary means of interpretation which are "relevant to the circumstances of conclusion of the India-UK BIT because they give direct insight into the Respondent's negotiating position for, and its understanding of, the correct interpretation of, the India-UK BIT."[843] India relies specifically on the following documents:[844]

   a.   A telefax from Mr Nayak of India's Department of Economic Affairs to Mr K. Rana, India's Ambassador to Germany during the negotiation of the India-Germany BIT signed in July 1995, which (in the context of the negotiation of the National Treatment/MFN clause) stated that "[w]ith other countries, we have taken a somewhat stronger view that all domestic tax laws would be outside the scope of such Agreements, and have justified this by arguing that tax matters are inherently specialised matters which should be the subject of separate bilateral Agreements and ought not to form part of an Investment Protection Agreement."[845]

   b.   A telefax from Mr Nayak of India's Department of Economic Affairs to Mr I.P. Khosla, India's Ambassador to the Netherlands during the negotiation of the India-Netherlands BIT in October 1994, indicating that "[w]e are very clear that we do not wish taxation matters to come within the purview of the Bilateral Investment Protection Agreement as it may lay open the possibility of an overseas investor from the Netherlands challenging Indian tax assessments in international arbitration. We would continue to request that on this point you should remain firm in your discussions with the Netherlands Government and we are pleased that the matter will be reviewed afresh by them."[846]

   c.   A message from Mr A. Mishra, Director, Foreign Investment to the Joint Secretary, Foreign Trade and Investment, during the negotiation of the India-Mauritius BIT in 1998, stating that "[t]he Mauritius counter draft […] did not extend derogation clause to all matters relating wholly or mainly to taxation […] It was also clarified that taxation matters are appropriately addressed under the Double Taxation Avoidance Agreement between the two countries and there should be no overlap between DTAA and BIPA provisions."[847]

   d.   The Office Memorandum on the Issuance of Joint Interpretative Statements for Indian Bilateral Investment Treaties dated 8 February 2016 issued by the Investment Division of the Department of Economic Affairs of India's MoF, which stated that "[i]n the treaties which are silent on inclusion or exclusion of taxation measures from scope, it is implied that such treaties, do not apply to any

---

[843]   R-PHB, ¶ 56.

[844]   See, R-Rejoinder, ¶ 79; R-PHB, ¶¶ 57-62; Compilation of excerpts, RLA-359.

[845]   Telefax from P.J. Nayak, Department of Economic Affairs, to K Rana, Ambassador to Germany dated 5 July 1995, RLA-359, p. 34.

[846]   Telefax from PJ Nayak, Department of Economic Affairs, to I.P. Khosla, Ambassador to the Netherlands dated 26 October 1994, RLA-359, pp. 2-3.

[847]   Message from A. Mishra, Director, Foreign Investment to the Joint Secretary, Foreign Trade and Investment dated 14 August 1998, RLA-359, pp. 14-15.

law or measure regarding taxation including measures taken to enforce taxation obligations."[848]

e.   Joint Interpretive Notes between the Respondent and the Government of Bangladesh dated 4 October 2017, following the conclusion of the India-Bangladesh BIT, which repeated the above interpretation.[849]

812.   As is evident from their nature, the documents on which India relies do not properly qualify as secondary sources for the interpretation of this BIT. In particular, they cannot be considered to be "preparatory work" for the UK-India BIT or to relate to "the circumstances of its conclusion", as mandated by Article 32 of the VCLT. Rather, documents (a), (b), (c), and (e) relate to the negotiation of India's investment treaties with Germany, the Netherlands, Mauritius, and Bangladesh. The Respondent has not demonstrated how those communications, many of which postdate the present BIT, would have informed the mutual intentions of the Contracting Parties when entering into this BIT. Even if those documents were to show India's contemporaneous intentions, this could not bind the United Kingdom or UK investors, who have the benefit of the unambiguous language of the BIT, which contains only a limited tax-related carve out in Article 4.3.

813.   As to document (d), the 2016 Interpretative Statement for Indian BITs, this is a unilateral statement by India purporting to interpret its BITs as including an implicit carve-out for fiscal measures in those BITs that have no express carve-out. The Respondent has provided no evidence suggesting that the UK agreed to this carve-out for the UK-India BIT. The 2016 Interpretative Statement, issued over 20 years after the negotiation of the BIT, is of limited value even to establish the Respondent's contemporaneous intentions at the time of execution of the BIT: as noted by the *Daimler v. Argentina* tribunal, "an interpretive declaration issued by a State after a treaty-based interpretive dispute has already arisen cannot be considered as a definitive guide to the State's original intentions – particularly when the declaration relates to a different treaty."[850]

814.   Consequently, the Tribunal concludes that there are no relevant supplementary means of interpretation that should be used or that could lead it to modify its interpretation of the BIT reached on the basis of primary means of interpretation.

815.   For these reasons, the Tribunal concludes that India consented to arbitrate tax-related investment disputes (such as the present dispute) pursuant to Article 9 of the BIT.

### (ii)   Are tax-related investment disputes arbitrable?

816.   Having established that the UK and India have consented to submit tax-related investment disputes to arbitral jurisdiction, the Tribunal now turns to whether they have

---

[848]   Government of India, Ministry of Finance, Department of Economic Affairs, Investment Division, Office Memorandum on "Issuing Joint Interpretative Statements for Indian Bilateral Investment Treaties" dated 8 February 2016, CLA-251; Note 5, India's Consolidated Interpretative Statements, Department of Economic Affairs, Investment Division dated 8 February 2016, RLA-361.

[849]   Article 2, Joint Interpretative Notes on the India-Bangladesh BIT dated 4 October 2017, RLA-362.

[850]   *Daimler Financial Services AG v. Argentine Republic*, ICSID Case No. ARB/05/1, Award, 22 August 2012, CLA-159, ¶ 272.

done so contrary to international public policy, or to other mandatory rules of law, both of which would render their agreement invalid or inoperable. India argues that the present dispute is not arbitrable as a matter of international public policy, as well as under the municipal laws of India or the Netherlands.

817. The notion of (objective) arbitrability relates to whether a particular subject-matter is lawfully susceptible to decision by arbitration. Whether a particular type of dispute is arbitrable is a policy choice of the relevant legislator. The question here is what laws are relevant to determining the existence of such policy choice with respect to this particular investment arbitration.

818. That the dispute must concern a subject-matter lawfully capable of being submitted to arbitration is a requirement for the Tribunal's jurisdiction. The Tribunal considers that two laws are potentially relevant in this regard. As noted in Section VI.A above, the Tribunal's jurisdiction is governed by international law, and in particular, by the BIT. International law (including the notion of international public policy) is thus relevant to this question.

819. The law of the seat is also relevant to this question. Given the Tribunal's decision that the seat of this arbitration is The Hague, the Netherlands, this arbitration is governed by the mandatory provisions of the *lex arbitri,* which is Dutch law. Any award rendered by this Tribunal is subject to the control of the Dutch courts, which may apply Dutch concepts of arbitrability. It is the Tribunal's intention to render an award that is valid at the seat, and for this reason, it will assess the question of the arbitrability of this dispute under Dutch law.

820. The question that ensues is what other laws are relevant to determining whether this dispute is arbitrable. One could consider that such a policy choice might fall to the domestic laws of the Contracting Parties, as the Respondent (and even the Claimants) seems to suggest, or at the very least to the host State, as certain aspects of the investment will be governed by the host State's law. However, the Contracting States' agreement to arbitrate is contained in an international treaty and thus governed by international law. It is a principle of international law that States may not negate such agreements in reliance on their municipal laws,[851] for instance, by arguing that the subject-matters that fall within the scope of the relevant treaty are not arbitrable under their domestic laws. Absent an exclusion by the terms of the relevant treaty or a derogation by a subsequent treaty, the Contracting States should be deemed to have agreed to arbitrate all matters that fall under the scope of the Treaty. Sovereign actions, and in particular administrative law decisions by State entities, may not be arbitrable domestically. However, when a State enters into a bilateral investment treaty, it cannot argue that its sovereign conduct is not arbitrable under the treaty. To transpose the domestic law concept of arbitrability to investment arbitration would deprive investment treaties of any useful meaning.

821. In this context, it bears recalling that the Tribunal is not faced here with a tax dispute. The Tribunal is not assessing whether the 2006 Transactions gave rise to tax, and if so, in what amount. This is a tax-related *investment* dispute, in which the Tribunal is tasked

---

[851]  See ILC Articles on Responsibility of States for Internationally Wrongful Acts, Article 3.

with determining whether certain fiscal measures imposed by the Respondent have breached the Treaty. Accordingly, whether tax disputes are arbitrable in the Netherlands, India, or even the UK, is irrelevant. To the extent that any of these laws is relevant, what matters is whether they prohibit arbitration of tax-related investment disputes.

822. For these reasons, the Tribunal will address the issue of arbitrability as a matter of (i) the mandatory law of the seat of this arbitration (i.e., Dutch law), and (ii) international public policy, bearing in mind that this is a tax-related investment dispute, and not a tax dispute.

*(1)    Are tax-related investment disputes arbitrable under Dutch law?*

823. The Respondent contends that taxation disputes are not arbitrable as a matter of mandatory rules in the Dutch Arbitration Act. In particular it invokes Article 1020(3) of the Dutch Arbitration Act, which reads as follows:

> The arbitration agreement shall not serve to determine legal consequences of which the parties cannot freely dispose.

824. According to the Respondent, the Dutch Supreme Court has determined that "tax disputes pertain to the exclusive competence of Dutch tax courts and are therefore not arbitrable".[852] The quote from the decision referred to by the Respondent reads as follows:

> [P]arties may not freely determine whether the tax court or the civil court will hear a dispute. The Dutch tax court is exclusively competent to determine the correctness of the tourist tax assessed [...].[853]

825. Once again, the provisions invoked by the Respondent relate to tax disputes, not tax-related investment disputes. In the former, the dispute concerns the taxability of a given transaction, and the determination may indeed potentially have an *erga omnes* effect *vis-à-vis* other taxpayers in like circumstances. In the latter, the determination is made in respect of the host State's treatment of individual investors. Article 9(3)(v) of the BIT provides that the decision of the arbitral tribunal is binding on the disputing parties. It has no *erga omnes* effect. By way of example, even if this Tribunal were to determine that India's tax measures violated the Claimants' rights under the BIT, this would not result in the invalidity of the 2012 Amendment or the FAO. The mandate of this Tribunal is different from that of a domestic tax court, which may determine with an *erga omnes* or at least precedential effect whether particular types of transactions are taxable as a matter of municipal tax law.

826. Therefore, even if tax disputes are not arbitrable in the Netherlands, this has no bearing on the arbitrability of tax-related investment disputes, especially when Dutch taxes are not at stake. The public policy rationale of keeping tax disputes within the exclusive

---

[852]   R-Rejoinder, ¶ 97, citing Dutch Supreme Court 21 April 2006, ECLI:NL:HR:2006:AU4548, NJ 2006, 271 (*Abacus*), RLA-80, consideration 3.4.3.

[853]   Dutch Supreme Court 21 April 2006, ECLI:NL:HR:2006:AU4548, NJ 2006, 271 (*Abacus*), RLA-80, consideration 3.4.3.

competence of domestic courts does not apply to disputes related to alleged violations of investment treaties by fiscal measures.

827. The evidence submitted in the record by the Respondent shows that the Netherlands understands this distinction. Indeed, that evidence suggests that when the Netherlands negotiated its BIT with India, it considered fiscal measures to fall within the BIT's scope, except for a limited carve-out for the National Treatment and MFN provisions. In particular, when the Dutch foreign ministry transmitted the Netherlands-India BIT for ratification, it confirmed its understanding that "[a]ll other provisions of this treaty are applicable in relation to fiscal measures."[854] This shows that the Netherlands does not view even tax-related investment disputes arising under treaties to which it is a party as inherently incapable of being resolved by international arbitration. Many more investment treaties concluded by the Netherlands, which contain no or limited tax-related exceptions, further stand in support of this conclusion.

*(2)   Are tax-related investment disputes arbitrable as a matter of international public policy?*

828. India contends that tax disputes are not arbitrable as a matter of international public policy. As noted above, this is not a tax dispute; it is a tax-related investment dispute. Whether tax disputes proper are not arbitrable as a matter of international public policy is thus irrelevant.

829. To the extent that the Respondent is referring to tax-related investment disputes, the sources that it invokes do not support its position.

830. In particular, the Respondent refers to the European Commission's 1976 proposal for an arbitration directive that never came into force. According to India, the reason why the project did not succeed was the EU Member States' "fear of losing sovereignty in tax matters".[855] Even if this were the case, the fact that, at that time, EU Member States may have allegedly preferred to retain unfettered discretion in tax-related matters does not render other States' consent to arbitrate such disputes contrary to international public policy. In any event, in the decades following 1976, many (if not all) EU Member States entered into investment treaties that provide for the arbitration of investor-State disputes, many times without exempting tax-related disputes, or containing limited exceptions directed specifically to certain provisions, such as National Treatment and MFN.

831. India also relies on a 1984 OECD report, which, according to the Respondent, posits that accepting compulsory arbitration "would represent an unacceptable surrender of

---

[854]   Telefax from PJ Nayak, Indian Department of Economic Affairs, to I.P. Khosla, India's Ambassador the Netherlands, RLA-359.

[855]   Sriram Govind and Laura Turcan, "The Changing Contours of Dispute Resolution in the International Tax World" (2017) 72 Bulletin for International Taxation No. 3/4 (IBFD, 2017), RLA-185.

fiscal sovereignty".[856] The full quote of the relevant paragraph of the report is not, however, nearly as categorical. It reads as follows:

> The Committee does not, for the time being, recommend the adoption of a compulsory arbitration procedure to supersede or supplement the mutual agreement procedure. In its view the need for such compulsory arbitration has not been demonstrated by the evidence available and the adoption of such a procedure would represent an unacceptable surrender of fiscal sovereignty.[857]

832. Such cautious language (in particular the use of the terms "for the time being", "recommend", and "not been demonstrated by the evidence available") suggests that arbitrating tax-related disputes is not an issue of international public policy. In any event, this report was issued well over 30 years ago and thus predates the proliferation of investment protection treaties. It sets out "a Recommendation to the Governments of Member countries" and is concerned specifically with "the ways in which a multinational enterprise may be relieved from 'economic double taxation'".[858] It is silent on whether two sovereign States are at liberty to submit tax-related investment disputes to arbitration by virtue of an international treaty, and does not suggest that such an endeavour would be contrary to international law or, *a fortiori*, contrary to international public policy. Indeed, many OECD member States have done so by subscribing to a vast network of bilateral and multilateral investment treaties since the issuance of that report.

833. In any event, the Respondent does not deny that, in 2016, the OECD adopted the Multilateral Convention to Implement Tax Treaty Related Measures to Prevent Base Erosion and Profit Shifting, which contains provisions relating to arbitration of tax-related disputes.[859] Article 18 specifically envisages the possibility for member States to notify their agreement to arbitrate such disputes. This contradicts the assertion that tax disputes, or more precisely tax-related investment disputes, are not arbitrable as a matter of international public policy, especially as international public policy stood at the time of the initiation of this arbitration.

834. The Respondent further contends that there exists a "[w]idespread and longstanding consensus amongst States that customary international law imposes few, if any, restrictions on the right of a State to set and enforce tax laws".[860] Even if such a consensus exists, however, it has little to do with the jurisdiction of this Tribunal or the arbitrability of tax-related investment disputes under this Treaty which is conventional international law, and thus, by its very nature, is not to be equated to customary international law because it represents a negotiated advance on such rules as between the two Contracting Parties. Indeed, it may well be that sovereign measures of general taxation might call for a deferential scrutiny under international law, since such

---

[856] OECD Committee on Fiscal Affairs, Transfer Pricing and Multinational Enterprises – Three Taxation Issues, June 1984, RLA-184, ¶ 115(c).

[857] *Ibid*.

[858] *Id.*, p. 3.

[859] OECD, *Multilateral Convention to Implement Tax Treaty Related Measures to Prevent Base Erosion and Profit Shifting*, Part VI, 24 November 2016, CLA-284.

[860] R-Rejoinder, ¶ 77.

measures are arguably likely to qualify as a legitimate exercise of the State's police or regulatory powers, depending on the circumstances. This has no bearing on the question of who is competent to carry out such scrutiny, whatever its scope. In other words, what customary international law, or more relevantly, the BIT's standards of protection, require in respect of tax-related measures is an issue for the merits, which should not be conflated with the question of the Tribunal's jurisdiction or the arbitrability of tax-related investment disputes.

835.    For these reasons, the Tribunal is not convinced that tax-related investment disputes are not arbitrable as a matter of international public policy.

836.    The Tribunal thus concludes that the Parties have consented to submit the present dispute to the jurisdiction of this Tribunal, and that in doing so, the Parties have not acted contrary to the Dutch notion of arbitrability, or to international public policy.

### 4.    Maturity of the claims

837.    The Parties disagree on whether the Claimants' claims are mature and thus, whether they can be arbitrated before this Tribunal.

### a.    The Respondent's position

838.    The Respondent argues that "the Claimants' claim is inadmissible because it is premature".[861] The Respondent's case is that "the Claimants have not made appropriate use of the dispute settlement procedures available to them under the Income Tax Act and generally under Indian law", which "means that various questions which are essential to the task of this Tribunal in determining the Claimants' claims have not yet been ventilated before and clarified by the bodies which are best qualified to answer those questions (i.e., the Indian courts)".[862] For the Respondent, this objection "goes to the admissibility of the Claimants' claim".[863]

839.    This objection, so says the Respondent, does not "impl[y] a requirement for exhaustion of remedies under the BIT".[864] It is rather "based on sound principle and precedent, that an investor cannot prove an international wrong based on lower tier decisions of the State's administrative and judicial authorities, without taking appropriate action to test those decisions before the system of law designed for that purpose, i.e. (in the present case) the Indian judicial system".[865]

840.    For the same reason, the Claimants' attempt "to portray this issue as being one of 'ripeness' is an oversimplification that is unhelpful and inappropriate on the facts of this

---

[861]    R-Rejoinder, ¶ 51; R-PHB, ¶ 43.

[862]    R-PHB, ¶ 43.

[863]    Transcript, Evidentiary Hearing, Day 1, 194:9-10.

[864]    R-PHB, ¶ 52.

[865]    *Ibid*.

case".[866] The Respondent contends that "the Claimants' claim involves untested issues of Indian law which are central to the resolution of this dispute, including the constitutionality of the 2012 Clarification, as well as the issues of abuse and the operation of section 2(47)(vi) of the Income Tax Act", all of which are issues in which appropriate deference should be given to the Indian courts and their jurisdiction to rule on these issues.[867] The Claimants have refused to bring the issue of constitutionality before the Indian courts, and "have instead come directly to an international tribunal which inevitably has to consider as part of its deliberations whether or not the 2012 Clarification was permissible as a matter of Indian law".[868]

841.    The Respondent cites several investor-State arbitration decisions to support its position. In particular, it relies on *Generation Ukraine v. Ukraine*, where the tribunal found that "the failure to seek redress from national authorities disqualifies the international claim, not because there is a requirement of exhaustion of local remedies but because the very reality of conduct tantamount to expropriation is doubtful in the absence of a reasonable – not necessarily exhaustive – effort by the investor to obtain correction".[869]

842.    Similarly, in *Feldman v. Mexico*, the tribunal found that the claimant had failed to seek clarifications related to the availability of tax rebates before the Mexican authorities "at his peril", since the impugned tax measures at issue were "subject to extensive formalities in Mexico and in most other countries of the world".[870]

843.    In *Parkerings v. Lithuania*, the tribunal held that the claimant's failure to challenge the decision of the Vilnius municipality to terminate the agreement concluded with the claimant's subsidiary on the development of the public parking system in Vilnius, was one of the factors undermining the expropriation claim.[871]

844.    Similarly, one of the issues in *Jan de Nul v. Egypt* was whether the dispute concerning the respondent's alleged failure to adhere to certain representations made during the 1992 tender for the development of the Suez Canal was within the temporal scope of the tribunal's jurisdiction, given that the 2002 Netherlands-Egypt BIT expressly excluded from its scope disputes that had arisen prior to its entry into force. The tribunal concluded that the dispute arose in 2003, i.e., only after the respondent's administrative court had rejected the claimants' claims. In reaching this conclusion, the tribunal highlighted that "there is a clear trend of cases requiring an attempt to seek redress in domestic courts before bringing a claim for violations of BIT standards irrespective of any obligation to exhaust local remedies".[872]

---

[866]   R-PHB, ¶ 55.

[867]   R-PHB, ¶ 52.

[868]   *Id.*

[869]   *Generation Ukraine v. Ukraine*, ICSID Case No. ARB/00/9, Award, 16 September 2003, RLA-43, ¶ 20.30.

[870]   *Feldman v. Mexico*, ICSID Case No. ARB(AF)/99/1, Award, 16 December 2002, RLA-44, ¶ 114.

[871]   *Parkerings-Compagniet AS v. Lithuania*, ICSID Case No. ARB/05/8, Award, 11 September 2007, CLA-38, ¶ 453.

[872]   *Jan de Nul N.V. and Dredging International N.V. v. Egypt*, ICSID Case No. ARB/04/13, Decision on Jurisdiction, 16 June 2006, RLA-174, ¶ 121.

845.   According to the Respondent, the three main issues at stake in the present dispute are (a) whether the 2006 Transactions were an abusive tax avoidance scheme, and thus, taxable irrespective of the 2012 Amendment; (b) whether tax was in any event due under Section 2(47)(vi) of the ITA prior to 2012; and (c) whether the 2012 Amendment is constitutional under the settled principles of Indian constitutional law. The Respondent submits that these matters are to be resolved under Indian law. Even if the Tribunal had jurisdiction, which it does not,[873] it would have to "exercise proper deference to the Indian Court system as regards the answers to these central questions of Indian law".[874]

846.   However, no Indian court has given a ruling on any of these issues to date. While the Claimants have challenged the FAO, they have carefully avoided the key questions concerning the basis of the tax demand and the constitutionality of the 2012 Amendment. This renders the Claimants' initiation of this arbitration premature. For these reasons, India calls upon the Tribunal to prevent the Claimants from "erect[ing] this Tribunal as an overarching forum designed to supersede every process of the system of law in which the Claimants chose to 'invest'".[875]

### b.   The Claimants' position

847.   The Claimants submit that the jurisdictional clause contained in Article 9 of the BIT vests the Tribunal with competence to decide "any dispute […] in relation to an investment" and does not contain a requirement of exhaustion of local remedies. The Respondent is essentially asking the Tribunal to rewrite the freely-negotiated Treaty and to read a non-existent requirement of exhaustion of remedies into it.

848.   According to the Claimants, the Respondent's position is disingenuous. In a memorandum prepared in February 2016 by the MoF, the Respondent recognised the distinction between ripeness and exhaustion of remedies. According to the memorandum, "[t]o be ripe, claims must be based on government conduct that is final and legally binding, and inflicts a definitive and concrete injury capable of being assessed as a breach", while "exhaustion relates to the process that must be followed".[876] India must be precluded from disavowing its official position on the interpretation of its BITs based on its current litigation interests.

849.   Investment treaty jurisprudence does not support India's attempt to reintroduce the exhaustion requirement into a treaty that does not contain one. The Respondent relies heavily on *Generation Ukraine v. Ukraine*. The *ad hoc* committee in *Helnan v. Egypt* cautioned against reading too much into the dictum pronounced in this case, since it is "somewhat outside the *jurisprudence constante*".[877] In any event, the *Generation*

---

[873]   See above India's jurisdictional objections.

[874]   Rejoinder, ¶ 56.

[875]   *Id.*, ¶ 66.

[876]   Government of India, MoF, Department of Economic Affairs, Investment Division, *Office Memorandum: Issuing Joint Interpretative Statements for Indian Bilateral Investment Treaties*, 8 February 2016, CLA-251, p. 8, n. 5.

[877]   *Helnan International Hotels A/S v. Arab Republic of Egypt*, ICSID Case No. ARB/05/19, Decision of the *ad hoc* Committee, 14 June 2010, CLA-87, ¶ 49.

*Ukraine v. Ukraine* case is inapposite, since in the present case the Claimants do not "seize upon an act of maladministration, no matter how low the level of the relevant governmental authority".[878] The FAO of which the Claimants complain is a final and binding administrative act issued pursuant to an act of the Indian Parliament, which in itself had overturned a decision of the Supreme Court. Nor did the Claimants "abandon [their] investment without any effort at overturning the administrative fault".[879] Instead, they actively participated in every procedural step leading up to the issuance of the FAO and challenged the tax assessment before the ITAT. Therefore, *Generation Ukraine* offers no support to the Respondent's misconceived objection.

850. *Jan de Nul v. Egypt* is even more inapposite. Nowhere in that case did the tribunal require the claimants to exhaust local remedies. Instead, it recognised that there is "no requirement for a mandatory pre-trial before the local courts".[880] The resort to local courts was relevant insofar as it helped establish the date on which the treaty dispute "crystallized" for the purposes of the *ratione temporis* provision of the applicable investment treaty.

851. As for *Waste Management v. Mexico (II)* and *Parkerings v. Lithuania*, both of these cases concerned situations in which the State's breaches had been originally contractual in nature. These tribunals found that, for those contractual breaches to qualify as possible treaty violations, the claimants should have first adjudicated their contractual claims before the relevant *fora* of contractual dispute resolution. The failure by the claimants to challenge the impugned contractual breaches thus proved fatal to their claims. This has nothing to do with the present case, where the conduct of which the Claimants complain is indisputably sovereign conduct by India's legislative and executive organs, fully attributable to India.

852. The Claimants further deny that this Tribunal cannot decide on the Claimants' claims in the absence of determinations regarding whether the 2006 Transactions were chargeable under the applicable Indian tax law, or whether the 2012 Amendment was consistent with the Indian Constitution. The mandate of a treaty tribunal is to adjudicate the respondent State's compliance with the applicable treaty standards, not with domestic law. In carrying out this mandate, it is well established that treaty tribunals are fully competent to apply domestic law. As the *Crystallex v. Venezuela* tribunal reasoned, investors do not need to obtain determinations from local courts as a condition of establishing the merits of their international claims.[881]

853. Thus, contrary to the Respondent's assertion, the Claimants do not seek to erect this Tribunal as an appeals mechanism for the decisions of Indian courts or its administrative organs. International protections under the Treaty exist in parallel to those under Indian law, and the Treaty expressly vests the Tribunal with the authority to decide any

---

[878] *Generation Ukraine v. Ukraine*, ICSID Case No. ARB/00/9, Award, 16 September 2003, RLA-43, ¶ 20.30.

[879] *Ibid*.

[880] *Jan de Nul N.V. and Dredging International N.V. v. Egypt*, ICSID Case No. ARB/04/13, Decision on Jurisdiction, 16 June 2006, RLA-174, ¶ 121.

[881] *Crystallex International Corporation v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB(AF)/11/2, Award, 4 April 2016, CLA-19, ¶ 710.

investment dispute. The Claimants therefore ask the Tribunal to assume this mandate and dismiss India's attempt to rewrite the Treaty.

### c.   The Tribunal's analysis

854.   Prior to entering into the substance of the Respondent's objection on the maturity of the claims, the Tribunal must ask itself whether this is properly characterised as a jurisdictional or admissibility objection, or whether it is a defence on the merits.

855.   The Respondent does not contend that its objection goes to the Tribunal's jurisdiction, and rightly so. It is common ground between the Parties that the BIT does not contain a requirement of exhaustion of local remedies as a pre-condition to the jurisdiction of the tribunal or the admissibility of the claims.[882] Instead, Article 9 of the BIT mandates the Tribunal to resolve "[a]ny dispute between an investor of one Contracting Party and the other Contracting Party in relation to an investment of the former".[883]

856.   Rather, the Respondent's case is that the claims are premature and thus inadmissible. Indeed, it is well-accepted that the prematurity of a claim may render it inadmissible until the claim becomes ripe for decision.[884]

857.   Here, however, the Tribunal agrees with the Claimants that the claims are ripe. As the memorandum by the MoF explains, when the applicable treaty contains no requirement of exhaustion of local remedies, claims are ripe for international arbitration if they can be found to be "based on government conduct that is final and legally binding, and inflicts a definitive and concrete injury capable of being assessed as a breach".[885] This is precisely the case here. The measure that underlies the claims (the FAO) is a binding sovereign act that India has been enforcing with coercive power. The claims are thus based on what can be characterised as measures that amount to a "treatment" of the Claimants' investment that can be potentially assessed for breaches of the relevant substantive standards of the BIT. Accordingly, to the extent that the Respondent is arguing that the claims are not ripe, its objection fails.

858.   The Respondent has clarified however that its objection is *not* that the claims are premature in the sense that they are not ripe; rather, the Respondent bases its objection on what it calls a "sound principle and precedent, that an investor cannot prove an international wrong based on lower tier decisions of the State's administrative and judicial authorities, without taking appropriate action to test those decisions before the system of law designed for that purpose".[886] Accordingly, the question before the

---

[882]   R-Rejoinder, ¶ 52.

[883]   CLA-1.

[884]   See, e.g., *SGS Société Générale de Surveillance S.A. v. Republic of the Philippines*, ICSID Case No. ARB/02/6, Decision on Jurisdiction, 29 January 2004, Exhibit RLA-23, ¶ 171; *Ickale Insaat Limited Sirketi v. Turkmenistan*, ICSID Case No. ARB/10/24, Award, 8 March 2016, Exhibit CLA-148, ¶ 242.

[885]   Government of India, MoF, Department of Economic Affairs, Investment Division, *Office Memorandum: Issuing Joint Interpretative Statements for Indian Bilateral Investment Treaties*, 8 February 2016, CLA-251, p. 8, n. 5.

[886]   R-Rejoinder, ¶ 52.

Tribunal is whether the Claimants' failure to challenge the disputed measures before the relevant domestic *fora* has rendered the claims otherwise inadmissible.

859.  To establish that the claims are inadmissible, the Respondent must show a ground impeding the Tribunal from exercising its jurisdiction. For instance, it must demonstrate that by failing to challenge the impugned acts before the relevant domestic *fora*, the Claimants have waived their claims or are otherwise estopped from bringing them in this arbitration. The Respondent has not, however, argued waiver or estoppel, and rightly so.

860.  Instead, the Respondent contends that, by admitting claims that have not been properly tried at the domestic level, this Tribunal would act as an appellate tribunal, which would be contrary to the Tribunal's agreed-upon mandate.[887] The Tribunal is not convinced. The nature of the Tribunal's scrutiny of the measures challenged in this arbitration is fundamentally different from that of an appellate court. The Tribunal's task is to determine whether the Respondent has breached the applicable substantive standards of the BIT. To establish a treaty violation, and more particularly an FET violation, the investor needs to demonstrate fundamental shortcomings, such as arbitrariness, unreasonableness, discrimination, or infringement of the general principles of procedural fairness, rule of law, legal certainty, or respect of legitimate expectations. To determine whether this has occurred, the Tribunal does not sit as an appellate tribunal with respect to the acts of local courts or State organs, because its task does not entail scrutinizing the respondent State's conduct for ordinary errors of law and fact.

861.  Whether or not an investor has previously resorted to domestic *fora* has little to do with the problem of a treaty tribunal improperly acting as an appellate instance. Indeed, even where the investor has exhausted all judicial instances, a treaty tribunal that misapplies the applicable treaty standards could nevertheless act as a (fourth) appellate tribunal by purporting to scrutinise ordinary errors of law and fact.

862.  In this particular case, to establish an FET violation, the Claimants would need to show more than just erroneousness or unlawfulness of India's measures under Indian law. Indeed, the Claimants do not appear to impugn the FAO or the 2012 Amendment on the ground of unlawfulness under Indian law. Rather, they accuse India of changing the applicable legal framework retroactively and without rational justification, contrary to the principle of legal stability and the Claimants' legitimate expectations.

863.  It is true that in assessing Cairn's claims under international law and the BIT, the Tribunal may need to determine incidental issues of Indian law. By way of example, in order to assess whether the 2012 Amendment retroactively changed the scope of application of Section 9(1)(i) of the ITA, the Tribunal may need to assess the scope of application of that section prior to and after the 2012 Amendment. The Tribunal should make this assessment independently from, although not in ignorance of, any relevant determinations of India's organs. If treaty tribunals refused to perform this independent analysis, investment disputes would be rendered self-judging by respondent States, and the only wrongful act that a claimant investor would ultimately be able to complain of at a treaty level would be denial of justice. Such an interpretation would run afoul of the

---

[887]  Transcript, Evidentiary Hearing, Day 1, 200:4-14.

text and the object and purpose of the BIT, as it would render most of its substantive provisions obsolete. It is precisely such blind deference to the respondent State's assessment of its own laws that would arguably constitute a misinterpretation of the Tribunal's mandate under Article 9 of the BIT.

864.   In line with this reasoning, the *ad hoc* committee in *Helnan v. Egypt* annulled a decision that required Helnan to have challenged a minister's decision on the termination of a management contract before Egyptian administrative courts. The Committee reasoned:

> [T]he decision of a Government Minister, taken at the end of an administrative process […] is one for which the State is undoubtedly responsible at international law, in the event that it breaches the international obligations of the State. Moreover, the characterization of such an act as unlawful under international law is not affected by its characterization as lawful under internal law. Thus a decision by a municipal court that the Minister's decision was lawful (a judgment which such a court could only reach applying its own municipal administrative law) could not preclude the international tribunal from coming to another conclusion applying international law.[888]

865.   Accordingly, the Tribunal's mandate to resolve "[a]ny dispute […] in relation to an investment" includes the authority to ascertain independently the content of the domestic law, where this is necessary. This does not entail sitting in judgment of ordinary errors of fact or law that the Respondent's organs, including its courts, may have made. Unlike an appellate court, the Tribunal is not tasked with determining whether India's organs erred in the application of Indian law. This does not prevent the Tribunal from making such a finding if this is incidental to discharging its mandate, which is to determine whether India's treatment of the Claimants' investment was consistent with the substantive standards of the BIT.

866.   The Tribunal has concluded that the claims are ripe for international arbitration, and that the fact that the Tribunal may need to scrutinise the acts of the Respondent's organs does not render the claims otherwise inadmissible. India's objection on the maturity of the claims does not therefore go to the Tribunal's authority to resolve the dispute; nor does it relate to any recognised ground of inadmissibility of claims.

867.   Rather, the Respondent's objection properly goes to the merits of this dispute. The Tribunal recalls that the Respondent bases its objection on what it calls a "sound principle and precedent, that an investor cannot prove an international wrong based on lower tier decisions of the State's administrative and judicial authorities, without taking appropriate action to test those decisions before the system of law designed for that purpose".[889] Aside from whether or not such principle and precedent indeed exists in investment treaty law, the Claimants' ability to "*prove an international wrong*" remains a quintessential issue of the merits.

---

[888]   *Helnan International Hotels A/S v. Arab Republic of Egypt*, ICSID Case No. ARB/05/19, Decision of the *ad hoc* Committee, 14 June 2010, CLA-87, ¶ 51.

[889]   *Ibid*.

868. Unsurprisingly, the cases on which the Respondent relies have consistently treated the investor's failure to seek reasonable redress from domestic *fora* as an issue for the merits, when the applicable treaties contained no specific requirement of exhaustion of local remedies. The tribunal's reasoning in *Generation Ukraine v. Ukraine* that "it is not enough for an investor to seize upon an act of maladministration, no matter how low the level of the relevant governmental authority; to abandon his investment without any effort at overturning the administrative fault; and thus to claim an international delict"[890] is indisputably contained in the merits section of the award. In turn, in the preliminary objections section, the tribunal found that the claims "allege expropriatory acts attributable to Ukraine and thus fall within the Tribunal's jurisdiction *ratione materiae* as giving rise to a dispute with respect to a right created by the BIT".[891] Thus, the tribunal's finding that the claims were based on a mere administrative fault, which the claimant did not sufficiently seek to overturn, undermined the merits of the claims, not their admissibility or the competence of the tribunal.

869. Similarly, in *Feldman v. Mexico*, the tribunal found that the claimant's failure to seek clarifications on tax rebates before the relevant domestic authorities in a timely manner undermined the merits of his expropriation claim.[892] The tribunal explained that, although the claimant had "experienced great difficulties in dealing with [tax] officials […] that treatment under the circumstances of this case d[id] not rise to the level of a violation of international law".[893] Indeed, as explained above, a mere maladministration is not sufficient to constitute a treaty violation. If the investor remains unreasonably passive in face of this type of maladministration, this would further undermine the credibility of its claim. This is, however, an issue for the merits, and the *Feldman* tribunal rightly treated it as such.

870. In *Jan de Nul v. Egypt*, the tribunal concluded that, for the purposes of the *ratione temporis* scope of the treaty, the dispute crystallised only after the Egyptian court of Ismaïlia dismissed the claimant's contractual claims, and not when those contractual claims arose. The key point that the tribunal made was that the claimant's contract claims turned into treaty claims only after the Court of Ismaïlia adopted the judgment:

> [T]he claims regarding the judgment and the manner in which the Egyptian courts dealt with the dispute address the actions of the court system as such, and are thus separate and distinct from the conduct which formed the subject matter of the domestic proceedings. Hence, they do not coincide with the conduct examined in the course of the dispute brought under domestic law.[894]

871. Indeed, when the claims originate from a contractual as opposed to a sovereign conduct, a treaty dispute may arise only after the State affects those contract claims by using its

---

[890] *Generation Ukraine v. Ukraine*, ICSID Case No. ARB/00/9, Award, 16 September 2003, RLA-43, ¶ 20.30.

[891] *Id.*, ¶ 17.3.

[892] *Feldman v. Mexico*, ICSID Case No. ARB(AF)/99/1, Award, 16 December 2002, RLA-44, ¶ 114.

[893] *Id.*, ¶ 113.

[894] *Jan de Nul N.V. and Dredging International N.V. v. Egypt*, ICSID Case No. ARB/04/13, Decision on Jurisdiction, 16 June 2006, RLA-174, ¶ 119.

sovereign powers, e.g., through its judiciary.[895] However, this does little to support the Respondent's argument that Cairn's claims, which refer to the Respondent's indisputably sovereign conduct, are inadmissible in this arbitration on account of an unwritten requirement to "ventilate" the underlying issues of the municipal law before the domestic *fora*.

872.  Similarly, in *Parkerings v. Lithuania*, the tribunal was clear that the claimant's failure to challenge the measures of the Vilnius Municipality was an issue of the merits:

> Prima facie, the conduct of the Republic of Lithuania through its subdivision constituent (the Municipality of the City of Vilnius) had an impact on the investment of the Claimant. The claims are therefore in connection with the investment and fall under the Treaty. The Arbitral Tribunal emphasizes that the substantive justification of the Claimant's claims is not a matter of jurisdiction but of merit. […]
>
> As the claims fall under the Treaty, whether the Claimant should have submitted the dispute before the Lithuanian courts is not relevant at the stage of examination of the jurisdiction.[896]

873.  For these reasons, the Tribunal concludes that the Claimants' alleged failure to challenge India's measures before the relevant domestic *fora* is not an issue of jurisdiction or admissibility but rather one that pertains to the merits of the case. Consequently, the Tribunal will assess the significance of the alleged absence of determinations by Indian courts on issues such as the constitutionality of the 2012 Amendment and the taxability of the 2006 Transactions under Section 2(47)(vi) ITA, if necessary, in the analysis of the merits below.

\* \* \*

874.  Having disposed of the Respondent's preliminary objections, the Tribunal concludes that it has jurisdiction to resolve the present dispute and that the Claimants' claims are admissible in this arbitration.

## VII.  LIABILITY

875.  The Claimants allege that, by retroactively applying capital gains tax on a transaction – the CIHL Acquisition – that was not liable to tax when it took place, and by attaching and enforcing against CUHL's assets to obtain payment of the tax demand, the Respondent has breached its obligations under the Treaty. The Claimants also complain of arbitrary and discriminatory treatment and bad faith on the part of the Indian

---

[895]   See, e.g., *Impregilo v. Pakistan*, ICSID Case No. ARB/03/3, Decision on Jurisdiction, 22 April 2005, RLA-265, ¶ 281; *Azurix Corp. v. Argentine Republic*, ICSID Case No. ARB/01/12, Award, 14 July 2006, ¶ 315; *Parkerings-Compagniet AS v. Lithuania*, ICSID Case No. ARB/05/8, Award, 11 September 2007, CLA-38, ¶ 443.

[896]   *Parkerings-Compagniet AS v. Lithuania*, ICSID Case No. ARB/05/8, Award, 11 September 2007, CLA-38, ¶¶ 265-66.

Government in the manner in which CUHL has been pursued and treated in connection with the Respondent's fiscal measures.[897] In particular, the Claimants argue that the Respondent has:[898]

    a.    Failed to create favourable conditions for the Claimants' investment and to accord the Claimants and their investment FET, as required by Article 3 of the Treaty;

    b.    Unlawfully expropriated CUHL's investment in CIL without providing fair and equitable compensation, and subjected the Claimants' investment to measures having an effect equivalent to expropriation in violation of Article 5 of the Treaty; and

    c.    Violated the Claimants' right under Article 7 of the Treaty to the unrestricted transfer of their investments and returns by depriving CUHL of the ability to sell its remaining CIL shares and to repatriate the proceeds, as well as the dividends that have accrued in respect of such shares.

876.    The Respondent denies that there has been a breach of the Treaty. The Respondent's argument is two-pronged:[899]

    a.    First, the Respondent argues that, as a matter of Indian law, the share transfers that made up the CIHL Acquisition were taxable in 2006 irrespective of the 2012 Amendment, because it was a tax avoidant transaction and thus taxable under the "look at doctrine", and because it involved the transfer of immovable property, which is taxable under Section 2(47)(vi) of the ITA 1961.

    b.    In any event, the 2012 Amendment did not give rise to a breach of the Treaty (whether of FET or otherwise[900]) because (i) it was clarificatory and not retroactive, and (ii) even if it was found to be retroactive, retroactive taxation is lawful in India and was thus a part of the legislative framework in which the Claimants invested.

877.    The Respondent's argument could be understood to be raising point (a) as a preliminary matter. However, as the Respondent itself has stated, "the legitimacy of the Respondent's impugned taxation of the Claimants' capital gains is to be assessed by reference to well-established principles regarding the FET standard",[901] and, the Tribunal may add, by reference to the remaining treaty standards invoked by the Claimants. The Tribunal will thus assess the question of whether the CIHL Acquisition was taxable irrespective of the 2012 Amendment in the context of the Claimants' FET claim, which is the claim the Tribunal will address first.

---

[897]  C-PHB, ¶ 4.

[898]  C-SoC, ¶ 296.

[899]  R-SoD, ¶ 9.

[900]  As explained in Section IV.B above, the Respondent argues that the only colourable claim is the Claimants' FET claim, on which the other two depend. See R-SoD, ¶ 6.

[901]  R-SoD, ¶ 248.

878. The Tribunal will structure its analysis of the Treaty breaches alleged by the Claimants as follows. It will first address the Claimants' FET claim under Article 3(2), which is, according to the Respondent, the overarching treaty claim upon which the remaining claims depend (Section A). Depending on the results of its conclusions, it will then address the Claimants' remaining treaty claims (Section B).

## A.      Fair and Equitable Treatment (Article 3(2))

### 1.      The Claimants' position

879. The Claimants contend that, by imposing the capital gains tax on the CIHL Acquisition on the basis of the 2012 Amendment to the ITA 1961, and then taking enforcement action in respect of the Claimants' remaining assets in India, the Respondent has treated the Claimants unfairly and inequitably, in breach of its obligation under Article 3(2) of the Treaty. In particular, the Claimants complain that the FAO, which applied the 2012 Amendment to the CIHL Acquisition, retroactively imposed capital gains tax on a transaction that was not taxable at the time that it was carried out. The Claimants further contend that the Respondent's defences based on theories of tax abuse and Section 2(47)(vi) of the ITA are meritless.

880. The Tribunal will start by summarising the Claimants' position on the content of the FET standard (Section (a) below). It will then address the Claimants' argument that the Respondent retroactively taxed the CIHL Acquisition in breach of its FET obligation under the BIT (Section (b) below). The Tribunal will complete this summary by addressing the Claimants' arguments with respect to the Respondent's tax abuse defence (Section (c) below) and its defence based on Section 2(47)(vi) of the ITA (Section (d) below).

#### a.      The FET standard

881. Citing case law and scholarly opinion, the Claimants submit that the FET standard has been described as a "broad and widely accepted standard encompassing such fundamental standards as good faith, due process, non-discrimination, and proportionality",[902] and as "the embodiment of the rule of law".[903] In practice, the Claimants submit that "the FET standard requires States to act in a manner consistent with the legitimate expectations of investors, which include the obligation to ensure the stability of the applicable legal framework, treat investors in a manner that is not arbitrary or unfair and act in a consistent and transparent manner."[904]

882. The Claimants further submit that the FET standard is "an objective requirement unrelated to whether the [host State] has had any deliberate intention or bad faith in adopting the measures in question", although "such intention and bad faith can

---

[902]   C-SoC, ¶ 325, citing *MTD Equity Sdn. Bhd. and MTD Chile S.A. v. Republic of Chile*, ICSID Case No. ARB/01/7, Award, 25 May 2004, CLA-49, ¶ 109.

[903]   *Ibid.*, citing Stephen Schill, "Fair and Equitable Treatment under Investment Treaties as an Embodiment of the Rule of Law", 3(5) TDM (December 2006), CLA-66, p. 29.

[904]   C-SoC, ¶ 327.

aggravate the situation".[905] Nor must the State's conduct be considered "shocking", "outrageous", or "egregious" to breach the FET standard.[906]

883. According to the Claimants, the FET standard is an autonomous standard, whose content must be established in accordance with the rules of treaty interpretation set out in the VCLT.[907] This content depends neither on the customary international law minimum standard of treatment (the "minimum standard of treatment" or "MST")[908] nor, in the present case, on the Indian Constitution.[909] The Claimants reject in particular the Respondent's attempt to equate the FET standard to the minimum standard of treatment of aliens as formulated in the 1926 decision of the US-Mexican Claims Commission in the *Neer* case.[910]

884. For this reason, the Claimants submit that they need not establish that the 2012 Amendment was unconstitutional or contrary to customary international law; they only need to show that it contradicted one of the core protections guaranteed by the broad and unqualified FET provision contained in Article 3(2) of the BIT.

885. Relying on the case law of investment treaty tribunals, the Claimants submit that the FET standard contained in the BIT encompasses the following core principles:[911]

    a. *Legal Stability*: The tribunal in *Occidental v. Ecuador* recognised that "stability of the legal and business framework is […] an essential element of fair and equitable treatment", and found an FET breach when "the framework under which the investment was made and operate[d] ha[d] been changed in an important manner by the actions adopted by the [tax authority]".[912]

    b. *Consistency*: The *Crystallex v. Venezuela* tribunal recognised that FET requires the State to act with "transparency and consistency",[913] while the *Arif* tribunal found that the "direct inconsistency between the attitudes of different organs of the State to the investment […] in itself amounts to a breach of the fair and equitable treatment standard".[914]

---

[905] *Id.*, ¶ 326, citing *CMS Transmission Company v. Argentine Republic*, ICSID Case No. ARB/01/8, Award, 12 May 2005, CLA-46, ¶ 280.

[906] *Ibid.*, citing *Mondev International Ltd. v. United States of America*, ICSID Case No. ARB(AF)/99/2, Award, 11 October 2002, CLA-51, ¶ 116.

[907] C-Updated Reply, ¶¶ 529-533.

[908] *Id.*, ¶¶ 520-528.

[909] See Section VII.A.3.f(i)(1).

[910] *LFH Neer and Pauline Neer (USA) v. United Mexican States* (1926) IV UNRIAA 60, CLA-194, pp. 61-62.

[911] C-Updated Reply, ¶ 599.

[912] *Occidental Exploration and Production Company v. Republic of Ecuador*, LCIA Case No. UN3467, Final Award, 1 July 2004, CLA-48, ¶¶ 183-184.

[913] *Crystallex International Corporation v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB(AF)/11/2, Award, 4 April 2016, CLA-19, ¶ 543.

[914] *Franck Charles Arif v. Republic of Moldova*, ICSID Case No. ARB/11/23, Award, 8 April 2013, CLA-155, ¶ 547(b).

c.   *Transparency*: The tribunal in *L.E.S.I. v. Algeria* confirmed that the FET "obligation means that the State must act in a consistent, unambiguous and transparent manner, that it must maintain an environment that is stable enough to enable a reasonably diligent investor to adopt a commercial strategy, and that it must act in a non-arbitrary or discriminatory manner and without misuse of powers and in compliance with its commitments".[915]

d.   *Predictability*: The tribunal in *Tecmed v. Mexico* confirmed that FET obligates a State to allow investors to "know beforehand any and all rules and regulations that will govern its investments, as well as the goals of the relevant policies and administrative practices or directives, to be able to plan its investment and comply with such regulations".[916]

e.   *Protection of legitimate expectations*: The tribunal in *Micula v. Romania* observed that "an overwhelming majority of cases supports the contention that […] where the state has acted in such a way so as to generate a legitimate expectation in the investor and that investor has relied on that expectation to make its investment, action by the state that reverses or destroys those legitimate expectations will be in breach of the fair and equitable treatment standard and thus give rise to compensation".[917]

f.   *Non-discrimination*: The tribunal in *CMS v. Argentina* recognised that "[a]ny measure that might involve arbitrariness or discrimination is in itself contrary to fair and equitable treatment".[918]

g.   *Substantive propriety*: The *Micula* tribunal observed that "the correct position is that the state may always change its legislation, being aware and thus taking into consideration that […] the state's conduct must be substantively proper".[919]

h.   *Procedural propriety*: The *Micula* tribunal further confirmed the "central role" that FET plays in ensuring "compliance with contractual obligations, procedural propriety and due process, action in good faith and freedom from coercion and harassment".[920]

---

[915]   *L.E.S.I., S.p.A. and Astaldi, S.p.A. v. Popular Democratic Republic of Algeria*, ICSID Case No. ARB/05/3, Award, 12 November 2008, CLA-245, ¶ 151.

[916]   *Técnicas Medioambientales Tecmed S.A. v. United Mexican States*, ISCID Case No. ARB(AF)/00/2, Award, 29 May 2003, CLA-50, ¶ 154.

[917]   *Ioan Micula, et al v. Romania*, ICSID Case No. ARB/05/20, Final Award, 11 December 2013, CLA- 23, ¶ 667.

[918]   *CMS Transmission Company v. Argentine Republic*, ICSID Case No. ARB/01/8, Award, 12 May 2005, CLA-46, ¶ 290; Waste Management v Mexico (No 2), ICSID Case No ARB(AF)/00/3, Award, 30 April 2004, RLA-92, ¶ 98.

[919]   *Ioan Micula, et al v. Romania*, ICSID Case No. ARB/05/20, Final Award, 11 December 2013, CLA- 23, ¶ 529.

[920]   *Id.*, ¶ 519.

    i.    *Non-arbitrariness*: The *Crystallex* tribunal stated that "[i]t is beyond peradventure that a conduct that is arbitrary is contrary to FET, whether or not a separate provision on prohibition of 'arbitrary treatment' is present in the treaty".[921]

886.    According to the Claimants, tribunals rely on each of these core principles when applying the FET standard. Contrary to the Respondent's contention, there is no hierarchy between these principles. The breach of any core principle thus may give rise to a treaty breach, although tribunals often evaluate multiple, overlapping FET strands within the factual context of each case, rather than in an abstract manner.

### b.    The FAO taxed the Claimants retroactively in breach of the FET standard

887.    The Claimants contend that, by applying the 2012 Amendment to the CIHL Acquisition, the Respondent taxed that transaction retroactively in breach of the FET standard. The Claimants' FET case is essentially the following: the 2012 Amendment was not merely clarificatory but rather fundamentally changed Indian tax law on a retroactive basis (Section (i) below). The FAO against the Claimants relied exclusively on the 2012 Amendment as the ground for taxation, and as a result taxed the CIHL Acquisition retroactively (Section (ii) below). By applying and enforcing the FAO, the Respondent breached "every conceivable strand of the FET standard",[922] in particular the principles of legal stability, predictability, and legitimate expectations (Section (iii) below).

### (i)    The 2012 Amendment fundamentally changed Indian tax law on a retroactive basis, and was not merely clarificatory

888.    The Claimants submit that, contrary to the Respondent's contention, the 2012 Amendment fundamentally changed Indian tax law on a retroactive basis and was not merely clarificatory in nature.

889.    According to the Claimants, the meaning of the fourth limb of Section 9(1)(i) of the ITA 1961, as it stood before the 2012 Amendment, was "plain and unambiguous": the provision applied to the transfer of capital assets "situate in India", and not to capital assets situated abroad.[923] For purposes of this provision, a share in a company incorporated outside of India was an asset situated abroad, even if the foreign company owned capital assets situated in India. This is because "India has always observed the rule of territoriality while taxing non-residents", and "Indian law clearly recognizes the principle of separate entity, i.e. a company is distinct from its shareholders, and that the situs of a share is the place of the company's incorporation."[924] It was thus clear to all stakeholders that, under the ITA 1961, shares in companies were capital assets that were

---

[921]    *Crystallex International Corporation v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB(AF)/11/2, Award, 4 April 2016, CLA-19, ¶ 577.

[922]    C-Updated Reply, ¶ 599.

[923]    C-SoC, ¶ 304.

[924]    C-PHB, ¶ 18.

situated in the company's country of incorporation,[925] and transfers by non-residents of shares in companies incorporated outside of India (also referred to as "indirect transfers") did not fall within the ambit of Section 9(1)(i).

890.  According to the Claimants, until the 2012 Amendment, the law was "settled" in this respect. While the Claimants acknowledge that, prior to the 2012 *Vodafone* decision, no Indian court had ever interpreted the fourth limb of Section 9(1)(i),[926] they argue that "when a statute is clear and unambiguous and its interpretation has not been challenged for decades of its existence, then the law is considered settled".[927] According to the Claimants, the following elements in the record support their contention that the law was settled prior to the *Vodafone* decision:

a.  The 2002 Task Force, a high-level government committee, noted that "Section 9(1)(i) applied only to transfers of capital assets 'situated in India' and expressly clarified that these only included shares 'in a company incorporated in India'".[928]

b.  In a decision in proceedings against Tata in 2011, the Bombay High Court reaffirmed the general principle that "income accrued to a nonresident on account of sale of shares of a foreign Company would not [be] taxable in India", noting that colourable transactions were exceptions to that rule.[929] According to the Claimants, this decision stands as affirmative evidence that Section 9(1)(i) did <u>not</u> cover indirect transfers at the time."[930]

c.  The ITD's conduct prior to and during its "test case" against Vodafone confirms that, at least until 2007, the ITD understood that indirect transfers were not covered by the fourth limb of Section 9(1)(i). The Acting Chairman of the CBDT expressly recognised that the Vodafone assessment was a "test case" for the ITD,[931] and its origin demonstrates that "the Respondent was aware that charging such a transaction would be out of the ordinary, but was nonetheless interested in exploring methods to tax it."[932] The Claimants point out that on 8 March 2007, the Department of Revenue forwarded Vodafone's FIPB file to the ITD, directing it to issue a report on the "taxability or otherwise" of the Hutchison-Vodafone

---

[925]  C-SoC, ¶ 299, referring to *Vodafone International Holdings B.V. v. Union of India & Anr.* [2012] 6 SCC 613, Exh. C-59, ¶ 127. (The "[s]itus of shares situates at the place where the company is incorporated and/or the place where the share can be dealt with by way of transfer"); *Salomon v. Salomon* [1897] A.C. 22, Exh. Gardiner-28.

[926]  C-PHB, ¶ 27.

[927]  *Id.*, ¶ 26, citing Transcript, Evidentiary Hearing, Day 8, 21:1-21:16 (Mr Datar).

[928]  *Id.*, ¶ 24, citing Task Force on Direct Taxes, Report of the Task Force on Direct Taxes (December 2002), Exh. C-133, p. 56, n. 14.

[929]  *Id.*, ¶ 54, citing *Aditya Birla Nuvo v. Deputy Director of Income Tax (International Taxation) and Union of India, through the Ministry of Finance*, [2012] 342 ITR 308 (Bom), Exh. R-77, ¶¶ 91, 96.

[930]  *Id.*, ¶ 54; Transcript, Evidentiary Hearing, Day 8, 227:14-228:14 (Mr Puri).

[931]  C-PHB, ¶ 48, citing *inter alia* to "Govt to look into Vodafone-like deals: CBDT" (The Press Trust of India, 8 September 2010), Exh. C-332 (quoting acting Chairman Sudhir Chandra as saying, "This (Vodafone case) is a test case, we will look at similar cases. There are already some cases under investigation.").

[932]  *Id.*, ¶ 47.

transaction "under the provisions of the Indian Income-Tax Act, 1961", even "though" it recognised that the transaction involved the "transfer of shares of an overseas company".[933] According to the Claimants, "[i]f indirect transfers were always taxable in India as the Respondent now suggests, there would have been no need for the [Department of Revenue] to commission this exploratory report to see if the Vodafone transaction could be brought to tax under the ITA."[934]

d.   The Respondent has failed to provide evidence of a single instance in which the ITD attempted to tax an indirect transfer prior to the Vodafone assessment. In particular, the Claimants note that the four examples cited by Mr Puri in his First Witness Statement all post-date the initiation of the assessment against Vodafone. As to the assessment launched against Tata mentioned by Mr Puri in his Second Witness Statement, it also post-dates the initiation of the Vodafone assessment and in any event the Respondent has failed to show that it was initiated on indirect transfer grounds.[935] In any event, the Claimants note that the Respondent's position seems to have changed during the course of this arbitration, as at the hearing and in its PHB it sought to argue that the law was not settled on this point.[936]

e.   As discussed further below, the ITD made no attempt to tax the CIHL Acquisition until 2014, after the 2012 Retroactive Amendment had been passed, despite having direct knowledge of the transaction and having reviewed it at least four times between 2008 and 2013.

891.   The Claimants thus contend that the meaning of Section 9(1)(i) was clear in that it did not cover indirect transfers and it had never been interpreted to do so prior to the ITD's attempt to tax Vodafone in late 2007. For the Claimants, this means that the law was "settled" on this point.

892.   The Claimants submit that this understanding was confirmed by the Supreme Court in its 2012 decision in *Vodafone*.[937] In that decision, the Supreme Court held that the Hutchison-Vodafone transaction "was not chargeable under Section 9(1)(i) because from a plain reading of the provision it was clear that Section 9(1)(i) did not contain a 'look through' provision to allow taxing of indirect transfers."[938] Specifically, the Supreme Court held that, in the context of Section 9(1)(i), "[s]hareholding in companies incorporated outside India […] is property located outside India", and that the statute

---

[933]   *Id.*, ¶¶ 5, 46-47, citing Letter from the Department of Revenue to the ITD dated 8 March 2007, Exh. C-360, p. 1, ¶ 3.

[934]   *Id.*, ¶ 5.

[935]   *Id.*, ¶¶ 51-55.

[936]   Transcript, Hearing on Closing Arguments, Day 1, 12:3-21.

[937]   C-SoC, ¶ 313, referring to *Vodafone International Holdings B.V. v. Union of India & Anr.* [2012] 6 SCC 613, Exh. C-59.

[938]   C-PHB, ¶ 28.

cannot "by a process of interpretation be extended to cover indirect transfers of capital assets/property situate in India".[939]

893.   The Claimants submit that the 2012 Amendment radically changed this settled law. Through a series of "Explanations", the 2012 Amendment amended Section 9(1)(i) of the ITA 1961 so as to include in the scope of this provision indirect transfers of capital assets [by non-residents].[940] Specifically, the Claimants point out that Explanation 5 to the amended Section 9(1)(i) (which "shall be inserted and shall be deemed to have been inserted with effect from the 1st day of April, 1962") "clarified" that a share or interest in a company registered or incorporated outside of India "shall be deemed to be and shall always be deemed to have been situated in India, if the share or interest derives, directly or indirectly, its value substantially from the assets located in India".[941]

894.   The Claimants contend that, while these explanations purported to "clarify" that the law "had always taxed indirect transfers by non-residents", they effectively created a new tax retroactively.[942] It "systematically overturn[ed] every ruling of the Supreme Court in *Vodafone*" with respect to the meaning of the terms "situate in India", "through", "capital assets", "transfer", and "withholding tax."[943]

895.   According to the Claimants, the retroactive nature of the 2012 Amendment is confirmed by (i) the history of the ITA 1961, (ii) the Supreme Court's interpretation of Section 9(1)(i) in *Vodafone*, (iii) statements by the Finance Minister who promoted the 2012 Amendment, (iv) the analysis of special tax committees tasked by the Indian Government to assess the impact of the 2012 Amendment, and (v) the fact that the Government of India felt the need to further amend or clarify the 2012 Finance Act because of the Amendment's unanticipated effects.

   a.   First, the Claimants emphasise that, for nearly 50 years (from the enactment of the ITA 1961 until 2007, when the ITD launched its "test case" against Vodafone), "no serious suggestion had ever been made that Section 9(1)(i) could be interpreted to tax indirect transfers by non-residents."[944] According to the Claimants, there is no evidence that this was the legislature's original intent, nor was this interpretation ever suggested in the ensuing decades until the *Vodafone* case.[945] The Claimants rely in particular on comments made by the Shome

---

[939]   *Vodafone International Holdings B.V. v. Union of India & Anr.* [2012] 6 SCC 613, Exh. C-59, ¶ 71.

[940]   C-SoC, ¶ 204; L. Sabha, Fifteenth Series, Vol. XXIII, Tenth Session, 2011/1933 (Saka), 16 March 2012, p. 47, Exh. C-120; Ernst & Young, International Tax Alert: India's Union Budget 2012-2013, released 21 March 2012, p. 1, Exh. C-216.

[941]   2012 Amendment, Section 9, Explanation 5, as it appeared on the Finance Act 2012 [Act No. 23 of 2012], Exh. C-53.

[942]   C-SoC, ¶ 208.

[943]   C-PHB, ¶ 66.

[944]   C-SoC, ¶ 308.

[945]   *Id.*, ¶¶ 309-311.

Committee,[946] the legislative history of the ITA 1960,[947] comments made by the 2002 Task Force,[948] and by the amendments proposed by the new direct tax codes that the MoF attempted to introduce in 2009 and 2010 (the DTC 2009 and DTC 2010).

b.   Second, the Supreme Court's reasoning in *Vodafone* shows that the 2012 Amendment went beyond the scope of Section 9(1)(i). In particular, it held that the expansive interpretation advocated by the ITD "would amount to changing the content and ambit of Section 9(1)(i)," and would undermine the "[c]ertainty and stability [that] form[s] the basic foundation of any fiscal system".[949] The Supreme Court also considered that the fact that the 2010 DTC proposed the taxation of offshore share transactions "indicate[d] in a way that **indirect transfers** are not covered by the existing Section 9(1)(i) of the Act", and "show[ed] that in the existing Section 9(1)(i) the word **indirect** cannot be read on the basis of purposive construction."[950]

c.   Third, the Finance Minister who led the 2012 Finance Act into Parliament, Mr Pranab Mukherjee, stated that the purpose of the 2012 Amendment was "to amend the Income Tax Act, 1961, with retrospective effect to undo the Supreme Court judgement in the Vodafone tax case" and "not merely to check the erosion of revenues in present cases, but also to prevent the outgo of revenues in old cases."[951] In a speech to Parliament three days before the passing of the 2012 Amendment, the Minister noted that the ITD estimated that it would collect taxes of US$ 7 billion from the application of the "retrospective amendments" to old cases.[952]

d.   Fourth, according to the Claimants, all three special tax committees appointed by the Indian Government after the 2012 amendment (specifically, the Shome Committee, the TARC Committee, and the Damodaran Committee) acknowledged "without any ambiguity" that the 2012 Amendment did not clarify existing obligations, but rather created new ones and imposed them retroactively.[953]

---

[946]   *Id.*, ¶ 308; C-PHB, ¶ 70, citing Expert Committee, Draft Report on Retrospective Amendments Relating to Indirect Transfer (2012), Exh. C-56, p. 33.

[947]   *Id.*, ¶ 310, referring to Legislative Assembly Debate dated 13 March 1947, Exh. C-113, p. 1897; Legislative Assembly Debate, 7 April 1947, Exh. C-114, p. 3029.

[948]   *Id.*, ¶ 311, citing Task Force on Direct Taxes, Report of the Task Force on Direct Taxes (December 2002), Exh. C-133, p. 56.

[949]   *Vodafone International Holdings B.V. v. Union of India & Anr.* [2012] 6 SCC 613, Exh. C-59, ¶¶ 71, 91.

[950]   *Id.*, ¶ 71 (emphasis in original).

[951]   C-Updated Reply, ¶¶ 184-185; C-PHB, ¶ 64, citing Pranab Mukherjee, The Coalition Years 1996-2012, Exh. C-354, pp. 186, 189-190.

[952]   C-PHB, ¶ 65, citing Rajya Sabha Written Answers dated 24 April 2012, Exh. C-570, p. 103.

[953]   C-SoC, ¶ 315.

e.   Fifth, the fact that the Indian Government felt the need to impose further clarifications, amendments, and limitations to the 2012 Amendment confirms that the Government understood that it had imposed a new tax burden on a retroactive basis.[954] The Claimants note that these circulars and clarifications served to narrow down the 2012 Amendment's application and to protect against extravagant or inconsistent tax demands. According to the Claimants, "[t]hey proceed from the basis that the Retroactive Amendment introduced a new, broad basis for taxation with uncertain scope and would not have been necessary if the Retroactive Amendment had merely codified prior understanding and practice."[955] The Claimants note that these protections "unfortunately […] have not been made available to Cairn."[956]

896.   The Claimants deny that Section 9 was originally legislated to be "broad" and "capable of dynamic interpretation, and of application over time, to changing circumstances", as the Respondent contends.[957] Relying on Indian case law, the Claimants submit that Indian courts interpret tax statutes strictly, i.e., "a person must not to be taxed unless the language of the statute clearly imposes such a tax."[958] Applying this principle, in *Vodafone*, the Supreme Court rejected the ITD's submission that a purposive approach must be applied when interpreting Section 9(1)(i) and instead applied a strict interpretation to find that this provision did not cover indirect transfers of capital assets.[959] As the Respondent has acknowledged that the *Vodafone* decision was the first judicial interpretation of the fourth limb of Section 9(1)(i), the Claimants argue that "in keeping with the ruling of the highest court in India and settled Indian law principles, this Tribunal must accept that the fourth limb of Section 9(1)(i) ought to be interpreted strictly."[960]

897.   According to the Claimants, the Respondent's attempts to rely on allegedly purposive interpretations of the first three limbs of Section 9(1)(i) also fail, because (i) as opposed to the other three limbs, the fourth limb of Section 9(1)(i) is clear and contains no ambiguity, and because (ii) in any event, the cases cited by the Respondent do not apply a purposive approach to the first three limbs.[961]

### (ii)   The FAO was based on the 2012 Amendment

898.   Turning to the fiscal measures imposed upon them, the Claimants observe that they were grounded exclusively on the 2012 Amendment. The FAO which declared the CIHL

---

[954]   *Id.*, ¶¶ 317-318; C-PHB, ¶¶ 77-85.

[955]   C-PHB, ¶ 85.

[956]   *Ibid.*

[957]   *Id.*, ¶ 32, citing Transcript, Evidentiary Hearing, Day 4, 69:15-25 (Mr Moollan); R-Rejoinder, Section IV.A.1.

[958]   C-PHB, ¶ 33, citing *Commissioner of Wealth Tax vs. Ellis Bridge Gymkhana and Ors*, AIR 1998 SC 120, Exh. C-622, ¶ 5; referring to *Cub Pty Limited (Formerly Known as Foster's Australia Ltd.) v. UOI & Ors*., WP(C) 6902/2008, Exh. C-276, ¶ 22.

[959]   *Id.*, ¶ 36.

[960]   *Id.*, ¶ 38.

[961]   *Id.*, ¶¶ 39-45.

Transaction chargeable to tax did so exclusively on the basis of Explanation 5 of the 2012 Amendment. This means that the ITD considered the transaction to be taxable because it involved an indirect transfer, and not because the transaction was tax avoidant or taxable under Section 2(47)(vi) of the ITA 1961, as the Respondent has sought to argue in this arbitration.

899. As a result, the Claimants allege that the fiscal measures imposed by the Respondent entail the retroactive application of a substantive amendment of Section 9(1)(i) which, in the Claimants' submission, is in breach of the FET standard.

900. The Claimants further submit that the Government's conduct at the time of Cairn's corporate reorganisation and in the years that followed confirms that none of the transactions involved in that reorganisation were taxable at the time. To the contrary, "all regulatory bodies clearly understood" that the share transfers involved were not taxable.[962] The Claimants assert that details of Cairn's corporate reorganisation (including the CIHL Acquisition) were disclosed to the Indian authorities (including the ITD) on several occasions, "without the suggestion ever raised that Cairn was liable for billions of dollars in unpaid tax."[963] According to the Claimants, it was evident from the various documents submitted to the Government prior to the IPO (in particular, the FIPB Application) that the reorganisation would involve indirect transfers. According to the Claimants, this silence is confirmation that the law was settled in this respect, i.e., that it was clear to all branches of the Indian Government that Section 9(1)(i) did not tax indirect transfers.

901. The Claimants further note that the ITD reviewed the CIHL Acquisition at least four times between 2007 and 2014, as follows:

a. During the course of a tax assessment for CIL for Assessment Year 2007-2008, the ITD referred the CIHL Acquisition to the TPO to ensure that the transfers did not involve an element of tax avoidance. The TPO confirmed that they did not.[964]

b. The ITD reviewed the CIHL Acquisition in the context of CUHL's sales of CIL shares to Petronas and Vedanta between 2009 and 2010. Both of these sales were taxable events, as they dealt with the sale of shares situated in India, and the ITD was required to scrutinise the CIHL Acquisition to establish the base cost for any applicable capital gains tax and to issue the withholding certificate. CUHL paid capital gains tax for both sales, but at no point did the ITD suggest that any tax was due on the CIHL Acquisition.[965]

c. The CIHL Acquisition was also reviewed by the Indian courts in 2013 in litigation brought by Cairn against the ITD for having wrongly applied double the applicable tax rate to CUHL's sale of shares in CIL to Petronas. This litigation (in which Cairn was ultimately successful) involved another round of scrutiny of the

---

[962] C-SoC, ¶ 18.

[963] Id., ¶ 16.

[964] Id., ¶¶ 16, 127-130; Brown WS1, ¶¶ 96-100.

[965] Id., ¶¶ 17, 131-138; Brown WS1, ¶¶ 101-105.

CIHL Acquisition, without the Government of India suggesting that any tax was owed for that transaction.[966]

902. It was only in 2014, more than seven years after Cairn's corporate reorganisation, that the ITD first attempted to tax the CIHL Acquisition. During the course of CIL's 2014 Buy-Back Programme, in which CUHL was to participate, the ITD notified CUHL that it had found information indicating that CUHL had failed to report capital gains taxable in India arising from the CIHL Acquisition, and issued an order attaching CUHL's equity shares in CIL (worth approximately US$ 1 billion at the time).[967] Specifically, the ITD calculated at that time that, through its sale of CIHL to CIL, CUHL had made a capital gain of US$ 5.5 billion. The ITD issued a DAO in March 2015, and its FAO in January 2016, together with a Notice of Demand for a principal amount of capital gains tax of US$ 1.6 billion, plus applicable interest and penalties which raised the amount payable to approximately US$ 4.4 billion on the date of the Claimants' Statement of Claim.[968]

903. The Claimants contend that this tax demand would not have been possible under the ITA 1961 as it stood on the date of the CIHL Acquisition, and was only made possible with the 2012 Amendment which, in the Claimants' view, amounted to a retroactive amendment of the law.[969]

### (iii)   The Respondent has breached Article 3(2) of the BIT

904. The Claimants contend that, by issuing the FAO against the Claimants and enforcing it against the Claimants' assets, the Respondent has treated the Claimants unfairly and inequitably, in breach of Article 3(2) of the BIT. As a preliminary matter, the Claimants allege that the Respondent has arbitrarily applied capital gains tax on a transaction that yielded no capital gains (Section (1) below). The core of the Claimants' case, however, is that, by applying the 2012 Amendment to the CIHL Acquisition through the FAO, the Respondent has taxed the Claimants retroactively in breach of the FET standard (Section (2) below). The Claimants further argue that the enactment and application of the 2012 Amendment to the Claimants was arbitrary, discriminatory, and inconsistent with obligations of good faith (Section (3) below).

*(1)   The Respondent's calculation of the alleged capital gains has no rational basis*

905. According to the Claimants, there was no rational basis for the FAO to conclude that CUHL had realised capital gains as a result of the CIHL Acquisition, thus making the tax assessment arbitrary and inequitable.[970]

---

[966]   *Id.*, ¶¶ 17, 133-135.

[967]   *Id.*, ¶ 30.

[968]   *Id.*, ¶ 37.

[969]   The Claimants also reject the Income Tax Authority's methodology for calculating the purported capital gain, because it confused tax and financial gains, and because it ignored that no taxable gain was earned on these intra-group transfers. *Id.*, ¶ 32.

[970]   C-PHB, ¶ 183.

906. Indeed, the Claimants deny that the CIHL Acquisition gave rise to any capital gain that could have been subject to tax. They recall that the 2006 Transactions proceeded in the following essential steps:[971]

   a. First, CEP transferred to CUHL the 9 Subsidiaries and a debt due from CEHL. In return, CUHL issued new shares to CEP.

   b. Second, CUHL transferred the 9 Subsidiaries and debt to CIHL. In return, CIHL issued new shares to CUHL.

   c. Third, CUHL transferred the CIHL shares to CIL in return for consideration in the form of cash and shares.

907. As the tax demand seeks to tax the transfers of CIHL shares from CUHL to CIL in step three, the Claimants contend that it should have determined the cost of acquisition of those CIHL shares by reference to the cost that CUHL paid to obtain them at step two. However, it incorrectly looks to the cost that CUHL is said to have paid to acquire the 9 Subsidiaries and debt in step one.[972]

908. More specifically, the Claimants allege that "the FAO completely confuses the distinction between tax and financial accounting", and "distorts the way in which the 2006 restructuring was recorded in CUHL and CIL's books for accounting purposes into a tool for deeming the transfers to have yielded a taxable gain of US$ 5.5 billion."[973] This is because, to calculate the alleged capital gain, the FAO relied on the accounting results of the group restructuring as reflected in CUHL's stand-alone financial statements and CIL's consolidated financial statements, improperly using the historical book value at which the CIHL shares had been transferred within the Cairn group as a matter of book accounting.[974] Specifically, the FAO "treat[ed] the 251,224,744 shares recorded on CUHL's financial statements at a par value of GBP 1 per share as a proxy for CUHL's supposed acquisition cost of those shares for capital gains tax purposes", when "[n]o taxable gain was realised on the transfer of these shares between members of the same corporate group."[975] In addition, the ITD's reliance on the goodwill entries in CIL's consolidated balance sheet as further evidence of the existence of a capital gain is incorrect.[976]

909. For the Claimants, the value of the 251,224,744 CUHL shares must be determined by their fair market value, not their face value. This market value, as assessed contemporaneously by Rothschild, was between US$ 6 to 7.5 billion.[977]

---

[971] *Id.*, ¶ 185.

[972] *Id.*, ¶ 186.

[973] C-SoC, ¶ 273.

[974] Brown WS1, ¶ 114.

[975] *Ibid.*

[976] *Id.*, ¶ 115.

[977] C-PHB, ¶ 196.

910.  However, they contend that "this question is ultimately irrelevant, since a different set of assets altogether was contributed to acquire the CIHL shares."[978] The "asset" that CUHL obtained from its "parent" (CEP) is the 9 Subsidiaries (and debt), not the CIHL shares.[979] Put in syllogistic terms, the Claimants argue that: "if (i) 'the cost of acquisition is the value of what you give up to acquire an asset'", as Mr Puri accepted at the Evidentiary Hearing, and (ii) "'CUHL gave up the nine subsidiaries [plus debt] to acquire the …. CIHL shares', then it necessarily follows that (iii) the cost of acquisition must be the value of the nine subsidiaries (plus the debt)."[980]

911.  According to the Claimants, "[t]he fundamental error with the FAO's approach is clear upon any close analysis of the tax demand", but the ITD has refused to correct it.[981]

*(2)   The retroactive application of the 2012 Amendment to the Claimants is unfair and inequitable*

912.  The Claimants contend that, by retroactively taxing the CIHL Acquisition, the Respondent has failed to accord the Claimants FET and has thus breached Article 3(2) of the BIT.

913.  According to the Claimants, "[t]his sort of retroactive legislation that imposes fresh obligations in respect of past events is fundamentally contrary to the very essence and purpose of the rule of law", and violates the FET standard.[982] This is because retroactive legislation of that sort "deprives an investor of the right to rely on existing rules, and conform its actions to them," thus "thoroughly undermin[ing] the rule of law."[983]

914.  The Claimants submit that, by enacting the 2012 Amendment and applying it to the Claimants, the Respondent "failed to ensure the certainty, stability, and predictability of its tax laws, and its actions were arbitrary, unfair and inconsistent with its obligations of good faith."[984]

915.  More specifically, the Claimants assert that "the Respondent's actions breached every conceivable strand of the FET standard, any one of which would breach Article 3(2) of the Treaty"[985], as follows:

   a.   <u>Stability</u>: Citing the Supreme Court of India, the Claimants submit that "[c]ertainty and stability form the basic foundation of any fiscal system".[986] The

---

[978]   *Id.*, ¶ 190.

[979]   *Id.*, ¶ 193.

[980]   *Id.*, ¶ 195.

[981]   *Id.*, ¶ 191.

[982]   C-SoC, ¶¶ 294, 325.

[983]   *Id.*, ¶ 325.

[984]   C-Updated Reply, ¶ 518.

[985]   *Id.*, ¶ 599.

[986]   C-Updated Reply, ¶ 599, citing *Vodafone International Holdings B.V. v. Union of India & Anr.* [2012] 6 SCC 613, Exh. C-59, ¶ 91.

Claimants contend that the Respondent breached its obligation of stability "by making an 'overnight change' in Indian tax law that had 'held ground for decades', leaving 'tax officials to rake up settled positions'."[987] Citing the Shome Committee, the Claimants argue that "[t]he language and scope of the amendments led [...] to apprehensions about the certainty, predictability and stability of tax laws in India", and that "[t]he legislation with retrospective application in particular obviating an earlier Supreme Court decision on the matter of indirect transfer was not expected."[988]

b.   <u>Consistency</u>: The Claimants contend that the Respondent breached its obligation of consistency by "reversing its interpretation and application of ITA Section 9(1)(i) to cover the transfer of capital assets outside of India, after 50 years of uniform interpretation and application to the contrary."[989]

c.   <u>Legitimate expectations</u>: The Claimants argue that the Respondent "destroyed the Claimants' legitimate expectations concerning the existence, scope and applicability of the law at the time the Claimants made their investment, by purporting to change the fiscal and legal consequences of the Claimants' past transactions."[990] According to the Claimants, "tribunals and commentators uniformly confirm that '[e]ven absent specific commitments, FET would protect the investor against regulatory changes with retroactive effect'."[991] In any event, the Claimants allege that in this case the Respondent did make specific assurances to induce the Claimants' investment. In particular, the Claimants allege that India represented to the WTO that it entered into BITs "with a view to providing predictable investment climate to foreign investment in India",[992] and invited Cairn and other foreign investors in the oil and gas sector to invest in India promising attractive conditions for investment.[993]

---

[987]   *Ibid.*, citing TARC Report, Exh. C-137, p. 249, V.3.e.

[988]   *Ibid.*, citing Expert Committee, Final Report on Retrospective Amendments relating to Indirect Transfer (2012), Exh. C-376, p. 4.

[989]   *Ibid.*

[990]   *Ibid.*

[991]   *Id.*, n. 906, citing Nicolas Angelet, *Fair and Equitable Treatment*, Max Planck Encyclopedia of Public International Law, March 2001, CLA-247, ¶ 28 (in turn citing *ATA Construction, Industrial and Trading Co. v. Hashemite Kingdom of Jordan*, ICSID Case No. ARB/08/2, Award, 18 May 2010, CLA-230, ¶ 128, and Stephan Schill: *Fair and Equitable Treatment under Investment Treaties as an Embodiment of the Rule of Law*, RLA-66, p. 28 ("[W]here a foreign investor merely relies on the general legal framework without any specific commitments or intention on behalf of the host state to attract foreign investors, the concept of legitimate expectations may only have a more marginal scope of application. It will mostly come into play with respect to legislation with a retroactive [e]ffect".)).

[992]   *Id.*, n. 799, referring to Communication from the Permanent Mission of India dated 22 March 1999 to the Working Group on the Relationship Between Trade and Investment, World Trade Organization WT/WGTI/W/71, 13 April 1999, CLA-226.

[993]   *Ibid.*, referring to Government of India, Press Information Bureau, "Second Road Show for NELP-II Blocks Held in London" (Government of India, 19 January 2001), Exh. C-329; Indian Ministry of Petroleum and Natural Gas, Press Information Bureau, "NELP -IV London Road Show A Success: 83 Companies & Organisations Participate" (Ministry of Petroleum & Natural Gas, 5 June 2003), Exh. C-330.

d.  Transparency: The Claimants argue that the Respondent "breached its obligation of transparency by imposing a tax not found in the plain text of the law; not part of the longstanding practice of the Indian tax authorities or courts; not identified as a risk by the Claimants' experienced legal and financial team during due diligence; and not spotted or raised by at least four Government entities during their scrutiny and approval of the underlying transaction."[994]

e.  Predictability: The Claimants contend that the Respondent "breached its obligation to provide a predictable legal framework by depriving the Claimants of the ability to plan for (or 'visualize', as the ITAT found) the tax consequences of its investments in India."[995]

f.  Discrimination: The Claimants argue that the Respondent discriminated against them by "selectively applying the Retroactive Amendment during a two-year window to a small subset of investors (including Cairn) whose transactions ostensibly fell within the law's ambit, for the sole purpose of remedying revenue shortfalls."[996]

g.  Substantive impropriety: The Claimants contend that the Respondent "breached its obligation to ensure that its measures are substantively proper, by radically changing – with retroactive effect, and to the investor's detriment – the interpretation and application of extant law."[997]

h.  Procedural impropriety and due process: The Claimants argue that the Respondent "breached its obligation of procedural propriety and due process by imposing sudden, radical and poorly planned changes in Indian tax law through a series of 'explanations', with no notice or consultation and a 'complete lack of accountability at any level except on grounds of lagging behind in revenue collection'."[998]

i.  Arbitrariness: The Claimants contend that the Respondent acted arbitrarily by "applying the 2012 Retroactive Amendment to a single set of share exchanges within the 2006 [T]ransactions, with no explanation as to why it would or would not apply to all similar share exchanges by the Claimants."[999] They add that, although it was enacted as a "clarification", "the Retroactive Amendment was arbitrarily applied only to transactions falling within a narrow timeframe, which happened to capture certain transactions with significant revenue implications for India."[1000]

---

[994]  Id., ¶ 599.

[995]  Ibid., citing ITAT Order of 9 March 2017, Cairn UK Holdings Ltd v. D.C.I.T., ITA No. 1669/Del/2016, Exh. C-228, ¶ 41.

[996]  Ibid., referring to C-SoC, Sections II.B, II.E.9 and II.F.

[997]  Ibid.

[998]  Ibid., citing TARC Report, Exh. C-137, pp. 11-12.

[999]  Ibid.

[1000]  Ibid.

916.   At its core, the Claimants' case is one of predictability, stability and legitimate expectations. They argue that "the Respondent's enactment and application of the Retroactive Amendment deprived the Claimants of a legal framework for investment that was knowable, stable, and capable of being complied with", which, "in turn, undermined the certainty, stability, and predictability of the legal framework in which Cairn made its investment, in breach of Article 3 of the Treaty."[1001]

917.   The Claimants allege that they had a legitimate expectation that the existing legal framework would apply to the 2006 Transactions. This expectation existed independently of, but was confirmed by, India's multiple specific and implicit assurances in respect of the stability and predictability of its fiscal framework. According to Cairn, such assurances include (i) specific assurances to the Claimants that India's "fiscal and contract terms [were] amongst the best in the world";[1002] (ii) implicit assurances in the stability of the Section 9(1)(i), which (apart from one dissimilar instance) had not been retroactively changed in text or interpretation from its enactment in 1961;[1003] and (iii) the State's conduct, including its non-application of Section 9(1)(i) over many years to numerous indirect transfers, including several indirect transfers by the Claimants from 1996 to 2006. In any event, as the tribunal in *Bilcon v. Canada* explained, specific assurances are not required to find a breach of FET when the State changes its laws retroactively:

> That freedom [to change law or policy] is not absolute; breaches of the international minimum standard might arise in some special circumstances – such as *changes in a legal or policy framework that have retroactive effect*, are not proceeded by reasonable notice, are aimed or applied in a discriminatory basis *or* are contrary to *earlier specific assurances* by state authorities that the regulatory framework would not be altered to the detriment of the investor.[1004]

918.   The Claimants also point out to the following factors which served as basis for that expectation:

   a.   "The Claimants' own transactional experience under Indian law, which reaffirmed the Indian Government's then-uniform interpretation and application of Section 9 of the ITA;"

---

[1001]   *Id.*, ¶ 539, referring to C-SoC, ¶¶ 336-337 (footnotes omitted).

[1002]   C-Updated Reply, n. 799 and C-PHB, ¶ 389, referring to Government of India, Press Information Bureau, "Second Road Show for NELP-II Blocks Held in London" (Government of India, 19 January 2001), Exh. C-329 (reporting that the Minister of Petroleum and Natural congratulated Cairn Energy for its recent discovery from a previously awarded block; invited oil and gas companies in the UK to "avail of the highly attractive investment opportunities under NELP-II"; and proclaimed India's "fiscal and contract terms [as] amongst the best in the world […]").

[1003]   *Ibid.*

[1004]   *William Ralph Clayton, William Richard Clayton, Douglas Clayton, Daniel Clayton and Bilcon of Delaware Inc. v. Government of Canada*, UNCITRAL, PCA Case No. 2009-04, Award on Jurisdiction and Liability, 17 March 2015, CLA-22, ¶ 572 (Claimants' emphasis).

    b.    "The Claimants' exhaustive legal and financial due diligence, which confirmed no tax implications for the 2006 transaction;"

    c.    "The Claimants' extensive disclosures of the details of the 2006 transaction to the Indian Government, including to the Ministry of Finance and its Department of Revenue, which scrutinised and approved the 2006 transaction without raising any latent or hidden taxation;" and

    d.    "The applicable law itself, which had been interpreted and applied uniformly for decades until the 2007 *Vodafone* 'test case'."[1005]

919.    The Claimants submit that a comparative analysis of tax laws of various jurisdictions confirms that the retroactive modification of tax legislation to the detriment of a taxpayer is justified only in specific circumstances, such as in cases of abuse by taxpayers.[1006] In the present case, the Respondent altered not only the settled interpretation of Section 9(1)(i) of the ITA which had persisted for over four decades, but in fact rewrote that section by a retroactive 2012 Amendment. As the Supreme Court of India held in *Vodafone*, prior to that amendment, "Section 9(1)(i) [could not] by a process of 'interpretation' or 'construction' be extended to cover 'indirect transfers' of capital assets/property situate in India."[1007] This understanding is confirmed by unequivocal and unanimous advice that Cairn received at the time of structuring the 2006 Transaction, that the transaction as structured did not attract a capital gains tax under Section 9(1)(i).

920.    By overturning the settled law by a retroactive amendment, and by applying that amendment to the 2006 Transactions that had taken place six years prior to the amendment, India upset legal stability and predictability as well as the Claimants' legitimate expectations.

921.    The Claimants reject the Respondent's argument that Cairn should have obtained a more comprehensive stabilisation guarantee in its contracts. While the stabilisation guarantees in Cairn's PSCs were broad, protecting against "any change in or to any Indian law, rule or regulation",[1008] the Claimants argue that not even the broadest stabilisation guarantee would have prevented India from the type of wrongful act that it engaged in. Indeed, India's primary position is that the 2012 Amendment did not change, but simply clarified, the existing law. A stabilisation guarantee would be to no avail in these circumstances.

---

[1005]  C-Updated Reply, ¶ 540.

[1006]  Christian Tietje & Karoline Kampermann, *Taxation and Investment: Constitutional Law Limitations on Tax Legislation in Context*, in Stephan W. Schill (ed.), *International Investment Law and Comparative Public Law* (2010), CLA-380, pp. 581-584.

[1007]  *Vodafone International Holdings B.V. v. Union of India & Anr.* [2012] 6 SCC 613, Exh. C-59, ¶ 171.

[1008]  See, e.g., Production Sharing Contract between the Government of India and Oil & Natural Gas Corporation Limited and Cairn Energy Gujarat Block Limited dated 6 February 2004, Exh. C-273, Article 17.10.

*(3)    The enactment and application of the 2012 Amendment to the Claimants was arbitrary, discriminatory and inconsistent with obligations of good faith*

922.    The Claimants further contend that the Respondent breached the FET standard because the enactment and application of the 2012 Amendment to the Claimants was arbitrary, discriminatory, and inconsistent with obligations of good faith.

923.    According to the Claimants, the 2012 Amendment and its application to the Claimants was arbitrary for the following reasons:

   a.    "When enacting the Retroactive Amendment, the Respondent virtually guaranteed its arbitrary application by pretending to clarify existing law rather than prospectively amending the law with clear, considered, and non-arbitrary standards." [1009]

   b.    Further, the Claimants argue that the specific manner in which the ITD applied the 2012 Amendment to the Claimants suggests arbitrariness and a lack of good faith. First, having been given full knowledge of the 2006 Transactions when they occurred, the Respondent waited seven years to commence its assessment and enforcement actions until on the eve of when CUHL was about to begin to sell its remaining shares in CIL.[1010] Second, the Respondent applied the 2012 Amendment "to a single set of share exchanges, within an arbitrarily determined timeframe, applying a short-term capital gains tax rate to long-term capital gains on grounds that have no rational basis."[1011] Third, the false accusations levelled in the FAO orders "further reflect a tax prosecution effort that is results-driven and devoid of principle." [1012]

924.    With respect to discrimination, the Claimants allege that the Respondent selectively applied the 2012 Amendment and in this respect has to date enforced it exclusively against the Claimants. When enacting the 2012 Amendment, the Respondent failed to ensure that it was adopted and applied in a non-discriminatory manner.[1013]

925.    First, the Claimants allege that the enactment of the 2012 Amendment was targeted at CUHL, with a view to taxing the 2006 Transactions. The Claimants allege that the Minister of Finance (Mr Mukherjee) supported his case in favour of the 2012 Amendment by citing eight "cases similar to Vodafone" in which the government had made "huge revenue demands", and which the Government would be able to tax if the *Vodafone* judgment was overturned.[1014] The first among the cases listed was "'Cairns

---

[1009]    C-PHB, ¶ 418(h).

[1010]    C-SoC, ¶ 357.

[1011]    C-PHB, ¶ 418(h).

[1012]    C-Soc, ¶ 357.

[1013]    C-PHB, ¶ 418(e).

[1014]    *Id.*, ¶ 117, citing Letter dated 9 March 2012 from Income-tax Officer (Hqrs.) (Intl. Taxation) to the Under-Secretary, FT and TR-I, CBDT, Exh. RK-13; Rajya Sabha Written Answers dated 13 March 2012, Exh. C-119

UK Holding Ltd' [*sic*]".[1015] The ITD also drew up a list of the ten largest transactions in which a "Tax Demand [was] already Raised", indicating for each transaction the potential revenue loss.[1016] "Cairn UK Holding Scotland" was on this list too, representing an estimated loss in tax receipts of Rs. 2,670 crores (approximately US$ 540 million) if *Vodafone* were not overturned.[1017] While the Claimants concede that this corresponds to the taxable amount on CUHL's sale of CIL shares to Vedanta in 2011, they dispute the authenticity of the document that purports to provide a link between that list and the Vedanta transaction (Exh. RK-13). The Claimants submit in this respect:

> Whatever the reality that lies behind the ITD's reason for identifying and prioritising Cairn, the Respondent's argument in this arbitration that Cairn was not a target of the Retroactive Amendment because the legislation was never applied to the Vedanta transaction is unconvincing. There is no escaping the facts that (i) the passage of the Retroactive Amendment was an unprincipled effort motivated by fiscal and political concerns, and (ii) Cairn was listed at or near the top of the MNCs specifically identified as the prime targets of that illegitimate legislative act. When the Department of Revenue inevitably came to realise that the 2011 transaction was not hit by the Retroactive Amendment, it subsequently went searching further back in time for other Cairn transactions to tax, first examining the 2010 accounting write-off by CIL, before finally settling on the 2006 Transaction.[1018]

926. Second, the Claimants contend that the subsequent investigation against CUHL was a premeditated effort to target Cairn and to block CUHL from selling its investment.[1019] The Claimants note in this respect that there are no contemporaneous internal documents on record which describe Mr Kumar's instructions or report his progress, and Mr Kumar's explanations that this was due to the alleged secrecy of the investigation are unconvincing. The Claimants point out that Mr Kumar's written testimony suggests that he started focusing his investigations on Cairn immediately after assuming his position as Investigation Officer.[1020] The Claimants further argue that "Mr Kumar's testimony as to how his investigations eventually led him to the 2006 Transaction[s] requires the Tribunal to accept a long series of highly improbably [*sic*] coincidences in which he consistently chose the one narrow avenue leading to the 2006 Transaction and consistently eschewed every other – often more obvious – path."[1021] In particular, Mr Kumar did not offer any credible explanation as to why he focused on CUHL, which was only a 10% shareholder of CIL at the time, but did not investigate Vedanta, which held 90% of CIL's shares, "[n]or is there any credibility to Mr Kumar's explanation as

---

[1015] *Ibid.*

[1016] *Id.*, ¶ 118, citing Rajya Sabha Written Answers dated 24 April 2012, Exh. C-570.

[1017] *Ibid.*

[1018] *Id.*, ¶ 122.

[1019] *Id.*, ¶¶ 123-147.

[1020] C-PHB, ¶¶ 126-128, referring to Kumar WS1, ¶ 12; Second Witness Statement of Mr Sanjay Kumar ("Kumar WS2,") ¶ 7; in contrast to his oral testimony at Transcript, Evidentiary Hearing, Day 9, 188:10-14 (Mr S. Kumar).

[1021] *Id.*, ¶ 129.

to how he finally discovered the 2006 Transaction[s]" (ostensibly as a result of a write-off described in CIL's 2012-2013 balance sheet).[1022] The Claimants further assert that "Mr Kumar's story surrounding the urgent survey conducted at CIL's offices on 15 January 2014 also broke down at the hearing", when he reversed his written testimony and admitted that he had been aware of CIL's buy-back programme since November 2013.[1023]

927.  According to the Claimants, "[t]he likely reality is that Mr Kumar was instructed to target Cairn, and in particular to search for transactions involving indirect transfers to which the Retroactive Amendment could be applied. Cairn had previously been identified to Parliament as a major source of tax revenue if the Retroactive Amendment were enacted, and Cairn continued to be in the ITD's gunsight, as confirmed by the fact that the Ministry of Finance's Annual Report for 2013-14 noted a concerning increase in undisclosed income and specifically identified Cairn India as a major contributor to that figure."[1024] The Claimants contend that "the highly rushed manner in which Mr Kumar sought and obtained approvals and conducted the survey of CIL's offices, assembled a 125-page interim report, and then issued the freezing order, all further demonstrate a premeditated plan to block CUHL from disposing of its shares."[1025]

928.  Third, the Respondent limited the scope of the 2012 Amendment in a discriminatory (and arbitrary) fashion. As a result of two subsequent clarifications by the CBDT, the 2012 Amendment applied only to a small subset of investors (i.e., those whose tax assessments proceedings were still pending as of 1 April 2012, those to whom notices had been given or proceedings commenced between April 2012 and July 2014 (Cairn fell in that category), and those against whom "fresh cases" could only be launched after July 2014, if the CBDT's High Level Committee gave its consent). The Claimants contend that the fact that the Respondent limited the application of this retroactive tax to these "narrow and disparately treated categories of taxpayers cannot be reconciled with the pretence that it had consistently applied the tax in that 'clarified' manner for the past 50 years."[1026]

929.  Fourth, the Claimants allege that the Respondent has discriminated against the Claimants in the enforcement of the tax demand. The Respondent attached CUHL's shares in CIL in violation of its clear representation before this Tribunal that they would refrain from doing so, citing the lack of discretion under Indian law. The assertion that India had no discretion not to enforce the tax demand is belied by its legislation, as well as the fact that the Respondent has not yet enforced its similar tax demands against other companies, such as Vodafone. By treating CUHL less favourably than other companies in like circumstances, the Respondent also violated the non-discrimination obligation under the FET standard.

---

[1022]  *Id.*, ¶ 138.

[1023]  *Id.*, ¶¶ 141-142, referring to Transcript, Evidentiary Hearing, Day 9, 177:14-178:4 (Mr S. Kumar); in contrast to S. Kumar WS2, ¶ 8, where he had stated that he had only learned of the buy-back on the day of the survey.

[1024]  *Id.*, ¶ 140.

[1025]  *Id.*, ¶ 145.

[1026]  C-SoC, ¶ 363.

930. Overall, the Claimants submit that the Respondent's retroactive application of the 2012 Amendment to the 2006 Transactions was an unreasonable and arbitrary measure that violated the Claimants' legitimate expectations as well as their interests of stability and predictability of the legal framework.

### c.    The Respondent's tax abuse defence fails

931. The Claimants contend that the Respondent's tax avoidance defence has been fabricated for this arbitration, and the Respondent is estopped from relying on it. Indeed, according to the Claimants, the tax abuse argument does not form part of the principal measure challenged in this case, which is the FAO, and has been raised to distract attention from the core issue of retroactivity.[1027] The Claimants note that the Section 281B Order and the FAO expressly relied on the 2012 Amendment as basis for the tax.[1028] According to the Claimants, "the Tribunal should dismiss the entire tax avoidance argument on that basis alone."[1029] Further, the FAO and both CUHL's and CIL's assessing officers expressly rejected that the 2006 reorganisation was a "sham transaction".[1030] The Claimants also contend that the Respondent's new tax avoidance argument is inconsistent with the ITAT's conclusion that, in 2006, CUHL "could not have visualize[d] its liability for payment" arising from the 2012 Amendment, which resulted in the ITAT's decision to relieve CUHL of the burden of paying interest.[1031] The Claimants submit that "India should be precluded from asking the Tribunal to contradict the conclusions of its own tax authorities and administrative tribunal."[1032]

932. In any event, the Claimants submit that the defence is baseless: applying the correct legal principles, it is clear that the Respondent has failed to discharge its burden of proving tax avoidance. More specifically, the Claimants argue that the Respondent has failed to coherently identify the tax avoided. Relying on Mr Gardiner QC's expert opinion and on *Vodafone*, the Claimants submit that "a basic preliminary step in any tax avoidance analysis is for Revenue to identify the tax that has supposedly been avoided by the taxpayer".[1033] However, the Respondent has been unable to "identify in any consistent and coherent manner the tax that the Claimants supposedly avoided or the colourable device the Claimants supposed[ly] created to avoid that tax."[1034]

---

[1027]  Transcript, Evidentiary Hearing, Day 1, 39:7-8; 68:13-14 (Mr McNeill).

[1028]  C-SoC, ¶ 31, citing Order under Section 281B of ITA 1961 dated 22 January 2014, Exh. C-11, ¶¶ 10-12; FAO, Exh. C-70, pp. 49, 98.

[1029]  Transcript, Evidentiary Hearing, Day 1, 71:1-3 (Mr McNeill).

[1030]  C-Updated Reply, ¶¶ 21-22, citing FAO, Exh. C-70, ¶ 10, p. 94; referring to Final Assessment Order issued against CIL enclosed with Letter from Deputy Commissioner of Income Tax (International Taxation) to CIL dated 11 March 2015, Exh. C-355, ¶ 8.

[1031]  *Id.*, ¶ 22, citing ITAT Order of 9 March 2017, *Cairn UK Holdings Ltd v. D.C.I.T.*, ITA No. 1669/Del/2016, Exh. C-228, ¶ 41, p. 164.

[1032]  *Ibid*.

[1033]  C-PHB, ¶¶ 478-482, referring to Second Expert Report of Mr John Gardiner QC ("Gardiner ER2"), ¶ 23; *Vodafone International Holdings B.V. v. Union of India & Anr.* [2012] 6 SCC 613, Exh. C-59, ¶ 68.

[1034]  *Id.*, ¶ 483.

933.    According to the Claimants, the Respondent has advanced four main tax avoidance theories that allegedly allow the ITD to tax the 2006 Transactions, all of which focus on a different interpretation of the economic transactions and identify a different Indian tax that was allegedly avoided: [1035]

a.    ***Theory I:*** The pre-IPO steps of the 2006 Transactions (whereby Cairn Energy transferred all of the underlying oil and gas assets to CIL in preparation for the IPO) were abusive because they relied on the interposition of an abusive holding structure. The tax avoided is the tax that would have been paid on a direct sale of the PSC assets, disregarding the holding companies.

b.    ***Theory II:*** The 2006 Transactions were a disposition (through the IPO) to third parties of a partial interest of the underlying Indian oil and gas assets. The tax avoided was again the tax that would have been paid on a direct sale of the PSC assets to these third parties.

c.    ***Theory III***: By choosing Plan C instead of Plan A, Cairn avoided payment of capital gains tax on an offer for sale of shares of CIL.

d.    ***Theory IV:*** The 2006 Transactions artificially inflated the cost basis of the CIL shares, so that when Cairn disposed of them in 2009 to Petronas and in 2011 to Vedanta, less tax was payable.

934.    The Claimants further note that the Respondent alleges that the Claimants avoided other (Indian and non-Indian) taxes, not as a basis for taxation in India but as additional evidence of showing that the structure employed for the 2006 Transactions evidenced the dominant purpose of avoiding tax. In particular: [1036]

a.    ***Theory V:*** The 2006 Transactions were structured to allow CIL to distribute to its shareholders proceeds from the IPO without paying UK corporate tax on dividends.

b.    ***Theory VI:*** The 2006 Transactions avoided Indian corporate tax on dividend flows from the operating companies to CIL (the so-called "tax leakage");

c.    ***Theory VII:*** The 2006 Transactions were structured to avoid UK stamp duty on intra-Group share transfers.

935.    As discussed in Section VII.A.3.c below, the Claimants deny that they avoided tax on any of these theories. In essence, the Claimants deny that their corporate reorganisation and IPO in general, or the CIHL Acquisition in particular, were tax avoidant or abusive. According to the Claimants, "[n]ot only was the 2006 transaction carried out transparently and lawfully with the full participation of multiple Government agencies; the Respondent has never previously raised such an argument in any of its prior tax

---

[1035]  *Id.*, ¶ 484.

[1036]  *Id.*, ¶ 486.

proceedings against Cairn."[1037] The reorganisation was complex because "it was structured to comply with complex Indian regulations, and every transactional step was driven by a legitimate business and/or regulatory purpose that had nothing to do with avoiding taxes in India."[1038]

936. In any event, the Claimants allege that the actual tax assessment (in the FAO) did not apply any of the theories described above. In particular, it did not purport to tax the substance of the transaction; it indisputably taxed its form, i.e., the transfer of CIHL shares from CUHL to CIL.

### d. The Respondent's immovable property defence also fails

937. The Claimants deny that the 2006 Transactions were always taxable as an indirect transfer of immovable property under Section 2(47)(vi) of the ITA, as the Respondent contends.[1039]

938. As a preliminary matter, the Claimants contend that the Respondent is estopped from raising this defence.[1040] Not only did the FAO not rely on this theory of liability, but (contrary to the Respondent's contentions in this arbitration), the ITD has not invoked this ground in *post hoc* domestic tax proceedings. Consequently, the Claimants argue that "Section 2(47)(vi) simply is not and will not be a basis for the measure at issue", and the Respondent's defence "can be rejected by the Tribunal for this reason alone."[1041]

939. In any event, the Claimants contend that this defence fails on its merits. Essentially, the Claimants deny (i) that the PSCs are rights "with respect to" land, and therefore constitute "immovable property" in India; or (ii) that the 2006 Transactions are taxable under Sections 5 and 9 of the ITA 1961 because it had the effect of transferring or enabling the enjoyment of those rights.[1042] The Claimants' detailed arguments in this respect are set out in Section VII.A.3.d below.

### 2. The Respondent's position

940. The Respondent denies that there has been a breach of FET (or, for that matter, of any other BIT standard). Essentially, the Respondent argues that, as a matter of Indian law, the 2006 Transactions were taxable in 2006 irrespective of the 2012 Amendment, for two different grounds: first, because they were tax avoidant transactions, and thus taxable under the "look at" doctrine, which allows the courts to look at the substance of a transaction over its form (Section (a) below), and second, because they entailed the indirect transfer of immovable property and were thus taxable under Section 2(47)(vi)

---

[1037] C-Updated Reply, ¶ 21.

[1038] *Id.*, ¶ 23.

[1039] C-PHB, ¶ 170.

[1040] C-Updated Reply, ¶¶ 453-456; C-PHB, ¶¶ 584-586.

[1041] C-PHB, ¶ 588.

[1042] *Id.*, ¶ 587.

of the ITA 1961 (Section (b) below). This, according to the Respondent, is a complete answer to the Claimants' case.

941.  Should the Tribunal find that India's fiscal measures against the Claimants are not justified by either of these two separate grounds, the Respondent submits that the 2012 Amendment did not give rise to a breach of the UK-India BIT.[1043] This is because it was merely a clarification of the existing law, and not a substantive amendment (let alone a retroactive one) (Section (c) below). Even if the Tribunal were to find that it was a retroactive/retrospective amendment of the law, the Respondent contends that this type of retrospective legislation is constitutionally valid in India and cannot be considered to be a breach of FET (Section (d) below). The use of retroactive taxation legislation in India was long-standing, predated Cairn's entry into India, and was therefore knowable. It therefore would have shaped its legitimate expectations and the Claimants cannot now complain of Parliament's decision to clarify the operation of Section 9(1)(i) of the ITA.

### a.    Cairn's 2006 corporate reorganization was tax abusive/tax avoidant

942.  The Respondent's first defence is that the 2006 Transactions were taxable in India irrespective of the 2012 Amendment because they were "deliberately structured to evade applicable taxes".[1044] According to the Respondent, when the dominant purpose of a transaction is to avoid taxes, the Indian courts are entitled to apply a judicial anti-avoidance rule that allows them to disregard the form of the transaction and tax its substance.

943.  The Respondent alleges that the 2006 Transactions were tax avoidant, and thus the Department of Revenue or an Indian court would have been allowed to tax their substance. The Tribunal understands the Respondent's argument to be that, as a result, the Tribunal does not need to address whether the 2012 Amendment breaches the Treaty (and in particular its fairness and equitableness) because there were other grounds for taxation. Contrary to the Claimants' contention, the Respondent denies that it is estopped from raising this defence.

944.  According to the Respondent, the legal test is whether the dominant purpose of a transaction was the avoidance of tax. This allows the Department of Revenue or the courts to apply the "substance over form" principle. The Respondent asserts that this was the case here: the specific form of the 2006 Transactions was chosen for the dominant purpose of avoiding tax. Even if the Tribunal were to find that the legal test is not "substance over form" but requires a piercing of the corporate veil, the Respondent contends that the 2006 Transactions were also taxable as sham transactions.

945.  The Respondent has advanced several theories as to what tax was avoided:

a.    By the end of the proceedings, the Respondent appeared to have settled on essentially one theory: that the Claimants chose Plan C over Plans A and B to avoid taxes on the offer for sale of CIL shares.[1045]

---

[1043]  R-SoD, ¶ 9; R-Rejoinder, ¶¶ 26, 29.

[1044]  R-Rejoinder, ¶ 45.

[1045]  Transcript, Hearing on Closing Arguments, Day 1, 128:15:129:3 (Mr Moollan).

b.   However, in its Statement of Defence the Respondent's main theory was that the 2006 Transactions were in substance the transfer of the underlying oil and gas assets.

c.   Further, throughout the proceedings the Respondent also appeared to argue that the Claimants had structured the transaction to avoid "tax leakage".

d.   In addition, the Respondent's expert, Professor Rosenbloom, opined that the 2006 Transactions had artificially inflated the cost basis of the CIL shares, so that, when sold, they attracted less tax (because, admittedly, a taxable capital gain is the subtraction of the cost basis from the price obtained in the sale of the considered asset).

e.   The Respondent has also suggested that the 2006 Transactions were structured to avoid the payment of UK stamp duty and UK corporations tax.

946.   On this basis, the Respondent has argued that the dominant purpose of the 2006 Transactions was the avoidance of tax.

947.   The Respondent also alleges in connection with its tax avoidance defence that the Claimants circumvented other Indian regulatory requirements (in particular, SEBI regulations).

948.   The Respondent's detailed arguments in relation to this defence are set out at Section VII.A.3.c below.

## b.   The transactions are taxable under Section 2(47)(vi) of the ITA

949.   The Respondent's second defence is that the 2006 Transactions were taxable irrespective of the 2012 Amendment because they involve the indirect transfer of immovable property, and as such are taxable under Section 2(47)(vi) of the ITA.

950.   According to the Respondent, its argument under section 2(47)(vi) is a pure question of law. Regardless of whether Section 9(1)(i) covers indirect transfers, the Respondent submits that, because this case involves the transfer of rights in oilfields situated in India, they are taxable on the basis of Section 2(47)(iv), read in conjunction with Sections 5 and 45, as well as Section 269UA(d) of the ITA 1961, which have been in force since 1987 and thus prior to the making of Cairn's investments in the mid-1990s.[1046]

951.   The Respondent submits that the definition of "transfer" in relation to immovable property at Section 2(47)(iv) makes clear that any transaction "which has the effect of transferring" immovable property (such as acquiring shares in a company) is considered

---

[1046]   R-PHB, ¶ 275.

a transfer.[1047] Thus, "in other words, a transaction amounting to a transfer of shares is treated as a transfer of the underlying assets itself."[1048]

952.   In turn, the meaning of "immovable property" for purposes of Section 2(47)(vi) must be found in Section 269UA(d) of the ITA. This includes "any rights in or with respect to any land".[1049] According to the Respondent, as the Claimants' rights in the PSCs are "in" or "with respect to" immovable property (oilfields situated in India), these rights qualify as immovable property under the definition provided at Section 269UA(d).[1050]

953.   On this basis, the Respondent submits that "[a]n indirect transfer of this specific type of asset was chargeable to tax from a plain reading of section 2(47) read with the charging provisions under section 5 and 45 of the Act" since 1987, once again well before the making of Cairn's purported investment in the mid-1990s.[1051]

954.   The Respondent's detailed arguments in relation to this defence are set out at Section VII.A.3.d below.

### c.   The 2012 Amendment is merely clarificatory

955.   Even if the 2006 Transactions were not tax avoidant and the Respondent's tax assessment was dependent on the 2012 Amendment, the Respondent submits that the 2012 Amendment did not give rise to a breach of the UK-India BIT. The Respondent's primary argument in this respect is that the 2012 Amendment was "just […] a clarification of the Parliamentary intent regarding indirect transfers of Indian assets",[1052] and not a substantive retroactive/retrospective amendment. As a result, the Respondent contends that it taxed the 2006 Transactions in accordance with the existing legislation, which was merely clarified by the 2012 Amendment. There is thus no retroactive taxation that could allegedly be found to be a breach of the BIT.

956.   The Respondent advances two alternative arguments in this respect. On the one hand, the Respondent has asserted that "[t]he taxability of indirect transfers under s. 9 of the ITA was recognised prior to the 2012 Clarification […] in judicial, administrative and legislative practice."[1053] The Respondent's witness, Mr Puri, has testified that Section 9(1)(i) has always been a "look through" provision.[1054]

---

[1047]   R-PHB, ¶¶ 275-287; R-Rejoinder, ¶ 378.

[1048]   *Id.*, ¶ 276.

[1049]   R-Rejoinder, ¶¶ 384-390; R-PHB, ¶¶ 281-283, citing *Hindustan Lever v. Appropriate Authority & Others*,(1994) 207 ITR 772, Calcutta High Court, Judgment of 1 March 1993, Exh. R-143.

[1050]   R-Rejoinder, ¶ 391; R-PHB, ¶ 286.

[1051]   R-PHB, ¶ 287.

[1052]   R-SoD, ¶ 113.

[1053]   *Id.*, ¶ 125(a); see also *Id.*, ¶ 273 ("[T]he 2012 Clarification confirms the original intention of the legislature and is consistent with the way that the Respondent has always applied s. 9 of the ITA.").

[1054]   See, e.g., Puri WS1, ¶ 28 ("It is my belief and experience that section 9 has always been interpreted and applied in such a way as to consider income arising from the transfer of any capital asset situated in India to be deemed as accruing or arising in India. That is, where the capital asset was situated in India, any income arising from its transfer anywhere and by whatever means would be taxable in India.").

957. On the other hand, the Respondent has also suggested that, even if prior to the 2012 Amendment Section 9(1)(i) was not interpreted to be a "look through" provision, it could apply to indirect transfers depending on whether (i) the transaction had a nexus with India, or (ii) the transaction was tax avoidant. The Respondent argues that "[i]t was never the case that capital gains on transfers of foreign shares were *ipso facto* not taxable. Rather, the question has always been whether the nexus of the transaction with India, and/or the tax avoidant character of the transaction, were such as to attract Indian taxation."[1055] The Supreme Court took one particular view in *Vodafone*, which contradicted the view of other Indian courts. Parliament disagreed with the Supreme Court's decision in *Vodafone*, and thus clarified the "true intent" of Section 9 of the ITA in the context of these new business practices.[1056] "The 2012 Clarification simply made clear that modern aggressive tax avoidant practices, where investors profited from Indian assets, but sought to avoid the payment of tax, fell within the scope of s. 9 of the ITA." [1057] Thus, the text of Section 9 of the ITA 1961 required an interpretation to adjust it to the changing economic and commercial context, in particular, to address the emergence of aggressive tax avoidant investment structures in which Indian assets were placed in shell companies outside of India.

958. Despite arguing that the legislative intention behind the provision was clear, the Respondent emphasises that the law on Section 9(1)(i) was not, as the Claimants contend, "settled" prior to *Vodafone*. According to the Respondent, until then "there was no authority whatsoever on the meaning or scope of the relevant limb of section 9(1)(i), and the decisions which did exist on the other three limbs thereof all held that section 9(1)(i) enshrined a broad deeming provision of wide ambit."[1058] The Respondent submits that, "[b]y its very nature, the provision is one which should be read purposively looking at the economic substance of the transaction; not a provision to be read narrowly and formalistically as the Supreme Court ended up doing."[1059] Specifically, there was "no case which held that the fourth limb of section 9(1)(i) (which applies to the transfer of assets "situate in India") had to be applied by reference to the formal situs of the relevant asset, applying formal conflict of law principles. Rather, the authorities suggested that the language of the fourth limb of section 9(1)(i) fell to be interpreted not in a formalistic manner, but keeping in view the deeming nature of the provision."[1060] Since the provision was "a broad source rule, and all other limbs of that provision had been interpreted in a flexible manner, looking at practical realities", the Respondent submits that the fourth limb "also fell to be interpreted in a flexible manner, to identify what a practical person would consider as the source of income: not simply by looking at private international law rules on the situs of assets."[1061]

---

[1055] R-SoD, ¶ 8(d).

[1056] *Ibid*.

[1057] *Ibid*.

[1058] R-PHB, ¶ 92.

[1059] *Ibid*.

[1060] *Ibid*.

[1061] *Ibid*; see also, Respondent's Answers to the Tribunal's Questions, ¶¶ 41-42.

959. For the Respondent, the analysis must be carried out in the following steps:

a. The basic charge to tax is set out in Section 5 of the ITA, which provides that income, which accrues or arises in India is within the scope of the charge.

b. Section 9 is a deeming provision, according to which "certain incomes which may not actually accrue in India are nonetheless deemed to accrue in India."[1062] Pursuant to Section 9(1), incomes arising, directly or indirectly, through or from a business connection, property, a source in India, or the transfer of a capital asset situate in India, are "deemed" to accrue or arise in India.

c. With respect to the fourth limb (capital asset situate in India), the question is not whether taxing statutes are to be read "strictly", or whether there can be tax by implication, as the Claimants have sought to argue; rather, "[t]he question is whether the words 'situate in India' are to be interpreted by adopting a private international law situs test or by adopting a flexible test looking at the economic substance".[1063] The Respondent adds:

> No matter how strictly one reads section 9, one cannot escape that it is a deeming provision – it treats as "accrual" something which would not ordinarily be treated as accrual. Section 9 is a source rule, seeking to bring to tax incomes which have a territorial nexus with India. Whether an income has a nexus with one territory or not is necessarily a matter to be answered by reference to the facts of the transaction under consideration – it is not a question which can ever be answered in the abstract. In that view of the matter, it is reasonable to posit that section 9 would not adopt a single "one size fits all" approach, but would enshrine a rule looking at the economic realities.[1064]

960. The Respondent relies on a number of authorities that existed at the time of the enactment of the ITA 1961, which it alleges interpreted the source rule in a broad and flexible manner, and "which favoured analysing economic substance rather than stopping with legal formalism."[1065] The Respondent thus submits that "the authorities demonstrate that the Indian Legislature intended – in 1961, as well as in the predecessor legislation – to have a broad source-based rule turning on an economic (rather than legalistic) understanding of nexus."[1066] According to the Respondent, the Supreme Court in *Vodafone* "changed course", but that does not mean that the law on the fourth limb of Section 9(1)(i) was "settled" prior to that decision.[1067]

---

[1062] R-PHB, ¶ 93.

[1063] *Ibid.*

[1064] *Ibid.*

[1065] R-SoD, Annex B; R-PHB, ¶¶ 94-102, citing, *inter alia*, *Caltex (India) Ltd. v. Commissioner of Income Tax, Bombay City* [1952] 21 ITR 278 (Bom), Exh. R-55; *CIT v. Lady Kanchanbai* [1969] 77 ITR 123, Exh. R-177; *Hira Mills Ltd., Cawnpore v. Income Tax Officer* [1946] 14 ITR 417, Exh. R-47; *Assam Consolidated v. ITO*, [1971] 81 ITR 699 (R-56); *State v. SJ Choudhary* [1996] 2 SCC 428, Exh. R-166.

[1066] R-PHB, ¶ 102.

[1067] *Ibid.*

961.    In any event, the Respondent contends that the Claimants' reliance on the *Vodafone* decision is misplaced. While the Supreme Court rejected the ITD's alternative "look through" theory, it accepted that transactions could be taxed according to their economic substance in accordance with the "look at" doctrine, but rejected it on the facts of the case. According to the Respondent, the facts of the 2006 Transactions are radically different to those in *Vodafone*, because as discussed above in Section IV.B they involve tax avoidance.

962.    The Respondent further points out that, under Indian constitutional law, "the final word over the interpretation of statutes (such as the ITA) falls with Parliament, not with the Supreme Court, as it might in other systems of law; subject to a review of constitutionality of the said legislative interpretation by the courts applying longstanding, settled and transparent constitutional standards."[1068] The Indian Parliament was thus entitled to disagree with the Supreme Court's decision in *Vodafone* of 20 January 2012, and "the passing of the 2012 Clarification on 12 June 2012 did nothing more than to re-establish its intention that the fourth limb of section 9(1)(i) of the ITA 1961 should be interpreted as a broad and fact-dependent source rule to be applied on the basis of economic substance (in keeping with a wealth of Indian and international authorities on source taxation) and not as a narrow rule to be applied on the basis of formal rules of conflict of law."[1069] The Claimants' reliance on the opinion of various committees and commissions as to the validity of the 2012 Amendment is misplaced, because it is the courts, not committees looking at policy, who are the judges of whether the 2012 Amendment is valid or not. Accordingly, the views of these committees "carry limited weight, and none have any bearing on the correct interpretation or application of the ITA."[1070]

963.    In any case, the Respondent submits that "[i]f and insofar as there was any retroactivity therefore, and as explained at the hearing, that retroactivity was of no more than two months (i.e. the two months between the decision of the Supreme Court in *Vodafone* and the announcement and then passage of the 2012 Clarification); there was no decision whatsoever on the point prior to the Supreme Court's decision in *Vodafone*, and that decision was immediately corrected by Parliament."[1071]

### d.    Even if retroactive, the 2012 Amendment does not breach FET

964.    Even if the 2012 Amendment was retroactive/retrospective, the Respondent denies that it breached the FET standard. The Tribunal will first summarise the Respondent's arguments on the content of the FET standard (Section (i) below), before passing to the Respondent's arguments as to why neither the 2012 Amendment nor its application to the Claimants constitutes a breach of FET (Section (ii) below).

---

[1068]    *Id.*, ¶ 16.

[1069]    *Id.*, ¶ 17.

[1070]    R-SoD, ¶ 8(f).

[1071]    R-PHB, ¶ 18 (footnotes omitted).

### (i)    The FET standard

965.  For the Respondent, "the FET standard reflects, or is at least tied to, the minimum standard of treatment under customary international law".[1072] According to the Respondent, this is confirmed by the historical record of the inclusion of the FET standard in BITs, the writings of commentators,[1073] the commentary to the OECD's Draft Convention on the Protection of Foreign Property of 1967,[1074] the practice of investment tribunals,[1075] and State practice.[1076]

966.  According to the Respondent, the UK Model BIT was "heavily influenced" by the OECD Draft Convention,[1077] and "[t]here is also evidence to demonstrate that the Indian understanding of the FET clauses in its investment treaties was guided by" that draft convention as well.[1078] The Respondent points to the fact that on 1 November 1994, during the course of negotiations between India and the then-USSR, a representative of the Indian Government's Department of Economic Affairs (Dr PJ Nayak) sent the OECD Draft Convention to the Indian Embassy in Moscow, requesting that it be transmitted to the Soviet negotiating counterparty, which was then done.[1079]

967.  The Respondent highlights that several States (including the United States and Canada, and the members States of CAFTA-DR), as well as the European Union, have "expressed discomfort with expansive interpretations of FET standards" and have clarified in their respective model BITs or through various interpretive statements that the FET standard prescribes the minimum standard of treatment and does not create

---

[1072]  R-SoD, ¶ 267; see also R-Rejoinder, ¶¶ 825-834.

[1073]  R-SoD, ¶ 267; R-Rejoinder, ¶¶ 829-830; citing Francis Mann, *The Legal Aspect of Money* (Oxford University Press, 4th ed, 1982), RLA-86, p. 510; *Newcombe and Paradell, Law and Practice Of Investment Treaties* (Kluwer Law International, 2009) RLA-102, pp. 268-269.

[1074]  R-SoD, ¶ 267, citing OECD, *Draft Convention on the Protection of Foreign Property: Text with Notes and Comments* (1967), RLA-87, p. 9.

[1075]  R-SoD, ¶ 268, referring to *William Nagel v. Czech Republic*, SCC Case No. 049/2002, Final Award, 9 September 2003, RLA-89, ¶ 193; *Occidental Exploration and Production Company v. Ecuador*, LCIA Case No. UN3467,Final Award dated 1 July 2004, CLA-48, ¶ 190; *Siemens AG v. Argentine Republic*,ICSID Case No ARB/02/8, Award, 6 February 2007, CLA-41, ¶¶ 291-300; *Biwater Gauff (Tanzania) Ltd v. Tanzania*, ICSID Case No. ARB/05/22, Award, 24 July 2008, CLA-36, ¶ 599; *Rumeli Telekom AS v. Kazakhstan*, ICSID Case No. ARB/05/16, Award, 29 July 2008, CLA-35, ¶ 611; *Duke Energy Electroquil Partners & Electroquil SA v. Ecuador*, ICSID Case No ARB/04/19, Award, 18 August 2008, RLA-90, ¶¶ 336-337; *El Paso Energy International Company v. Argentine Republic*, ICSID Case No ARB/03/15, Award, 31 October 2011, CLA-24, ¶¶ 336-337; *Murphy Exploration and Production Company International v. Ecuador (II)*, UNCITRAL, PCA Case No. 2012-16 (formerly AA 434), Partial Final Award, 6 May 2016, RLA-91, ¶ 208.

[1076]  R-Rejoinder, ¶ 833.

[1077]  R-SoD, ¶ 267; R-Rejoinder, ¶ 827, citing Eileen Denza and Shelagh Brooks, "Investment Protection Treaties: United Kingdom Experience" (1987) 36 International and Comparative Law Quarterly, RLA-88, 908, 910-912.

[1078]  R-Rejoinder, ¶ 828.

[1079]  R-Rejoinder, ¶ 828, citing Fax dated 1 November 1994 from Dr PJ Nayak (Department of Economic Affairs) to Shri M Ganpathi (Embassy of India, Moscow), RLA-367; Fax dated 15 November 1994 from Shri M Ganpathi (Embassy of India, Moscow) to Dr PJ Nayak (Department of Economic Affairs), RLA-368.

additional rights.[1080] This understanding is also reflected in the India-Mexico BIT of 2007, in India's draft interpretive statement to the new model Indian bilateral investment treaty, and in the joint interpretive notes to the existing India-Bangladesh investment agreement.[1081]

968.    While the Claimants have argued that the link to the minimum standard of treatment in the UK-India BIT needs to be made explicit in order for the Treaty's FET standard to be considered not to be an autonomous standard, and that neither of the examples cited in the preceding paragraph are applicable to the interpretation of Article 3(2) of the UK-India BIT, the Respondent contends that this misses the point, which is that "[t]he emergence of the explicit equation of FET and the customary minimum standard of treatment in treaty texts has been a response to the excessively broad interpretation of the FET standard by investment tribunals, and is intended to clarify the original understanding of states as to the interpretation of the FET standard."[1082]

969.    As to the practice of investment treaty tribunals, the Respondent asserts that, while such practice has been inconsistent as to the precise content of the FET standard, "what is clear is that the award of the United States – Mexican Claims Commission in the *Neer* claim remains influential in identifying what is required of States under that standard."[1083] In that decision, the minimum standard of treatment of aliens under customary international law was formulated as follows:

> [T]he treatment of an alien, in order to constitute an international delinquency, should amount to an outrage, to bad faith, to wilful neglect of

---

[1080]  R-Rejoinder, ¶ 833, citing, *inter alia*, Description of the U.S. Model Bilateral Investment Treaty (BIT), submitted by the State Department, 30 July 1992, Hearing before the Committee on Foreign Relations, United States Senate, 102nd Congress, 2nd Session, 4 August 1992, S. HRG 102-795 (U.S. Government Printing Office 1992), RLA-333, p. 62 ("This paragraph [on fair and equitable treatment] sets out a minimum standard of treatment based on customary international law."); *1994 U.S. Model Bilateral Investment Treaty, International Investment Instruments: A Compendium, Vol. III, Regional Integration, Bilateral And Non-Governmental Instruments* (United Nations, 1996), RLA-334, Article II(3)(a); 2004 U.S. Model Bilateral Investment Treaty, RLA-336, Article 5(2), Annex A; 2012 U.S. Model Bilateral Investment Treaty, RLA-237, Article 5(2), Annex A; 2004 Canada Model Bilateral Investment Treaty, RLA-337, Article 5; European Parliament, Resolution on the Future European International Investment Policy (2010/2203(INI)), adopted 6 April 2011, RLA-338, ¶ 19; European Parliament, Committee on International Trade, Report on the Future European International Investment Policy (2010/2203(INI)), Report No. A7-0070/2011, dated 22 March 2011, RLA-339, pp. 11-12; NAFTA Free Trade Commission, Notes of Interpretation of Certain Chapter 11 Provisions, dated 31 July 2001, RLA-340  ("NAFTA Interpretive Statement"); The Dominican Republic-Central American-United States Free Trade Agreement, signed 5 August 2004, RLA-344, Article 10.5.

[1081]  R-Rejoinder, ¶¶ 831-832, citing India–Mexico BIT, RLA-330, Article 5(3); Office Memorandum of the Investment Division Issuing Joint Interpretive Statements for Indian Bilateral Investment Treaties, RLA-331, Annex, Consolidated – Interpretative Statements, Note 6(1) (stating that "the concept of 'fair and equitable treatment'[…] does not require treatment in addition to or beyond that which is required by the customary international law minimum standard of treatment of aliens, and does not create additional substantive rights"); Joint Interpretative Notes on the Agreement between the Government of the Republic of India and the Government of the People's Republic of Bangladesh for the Promotion and Protection of Investments, RLA-332, Article 3(2)(1).

[1082]  R-Rejoinder, ¶ 834.

[1083]  R-SoD, ¶ 266, citing *LFH Neer and Pauline Neer (USA) v. United Mexican States* (1926) IV UNRIAA 60, RLA-84.

duty, or to an insufficiency of governmental action so far short of international standards that every reasonable and impartial man would readily recognize its insufficiency. Whether the insufficiency proceeds from the deficient execution of a reasonable law or from the fact that the laws of the country do not empower the authorities to measure up to international standards is immaterial.[1084]

970. The Respondent also relies on the articulation of the minimum standard of treatment set out in *Waste Management II*, which it characterises as "influential".[1085] According to that tribunal:

> [T]he minimum standard of treatment of fair and equitable treatment is infringed by conduct attributable to the State and harmful to the claimant if the conduct is arbitrary, grossly unfair, unjust or idiosyncratic, is discriminatory and exposes the claimant to sectional or racial prejudice, or involves a lack of due process leading to an outcome which offends judicial propriety — as might be the case with a manifest failure of natural justice in judicial proceedings or a complete lack of transparency and candour in an administrative process. In applying this standard it is relevant that the treatment is in breach of representations made by the host State which were reasonably relied on by the claimant.[1086]

971. To this, the Respondent, citing *Saluka*, recalls that the term "fair and equitable" in the FET obligation does not mean that the Tribunal has a licence to decide disputes "*ex aequo et bono*". [1087] As the *Micula* tribunal recognised, "the content of the fair and equitable treatment standard does not depend on a tribunal's idiosyncratic interpretation of the standard but 'must be disciplined by being based upon State practice and judicial or arbitral case law or other sources of customary or general international law'."[1088] Or, as explained by the *Saluka* tribunal, "[t]he standards formulated in Article 3 of the Treaty, vague as they may be, are susceptible of specification through judicial practice and do in fact have sufficient legal content to allow the case to be decided on the basis of law."[1089]

972. Relying on *Saluka, El Paso, Electrabel* and *Perenco*,[1090] the Respondent argues that the "dominant element" or "core of FET" is legitimate expectations, beyond which are mere

---

[1084] *LFH Neer and Pauline Neer (USA) v. United Mexican States* (1926) IV UNRIAA 60, RLA-84, pp. 61-62.

[1085] R-SoD, ¶ 269, referring to *Waste Management v. Mexico (II)*, ICSID Case No ARB(AF)/00/3, Award, 30 April 2004, RLA-92.

[1086] *Waste Management v. Mexico (II)*, ICSID Case No ARB(AF)/00/3, Award, 30 April 2004, RLA-92, ¶ 98.

[1087] R-PHB, ¶ 319, citing *Saluka Investments BV v. Czech Republic*, UNCITRAL, Partial Award, 17 March 2006, CLA-44, ¶ 284.

[1088] *Ioan Micula, Viorel Micula, S.C. European Food S.A, S.C. Starmill S.R.L. and S.C. Multipack S.R.L. v. Romania [I]*, ICSID Case No. ARB/05/20, Final Award, 11 December 2013,, CLA-23, ¶ 507,, referring to *ADF Group Inc. v. United States of America*, ICSID Case No. ARB (AF)/00/1, Award, 9 January 2003, ¶ 184.

[1089] *Saluka Investments BV v. Czech Republic* UNCITRAL, Partial Award, 17 March 2006, CLA-44, ¶ 284.

[1090] R-PHB, ¶¶ 323-326, citing *Saluka Investments BV v. Czech Republic*, UNCITRAL, Partial Award, 17 March 2006, CLA-44, ¶ 302; *El Paso Energy International Company v. Argentine Republic*, ICSID Case No.

"residual elements".[1091] While the Respondent acknowledges a conceptual possibility that there "still be a breach of FET absent legitimate expectations",[1092] the FET standard does not envisage an automatic obligation of stability of the regulatory framework.

973.    More generally, the Respondent rejects what it calls the "scattergun allegations"[1093] or "laundry list" approach[1094] adopted by the Claimants in respect of the strands of the FET standard other than legitimate expectations (including alleged obligations of stability, consistency, transparency, lack of arbitrariness, lack of discrimination, among others). The *Micula* tribunal made it clear that the FET standard is not "a laundry list of potential acts of misconduct".[1095] The Respondent submits in this respect that "while the terminology of 'duty' or 'obligation' is often used by arbitral tribunals to refer to obligations which arise on the specific facts of the case at issue, they cannot […] be translated without any analysis into an alleged general obligation which would somehow arise as a matter of law under the FET standard of every BIT in every fact situation."[1096] In the Respondent's submission, "[t]he FET standard is a broad-based standard which has at its heart the concepts of legitimate expectation, non-discrimination (including a prohibition against arbitrary treatment), and denial of justice"; "[i]t cannot be dissected into a myriad of allegedly separate 'obligations' extracted as sound bites from investment arbitration awards, 'breach' of any of one of which would somehow breach the FET standard".[1097]

974.    As the Respondent's arguments on how and whether these other individual strands are intertwined with the facts of the case, the Tribunal addresses them in Section VII.A.3.f(i) below.

(ii)    **Neither the 2012 Amendment nor its application to the Claimants breaches FET**

975.    The Respondent denies that the 2012 Amendment or its application to the Claimants amounts to a breach of FET. Essentially, it contends that, even if the 2012 Amendment was retroactive/retrospective, it cannot be characterised as a breach of FET because it is "valid and binding applying the longstanding constitutional, legislative and legal framework in which the Claimants have invested".[1098] Accordingly, and in the absence of a comprehensive stabilisation clause, the Claimants could have no legitimate

---

ARB/03/15, Award, 31 October 2011, CLA-24, ¶ 348; *Electrabel SA v. Hungary*, ICSID Case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability, 30 November 2012, RLA-99, ¶ 7.75; *Perenco v. Ecuador*, ICSID Case No ARB/08/6, Decision on Jurisdiction and Liability, 12 September 2014, RLA-50, ¶ 560.

[1091]   R-PHB, ¶¶ 323-327; Transcript, Evidentiary Hearing, Day 6, 157:17-159:23 (Mr Moollan).

[1092]   R-PHB, ¶ 327.

[1093]   R-Rejoinder, ¶¶ 821-823.

[1094]   R-PHB, ¶¶ 509-532.

[1095]   *Ioan Micula, Viorel Micula, S.C. European Food S.A, S.C. Starmill S.R.L. and S.C. Multipack S.R.L. v. Romania [I]* , ICSID Case No. ARB/05/20, Final Award, 11 December 2013, CLA-23, ¶ 517.

[1096]   R-Rejoinder, ¶ 823.

[1097]   *Ibid*.

[1098]   R-SoD, ¶ 9(b).

expectation that they would not be taxed retroactively. The Respondent further submits that retroactivity in itself does not breach the Treaty, as there is no rule of customary international law against retrospective or retroactive taxation, and argues that the Claimants' allegations that the 2012 Amendment targeted them specifically, and was discriminatory and disproportionate, are unfounded.

976.  The Tribunal summarises below the Respondent's arguments on the relevance of Indian law (Section 1 below), legitimate expectations (Section 2 below), and other alleged breaches to other "strands" of the FET standard (Section 3 below).

*(1)    Relevance of Indian law*

977.  The Respondent submits that Indian law (and in particular, Indian constitutional law) is relevant to determining whether the 2012 Amendment breached the FET standard.

978.  The Respondent contends at the outset that the Claimants' arguments on applicable law are contradictory in that they rely on Indian law to argue that the 2006 Transactions were not tax avoidant, but ask the Tribunal to ignore Indian law when determining the legitimacy of the 2012 Amendment. However, "the Claimants cannot eat their cake and have it too. If Indian *tax* law is relevant for determining the validity of the Claimants' 2006 Transactions […], then equally, Indian *constitutional* law is relevant for determining the validity and legitimacy of the Respondent's 2012 Clarification. In both cases, the link between domestic law and the Treaty claims is established through the text of the BIT itself and the nature of the claims".[1099] In particular, the Respondent submits that "whether 'fair and equitable treatment' was accorded to the Claimants, and whether 'legitimate expectations' were defeated, depends upon the existing legal structure in the State in which the Claimant chose to invest."[1100]

979.  According to the Respondent, the Claimants' reliance on Article 27 of the VCLT ("[a] party may not invoke the provisions of its internal law as justification for its failure to perform a treaty"), and Article 13 of the ILC Articles on Responsibility of States for Internationally Wrongful Acts ("[t]he characterization of an act of a State as internationally wrongful is governed by international law") is misconceived. Citing Douglas and Sasson, the Respondent submits that the investment treaty regime requires the application of a "mosaic" of applicable laws, including both municipal and international, and that the key issue is how these laws interact.[1101]

980.  With respect to this interaction, the Respondent argues that:

---

[1099]  R-Rejoinder, ¶ 423 (emphasis in original).

[1100]  *Ibid*.

[1101]  *Id*., ¶¶ 427-429, citing Zachary Douglas, *The International Law of Investment Claims* (CUP, 2009), RLA-63, p. 40; Monique Sasson, *Substantive Law in Investment Treaty Arbitration* (Kluwer International Law, 2nd ed, 2017), RLA-241, pp. 7-8.

a.   The investor must take the host State as it finds it, and its legitimate expectations fall to be shaped by all circumstances, including the legal framework in which the investor has invested;[1102]

b.   The investor cannot plead ignorance of the law as an excuse because it has an affirmative duty to investigate what the host State's law permits or prohibits. If the investor has failed to carry out the appropriate due diligence, it cannot seek to rely on a BIT as an insurance policy.[1103] Investors have the duty to inform themselves of the circumstances prevailing in the host State, including host State law.[1104]

981.   Here, the legal framework in which the Claimants invested "included a longstanding, well-established and transparent practice of retrospective tax legislation by Parliament within constitutional bounds long settled by the Supreme Court, and the Claimants can have had no legitimate expectation that that legal framework would not apply to them within those bounds."[1105]

982.   Accordingly, the Respondent submits that it "is not invoking its own laws against the application of international law. Rather, as a matter of international law, the Respondent's behaviour is to be judged by a standard – the violation of legitimate expectations at the heart of the FET standard – which itself requires that any expectations of the investor be grounded in the Respondent's legal framework. In the present case, that legal framework was not one which banned retroactive taxation, but one with a long and transparent history of retroactive taxation."[1106]

983.   The Respondent submits that under the Indian constitutional framework, Parliament has the last word on the interpretation of statutes. Clarifying the law's true intent is and has been Parliament's constitutional prerogative under the Indian Constitution long before the Claimants made their purported investment in India in 1996.[1107] If a Court interprets a provision to carry a certain meaning, like the Supreme Court did in *Vodafone*, Parliament is constitutionally entitled to disagree and to express its disagreement through retrospective legislation which has the effect of reversing the relevant judgment. Parliament has repeatedly done so over the years, again well before the Claimants made their purported investment into India. Retrospective legislation, in turn, can be tested by

---

[1102]   *Id*., ¶¶ 432-447,citing *inter alia*, *Generation Ukraine v. Ukraine*, ICSID Case No ARB/00/9, Award, 16 September 2003, RLA-43,¶ 20.37; *Saluka Investments BV v. Czech Republic* UNCITRAL, Partial Award, 17 March 2006, RLA-243, ¶ 304; *Parkerings-Compagniet AS v. Lithuania*, ICSID Case No ARB/05/8, Award, 11 September 2007, CLA-38, ¶¶ 335-336; *White Industries v. India*, UNCITRAL, Final Award, 30 November 2011, RLA-64, ¶ 10.3.15.

[1103]   *Id*., ¶¶ 432, 448-465, citing, *inter alia*, *Genin v. Estonia*, ICSID Case No ARB/99/2, Award, 25 June 2001, RLA-246, ¶¶ 343-345; referring to  *Olguin v. Paraguay*, ICSID Case No ARB/98/5, Final Award, 26 July 2001, RLA-247, ¶¶ 45-55.

[1104]   *Id*., ¶ 450.

[1105]   R-Rejoinder, ¶ 465 (emphasis omitted).

[1106]   R-PHB, ¶ 361 (emphasis omitted).

[1107]   R-SoD, ¶ 8(d) (emphasis omitted).

the courts on a review of constitutionality.[1108] In this respect, the Respondent makes much from the Claimants' failure to test the constitutionality of the 2012 Amendment before the Indian courts. They have not done so, the Respondent says, because they recognise that the amendment was constitutional.

984. More specifically with respect to tax legislation, and relying on the case law of Indian courts and scholarly writings, the Respondent submits that Parliament has the power to tax either prospectively or retrospectively.[1109] In particular, "Parliament is entitled to adopt retrospective tax legislation, even when such legislation has the effect of rendering previous court judgments ineffective."[1110] The Respondent quotes, *inter alia*, *Indian Aluminium v. State of Kerala*, where the Supreme Court stated:

> The consistent thread that runs through all the decisions of this Court is that the legislature cannot directly overrule the decision or make a direction as not binding on it but has power to make the decision ineffective by removing the base on which the decision was rendered, consistent with the law of the Constitution and the legislature must have competence to do the same.[1111]

985. The Respondent alleges that, on this basis, the Indian Parliament has introduced no fewer than 346 retrospective amendments to the ITA 1961 since the time of its enactment.[1112]

986. The Respondent also relies on the writings and statements of the Claimants' former counsel, Mr Harish Salve SA, for the proposition that, within the limits developed by

---

[1108] R-PHB, ¶ 384.

[1109] R-Rejoinder, ¶ 483, citing *Jawaharmal v. State of Rajasthan and Others* [1965] 1 SCR 890, Exh. R-149, pp. 900-901 ("If the Legislature decides to levy a tax, it may levy such tax either prospectively or even retrospectively […] [T]he power to tax can be competently exercised by the legislature either prospectively or retrospectively; and that is precisely what [section] 2 [of the amendment] has done in the present case.").

[1110] R-Rejoinder, ¶¶ 479-501; R-SoD, Annex E, referring, *inter alia*, to *J.K. Jute Mills Co. Ltd.v. The State of Uttar Pradesh and Anr.*, AIR 1961 SC 1534, Exh. R-80; *Chhotabhai Jethabhai Patel v. Union of India*, AIR 1962 SC 1006, Exh. R-144; *Rai Ramkrishna and Others v. State of Bihar*, AIR 1963 SC 1667, Exh. R-27; *Jawaharmal v. State of Rajasthan and Others*, [1965] 1 SCR 890, Exh. R-149; *Shri Prithvi Cotton Mills v. Broach Borough Municipality*, 1970 AIR 192, Exh. C-298; *Assistant Commissioner of Urban Land Tax, Madras, and Others v. The Buckingham and Carnatic Co. Ltd.*, [1969] 75 ITR 603, Exh. R-150; *Krishnamurthi and Co. v. State of Madras*, AIR 1972 SC 2455, Exh. R-29; *The Government of Andhra Pradesh and Anr. v. Hindustan Machine Tools Ltd.*, AIR 1975 SC 2037, Exh. R-151; *Ujagar Prints v. Union of India and Others*, [1989] 3 SCC 488, Exh. R-183; *Indian Aluminium Co. v. State of Kerala and Others*, AIR 1996 SC 1431, Exh. R-152; *Premier Enterprises, Secunderabad v. Commercial Tax Officer & Anr.*, AIR 2003 SC 4449, Exh. R-153; *Central Wines and Ors. v. Govt. of A.P. & Ors.*, 1992(2) ALT 289, Exh. R-146; *Easland Combines, Coimbatore v. The Collector of Central Excise, Coimbatore*, AIR 2003 SC 843, Exh. R-145; *Ashapura Minichem Limited v. Assistant Director of Income Tax – International Taxation*, [2010] 40 SOT 220 (Mum), Exh. R-154; *Assistant Commissioner of Agricultural Income Tax and Ors. v. Netley 'B' Estate and Ors.*, AIR 2015 SC 1912, Exh. R-159.

[1111] R-Updated Reply, ¶ 489, citing *Indian Aluminium Co. v. State of Kerala and Others*, AIR 1996 SC 1431, Exh. R-152, ¶ 57(9).

[1112] R-Rejoinder, ¶ 500; R-SoD, Annex D.

the Indian courts, retrospective tax legislation is legitimate in India.[1113] The Respondent notes that in a 2014 article, Mr Salve explained that "Indian law on the legitimacy of retrospective tax legislation has been clear since the 1961 decision in *Chhotabhai Jethabhai Patel v. Union of India*, in which the Supreme Court followed the reasoning of the 1906 decision of the United Kingdom Privy Council in *Colonial Sugar Co. Ltd. v. Irving*",[1114] which in turn stood for the following proposition: "if there was a power to impose taxation conferred by a constitution, the legislature could equally make the law retroactive and impose the duties from a date earlier than that from which it was imposed."[1115] Mr Salve explained further that the Indian courts had followed the approach of US courts, which had "rejected the suggestion that mere retrospectivity would render a tax law arbitrary and capricious".[1116] Mr Salve noted that Indian courts recognise that "Parliament can pass retrospective laws to 'override' court judgments",[1117] and that retrospective amendments frequently concern substantive changes to tax laws.[1118] Mr Salve observed that many changes in Indian tax law in recent years had been prompted by the growth of foreign investment and the need "to deal with the economic change in which a significant portion of tax revenues now flows from either multinational corporations carrying on business in India, or from transactions that are transnational with one of the parties receiving income being a non-resident."[1119] While he criticised the 2012 Amendment, the Respondent notes that he did so not by questioning Parliament's power to impose retroactive taxation, but by questioning the wisdom of Parliament's policy choice.[1120] As a matter of procedure in this arbitration and as discussed in Section VII.A.3.f(i)(1) below, the Respondent asks the Tribunal to draw adverse inferences from Mr Salve's prior statements made within and without this arbitration as well as from his withdrawal from the case shortly before the hearing.

---

[1113]  R-Rejoinder, ¶¶ 467-479, citing Harish Salve, "Retrospective Taxation – The Indian Experience",(Working Paper 2014/06) Bingham Centre for the Rule of Law, BIICL (September 2014), Exh. R-148 ("Salve, Retrospective Taxation").

[1114]  *Id.*, ¶ 467.

[1115]  Salve, Retrospective Taxation, Exh. R-148, p. 5, referring to *Chhotabhai Jethabhai Patel and Co. v. The Union of India and Anr.*, AIR 1962 SCR 1006. Exh. R-144.

[1116]  *Id.*, p. 5.

[1117]  R-Rejoinder, ¶ 469, citing Salve, Retrospective Taxation, Exh. R-148, pp. 7-8 ("In the early 60s, the Supreme Court of India dealt with challenges to the constitutional validity of statutes brought into force with retrospective effect in a manner so as to nullify the effect of a decision of the Court. The Court recognised that as a facet of the power to make laws with retrospective effect, it was open to the legislature to correct the defect and change the basis on which the decision of the Court had been rendered, and having done so it was open to legislatively declare that notwithstanding anything contained in any judgment or decree of a Court, the imposition of tax for the past also would be valid. [...] [I]f the amendment carefully altered the basis of the judgment which had declared a demand or a recovery of tax illegal (irrespective of whether it was merely a matter of interpretation or on account of some feature of the law the Court had found the statute to be unconstitutional) then the legislature could not only legislate retrospectively but could also validate past collections or past demands.") (emphasis omitted).

[1118]  Salve, Retrospective Taxation, Exh. R-148, p. 10.

[1119]  *Id.*, p. 13.

[1120]  R-Rejoinder, ¶ 473, citing Salve, Retrospective Taxation, Exh. R-148, p. 20.

987. According to the Respondent, the 2012 Amendment "was and is perfectly valid and legitimate applying the longstanding test [*sic*] of constitutionality which were transparently in existence at the time the Claimants made their purported investment in India."[1121] It asserts that the Claimants (through Mr Salve) have expressly conceded as much, and have only half-heartedly attempted to retract these concessions.[1122] It notes in particular the Claimants' statements that any challenge to the constitutional validity of the 2012 Amendment "would likely be futile",[1123] and Mr Salve's statements at the RIM Hearing,[1124] which the Respondent argues amount to concessions from the Claimants.[1125]

988. The fact that the Claimants have refused to challenge the constitutionality of the 2012 Amendment is, in the Respondent's submission, proof that they rightly concede its constitutionality. If the Claimants believed that a constitutionality challenge had any prospect of success, it is "unthinkable" that they would not have brought it given the stakes at issue. The Respondent points out in this respect that "[t]he effect of a finding of unconstitutionality by the Indian Courts would be to put an end to the disputed tax demands and all related (interest and penalty) proceedings directly in the legal order in which those tax demands have been made (that of the Respondent); in contradistinction to the present arbitral proceedings, the outcome of which (by way of an award) will stand to be enforced in that or another legal order."[1126] Accordingly, for the Respondent, there can be no doubt as to the 2012 Amendment's constitutionality.

989. The significance of the Claimants' failure to challenge the 2012 Amendment, in the Respondent's submission, lies in the fact that the standards applied by the Indian courts when considering the constitutionality, or not, of legislation are "congruent" with the standards that international tribunals typically apply under the FET standard. The standards which an Indian court would apply on a review of constitutionality, while not identical to those under the BIT, broadly reflect the FET standard under the Treaty. These standards include reasonableness (Article 14 of the Constitution), proportionality (Article 19), and the rule of law (Articles 14 and 21).[1127] The Respondent clarifies that it has never argued that these standards are identical; however, "both Parties are agreed that the constitutional test and the test under Article 3(2) use the same tools – such as rationality, the absence of discrimination or arbitrariness – to assess the legality of the

---

[1121] *Id.*, ¶ 511.

[1122] *Id.*, ¶¶ 506-511.

[1123] C-SoC, ¶ 382.

[1124] Transcript, RIM Hearing, 29:21-30:1 (Mr Salve) ("MR SALVE: Let me tell you very honestly, let me tell you very honestly why. We have three broad grounds on which we have challenged. We cannot, before the statutory authorities, say the law is unconstitutional. Besides, we don't want to, because that, according to us, is a very thin challenge in India."); 205:1 to 205:8 ("The speech has constitutional overtone because this was actually introducing the Finance Bill in Parliament. The day the Finance Bill comes into Parliament its rates become enforceable. Look at what it says in paragraph 10. 'The sovereign right of the Government to undertake retrospective legislation is unquestioned.' He's right.").

[1125] R-Rejoinder, ¶ 509; R-PHB, ¶¶ 12, 46.

[1126] R-Rejoinder, ¶ 511.

[1127] Respondent's Answers to the Tribunal's Questions, ¶¶ 113-120; Transcript, Evidentiary Hearing, Day 4, 40:8-15 (Mr Moollan).

legislation", and "are, in that sense, functionally equivalent".[1128] The Respondent further clarifies that its case is that this congruence "undermine[s] the Claimants' claims as a matter of credibility: if the Claimants' claims in this arbitration had any merit, the Claimants would have brought a constitutional challenge, and the fact that they run away from such a challenge is a factor which should weigh against the credibility of their claims in this arbitration."[1129]

*(2)   There has been no breach of the Claimants' legitimate expectations*

990.   The Respondent contends that, while the Claimants have sought to frame their FET claim as various breaches of the so-called "strands" of the FET standard, properly analysed, their principal complaint involves a violation of their alleged legitimate expectations. The Respondent denies that there has been any such breach here.

991.   For the Claimants to show that their legitimate expectations were violated, they must – in the Respondent's submission – demonstrate that their expectations:

   a.   Were based on specific commitments given by the Respondent;[1130]

   b.   Were reasonable and legitimate in light of the circumstances (which includes all the circumstances, including the legal framework of, and other conditions in, the host State);[1131] and

   c.   Were reasonably relied on by the Claimants at the time that they made the investment.[1132]

992.   According to the Respondent, the Claimants meet none of these requirements.

993.   As discussed in the preceding Section, the Respondent submits that the FET standard "itself requires that any expectations of the investor be grounded in the Respondent's legal framework. In the present case, that legal framework was not one which banned retroactive taxation, but one with a long and transparent history of retroactive taxation."[1133] Any expectation that this would not occur would require specific commitment to the contrary, by way of a stabilisation clause or otherwise. More specifically, "what the Claimants would have needed to show was a specific commitment made by the Respondent to the Claimants with a specific assurance that

---

[1128]   *Id.*, ¶ 120

[1129]   *Id.*, ¶ 118 (emphasis omitted).

[1130]   R-PHB, ¶¶ 329, 331-357, citing *Metalclad v. Mexico*, ICSID Case No ARB(AF)/97/1, Final Award, 30 August 2000, CLA-52, ¶¶ 78-101; *CMS v. Argentine Republic*, ICSID Case No ARB/01/8, Award, 12 May 2005, CLA-46, ¶ 277; *Continental Casualty v. Argentine Republic*, ICSID Case No ARB/03/9, Award, 5 September 2008, RLA-259, ¶ 261; *GAMI v. Mexico*, UNCITRAL (NAFTA), Award, 15 November 2004, CLA-125, ¶ 76; *Feldman v. Mexico*, ICSID Case No ARB(AF)/99/1, Award, 16 December 2002, RLA-44, ¶ 148; *PSEG Global v. Turkey*, ICSID Case No ARB/02/5, Award, 19 January 2007, RLA-376, ¶ 241.

[1131]   R-Rejoinder, ¶¶ 529-530; R-PHB, ¶¶ 329, 358-364.

[1132]   *Id.*, ¶ 531; R-PHB, ¶¶ 329, 365-374.

[1133]   R-PHB, ¶ 361.

the tax regime would remain constant throughout the period of the Claimants' investment."[1134] Yet, India gave no specific assurances as to the stability of the fiscal framework or that the laws would not change retroactively/retrospectively.

994.   The Respondent submits in this respect that the relevant point in time to assess whether the Claimants' asserted legitimate expectations allegedly arose and were relied upon is the time in which the Claimants made their investment in India (i.e., 1996) and not in 2006, when the Claimants in fact made a divestment of that investment.[1135] Accordingly, the Claimants can only invoke legitimate expectations relied upon at the time of the Command Acquisition. However, the Claimants have adduced no evidence "(i) that the Command transaction was brought to the attention of the tax authorities by either Command and its shareholders (Command being a listed company) or Cairn; (ii) of whether Command's shareholders made any capital gains, how those were treated in each shareholder's relevant jurisdictions and/or under any applicable DTAA; or (crucially) (iii) that – even assuming that Command's shareholders made capital gains as a result of Cairn's acquisition of Command and that they did not pay capital gains tax in India on the same – that fact was a determining factor in the Claimants' decision to invest in India in 1996."[1136] The Claimants cannot seek to rely on any expectations that could have arisen at the time of the 2006 Transactions, because their alleged "reorganisation" involved no new investments, only divestments.[1137]

995.   None of the other factors invoked by the Claimants qualify as specific assurances that could have given rise to a legitimate expectation at the relevant point in time:

   a.   None of the alleged representations cited by the Claimants at footnote 799 of the Updated Reply (namely, that (i) India represented to the WTO that it had entered into BITs "with a view to providing predictable investment climate to foreign investment in India", (ii) India invited Cairn and other foreign investors in the oil and gas sector to invest in India promising attractive conditions for investment, and (iii) during the negotiation of the UK-India BIT, the UK delegation opined that the BIT was designed "to create a climate of confidence for investors") amount to the type of representation that could give rise to a legitimate expectation, nor do they make any specific representation of tax stability. In any event, they all post-date the Claimants' purported investment in India.[1138]

   b.   The specific agreements (the PSCs) that the Claimants entered into with the Indian State had stabilisation clauses of narrow ambit, which applied only to petroleum taxes. If the Claimants wanted to be insulated from India's longstanding practice of retrospective tax legislation, they should have negotiated wider stabilisation clauses than those included in the PSCs, covering not only their operating companies, but also the parent companies, which were required to give parent

---

[1134]   R-Rejoinder, ¶ 570.

[1135]   R-PHB, ¶¶ 365-374.

[1136]   *Id*., ¶ 368 (footnotes omitted).

[1137]   *Id*., ¶ 372.

[1138]   R-Rejoinder, ¶¶ 565-568.

company guarantees under the PSCs. What the Claimants are effectively seeking to do is to renegotiate that contractual bargain, in a way which investment tribunals have consistently denied.[1139]

c.   Nor does the Claimants' prior transactional experience in India amount to a specific representation by India. As discussed above, there is no evidence that India made any specific representation of tax stability to Cairn prior to its decision to invest. Further, the Claimants have not provided any details regarding those transactions, shown that any disclosures were made to the tax authorities, or the basis for their non-taxability. On this basis, it was impossible for the Respondent to determine whether these transactions should have been taxed.[1140]

d.   The Claimants' reliance on the ITAT Order of 9 March 2017 is misconceived. This decision post-dates the Claimants' investment by two decades, and the measure challenged by several years, so it cannot amount to a specific representation by India. In any event, the Claimants have misunderstood the ITAT's ruling: when the ITAT stated that CUHL "could not have visualize[d] its liability for payment of advance in the year of transaction",[1141] it was not stating that CUHL could not have foreseen that the 2006 Transactions were taxable; it was stating that CUHL could not have visualised the payment of advance tax, because such advance tax would have been reduced by the tax deductible at source. In any event, the Respondent notes that the ITAT's finding on this issue is *per incuriam* and is currently being appealed by the ITD before the Delhi High Court.[1142]

996.   As to the Claimants' alleged due diligence and "extensive disclosures" to and approvals from the Indian authorities in the context of the 2006 Transactions, the Respondent argues that they are irrelevant since "the Claimants cannot rely on any asserted representations that were made after the time at which they made their first investment in India, in 1996."[1143] Even if they were relevant, the Respondent makes the following points:

a.   An investor's purported "due diligence" is no substitute for a specific representation emanating from the host State and directed at the investor;[1144] nor did any of the approvals granted by other branches of the Government (RBI, SEBI, FIPB) amount to a specific commitment that the tax laws would not change.[1145]

---

[1139]   *Id.*, ¶¶ 414(b), 465, 572-589; Transcript, Evidentiary Hearing, Day 6, 9:2-19 (Mr Moollan).

[1140]   R-SoD, ¶ 276(a); R-Rejoinder, ¶ 673.

[1141]   ITAT Order of 9 March 2017, *Cairn UK Holdings Ltd v. D.C.I.T.*, ITA No. 1669/Del/2016, Exh. C-228, ¶ 41.

[1142]   R-Rejoinder, ¶¶ 674-686.

[1143]   R-PHB, ¶ 373.

[1144]   R-Rejoinder, ¶¶ 649-660.

[1145]   R*Id.*, ¶¶ 661-672; R-SoD, Annex A.

b.   In any event, the Claimants did not disclose the 2006 Transactions to the tax authorities, nor did they obtain a specific representation from those authorities as to the taxability of the 2006 Transactions. The Respondent explains that India "operates a system of self-assessment, and the duty is on the taxpayer to make use of the specific mechanisms placed by the tax authorities at its disposal to bring cases to their attention and obtain specific representations as to the tax position".[1146] The Claimants had the possibility, but did not use it, to apply to the Authority for Advanced Rulings ("AAR") for an advance ruling, or a Low Deduction/No Deduction of Tax Certificate for the repatriation of the money involved in the 2006 Transactions under section 195/197 of the ITA, or they could have filed a tax return for the relevant year.[1147] Nor can the Claimants' disclosures to the TPO or AO in the context of unrelated transactions (the sale of CIL shares to Petronas and Vedanta) amount to a representation of the non-taxability of the 2006 Transactions.[1148]

997.   To the extent that any Claimants' conduct post-dating their alleged investment may be taken into account, the Respondent argues that the reckless behaviour (in particular, the Claimants' aggressive tax planning and their attempts to circumvent and exploit Indian regulations, as they did for instance with the SEBI Guidelines) undermines any expectation they could have had that they would not be taxed for the 2006 Transactions.[1149]

998.   In the absence of a specific commitment at the relevant time, the Respondent submits that the Claimants' case boils down to "their allegation that they had a purported legitimate expectation based on the purportedly settled meaning of a general provision of India's general income tax legislation – section 9(1)(i)."[1150] However, the Claimants cannot rely on this alleged "settled law" as basis for their purported legitimate expectation. Leaving aside the Respondent's argument that the law was not settled in this respect (which has been addressed at Section VII.A.3.b(iii) above), the Respondent submits that, to give rise to legitimate expectations, any representations or commitments made by the State must be specific; legitimate expectations cannot arise from general regulations.[1151]

999.   Alternatively, should the Tribunal consider that legitimate expectations may arise from "implicit representations" in legislation, it should nonetheless exercise constraint in

---

[1146]   R-Rejoinder, ¶ 254; Second Witness Statement of Mr Sanjay Puri ("Puri WS2"), ¶ 23.

[1147]   R-Rejoinder, ¶¶ 599, 668.

[1148]   *Id*., ¶¶ 663-664.

[1149]   *Id*., ¶¶ 590-595.

[1150]   R-PHB, ¶ 369.

[1151]   *Id*., ¶ 349, espousing the "second school of thought" referred to in *Masdar Solar v. Spain*, ICSID Case No ARB/14/1, Award, 16 May 2018, CLA-341, ¶ 504: ("[t]he second school of thought considers that a specific commitment giving rise to legitimate expectations cannot result from general regulations and that something more is needed. It espouses the principle that a stabilisation commitment made in a law is just as much subject to change as all the other dispositions of the law in question. A limitation of the State's legislative power can only be derived from constitutional principles in the internal legal order and possibly rules of *jus cogens* in the international legal order.").

doing so.[1152] The Respondent argues in this respect that, when tribunals have recognised that legitimate expectations may arise from general regulations, they have done so when faced with legislation creating specific incentive schemes or specific legal regimes and on which the investment based. As noted by the *El Paso* tribunal, "two types of commitments might be considered 'specific': those specific as to their addressee and those specific regarding their object and purpose."[1153] So for instance, *Micula v. Romania* concerned an incentive scheme for the development of a remote part of Romania, and the Spanish solar cases (in particular, *Eiser v. Spain*) concerned specific incentive regimes set out in general legislation, the very purpose of which was to cause investors to invest in reliance on those specific incentive regimes.[1154]

1000.   According to the Respondent, "[t]hese cases are a world away from the facts of the present case, in which the Claimants seek to found a legitimate expectation on a general provision (section 9(1)(i)) of a general piece of legislation (the Income Tax Act of 1961), all the more so when the alleged 'representation' relied on is not contained in the terms of the provision itself but of an allegedly settled meaning thereof which was not contained in a single decision of the Respondent's courts (there having been by the Claimants' own admission, no decision whatsoever on point until *Vodafone*)."[1155]

1001.   The Respondent contends in this respect that the Claimants' reliance on *ATA v. Jordan* is misconceived. The Claimants seek to argue that it concerned a general law in Jordan, and not an incentive scheme. However, they confuse the representation made to the investor with the measure said to have frustrated that representation. While the frustrating measure was indeed a general law on arbitration, Jordan had made a representation to the claimants by way of a specific arbitration clause contained in a specific contract with a government-controlled entity.[1156]

1002.   The Respondent concludes that, "in the absence of any specific representation to the contrary and in particular of any applicable stabilisation clause", the Claimants could have "no legitimate expectations that India would not make use of its longstanding and transparent legislative powers, within the bounds of the equally longstanding constitutional safeguards put in place by the Indian Courts."[1157] As, in the Respondent's submission, the 2012 Amendment is undoubtedly constitutional, this "puts an end to the Claimants' allegation of breach of legitimate expectations, for the Claimants could not as a matter of law and fact and absent any specific representation to the contrary hold any legitimate expectation that the normal constitutional framework of India would not apply to it".[1158]

---

[1152]   *Id.*, ¶ 350.

[1153]   *El Paso v Argentina*, ICSID Case No. ARB/03/15, Award, 31 October 2011, CLA-24, ¶ 375.

[1154]   R-PHB, ¶¶ 336-337, 341.

[1155]   *Id.*, ¶ 350(b).

[1156]   *Id.*, ¶ 25.

[1157]   R-Rejoinder, ¶ 501.

[1158]   *Id.*, ¶ 414 (emphasis omitted).

*(3)   There has been no breach of the "residual elements" of the FET standard*

1003.  In the Respondent's submission, neither the 2012 Amendment nor its application to the Claimants violates any of the other "strands" of the FET standards (what the Respondent calls the "residual elements" of the FET standard).[1159] According to the Respondent, in the absence of a legitimate expectation,[1160] the Claimants' "claim must fail unless the Claimants can show that the measure taken was unconstitutional or the breach of a rule of *jus cogens* (or at the very least of customary international law)."[1161]

1004.  <u>First</u>, according to the Respondent, "the Claimants' case is at heart an unprincipled appeal to prejudice built on an assumption – never expressly articulated, let alone proven – that retroactivity in tax matters is unfair *per se*, or that the taxation of indirect transfers is anomalous and a breach of international standards, or (failing that) that a combination of the two would itself be a breach of international standards."[1162]

1005.  While the Claimants seek to rely on the statement made in *ATA v. Jordan* that "retroactivity is the problem here",[1163] nothing in the text of the Treaty, nor in Indian law, nor in customary international law, prohibits retroactive taxation.[1164] The Respondent's argument on retroactivity is essentially the following:[1165]

  a.   There is no express provision in the Treaty banning retroactive or retrospective taxation. Accordingly, for the Claimants' claim to succeed, they would need to demonstrate that there is a free-standing customary international law rule that prohibits retroactive/retrospective taxation. For this, they would need to establish that there is sufficient State practice and expressions of *opinio juris* to give rise to a customary international law prohibition.

  b.   The Claimants cannot discharge this burden. As they themselves recognise, there is no "undefined customary international law standard of taxation".[1166] There is no consistent State practice or *opinio juris* which prevents retroactive taxation. According to the Respondent, States have "unfettered powers in that respect, subject only to legal and constitutional limits set by themselves".[1167] The Claimants "cannot manufacture a test based on selected comparative law which

---

[1159]  R-PHB, ¶¶ 509-532.

[1160]  While the Respondent refers to the absence of a specific commitment, the Tribunal understands this argument to address the other "strands" of the FET standard other than legitimate expectations.

[1161]  R-PHB, ¶ 349.

[1162]  R-Rejoinder, ¶ 3.

[1163]  *ATA Construction, Industrial and Trading Co. v. Hashemite Kingdom of Jordan*, ICSID Case No. ARB/08/2, Award, 18 May 2010, CLA-230, ¶ 128.

[1164]  R-Rejoinder, ¶ 417.

[1165]  *Id.*, ¶¶ 417, 688-757.

[1166]  *Id.*, ¶ 417, citing C-SoC, ¶ 298.

[1167]  *Id.*, ¶ 689.

does not establish a rule of customary international law."[1168] The jurisprudence of the European Court of Human Rights ("ECtHR") is irrelevant, as the Claimants invested in India, not in European States subject to its jurisdiction.

c.   Retrospective legislation is an established practice in many States, such as the United States, the United Kingdom, Australia, Canada, the Netherlands, Germany, Italy and Belgium. Relying on a treatise on comparative tax law, the Respondent asserts that "there is generally no restriction on a legislature's ability to tax retrospectively, as long as it does not act capriciously".[1169]

d.   In any event, it is Indian law and practice that is relevant to determine whether retrospective tax legislation is acceptable and what is Parliament's margin of manoeuvre.[1170] As discussed in Section VII.A.3.f(i)(1) below, Indian law allows retroactive/retrospective taxation, subject to certain constitutional safeguards.

1006.  The Respondent further submits that "[t]here is equally no rule of customary international law prohibiting the taxation of indirect [*sic*] offshore indirect transfers, whether retroactive or otherwise, or limiting States' sovereignty in that respect."[1171]

1007.  The Claimants' attempt to rely on other alleged rules of public international law relating to (a) separate corporate personality and (b) the situs of shares is similarly misconceived. The Claimants have not proved the existence of these alleged rules as a matter of customary international law, nor do they explain what the exact contours of those rules would be. Even assuming *arguendo* that each of these two rules is a separate rule of customary international law, they cannot somehow be combined to prove a rule of customary international law that does not otherwise exist. Neither alleged rule has ever barred source taxation, nor can the combination of these rules prohibit indirect or source taxation, either prospective or retroactive.[1172]

1008.  Second, the Respondent denies that the 2012 Amendment fundamentally undermined the rule of law in India, or that India somehow failed to apply the law. The Respondent insists that it applied Indian law in accordance with its transparent constitutional framework, which long predated the Claimants' purported investment. While the Claimants argue in this arbitration that the 2012 Amendment is unconstitutional,[1173] they have chosen not to challenge its constitutionality before the Indian courts. As a result, absent a denial of justice, the Claimants' claim must fail.[1174]

---

[1168]  *Ibid.*

[1169]  *Id.*, ¶ 693, citing Victor Thuronyi, Kim Brooks, and Borbala Kolozs, *Comparative Tax Law* (2nd ed., Kluwer Law International, 2016), RLA-276, pp. 64-65.

[1170]  *Id.*, ¶¶ 715, 729.

[1171]  *Id.*, ¶ 730.

[1172]  *Id.*, ¶¶ 756-757.

[1173]  *Id.*, ¶ 765, citing C-Updated Reply, ¶ 477.

[1174]  *Id.*, ¶¶ 418, 758-776.

1009. <u>Third</u>, the Respondent contends that "the Claimants' case boils down to an argument that the 2012 Amendments were bad policy."[1175] Indeed, the Claimants rely on the Shome Committee Report and the Damodaran Report, which considered the desirability of retrospective legislation from a policy perspective, and on policy statements of past and present Finance Ministers.[1176] However, the Claimants themselves recognise that they cannot challenge India's policy decisions.[1177] According to the Respondent, this concession "wholly undermines the Claimants' claims", because "[t]he function of this Tribunal is not to adjudicate the wisdom of policy and its effect on encouraging or discouraging foreign investment", which would be "beyond the Tribunal's authority."[1178]

1010. The Respondent submits in this respect that Indian and international case law confirms that it is for the State to determine how the burden of taxation will be distributed.[1179] The Respondent relies in particular on the following cases:

    a. *Chhotabhai Jethabhai Patel v. Union of India*, where the [Indian court] held that "it is for that department of the State [the legislature] to determine how the burden [of taxation] will be distributed and why, because that department is the policy making body and is familiar with the economics and the resources of the country and its needs";[1180]

    b. *Ujagar Prints v. Union of India*, where the [Indian court] stated that the "[v]alidity of legislations retroactively curing defects in taxing statutes is well-recognised and courts, except under extraordinary circumstances, would be reluctant to override the legislative judgment as to the need for and the wisdom of the retrospective legislation";[1181]

    c. The US case *United States v. Carlton*, where the US Supreme Court held that, "[p]rovided that the retroactive application of a statute is supported by a legitimate legislative purpose furthered by rational means, judgments about the wisdom of such legislation remain within the exclusive province of the legislative and executive branches";[1182]

    d. *Paushok v. Mongolia*, where the tribunal stated that tax policy "is more a subject for political debate than arbitral decisions";[1183] and

---

[1175] *Id.*, ¶ 474.

[1176] *Ibid.*

[1177] *Id.*, ¶ 475, citing C-Updated Reply, ¶¶ 17, 38-39.

[1178] *Id.*, ¶ 476.

[1179] *Id.*, ¶¶ 777-785.

[1180] *Chhotabhai Jethabhai Patel v. Union of India*, AIR 1962 SC 1006, Exh. R-144, ¶ 117.

[1181] *Ujagar Prints v. Union of India and Others*, [1989] 3 SCC 488, Exh. R-183, pp. 347-348.

[1182] *United States v. Carlton*, (512 U.S. 26 (1994)), Exh. DR-31, pp. 32-33.

[1183] *Sergei Paushok, CJSC Golden East Company and CJSC Vostokneftegaz Company v. Mongolia*, UNCITRAL, Award on Jurisdiction and Liability, 28 April 2011, RLA-189, ¶ 328.

e.   *Mamidoil v. Albania*, holding that a tribunal has "no authority to replace the State's policy rationale by its own".[1184]

1011.   Fourth, the Respondent denies that there has been any discrimination, arbitrary conduct, bad faith or lack of proportionality against the Claimants. In any event, it argues that these claims "sit ill" with the Claimants' decision not to challenge the constitutionality of the 2012 Amendment (as all of these claims would, if true, serve as basis for a challenge to constitutionality in India).[1185]

1012.   In particular, the Respondent rejects the Claimants' argument of discrimination. It argues in particular that:

a.   The Claimants were not targeted in the tax assessment. The reference to "Cairns UK Holding Ltd" in the Written Answers of the Finance Minister to the Rajya Sabha in March 2012 which answered questions on the taxation of overseas transactions was not a reference to the 2006 Transactions, as the Claimants contend, but rather a reference to the Vedanta sale in 2011.[1186]

b.   As to the Claimants' allegation that they were targeted at the stage of enforcement of the tax demand, it is inadmissible as it was raised for the first time during the hearing, in response to a question by the Chairman of the Tribunal. In any event, the Respondent presents a table, which purportedly shows five other transactions for which India has presented tax demands for indirect transfers, and dispels the allegation that Cairn has been unfairly targeted.[1187]

c.   Nor were the Claimants discriminated by the High Level Committee simply because they were too late to qualify for the 1 April 2012 cut-off for closed tax assessments, and too early to benefit from the High Level Committee's allegedly special treatment of "fresh" cases arising after August 2014. The reasons for these cut-off dates were based on reasonable and objective policy choices. In any event, the High Level Committee does not have discretionary or arbitrary powers; it is only one more filtering mechanism to ensure that only cases that fell within the 2012 Clarification would be pursued.[1188]

1013.   The Respondent also argues that the measure is not disproportionate.[1189] In particular, the Claimants' allegations of lack of proportionality "disregard the very wide margin for manoeuvre which States are granted in the taxation field, and are in any event based on a complete misrepresentation of the measure which ignores or misrepresents the facts that (a) its rationale was to combat tax avoidance, and in particular cases of double non

---

[1184]   *Mamidoil Jetoil Greek Petroleum Products SA v Albania*, ICSID Case No ARB/11/24, Award, 30 March 2015, CLA-150, ¶ 787.

[1185]   R-Rejoinder, ¶¶ 420, 786-816.

[1186]   R-PHB, ¶¶ 533-540.

[1187]   *Id.*, ¶¶ 541-544.

[1188]   *Id.*, ¶¶ 546-549.

[1189]   R-Rejoinder, ¶ 817.

taxation; and (b) even though framed as a retroactive measure going back 61 years as a matter of legislative draughtsmanship and constitutional practice, it only went back 6 years."[1190]

1014. More generally, the Respondent finds fault with what it calls the "scattergun allegations"[1191] or "laundry list" approach[1192] adopted by the Claimants in respect of the strands of the FET standard other than legitimate expectations. The *Micula* tribunal made it clear that the FET standard is not "a laundry list of potential acts of misconduct".[1193] In particular, the Respondent makes the following submissions:[1194]

    a.   <u>Stability</u>: there is no self-standing obligation of "stability" under the FET standard; instead, the FET standard "balances any legitimate expectation of stability on the part of the investor with the State's legitimate policy interests and its sovereign rights to regulate."[1195] For the Respondent, the fact that the Claimants had no legitimate expectations is dispositive of their claim for any violation of the stability of legal framework. The notion of "predictability", which the Claimants seek to portray as a separate "strand" of the FET obligation, forms part of the notion of stability.

    b.   <u>Consistency</u>: the Claimants allege that they purportedly fully disclosed the content of the 2006 Transactions to the authorities, and thus India acted inconsistently when later taxing this transaction. This is based on the same deliberate confusion as to the entirely separate competence of the FIPB, the SEBI, and the RBI, to which certain disclosures were made on one hand; and of the ITD on the other. There was no "inconsistency", only a deliberate decision by the Claimants to give each regulator exactly what they thought that regulator needed to know and no more, the suppression of material information (such as the Daylight Loan) from all regulators, and a complete failure to approach the competent authority on matters of taxation and assessment (the ITD).

    c.   <u>Transparency</u>: this standard requires that there be "a readily apparent legal framework which the relevant decision can be traced back to".[1196] This test is easily satisfied, as the Indian constitution always allowed retroactive taxation.

---

[1190] R-Rejoinder, ¶ 420.

[1191] *Id.*, ¶¶ 821-823.

[1192] R-PHB, ¶¶ 515-532.

[1193] *Ioan Micula, Viorel Micula, S.C. European Food S.A, S.C. Starmill S.R.L. and S.C. Multipack S.R.L. v. Romania [I]*, ICSID Case No. ARB/05/20, Final Award, 11 December 2013, CLA-23, ¶ 517.

[1194] R-PHB, ¶¶ 515-532.

[1195] R-PHB, ¶ 515.

[1196] R-PHB, ¶ 519, referring to *Ioan Micula, Viorel Micula, S.C. European Food S.A, S.C. Starmill S.R.L. and S.C. Multipack S.R.L. v. Romania [I]*, ICSID Case No. ARB/05/20, Final Award, 11 December 2013, CLA-23, ¶ 530.

d.   <u>Due process</u>: the Claimants' allegation of violation of due process is entirely baseless as the impugned 2012 Amendment was passed fully in accordance with the Indian Parliament's procedures.

e.   <u>Reasonableness</u>: the Claimants have not pleaded in their pre-hearing submissions that the 2012 Clarification was in any way "unreasonable", and it is not open to the Tribunal to find for the Claimants on that basis. In any event, according to the Respondent, this is a simple requirement – which one can also see at play in domestic administrative law systems – that the measure must bear a "reasonable relationship to some rational policy".[1197] When applying this standard, the Tribunal must pay proper respect and deference to the sovereignty of the host State, and not simply substitute its own judgment to that of the elected government of the host State. The Tribunal should thus give no value to the Claimants' heavy reliance on several reports that have criticised the 2012 Amendment on the basis of policy.[1198]

In the present case, the policy rationale behind the 2012 Amendment was set out by the Finance Minister during the Parliamentary debates as follows:

> There cannot be a situation where somebody will make money on an asset located in India and will not pay tax either to India or to the country of its origin by making some arrangements to certain tax haven areas, to certain tax haven locations through a complicated setting up of a series of subsidiaries, and having huge capital gains on the assets located in India. We cannot declare India as a tax haven simply to attract the foreign investment. I want foreign investment for technology, for development, for resources. Either you pay tax here or you pay tax in your own country with which we have a Double Taxation Avoidance Agreement. It is as simple as that.[1199]

Thus, India made a policy choice that the (negative) implications of India becoming a tax haven should prevail over the potential negative effects on foreign investment. That was an entirely rational policy choice, with which the measure impugned bore an entirely reasonable relationship.

f.   <u>Substantive Propriety</u>: this standard refers to prohibition of arbitrariness or discrimination, which is not proven in the present case. The Respondent calls the Claimants' allegation that they were targeted by India's measures along with a small group of investors an "utter nonsense" and "a complete fabrication".[1200] The 2012 Amendment was a measure of general application. The Claimants rely on

---

[1197] *Saluka Investments BV v. Czech Republic*, UNCITRAL, Partial Award, 17 March 2006, CLA-44, ¶ 460.

[1198] Expert Committee, Final Report on Retrospective Amendments Relating to Indirect Transfer dated 2012 ("Shome Report"), Exh. C-376; Report of the Committee for Reforming the Regulatory Environment for Doing Business in India submitted 2 September 2013 ("Damodaran Report"), Exh. C-136; TARC Report, Exh. C-137.

[1199] Shri Pranab Mukherjee, Minister of Finance, Transcript of Speech before Lok Sabha (Parliament) dated 7 May 2012, Exh. R-165, pp. 30-31.

[1200] R-PHB, ¶¶ 532, 534.

the fact that in the March 2012 letter to the Rajya Sabha the Finance Minister identified several transactions, including that of "Cairns UK Holding Ltd" in which India could lose tax revenue due to the *Vodafone* judgment of the Supreme Court. However, that reliance is misconceived: It was abundantly demonstrated at the hearing that this reference pertained to the 2011 Vedanta sales transaction and not to the 2006 Transactions.[1201]

1015.  Overall, the Respondent contends that the Claimants have failed to discharge the burden of proving a violation of the FET standard. Their self-serving complaints about retroactivity in general are devoid of any substance. The Claimants' entire case proceeds on the constant assumption that retroactive taxation is wrong *per se*, but they continuously fail to articulate any principled reason as to how or why. Indeed, there is clearly no customary international law rule limiting States' powers of retroactive taxation. Thus, according to the Respondent, "States have unfettered powers in that respect, subject only to legal and constitutional limits set by themselves."[1202] Given the absence of any specific commitments from India and given India's long-standing history of applying its fiscal measures retroactively, the Tribunal should respect the Respondent's sovereign prerogative in the field of taxation and dismiss the Claimants' unfounded claim under Article 3(2) of the BIT.

### 3.    The Tribunal's analysis

1016.  The Claimants argue that the Respondent's fiscal measures amount to treatment that is unfair and inequitable under the BIT. In particular, they argue that the assessment of capital gains tax on the CIHL Acquisition, more than seven years after it occurred, is unfair and inequitable, because it is grounded on a substantive amendment of the law (namely, the 2012 Amendment) that retroactively applied to the Claimants a tax burden that did not exist when the CIHL Acquisition took place. The Claimants further contend that the enforcement measures that followed from that tax assessment are similarly unfair and inequitable, not only because they derive from the retroactive amendment of the law, but because they were arbitrary and discriminatory.

1017.  The Respondent denies that it has treated the Claimants unfairly and inequitably. Its primary position, however, is not that the measure that the Claimants complain of is fair and equitable, but rather that the Tribunal should disregard it because the tax imposed upon the Claimants was in any event justified under the law in force at the time on different grounds.[1203] In particular, the Respondent argues that the 2006 Transactions (of which the CIHL Acquisition is part) would have been taxable even without the 2012 Amendment because (i) they were tax avoidant transactions, and thus taxable under the "look at" doctrine developed by Indian courts, which focuses on substance over form, and (ii) they entailed the indirect transfer of immovable property, which is taxable under Section 2(47)(vi) of the ITA. It is only if the Tribunal is not persuaded that the 2006

---

[1201]  *Id.*, ¶¶ 533-540.

[1202]  *Id.*, ¶ 570.

[1203]  See, e.g., R-SoD, ¶ 75 (submitting that: "The primary issue that arises in this case – and one which is itself studiously avoided by the Claimants – is that of tax avoidance under s. 9 of the ITA.") and R-Rejoinder, ¶ 423 (submitting that "the measure challenged by the Claimants (the 2012 Clarification) is simply irrelevant if the transaction was tax abusive and therefore taxable on that separate ground").

Transactions were otherwise taxable that the Respondent asks the Tribunal to examine the 2012 Amendment. Should the Tribunal reach this stage, the Respondent argues that the 2012 Amendment was not unfair and inequitable because it merely clarified existing law, and thus did not create a new tax burden. Even if it did, the Respondent contends that retrospective legislation is legitimate in India, provided it meets certain constitutional requirements, and thus cannot be considered to be unfair and inequitable.

1018. The Tribunal understands the structure of the Respondent's argument, and agrees that its two primary defences (tax avoidance and Section 2(47)(vi)), if successful, could potentially defeat an FET claim. Indeed, if a particular transaction has been taxed or is subject to tax under different grounds, and at least one of them has been fairly imposed, an international tribunal might find that taxing the investor that way would not be treating the investor unfairly or inequitably. The Tribunal will accept, *arguendo* only, that this proposition is correct and will thus assess whether either of the alternative tax grounds that the Respondent now advances would be warranted. However, the Tribunal's analysis must begin by assessing the treatment that the Claimants contend has been unfair and inequitable; it cannot start by addressing the Respondent's defences in a vacuum.

1019. Given the Parties' submissions in this case, the Tribunal considers that it must first start by addressing certain disputed factual matters, in particular, the measures complained of and their nature.

    a.    First, the Tribunal will identify the challenged fiscal measures, and the grounds invoked by the Respondent to impose those measures (Section (a) below).

    b.    Second, it will determine what was the effect of the 2012 Amendment, and in particular whether it was a retroactive amendment of the law, as the Claimants contend, or clarificatory in nature, as the Respondent submits (Section (b) below).

1020. Having done this, the Tribunal will turn to whether the fiscal measures decried by the Claimants are unfair and inequitable. In this context:

    a.    It will establish as a third step in its analysis the content of the FET standard (Section (c) below).

    b.    It will then address the Respondent's defence that the 2006 Transactions (and in particular the CIHL Acquisition) cannot be characterised as unfair or inequitable, because they were taxable events even absent the 2012 Amendment, be it because they were tax abusive/tax avoidant (Section (d) below), or because they were taxable under Section 2(47)(vi) of the ITA 1961 (Section (e) below).

    c.    If the Tribunal is satisfied that the 2006 Transactions were not "otherwise taxable" in India absent the 2012 Amendment, it will then address whether the application of the 2012 Amendment to the Claimants was unfair and inequitable (Section (f) below).

### a.   The challenged measures

1021. The Tribunal will start by determining what is the "treatment" that the Claimants complain is unfair and inequitable.

1022. The Claimants' case under Article 3 of the BIT is directed both at the 2012 Amendment itself, and against its application against the Claimants. They submit in this respect that "[b]y enacting the Retroactive Amendment and imposing it on Cairn and its investment in India, the Respondent grossly failed to uphold its obligations under Article 3 of the UK-India BIT to create and maintain 'favourable conditions' for that investment and to accord the Claimants and their investment the right to 'fair and equitable treatment'."[1204] The Claimants also complain of other related measures allegedly depriving them of assets or monies due to them, or imposing other harm.[1205]

1023. More specifically, in their various submissions the Claimants have complained of the following fiscal measures:[1206]

    a.    The ITD's "sham 'investigation'" into Cairn, which the Claimants allege "amounted to a pre-determined hunt through Cairn's financial history for any transaction to which it could apply the Retroactive Amendment",[1207] on the eve of the beginning of CIL's Buy-Back Programme. The Claimants complain in particular of the ITD's "urgent survey at CIL's offices in January 2014 (where it falsely claims to have 'found' documents long held in its files) to manufacture a pretence for blocking CUHL's share sale on 23 January 2014".[1208]

    b.    "[T]he issuance of notices and information requests to CUHL on 21/22 January 2014, followed by [the ITD's] pre-determination of Cairn's tax liability and attachment of CUHL's shares on 22 January before CUHL had any opportunity to respond"[1209] through the ITD's Section 281B Order dated 22 January 2014.[1210]

    c.    The subsequent extensions to that attachment, which prevented CUHL from selling its shares in CIL's Buy-Back Programme, as it had announced in January 2014, and from distributing dividends to CUHL's shareholders.

    d.    The ITD's decision to apply the 2012 Amendment "to intra-group share transfers from 2006, which resulted in no real gains and had been fully disclosed to all relevant government bodies without anyone raising an issue of taxability."[1211] The Claimants complain of "the shocking disproportionality of the tax assessment,

---

[1204]  C-SoC, ¶ 320.

[1205]  C-Updated Reply, ¶¶ 13, 240-255.

[1206]  C-NoA, ¶¶ 42-65; C-SoC, ¶¶ 343-372; C-Updated Reply, ¶¶ 8-13.

[1207]  C-PHB, ¶ 4(ii).

[1208]  *Id.*, ¶ 4(iv) (footnotes omitted).

[1209]  *Id.*, ¶ 4(v).

[1210]  See Section II.

[1211]  C-PHB, ¶ 4(iii).

now potentially amounting to more than US$ 7 billion (with interest and penalties), several times larger than the entire market valuation of Cairn Energy".[1212] In terms of specific measures, the Claimants point to:

i.    The DAO dated 9 March 2015, in which the Assessing Officer concluded that the Claimants had failed to report capital gains tax on the CIHL Acquisition in fiscal year 2006/07, and imposed a tax in the amount of INR 102,473,642,264 (approximately US$ 1.6 billion at the time).[1213] The Claimants argue that the DAO was "flawed and unfair as it [was] brought primarily on the basis of information long available to the Indian Tax Authorities."[1214]

ii.   The FAO issued by the ITD on 25 January 2016, where the Assessing Officer confirmed the DAO and issued it with slight modifications.[1215] The Claimants allege that, like the DAO, "the FAO is rife with inaccuracies and misrepresentations", relied on documents purportedly found during the 2014 survey but that had already been available to it, and failed to take into account CUHL's objections and evidence.[1216] The Claimants further decry "the many false and unsubstantiated accusations in the FAO made against CUHL, including that CUHL deliberately falsified its FIPB application by concealing that the final exchange with CIL was for cash;"[1217]

e.    The ITD's "decision to pursue CUHL for penalties and interest, despite its own tax appellate tribunal having ruled that CUHL could not have 'visualised'" the 2012 Amendment,[1218] and in particular:

i.    The Notice of Demand received by CUHL on 4 February 2016, which instructed CUHL to pay INR 291,025,144,030 or approximately US$ 4.4 billion at that time. This included interest under Sections 234A and 234B of the ITA 1961 that had allegedly accrued at a rate of 2% per month on the US$ 1.6 billion principal.[1219]

ii.   The Section 274 Notice received by CUHL on 4 February 2016, requiring it to "show cause as to why an order imposing a penalty for allegedly concealing the particulars of income or furnishing inaccurate particulars of income in the assessment year 2007-08 should not be made under Section

---

[1212]   *Id*., ¶ 4(vii).

[1213]   DAO to CUHL dated 9 March 2015, Exh. C-31.

[1214]   C-NoA, ¶ 59.

[1215]   FAO, Exh. C-70.

[1216]   C-SoC, ¶ 266.

[1217]   C-PHB, ¶ 4(vi).

[1218]   *Id*., ¶ 4(viii).

[1219]   Notice of Demand under Section 156 dated 25 January 2016, Exh. C-71.

271(1)(c) of the ITA 1961".[1220] The Claimants contend, that statutorily available penalties under this provision, which the Respondent has the authority to invoke, would increase the overall tax claim by billions of dollars.[1221]

   iii.   The ITD's updated tax demand dated 14 March 2017, requiring payment by 15 June 2017.[1222]

   iv.   The Respondent's imposition of a penalty order on 27 September 2017, where the Claimants assert that the Respondent alleged for the first time in any Indian proceeding that the 2006 Transactions were an "abusive tax avoidance scheme".[1223]

f.   The Respondent's enforcement actions to obtain payment of the tax demand, in particular through the attachment and forced sale of CUHL's shares in CIL, starting on 16 June 2017. The Claimants complain in particular of the following actions:

   i.   The notice of demand dated 16 June 2017 which initiated the [definitive] attachment,[1224] followed by a warrant of attachment of movable property on 26 July 2017.[1225]

   ii.   The Prohibitory Order issued by the Tax Recovery Officer on 18 August 2017, in which it formally attached the shares and forbade their sale.[1226]

   iii.   The Respondent's garnishment/set off of the refund received pursuant to an order of the Commissioner of Income Tax relating to the 2011 sale of CIL shares to Vedanta, against the outstanding tax demand issued in the context of the 2006 Transactions.[1227] The Claimants allege that they found out that this amount had been set off against the existing tax demand through an updated notice of demand issued by the Tax Recovery Officer on 16 June 2017, which indicated that the amount of interest had been "reduced by Rs.

---

[1220]   C-SoC, ¶ 283.

[1221]   Ibid.

[1222]   Letter from the Assistant Commissioner of Income Tax to CUHL dated 1 March 2017, Exh. C-324; see also CUHL Appeal Effect dated 31 March 2017, Exh. C-320.

[1223]   Penalty Order for A.Y. 2007-08 issued against CUHL dated 29 September 2017, Exh. C-382.

[1224]   Notice of Demand to the Defaulter dated 16 June 2017, Exh. C-327; Notice under Section 226(3) of the ITA 1961 dated 16 June 2017, Exh. C-326.

[1225]   Warrant of Attachment of Movable Property dated 26 July 2017, Exh. C-383.

[1226]   Prohibitory Order where the Property Consists of Shares in a Corporation dated 18 August 2017, Exh. C-384.

[1227]   C-Updated Reply, ¶¶ 252-255; Letter from the Assistant Commissioner of Income Tax to CUHL dated 1 March 2017, Exh. C-324.

1593,99,28,667/- already collected by adjustment of refund arising in assessment year 2012-13 in the assessee's case".[1228]

    iv.   The Respondent's decision "to liquidate CUHL's holdings of CIL/VL shares shortly before this dispute is resolved, to thwart the Claimants' ability to collect on any damages award."[1229]

g.   The Respondent's statements and/or actions directed to detain the releases of dividends from CIL to CUHL,[1230] as discussed in PO7 and summarised in Section III above.

h.   "[T]he Respondent's false and constantly evolving accusations that Cairn engaged in deliberate tax abuse, despite the absence of any basis in the tax assessment, and its belated attempt to inject similar claims into the High Court proceedings".[1231]

1024.   The Claimants' litany of grievances encompasses, essentially, three categories of "treatment" by the Respondent which could give rise to different breaches of FET:

a.   First and foremost, there are the fiscal measures related to the Respondent's taxation of the 2006 Transactions, specifically, the ITD's investigation and evaluation of the 2006 Transactions, its conclusion that CUHL had made capital gains in the CIHL Acquisition, its imposition of capital gains tax on that transaction, its decision to impose interest and penalties on the tax assessed, and its related enforcement measures (including the attachment and forced sale of the shares, and the attachment/obstruction of the release of dividends from CIL to CUHL). The essential question to be answered in this respect is whether the fiscal measures were grounded in Indian law, and if in applying those grounds the Respondent acted in accordance with its international law obligations under the BIT. In particular, if those fiscal measures were grounded in the 2012 Amendment, the question will be whether the application of the 2012 Amendment to the Claimants is in compliance with the Respondent's FET obligation under the BIT.

b.   The second category of "treatment" is whether, irrespective of whether the fiscal measures were in themselves lawful under Indian law, the manner in which they were applied is in conformity with the Respondent's obligations under the BIT. Rather than focusing on the lawfulness of the measures themselves, the concern here is on the form in which they were applied, including whether the Respondent respected due process, and whether it targeted the Claimants in an arbitrary or discriminatory fashion.

c.   The third category of "treatment" relates to the Claimants' allegations that, as part of its defence strategy in this arbitration, the Respondent is accusing the Claimants

---

[1228] C-Updated Reply, ¶ 253, citing Notice of Demand to the Defaulter dated 16 June 2017, Exh. C-327; Calculation of Tax Refund for A.Y. 2012-13 dated 27 July 2017, Exh. C-423.

[1229] C-PHB, ¶ 4(x).

[1230] C-Updated Reply, ¶¶ 235, 248-252.

[1231] C-PHB, ¶ 4(ix).

of deliberate tax avoidance/abuse, and has even initiated proceedings in India to amend the original basis for its taxation measures. It is unclear however whether the Claimants argue that this conduct breaches the Treaty.

1025. In the sections that follow, the Tribunal will assess whether these various categories of treatment were unfair and inequitable under the BIT, starting with category (a) (i.e., the Respondent's fiscal measures) and addressing the remaining categories if needed. Before entering into this analysis, the Tribunal will address three factual issues related to category (a), namely:

a.  Did the 2006 Transactions gave rise to any capital gains, and which alleged capital gains were taxed? As these two issues are interrelated, the Tribunal will address them together in Section (i) below.

b.  What were the grounds for taxation invoked by Respondent in the fiscal measures imposed? (Section (ii) below).

### (i)  Did the 2006 Transactions give rise to any capital gains? Which alleged capital gains were taxed?

1026. The Respondent has argued that the 2006 Transactions gave rise to substantial capital gains, in respect of which no tax was paid anywhere in the world.[1232] The Claimants, by contrast, argue that the Respondent has misconstrued basic capital gains tax principles, and that the 2006 Transactions did not give rise to any taxable capital gain.[1233]

1027. The 2006 Transactions involved essentially reorganising the Cairn group's Indian assets (held by 27 non-Indian foreign subsidiaries of Cairn, and consolidated under the 9 Subsidiaries) into a Jersey holding company, the shares of which could then be acquired by the newly listed Indian subsidiary that the Claimants planned to float in the Indian markets (CIL). It is undisputed that, at the time of the 2006 Transactions, the book value of the 9 Subsidiaries (as recorded in CEP's accounts) was GBP 251 million[1234] (approximately US$ 455 million at the time).[1235] However, their market value (as estimated by Rothschild during the process of bringing the IPO to market) was between US$ 6 and 7.5 billion.[1236]

1028. The 2006 Transactions proceeded in the following essential sequence:

a.  Step 1: CEP consolidated all Indian assets in the 9 Subsidiaries (which in turn owned the remaining 18 Subsidiaries) and separated all non-Indian assets (which were organised under Cairn Resources Ltd.).

---

[1232]  See, e.g., R-SoD, ¶¶ 16-18.

[1233]  See, e.g., C-PHB, ¶¶ 183-204.

[1234]  Transcript, Hearing on Closing Arguments, Day 2, 35:6-8 (Mr McNeill).

[1235]  For the conversions in this section, the Tribunal has used the following currency converter on the appropriate date:  https://www1.oanda.com/currency/converter/.

[1236]  Letter from Rothschild to CIL dated 18 September 2006, Exh. CWS-Brown-66, p. 4; Brown WS2, ¶ 120.

b.   <u>Step 2</u>: CEP incorporated CUHL in the UK and transferred its shares in the 9 Subsidiaries to CUHL, in consideration for CUHL shares. As a result, CUHL became the direct and indirect owner of the 27 Subsidiaries.[1237]

c.   <u>Step 3</u>: CUHL incorporated CIHL in Jersey and transferred its shares in the 9 Subsidiaries to CIHL, in consideration for CIHL shares. As a result, CUHL owned 100% of CIHL, which in turn owned the 9 Subsidiaries.

1029.   Up until this point, the 9 Subsidiaries were still within the Cairn group, and indirectly under CEP. According to Ms Brown, in accordance with international and UK accounting principles at the time, their value was reflected as follows as they moved down the chain:[1238]

> CUHL chose to book the value of the 9 Subsidiaries received from Cairn Energy at the amount equal to the carrying value of those subsidiaries as they were reflected in the solus accounts of Cairn Energy PLC immediately prior to the transfer. In exchange, CUHL issued shares at par value to Cairn Energy equal to that historic book value. Likewise, upon subsequent transfer of these subsidiaries to CIHL by CUHL, CUHL booked the shares it received in CIHL, again, at par value, being equal to the amount the subsidiaries were recorded at immediately prior to their transfer to CIHL – GBP 251,224,744 – notwithstanding that the market value of the asset received in consideration (namely the shares in CIHL) was approximately US$6 billion.[1239]

1030.   It is thus clear that CUHL acquired the 9 Subsidiaries at their book value (i.e., GBP 251 million, at that date approximately US$ 455 million), when their market value was approximately US$ 6 billion.

1031.   Around the same time, CEP assigned to CUHL a debt of GBP 29,780,710 owed to it by CEHL, in exchange for 29,780,710 shares at GBP 1 each.[1240] Immediately after this, CUHL assigned the CEHL Debt to CIHL in return for the issue of 29,780,710 ordinary GBP 1 shares in CIHL.[1241] According to the Respondent's witness, Mr Sanjay Puri, "the transactions relating to transfer of the debt of £29,780,710 from CEP to CUHL and then

---

[1237]   The 18 subsidiaries held indirectly were: Cairn Energy Netherlands Holdings BV; Cairn Energy Group Holdings BV; Cairn Energy Australia Pty Limited; Cairn Energy India Holdings BV; CEH Australia Limited; CEH Australia Pty Ltd; Cairn Energy Asia Pty Limited; Cairn Energy Investments Australia Pty Ltd; Wessington Investments Pty Limited; Sydney Oil Company Pty Ltd; Command Petroleum Limited (PPL56) Ltd; Cairn Energy India Pty Ltd; Cairn Energy India West Holding BV; Cairn Energy India West BV; Cairn Energy Cambay Holding BV; Cairn Energy Cambay BV; Cairn Energy Gujarat Holding BV; and Cairn Energy Gujarat BV. R-SoD, ¶ 14, n. 24.

[1238]   In particular, the International Financial Reporting Standards ("IFRS"), UK Generally Accepted Accounting Principles ("UK GAAP") and UK Companies Act of 1985 on Group Reconstruction Relief. Brown WS2, ¶ 119.

[1239]   Brown WS2, ¶ 120. Ms Brown further explains that, although CUHL first acquired 221,444,032 shares at GBP 1, the total of 251,224,744 incorporates an additional 29,780,710 shares subsequently issued under a debt conversion agreement. Brown WS2, ¶ 120, n. 149.

[1240]   Exh. CWS-Brown-59.

[1241]   R-SoD ¶ 15(g).

in turn from CUHL to CIHL conclusively establish that it was entirely appropriate to calculate the cost of acquisition on the basis of a par value of £1 per share."[1242]

1032.   Step 4 entailed the incorporation of CIL in India as a wholly owned subsidiary of CUHL with minimum capitalisation, and the transfer of the shares of CIHL to CIL (what the Tribunal has referred to as the "CIHL Acquisition"). The plan was that CIL would acquire 20% of CIHL prior to the IPO, in cash, and after the IPO it would acquire the remainder of CIHL's shares, partly with cash (obtained through the IPO) and partly through a share exchange.[1243] This was ultimately done in a series of four tranches, as discussed in Section II above:

1033.   In the event, CUHL acquired approximately 21.8% of CIL (slightly over the 20% MPC) in cash, as follows:

   a.   Tranche 1: On 12 October 2006, CUHL subscribed for shares in CIL, which it paid for through the Daylight Loan. CIL used these same funds to immediately acquire 16.5% of CIHL pursuant to the SSPA. As a result, this cash (which amounted to INR 50,373,987,924, or approximately US$ 1.1 billion) entered and left India on the same day.[1244]

   b.   Tranche 2: On 22 November 2006, CUHL paid an additional share premium of INR 17,554,239,705 (approximately US$ 380 million) to CIL for the shares subscribed for in October. The Tribunal understands that CUHL obtained these funds through the second tranche of the Daylight Loan.[1245] On that same date, CIL used the funds obtained through CUHL's subscription of shares to purchase from CUHL an additional 5.3% of shares in CIHL, specifically a further 13,390,789 shares at a price of INR 17,554,239,705 (approximately US$ 380 million).[1246] This allowed CUHL to repay the second tranche of the Daylight Loan.[1247]

   c.   Once the IPO price range was set, CUHL was required to pay an additional share premium to ensure that it did not acquire the CIL shares at less than the higher end

---

[1242]   Puri WS1, ¶ 54.

[1243]   C-SoC, ¶ 95; Brown WS1, ¶ 55.

[1244]   See Section II.B.3.b above.

[1245]   Brown WS2, ¶ 82; see also Brown WS1, ¶ 86 (stating that "the second transfer that the Indian Income Tax Department has alleged to be a taxable event likewise involves taxation of the return of borrowed funds injected to comply with Indian law."); C-SoC, ¶ 119 ("As with the transfer on 12 October 2006, the Indian Income Tax Department has alleged that this second transfer is also a taxable event even though involves taxation of the return of borrowed funds injected to comply with Indian law.").

[1246]   Brown, WS1, ¶ 86; SSPA, Exh. C-6, Recital F and Section 6; Share Purchase Deed, Exh. C-7, Recital B; FAO, Exh. C-70, ¶ 7.1.3. The Tribunal notes that, according to the SSPA, this second tranche of CIHL shares was envisaged to comprise 9,181,287 shares. However, as noted in the Share Purchase Deed, CIL ended up acquiring 13,390,789 in this second tranche, as reflected also in the FAO.

[1247]   Brown WS1, ¶ 86 ("[T]he second transfer that the Indian Income Tax Department has alleged to be a taxable event likewise involves taxation of the return of borrowed funds injected to comply with Indian law."); see also C-SoC, ¶ 119 ("As with the transfer on 12 October 2006, the Indian Income Tax Department has alleged that this second transfer is also a taxable event even though involves taxation of the return of borrowed funds injected to comply with Indian law.").

of the price range.[1248] Accordingly, on 8 December 2006, CUHL paid a further share premium of INR 1,427,262,991 to CIL (approximately US$ 32 million), in respect of the 365,028,898 shares issued by CIL on 12 October 2006.[1249]

1034. The bidding period for CIL's IPO opened on 11 December 2006, and ran through 15 December 2006.[1250] Shortly thereafter, CIL acquired the remaining 78.2% shareholding in CIHL, also in two tranches:[1251]

    a.    <u>Tranche 3</u>: On 20 December 2006, CIL acquired 53.9 per cent of CIHL through a share swap with CUHL. More specifically, CIL acquired 135,267,264 shares in CIHL from CUHL, for which it issued 861,864,893 of its own shares to CUHL in consideration.[1252] It is undisputed that the value of the shares was INR 160 per share, which was the value fixed by the price achieved for CIL's shares in the IPO, and that this value was later declared to the TPO.[1253] Accordingly, the total consideration for the third tranche of shares was INR 137,882,382,880[1254] (approximately US$ 3 billion at the time).

    b.    On 29 December 2006, following completion of CIL's pre-IPO placement and the IPO itself, CIL acquired the remaining 24.3 per cent of CIHL from CUHL for cash consideration, using a portion of the proceeds from the IPO.[1255] Specifically, CIL acquired 61,073,032 shares in CIHL for a consideration of INR 61,008,099,631[1256] (approximately US$ 1.3 billion at the time).

1035. From the description above, it is clear that CUHL transferred the CIHL shares to CIL at approximately US$ 5.8 billion, i.e., roughly at their value of US$ 6 billion. Ms Brown has testified in this respect:

> In contrast, when CIL acquired CIHL from CUHL, it did so through a series of four steps, three of which were settled in cash. For each of the three cash-settled steps, CUHL booked the value of the consideration received from CIL at the cash price of the transaction. As settlement was by way of a monetary asset, Group Reconstruction Relief did not apply. Only one step in the acquisition of CIHL by CIL involved a share-for-share exchange, with CIL issuing shares to CUHL in exchange for shares in CIHL. Consideration for this share exchange step was recorded at the par

---

[1248]  Brown WS1, ¶ 85.

[1249]  Brown WS1, n. 87; SSPA, Exh. C-6, Clauses 7.1 and 7.2.

[1250]  Brown WS1, ¶ 90; CIL, Annual Report and Financial Statements 2006, Exh. C-5, p. 50.

[1251]  C-SoC, ¶ 120; Brown WS1, ¶ 88.

[1252]  C-SoC, ¶ 121; Brown WS1, ¶ 88 and n. 88; R-SoD, ¶ 15(i)(v); Share Purchase Deed, Exh. C-7, Recital L; Sections 4,1(A) and 5.1); FAO, Exh. C-70, ¶ 7.1.3.

[1253]  See, e.g., R-SoD, ¶ 15(i)(v), citing Form No. 3CEB dated 30 October 2007, Exh. C-4; C-PHB, ¶ 560.

[1254]  R-SoD, ¶ 15(i)(v), citing Form No. 3CEB dated 30 October 2007, Exh. C-4.

[1255]  C-SoC, ¶ 121; Brown WS1, ¶ 88 and n. 89; R-SoD, ¶ 15(vi); Share Purchase Deed, Exh. C-7; Recital A; Sections 4.1(B), 6.1 and 6.3; FAO, Exh. C-70, ¶ 7.1.3.

[1256]  Brown WS1, n. 89.

value of the shares received. The combined total consideration of INR 266,818,710,140 (or approximately US$5.8 billion at the prevailing exchange rate) received by CUHL from CIL is therefore a mix of cash amounts settled at fair value and a share exchange recorded at nominal value. This difference in how the value of the consideration and the value of the CIHL shares transferred appear on CUHL's accounts was thus merely a reflection of standard accounting practices and was not a reflection of any actual taxable gain.[1257]

1036.   Following the IPO and the last tranches of the CIHL Acquisition:

a.   CIHL was a wholly owned subsidiary of CIL, and

b.   CIL in turn was 69 per cent owned by CUHL, with the remaining 31 per cent of CIL shares held by the investing public.[1258]

1037.   The IPO raised nearly US$ 1.98 billion.[1259] It is undisputed that the funds were distributed as follows:

a.   US$ 600 million remained in CIL, to be used for its working capital needs (exploration and development activities in Rajasthan and elsewhere in India).[1260]

b.   Approximately US$ 1.35 billion went to CUHL as consideration for the fourth tranche of the CIHL Acquisition, and then to CEP. CEP distributed roughly US$ 940 million to its shareholders and used the remaining funds for its on-going business and operations.[1261]

1038.   The record evidences that the only one of the 2006 Transactions that has been taxed by the Respondent is the CIHL Acquisition. Both the DAO and the FAO focused almost exclusively on CUHL's sale of CIHL's shares to CIL, and concluded that that transaction (and only that transaction) resulted in a taxable capital gain for CUHL, which it had failed to declare, and imposed capital gains tax on that capital gain at the short-term rate of 40%.[1262]

---

[1257]   Brown WS2, ¶ 121.

[1258]   Brown WS1, ¶ 90, n. 91 ("These percentages account for the exercise of the Green Shoe Option, under a stabilisation agreement dated 12 October 2006, by the underwriter, DSP Merrill Lynch. Pursuant to this agreement, CIL issued an additional 13,085,041 shares to CUHL on 2 February 2007 as part of the underwriter's efforts to stabilise the initial price of CIL shares"); see also CIL Prospectus, 22 December 2006, Exh. CWS-Brown-75, pp. 6-8.

[1259]   Brown WS1, ¶ 93; Cairn Energy, Annual Report & Accounts 2006, Exh. CWS-Brown-42, p. 32 ("The total proceeds raised in the flotation were $1.98bn with $751.8m pre IPO placing funds included in net cash at the year end.").

[1260]   Brown WS1, ¶ 91; Cairn Energy, Annual Report & Accounts 2006, Exh. CWS-Brown-42, p. 32.

[1261]   C-SoC, ¶ 124; Brown WS1, ¶ 91; Cairn Energy, Annual Report & Accounts 2006, Exh. CWS-Brown-42, p. 32.

[1262]   DAO, Exh. C-31, p. 9-10, 26-28, 97-101; FAO, Exh. C-70, ¶¶ 2.2.8, 12.

1039.  The ITD taxed CUHL on the difference between the value at which CUHL recorded the 9 Subsidiaries when it acquired them (i.e., their book value of GBP 251 million), and the value at which CIL recorded their acquisition (i.e., their market value of US\$ 6 billion).[1263] According to the Claimants, this is a fundamental mistake which lacks "any rational basis".[1264] The Claimants submit that, "to determine the gain on the transfer of a given capital asset, one takes the full value of consideration obtained for the capital asset and subtracts the cost at which that asset was acquired. Here, India has sought to tax the transfer of CIHL shares to CIL. The Parties do not dispute the full value of the consideration received by CUHL from CIL, notwithstanding that the transfer occurred in multiple tranches and in various forms of consideration. The sole dispute is over the cost of acquisition of the CIHL shares, i.e. how much CUHL paid to acquire them."[1265]

   a.  For the Claimants, this should be equivalent to the market value (despite the fact that CUHL recorded this acquisition at book value). They argue that "the only relevant question in determining the cost of acquisition is what CUHL gave up to acquire the CIHL shares, which was the Nine Subsidiaries", which had a market value of US\$ 6 billion.[1266]

   b.  For the Respondent, this cost of acquisition is reflected at book value at which CUHL recorded the acquisition of the CIHL shares (i.e., book value of GBP 251 million).[1267] Mr Puri testified in this respect that the CIHL Acquisition had the "parent handing out an asset at a much lesser value than the market value to the subsidiary", and the "[s]ubsidiary then transferring that to a third party, which includes public, at a much higher value."[1268]

1040.  It is thus undisputed that what was taxed were the alleged capital gains made by the Claimants as a result of the CIHL Acquisition. These alleged capital gains essentially amount to the difference between the book value at which the 9 Subsidiaries were recorded plus the CEHL Debt (approximately GBP 251 million, or about US\$ 455 million at the time), and the market value of the 9 Subsidiaries (approximately US\$ 5.8 million).

---

[1263]  FAO, Exh. C-70, ¶¶ 2.2.8, 12; C-Updated Reply, ¶ 130 (arguing that "[t]he Income Tax Authority reached the erroneous conclusion that CUHL made a capital gain on the transfer of CIHL shares because it incorrectly compared the book value of CIHL shares as reflected in CUHL's accounts and the market value of those shares as reflected in CIL's accounts.").

[1264]  C-PHB, ¶ 183.

[1265]  *Id.*, ¶ 184.

[1266]  *Id.*, ¶¶ 194-204.

[1267]  Mr Puri has explained that: "It was these two assets (i.e. (i) the shares of the Nine Subsidiaries having an aggregate value of £221,444,034, and (ii) the debt of £29,780,710) amounting to £251,224,744 in value that CUHL parted with as a price consideration for acquiring the shares of CIHL. On 7 August 2006, CUHL transferred the shares of the Nine Subsidiaries in return for 221,444,034 CIHL shares, and then on 1 September 2006, CUHL transferred the debt of GBP 29,780,710 in return for 29,780,710 CIHL shares. CUHL thereby acquired a total of 251,224,744 CIHL shares for a consideration price of £251,224,744 (i.e., £221,444,034 + £29,780,710). Therefore, even though CIL paid a much higher price for these 251,224,744 CIHL shares, the price paid by CUHL was not more than £251,224,744." Puri WS1, ¶ 53.

[1268]  Transcript, Evidentiary Hearing, Day 9, 117:19-22 (Mr Puri).

1041. Separately, the Claimants have alleged that the capital gains that had accrued on the 9 Subsidiaries were realised by CEP when it transferred them down the chain (either at Step 1 or Step 2 above). As this was an indirect transfer, it attracted no capital gains tax in India. However, the Claimants explain that those gains were in principle taxable in the UK, where CEP is domiciled, but were subject to the substantial shareholder exemption provided in the UK tax regime.[1269] As a result, they did not pay tax in the UK either. It is unclear however what is the quantum of the capital gains that the Claimants are referring to, whether it is any gains reflected in the book value of the 9 Subsidiaries, or the difference between their book value and market value.

1042. From the facts and arguments set out above, the Tribunal draws the following conclusions:

   a.  While CEP might have realised capital gains reflected in their book value at Steps 1 and 2 (i.e., when it started transferring them down the chain), the record shows that CEP did not record capital gains reflecting the market value of the assets. This market value was recorded for the first time in CUHL's books when it transferred the CIHL shares to CIL. Accordingly, gains crystallised at the CUHL level as a result of the CIHL Acquisition. While in principle they could have crystallised at the CEP level, CEP chose to avail itself of UK tax regulations and transferred the 9 Subsidiaries at book value. The 9 Subsidiaries were transferred at book value until they were transferred to CIL, which acquired them at market value. Any capital gains made by CUHL (a company incorporated in Scotland) in the CIHL Acquisition could thus have arguably been taxed in the UK; however, the Tribunal understands that the UK has not attempted to tax those gains, whether because of the substantial shareholder exemption or otherwise.

   b.  The Tribunal is not a tax assessment court, and therefore does not consider it is its place to supervise the accounting principles applied by the ITD to determine the applicable tax. However, given the facts summarised above, and in particular the Claimants' decision to record the 9 Subsidiaries at their book value until they reached CIL, the ITD's decision to consider that the capital gains had arisen as a result of the CIHL Acquisition does not appear to lack a rational basis.

1043. The Respondent has further argued that:

   a.  "No capital gains tax has ever been paid on the gains of around US$5 billion made by Cairn on its Indian assets between 1996 and 2006; and

   b.  In 2006, the Claimants extracted US$1.35 billion from India without paying a single dollar of tax on those proceeds anywhere."[1270]

1044. These statements appear to be undisputed (assuming, of course, that the FAO had not taxed CUHL for the gains arising from the CIHL Acquisition), subject to the following caveats:

---

[1269]  Transcript, Hearing on Closing Arguments, Day 1, 35:6-36:13 (Mr McNeill).

[1270]  R-PHB, ¶ 188.

a.   The fact that the Claimants did not pay capital gains tax in the UK is a consequence of the substantial shareholder exemption provided in the UK tax regime. The decision not to tax these gains is thus the UK's policy choice; it is not the consequence of an inadvertent omission of the Inland Revenue, nor does it appear to be a result of a tax avoidant scheme under English law.

b.   Cairn did not "cash in" US$ 5.5 billion in capital gains through the 2006 Transactions. CUHL "realised" this gain partly in shares of CIL, and partly in cash. Ultimately in 2006, CUHL only "cashed in" US$ 1.35 billion (roughly 23%) of the total value of CIHL (assuming US$ 5.8 billion). While CUHL indisputably received 100% of the value of CIHL, the remaining US$ 4.45 billion was reflected in shares of CIL (69% of its total shareholding), which CUHL retained for several years. When CUHL eventually sold most of those shares to Petronas and Vedanta in 2009 and 2010, it paid capital gains tax in India on those sales (although on the capital gains made between the CIHL Acquisition and the dates of the respective sales, not on the long-term capital gains accrued between 1996 and 2006).

### (ii)   What were the grounds for taxation invoked by the fiscal measures imposed?

1045.   The Claimants allege that, the Respondent's tax demand "is based on the FAO, which in turn (as subsequently confirmed by the ITAT) is based solely on the Retroactive Amendment".[1271] The Respondent admittedly did not base its tax assessment on any other grounds.

1046.   In turn, the Respondent asserts that "[a]s a matter of Indian law, the tax demand was issued on the basis that the real effect of the transfer of the shares of CIHL (which gave rise to a capital gain) was to transfer capital assets situate in India and that the transfer was therefore within the scope of the section 9(1)(i), as clarified by Explanation 5 (inserted in the 2012 Clarification)".[1272] The Respondent argues further that the Assessing Officer did not need to rely on other legal grounds, because the Claimants never challenged the validity or constitutionality of the 2012 Amendment. Despite this, the Respondent contends that "the Assessing Officer also expressly proceeded on the basis that the 2006 Transactions were taxable under section 9(1)(i) of the ITA, irrespective of Explanation 5".[1273] On that basis, the Assessing Officer considered that the 2006 Transactions had been abusive because they had been structured "to disguise the true nature of the transaction and make it look like a transfer of foreign shares rather than of the Indian assets."[1274] The Respondent also notes that DRP "expressly identified that the assessment could be separately supported on the basis of the application of judicial anti-avoidance rules and of the substance over form doctrine".[1275] According to

---

[1271]   Claimants' Answers to the Tribunal's Questions, ¶ 16; C-PHB, Sections IV.A and B.

[1272]   Respondent's Answers to the Tribunal's Questions, ¶ 43 (emphasis in original).

[1273]   *Id.*, ¶ 44, referring to FAO, Exh. C-70, ¶ 9.5.

[1274]   *Ibid.*

[1275]   *Id.*, ¶ 46, referring to Directions of the DRP under Section 144C(5) of the ITA 1961 of 31 December 2015, Exh. C-264.

the Respondent, pursuant to Section 144(c) of the ITA, the directions of the DRP are binding on the Assessing Officer, and as a matter of Indian law the FAO is based on the directions of the DRP.[1276]

1047. The record supports the Claimants' allegation that the only ground invoked by the Respondent to tax the capital gains arising from the CIHL Acquisition was Section 9(1)(i) of the ITA, interpreted by reference to Explanations 4 and 5 of the 2012 Amendment. More specifically, the Assessing Officer's reasoning in the DAO and FAO confirms that the CIHL Acquisition was being taxed because it amounted to an indirect transfer of the assets located in India which were indirectly held by CIHL.

1048. In particular, both the DAO and the FAO expressly relied on the 2012 Amendment to impose the tax. This is evident not only from the FAO's operative part, but also from the Assessing Officer's analysis of the facts. The FAO devoted considerable ink to determining the location from which the shares derived their value,[1277] to conclude that:

> [I]t is evident that the shares of Cairn India Holdings Ltd which were acquired by Cairn India Ltd from Cairn UK Holdings Ltd derive their value solely from the assets located in India and, therefore, in accordance with the provisions of Section 9(1)(i) of the Income Tax Act, shall be deemed to have been situated in India and consequently any gains arising from transfer of such shares are chargeable to tax under the Indian Income Tax Act, 1961.[1278]

1049. The FAO then relied heavily on the 2012 Amendment to impose the tax.[1279] The Assessing Officer devoted almost four pages to discussing the 2012 Amendment, emphasising its clarificatory nature.[1280] It noted in particular that "the legislature has clarified that the stand of the Revenue, that offshore transactions/indirect transfers were always taxable under the Indian Law (read S. 9(1)) was correct and the courts have been reading/interpreting it the other way."[1281] It then concluded that because "CIL made a payment of Rs. 26,681,87,10,140/- to CUHL for acquiring Indian assets through 100% shareholding of CIHL", "the resulting capital gains were taxable in the hands of CUHL."[1282]

1050. The following excerpt, summarising the Assessing Officer's conclusions and the grounds on which he assessed the tax, make it clear that the CIHL Acquisition was being taxed because it was an indirect transfer of assets located in India:

---

[1276] *Id.*, ¶ 47; R-PHB, ¶ 146(c); Transcript, Evidentiary Hearing, Day 6, 51:7-14 (Mr Moollan).

[1277] FAO, Exh. C-70, Section 8, pp. 40-50.

[1278] *Id.*, ¶ 8.9, p. 49.

[1279] *Id.*, ¶¶ 9.5, 9.6, 11.1.4, pp. 83-99.

[1280] *Id.*, ¶ 9.5, pp. 83-86.

[1281] *Id.*, ¶ 9.5.3, p. 86.

[1282] *Ibid*

[I]n the present case shares of CIHL derive 100% of their value from the assets located in India, therefore, any capital gains arising on the transfer of these assets will be taxable in India.[1283]

[…]

In view of the discussion above, I am of the firm opinion that the said gains arising to the assessee are in the nature of short term capital gains as the period of holding of these shares by the assessee company is less than 12 months. As per section 9(1)(i) read with Explanation 4 and 5 of I. T. Act, 1961 the income which is accruing or arising whether directly or indirectly, through or from any asset or source of income in India or through the transfer of a capital asset situate in India is chargeable to tax in India. In the instant case the shares of CIHL were transferred by the assessee resulting in the said capital gains. CIHL is the holding company for the shares of 27 subsidiaries as detailed above. All these subsidiaries are doing business in India and are having all their assets in India. Therefore the shares of CIHL derive all their value from the assets located in India. The real effect of transfer of these shares of CIHL will be the transfer of control of the assets of the subsidiaries in India. So, this transfer of shares will indirectly result in transfer of capital assets situate in India. Hence, the conditions laid down in section 9(1)(i) read with Explanation 4 and 5 of I.T. Act, 1961 are fully satisfied, thereby making the capital gains taxable in India as per the domestic tax law.[1284]

1051. The Respondent has argued that the Assessing Officer was merely applying the "look through" theory that the ITD had espoused in *Vodafone* and that the Respondent's witness, Mr Puri, has testified was the ITD's long-standing interpretation of Section 9(1)(i) (as discussed in the sections that follow).[1285] However, as the Claimants have pointed out, the Assessing Officer was not applying a "look through" theory, but rather the "situs-shifting" theory imposed by Explanation 5 of the 2012 Amendment.[1286] A "look through" theory involves disregarding the non-Indian holding companies and taxing the transaction as if the underlying assets had been transferred. This was the ITD's theory in *Vodafone*.[1287] A "situs-shifting" theory, by contrast, deems the shares of the non-Indian holding company (which is the direct or indirect owner of the assets located in India) to be situated in India. As discussed further below, this was the theory

---

[1283]  *Id.*, ¶ 9.6, p. 92.

[1284]  *Id.*, ¶ 11.1.4, pp. 98-99.

[1285]  Puri WS1, ¶ 28 ("It is my belief and experience that section 9 has always been interpreted and applied in such a way as to consider income arising from the transfer of any capital asset situated in India to be deemed as accruing or arising in India. That is, where the capital asset was situated in India, any income arising from its transfer anywhere and by whatever means would be taxable in India.").

[1286]  Transcript, Evidentiary Hearing, Day 3, 97:8-103:23 (Mr McNeill).

[1287]  As summarized in *Vodafone*, "[w]hat is contended on behalf of the Revenue is that under Section 9(1)(i) it can 'look through' the transfer of shares of a foreign company holding shares in an Indian company and treat the transfer of shares of the foreign company as equivalent to the transfer of the shares of the Indian company on the premise that Section 9(1)(i) covers direct and indirect transfers of capital assets." *Vodafone International Holdings B.V. v. Union of India & Anr.* [2012] 6 SCC 613, Exh. C-59, ¶ 71.

used by Explanation 5 of the 2012 Amendment.[1288] As the Claimants have illustrated, the difference has practical effects.[1289] In a "look through" theory, the taxable event is the indirect transfer of an Indian asset; the tax rate is determined on the basis of the length of the indirect holding of the asset, and the acquisition value is the cost of the Indian asset. In a situs-shifting theory, by contrast, the taxable event is the direct transfer of shares in the non-Indian holding company, the tax rate is calculated on the length of time the seller has held the shares in the holding company, and the acquisition value is the cost of the shares.

1052. As the excerpt quoted at paragraph 1048 above demonstrates, the FAO relied on the situs-shifting theory articulated in Explanation 5. The Assessing Officer reasoned that, because CIHL's shares derived their value solely from assets located in India, "in accordance with the provisions of Section 9(1)(i) of the Income Tax Act, shall be deemed to have been situated in India and consequently any gains arising from transfer of such shares are chargeable to tax under the Indian Income Tax Act, 1961."[1290]

1053. That the tax assessed on CUHL was based on the 2012 Amendment is confirmed in various other contemporaneous documents and, in particular, in the following:

a.   Mr Sanjay Kumar's interim report which expressly states that the taxability of the 2006 Transactions was based on "Explanation 5" of the 2012 Finance Act:

> Thus it is evident that the shares of M/s Cairn India Holdings Ltd which were acquired by M/S Cairn India Ltd from the assessee company M/s Cairn UK Holdings Ltd derive its value solely from assets located in India and therefore in accordance with the provisions of Explanation 5 of Section 9(1)(i) of the income Tax [sic] shall be deemed to have been situated in India and consequently any gains arising from transfer of such shares is chargeable to tax under the Indian Income Tax Act 1961.[1291]

b.   Mr Sanjay Kumar's Survey Report, which likewise referred to Explanation 5:

> The entire assets owned by M/s Cairn UK Holdings Ltd are the shares of CIL, which is an Indian company. holding Indian assets. Therefore in accordance with the provisions or explanation 5 to section 9(1)(i) of the Income Tax Act. The situs or the shares or M/s Cairn UK Holdings Ltd shall be deemed to be in India and therefore any income arising

---

[1288]   Explanation 5 stated: "Explanation 5.—For the removal of doubts, it is hereby clarified that an asset or a capital asset being any share or interest in a company or entity registered or incorporated outside India shall be deemed to be and shall always be deemed to have been situated in India, if the share or interest derives, directly or indirectly, its value substantially from the assets located in India." Finance Act 2012 [Act No. 23 of 2012], Exh. C-53, ¶ 4.

[1289]   Transcript, Evidentiary Hearing, Day 3, 97:8-103:23 (Mr McNeill).

[1290]   FAO, Exh. C-70, ¶ 8.9, p. 49.

[1291]   Interim Report from the Office of the Deputy Director of Income Tax (Inv.) Unit-IV (2) to the Deputy Director of Income Tax Cir. 1(1)(International Tax), New Delhi, 16 January 2014, Exh. Kumar-5, ¶ 12.

from such shares shall come within the purview of the Indian Income Tax Act.[1292]

c. The Section 281B Order against CUHL also relied on the 2012 Amendment as the basis for taxing this capital gain. The Deputy Director of Income Tax stated that, during the survey operations, the ITD had obtained the Rothschild valuation report prepared for the 2006 reorganisation and IPO, and that this report "ma[de] it amply clear that all the assets of [CIHL] and its subsidiaries [were] located in India alone."[1293] The Deputy Director of Income Tax also cited statements by CIL's CEO and CFO, affirming that during 2006, the assets of CIHL's subsidiary companies "derived [their] value directly or indirectly, substantially from the assets i.e. oil and gas right / reserves located in India."[1294] As a result, the Deputy Director of Income Tax concluded that "it is evident that the shares of [CIHL] which were acquired by [CIL] from the assessee company [CUHL] derive their [their] value solely from the assets located in India and therefore in accordance with the provisions of Explanation 5 to Section 9(1)(i) of the [ITA] shall be deemed to have been situated in India and consequently any gains arising from [the] transfer of such shares is chargeable to tax under the [ITA 1961]."[1295]

d. Likewise, the Section 201 Order issued against CIL also relied on the 2012 Amendment:

> [I]t is evident that the shares of [CIHL] which were acquired by [CIL] from the assessee company [CUHL] derive its value solely from the assets located in India and therefore in accordance with the provisions of section 9(1)(i) of the Income Tax Act as also clarified by Explanation 5 thereof, these shall be deemed to have been situated in India and consequently any gains arising from transfer of such shares is chargeable to tax under the Indian Income Tax Act 1961.[1296]

1054. Documents in the record also suggest that, as late as 2016, the ITD still considered the 2012 Amendment to be the basis of the tax levied against CUHL. In an internal letter dated 3 March 2016 relating to the tax demand against CIL for failure to withhold capital gains tax, the Respondent's witness, Mr Sanjay Puri, who at the time was Commissioner of Income Tax (International Taxation)-2, Delhi, stated:

> The tax demand in the case has arisen as the assessee had failed to deduct tax from the consideration it paid to a non-resident for acquiring assets that were deemed as situated in India. The sum chargeable to tax in the hands

---

[1292] Survey Report in the Case of Cairn Group, 24 February 2014, Exh. Puri-1, p. 2.

[1293] Order under S. 281B of the ITA 1961 dated 22 January 2014, Exh. C-11, ¶¶ 11.3.

[1294] Id., ¶ 11.4.

[1295] Id., ¶ 12.

[1296] Show Cause Notice Under Section 201(1) of the ITA 1961 dated 9 October 2014, Exh. C-380, ¶ 4.5, pp. 32-38.

of non-resident was determined by applying the retrospective amendment in section 9 of the IT Act. [1297]

1055. Mr Puri then referred to the offer made by the Finance Minister in his budget speech of 29 February 2016 with respect to "past cases" being assessed under the "retrospective amendment", according to which "[i]n order to give [them] an opportunity", he was proposing "a one-time scheme of Dispute Resolution for them; in which, subject to their agreeing to withdraw any pending case lying in any Court or Tribunal or any proceeding for arbitration, mediation, etc, under BIPA, they can settle the case by paying only the tax arrears in which case liability of the interest and penalty shall be waived."[1298] Mr Puri then stated:

> In view of the foregoing, and considering that the demand in this case has arisen primarily due to the retrospective amendment to section 9 of the IT Act, it is imperative that the assessee is allowed some time to consider the offer extended by the Government and comply with the demand notice by paying tax amount in arrears, in order to avail the benefit of waiver of interest and penalty.[1299]

1056. That the 2012 Amendment was the basis of the tax levied against CUHL was further confirmed by the ITAT in its Order of 9 March 2017, which unequivocally stated that "the tax payable by the assessee […] has arisen because of [the] retrospective amendment made by The Finance Act, 2012."[1300]

1057. The Tribunal thus concludes that the basis for the tax imposed on CUHL was the 2012 Amendment, specifically, Section 9(1)(i) of the ITA 1961, as amended by Explanation 5.

1058. The Respondent has also asserted that, in its Order of 31 December 2015,[1301] the DRP identified tax avoidance as "a possible additional basis of taxation" for the tax demand,[1302] and that under Indian tax law, the FAO is legally based on the DRP Order.[1303] As discussed in more detail in Section VII.A.3.c(ii)(3) below, the DRP Order did indeed state that the principles of tax avoidance to which it had previously referred (in particular, the principle of substance over form) had "far-reaching consequences" and were "a useful supporting test."[1304] However, it unequivocally stated that the Assessing Officer's decision "stands strongly on merits without requiring any additional

---

[1297]  Letter from Sanjay Puri, Commissioner of Income Tax (International Taxation) – 2, Delhi to Addl. Commissioner of Income Tax (International Taxation) Chandigarh, dated 3 March 2016, Exh. C-381, ¶ 2.

[1298]  *Id.*, ¶ 4.

[1299]  *Id.*, ¶¶ 2, 5.

[1300]  *Cairn UK Holdings Ltd v. D.C.I.T.*, ITA No. 1669/Del/2016, Order, 9 March 2017, Exh. C-228.

[1301]  Directions of the DRP under Section 144C(5) of the ITA 1961, 31 December 2015, Exh. C-264.

[1302]  R-PHB, ¶ 46(c).

[1303]  *Id.*, ¶ 146(c); Transcript, Evidentiary Hearing, Day 6, 51:7-14 (Mr Moollan).

[1304]  Directions of the DRP under Section 144C(5) of the ITA 1961, 31 December 2015, Exh. C-264, p. 38.

support" and "stands strongly justified on merits alone."[1305] The FAO, which was issued subsequently and should have incorporated any directions from the DRP, did not add tax avoidance (or any other ground for taxation) for basis of its decision. This confirms that the tax assessment was based exclusively on Section 9(1)(i) of the ITA, as amended by Explanations 4 and 5 inserted by the 2012 Amendment.

1059. Despite its contentions, as noted in paragraph 1046 above, the Respondent appears to concede that the tax proceedings were – at least primarily – based on the 2012 Amendment. Its argument is not that the fiscal measures were not based on the 2012 Amendment, but rather that, in the absence of a constitutional challenge from the Claimants, the ITD did not need to invoke any other grounds to tax the transaction.[1306] The Tribunal will address this argument when dealing with the Respondent's defences on tax avoidance and Section 2(47)(vi). For present purposes, it finds as a fact that the Respondent's fiscal measures, and in particular the assessment of tax on the CIHL Acquisition, were based on the 2012 Amendment and in particular on Explanation 5.

### b.   Substantive and temporal effect of the 2012 Amendment

1060. As the 2012 Amendment is the basis for the fiscal measures imposed on the Claimants, its nature and effects are relevant to determining whether, by imposing those fiscal measures, the Respondent has treated the Claimants unfairly and inequitably in breach of its obligation under Article 3(2) of the BIT. In this respect, one of the key issues in dispute between the Parties is the effect of the 2012 Amendment: was it a substantive amendment of Section 9(1)(i) that operated retroactively, as the Claimants contend, or was it a mere clarification of Section 9(1)(i) and thus a statement of the law as it always was, as the Respondent submits?

1061. According to the Claimants, the 2012 Amendment expanded the ambit of Section 9(1)(i) retroactively. The Claimants argue that, prior to the 2012 Amendment, Section 9(1)(i) did not apply to the transfer of shares in non-Indian companies which derived their value from assets located in India (also known as "indirect transfers"[1307]). As a result, the introduction of Explanations 4 and 5 by the 2012 Amendment created a new tax burden where previously there was none.

1062. India's primary case is that the 2012 Amendment was "a clarification of the Parliamentary intent regarding indirect transfers of Indian assets",[1308] and therefore cannot be considered to be a retroactive modification of the scope of that section. Explanations 4 and 5 expressly state that they "hereby clarify[]" the meaning of certain terms in Section 9(1)(i),[1309] and the Memorandum accompanying the 2012 Finance Bill

---

[1305]  *Ibid.*

[1306]  R-Rejoinder, ¶ 30(a) and (b).

[1307]  The Tribunal understands that the term "indirect transfer" is used to convey the idea that the underlying assets located in India, from which the foreign share substantially derives its value directly or indirectly, have been indirectly transferred by the transfer of the share. See also ¶ 891 above.

[1308]  R-SoD, ¶ 113.

[1309]  Excerpt of the ITA 1961, Exh. C-43, section 9.

refers to its clarificatory nature.[1310] The cumulative effect of Explanations 4 and 5 "was to clarify Parliamentary intent in respect of the application of the source rule embodied in s. 9 of the ITA as regards a very specific and particular species of transactions, i.e. transfers of shares (or other interests) of companies incorporated abroad in cases where those shares derived their value substantially from assets located in India."[1311] In the Respondent's submission, the terms "situate in India" in the fourth limb of Section 9(1)(i) always meant to include shares in foreign companies, when those shares substantially derived their value, whether directly or indirectly, from assets situated in India; the 2012 Amendment merely clarified that intent.

1063.  The fact that Parliament labelled the amendment of Section 9(1)(i) as a "clarification" is not decisive. It goes without saying that that is an important piece of evidence, but it cannot be dispositive of the inquiry when the Tribunal considers the international legal effect of the Amendment. Otherwise, the matter would be self-judging and automatic acceptance of such a statement would defeat any independent appraisal that the Tribunal must undertake. The question whether the 2012 Amendment expanded the scope of Section 9(1)(i) is one of the key issues in dispute in this case, and the Tribunal must conduct an independent and objective analysis of the issue. This means that it must put the legislature's characterisation of what it was doing to one side for present purposes and ascertain objectively the scope of application of Section 9(1)(i) prior to and after the 2012. If the post-2012 Amendment scope is broader, i.e. it captures transactions that would not have been captured but for that amendment, then the 2012 Amendment will have changed the scope of application of Section 9(1)(i), possibly retroactively.

1064.  Throughout the proceeding, the Respondent has stressed that Parliament has the ultimate authority to interpret the meaning of statutes in India, subject only to constitutional review by the courts.[1312] The Tribunal accepts that this is the case as a matter of Indian municipal law. But the question in the present case is not whether the Indian Parliament had the authority to clarify its previously enacted law; nor is it that the 2012 Amendment is, in the absence of a finding of unconstitutionality to be treated as presumptively constitutional as a matter of Indian law; it is rather whether the Indian Parliament and tax authorities exercised such authority in conformity with India's international obligations under the BIT. Parliaments around the world may have the constitutional authority to change any law, including in some cases the constitution itself.[1313] However, if such a change is arbitrary, discriminatory or contrary to basic standards of legal certainty or procedural fairness such as to amount to a breach of a treaty standard such as FET, the respondent State's argument that Parliament was using a recognised authority, which exercise has not been challenged or found to be unconstitutional, does not *ipso facto* preclude a finding that the State has breached its international obligations. It is a basic rule of international law that a State cannot invoke its own law as justification of a breach of its international obligations, and under the UK-India BIT, the

---

[1310]  Memorandum Accompanying Finance Bill, 2012, Exh. R-48, p. 19.

[1311]  R-SoD, ¶ 118.

[1312]  See, e.g., R-SoD, ¶ 8(d) and Annex E; R-Rejoinder, ¶¶ 479-501.

[1313]  The Tribunal notes that the process for creating and amending constitutions vary by country and it is unnecessary for the purposes of this Award to enter into a discussion of these processes.

responsibility and jurisdiction to determine whether on the facts of the case such a breach has been made out is vested in this Tribunal.[1314] No doubt decisions of the Respondent's courts can be useful in assisting the Tribunal in evaluating an alleged breach, but they are not indispensable requirements, and their absence does not preclude the Tribunal from discharging its mandate under the Treaty. Moreover, even if an Indian court determined that the 2012 Amendment was constitutional, that would not necessarily answer the question whether it was consistent with India's international obligations under the BIT.

1065.  To determine whether the Respondent has complied with its obligations under the BIT, the Tribunal must first establish what was the effect of the 2012 Amendment. Did it substantively amend Section 9(1)(i) retroactively, as the Claimants contend, or did it merely clarify the meaning of that provision because the Supreme Court had failed to correctly discern Parliament's intent?

1066.  Before addressing this question, the Tribunal notes that the Respondent and its representatives have not been entirely consistent on the nature of the 2012 Amendment. While on the one hand Parliament labelled the relevant sections of the amendment as "clarifications", government representatives and committees, including ITD officials, and ministers, have referred to its effects as "retrospective".[1315] In particular, the Minister of Finance stated that, as a result of the 2012 Amendment, "the tax liability will arise retrospectively", albeit only for six years, given that Section 161 of the ITA provides that no tax can be levied beyond the six-year time limit.[1316] Further, in this arbitration, the Respondent has characterised the 2012 Amendment as "*both* retrospective and clarificatory", which it argues is "perfectly legitimate" because "retrospective clarifications were and always have been well within the powers of the Indian Parliament."[1317] In any event, the Respondent argues that, "[i]f retroactive, the measure was in fact retroactive by no more than 2 months (being the time between the Supreme Court's judgment in *Vodafone* and the announcement of the passage of the 2012 Clarification)."[1318]

1067.  The Parties' submissions raise, *first*, questions of terminology. What do the terms "retroactive", "retrospective" and "clarificatory" mean? The Tribunal addresses these questions in Section (i) below. *Second*, the Tribunal will establish whether, as a matter of fact, the 2012 Amendment expanded the scope of Section 9(1)(i), or whether it was

---

[1314]  See, e.g., ILC Articles on Responsibility of States for Internationally Wrongful Acts, Commentary to Article 3, ¶ 1 (noting that "a State cannot, by pleading that its conduct conforms to the provisions of its internal law, escape the characterization of that conduct as wrongful by international law.").

[1315]  See, e.g., Letter from the Commissioner of Income Tax to the Joint Commissioner of Income Tax dated 3 March 2016 referring to CUHL, Exh. C-75 (stating that "in this case, [the] tax demand arisen due to taxation of capital gains from transfer of assets by the assessee that were deemed as situate in India under the *retrospectively* amended provisions of section 9 of the Income Tax Act, 1961.") (emphasis added).

[1316]  Shri Pranab Mukherjee, Minister of Finance, Transcript of Speech before Lok Sabha (Parliament), 8 May 2012, Exh. R-51, p. 9389.

[1317]  R-SoD, ¶ 116

[1318]  R-PHB, ¶ 530.

a mere clarification (Section (ii) below). The Tribunal will then establish the temporal effects of that amendment (Section (iii) below).

### (i) Terminology: "retroactive", "retrospective" and "clarificatory" legislation

1068. The issues before the Tribunal raise questions of terminology. The Claimants allege that the 2012 Amendment was "retroactive", while the Respondent argues that it was "clarificatory" (while accepting that it was also "retrospective").

1069. Faced with these differences in terminology, the Tribunal requested the Parties to make submissions on the concepts of retroactivity and retrospectivity.[1319] In particular, it asked the following question:[1320]

> If either Party considers that any difference between retroactive and retrospective legislation exists and should produce any effects in this arbitration, then that Party should explain the difference and its effect under any law applicable in this arbitration. Provisionally, the Tribunal will use both terms interchangeably.

1070. In their submissions, the Parties largely agreed on the following points: (i) the terms "retroactive" and "retrospective" are not used consistently across legal different legal systems, or even within the same legal system;[1321] (ii) despite this, a number of scholars have drawn a distinction that is explained further below; (iii) given point (i) above, this distinction should be used with caution: (iv) in any event, this distinction is not dispositive of the issues before this Tribunal, because what matters is not the label used, but whether the 2012 Amendment violated the BIT's standards;[1322] and (iv) as a result, the Parties agree that the Tribunal can use the terms "retroactive" and "retrospective" interchangeably, or at least do not object to its doing so.[1323]

1071. The Tribunal agrees with the Parties that what matters is not how the 2012 Amendment is labelled, but whether that Amendment (and its application to the Claimants) violated

---

[1319] Tribunal's Questions to the Parties, 11 October 2018, Question E.1.a.

[1320] *Id*., Question E.1.a(ii).

[1321] Respondent's Answers to the Questions from the Tribunal, ¶ 127; Claimants' Response to Questions from the Tribunal, ¶ 58.

[1322] Claimants' Response to Questions from the Tribunal, ¶ 67 (submitting that "there is overlap in these categories, and merely labelling an enactment may not be conclusive in determining whether it is legitimate under domestic or international law"); Respondent's Answers to the Questions from the Tribunal, ¶¶ 130, 126 (submitting that "the use of these labels will ultimately not assist the Tribunal", as "it does not affect the outcome of the present arbitration if the Tribunal chooses to characterise the 2012 Clarification as being 'retrospective' or 'retroactive'").

[1323] Claimants' Response to Questions from the Tribunal, ¶ 58; Respondent's Answers to the Questions from the Tribunal, ¶ 132 (As a result, the Respondent updates its position to state that "India is a country which has a long history of frequent retrospective / retroactive taxation, and such legislation is subject to constitutional control by the Supreme Court of India, applying longstanding and transparent principles.").

the BIT.[1324] As the Respondent has put it, "[t]he correct approach is to identify the content of the relevant standards under the BIT and to assess the measure against those standards, including all its features, including its alleged retroactivity".[1325] To do so, it is useful to have some clarity on concepts such as "retroactivity" and "retrospectivity". Further, although "[l]abelling is […] no substitute for analysis",[1326] it might shed light on the nature of the legislation being labelled, especially if the labelling comes from official sources or from reliable sources assessing its effects.

1072. Both Parties have pointed to two leading treatises on the subject of retroactivity, one by Ben Juratowitch QC[1327] and another by Hans Gribnau and Melvin Pauwels,[1328] which provide guidance on the temporal effects of the law and on the meaning of retroactivity and retrospectivity. Juratowitch explains that "[s]tatutes can have at least three types of temporal effect":[1329]

    a.    *First*, a statute may apply only to "events occurring after the entry into force of the statute." [1330]

    b.    *Second*, a statute may apply "only after the entry into force of the statute but in doing so affects settled expectations that arose, or vested rights that accrued, prior to the entry into force of the statute. It does not deem it at the time that the expectation arose or the vested right accrued to have been otherwise than it actually was, but only affects the existing expectation or right from the entry into force of the statute."[1331]

    c.    *Third*, a statute may "deem[] the law at the time of a past event to have been as provided in the subsequent statute, where the law at the time of the event was actually something different." [1332]

1073. The first category poses no issue: it is clear that the statute applies with prospective effect. It is also relatively uncontroversial that the third category falls squarely into the realm of retroactivity, because the new statute purports to change the scope and the effects of the previous law in the past.[1333] As stated by Buckley, L.J. in *West v. Gwynne*,

---

[1324]  See Claimants' Response to Questions from the Tribunal, ¶ 67 (submitting that "there is overlap in these categories, and merely labelling an enactment may not be conclusive in determining whether it is legitimate under domestic or international law"); Respondent's Answers to the Questions from the Tribunal, ¶ 130 (submitting that "the use of these labels will ultimately not assist the Tribunal").

[1325]  Respondent's Answers to the Questions from the Tribunal, ¶ 121.

[1326]  *Azinian v. Mexico*, ICSID Case No. ARB/AF/97/2, Award, 1 November 1999, RLA-120, ¶ 90.

[1327]  Ben Juratowitch, Retroactivity and the Common Law (2008), CLA-372.

[1328]  Hans Gribnau, Melvin Pauwels, *Retroactivity of Tax Legislation* (EATLP International Tax Series, 2013), CLA-381.

[1329]  Ben Juratowitch, Retroactivity and the Common Law (2008), CLA-372, p. 5.

[1330]  *Ibid*.

[1331]  *Ibid.*

[1332]  *Ibid.*

[1333]  *Id.*, pp. 6, 9-12.

a law is retroactive when it "provides that as at a past date the law shall be taken to have been that which it was not".[1334]

1074.  It is the second category that poses problems, perhaps limited to semantics. Juratowitch notes that some authors and courts have referred to this type of law as having "retrospective" effect.[1335] He cites an article by E.A. Driedger where he offers the following clear-cut distinction:[1336]

> A retroactive statute is one that operates as of a time prior to its enactment. A retrospective statute is one that operates for the future only. It is prospective but it imposes new results in respect of a past event. A retroactive statute *operates backwards*. A retrospective statute *operates forwards* but looks backwards in that it attaches new consequences for the future to an event that took place before the statute was enacted. A retroactive statute changes the law from what it was; a retrospective statute changes the law from what it otherwise would be with respect to a prior event.

1075.  This distinction is similar to one proposed by English tax barrister Philip Baker QC, for tax legislation:[1337]

> "Retroactive legislation" refers to legislation, which imposes a tax burden, or a higher tax burden, on income that has already been earned, or a gain that has already been realised, or an inheritance that has already been received (etc.). It is concerned with the scenario, therefore, where at the time that income was earned (etc.), there was no tax burden under the law at that time, or a lower tax burden, and the retroactive legislation imposes a burden or a higher one.
>
> This may be contrasted with "retrospective legislation" which imposes a tax burden, or a higher tax burden, on future income (or gains or inheritance […]) from a transaction which has already been completed.

1076.  Juratowitch notes that, building on Driedger's distinction, Salembier proposes the following taxonomy: the first category of statutes has "prospective" effect; the second category has "retrospective" effect, and the third has "retroactive" effect.[1338]

1077.  Despite the seductive clarity of this taxonomy, Juratowitch notes that it does not reflect current usage. Laws in the second category have also been described as having prospective effect, and laws in the third category have been characterised as

---

[1334]  C-SoC, ¶ 332, citing Buckley L. J. in *West v. Gwynne* [1911] 2 Ch l, Exh. Gardiner-29, p. 6.

[1335]  Ben Juratowitch, Retroactivity and the Common Law (2008), CLA-372, pp. 6, 9-12.

[1336]  *Id.*, p. 6, citing EA Driedger, "Statutes: Retroactive Retrospective Reflections" (1978) 56 Canadian Bar Review 264, 268-269.

[1337]  Philip Baker QC, "Retroactive Tax Legislation", 2012, 6(48) International Taxation 780, CLA-60, p. 780.

[1338]  Ben Juratowitch, Retroactivity and the Common Law (2008), CLA-372, p. 6, citing J. P. Salembier, *Understanding Retroactivity: When the Past just Ain't What it Used to Be* (2003) 33 Hong Kong Law Journal 99, 102, 104.

retrospective.[1339] In general, he notes that the concept of retrospectivity "has more commonly been deployed to include a broader range of intertemporal effects."[1340]

1078.  Gribnau and Pauwels reach a similar conclusion. In line with the ECJ's usage, they use the term "retroactive" to describe situations in which "a legal provision changes the past legal consequences of facts that occurred before the provision was officially published."[1341] They use the term "retrospective" to describe "the situation in which a new legal provision has 'immediate effect', i.e. prospectively but without grandfathering existing situations, and as such is also applicable to the future consequences of transactions or events that have already happened." [1342] However, they caution that "these concepts are sometimes (implicitly or explicitly) considered synonyms or interchangeable", and that even if a conceptual distinction is made, "the meaning of retroactivity and retrospectivity is not the same in the various countries and legal discourses in which English is spoken or used."[1343]

1079.  Notably, neither Party has attempted to define what the terms "retroactive" and "retrospective" mean in Indian law. This is so despite the fact that, in its earlier briefs, the Respondent took issue with the Claimants' use of these terms, and in particular with its reliance on Baker's definition quoted above. In its Rejoinder, the Respondent argued that "the Claimants seek to use the terms 'clarificatory' 'retroactive', [and] 'retrospective' in a vacuum disconnected from Indian constitutional law, as if they had an independent and universal meaning assessment […]."[1344] Yet, the Respondent itself did not attempt to define what these terms mean in Indian constitutional law. It merely noted, as the Claimants already had, that the distinction proposed by Baker was "hardly universal",[1345] and argued that the Claimants could not rely on the Finance Minister's or the Shome Committee's characterisation of the 2012 Amendment as "retrospective" because "Parliament is endowed with plenary powers of legislation, and it is competent to legislate with prospective or retrospective effect and such power to legislate retrospectively is upheld by the Courts",[1346] and because there is no "undefined customary international law standard of taxation." [1347] However, these arguments go to the legitimacy of the retroactivity/retrospectivity, and not to its meaning. And while the Respondent did make submissions on the general meaning of these terms in its Answers to the Tribunal's Questions, it did not do so on the basis of Indian constitutional law.

---

[1339]  *Id.*, pp. 6-12.

[1340]  *Id.*, p. 9.

[1341]  Hans Gribnau, Melvin Pauwels, *Retroactivity of Tax Legislation* (EATLP International Tax Series, 2013), CLA-381, p. 43.

[1342]  *Ibid.*

[1343]  *Id.*, p. 42.

[1344]  R-Rejoinder, ¶ 502.

[1345]  R-Rejoinder, ¶ 503(c), citing C-SoC, ¶ 332.

[1346]  R-Rejoinder, ¶ 503(a), citing Expert Committee, Draft Report on Retrospective Amendments Relating to Indirect Transfer (2012), Exh. C-56, p. 30.

[1347]  R-Rejoinder, ¶ 503(b), citing C-SoC, ¶ 298.

1080.  Given the lack of clarity surrounding the concept of "retrospectivity" and the Parties' agreement that it can be used interchangeably with the term "retroactivity", the Tribunal will adopt the following terminology going forward:

   a.  The Tribunal will use the term "retroactive" to refer to a law which "deems the law at the time of a past event to have been as provided in the subsequent statute, where the law at the time of the event was actually something different." [1348] Stated differently, it will consider a law to be retroactive if it changes the content of the law in the past, so that the law is deemed to have always had such (new) content, and applies to transactions that took place in the past.

   b.  The Tribunal will consider that a law that operates prospectively but modifies the effects of transactions occurring in the past has "immediate" effect (see above). It will not use the term "retrospective" to refer to this situation.

   c.  The Tribunal will understand that when the Parties refer to "retrospective" legislation, they use it as a synonym of "retroactive", unless expressly stated otherwise or resulting from the context. The Tribunal notes in particular that, in its final written submission, the Respondent essentially used these words interchangeably, submitting that "India is a country which has a long history of frequent retrospective / retroactive taxation, and such legislation is subject to constitutional control by the Supreme Court of India, applying longstanding and transparent principles."[1349]

   d.  When the term "retrospective" is used by a source or document other than by the Parties, the Tribunal will understand that it refers generally to a law that affects situations that arose in the past, but could have either "retroactive" or "immediate" effect. To the extent necessary, the Tribunal will attempt to establish the meaning of this term in light of the context in which it is used.

1081.  A final word on the term "clarificatory" is in order. Literally, to "clarify" means "to make something clear or easier to understand [...]".[1350] This suggests that a clarificatory statute will make the meaning of the already existing law clearer and will not change its meaning or scope. The question is whether this definition can be applied to a clarificatory statute in India.

1082.  In response to the Tribunal's questions, the Parties have made submissions on the nature of a clarificatory statute, and who decides whether that statute is truly clarificatory. The Respondent has submitted in this respect that, like the terms "retroactive" and "retrospective", the term "clarificatory" is not a loose standard disconnected from any system of law, but an Indian law concept applicable on a test of constitutionality.[1351] However, the Respondent has not spelled out what exactly that concept is under Indian

---

[1348]  Ben Juratowitch, Retroactivity and the Common Law (2008) CLA-372, p. 5.

[1349]  Respondent's Answers to the Questions from the Tribunal, ¶ 132.

[1350]  Cambridge Dictionary, https://dictionary.cambridge.org/dictionary/english/clarify ("to make something clear or easier to understand by giving more details or a simpler explanation").

[1351]  R-Rejoinder, ¶ 502.

law. That said, the Tribunal notes that there appears to be common ground on the following points:

1083.  First, whether legislation is truly clarificatory, or to the contrary, effectively changes the scope of a provision, will depend on the nature of the legislation in question. While each Party has described this issue in a way that fits its case, they do not differ materially in the focus of the analysis that must be conducted. The Claimants submit that "there does not appear to be a fundamental distinction between a statute that 'interprets' another statute versus one that purports to 'clarify'. In both cases, if the original meaning of the statute was controversial or obscure, it may be more difficult for an investor to claim that legal certainty has been undermined by an interpretation or clarification because there was little legal certainty to begin with. On the other hand, where the meaning of a statute is settled (as evidenced, perhaps, by the longstanding reliance on its meaning by stakeholders, and the lack of any debate or controversy in the courts or academic circles), presumably there is no need for an interpretation or clarification, and any purported interpretation or clarification that subverts the settled meaning should be inherently suspect."[1352]

1084.  The Respondent makes the point in a not entirely dissimilar way, albeit one that does not emphasise the taxpayer/investor's perspective as much as the Claimants' approach: "[w]hether legislation is clarificatory or not turns on the extent to which the law was generally settled or not settled, not on the consequences which Parliament's clarification will have on taxpayers, where taxpayers have mistakenly assumed that the law was settled in their favour. [...] The question of whether [a law is] clarificatory is simply: was there genuine doubt? Was there an ambiguity which Parliament was entitled to step in and resolve?"[1353]

1085.  The Tribunal's review of the Indian case law submitted by the Parties reveals first, that, when considering amendments that are said to be clarificatory, Indian courts consider such factors as: (i) whether the claimed clarification imposed a financial burden for the first time,[1354] and (ii) whether the claimed clarification expanded the reach or meaning of a term such as to capture transactions that it could not have been contemplated or foreseen at the time would be reached by the then-extant law.[1355] In this connection, the Indian courts have concerned themselves with considering whether the amendment exhibits irrationality, arbitrariness, or unreasonableness.[1356]

---

[1352]  Claimants' Answers to the Tribunal's Questions, ¶ 107.

[1353]  Transcript, Hearing on Closing Arguments, Day 1, 115:13-116:3 (Mr Moollan).

[1354]  *Jayam and Company v. Assistant Commissioner & Anr.*, (2016) 2 SCC, XX, Exh. C-614, ¶ 19.

[1355]  *Shew Bhagwan Goenka v. Commercial Tax Office and Others*, (1973) 32 STC 368, Exh. C-296, ¶ 15.

[1356]  *Jayam and Company v. Assistant Commissioner & Anr.*, (2016) 2 SCC, XX, Exh. C-614, ¶¶ 15, 17, citing another Supreme Court decision in *Tata Motors Ltd. v. State of Maharashtra and Others* (2004) 5 SCC 783, and *Shew Bhagwan Goenka v. Commercial Tax Office and Others*, (1973) 32 STC 368, Exh. C-296, ¶ 15.

1086. <u>Second</u>, the legislature's labelling of a statute as clarificatory is not dispositive of the matter. In India, the courts are entitled to assess the true nature of the legislation.[1357] The Tribunal addresses this point in Section VII.A.3.b(ii) below.

1087. <u>Third</u>, as a matter of international law, whether a law is labelled "clarificatory" does not necessarily impact whether it breaches a treaty or customary international law; whether there is such a breach will depend on the relevant international law standards and the compatibility of the effects of the measure with such standards, for instance, whether it has breached an investor's legitimate expectations.[1358] This is also addressed in Section VII.A.3.f(i) below.

1088. What the Parties do appear to dispute is whether this Tribunal has the authority to question the Indian Parliament's labelling of the 2012 Amendment as clarificatory. According to the Respondent, as the Claimants have not challenged the constitutionality of the 2012 Amendment (and therefore they must be taken to have conceded its constitutionality), the Tribunal should proceed on the basis that the 2012 Amendment is clarificatory.[1359] The Claimants, for their part, contend that the "assertion by a State that its new legislation merely interprets or clarifies existing law cannot be purely self-judging, but must instead be subject to independent scrutiny by a tribunal with jurisdiction over the question. If it were otherwise, a State could legislatively expropriate or destroy any foreign investment with impunity through the mere artifice of labelling."[1360] Consequently, the Tribunal is empowered to consider whether the 2012 Amendment was merely "clarificatory", or whether it retroactively expanded the scope of taxable transfers.[1361]

1089. The Tribunal understands this dispute to be more apparent than real. Indeed, as noted in paragraph 1070 above, the Parties agree that, irrespective of how the 2012 Amendment is labelled, what matters is whether that Amendment (and its application to the Claimants) violated the BIT. To do so, the Tribunal must assess the effects of the 2012 Amendment, to determine whether it has breached any BIT standards. In doing so, one of the key inquiries will be whether the 2012 Amendment merely clarified the existing legislation or expanded its scope. Stated differently, a true clarification will not expand the scope and the effects of a provision beyond what its reasonable and objective interpretation could have established in its previous text. In conducting this exercise, the Tribunal considers that just as the Indian courts can evaluate the constitutionality of a statute labelled as clarificatory, the situation should be no different for a tribunal applying international law to a statute, the temporal effects of which are disputed by the parties to the dispute.

---

[1357]  Claimants' Answers to the Tribunal's Questions, ¶¶ 109-110; Respondent's Answers to the Tribunal's Questions, ¶ 154.

[1358]  Claimants' Answers to the Tribunal's Questions, ¶ 111; Respondent's Answers to the Tribunal's Questions, ¶ 152.

[1359]  Claimants' Answers to the Tribunal's Questions, ¶¶ 109-110; Respondent's Answers to the Tribunal's Questions, ¶ 153.

[1360]  Claimants' Answers to the Tribunal's Questions, ¶ 111.

[1361]  *Id.*, ¶ 113.

1090. Separately, as already observed, the Respondent has submitted that a statute can be "*both* retrospective and clarificatory".[1362] This suggests that clarifications may or may not have retroactive and/or immediate effect. On the basis of the considerations discussed in the preceding paragraphs, the Tribunal concludes that, to determine whether a statute is clarificatory in nature, the first question is not whether it operates towards the past or towards the future; the question is whether it expands the scope or operation of the provision being clarified so that it effectively changes the content of that provision, whether prospectively or retroactively.

1091. The Tribunal will thus conduct its factual inquiry in two stages. First, it will determine whether the 2012 Amendment expanded the scope or operation of Section 9(1)(i), or whether it was a true clarification (Section (ii) below). Stated differently, did it impose a new tax burden where previously there was none, or did it simply clarify the scope of the existing tax burden? If it is the former, then the 2012 Amendment will have altered the legal, tax and financial consequences of past transactions, and should be characterised as a substantive amendment of the ITA 1961. If it is the latter, the 2012 Amendment will simply have confirmed the pre-existing legal consequences of past transactions.

1092. Whatever the nature of the amendment, the Tribunal will then determine its temporal effect; i.e., whether it operated prospectively, retroactively, or with immediate effect. (Section (iii) below).

### (ii)   Did the 2012 Amendment expand the scope of Section 9(1)(i), or did it clarify it?

1093. Did the 2012 Amendment expand the scope or operation of Section 9(1)(i) of the ITA, or did it merely clarify that provision? Stated differently, did it impose a new tax burden where there previously was none, or did it simply clarify the scope of the existing tax burden?

1094. The basis for taxation of non-residents is found at Section 5(2) of the ITA 1961, which provides:

> **Scope of total income.**
>
> 5. […]
>
> (2) Subject to the provisions of this Act, the total income of any previous year of a person who is a non-resident includes all income from whatever source derived which—
>
> (a) is received or is deemed to be received in India in such year by or on behalf of such person ; or
>
> (b) accrues or arises or is deemed to accrue or arise to him in India during such year.[1363]

---

[1362]   R-SoD, ¶ 116 (emphasis in original).

[1363]   Excerpt of the ITA 1961, Section 5, Exh. R-73.

1095. At the time of Cairn's corporate reorganisation and up until April 2012, Section 9(1)(i) of the ITA 1961 provided as follows (the numbers in bold brackets have been added by the Tribunal for clarity to distinguish between the four limbs of this provision):

> **Income deemed to accrue or arise in India.**
>
> 9. (1) The following incomes shall be deemed to accrue or arise in India : (i) all income accruing or arising, whether directly or indirectly, **[1]** through or from any business connection in India, or **[2]** through or from any property in India, or **[3]** through or from any asset or source of income in India, or **[4]** through the transfer of a capital asset situate in India.[1364]

1096. The Finance Act 2012, which was made into law on 1 April 2012 amended this text as follows:

> **Amendment of section 9.**
>
> 4. In section 9 of the Income-tax Act, in sub-section (1),—
>
> (a) in clause (i), after Explanation 3, the following Explanations shall be inserted and shall be deemed to have been inserted with effect from the 1st day of April, 1962, namely:—
>
> 'Explanation 4.—For the removal of doubts, it is hereby clarified that the expression "through" shall mean and include and shall be deemed to have always meant and included "by means of", "in consequence of" or "by reason of".
>
> Explanation 5.—For the removal of doubts, it is hereby clarified that an asset or a capital asset being any share or interest in a company or entity registered or incorporated outside India shall be deemed to be and shall always be deemed to have been situated in India, if the share or interest derives, directly or indirectly, its value substantially from the assets located in India'.[1365]

1097. It is the Claimants' position that, as it stood before the 2012 Amendment, the fourth limb of Section 9(1)(i) did not apply to indirect transfers by means of transfers of shares of companies situated outside of India even if such companies owned capital assets situated in India. According to the Claimants, "Indian law clearly recognizes the principle of separate entity, i.e. a company is distinct from its shareholders, and that the situs of a share is the place of the company's incorporation."[1366] Accordingly, a share in a non-Indian company was a capital asset situated abroad, regardless of whether the company held assets located in India. It followed that transfers by non-residents of shares in companies incorporated outside of India did not fall within the ambit of Section 9(1)(i), regardless of whether those companies held, directly or indirectly, assets located in India.

---

[1364]   Excerpt of the ITA 1961, Section 9, Exh. C-43 (emphasis added).

[1365]   Finance Act 2012 [Act No. 23 of 2012], Exh. C-53, ¶ 4.

[1366]   C-PHB, ¶ 18.

1098. By contrast, the Respondent argues that Explanations 4 and 5 merely clarified that the terms "situate in India" in the fourth limb of Section 9(1)(i) always meant to include shares in foreign companies, when those shares substantially derived their value, whether directly or indirectly, from assets in India.

1099. Hence, the question before the Tribunal is the following: prior to the 2012 Amendment, did Section 9(1)(i) of the ITA 1961 apply or, *a fortiori*, was Section 9(1)(i) of the ITA 1961 in fact applied, to indirect transfers (i.e., to the transfer by a non-resident of a share in a company incorporated abroad, if the share derived, directly or indirectly, its value substantially from assets located in India)? The answer to this question must be based on an assessment of Indian law in times prior to the 2012 Amendment. If the answer is in the affirmative, then the 2012 Amendment objectively can be considered as a clarification. If in turn the answer is in the negative, the 2012 Amendment will constitute a modification of the scope of the law or of its operation.

1100. Having carefully reviewed the Parties' arguments and the evidence in the record, the Tribunal is convinced that the 2012 Amendment substantively changed the scope or operation of Section 9(1)(i) and was thus not a true clarification. This conclusion is supported by the legislative history of Section 9(1)(i) and the subsequent attempts to amend it (Section (1) below); the opinions of specialised tax committees tasked with examining the 2012 Amendment (Section (2) below); the numerous amendments and clarifications made to the 2012 Amendment after it was enacted into law (Section (3) below); the ITD's practice since the enactment of the ITA 1961 (Section (4) below); the timing of the ITD's assessment against CUHL (Section (5) below); the tax advice received by the Claimants when structuring their 2006 corporate reorganisation (Section (6) below); the ITAT's March 2017 Order (Section (7) below), and finally, the Supreme Court's decision in *Vodafone* (Section (8) below).

*(1)   The ITA 1961's original intent*

1101. The Respondent argues that the 2012 Amendment merely clarified Parliament's original intent, which was always to tax indirect transfers. The Respondent has cited the Memorandum accompanying the 2012 Finance Bill, which explained that "there is a need to provide clarificatory retrospective amendment to restate the legislative intent in respect of scope and applicability of section 9 […]" because "[c]ertain judicial pronouncements have created doubts about the scope and purpose of section[] 9 […]", and "there are certain issues in respect of income deemed to accrue or arise where there are conflicting decisions of various judicial authorities".[1367] As to this legislative intent, the Memorandum made the following comments:

> Section 9 of the Income Tax provides cases of income, which are deemed to accrue or arise in India. This is a legal fiction created to tax income, which may or may not arise in India and would not have been taxable but for the deeming provision created by this section. Sub-section (1)(i) provides a set of circumstances in which income accruing or arising, directly or indirectly, is taxable in India. One of the limbs of clause (i) is income accruing or arising directly or indirectly through the transfer of a capital asset situate in India. <u>The legislative intent of this clause is to widen</u>

---

[1367]   Memorandum Accompanying Finance Bill, 2012, Exh. R-48, p. 19.

> the application as it covers incomes, which are accruing or arising directly or indirectly. The section codifies source rule of taxation wherein the state where the actual economic nexus of income is situated has a right to tax the income irrespective of the place of residence of the entity deriving the income. Where corporate structure is created to route funds, the actual gain or income arises only in consequence of the investment made in the activity to which such gains are attributable and not the mode through which such gains are realized. Internationally this principle is recognized by several countries, which provide that the source country has taxation right on the gains derived of offshore transactions where the value is attributable to the underlying assets. [1368]

1102.   This Memorandum appears to suggest that the original legislative intent was that the fourth limb of Section 9(1)(i) should tax indirect transfers of underlying Indian assets. However, the Tribunal cannot rely on this document to establish the ITA 1961's original intent. This Memorandum was drafted by the MoF to justify the 2012 Finance Bill, which resulted in the 2012 Amendment. Just as the Tribunal cannot rely solely on Parliament's having labelled the 2012 Amendment as a clarification, it similarly cannot rely solely on the MoF's explanation or interpretation of the original legislative intent behind Section 9(1)(i) when it proposed the 2012 Amendment. The Tribunal must conduct its own objective investigation as to what was Section 9(1)(i)'s original intent under the ITA 1961.

1103.   The Claimants allege (and the Respondent does not dispute) that capital gains tax was introduced in India in 1947 pursuant to the Income Tax and Excess Profits Tax (Amendment) Act. This tax was applied to non-residents by amending the scope of the "deeming fiction" in Section 42(1) of the Income Tax Act 1922, according to which certain income that accrued, arose or was received outside of India would be deemed to accrue, arise or be received in India. Specifically, this deeming fiction now encompassed gains arising or accruing "through or from the sale, exchange or transfer of a capital asset in the taxable territories."[1369]

1104.   In 1956, the Government appointed the first Law Commission to restructure and simplify the ITA. The Law Commission found that Section 42(1) was ambiguous, and made the following recommendation:

> The words 'sale […] of a capital asset in the taxable territories' in the existing Section 42(1) are slightly ambiguous, since 'in the taxable territories' can be read either with 'sale' or with 'capital asset'. To remove this ambiguity, the word 'situate' has been added after 'capital asset'.[1370]

1105.   The ITA 1961 adopted the Law Commission's recommendations. Specifically, Section 9(1)(i) provided that "all income accruing or arising, whether directly or indirectly, […]

---

[1368]   *Ibid* (emphasis added).

[1369]   C-SoC, ¶ 150, quoting Income Tax Act 1922, Section 42(1) [excerpt], Exh. C-105, as amended by Income Tax and Excess Profits Tax (Amendment) Act 1947 (Act No. XXII of 1947), Section 12B.

[1370]   Law Commission of India, 12th Report, Income-Tax Act, 1922 (26 September 1958), Exh. C-132, p. 331.

through the transfer of a capital asset <u>situate in India</u>" would be "deemed to accrue or arise in India."[1371]

1106. The Law Commission's comment suggests that the term "situate" after "capital asset" was meant to qualify the location of the asset, so that the provision would be triggered when a capital asset "situate in India" was transferred. According to its plain terms, the use of the word "situate" (which, used to qualify a noun, corresponds to the adjective "situated"), indicates that the intention of the provision was that the capital asset being transferred would need to be located, placed or positioned in India.[1372] This focus on the location of the asset seems so clear that it would take a significant piece of legislative history to dislodge the intention from what was plainly written. Consistent with this approach, in the case of shares, a 1957 CBDT circular expressly indicated that "shares, stock, debentures or debenture stock in a company are located at the place where the company is incorporated."[1373] In other words, a share in a company incorporated outside of India was understood to be situated outside of India. It is undisputed that Indian corporate law has long espoused the principle laid out in *Salomon v. Salomon* that a company is a separate legal entity from its shareholders and that the assets of the company are not assets of the shareholder.[1374] In light of these principles, it would be difficult to conclude without evidence of an express legislative intent to tax indirect transfers, that the drafter's use of the phrase "situate in India", Section 9(1)(i) applied to the transfer of shares in a foreign company simply because that company held underlying assets in India.

1107. There is no evidence of an intent that the fourth limb of Section 9(1)(i) should bear a meaning other than its natural meaning, either in 1946, 1956 or 1961. To the contrary, the record suggests that indirect transfers by non-residents were not discussed in the relevant parliamentary debates at that time.[1375] Nor, as the Shome Committee later concluded, is there evidence of such an intent in the ITA 1961 itself. After noting that "[t]he retrospective amendments carried through Finance Act, 2012 relating to indirect transfer have been specified by the Government as clarificatory in nature and as a restatement of the legislative intent", the Shome Committee "analyse[d] various

---

[1371] Excerpt of the ITA 1961, Exh. C-43, section 9.

[1372] The Oxford English Dictionary defines "situate" (in legal contexts) as "Situated, located" (https://www.oed.com/view/Entry/180517?rskey=BgEjq4&result=1&isAdvanced=false). In turn, "situated" is defined as "[s]ited in a particular location; having a particular location or position." https://www.oed.com/view/Entry/180519?rskey=0qhZe9&result=2&isAdvanced=false).

[1373] CBDT Circular dated 28 September 1957 dealing with the exclusion of assets or debts outside of India for purposes of wealth tax, Exh. C-140, section 1594 (Location of assets - Instructions for general guidance). The Circular stated that "The question as to where the asset is located is essentially one of fact and will have to be decided in the light of evidence", but issued certain instructions for general guidance, including the one quoted above.

[1374] *Salomon v. Salomon* [1897] 25 A.C. 22, Gardiner-28; Gardiner ER1, ¶ 62 ("The decision of the House of Lords in *Salomon v Salomon* [1897] AC 22 which held that a company was a separate legal entity from its shareholders and that, in principle, one could not pierce the corporate veil is a principle adopted and applied in all the common law countries referred to in relation to Question 1 above. It is also the principle accepted and applied in the courts of India.").

[1375] Legislative Assembly Debate, 13 March 1947, Exh. C-113, p. 1897; and Legislative Assembly Debate, 7 April 1947, Exh. C-114, p. 3029.

provisions of the [ITA 1961] to see if there is any indication of such legislative intent in the past." [1376] The Committee concluded that the various provisions of the ITA 1961 "clearly show not only the absence of any evidence proving that these retrospective amendments are clarificatory in nature but also demonstrate lack of any legislative intent of taxation of capital gains arising on account of indirect transfer."[1377]

1108. The Tribunal cannot fail to note that the Finance Minister who tabled the 2012 Finance Act in Parliament, Mr Pranab Mukherjee, subsequently made statements that suggest that the 2012 Amendment was not merely clarificatory in nature. In an autobiography published in 2017, Mr Mukherjee described the purpose of the 2012 Amendment being "to amend the Income Tax Act, 1961, with retrospective effect to undo the Supreme Court judgement in the Vodafone tax case."[1378] Mr Mukherjee then explained that:

> The budgetary proposal to amend the Income Tax Act with retrospective effect from 1962 to assert the government's right to levy tax on merger and acquisition (M&A) deals involving overseas companies with business assets in India was an enabling provision to protect the fiscal interests of the country and avert the chances of a crisis. This retrospective arrangement was not merely to check the erosion of revenues in present cases, but also to prevent the outgo of revenues in old cases.[1379]

1109. While it does not properly qualify as evidence of legislative intent, the statement of one of the persons responsible for drafting and promoting the 2012 Amendment is a relevant indicator of its nature.

*(2)    The evolution of the legislative debates*

1110. The evolution of public discussion and legislative debates on Section 9(1)(i) prior to the 2012 Amendment further suggests that both the Government and Parliament understood that the ITA 1961 did not tax indirect transfers *de lege lata* and that they contemplated possible improvements *de lege ferenda*.

1111. The 2002 Task Force (which was constituted by the Indian Government to, *inter alia*, rationalise and simplify direct taxes) noted that "[n]onresidents may also be taxed on income deemed to accrue or arise in India through a business connection, through or from any asset or source of income in India, or through the transfer of a capital asset situated in India (including a share in a company incorporated in India)."[1380] While the 2002 Task Force referred to a share in a company incorporated in India as an example of a capital asset situated in India, the fact that it chose such an example suggests *a contrario* that a share in a company incorporated abroad would not fall within the ambit of Section 9(1)(i), even if its value derived from underlying assets in India.

---

[1376]   Shome Committee Report, Exh. C-56, p. 30.

[1377]   *Id.*, p. 33.

[1378]   Pranab Mukherjee, The Coalition Years 1996-2012, Exh. C-354, pp. 186.

[1379]   *Id.*, pp. 189-190.

[1380]   Task Force on Direct Taxes, Report of the Task Force on Direct Taxes (December 2002), Exh. C-133, p. 56, n. 14.

1112. Significantly, in 2009 and 2010, Parliament considered new direct tax codes (the DTC 2009 and DTC 2010) that would tax indirect transfers by non-residents. In the Tribunal's view, this is persuasive evidence that the ITA 1961 did not previously tax indirect transfers. To recall, while the ITD was attempting to tax the Hutchison-Vodafone transaction, the MoF proposed two amendments to the ITA 1961 – the DTC 2009 and the DTC 2010 – both of which included new language with the clear effect of taxing indirect transfers. Specifically, Clause 5(1) of the DTC 2009 (which the Tribunal understands would have replaced Section 9(1)(i)), provided:

> (1) The income shall be deemed to accrue in India, if it accrues, whether directly or indirectly, through or from […] (d) the transfer, ***directly or indirectly,*** of a capital asset situate in India.[1381]

1113. After the DTC 2009 failed to be enacted into law, the Finance Minister introduced the DTC 2010 in Parliament. Clause 5(1) of this version of the DTC eliminated the terms "directly or indirectly" from sub-clause (d),[1382] but Clause 5(4)(g) then specified as follows:

> The income deemed to accrue in India under sub-section (1) shall, in the case of a non-resident, not include the following, namely […] (g) income from transfer, outside India, of any share or interest in a foreign company <u>unless at any time in twelve months preceding the transfer, the fair market value of the assets in India, owned, directly or indirectly, by the company, represent at least fifty per cent of the fair market value of all assets owned by the company</u>.[1383]

1114. The DTC 2010 thus proposed to tax the "transfer, outside India, of any share or interest in a foreign company" if "the fair market value of the assets in India, owned, directly or indirectly, by the company, represent at least fifty per cent of the fair market value of all assets owned by the company".[1384] Clause 5(6) of the DTC 2010 then proposed the following formula for calculating the income that would be taxable in such an indirect transfer:

> Where the income of a non-resident in respect of transfer, outside India, of any share or interest in a foreign company is deemed to accrue in India under clause (d) of sub-section (1), it shall be computed in accordance with the following formula –
>
> A x B / C
>
> Where A = Income from the transfer computed in accordance with provisions of this Code as if the transfer was effected in India;

---

[1381] Department of Revenue, DTC 2009, MoF (2009) [excerpt], Exh. C-54, Clause 5(1) (emphasis added).

[1382] Excerpt of Department of Revenue, DTC 2010, MoF (2010), Exh. C-55, Clause 5(1).

[1383] *Id.*, Clause 5(4)(g) (emphasis added).

[1384] *Id.*, Clause 5(4)(g).

B =      fair market value of the assets in India, owned, directly or indirectly by the company;

C =      fair market value of all assets owned by the company.[1385]

1115.  Before engaging in an assessment of the DTC 2009 and 2010, which it has carefully reviewed, the Tribunal notes that the Parties have made certain confidential submissions as to whether these bills expanded the tax base, commenting on certain Restricted Documents produced in response to PO5 and PO6.[1386] After reviewing the Restricted Documents and confidential submissions, the Tribunal considers that they did not materially advance either Party's position beyond what has already been stated or argued in the non-confidential record. In particular, they would not support the Respondent's position on the taxability of indirect transfers prior to the 2012 Amendment, and would be unnecessary to support the Claimants' position on that point. For these two reasons in particular, and in view of the sensitive nature of the Restricted Documents, the Tribunal will refrain from discussing them in this Award. For the avoidance of doubt, the Tribunal has reached the conclusions that follow on the basis of the non-confidential record.

1116.  The Claimants contend that the MoF's attempt to introduce these provisions demonstrates that the ITA 1961, the statute actually in force, did not tax indirect transfers. According to the Respondent, the contrary is true: it submits that "[t]he DTCs of 2009 and 2010 made clear and explicit, well before the decision of the Supreme Court in *Vodafone*, that indirect transfers are covered within the scope of s. 9 of the ITA."[1387] It argues that "[t]he DTC 2009 included the words 'directly or indirectly' before the words 'capital asset situate in India' not because s. 9 of the ITA did not already cover indirect transfers", but "as a matter of explanation and clarification."[1388] According to the Respondent, "[t]his is demonstrated by the fact that the DTC 2010 removed those words; Clause 5(1) of the DTC 2010, which the Claimants accept covers indirect transfers, was identical to s. 9(1) of the ITA."[1389] The Tribunal is not persuaded by this argument: the fact that the DTC 2010 removed the words "directly or indirectly" means that the provision is left with the same text as Section 9(1)(i), the scope of which is disputed.

1117.  The Respondent argues further that, under the DTC 2010, the chargeability to tax of indirect transfers arose directly from Clause 5(1)(d), despite the fact that it did not include the terms "directly or indirectly" in relation to a capital asset situate in India. Contrary to the Claimants' contentions, this chargeability to tax did not arise from Clause 5(4)(g) of the DTC 2010, which provided an *exclusion* for certain categories of

---

[1385]  *Id.*, Clause 5(6).

[1386]  Specifically, CCom-205, RCom-312, CCom-270, and RCom-356, submitted in accordance with PO5 and PO6, commenting on Restricted Documents, Exh. C-576 and C-577.

[1387]  R-SoD, ¶ 129.

[1388]  *Id.*, ¶ 138.

[1389]  *Ibid.*

foreign investors when the foreign company derived less than 50% of its value from Indian assets.[1390]

1118. The Tribunal cannot follow the Respondent's argument. Each iteration of this clause introduced language that was not previously included in Section 9(1)(i), with the goal of capturing indirect transfers. Clause 5(1) of the DTC 2009 included the terms "directly and indirectly" under sub-clause (d), thus expressly qualifying the term "transfer" of a "capital asset situate in India" (whereas Section 9 (1)(i)'s use of "directly or indirectly" qualified the income arising, not the means by which the asset was transferred). As discussed further below, this is what the Supreme Court held in *Vodafone* when it found that the terms "directly and indirectly" at the chapeau of Section 9(1)(i) qualified the terms "income accruing", and could not be understood to reach the terms "transfer" or "capital asset".[1391]

1119. In turn, the DTC 2010 removed the terms "directly or indirectly" from Clause 5(1). Instead, it clarified at Section 5(4)(g) that income arising from the transfer of a share or interest in a foreign company would not be deemed to accrue in India unless in the 12 months prior to the transfer the fair market value of the assets in India, owned directly or indirectly by the company, represented at least 50% of the value of the company's total assets. While this was formulated as an exclusion from Clause 5(1), the effect was very similar to that of Explanation 6 to the 2012 Amendment, i.e., it indicated that the transfer of a share in a foreign company would be taxed in India if 50% or more of the company's value derived from underlying assets located in India. This language was not included in Section 9(1)(i), and as the Supreme Court concluded in *Vodafone*, could not have been read into that provision without doing violence to its text.[1392]

1120. The Standing Committee's comments on the DTC 2010 confirm this conclusion. In its official report on the DTC 2010, the Standing Committee noted that the "[ITA 1961] *does not contain a provision analogous* to clause 5(4)(g) and Clause 5(6) of the DTC, 2010",[1393] and that "Clause 5(1)(d) read with Clause 5(4)(g) and Clause 5(6) *seek to tax* income of a non-resident, arising from indirect transfer of capital asset, situated in India."[1394] Read together, these provisions confirm that indirect transfers were not previously taxed under the ITA 1961: had they already been covered by Section 9(1)(i), there would have been no need to introduce new provisions to "seek to tax" indirect transfers.

1121. The Standing Committee's answers to stakeholder suggestions further confirm this conclusion: faced with the suggestion that these provisions should be deleted because "[a]ny tax evasion scheme or arrangement would stand covered under the GAAR provisions in the DTC 2010", the Committee responded as follows:

---

[1390]  R-SoD, ¶ 139-140.

[1391]  See Section VII.A.3.b(ii)(9) below.

[1392]  *Ibid.*

[1393]  Standing Committee Report, Exh. C-57 (resubmitted), p. 69 (emphasis added).

[1394]  *Id.*, p. 70, ¶ 1.20 (emphasis added).

> In accordance with the principles of taxation, the tax statute has to first specify the income which is chargeable to tax i.e. first the charge on income has to be provided before anti evasion or avoidance machinery may operate to bring such income in the tax net. Accordingly, the suggestion is not acceptable as the income has to first fall within the scope of total income and then only it can be brought to tax by invoking anti-evasion provisions.[1395]

1122. This comment suggests that, as it stood, Section 9(1)(i) did not specify that income resulting from an indirect transfer was chargeable to tax, thus necessitating the inclusion of Clauses 5(4)(g) and 5(6) if that was the desired legislative objective.

1123. That Clauses 5(4)(g) and 5(6) of the DTC 2010 created a new chargeability to tax is further confirmed by the Standing Committee's recommendations. After noting that "Clause 5(1)(d) read with Clause 5(4)(g) and Clause 5(6) *seek to tax* income of a non-resident, arising from indirect transfer of capital asset, situated in India", the Committee recommended certain exemptions, specifically in the case of transfers of "small share-holdings" or "listed shares outside India", because these provisions would "cause hardship to the non-resident shareholder", and in the case of "intra group restructuring outside India, when the Code itself provides exemption from capital gains in cases of business reorganization through Clause 47(1)(g) and Clause 47(1)(h) of the Code."[1396] The Committee also recommended some changes to the date on which the fair market value of the assets should be assessed.[1397] The fact that the Committee recommended exemptions and clarifications to these provisions suggests that a new tax burden was being imposed, and that its scope needed to be narrowed down or refined.

1124. The Tribunal thus finds that the fact that the drafters of the DTC 2009 and 2010 felt the need to propose new language expressly taxing indirect transfers is compelling evidence that, as it stood, Section 9(1)(i) did not apply to indirect transfers. As discussed further below, the Supreme Court reached the same conclusion in *Vodafone*.[1398]

*(3)    The opinions of special tax committees*

1125. It is undisputed that the enactment of the 2012 Amendment generated much concern among stakeholders. To address these concerns, the Government appointed several special tax committees to examine the 2012 Amendment. The conclusions of these tax committees further support the Tribunal's conclusion that the 2012 Amendment expanded the tax base.

1126. The Shome Committee's conclusions are particularly relevant. The Shome Committee, which was led by Dr Parthasarathi Shome (an advisor to the Finance Minister), was tasked, *inter alia*, with examining "the implications of amendment made to the Income Tax Act, 1961 (the Act) relating to the taxation of non-resident transfer of assets where

---

[1395]  *Id.*, p. 70 (emphasis added).

[1396]  *Id.*, p. 70, ¶ 1.20 (emphasis added).

[1397]  *Ibid.*

[1398]  *Vodafone*, ¶ 71.

the underlying asset is in India, particularly in the context of the tax liability of portfolio investors and Foreign Institutional Investors (FIIs)."[1399]

1127. The Shome Committee explained that "[r]etrospective amendments" could be of the following types "(i) to correct apparent mistakes/anomalies in the Statute"; "(ii) to remove technical defects, particularly in procedure, which had vitiated the substantive law"; "(iii) to 'protect' the tax base from highly abusive tax planning schemes that have the main purpose of avoiding tax, without economic substance"; and "(iv) to 'expand' the tax base."[1400] The Committee went on to say that:

> Retrospective amendments as mentioned at (i) & (ii) are necessary and fair as they do not create any additional burden on the taxpayer. Retrospective amendments at (iii) above may also be justified as any avoidance of tax through exploitation of any loophole in the system means a windfall to a dishonest taxpayer at the cost of general body of the taxpayers. However, retrospective amendment as mentioned at (iv) is against the basic tenet of the law as it affects the certainty of law.[1401]

1128. The Committee thus recommended that "retrospective application of tax law should occur in exceptional cases, and exclusively to address types (i), (ii) & (iii) above", and "should be confined to matters that are genuinely of a clarificatory nature, or to 'protect' the tax base by countering highly abusive tax planning schemes, rather than 'expand' the tax base".[1402] It is the Tribunal's understanding that this statement is about good policies and best practices and not about the validity of a Statute that would be retroactive, which is a different question. However, the Shome Committee does distinguish between what it would consider to be clarificatory and what would be considered to be in effect changing the reach of an existing taxing Statute.

1129. As to the nature of the 2012 Amendment, the Committee concluded in no uncertain terms that "the provisions relating to taxation of indirect transfer as introduced by the Finance Act, 2012 are not clarificatory in nature and, instead, would tend to widen the tax base".[1403] As a result, it recommended that "[t]hese provisions, after the incorporation of their definitions as recommended separately in this Report, should be applied prospectively", as "[t]his would better reflect global practice, as well as the principle of equity and probity in the formulation and implementation of commonly recognized taxation principles."[1404]

---

[1399]   Shome Committee Report, Exh. C-56, p. 12.

[1400]   *Id.*, p. 30.

[1401]   *Ibid.*

[1402]   *Ibid.*

[1403]   *Id.*, p. 5. See also *id.,* p. 34 ("The provisions relating to taxation of indirect transfer as introduced by the Finance Act, 2012 are not clarificatory in nature. These provisions, after the incorporation of their definitions as recommended separately in this Report, should be applied prospectively. This would better reflect global practice, as well as the principle of equity and probity in the formulation and implementation of commonly recognized taxation principles.").

[1404]   Shome Committee Report, Exh. C-56, p. 34.

1130.  The Tax Administration Reform Commission ("TARC"), another expert group chaired by Dr Shome (which had been mandated post 2012 "to review the application of tax policies and tax laws in the context of global best practices and to recommend measures for reforms required in tax administration to enhance its effectiveness and efficiency"[1405]) reached a similar conclusion. The TARC characterised the 2012 Amendment as a "retrospective amendment" introduced to counter a prior interpretation by the judiciary, noting that it had caused an "overnight change" in the interpretation of a provision:

> Retrospective amendments have further undermined the trust between taxpayers and the tax administration. Many seem to feel that it has become the order of the day. Many of the retrospective amendments have been introduced to counter interpretation in favour of the taxpayer upheld earlier by the judiciary. <u>The most famous is the introduction of provisions for taxation of 'indirect transfer' with effect from April 1, 196[2], to overrule a Supreme Court judgement which held that Indian tax authorities did not have territorial jurisdiction to tax offshore transactions, and therefore, the taxpayer was not liable to withhold the taxes. An overnight change in the interpretation of a provision, which earlier held ground for decades,</u> provides scope for tax officials to rake up settled positions. This approach to retrospective amendments has resulted in protracted disputes, apart from having deeply harmful effects on investment sentiment and the macro economy.[1406]

1131.  The Committee for Reforming the Regulatory Environment for Doing Business in India (also called the "Damodaran Committee", as it was chaired by Mr Meleveetil Damodaran, the former Chairman of SEBI), similarly condemned retrospective taxation. The Damodaran Committee was set up in August 2012 by the Ministry of Corporate Affairs in the wake of the Word Bank's Doing Business Report which had ranked India at the lower end of various sub-indices, and was asked to "look into various parameters which affect the regulatory environment for doing business in India and make appropriate recommendations".[1407] While the Committee did not expressly refer to the 2012 Amendment, the context and timing in which it was issued suggest that the following comment referred to the 2012 Amendment:

> While the World Bank Report does not specifically address the problem of retrospective taxation it is considered necessary to touch on the subject. It has often been said that death and taxes are equally undesirable aspects of human life. Yet, it can be said in favour of death that it is never retrospective. Retrospective taxation has the undesirable effect of creating major uncertainties in the business environment and constituting a significant disincentive for persons wishing to do business in India. While the legal powers of a Government extend to giving retrospective effect to taxation proposals, it might not pass the test of certainty and continuity.

---

[1405]  TARC Report, Exh. C-137, p. ii.

[1406]  *Id.*, p. 249 (emphasis added).

[1407]  Committee For Reforming the Regulatory Environment for Doing Business in India, Report of the Committee for Reforming the Regulatory Environment for Doing Business in India (2 September 2013), Exh. C-136, p. 6.

> This is a major area where improvements should be attempted sooner rather than later since business cannot take corrective action retrospectively."[1408]

1132. Given the nature of the comments made by these three committees, the Tribunal understands that they were using the term "retrospective" as a synonym of "retroactive", or at least in a broad manner to refer to laws attaching new consequences to acts occurring in the past.

1133. The Respondent has argued that these committees were asked to look at issues of policy and were not tasked with assessing the constitutionality or validity of the 2012 Amendment. While this is undisputed, it does not deny their factual conclusion (at least in the case of the Shome Committee and TARC) that the 2012 Amendment was not clarificatory in nature or constituted a change in the content of the law. The Tribunal does not employ these documents for their policy statements or recommendations; it is concerned only with their determinations that the 2012 Amendment effected a change in the law and did so retroactively.

*(4)*     *The subsequent clarifications and amendments to the 2012 Amendment*

1134. The Claimants have argued further that the fact that Parliament and the CBDT felt compelled to issue several crucial clarifications and limitations to the 2012 Amendment further confirms that it was imposing a new tax burden. The Tribunal agrees. These subsequent amendments, clarifications and limitations show that, as enacted, the 2012 Amendment was capable of being interpreted in widely different ways, to the point where its application would have been virtually impossible in practice or would have led to absurd results.

1135. The introduction of Explanations 6 and 7 is an eloquent example. Explanation 5 to Section 9(1)(i) stated that "any share or interest in a company or entity registered or incorporated outside India shall be deemed to be and shall always be deemed to have been situated in India, if the share or interest derives, directly or indirectly, its value *substantially* from the assets located in India."[1409] However, it was unclear what the term "substantially" meant; more specifically, there was no indication as to how substantial the value of the foreign share would need to derive from underlying Indian assets for it to have been considered to be "situate in India" and thus come under the purview of Section 9(1)(i). This created a situation whereby publicly traded corporations whose shares were traded in stock exchanges around the world came under a taxation risk in India even if their shares derived a relatively minor portion of their value from Indian assets.

1136. To address this uncertainty, the Finance Act 2015 introduced Explanations 6 and 7 (on a prospective basis), clarifying *inter alia* that Explanation 5 would only apply to those share transfers which were valued above Rs. 10 crores or the company derived not less

---

[1408] *Id.*, pp. 76-77.

[1409] Finance Act 2012 [Act No. 23 of 2012], Exh. C-53, ¶ 4 (emphasis added).

than 50% of its value from Indian assets,[1410] or to cases in which the transferor held the right to management or control of the company which directly or indirectly held the Indian assets.[1411] The Respondent acknowledges that Explanations 6 and 7 "fine-tuned" Explanations 4 and 5 "to reflect a very particular, and narrowly defined, class of transactions: those high-value transactions where the underlying Indian assets represent at least half of the value of the total assets of the foreign company whose shares are being transferred, and where the transferor holds rights of management or control (or greater than five percent of the share capital or voting power) over the foreign company."[1412]

1137. Explanations 6 and 7 thus effectively narrowed down the scope of the type of transactions covered by Section 9(1)(i), as amended. In the Tribunal's view, this confirms that Explanations 4 and 5 had widened the tax base and experience had led the MoF to seek to ameliorate the unintended consequences of that widening. If, as the Respondent contends, Section 9(1)(i) was always meant to apply to all transactions specified in Explanations 4 and 5, this means that, prior to Explanations 6 and 7,

---

[1410]   ITA 1961, Exh. C-569, Section 9(1)(i):

"*Explanation 6.*—For the purposes of this clause, it is hereby declared that— (a) the share or interest, referred to in Explanation 5, shall be deemed to derive its value substantially from the assets (whether tangible or intangible) located in India, if, on the specified date, the value of such assets— (i) exceeds the amount of ten crore rupees; and (ii) represents at least fifty per cent. of the value of all the assets owned by the company or entity, as the case may be; […]."

[1411]   ITA 1961, Exh. C-569, Section 9(1)(i):

"*Explanation 7.*—For the purposes of this clause,—

(a) no income shall be deemed to accrue or arise to a non-resident from transfer, outside India, of any share of, or interest in, a company or an entity, registered or incorporated outside India, referred to in the Explanation 5,—

(i)     if such company or entity directly owns the assets situated in India and the transferor (whether individually or along with its associated enterprises), at any time in the twelve months preceding the date of transfer, neither holds the right of management or control in relation to such company or entity, nor holds voting power or share capital or interest exceeding five per cent. of the total voting power or total share capital or total interest, as the case may be, of such company or entity; or

(ii) if such company or entity indirectly owns the assets situated in India and the transferor (whether individually or along with its associated enterprises), at any time in the twelve months preceding the date of transfer, neither holds the right of management or control in relation to such company or entity, nor holds any right in, or in relation to, such company or entity which would entitle him to the right of management or control in the company or entity that directly owns the assets situated in India, nor holds such percentage of voting power or share capital or interest in such company or entity which results in holding of (either individually or along with associated enterprises) a voting power or share capital or interest exceeding five per cent. of the total voting power or total share capital or total interest, as the case may be, of the company or entity that directly owns the assets situated in India;

(b) in a case where all the assets owned, directly or indirectly, by a company or, as the case may be, an entity referred to in the Explanation 5, are not located in India, the income of the non-resident transferor, from transfer outside India of a share of, or interest in, such company or entity, deemed to accrue or arise in India under this clause, shall be only such part of the income as is reasonably attributable to assets located in India and determined in such manner as may be prescribed;

(c) — 'associated enterprise' shall have the meaning assigned to it in section 92A;"

[1412]   R-SoD, ¶ 121.

potentially all transfers of shares in foreign companies which indirectly held assets in India would have been taxable under the ITA 1961, no matter what percentage of the value of the foreign shares derived from the underlying Indian assets. Yet, the Respondent asserts that "[t]aken together, the 2012 Clarification captures income generated by the transfer of capital assets situated in India, in those instances where such transfer is effected by the transfer of the shareholding of a foreign company – whose primary holding is of the underlying Indian assets – and over which the transferor exercises substantial control."[1413] This implies that the 2012 Amendment (Explanations 4 and 5) must be interpreted as narrowed down in Explanations 6 and 7. Otherwise, from 1962 to 2015, Section 9(1)(i) would have applied to all indirect transfers, and not only to "a very particular, and narrowly defined, class of transactions", as the Respondent contends.

1138. More importantly, it is clear from the record that, prior to Explanations 6 and 7, neither the law nor the ITD provided guidelines or a methodology to determine when a share or interest derived, directly or indirectly, its value substantially from assets located in India. Not only does this suggest that the pre-2012 version of Section 9(1)(i) did not apply to indirect transfers of capital assets as a matter of law, it also shows that it could hardly have done so as a matter of practice.

1139. Other amendments, limitations or clarifications to the 2012 Amendment lead to the same conclusion. For instance, in March 2015, the Government clarified that dividends were excluded from the scope of the 2012 Amendment.[1414] Had Section 9(1)(i) always taxed indirect transfers, presumably the CBDT would have clarified between 1962 and 2012 whether dividends were included among the scope of income chargeable to tax.

1140. Similarly, to address the concern regarding multiple taxation among investment funds, the Finance Act 2017 exempted Category I and Category II foreign portfolio investors from the ambit of the 2012 Amendment.[1415] In November 2017, the CBDT issued a circular exempting income from redemption of shares or interests in multi-tiered investments outside India resulting or arising out of redemption or sale of investment in India.[1416] Absent these exemptions, these investors or transactions would have always been covered by the ITA 1961. In the Tribunal's view, these clarifications and exemptions further confirm that the 2012 Amendment imposed a new tax burden, the limits and scope of which needed to be refined, indeed confined.

*(5)    The tax advice received by the Claimants*

1141. The advice received by the Claimants at the time of Cairn's corporate reorganisation further confirms that, in 2006, Section 9(1)(i) was not seen to tax indirect transfers. Cairn's advisors were clear that the transfer of shares of non-Indian companies would

---

[1413]    *Id.*, ¶ 122.

[1414]    CBDT Circular, 26 March 2015, Exh. C-144.

[1415]    As explained in the CBDT Circular dated 7 November 2017, Exh. C-377, ¶ 4; see also Budget 2017-2018 – Speech of Arun Jaitley – Minister of Finance, 1 February 2017, Exh. C-241, p. 34.

[1416]    C-PHB, ¶ 84; CBDT Circular, 7 November 2017, Exh. C-377.

not be subject to capital gains tax, even if those companies owned (whether directly or indirectly) assets in India.

1142. The record shows that, in early May 2006, Cairn asked RSM, its Indian tax advisors, to prepare a "Concept Paper" that would outline the steps and regulatory implications of the structure chosen by Cairn's management at the meetings that took place in Mumbai on 3-4 May 2006.[1417] As explained by Paul Hally of Shepherd & Wedderburn in an email of 6 May 2006, for the pre-IPO structure Cairn had "agreed to go forward with Plan C without the use of Mauritian companies and to collect the Indian assets/subsidiaries under a UK holding company which [would] then be acquired by Newco" (i.e., the new Indian Subsidiary who would then be listed in the Indian stock exchanges).[1418] RSM's task was to "set out the steps involved in the plan, explain how the steps deal with the Sebi and Indian government and Indian Federal Reserve Bank issues such that [Cairn could] have a structure which [was] either compliant or should not require significant approvals", identify any required approvals or lengthy procedural steps, and identify any risks or roadblocks.[1419] This paper was to be reviewed by Merrill Lynch, ABN Amro Rothschild, and Amarchand & Mangaldas & Suresh A Shroff & Co. ("Amarchand"), Cairn's Indian legal counsel.[1420]

1143. RSM circulated an initial version of this Concept Paper on 11 May 2006, which included comments from Merrill Lynch and Amarchand.[1421] New versions of this Concept Paper were circulated in the following weeks, reflecting updates to the structure and comments from different advisors.[1422] The various iterations of this Concept Paper are analysed in depth in Section VII.A.3.c below. For present purposes, it suffices to say that the Concept Papers outlined three possible structures to be used by Cairn (Plans A, B and C), already focusing on Plan C, which was the one that Cairn, in the 3 to 4 May meetings in Mumbai, had decided to move forward with.

1144. Plan C reflected, in broad strokes, the structure that Cairn finally implemented.[1423] In a nutshell, it involved:[1424]

---

[1417] C-Updated Reply, ¶ 119. Email from Paul Hally to Cairn, Rothschild, Merrill Lynch, AMSS, RSM, Slaughter & May and AMB Amro Rothschild dated 6 May 2006, Exh. C-367.

[1418] Email from Paul Hally to Cairn, Rothschild, Merrill Lynch, AMSS, RSM, Slaughter & May and ABN Amro Rothschild dated 6 May 2006, Exh. C-367.

[1419] *Ibid*.

[1420] *Ibid.*

[1421] Cover Email to 11 May 2006 RSM Concept Paper, Exh. C-369; RSM Concept Paper, 11 May 2006, Exh. CWS-Brown-49A.

[1422] Cover Email to 19 May 2006 RSM Concept Paper, Exh. C-370; RSM Concept Paper, 19 May 2006, Exh. CWS-Brown-50A; Cover Email to 9 June 2006 RSM Concept Paper Exh. C-371 ("noting that it "incorporate[ed] inputs / comments provided by everyone."); RSM Concept Paper, 16 June 2006, Exh. CWS-Brown-51A.

[1423] Except that in the final structure, Cairn inserted a Jersey company (CIHL) beneath the UK India Hold Co. (CUHL), and it was this Jersey company which was ultimately transferred to the Indian list Co. (CIL).

[1424] RSM Concept Paper, 11 May 2006, Exh. CWS-Brown-49A, pp. 5-7.

a.   Consolidating all of Cairn's Indian shareholdings (and underlying assets) into a single UK holding company (referred to as "India Hold Co.") 100% held by Cairn Energy (what later became CUHL);

b.   Incorporating an Indian company which would eventually be listed in the Indian stock exchanges (referred to as "India list Co.", and later became CIL);

c.   Cairn Energy would then subscribe 20% of the expected post-IPO capital of the India list Co. in exchange for cash (so as to comply with the Minimum Promoter Contribution);

d.   The India list Co. would then acquire 20% of the shares of the India Hold Co. (and thus its underlying Indian assets), in cash, from Cairn Energy;

e.   Post-IPO (assuming it was successful), the India list Co. would have the option to acquire the remaining 80% of the shares of the India Hold Co. (and thus its underlying Indian assets), from Cairn Energy, whether in shares, cash, or a mix of both.

1145.  When discussing Plan C's income tax implications, RSM provided the following advice:[1425]

> The transfer of shares of all UK companies into a single UK India Hold Co. involves a transfer by a nonresident to a non resident of a foreign asset. It would have no tax implications in India. Acquisition of the India Hold Co by the India list Co would have no tax implications.
>
> Any subsequent transfer of shares of India list Co. will be subject to capital gains tax. […]

1146.  This advice was reiterated in identical terms in all versions of the Concept Paper.[1426] None of Cairn's other advisors providing comments to this Concept Paper (including Cairn's Indian counsel, Amarchand, as well as other advisors who were looking at different aspects of the transaction, e.g., Merrill Lynch, and ABN Amro Rothschild – to the extent that the latter turned their minds to tax issues (a point on which the record evidence is thin)) identified the risk of Indian capital gains tax applying to any of the steps in Plan C.

1147.  On 11 October 2006, RSM issued comfort letters to CIL (one of them to be forwarded to Citibank), formally confirming that "[t]he infusion of capital into Cairn India Limited as well as acquisition of shares of Cairn India Holdings Limited by Cairn India Limited from Cairn UK Holdings Limited does not give rise to any tax liability in India and

---

[1425]  *Id.*, p. 8.

[1426]  RSM Concept Paper, 11 May 2006, Exh. CWS-Brown-49A, p. 8; RSM Concept Paper, 19 May 2006, Exh. CWS-Brown-50A, p. 26; RSM Concept Paper dated 9 June 2006, Exh. C-371, p. 27; RSM Concept Paper dated 16 June 2006, Exh. CWS-Brown-51A, p. 26.

would in our opinion, not require any tax clearance."[1427] The next day, Amarchand issued a letter to CIL in which it reiterated its view, tracking RSM's advice verbatim.[1428]

1148. The Respondent has argued that RSM's advice was "short" and "unreasoned", and reflected the opinion of a single tax advisor.[1429] According to the Respondent, to have clarity on the taxability of the transactions, the Claimants should have "applied for an advance ruling from the tax authorities which would have bound the tax authorities; and not relied on the unreasoned opinions of their own advisors."[1430]

1149. The Tribunal cannot dismiss RSM's advice so lightly. <u>First</u>, a number of experienced law firms, accountants and investment banks assisted Cairn with the 2006 corporate reorganisation and IPO. Considering the scale of Cairn's 2006 corporate reorganisation, one would have expected that advisors of this standing would have highlighted any regulatory risk, including risks like taxation of the transaction. Yet, RSM's and Amarchand's advice was as unequivocal as it was concise: "[t]he infusion of capital into Cairn India Limited as well as acquisition of shares of Cairn India Holdings Limited by Cairn India Limited from Cairn UK Holdings Limited does not give rise to any tax liability in India."[1431] There can be two explanations for this: either the advisors were incompetent, or Section 9(1)(i) simply did not apply to indirect transfers at that time. Given the plain wording of the fourth limb of Section 9(1)(i), the latter explanation appears more plausible.

1150. <u>Second</u>, the fact that RSM did not consider it necessary to elaborate or, tellingly, include any reasoning or caveats to their advice, further bolsters the conclusion that, under the legal framework in force at the time, indirect transfers were not taxable. When a client requests a tax advisor for his or her advice, it expects to receive an indication as to what are the tax implications of a particular transaction. If the advisor identifies a tax implication, it is reasonable for him/her to provide explanations (and indeed, as discussed in more detail in Section VII.A.3.c(v)(2) below, Cairn's tax advisors did provide explanations of the taxes or taxation risks that could arise under Plans A or B). If, however, the tax advisor considers that a transaction does not give rise to tax, it generally suffices to say so (which RSM did); it would be unreasonable to expect him/her to explain why a particular tax does *not* arise. That there is no reference at all to a possibly applicable tax will mean either a serious error or conceivably even an intent to defraud, on the one hand, or it could mean that the prospect of this tax coming to application would not be a conceivable occurrence, on the other. Taken to the absurd, this would require every tax advisor to list all of the taxes that are not applicable to a particular transaction and then explain why they are not applicable.

---

[1427] Letter from RSM to CIL, 11 October 2006, Exh. C-372; Letter from RSM to CIL, 11 October 2006, Exh. C-373.

[1428] Letter from Amarchand to CIL, 12 October 2006, Exh. CWS-Brown-152.

[1429] R-SoD, ¶ 31; R-Rejoinder, ¶ 658.

[1430] R-SoD, ¶ 31.

[1431] Letter from RSM to CIL, 11 October 2006, Exh. C-372; Letter from RSM to CIL, 11 October 2006, Exh. C-373; Letter from Amarchand to CIL, 12 October 2006, Exh. CWS-Brown-152.

1151. There is no reason to doubt that Cairn's advisors approached this transaction in a professional way. They were aware that it was a very significant transaction for Cairn and that their client expected them to give reliable, objective, and accurate advice. They would also know that they were under a duty to act according to their accredited profession's standards and further that if they failed to do so, they might be subject to suit or to professional sanction. Thus, the strong (albeit rebuttable) presumption is that RSM and Amarchand took their mandates seriously and sought to provide reliable, objective and accurate advice. Such advice can range from 'clear and succinct' because the answer to the client's question is clear; it can also be filled with qualifications because the answer cannot be a straight yes or no. RSM's advice, seconded by Amarchand's, fell into the former category. Based on their professional experience and their understanding of the applicable tax act, they opined that the Transaction, structured as it ultimately was, was not taxable in India. As it turns out, the Tribunal agrees with that advice. Moreover it does not consider that it was necessary for the advisors to give a lengthy opinion on a matter that they considered to be straightforward. If they considered it otherwise, they would have understood the need to either qualify the advice (as RSM did in respect of Plan B and the 'maverick tax inspector') or recommend that an advance ruling be obtained.

1152. In making this finding, the Tribunal is aware that even the most experienced advisors are not immune from making mistakes and the mere fact that an advisor does not qualify his/her advice is not dispositive of the question. The judgments of courts around the world are replete with examples where taxpayers, even with the advice of leading law and accounting firms, have been found to have run afoul of a country's tax laws. But here, the Tribunal is not considering RSM's advice in a vacuum; as already seen in the Tribunal's discussion of the Shome Committee and the TARC, as well as Explanations 6 and 7, the consideration of RSM's advice forms only a part of a much fuller factual context. The key point is that RSM's advice, terse as it might have been, was consistent with that other evidence, and, as shall be seen below, is consistent with the Tribunal's own view of the meaning of Section 9(1)(i) – a view which the Tribunal shares with no less an authority than the Supreme Court of India.

1153. <u>Third</u>, this was not the first time that Cairn was advised that the sale or transfer of shares in a non-Indian company which indirectly held assets in India was not taxable in India. The record provides at least three examples in which Cairn requested tax advice in relation to an indirect transfer, and the advisor either affirmatively noted that the transaction was not subject to tax or did not identify a taxation risk.

1154. The first such instance was in September 2000, when Ernst & Young provided advice in relation to a possible transfer of Cairn's interest in three exploration blocks in India owned by three Dutch companies to Indian subsidiaries. Ernst & Young explained that, if the exploration blocks were sold directly, any gain arising from the sale or transfer would be chargeable to tax in India. However, no tax would arise if the Dutch companies themselves were sold. Specifically, Ernst & Young stated:[1432]

> 1. Exploration blocks are 'capital assets' within the definition of capital assets under the Indian Income Tax Act, which includes movable or

---

[1432]   Email from Ernst & Young to Cairn, 12 September 2000, Exh. C-356.

> immovable property (owned by Indian or overseas entity). Any profit/ gain arising from the sale or transfer of a capital asset is chargeable to tax in India […].

> 2. No tax issue would arise in India if BV or any of the three Netherlands companies are sold as these companies are not Indian companies. Although the three Netherlands companies are currently having assets in India, but still if the shares of these companies are sold there will be no tax issues. However, if the Indian subsidiary is sold, sale of its shares would give rise to tax issues relating to levy of capital gains tax.

1155.  Similarly, in November 2003, Mr Dinesh Kanabar of RSM[1433] provided the following advice in connection with Cairn's intention to sell its interests in two exploration licences to the ONGC:[1434]

> [T]he one clear structure which seems to work is that if ONGC were to set up a subsidiary abroad and the subsidiary was to acquire equity of the foreign companies which held India interests, we would have no tax implications in India. […] Clearly, planning is possible only if ONGC agrees to acquire shares of the Companies instead of acquiring the Indian assets.

1156.  Notably, in April 2004, shortly after two of the Rajasthan discoveries, Rajiv Memani, CEO & Country Managing Partner of Ernst & Young, provided Cairn with preliminary advice on the possibility of listing Cairn's Indian assets on the Indian stock exchanges.[1435] Mr Memani noted that Cairn's first step should be to "[e]stablish [an] Indian subsidiary company ("Indian Sub") of Cairn and transfer [the] identified PSC assets (all assets except UK and Bangladesh assets) to [the] Indian Sub", and then "[l]ist [the] Indian company on [the] Indian stock exchanges", at a "75% dilution proposed by

---

[1433]  The Claimants allege that Mr Kanabar was "one of India's leading tax experts, […] who was subsequently retained by the Government of India in various capacities to advise on important tax matters". C-Updated Reply, ¶ 67. The Claimants note in particular that Mr Kanabar was appointed by the Government to the Rangachary Committee, which was set up in 2012 to recommend various tax reforms, and that after leaving RSM Mr Kinabar served as Chairman of KPMG's tax practice in India, Head of the Tax and Regulatory practice of Pricewaterhouse Coopers in India and Chairman of the Taxation Committee of the Federation of Indian Chambers of Commerce & Industry. C-Updated Reply, n. 89. The Respondent has not disputed this, although it alleges that Ms Brown found Mr Kanabar's advice on the use of a Mauritian structure "unconvincing". R-PHB, ¶ 405(b), citing Transcript, Evidentiary Hearing, 147:25-148:4 (Ms Brown).

[1434]  Email from RSM to Cairn, 27 November 2003, Exh. C-357.

[1435]  Email from R. Memani of Ernst & Young to Cairn dated 8 April 2004, with presentation attached, Exh. C-358. The record is unclear as to whether this advice was solicited or unsolicited. The Claimants write that Cairn "sought" this advice after the Rajasthan discoveries (C-Updated Reply, ¶ 68). However, Ms Brown was adamant in her oral testimony that Mr Memani had offered this advice during the course of a dinner in April 2004, and that the possibility of an Indian listing was a very distant possibility at that stage. See, e.g., Transcript, Evidentiary Hearing, Day 4, 198:22-23 ("It was Ernst & Young's instigation and they were definitely touting for work. It was not ours."). The Respondent has contested this evidence. See, e.g., R-PHB, ¶¶ 209-211. While this dispute may be relevant to the question as to when Cairn began considering the possibility of listing in the Indian markets, whether Mr Memani was "touting" as Ms Brown asserted, or not, the Tribunal does not consider that it affects the credibility of Mr Memani's advice.

Cairn."[1436] He identified two options for the transfer of assets from Cairn to the Indian Sub:[1437]

a.    "Option A: Sale of stake in UK PSC asset holding company to Indian Sub", and

b.    "Option B: De merge identified PSC assets to Indian Sub".

1157.   Option A involved the following steps: (i) Cairn Energy was to transfer the PSC assets (at that time held under Cairn Australia) to a UK company (given the diagram provided and Mr Memani's explanations as to tax implications, the Tribunal understands this would have involved the transfer of shares of Cairn Australia to the UK company rather than transferring the PSC assets themselves); (ii) Cairn Energy would then establish the Indian Sub, which would be a holding company; (iii) Cairn Energy would then transfer the UK company to the Indian Sub, and the Indian Sub would pay consideration in equity/debt instruments; and (iv) the Indian Sub would then be listed on the Indian stock exchange(s), either through a fresh issue of shares or an offer for sale of existing promoter stake.[1438] The resulting structure was illustrated in the diagram below:[1439]



1158.   As is immediately evident, Mr Memani's proposed Option A involved several indirect transfers, including the transfer of Cairn's Indian assets to an Indian subsidiary through a holding company. The tax advice that followed is thus relevant to the structure that

---

[1436]   Exh. C-358, slide 3.

[1437]   *Ibid.*

[1438]   *Id.*, slide 4.

[1439]   *Id.*, slide 4.

Cairn ultimately adopted. Specifically, Mr Memani noted that Option A would have the following direct tax implications: [1440]



1159. The only Indian taxes mentioned above relate to the "[d]ouble taxation of income arising from Indian E&P assets due to multi-layered structure" (which the Claimants have explained relates to taxation on dividends, and to what they have called "tax leakage"[1441]), and the stamp duty costs on the issue of shares of the Indian Sub to Cairn Energy. While Mr Memani suggested that UK and Australian capital gains tax might apply to the transfer of shares of Cairn Australia to the UK company, he made no mention of Indian capital gains tax arising either from the transfer of the shares of Cairn Australia to the UK company, or from the transfer of the shares of the UK company to the Indian Sub, despite the fact that both of these companies indirectly held Indian assets. Given Mr Memani's senior position with Ernst & Young and the level of detail of his presentation, it is reasonable to infer that, in his opinion, the proposed Option A had no capital gains tax implications in India.

1160. The Tribunal is thus persuaded that RSM's tax advice was reliable and reflected the state of the law at the time. Given the numerous times in which this advice was given, its unequivocal formulation, and the fact that it was consistent with that given by more than one experienced advisor, based on the evidence before it, the Tribunal does not consider that the Claimants were reasonably required to request an advance ruling from

---

[1440]   *Id.*, slide 6.

[1441]   The Parties dispute to what this tax leakage refers. The Tribunal addresses this dispute in Section VII.A.3.c below (on the Respondent's tax avoidance defence).

the Authority for Advance Rulings, as the Respondent has suggested.[1442] They had sufficient comfort resulting from the plain language of the Act, the repeated advice from various sources, without reservations or expression of doubts, including without the kind of qualification that RSM raised with respect to Plan B (the maverick tax inspector who might challenge a Mauritius structure for lack of substance). Simply put, there was nothing in the record that should have drawn the Claimants' attention to the possibility of a capital gains tax being levied on indirect transfers.

1161. To counter the consistent advice that the Claimants received at the time of structuring the 2006 corporate reorganisation, the Respondent argues that Ms Brown admitted that "it was stupid to rely on such '*advice*', and Cairn ought to have obtained proper advice."[1443] That is not, in the Tribunal's view, an entirely faithful portrayal of Ms Brown's oral testimony. Counsel for the Respondent took Ms Brown through the various versions of RSM's Concept Paper, and pointed out that, while the presentations were getting more detailed, the tax advice remained the same. This exchange was as follows:[1444]

> Q. If you turn, please, to the next iteration of the concept paper which is May 2006, CWS-Brown 50 at tab 25. And if you just look at the document. […] I'm just drawing your attention to the fact that it's now fairly detailed, do you accept that?
>
> A. It's getting more granular as we go along.
>
> Q. But in terms of the advice on tax […] it's exactly the same words. Hasn't evolved at all ; yes?
>
> A. I wouldn't have expected it to.
>
> Q. Then you have the next iteration at C371, tab 26. 3 And if you go to page, now, 27. Paragraph (a). This has not evolved at all , has it ?
>
> A. Again, I would not have expected it to. It was just crystal clear, to everybody involved, based on precedent, based on the advisers' experience, based on all the experiences of the people in the room who did these things for day jobs that this was not a taxable event in India.
>
> Q. And so it says: "The transfer of shares of all UK companies into a single UK India Hold Co. involves a transfer by a nonresident to a non resident of a foreign asset. It would have no tax implications in India." It says: "Acquisition of the India Hold Co by the India list Co would have no tax implications." So, by that time, we have the transfer to CIL also being asserted not to have tax implications; correct?

---

[1442] The Tribunal recognises that it does not have a complete picture of the advice which Cairn received. Privilege was claimed in respect of certain documents in respect of which the Respondent sought production and these claims were [largely] upheld by the Tribunal. In addition, the only person with direct personal knowledge of the planning was Ms Brown. None of Cairn's professional advisors were tendered to testify as to the advice given and received.

[1443] R-PHB, ¶ 91 (emphasis in original).

[1444] Transcript, Evidentiary Hearing, Day 5, 245:14-247:22 (Mr Moollan/Ms Brown).

A. That's correct. It's neither the transferor nor the assets being transferred were Indian?

Q. But, similarly, absolutely no reasoning; no reference to authority; no reference to any provision; correct [?]

A. It was - - yes. Yes, that is correct .

Q. But, on that, on that last sentence actually rode potentially a massive liability, if it were wrong?

A. Yes. So, as I said earlier, you could accuse me of stupidity - -

Q. I wouldn't dream to do that - -

A. For - -  for not - -  but we had absolutely no reason to believe that that was, in any way, shape or form, flawed advice , from our experience.

Q. But for much smaller amounts of, for example, stamp duty, we see, in the papers, Ms Brown, very detailed advice from Shepherd and Wedderburn about whether taxable, whether not taxable. You didn't think fit to actually have a proper legal opinion, that would analyse the relevant issue, give you the comfort, you have that in the files, it's done, no?

A. As I say, you can accuse me of stupidity on that. Mind you, not that it would be worth the paper it's written on since the 2012 amendment. But it would have been nice to have had it at the time.

Q. It would have been nice. You should have got it, yes?

A. I should have asked for it . Yes. I was --

1162. In other words, Ms Brown's testimony was that it might have been stupid not to have requested "a proper legal opinion, that would analyse the relevant issue"[1445] (i.e., the taxability of indirect transfers), as Mr Moollan suggested; she did not testify that it was stupid to rely on RSM's advice. At the time, Ms Brown "would not have expect[ed]" RSM to provide more elaborate advice, because "[i]t was just crystal clear, to everybody involved, based on precedent, based on the advisers' experience […] that this was not a taxable event in India." [1446] But whether or not Cairn had obtained such a legal opinion, there is no reason to believe that it would have identified a risk of taxation of an indirect transfer of capital assets situate in India at that stage. The Tribunal has already concluded that RSM's lack of reasoning was due to the simple fact that indirect transfers were not taxable at the time. Indeed, as discussed in the previous sections, the Respondent has been unable to provide any evidence showing that as of 2006 the ITD had attempted to tax an indirect transfer based on Section 9(1)(i), and the record of this proceeding shows no legislative intent to tax indirect transfers prior to 2009, when the DTC 2009 was discussed.

---

[1445] *Id.*, 247:13-14 (Mr Moollan).

[1446] *Id.*, 246:5-10 (Ms Brown).

1163.   The Respondent further points to the Claimants' internal risk matrix from 2010, which shows that Cairn identified a risk of what the matrix calls "Potential IPO Withholding Tax dispute".[1447] This was prepared four years after the transaction and, at that time, the ITD had already presented its first demands against other taxpayers under Section 9(1)(i) of the ITA 1961 for capital gains tax on indirect transfers and made an attempt at finding in 9(1)(i) the authority to tax indirect transfers.



1164.   The Respondent alleges that this "was an assessment of risk made in March 2010, at a time when no decision on the point had been rendered (the Bombay High Court's judgment in *Vodafone* was only rendered in September 2010), and when there was of course no question yet of any retroactive taxation."[1448] The Respondent's argument appears to be that, given that the Claimants identified this risk in 2010, prior to the Bombay High Court's judgment in *Vodafone*, this means that they were aware that Section 9(1)(i) could apply to indirect transfers before the 2012 Amendment. This is said to provide further proof that the law was not settled until the *Vodafone* decision.

1165.   The Tribunal cannot follow this line of reasoning. First, the relevant period is 2004-2006, as the Respondent itself repeats several times, not 2010, when the matrix was prepared. Second, the matrix shows what it calls a "new risk", the implication being that Cairn had not identified that risk earlier. This suggests that the perception of the risk

---

[1447]   Brown WS2, p. 39.

[1448]   R-PHB, ¶ 91.

arose around the time of the matrix's making, i.e., in 2010, after the tax authorities started seeking to tax indirect transfers under the ITD's expansive interpretation of Section 9(1)(i) in 2007 and while the *Vodafone* case – the case that would ultimately determine whether there was a lawful basis (in Indian law) for such an expansive interpretation – was still pending, All this was public knowledge and Ms Brown testified on that matter.

1166. <u>Third</u>, the fact that Cairn identified the taxation of indirect transfers as a potential risk does not mean that it understood that indirect transfers were taxable under the legal framework existing at the time. Although the matrix places the risk of a tax dispute in the "high-impact" category, due to its potentially substantial monetary impact, it was also placed at the left side of the "possible" risks category. This indicates that Cairn viewed the likelihood of the risk's materialisation to be closer to "improbable" than "probable", despite the position taken by the tax authorities. The Supreme Court's decision in *Vodafone* proved that estimation to be correct in the existing circumstances, i.e., before Parliament issued the 2012 Amendment. In disputes with governmental entities perhaps even more than in other disputes, there is often uncertainty and, in particular, some possibility that the Government might succeed in imposing its (possibly legally questionable) position on an individual. Given that the ITD had at that time opted for such a route, it was only prudent for Cairn to identify the relevant risk for internal and possibly regulatory purposes. This cannot reasonably be taken as a concession in respect of Cairn's position as to whether in 2006 Section 9(1)(i) could be correctly interpreted to cover indirect transfers. Cairn's subjective assessment of risk in 2010, when the Vodafone assessment was under way, cannot stand as good evidence of what it believed, based on the advice of accountants and lawyers, Section 9(1)(i) meant in 2006.

1167. What Cairn believed were its risks in 2006 is reflected in CIL's final Prospectus prepared for the IPO. The Prospectus disclosed 42 risk factors (30 internal, 7 external, and 5 related to the issue itself), including certain taxation risks and risks of regulatory change. It did not identify any taxation risks to CIL arising from Cairn's pre-IPO transactions.[1449] The Tribunal notes in particular that the Prospectus identified as an internal risk the fact that CIL had "entered into certain related party transactions with [its] Promoters and Promoter Group entities", and provided detailed information about these transactions in the Sections entitled "Relationship with Cairn Energy PLC" and "Financial Information".[1450] Despite this, the Prospectus did not identify the risk that CIL might be liable to withhold capital gains tax arising from the CIHL Acquisition. The Prospectus was prepared with the advice of Merrill Lynch, ABN Amro Rothschild and JM Morgan Stanley, among others, and was signed by all of CIL's directors, its Chief Executive Officer and its Chief Financial Officer (who at the time was Ms Brown). Had Cairn envisaged the risk that the CIHL acquisition (or any other aspect of the 2006 corporate reorganisation) would have been subject to capital gains tax at a rate of 40%, it would have been surprising for the Prospectus to have omitted to mention such a risk, in particular given the liability that could arise to the company, its advisors, and of course the signatories to the Prospectus.

---

[1449]   CIL Prospectus, 22 December 2006, Exh. CWS-Brown-75, pp. xiv-xxxv; Brown WS2, ¶ 104.

[1450]   CIL Prospectus, 22 December 2006, Exh. CWS-Brown-75, p. xxvii, s. 13; 141-148; 150-156.

1168. Once again, the Tribunal is well aware that misleading or incorrect statements of risk factors are hardly uncommon in the commercial world. But the Tribunal sees the Prospectus' treatment of risk factors as simply one more piece of evidence that sits consistently with the totality of the evidence which the Tribunal has already addressed.

*(6)      The ITD's practice prior to the 2012 Amendment*

1169. A compelling piece of evidence that, prior to the 2012 Amendment, Section 9(1)(i) did not tax indirect transfers is that, in respect of the four decades between the enactment of the ITA 1961 and the initiation of the investigation against Vodafone, the Respondent was unable to produce *any* documentary evidence that the ITD had taxed a single indirect transfer of capital assets under that Section.

1170. The Respondent's witness, Mr Sanjay Puri, Commissioner of Income Tax (International Taxation) – 1, New Delhi, testified that it was his "belief and experience that section 9 has always been interpreted and applied in such a way as to consider income arising from the transfer of any capital asset situated in India to be deemed as accruing or arising in India. That is, where the capital asset was situated in India, any income arising from its transfer anywhere and by whatever means would be taxable in India."[1451]

1171. Yet Mr Puri could not point to a single instance prior to the commencement of the ITD's investigation into Vodafone in 2007 in which the ITD had taxed or attempted to tax an indirect transfer. In the four examples provided by Mr Puri in his First Witness Statement, the assessment proceedings against the taxpayers were all commenced after September 2007, i.e., after the ITD had commenced assessment proceedings against Vodafone.[1452]

1172. In his Second Witness Statement, Mr Puri insisted that Vodafone "was certainly not the first proof of intention of the ITD to tax indirect transfers under s. 9(1)(i)".[1453] In support of this assertion, Mr Puri cited a show cause notice under Section 201 issued to Tata Cellular Industries ("Tata") on 25 April 2007 in relation to its failure to withhold tax after purchasing shares in Idea Cellular Ltd. from New Cingular Wireless Services Inc., U.S.A. and MMM Holdings, LLC, U.S.A. While Mr Puri did not submit a copy of the show cause notice, he submitted a subsequent order dated 28 March 2008 in which this show cause notice is cited.[1454] That subsequent order notes that one of the issues for the ITD's consideration was "[w]hether income of the said U.S. companies is chargeable to tax in India under section 9(1)(i) of the Act and whether the same is taxable in India under the Double Taxation Avoidance Agreement between India and U.S.A.?"[1455] That

---

[1451] Puri WS1, ¶ 28.

[1452] Puri WS1, ¶ 33. A fifth case was also mentioned by the Respondent in its Statement of Defence, but it also post-dated the Vodafone assessment. SoD, ¶ 127(b).

[1453] Puri WS2, ¶ 9.

[1454] Exh. Puri-36, Order under section 201(1) and 201(1A) of the Income-tax Act, 1961 issued against Tata Industries Ltd. on 28 March 2008 ("Tata Section 201 Order"), p. 5.

[1455] *Id.*, p. 6.

order contains an interpretation of Section 9(1)(i) that corresponds to Mr Puri's interpretation quoted above.[1456]

1173. That said, the Tribunal finds that there is insufficient evidence to establish that the ITD's attempt to tax Tata predates the Vodafone investigation, mainly out of three considerations. First, the show cause notice postdates the initiation of the investigation against Vodafone, more specifically the letter from the Department of Revenue to the ITD requesting that it examine "the taxability or otherwise" of the Hutchison-Vodafone transaction could be taxed, which was dated 8 March 2007.[1457] Second, the show cause notice against Tata has not been submitted, so the only evidence in the record showing the reasons for which the ITD requested Tata to show cause postdates the show cause notice against Vodafone, which was issued on 19 September 2007.[1458] Indeed, as Mr Puri admitted at the hearing, it is unclear whether at that point in time the ITD suspected that the transaction was a direct rather than an indirect transfer.[1459] Third, the order against Tata reveals that, ultimately, it was taxed because the ITD found that some of the holding companies had no substance and thus taxed the transaction after lifting the corporate veil.[1460] This was later confirmed by the Bombay High Court, which found

---

[1456] *Id.*, ¶ 5.4.12.2, pp. 321-322 (providing the following summary of the ITD's assessment of the taxability of the transaction under Section 9(1)(i):

"An analysis made with respect to the various decisions given on section 9(1)(i) indicates that the chargeability under section 9(1)(i) will be dependant on the 'real and intimate connection', the extra commonness of interest or the 'territorial nexus' which can only be determined on the basis of common sense, plain thinking and the hard facts and circumstance of the case (para 5.4.2.16)

[…] The gains arising from the said investment in the joint venture, therefore, does have a sufficient territorial connection with India to attract the taxability provisions (para 5.4.3.8)

The conditions prescribed in the telecom licenses further establishes that there does exist sufficient territorial connection with India to attract the taxability provisions (para 5.4.4.3)

In section 9, "directly or indirectly" qualifies 'arising/accrual' of income. A plain meaning of this section is that indirect income will arise from indirect holding and direct income will arise from direct holding. In other words, if the US companies have directly held the shares of Idea Cellular Ltd. and had sold it then there would be a direct accrual of income to the said US companies. And if they had hold shares of Idea Cellular Ltd. indirectly (through say Mauritian company as in this case), there would be an indirect accrual of income. In either case, the income is deemed to accrue/arise in India as per section 9(1)(i) of the Act (para 5.4.5.5). By adding the phrase 'indirectly' the scope of section 9(1)(i) does get enlarged but this is not ultra vires of the Constitution

Any interpretation suggesting that transfer of shares of the foreign company holding immovable property in India would not be covered under 'indirect transfer' would make the provisions of Article 13(4) otiose in a number of DTAAs and would not be in consonance with the legislative intent of section 9(1)(i) and the tax treaties (para 5.4.6.7)").

[1457] Letter from the Department of Revenue to the ITD, 8 March 2007, Exh. C-360.

[1458] Show Cause Notice under Section 201(1) of the ITA 1961 to Vodafone, 19 September 2009, Exh. C-308.

[1459] Transcript, Evidentiary Hearing, Day 8, 216:13-222:8 (Mr McNeill/Mr Puri).

[1460] Tata Section 201 Order, ¶¶ 5.4.12.2-5.4.12.3, pp. 322-323 (continuing the summary quoted at p. 311 n. 1456 above:

"The facts of the case clearly indicates [sic] that AT&T Cellular Pvt. Ltd./Apex Investments (Mauritius) Holding Pvt. Ltd. had no substance and the US Companies have effectively sold the shares of Idea Cellular Ltd. and not the shares of a company based in Mauritius (para 5.4.8.3). The filings before the Securities and

that the transaction could be taxable as a colourable transaction, not as an indirect transfer.[1461] Indeed, in its judgment of 14 July 2011, the Bombay High Court confirmed that "[i]n the ordinary course, income accrued to a nonresident on account of sale of shares of a foreign Company would not be taxable in India."[1462] However, it agreed with the ITD that the sale was a colourable transaction and thus could be taxed on that basis.[1463]

1174. At most, the evidence enables the Tribunal to find that the ITD's attempts to tax Tata occurred roughly contemporaneously with the ITD's attempts to tax Vodafone. This is hardly surprising, because if, as the Tribunal believes, the ITD was applying a more expansive interpretation of Section 9(1)(i) in early 2007, it is likely that it would apply it to more than one taxpayer.

1175. What is undisputed is that the record contains no examples of the ITD's attempt to tax indirect transfers prior to 2007. Indeed, during the document production phase, the Claimants requested the Respondent to produce any such examples,[1464] and the Respondent was unable to find any responsive documents.[1465] Given the stated view that

---

Exchange Commission, USA, clearly shows that AT&T Cellular (P) Ltd., Mauritius, had no substance and the US companies have for all practical purposes made investments only in Idea Cellular Ltd. (para 5.4.9)

It is true that the shareholders and the company are two separate juridical persons as held in the case of Salomon v. Salomon. However, in appropriate cases, the tax authorities and courts are entitled to lift the corporate veil and they must make a conscious effort all the time to determine what the real nature of the transaction is. Applying this principle on the facts of the case, there is no doubt that the true nature of the transaction was the sale of Indian asset by the two US companies to Tata Industries Ltd. chargeable to tax under section 9(1)(i) of the Income-tax Act, 1961 (para 5.4.10.17, 5.4.10.18 and 5.4.10.19). The summary made in para 5.4.10.18 on the issue of lifting the corporate veil on the facts of the case vividly demonstrates that AT&T Cellular Pvt. Ltd. has no corporate personality of its own.

5.4.12.3 In view of the above discussion, it is held that the income of New Cingular Wireless Services Inc., U.S.A. and MMM Holdings LLC, U.S.A. arising from the sale of their stake in Idea Cellular Ltd. is chargeable to tax in India under section 9(1)(i) of the Income-tax Act, 1961. […]" (emphasis added)).

[1461] *Aditya Birla Nuvo v. Deputy Director of Income Tax (International Taxation) and Union of India, through the Ministry of Finance*, [2012] 342 ITR 308 (Bom), Exh. R-77, ¶¶ 91, 96-99.

[1462] *Id.*, ¶ 91.

[1463] *Id.*, ¶¶ 91, 96-99 (holding that "the primafacie [*sic*] opinion of the Revenue that the transaction between TIL and NCWS/MMMH for sale and purchase of shares of AT&T Mauritius was a colourable transaction and in fact the transaction was for sale and purchase of ICL shares by NCWS to TIL cannot be said to be devoid of any merit.").

[1464] Claimants' Document Request No. 23, seeking "[a]ssessment orders issued by the Income Tax Authority prior to 2007 assessing capital gains tax under Section 9 of the ITA 1961 on transfers of shares or interests in a company or entity registered or incorporated outside India on the basis that: (a) the shares or interests derive, directly or indirectly, their value substantially from assets located in India; or (b) the transfers have the effect of transferring immovable properties in the form of oil wells or other natural resource assets situated in India." In response to the Respondent's objection that this request was unduly burdensome, the Claimants narrowed down the request as follows: "The Claimants would be satisfied if the Respondent would produce, for example, five instances of assessment orders responsive to either of subrequests (a) or (b). At the very least, the Respondent should be required to produce Documents sufficient to show 'the way that the Respondent has always applied s. 9 of the ITA' prior to 2006." The Tribunal granted this request as narrowed down. Procedural Order No. 8, Annex A, Tribunal's Order on Claimants' Document Request No. 23.

[1465] See Respondent's Further Responses to the Claimants' Application to Produce, submitted on 18 August 2017 under cover of RCom-153, Response to Request No. 23 ("Without prejudice to the above objections [on

the 2012 Amendment clarified the meaning of Section 9(1)(i) dating back to 1961, the Tribunal finds the absence of any evidence showing an application of the section to indirect transfers of capital assets situated in India before 2007 to be indicative of a shift in thinking in the ITD around that time and contrary to the claimed original intent. In cross-examination, Mr Puri admitted that he had never conducted an assessment on the basis of his interpretation of Section 9(1)(i), and that those he had supervised had taken place after 2015.[1466] He also testified that he was not aware of any tax circulars or legal publications supporting this interpretation.[1467] Similarly, while Mr Puri asserted that he had conducted internal trainings espousing this interpretation,[1468] he submitted no documentary evidence supporting this assertion (notably, no copies of any presentations used to carry out the trainings, and no internal memoranda summarising this theory).

1176. The Tribunal thus finds that the Respondent has failed to prove that, prior to 2007, the ITD attempted to tax any indirect transfer under Section 9(1)(i), let alone that it had "the consistent position […] that the indirect transfers of capital assets situate in India are taxable under the 'source' principle embodied in section 9 of the ITA", as Mr Puri asserted.[1469] The record suggests (and Mr Puri in fact admits) that this was a recent practice,[1470] which coincided with the initiation of the investigation into Vodafone.

1177. In the Tribunal's view, the absence of any attempt by the ITD to tax indirect transfers prior to 2007 (including the 2006 Transactions, which, as discussed in the next section below, were widely disclosed to the ITD in several occasions), is compelling evidence that, prior to the 2012 Amendment, Section 9(1)(i) did not tax indirect transfers and the ITD recognised this to be the case.

1178. The Respondent has advanced several arguments to explain the absence of assessments against indirect transfers prior to 2007. In particular, it argues that the practice of indirect transfers of Indian assets through foreign companies was a new practice, and the first wave of such cases emerged in or around 2007, when foreign investors which had invested after India's opening of its economy in the 1990s began to exit India, and the Indian tax authorities presented their first tax demands for indirect transfers.[1471] The Tribunal understands the Respondent's argument to be that, prior to 2007 the ITD did not have the opportunity to apply its interpretation. However, the Respondent has not submitted evidence to support the factual premise underlying this argument. The Tribunal acknowledges that it would be difficult for the Respondent to provide evidence of transactions it alleges did not happen; however, it is unlikely that indirect transfers

---

excessive burden and confidentiality], the Respondent states that despite its diligent search it has not been able to locate any responsive documents.").

[1466]   Transcript, Evidentiary Hearing, Day 8, 200:4-22 (Mr Puri).

[1467]   *Id.*, 202:10-203:22 (Mr Puri).

[1468]   *Id.*, 204:3-19 (Mr McNeill/Mr Puri).

[1469]   Puri WS1, ¶ 34.

[1470]   *Id.*, ¶ 33 (stating that his interpretation of Section 9(1)(i) reflected "the understanding on which the tax authorities have operated *in recent times* in respect of the taxation of indirect transfers of Indian assets." (emphasis added).

[1471]   R-PHB, ¶¶ 22(d), 128.

had never occurred before 2007. While India may have been a highly regulated economy until the early 1990s, the Respondent has not suggested that foreign nationals and companies could not or did not own assets situated in India, and it is unlikely that no assets were ever transferred indirectly. The fact that the Government was exercising close control over the economic activity in that period is all the more reason to presume that it was aware of indirect transfers of Indian assets.

1179.   In any event, the Respondent's argument is contradicted by the record. As the Command Acquisition demonstrates, indirect transfers had been occurring in India at the very least since 1996. To recall, when Cairn acquired Command's investments in India, it did so by taking over Command Petroleum Pty Ltd, an Australian company which held interests in a 1994 PSC for the Ravva oil and gas field.[1472] As explained at the hearing, Command held the interests in the Ravva PSC indirectly, through several holding companies.[1473] When Cairn acquired Command, an indirect transfer of the interest in the Ravva PSC took place, and the record suggests that Command's seller realised capital gains but was not taxed on them.[1474] The Respondent argues that there is no evidence as to whether Command's seller was taxed in India or not.[1475] This is not entirely accurate: as discussed above, the Respondent has failed to provide evidence of a single instance in which an indirect transfer was taxed in India prior to 2007. By exclusion, this constitutes evidence that the Command Acquisition was not taxed in India.

1180.   More indirect transfers occurred when Cairn reorganised its company structure in India after acquiring Command between 1996 and 2001. The Claimants have asserted (and the Respondent has not disputed) that Cairn's reorganisation after acquiring Command "involved five transfers of share capital in non-Indian companies – entities incorporated in Australia, the UK, the Netherlands, and the British Virgin Islands – all of which derived substantial value, directly or indirectly, from their underlying assets in India."[1476] They further note (and the Respondent does not dispute) that the Indian Government was "fully aware of this change in foreign control in connection with one of the most important PSCs in the Indian oil and gas sector, the Ravva concession."[1477] The Indian Under-Secretary of the Ministry of Petroleum and Natural Gas signed an amendment to the Ravva PSC to reflect Command's acquisition by Cairn Energy and its resulting name change, and the Government accepted a new parent company guarantee by a company of the Cairn group in relation to liabilities under the Ravva

---

[1472]   C-SoC, ¶ 56; Transcript, Evidentiary Hearing, Day 2, 165:20-167:12 (Mr McNeill).

[1473]   Transcript, Evidentiary Hearing, Day 2, 165:20-167:12 (Mr McNeill); Claimants' Presentation "Submissions on the Merits", Consolidated Volumes I and II, slides 11-12.

[1474]   Transcript, Closing Hearing, Day 2, 33:20-34:23.

[1475]   R-PHB, ¶¶ 21, 368; Transcript, Hearing on Closing Arguments, Day 1, 98:18-100:3 (Mr Moollan).

[1476]   C-SoC, ¶ 57; Brown WS1, ¶ 26; see also Transcript, Evidentiary Hearing, Day 2, 165:20-167:12 (Mr McNeill); Claimants' Presentation "Submissions on the Merits", Consolidated Volumes I and II, slides 11-12.

[1477]   Brown WS1, ¶ 27.

PSC.[1478] However, the Claimants allege that "India did not indicate that any tax liabilities had accrued to any member of the Cairn corporate group as a result of the transfers of shares of the non-Indian corporations involved which derived substantial value from Indian interests".[1479] In particular, Ms Brown testified that "[t]he Indian Income Tax Department […] never once sought to assess capital gains tax on any of these transactions."[1480] The Respondent has not denied this, although it has argued that this is not evidence that the transactions were not taxable.[1481]

1181.   The Respondent further argues that the Indian tax system operates based on the principle of self-assessment, whereby it is the taxpayer's duty to declare a tax liability. Thus, the fact that the tax authorities might have failed to tax indirect transfers before 2007 (such as those involved in Cairn's reorganisation after acquiring Command) was due to the taxpayers' failure to declare taxes. The Tribunal is not persuaded. Most of the instances cited by Mr Puri as examples of the ITD's attempts to tax indirect transfers commenced with the ITD requesting an alleged taxpayer in default to show cause. If the ITD was capable of pursuing taxpayers who had failed to declare a tax liability in 2007, there is no reason why it would not have done so before that, especially before the 1990s, when the market was still highly regulated. This argument also insinuates that the entire market, including tax advisors and lawyers, were at best ignorant of a tax payable. There is a simpler and more credible explanation as to why the Indian tax authorities did not tax indirect transfers for decades; namely, they understood that Section 9(1)(i), interpreted literally, simply did not apply to indirect transfers.[1482]

1182.   The Respondent also seems to be suggesting that the pool of relevant indirect transfers should be narrowed down to those which relate to what it calls "exits" of foreign investors from the Indian market.[1483] This is unconvincing. There is nothing in Section 9(1)(i), or in Explanations 4 or 5 (even as later amended by Explanations 6 and 7) suggesting that only indirect transfers carried out to allow an investor to exit the Indian market are subject to tax. If the Respondent's argument was correct, then Section 9(1)(i) would not apply to partial alienation of shares or intra-group share transfers. Yet, the FAO against the Claimants did tax an intra-group share transfer. In any event, the Command Acquisition constituted an "exit" for Command's seller, and there is no evidence on the record that that transaction was taxed.

1183.   For these reasons, the Tribunal finds that the ITD has failed to show that it had a practice of taxing indirect transfers under Section 9(1)(i) prior to 2007. This supports the Tribunal's conclusion that such transfers were not covered by that provision prior to the 2012 Amendment.

---

[1478]   Brown WS1, ¶ 27, citing Addendum to the Production Sharing Contract dated 31 July 1998, Exh. CWS-Brown-14, pp. 2-3; Guarantee by Cairn Energy Asia Limited to Cairn Energy India Limited dated 23 July 1998, Exh. CWS-Brown-13.

[1479]   C-SoC, ¶ 59.

[1480]   Brown WS1, ¶ 28.

[1481]   R-PHB, ¶ 401.

[1482]   *Vodafone International Holdings B.V. v. Union of India & Anr.* [2012] 6 SCC 613, Exh. C-59, ¶ 71.

[1483]   R-PHB, ¶ 128; Transcript, Hearing on Closing Arguments, Day 1, 98:18-100:3 (Mr Moollan).

1184. The fact that the ITD attempted to tax indirect transfers between 2007 and 2012 does not alter this conclusion. The record suggests that, starting with the Department of Revenue's letter to the ITD requesting that it investigate the taxability of the Hutchison-Vodafone transaction,[1484] the ITD attempted to expand its interpretation of this provision to include indirect transfers. The Tribunal does not question the Respondent's assertion, based on Mr Puri's evidence that, around that date there might have been "an internal view within the [ITD] […] that section 9.1(i) embodied a broad source rule allowing the taxation of such transactions according to economic substance."[1485] However, the internal views of the tax department of a State do not necessarily reflect the correct interpretation of the law. What matters is that, once that interpretation was applied to concrete cases and then tested before the Indian courts, it was found to be unsupportable as a matter of Indian law.[1486] This is of some importance to the analysis of the international law implications of the demand made on the Claimants and will be discussed in connection with the *EnCana* award below.

1185. In any event, as discussed below, the timing of the assessment against CUHL suggests that, whatever the internal convictions of its officers, the ITD understood that its interpretation of Section 9(1)(i) amounted to a departure from the long-standing view of the operation of Section 9(1)(i).

*(7)    The timing of the ITD's assessment against CUHL*

1186. Despite the ITD's purported internal conviction as to the taxability of indirect transfers, it waited seven years to attempt to levy tax on CUHL for the CIHL Acquisition. In the Tribunal's view, this further confirms that indirect transfers were not taxable when the CIHL Acquisition took place.

1187. The Respondent has argued that, given the principle of self-assessment, the ITD had no reason to know of Cairn's corporate reorganisation in general or of the CIHL Acquisition in particular, and it only found out as a result of an investigation carried out in January 2014 in CIL's offices by Mr Sanjay Kumar. However, the record shows that the ITD was aware, or could not have failed to become aware, of Cairn's corporate reorganisation at the very least from October 2007. Indeed, between October 2007 and January 2014, the ITD analysed the CIHL Acquisition in detail no less than three times.

1188. The first such instance was in 2007, when CIL was subjected to a transfer pricing assessment by the ITD. As the Claimants explain (and the Respondent does not dispute), the ITA 1961 requires Indian taxpayers who entered into an international transaction in the previous year to file a report on that transaction with the TPO in the Office of the Additional Commissioner of Income Tax. The task of the TPO is to ensure that the transaction has been carried out at arm's length pricing,[1487] and more specifically, "to ensure that India does not lose any tax revenues as a result of a multinational group

---

[1484]   Letter from the Department of Revenue to the ITD, 8 March 2007, Exh. C-360.

[1485]   R-PHB, ¶ 22(d)(iv); Transcript, Evidentiary Hearing, Day 8, 200:23-202:24 (Mr McNeill/Mr Puri).

[1486]   See Section VII.A.3.b(ii)(9) below (discussing the Supreme Court's decision in *Vodafone*).

[1487]   C-SoC, ¶ 128; R-SoD, ¶ 30(d).

intentionally allocating its profits to low-tax jurisdictions via non-arms' length pricing".[1488]

1189.   On 30 October 2007, CIL (through its chartered accountants, BSR & Co.), filed a Form 3CEB with the ITD providing details of the international transactions in which CIL had been involved in during 2006, including the transactions related to the CIHL Acquisition.[1489] Specifically, the form reflected CIL's investment in CIHL for a total amount paid or payable of INR 289,083,710,140, with the following explanation:[1490]

> During the year assessee [i.e., CIL] has acquired 272,389,192 ordinary shares of £1 each, in Cairn India Holdings Limited out of which 251,224,744 shares has been acquired from its holding company Cairn UK Holdings UK for total purchase consideration of Rs 266,818,710,140 for which it has issued 861,764,893 shares shares [*sic*] at Rs 160 each to Cairn UK Holdings Limited by way of share swap arrangement for acquiring 135,267,264 ordinary shares of Cairn India Holdings Limited. The said transaction does not impact P&L account and is in accordance with the provisions of Foreign Exchange Management Act (FEMA) and CCI guidelines. Thus, the transaction is considered to be at arm's length.

1190.   On 29 December 2009, the ITD requested CIL to provide detailed information regarding the arm's length price of its international transactions during the fiscal year 2006-2007.[1491] During the course of 2010, CIL representatives attended hearings with the ITD and submitted "detailed information about the pricing of the CIL shares and underlying CIHL assets and the process of their acquisition by CUHL", including certain key documents prepared during the course of the restructuring, such as the FIPB and RBI approvals, the Rothschild valuation, and the final CIL prospectus.[1492]

1191.   The TPO issued its order on 5 October 2010. It concluded that the CIHL Acquisition had been carried out at arm's length conditions and had complied with certain regulatory approvals. The order specifically recognised that CIL had acquired the CIHL shares "to acquire the oil and gas assets of CIHL and its subsidiaries":[1493]

> Assessee has acquired 272,389,192 ordinary shares of £1 each, in Cairn India Holdings Limited (CIHL) for Rs. 289,083,710,140. Out of

---

[1488]   Brown WS1, ¶ 96.

[1489]   Form No. 3CEB, 30 October 2007, Exh. C-4. The form also referred to other transactions deemed international, including certain expenses.

[1490]   *Ibid*.

[1491]   C-SoC, ¶ 129; Notice under Sections 92CA(2) and 92D(3) of the ITA 1961 to CIL, 29 December 2009, Exh. C-146.

[1492]   Brown WS1, ¶ 97; Letter from CIL to the Additional Commissioner of Income Tax dated 3 September 2010 [without annexures], Exh. CWS-Brown-88 (indicating enclosure of the CIL Prospectus, the Rothschild valuations dated 18 September 2006 and 19 December 2006, the RBI approval dated 10 October 2006 and the FIPB approval dated 10 October 2006); Letter from CIL to the Additional Commissioner of Income Tax dated 20 September 2010 [without annexures], Exh. CWS-Brown-89 (discussing a hearing held on 3 September 2010 and providing details on the CIHL Acquisition); Letter from CIL to the Additional Commissioner of Income Tax dated 29 September 2010 [without annexures], Exh. CWS-Brown-90 (indicating enclosure of the brokers' reports referred to in the Rothschild valuation).

[1493]   Order under Section 92 CA(3) of the ITA 1961, 5 October 2010, Exh. C-8, ¶ 5 (emphasis added).

272,389,192 shares in CIHL, 251,224,744 shares has been acquired from Cairn UK Holdings Limited (CUHL) for total purchase consideration of Rs. 266,818,710,140. Assessee has issued 861,764,893 shares @ Rs. 160 to CUHL for Rs. 137,882,382,880 as part of the consideration for acquiring CIHL from CUHL by way of share swap arrangement for acquiring 135,267,264 ordinary shares CIHL. The said transaction[s] are based on the terms and conditions prescribed by the share purchase agreement executed between CEPLC, CUHL, CIHL and CIL dated October 12, 2006 and in accordance with the approvals in this behalf received from the Foreign Investment Promotion Board, Government of India and from other relevant regulatory authorities in India and as per applicable valuation norms. ***This strategic investment has been made to acquire the oil and gas assets of CIHL and its subsidiaries***.

[…]

The documents filed by the assessee as prescribed under Rule 10D were perused and matter was discussed with the authorized representative of the assessee. In view of the functions, assets and risk analysis, no adverse inference is drawn in respect of the arm's length price in respect of 'international transactions' entered into by the assessee during the year.

1192. The Claimants allege, and the Respondent does not dispute, that the TPO communicated this finding to the assessing officer, who reviewed the TPO's determination and the evidence submitted by CIL, and then closed the assessment, without imposing any tax on CIL in connection with the assessment.[1494]

1193. The above record shows that the ITD was aware of the CIHL Acquisition, and indeed studied it in depth during the transfer pricing assessment. The Respondent seeks to deny importance to this fact, arguing that the spheres of competence of the TPO and the assessing officer are different. It contends that "[t]he TPO's jurisdiction is simply to examine whether the price paid by CIL for CIHL's shares was consistent with the Arm's Length Price", and notes that a "Form 3CEB does not require taxpayers to indicate whether any taxable income has been generated; rather, the focus is simply on determining whether the valuation of the transaction between related entities is at arm's length price. […]".[1495] Accordingly, "the TPO clearly did not consider, or make any representations in relation to, liability to tax", nor did he "give any general confirmation that the 2006 Transaction 'complied with Indian tax law'", as the Claimants have alleged.[1496] The Respondent adds that "[i]t is simply not the case that disclosure of any information about a transaction to any department of any Governmental authority in India somehow amounts to disclosure to the income tax authorities".[1497]

1194. This may be so, but the TPO is not "any department of any Governmental authority"; it forms part of the Office of the Additional Commissioner of Income Tax. And while the

---

[1494]   C-SoC, ¶ 130; Brown WS1, ¶ 99; R-SoD, ¶ 30(d).

[1495]   R-SoD, ¶ 30(d).

[1496]   *Ibid.*

[1497]   *Ibid.*

TPO might not have the competence to determine whether there is liability to tax, the Respondent has not denied that the TPO communicated its conclusions to the assessing officer, who reviewed the TPO's determination and the evidence submitted by CIL, and then closed the assessment, without imposing any tax on CIL in connection with the assessment.[1498]

1195. The Claimants submitted information on the CIHL Acquisition to the ITD on two additional occasions prior to 2014. Between 2009 and 2010, CUHL sold much of its shareholding in CIL to third parties. The most important transactions were two off-market share sales, one to Petronas in 2009, when CUHL sold 2.3% of CIL's issued share capital, [1499] and another to a subsidiary of Vedanta, in 2010, when CUHL sold approximately 40% of CIL's issued share capital.[1500] On both occasions, the transactions involved the off-market sale of shares in an Indian company (CIL), and it is undisputed that any capital gains deriving from this transaction were taxable in India. In both occasions, the Claimants argued that the applicable long-term capital gains tax rate should be 10%, but the ITD decided to apply a rate of 20%.[1501]

1196. What matters for present purposes is that, in its application for withholding certificates in both transactions and in support of its requested 10% rate, CUHL provided information on how it had acquired CIL's shares, including the consideration it had given for them (i.e., cash and exchange of shares in CIHL).[1502] The Claimants contend that, in considering (and rejecting) CUHL's request for a 10 per cent tax rate, the ITD

---

[1498] C-SoC, ¶ 130; Brown WS1, ¶ 99; R-SoD, ¶ 30(d).

[1499] NoA, ¶ 28; C-SoC, ¶ 133. Ms Brown explains that "[t]he transaction was made pursuant to an agreement providing for a transfer of 43,600,000 shares to Petronas for consideration of INR 11,141,823,040 or approximately US$ 241,426,379". Brown WS1, n. 100, referring to Heads of Agreement between Cairn Energy and Petronas International Corporation Ltd dated 14 October 2009, Exh. CWS-Brown-81; *Cairn UK Holdings Limited v. Director of Income-Tax* [2013] Writ Petition (Civil) No. 6752/2012 dated 7 October 2013, Exh. CWS-Brown-108, ¶ 3.

[1500] C-SoC, ¶ 131; Brown WS1, ¶¶ 102-104.

[1501] See Section II.B. With respect to the Petronas transaction: C-SoC, ¶ 134; Brown WS1; ¶ 103; NoA, ¶ 28. Order under Section 197 of the ITA 1961 dated 23 October 2009, Exh. CWS-Brown-84; National Securities Depository Limited, Quarterly Statement of TDS under Section 200(3) of ITA 1961 dated 11 January 2010, Exh. CWS-Brown-86; Order under Section 197 of the IITA 1961 dated 23 October 2009, Exh. CWS-Brown-84. With respect to the Vedanta transaction: C-SoC, ¶ 137; Brown WS1, ¶ 105; CUHL, Application for Withholding Certificate under Section 197 of the ITA 1961 dated 4 October 2010, Exh. CWS-Brown-91 [Without Annexures]; Annexure 4, CUHL, Application for Withholding Certificate under Section 197 of the ITA 1961, 4 October 2010, Exh. CWS-Brown-92; Order under Section 197 of the ITA 1961, 3 June 2011, Exh. CWS-Brown-95 (Withholding Certificate).

[1502] With respect to the Petronas transaction: C-SoC, ¶ 133; Brown WS1, ¶ 103; CUHL, Application for Withholding Certificate under Section 197 of the ITA 1961, 19 October 2009 [without annexures], Exh. CWS-Brown-82 (noting enclosure of the FIPB approval granted to CUHL and the certificate issued by the Statutory Auditor certifying CIL's value); CUHL, Annexure 3 to Application for Withholding Certificate under Section 197 of the ITA 1961, 19 October 2009, Exh. CWS-Brown-83. With respect to the Vedanta transaction: C-SoC, ¶¶ 136-137; Brown WS1, ¶ 105; CUHL, Application for Withholding Certificate under Section 197 of the ITA 1961, 4 October 2010, Exh. CWS-Brown-91 [without annexures]; Annexure 4, CUHL, Application for Withholding Certificate under Section 197 of the ITA 1961, 4 October 2010, Exh. CWS-Brown-92.

must have examined the base cost of the shares resulting from the CIHL Acquisition, and yet it did not suggest that those transactions were subject to capital gains tax.[1503]

1197. The Claimants allege in particular that the ITD "paid particularly close attention to [the] very large transaction between Cairn and Vedanta",[1504] and "carefully scrutinised the share exchanges in order to establish the base cost" for this transaction.[1505] They note that the withholding certificate issued by the ITD described CUHL's acquisition of the CIL shares in detail, as follows:

> 365,028,898 equity shares of CIL were allotted to the Applicant as fully paid up at a price of Rs. 190 per equity share, face value being Rs. 10 per share and premium being Rs. 180 per share on 12 October 2006 […] CIL further issued 861,764,893 equity shares to the Applicant on 20 December 2006 at Rs. 160 per equity share.[1506]

1198. The Respondent contends that the ITD's involvement in these two transactions was limited to determining the relevant withholding tax rate applicable to CUHL's post-IPO sales of CIL shares and not the cost basis of CUHL's pre-IPO acquisition of CIL shares.[1507] More specifically, it argues that the dispute between the Parties "concerned solely the rate of capital gains tax which had been applied by the Income Tax Department, and not the base cost or sale cost of the shares. There was accordingly no need for the Income Tax Department to investigate the cost basis of the Petronas and Vedanta transactions, still less to look into the 2006 Transactions and, in particular, to discover the cost at which CUHL had acquired the CIHL shares which it had provided as consideration for the CIL shares."[1508]

1199. The Tribunal agrees with the Respondent that the focus of the ITD's evaluation in these two transactions was not the cost at which CUHL had transferred CIHL's shares to CIL in the CIHL Acquisition, nor what capital gains might have arisen from that transaction. Yet, CUHL did provide information on the CIHL Acquisition to the ITD, in particular, CUHL's FIPB Application, which described that transaction in detail, including the fact that it involved the indirect transfer of assets located in India,[1509] and a description of the consideration paid by CUHL to acquire its shares in CIL (part of which was paid through an exchange of shares in CIHL).[1510] This information was sufficient to understand that an indirect transfer had taken place. If at that time Section 9(1)(i) taxed

---

[1503] C-SoC, ¶¶ 134-135, 138; Brown WS1, ¶¶ 103, 105.

[1504] C-SoC, ¶ 137.

[1505] Brown WS1, ¶ 105.

[1506] Order under Section 197 of the ITA 1961, 3 June 2011, Exh. CWS-Brown-95 (Withholding Certificate).

[1507] R-PHB, ¶¶ 478-479.

[1508] R-PHB, ¶ 478.

[1509] CUHL, Application for Withholding Certificate under Section 197 of the ITA 1961, 19 October 2009 [without annexures], Exh. CWS-Brown-82 (noting that the FIPB approval granted to CUHL is enclosed); Letter from CUHL to the MoF, 10 August 2006, Exh. C-1 (enclosing *inter alia* its FIPB Application).

[1510] CUHL, Annexure 3 to Application for Withholding Certificate under Section 197 of the ITA 1961, 19 October 2009, Exh. CWS-Brown-83.

indirect transfers, as the Respondent contends, it is to be expected that the TPO would have shared this information with the AO.

1200. The record thus shows that the ITD knew of the CIHL Acquisition at least since October 2007. The information provided to the ITD made it clear that this transaction involved the indirect transfer assets located in India. Had the ITD believed that indirect transfers were taxable already in 2006, in the Tribunal's view, it would have initiated assessment proceedings against CUHL or CIL prior to the enactment of the 2012 Amendment.

*(8)    The ITAT's Order of 9 March 2017*

1201. A further confirmation that, prior to the 2012 Amendment, Section 9(1)(i) did not apply to indirect transfers of capital assets situate in India was the order issued by the ITAT on 9 March 2017 ruling on CUHL's appeal against the FAO. It is common ground that this decision dissatisfied both parties and that they have appealed the decision to the Delhi High Court. It is thus possible that that court might take a different view of the matter than that of the ITAT. For present purposes, however, the Tribunal considers that the ITAT's finding that it would be unfair to impose interest on CUHL's tax debt because the tax had arisen out of the 2012 Amendment (and which the ITAT described as having "retrospective" application) is consistent with the evidence reviewed above. The ITAT concluded that CUHL could not have "visualize[d]" its liability to pay the tax in advance in the year in which the transaction occurred (i.e., 2006), and therefore relieved that Claimant of the obligation to pay interest on the unpaid taxes that the ITD has demanded be paid].

> In the present case the interest has been charged on the tax payable by the assessee which has arisen because of retrospective amendment made by The Finance Act, 2012. Therefore, it is correct on the part of the assessee to submit that it could not have visualize[d] its liability for payment of advance in the year of transaction therefore, there cannot be any interest payable by the assessee u/s 234A and 234B of the Act….
>
> Admittedly in the present case, the income of nonresident appellant has become chargeable to tax due to retrospective amendment in the act …
>
> [W]e are of the opinion that assessee cannot be burdened with interest u/s 234A and 234B of the Act on tax liability arising out of retrospective amendment [with effect from] 01.04.1962 in the provision of section 9(1) of the Income Tax Act[.][1511]

1202. The Respondent has argued that the Claimants' reliance on the ITAT Order is misconceived. It argues that "when the ITAT stated that the assessee could not have visualised its liability, it was not stating that the Claimants could not have foreseen that the 2006 Transactions was taxable; the ITAT was only making an observation in respect of visualization for the payment of advance tax."[1512] In any event, the Respondent

---

[1511] *Cairn UK Holdings Ltd v. D.C.I.T.*, ITA No. 1669/Del/2016, Order, 9 March 2017, Exh. C-228, ¶ 41, pp. 164-166.

[1512] R-Rejoinder, ¶ 680.

alleges that "the finding of the ITAT on this issue is *per incuriam* and is currently being appealed by the ITD before the Delhi High Court." [1513]

1203.   Leaving to one side what might be found by the Delhi High Court (which cannot be anticipated by the Tribunal) and confining itself to the text of the ITAT Order, the Tribunal is not persuaded by the Respondent's argument. The ITAT's reasoning in the paragraph quoted above is clear: its view was that the tax burden imposed on the Claimants arose only as a result of the 2012 Amendment and did not exist before that; consequently, the Claimants could not have visualised the payment of advance tax in that fiscal year. Whether or not the Claimants could visualise that the CIHL Acquisition could never be taxed on other grounds or could rely on the ITAT's order as a basis for a legitimate expectation that the transaction would not have been taxable is a different question. What is clear is that the ITAT recognised that the tax burden that was *actually imposed* on the Claimants (i.e., on the basis of the 2012 Amendment) could not have been visualised in the year of that transaction because in that year Section 9(1)(i) did not tax indirect transfers.

*(9)*     *The Supreme Court's decision in* Vodafone

1204.   The Tribunal now turns to the sole judicial authority that interpreted Section 9(1)(i) as it stood prior to the 2012 Amendment – the Supreme Court of India's 2012 decision in *Vodafone*.[1514] This is the decisive evidence in the record which confirms the Tribunal's conclusion that, prior to the 2012 Amendment, Section 9(1)(i) did not tax indirect transfers. Employing the methods of statutory interpretation used in Indian law, the Supreme Court arrived at the unequivocal finding that "Section 9(1)(i) cannot by a process of interpretation be extended to cover indirect transfers of capital assets/property situate in India. To do so, would amount to changing the content and ambit of Section 9(1)(i). We cannot re-write Section 9(1)(i)."[1515]

1205.   It is worth recalling the Supreme Court's reasoning and conclusions at some length. As the Respondent has explained, the ITD's main case was that the Hutchison-Vodafone transaction "was tax avoidant, because subsidiaries interposed between the transferor and the underlying Indian asset had no economic or commercial substance other than avoidance of payment of Indian taxes."[1516] As discussed further in Section VII.A.3.c(iv)(3) below, the Supreme Court accepted that, in principle, the substance of a tax avoidant transaction may be taxed by applying the doctrine of 'substance over form', but found on the facts that there was no tax avoidance in that case.

1206.   The ITD's alternative argument was that Section 9(1)(i) was a "look through" provision that allowed the ITD to tax the transfer of a foreign share deriving its value from assets

---

[1513]   *Ibid.*

[1514]   *Vodafone International Holdings B.V. v. Union of India & Anr.* [2012] 6 SCC 613, Exh. C-59. The main judgment was rendered by Chief Justice S.H. Kapadia and Justice Swatenter Kumar. Justice K. Radhakrishnan issued a separate concurring judgment. Unless otherwise noted, the references to the judgment are to the majority judgment.

[1515]   *Vodafone International Holdings B.V. v. Union of India & Anr.* [2012] 6 SCC 613, Exh. C-59, ¶ 71.

[1516]   R-SoD, ¶ 33(a).

in India as an indirect transfer of assets in India, i.e., that it allowed the ITD to "'look through' the foreign assets to the underlying Indian asset."[1517] In other words, it argued that the provision should be read to apply to transfers of assets "directly or indirectly" situated in India.

1207. The Supreme Court started its analysis of whether Section 9(1)(i) was a "look through" provision by recalling the nature and scope of application of Section 9(1)(i). It noted that under Section 5(2) of the ITA 1961, non-residents cannot be subject to tax in India unless the place of accrual of income is within India. Section 9(1)(i) is a "deeming provision" whereby income not accrued in India will be "deemed" to have been accrued in India, thereby allowing non-residents to be taxed on that income:

> The fiction created by Section 9(1)(i) applies to the assessment of income of non-residents. […] [I]n the case of a non-resident, unless the place of accrual of income is within India, he cannot be subjected to tax. In other words, if any income accrues or arises to a non-resident, directly or indirectly, outside India is fictionally deemed to accrue or arise in India if such income accrues or arises as a sequel to the transfer of a capital asset situate in India. Once the factum of such transfer is established by the Department, then the income of the non-resident arising or accruing from such transfer is made liable to be taxed by reason of Section 5(2)(b) of the Act. […]. Thus, income accruing or arising to a non-resident outside India on transfer of a capital asset situate in India is fictionally deemed to accrue or arise in India, which income is made liable to be taxed by reason of Section 5(2)(b) of the Act.[1518]

1208. The Supreme Court recognised that, as a deeming provision, Section 9(1)(i) was a legal fiction, and as such could not be given a purposive interpretation:

> We have to give effect to the language of the section when it is unambiguous and admits of no doubt regarding its interpretation, particularly when a legal fiction is embedded in that section. A legal fiction has a limited scope. A legal fiction cannot be expanded by giving purposive interpretation particularly if the result of such interpretation is to transform the concept of chargeability which is also there in Section 9(1)(i), particularly when one reads Section 9(1)(i) with Section 5(2)(b) of the Act. [1519]

1209. The Court then rejected the ITD's argument that Section 9(1)(i) was a "look through" provision which allowed the taxation of indirect transfers. In its view, accepting the ITD's argument would entail the re-writing of Section 9(1)(i) in order to change its content and ambit. It concluded, in particular, that given the language and structure of the provision, the terms "directly or indirectly" in Section 9(1)(i) qualified the *income* arising from the transfer, but not the *asset* being transferred:

---

[1517] *Ibid.* See also *Vodafone International Holdings B.V. v. Union of India & Anr.* [2012] 6 SCC 613, Exh. C-59, ¶ 69.

[1518] *Vodafone International Holdings B.V. v. Union of India & Anr.* [2012] 6 SCC 613, Exh. C-59, ¶ 71.

[1519] *Vodafone International Holdings B.V. v. Union of India & Anr.* [2012] 6 SCC 613, Exh. C-59, ¶ 71 (emphasis added).

What is contended on behalf of the Revenue is that under Section 9(1)(i) it can "**look through**" the transfer of shares of a foreign company holding shares in an Indian company and treat the transfer of shares of the foreign company as equivalent to the transfer of the shares of the Indian company on the premise that Section 9(1)(i) covers direct and **indirect transfers** of capital assets.

For the above reasons, <u>Section 9(1)(i) cannot by a process of interpretation be extended to cover **indirect transfers** of capital assets/property situate in India. To do so, would amount to changing the content and ambit of Section 9(1)(i). We cannot re-write Section 9(1)(i). The legislature has not used the words **indirect transfer** in Section 9(1)(i). If the word indirect is read into Section 9(1)(i), it would render the express statutory requirement of the 4th sub-clause in Section 9(1)(i) nugatory.</u> This is because Section 9(1)(i) applies to transfers of a capital asset **situate in India**. This is one of the elements in the 4th sub-clause of Section 9(1)(i) and if indirect transfer of a capital asset is read into Section 9(1)(i) then the words **capital asset situate in India** would be rendered nugatory. Similarly, the words underlying asset do not find place in Section 9(1)(i). Further, "transfer" should be of an asset in respect of which it is possible to compute a capital gain in accordance with the provisions of the Act. Moreover, even Section 163(1)(c) is wide enough to cover the income whether received directly or indirectly. Thus, <u>the words directly or indirectly in Section 9(1)(i) go with the income and not with the transfer of a capital asset (property).</u>[1520]

1210. The Court (like the present Tribunal) found that this conclusion was supported by the draft DTC 2009 and DTC 2010, both of which proposed to introduce an amendment similar to the one introduced by the 2012 Amendment. The Court reasoned that if the DTC 2009 and 2010 proposed to introduce an express provision taxing indirect transfers, by necessary implication the existing provision did not reach indirect transfers:

Lastly, it may be mentioned that the Direct Tax Code (DTC) Bill, 2010 proposes to tax income from transfer of shares of a foreign company by a non-resident, where at any time during 12 months preceding the transfer, the fair market value of the assets in India, owned directly or indirectly, by the company, represents at least 50% of the fair market value of all assets owned by the company. Thus, the DTC Bill, 2010 proposes taxation of offshore share transactions. <u>This proposal indicates in a way that indirect transfers are not covered by the existing Section 9(1)(i) of the Act.</u> In fact, the DTC Bill, 2009 expressly stated that income accruing even from **indirect** transfer of a capital asset situate in India would be deemed to accrue in India. <u>These proposals, therefore, show that in the existing Section 9(1)(i) the word **indirect** cannot be read on the basis of purposive construction.</u>[1521]

1211. Finally, the Supreme Court noted that a "look through" provision needed to be expressly provided for in the relevant statute or treaty, and could not be read into it by interpretation:

---

[1520]   *Id.*, ¶ 71 (bold emphasis in original; underline emphasis added).

[1521]   *Id.*, ¶ 71 (bold emphasis in original; underline emphasis added).

> The question of providing "**look through**" in the statute or in the treaty is a matter of policy. <u>It is to be expressly provided for in the statute or in the treaty</u>. Similarly, **limitation of benefits** has to be expressly provided for in the treaty. <u>Such clauses cannot be read into the Section by interpretation.</u> For the foregoing reasons, we hold that Section 9(1)(i) is not a "look through" provision.[1522]

1212. It warrants noting that the Supreme Court criticised the Bombay High Court for having wrongly considered that the Hutchison-Vodafone transaction involved an asset sale. The Supreme Court repeated several times throughout the judgment that the Hutchison-Vodafone transaction concerned a share sale, and not an asset sale, and stressed that the tax consequences of each were different:

> We have to view the subject matter of the transaction, in this case, from a commercial and realistic perspective. The present case concerns an offshore transaction involving a structured investment. <u>This case concerns **"a share sale" and not an asset sale**. It concerns sale of an entire investment</u>. A "sale" may take various forms. Accordingly, tax consequences will vary. <u>The tax consequences of a **share sale** would be different from the tax consequences of an **asset sale**</u>. A slump sale would involve tax consequences which could be different from the tax consequences of sale of assets on itemized basis.[1523]

1213. The Supreme Court went on to hold that the fact that Vodafone was acquiring a controlling interest over the underlying companies did not mean that Vodafone had acquired a distinct capital asset independent of the shares:

> "Control" is a mixed question of law and fact. Ownership of shares may, in certain situations, result in the assumption of an interest which has the character of a **controlling interest** in the management of the company. A controlling interest is an incident of ownership of shares in a company, something which flows out of the holding of shares. <u>A controlling interest is, therefore, not an identifiable or distinct capital asset independent of the holding of shares</u>.[1524]

1214. Similarly, the Supreme Court found that, even if the share transfer had the effect of transferring certain put and call options in underlying agreements over which Vodafone had acquired control, these options could not be considered to be capital assets transferred pursuant to Section 9(1)(i):

> Applying the above principles governing shares and the rights of the shareholders to the facts of this case, we find that this case concerns a straightforward **share sale**. VIH acquired Upstream shares with the intention that the congeries of rights, flowing from the CGP share, would give VIH an indirect control over the three genres of companies. If one looks at the chart indicating the Ownership Structure, one finds that the acquisition of the CGP share gave VIH an indirect control over the tier I Mauritius companies which owned shares in HEL totalling to 42.34%;

---

[1522] *Ibid* (bold emphasis in original; underline emphasis added).

[1523] *Id.*, ¶ 88 (bold emphasis in original; underline emphasis added).

[1524] *Ibid* (underline emphasis added).

CGP India (Ms), which in turn held shares in TII and Omega and which on a pro rata basis (the FDI principle), totalled up to 9.62% in HEL and an indirect control over Hutchison Tele-Services (India) Holdings Ltd. (Ms), which in turn owned shares in GSPL, which held call and put options. Although the High Court has analysed the transactional documents in detail, it has missed out this aspect of the case. It has failed to notice that till date options have remained **un-encashed** with GSPL. Therefore, even if it be assumed that the options under the Framework Agreements 2006 could be considered to be property rights, there has been no transfer or assignment of options by GSPL till today. Even if it be assumed that the High Court was right in holding that the options constituted capital assets even then Section 9(1)(i) was not applicable as these options have not been transferred till date. Call and put options were not transferred vide SPA dated 11.02.2007 or under any other document whatsoever. Moreover, if, on principle, the High Court accepts that the transfer of the CGP share did not lead to the transfer of a capital asset in India, even if it resulted in a transfer of indirect control over 42.34% (52%) of shares in HEL, then surely the transfer of indirect control over GSPL which held options (contractual rights), would not make the transfer of the CGP share taxable in India. Acquisition of the CGP share which gave VIH an indirect control over three genres of companies evidences a straightforward **share sale** and not an **asset sale**.[1525]

1215.  As discussed in Section VII.A.3.c(iv)(3) below, after applying the "look at" test "to ascertain the true nature and character of the transaction", the Supreme Court found that the Hutchison-Vodafone transaction was a "bonafide (sic) structured FDI investment into India which fell outside India's territorial tax jurisdiction, hence not taxable".[1526] More specifically, the Court concluded:

> The said Offshore Transaction evidences **participative investment** and not a sham or tax avoidant preordained transaction. The said Offshore Transaction was between HTIL (a Cayman Islands company) and VIH (a company incorporated in Netherlands). The subject matter of the Transaction was the transfer of the CGP (a company incorporated in Cayman Islands). Consequently, the Indian Tax Authority had no territorial tax jurisdiction to tax the said Offshore Transaction.[1527]

1216.  As the Tribunal understands it, this conclusion is to be read jointly with the Supreme Court's conclusion that Section 9(1)(i) was not a "look through" provision. In other words, after rejecting the ITD's argument that the Hutchison-Vodafone transaction was a "sham or tax avoidant" transaction, the Court determined that it fell outside of the Indian tax net, because Section 9(1)(i) – the only provision which could potentially provide territorial tax jurisdiction to the ITD – did not apply to the transfer of shares in foreign companies.

1217.  In his separate concurring opinion, Radhakrishnan, J. elaborated on some of these points. Commenting on the scope of application of Section 9(1)(i), he concurred with

---

[1525]  *Ibid* (bold emphasis in original; underline emphasis added).

[1526]  *Id.*, ¶ 90.

[1527]  *Ibid* (bold emphasis in original; underline emphasis added).

the majority opinion that the words "directly or indirectly" qualified the words "all income accruing or arising", so that they would come into play only once the factual premises of each of the four limbs of Section 9(1)(i) was established:

> The meaning of the words "either directly or indirectly", when read textually and contextually, would indicate that they govern the words those precede them, namely the words "all income accruing or arising". The section provides that all income accruing or arising, whether directly or indirectly, would fall within the category of income that is deemed to accrue or arise in India. Resultantly, <u>it is only where factually it is established that there is</u> either a business connection in India, or a property in India, or <u>an asset or source in India or a capital asset in India, the transfer of which has taken place, the further question arises whether there is any income deeming to accrue in India from those situations</u>. […][1528]

1218. With respect to the factual premise for the fourth limb of Section 9(1)(i), Radhakrishnan, J. formulated the test as follows:

> [I]n the case of a case of "transfer of a capital asset in India", the following test has to be applied: (a) there must be a capital asset situated in India, (b) the capital asset has to be transferred, and (c) the transfer of this asset must yield a gain. The word 'situate', means to set, place, locate. The words "situate in India" were added in Section 9(1)(i) of the Income Tax Act pursuant to the recommendations of the 12th Law Commission dated 26.9.1958. [1529]

1219. On this basis, Radhakrishnan, J. concluded that Section 9(1)(i) applied only to capital gains arising from transfers of capital assets situated in India, and not to indirect transfers:

> Section 9 on a plain reading would show, it refers to a property that yields an income and that property should have the situs in India and it is the income that arises through or from that property which is taxable. <u>Section 9, therefore, covers only income arising from a transfer of a capital asset situated in India and it does not purport to cover income arising from indirect transfer of capital asset in India.</u>[1530]

1220. Radhakrishnan, J. noted in this regard that whenever the law intended to tax indirect income or indirect transfers, it had expressly provided so:

> The Legislature wherever wanted to tax income which arises indirectly from the assets, the same has been specifically provided so. For example, reference may be made to Section 64 of the Indian Income Tax Act, which says that in computing the total income of an individual, there shall be included all such income as arises <u>directly or indirectly</u>: to the son's wife, of such individual, from <u>assets transferred directly or indirectly</u> on or after 1.6.73 to the son's wife by such individual otherwise than for adequate

---

[1528] *Id.*, ¶ 163.

[1529] *Id.*, ¶ 164.

[1530] *Id.*, ¶ 165 (emphasis in original).

consideration. […] Similar expression like "from asset transferred directly or indirectly" we find in Section 64(7) and (8) as well. On a comparison of Section 64 and Section 9(1)(i) what is discernible is that the Legislature has not chosen to extend Section 9(1)(i) to "indirect transfers". Where ever "indirect transfers" are intended to be covered, the Legislature has expressly provided so.[1531]

1221. He reiterated the majority's conclusion that "Section 9(1)(i) cannot by a process of 'interpretation' or 'construction' be extended to cover 'indirect transfers' of capital assets/property situate in India."[1532] He added:

> On transfer of shares of a foreign company to a non-resident off-shore, there is no transfer of shares of the Indian Company, though held by the foreign company, in such a case it cannot be contended that the transfer of shares of the foreign holding company, results in an extinguishment of the foreign company control of the Indian company and it also does not constitute an extinguishment and transfer of an asset situate in India. Transfer of the foreign holding company's share off-shore, cannot result in an extinguishment of the holding company right of control of the Indian company nor can it be stated that the same constitutes extinguishment and transfer of an asset/management and control of property situated in India.[1533]

1222. Like the majority, Radhakrishnan, J. concluded that "Section 9 has no 'look through provision' and such a provision cannot be brought through construction or interpretation of a word 'through' in Section 9."[1534] That said, he added that "[i]n any view, 'look through provision' will not shift the situs of an asset from one country to another. Shifting of situs can be done only by express legislation."[1535]

1223. The Respondent has criticised the Supreme Court's decision in *Vodafone*, which it describes as "poorly reasoned"[1536] and "contrary to administrative, judicial and legislative practice predating the decision."[1537] It argues in particular that the Supreme Court should have interpreted Section 9(1)(i) purposively.[1538] Yet, the "purposive interpretation" argument was advanced in *Vodafone* and the Supreme Court considered and rejected it, in both the majority judgment and the separate opinion. As noted above, the majority judgment expressly noted that, because Section 9(1)(i) was a legal fiction, it could not be given a purposive interpretation:

---

[1531] *Id*., ¶ 173 (emphasis in original).

[1532] *Id*., ¶ 171.

[1533] *Id*., ¶ 172 (emphasis in original).

[1534] *Id*., ¶ 174 (emphasis omitted).

[1535] *Ibid* (emphasis omitted).

[1536] R-PHB, ¶ 17.

[1537] R-SoD, ¶ 114.

[1538] R-PHB, ¶ 5(d).

> We have to give effect to the language of the section when it is unambiguous and admits of no doubt regarding its interpretation, particularly when a legal fiction is embedded in that section. A legal fiction has a limited scope. A legal fiction cannot be expanded by giving purposive interpretation particularly if the result of such interpretation is to transform the concept of chargeability which is also there in Section 9(1)(i), particularly when one reads Section 9(1)(i) with Section 5(2)(b) of the Act.[1539]

1224. Likewise, the Supreme Court noted that a "look through" provision needed to be expressly provided for in the relevant statute or treaty; it could not be read into it by interpretation.

> The question of providing "**look through**" in the statute or in the treaty is a matter of policy. It is to be expressly provided for in the statute or in the treaty. Similarly, **limitation of benefits** has to be expressly provided for in the treaty. Such clauses cannot be read into the Section by interpretation. For the foregoing reasons, we hold that Section 9(1)(i) is not a "look through" provision. [1540]

1225. Radhakrishnan, J. similarly concluded that Section 9(1)(i) could not be interpreted purposively. His analysis, was based on the basic principle of legality with respect to taxation, namely, that no tax can be levied except by law, and there can be no tax without clear language showing intention to tax:

> Power to impose tax is essentially a legislative function which finds in its expression Article 265 of the Constitution of India. Article 265 states that no tax shall be levied except by authority of law. Further, it is also well settled that the subject is not to be taxed without clear words for that purpose; and also that every Act of Parliament must be read according to the natural construction of its words. Viscount Simon quoted with approval a passage from Rowlatt, J. expressing the principle in the following words:
>
> > "In a taxing Act one has to look merely at what is clearly said. There is no room for any intendment. There is no equity about a tax. There is no presumption as to tax. Nothing is to be read in, nothing is to be implied. One can only look fairly at the language used. [Cape Brandy Syndicate v. IRC (1921) 1 KB 64, P. 71 (Rowlatt,J.)]"
>
> In ***Ransom (Inspector of Tax) v. Higgs*** 1974 3 All ER 949 (HL), Lord Simon stated that it may seem hard that a cunningly advised tax-payer should be able to avoid what appears to be his equitable share of the general fiscal burden and cast it on the shoulders of his fellow citizens. But for the Courts to try to stretch the law to meet hard cases (whether the hardship appears to bear on the individual tax-payer or on the general body of tax-payers as represented by the Inland Revenue) is not merely to make bad law but to run the risk of subverting the rule of law itself. The proper course in construing revenue Acts is to give a fair and reasonable construction to their language without leaning to one side or the other but keeping in mind

---

[1539] *Vodafone International Holdings B.V. v. Union of India & Anr.* [2012] 6 SCC 613, Exh. C-59, ¶ 71 (emphasis added).

[1540] *Ibid* (bold emphasis in original; underline emphasis added).

that <u>no tax can be imposed without words clearly showing an intention to lay the burden and that equitable construction of the words is not permissible</u> [*Ormond Investment Co. v. Betts* (1928) All ER Rep 709 (HL)], a principle entrenched in our jurisprudence as well. In *Mathuram Aggarwal* (supra), this Court relied on the judgment in *Duke of Westminster* and opined that the charging section has to be strictly construed. An invitation to purposively construe Section 9 applying look through provision without legislative sanction, would be contrary to the ratio of *Mathuram Aggarwal*.[1541]

1226. As the Respondent has pointed out, the Supreme Court's rejection of a purposive interpretation of Section 9(1)(i) relates to cases not involving tax avoidance and the *Ramsey* principle.[1542] The Respondent criticises the judgment for its failure to employ a purposive interpretation to the statute and in particular its failure to apply the source rule in the fashion that the Judicial Committee of the Privy Council did in the leading *Rhodesia Metals* case.[1543] The Tribunal discusses whether Section 9(1)(i) should be given a purposive interpretation in cases involving tax avoidance below.

1227. The Tribunal has quoted the Supreme Court's decision in *Vodafone* at some length because it is the sole judicial authority to have interpreted Section 9(1)(i) prior to the 2012 Amendment. If the law was not settled prior to *Vodafone*, this decision settled it. As the excerpts cited above demonstrate, India's highest court (short of the Constitutional Court) determined in no uncertain terms that, as it stood prior to the 2012 Amendment, Section 9(1)(i) did not apply to indirect transfers. While the *Vodafone* decision is not binding on this Tribunal, it constitutes compelling evidence that the pre-2012 version of Section 9(1)(i) not only did not apply to indirect transfers of capital assets, but could not be so interpreted without rewriting its language.

1228. Of course, the Claimants were not parties to the *Vodafone* litigation. But international law has long considered the highest courts of States to be the most authoritative expositors of municipal law and have therefore accorded weight to their pronouncements. It would be an extraordinary step indeed for this Tribunal not to give the judgment of the Supreme Court the weight that it commands. In addition, on well-established principle, this Tribunal does not sit as an appellate body on decisions rendered by the Respondent's courts. For these reasons alone, even if the Tribunal took a different view of Section 9(1)(i) than the Court, it would approach any suggestion that it should embrace the Respondent's criticisms of its own Supreme Court's judgment with great care. Subject only to the role played by the Constitutional Court in the Indian judicial firmament, the Supreme Court is the ultimate interpreter of Indian law and it goes without saying that it is far more expert than this Tribunal in understanding and applying that law. Fortunately, however, the Tribunal is not in the position of having to second-guess the Supreme Court. Although the Tribunal has independently sought to ascertain the state of Indian law on the issue up to the 2012 Amendment, it is convinced by the Chief Justice's Reasons for Judgment. The Court's analysis of the fourth limb of Section 9(1)(i) accords with a plain reading of the provision and as already seen, its

---

[1541] *Vodafone International Holdings B.V. v. Union of India & Anr.* [2012] 6 SCC 613, Separate Opinion of Justice K.S. Radhakrishnan, Exh. C-59, ¶¶ 169-170 (emphasis in original).

[1542] R-SoD, ¶¶ 114, 147.

[1543] R-Rejoinder, ¶ 603(g); R-PHB, ¶¶ 98, 104-108.

conclusion that that limb, as written, did not reach indirect transfers is shared by this Tribunal.

1229. The Respondent has argued however that the law was not settled prior to *Vodafone*. The Tribunal understands the Respondent's argument to be that the 2006 Transactions cannot be interpreted in light of the Supreme Court's conclusions in *Vodafone* because up to that time there had been no judicial decision on the meaning of the fourth limb of Section 9(1)(i), and therefore the provision was open to interpretation. Indeed, the Claimants' former counsel in this proceeding, Mr Salve SA, declared that the Supreme Court "could go either way" in *Vodafone*.[1544]

1230. The Tribunal cannot follow this argument. Whether the provision could potentially have been interpreted otherwise prior to the *Vodafone* decision is irrelevant. What matters is that, when it was seized of the question, the Supreme Court unanimously found that the relevant legal principles did not support the interpretation that Section 9(1)(i) was a "look through" provision. In particular, the Supreme Court held that, applying the principles governing taxation (and leaving aside any question of tax avoidance), the fourth limb of Section 9(1)(i) could not be given a purposive interpretation. While the decision was issued some six years after the 2006 Transactions, this does not deprive it of interpretative value: the provision that the Supreme Court was interpreting in 2012 was what was in force in 2006. Accordingly, a "look through" provision (which would have the effect of extending the scope of the provision to tax capital gains made through indirect transfers) could not be implied into the provision without clear and express language showing Parliament's intention to tax indirect transfers.[1545]

1231. The Tribunal observes further that, in arriving at its decision, the Supreme Court was mindful of the need for certainty and the rule of law. The majority observed that "[c]ertainty is integral to rule of law", and further that "[c]ertainty and stability form the basic foundation of any fiscal system":

> FDI flows towards location [sic] with a strong governance infrastructure which includes enactment of laws and how well the legal system works. Certainty is integral to rule of law. Certainty and stability form the basic foundation of any fiscal system. Tax policy certainty is crucial for taxpayers (including foreign investors) to make rational economic choices in the most efficient manner. Legal doctrines like "Limitation of Benefits" and "look through" are matters of policy. It is for the Government of the day to have them incorporated in the Treaties and in the laws so as to avoid conflicting views. Investors should know where they stand.[1546]

1232. As shall be seen, these observations are relevant to the Tribunal's application of an international obligation which is concerned with the protection and promotion of the

---

[1544] Samar Srivastave and KP Narayana Kumar, "A Salve for a Taxing Moment: The Vodafone Inside Story", Forbes India (6 February 2012), Exh. R-211.

[1545] Whether the meaning of Section 9(1)(i) prior to the *Vodafone* decision was sufficiently "settled" to give rise to a legitimate expectation is a different question, which the Tribunal addresses in Section VII.A.3.f(i)(4) below.

[1546] *Vodafone International Holdings B.V. v. Union of India & Anr.* [2012] 6 SCC 613, Exh. C-59, ¶ 91.

rule of law and its integral limbs such as reasonable predictability and certainty, due process, and the like. The Tribunal will return to this issue below.

1233. To return to *Vodafone*, the Supreme Court's refusal to give a purposive interpretation to the fourth limb of Section 9(1)(i) is justified when one examines the clause closely. In this regard, the Tribunal has carefully considered the Respondent's submissions on the need to take a purposive interpretation to the fourth limb of Section 9(1)(i). The Tribunal can well understand why Indian courts have done so with respect to the first three limbs of the sub-article (*viz.* "through or from any business connection in India, or through or from any property in India, or through or from any asset or source of income in India…") because the term "business connection", in particular, seems capacious and in each of the first three limbs Parliament used the wording "*through or from*" in relation to the business connection in India, any property in India, or any asset or source of income in India, as the case may be.

1234. Intuitively, it might therefore be expected that a purposive interpretation should be given to all limbs of the same article. The Respondent's submission in this respect is not unreasonable. That would be an accepted approach to statutory interpretation in any common law jurisdiction. But it collides with the simplicity and clarity of drafting of the fourth limb. In the Tribunal's view, that limb is drafted in a more limited way than the preceding three limbs to require, as a basis for taxability, income accruing or arising, whether directly or indirectly "through the transfer of a capital asset situate in India." In short, by the use of the word "*through*" (rather than "through or from any…" as used in the other three limbs), and more importantly the specification that the capital asset must be "*situate* in India" (a word not included in the prior three limbs), the fourth limb is more narrowly focused than the others. Given its plain wording, the Tribunal cannot see how a purposive interpretation could yield a more expansive meaning of that limb without doing violence to it. Put simply, a capital asset is either situated in India or it is not. If it is, any income generated from the transfer is taxable; if it is not, there is no income to be taxed.

1235. The *Rhodesia Metals* case, a 1940 decision of the Judicial Committee of the Privy Council, on which reliance was placed by the Respondent, does not, in the Tribunal's view, change the foregoing conclusion.[1547]

1236. The Respondent stressed that for many years, the courts in India and in other common law countries have taken the pragmatic "substance over form" approach exemplified in a passage quoted in a judgment of a South African Court of Appeal judge in *Rhodesia Metals*. (To be precise, the test was stated in the dissenting judgment of Villiers, J.A.[1548]) The Judicial Committee of the Privy Council embraced Villiers J.A.'s view that the "practical hard matter of fact" approach should be employed when determining what the true source of income is in order to determine who has the authority to tax such income.[1549]

---

[1547] *Liquidator, Rhodesia Metals, Limited (In Liquidation) v. Commissioner of Taxes* (South Africa) [1940] UKPC 28 (27 May 1940), Privy Council Appeal No 9 of 1939, RLA-138, p. 774.

[1548] *Id.*, p. 789.

[1549] *Ibid.*

1237. Applying this approach, the Respondent argues, the true source of the gain enjoyed by Hutchison in the *Vodafone* case, and by CUHL in the instant case, was India. In support of this proposition and the continued use of the purposive approach, which it says the Supreme Court incorrectly rejected, the Respondent adduced various cases which showed how the Indian courts have decided where the source of income was to be established. It appears that the courts have had considerable experience in handling this type of issue dating back to the days of British India (well before *Rhodesia Metals* was decided in 1940), when the then-applicable act did not apply to various Indian principalities. Transactions that took place within and without British India raised questions as to the true source of the income generated in such transactions and a practical approach was taken by the courts to decide where the source of income was located.[1550]

1238. The Judicial Committee's decision in *Rhodesia Metals* is on the record of this arbitration. However, the Committee did not set out the facts of the transaction in detail and for that reason, the Tribunal reviewed the reasons for judgment of Stratford, C.J., Tindall, J.A. and Villiers, J.A. of the South African Court of Appeal, where the facts were more fully developed.[1551] It was this judgment, which held by a majority that Southern Rhodesia had the right to tax the transaction, which was appealed to the Privy Council.[1552]

1239. To summarise the facts briefly: An Englishman, Sir Edmund Davis, acquired certain tungsten mining claims in Southern Rhodesia. On 30 November 1935, two companies (Rhodesia Metals Ltd. and St Swithin's Ores and Metals Ltd.) were incorporated in England. St Swithin's had a larger share capital of £100,000 as compared to Rhodesia

---

[1550] The practical approach has been accepted in different factual contexts. See *Rahim v. Commissioner of Income Tax* [1949] 17 ITR 256 (Orissa), Exh. C-152. This case involved the buying of raw material in a principality (without further value being added in British India) and its sale in British India at a higher price. The Orissa High Court held that the profits arose in British India. At p. 5, Ray, C.J. took note of the "truism that actual circumstances are of more weight in law cases … than abstract theories." In *Commissioner of Income Tax v Ahmedbhai Umarbhai & Co., Bombay* [1950] AIR 134, Exh. C-154, the taxpayer manufactured oil in a principality and sold it in British India. Kania, C.J. observed, at p. 7, that "the income may accrue or arise at the place of the source or may accrue or arise elsewhere" and the question is to be determined on the facts of each case". In *Kusumben Mahadevia v Commissioner of Income Tax* [1965] 63 BOMLR 1011, Exh. C-155, a taxpayer resident in British India held shares in an Indian incorporated company which held its board meetings and declared and paid dividends in a principality. The question was whether the dividend income accrued in British India or in the principality. Having reviewed the facts, the Bombay High Court held that the income accrued outside of British India because that is where it came into existence and the foundation of the dividends rested on the contractual relationship between the company and the shareholder.

[1551] *Rhodesia Metals Ltd. (in Liquidation) v. Commissioner of Taxes*, 9 SATC 363 (22 March 1938). As is often the case, a lower court judgment may set out the facts more extensively than the higher court. Given the importance attached to *Rhodesia Metals* by the Respondent, the Tribunal considered it appropriate to examine the Court of Appeal judgment to see what facts it could glean from that judgment so as to better understand the Judicial Committee's decision.

[1552] The case was decided under s. 5 of the 1918 income tax legislation then applicable in South Africa, which taxed "the total amount other than receipts or accruals of a capital nature, received by or accrued to or in favour of any person from any source within the Territory or deemed to be within the Territory". *Liquidator, Rhodesia Metals, Limited (In Liquidation) v. Commissioner of Taxes* (South Africa) [1940] UKPC 28 (27 May 1940), Privy Council Appeal No 9 of 1939, RLA-138, p. 785.

Metals' share capital of £10,000. Davis was the chairman and a large shareholder in each.[1553]

1240. On 5 December 1935, Davis sold his mining claims to Rhodesia Metals Ltd. for a sum of £5000. The company then spent some £2000 in development work on the claims. On 20 January 1936, St Swithin's increased its capital to £200,000.[1554] Four days later, on 24 January 1936, Rhodesia Metals went into voluntary liquidation and a liquidator was appointed. On 5 February 1936, the liquidator offered to sell the mining claims to St. Swithin's for £150,000, to be satisfied by 150,000 shares in St. Swithin's stock. This was accepted by the company on the following day. Later on, it became apparent that there were assets other than the original claims themselves and therefore on 28 February 1936, the liquidator offered to sell the whole undertaking of Rhodesia Metals Ltd. Thus, on 5 March 1936, a sale and purchase agreement was entered into by the liquidator and St Swithin's for £150,000 in shares and £2000 in cash.[1555]

1241. Southern Rhodesia sought to tax the gain realised on the transaction on the basis that the source of the gain was Southern Rhodesia, not England.

1242. Notable features of the transaction which the liquidator argued showed the transaction was sited in England rather than to Southern Rhodesia were the following:

    a.   Rhodesia Metals Ltd. was incorporated in England. St Swithin's was also an English company.[1556]

    b.   The capital which Rhodesia Metals Ltd. used to make the profit was *ab initio* situated in London.[1557]

    c.   To generate taxable income a company must be carrying on business; it was argued that *prima facie* the sale of the company's assets in liquidation is not carrying on business (because a company ceases to do so when it goes into liquidation).[1558]

    d.   If the accrual was income, it was not received, nor did it accrue from any source within Southern Rhodesia or deemed to be within it.[1559]

---

[1553] *Rhodesia Metals Ltd. (in Liquidation) v. Commissioner of Taxes*, 9 SATC 363 (22 March 1938), 282 at 292-293.

[1554] The evidence before the South African Court of Appeal showed that the purpose of this was to enable St Swithin's to be able to purchase the claims from Rhodesia Metals Ltd.

[1555] *Rhodesia Metals Ltd. (in Liquidation) v. Commissioner of Taxes*, 9 SATC 363 (22 March 1938), 282 at 292-294.

[1556] *Rhodesia Metals Ltd. (in Liquidation) v. Commissioner of Taxes*, 9 SATC 363 (22 March 1938), 282 at 292.

[1557] *Id.*, at 292-296.

[1558] *Id.*, at 287.

[1559] *Id.*, at 283.

    e.    The source rather was said to be located where the business was located (i.e., London).[1560]

    f.    The contract of sale and purchase was made in England between the liquidator on behalf of Rhodesia Metals, an English company, and St Swithin's Ores and Metals Ltd., also an English company.[1561]

    g.    The purchase price of £152,000 was received in London.[1562]

1243. These facts had led the liquidator to argue (and this argument was accepted by one of the judges of the South African Court of Appeal[1563]) that the true source of the profit was London. However, the majority of the Court of Appeal disagreed, finding that the tungsten mining claims were the source of the profit realised in London. On appeal, the Privy Council ultimately agreed with that finding.[1564]

1244. The Respondent relies on *Rhodesia Metals* as follows:

> A report of the arguments before the Privy Council indicates that the point was taken on behalf of Rhodesia Metals that: "The capital employed in the business is not situated where the property purchased is situated, it is employed in the country in which it is in fact embarked…" This argument is premised on formalism, in that it was argued that as a matter of strict legal form, capital was employed at the place where the company was incorporated and where transactions for the purchase of property were concluded (as opposed to where the property was located). It was in rejecting this argument that the Privy Council held that "source" is a practical concept rather than a formal legal concept. And this advice of the Privy Council was expressly adopted by the Supreme Court of India in *Lady Kanchanbai* and by numerous High Courts. In terms, to add to the factual similarities with *Rhodesia Metals*, it is therefore clear that the source rule in section 9 must be construed "practically" in light of economic realities rather than formally.[1565]

1245. The Tribunal agrees with the Respondent that *Rhodesia Metals* is good law in India. It also accepts that in principle "source" is a practical concept rather than a formal legal

---

[1560]   *Id.*, at 283, 285.

[1561]   *Id.,* at 290-292, 296.

[1562]   *Id.*, at 292-299. Villiers, J.A. attached much significance of these factors, finding that: "…to put it shortly, the whole affair was a London financial transaction."

[1563]   Villiers J.A. found that the source of the profit, due to these connecting factors was England, not Southern Rhodesia. He considered that the capital was employed in London before the transactions took place and it never traveled to Southern Rhodesia and everything connected with the profit-making took place in London. *Id.,* at 299.

[1564]   *Liquidator, Rhodesia Metals, Limited (In Liquidation) v. Commissioner of Taxes* (South Africa) [1940] UKPC 28 (27 May 1940), Privy Council Appeal No 9 of 1939, RLA-138, pp. 789-790.

[1565]   R-Rejoinder, ¶ 621 (footnotes omitted).

concept and that courts in India (and other Commonwealth countries) have applied the "practical hard matter of fact" approach endorsed by the Privy Council.[1566]

1246. However, the Tribunal also notes that the pivotal reason for determining taxability in *Rhodesia Metals* was the fact that what was being conveyed was principally a mining concession granted by Southern Rhodesia (which transaction was later expanded to include the whole of the undertaking in Southern Rhodesia).[1567] Although the liquidator had evidently sought to add as many connecting factors to England as possible with a view to establishing the situs of the transaction there,[1568] at the end of the day, it was a capital asset situated in Southern Rhodesia that was being conveyed in England.[1569] In short, had the case arisen out of India, with its ITA applying, this transaction would have fallen into the scope of Section 9(1)(i) of the Act because the mining claims – which are akin to the PSCs in the present case – would have been considered to be capital assets situate in India.

1247. As the Tribunal has already found (and in terms as the Supreme Court has already found), the fourth limb of Section 9(1)(i) is worded so as to present a binary question: is the capital asset, the transfer of which is sought to be taxed, situated in India or not? The problem in applying the *dicta* from *Rhodesia Metals* in the present case is that textually the fourth limb simply does not lend itself to a purposive interpretation. It captures only income accruing or arising through the transfer of a capital asset situate in India. The asset must be located in India; if it is not, the transfer is not captured. This, in the Tribunal's view, is why the Supreme Court found that "show[ed] that in the existing Section 9(1)(i) the word **indirect** cannot be read on the basis of purposive construction."[1570] It is a finding with which the present Tribunal agrees.

1248. The fact that a purposive approach could/should be given to the standard for tax abuse has no bearing in the present question. The Tribunal is dealing here with the scope of Section 9(1)(i), and the question as to whether it should be interpreted so that the ITD can "look through" the share being transferred and any layers of holding companies all the way to the underlying Indian assets. The Supreme Court's unanimous conclusion is that this could not be done without express language from Parliament showing an intention to tax the indirect transfer of those underlying assets. The Tribunal addresses the approach that should be given in cases of tax avoidance in Section VII.A.3.c below.

---

[1566] *Liquidator, Rhodesia Metals, Limited (In Liquidation) v. Commissioner of Taxes (South Africa)* [1940] UKPC 28 (27 May 1940), Privy Council Appeal No 9 of 1939, RLA-138, p. 789 ("Their Lordships incline to the view quoted with approval from Mr Ingram's work on South African Income Tax Law by de Villiers J.A. in his dissenting judgment: 'Source means not a legal concept, but something which a practical man would regard as a real source of income'; 'the ascertaining of the actual source is a practical hard matter of fact.'").

[1567] *Id.*, p. 789.

[1568] *Id.*, p. 776-781.

[1569] *Id.*, p. 789.

[1570] *Vodafone International Holdings B.V. v. Union of India & Anr.* [2012] 6 SCC 613, Exh. C-59, ¶ 71 (bold emphasis in original).

1249. Being the sole authority to have interpreted the fourth limb of Section 9(1)(i) prior to the 2012 Amendment, and emanating from the highest court in the Indian judicial system (save for the Constitutional Court), *Vodafone* is compelling evidence that this provision not only did not cover indirect transfers, but could not "by a process of interpretation be extended to cover" such transfers.[1571] As the Supreme Court categorically found, this "would amount to changing the content and ambit of Section 9(1)(i)".[1572] This, in the Tribunal's view, is precisely what the 2012 Amendment did.

* * *

1250. For the reasons set out above, the Tribunal is satisfied that the record establishes that the pre-2012 Amendment version of Section 9(1)(i) of the ITA 1961 did not, and could not by way of interpretation, extend to indirect transfers of capital assets situate in India. The conclusion that follows as a matter of logic is that the 2012 Amendment did not merely clarify, but rather, expanded the scope of application of Section 9(1)(i). The Tribunal thus concludes that the 2012 Amendment amended Section 9(1)(i) by imposing a new tax burden where none previously existed.

1251. In concluding its analysis of *Vodafone*, and apropos of Mr Salve SA's comment that *Vodafone* could have gone "either way," the Tribunal wishes to record its view that in principle it sees nothing objectionable *per se* as a matter of international law in a State's Executive taking a contestable position *vis-à-vis* a foreign investor on a matter of municipal law. The evidence suggests that the *Vodafone* case was regarded by the Revenue and the taxpayer alike as a "test case."[1573] The fact that the Court gave a literal interpretation to the fourth limb of Section 9(1)(i) and that this Tribunal, aided by the record evidence and by the Court's analysis, has arrived at the same conclusion, does not mean that the Revenue had no right to attempt to convince the Supreme Court (as it had convinced the Bombay High Court) that it could tax that transaction. The common law evolves in light of changing circumstances and it is not unusual for authorities such as the ITD to seek to give new interpretations to existing laws in response to such changing circumstances. Sometimes the courts will bless such interpretations, sometimes they do not; indeed, sometimes the courts themselves will revisit what was thought to be settled law. But the courts must also give effect to the laws as written by Parliament and there are many instances where the courts will hold that the law, as written, does not support the taking of administrative, investigative or enforcement action. In the Tribunal's view, this is the case here: the Court disagreed with the

---

[1571]  *Ibid*.

[1572]  *Ibid*.

[1573]  See, e.g., "Govt to look into Vodafone-like deals: CBDT", The Press Trust of India (8 September 2010), Exh. C-332 (quoting acting Chairman Sudhir Chandra as saying, "This (Vodafone case) is a test case, we will look at similar cases. There are already some cases under investigation."); see also "Vodafone faces a $2.8bn bill after losing Indian tax case", The Australian (9 September 2010), Exh. C-334; "I-T dept can demand tax from Vodafone for Hutch deal: HC", The Financial Express (13 September 2010), Exh. C-338; "Indian court rules against Vodafone in tax case", MarketWatch (8 September 2010), Exh. C-331; "Vodafone ruling a game changer for share transfers to foreign companies", Economic Times (10 September 2010), Exh. C-335; "CBDT to look into deals like Hutchison-Voda", The Times of India (10 September 2010), Exh. C-337; "Other foreign M&As under scanner after Vodafone verdict", SiliconIndia News (10 September 2010), Exh. C-336.

interpretation of the Executive and gave effect to the law, i.e., Section 9(1)(i), as written by Parliament.

### (iii)   What was the temporal effect of the 2012 Amendment?

1252.   Having established that the 2012 Amendment was a substantive amendment of Section 9(1)(i), the question is now whether it applied prospectively, with immediate effect or, retroactively.

1253.   It is undisputed that the 2012 Amendment applied to transactions carried out before its enactment. Its text is unequivocal in that it purports to apply as of the entry into force of the ITA 1961, i.e., 1 April 1962. The Finance Act 2012 expressly stated that Explanations 4 and 5 "shall be inserted and shall be deemed to have been inserted with effect from the 1st day of April, 1962". [1574]

1254.   Had the 2012 Amendment by its nature and intrinsically been a true clarification, it would have merely confirmed the pre-existing legal consequences of past transactions. The Tribunal has found however that the 2012 Amendment expanded the scope of application of Section 9(1)(i), imposing on indirect transfers occurring between 1 April 1962 and 1 April 2012 a tax burden that did not exist according to the law in effect when those transactions occurred. To quote *West v. Gwynne*, it provided that, as of 1 April 1962, Section 9(1)(i) "shall be taken to have been that which it was not".[1575] The Tribunal thus concludes that the 2012 Amendment amended Section 9(1)(i) with retroactive effect.

1255.   The Respondent has argued in the alternative that, were the Tribunal to find that the 2012 Amendment applied retroactively, "the measure was in fact retroactive by no more than 2 months (being the time between the Supreme Court's judgment in *Vodafone* and the announcement of the passage of the 2012 Clarification)."[1576] The Respondent's argument is essentially the following: in the absence of a court decision on the meaning of the fourth limb of Section 9(1)(i), the meaning of that limb was not settled. The first time that there was a declaration by any Indian court as to the meaning of Section 9(1)(i) was the *Vodafone* decision in January 2012. Given that under Indian constitutional law, "the final word over the interpretation of statutes (such as the ITA) falls with Parliament, not with the Supreme Court",[1577] and that Parliament exercised this authority within two months of that decision, the measure was in fact retroactive for only two months.[1578]

1256.   The Tribunal cannot agree. The fact that no court had ever expressly ruled on the meaning of the fourth limb of Section 9(1)(i) does not mean that this provision did not have an objective meaning, upon which taxpayers relied for some 50 years. As discussed above, when the Supreme Court ruled in *Vodafone* that Section 9(1)(i) could not by a

---

[1574]   Finance Act 2012 [Act No. 23 of 2012], Exh. C-53, ¶ 4.

[1575]   C-SoC, ¶ 332, citing Buckley, L. J. in *West v. Gwynne* [1911] 2 Ch l, Exh. Gardiner-29, p. 6.

[1576]   R-PHB, ¶ 530.

[1577]   R-PHB, ¶ 16.

[1578]   Transcript, Evidentiary Hearing, Day 6, 43:7-14 (Mr Moollan).

process of interpretation be extended to cover direct transfers, it confirmed that this was the only objectively reasonable interpretation that could be given to that provision without rewriting it *as of its enactment*, i.e., 1 April 1962. Stated differently, the highest court in the land ruled that the correct interpretation of Section 9(1)(i) was that, from 1 April 1962, it did not cover indirect transfers. When Parliament passed the 2012 Amendment in June 2012,[1579] it literally rewrote Section 9(1)(i) so that it would contain words giving it the meaning that Parliament wished it to have. In so doing, it changed the provision's objective meaning and expanded its application, and expressly stated that it was doing so as of 1 April 1962. The retroactive effect of the law thus clearly extended some 50 years into the past.

1257. In the further alternative, the Respondent contends that "the measure would not have a temporal effect in excess of six years", because the ITA 1961[1580] provides that no tax can be levied beyond six years.[1581] The Respondent quotes the following statement made by the Finance Minister in a speech before the Lok Sabha when the Finance Act 2012 was being debated:[1582]

> I have explained that retrospective effect, to clarify the legislative intention, must be with reference to the date of enactment. How can the intentions of the legislature have any other reference point than the date of enactment, whether it is 1961 or 1951 or 1948? If clarificatory retrospective arrangement is to be made, it will be with reference to the date of enactment. But, the effect of the retrospective amendment in respect of the taxation will be covered by other laws. Here, the Income Tax Act Section 161 says that no tax can be levied beyond six years. Therefore, the mention of 1961 is academic, but the tax liability will arise retrospectively, six years before, from the current date of assessment.

1258. The temporal effect of the law is one thing; its application in practice is quite another. The indisputable fact is that the 2012 Amendment purported to amend the content of Section 9(1)(i) from the date of enactment of the ITA 1961 (i.e., 1 April 1962). The fact that, in practice, the tax authorities are precluded from levying taxes beyond six years does not change the period of retroactivity for which the 2012 Amendment purported to apply.

1259. That said, the Tribunal agrees that the statute of limitations provided in the ITA 1961 would determine *in practice* how far back the tax authorities could go to pursue taxes arising from indirect transfers that took place prior to 2012. The Tribunal understands

---

[1579]  It is unclear from the record when the Finance Act 2012 was passed into law, but the Respondent has asserted that it was on 12 June 2012. See, e.g., R-PHB, ¶ 17 (stating that "the passing of the 2012 Clarification on 12 June 2012 did nothing more than to re-establish its intention that the fourth limb of section 9(1)(i) of the ITA 1961 should be interpreted as a broad and fact-dependent source rule to be applied on the basis of economic substance […]").

[1580]  The Respondent has cited Section 161 of the ITA 1961, but the reference seems to be either to Section 151 or Section 149 (Exh. Puri-5).

[1581]  R-SoD, ¶ 123(a); R-PHB, ¶ 530.

[1582]  Shri Pranab Mukherjee, Minister of Finance, Transcript of Speech before Lok Sabha (Parliament), 8 May 2012, Exh. R-51, pp. 9388-9389.

that, pursuant to Section 149 of the ITA 1961,[1583] the ITD could only pursue transactions occurring after 1 April 2006. The 2006 Transactions at issue in the present case occurred between October and December 2006, and thus fall within the limitation period. The 2012 Amendment thus applied to the Claimants.

### c.   The Respondent's tax avoidance defence

1260.   The Tribunal has found that the fiscal measures imposed by the Respondent on the Claimants were based on the 2012 Amendment (Section (a) above). It has also found that the 2012 Amendment substantively amended Section 9(1)(i), imposing a new tax burden that did not previously exist, and did so retroactively (Section (b) above). The Claimants contend that, by imposing these measures, the Respondent treated their investments unfairly and inequitably, in breach of Article 3(2) of the BIT.

1261.   The Respondent, however, asks the Tribunal not to assess the fairness and equitableness of these measures. It asserts that the fiscal measures actually imposed on the Claimants (principally, the FAO based on the 2012 Amendment) are irrelevant, because the tax imposed upon the Claimants was in any event justified under the law in force at the time on different grounds.[1584] The Respondent's first defence is that the 2006 Transactions would have been taxable even without the 2012 Amendment because they were tax avoidant transactions, and thus taxable under the "look at" doctrine developed by the Indian courts which focuses on 'substance over form'.

1262.   The Tribunal understands the Respondent's argument to be that, if the 2006 Transactions were tax avoidant and thus taxable in India (even if under different grounds), the fiscal measures actually imposed cannot be characterised as being unfair and inequitable. The Tribunal agrees that had the 2006 Transactions been taxable under different grounds, the analysis as to whether the Respondent's imposition of a tax under the 2012 Amendment (and no other allegedly "possible" basis) would be somewhat different. However, for the Respondent's argument to succeed, the tax actually imposed and the alternative tax would need to be identical or at least similar, especially in the amount of tax demanded. Further, while the taxability of the transaction might not be in itself unfair or inequitable, this does not necessarily solve the question as to whether the manner in which it was imposed was fair and equitable.

1263.   With these preliminary points in mind, the Tribunal now turns to the Respondent's tax avoidance defence. The Tribunal will begin by making a few remarks on terminology (Section (i)). It will then determine whether the Respondent is estopped from bringing the tax avoidance defence, as the Claimants contend, or whether it is otherwise inadmissible (Section (ii)). The Tribunal will then address the nature of its task with respect to tax avoidance (Section (iii)) and set out the applicable legal standard (Section (iv)). The Tribunal will then determine whether, on the facts, there is sufficient proof that the 2006 Transactions were tax avoidant (Section (iv)). On this basis, the Tribunal

---

[1583]   Exh. Puri-5.

[1584]   See, e.g., R-Rejoinder, ¶ 423 (submitting that "the measure challenged by the Claimants (the 2012 Clarification) is simply irrelevant if the transaction was tax abusive and therefore taxable on that separate ground").

will set out its conclusions as to whether its assessment of the challenged measures has been rendered irrelevant (Section (v)).

### (i)   Terminology

1264.   The Tribunal requested submissions from the Parties on the terminology to be used in analysing this defence, in particular, on the terms "tax evasion", "tax avoidance" and "tax planning."

1265.   The Respondent argues that there is no "international law" definition of these terms, and accordingly their meaning will vary depending on the jurisdiction concerned.[1585] That said, the Tribunal notes that both Parties' definitions are roughly consistent, with the exception of that for tax evasion:

   a.   According to the Claimants, the term "tax evasion" usually refers to "the illegal evasion of taxes, often entailing the deliberate misrepresentation of the true state of its affairs to the tax authorities in an attempt to reduce one's tax liability, such as by underreporting income or overstating deductions."[1586] According to the Respondent, "[t]ax evasion is a failure to pay taxes in compliance with the law".[1587]

   b.   According to the Claimants, "tax avoidance" is generally used to refer to "the organization of one's business affairs with the object of obtaining a tax advantage while *prima facie* fully intending to comply with the tax law."[1588] While tax avoidance relates to lawful tax arrangements, certain jurisdictions now consider that certain aggressive tax avoidance schemes (in particular those involving the exploitation of tax havens or artificial schemes) are abusive and may be taxed as such.[1589] For the Respondent, "[t]ax avoidance is an attempt to reduce or avoid liability by questionable measures in a manner that is not intended by the legislature and which may, or may not, be found legally permissible by the tax authorities."[1590]

   c.   For the Claimants, "tax planning" usually describes "the process of organizing one's affairs in a tax efficient manner that is consistent with the letter and intent of the tax laws."[1591] However, while tax planning in principle involves lawful actions, aggressive tax planning may be considered abusive and fall into the category of abusive tax avoidance.[1592] For its part, the Respondent notes that, "[t]ax planning includes any measures to reduce tax liability ranging from those

---

[1585]   Respondent's Answers to the Tribunal's Questions, ¶ 59.

[1586]   C-PHB, ¶ 465.

[1587]   Respondent's Answers to the Tribunal's Questions, ¶ 62(a).

[1588]   C-PHB, ¶ 465.

[1589]   C-PHB, ¶ 466.

[1590]   Respondent's Answers to the Tribunal's Questions, ¶ 62(b).

[1591]   C-PHB, ¶ 467.

[1592]   C-PHB, ¶ 467.

that are explicitly allowed by a specific statutory provision (such as tax incentives) to tax avoidance measures that may not be held to be legally permissible by the tax authorities, courts or legislature."[1593]

1266. The Respondent suggests that these concepts should be viewed as a spectrum, with tax planning pursuant to an express statutory scheme at one end, and at the other the failure to pay tax that is clearly due. In the middle would be "measures which seek to exploit ambiguities in the tax provisions and which may or may not be held to be legally permissible. If it is subsequently decided that a tax avoidance measure is not in accordance with the law, it will be held to have been tax abusive and will become an instance of tax evasion, because there will have been a failure to pay tax which is now established to be due."[1594]

1267. The Respondent adds that, under Indian judge-made anti-avoidance rules, there can be no assumption that all tax planning or all attempts at tax avoidance will be legitimate. For that reason, the Respondent has used the term "tax abuse" to refer to conduct which falls afoul of the Indian law test, and it suggests that the Tribunal should also adopt that term.

1268. In light of these submissions, it appears undisputed that, at least pursuant to Indian law, both tax planning and tax avoidance may be either legitimate or illegitimate. Whether it is the former or the latter will essentially depend on whether the planning or avoidance of tax conforms with the intent of the law, on the one hand, or is abusive, on the other. The criteria to determine this are discussed further below.

1269. The main difference between the Parties is on the definition of tax evasion. The Claimants rely on a 1954 report from the Taxation Enquiry Commission, which explained that tax avoidance "is taken to refer to arrangements by which a person, acting within the letter of the law, reduces his true tax liability", whereas tax evasion "denotes downright defrauding of revenue through illegal acts and deliberate suppression or falsification of the facts relating to one's true tax liability."[1595] Accordingly, for the Claimants, tax evasion appears to involve a deliberate intention to defraud. By contrast, for the Respondent the mere failure to pay an applicable tax amounts to tax evasion, even if there has been no abuse or intention to defraud.

1270. The Tribunal does not consider it necessary to resolve this dispute. It understands the Respondent's case to be one of abusive tax avoidance (i.e., one where the form of the transactions, even if formally lawful, was chosen with the dominant purpose of reducing or avoiding liability to pay tax in ways that are inconsistent with the intent of the law), and the Tribunal will address it as such. Given that the Claimants have referred to it as tax avoidance, the Tribunal will use the terms tax abuse and tax avoidance interchangeably.

---

[1593]   Respondent's Answers to the Tribunal's Questions, ¶ 62(c).

[1594]   Respondent's Answers to the Tribunal's Questions, ¶ 63.

[1595]   C-PHB, ¶ 472, citing Report of the Direct Taxes Administration Enquiry Committee 1958-1959 (1959), Exh. C-393, p.147.

(ii)   **Is the Respondent estopped from bringing this defence, or is it otherwise inadmissible?**

*(1)   The Claimants' position*

1271.  According to the Claimants, the Respondent's tax avoidance defence "has absolutely no substance whatsoever", and "has been fabricated for purposes of this arbitration […] to distract attention from the core issues of retroactivity."[1596]

1272.  The Claimants assert that the Section 281B Order and the FAO expressly relied on the 2012 Amendment. In particular, the Section 281B Order stated that "the subsidiaries [of CIHL] derived [their] value directly or indirectly, substantially from the assets, i.e., oil and gas right/reserves located in India," and concluded that "in accordance with the provisions of Explanation 5 to Section 9(1)(i) of the [ITA 1961]" the CIHL shares transferred between CUHL and CIL "shall be deemed to have been situated in India", so that "any gains arising from [the] transfer of such shares is chargeable to tax under the [ITA 1961]".[1597]

1273.  As a result, the Claimants argue that the Respondent is "estopped from advancing an entirely new justification for its actions, *ex post facto*, for purposes of this arbitration."[1598] Had the Claimants indeed engaged in abusive tax avoidance, as the Respondent contends, the ITD would have noted and investigated it. While in their Statement of Claim the Claimants appear to recognise that the FAO did contain allegations of tax avoidance,[1599] in their Reply they allege that neither the ITD nor any other Government entity hinted at such illegality. To the contrary, the FAO "expressly declared that there was no evidence of tax avoidance or other illegality", noting that there was no evidence of a "sham transaction."[1600] As this was "the Respondent's considered, contemporaneous conclusion on this key issue", the Respondent is now estopped from arguing that the tax is justified by other grounds.[1601]

*(2)   The Respondent's position*

1274.  The Respondent denies that it is estopped from raising its tax avoidance defence. The Respondent raises two preliminary points in this respect:

a.   First, the Respondent formally objects to the Tribunal's consideration of the Claimants' estoppel argument because the Claimants raised this argument in their Updated Reply rather than in their Reply. The purpose of the Updated Reply was only to address new documents produced, not to put forward an entirely new legal

---

[1596]  Transcript, Evidentiary Hearing, Day 1, 68:12-14 (Mr McNeill).

[1597]  C-SoC, ¶ 31, citing the Order under Section 281B of ITA 1961 dated 22 January 2014, Exh. C-11, ¶¶ 10-12.

[1598]  C-Updated Reply, ¶ 566.

[1599]  C-SoC, ¶ 38, stating that the FAO "paints a fabricated and distorted picture of deliberate tax evasion that bears no resemblance to the conservative and transparent transaction that Cairn undertook in 2006."

[1600]  C-Updated Reply, ¶ 566, p. 192 n. 839, citing FAO, Exh. C-70, ¶ 10 (emphasis omitted).

[1601]  *Id.*, ¶ 566 (emphasis omitted).

case. The Respondent therefore addresses this argument on a without prejudice basis.[1602]

b.   Second, the Respondent contends that the Claimants' estoppel argument is misconceived. As the Claimants have never challenged the constitutional validity of the 2012 Amendment, the Indian tax authorities did not need to rely on anything other than that Amendment to tax the 2006 Transactions.[1603] This does not change the fact that the 2006 Transactions were always taxable as tax abusive transactions, applying the law as it stood before the 2012 Amendment. Even if the tax authorities had not raised the question of tax abuse in the assessment proceedings, this does not mean that they cannot raise it as a defence to the Claimants' treaty claims in international proceedings.[1604]

1275.   Turning to the substance of the Claimants' estoppel defence, the Respondent argues that the Claimants fail to meet the international law test for estoppel, which requires (i) an unequivocal and clear representation, (ii) that must have been relied on by the recipient, and (iii) such reliance must have caused detriment to the recipient.[1605] None of these elements is present in this case.

a.   First, there can be no estoppel on the grounds of alleged disclosures to or approvals from the Indian authorities. The Respondent did not have specific knowledge of the Claimants' abusive scheme of tax avoidance, or provide "active and unambiguous endorsement of the tax implications of the 2006 Transaction."[1606] Nor could the Claimants legitimately or reasonably infer tax approval from the decisions of regulatory agencies that had no competence on matters of taxation, especially since the Claimants did not avail themselves of the processes that Indian law prescribes for taxpayers to ascertain the taxability or not of a planned transaction. None of the approvals sought or received by the Claimants discussed the question of taxation or made any representation in this respect. The FAO therefore does not contradict any decisions or representations made by other Indian Governmental entities.[1607]

b.   Second, there can be no estoppel based on the content of the FAO. The Respondent contends that the FAO did find that the Claimants had engaged in "deliberate tax evasion",[1608] and that this constituted an "additional basis" for the assessment.[1609] The Respondent argues that the FAO rejected the Claimants' allegation that the 2006 Transactions were a genuine group restructuring involving

---

[1602]   *Id.*, ¶¶ 178, 219.

[1603]   *Id.*, ¶ 182.

[1604]   *Id.*, ¶ 231.

[1605]   *Id.*, ¶¶ 184-195

[1606]   *Id.*, ¶ 196.

[1607]   *Id.*, ¶¶ 196- 212.

[1608]   *Id.*, ¶ 229 (emphasis omitted).

[1609]   *Id.*, ¶ 228.

genuine strategic planning, emphasising that CIHL had been incorporated in Jersey "only for the purpose of creating a conduit for transferring the ownership of Indian assets."[1610] The FAO went on to say that, "where corporate structures are created to route funds, the actual gain or income arises only in consequence of the investment made in the activity to which such gains are attributable and not the mode through which such gains are realized."[1611] The Respondent argues on this basis that "[t]he Respondent's case on avoidance has been entirely consistent: the Claimants' liability arises from a corporate restructuring entered into with no business rationale other than eliminating tax liability, which had always been taxable on a proper application of Section 9, and in any event, was taxable in view of the 2012 Clarification."[1612]

c.   Third, the Respondent is not estopped from alleging that the 2006 Transactions manipulated the cost basis for the CIL shares, simply because the tax authorities later accepted CUHL's calculation of that cost basis when reviewing subsequent off-market sales of those shares, or because of the way in which the FAO taxed the CIHL Acquisition. The Respondent explains that its tax abuse case does not depend on this point; it has simply been made "for the sake of consistency, so as to further demonstrate the tax evasive nature of the 2006 Transactions."[1613] The Respondent's case is that the Claimants' tax abuse consisted in avoiding the payment of taxes on the capital gains tax applicable on shares offered for sale under the IPO under Plan A, and as explained by Professor Rosenbloom "there are multiple ways in which tax authorities could reasonably 'unpack the artificiality inherent' in the relevant transactions."[1614] The Respondent explains that the Indian tax authorities did so by applying the judicial anti-avoidance rule, and "have taxed directly the actual gain realised upon CUHL's disposition of the shares of CIHL, as opposed to waiting to tax that gain upon subsequent dispositions of the CIL shares obtained by CUHL."[1615] As noted by Professor Rosenbloom, the ITD did not adopt the carried cost basis approach to taxing the transaction, but rather taxed the form of the transaction, which in his view "is a reasonable alternative means of reaching the tax that Cairn's scheme was designed to avoid."[1616] In any event, the Respondent alleges that the ITD could not identify the correct cost basis of the CIL shares until the survey carried out in CIL's offices in January 2014, because the Claimants had not previously disclosed the actual cost of acquisition until that date. As a result, the Respondent cannot be estopped from identifying such correct cost basis now. In any event, the ITA allows the ITD to raise a notice of demand within six years, the assessment proceedings were

---

[1610]  FAO, Exh. C-70, ¶ 9.1.7.

[1611]  *Id.,* ¶ 9.4.

[1612]  R-Rejoinder, ¶ 229.

[1613]  *Id.*, ¶ 234.

[1614]  *Id.*, ¶ 236.

[1615]  *Id.*, ¶ 236.

[1616]  Rosenbloom ER1, ¶ 36.

brought within this limitation period, and the Claimants themselves have kept the issue live in the proceedings before the Delhi High Court.[1617]

*(3)    The Tribunal's analysis*

1276.   The Claimants have requested the Tribunal not to address the Respondent's tax avoidance, arguing that it does not form part of the measure being challenged. The Claimants allege that (i) the main measure – the FAO – was not grounded on tax abuse, but on the 2012 Amendment, and that (ii) the question of tax avoidance was never raised until this arbitration.

1277.   The Tribunal agrees with the Claimants on the first point. As discussed in Section VII.A.3.a above, the FAO was unequivocally grounded on the 2012 Amendment. While the Respondent later applied to the Delhi High Court for leave to amend its grounds of appeal of the ITAT decision so as to add the tax avoidance, which leave was granted on 3 December 2019,[1618] the fact is that at the time in which the FAO was issued and until now, the sole ground invoked for taxing the 2006 Transactions was the 2012 Amendment. In addition, all enforcement measures taken against the Claimants have been grounded on the FAO. To the Tribunal's knowledge, this remains the case to date.

1278.   However, the Tribunal cannot agree with the Claimants on the second point. Both the ITD (in the DAO and FAO), and the DRP (in its decision on CUHL's challenge to the DAO) adverted to possible tax avoidance, although they fell short of invoking it as a basis for taxability.

1279.   The paragraph in the FAO which discussed tax avoidance did so in factual terms that are broadly similar to the Respondent's first tax avoidance theory in this arbitration (namely, that the 2006 Transactions were in substance a direct transfer of the underlying Indian oil and gas assets), as follows:

> This analysis clearly points out to the arrangement structured by the Cairn Energy Group to **systematically divest** its stake in Indian Oil and Gas business. As a result of this arrangement, even though the assessee had earned substantial capital gains, it did not pay any taxes in any territory in the world. This makes it a **classic case of double non taxation** which is biggest area of concern to International community and policy makers. The affairs of the Group were structured in such a manner that the shares of companies which are operating and using and owning the assets involved in Oil and Gas business enterprise were transferred first to a UK based holding company from where they were transferred to the Jersey based another holding company the shares of which are ultimately sold to an Indian Company for a **substantial cash consideration**. All this happened

---

[1617]   R-Rejoinder, ¶¶ 238-245.

[1618]   As discussed in Section VII.A.3.d below, it is unclear if the Respondent has also requested that its appeal be amended to add the 2(47)(vi) ground. See RCom-391 of 14 January 2020 (asserting that "[a]t the Hearing in the Delhi High Court proceedings on 03 December 2019, the Court admitted the amended memorandum of appeal of the [ITD] which includes submissions *inter alia* on the ground of tax abuse (with the merits of the amended grounds for appeal to be considered at a later date)."). While the Claimants have disputed the Respondent's account of what transpired at the hearing, they do not dispute that the Court admitted the amended memorandum of appeal. See CCom-308 of 30 January 2020.

in **preplanned sequential steps** within a period of three months. The physical operations of the enterprise were not effected at all during this period. **The money was remitted out of the country bypassing or circumventing all procedural requirements.** The transaction did not attract any tax liability in UK probably because of CFC regime, as the assets changing hands were not in UK. For India, where they (the business operations as well as the assets) were located, the transaction was given the colour of a share sale transaction of a Foreign company incorporated in a Low tax Jurisdiction. The liberalised economic regime of India was taken advantage of for making hassle free remittance on the **basis of perfunctory legal opinion of a Tax consultant without withholding** any due taxes and following automatic approval route. The FIPB approval was sought for the cashless portion of the transaction (Share swap) making it look like an investment proposal. The money which was remitted during the course of this transaction was partly sourced from Indian Public and other institutional investors through IPO in Indian Capital markets. The remaining stake of the Cairn Group held in CIL through CUHL was again offloaded to Indian investors in succeeding years leaving a balance of about 10% shareholding of CIL with CUHL. This remaining 10% stake was also planned to be divested to CIL, which had announced a share buyback scheme to be commenced from 23.01.2014…"[1619]

1280.  In turn, the DRP decision of 31 December 2015 confirmed that the primary basis for the demand was Section 9(1)(i) of the ITA as "explained" by Explanation 5. However, the DRP added the following section:

> **Judicial Doctrines on Anti Avoidance and Jurisprudence from Other Civil Law Jurisdictions that support AOs actions**
>
> Judicial doctrines such as the "business purpose" and "economic substance" doctrines established in Gregory v Helvering in the United States finds complement in the UK through the Ramsey and Dawson cases. While the specifics may vary according to jurisdiction, these rules invalidate tax avoidance which is technically legal but not for a business purpose or in violation of the spirit of the tax code. […] The arrangement structured by the Cairn Energy Group and was also to raise monies in the Indian capital markets. But what has happened is that the money raised has effectively been used to divest its stake in Indian Oil and Gas business and assets thus resulting in a strategic process of disinvestment. Taxpayer has in the process, earned substantial capital gains, but not paid taxes in any territory in the world. India being the jurisdiction where the oil assets are located should rightly have been the source jurisdiction of such taxation. Thus prima facie, the series of steps that commenced with a span of 7 months starting with incorporation of assessee company/taxpayer on 26-062006, as a 100% subsidiary of Cairn Energy PLC and ended with sale of CIHL shares, a company registered in Jersey, to CIL at the average rate of Rs 1062.07/Shar between 12-10-2006 and 29-12-2006 resulting in no taxes being paid in India, UK or Jersey is thus a tax evasion scheme which deserves to be tested in light of business purpose and economic substance doctrines. To reiterate, it was stated in the Schedule 6 to the Income Statement of CUHL as on 31.12.2006 that the disposal of shares is exempt

---

[1619]  FAO, Exh. C-70, ¶ 9.1.9 (emphasis in original).

from tax under schedule 7AC of Taxation of Chargeable Gains Act 1992. This does appear to be a case of double non-taxation and is currently an area of concern under the BEPs initiative for global policy makers and tax authorities.

*Gregory v Helvering*, 293 US 465 (1935), was a landmark decision by the United States Supreme Court which is cited as part of the basis for two legal doctrines: the business purpose doctrine and the doctrine of substance over form. The business purpose doctrine is essentially that where a transaction has no substantial business purpose other than the avoidance or reduction of tax, the tax law will not regard the transaction. The issue for determination was whether what was done, apart from the tax motive, was the thing which the statute intended. The reasoning of the court below [i.e., the reasoning of the Court of Appeals] in justification of a negative answer is articulate and its denunciation of tax avoidance.

> When [the statute] speaks of a transfer of assets by one corporation to another, it means a transfer made 'in pursuance of a plan of reorganization' […] Of corporate business; and not a transfer of assets from one corporation to another in pursuance of a plan having no relation to the business of either, as plainly as the case here. Putting aside, then, the question of motive in respect of taxation altogether, and fixing the character of the proceeding by what actually occurred, what do we find? Simply an operation having no business or corporate purpose – in your device which put on the form of a corporate reorganization as a disguise for concealing its real character, and the soul logic and accomplishment of which was the consummation of a preconceived plan, not to reorganize a business or any part of the business, but to transfer a parcel of corporate shares to the petitioner. No doubt, a new invalid corporation was created. But that corporation was nothing more than a contrivance to the end last described. It was brought into existence for no other purpose; it performed, as it was intended from the beginning it should perform, no other function. When that limited function had been exercised, it was immediately put to death.
>
> In the circumstances, the facts speak for themselves and are susceptible of but one interpretation. The whole undertaking, though conducted according to the terms of [the statute], was in fact an elaborate and devious form of conveyance masquerading as a corporate organization, and nothing else. The transaction upon its face lies outside the plain intent of the statute. To hold otherwise would be to exalt artifice above reality and to deprive the statutory provision in question of all serious purpose."

AOs addition (sic) stands strongly on merits without requiring any additional support. However these principles have far-reaching consequences and since India is also a Civil Law jurisdiction and principles of substance over form have precedential value this is a useful supporting

test. But it is clarified that the decision of the AO stands strongly justified on merits alone."[1620]

1281. Thus, while it is true that the FAO and the DRP decision were based on Section 9(1)(i) and the 2012 Amendment, both the Assessing Officer and the DRP referred to alternative grounds for taxing the transaction. Although the FAO did not explicitly use the term "tax avoidance", the DRP decision did. The title of the section just quoted is, "*Judicial Doctrines on Anti-Avoidance and Jurisprudence from Other Civil Law Jurisdictions that support AOs action*".[1621] Its description of the transaction as a series of steps taken over some seven months which resulted in a strategic process of disinvestment and which earned Cairn substantial untaxed capital gains is indicative of the view that the structure could be characterised as avoidant. The DRP decision explicitly refers to the "*business purpose*", "*economic substance*" and "*substance over form*" doctrines and refers to US and English authorities on tax avoidance.[1622]

1282. Accordingly, the Tribunal cannot now find the Respondent's tax avoidance defence inadmissible or declare that the Respondent is estopped from raising it. This arbitration is not the first time that the Respondent raises the question of tax avoidance.

1283. The nature of the Respondent's defence, and its specific implications in this case, must also be kept in mind. As discussed below, the Tribunal's task is not to determine whether the 2006 Transactions were tax avoidant/abusive as an Indian court would do. Its task is to determine whether the challenged measures (the FAO and related measures) were fair and equitable. In doing so, it must assess all facts and circumstances. The Respondent's argument is essentially that the FAO was fair and equitable because the 2006 Transactions were otherwise taxable. In the Tribunal's view, given that the ITD and the DRP had previously raised this point, the Respondent is entitled to do so in this proceeding.

### (iii)   Nature of the Tribunal's task

1284. The Respondent's first defence is that the 2006 Transactions were tax avoidant or abusive under Indian law even before the 2012 Amendment. While it has raised this as a defence, the Respondent submits that "it is not the task of this Tribunal to conduct a factual enquiry into the tax avoidant nature of the transaction, or to apply the relevant principles of Indian law to the relevant facts: that is the task of the Indian Courts. The Tribunal must simply satisfy itself that the relevant principles – preventing tax avoidance – do exist and could apply to the present transaction[.] […] Once this is established, the Claimants cannot escape the normal application of the Respondent's system of tax adjudication; its recourse is to that system (including recourse to the Indian Courts as appropriate), not to an investment tribunal mandated to adjudicate on systemic

---

[1620] Directions of the DRP under Section 144C(5) of the ITA 1961 dated 31 December 2015, Exh. C-69, pp. 37-38. (According to the Respondent, under Indian tax law, the FAO is legally based on the DRP ruling. See R-PHB, para 146 c. and FN 243.) (emphasis added).

[1621] *Id.*, p. 37.

[1622] *Id.*, pp. 37-38. (The Parties debated the precise relationship between the FAO and the DRP decision. The Tribunal considers it unnecessary for present purposes to determine whether section 144C of the ITA binds the AO to the findings of the DRP.).

failings under the BIT, and not to administer the normal taxation disputes under Indian law."[1623]

1285. The Claimants reject this proposition. They contend that "[t]he Respondent cannot base its primary defence in this arbitration on the allegation that the Claimants engaged in unlawful conduct and then assert that the Tribunal has no authority to scrutinise that allegation", arguing that "[s]uch a convenient argument would allow respondent States to sidestep their treaty obligations and channel investment disputes into their courts simply by alleging an illegality under their domestic laws."[1624]

1286. In response, the Respondent clarifies that it "does not suggest that the Tribunal cannot consider Indian law, or that it must be bound by decisions of Indian courts", rather, it "submits that the Tribunal's assessment of questions of Indian law should be appropriately deferential to determinations on those same questions by Indian courts."[1625] More specifically, it submits that, when considering the Respondent's tax abuse defence, "this Tribunal should be guided by, and indeed in light of the longstanding consistency on these questions in Indian law should defer to, the interpretations of those laws by Indian courts. It should do so by finding that the Respondent's allegation of tax abuse raises a serious question to be tried, and staying the present proceedings pending consideration thereof by the Indian Courts as part of the appeal to the ITAT Order."[1626]

1287. To the extent that the Respondent's position is that the Tribunal should stay this arbitration, the Tribunal rejects it. The Tribunal has already found in Section VI.C.4 above that the claims are ripe for determination. Having done so, it must now rule on them. It is the Tribunal's duty to issue a decision on the claims before it.

1288. To the extent that the Respondent is arguing that the Tribunal should give appropriate deference to the decisions of Indian courts when interpreting Indian law, the Tribunal agrees. The Tribunal also agrees that its task is to determine whether the measures complained of breach the Treaty, and it is in this context that it will examine the Respondent's tax avoidance defence.

### (iv)   Legal standard

*(1)   The Claimants' position*

1289. The Claimants submit that, while both permissible and abusive tax avoidance "naturally pre-suppose the existence of alternative options and the existence of a tax sought to be avoided[,] […] the mere selection of a more tax efficient option is widely regarded as acceptable and does not convert ordinary tax planning into an abusive tax scheme."[1627] To determine whether a particular form of tax avoidance is permissible or abusive,

---

[1623] R-SoD, ¶ 76.

[1624] C-Updated Reply, ¶ 359.

[1625] R-Rejoinder, ¶ 257.

[1626] *Id.*, ¶ 265.

[1627] C-PHB, ¶ 468.

courts will consider the "nature of the device that is employed to reduce or avoid a tax (and in particular its degree of artificiality), as well as the motive of the person using such device" among the relevant factors.[1628] A transaction that uses "a highly contrived, artificial or 'colourable' device that has no business purpose other than to reduce or avoid taxes" will be often considered to be abusive tax avoidance in the United States, the United Kingdom, and India.[1629] The Claimants submit that these three jurisdictions apply some form of a "business purpose test", to determine whether the transaction or interposed entity has any other commercial or business purpose other than to avoid tax. Any steps or interposed entities lacking economic substance or a legitimate business purpose will be disregarded in application of the fiscal nullity remedy.[1630]

1290. For the Claimants, the key distinction between permissible tax planning and impermissible tax avoidance is the existence of a "colourable device". As explained by Claimants' counsel at the Closing Hearing, it is perfectly legitimate for an investor to structure its investments in the manner that is least onerous in terms of taxation; what is not permissible are "colourable devices", i.e., schemes or steps taken with the only purpose of avoiding tax and not for a commercial purpose. As a result, the Claimants submit that "[t]ax avoidance is tax planning with a colourable device."[1631] According to the Claimants, this conclusion is supported by the Supreme Court's decisions in *McDowell, Azadi Bachao* and *Vodafone*, among others.[1632]

1291. More specifically, the Claimants submit that the applicable legal principles can be summarised as follows:[1633]

    a. Indian law recognises that legitimate tax planning is permissible (as an iteration of the "Westminster principle"), provided that the transaction has some economic or commercial substance.[1634]

    b. The "look at" doctrine articulated in *Ramsey* "did not discard Westminster but read it in the proper context by which 'device' which was colourable in nature had to be ignored as fiscal nullity."[1635] This has been extended to apply to the situation where the taxpayer interposes a company or transactional step with no business purpose other than to evade tax (also known as the "step transaction" version of the fiscal nullity test).[1636]

---

[1628] *Ibid.*

[1629] *Ibid.*

[1630] *Id.*, ¶ 470.

[1631] Transcript, Hearing on Closing Arguments, Day 1, 181:24-185:12 (Mr Datar).

[1632] *Ibid.*

[1633] C-PHB, ¶¶ 474-482.

[1634] C-PHB, ¶ 474, citing *Vodafone International Holdings B.V. v. Union of India & Anr.* [2012] 6 SCC 613, Exh. C-59, ¶ 115.

[1635] C-PHB, ¶ 475, citing *Vodafone International Holdings B.V. v. Union of India & Anr.* [2012] 6 SCC 613, Exh. C-59, ¶ 61.

[1636] C-PHB, ¶ 476, citing *Furniss (Inspector of Taxes) v. Dawson* (1984) 1 All E.R. 530, RLA-143, and *Vodafone International Holdings B.V. v. Union of India & Anr.* [2012] 6 SCC 613, Exh. C-59, ¶ 62.

c.   Indian law will give effect to holding structures unless there is clear evidence that the corporate form has been abused. The burden of proof of this abusive form is on the Revenue. If a structure is (i) used for an illegitimate purpose (such as circular trading, round tripping or paying bribes), or (ii) has no commercial or business substance and has been interposed only to avoid tax, it may be disregarded. Whether a structure is abusive should be determined in consideration of all the circumstances, and in particular the following factors: "the concept of participation in investment, the duration of time during which the Holding Structure exists; the period of business operations in India; the generation of taxable revenues in India; the timing of the exit; the continuity of business on such exit". A balancing test may be applied as between the artificiality of a structure and its business purpose.[1637] The mere fact that capital gains tax is not payable on the transfer or disposal of an asset is not evidence of a sham or tax avoidance. [1638]

d.   It is generally accepted that a group parent company will provide general policy guidance to group subsidiaries and exercise shareholders' influence, and that the group parent company's executives may lead the group, which implies a restriction on the autonomy of the subsidiary's directors. [1639]

*(2)*   *The Respondent's position*

1292.   According to the Respondent, there can be no doubt that economic substance of the 2006 Transactions was the realisation of the value of Indian assets. The issue is whether, as a matter of Indian law, the ITD could tax this economic substance, or whether it was precluded from going beyond the legal form.[1640]

1293.   In the Respondent's submission, "[t]he correct legal test as a matter of Indian law is that, if a particular form for a transaction is chosen by the taxpayer with the dominant motive of avoiding taxes, it is then open to the Revenue to disregard the particular form of the transaction and to instead visit tax consequences on the taxpayer based on the underlying economic realities."[1641] The Respondent emphasises that "[t]his legal test – 'substance over form' – is distinct from and does not in any way depend on any findings that the transactions were a 'sham' or that the corporate veil has to be pierced."[1642] In *Vodafone*, the Supreme Court recognised two separate bases which entitle the ITD and the courts to look beyond the form of the transaction: (a) a finding that the transaction or corporate structure was a sham, or (b) a finding that it was tax avoidant. In either scenario, the ITD (or the courts) may look beyond the legal form of the structure or transaction not

---

[1637] C-PHB, ¶ 477, citing *Vodafone International Holdings B.V. v. Union of India & Anr*. [2012] 6 SCC 613, Exh. C-59, ¶ 68.

[1638] *Ibid*., citing *Vodafone International Holdings B.V. v. Union of India & Anr*. [2012] 6 SCC 613, Exh. C-59, ¶ 68.

[1639] *Ibid*., citing *Vodafone International Holdings B.V. v. Union of India & Anr*. [2012] 6 SCC 613, Exh. C-59, ¶ 74.

[1640] R-Rejoinder, ¶ 268.

[1641] *Id.*, ¶ 270.

[1642] *Id.*, ¶ 270 (emphasis omitted).

only by piercing the corporate veil, but also by disregarding the legal form of the transaction to look at its substance. [1643] This means that the Respondent does not need to show that the 27 subsidiaries were "puppets".[1644]

1294. According to the Respondent, this judicial anti-avoidance rule is firmly rooted in Indian tax jurisprudence. Relying on the Constitutional Court's 1986 decision in *McDowell*[1645], the Respondent argues that if a transaction's dominant purpose is the avoidance of tax, then the ITD or the courts are entitled to tax its substance. The Respondent relies in particular on the statement by Chinnappa Reddy, J., who declared that the proper approach "is not to ask whether the provisions should be construed literally or liberally, nor whether the transaction is not unreal and not prohibited by the statute, but whether the transaction is a device to avoid tax, and whether the transaction is such that the judicial process may accord its approval to it."[1646] Contrary to the Claimants' contentions, this statement was not a minority opinion: it was the express opinion of one judge that was endorsed by the four remaining judges. Because it was a Constitutional Bench decision,[1647] it also prevails over the later Supreme Court decisions in *Azadi Bachao Andolan* or *Vodafone.* The Respondent contends that the Supreme Court has affirmed the *McDowell* principle on other occasions, such as in *Calcutta Chromotype v Collector of Central Excise* (1998).

1295. As to the Claimants' contention that the test is whether a transaction involves a "colourable device", the Respondent contends that this must be understood in context. While the Respondent recognises that several cases (including *Calcutta Chromotype* (1998), *Azadi Bachao Andolan* (2004), *Aditya Birla Nuvo* (2012), *AB Mauritius* (2017)) refer to the concept of "colourable device", it submits that, under Indian law, this term is not synonymous with "sham". Relying on *McDowell*, the Bombay High Court explained in *Twinstar Holdings* (2002) that "even if a transaction is genuine and even if it has been actually acted upon, but if the transaction is entered into with the intention of tax avoidance, then the transaction would constitute a colourable device […] the courts are now concerned, not merely with the genuineness of a transaction, but with the intended effect of the transaction on the fiscal purpose […]."[1648] Citing *Vodafone*, the Delhi High Court further held in *CIT v. Abhinandan Investments* that, "in order to examine whether a transaction is a device or a subterfuge the answer to the question whether the transaction has any reasonable business purpose would be a vital consideration".[1649] The Respondent alleges that, in this latter case, the court found that there was an abuse of the corporate form when that form was used for no commercial

---

[1643] *Id.*, ¶¶ 272-273, citing *Vodafone International Holdings B.V. v Union of India & Anr.* [2012] 6 SCC 613, Exh. C-59, ¶ 68 (The Chief Justice of India's judgment).

[1644] *Id.*, ¶ 271.

[1645] *McDowell & Co. Ltd. v Commercial Tax Officer*, AIR 1986 SC 649, Exh. R-75.

[1646] *Id.*, ¶ 46.

[1647] The Respondent notes that *McDowell* was a Constitutional Bench decision, i.e. a five-judge bench that binds all two- and three-judge benches.

[1648] R-Rejoinder, ¶ 285, citing *Twinstar Holdings Ltd. v. Anand Kedia* 260 ITR 6, Exh. R-126.

[1649] *Id.*, ¶ 287, citing *CIT v. Abhinandan Investments*, 381 ITR 139 (Del), Exh. R-127.

purpose but to create a tax loss, and that this was sufficient to render the transaction a colourable device.[1650]

1296. On this basis, the Respondent submits that, once it is established as a matter of fact that the motive behind a transaction is tax avoidance, it is open to the ITD to re-characterise the transaction in accordance to its economic substance.[1651] The Respondent sums up the position in Indian law as follows:[1652]

    a.    "An enquiry into substance over form is justified even in the absence of needing to find out whether the transaction is unreal or illegal: a transaction can be 'real' (in the sense of not being a sham) and not prohibited by any law, yet it may still be one which is simply a stratagem to avoid tax."[1653] In other words, "the fact that a transaction is genuine and not a 'sham' does not mean that the [ITD] cannot have recourse to other anti-avoidance principles".[1654]

    b.    In this context, a transaction will be characterised as a "colourable device" if it is entered into with the intention of tax avoidance; a finding of a sham is not required.[1655]

    c.    Once "this intention [to avoid tax] is present, the [ITD] is entitled to look at the economic substance of the transaction and to assess tax on that basis", rather than on the form adopted.[1656] "The stratagem (or 'colourable device') will be ignored, and tax will thus be imposed by looking at the economic substance."[1657]

1297. The Respondent emphasises that the remedy to be applied by the courts is not the theory of "fiscal nullity", as the Claimants contend, i.e., it does not require the court to disregard the offending holding company or transaction; it is "a judicial anti-avoidance rule which allows the courts to tax an abusive transaction on the basis of its substance and not of its form."[1658] According to the Respondent, this is supported by the Supreme Court's analysis of the ITD's tax avoidance case in *Vodafone*. Indeed, if the sole remedy was to lift the relevant entity's (in that case CGP's) corporate veil or to disregard a transactional step, there would have been no need for any further enquiry in that case, because that would have still left at least one more layer of non-Indian companies below CGP and would not have led to a taxable Indian asset. To the contrary, had the Supreme Court applied the "look at" test in the ITD's favour, that "would not have led to the disregarding of CGP or of any transactional step on the basis of purported 'fiscal nullity'

---

[1650] *Id.*, ¶ 288, citing *CIT v. Abhinandan Investments*, 381 ITR 139 (Del), Exh. R-127.

[1651] *Ibid.*

[1652] *Id.*, ¶ 290.

[1653] *Ibid.*

[1654] *Ibid.*

[1655] *Ibid.*

[1656] *Ibid.*

[1657] *Ibid.*

[1658] R-PHB, ¶ 32(a) (emphasis omitted).

but to the taxation of the transaction as it was concluded (the transfer of the single share of CGP), but on the basis not of the form of the asset transferred (one non-Indian share) but of its economic substance (the underlying Indian assets)".[1659]

*(3)     The Tribunal's analysis*

1298.   The Tribunal agrees with the Respondent that the applicable standard to determine whether there was tax avoidance is to be found in Indian law. The Parties do not appear to dispute this.

1299.   The dispute is rather on the content of that standard, and can be summarised as follows:

    a.    For the Claimants, tax planning will be legitimate unless the taxpayer structures it through a "colourable device", i.e., an artificial structure or transaction that has no business purpose other than the avoidance of tax. The remedy is the principle of fiscal nullity, which enables the court to disregard the colourable device and tax the structure as if that device had not existed.

    b.    For the Respondent, tax planning will become abusive tax avoidance if the dominant purpose of the transaction is the avoidance of tax. No colourable device or sham is needed. The remedy is not only the possibility to apply the fiscal nullity test or to pierce the corporate veil, but the substance over form principle, which allows the court to disregard the form of the transaction and tax its economic substance.

1300.   The Parties have relied heavily on Indian (as well as some English and other Commonwealth) jurisprudence in support of their submissions. The Tribunal thus finds it useful to review how the Indian law on tax avoidance has evolved in phases that are relevant to the present dispute: (i) the law up to 1996 when Cairn made its investment in India; (ii) the law from 1996 to 2006, when Cairn planned and implemented its IPO; and (iii) the law as discussed by the Supreme Court in *Vodafone* and thereafter, before reaching its conclusions.

Phase 1: Up to 1996

1301.   For many years, Indian law followed the so-called Westminster principle, with the courts citing, for example, the following passage from Lord Tomlin's speech:

> Every man is entitled if he can to order his affairs so as that the tax attaching under the appropriate Acts is less than it otherwise would be. If he succeeds in ordering them so as to secure this result, then, however, unappreciative the Commissioners of Inland Revenue or his fellow tax gatherers may be of his ingenuity, he cannot be compelled to pay an increased tax.[1660]

---

[1659]   R-PHB, ¶ 32(a) (emphasis omitted).

[1660]   *The Commissioners of Inland Revenue v. Duke of Westminster*, [1935] A C, 1; All ER 259, (H.L.), Exh. C-295, pp. 19-20 (Lord Tomlin).

1302.   This case arose out of the Duke of Westminster's decision to restructure his relationship with his employees. He had long employed some 100 people, and under the then-applicable statutory regime, their salary costs could not be treated as a deductible expense against his income. For each then-employee, therefore, the Duke executed a deed of covenant by which he committed to pay that person a yearly sum in weekly payments for a period of seven years or during the joint lives of the parties. The deeds explicitly provided that the payments were not remuneration and that each individual was not prevented from "being entitled to and claiming full remuneration for such further work"[1661] as he or she might do. The letter added that it was "expected that in practice [the former employee] will be content with the provision which is being legally made" for him/her.[1662] If the individual concerned was content to proceed with the new arrangement, he/she was to acknowledge the letter accompanying the deed and to return it to the Duke's solicitors.

1303.   The Revenue took a dim view of the deeds and considered that the Duke had sought, in substance, to pay the former employees a form of remuneration which was equally not deductible against the Duke's income. The tax commissioners' view upholding the Revenue's determination was upheld by Finlay, J., but then overturned by the Court of Appeal. On appeal to the House of Lords, four of the five Law Lords hearing the appeal (Lord Atkins dissenting) ruled in the Duke's favour, holding in varying degrees of emphatic language that once it was accepted that the deeds at issue were *bona fide*, the payments made could not be considered salary or wages and therefore could lawfully be deducted from the Duke's income for the purposes of calculating his tax liability. Lord Tomlin held, for example, that the "so-called doctrine of 'the substance' seems to me to be nothing more than an attempt to make a man pay notwithstanding that he has so ordered his affairs that the amount of tax sought from him is not legally claimable."[1663] Lord Russell likewise viewed with "disfavour" the idea of the Revenue's taxing the substance of the taxpayer's transaction(s), finding that this meant "that the true legal position is disregarded, and a different legal right and liability substituted in the place of the legal right and liability which the parties have created."[1664] Lords Macmillan and Wright arrived at similar outcomes, although not in such strong terms as Lord Tomlin and Lord Russell.

1304.   The approach therefore was to focus the analysis on the legal relations established by the transaction between the parties, even if the intention was primarily or even solely to minimise the taxes payable. It was not open to the Revenue to look at the substance of the transaction if that was taken to mean the surrounding circumstances (e.g., the prior employer/employee relationship between the parties which had been changed by the various deeds). Subject to any allegation that the transaction was used as a cloak to conceal a different transaction, not *bona fide* or genuine, there was no basis for the Revenue to go beyond the legal relations actually established by the documents. This

---

[1661]   *Id.*, p. 2 (Headnote).

[1662]   *Ibid.*

[1663]   *Id.*, pp. 20.

[1664]   *Id.*, p. 24 (Lord Russell of Killowen).

was a literal and restrictive application of a taxation statute in favour of the taxpayer and a formal characterisation of the relationships created thereby.

1305. This approach appeared to be settled law in India in the period leading up to *McDowell*. In the 1968 case of *CIT, Gujarat v. M/s. A. Raman and Co.,* a three-judge bench of the Supreme Court considered an appeal by the tax authorities which had sought to assess the respondent, a dealer in "mill stores".[1665] In the course of their business, M/s. A. Raman and Co. sold mill stores to other dealers, including two concerns trading under the names of M/s A.M. Shah and Co. and M/s R. Ambalal and Co. The latter were owned by Hindu undivided families, the managers of which were the only partners of M/s. A. Raman and Co. In the taxation officer's view, the partners had contrived to divert profits of M/s. A. Raman and Co. to their respective Hindu undivided families and had thereby sought to "evade proper taxation".[1666] In the officer's view "income *which could have been earned* by the assessees was not earned, and a part of that income was earned by the Hindu undivided families"[1667] and this was brought about by a "subterfuge or contrivance".[1668] It was argued further that income which accrued to a trader was taxable in his hands and income which he could have, but was not earned by him, was taxable as income if that income which belonged to him had been earned by some other person.[1669]

1306. The argument was rejected by the Supreme Court, per Shah, J., writing on his own behalf and on behalf of Sikri and Rama Swami, JJ. In words reminiscent of the *Duke of Westminster* case, Shah, J. commented:

> Avoidance of tax liability by so arranging commercial affairs that charge of tax is distributed is not prohibited. A taxpayer may resort to a device to divert the income before it accrues or arises to him. Effectiveness of the device depends not upon considerations of morality, but on the operation of the Income-tax Act. Legislative injunction in taxing statutes may not, except on peril of penalty, be violated, but it may lawfully be circumvented.[1670]

1307. This passage was consistent with the Westminster principle. Shah, J. did go on to note that had it been shown that the Hindu undivided families were acting "merely as *benamidars*[1671] for the assessees, and the profits were earned in truth by the assessees, income earned by the sale of the goods by the Hindu undivided families could be held chargeable to tax as income which has escaped assessment".[1672] But this had not been

[1665] *Commissioner of Income Tax, Gujarat v. A. Raman & Company*, [1968] 67 ITR 11 (SC), Exh. C-389.

[1666] *Id.*, ¶ 1.

[1667] *Id.*, ¶ 9.

[1668] *Id.*, ¶ 9 (emphasis added).

[1669] *Id.*, headnote.

[1670] *Id.*, ¶ 9 (emphasis added).

[1671] So-called "*name-lenders*"; they are essentially persons who hold goods on behalf of another party but do not actually take title to them.

[1672] *Commissioner of Income Tax, Gujarat v. A. Raman & Company*, [1968] 67 ITR 11 (SC), Exh. C-389, ¶ 10.

made out in the case and therefore the officer had no basis to believe that income chargeable to tax had escaped assessment for the years in question.[1673]

1308. In sum, *Raman* decided that if the tax officer had evidence that M/s A.M. Shah and Co. and M/s R. Ambalal and Co. were truly holding the profits for M/s. A. Raman and Co. and not for themselves, there would have been a basis for finding tax avoidance applying the Westminster principle; but since there was no evidence that this was the case, it was lawful for M/s. A. Raman and Co. to divert part of the income stream to the two companies by "resort to a device" before it became taxable in M/s. A. Raman and Co.'s hands.[1674]

1309. Also in 1968, three-judge bench of the Supreme Court heard another appeal by the income tax authorities in *CIT, Gujarat II v. B. M. Kharwar*.[1675] At issue in that case was the question of whether a sum of money equal to the excess realised over the written-down value of certain machinery that was sold by the respondent partnership to a private company, in the share capital of which the partners of the selling firm had the same interest as they had in the assets and profits of the partnership, could be taxed. The Commissioner had asserted that based on the "substance of the transaction", the transaction was of the nature of a step to re-adjust the business relations of the partners *inter se* and therefore was taxable.[1676]

1310. The Supreme Court, with Shah, J. once again writing the reasons for judgment (on his own behalf and on behalf of Rama Swami and Grover, JJ.), referred to the Westminster principle, a 1940 decision of the Judicial Committee of the Privy Council in *Bank of Chettinad*, which had rejected the suggestion that "in revenue cases 'the substance of the matter' may be regarded as distinguished from the strict legal position"[1677], and a prior Supreme Court of India judgment in *Motors & General Stores (P) Ltd*. holding that in the absence of any suggestion of bad faith or fraud, the "true principle" is that the taxing statute is to be applied in accordance with the legal rights of the parties to the transaction and when the transaction is embodied in a document the liability to tax depends upon the meaning and content of the language used in accordance with the ordinary rules of construction.[1678]

1311. In Shah, J.'s words:[1679]

> The taxing authority is entitled and is indeed bound to determine the true legal relation resulting from the transaction. If the parties have chosen to conceal by a device the legal relation, it is open to the taxing authorities to unravel the device and determine the true character of the relationship. But

---

[1673] *Ibid.*

[1674] *Id.*, ¶ 9.

[1675] *Commissioner of Income Tax v. M/s B.M. Kharwar*, AIR 1969 SC 812, Exh. C-410.

[1676] *Id.*, ¶¶ 1, 4.

[1677] *Id.*, ¶ 9.

[1678] *Id.*, ¶¶ 7-10.

[1679] *Id.*, ¶¶ 11-12 (emphasis added).

the legal effect of the transaction cannot be displaced by probing into the
'substance of the transaction' […] [and further that there could be no doubt
of] the principle that the true legal relation arising from the transaction
alone determines the taxability of a receipt arising from the transaction.

1312.  In the result, in *Kharwar*, the Supreme Court found that there was an absence of a clear
finding that there was a sale of machinery which resulted in an excess realisation over
the written down value and therefore set aside the High Court's decision (while noting
that it was open to the tribunal below to re-hear the parties and record clear findings in
light of the observations made in the judgment).[1680]

1313.  Up to 1986, therefore, Indian law on tax avoidance closely followed *Duke of
Westminster*. In 1986, however, the formalism of the Westminster principle was
questioned by the Constitutional Court in *McDowell and Co. Ltd. v. CIT*.[1681] An
important bit of context to be borne in mind when considering *McDowell* is that a few
years before the case came on before the Constitutional Court, a trilogy of House of
Lords decisions had moved away from the strict application of the Westminster
principle and had developed the so-called "step-transactions doctrine" which permitted
the Revenue or the court, as the case may be, to disregard purely tax-motivated
transactions inserted into a preordained series of transactions.[1682]

1314.  *McDowell* concerned a liquor distiller who under state law (Andhra Pradesh's Excise
Tax Act) was obliged to charge both excise tax and sales tax on sales of liquor. Payment
of excise duty was a legal liability of the manufacturer; proof of payment of the tax was
a condition precedent to the removal of liquor from the distillery. The appellant required
its customers to pay the excise tax prior to taking possession of the liquor at the distillery
and therefore that tax was not absorbed into the final sales price or recorded as a tax in
the appellant's final sales invoice. A Division Bench of the Supreme Court had earlier
found the appellant's practice to be lawful, but the state of Andhra Pradesh then
amended its law. However, the appellant continued its practice of making the purchaser
responsible for the payment of excise tax.

1315.  The effect of this invoicing practice was that it affected the calculation of the sales tax
payable to the state (which was calculated based on the company's turnover). If the
excise tax part of the sales transactions was not included in the turnover, the sales tax
base (from which McDowell's sales tax was calculated) was lower and therefore less
tax would be paid. In a similar vein to the argument run in *Raman*, the company's
argument was that excise duty never came into its hands and therefore it had no occasion
or opportunity to turn it over in its hands, and, thus, the same could never be considered
as a part of its turnover. The argument was rejected by the Andhra Pradesh High Court.
The assessee then appealed to the Supreme Court.

---

[1680]  *Id.*, ¶ 18.

[1681]  *McDowell and Co. Ltd. v. CIT*, [1985] 3 SCC 230, Exh. R-75.

[1682]  *W. T. Ramsay Ltd. v. Internal Revenue Commissioners*, [1981] 1 All E. R.865 (H.L.), RLA-141; *Inland
Revenue v. Burmah Oil*, [1981] T.R. 535 (H.L.), and RLA-142; *Furniss (Inspector of Taxes) v. Dawson*,
[1984] All E.R. 530 (H.L.), RLA-143.

1316. Before recounting the Constitutional Court's consideration of the appeal, the Tribunal observes that the factual similarity between *Duke of Westminster* and *McDowell* warrants noting. In the former case, the deeds were aimed at reducing the Duke's taxable income by changing non-deductible salary and wage arrangements into deductible payments under deeds, with the resulting reduction in the Duke's tax base for surtax purposes; in the latter case, the excise tax was shifted to the purchaser (and thus still paid), but the effect of doing so was to reduce the seller's tax base for the purpose of calculating sales tax payable. The Westminster principle would strongly point in the direction of a finding that this was legitimate tax planning. However, that was not what the Constitutional Court found.

1317. Due to questions as to the correctness of the previous Supreme Court judgment involving the appellant, the case was heard by a five-judge bench of the Constitutional Court by means of an appeal by special leave.[1683] After considering the parties' submissions, the appeal was dismissed.[1684]

1318. In support of its argument that it was "open to every one to so arrange his affairs as to reduce the brunt of taxation to the minimum and such a process does not constitute tax evasion; nor does it carry any ignominy"[1685], the appellant cited *Raman*, *Kharwar*, a third Supreme Court judgment in *Jiyajeerao Cotton Mills Ltd. v. Commr. of Income-tax and Excess Profits Tax* and a Gujarat High Court judgment (later affirmed by Supreme Court) in *Commr. of Income-tax v. Sakarlal Balabhaiin* in support of its argument that it had engaged in legitimate tax planning.[1686]

1319. There are two judgments from the Constitutional Court, the first authored by Misra, J., writing for himself and three other judges, and the second a concurring opinion by Reddy, J. Misra, J. stated that "Reddy, J., has proposed *a separate and detailed opinion with which we agree*"[1687] and for his part, Reddy, J. stated that while he "*entirely agree[d] with … with Misra, J. in the judgment proposed to be delivered by him*", he wished to add a few paragraphs, "*particularly to supplement what he has said on the 'fashionable' topic of tax avoidance*".[1688] The statements made in both judgments made clear that there was agreement between the judges on the points made in each insofar as tax avoidance is concerned. (This assumes importance when looking at what subsequent courts said was the effect of *McDowell*.)

---

[1683] *McDowell and Co. Ltd. v. CIT*, [1985] 3 SCC 230, Exh. R-75 (Misra, J. noted in this regard, at ¶ 4: "When leave was granted by a Division Bench of this Court to appeal against the judgment of the High Court, the correctness of the decision in appellant's case [that is, the earlier judgment of the Supreme Court] reported in MANU/SC/0293/1976 : [1977]1SCR914, was doubted and the matter was referred to a larger Bench. That is how this appeal came to be heard by us.").

[1684] *Id.*, ¶ 16 ("We are, therefore, clearly of the opinion that excise duty though paid by the purchaser to meet the liability of the appellant, is a part of the consideration for the sale and is includible in the turnover of the appellant." It therefore dismissed the appeal of the decision of the High Court to dismiss the writ petition filed by McDowell & Company.).

[1685] *Id.*, ¶ 22.

[1686] *Id.,* ¶¶ 22-24.

[1687] *Id.*, ¶ 27.

[1688] *Id.*, ¶ 30 (emphasis added)

1320.  Turning first to Misra, J.'s reasons for judgment, after dealing with various matters not relevant to the present case, he reviewed two prior decisions of the Supreme Court (the *Raman* and *Khawar* cases) in which Shah J., writing for other judges, had embraced the Westminster principle's approach, finding that "[a]voidance of tax liability by so arranging commercial affairs that charge of tax is distributed is not prohibited" and that a "taxpayer may resort to a device to divert the income before it accrues or arises to him"[1689], and a Supreme Court judgment that observed that "[e]very person is entitled so as to arrange his affairs as to avoid taxation but the arrangement must be real and genuine and not a sham or make-believe…"[1690] A third judgment of the Gujarat High Court (later affirmed by the Supreme Court) was also noted. In that case the court had held that:

> Tax avoidance postulates that the assessee is in receipt of amount <u>which is really and in truth his income liable to tax but on which he avoids payment of tax by some artifice or device</u>.

And:

> <u>But there must be some artifice or device</u> enabling the assessee to avoid payment of tax on what is really and in truth his income.[1691]

1321.  Having noted that tax planning is permissible, Misra, J. then shifted gears, stating that "we may also recall the observations of Viscount Simon" in a 1943 judgment of the House of Lords, in *Latilla v. Inland Revenue Commissioners*, which expressed concern that one could find judicial *dicta* that "however elaborate and artificial such methods [of organizing one's tax affairs] may be, those who adopt them are 'entitled' to do so", *but there was no reason to regard this as 'a commendable exercise of ingenuity or as a discharge of the duties of good citizenship'*…"[1692] This was a less approving view of the freedom to structure transactions than that articulated in *Duke of Westminster*.

1322.  All of these authorities considered, Misra, J. then stated:

> <u>Tax planning may be legitimate provided it is within the framework of law. Colourable devices cannot be part of tax planning and it is wrong to encourage or entertain the belief that it is honourable to avoid the payment of tax by resorting to dubious methods</u>. It is the obligation of every citizen to pay the taxes honestly without resorting to subterfuges.

> On this aspect one of us, Chinnappa Reddy, J., has proposed a separate and detailed opinion <u>with which we agree</u>.[1693]

---

[1689]  *Id.*, ¶ 22 (Misra, J. quoting Shah J. in *Raman* and the same judge in *Kharwar*.)

[1690]  *Id.*, ¶ 23 citing *Jiyajeerao Cotton Mills Ltd. v. Commissioner of Income-tax and Excess Profits Tax*, [1958] 34 ITR 888 (SC).

[1691]  *Id.*, ¶ 24, citing *Commissioner of Income-tax v. Sakarial Balabhai*, [1968] 69 ITR 186 (Guj), upheld by the Supreme Court in [1972] 86 ITR 2 (SC) (emphasis added).

[1692]  *Id.*, ¶ 25, citing *Latilla v. I.R.C.* (1943) 25 T C 107 (emphasis added).

[1693]  *Id.*, ¶¶ 26-27 (emphasis added).

1323. Before turning to Reddy, J.'s separate judgment, it warrants noting that when discussing the legitimacy of tax planning, Misra, J. used the word "*may*" rather than "*is*" (thus making the statement somewhat conditional). And it follows from the appeal's dismissal (unanimously), that the Constitutional Court as a whole considered that McDowell's attempt to reduce its tax base for purposes of sales tax was not legitimate tax planning. This outcome is, in the Tribunal's view, at odds with *Duke of Westminster*.[1694]

1324. For his part, Reddy, J. began by tracing the origins of the Westminster principle and its strong influence on English tax law.[1695] He quoted the same passage from Viscount Simon's speech in *Latilla* as Misra, J. had, and went on to note that in a number of recent judgments, the English courts had moved away from the Westminster principle.[1696]

1325. Reddy, J. then made two statements of relevance to the present case. First, he articulated what in his view was the "proper" way to interpret a taxation statute:

> In our view, the proper way to construe a taxing statute, while considering a device to avoid tax, is not to ask whether the provisions should be construed literally or liberally, nor whether the transaction is not unreal and not prohibited by the statute, but whether the transaction is a device to avoid tax, and whether the transaction is such that the judicial process may accord its approval to it. A hint of this approach is to be found in the judgment of Desai, J. in *Wood Polymer Ltd. and Bengal Hotels Limited* (1977) 47 C C 597 (Guj) where the learned Judge refused to accord sanction to the amalgamation of companies as it would lead to avoidance of tax.[1697]

1326. This approach plainly departs from the formalistic interpretative approach in favour of a more purposive application of the law.

1327. To this, Reddy, J. added:

> It is neither fair not desirable to expect the legislature to intervene and take care of every device and scheme to avoid taxation. It is up to the Court to take stock to determine the nature of the new and sophisticated legal

---

[1694] On the facts, the Constitution Court must have considered the appellant's practice of requiring the purchaser of its distilled spirits to pay the excise tax and thereby not recorded in its invoices and its statements of account as falling within that category. There was no avoidance of excise tax because the purchaser paid it, but the device reduced the tax base of the sales tax.

[1695] *McDowell and Co. Ltd. v. CIT*, [1985] 3 SCC 230, Exh. R-75, ¶¶ 32-34, referring to *Inland Revenue Commissioners v. Fishers Executors*, 1926 AC 395 and *Inland Revenue Commissioners v Duke of Westminster* 1936 AC 1.

[1696] *Id.*, ¶¶ 34-41, referring to *Lord Howard De Waldan v. Inland Revenue Commissioners* (1942) 1 KB 389; *Latilla v. Inland Revenue Commissioners* 1943 AC 377 (the same passage of Lord Scarman also quoted in the majority judgment in *McDowell*); *Griffiths v. J.P. Harrison Ltd.* 1963 AC 1, *Morgan v. Inland Revenue Commissioners* 1963 Ch 438, *Public Trustee v. Inland Revenue Commissioners* 1965 Ch 286; *Campbell v. Inland Revenue Commissioners* 1967 Ch 651; *Greenberg v. Inland Revenue Commissioners* (1971) 3 All ER 136; and the seminal judgment of the House of Lords in *W. T. Ramsay v. Inland Revenue Commissioners* 1982 AC 300, followed by *Inland Revenue Commissioners v. Burmah Oil Co. Ltd.* (1982) STC 30; and *Furniss v. Dawson* (1984) 1 All ER 530.

[1697] *Id.*, ¶ 46 (emphasis added).

> devices to avoid tax and consider whether the situation created by the
> devices could be related to the existing legislation with the aid of
> 'emerging' techniques of interpretation [as] was done in *Ramsay* 1982 AC
> 300, *Burma Oil* 1982 STC 30 and *Dawson* 1984-1 All ER 530, to expose
> the devices for what they really are and to refuse to give judicial
> benediction.[1698]

1328.  This was an endorsement of the development of judicial anti-avoidance rules said to be necessitated by "new and sophisticated legal devices to avoid tax", again running counter to Lord Tomlin's famous *dictum* that "[e]very man is entitled if he can to order his affairs so as that the tax attaching under the appropriate Acts is less than it otherwise would be…". The final sentence in the quote from Reddy, J.'s reasons, just noted, is also one that looks at the "substance of the transaction" (*i.e.*, "expose the devices for *what they really are*"), the very approach which was rejected by four of the five Law Lords in *Duke of Westminster*.

1329.  Then there is an arresting fact which is relevant to the present case: Both of the Supreme Court judgments in *Raman* (1968) and *Khawar* (1969), which show the Indian courts faithfully applying the Westminster principle, and which were relied upon by the appellant in *McDowell*, were expressly singled out for disapproval.

1330.  At paragraph 45 of his reasons for judgment, Reddy, J. referred to the two judgments of Shah, J. in *Raman* and *Kharwar*.[1699]

1331.  As already noted, in *Raman*, Shah, J., speaking for himself and two other Supreme Court judges, had stated:

> Avoidance of tax liability by so arranging commercial affairs that charge of tax is distributed is not prohibited. A taxpayer may resort to a device to divert the income before it accrues or arises to him. Effectiveness of the device depends not upon considerations of morality, but on the operation of the Income-tax Act. Legislative injunction in taxing statutes may not, except on peril of penalty, be violated, but it may lawfully be circumvented."[1700]

1332.  In *Kharwar*, Shah, J., again speaking for himself and two other Supreme Court judges, had adverted to *Duke of Westminster* (and to two other authorities) and stated:

> The taxing authority is entitled and is indeed bound to determine the true legal relation resulting from a transaction. If the parties have chosen to

---

[1698]  *Id.*, ¶ 47 (emphasis added).

[1699]  *Id.*, ¶ 45 (Reddy J.: "In *Commr. of Income-tax, Gujarat v. A. Raman & Co.* MANU/SC/0134/1967, [1968] 67 ITR11 (SC), J.C. Shah, J. speaking for himself and Sikri and Ramaswami, JJ. repeating almost verbatim the observations in *Westminster* 1936 AC 1 and *Fishers Executors* 1926 AC 395 observed: 'Avoidance of tax liability by so arranging commercial affairs that charge of tax is distributed is not prohibited. A taxpayer may resort to a device to divert the income before it accrues to arise to him. Effectiveness of the device depends not upon considerations of morality, but on the operation of the Income-tax Act. Legislative injunction in taxing statutes may not, except on peril of penalty, be violated, but it may lawfully be circumvented.'").

[1700]  *Id.*, ¶ 45, citing *Gujarat v. A. Raman & Co.* MANU/SC/0134/1967, [1968] 67 ITR11 (SC), ¶ 9.

conceal by a device the legal relation, it is open to the taxing authorities to unravel the device and to determine the true character of relationship. But the legal effect of a transaction cannot be displaced by probing into the "substance of the transaction".[1701]

1333.   Both of those passages were quoted by Reddy, J. at paragraph 45 of his reasons for judgment. He then not only urged the Constitutional Court to follow the recent trend in English law, but also expressly rejected the statements just quoted from the prior Supreme Court judgments (and other unidentified prior judgments to same effect):

> We think that time has come for us to depart from the Westminster principle as emphatically as the British Courts have done and to dissociate ourselves from the observations of Shah, J. and similar observations made elsewhere.[1702]

1334.   Given that the four other judges agreed with Reddy, J.'s "*separate and detailed opinion*", it follows that the Constitutional Court as a whole subscribed to Reddy, J.'s repudiation of the approach to tax avoidance taken in *Raman* and *Khawar*.

1335.   In sum, the Constitutional Court accepted the continued lawfulness of tax planning but seemed to suggest that there was a larger category of offending devices than hitherto had been understood to transgress the rule. This pronouncement predated the making of Cairn's investment in 1996 and was plainly the authoritative statement on the law of India on tax avoidance at that time.

1336.   This was also the view of two judges of the Bombay High Court who decided the 1993 case of *Nayantara G. Agrawal v. CIT*, which applied *McDowell*.[1703] In that case, the High Court, per Sarat J., writing for himself and Dhanuka, J., described *McDowell*'s effect as follows:

> …**the Supreme Court** disapproved the observation of Shah, J. in *CIT v B.M. Kharwar*, [1969] 72 ITR 603 (SC) to the effect that 'the legal effect of a transaction cannot be displaced by probing into the substance of the transaction'[1704]

1337.   The Bombay High Court went on to quote Reddy, J.'s view as to the need for the Court to dissociate itself with Shah, J.'s views "and similar observations made elsewhere".

1338.   The Tribunal notes that the High Court did *not* characterise this as a minority view of one judge of the Constitutional Court not shared by the majority, but rather ascribed that view to the Court as a whole.

---

[1701]   *Ibid*., citing *Commr. Of Income-tax, Gujarat v. Kharwar* MANU/SC/0231/1968; [1969] 72 ITR603 (SC), ¶ 11.

[1702]   *Id*., ¶ 46 (emphasis added).

[1703]   *Nayantara G. Agrawal v. CIT*, 1993 SCC OnLine Bom 661; (1994) 207 ITR 639; (1994) 117 ITR 365, Exh. R-123.

[1704]   *Id.*, ¶ 12 (double emphasis added).

1339. The High Court then found that the impugned transaction that formed the basis for the appeal from a finding of the Income-tax Appellate Tribunal was not genuine and that there had been a taxable transfer of an asset that was liable to capital gains tax.[1705] In doing so, it probed the substance of the transaction (precisely what four of the five Law Lords in *Duke of Westminster* had said was *not* permissible). After recapitulating what *McDowell* had said, the court stated:

> It is up to the court to take stock to determine the nature of the new and sophisticated legal devices to avoid tax and to consider whether the situation created by the devices could be related to the existing legislation with the aid of emerging techniques of interpretation to expose the devices for what they really are and to refuse to give judicial benediction. The courts in such a case should not lay undue emphasis on the language of each individual document as that is not determinative of the controversy. What is really necessary to be considered in such cases is the true nature and effect of the transaction. If on such a consideration, the court arrives at a finding that the true nature is 'transfer of land' in the various steps originating from the affidavit and formation of partnership and culminating into dissolution of the same, in the process leaving the land with the company, are nothing but a device to avoid capital gains tax leviable under section 45 of the Act on transfer the land to the company, such a device cannot get the seal of approval of this court.[1706]

## Phase 2: from 1996 to 2006

1340. At the beginning of this period, *McDowell* continued to be viewed as an authoritative ruling. In 1998, in the case of *Calcutta Chromotype v. Collector of Central Excise*, a two-judge bench of the Supreme Court referred to *McDowell*, noting:

> "… <u>this Court examined the concept of tax avoidance or rather the legitimacy of the art of dodging tax without breaking the law. This</u> Court stressed upon the need to make a departure from the Westminster principle based upon the observation of Lord Tomlin in the case of *IRC v. Duke of Westminster* (1936) AC 1 that every assessee is entitled to arrange his affairs as to not attract taxes. <u>The Court</u> said that tax planning may be <u>legitimate provided it is within the framework of law.</u> Colourable devices, however, cannot be part of tax planning. Dubious methods resorting to artifice or subterfuge to avoid payment of taxes on what really is income can today no longer be applauded and legitimised as a splendid work by a wise man but has to be condemned and punished with severest of penalties…"[1707]

---

[1705] *Id.,* ¶ 11, (The transaction at issue involved that a transfer of land by the assessee (without a deed pf conveyance) to a partnership with a company of which the transferor/assessee was a director; the partnership was ostensibly aimed at the sale and purchase of lands (but did not do any business) and lasted only three months, whereupon the land became the property of the other partner and the assessee received 10 lakhs in the form of shares).

[1706] *Id.*, ¶ 13.

[1707] *Calcutta Chromotype v. Collector of Central Excise,* AIR 1998 SC 1631, Exh. R-125, ¶ 14 (Wadhwa, J. writing for himself and Manohar, J.) (emphasis added).

1341. The facts of *Calcutta Chromotype* were the following: The appellant manufactured playing cards, the entire stock of which it sold to its sole distributor M/s Ganga Sara & Sons Pvt. Ltd. An excise tax inspector found that both the appellant and its sole distributor were limited companies the shares of each were owned by members of the Sharma family, i.e., related persons. Both companies had a common Managing Director and a Director and further the appellant was selling the goods under the brand name of its distributor, M/s Ganga Sara & Sons Pvt. Ltd. This led to scrutiny of the prices at which the goods were being sold. Under the relevant act, when duty of excise was chargeable on the goods with reference to their value, then the normal price in which the goods were sold was deemed to be the value, provided *inter alia* that the buyer was not related to the seller.[1708]

1342. The ITAT, while upholding the order of the collector, found that although there was an identity of interest between the manufacturer and the distributor, the collector had not considered the "break-up of the shares of each member of the family of the manufacturer and distributor" and therefore remanded the matter to the inspector to consider that issue in order to ensure whether the "test of identity" was satisfied.

1343. An appeal was taken to the Supreme Court, which allowed the appeal on the ground that in years subsequent to the year of assessment (1976), the authorities had *not* treated the distributor as a related person and therefore no purpose would be served by inquiring into the shareholdings of the assessee, the appellant and its sole distributor as directed by the ITAT for the assessment year of 1976.[1709]

1344. The case's relevance for present purposes is the Court's discussion of piercing the corporate veil and the continued applicability of the approach taken in *McDowell*.

1345. With respect to the first issue, observing that the "[l]aw has travelled quite a bit after the decision of the House of Lords in the case of *Salomon v Salomon*"[1710], the Supreme Court referred to prior jurisprudence of the Court which reaffirmed the corporation's status as a separate legal entity with assets that are separate and distinct from those of its members, but which further held that "in the course of time, the doctrine that the Corporation or a Company has a legal and separate entity of its own has been subjected to certain exceptions by the application of the fiction that the veil of the Corporation can be lifted and its face examined in substance" and this marked a "change in the attitude" that the "law had originally adopted towards a concept of the separate entity or personality of the Corporation".[1711]

1346. The Supreme Court went on to note that in these prior cases the Court had referred to a variety of different circumstances in which the veil could be lifted (one judgment quoted Pennington's *Company Law* treatise (4th edition) as having identified four inroads that had been made by English law on the principle of separate legal personality, Palmer's *Company Law* (23rd edition) which had enumerated the occasions in English law when

---

[1708] *Id.*, p. 682 (Headnote).

[1709] *Id.*, ¶ 16.

[1710] *Id.*, ¶ 12.

[1711] *Id.*, ¶¶ 12-13, citing the Supreme Court's decisions in *TELCO v. State of Bihar*, (1964) 6 SCR 885 and *LIC of India v. Escorts Ltd.* (1986) 1 SCC 264.

the corporate veil could be lifted and classified into 14 categories, and Gower's *Company Law* (4th edition) where a chapter had been devoted to the issue of lifting the corporate veil.

1347.   The Supreme Court noted further that the corporate veil had been lifted by the Court in *CIT v Sri Meenakshi Mills Ltd*. to prevent evasion of income tax by having regard to the "economic realities behind the legal façade" and in *Workmen v Associated Rubber Industry Ltd*. to prevent devices to avoid welfare legislation, the Court emphasizing in this latter case that "regard must be had to substance and not the form of a transaction".[1712]

1348.   Turning to *McDowell*, the Supreme Court noted that the Constitutional Court (again speaking of the Court as a whole) had "stressed upon the need to make a departure from the Westminster principle" while recognising that "tax planning may be legitimate provided it is within the framework of law". [1713]

1349.   Having regard to the excise tax issue that was before it, the Court concluded:

> If we examine the thrust of all the decisions, there is no bar on the authorities to lift the veil of a company, whether a manufacturer or a buyer, to see it was not wearing the mask of not being treated as related person when, in fact, both, the manufacturer and the buyer, are in fact the same persons.[1714]

1350.   Thus, in *Calcutta Chromotype*, the views of Reddy, J. and Misra, J. in *McDowell* were both quoted by the Supreme Court and both considered to be the Constitutional Court's authoritative statement of the law.

1351.   This is not to say that *Duke of Westminster* had been completely disapproved. In 1999, in the case of *Mathuram Agrawal v State of Madhya Pradesh*, the Constitutional Court referred to *Duke of Westminster*.[1715]

1352.   The issue presented in *Mathuram Agrawal* was not one of alleged tax avoidance, but rather concerned the application of a state Municipalities Act in relation to the levying and collection of property tax in respect to buildings owned by the appellant and whether that Act was consistent with Article 265 of the Constitution of India.[1716] The question concerned whether the letting value of the buildings should be assessed individually, in which case since the value of each would not exceed Rs.1800 per annum, they would be taxed at a lower rate or not at all (the judgment is not clear on this point), or whether it was open to the municipal authorities to aggregate the annual letting value of all the buildings owned by the taxpayer in order to levy property tax. This required a close interpretation of the taxing statute's charging provision.

---

[1712]   *Id.*, ¶ 13.

[1713]   *Id*., ¶ 14.

[1714]   *Id.*, ¶ 14 (The bench comprised Kapadia, J. and Devadhar, J. The former went on to become Chief Justice of the Supreme Court and wrote the Court's judgment in *Vodafone*.).

[1715]   *Mathuram Agrawal v. State of Madhya Pradesh*, (1999) 8 Supreme Court Cases 667, Exh. C-285.

[1716]   Which provides: "No tax shall be levied or collected except by authority of law."

1353.  In rejecting the tax authorities' interpretation that a collective assessment could be made, the Constitutional Court, per Mohapatra, J., stated:

> The intention of the Legislature in a taxation statute is to be gathered from the language of the provisions particularly where the language is plain and unambiguous. In a taxing Act it is not possible to assume any intention or governing purpose of the statute more than what is stated in the plain language. It is not the economic results sought to be obtained by making the provision which is relevant in interpreting a fiscal statute. Equally impermissible is an interpretation which does not follow from the plain, unambiguous language of the statute. <u>Words cannot be added to or substituted so as to give a meaning to the statute which will serve the spirit and intention of the legislature. The statute should clearly and unambiguously convey the three components of the tax law i.e., the subject of the tax, the person who is liable to pay the tax and the rate at which the taxes to be paid.</u> If there is any ambiguity regarding any of these ingredients in a taxation statute that there is no tax and law. then it is for the legislature to do the needful in the manner.[1717]

1354.  The Constitutional Court cited in support of this proposition the decision of the Privy Council in *Bank of Chettinad Ltd. v. Commissioner of Income-tax, Madras*, (1940) 8 ITR 522 (PC) which in turn had cited with approval the statement made by Lord Russell in *Duke of Westminster* (to which the Tribunal has already adverted at paragraph 1303 above) that he viewed "with disfavour":

> …the doctrine that in taxation cases the subject is to be taxed if in accordance with a Court's view of what it considers the substance of the transaction, the Court thinks that the case falls within the contemplation or spirit of the statute. The subject is not taxable by inference or by analogy, but only by the plain words of the statute applicable to the facts and circumstances of his case.[1718]

1355.  Having regard to *Bank of Chettinad* and other authorities, the Constitutional Court found that the municipal authorities' construction of the relevant provision did "not flow from the plain language of the provision" and:

> One cannot determine the rateable value of the small property by aggregating and adding the value of other properties, and arrive at a figure which is more than possibly the value of the property itself. Moreover, what rate of tax is to be applied to such property is also not indicated.[1719]

1356.  The Court accordingly struck down the relevant language of the state's legislation as *ultra vires*.

---

[1717] *Mathuram Agrawal v. State of Madhya Pradesh*, (1999) 8 Supreme Court Cases 667, Exh. C-285, ¶ 12 (emphasis added).

[1718] *Id.*, ¶ 13.

[1719] *Id*., ¶ 16.

1357. *McDowell*'s treatment of tax avoidance was not relevant to the issue before the Constitutional Court (the judgment was not even cited by the Court), but the citation of the older Privy Council cases showed that the Court continued to consider *Duke of Westminster* as good law insofar as construing the charging section of a taxation statute was concerned.

1358. In 2002, in *Twinstar Holdings Ltd. v. Anand Kedia*, a two-judge bench of the Bombay High Court considered *McDowell*.[1720] It warrants noting that the judge who wrote the reasons for judgment in this case was Kapadia, J. who went on to become Chief Justice of India and the author of the principal *Vodafone* judgment.

1359. The facts of *Twinstar Holdings Ltd.* are complex. The petitioner, Twinstar, a Mauritian company, owned 100% of the shares of three Indian "investment companies". The three companies in turn owned shares in two Indian companies (SIIL and MALCO). The two shareholders of Twinstar were two non-resident Indian nationals (the Agarwal bothers). The Agarwal brothers occupied key positions in all three companies and were promoters of the Mauritian parent and the three Indian subsidiaries.

1360. The shares of the two Indian companies were held by the three investment companies as 'stock-in-trade'[1721], not as 'investment'. The brothers wished to borrow funds from what the court called the "international market" and in that connection wished to use the shares of the two Indian companies as security. They therefore sought to liquidate the three interposed Indian holding companies. When the three companies were liquidated, the shares in the two Indian companies were transferred to the petitioners (at book value rather than market value). An income tax assessment was made on the ground that conversion of the shares from stock-in-trade into investment was a sham and the transmission of the shares to the petitioner generated a taxable gain in the hands of the three Indian investment companies. In short, the Revenue contended that the three companies had been liquidated without making provision for the liquidation of the tax liability.[1722]

1361. Parenthetically (since the Claimants in the present case have placed much emphasis on the disclosures they made to the RBI and the FIPB – in the sense that this served to put the ITD on notice of the structure that they intended to use to effect the transfer of the Indian interests to what became CIL), it warrants noting that the petitioners in *Twinstar* similarly argued that they had effected the transaction only after having obtained the necessary approvals from the RBI and the FIPB.[1723] This appeared to carry little weight with the Bombay High Court.

1362. The shares of the two Indian companies were frozen by the ITD so that they could not be received by or delivered to any person and two ex-directors of one of the three companies were made personally liable for payment of tax arrears of one of the three

[1720] *Twinstar Holdings Ltd. v. Anand Kedia*, 260 ITR 6, Exh. R-126.

[1721] That is, as goods or things in stock necessary for the carrying on of a business.

[1722] *Twinstar Holdings Ltd. v. Anand Kedia*, 260 ITR 6, Exh. R-126, p. 967.

[1723] *Id.*, p. 980.

companies on the ground that the company had no assets such as to enable the tax department to recover the tax arrears.

1363.   The High Court recounted the contents of an affidavit from the tax department:

> […] during the search [conducted by the Revenue], a statement of Navin Agarwal, son of Dwarkaprasad Agarwal and a full-time Director of SIIL came to be recorded under section 132 (4) of the Act. This with on 9th of December 1999. That, in the statement, Navin admitted that Directors of PNIT were controlling affairs of Investment Companies and also of the petitioner-company. That, various incriminating papers have been seized from which it was gathered that the entire device was to transfer shares held by the three Investment Companies in SIIL and MALCO to the petitioner, without paying tax. That, to avoid payment of tax, shares of Sterilite Group held as stock-in-trade in the books of three Investment Companies were sought to be converted as investment. That, it was a deliberate device to escape from payment of tax on distribution of shares from Investment Companies to the petitioner-company. that the three investment Companies were advised to convert the shares, held as stock-in-trade, into investment because if the shares are so transferred from the three Investment Companies to the petitioners as stock-in-trade, then there was an apprehension that the department would bring to tax, the difference between the market value in the book value of the shares as business income under section 28 of the Income-tax Act. That, under the circumstances, the petitioner-company was advised to convert the stock-in-trade into investment and thereafter the Investment Companies could conveniently escape capital gains on transfer as the transferee-company viz, the petitioner-company was not liable to pay capital gains tax under Article 13 and Article 22 of the Double Tax Avoidance Agreement (DTA) between India and Mauritius.[1724]

1364.   It was contended by the Revenue that "…the entire process of conversion of stock-in-trade to investment and liquidation of the three Investment Companies was a device formulated with the sole motive of avoiding tax liability."[1725]

1365.   While the matter was still before the ITAT, the various steps taken by the Revenue to freeze the shares and hold the directors personally liable were challenged in the Bombay High Court. A series of arguments not relevant to the present case were advanced, but on the key point, the Bombay High Court expressed its view that the "entire device was implemented by the petitioner and the Investment Companies to evade tax".[1726] It should be noted that in the final paragraph of its reasoning the court cautioned that its views were tentative and did not bind the ITAT on the merits. However, it was clear that *McDowell* was still considered to be good law in 2002 and the overall transaction before the Bombay High Court was considered to be tax avoidant, at least on a *prima facie* basis.

---

[1724] *Id*., p. 966.

[1725] *Id*., pp. 966-967.

[1726] *Id*., p. 981.

1366.  At the end of his reasons for judgment, Kapadia, J. (as he then was) stated the effect of *McDowell* in broad terms:

> In conclusion, we may refer to the judgment of the Supreme Court in the case of *McDowell & Co. Limited v Commercial Tax Officer* [citation omitted] in which it has been held <u>that even if the transaction is genuine and even if it has been actually acted upon, but if the transaction is entered into with the intention of tax avoidance, then the transaction would constitute colourable device</u> (sic). <u>That the Courts are now concerned, not merely with the genuineness of a transaction, but with the intended effect of the transaction on the fiscal purpose</u>. That, the true principle in case of *Ramsay* was that one must consider fiscal consequences of a pre-planned series of transaction and one has not to dissect the scheme and consider individual stages separately. This judgment squarely applies to our case…[1727]

1367.  This characterisation of *McDowell*'s effect, stressing the focus on the "intended effect of the transaction" (which had been considered to be irrelevant to the analysis employed by the House of Lords in *Duke of Westminster*), reflected the state of the law as of 2002, some four years before Cairn's 2006 Transactions.

1368.  Were the matter to rest there, the law would appear to have shifted decisively in favour of a greater willingness on the part of the Indian courts to scrutinise even genuine transactions with a view to determining into which of the two categories (legitimate planning or avoidance) challenged transactions would fall. However, in 2003, a Supreme Court bench in *Azadi Bachao* reverted to the more formalistic approach, and in doing so embraced the approach articulated in Shah, J.'s judgment in *Raman* (and *Kharwar*).[1728]

1369.  The Tribunal accepts the Respondent's point that *Azadi Bachao* did not consider a dispute between the tax authorities and a taxpayer, so the Supreme Court was not concerned with determining whether a specific transaction was tax avoidant or not. Rather, the *lis* between a public interest group, on the one hand, and the tax authorities, on the other, concerned the power of the CBDT to issue a circular dealing with the Double Taxation Avoidance Treaty between India and Mauritius. The petitioners objected to the treaty as encouraging unlawful treaty-shopping and hence to the Circular issued by the CBDT pertaining to the Treaty, contending that the department had no legal right to refuse to collect tax that was otherwise owing. The Delhi High Court agreed with the petitioners, holding that the Circular's issuance was *ultra vires* the ITA.[1729]

1370.  An appeal to the Supreme Court ensued. Much of the Supreme Court's analysis was concerned with the treaty-making power and the implementation of treaties in India's legal system, the utility of using circulars to give effect to DTAAs, related domestic law issues on the delegation of powers, the purposes of DTAAs, the legality (or not) of

---

[1727] *Id.*, p. 985 (emphasis added).

[1728] *Union of India v Azadi Bachao Andolan* [2003] 10 SCC 1, Exh. C-159.

[1729] *Id.*, pp. 5-6.

treaty-shopping and so on. All this to consider why a particular section (Section 90) had been added to the ITA to empower the CBOT to promulgate circulars to notify the terms of a DTAA and what the effect of that amendment was.[1730] The Supreme Court, per Srikrishna, J., upheld the appeal and overturned the Delhi High Court's judgment invalidating the Circular.

1371. The Court agreed with the tax authorities that it was within the power of the department to promulgate a circular which specified the effect of the taxation treaty (notwithstanding the ordinarily applicable provisions of the ITA).[1731]

1372. *McDowell* played an unusual role in the case. It was used by the respondents, in what must be said to be a rather bold argument, to assert that the case supported a finding that *all* companies that were incorporated in Mauritius for use in an Indian transaction should be characterised as a sham or a device actuated by improper motives. As the Supreme Court noted:

> The respondents […] contend that this Court should interdict such arrangements and, as if by waving a magic wand, bring about a situation where the incorporation becomes non est. For this they heavily rely on the judgment of the Constitution Bench of this Court in *McDowell and Company Ltd. v. Commercial Tax Officer*. Placing strong reliance on *McDowell* it is argued that *McDowell* has changed the concept of fiscal jurisprudence in this country and any tax planning which is intended to and results in avoidance of tax must be struck down by the Court.[1732]

1373. It was in that context that this Division Bench of the Supreme Court limited the reach of *McDowell*. In doing so, it characterised Reddy, J.'s concurring opinion as strictly a minority opinion:

> …it does not appear that the rest of the learned Judges of the Constitutional Bench contributed to this radical thinking.[1733]

1374. This, in the Tribunal's view, is a surprising statement because it seems most unlikely that Misra, J. and the other three judges did not read Reddy, J.'s concurring opinion before expressly stating that they agreed with it.

1375. Interestingly, in this regard, while *Azadi Bachao* quoted Misra, J.'s statement at paragraph 45, observing that a "colourable device cannot be a part of tax planning and it is wrong to encourage the belief that it is honourable to avoid payment of tax by resorting to dubious methods" and "[i]t is the obligation of every citizen to pay the taxes without resorting to subterfuges", it did not note his statement in paragraph 46 linking

---

[1730] The purpose of this was, in the Supreme Court's words; "…to issue a notification for implementation of the terms of a double taxation avoidance agreement. When that happens, the provisions of such an agreement, with respect to cases to which they apply, would operate even if inconsistent with the provisions of the Income-tax Act." (See *Id.*, p. 11).

[1731] *Id.*, pp. 17, 18, 19, 25, 28.

[1732] *Id.*, p. 34 (emphasis added).

[1733] *Id.*, p. 35.

this finding to Reddy, J.'s concurring opinion: "on this aspect one of us, Chinnappa Reddy, J. has proposed a separate and detailed opinion with which we agree".

1376. Having quoted paragraph 45 of Reddy, J.'s reasons, the Supreme Court then stated:

> We are afraid that we are unable to read or comprehend the majority judgment in *McDowell* as having endorsed this extreme view of Chinnappa Reddy, J., which, in our considered opinion, actually militates against the observations of the majority of the Judges which we have just extracted judgment of Ranganath Mishra, J. (as he then was).[1734]

1377. This seems, to the Tribunal, to be at odds with what the Constitutional Court actually said in *McDowell*, and what it was understood by subsequent Indian courts, including the Supreme Court itself, to have decided.[1735] Given the Constitutional Court's position at the apex of the Indian judiciary, it is surprising that a two-judge bench, although ranking very highly in the Indian judicial hierarchy, would cast doubt on what was decided by a higher-ranking court.

1378. It is clear that *Azadi Bachao* sought to "read down" the effect of *McDowell* by characterising Reddy, J.'s reasons for judgment as an outlying minority view. The Tribunal believes that this approach must have displeased the ITD because when *Vodafone* later came on before the Supreme Court, the Chief Justice noted that the ITD had argued that *Azadi Bachao* should be overruled "insofar as it depart[ed] from *McDowell* … principle for the following" reasons:

> i) Para 46 of *McDowell* judgment has been missed which reads as under: "on this aspect of Chinnappa Reddy, J. has proposed to a separate opinion with which we agree". [i.e. Westminster principle is dead]. ii) That, *Azadi Bachao* failed to read paras 41-45 and 46 of *McDowell* in entirety. If so read, the only conclusion one could draw is that four learned judges speaking through Misra, J. agreed with the observations of Chinnappa Reddy, J. as to how in certain circumstances tax avoidance should be brought within the tax net…[1736]

1379. In the Tribunal's respectful view, the ITD was right to argue that in this respect *Azadi Bachao* misstated the view of the full Constitutional Court in *McDowell*.

1380. It appears further to the Tribunal that *Azadi Bachao* was on more solid ground in in observing that Reddy, J.'s view, expressed in 1968, that in *Ramsay*, English law had "exorcised the ghost" of *Duke of Westminster* was not borne out in later English cases in which the courts sought to find a balance in English law between legitimate tax planning and tax avoidance:

---

[1734] *Ibid.*

[1735] The fact that the Supreme Court alluded to the "temporary turbulence created in the wake of *McDowell*" suggests that the judges in *Azadi Bachao* considered that Reddy, J.'s position could not have been a minority position in *McDowell*. If Misra, J. had not stated that he and the three other judges agreed with Reddy, J.'s "separate and detailed" opinion, Reddy, J.'s opinion would not have been treated as declarative of the law on tax avoidance and no "turbulence", as *Azadi Bachao* put it, would have been caused by the judgment.

[1736] *Vodafone International Holdings B.V. v. Union of India & Anr.* [2012] 6 SCC 613, Exh. C-59, ¶ 57.

> With respect, therefore, we are unable to agree with the view that *Duke of Westminster* is dead, or that its ghost has been exorcised in England. The House of Lords does not seem to think so, and we agree, with respect. In our view, the principle in *Duke of Westminster* is very much alive and kicking in the country of its birth. <u>And as far as this country is concerned, the observations of Shah, J., in *CIT v. Raman* are very much relevant even today.</u>[1737]

1381. The last sentence of this paragraph warrants noting because it sought to resuscitate a series of judgments exemplified by *Raman* and *Kharwar* which had faithfully applied the approach taken in *Duke of Westminster* in the face of the Constitutional Court's evident concurrence with Reddy, J's express disapproval of the two cases.

1382. *Azadi Bachao* also noted that the 1999 judgment of the Constitutional Court in *Muthuram Agrawal* had cited *Duke of Westminster* as a relevant authority:

> The intention of the legislature in a taxation statute is to be gathered from the language of the provisions particularly where the language is plain and unambiguous. In a taxing Act it is not possible to assume any intention or governing purpose of the statute more than what is stated in the plain language. It is not the economic results sought to be obtained by making the provision which is relevant in interpreting a fiscal statute. Equally impermissible is an interpretation which does not follow from the plain, unambiguous language of the statute. Words cannot be added to or substituted so as to give a meaning to the statute which will serve the spirit and intention of the legislation.[1738]

1383. As discussed above, this judgment was indeed concerned with the interpretation of a taxing statute, but it was not a tax avoidance case.

1384. A final point about *Azadi Bachao*: The Tribunal notes that it was decided in October 2003. Given how favourable the judgment was as to the lawfulness of using Mauritian structures for tax planning in India, it can readily be understood why RSM thought that a Mauritian structure would do the job in Plan B in terms of mitigating the "short [term] capital gains" tax of 41.82% on the sale of CIL shares if offered for sale within the 12 month period after the IPO.[1739] It accords with common sense that this judicial embrace of the India-Mauritius DTAA, combined with its disparaging *McDowell*, would attract considerable interest in the Indian tax planning community and could be seen by many as ushering in a new era in Indian law on the distinction between legitimate tax planning and tax avoidance.

1385. It is thus no surprise that RSM would have adverted to *Azadi Bachao*. Yet even then, RSM recognised that there was a chance that a "maverick" tax inspector, to use its word,

---

[1737] *Union of India v. Azadi Bachao Andolan* [2003] 10 SCC 1, Exh. C-159, p. 38 (emphasis added).

[1738] *Mathuram Agrawal v. State of Madras*, [1999] 8 SCC 667, Exh. C-285, ¶ 12.

[1739] RSM, Project Gin Presentation dated 19 April 2006, Exh. C-365.

could challenge a Mauritian structure employed under Plan B.[1740] Having regard to the various authorities canvassed above, in the Tribunal's respectful view, the true state of the law of India on tax avoidance was more complex and variegated than as portrayed by the Court in *Azadi Bachao*. In the Tribunal's view, Indian law has developed in somewhat more expansive views of what constitutes tax avoidance than those expressed in the English cases, but they are far from suggesting that a taxpayer cannot engage in legitimate tax planning.

Post 2006

1386.   It is necessary to refer to only one other relevant Indian authority for the period between 2006 and *Vodafone*. That is the 2011 decision of the High Court of Bombay in *Aditya Biria Nuvo Limited and others v Deputy Director of Income Tax and others*.[1741]

1387.   The facts of this case are complicated and not on all fours with the present case, but the case is noteworthy for two reasons: (i) its treatment of a Mauritian-India structure; and (ii) the court's contemplating that in some cases the sale of shares of a company incorporated outside of India could trigger tax consequences in India. On the strict application of a *situs* rule, this would not be possible.

1388.   AT&T Corp. (USA), which carried on business in India, had entered into a joint venture agreement with the Birla Group. AT&T Corp. (USA) invested the funds in India by subscribing to the shares of a joint venture company (JVC) called Idea Cellular Limited (ICL). It did so in the following way: AT&T Corp (USA) had a wholly-owned Mauritian subsidiary called AT&T Cellular Private Limited, Mauritius.

1389.   AT&T Corp (USA) paid the amount towards the equity shares through its Mauritian subsidiary and had the shares of ICL registered in its name (*i.e.*, AT&T Cellular Private Limited, Mauritius) as a permitted transferee.[1742]

---

[1740]   RSM, Project Gin, Phase I Pre IPO, Plan C – Some thoughts Presentation dated 3 May 2006, Exh. C-364, p. 6. (Under "Income Tax", RSM noted: "In case of offer for sale, short-term capital gain arises taxable @ 41.82%" and further: "— The same is proposed to be mitigated by interposing Mauritius structure" and this "—Would have to stand the test of law (maverick tax inspector scrutiny and potential suit)".)

[1741]   *Aditya Biria Nuvo Limited and others v. Deputy Director of Income Tax and others*, MANU/MH/0884/2011, Exh. R-77.

[1742]   The case headnote recounted the transaction as follows, at pp. 5-6: "A shareholders agreement was entered into by and between AT&T Wireless Services Inc, USA (acting on behalf of itself and the AT&T Wireless Group), Grasim Industries Limited, India, (acting on behalf of itself and the AV Birla Group) and Tata Industries Limited, (acting on behalf of itself, the Tata Group), wherein it was agreed that the Tata Cellular Limited ('TCL') would merge with BACL and the respective share holdings of the three groups in BACL would be restructured as per the shareholders agreement. The name of BACL after the merger of TCL was changed to Birla Tata AT&T Limited. Subsequently, the name of Birla Tata AT&T Limited was once again changed to Idea Cellular Limited ('ICL'). Cingular Wireless LLC, USA acquired shares of AT&T Wireless Services Inc, USA from AT&T Corporation, USA and renamed it as New Cingular Wireless Services Inc, USA ('NCWS'). NCWS received an offer from India Tele Ventures Limited, an unrelated party, to purchase the interest of NCWS in ICL. NCWS called upon the Birla Group and the Tata Group to exercise their rights of first refusal in purchasing the shares of ICL owned by NCWS. Grasim Industries Limited, acting on behalf of the Birla Group and Tata Industries Limited acting on behalf of the Tata Group accepted the offer. Before entering into an agreement for purchase of 37,17,80,740 equity shares of Idea Cellular Limited (ICL) offered by NCWS, Indian Rayon representing the Birla Group applied to the Director of IT (Intl Taxn), Mumbai

1390.  Clearly this was intended to take advantage of the DTAA. After AT&T Corp (USA) later sold the shares, the question arose whether the transfer generated a taxable gain for AT&T Cellular Private Limited, Mauritius, which held a Tax Residence Certificate issued by Mauritius, and which, on the authority of *Azadi Bachao*, would fall outside of the Indian tax net, *or* for AT&T Corp (USA), which, although a non-resident, would be liable for tax on the gain.

1391.  Proceedings were initiated in the Bombay High Court to enjoin the Revenue from seeking to assess the petitioner/purchaser for its allegedly failing to withhold the tax payable on the sale of the shares of AT&T Cellular Private Limited, Mauritius.[1743] The argument was that no capital asset situate in India had been transferred (because the shares sold were those of a company incorporated outside of India), and therefore no income accrued or arose in India or could be deemed to have accrued or arisen in India from the sale of the shares of that non-Indian company.[1744]

1392.  The court however found merit in the Revenue's contention that given that AT&T Corp (USA) was a party to the JVC, the question arose whether the purchaser had paid US$150 million for shares of ICL or for shares of AT&T Mauritius. "These questions would have to be gone into in the assessment proceedings."[1745]

---

seeking no-objection certificate under section 195 of the 1961 Act to remit US$ 150 195(1) of the 1961 Act. ADIT, Mumbai passed an order holding Tata Industries Limited as an assessee in default under section 201(1) of the 1961 Act since it had failed to deduct tax as required under section 195 of the 1961 Act, before making payment of US$ 150 million to NCWS. Based on that the ADIT issued a show-cause notice calling upon Indian Rayon to show cause as to why Indian Rayon should not be assessed as a representative assessee (Agent) of NCWS under section 163 of the 1961 Act in respect of the gains arising to NCWS pursuant to the transaction under the Sale and Purchase Agreement. The argument of Indian Rayon was that since the shares of the JVC purchased by Indian Rayon stood in the name of AT&T Mauritius, the legal owner of the said shares would be AT&T Mauritius and, therefore, on sale of the said shares, capital gains would accrue to AT&T Mauritius which as per DTAA between India and Mauritius cannot be taxed in India and consequently the tax on capital gains arising from the transfer of shares of JVC cannot be recovered from Indian Rayon as a representative assessee. The fact that AT&T Mauritius immediately on receipt of the sale proceeds amounting to US$ 150,000,000 transferred on the same day $ 150,000,475 in favour of NCWS, cannot be a ground to infer that the shares of ICL belonged to NCWS and that the NCWS has received the sale proceeds through AT&T Mauritius. It was argued that the amount of US$ 150,000,475 paid by AT&T Mauritius to NCWS comprised of dividend amounting to US$ 43,915,312 distributed by AT&T Mauritius and US$ 101,685,163 represented repayment of loan. Thus, the sale consideration was received by the owner of ICL shares viz., AT&T Mauritius and utilized for its own purposes. Relying on the CBDT Circulars No. 682 and 789 as also the Apex Court decision in the case of UOI v. Azadi Bachao Andolan 263 ITR 706 (SC) wherein the above CBDT circulars have been held to be legal and binding, it was argued on behalf of India Rayon that once Tax Residence Certificate is issued to AT&T Mauritius by the Republic of Mauritius, then it would constitute sufficient evidence for accepting the status of residence as well as beneficial ownership for applying DTAA between India and Mauritius and it would not be open to the tax authorities to go behind the Tax Residence Certificate and find out as to who are the beneficial owners of the shares of the JVC.

[1743]  The question raised before the court concerned the taxability of income arising on the transfer of a capital asset under Sections 5, 9, 160 to 163 of the ITA, specifically whether any income chargeable to tax in India had accrued or arisen or deemed to have accrued or arisen in India to New Cingular Wireless Services Inc, USA (NCWS) and MMH Holdings LLC, USA, (MMMH) which subsequently merged with NCWS, on account of the share transactions.

[1744]  *Aditya Biria Nuvo Limitd and others v. Deputy Director of Income Tax and others*, Exh. R-77, ¶¶ 92-93.

[1745]  *Id*., ¶ 95.

1393. Thus, in the court's view, there was a *prima facie* basis for further conducting the assessment: "…the *prima facie* opinion of the Revenue that the transaction between TIL and NCWS/MMMH for sale and purchase of shares of AT&T Mauritius was a colourable transaction… cannot be said to be devoid of any merit."[1746] The implication of the High Court's holding was that if the real investor in Idea Cellular Limited was shown to be AT&T Corp, not AT&T Cellular Private Limited, Mauritius, the Mauritian company would be disregarded as a colourable transaction, notwithstanding its holding a Mauritian Tax Residence Certificate.

1394. This decision suggested that *Azadi Bachao*'s endorsement of Mauritian structures was subject to limits when it came to establishing the location of capital gains arising out of the sale of shares of an offshore entity.[1747]

1395. *Aditya Birla Nova* is notable for one other point. In terms reminiscent of certain arguments advanced by the Claimants in the present case and advanced by Twinstar before the Bombay High Court in *Twinstar*, counsel for one of the petitioners argued the following:

> Referring to various documents annexed to the Writ Petition, as also the compilation of documents furnished, Mr. Dada submitted that in the present case genuineness of the transaction were considered in detail by the Reserve Bank of India and it is only after the genuineness of the transaction was established, TIL was permitted to make remittances to the shareholders of AT&T Mauritius, viz. NCWS and MMMH. It was argued that TIL acquired the shares of AT&T Mauritius with a view to set up its wholly owned subsidiary for exploiting future telecom acquisition opportunities globally. It was further contended that Reserve Bank of India has allotted the identification number to TIL to set up/acquire AT&T Mauritius i.e. the Wholly Owned Subsidiary (WOS) in Mauritius subject to the condition that the WOS would not make any further investment in India without prior permission of Reserve Bank of India and, accordingly, no investments have been made in India. In these circumstances, the income tax authorities cannot go into the genuineness of the transaction once again and, therefore, the proceedings against PIL [must] be dropped […] [1748]

1396. The High Court was not swayed by this line of argument.

1397. Thus, prior to *Vodafone*, it can be seen that the three cases that actually considered the situation of a particular taxpayer (*Calcutta Chromotype*, *Twinstar*, and *Aditya*), expressed views such as that "the doctrine that the Corporation or a Company has a legal and separate entity of its own has been subjected to certain exceptions by the application of the fiction that the veil of the Corporation can be lifted and its face examined in

---

[1746]   *Id.*, ¶ 96.

[1747]   Given what *Vodafone* later said about the *situs* of shares, it may be that this part of the High Court's reasons was no longer good law.

[1748]   *Aditya Birla Nuvo Limited*, Exh. R-77, ¶ 94 (emphasis added).

substance" (*Calcutta Chromotype*),[1749] that "even if the transaction is genuine and even if it has been actually acted upon, but *if the transaction is entered into with the intention of tax avoidance, then the transaction would constitute colourable device*" and that "the Courts are now concerned, *not merely with the genuineness of a transaction, but with the intended effect of the transaction on the fiscal purpose*" (*Twinstar*),[1750] and that a sale of the shares of a Mauritian company holding a Tax Residence Certificate was not a complete answer to an allegation that a taxable event in India had been triggered by the sale of shares in an offshore company and might be found to be a "*colourable transaction*" (*Aditya Birla Nova*).[1751]

1398.  The Tribunal turns now to *Vodafone*. In this case, no doubt due to the case's importance, the Supreme Court sat three judges rather than the normal two-judge Divisional Bench.[1752] As already noted, the principal judgment was written by Kapadia, CJ., with whom Kumar, J. agreed. A second set of reasons for judgment was written by Radhakrishnan, J. Although he expressed agreement with the reasons given by the Chief Justice, the latter did not reciprocate in expressing approval of his reasons. Thus, the separate reasons are of lesser persuasive value than the reasons which formed the decision of the Court.

1399.  The Tribunal has addressed the *Vodafone* judgment's discussion of indirect transfers in Section VII.A.3.b(ii)(9) above. It now reviews the Supreme Court's discussion of the law of India on tax avoidance.

1400.  The Chief Justice first addressed the Revenue's contention that *Azadi Bachao* should be overruled for having failed to understand the extent to which the statements of Reddy, J. had been endorsed by the whole of the Constitutional Court in *McDowell*, and therefore erred in characterising Reddy, J.'s opinion as a minority opinion not shared by the majority. The Chief Justice sought to reconcile *Azadi Bachao* and *McDowell* by interpreting the latter's findings as dealing "only in relation to tax evasion through the use of colourable devices and by resorting to dubious methods and subterfuges."[1753] In the result, he did not find a conflict between *McDowell* and *Azadi Bachao*.[1754] The key point was that *McDowell* was <u>not</u> to be taken as holding that "all tax planning is illegal/illegitimate/impermissible".[1755]

1401.  The Chief Justice also did not follow *Azadi Bachao*'s attempt to minimise Reddy. J.'s concurring opinion in *McDowell*. This is not surprising because he had applied

---

[1749]  *Calcutta Chromotype v. Collector of Central Excise,* AIR 1998 SC 1631, Exh. R-125, ¶¶ 12-13, citing the Supreme Court's decisions in *TELCO v. State of Bihar*, (1964) 6 SCR 885 and *LIC of India v. Escorts Ltd*. (1986) 1 SCC 264 (emphasis added).

[1750]  *Twinstar Holdings Ltd. v. Anand Kedia*, 260 ITR 6, Exh. R-126, p. 985 (emphasis added).

[1751]  *Aditya Biria Nuvo Limitd and others v. Deputy Director of Income Tax and others*, Exh. R-77, ¶ 96 (emphasis added).

[1752]  *Vodafone International Holdings B.V. v. Union of India & Anr*. [2012] 6 SCC 613, Exh. C-59.

[1753]  *Id*., ¶ 64.

[1754]  *Ibid.*

[1755]  *Ibid.*

*McDowell* in *Twinstar* a few years previously. Nor would one expect the Chief Justice to purport to overturn a decision of the Constitutional Court as this could be done only by the Constitutional Court itself or by Parliament (within the bounds of constitutionality).

1402. Thus, at paragraph 64 of his reasons for judgment, the Chief Justice stated:[1756]

> The majority judgment in *McDowell* held that "tax planning may be legitimate provided it is within the framework of law" (para 45). In the latter part of para 45, it held that "colourable device cannot be a part of tax planning and it is wrong to encourage the belief that it is honourable to avoid payment of tax by resorting to dubious methods". It is the obligation of every citizen to pay the taxes without resorting to subterfuges. The above observations should be read with para 46 where the majority holds "on this aspect one of us, Chinnappa Reddy, J. has proposed a separate opinion with which we agree".

1403. This passage corrected what the Supreme Court had said about *McDowell* in *Azadi Bachao* and accepted what the Revenue had argued, namely, that *Azadi Bachao* had erred in failing to note that Misra, J., speaking for three other judges, had expressly agreed with Reddy, J.'s "separate and detailed opinion".

1404. The Chief Justice then sought to reconcile the previous authorities:

> The words "this aspect" express the majority's agreement with the judgment of Reddy, J. only in relation to tax evasion through the use of colourable devices and by resorting to dubious methods and subterfuges. Thus, it cannot be said that all tax planning is illegal/ illegitimate/impermissible. Moreover, Reddy, J. himself says that he agrees with the majority. In the judgment of Reddy, J. there are repeated references to schemes and devices in contradistinction to "legitimate avoidance of tax liability" (paras 7-10, 17 & 18). In our view, although Chinnappa Reddy, J. makes a number of observations regarding the need to depart from the "Westminster" (sic) and tax avoidance – these are clearly only in the context of artificial and colourable devices. Reading *McDowell*, in the manner indicated hereinabove, in cases of treaty shopping and/or tax avoidance, there is no conflict between *McDowell* and *Azadi Bachao* or between *McDowell* and *Mathuram Agrawal*."[1757]

1405. As a result, the Chief Justice endorsed Reddy, J.'s judgment insofar as it applied to tax evasion through the use of "dubious methods", "subterfuges", and "artificial and colourable devices". At the other end of the spectrum, it could not be said that "all tax planning is illegal/illegitimate/impermissible".[1758] (The Tribunal observes that although the Chief Justice used the term "tax evasion" at this point in his reasons, he later used the terms "tax avoidance" and "tax avoidant" with no evident distinction being drawn between them.)

---

[1756] *Ibid*.

[1757] *Ibid*.

[1758] *Ibid*.

1406. In the ensuing paragraphs of *Vodafone*, the Chief Justice elaborated upon the law as it related to international investments made in India.

1407. He recalled that the approach of both corporate and tax law generally is based on the "separate entity principle" and this was reflected in the ITA 1961, in the matter of corporate taxation. Thus, "the entities subject to income-tax are taxed on profits derived by them on a standalone basis, irrespective of their actual degree of economic independence and regardless of whether profits are reserved or distributed to the shareholders/participants."[1759] It is thus "fairly well accepted" that the subsidiary and its parent are totally distinct taxpayers.[1760]

1408. Likewise, it was generally accepted that a group parent company is involved in giving principal guidance to group companies by providing general policy guidelines to subsidiaries. The fact that the parent exercises shareholder's influence on its subsidiaries does not generally imply that the subsidiaries are to be deemed residents of the State in which the parent company resides. The relationship implies a restriction on the autonomy of the subsidiary's executive directors. However, there is a limit to this. If the subsidiary's executive directors' decision-making "has become fully subordinate to the Holding Company with the consequence that the subsidiaries executive directors are no more than puppets", then a turning point is reached in relation to the subsidiary's place of residence.[1761] The Chief Justice then noted:

> Similarly, if an actual controlling Non-Resident Enterprise (NRE) makes an indirect transfer through "abuse of organisation form/legal form and without reasonable business purpose" which results in tax avoidance [...], then the Revenue may disregard the form of the arrangement or the impugned action through the use of Non-Resident Holding Company, re-characterize the equity transfer according to its economic substance and impose the tax on the actual controlling Non-Resident Enterprise.[1762]

1409. The Court inquired into the extent to which HMTL actually had full control over the various subsidiaries that were arrayed in the structure below the level of the single

---

[1759] *Id.*, ¶ 66.

[1760] *Id.*, ¶¶ 65-66.

[1761] *Id.*, ¶ 67.

[1762] *Id.*, ¶ 68.

share.[1763] (HMTL did not exercise such sort of control, and therefore it could not be said that the subsidiaries were its puppets.[1764])

1410.   Related to this issue was the question of a "preordained transaction" which might be tax avoidant. At paragraph 76, the Chief Justice observed:

> There is a conceptual difference between preordained transaction which is created for tax avoidance purposes, on the one hand, and a transaction which evidences investment to participate in India. In order to find out whether a given transaction evidences a preordained transaction in the sense indicated above or investment to participate, one has to take into account the factors enumerated hereinabove, namely, duration of time during which the holding structure existed, the period of business operations in India, generation of taxable revenue in India during the period of business operations in India, the timing of the exit, the continuity of business on such exit, etc…

1411.   The Chief Justice then discussed the use of holding companies for the purposes of making foreign investments in India and how questions of abuse could arise:

> It is a common practice in international law, which is the basis of international taxation, for foreign investors to invest in Indian companies through an interposed foreign holding or operating company, such as Cayman Islands or Mauritius based company for both tax and business purposes. In doing so, foreign investors are able to avoid the lengthy approval and registration processes required for a direct transfer (i.e., without a foreign holding or operating company) of an equity interest in a foreign invested Indian company. However, taxation of such Holding Structures very often gives rise to issues such as double taxation, tax deferrals and tax avoidance. In this case, we are concerned with the concept of GAAR. In this case, we are not concerned with treaty-shopping but with the anti-avoidance rules.[1765]

1412.   By countenancing the possibility that holding structures established by foreign investors can give rise to tax avoidance and the application of the GAAR, the Chief Justice

---

[1763]   *Id.*, ¶ 76: "Facts of this case show that both the parent and the subsidiary companies worked as a group since 1994. That, as a practice, the subsidiaries did comply with the arrangement suggested by the Group holding company in the matter of voting, failing which the smooth working of HEL generating huge revenues was not possible. In this case, we are concerned with the expression "capital asset" in the income tax law. Applying the test of enforceability, influence/ persuasion cannot be construed as a right in the legal sense. One more aspect needs to be highlighted. The concept of "de facto" control, which existed in the Hutchison structure, conveys a state of being in control without any legal right to such state. This aspect is important while construing the words "capital asset" under the income tax law. As stated earlier, enforceability is an important aspect of a legal right. Applying these tests, on the facts of this case and that too in the light of the ownership structure of Hutchison, we hold that HTIL, as a Group holding company, had no legal right to direct its downstream companies in the matter of voting, nomination of directors and management rights." (emphasis added.)

[1764]   *Id.*, ¶ 74: "The decisive criteria is whether the parent company's management has such steering interference with the subsidiary's core activities that subsidiary can no longer be regarded to perform those activities on the authority of its own executive directors."

[1765]   *Id.*, ¶ 68 (emphasis added).

accepted that the Revenue could examine transactions that took place outside of India if there was an allegedly tax avoidant scheme.

1413. The Chief Justice noted that holding structures are recognised in India in corporate as well as tax laws. Turning to their taxation, he noted that "at the threshold, the burden is on the Revenue to allege and establish abuse, in the sense of tax avoidance in the creation and/or use of such structure(s)."[1766] He then adverted to the "judicial anti-avoidance rule"[1767] whereby:

> [T]he Revenue may invoke the "substance over form" principle or "piercing the corporate veil" test only after it is able to establish on the basis of the facts and circumstances surrounding the transaction that the impugned transaction is a sham **or** tax avoidant […] Similarly in a case where the revenue finds that in a Holding Structure an entity which has no commercial/business substance has been interposed only to avoid tax, then in such cases applying the test of fiscal nullity it would be open to the revenue to discard the inter-positioning of that entity.[1768]

1414. Indian law thus applies various tests that do not focus exclusively on the legal "relation between the parties" (the Westminster approach). But in order to do so, the Revenue must first be able to establish on the facts of the surrounding circumstances that the transaction is a sham or tax avoidant. The onus is on the Revenue to identify the scheme and its dominant purpose. A weighing exercise ensues: Evidence of a strong business purpose will tend to undermine the allegation of a colourable or artificial device, and *vice versa*.

1415. The Court then examined the structure of the Hutchison-Vodafone transaction, the length of time that the Cayman Islands part of the structure had been in place, the rights associated with the single share which was sold by Hutchison to Vodafone (and the rights that were <u>not</u> associated therewith), the business purpose for choosing to structure the transaction as the sale of the single share as opposed to other transactions that might have been undertaken, *etc*.[1769].

1416. The Tribunal pauses here to make a few observations about the paragraphs just quoted:

a.   The exercise of determining whether a transaction is tax avoidant is a fact-intensive one and it is not restricted to identifying a sham;

b.   The Revenue is to focus on the facts and circumstances surrounding the transaction;

c.   Only after it has determined that the scheme is tax avoidant, can the Revenue invoke the 'substance over form' principle or "piercing the corporate veil" test.

---

[1766]   *Ibid*.

[1767]   Which means that the courts have the power to determine whether or not a particular structure or scheme is tax avoidant. Such a determination is based on judge-made law rather than a statutory anti-avoidance rule.

[1768]   *Vodafone International Holdings B.V. v. Union of India & Anr*. [2012] 6 SCC 613, Exh. C-59, ¶ 67 (the Tribunal's emphasis of "or" added).

[1769]   *Id.*, ¶¶ 78-80.

    d.      The onus of showing a scheme and its dominant purpose is on the Revenue.

    e.      Finally, although Indian law recognises the situs rule, and the consequences that ordinarily follow from the separate legal personality of a company, the fact that a transaction involves the purchase and sale of shares of a company incorporated outside of India does not preclude the Revenue from investigating the transaction for its potential taxability in India.

1417.  The approach to determining tax avoidance in India, it seems to the Tribunal, is quite different from the strict formalism of *Duke of Westminster* and its progeny which rejected the tax authorities' view that the form of the transaction can be discarded and the assessee could be taxed by relying on the "substance of the transaction" having regard to the surrounding circumstances. For example, in Shah, J.'s words, previously discussed:

> The taxing authority is entitled and is indeed bound to determine the true legal relation resulting from the transaction. If the parties have chosen to conceal by a device the legal relation, it is open to the taxing authorities to unravel the device and determine the true character of the relationship. But the legal effect of the transaction cannot be displaced by probing into the 'substance of the transaction' [and further that there could be no doubt of] the principle that the true legal relation arising from the transaction alone determines the taxability of a receipt arising from the transaction.[1770]

1418.  Shah, J.'s approach, consistent with the Westminster principle, focused narrowly on the "true legal relation arising from the transaction" and held that that "*alone* determines the taxability of a receipt arising from the transaction".[1771] As has been seen, in subsequent Indian cases, this strict approach was not followed.

1419.  Kapadia, CJ.'s approach in *Vodafone*, it appears to the Tribunal, seems to, on the one hand, seek to confine *when* the Revenue can act (i.e., "*only* after it is *able to establish* […] that the impugned transaction is a sham or tax avoidant"[1772]), but on the other hand, seems to permit the Revenue to consider "the facts and circumstances *surrounding* the transaction".[1773] This formulation seems to be aimed at restricting the Revenue from engaging in a wide-ranging examination of transactions for their allegedly tax avoidant nature, while retaining the post-*McDowell* thinking that the genuineness of a transaction is not a complete bar to the Revenue's evaluation. To restate this approach: If the Revenue, looking at the transaction as a whole, can show in the "facts and circumstances surrounding the transaction" that it is tax avoidant, it can seek to assess the tax said to be avoided. This is what the courts seemed to be postulating in *Calcutta Chromotype*, *Twinstar*, and *Aditya* and as later articulated by the Chief Justice in *Vodafone*.

---

[1770] *Commissioner of Income Tax v. M/s B.M. Kharwar*, AIR 1969 SC 812, Exh. C-410, ¶¶ 11-12 (emphasis added).

[1771] *Ibid* (emphasis added).

[1772] *Vodafone International Holdings B.V. v. Union of India & Anr.* [2012] 6 SCC 613, Exh. C-59, ¶ 68.

[1773] *Id.*, ¶ 67.

1420. The Chief Justice then noted that the fiscal nullity doctrine can be used to discard structures used for circular trading or "round tripping" or to pay bribes.[1774] He added: "Similarly, an entity which has no commercial/business substance has been interposed only to avoid tax then in such cases applying the test of fiscal nullity it would be open to the Revenue to discard such inter-positioning of that entity." But this is to be done "at the threshold":

> [The court should apply] "the "**look at**" principle enunciated in **Ramsay … ** in which it was held that the Revenue or the Court must **look at** a document or a transaction in a context to which it properly belongs to. It is the task of the Revenue/Court to ascertain the legal nature of the transaction and while doing so it has to **look at** the entire transaction as a whole and not to adopt a dissecting approach. <u>The Revenue cannot start with the question as to whether the impugned transaction is a tax deferment/saving device but that it should apply the "**look at**" test to ascertain its true legal nature.</u>[1775]

1421. To this, he added that in England, *Craven v White* had held that "genuine strategic tax planning has not been abandoned by any decision of the English Courts till date".[1776]

1422. The Chief Justice then summarised what he labelled as the "holistic" approach that should be considered for foreign direct investments in India, focusing on the "dominant purpose" of a scheme:

> [E]very strategic foreign direct investment coming to India, as an investment destination, should be seen in a holistic manner. While doing so, the Revenue/Courts should keep in mind the following factors: the concept of participation in investment, the duration of time during which the Holding Structure exists; the period of business operations in India; the generation of taxable revenues in India; the timing of the exit; the continuity of business on such exit. <u>In short, the onus will be on the Revenue to identify the scheme and its dominant purpose. The corporate business purpose of a transaction is evidence of the fact that the impugned transaction is not undertaken as a colourable or artificial device. The stronger the evidence of a device, the stronger the corporate business purpose must exist to overcome the evidence of a device.</u>[1777]

1423. There is on the record of this arbitration one other judgment that, in the Tribunal's view, warrants noting. In a 2015 case, *State of Rajahthan and others v Gotan Lime Stone Khanji Udyog Pvt. Ltd. and Another*, the Supreme Court described what the Court had done in *Vodafone*.[1778] This was not a tax case, as it was concerned with piercing the corporate veil in connection with transactions involving mining rights, but *Gotan Lime* does express a view as to the approach articulated in *Vodafone*:

---

[1774]  *Id.*, ¶ 68.

[1775]  *Ibid* (bolding in original, underlining added).

[1776]  *Ibid.*

[1777]  *Ibid* (emphasis added).

[1778]  *State of Rajahthan and others v Gotan Lime Stone Khanji Udyog Pvt. Ltd. and Another*, CIVIL APPEAL No. 434 OF 2016, Exh. R-76.

In *Vodafone* […] the dispute arose out of claim by the income tax department to tax capital gain arising out of sale of share capital of a company called CGP by HEL to Vodafone. Question was whether income accrued in India. Negativing the claim of the Revenue, it was held that transaction took place outside territorial jurisdiction of India and was not taxable. This Court observed that "it is the task of the court to ascertain the legal nature of the transaction and while doing so it has to look at the entire transaction as a whole and not to adopt a dissecting approach." In so concluding, the court reconciled the apparent conflicting approach in earlier decisions in *Mc. Dowell & Co. vs. Commercial Tax Officer* and *Union of India vs. Azadi Bachao Andolan* with reference to English decisions in *IRC vs. Westminister* (sic) and *W.T. Ramsay vs. IRC* dealing with the question whether the Court must accept a transaction on face value or not. Thus, while discerning true nature of the entire transaction court has not to merely see the form of the transaction which is of sale of shares but also the substance […][1779]

Conclusions

1424.   The Tribunal has sought to trace the development of the law of India on the distinction between legitimate tax planning and tax avoidance in order to evaluate how it evolved in relation to certain key points in CEP's investment in India. It has done so with full knowledge that it is not an Indian court and that the exercise just completed is not as comprehensive as the Tribunal believes the briefing of the law would be, were an allegedly tax avoidant transaction to once again go before the Supreme Court or the Constitutional Court. The Tribunal has heard no expert evidence on the Indian law on tax avoidance and has been limited to those cases which the Parties put into the record. Nor has it been exposed to the full range of Indian jurisprudence and academic commentary that it would be open to an Indian court, hearing a similar matter, to consult. But the Tribunal is satisfied that with the assistance of counsel on both sides, it has been able to identify the general rules and approaches taken by the Indian courts. In arriving at a view on the law, although the Tribunal is not fully convinced that the "dominant purpose" test which the Respondent has sought to impress upon it is what has emerged from *Vodafone* (in that on one reading of the Chief Justice's reasons it might be said that a colourable device is required to demonstrate tax avoidance), the Tribunal has opted to accept the dominant purpose test as being the applicable one.

**(v)   Were the 2006 Transactions tax avoidant?**

1425.   The Tribunal now turns to whether the Respondent has made out its case that the 2006 Transactions were tax avoidant.

1426.   Before starting its assessment of the record, the Tribunal makes four preliminary points, which it considers fundamental.

1427.   First, the question of whether the 2006 Transactions were tax avoidant is distinct from the question of whether they were taxable under Section 9(1)(i) prior to the 2012 Amendment. It is axiomatic that there can be no tax avoidance without a tax that is being

---

[1779]   *Id.*, ¶ 30 (emphasis added).

avoided (the Parties' experts and witnesses are in agreement on this point[1780]). The Tribunal has found in Section VII.A.3.b(ii)(9) above that, prior to the 2012 Amendment, Section 9(1)(i) did not tax indirect transfers, nor could it be interpreted to tax indirect transfers without doing violence to its text. The Indian Supreme Court in *Vodafone* expressly concluded that "Section 9(1)(i) cannot by a process of interpretation be extended to cover indirect transfers of capital assets/property situate in India", because "[t]o do so, would amount to changing the content and ambit of Section 9(1)(i)."[1781] The Supreme Court thus categorically rejected the ITD's argument that Section 9(1)(i) could be interpreted as a "look through" provision that could allow the ITD to tax the underlying transfer of the Indian assets.

1428.  It follows that, prior to the 2012 Amendment, the indirect transfer of an Indian asset effected through the transfer of shares of a foreign holding company could not in itself amount to the avoidance of capital gains tax in India. Indirect transfers were simply not taxable at the time. Thus, having regard to the fact that Indian law accepts that tax planning can be legitimate and lawful, Cairn starts with a presumption in its favour that structuring the transaction as an indirect transfer is likely to fall within the category of legitimate tax planning. With this as the point of departure, in order to amount to tax avoidance, the Revenue would be obliged to show that the 2006 Transactions were structured in such a way as to avoid some other applicable tax, or *abusively structured* with the purpose of benefitting from the tax treatment of indirect transfers when they would have otherwise been taxable in India.

1429.  Consequently, the theory articulated at the Evidentiary Hearing by the Respondent's witness, Mr Sanjay Puri, Commissioner of Income Tax (International Taxation) – 1, New Delhi, must be rejected out of hand. According to Mr Puri, the Claimants had engaged in tax avoidance because they had structured the 2006 Transactions in such a way that they did not pay taxes anywhere in the world, when those transactions were taxable in India under Section 45 (which sets out the taxability of capital gains), read with Section 9(1)(i) (which, in Mr Puri's view, taxed indirect transfers), among other provisions. Mr Puri's position was that the tax avoided was the "capital gain tax earned on the shares sale" (i.e., the CIHL Acquisition).[1782] The exchange that followed between Claimants' counsel and Mr Puri suggested that, in Mr Puri's view, the fact that CUHL had failed to pay taxes on the indirect transfer effected through the CIHL Acquisition amounted to tax avoidance and tax evasion. [1783]

---

[1780]  Transcript, Evidentiary Hearing, Day 9, 154:7-8 (Mr Puri) ("If something is not taxable it is not tax avoidance"), 156:19-20 (Mr Puri) ("[I]f there is no taxable income, there is no tax avoidance."); Day 10, 183:11-12 (Professor Rosenbloom) ("You can't have avoidance if there is no tax applicable.").

[1781]  *Vodafone International Holdings B.V. v. Union of India & Anr.* [2012] 6 SCC 613, Exh. C-59, ¶ 71.

[1782]  Transcript, Evidentiary Hearing, Day 9, 153:4-157:15 (Mr Puri).

[1783]  *Id.*, 155:2-156:7 (Mr McNeill/Mr Puri):

(Q.  I'm just trying to understand, Mr Puri, whether your allegations of tax avoidance or your position that there's unlawful tax avoidance that forms the basis of this tax assessment is based on anything more than your view that the share transfers in the 2006 Transaction[s] were taxable and that that tax was not paid. Is it based on anything more than that?

A.  (Pause). Yes, those were taxable and tax were not paid.

1430.  The Respondent has objected to the Claimants' cross-examination of Mr Puri on the tax avoidance point and appears to object to the Tribunal's considering his evidence on this matter. Specifically, the Respondent makes the following submissions:

> As for Mr Puri, the Tribunal will recall that Mr Puri does not cover the question of tax abuse at all in his witness statements. This is for good reason. Not only is he not a lawyer and is not for him to make submissions of law in this arbitration, but he has no personal knowledge of the relevant events (i.e. of the manner in which the structure of the 2006 Transactions was adopted by Cairn, and as to the reason why they were adopted). If – as happened – he was to be cross-examined on that (another fool's errand calculated to mislead), the following ought at the very least to have been made clear to him:
>
> > a.  What the structures proposed had been, and what led to the adoption of the structure eventually adopted;
> >
> > b.  Crucially, that Mr Puri should answer the questions on tax abuse / tax avoidance on the assumed basis that offshore indirect transfers were not taxable applying the law as it stood in 2006 (an assumption which Mr Puri of course strongly disagrees with).
>
> As it is, neither point was made clear to him so that – in particular – the totality of Mr Puri's cross-examination on the point proceeded on the basis that the tax avoided was the capital gains tax on the transfer from CUHL to CIL of CIHL shares. As a result, Mr McNeill's cross-examination confused the question of abuse with the separate one of the operation of section 9, and all that Mr Puri stated – indeed, all that he could state given his position that offshore indirect transfers were taxable applying the law as it stood in 2006 – was that Cairn ought to have paid tax on the transfer from CUHL to CIL and that the failure to pay that tax was tax avoidance and tax evasion.[1784]

1431.  The Tribunal cannot accept the Respondent's attempts to disassociate Mr Puri from the Respondent's tax avoidance argument. Mr Puri expressly stated in his First Witness

---

Q.  And by not paying those taxes, then your view is unlawful tax avoidance?

A.  It was -- it was the unlawful tax avoidance and so by not - - and if I use the - - yes, it was tax avoidance - -

Q.  So we can rewrite this sentence to say, in your view, that Cairn - - CUHL committed tax avoidance by not paying taxes in India. That's how you read (b)?

A.  (Pause). To me, it seems tax evasion straightaway. When there is something chargeable to tax, you not only avoid paying tax, you don't pay tax, just it's tax evasion along with tax avoidance.

Q.  How do you distinguish between tax evasion and tax avoidance?

A.  Tax evasion is when there is a legal charge of tax and you do not disclose or you do not disclose the facts through the tax return, that's tax evasion. That's what happened in this case because the return was not filed. So it will come under the category of tax evasion because no particulars of income were filed before the tax authorities.

Q.  So the tax evasion was committed by not filing a tax return?

A.  Not filing the return.).

[1784]  R-PHB, ¶¶ 269-270.

Statement that he believed that "the decision to reorganise Cairn's Indian assets into an Indian company was taken, as one would expect, for a number of hard business reasons and, in particular, in order to *avoid paying any capital gains tax* on the transfer of Cairn's Indian assets into an Indian company."[1785] In his Second Witness Statement, he essentially stated that it was incorrect to assert that the FAO contained no allegation of tax avoidance.[1786] He noted in particular that the AO had concluded that (a) "the arrangement was structured by Cairn Energy to systematically divest its stake in the Indian oil and gas business", and that (b) "as a result of the arrangement, CUHL earned substantial capital gains but had not paid taxes on those gains anywhere in the world".[1787] Questioned by Claimants' counsel as to whether statement (b) constituted tax avoidance, Mr Puri responded: "What else is it? It is tax avoidance […] when CUHL earns gains -- taxable gains in India and does not pay tax, that is tax avoidance as well as tax evasion."[1788]

1432. Likewise, the Tribunal cannot accept the Respondent's suggestion that, because he is not a lawyer, Mr Puri cannot offer evidence on whether the Claimants engaged in tax avoidance. The witness is the Commissioner of Income Tax (International Taxation) – 1, New Delhi (and has also been Commissioner of Income Tax (International Taxation) – 2, New Delhi). He has worked in the ITD for over 30 years, and his experience has included "conducting tax assessments and investigations, tax training, managing development and implementation of computer systems in tax administration, interpreting and implementing international taxation and transfer pricing laws, and administrating anti-corruption laws in the Income Tax Department."[1789] It would be insulting him to suggest that he does not understand the basic principles of tax avoidance in India.

1433. Nor can the Tribunal accept the Respondent's suggestion that Mr Puri had "no personal knowledge of the relevant events."[1790] It may well be that since the planning documents were disclosed to the Respondent only in this arbitration, Mr Puri did not have access to the documents showing the reasons why the Claimants structured the 2006 Transactions as they did; but it remains a fact that he had personal knowledge of the 2006 Transactions themselves. In his capacity as Commissioner of Income Tax (International Taxation) – 1 and 2, New Delhi, Mr Puri had supervisory conduct over the tax demand against CUHL (including the DAO and FAO), as well as over the related tax demand against CIL, and made submissions on behalf of the ITD in the proceedings

---

[1785] Puri WS1, ¶ 45 (emphasis added).

[1786] Puri WS2, ¶¶ 5-6 ("At paragraphs 221 to 229 of the Updated Reply, the Claimants assert that the tax assessment proceedings were based on the 2012 Clarification and not on any allegation of tax avoidance. […] The assertion, at paragraph 229 of the Updated Reply, that the AO's approach is at cross purposes with the Respondent's defence in these arbitral proceedings is entirely incorrect.").

[1787] Puri WS2, ¶¶ 5(a)-5(b).

[1788] Transcript, Evidentiary Hearing, Day 9, 153:10-13 (Mr Puri). See above p. 387 n. 1783 for a quotation of the relevant passage of Mr Puri's cross-examination.

[1789] Puri WS1, ¶ 3.

[1790] R-PHB, ¶ 269.

against CUHL before the ITAT. [1791] Mr Puri devoted 20 paragraphs of his First Witness Statement to explaining the 2006 Transactions (with diagrams), [1792] and made a presentation in this respect during the Evidentiary Hearing. [1793] Indeed, that Mr Puri knew and understood the 2006 Transactions is evidenced by documents in the record, in particular his letter of 3 March 2016 to the Additional Commissioner of Income Tax (International Taxation), Chandigarh, in relation to the tax demand against CIL, in which he discussed the basis for the tax demand. [1794] In the circumstances, the Tribunal finds that the cross-examination of Mr Puri by Claimants' counsel on whether the 2006 Transactions were tax avoidant, as well as Mr Puri's oral evidence, is admissible and relevant.

1434. Leaving aside the question of tax evasion (which the Tribunal has addressed in Section VII.A.3.c(i) above), given the Tribunal's finding that indirect transfers were not taxable prior to the 2012 Amendment, Mr Puri's tax avoidance theory necessarily fails. It seems clear that Mr Puri considered in 2006 that indirect transfers of assets situated in India were taxable: Mr Puri confirmed his contemporaneous views when he appeared as a witness and there would be no reason to put that into question. It remains that, for the Claimants to have engaged in tax avoidance, they must have been attempting to avoid some other applicable tax (unless, as noted, the shift away from other tax plans can be characterised as abusive). The Respondent expressly recognises this:

> The tax abuse [defence] is, of course, an independent defence to the defence to Claimants' attack on the 2012 Clarification. It proceeds on the basis (which is otherwise denied) that the correct interpretation of the fourth limb of section 9.1(i) was as contended by the Claimants as of 2006, and accordingly assumed (*arguendo*) that indirect transfers of shares were not taxable. [1795]

1435. Indeed, the Respondent has put forward no less than six potential taxes that could have been avoided, each of which the Tribunal addresses below. The Tribunal will thus address the Respondent's tax avoidance argument on the basis that, prior to the 2012 Amendment, Section 9(1)(i) did not cover indirect transfers.

1436. The second preliminary observation is this: given the various ways in which the defence has been advanced, the tax avoidance defence requires a considerable measure of speculation. As discussed earlier (at paragraphs 1276-1283), although the FAO and the DRP decisions adverted to the possibility of tax avoidance, no concrete determination of avoidance has ever been made by the ITD. This has two important consequences for the consideration of this defence:

---

[1791]   Puri WS1, ¶ 6; Transcript, Evidentiary Hearing, Day 8, 189:7-16.

[1792]   Puri WS1, ¶¶ 41-61.

[1793]   Transcript, Evidentiary Hearing, Day 8, 181:24-185:16.

[1794]   Letter from Sanjay Puri, Commissioner of Income Tax (International Taxation) – 2, Delhi to Addl. Commissioner of Income Tax (International Taxation) Chandigarh, dated 3 March 2016, Exh. C-381, ¶ 2 ("The tax demand in the case has arisen as the assessee had failed to deduct tax from the consideration it paid to a non-resident for acquiring assets that were deemed as situated in India. The sum chargeable to tax in the hands of non-resident was determined by applying the retrospective amendment in section 9 of the IT Act.")

[1795]   R-PHB, p. 117 n. 336.

a.   First, the Tribunal agrees with submissions made by both sides that it is neither a tax investigator, nor an Indian court, and it ought not to undertake either of the roles associated therewith. The role of an international tribunal such as the present one is to examine measures taken by the respondent State to adjudge their consistency with the State's international obligations. Given the absence of a concrete determination of tax avoidance, the Tribunal has doubts about the Respondent's efforts to particularise a tax avoidance determination in its pleadings that can then be scrutinised. Although the Tribunal has deemed that the defence is admissible, it has also formed the view that without a concrete, reasoned determination by an assessment officer, it is difficult to determine whether, for any one of the theories of avoidance postulated by the Respondent, the Indian courts would uphold such a theory.

b.   Second, the Tribunal's concerns about the speculative nature of a pleaded tax avoidant scheme and the Tribunal's role and mandate, and the limits thereon, are underscored by developments in the legal proceedings between CUHL and the ITD currently underway in India. Both sides have appealed the ITAT decision to the Delhi High Court and, as discussed at some length in the parties' correspondence, the ITD was permitted to amend its appeal to include the tax avoidance and Section 2(46)(vi) grounds.[1796] Thus, independently of this international proceeding, which has been concerned with the determination of taxability that was *actually made by the ITD*, it appears that the Delhi High Court, and perhaps a higher court will pronounce on whether, among other things, the structure adopted by Cairn in 2006 can be considered to be tax avoidant. The Tribunal cannot anticipate what the Indian courts might or might not do, but the fact that the issue is presently *sub judice* before a court with the power to apply Indian law fully as well as the power to direct the tax authorities to act in accordance with the court's directives (i.e., to take action or to refrain to take action) not only underscores the mandate/role and lack of a 'concrete measure' issues just discussed, but also, as shall be seen, shows the frailties of determining tax avoidance based upon pleadings rather than on an actual determination by the relevant authority.

1437.   This takes the Tribunal to its third preliminary observation. The *Vodafone* judgment is crystal clear that the burden of proving tax avoidance is on the Revenue. The Supreme Court stated in no uncertain terms:

> When it comes to taxation of a Holding Structure, at the threshold, the burden is on the Revenue to allege and establish abuse, in the sense of tax avoidance in the creation and/or use of such structure(s). In the application of a judicial anti-avoidance rule, the Revenue may invoke the "substance over form" principle or "piercing the corporate veil" test only after it is able to establish on the basis of the facts and circumstances surrounding the transaction that the impugned transaction is a sham or tax avoidant. To give an example, if a structure is used for circular trading or round tripping or to pay bribes then such transactions, though having a legal form, should be discarded by applying the test of fiscal nullity. Similarly, in a case where the Revenue finds that in a Holding Structure an entity which has no

---

[1796]   See, e.g., correspondence cited in Section III.I.9 above.

commercial/business substance has been interposed only to avoid tax then in such cases applying the test of fiscal nullity it would be open to the Revenue to discard such inter-positioning of that entity. However, this has to be done at the threshold.[1797]

1438. The allocation of the burden of proof on the ITD is consistent with the ordinary rules concerning the burden of proof in international proceedings: the Respondent must prove that the Claimants adopted a tax avoidant structure. In accordance with well-established principle, the standard of proof is a balance of probabilities.

1439. The fourth and final preliminary observation is this: tax avoidance, even if proven, is not necessarily sufficient to preclude the Tribunal from assessing whether the measures actually imposed were fair and equitable. To constitute a full defence to the Claimants' FET claim, the Respondent must also show that the amount of the tax that would have been imposed in the application of a judicial anti-avoidance rule would have been identical, or at least as much as that which was in fact imposed.

1440. With these observations in mind, the Tribunal will now assess the evidence to determine whether the Respondent has discharged its burden of proving that the Claimants engaged in abusive tax avoidance.

1441. The Tribunal begins by observing that different arguments have been advanced at different stages of the proceedings. The Respondent argues that the changes in its case were caused both by the paucity of documents and the lateness with which the Claimants introduced such documents into the record, and that, from the moment in which the Respondent had access to documents relating to Cairn's meetings of 3-4 May 2006, its case has been the one described at para. (b) below.[1798] While it is clear that the evidence pertaining to the Claimants' tax planning emerged over time and sometimes, it might be said, fitfully, this is primarily due to the fact that the Claimants were contesting the measures that were actually taken and were seeking to confine the Tribunal's attention to those alone. The Tribunal has rejected that approach insofar as tax avoidance is concerned. But it also remains the case that the Respondent has advanced different allegations of tax avoidance. In the end, the Tribunal has considered it appropriate to address them all. In a nutshell, the Respondent has made the following allegations of tax avoidance:

a. In its Statement of Defence, the Respondent's argument was essentially that the 2006 Transactions were, in substance, a transfer (indeed, the divestment) of Cairn's underlying oil and gas assets in India. Because the 2006 Transactions relied on an abusive holding structure where CIHL and the 9 Subsidiaries had been interposed without any legitimate commercial or business purpose, the Revenue was entitled to disregard the form of the transactions and tax their substance. The Tribunal understands that, with this theory, the Respondent is arguing that the Claimants avoided paying tax on the capital gains that had accrued from Cairn Energy's acquisition of those assets (i.e., 1996) until their transfer in

---

[1797] *Vodafone International Holdings B.V. v. Union of India & Anr.* [2012] 6 SCC 613, Exh. C-59, ¶ 68 (emphasis added).

[1798] R-PHB, ¶¶ 265-271; Transcript, Evidentiary Hearing, Day 1, 128:14-129:3 (Mr Moollan).

2006, and that would have been payable if the oil and gas assets had been transferred directly to CIL. (The Claimants have referred to this as Theory I; the Tribunal will refer to it as the "Direct Transfer Theory").[1799]

b.   In its Rejoinder, the Respondent (relying upon documents produced by the Claimants in the document production phase) advanced a different tax avoidance theory. Focusing now on the structure of the pre-IPO steps of the 2006 Transactions, the Respondent argued that the Claimants chose an unnecessarily complex and artificial structure to consolidate the oil and gas assets under CIL (i.e., a modified version of Plan C) with the dominant purpose of avoiding the taxes that had been identified by their advisors as applicable had Cairn pursued the more "straightforward" structure that had been proposed as Plan A (or even as Plan B). The tax avoided under this theory was the capital gains tax on the offer for sale of CIL shares that CUHL would undertake in Plans A and B (but that was eliminated in Plan C). (This is what the Claimants have called "Theory III"; the Tribunal will refer to it as the "Tax Planning Theory".)

c.   The Respondent also appeared to espouse a theory advanced by its expert, Professor Rosenbloom, according to whom the 2006 Transactions had been abusively structured so as to inflate the cost basis of CIL's shares so that less tax would be payable on future sales of CIL shares. The tax avoided under this theory was the full capital gains tax that would have been applicable if the historic cost basis of the oil and gas assets would have been carried over to the CIL shares. (This is what the Claimants have referred to as Theory IV; the Tribunal will refer to it as the "Cost Basis Theory").

d.   The Respondent has also argued at different points that the Claimants sought to avoid other Indian or foreign taxes, as follows:

    i.    By planning to collapse all of the holding structure between CIL and the oil & gas assets into CIL, the Claimants avoided paying the full amount of Indian tax on dividends that would have been otherwise applicable (the "Tax Leakage Theory").

    ii.   By incorporating CIHL in Jersey, the Claimants avoided paying UK stamp duty;

    iii.  Through the modified version of Plan C that was finally adopted, the Claimants were able to disburse a large part of the IPO proceeds as payment from of a sale of shares, rather than as a dividend from CIL, thus avoiding UK corporation tax;

---

[1799]   The Claimants have identified a seventh theory (what they call Theory II), according to which the 2006 Transactions were a disposition (through the IPO) to third parties of a partial interest of the underlying Indian oil and gas assets. The tax avoided was again the tax that would have been paid on a direct sale of the PSC assets to these third parties (see ¶ 933.b above). To the extent that the Respondent does indeed make this argument, the Tribunal considers this argument to be a part of the Direct Transfer Theory.

1442. The Respondent has thus presented various possible taxes that the Claimants are alleged to have "avoided". There is nothing objectionable about that; however, the Tribunal cannot help but note that the Respondent has failed to establish that, contemporaneously, the ITD or the DRP identified any specific tax avoided. In fact, the DRP appears to have been satisfied with the sweeping statement that the 2006 Transactions amounted to a "strategic process of disinvestment" in which CUHL "ha[d] in the process, earned substantial capital gains, but not paid taxes in any territory in the world".[1800] The DRP added that "India being the jurisdiction where the oil assets are located should rightly have been the source jurisdiction of such taxation", and concluded that, "prima facie, the series of steps that commenced with [CUHL's incorporation and ended with the CIHL Acquisition] resulting in no taxes being paid in India, U.K. or Jersey is thus a tax evasion scheme which deserves to be tested in light of business purpose and economic substance doctrines."[1801]

1443. The conclusion to be drawn is that the Respondent's tax avoidance defence has been more fully developed in this arbitration. The Respondent has argued that this is because only in the context of this arbitration has it had access to documents pointing to the various possible taxes that were allegedly avoided. While this may be so for some of the theories, it is not the case for all of them (for instance, the Direct Transfer Theory). While the Tribunal has found that the Respondent's tax avoidance defence is admissible, it will keep this point in mind when assessing the credibility of the Respondent's arguments under each theory.

1444. The Tribunal now will now assess whether the Claimants engaged in abusive tax avoidance in any of the theories identified by the Respondent.

*(1)    Avoidance of capital gains tax on a direct divestment of Cairn's Indian assets (Direct Transfer Theory)*

1445. In its Statement of Defence, the Respondent argued that the 2006 Transactions were only formally the transfer of shares in foreign companies; in substance, they were "nothing but the transfer of Indian oil and gas assets, i.e. capital assets situated in India."[1802] According to the Respondent, Cairn wanted to "cash in on the gains in value" of the Indian oil and gas assets that it indirectly owned by way of a public sale on the Indian markets.[1803]

1446. Relying on the opinion of its expert, Professor Rosenbloom, the Respondent argues that the Claimants artificially fragmented a simple transaction (i.e., the divestment of the Claimants' oil and gas assets to the Indian public) by interposing holding structures (namely CIHL and the 9 Subsidiaries). This fragmentation "appears to have been made with the intention, and certainly had the clear effect, that even though the combined transactions resulted in capital gains for the group, each of the transactions would not

---

[1800]   Directions of the DRP under Section 144C(5) of the ITA 1961 dated 31 December 2015, Exh. C-69, p. 37 (emphasis omitted).

[1801]   *Ibid.*

[1802]   R-SoD, ¶ 105; Annex B to the SoD.

[1803]   R-SoD, ¶ 105.

appear to create any taxable income from formally local sources in India."[1804] The issue, according to the Respondent "is whether the formal existence of these interposed entities – the 9 Subsidiaries or CIHL – is backed by any substantive reason so as to justify the characterization of the transaction as a transfer of foreign assets."[1805] For this, the institution and operation of the interposed entities would need to have a legitimate business or commercial purpose, which the Respondent submits is not the case here.[1806]

1447. The Respondent's position thus appears to be that the oil and gas assets should have been transferred directly from Cairn Energy to CIL (or to the Indian public), or at least taxed as if they had been. As Mr Puri testified, "[i]nstead of selling the assets directly to whosoever was the willing buyer, […] these companies were created in between and assets were transferred in between so that it gives a colour of transfer of shares abroad, not transfer of assets in India."[1807]

1448. While this is no longer the Respondent's main tax avoidance theory, the Tribunal addresses it first because it was the first theory raised in this arbitration, and because it is the only theory that finds some support in the FAO or in the DRP Decision. Both the FAO and the DRP Decision suggested (the latter more clearly than the former) that, because the 2006 Transactions were essentially the transfer of underlying Indian assets and no tax had been paid in India (or anywhere in the world) on the capital gains earned, they amounted to a tax avoidant scheme. However, they did not articulate what tax had been avoided, and it is unclear from their reasoning whether the ITD relied on Section 9(1)(i) as the basis for taxation.

1449. In this arbitration, however, the Tribunal understands that the Respondent is assuming for purposes of this theory that indirect transfers are not taxable under Section 9(1)(i). Rather, the Respondent's argument is that, because the form of the 2006 Transactions was abusive (in particular, because the holding structure had no legitimate business purpose), the Revenue is entitled to look at its substance and tax the transactions as a direct transfer of Indian oil and gas assets, i.e., as if Cairn Energy had transferred these assets to CIL (or to the Indian public).

1450. The Respondent submits that it is not necessary for the companies to be a sham for the "substance over form" principle to apply. In *Vodafone*, the Supreme Court recognised two separate bases which entitle the ITD and the courts to look beyond the form of the transaction: (a) a finding that the transaction or corporate structure was a sham, or (b) a finding that it was tax avoidant (which, in the Respondent's submission, would be the case if the dominant purpose of the transaction was to avoid tax). In either scenario, the ITD (or the courts) may look beyond the legal form of the structure or transaction, not only by piercing the corporate veil, but also by disregarding the legal form of the transaction to look at its substance. According to the Respondent, this does not require the courts to apply the theory of fiscal nullity (i.e., disregarding the allegedly illegitimate

---

[1804]   *Id.*, ¶ 106 (emphasis omitted); Rosenbloom ER1, ¶¶ 26-39; Annex B to the SoD, ¶¶ 77-98.

[1805]   R-SoD, ¶ 105.

[1806]   R-SoD, ¶¶ 105-106.

[1807]   Transcript, Evidentiary Hearing, Day 8, 249:25-250:1, 250:1-252:4 (Mr Puri).

holding company or transaction), as the Claimants contend; it allows the courts to "look at" and tax the economic substance of the transaction.

1451. As a result, the Respondent argues that it does not need to show that the 27 Subsidiaries were "puppets";[1808] it is sufficient to show that the dominant purpose of the 2006 Transactions was to avoid tax. In any event, the Respondent alleges that the 2006 Transactions were indeed a "sham", and the requirements for veil piercing are met. Specifically, the 27 Subsidiaries had no legitimate business purpose other than to hold shares, which is insufficient for tax purposes, and were completely controlled by Cairn Plc, rendering them effectively its "puppets".

1452. The Claimants disagree on the legal test, and on its application to the facts of the case. They submit that, under the "substance over form principle", establishing that there is a dominant purpose to avoid tax is not sufficient to disregard an intermediate holding structure. As in cases of a "sham", "it must be determined if the form (in this case, a transfer of a holding company) is illegitimate, and only if this is established can the Revenue proceed to taxing the substance (a transfer of the underlying asset) through the application of the nullity doctrine."[1809] Applying this test, the Claimants contend that there is no reason to disregard either CIHL or the 9 (or 27 Subsidiaries), all of which had a legitimate business purpose.

1453. The Tribunal has some sympathy for the Respondent's argument. It is undisputed that in 1996, Cairn Energy acquired from Command Petroleum a series of Indian oil and gas assets (including a participation in various PSCs) which appreciated significantly in value between 1996 and 2006, in particular given the Rajasthan find.[1810] As discussed in Section VII.A.3.a(i) above, these capital gains amount to approximately US$ 5.5 billion. Yet, because the transfers of these oil and gas assets were never direct, but always indirect (i.e., through the transfer of shares in non-Indian companies), as previously found, they did not attract capital gains tax in India. The Respondent is understandably frustrated at not being able to benefit from this appreciation in value; however, this is because Indian law did not tax indirect transfers, as the Tribunal found at Section VII.A.3.b(ii)(9) above. The Respondent has since then widened its tax next to capture these transactions (with retroactive effect). However, in 2006, indirect transfers were not taxable in India.

1454. The Respondent's grievance (repeated in its submissions, in the FAO, in the DRP Decision and by its witnesses) is that the Claimants did not pay capital gains tax on this appreciation in value "anywhere in the world".[1811] Hence – so the Respondent's

---

[1808] R-Rejoinder, ¶ 271.

[1809] C-PHB, ¶ 497. See also *Id.*. ¶¶ 492-497.

[1810] The Claimants have expressly acknowledged this. See, e.g. Transcript, Hearing on Closing Arguments, Day 1, 35:6-23 (Mr McNeill).

[1811] See, e.g. R-PHB, ¶¶ 408; 528; FAO, Exh. C-70, p, 66, ¶ 9.1.9; Directions of the DRP under Section 144C(5) of the ITA 1961 dated 31 December 2015, Exh. C-69, p. 37; Transcript, Evidentiary Hearing, Day 8, 249:12-14 (Mr Puri) (Counsel for the Respondent also argued at the Evidentiary Hearing that no capital gains tax had ever been paid on the capital gains accrued between 1996 (when Cairn acquired the underlying oil and

argument seems to go – the 2006 Transactions must have been tax avoidant. As Mr Puri plaintively put it at the Evidentiary Hearing: "[a] transaction is undertaken resulting in a huge gain and no tax is paid anywhere in the world. If it is not tax avoidance then what is?"[1812]

1455. Plaintive though it may be, the Tribunal cannot agree with this statement. For a transaction to be tax avoidant, it must have been carried out with the dominant purpose of avoiding tax. The mere fact that a transaction does not result in taxes being paid anywhere in the world is insufficient to establish tax avoidance. Whether tax applies or not is a matter of legislative policy for each relevant jurisdiction. The question for this Tribunal is thus not whether the 2006 Transactions resulted in Cairn's not paying tax anywhere in the world; it is whether they were structured with the dominant purpose of avoiding an applicable tax in India.[1813]

1456. The Tribunal notes that Cairn largely inherited the structure (the various offshore subsidiaries) when it stepped into the shoes of Command Petroleum. Command had already taken the critical step of placing the ownership of the Indian assets in companies which were incorporated outside of India (evidently with the consent of the Indian oil and gas regulators). Thus, in a sense the die was cast: an appreciation in value of the Indian PSCs would be reflected – all things being considered – in an appreciation in the value of the shares of those non-Indian companies. The whole purpose of locating the companies outside of India was to locate them outside the expected reach of the Indian tax net. Whether it was good tax policy or bad tax policy on India's part not to extend its tax net to offshore companies owning or controlling capital assets in India, it was permissible to hold such a structure under Indian law as it stood from 1996 until the 2012 Amendment.

1457. Thus, when the Tribunal comes to the Respondent's argument that the Claimants deliberately "fragmented" the transfer into several intra-group share transfers between companies that had no legitimate business purpose, instead of directly transferring the PSC assets to CIL or the Indian public, the Tribunal immediately sees three problems. The first is that much of this structuring was done before Cairn arrived on the scene and Cairn built upon what it had purchased. The second is that the Tribunal cannot accept that there was no legitimate business purpose for the 9/27 subsidiaries. In this latter respect, it is plainly the case that if, for example, a company wishes to dispose of valuable contractual rights it is generally easier to sell the shares of the company holding the rights than it is to sell the rights themselves (especially when it comes to contractual rights, the transfer of which frequently requires counterparty consent, which might not be forthcoming or if forthcoming, comes with a price). The third problem is that, as discussed further below, the Tribunal does not share the Respondent's view that there

---

gas assets) and 2006 (when they were transferred to CIL)); Transcript, Evidentiary Hearing, Day 1, 182:1-184:1 (Mr Moollan).

[1812] See, e.g. Transcript, Evidentiary Hearing, Day 8, 249:12-14 (Mr Puri).

[1813] While conceivably a transaction may be structured to avoid taxes in several jurisdictions, the question for this Tribunal in this part of the analysis is whether the actual fiscal measures imposed by the Respondent on the Claimants are fair and equitable because other Indian taxes would have applied irrespective of the 2012 Amendment.

was no substance to the subsidiaries, or at least to some of them which were rolled into CUHL and then conveyed to CIHL.

1458. To recall, the 2006 Transactions dealt with Cairn's existing India-related holdings in the following essential sequence:[1814]

    a.    <u>Step 1</u>: CEP consolidated all of the Indian assets in the 9 Subsidiaries, and separated all non-Indian assets (which were organised under Cairn Resources Ltd.).

    b.    <u>Step 2</u>: CEP incorporated CUHL in the United Kingdom and transferred its shares in the 9 Subsidiaries to CUHL, in consideration for CUHL shares. As a result, CEP owned 100% of CUHL, which in turn owned the 9 Subsidiaries (which in turn owned the other 18 Subsidiaries and indirectly held the Indian oil and gas assets).

    c.    <u>Step 3</u>: CUHL in turn incorporated CIHL in Jersey and transferred its shares in the 9 Subsidiaries to CIHL, in consideration for CIHL shares. As a result, CUHL owned 100% of CIHL, which in turn owned the 9 Subsidiaries.

    d.    <u>Step 4</u>: CUHL incorporated CIL in India with minimum capitalisation and transferred all of its shares in CIHL to CIL in three tranches, in consideration for cash and shares. Three of these steps took place prior to the IPO (with the cash portions being funded by the Daylight Loan). The fourth tranche was carried out post-IPO, where CIL acquired 24.3% of CIHL for cash consideration, the cash having been raised through the IPO.

1459. The Respondent's argument has two prongs:

    a.    First, it argues that the 2006 Transactions were artificially fragmented into intra-group indirect transfers with the purpose of avoiding tax. In this respect, it argues that that the holding structure used by the 2006 Transactions (whether it was put in place for the 2006 Transactions or pre-existed them) was put in place with the dominant purpose of avoiding tax and had no legitimate business purpose.

    b.    Second, it appears to be arguing that the holding structure was a "sham" made of "puppet" companies with no independent management, which allows the Indian Revenue to disregard them.

1460. With respect to the first prong of the Respondent's argument, the question is whether this fragmented structure, which relied on several intra-group share transfers (and in which certain companies were specifically created to carry it out), was ((pre)dominantly) chosen to avoid paying capital gains tax on the accrued capital gains between 1996 and 2006. To quote *Vodafone*, were the 2006 Transactions a "preordained transaction" structured to avoid this particular tax?[1815] In the Tribunal's view, the Respondent has not met its burden of proof in this respect.

---

[1814]   See Section II.B.3 above.

[1815]   *Vodafone International Holdings B.V. v. Union of India & Anr.* [2012] 6 SCC 613, Exh. C-59, ¶ 73.

1461. The Respondent and its expert, Professor Rosenbloom,[1816] have suggested that it would have been more straightforward to transfer the actual oil and gas assets, i.e., Cairn's interests in the PSCs. Professor Rosenbloom appears to accept that a direct transfer to the public would have been impossible, as this transaction required an IPO and only Indian companies can be listed in the Indian markets, but its argument appears to be that CEP could have transferred these assets directly to CIL.[1817] The record shows however that this would have been highly impractical, as it would have required amending and assigning the PSCs, which in turn would have required consent from the relevant authorities, among other administrative hurdles.[1818] Indeed, the record suggests that one of the reasons that Cairn acquired the Command subsidiaries that held the PSCs, rather than the PSCs themselves, was to facilitate their transfer.[1819] It was thus commercially much simpler for CEP to transfer the shares in the holding companies that directly or indirectly held the assets, rather than to seek to transfer the assets themselves.

1462. Professor Rosenbloom appears to recognise this, as he has also suggested that "Cairn could have achieved its objective of transferring its Indian operations to an Indian corporation by forming CIL and: (1) contributing shares of each of the Indian Operating Subsidiaries to CIL in return for additional shares of CIL; or (2) contributing shares of the Indian Operating Subsidiaries to a holding company and then contributing shares of the holding company to CIL in return for additional shares of CIL[…], or, [4] selling shares of the Indian Operating Subsidiaries (or a company formed to hold the shares of the Indian Operating Subsidiaries) to CIL." [1820] However, Options 1 and 2 involved a share swap and would not have satisfied the MPC requirement, which needed to be made in cash (see Section VII.A.3.c(v)(2) below), and Option 4 would have involved the sale of shares in non-Indian companies holding Indian assets (i.e., indirect transfers), and thus is not materially different to the 2006 Transactions from an Indian tax perspective.

---

[1816]  Rosenbloom ER1, ¶¶ 26, 29.

[1817]  Rosenbloom ER1, ¶ 26. (Professor Rosenbloom also suggested that "Cairn could have achieved its objective of transferring its Indian operations to an Indian corporation by forming CIL and: (1) contributing shares of each of the Indian Operating Subsidiaries to CIL in return for additional shares of CIL; or (2) contributing shares of the Indian Operating Subsidiaries to a holding company and then contributing shares of the holding company to CIL in return for additional shares of CIL[…]." However, it is undisputed that this would not have met the MPC Requirement.).

[1818]  Ms. Brown testified that "[w]e did not consider directly transferring the underlying PSCs from the 27 Subsidiaries to the Indian entity because it would have been a lengthy and impracticable process." (Brown WS1, ¶ 43). She later explained that "such transfers would have required the approval of the Government of India in respect of each individual PSC and signatures on JOA amendments from each joint venture partner", and that "[o]ur previous experience of similar transfers of licence interests in India suggested that this would have extended the timescale for the IPO by many months or even years and rendered the timing highly uncertain." (Brown WS2, ¶ 70). The Respondent has not contested this, and Professor Rosenbloom acknowledges that this option would "doubtless have been 'a lengthy and impracticable process'." (Rosenbloom ER1, p.12, n. 28).

[1819]  Brown WS2, ¶ 70.

[1820]  Rosenbloom ER1, ¶ 26 (Professor Rosenbloom also suggested that "Cairn could have achieved its objective of transferring its Indian operations to an Indian corporation by forming CIL and: (1) contributing shares of each of the Indian Operating Subsidiaries to CIL in return for additional shares of CIL; or (2) contributing shares of the Indian Operating Subsidiaries to a holding company and then contributing shares of the holding company to CIL in return for additional shares of CIL[…]." *Ibid*. However, it is undisputed that this would not have met the MPC Requirement.).

1463. The Respondent has argued however that, even if the transactions formally required a share transfer, the holding companies between the operating companies and CEP should be disregarded because they were "interposed" for the 2006 Transactions and had no legitimate business purpose. The record does not support this characterisation, at least not for all the holding companies involved.

1464. First, the only companies that were "interposed" were CUHL, CIHL, and CIL. These three companies were created for Cairn's corporate reorganisation and IPO. The question is thus whether they had a legitimate business purpose.

1465. CIL (incorporated in India) was created to be the Indian listed company, which was indispensable for the IPO – it is undisputed that only Indian companies may be listed in the Indian stock exchanges. There is thus no dispute that CIL had a legitimate business purpose.

1466. The question that arises is rather whether CIHL or CUHL (both holding companies) had a legitimate business purpose, and if so, whether incorporating a second holding company served a purpose beyond avoiding taxes. It is undisputed that the original version of Plan C contemplated only one UK Hold Co (i.e., CUHL) to consolidate the 9 Subsidiaries and be transferred to CIL. The amended version of Plan C ended up inserting a Jersey company (i.e., CIHL) to play that role, but also kept CUHL. The two versions are illustrated in the following diagram:[1821]



1467. The Claimants explain that CUHL (incorporated in the UK) was originally incorporated to hold the 9 Subsidiaries so as to facilitate their transfer to CIL, and in the original version of Plan C, would have been acquired by CIL. However, once the consolidation of the 9 Subsidiaries was underway, the Claimants decided to take advantage of a new UK law which was expected to be enacted in July 2006 and which "would provide UK stamp duty relief if the holding company for the 9 Subsidiaries was incorporated in

---

[1821]   Claimants' Answers to the Tribunal's Questions, ¶ 35.

Jersey."[1822] This led to the creation of CIHL in Jersey, which assumed the role originally planned for CUHL.

1468. However, instead of removing CUHL from the plan, the Claimants decided to keep it as a holding company for CEP's CIL shares, so that CEP would not have to hold them directly. According to Ms Brown, "rather than just replacing CUHL with CIHL, leaving CUHL under [PLC] […] as an intermediate holding company to manage the different pieces of the business made sense."[1823] The Claimants assert that it has been CEP's policy since 2003 not to hold assets at the parent level, but rather through holding companies.[1824] The Claimants explain that the use of subsidiaries provides management and accounting flexibility (for instance, only three of CEP's directors are also CUHL's directors, which facilitates approvals, and CUHL's accounts were in INR).[1825] It also facilitates funding for the different businesses (for instance, CEP was able to pledge its CUHL shares to obtain funding required for Cairn's 2011 Greenland drilling campaign and other general corporate purposes, when it might not have been able to pledge its CIL shares in the same manner due to restrictions on pledging participating interests in the Indian PSCs held by CIL).[1826]

1469. As for CIHL (incorporated in Jersey), while the Claimants accept that its primary purpose was to mitigate UK stamp tax duty, they deny that it was its sole purpose.[1827] The Claimants submit that "a distinction must be drawn between the existence of a holding company as such, and the jurisdiction in which that holding company is incorporated."[1828] The purpose of the holding company was to consolidate the 9 Subsidiaries and thereby facilitate their transfer as a group. They assert that, because of cash flow considerations and the MPC, CIHL had to be transferred to CIL in four tranches. Had they decided to transfer each of the 9 Subsidiaries to CIL, this would have required 36 transfers. The Claimants thus argue that they would have used an (intermediate) holding company in the structure regardless of whether UK stamp tax relief was available. In other words, "the alternative to a Jersey holding company was a UK holding company, not no holding company at all."[1829] As to the choice of jurisdiction, they argue that, in addition to the stamp duty consideration, they chose Jersey because it was a jurisdiction that was familiar to them, and because it would have

---

[1822] *Id.*, ¶ 36, citing Email from RSM attaching Modified RSM Concept Paper dated 9 June 2006, Exh. C-371, pp. 28-29.

[1823] Transcript, Evidentiary Hearing, Day 4, 176:15-18 (Ms Brown).

[1824] Claimants' Answers to the Tribunal's Questions, ¶ 45, citing Recommended Proposal to establish New Cairn Energy PLC as the holding company of Cairn Energy by means of a Scheme of Arrangement under section 421 of the Companies Act 1985 dated 12 December 2002, Exh. CWS-Brown-133, p. 4.

[1825] *Id.*, ¶ 47, citing CUHL, Annual Report & Accounts 2006, dated 31 January 2007, Exh. C-573, p. 2.

[1826] *Ibid.,* citing CUHL – Report & Financial Statements for the Year ended 31 December 2011, Exh. C-656, p. 17.

[1827] *Id.*, ¶ 41-42; Brown WS2, ¶¶ 67, 89.

[1828] C-PHB, ¶ 499.

[1829] *Ibid*.

facilitated the eventual collapse of the holding structure in the future to avoid tax leakage.[1830]

1470. The Tribunal is persuaded that each of CIHL and CUHL had a valid business purpose. It is clear that having at least one holding company to consolidate the 9 Subsidiaries would facilitate their transfer to CIHL. As discussed further below, holding companies can serve legitimate business purposes. The Claimants have also sufficiently proven that having a second holding company between CEP and CIL, to hold CEP's shares in CIL, would make business sense and was in line with CEP's policies.

1471. The argument could be made that CUHL was not indispensable. It is also conceivable that an Indian court might find that CIHL's dominant purpose was to avoid tax (albeit UK tax). However, even if one were to disregard CUHL and CIHL, this would have no tax implications in India: there were several layers of foreign companies (the 9 Subsidiaries and the 18 subsidiaries under them) that would have still remained between CEP and the oil and gas assets. In other words, even if CUHL and CIHL were disregarded, and the shares of the 9 Subsidiaries had been transferred directly to CIL, this would have still constituted an indirect transfer, and thus would not have attracted capital gains tax in India.

1472. For the Respondent's tax avoidance case to succeed, it would need to prove that all of these 27 Subsidiaries should be disregarded, so as to enable the ITD to tax the underlying transfer of Indian oil and gas assets. The Tribunal finds that the Respondent has failed to discharge this burden.

1473. First, as noted previously, the 27 Subsidiaries pre-existed the 2006 Transactions by many years. Some of the companies had been incorporated in the 1980s and had been inherited by Cairn after acquiring Command Petroleum. Others were created at the time of the 1996 Command Acquisition or shortly thereafter. Prior to the 2006 Transactions, Cairn's organisational structure looked like this:[1831]

---

[1830]   Claimants' Answers to the Tribunal's Questions, ¶¶ 41-43; Transcript, Evidentiary Hearing, Day 4, 179:21-180:5 (Ms Brown).

[1831]   Claimants' Submissions on the Merits at the Evidentiary Hearing, slide 39.



1474. As a preliminary step to the 2006 Transactions, Cairn reorganised and separated its non-Indian holdings (which were now held under Cairn Resources Ltd), and consolidated its Indian holdings under CUHL, as follows:[1832]



1475. This reorganisation was done to facilitate the transfer of the 9 Subsidiaries to CIL. However, this does not mean that the 9 Subsidiaries (or the 18 below them) had no

---

[1832] *Id.*, slide 40.

substance or business purpose. The record evidence confirms that these structures were in place for business reasons and not with the dominant purpose of avoiding capital gains tax in India when they were eventually divested. This structure was not, in the Tribunal's view, a "preordained transaction created for tax avoidance purposes", in the sense used by *Vodafone*.

1476.  To recall, in *Vodafone* the Supreme Court articulated the following test:

> Ramsay (supra) enunciated the look at test. According to that test, the task of the Revenue is to ascertain the legal nature of the transaction and, while doing so, it has to look at the entire transaction holistically and not to adopt a dissecting approach. One more aspect needs to be reiterated. <u>There is a conceptual difference between preordained transaction which is created for tax avoidance purposes, on the one hand, and a transaction which evidences investment to participate in India.</u> In order to find out whether a given transaction evidences a preordained transaction in the sense indicated above or investment to participate, one has to take into account the factors enumerated hereinabove, namely, duration of time during which the holding structure existed, the period of business operations in India, generation of taxable revenue in India during the period of business operations in India, the timing of the exit, the continuity of business on such exit, etc.[1833]

1477.  Here, Cairn's holding structure had been substantially in place since 1996, and some elements from the 1980s. Cairn had investments in India from 1996 until 2018, when the last of its shares in CIL were subject to a forced sale. During that time, it generated significant taxable revenue for India during its operation in India, and between 2005 to 2011 it paid almost US$ 4 billion in taxes.[1834]

1478.  As to the "timing of the exit", the Respondent has repeatedly referred to the 2006 Transactions as Cairn's "divestment strategy". Indeed, the FAO refers to the 2006 Transactions as an "arrangement structured by the Cairn Energy Group to systematically divest its stake in Indian Oil and Gas business."[1835] As a preliminary point, there is nothing intrinsically wrong in divesting an asset. One of the essential attributes of property is the right to alienate it. Investors may legitimately choose to invest in a particular country or to divest themselves of such investments. The fact that their ultimate objective might be to "realise value" or "cash in" those investments does not make such a divestment illegitimate, objectionable or, most importantly, unlawful.

1479.  Having said this, the 2006 Transactions were only a partial divestment of Cairn's investments in India. The pre-IPO steps were in fact an internal reorganisation, which was carried out exclusively among members of the Cairn group. In particular, the first three tranches of CIHL were transferred to CIL when it was still a wholly-owned subsidiary of CUHL. It was only as a result of the IPO that the Cairn group divested of

---

[1833]  *Vodafone International Holdings B.V. v. Union of India & Anr.* [2012] 6 SCC 613, Exh. C-59, ¶ 73 (emphasis added).

[1834]  These taxes included profit petroleum taxes, cess and royalties, corporation tax, capital gains tax and other miscellaneous taxes. See C-PHB, ¶ 505, citing Transcript, Evidentiary Hearing, Day 7, 215:22-217:22 (Mr McNeill); Claimants' Rebuttal Presentation at the Evidentiary Hearing, slide 5.

[1835]  FAO, Exh. C-70, ¶ 9.1.9.

part of its Indian holdings (approximately 31%). The remaining 69% of CIL continued to be held by CUHL until 2009, when it sold a 2.3% stake in CIL to Petronas, and in 2010 when it sold an additional 40% stake to Vedanta. In the years that followed, CUHL sold additional shares on market, such that by the time of the filing of the Notice of Arbitration, it still owned 9.8% of CIL.

1480. To return to the *Vodafone* test, the evidence shows that CUHL continued to be the controlling shareholder of CIL until 2010, i.e., four years after the 2006 Transactions. When it divested itself of its controlling stake in off market sales to Petronas and Vedanta, it paid capital gains tax, to the order of approximately INR 820 million (approximately US$ 17.8 million) in capital gains tax for the Petronas transaction, [1836] and approximately INR 26.7 billion (about US$ 536 million) for the Vedanta transaction.[1837] While Cairn no longer owns shares in CIL (now VIL), the underlying Indian business continues. According to the Claimants, and not evidently disputed by the Respondent, VIL now accounts for over one quarter of India's onshore oil production.[1838]

1481. In the circumstances, applying the *Vodafone* test, the Tribunal considers that the 2006 Transactions were not a 'preordained transaction' structured with the dominant purpose of avoiding tax on the long-term capital gains accrued between 1996 and 2006. In particular, the majority of the corporate structures through which these transactions were implemented had been in place for many years and were not created for the transactions. The companies that were indeed created for the transactions (CIL, CUHL and CIHL) had legitimate business purposes related to facilitating the transaction itself or managing it after it had been completed. Even if CIHL and CUHL were to be disregarded, this would have no impact on Indian taxation. The Cairn group had a significant presence in India for over 20 years (before and after the 2006 Transactions) and paid significant taxes to India. In the Tribunal's view, neither the timing nor the form of its exit from India were objectionable under the *Vodafone* test.

1482. Despite this (and here the Tribunal turns to the second prong of the Respondent's argument), the Respondent seems to be arguing that, even if it was not a preordained transaction structured to avoid tax, the entire holding structure that had been in place since 1996 (or even prior to that) should be disregarded because the 27 Subsidiaries

---

[1836] C-SoC, ¶ 134; Brown WS1; ¶ 103; NoA, ¶ 28; Order under Section 197 of the ITA 1961 dated 23 October 2009, Exh. CWS-Brown-84; National Securities Depository Limited, Quarterly Statement of TDS under Section 200(3) of the ITA 1961 dated 11 January 2010, Exh. CWS-Brown-86 (showing payment by Petronas International Corporation Limited of INR 819,899,863 in assessment year 2010-2011). As discussed in Section II.B.4.a above (Facts), the Claimants disputed the applicable tax rate and were entitled to a rebate, but the Tribunal understands that it has not been paid. See Section VIII.C.3.c below.

[1837] C-SoC, ¶ 137; Brown WS1; ¶ 105; HDFC Bank, Taxpayer's Counterfoil dated 4 August 2011, Exh. CWS-Brown-98 (showing payment of INR 6,379,481,687 by Twin Star Mauritius Holdings Limited); IDBI Bank Challan Number / ITNS 281 dated 6 January 2012, Exh. CWS-Brown-106 (showing payment of INR 20,330,336,340 by Twin Star Mauritius Holdings Limited).

[1838] Transcript, Evidentiary Hearing, Day 7, 217:2-3 (Mr McNeill); Claimants' Presentation "Submissions on the Merits", Consolidated Volumes I and II, slide 4; Vedanta – Cairn Oil & Gas Fact Sheet 2018, Exh. C-550, p. 3.

were "puppets"[1839] or "instruments in the hands of Cairn Energy plc, with no separate mind"[1840], which CEP could move or collapse at will. In other words, the entire holding structure was a "sham", and an Indian court would be entitled to pierce the corporate veil in application of the first limb of the test set out in *Vodafone*. [1841]

1483.  For the Respondent, the main criterion is whether "the parent company's management has such steering interference with the subsidiary's core activities that the subsidiary can no longer be regarded to perform those activities on the authority of its own executive directors."[1842] Citing *CIT v United Breweries*, the Respondent adds that the following criteria are relevant: "whether the profits of the subsidiary were ordinarily available to the parent, whether persons conducting the business were appointed by the parent, whether the parent was the 'head and brain' of the trading venture, whether the parent governed the adventure and decided what should be done and what capital should be employed, whether profits were made at the skill and direction of the parent, whether the parent was in effectual and constant control."[1843]

1484.  According to the Respondent, all of these tests are satisfied here. With the exception of three companies,[1844] none of Cairn's intermediate subsidiaries had any valid commercial purpose other than holding shares. The fact that some of these companies were incorporated previously is irrelevant, the question is the nature of the control that a parent company exercises over its subsidiary. Here, the directing minds of all of these companies were the same; their boards of directors were not independent in the true sense of the term.

1485.  The Claimants deny that the "substance over form" principle allows the existence of these subsidiaries to be ignored. The question is whether the 27 Subsidiaries lacked substance. According to the Claimants, the Respondent has not provided any authority showing that a parent company's power to reorganise or liquidate companies in its corporate group implies that those companies lack substance. In any event, the Claimants allege that all of these companies had substance.[1845]

1486.  The Tribunal recalls that holding structures and subsidiaries more generally are recognised and accepted by Indian law as, at a minimum, *prima face* legitimate. As *Vodafone*, citing long-standing authority, recognised, subsidiaries are considered to be separate taxpayers from the parent, even if the parent company exercises influence on

---

[1839]  R-Rejoinder, ¶ 374.

[1840]  *Id.*, ¶ 354.

[1841]  *Id.*, ¶ 355.

[1842]  *Id.*, ¶ 373.

[1843]  *Id.*, ¶ 374, referring to *CIT v. United Breweries*, 89 ITR 17 (Kar), Exh. R-136.

[1844]  *Id.*, ¶ 369 (The Respondent notes that Command Petroleum Pvt. Ltd. (incorporated in Australia) employed 43 staff in 1996, and that Cairn Energy Pty. Ltd. and CNHBV had separate Directors from the rest of the group. The Respondent also notes that Cairn Energy India Pvt. Ltd. employed 269 staff in India in 2001, 400 staff again in India in 2002, and 425 staff in 2006 also in India.).

[1845]  C-PHB, ¶¶ 501-509.

their decisions.[1846] It is generally accepted that the parent company will provide general policy guidelines to the subsidiaries, and that the parent company's management will lead the group. While "[t]his obviously implies a restriction on the autonomy of the subsidiary's executive directors", it is the "inevitable consequence[] of any group structure", and "is generally accepted, both in corporate and tax laws."[1847]

1487. However, the Supreme Court recognised two limits to this principle:

    a.    First, there is the issue of the extent of the parent's control over the subsidiary. According to the Supreme Court, "where the subsidiary's executive directors' competences are transferred to other persons/bodies or where the subsidiary's executive directors' decision making has become fully subordinate to the Holding Company with the consequence that the subsidiary's executive directors are no more than puppets then the turning point in respect of the subsidiary's place of residence comes about."[1848] The Tribunal understands the Supreme Court to be saying that if the subsidiaries are no more than puppets of the parent, then effectively they should be deemed to have the same residence as the parent.

    b.    Second, "if an actual controlling Non-Resident Enterprise (NRE) makes an indirect transfer through 'abuse of organisation form/legal form and without reasonable business purpose' which results in tax avoidance or avoidance of withholding tax, then the Revenue may disregard the form of the arrangement or the impugned action through use of Non-Resident Holding Company, re-characterize the equity transfer according to its economic substance and impose the tax on the actual controlling Non-Resident Enterprise."[1849] The Tribunal understands the Supreme Court to be saying that if the transaction has been carried out through an abuse of the corporate form <u>and</u> without a reasonable business purpose, then the Revenue may apply the "substance over form" principle.

1488. The Supreme Court went on to say that "whether a transaction is used principally as a colourable device for the distribution of earnings, profits and gains, is determined by a review of all the facts and circumstances surrounding the transaction. It is in the above cases that the principle of lifting the corporate veil or the doctrine of substance over form or the concept of beneficial ownership or the concept of alter ego arises. There are many circumstances, apart from the one given above, where [the] separate existence of different companies, that are part of the same group, will be totally or partly ignored as a device or a conduit (in the pejorative sense)."[1850]

1489. The Tribunal has already rejected limitation (b) above. It has found that the 2006 Transactions did not use an abusive holding structure, and that the different companies had a legitimate business purpose. The question now is whether those companies were puppets of CEP and exercised no independent control (limitation (a) above).

---

[1846] *Vodafone International Holdings B.V. v. Union of India & Anr.* [2012] 6 SCC 613, Exh. C-59, ¶¶ 66-67

[1847] *Id.*, ¶ 67.

[1848] *Ibid.*

[1849] *Ibid.*

[1850] *Ibid.*

1490. The Tribunal does not find that the ability of a parent company to restructure its subsidiaries means *per se* that they have no independent management. In the Tribunal's view, the ability to establish the appropriate structure of the group is an attribute that falls squarely on the parent. This does not mean that, in its day-to-day activities, the subsidiary has no independent management.

1491. Here, the Claimants have shown to the Tribunal's satisfaction that several of the 27 Subsidiaries, even if not all, had substance. Ms Brown devoted seven pages of her Second Witness Statement to describing in detail how Cairn's corporate structure had come about and had evolved between 1996 and 2006; this was supported by copious documentary evidence.[1851] This evidence, which has not been persuasively rebutted by the Respondent, shows that many of the subsidiaries were operating companies, i.e., they operated the PSCs.[1852] These companies had employees and separate boards. In particular, Cairn's main assets (which accounted for almost the entire value of the group) were directly held by five companies: CEHL (Scotland), Cairn Energy India Pty Limited (Australia), Cairn Energy Cambay B.V., Cairn Energy Gujarat B.V. and Cairn Energy India West B.V. (the last three incorporated in the Netherlands).[1853] Other Scottish companies held the remainder of Cairn's PSC interests.[1854] While other companies were holding companies, Ms Brown has provided convincing evidence that they had a legitimate business purpose in the overall structure.[1855] The following chart reflects the main distribution of Cairn's operations in August 2006:[1856]

---

[1851] Brown WS2, Section II.

[1852] *Ibid.*, citing *inter alia* Production Sharing Contract between The Government of India and Oil & Natural Gas Corporation Ltd and Videocon Petroleum Limited and Command Petroleum (India) Pty Ltd and Ravva Oil (Singapore) Pte Ltd dated 28 October 1994, Exh. CWS-Brown-122; Production Sharing Contract between the Government of India and Oil & Natural Gas Corporation Ltd and Tata Petrodyne Limited and Cairn Energy India Ltd dated 30 June 1998, Exh. CWS-Brown-12; Production Sharing Contract between The Government of India and Oil & Natural Gas Corporation Ltd and Videocon Petroleum Limited and Cairn Energy Pty Limited dated 30 June 1998, Exh. CWS-Brown-126; Production Sharing Contract between the President of India, Oil & Natural Gas Corporation Limited and Shell India Production Development BV dated 15 May 1995, Exh. CWS-Brown-1; Production Sharing Contract between the Government of India and Cairn Energy India dated 12 April 2000 [executed], Exh. CWS-Brown-21A;

[1853] Brown WS2, p. 4 n. 7.

[1854] *Ibid.*

[1855] *Id.*, Section II. For instance, CEA was incorporated in Austrailia to acquire and then hold Command Petroleum Pty Ltd (later called Cairn Energy Asia Pty Ltd) and the remainder of the Command Group's pre-existing structure (Brown WS2, ¶ 16), which the Tribunal finds reasonable as direct acquisition of Command's assets and PSCs would have been highly impractical; several Dutch subsidiaries had been inherited, but Cairn also "held Dutch oil and gas license interests and ran an office with local staff"(Brown WS2, ¶ 24); following the hydrocarbon discoveries in Block CB/OS-2, in 2001 Cairn implemented a double holding company structure under CEGHBV to simplify any future disposition Cairn's interest in that block (Brown WS2, ¶ 26); that year Cairn also inserted a new intermediate holding company, CNHBV in order to consolidate two separate Dutch sub-groups of companies under a single Dutch holding company so as to create a single Dutch fiscal unity and simplify Dutch tax filings (Brown WS2, ¶ 26).

[1856] Brown WS2, p. 19 (Chart 7).



1492. The Tribunal recalls that it is the Respondent's burden to establish that the corporate structure shown above was a sham or tax avoidant. It is clearly not a sham. Even if the Tribunal were to agree with the Respondent that the 16 holding companies shown above were CEP's puppets, it cannot, on the present record, find that the 11 operating companies shown above could be characterised as such. The Tribunal also notes that the Respondent has admitted that at least four of these subsidiaries had some substance or independent will. In particular, the Respondent accepts that Command Petroleum Pvt. Ltd. (Australia) employed 43 staff in 1996, and Cairn Energy India Pvt. Ltd. (Australia) employed 269 staff in 2001, 400 staff in 2002, and 425 staff in 2006.[1857] The Respondent also acknowledges that Cairn Energy Pty. Ltd. and Cairn Energy Netherlands Holdings BV had separate Directors from the rest of the group, although it alleges that they were still appointed by CEP.[1858]

1493. In the circumstances, the Tribunal finds that the Respondent has failed to discharge its burden of proving that Cairn's corporate structure which evolved over the years leading up to the IPO was a sham or designed to be tax avoidant. Accordingly, the Tribunal cannot disregard the 27 Subsidiaries. Even if it were to do so for the holding companies, at least 11 operating companies would remain, and in the Tribunal's view, they cannot be ignored. Were the Tribunal to "look at" the 2006 Transactions and tax them in accordance to their substance, they would entail the transfer by CEP of these 11

---

[1857] R-Rejoinder, ¶ 368.

[1858] Ibid.

operating companies, all of which were incorporated abroad. In other words, the "substance over form" principle would lead the Tribunal to yet another indirect transfer that is not taxable in India.

1494. In any event, the Tribunal notes that the consequence of being a puppet of the parent appears to be, according to *Vodafone*, that the subsidiary should be deemed to have the residence of the parent.[1859] Here, the parent is a UK company. Thus, if such deeming were to take place, the subsidiaries (all of which were incorporated outside of India) would be deemed to have UK residence. Once again, this would not advance the Respondent's case on this point because the Tribunal would still be required to find that transfers of the shares of the subsidiaries would still take place outside the reach of the Indian tax net.

1495. Assuming for the sake of argument the Indian 'substance over form' test had been met by the Cairn subsidiaries, and thus the ITD and/or the Indian courts were entitled to disregard the form of the operating companies and tax the 2006 Transactions on their substance, i.e., on the appreciation in value of the underlying oil and gas assets, the Tribunal notes that the transactions would have been subject to long-term capital gains tax, rather than short-term capital gain tax (as levied in the FAO). As explained by Mr Puri, capital gains tax is levied on the difference between the cost of acquisition and cost of alienation of an asset.[1860] The rate for long-term capital gains tax is 40%; while the rate for short-term capital gains tax is 20%[1861] (although the Tribunal notes that the Claimants have also argued that it can be as low as 10%).[1862] Whether a capital gain is considered short-term or long-term will depend strictly on the time that the taxpayer has held the asset: according to Mr Puri, if an asset is held for less than 36 months, any gains accrued will be taxed at the short-term rate; if it is held for longer, the long-term rate will apply.[1863] However, it appears to be undisputed that off-market transactions of publicly listed shares held for more than 12 months are taxed at the long-term rate.[1864]

1496. Here, CEP held the assets for roughly ten years. Hence, it would have been subject to long-term capital gains tax. This means that, even if successful, the Respondent's defence is not a full one: it would boil down to arguing that the fact that the 2006 Transactions were taxed at 40% is fair, because even absent the 2012 Amendment,

---

[1859] *Vodafone International Holdings B.V. v. Union of India & Anr.* [2012] 6 SCC 613, Exh. C-59, ¶ 67.

[1860] Puri WS1, ¶ 23.

[1861] *Ibid.*

[1862] See, e.g. C-SoC, ¶ 134; *Cairn UK Holdings Limited v. Director of Income-Tax* [2013] Writ Petition (Civil) No. 6752/2012 dated 7 October 2013, Exh. CWS-Brown-108, ¶¶ 7, 13, citing the ITA 1961, Section 112(1)(c): "Tax on long-term capital gains.—(1) Where the total income of an assessee includes any income, arising from the transfer of a long-term capital asset, which is chargeable under the head 'Capital gains', the tax payable by the assessee on the total income shall be the aggregate of, — [...] (c) in the case of a non-resident (not being a company) or a foreign company, —[...] (iii) the amount of income tax on long-term capital gains arising from the transfer of a capital asset, being unlisted securities, calculated at the rate of ten per cent on the capital gains in respect of such asset as computed without giving effect to the first and second proviso to Section 48.".

[1863] Puri WS1, ¶ 24.

[1864] RSM, Project Gin, Phase I Pre-IPO Presentation dated 3 May 2006, Exh. C-363, p. 14.

assuming tax avoidance could be proven, they would have been taxable at 20% (or 10%).

1497. The Respondent has argued that it is not "easy to discern how a dispute about the applicable rate of tax can possibly be one for this tribunal."[1865] This may be so, but the Tribunal is not trying to determine what is the appropriate tax rate to be applied in case of tax avoidance. What it is trying to determine is whether the Respondent's decision to tax the 2006 Transactions in the FAO on the basis of the 2012 Amendment is fair and equitable because the transaction could have been taxed on an alternative basis. For this defence to succeed, the quantum of tax under each theory (2012 Amendment or tax avoidance) must necessarily be substantially equivalent, i.e., identical or at least similar. As things stand, even if the Tribunal had agreed with the Respondent that the 2006 Transactions were structured to avoid capital gains tax on the 1996-2006 capital gains, this would have only entitled the Respondent to impose on the Claimants a tax that is roughly half of that which was actually imposed. In the Tribunal's view, this is not a complete defence to the Claimants' FET claim, and cannot preclude the Tribunal from assessing the FAO's fairness.

*(2)    Avoidance of capital gains tax on shares offered for sale under Plans A or B (Tax Planning Theory)*

1498. The Respondent's second major theory of tax avoidance – the Tax Planning Theory – focuses on how Cairn's plans changed and ultimately arrived at the structure that was actually used by the Claimants. By the time of the post-hearing briefs and the two-day closing hearing in Paris, the Respondent appears to have settled on this theory.

1499. It is undisputed that the Claimants' commercial objective was to put the Indian oil and gas assets into a company which in turn would be listed in the Indian stock exchanges, in order to realise value for Cairn's shareholders.[1866] While the Claimants had originally considered floating on the UK markets, they finally settled on India, for a number of commercial reasons.[1867]

1500. It is also undisputed that, once the choice of India was made, the Claimants were required to establish an Indian company (what eventually became CIL), and needed to find a way to transfer the 27 Subsidiaries holding the underlying Indian oil and gas assets to CIL. The Claimants also wished to find a way to distribute some of the IPO's proceeds to Cairn's shareholders.

1501. The Respondent's case is that the most straightforward manner of obtaining these objectives was Plan A (and possibly Plan B).

---

[1865]  R-PHB, ¶ 274 (While the Respondent has made this argument in connection with its Plan A theory, the Tribunal understands that it also applies here.).

[1866]  See, e.g. Brown WS2, ¶¶ 44-47; R-Rejoinder, ¶¶ 293-300; Board Presentation: Project Sapphire – Options dated 6 April 2005, Exh. CWS-Brown-140; Cairn Energy Board Committee Meeting Minutes dated 8 March 2006, Exh. CWS-Brown-45, p. 5.

[1867]  Brown WS1, ¶¶ 41-42; Brown WS2, ¶¶ 47-48; Transcript, Evidentiary Hearing, Day 4, 206:25-218-12 (Ms Brown).

Plan A

1502. Plan A was summarised in RSM's Project Gin Presentation, which was prepared for the Mumbai planning meetings of 3-4 May 2006, as follows:[1868]



1503. As explained by Ms Brown, Plan A involved four steps:

    a.    Step 1: Incorporating an Indian company (what ended up being CIL);

    b.    Step 2: Contributing the 9 Subsidiaries to CIL in exchange for CIL shares;

    c.    Step 3: An IPO of CIL (i.e., an issuance of fresh shares);

    d.    Step 4: At the same time as the IPO, an "offer for sale" by Cairn of some or all of the shares in CIL which it obtained in Step 2.

1504. For the Respondent, it is evident that Plan A was the most straightforward way of implementing the IPO.[1869] This conclusion is supported by the fact that Mr Memani of Ernst & Young proposed a very similar structure (identified as Option A) in his preliminary advice to Cairn in April 2004.[1870] The Respondent also contends that Ms

---

[1868]   RSM Project Gin Presentation dated 3 May 2006, Exh. C-363, slide 7.

[1869]   R-PHB, ¶¶ 207-212.

[1870]   Email from Ernst & Young to Cairn of 8 April 2004, Exh. C-358, slide 4.

Brown conceded in cross-examination that this was the most straightforward way of achieving Cairn's commercial purposes.[1871]

1505. The Tribunal agrees that, in theory, Plan A entailed a straightforward manner of transferring the 9 Subsidiaries to CIL, and then realising their value on the market (and indeed, Ms Brown recognised as much[1872]). However, this plan was to be executed in India, and RSM identified certain regulatory hurdles and tax implications for this plan. Specifically, at Slide 8 of the Project Gin Presentation, RSM highlighted the following critical points:[1873]

---

**Initial Structure - Critical Points**

- In order to meet the SEBI requirement of minimum 20% promoter's contribution post IPO, Plc would either have to bring in cash at the time of IPO (or seek SEBI exemption in these regard)
- In regard to the offer for sale IPO route, the shares offered will need to have been held for a minimum period of one year. (SEBI exemption would have to been sought in these regard)
- A combined application for exemption to promoter contribution and lock in, in the case of offer for sale, can be made on the premises of shares of the underlying cos held for a period of more than one year and further on the principle of holding benefit available to group companies by SEBI under the takeover code
  - Outcome of dialogue with SEBI uncertain
- In addition, the structure envisages PLC directly holding shares in India Co. In the event of sale of Indian Company shares under offer for sale, there would be substantial tax implications in India
- The same can be mitigated by interposing the Mauritian structure and availing the benefit of India – Mauritius tax treaty
- In the light of above, an alternative structure has been devised to mitigate risk of SEBI requirement and its strict adherence to rules, while keeping in mind the tax impact – Merger Route

RSM                                                                                          8

---

1506. Essentially, RSM identified the following regulatory hurdles:

a.   To comply with the SEBI DIP Guidelines, the 20% Minimum Promoter Contribution (MPC) requirement needed to be made in cash, and could not be made by means of a share swap, as contemplated in Plan A.

b.   In addition, the SEBI DIP Guidelines required that shares reflecting the 20% MPC would be subject to a three-year lock-in period, while any other shares acquired by the promoter would be locked in for one year. This meant that Cairn would not

---

[1871]  Transcript, Evidentiary Hearing, Day 5, 64:12-65:3 (Ms Brown).

[1872]  Transcript, Evidentiary Hearing, Day 4, 205:1-6 (Ms Brown, accepting that Option A of Ernst & Young's April 2004 presentation (Exh. 358) resembled Plan A, and that this was "the natural way in which you would think of doing that transaction when you first come to it.").

[1873]  RSM Project Gin Presentation dated 3 May 2006, Exh. C-363, slide 8.

be able to offer for sale any of its shares in CIL together with the IPO and would have to wait one year to sell 80% of the shares, and three years to sell the remaining 20%.

1507. RSM noted that Cairn could seek an exemption with SEBI, and explained what grounds could be used for such an exemption (namely, that the shares of the underlying companies (which in turn held valuable assets) had been held for more than a year, and "on the principle of holding benefit available to group companies by SEBI under the takeover code", SEBI might agree to exempt Cairn from the 20% MPC cash requirement. However, RSM also noted that the outcome of the dialogue with SEBI was uncertain. This was the principal regulatory hurdle that Cairn faced if it wished to pursue Plan A.[1874]

1508. The RSM Project Gin Presentation also identified the tax implications of the plan. Specifically, RSM noted that if CIL's shares were offered for sale, there would be "substantial tax implications in India."[1875] RSM did not elaborate on these tax implications in this or in its later concept papers (and in particular did not explain in depth what the legal basis for taxability of the shares that would be offered for sale or how the amount of tax would be calculated (the 'cost base' of the shares)), but it is undisputed that they were related to the 'offer for sale' step of the transaction, and that they arose because the sale of a pre-existing share in an Indian company was a taxable event in India. (By contrast, it is also undisputed that the fresh issue of shares through an IPO is not a taxable event in India.[1876]) Because Cairn would have held the CIL shares for less than a year before offering them for sale, short-term capital gains tax at a rate of 41.82% would have been applicable.[1877] RSM then noted that these tax implications could be mitigated by interposing a Mauritian structure in order to benefit from the India-Mauritius DTAA.[1878]

1509. In this respect, RSM noted that an alternative structure had been devised to "mitigate risk of SEBI requirement and its strict adherence to rules, while keeping in mind the tax impact", i.e., Plan B, which considered a "[m]erger [r]oute".[1879]

1510. The Respondent's case is that Cairn rejected Plan A precisely to avoid the tax implications identified by RSM.[1880] The Claimants deny this, arguing that Plan A was

---

[1874] *Ibid.*

[1875] *Ibid.*

[1876] Claimants' Answers to the Tribunal's Questions, ¶ 32; Respondent's Answers to the Tribunal's Questions, ¶ 93.

[1877] RSM Project Gin Phase I – Pre IPO, Plan C – Some Thoughts dated 3 May 2006, Exh. C-364, slide 6 (referring to the offer for sale element in Plan B).

[1878] RSM Project Gin Presentation dated 3 May 2006, Exh. C-363, slide 8.

[1879] *Ibid.*

[1880] R-Rejoinder, ¶ 310. In its PHB and Response to Tribunal's Questions, the Respondent devoted considerable space to a discussion of the identification of the relevant charging provision of the ITA 1961 (Section 49 as interpreted by reference to Section 47 of the Act) which it contended would have been immediately obvious to RSM. In its response to Tribunal Questions, the Respondent noted at ¶ 90 and 92: "90. The Indian tax authorities would have established the cost base of the asset subject to tax by reference to Indian law (not UK

not feasible because it did not comply with the MPC or lock-in requirements of the SEBI DIP Guidelines, and would have required obtaining exemptions from SEBI. Ms Brown emphasises that these hurdles were characterised as "critical" by RSM, and that "[u]ltimately, [Cairn] did not consider it viable to embark on a transaction of the scale being contemplated if the success of the transaction were contingent on obtaining exemptions from applicable regulations governing IPO transactions – especially given that the alternate transaction structure we eventually identified would not require [Cairn] to obtain these exemptions."[1881]

1511. The Respondent submits that Cairn's purported justifications are not credible. It argues that the Claimants could have obtained a waiver from SEBI, and in fact they did request and obtain other waivers. Further, as explained in below, when implementing Plan C, the Claimants went to great lengths to circumvent the MPC requirement, with which they complied only in form, but not in substance. As to the lock-in requirement, the Respondent alleges that it "was not an issue for Cairn", because Ms Brown testified that only the funds to be used in the Rajasthan development (to be raised in the IPO) were urgently needed), and Cairn would have been "willing to live" with the offer for sale element at a later point in time.[1882] Accordingly, it can be "dismissed out of hand".[1883] For the Respondent, it is evident that the Claimants rejected Plan A in order to avoid its tax implications; the contention that it was rejected for regulatory reasons is a "fig leaf".[1884]

1512. The Claimants deny that their regulatory concerns were a "fig leaf" to hide a true motivation of tax avoidance. The advice that Cairn received was that seeking

---

law) in application of directly applicable statutory provisions of Indian law, which Mr Gardiner – who has no expertise whatsoever in Indian law – has not referred to. As explained in more detail in para 260 of the PHB, the Indian Income Tax Act sets out a specific regime for transfers between a Holding Company and one of its wholly-owned subsidiaries such as were contemplated under Plans A and B. Under the relevant section (Section 49(1)(iii)) of the Act, the cost basis for the calculation of capital gains tax for a transfer between a Holding Company and an Indian wholly-owned subsidiary (such as CIL) is statutorily limited to the historical cost base of the asset. Thus in the present instance, the cost base of CIL's shares under both Plan A and Plan B would have been the historical cost base of the shares of the 9 subsidiaries, not their market value." (emphasis in original). And at ¶ 92: As to the former, Mr Gardiner has no expertise to opine on this point of Indian law. As noted above, the cost basis which an Indian court would apply to calculate Cairn Energy's capital gains in any transfer by Cairn Energy of its CIL (i.e. Indian) shares in the 'offer for sale' element of the IPO is expressly set out in section 49(1)(iii) of the Income Tax Act as being the historical cost basis. No principle of Indian conflict of law effecting a purported *renvoi* to the place of incorporation of the transferred assets has been identified by Cairn or by Mr Gardiner, and any such principle flies in the face (and would, even if they existed, give way to) the specific statutory provisions of the Income Tax Act governing this issue." See also ¶ R-PHB, ¶ 260.

[1881] Brown WS2, ¶ 58.

[1882] Brown WS2, p. 19 n. 68 (stating that, in Plan C, "[h]ad the pre-placement offering and the IPO not raised more cash than was required to fund CIL's operational and development needs, then CUHL would not have sold its CIHL shares to CIL for cash (beyond the minimum 20% necessary to meet the MPC requirement), but instead exchanged them for CIL shares.").

[1883] R-PHB, ¶ 220.

[1884] R-Rejoinder ¶¶ 311-314, 335-350.

exemptions from SEBI was neither viable nor sensible, and this played a part in Cairn's decision to reject Plans A and B, both of which required SEBI waivers:[1885]

1513. The Claimants elaborated on this as follows

a. There is no basis to conclude that Cairn and its advisors conspired to hide their true motives for the 2006 Transactions, or that the series of internal presentations and concept papers set forth false justifications for rejecting Plans A and B. To the contrary, these presentations and concept papers reflected the *bona fide* assessment of the alternative transactional structures by Cairn's multiple legal and accounting advisors.[1886]

b. The Respondent's suggestion that the Claimants had no problem in requesting waivers from SEBI when it suited them is based on a misrepresentation of the record. While it is true that Cairn requested SEBI to confirm that the MPC funds that CUHL would pay to "top up" the share price would not be caught in escrow if they were paid until the date of the filing of the Red Herring Prospectus, Cairn did not ask for an exemption of an outright prohibition (as would have been the case for Plans A and B); it merely requested confirmation of the precise date intended by the term "prior to the public issue". Further, the escrow issue came up when the implementation of Plan C was well underway, and thus "[t]he Claimants' willingness to consider obtaining a waiver in such circumstances does not call into question the genuineness of their *ex ante* intent to design a structure that was compliant with the applicable regulations."[1887] Once SEBI confirmed that the cut-off date was the filing of the Red Herring Prospectus (rather than the Draft Red Herring Prospectus), the Claimants structured the transaction around that clarification, rather than seeking a waiver from the escrowing requirement. Even if Cairn had sought a waiver of the escrow provision, it could not be compared to a request for a waiver of the MPC or lock-in requirements, which are fundamental features of securities regulation in India.[1888]

c. The Claimants emphasise that their concern over the lock-in requirement was real, and that, contrary to the Respondent's contention, they were not "willing to live with" a one-year delay in selling the shares. While it is true that Cairn recognised that market demand limited the extent to which Cairn could dispose of its stake (specifically, Ms Brown noted that if the pre-placement and the IPO had not raised enough cash, CUHL would have had to exchange the CIHL shares exceeding the MPC for CIL shares[1889]), this does not reflect an indifference to when the disposal of the shares would occur. According to the Claimants, "Cairn clearly and

---

[1885] C-PHB, ¶¶ 534-541.

[1886] *Id.*, ¶ 535.

[1887] *Id.*, ¶ 541.

[1888] *Id.*, ¶¶ 537-541.

[1889] Brown WS2, p. 19 n. 68 ("Had the pre-placement offering and the IPO not raised more cash than was required to fund CIL's operational and development needs, then CUHL would not have sold its CIHL shares to CIL for cash (beyond the minimum 20% necessary to meet the MPC requirement), but instead exchanged them for CIL shares.").

legitimately sought to structure the 2006 Transaction so as to utilise all of the funds that could be raised on the market and minimise the number of locked-in CIL shares it was left holding."[1890] Had Cairn exchanged all of its CIHL shares[1891] for CIL shares that could not have been offered for sale in the IPO due to the lock-in requirement, "the result would have been either (i) a smaller IPO that did not exhaust market demand (leaving money on the table); or (ii) the issuance of more shares by CIL to meet market demand, leaving CIL with cash in excess of its operational needs" (which could not have been returned to the shareholders as a dividend, since dividends can only be declared out of profits).[1892] According to the Claimants, "[t]he desire to avoid these results was the obvious business purpose of Plan C."[1893]

1514.   In any event, the Claimants argue that the suggestion that Cairn should have proceeded with Plan A and exchanged its holdings for CIL shares subject to the lock-in does not advance the Respondent's case. If the shares were subject to the lock-in, they could not have been offered for sale with the IPO, and no tax could have been avoided on this account.[1894] "Instead, the final tranche of 24.31% of CIHL shares would have been exchanged for CIL shares, which CUHL could have then sought to sell later. Such CIL shares would have been no different than the 61.7 million CIL shares that CUHL in fact held subject to the one-year lock-in (obtained in return for 53.9% of CIHL in the third tranche of the 2006 Transaction). When Cairn later came to sell those shares, the ITD agreed that the correct cost basis for the calculation of capital gains was the value of the shares at the time of the IPO (160 Rs/share), and Mr Puri affirmed that position without qualification at the hearing. In other words, no tax would have been payable on pre-IPO gains."[1895]

1515.   Further, had Cairn opted for Plan A despite the lock-in requirement, and had thus held onto the CIL shares for more than a year before selling them, the Claimants argue that future sales would have either been (i) exempt from capital gains tax if sold on-market (on-market sales being subject to a nominal securities transaction tax), or (ii) sold off-market, but subject to long-term capital gains tax at a lower rate, as they would have been held for longer than a year.[1896]

1516.   The Respondent denies that the offer for sale would not have given rise to any capital gains, and thus no capital gains tax, as the Claimants contend. RSM expressly identified the liability to short-term capital gains tax when the 2006 Transactions were being discussed, and the Claimants even considered interposing Mauritian entities to mitigate this tax. The transfer of the 27 Subsidiaries from CEP to CIL through share swaps would

---

[1890]   C-PHB, ¶ 559.

[1891]   The Tribunal notes that the Claimants refers to "CUHL shares", but understands this to be a typo given the substance of the statement.

[1892]   C-PHB, ¶ 559.

[1893]   *Ibid.*

[1894]   *Id.*, ¶ 560.

[1895]   *Ibid.*

[1896]   *Id.*, ¶ 561.

have been a tax neutral event by which the assets would have been contributed at cost, and not at their market value, so under Plans A and B (the latter without the interposition of the Mauritian entities) "Cairn would have had to pay capital gains tax on the 'offer for sale' part (i.e., 90%) of the totality of the capital gains made on their Indian assets from their date of acquisition (1996) to their date of sale."[1897] The cost basis for those shares would have been equal to the price at which the 27 Subsidiaries were transferred by CEP to CIL, and not their market value [reflected by the IPO price], as the Claimants contend.[1898]

1517. It is the Respondent's burden to establish that the 'dominant purpose' of the 2006 Transactions was the avoidance of tax. At the risk of stating the obvious, the legal test is formulated in the singular; for the Revenue to be able to find a scheme to be tax avoidant, the objective of avoiding tax must be the dominant purpose; it appears to the Tribunal that it follows that if there is a commercial or regulatory purpose which is more dominant, the fact that lower or even no taxes will be leviable on a structure that achieves such a dominant commercial or regulatory purpose is a happy consequence for the taxpayer. Indian law does not seem to permit the Revenue to deem a scheme avoidant if the scheme meets commercial and or regulatory objectives *and* reduces or eliminates a potential tax.

1518. In the Tribunal's view, the documentary evidence and the oral evidence given at the hearing does not establish that the Claimants rejected Plan A primarily out of tax concerns. While the Tribunal does not delude itself by thinking that tax implications did not play an important role in the structuring exercise, the evidence does not show that it was the Claimants' *dominant* purpose in abandoning Plan A. To the contrary, the evidence suggests that main reason for rejecting Plan A was Cairn's (and its advisors') view that it was undesirable to base the entire IPO exercise on gaining an exemption from SEBI, the prospects of which were uncertain. It is true that Cairn did not test RSM's initial suggestion that an exemption might be obtainable; but the Tribunal does not consider that Cairn was obliged to try every possible option that might exist at each step of the process; as in any complex commercial undertaking, Cairn was entitled to rely on its advisors' best judgement. The Tribunal has reached this conclusion after assessing the following factors:

1519. First, it is clear from the record that when Cairn finally decided to move in earnest with an Indian IPO, Plan A was rejected early on in that process. It is mentioned for the first time in RSM's Project Gin presentation for the meetings of 3-4 May 2006, and only two slides of RSM's presentation were devoted to this plan (the remainder of the presentation – 23 slides, excluding annexures – focused on Plan B).[1899] RSM also made

---

[1897] R-PHB, ¶ 260.

[1898] *Ibid.*

[1899] In making this finding, the Tribunal observes that there is some merit in the Respondent's contention that the claimed "early" abandonment of Plan A is dubious if one considers that the essence of Plan A had been explained to Cairn some two years previously by Ernst & Young's Mr Memani. During her cross examination, Ms Brown conceded that RSM's Plan A closely resembled Ernst & Young's Option A. See Transcript, Evidentiary Hearing, Day 4, 205:1-3 ("… it's the natural way you would think of doing that transaction when you first come to it."). See the R-PHB, ¶ 32(b)(i) ("Ms Brown expressly accepted under cross-examination (i) that Plan A was the most obvious way to give effect to Cairn's commercial objectives

another presentation at the 3-4 May meetings, discussing Plan C, but Plan A was not mentioned.[1900] Plan A is briefly mentioned in the various iterations of RSM's concept papers dated 11 May 2006 and 19 May 2006 under the heading "Structuring Exercise" (with more details in an annexure), but by that time Cairn had already decided to proceed with Plan C, as reported by Paul Hally of Shepherd & Wedderburn in an email dated 6 May 2006.[1901] While this does not in itself indicate the reasons as to why the plan was rejected, it is consistent with Ms Brown's statement that Plan A was rejected early on as a result of the SEBI regulatory hurdle, and that, consequently, Cairn did not get to the point of analysing what tax would have been applicable on the offer for sale. Ms Brown's testimony that "[t]hat we did not perform a full tax analysis is reflective of the fact that Plan A was abandoned early in our planning process as a result of the (non-tax) regulatory hurdles identified above" is consistent with the contemporaneous documents prepared by RSM.[1902]

1520. <u>Second</u>, RSM's Project Gin Presentation states at the end of Slide 8 that an alternative structure had been devised to "mitigate risk of SEBI requirement and its strict adherence to rules, while keeping in mind the tax impact", i.e., Plan B, which considered a "merger route".[1903] Notably (and as discussed further below), Plan B still maintained the offer for sale element, although "mitigated" by the Mauritian structure. This suggests that the reasons for discarding Plan A were both regulatory and tax-related.

1521. <u>Third</u>, the MPC requirement and lock-in requirements were set out in imperative terms in the SEBI DIP Guidelines, as follows:

> 4.1.1 In a public issue by an unlisted company, the promoters *shall* contribute not less than 20% of the post issue capital.
>
> […]
>
> 4.2.1 The promoters' shareholding after offer for sale *shall* not be less than 20% of the post issue capital.
>
> […]
>
> 4.6.1 Where the promoters of any company making an issue of securities have acquired equity during the preceding three years, before filing the offer documents with the Board, such equity *shall not* be considered for computation of promoters contribution if it is; (i) acquired for

---

(to tap the Indian markets, bring a limited amount of money to CIL for future development of the fields, and bring the rest to the shareholders), as had been immediately identified by Mr Memani of Ernst & Young in 2004; and (ii) that the tax liabilities identified by RSM for Plans A and B were identical", referring to Transcript, Evidentiary Hearing, Day 4, 116:14-117:12 (Mr Moollan).) What is clear to the Tribunal, however, is that after Cairn resolved to proceed with an Indian IPO, Plan A was considered and rejected in fairly short order.

[1900] RSM Project Gin Phase I – Pre IPO, Plan C – Some Thoughts, 3 May 2006, Exh. C-364, slide 6 (referring to the offer for sale element in Plan B).

[1901] Email from Paul Hally of Shepherd & Wedderburn to Kathryn Anderson of Cairn and others of 6 May 2006, Exh. C-367.

[1902] Brown WS2, ¶ 59.

[1903] RSM Project Gin Presentation dated 3 May 2006, Exh. C-363, slide 8.

consideration other than cash and revaluation of assets or capitalisation of intangible assets is involved in such transaction(s);

[…]

4.11.1 In case of any issue of capital to the public the minimum promoters' contribution (as per clause 4.1, 4.2 […]) *shall* be locked in for a period of 3 years.

[…]

4.12.1 In case of a public issue by unlisted company, if the promoters' contribution in the proposed issue exceeds the required minimum contribution, such excess contribution *shall* also be locked in for a period of (one year).[1904]

1522. While RSM had suggested that Cairn could request a waiver from the MPC and lock-in requirements, the Tribunal can appreciate Cairn's position that it wished to comply with Indian law and regulation and did not wish to begin the structuring process by seeking an exemption (with the associated possibilities of delay, uncertainty, and perhaps unanticipated demands by the regulator). This is not necessarily because Cairn wished to be a "good citizen", as Ms Brown has testified ("as a guest in India, we prided ourselves on being fully compliant with all regulations – we did not seek to find a way around any requirement"[1905] – a statement that the Respondent has taken strong issue with); it is because (as Ms Brown has also testified) requesting these waivers made the outcome and timeline of the IPO uncertain. The decision not to proceed with Plan A (which was premised on a share swap that was on its face not compliant with the MPC requirement, and an offer for sale that was not compliant with the lock-in requirement) is thus reasonable and the Claimants' account of this part of the planning process is consistent with the record, especially when, as discussed below, Cairn found a way of addressing this regulatory requirement that did not require a waiver.

1523. In this regard, the Tribunal considers that it is important to take a step back from the mass of detail and consider the larger picture. Cairn was an oil and gas exploration company, not an oil and gas producer. Its focus was on finding new or existing properties that held promise, rather than bringing such projects into production. Once the Rajasthan find had been proven, it made commercial sense for Cairn to seek a profitable exit. Related to this was the fact that the Rajasthan find was so large and so valuable that it would have been impossible for Cairn – a mid-sized company – to come up with the cash to satisfy the MPC 20% cash requirement if that cash had to be committed to CIL for a lengthy period of time. The Tribunal recalls Ms Brown's oral testimony on how for weeks she developed and rehearsed the steps that had to be taken to effect this particular transaction in order to ensure that the funds that entered India would make their way out on the same day so as to allow them to be repaid to Citibank.[1906] Evidence of Cairn's borrowing restrictions, together with the expected size of the MPC 20% cash contribution, has satisfied the Tribunal that finding a way to

---

[1904] SEBI (Disclosure and Investor Protection) Guidelines, Exh. R-131 (emphasis added).

[1905] Brown WS2, ¶ 58.

[1906] See e.g., Transcript, Evidentiary Hearing, Day 5, 101:12-107:19.

comply with the MPC requirement posed a real and significant commercial/regulatory problem for Cairn that had to be resolved in order to attain its objective of listing CIL. These background facts assist in understanding why Cairn planned the Daylight Loan transaction (discussed below at paragraphs 1541-1566).

1524. <u>Fourth</u>, the Tribunal is persuaded that obtaining an immediate economic advantage for Cairn's shareholders was a reasonable commercial objective for Cairn, and one that Cairn legitimately could seek to work into the ideal structure. The fact that Ms Brown testified that in Plan C Cairn would have been "willing to live" with an IPO that did not bring enough money to allow CIL to purchase the last tranche of the CIHL shares for cash, and that the CIHL shares would have been swapped for CIL shares subject to the lock-in requirement,[1907] does not mean that this was the ideal solution for Cairn. It was reasonable for Cairn to seek to develop an alternative structure that was not premised on this hurdle.

1525. Even if the Respondent was right and Cairn was willing to live with the lock-in requirement, this would have meant that Cairn would not have offered any shares for sale with the IPO – which means that no tax liability would have arisen, at least at this stage. Cairn could have sold 80% of those shares after one year, and the remaining 20% after three years, at which point arguably long-term capital gains tax at the lower rate of 20% (or even possibly 10%) would have applied on any capital gains made between the date of acquisition and the date of sale.

1526. Finally, assuming that the Lock-In Requirement would not have prevented CEP from offering CIL shares for sale together with the IPO, the Claimants have also argued that the cost basis of those shares would have been identical to the IPO price (i.e., INR 160 per share), which is the cost basis that was applied to the CIL shares for the Petronas and Vedanta sales.[1908] As a result, the Claimants submit that, even if the offer for sale of CIL shares would have been a taxable event, there would have been no taxable gain.[1909] The Respondent has disputed this, arguing that, because CEP would have been transferring the 27 Subsidiaries to a wholly-owned Indian subsidiary (i.e., CIL), pursuant to Section 49 of the ITA the 27 Subsidiaries would have been transferred at their historical cost and not at their market value and the CIL shares offered for sale would have therefore had a lower cost basis.[1910] The Claimants deny this, arguing that Section 49 does not apply and that it is not possible that all of the different government agencies (the AAR, the DRP, the ITD, the TPO and the ITAT) would have used the wrong cost basis for CIL.[1911]

---

[1907] *Id.*, 92:9-22, referring to Brown WS2, p. 19 n. 68 ("Had the pre-placement offering and the IPO not raised more cash than was required to fund CIL's operational and development needs, then CUHL would not have sold its CIHL shares to CIL for cash (beyond the minimum 20% necessary to meet the MPC requirement), but instead exchanged them for CIL shares.").

[1908] C-PHB, ¶¶ 560; 563-567; Transcript, Hearing on Closing Arguments, 54:23-58:1 (Mr McNeill).

[1909] C-PHB, ¶¶ 560; 563-567.

[1910] R-PHB, ¶¶ 260-261; see e.g., Transcript, Hearing on Closing Arguments, 141:9-144:21.

[1911] Transcript, Hearing on Closing Arguments, Day 1, 58:2-66-12 (Mr McNeill).

1527. These arguments were raised late in the proceedings, and with one exception, the Tribunal has not seen any evidence as to how these provisions should be interpreted. The Tribunal will thus refrain from making a definitive finding on this point. It notes however that Mr Puri testified that, "if CUHL had sold CIL shares immediately after [the] IPO" or "in the IPO", the "cost basis would have been 160." [1912] He further testified that, assuming that the shares had been sold at the IPO price of INR 160, the "[c]ost base would have been 160", and although "it might have been a taxable event because it was a sale of Indian shares", "it wouldn't have been a taxable gain."[1913] While Mr Puri testified before the Respondent raised its Section 49 argument and thus did not have an opportunity to comment on it, his testimony suggests that, while an offer for sale of

---

[1912] Transcript, Evidentiary Hearing, Day 9, 65:17-67:6 (Mr Puri/Mr McNeill):

Q. And if CIL - - if CUHL, I 'm sorry, were selling its shares earlier on that it acquired at the same time, at the same base cost - -

A. Yes.

Q. - - it would be selling those shares using a cost of acquisition of 160 in the IPO; right ?

A. (Pause). After it - - after acquiring the shares - -

Q. Yes.

A. - - from CIL as a consideration for CIHL shares, then you are suggesting that if - - if CUHL had sold CIL shares immediately after IPO. That's what you are saying?

Q. Or in the IPO.

A. Or in the IPO?

Q. Yes.

A. The cost base would have remained the same if it 7 would have gone to public , yes.

Q. Yes.

A. That was the price at that point of time.

Q. Exactly .

A. Yes.

Q. So the cost basis would have been 160.

A. Yes.

Q. Now, if they were selling those shares in the IPO, they would have sold it at the IPO price of 160; right ?

A. Yes, they would have -- in the IPO that was the market price - - market determined price. But if you had sold those many number of shares probably lesser price would have been achieved but cost base would have remained the same, yes.

Q. Okay. Lesser price would --

A. I don't know how that would be structured. I don't understand how these deals are structured . I don't understand that.

Q. Okay. Assuming it would have been sold at the IPO price of 160?

A. Cost base would have been 160.

Q. Right . Then it might have been a taxable event because it was a sale of Indian shares, but it wouldn't have been a taxable gain; correct?

A. Yes, correct."

[1913] Transcript, Evidentiary Hearing, Day 9, 66:25-67:6 (Mr Puri/Mr McNeill).

CIL shares carried out together with the IPO and at the same price would have been a taxable event, in practice CEP (or CUHL) would have incurred no tax liability.

1528. For these reasons, the Tribunal finds that the Respondent has not established that the dominant purpose of the Claimants' rejection of Plan A was to avoid short-term capital gains tax on the offer for sale element of that plan. To be clear: the Tribunal does not hold that the tax implications of Plan A played no role in its rejection; the finding is rather that this was not the dominant purpose for dispensing with Plan A.

Plan B

1529. Plan B was described in RSM's Project Gin presentation as follows:



1530. Plan B involved a "merger route" and the interposition of two layers of Mauritian companies, M1 and M2. M1 would infuse capital into the Indian subsidiary and would ultimately hold it directly. The Indian PSC assets would be transferred to M2, which would then be merged into the Indian subsidiary.[1914] This would comply with the MPC requirement, which contained an exception for shares acquired through mergers.[1915]

---

[1914] Project Gin Presentation (RSM), 19 April 2006, Exh. C-365, slides 7, 11.

[1915] Brown WS2; RSM, Phase I Plan C – Concept Paper dated 11 May 2006, Exh. CWS-Brown-49A, p. 31; SEBI (Disclosure and Investor Protection) Guidelines, Exh. R-131, § 4.6.4 ("In respect of Clauses 4.6.1, 4.6.2 and 4.6.3, such ineligible shares acquired in pursuance to a scheme of merger or amalgamation approved by a High Court shall be eligible for computation of promoters' contribution.").

1531. If implemented correctly, Plan B also mitigated the tax implications of the offer for sale, because the sale of shares in the Indian company would benefit from the DTAA between India and Mauritius, which allowed capital gains to be taxed in the country of residence. As the seller would be M1, and since there is a zero rate of capital gains tax in Mauritius, no capital gains tax would arise.[1916] However, Cairn's advisors stressed that, for Plan B to work, the Mauritian companies would need to have a genuine commercial purpose or substance; otherwise Plan B could lead to taxation at more than 41%.[1917] For its part, the Respondent stresses that this rate of taxation was the same as that which would have been applied in Plan A – the argument apparently being that there was an underlying continuity in capital gains taxability exposure in the first two plans which demonstrated the Claimants' efforts to consider and reject one plan, then another, and finally to land on a plan which the Respondent contends was marked by artificiality but which also eliminated the troublesome (from Cairn's perspective) taxability issues identified in the first two plans.[1918]

1532. The Respondent contends that the Claimants rejected Plan B not because they wished to be "fully compliant" with Indian law, as the Claimants assert,[1919] but because the use of Mauritian companies involved a legal risk of taxation for Cairn (and not just a litigation risk).[1920] According to the Respondent, "[p]ursuing the Mauritius route would not only have exposed the Claimants to risks of taxation clearly identified by their own advisers, but it would in all likelihood have attracted attention to the transactions in a way which would have undermined Cairn's desire to present them as mere corporate restructurings undeserving of close scrutiny."[1921]

1533. In addition, the Respondent notes that under Plan B, the proceeds of the IPO would be distributed to the UK shareholders as a dividend that would be chargeable to UK corporations tax at 30%. This, it contends, was an additional reason for the Claimants to discard Plan B.[1922]

1534. The Claimants deny that the dominant purpose for rejecting Plan B was to avoid tax, specifically for fear that they would attract unwanted tax litigation and possible taxation, as the Respondent contends. They point out that the Mauritian holding structure was retained in the first version of Plan C, so the evidence shows that the reason they rejected Plan B in favour of Plan C was the possibility to transfer CIHL shares in consideration

---

[1916] Project Gin Presentation (RSM), 19 April 2006, Exh. C-365, slides 7, 11.

[1917] Email from E&Y dated 12 September 2000, Exh. C-356; Presentation on Project Gin, Phase I – Pre IPO, Exh. C-363, slide 15; RSM, Project Gin, Phase I Pre-IPO, Plan C – Some thoughts Presentation dated 3 May 2006, Exh. C-364; RSM, Project Gin Presentation dated 19 April 2006, Exh. C-365; Email from Paul Hally to Cairn, Rothschild, Merrill Lynch, AMSS, RSM, Slaughter & May and AMB Amro Rothschild of 6 May 2006, Exh. C-367.

[1918] Ms Brown was directed to the fact that RSM identified the same capital gains taxability exposure for both plans, and the same taxable rate of 41.58%. Ultimately, she conceded that the tax liabilities identified by RSM for Plans A and B were identical. Her testimony is reviewed in R-PHB, at ¶ 32(b)(i).

[1919] Brown WS2, ¶ 58.

[1920] R-Rejoinder, ¶¶ 304-305; 316-321.

[1921] *Id.*, ¶ 305.

[1922] *Id.*, ¶¶ 316-317.

of cash, not shares, since an offer for sale would have been prevented by the lock-in requirement.

1535. According to the Claimants, Plan B was rejected because it also did not comply with the SEBI Guidelines. While the MPC requirement would be met by transferring CIHL to CIL by means of a merger, the Claimants assert that they were "advised clearly and repeatedly" that this lock-in requirement prohibited a potential offer for sale of shares, as contemplated in both Plans A and B.[1923] This would have prevented the offer for sale and again would have required an exemption from SEBI (identified as a "critical point"[1924]), the outcome of which was uncertain. In addition, the merger option was lengthy. These problems were resolved by using the "cash flow" option proposed in Plan C.

1536. After assessing the evidence, the Tribunal is once again unable to conclude that the Respondent has shown that the *dominant* purpose of rejecting Plan B was the avoidance of tax. The Tribunal's conclusion is premised on the following factors:

1537. <u>First</u>, while Plan B, *if implemented correctly*, would have resolved the MPC requirement and mitigated the tax aspects of the 'offer for sale' element, the lock-in requirement would have still prevented an immediate offer for sale of the CIL shares. For the same reasons given above for Plan A, the Tribunal finds that it was commercially reasonable for Cairn not to premise the structure of the IPO on a waiver from a regulatory body, the outcome of which was uncertain, or on a structure that was unable to deliver immediate value to Cairn's shareholders.

1538. <u>Second</u>, even if the Claimants had rejected Plan B because the Mauritius structure carried a litigation and taxation risk, the Tribunal does not consider this to be indicative of tax avoidance. To the contrary, it is suggestive of a desire to avoid any imputation that Cairn was not compliant with Indian tax law. To recall, although there had been much litigation in India as to the specifics of Mauritian structures (some of which had been found to fall offside), they had been accepted as lawful (or to put it in a perhaps slightly more accurate manner, not unlawful if structured appropriately) at that point in time by the Supreme Court in *Azadi Bachao* and Mauritius was a commonly used route.[1925] The Tribunal recalls in this regard the advice from RSM (which was consistent with advice that Cairn received some five years previously from Ernst & Young[1926]) that there had to be real substance to the Mauritian companies to avoid problems with the Indian tax authorities. Ms Brown testified, and the Tribunal accepts, that this would have entailed a significant change in the way in which Cairn did business and it was not

---

[1923] C-PHB, ¶ 532.

[1924] C-PHB, ¶ 532, citing RSM, Phase I Plan C – Concept Paper dated 11 May 2006, Exh. CWS-Brown-49A, p. 31.

[1925] Email from Ernst & Young to Cairn of 12 September 2000, Exh. C-356.

[1926] This also seems to be the logic of advice that E&Y (UK) gave to Cairn (specifically Ms Brown) five years earlier that: "it is important that the Mauritius company has a genuine commercial purpose/substance as there has been a lot of litigation in this area. Our Indian colleagues have indicated that each case depends on its facts and there are no hard and fast rules on where the dividing line lies between sufficient and insufficient substance in Mauritius."

a change with which Cairn was comfortable.[1927] The consequence of rejecting this route (which was also contemplated for Plan C) was that CUHL would eventually have to pay capital gains tax on its future sales of CIL shares (which subsequently happened to be to Petronas and Vedanta). Even if the Claimants rejected this route out of fear of the "maverick tax inspector" and not out of the goodness of their hearts, this does not alter the fact that their choice was to choose a more clearly tax-compliant (and therefore more onerous) structure than Plan B.

1539.  Third, while the Respondent has suggested that Plan B could have moved forward without the Mauritius structure after obtaining a waiver from SEBI for the lock-in requirement, Ms Brown testified that Plan B was never considered without the Mauritius structure, and the record supports this testimony.[1928] Indeed, the Mauritius structure was also included in the initial version of Plan C.[1929] This suggests that the dominant purpose of rejecting Plan B was indeed the lock-in requirement, not the potential tax liability on the offer for sale.

1540.  One final note on Plan B, which the Tribunal considers weakens the tax avoidance defence: The Respondent has conceded that if a Mauritian structure (with real substance) had been implemented, it would have been a lawful structure as a matter of Indian law. This shows that to the extent that the defence is predicated on the theory that Cairn discarded one structure that exposed it to capital gains tax (Plan A) only to consider another (Plan B) which also carried tax exposure, and finally settled on a third which carried no exposure, the chain of logic is not made out. The fact is that in 2006 Indian law would have recognised a proper Mauritian structure as legitimate tax planning. RSM's reference to *Azadi Bachao* is a contemporaneous recognition of the possibility of lawfully structuring the reorganisation through Mauritius. Thus, on the Respondent's own analysis of Plan B, there was a possibility of lawfully structuring the Mauritian scheme. On its own case, a proper Mauritian structure would not be tax avoidant.

Plan C

1541.  The Claimants ultimately adopted a version of Plan C, which was premised on a "cash flow" route. The first iteration was contained in the second presentation prepared by RSM for the 3-4 May 2006 meetings, "Project Gin – Phase I –, Plan C – Some Thoughts":[1930]

---

[1927]  Brown WS1, ¶¶ 37, 53; Third Witness Statement of Ms Janice M. Brown ("Brown WS3"), ¶¶ 43-44; Transcript, Evidentiary Hearing, Day 4, 147:14-148:4, Day 5, 88:18-24 (Ms Brown).

[1928]  Transcript, Hearing on Closing Arguments, Day 5, 145:23-146:2, 147:14-20, 148:19-21 (Ms Brown).

[1929]  RSM, Project Gin, Phase I Pre-IPO, Plan C – Some thoughts Presentation dated 3 May 2006, Exh. C-364, p. 4.

[1930]  *Id.*, p. 4.



1542. The primary version (Plan C1) also involved the incorporation of two layers of Mauritian companies (M1 and M2), and an Indian subsidiary with minimum capitalisation. The shares in the foreign/UK companies that held the Indian PSCs would be transferred to M1, and then from M1 to M2. The Indian subsidiary would sell up to 80% shares to the public through an IPO, with M1 retaining 20% (the MPC). M1 would then transfer 40% of its shares in M2 to the Indian subsidiary. A cash dividend would be distributed out of M1 to CEP.[1931]

1543. Plan C2 stripped out the Mauritian companies, and had the Indian subsidiary acquire 40% of the foreign/UK companies holding the PSC assets directly from CEP. [1932] Plan C2 was further refined in subsequent iterations of RSM's "Plan C – Concept Paper", in particular to (i) include the interposition of a UK Hold Co. (which later became CUHL) into which the 9 Subsidiaries would be consolidated, and (ii) to allow the Indian subsidiary to acquire the UK holding company against shares, cash or both.[1933] Crucially, the Indian subsidiary would acquire part of the UK Hold Co. prior to the IPO

---

[1931]  R-Rejoinder, ¶ 323; RSM, Project Gin, Phase I Pre-IPO, Plan C – Some thoughts Presentation dated 3 May 2006, Exh. C-364.

[1932]  R-Rejoinder, ¶ 324; RSM, Project Gin, Phase I Pre-IPO, Plan C – Some thoughts Presentation dated 3 May 2006, Exh. C-364.

[1933]  R-Rejoinder, ¶ 332; RSM, Phase I Plan C – Concept Paper dated 11 May 2006, Exh. CWS-Brown-49.

(including the MPC), and partly following the IPO (the cash part of which would be funded with IPO proceeds).[1934]

1544.   In the Concept Paper of 16 June 2006, Plan C2 is illustrated as follows:[1935]

The graphical representation of the Plan is as under :-



1545.   According to the Respondent, the key distinctions between Plan B and the two versions of Plan C were that:

    a.   The IPO in Plan B would be an offer for sale by the parent company of existing shares (so that the proceeds would attract Indian capital gains tax, which would need to be avoided by the interposition of the Mauritian companies, M1/M2), whereas the IPO in Plans C would be an issue of new shares by the new Indian company, which would not attract tax; and

    b.   The IPO in Plan C takes place at an earlier stage, allowing the Indian company to complete the acquisition of the Indian assets with cash raised from the IPO.[1936]

1546.   The Respondent notes that Plan C2 is barely mentioned in RSM's "Project Gin – Phase I Pre-IPO – Plan C – Some Thoughts" presentation of 3 May 2006 (it is "simply a

---

[1934]   RSM, Phase I Plan C – Concept Paper dated 11 May 2006, Exh. CWS-Brown-49; RSM, Structure Concept Paper 16 June 2006 (with annexures), Exh. CWS-Brown-51A.

[1935]   RSM, Structure Concept Paper 16 June 2006 (with annexures), Exh. CWS-Brown-51A.

[1936]   R-Rejoinder, ¶ 325.

footnote to the diagrammatic presentation of Plan C1 at Slide 4").[1937] However, when Plan C2 is set out in diagrammatic form, the Respondent highlights one additional key difference: when the Mauritian entities are removed, the proceeds of the IPO move directly to Cairn as consideration for the shares in the foreign/UK companies that held the PSC assets. According to the Respondent, "[t]his is the *coup de grace*, which enables Cairn to extract the value of the Indian assets through the IPO without attracting either (i) capital gains tax at the IPO stage, because it is an issue of new shares not a sale of existing shares; and (ii) UK corporation tax when the proceeds reach Cairn, because they arrive in the form of consideration for the transfer of the foreign/UK shares rather than in the form of a dividend."[1938]

1547. According to the Respondent, this is the main reason why the Claimants adopted Plan C2, and not for any legitimate business purpose, as the Claimants contend.[1939] The Respondent notes that, despite the fact that RSM's presentation contained no analysis of the implications of Plan C2, the decision to proceed with this structure was apparently taken at the meeting of 3-4 May 2006. This belies the Claimants' allegations that they exercised the utmost due diligence and care when considering their restructuring. The outcome of the meeting was reported in an email from Shepherd & Wedderburn of 6 May 2006 which, according to the Respondent, "indicates that the mechanics and implications of Plan C2 were considerably more advanced than the RSM Plan C Paper would suggest."[1940] The Respondent also notes that Ms Brown did not explain the genesis of Plan C2, or refer to the meetings of 3-4 May 2006, in any of her witness statements, and that the Respondent learned of these meetings and that the decision to proceed with Plan C2 was taken during those meetings as a result of the Respondent's further disclosure requests.[1941] The Respondent further notes that, "conveniently for Cairn", there is no record of the 3-4 May 2006 meetings, or of the reasons why Plan A was rejected. However, the Respondent submits that the existing record is sufficient to conclude that this decision was driven by the desire to avoid the tax implications identified in Plan A.

1548. The Respondent contends that Plan C2, as it was ultimately adopted, had the following effect:[1942]

 a. The IPO would allow Cairn to gain access to significant Indian equity capital flows. As it was conducted through an issue of fresh CIL shares, it was not a taxable event in India.

 b. The majority of the proceeds of that IPO would be passed on from CIL to Cairn and then to its shareholders as a result of CIL's purchase of a further portion of

---

[1937] R-Rejoinder, ¶ 326; RSM, Project Gin, Phase I Pre-IPO, Plan C – Some thoughts Presentation dated 3 May 2006, Exh. C-364, slide 4.

[1938] R-Rejoinder, ¶ 327.

[1939] *Id.*, ¶¶ 328-330.

[1940] *Id.*, ¶ 330, referring to Email trail from Paul Hally to Kathryn Anderson with subject dated 6 May 2006, Exh. C-367.

[1941] *Id.*, ¶ 331; RCom-186, ¶ 19.

[1942] R-Rejoinder, ¶ 333; R-PHB, ¶ 192.

CIHL shares from CUHL. This allowed Cairn to receive the money without paying (i) the capital gains tax which would have been payable in India if Cairn has sold its shares in the IPO, and (ii) any tax that could have been payable in the UK if CIL had distributed this money as a dividend.

c.   The MPC requirement would be observed in form only by means of the initial cash subscription by CUHL of 20% of CIL's issued share capital. However, in substance, Cairn would not be required to put any cash into CIL, because its contribution would be returned the same day in the form of consideration for the next tranche of shares of CIHL.

1549.   The 27 Subsidiaries were then collapsed pursuant to an Indian court-approved scheme of arrangement, allowing Cairn to avoid the "tax leakage" on dividends going up the corporate chain. While this occurred in 2011, Ms Brown acknowledged that Cairn was already planning for this in May 2006 (as Phase 2 of the restructuring).[1943]

1550.   The Respondent thus submits that, with Plan C2, "Cairn's objectives (divestment of its Indian assets through an Indian flotation) would be achieved in full, and its tax and regulatory concerns dismissed through circumvention, not compliance", with the only losers being the public exchequers in all jurisdictions.[1944]

1551.   The Claimants, for their part, assert that the modified version of Plan C was adopted for the following reasons:

a.   The "cash flow" option (acquiring CIHL shares for cash procured through the Daylight Loan, rather than against CIL shares) would allow CUHL to comply with the MPC requirement. As this structure envisaged that CIL would raise funds in the IPO to acquire the last tranche of CIHL, there would be no offer for sale of shares, so the lock-in requirement would not apply.

b.   Plan C originally envisaged a Mauritian holding structure, which would have allowed Cairn to benefit from the DTAA between India and Mauritius (namely, future sales of CIL shares would be taxed in Mauritius, where no capital gains tax would have applied). Despite this significant tax benefit, and the fact that it was a route commonly used at the time which had been confirmed by the Supreme Court in *Azadi Bachao*, Cairn felt "very, very uneasy about using that route"[1945], and Cairn did not wish to "tarnish [its] reputation by using a jurisdiction that [it] thought [it] had no viable presence in."[1946] The Claimants contend that "Ms Brown's almost visceral discomfort with the structure notwithstanding the express advice of her advisors reveals just how much she valued Cairn's reputation as a company that did not use tax shelters for its investments."[1947] Given that her

---

[1943]   *Ibid*.

[1944]   R-Rejoinder, ¶ 334.

[1945]   Transcript, Evidentiary Hearing, Day 5, 88:19-24 (Ms Brown).

[1946]   Transcript, Evidentiary Hearing, Day 5, 149:25-150:7 (Ms Brown).

[1947]   C-PHB, ¶ 554.

decision not to adopt a Mauritian structure meant that Cairn had to pay hundreds of millions of dollars of capital gains tax on Cairn's subsequent sales of CIL shares in India, they submit that "[i]t is acutely ironic that the Respondent attempts to turn Ms Brown's decision to reject her advisors' advice to structure through Mauritius into an argument that Cairn sought to abuse the tax laws." [1948]

c.   As to the Respondent's argument that the Claimants chose "a unique and untested structure" that was difficult to implement and required unprecedented regulatory approvals, the Claimants argue that these elements refer to the Daylight Loan Structure, which was put in place to comply with the MPC requirement, and had nothing to do with the lock-in requirement or tax. [1949] The Claimants allege that "[t]he fact that the Claimants were willing to go to such lengths to comply with the minimum promoter's requirement – when doing so provided no tax benefit – serves to underscore that the Claimants' motivations were to comply with the applicable regulations, not to avoid tax." [1950]

1552.   To simplify matters, the Tribunal will refer here to the structure ultimately adopted, which is essentially Plan C2 but with the participation of two holding companies, CUHL and CIHL, with CIHL being acquired by CIL and CUHL eventually holding CIL's shares.

1553.   It is undisputed that both versions of Plan C involved a structure that found a way around the MPC and lock-in requirements without requiring a waiver. The 20% MPC would be brought in cash: there would be no offer for sale of CIL shares. All shares offered to the public would be new shares issued through the IPO, and CIL would purchase the last tranche of CIHL with funds raised through the IPO. It is also undisputed that, assuming that indirect transfers are not taxable, this structure allowed Cairn to "cash in" part of the capital gains that had accrued on the 9 Subsidiaries without paying capital gains tax in India.

1554.   The question is whether the dominant purpose for Claimants' adopting Plan C2 was to escape the tax implications in Plans A and B (if the Mauritian structure was found wanting by the Indian tax authorities), namely, the 41.83% capital gains tax on the shares offered for sale, or whether the Claimants implemented Plan C2 because it presented a legitimate solution to their regulatory problems. A related question is whether Plan C2 is an artificial and contrived structure, which could be evidence of a "colourable device" and thus an indicator of tax avoidance.

1555.   The Tribunal has already found that Plans A and B were not feasible because of regulatory and/or legitimate commercial reasons. Accordingly, choosing the "cash flow" option appears (at first glance at least) to be a reasonable and legitimate choice for Cairn. The Tribunal recalls at this juncture that Indian law has clearly and consistently recognised (even in *McDowell*) that tax planning can be lawful. Kapadia, CJ. stressed this in *Vodafone* when he stated that *McDowell* was not to be taken as

---

[1948]   *Ibid.*

[1949]   *Id.*, ¶ 542, citing Transcript, Evidentiary Hearing, Day 5, 180:4-181:12, 182:14-19 (Mr Moollan).

[1950]   *Id.*, ¶ 543.

holding that "all tax planning is illegal/illegitimate/impermissible".[1951] Thus, the fact that the structure ultimately selected by the Claimants eliminated the possibility of Indian capital gains tax being levied on them at the time of the IPO does not in and of itself make the scheme that they adopted tax avoidant. Rather, mindful of the Chief Justice's characterisation of *McDowell* as dealing "*only in relation to tax evasion through the use of colourable devices and by resorting to dubious methods and subterfuges*" the focus of the analysis must be on proving the existence of these kinds of devices from which it can be inferred that the dominant purpose of the scheme was the avoidance of tax.[1952]

1556. The Respondent itself, while emphasising that *Vodafone* makes clear that it need not prove a sham, nevertheless accepted that it must show the existence of devices or features of the Plan which was ultimately adopted that would allow the Tribunal to find that the dominant purpose of the structure was to avoid tax. In order to make out its case, the Respondent has pointed to certain aspects of Plan C2 that in its view were indicators of artificiality, namely:

   a.   In order to obtain the cash for the MPC, CUHL had to obtain a loan that would be repaid the same day. The Daylight Loan would be used by CUHL to subscribe for shares of CIL; that same day CIL would use that money to purchase approximately 20% of CIHL, and the money would go back to CUHL that same day.[1953] The Respondent has argued that, while this formally complies with the SEBI regulations, it is really a share swap, which was forbidden by the SEBI DIP Guidelines (and the very thing that RSM has stated could be the subject of a waiver request if Cairn was minded to pursue Plan A). The Respondent thus argues that this covert share swap, implemented through the Daylight Loan and the round-tripping of the funds, was an artificial device that qualifies as a "colourable device" for tax purposes.

   b.   Professor Rosenbloom has also opined that this transaction artificially inverted the logical order of the IPO. Logically, the CIL should have owned all of CIHL before offering its shares to the public. Here, however, the last tranche of CIHL was acquired after the IPO and with IPO funds.

1557. The Tribunal addresses the Respondent's allegation that the Claimants breached the SEBI DIP Guidelines in Section VII.A.3.e(iii) below. The Tribunal understands, however, that the Respondent's case is that, whether or not the Claimants breached the MPC requirement, "the high degree of artificiality of the scheme used to 'comply' with the MPC requirement" [1954] is indicative of tax abuse.

1558. After carefully reviewing the evidence, the Tribunal concludes that it cannot hold that the means by which the Claimants complied with the MPC requirement supports the

---

[1951] *Vodafone International Holdings B.V. v. Union of India & Anr.* [2012] 6 SCC 613, Exh. C-59, ¶ 64.

[1952] *Ibid.*

[1953] The Tribunal understands that this happened in two tranches, the first on 12 October 2006 (for the bulk of the MPC), and the second on 22 November 2006 (for the additional premium). See Section II.B.3.b above.

[1954] Respondent's Answers to the Tribunal's Questions, ¶ 24.

conclusion that it was an artificial device whose dominant purpose was to allow Cairn to avoid Indian capital gains tax.

1559. To begin, the Tribunal recalls its observations made previously at paragraph 1523, as to the difficulties posed to Cairn, were it obliged to "park" a large sum of money with CIL. The solution found through the Daylight Loan was to allow CEP, as the Promoter, to comply with the MPC without having to park cash equivalent to the contribution in India. The solution entailed the rapid circular flow of the necessary funds (subject only to a later top-up as the IPO price discovery process unfolded), which enabled CUHL to acquire the first tranche of CIL shares and then CIL to use immediately thereafter the proceeds of the sale of its shares to acquire the first tranche of CIHL shares from CUHL. Although these transactions were effected very quickly, it is undisputed that at the end of that day, 12 October 2006, two share sale and purchase agreements were consummated which enabled CIL's IPO to proceed.[1955] A similar circular flow of funds was carried out on 22 November 2006, when Cairn used the second tranche of the Daylight Loan to pay for the additional share premium for the shares it had subscribed in October.[1956]

1560. The Daylight Loan and the round-tripping of the funds had no tax implications, nor did they provide Cairn with any tax benefit. That said, the Tribunal understands the Respondent's argument to be that, had it not been for the Daylight Loan and the round-tripping, the Claimants could not have opted for Plan C2: it was the Daylight Loan and the round-tripping which allowed CUHL to sell its shares in CIHL to CIL against a cash consideration, instead of contributing them to CIL and then offering CIL shares for sale to the public. According to the Respondent, this shows that the Claimants implemented the Daylight Loan and the circular flow of funds to avoid the tax implications of Plan A.

1561. While it may be true that the Claimants would not have been able to implement Plan C2 without the Daylight Loan and the circular flow of funds, the Tribunal cannot conclude from this fact that the Claimants were avoiding Plan A: as discussed above, Plan A was not feasible for several reasons. Indeed, the very premise of Plan A (contributing shares in kind) was incompatible with the MPC Requirement, while the offer for sale that it entailed was incompatible with the Lock-In Requirement. The Daylight Loan and the round-tripping of the funds (which, as discussed below, received SEBI's blessing), was what allowed Cairn to comply with SEBI regulations. The Tribunal thus concludes that the Claimants' reliance on the Daylight Loan and the circular flow of funds to meet the MPC Requirement was motivated by *bona fide* regulatory concerns, and not by an intention to avoid tax.

1562. In any event, as discussed in Section VII.A.3.e(iii) below, nothing in the SEBI regulations prevented the MPC from being complied with through the assistance of a loan. While it is true that the cash entered and left India on the same day, having sold the first tranche of its shares to CUHL, CIL used the funds received from that sale to immediately purchase approximately 20% of CIHL, with the result that it had acquired a significant shareholding in CIHL, which shareholding would continue to increase until

---

[1955] See Section II.B.3.b above.

[1956] *Ibid.*

the IPO was completed. While this closely resembles a share swap,[1957] it was approved by SEBI.[1958] There is no indication in the record that SEBI considered this to be illegal or otherwise non-compliant with its regulations at the time. (To be sure, the Respondent has alleged that the Claimants did not fully disclose the details of the scheme to SEBI at the time, but the Tribunal has received no evidence from SEBI in the present proceeding which supports the Respondent's view that there was a *prima facie* case of non-compliance with SEBI's regulations.[1959])

1563. Nor can the Tribunal accept the Respondent's argument that the sequence of steps in the CIHL Acquisition was artificial and thus indicative of tax avoidance, as Professor Rosenbloom has suggested. There is nothing intrinsically wrong with using IPO funds to acquire the final tranche of CIHL shares. The Red Herring Prospectus disclosed that, on the date of the IPO, CIL held 21.8% of CIHL's shares, and that the remaining 78.2% would be acquired with the funds raised by the IPO.[1960] Prospective purchasers were thus fully on notice of the conditions of the IPO, and would or should have understood that part of the IPO proceeds would be used to obtain approximately 78% of Cairn's Indian oil and gas assets held by CIHL.

1564. In conclusion, the Tribunal finds that the Claimants' decision-making process was driven by regulatory and/or legitimate commercial reasons, and that the structure chosen was legitimate and not artificial. Once again, the Tribunal has no doubt that tax implications also played a role in rejecting Plans A and B and structuring Plan C, but the record does not support a finding that avoidance of tax was the *dominant* purpose for using Plan C.

1565. Indeed, in the Tribunal's view, the way that Cairn dealt with its tax concerns falls at the 'legitimate tax planning' end of the tax planning-tax avoidance spectrum. As already noted, Indian law recognises that there is a difference between a party's avoiding the application of an existing tax and creating a structure that is tax efficient. In this case, the issue was less one of avoiding a tax than of choosing between structures that generated different tax consequences while simultaneously seeking to meet the regulatory requirements which governed the ultimate commercial objective, namely, conveying the offshore companies holding valuable Indian assets either directly or indirectly into an Indian listed company whose shares could then be sold to the public. Once again, the Tribunal recalls that, prior to the 2006 Transactions, the entirety of

---

[1957] The Tribunal observes that even RSM appeared to view the transaction as mimicking a share swap. In its letter of 11 October 2006 to CIL with respect to the Daylight Loan transaction being implemented the following day, RSM referred to the FIPB's letter of 21 September 2006 "approving the share swap transaction between Cairn India Limited / Cairn UK Holdings Limited and Cairn India Holdings Limited…" Exh. CWS-Brown-69.

[1958] See Section II.B.3.b above.

[1959] See Section VII.A.3.e below.

[1960] Red Herring Prospectus, Exh. CWS-Brown-72, p. XXV (disclosing among "Risks Relating to Our Business" that "We have entered into the Subscription and Share Purchase Agreement and the Share Purchase Deed with Cairn Energy, Cairn UK Holdings Limited and Cairn India Holdings Limited pursuant to which we have acquired 21.8%, and have agreed to acquire, subject to the terms and conditions described in the section entitled "History and Corporate Structure" at page 95 of this Red Herring Prospectus, the remaining 78.2%, of the issued share capital of Cairn India Holdings Limited."), pp. 95-100 (providing detailed information on these transactions).

Cairn's Indian holdings was held by companies that were already at a minimum presumptively situated outside the Indian tax net. Leaving the SEBI compliance issues (which the Tribunal has already accepted were real and genuine) to one side, the Tribunal does not accept that given this pre-existing situation, the price of gaining access to the Indian capital markets was for Cairn to employ the least tax-efficient structure. Indian law recognised Cairn's right to engage in tax planning. Admittedly, Indian law sets limits on such planning, but the Tribunal considers that based on the record before it and having regard to the tests reviewed and approved in *Vodafone*, the structure ultimately selected did not transgress those limits.

1566. By carrying out an IPO, Cairn "Indianised" the 9 Subsidiaries for the first time. As the Respondent has noted, this inevitably carried tax implications. However, in the Tribunal's view, given that it was Cairn's choice whether to Indianise the 9 Subsidiaries in the first place (having had the possibility to carry out an IPO in the UK), it was legitimate for it to do so in a way that minimised its tax exposure, which did not exist at all until this Indianisation, provided that the dominant purpose of choosing the structure was not the avoidance of tax. Stated differently, Indian law does not require Cairn to choose the structure that imposes the most tax. In fact, Plans A and B seem a counterintuitive choices for Cairn, because they would have implied a voluntary choice by Cairn to create a structure that would have exposed it to capital gains tax in India, when that exposure did not hitherto exist. The Tribunal does not believe that the dominant purpose test penalises an investor for rejecting a structure that would have led to the imposition of a tax that did not previously apply. To this, the Tribunal recalls its earlier observation that even on the Respondent's own analysis of the process by which Cairn proceeded through Plans A and B to arrive at Plan C, it accepted that Plan B (if the Mauritian companies had real substance) would likely be accepted as legitimate tax planning and therefore the previously identified capital gains taxability could be addressed. In this sense, in selecting Plan C over Plan B, Cairn was choosing between two structures, either of which could shield it from the tax exposure that Plan A presented.

Tax liability under Plans A and B

1567. Even assuming that the offer for sale (under either Plans A or B) had been feasible (or a waiver had been obtained), the question that arises is what would have been the economic impact of that offer for sale. In its Post-Hearing Brief, the Respondent asserted that the tax exposure identified in Plans A and B was the application of "41.58% short term capital gains tax liability on the 'offer for sale' element of Plans A and B (which represented all but $600 mn of the proposed $ 6 bn IPO, i.e. 90% thereof)".[1961] As the Claimants have explained,[1962] this is factually impossible, for the following reasons:

   a.   First, as explained above, the market value of the 9 Subsidiaries was approximately US$ 6 billion. However, Cairn never contemplated offering the entire value of the 9 Subsidiaries to the public. That would have meant that either (i) the entire share capital of CIL would have been sold to the public in the IPO,

---

[1961]   R-PHB, ¶¶ 32(b), 191(a).

[1962]   Transcript, Evidentiary Hearing, Day 1, 51:7-54:10 (Mr McNeill).

with Cairn retaining no interest in the company, or (ii) CIL's share value would have been significantly diluted. But this is not what occurred. Cairn decided on a partial IPO that would raise between US$ 1.5 to 2 billion. As noted in minutes of the meeting of Cairn's Committee of Board of Directors of 8 March 2006:[1963]

> The Committee agreed that the overall strategic aim was to create two quality companies with separate high quality management and that it was reasonably clear that a new Indian (IPO) company would represent an attractive value proposition. In particular, the Committee noted that in the event that a partial IPO was implemented, eg 40% a substantial amount of value would remain in the UK listed company through the shareholding in the company listed in India.

> The Committee noted that the starting point recommended by the advisers was, broadly speaking, to raise approximately US$1.5- US$2 billion through an IPO. An initial amount in excess of this would potentially risk a diminution in value.

> After careful and detailed consideration it was resolved to proceed with a partial IPO on the Mumbai Stock Exchange, raising approximately US$1.5 - US$2 billion and retaining a majority interest in Cairn India. Any decision in relation to the majority interest would be deferred until a later date. It was agreed that the exact timing for the IPO would be considered at a later date, but that in principle, the Company should aim to complete the transaction no later than first oil from Mangala. Any decision to proceed would also be subject to suitable market conditions.

1568. Indeed, as the diagram reproduced below illustrates,[1964] when the IPO was carried out, it raised only US$ 1.98 billion, i.e., approximately one-third of the US$ 6 billion value of the 9 Subsidiaries. Cairn retained shares 69% of CIL's shareholding, i.e., US$ 4.14 billion in shares of CIL. In view of these facts, it is difficult to envisage that, either under Plans A or B, Cairn would have offered for sale shares equivalent to 90% of the value of CIL (which would have at that point been equivalent to the market value of the 9 Subsidiaries).

---

[1963] Meeting of Committee of Board of Directors of Cairn Energy, 8 March 2006, Exh. CWS-Brown-45, p.5.

[1964] Claimants' Demonstrative Exhibit at Hearing on Closing Arguments, "Equivalence of Stake Disposed of in Plans A/B and C".

**Equivalence of Stake Disposed in Plans A/B and C**



**Note 1**: in Plans A/B, these CIL shares to be issued to Cairn in return for 24.31% interest of 9 Subsidiaries and sold by Cairn to public in offer for sale; in Plan C, these shares to be issued to public and proceeds used to purchase 24.31% of CIHL from CUHL

**Note 2**: in both Plans A/B and Plan C, these CIL shares be issued to public and proceeds retained by CIL to meet working capital requirements

Sources: **Exhibit C-5**, p. 74, Brown1 ¶ 91

1569. The Claimants thus argue that Cairn would have offered for sale the same amount of CIL shares that CUHL acquired for cash in the fourth tranche of the CIHL Acquisition in the version of Plan C that was finally adopted (i.e., roughly 24%). While there is nothing in the record to support this exact number, the record does establish that Cairn intended to retain approximately 60% of CIL post-IPO.[1965] It is therefore reasonable to assume that, in Plans A and B, CEP would have offered for sale at most 40% of its shareholdings in CIL, i.e., US$ 2.3 billion. The potential tax liability for Cairn would thus have been in the order of 41.82% over US$ 2.3 billion, i.e., approximately US$ 970 million. This is roughly one half of the tax that the FAO actually assessed on Cairn (US$ 1.6 billion).

1570. For the reasons set out above, the Tribunal finds that the Respondent has not satisfied its burden of proving that the Claimants' decision to reject Plans A and B in favour of a revised version of Plan C amounts to tax avoidance.

*(3)   Inflation of the cost basis of CIL's shares (Cost Basis Theory)*

1571. Relying on Professor Rosenbloom's expert report, the Respondent has raised a third tax avoidance theory: in its Statement of Defence, it argued that the 2006 Transactions artificially inflated the cost basis of the CIL shares, so that when Cairn disposed of them in 2009 to Petronas and in 2011 to Vedanta, less tax was payable.

---

[1965]   Exh. CWS-Brown-49A, p. 5.

1572. The Claimants note that the Respondent does not appear to maintain this theory. In any event, they argue that Cairn's subsequent disposals of CIL shares in 2009 and 2011 have already been taxed and assessed in India, and the cost basis of those transactions was already approved by the ITD at INR 160 per share (or INR 190 per share, depending on the date of acquisition). The Claimants assert in particular that the ITD accepted that CUHL had acquired the shares in CIL at their full market value at the time of the acquisition, and that such fair market value in 2006 (not the "carried over" 1996 value of the participating interests in the PSC) constituted the cost basis of the CIL shares. The ITD reached this conclusion after carefully reviewing the steps in Cairn's 2006 corporate reorganisation in which CUHL acquired shares in CIL, both in the context of CUHL's applications for withholding certificates after the sales to Petronas and Vedanta, and in court proceedings related to the tax rate to be applied.[1966]

1573. As the Claimants have noted, the Respondent does not appear to maintain this theory. As it explains in its Rejoinder, "[w]hile the "cost basis" point has accordingly been taken in the Statement of Defence, and in the Respondent's tax authorities' proceedings in India for the sake of consistency, so as to further demonstrate the tax evasive nature of the 2006 transactions, the Respondent's tax abuse allegations do not depend on the point."[1967] The Tribunal thus need not address it in detail.

1574. The Tribunal simply notes that, while Professor Rosenbloom's theory is worth considering, there is no evidence in the record to provide a factual predicate for it. In particular, the Respondent has not pointed to any evidence showing Cairn's intention artificially to increase the cost basis of CIL's shares. To the contrary, Ms Brown testified that Cairn did not discuss consider the cost basis of CIL's shares when determining the structure to be adopted.[1968]

*(4)    Avoidance of tax leakage (Tax Leakage Theory)*

1575. The Respondent has further alleged that Cairn's commercial objective was to extract value from its Indian assets without "tax leakage".[1969] While in its Rejoinder the Respondent appeared to use this term broadly, it appears to have accepted in its later submissions that the reference to "tax leakage" related specifically to the taxation of dividend flows from the subsidiaries below CIHL to CIL, and not the return of profits from CIL to Cairn.[1970]

---

[1966]  C-PHB, ¶ 569; C-Updated Reply, ¶¶ 402-407, citing CUHL, Annexure 3 to Application for Withholding Certificate under Section 197 of the ITA 1961 dated 19 October 2009, Exh. CWS-Brown-83; CUHL, Petition to the High Court of Delhi dated 27 September 2012, Exh. CWS-Brown-107, p. 171 of the bundle; *Cairn UK Holdings Limited v. Director of Income Tax* [2012] Writ Petition Index Volume - II (High Court of Delhi, 27 September 2012), Exh. C-318, p. 203 of the bundle; Order under Section 197 of the ITA 1961 dated 3 June 2011, Exh. CWS-Brown-95.

[1967]  R-Rejoinder, ¶ 234.

[1968]  Brown WS2, ¶ 59; Transcript, Evidentiary Hearing, Day 5, 86:16-25 (Ms Brown).

[1969]  R-Rejoinder, Section III.D.1.

[1970]  R-PHB, ¶¶ 173, 190.

1576. The Claimants acknowledge that the documentary record reflects their plan to reduce tax leakage.[1971] Essentially, the interposition of an Indian company (CIL) meant that the profits that flowed up the chain were taxed three times in India before reaching the shareholders, because the Indian tax-system does not provide for a "holding-exemption" on dividends received from subsidiaries that would already have been taxed on their profits.[1972] Ms Brown testified in this respect:

> Prior to the IPO, Cairn held its Indian assets through a series of UK, Australian and Dutch companies that operated through local branches. Those branches were subject to Indian taxes in respect of their profits in India, and the distribution of those profits through intermediate companies in Cairn's corporate structure was either exempt from tax (e.g. in The Netherlands), or benefitted from tax credits given for underlying taxes paid in India. Inserting the required Indian IPO company (CIL) into the structure was going to make it highly tax inefficient, since India gives no credits for taxes paid on the underlying profits out of which dividends are distributed – even taxes paid in India. Thus, the consequence of inserting CIL was that distributions – made out of profits already taxed in India – would be taxed in India again on receipt by CIL, creating what we referred to as "tax leakage". To quantify this effect: if a branch in India made $100 of profit, that amount would be taxed at branch level at 42%, leaving $58 for distribution. Those dividends could then be distributed through Australia, the Netherlands, the UK and Jersey without incurring additional tax, but on receipt by CIL, they would be subject to tax again at 34%, leaving $38. If CIL were then to distribute those $38, the distribution would be subject to a 14% Indian dividend distribution tax, leaving only $33 of the original $100 (as opposed to $58 before CIL was inserted). In essence, inserting CIL meant that India would have an effective tax rate of 77%, rather than 42%.[1973]

1577. Ms Brown explained that "[i]t would have been unreasonable to consider adopting a structure that imposed an additional level of taxation without also considering a means of addressing it."[1974] To solve this problem, Cairn decided that once the IPO was completed, it would "collapse the structure where possible by merging Australian and Dutch subsidiaries into CIL, leaving CIL holding most of the Indian oil & gas assets and thereby removing most of the branch level tax."[1975] Ms Brown added that, while Cairn was already planning for this in 2006, this was planned as Phase II of the reorganisation and occurred only in 2011 pursuant to an Indian court-approved scheme of arrangement.[1976]

---

[1971]  C-PHB, ¶ 572.

[1972]  *Ibid.,* citing C-Rejoinder, ¶¶ 29-34; Brown WS1, ¶¶ 33-36; Transcript, Evidentiary Hearing, Day 1, 83:24-85:9 (Mr McNeill); Day 4, 204:4-207:18 (Mr McNeill); Day 4, 143:21-144-19 (Ms Brown).

[1973]  Brown WS3, ¶ 34.

[1974]  *Id.,* ¶ 35.

[1975]  *Id.,* ¶ 36.

[1976]  *Ibid.*

1578. At the Evidentiary Hearing, the Respondent confirmed that it was "not challenging the tax leakage fix" in these proceedings, but it was arguing that Cairn's plan to collapse the 27 subsidiaries into CIL after the IPO had the following implications: (i) that having an Indian company "immediately created tax consequences in India"; (ii) that Cairn's attention to resolving the tax leakage problem undermines Ms Brown's testimony that the 2006 Transactions were not structured with the intention of reducing taxes in India; and (iii) that the plans to collapse the corporate structure demonstrated the lack of independence of the subsidiaries and thus provides a basis for the Tribunal to disregard them.[1977]

1579. According to the Claimants, none of these arguments has merit:[1978]

a. Statement (i) is a truism that does not provide guidance as to whether the 2006 Transactions were tax avoidant.

b. As to (ii), the problem of tax leakage was created by the 2006 Transactions, and in 2006 Cairn wished to have a "line of sight" as to how to solve the problem. The Claimants state that "[i]t is obvious that Cairn was not structuring the 2006 Transaction so as to reduce tax in India, but rather seeking comfort that the effect of the 2006 Transaction would not be to increase Cairn's taxes to unreasonable levels."[1979] Further, the post-IPO collapse of CIL's corporate structure was not an integral part of the 2006 Transactions, as the Respondent suggests. The evidence shows that this collapse was referred to as "Phase II" of the corporate restructuring, and once Cairn was satisfied that it could find a solution to this problem, it focused on structuring the immediate corporate reorganisation and left this collapse for a later stage (which took place in 2010 and 2011).

c. As to (iii), the Claimants deny that a subsidiary's independence may be undermined by a group restructuring, as this would mean that all wholly owned subsidiaries can be disregarded. The test (as accepted by the Supreme Court in *Vodafone*) is that the separate legal status of subsidiaries will be respected if they display indicia of sufficient substance.

d. Finally, there was an independent, non-tax reason for collapsing CIL's corporate structure. The RBI expressly required Cairn to commit that the assets would be moved from CIHL to CIL to avoid CIL being considered a Non-Bank Financial Company, a commitment which Cairn undertook.[1980]

1580. The Tribunal first notes that the Respondent has confirmed that it is not independently arguing that the Claimants avoided the payment of Indian tax on dividends. Its argument is rather that (i) the 2006 Transactions were structured with the dominant purpose of avoiding tax, and (ii) the fact that the Claimants were planning to collapse the 27 Subsidiaries into CIL shows that they had no substance.

---

[1977] C-PHB, ¶ 573, citing Transcript, Evidentiary Hearing, Day 6, 116:6-118:15 (Mr Moollan).

[1978] *Id.*, ¶¶ 574-576.

[1979] *Id.*, ¶ 575.

[1980] *Id.*, ¶ 578, citing Transcript, Evidentiary Hearing, Day 5, 270:12-274:10 (Ms Brown); Letter from CIL to the RBI dated 6 October 2006, Exh. CWS-Brown-67, p. 2.

1581. The Tribunal has already addressed (ii) in Section VII.A.3.c(v)(1) above, when assessing the direct divestment theory.

1582. As to (i), the Tribunal first notes that whether Cairn wished to avoid Indian tax on dividends up the chain of subsidiaries has no impact on whether it avoided capital gains tax when structuring its transaction. Whatever motivation the Claimants could have had in wishing to collapse the 27 Subsidiaries has no bearing on the tax assessment at issue. In the circumstances, the Tribunal cannot accept it as evidence for purposes of determining whether the pre-IPO structure was chosen with the dominant purpose of avoiding tax.

1583. In any event, the Tribunal considers the Claimants' plans to prevent tax leakage to be legitimate tax planning. The Claimants' structure prior to the 2006 Transactions held no exposure to tax leakage. By Indianising its investments and placing the 27 Subsidiaries under CIL, Cairn would be creating additional taxes that did not exist before. By deciding to collapse the 27 Subsidiaries, Cairn was essentially maintaining its taxation at its existing level. As noted above, while a taxpayer should not avoid or evade the payment of applicable taxes, under Indian law it is not required to choose the structure that is most onerous in terms of taxes.

*(5)   Avoidance of UK corporation tax*

1584. The Respondent also appears to allege that the 2006 Transactions were structured in a way to permit Cairn to obtain proceeds from the IPO without having to distribute them as a dividend, thus avoiding UK corporation tax. Specifically, the Respondent argues that the removal of the Mauritian holding company from the structure "is the *coup de grace*, which enables Cairn to extract the value of the Indian assets through the IPO without attracting either (i) capital gains tax at the IPO stage, because it is an issue of new shares not a sale of existing shares; and (ii) UK corporation tax when the proceeds reach Cairn, because they arrive in the form of consideration for the transfer of the foreign/UK shares rather than in the form of a dividend."[1981]

1585. The Claimants' arguments on (i) have been discussed in Section VII.A.3.c(v)(2) above. As to (ii), the Claimants argue that no tax could have been avoided because, under the Indian Companies Act, Indian companies may only pay dividends out of profits.[1982]

1586. The Tribunal does not understand the Respondent to be basing its tax avoidance theory on the potential avoidance of a UK tax. The Tribunal understands the Respondent to have made this argument as further proof that the Claimants' dominant purpose in choosing Plan C was to avoid tax (including UK corporations tax) anywhere and, it seems to the Tribunal, to fix in the Tribunal's mind what the Respondent considers to be the unfairness of an investor's realising extraordinary gains and having the ability to organise its affairs so as not to pay tax on the gains anywhere in the world.

1587. With respect to the first issue, the Tribunal has already found that the Claimants' dominant purpose in choosing Plan C was not to avoid tax but rather to find a means of

---

[1981]   R-Rejoinder, ¶ 327.

[1982]   C-PHB, ¶ 571.

complying with the MPC requirement and to find a means of meeting its commercial objection of effecting gains for CEP's shareholders – even though the lack of taxability was no doubt a much valued side effect of the structure. The possible avoidance of UK corporation tax would not change the Tribunal's conclusion that the Respondent could not have taxed the 2006 Transactions (whether on its Direct Transfer Theory or on its Tax Planning Theory) irrespective of the 2012 Amendment. In any event, the Respondent has not contested the Claimants' argument that, pursuant to Indian law, CIL could not have distributed IPO proceeds as dividends, and therefore has failed to prove that the "cash-flow" element of Plan C was conceived to avoid UK corporation tax.

1588. As for the 'Cairn paid no capital gains tax anywhere in the world' line of argument, this, in the Tribunal's view, really goes to matters of tax policy, not law, which are matters for legislators, not the Tribunal. The Tribunal must decide on the basis of the law, irrespective of what its members' views may be as to the overall fairness of the transaction from a policy perspective. In the end, Cairn and its advisors spent considerable effort and no doubt money devising a creative structure that met the company's commercial objectives. If some aspects of the structure seem to be a triumph of form over substance, it is because corporations law attaches much significance to matters of form. This, in the Tribunal's opinion, is the stuff of solicitors' work in complex commercial affairs.

*(6)*   *Avoidance of UK stamp duty*

1589. The Respondent has also argued that CIHL's sole purpose was to mitigate UK stamp duty, mainly by interposing a Jersey holding corporation, CIHL.[1983] The Claimants deny this, stating that a holding company was always envisaged to hold the underlying Indian assets. The fact that stamp duty was mitigated resulted from the choice to incorporate CIHL in Jersey, but "a holding company had a legitimate role to play in the structure regardless of nationality."[1984]

1590. The Tribunal has already found (at Section VII.A.3.c(v)(1) above) that CIHL had a valid business purpose. That said, it is undisputed that one of the reasons for choosing Jersey as its place of incorporation was to "mitigate" (i.e., avoid or reduce) UK stamp duty. On the present record, the Tribunal cannot comment as to that amounts to tax avoidance under UK law. It can only say that, whether this amounted to tax avoidance in the UK has no bearing on whether the Claimants structured the 2006 Transactions to avoid the payment of capital gains tax in India. Indeed, if CIHL were to be removed from the transactions, this would have no impact on the taxability of the transactions in India.

\* \* \*

1591. For the reasons set out above, the Tribunal finds that the Respondent has failed to establish that the Claimants engaged in abusive tax avoidance. But even if they had, the 'substance over form' principle would not have allowed the ITD or an Indian court to impose a tax substantially equivalent in amount to that which was actually applied. For these reasons, the Tribunal finds that the Respondent's first defence does not preclude

---

[1983]   R-Rejoinder, ¶ 376.

[1984]   C-PHB, ¶ 580; Claimants' Answers to the Tribunal's Questions, Section III.C.4.

it from assessing whether the fiscal measures actually imposed by the Respondent breach the BIT's FET standard.

### d.    The Respondent's 2(47)(vi) defence

#### (i)    The Respondent's position

1592. The Respondent's second defence is that the 2006 Transactions were taxable irrespective of the 2012 Amendment because they involve the indirect transfer of immovable property, and as such are taxable under Section 2(47)(vi) of the ITA.

1593. The Respondent devoted a single paragraph of its Statement of Defence to this argument, which stated as follows:

> Next, s. 2(47)(vi) of the ITA itself contemplates the taxation of indirect transfers of Indian assets. s. 2(47) of the ITA defines the word "transfer" in relation to a capital asset, and includes in sub-clause (vi), "any transaction … which has the effect of transferring, or enabling the enjoyment of, any immovable property." Thus, the ITA itself contemplates, and makes clear, the principle that indirect transfers of Indian assets fall within the scope of s. 9 of the ITA. s. 2(47)(vi), a definitional s., does not create a right to tax; that is created by the primary charging section, i.e. s. 9. It accordingly confirms that the scope of that primary charging section included indirect transfers (in that specific instance, of immovable property).[1985]

1594. The Respondent elaborated on this defence in its subsequent written and oral submissions, where it describe[d] it as "an independent, complete answer to the Claimants' case".[1986]

1595. According to the Respondent, its argument under Section 2(47)(vi) is a pure question of law. Regardless of whether Section 9(1)(i) covers indirect transfers, the Respondent submits that, because this case involves the transfer of rights in oil wells situated in India, they are taxable on the basis of Section 2(47)(iv), read in conjunction with Sections 5 and 45, as well as Section 269UA(d) of the ITA 1961, which have been in force since 1987 and prior to Cairn's investments in the mid-1990s.[1987]

1596. The Respondent submits that the definition of "transfer" in relation to immovable property at Section 2(47)(iv) makes clear that any transaction "which has the effect of transferring" immovable property (such as acquiring shares in a company) is considered a transfer.[1988] Thus, "in other words, a transaction amounting to a transfer of shares is treated as a transfer of the underlying assets itself."[1989]

---

[1985]   R-SoD, ¶ 145.

[1986]   R-Rejoinder, ¶ 378.

[1987]   R-PHB, ¶ 275.

[1988]   *Id.*, ¶¶ 275-287; R-Rejoinder, ¶ 378.

[1989]   R-PHB, ¶ 276.

1597. The Respondent points out that Section 2(47)(vi) was inserted with effect from 1 April 1988. At that time, the legislative intention for that provision was provided through CBDT Circular No. 495 of 1987, which explained that this new clause had been inserted to address "arrangements [which] confer[red] the privileges of ownership without transfer of title in the building and [were] a common mode of acquiring flats particularly in multi-storeyed constructions in big cities."[1990] The Circular went on to say that this clause "ha[d] brought into the ambit of 'transfer', the practice of enjoyment of property rights through what is commonly known as Power of Attorney arrangements", which is "adopted normally where transfer of ownership is legally not permitted." [1991]

1598. According to the Respondent, Indian courts have confirmed that Section 2(47)(iv) is interpreted broadly and will apply regardless of whether the transfer is *de jure* or *de facto*.[1992] The legal form of the transaction is irrelevant; what matters is whether the transfer has the effect of transferring immovable property. For instance, the Punjab High Court has held that "[t]he purpose of introducing clause (v) in conjunction with clause (vi) in Section 2(47) of the Act, defining 'transfer' is to widen the net of taxation of capital gains so as to include transactions that closely resembles [*sic*] transfers but are not treated as such under the general law."[1993]

1599. The Respondent then notes that, pursuant to an explanation in Section 2(47), the meaning of "immovable property" for purposes of clause (vi) must be found in Section 269UA(d) [of the ITA]. According to Section 269UA(d), this includes "any rights in or with respect to any land".[1994] The Calcutta High Court has confirmed that the notion of immovable property under Section 269UA(d) is broad, holding that "[t]he definition of immovable property [in s. 269UA(d)] includes not only the assets themselves but also any rights therein as well as rights with respect thereto not only existing but which would arise in future", and that "[t]he object was to cast the net wide so as to bring within the purview of the Chapter all possible modes of transfer of property[.]"[1995] The Respondent thus submits that, even if a contractual right is considered to be a species of movable property under the general law, if that contractual right is "in or with respect to" immovable property, it will be treated as immovable property for the purpose of tax law.[1996]

1600. According to the Respondent, as the Claimants' rights in the PSCs are "in" or "with respect to" immovable property (oil wells situated in India), these rights qualify as

[1990] CBDT, Circular No. 495, "Explanatory Notes on the Provisions of the Finance Act, 1987", dated 22 September 1987, Exh. R-137; R-Rejoinder, ¶ 386.

[1991] *Ibid*.

[1992] R-PHB, ¶¶ 278-279; R-Rejoinder, ¶¶387, 389, 403.

[1993] R-PHB, ¶ 278, citing *C.S. Atwal v. Commissioner of Income Tax*, (2015) 278 ITR 244, High Court of Punjab, Exh. R-141.

[1994] R-Rejoinder, ¶¶ 384-390; R-PHB, ¶¶ 281-283; *Hindustan Lever v. Appropriate Authority & Others*, (1994) 207 ITR 772, Calcutta High Court, Judgment of 1 March 1993, Exh. R-143.

[1995] R-Rejoinder, ¶¶ 384-390; R-PHB, ¶¶ 281-283; *Hindustan Lever v. Appropriate Authority & Others*, (1994) 207 ITR 772, Calcutta High Court, Judgment of 1 March 1993, Exh. R-143.

[1996] R-PHB, ¶ 284; R-Rejoinder, ¶ 391.

immovable property under the definition provided at Section 269UA(d).[1997] Using as examples the JOA between ONGC, Tata Petrodyne and Cairn Energy India[1998] and the Shell PSC for the Rajasthan block,[1999] the Respondent argues that the PSCs invariably link the Claimants' rights to a particular "contract area" that is defined in relation to oil blocks, which are "unquestionably immovable property" and "unquestionably land." Consequently, these rights are captured by the extended definition at Section 269UA(d) and amount to immovable property for purposes of the tax laws.[2000]

1601. On this basis, the Respondent submits that "[a]n indirect transfer of this specific type of asset was chargeable to tax from a plain reading of section 2(47) read with the charging provisions under section 5 and 45 of the Act" since 1987, well before Cairn's purported investment in the mid-1990s.[2001]

1602. On this basis, the Respondent submits that "the Indian legislature intended specifically to cast a wide net for taxing transactions which relate to immovable property in the broadest sense: tax could be imposed even if the property is strictly speaking not 'immovable', and even if strictly speaking that property has not been 'transferred'."[2002] As a result, "[t]ax is imposed on the gains from a transaction which has the effect of enabling enjoyment of something related to some Indian real property resource."[2003] In the Respondent's submission, this means that "the wide definition of transfer in Section 2(47)(vi) read with s. 269UA make it clear that the legislative intent has been (at the very least, since 1988) to treat capital gains from transfer of shares in a company (whether Indian company or foreign company) owning immovable property (including any rights in respect of mineral deposits and natural resources) in India, as capital gains from transfer of immovable property in India."[2004]

1603. According to the Respondent, the Claimants have no answer to the Respondent's case on Section 2(47)(vi), and their case has "changed in practically each of their submissions".[2005] In any event, the Respondent rejects each of the Claimants' arguments.

1604. First, the Respondent contends that the Claimants' initial argument that the PSCs could not be considered as immovable property is contradicted by the definition in Section 269UA(d).

---

[1997]  R-Rejoinder, ¶ 391; R-PHB, ¶ 285.

[1998]  Exh. CWS-Brown-12.

[1999]  Exh. CWS-Brown-1.

[2000]  R-PHB, ¶¶ 285-286.

[2001]  Id., ¶ 287.

[2002]  R-Rejoinder, ¶ 391.

[2003]  Ibid.

[2004]  Ibid.

[2005]  R-PHB, ¶¶ 289, 290.

1605. Second, contrary to the Claimants' contention, the fact that the PSCs and their transfers were not registered under the Registration Act does not mean that they do not qualify as immovable property for purposes of the tax laws. This is because: [2006]

    a.    The definition of immovable property under Section 2(47)(vi) is broader than the one contained in the Registration Act. While the former includes "any rights" in relation to immovable properties, the latter is restricted to a narrower definition.

    b.    Second, the operative provisions of both acts are different. After comparing Section 17 of the Registration Act with Section 2(47)(vi), the Respondent submits that "if something enables the enjoyment of property, but does not purport or operate to create rights, title or interest, it is covered in the definition of transfer under the tax laws, but not caught in the scope of compulsory registration".[2007]

    c.    Third, even if Section 17 of the Registration Act were applicable to contracts with the Government, it would fall within the exemptions from registration under section 90(d) of the Registration Act.

1606. As to the Claimants' argument that they could not have "transferred" natural resources because under Indian law these are state-owned,[2008] the Respondent argues that Section 2(47)(vi) is not restricted to direct transfers, but is conceived precisely to cover indirect transfers of immovable property such as the ones carried out by the Claimants.[2009]

1607. Similarly, the Respondent denies the Claimants' submission that the interpretation of "immovable property" under Section 269UA(d) should be restricted to the context of the chapter in which it is contained (i.e., Chapter XXC) and limited to "lands, buildings and apartments". The Respondent notes that Section 2(47)(vi) only relies on the definition of 'immovable property' provided in Section 269UA(d) and is not concerned with Chapter XXC on stamp duty. According to the Respondent, the "legislator has chosen to use a definition which was already in the Act to deal with another issue (the taxation of indirect transfers of immovable property)" and, as indicated in the Explanation applicable to Section 2(47)(vi) (*Supra* ¶ 5), it constitutes a mere reference to the definition at Section 269UA(d) and not to Chapter XX-C. [2010]

1608. The Respondent also objects to the Claimants' attempt to rely on the UK-India DTAA to argue that, contrary to other Indian DTAAs, it did not expressly allow gains from transfers of immovable property to be taxed in India.[2011] The Respondent argues that the taxation of transfers of immovable rights and related rights (which covers mineral rights) is one of the most common forms of source taxation, as exemplified by Article

---

[2006]  *Id.*, ¶¶ 289(a), 291.

[2007]  *Id.*, ¶ 291(b).

[2008]  R-PHB, ¶¶ 289(b), 293; R-Rejoinder, ¶ 402.

[2009]  R-PHB, ¶¶ 289(b), 293; R-Rejoinder, ¶ 402.

[2010]  R-PHB, ¶¶ 289(c), 294-296.

[2011]  *Id.*, ¶¶ 289(d), 297-302.

13(4) of the OECD Model Tax Convention.[2012] The Respondent recognises that the UK-India DTAA does not contain a provision expressly stipulating a right of source taxation for gains from immovable property, but argues that Article 14 of the UK-India DTAA delegates the "topic of capital gains tax to the discretion of domestic legislature".[2013] The Respondent also notes that "Article 6 of the UK-India DTAA has a definition of immovable property which mirrors the OECD minimum definition while leaving that definition open to domestic law".[2014] Accordingly, for the Respondent, applying the UK-India DTAA "[t]he only relevant question […] is and remains whether India's domestic law – section 2(47)(vi) read with section 269UA(d) – applied to the PSCs."[2015]

1609. Nor does the Respondent accept the Claimants' last argument that gains pertaining to oil and gas assets are taxed under Section 42(2) of the ITA 1961. The Respondent considers that this argument, which was not raised in any memorial but at the Evidentiary Hearing, should "be struck out as being entirely beyond the pleadings."[2016]

1610. In any event, the Respondent argues that Section 2(47)(vi) and Section 42 operate in different scopes:[2017]

   a.   Section 42(1) provides a special deduction to the computation of profits and gains (non-related to capital gains) of a business in the case of prospecting/extraction/production of mineral oil, in relation to which the Government has entered into an agreement for and on the condition that such deduction have been specifically provided in said agreement.[2018]

   b.   According to the Respondent's interpretation of Section 42(2), "where this business is transferred in accordance with the Agreement, if certain expenses have been incurred which remain unallowed (i.e. they have not yet been taken into account under section 42(1)), then subject to the provisions of the Agreement, deductions may be allowed in the year in which the business is transferred." [2019]

---

[2012] Article 13(4) of the OECD Model Tax Convention provides: "Gains derived by a resident of a Contracting State from the alienation of shares deriving more than 50 per cent of their value directly or indirectly from immovable property situated in the other Contracting State may be taxed in that other State."

[2013] R-PHB, ¶ 301, citing UK-India DTAA, RLA-45, Article 14 ("Article 14 Capital gains: Except as provided in Article 8 (Air transport) and 9 (Shipping) of this Convention, each Contracting State may tax capital gains in accordance with the provisions of its domestic law.").

[2014] R-PHB, ¶ 301. The Respondent further notes that "the definition of immovable property under the Model Convention is unquestionably left to the domestic law, but it is made clear that immovable property 'shall in any case' include 'property accessory to immovable property', the 'usufruct of immovable property' and payments for the 'working of, or the right to work mineral deposits, sources and other natural resources.'" *Id.*, ¶ 300.

[2015] *Id.*, ¶ 302.

[2016] *Id.*, ¶ 303.

[2017] *Id.*, ¶¶ 289(e), 303.

[2018] *Id.*, ¶ 303(a).

[2019] *Id.*, ¶ 303(b).

c.   The Respondent concludes that Section 42(2) does not modify the regime applicable to capital gains and it only applies where there is a transfer of a business in compliance with the agreement with the Government. In the case at hand, the subsidiaries continue to hold the PSCs and there has been no transfer under the Agreement. Consequently, Section 42(2) does not apply and, in any case, this provision is not concerned with capital gains.[2020]

1611.   The Respondent concludes that Section 2(47)(vi) allowed the taxation of the transfer by CUHL to CIL of the shareholding in CIHL in 2006, as this qualified as an indirect transfer of immovable property taxable under Sections 5 and 45 of the ITA 1961.[2021]

1612.   According to the Respondent, the Claimants' argument that the Respondent is estopped from raising this defence is misconceived and should be dismissed.[2022] As to the Claimants' attempts to undermine the credibility of this defence by arguing that it was not raised or invoked in this manner until this arbitration, the Respondent argues that (i) this is a pure question of law, and thus no question of factual credibility arises, and (ii) the Claimants have failed to submit the transaction for consideration to the tax authorities at the relevant time, and by the time it came to the attention of the tax authorities, the transfer was clearly taxable under the 2012 Amendment; and (iii) this matter is currently being argued before the Indian courts following the ITAT Order.[2023]

1613.   Finally, the Respondent contends that, even in the hypothesis that Section 2(47)(vi) did not suffice to answer the claim, it still weakens the legality of any expectation that the Claimants could have had in relation to the 2006 Transactions. This is because (i) the UK and many other jurisdictions tax oil and gas assets on a source basis as akin to immovable property; (ii) Article 6(2) of the OECD Model Convention treats such assets as immovable property; (iii) Article 6(2) of the UK-India DTAA mirrors the OECD Model; and (iv) the record does not contain any evidence that either the Claimants obtained any advice on this point when they invested in India or any representation from the Respondent or that this factor played any role in their decision to invest in India.[2024]

### (ii)   The Claimants' position

1614.   The Claimants deny that Section 2(47)(vi) is an answer to the Claimants' case, as the Respondent contends.[2025]

1615.   As a preliminary matter, the Claimants contend that the Respondent is estopped from raising this defence.[2026] According to the Claimants, the Respondent's argument that the 2006 Transactions were taxable as an indirect transfer of immovable property under

---

[2020]  *Id.*, ¶ 303(c).

[2021]  *Id.*, ¶ 304.

[2022]  *Id.*, ¶ 305.

[2023]  *Id.*, ¶ 305.

[2024]  *Id.*, ¶ 306.

[2025]  C-PHB, ¶ 171.

[2026]  C-Reply, ¶¶ 453-456; C-PHB, ¶¶ 584-586.

Sections 2(47)(vi) and 269UA(D) of the ITA 1961 "is not properly before this Tribunal and directly contradicts the record".[2027] Indeed, not only did the FAO not rely on this theory of liability (as confirmed by Mr Puri at the Evidentiary Hearing), but (contrary to the Respondent's contentions in this arbitration), the ITD has not invoked this ground in *post hoc* domestic tax proceedings. The Claimants note in particular that the Respondent's application to amend its memorandum of appeal before the Delhi High Court only seeks to introduce the ground of tax avoidance, but not Section 2(47)(vi).[2028] Consequently, "Section 2(47)(vi) simply is not and will not be a basis for the measure at issue", and the Respondent's defence "can be rejected by the Tribunal for this reason alone."[2029]

1616.   In any event, the Claimants contend that this defence fails on its merits. Essentially, the Claimants deny (i) that the PSCs "are rights "with respect to" land, and therefore constitute "immovable property" in India"; or (ii) that the 2006 Transactions are taxable under Sections 5 and 9 ITA 1961 because it had the effect of transferring or enabling the enjoyment of those rights,[2030] for the following reasons.

1617.   First, the Claimants contend that the Respondent's interpretation contradicts domestic practice. Not only has the Respondent been unable to cite a single instance in which Section 2(47)(vi) has been applied to an indirect transfer of PSCs or related rights; the Respondent's own Ministry of Petroleum and Gas confirmed that the share transfers to be carried out in the 2006 Transactions were not envisioned to affect any rights under the PSCs.[2031] Thus, according to the Claimants, "the Respondent is requesting the Tribunal to make new law in India".[2032]

1618.   Second, while the UK-India DTAA provides that gains derived from the alienation of immovable property are to be taxed in the State where the property is located, it does not (unlike many of India's other DTAAs) provide that gains derived from the alienation of shares in companies substantially deriving their value from immovable property are to be taxed by the State where the property is located.[2033]

1619.   Third, the definition of "immovable property" at 269UA(D) was conceived for the purpose of Chapter XXC (as opposed to the entirety of the ITA 1961) and should not be applied to Section 2(47)(vi).[2034]

---

[2027]   C-PHB, ¶¶ 584.

[2028]   *Id.*, ¶¶ 172, 588, citing *Principal Commissioner of Income Tax v. Cairn UK Holdings Ltd.*, I.T.A. No 800/2017, Application seeking amendment of memorandum of appeal, 8 February 2018, Exh. C-495.

[2029]   *Id.*, ¶ 588.

[2030]   *Id.*, ¶ 587.

[2031]   *Id.*, ¶¶ 589-590, citing FIPB File Correspondence, Exh. R-284, p. 50.

[2032]   *Id.*, ¶ 590.

[2033]   *Id.*, ¶ 592; Transcript, Evidentiary Hearing, 261:15-265:15 (Mr Datar).

[2034]   C-PHB, ¶ 593.

1620. <u>Fourth</u>, the PSCs do not grant the Claimants' operating companies any rights that can be characterised as immovable property.[2035] Specifically:

    a.    The PSCs do not grant any title to or rights on the natural resources in the ground, which, according to Indian law, can only be owned by the Indian Government. Rather, the PSCs allow the passage of the title of the natural resources to the purchaser after their extraction from the ground.[2036] The Claimants' PSCs provide that "[t]he Government is the sole owner of Petroleum underlying the Contract Area and shall remain the sole owner of Petroleum produced pursuant to the provisions of this Contract except as regards that part of Crude Oil or Gas the title whereof has passed to the Contractor or any other person in accordance with the provisions of this Contract."[2037] The PSCs then explain that the Cairn subsidiaries only obtain an economic interest at a defined "delivery point", once the natural resources have been extracted from the ground, i.e., once they have become "moveable" property.[2038]

    b.    The PSCs do not grant the Cairn subsidiaries a licence to explore the natural resources in the ground. Only the ONGC (i.e., the state oil company) has license to explore the blocks, and it is prohibited by law from creating any right, title or interest in the license in favour of any third person. Cairn's operating subsidiaries are appointed as "Operators" to carry out petroleum operations on behalf of the Contractor in accordance with the operating agreements. Cairn's rights under the PSCs and the operating agreements are contractual rights to recover a percentage of the revenue derived from the petroleum produced. While the PSCs allow Cairn's operating subsidiaries to lift and export their "Participating Interest" share of the petroleum once India meets its domestic demand, this has not happened yet, and in any event that interest arises only after the petroleum has been extracted from the ground.[2039]

    c.    Accordingly, the rights under the PSCs are not "rights to variable or fixed payment as consideration for the working of natural resources", and thus do not satisfy the definition of immovable property at Article 6(2)of the UK-India DTAA. In any event, Article 6(1) merely gives India the right to tax income derived from immovable property located in India; it does not imply that India has exercised that right, or has included such income within the scope of "immovable property" under domestic law. According to the Claimants, India taxes income derived from

---

[2035]  *Id.*, ¶ 594.

[2036]  *Id.*, ¶ 594.

[2037]  Production Sharing Contract between the Government of India and Oil & Natural Gas Corporation Limited and Tata Petrodyne Limited and Cairn Energy India Pty Ltd dated 30 June 1998, Exh. CWS-Brown-12, Article 27.1; Production Sharing Contract between the Government of India and Oil & Natural Gas Corporation Limited and Cairn Energy Gujarat Block Limited dated 6 February 2004, Exh. C-273, Article 27.1.

[2038]  C-PHB, ¶¶ 594, C-Reply, ¶¶ 459-462.

[2039]  C-PHB, ¶ 594, with reference to Production Sharing Contract between the Government of India and Oil & Natural Gas Corporation Ltd and Tata Petrodyne Limited and Cairn Energy India Ltd dated 30 June 1998, Exh. CWS-Brown-12.

PSC interests only by way of special tax provisions, and not by assimilation to immovable property under the ITA 1961.[2040]

1621.   Fifth, the 2006 Transactions did not trigger any transfer or assignment of rights under the PSCs. Under the PSCs, such a transfer or assignment can only occur with the consent of the Indian Government, and as discussed at paragraph 1617 above the Ministry of Petroleum and Natural Gas confirmed that this would not occur with the 2006 Transactions.[2041]

1622.   Sixth, the applicable tax regime for the transfer of rights under the PSCs is provided at Section 42 of the ITA 1961 (which is specifically referred to in some of the PSCs). Pursuant to this special regime, gains on the transfer of businesses which consist of the prospecting for or extraction or production of petroleum and natural gas are considered as "income of the business (i.e., the operating subsidiary) and not of the transferor".[2042] As the CBDT Circular No. 308 of 1981 makes clear, Section 42 excludes the application of more general provisions under the ITA, such as Section 9.[2043] The Petroleum Tax Guide prepared by the Indian Government confirms what is the applicable tax regime for transfers of PSC interests: while it contains a summary of the Section 42(2) regime, it does not contain any mention of immovable property or Section 2(47)(vi) of the ITA.[2044]

1623.   Seventh, the Claimants contend that the legislative history of Sections 2(47)(vi) and 269UA of the ITA 1961 does not support the interpretation that they would include the transfer of companies holding PSC interests. Section 2(47)(vi) was enacted to address the methods employed in India for the transfer property ownership; while Section 269UA was enacted to prevent tax evasion in transactions for the sale of land and buildings.[2045]

1624.   Eighth, the Claimants contend that interpreting of Section 2(47)(vi) to include the changes in control of companies which have rights in land is contrary to fundamental principles of corporate law.[2046] On its plain terms, Section 2(47)(vi) applies only to transactions that allow the transferee to enjoy the immovable property being transferred. To interpret this as covering changes in control of companies holding rights in land would be contrary to the principle that shareholders cannot claim an interest in the company's assets. As the Supreme Court stated in *Vodafone*, share transfers only provide the transferee with the rights related to share ownership. The Claimants further assert that shares are movable property under statutory law.[2047]

---

[2040]   C-PHB, ¶ 594.

[2041]   *Id.*, ¶ 595.

[2042]   *Id.*, ¶ 596.

[2043]   *Id.*, ¶ 597.

[2044]   *Id.*, ¶ 598.

[2045]   *Id.*, ¶ 599.

[2046]   *Id.*, ¶ 600.

[2047]   *Ibid.*

1625. Finally, the Claimants argue that the 2006 Transactions were an intragroup operation that did not cause any "transfer of enjoyment to the rights in the underlying PSC interests" and therefore, do not satisfy the requirements of Section 2(47)(vi) of the ITA 1961. [2048]

### (iii)   The Tribunal's analysis

*(1)   Is the Respondent estopped from bringing this defence, or is it otherwise inadmissible?*

1626. The Claimants submit that the Tribunal should disregard the Respondent's second defence, without addressing its merits. As with the Respondent's tax avoidance defence, they advance the argument that the 2006 Transactions involved an indirect transfer of immovable property under Section 2(47)(vi) (i) was not a ground for taxation under the FAO, and (ii) was never raised before this arbitration (and indeed, has not been properly raised in domestic proceedings).

1627. This time the Tribunal agrees with the Claimants on both counts. As noted in Section VII.A.3.a(ii) above, the only ground for taxation in the FAO was Section 9(1)(i). Mr Puri confirmed at the Evidentiary Hearing that Section 2(47)(vi) "does not form any basis of the Final Assessment Order".[2049] While Mr Puri explained that this was because "[i]t was not needed",[2050] the fact remains that this provision was not invoked as ground for taxation in the FAO.

1628. Further, in contrast to the tax avoidance defence, the immovable property defence was not raised at all during the tax assessment proceedings. While there is one mention of Section 2(47)(vi) in the FAO, this was to illustrate that the definition of "transfer" in Section 2(47) is broad and "artificially brings in certain cases where in law, there may not have been a transfer."[2051] However, the AO did not characterise the 2006 Transactions as an indirect transfer of immovable property, nor did he address whether they should be taxed as such under Section 2(47)(vi).

1629. Indeed, the Respondent brought its Section 2(47)(vi) argument for the first time in these proceedings, in its Statement of Defence.[2052] At that point, it was contained in a single paragraph. It was in its Rejoinder where the Respondent finally elaborated on this defence. While the Delhi High Court granted leave to the ITD to amend its Memorandum of Appeal against the ITAT Order of 9 March 2017, its Application seeking leave to amend that Memorandum of Appeal makes no mention of this alleged

---

[2048]   *Id.*, ¶ 601.

[2049]   Transcript, Evidentiary Hearing, Day 9, 165:8-11 (Mr Puri).

[2050]   *Ibid.*

[2051]   FAO, Exh. C-70, ¶ 9.2, p. 75. The AO went on to provide two examples: "1. For instance, a transaction by which possession of immovable property is taken or retained in part performance of a contract under Section 53A of the Transfer of Property Act, 1882, is brought within the ambit of the provision. Similarly, by sub-clause (vi) any transaction which has the effect of transferring or enabling the enjoyment of any immovable property, is within the ambit of the expression 'transfer'."

[2052]   R-SoD, ¶ 145.

new ground for taxation;[2053] this belatedness in raising this argument is striking and, more importantly, it remains that the tax assessment and ensuing proceedings are not predicated on such legal basis.[2054]

1630.   Thus, the Tribunal thus finds that, as a matter of fact, the Respondent did not contend in the FAO and has not argued outside of this arbitration until very recently that the 2006 Transactions were taxable as indirect transfers of immovable property under Section 2(47)(vi). The Respondent's immovable property defence is thus unquestionably a post-factum defence, and the record suggests that it was raised here for the first time and only then did it appear in the domestic legal proceedings. The question that follows is whether, as a result, the Respondent is estopped from raising this defence in this arbitration, or whether the defence is inadmissible.

1631.   To recall, the Tribunal's role is to determine the compatibility of the Respondent's measures with the BIT, not to sit as a domestic tax court. The Tribunal is not here to determine whether the Respondent can invoke other grounds to justify the FAO; its task is to determine whether the fiscal measures actually imposed (i.e., the FAO and related measures) were fair and equitable. The Respondent has argued that the Tribunal need not address this matter, because the measures were otherwise taxable in India. The Tribunal has agreed that, to determine the overall fairness of the measures actually imposed, it will assess whether the 2006 Transactions were taxable in India irrespective of the 2012 Amendment. Accordingly, while in the context of domestic proceedings the Respondent might be estopped from raising this defence or the defence might ultimately be found to be inadmissible, the Tribunal considers that the Respondent may still raise it in this arbitration to provide context to the Tribunal's assessment of the overall fairness of the measures. The Tribunal will thus address the Respondent's second defence on its merits.

*(2)*   *Does the Respondent's immovable property defence have merit?*

1632.   The Respondent argues that the 2006 Transactions amount to an indirect transfer of immovable property under Section 2(47)(vi), and as such they would have been taxable

---

[2053]   *Principal Commissioner of Income Tax v. Cairn UK Holdings Ltd.*, I.T.A. No 800/2017, Application seeking amendment of memorandum of appeal dated 8 February 2018, Exh. C-495.

[2054]   It is unclear from the record whether the Respondent has formally raised the Section 2(47)(vi) argument before the Delhi High Court. In December 2018, the Claimants asserted that "the Section 2(47)(vi) argument forms no part of the tax assessment (and indeed has not yet been raised in the Delhi High Court proceedings)." CCom-275, ¶ 7(d), While the Respondent has argued that "the Delhi High Court is of course well aware of the state of the proceedings before it, and will have to decide the extent to which the Respondent can run this pure point of law in respect of which no fresh evidence needs to be adduced (it being the Respondent's contention that it clearly can)" (RCom-345 of 4 January 2019, ¶ 7(d)(iii), the Respondent has not adduced any evidence that it has in fact applied to amend the FAO to include the 2(47)(vi) ground. Indeed, when the Respondent provided its last update on the status of the Delhi High Court proceedings, it asserted that "[a]t the Hearing in the Delhi High Court proceedings on 03 December 2019, the Court admitted the amended memorandum of appeal of the [ITD] which includes submissions *inter alia* on the ground of tax abuse (with the merits of the amended grounds for appeal to be considered at a later date)" (RCom-391 of 14 January 2020), but did not specifically state that it had requested the introduction of the 2(47)(vi) ground.

in 2006 irrespective of the 2012 Amendment. As discussed elsewhere, the Respondent essentially requests this Tribunal not to look at the measures actually imposed, but to accept instead that equivalent measures could have been imposed on other legal grounds. In the Tribunal's view, it is the Respondent's burden to prove that an alternative ground of taxation exempts it from having the international legitimacy of the FAO and related measures tested against the BIT's standards. For the reasons that follow, the Respondent has failed to discharge that burden.

1633.   First, the Respondent has been unable to identify a single instance in which the ITD has sought to tax the transfer of shares in companies indirectly holding interests in PSCs. At the Evidentiary Hearing, Mr Puri testified that he was not aware whether this had ever been done.[2055]

1634.   Second, the fact that the Respondent never raised this defence until this arbitration is fatal for that argument's credibility. The 2006 Transactions occurred in late 2006. As discussed in Section VII.A.3.b(ii)(7) above, the Indian Government as a whole was fully aware that the 2006 Transactions had taken place, as they required certain approvals from the FIPB and other governmental agencies. While the Respondent has argued that the ITD was unaware of these transactions (or did not have in its possession the underlying documents) until Mr Sanjay Kumar's investigation into CIL in January 2014, the record shows that the ITD was aware of these transactions at the very latest by 2010, when it assessed CUHL's sale of a stake in CIL to Petronas, and in the subsequent domestic proceedings concerning the taxability of that transaction. Had the Respondent really considered that the 2006 Transactions were taxable under Section 2(47)(vi) as an indirect transfer of immovable property, it would have attempted to tax the Claimants on this ground much earlier than 2014, and would not have waited until the 2012 Amendment to do so. It is symptomatic that neither the ITD nor Claimants' advisors contemporaneously (2004-2012) ever raised that possible legal basis for assessment: in turn, this shows that such a basis for taxability was not predictable and not transparent; this could seriously raise the issue of compatibility of a tax with FET if no other basis exists.

1635.   Third, the Respondent's interpretation of Sections 2(47)(vi) and 269UA(d) of the ITA is not supported by the record, nor can these provisions, on their plain terms, be applied to an indirect transfer of rights in PSCs.

1636.   The Respondent's argument is essentially the following:[2056]

   a.   The definition of "transfer" in relation to immovable property at Section 2(47)(iv) includes the indirect transfer of immovable property (including the transfer of shares in companies that indirectly own immovable property);

   b.   Pursuant to an explanation to Section 2(47), the meaning of "immovable property" for purposes of clause (vi) must be found in Section 269UA(d). According to Section 269UA(d), this includes "any rights in or with respect to any land".

---

[2055]   Transcript, Evidentiary Hearing, Day 9, 30:25-31:19 (Mr Puri).

[2056]   R-PHB, ¶¶ 275, 287; R-Rejoinder, ¶ 378.

According to the Respondent, this reference should be interpreted to include rights in oil wells located in India, such as the rights in the PSCs held by the Claimants;

c.   As a result, the indirect transfer of the Claimants' rights in the PSCs is taxable under Sections 5 and 9 of the ITA 1961.[2057]

1637. The Tribunal agrees that Step (a) of the Respondent's reasoning appears to gain some support from the wording of the provision in question. Section 2(47)(vi), which reads as follows, could indeed be understood to include indirect transfers effected by share transfers:

> 2. In this Act, unless the context otherwise requires,-
>
> (47) "transfer" in relation to a capital asset, includes … (vi) <u>any transaction</u> (whether by way of becoming a member of, or <u>acquiring shares in</u>, a co-operative society, <u>company</u> or other association of persons or by way of any agreement or any arrangement or in any other manner whatsoever) which has the effect of transferring, or enabling the enjoyment of, any immovable property.[2058]

1638. The problems, however, do not fail to arise in the following steps of the Respondent's argument. To be characterised as an indirect transfer under this provision, a share transfer would need to have "the effect of transferring, or enabling the enjoyment of, any immovable property." Explanation 1 to Section 2(47) unequivocally states that "[f]or the purposes of sub-clauses (v) and (vi), 'immovable property' shall have the same meaning as in clause (d) of section 269UA."[2059]

1639. In turn, Section 269UA(d) of the ITA provides the definition of immovable property which must be used for purposes of Section 2(47)(vi):

> 269UA. In this Chapter, unless the context otherwise requires,—
>
> (d) "immovable property" means—
>
> (i) any land or any building or part of a building, and includes, where any land or any building or part of a building is to be transferred together with any machinery, plant, furniture, fittings or other things, such machinery, plant, furniture, fittings or other things also.

---

[2057]   R-PHB, ¶¶ 275, 287; R-Rejoinder, ¶ 378.

[2058]   ITA 1961, Section 2(47)(vi), Exh. C-42 (emphasis added).

[2059]   The Finance Act 2012 (the same that introduced the 2012 Amendment) inserted a second explanation, which the Respondent does not rely on for its Second Defence, presumably because it post-dates the 2006 Transactions:

"Explanation 2.-For the removal of doubts, it is hereby clarified that "transfer" includes and shall be deemed to have always included disposing of or parting with an asset or any interest therein, or creating any interest in any asset in any manner whatsoever, directly or indirectly, absolutely or conditionally, voluntarily or involuntarily, by way of an agreement (whether entered into in India or outside India) or otherwise, notwithstanding that such transfer of rights has been characterised as being effected or dependent upon or flowing from the transfer of a share or shares of a company registered or incorporated outside India[.]"

Explanation.—For the purposes of this sub-clause, "land, building, part of a building, machinery, plant, furniture, fittings and other things" include any rights therein;

(ii) any rights in or with respect to any land or any building or a part of a building (whether or not including any machinery, plant, furniture, fittings or other things therein) which has been constructed or which is to be constructed, accruing or arising from any transaction (whether by way of becoming a member of, or acquiring shares in, a co-operative society, company or other association of persons or by way of any agreement or any arrangement of whatever nature), not being a transaction by way of sale, exchange or lease of such land, building or part of a building[.][2060]

1640. According to the Respondent, with these provisions "the Indian legislature intended specifically to cast a wide net for taxing transactions which relate to immovable property in the broadest sense: tax could be imposed even if the property is strictly speaking not 'immovable', and even if strictly speaking that property has not been 'transferred'."[2061] As a result, "[t]ax is imposed on the gains from a transaction which has the effect of enabling enjoyment of something related to some Indian real property resource."[2062] In the Respondent's submission, this means that "the wide definition of transfer in Section 2(47)(vi) read with Section 269UA make it clear that the legislative intent has been (at the very least, since 1988) to treat capital gains from transfer of shares in a company (whether Indian company or foreign company) owning immovable property (including any rights in respect of mineral deposits and natural resources) in India, as capital gains from transfer of immovable property in India."[2063]

1641. The Respondent goes too far. No matter how broadly Indian courts may have interpreted the definition of transfer at Section 2(47)(vi), it is still restricted to transfers of immovable property as defined in Section 269UA(d). This latter provision clearly refers to land and buildings, and to rights therein. It does not refer to contractual rights to operate oil wells, or to obtain payment from operating oil wells.

1642. The legislative intent of Section 2(47)(vi), as set out in CBDT Circular No. 495 of 1987, was clearly to capture *ad hoc* arrangements which provided the transferee with the privileges of ownership in *buildings*, in particular in multi-storied constructions. Specifically, Circular No. 495 explained:[2064]

11.1 The existing definition of the word "transfer" in s. 2(47) does not include transfer of certain rights accruing to a purchaser, by way of becoming a member of or acquiring shares in a co-operative society, company, or association of persons or by way of any agreement or any arrangement whereby such person acquires any right in any building which is either being constructed or which is to be constructed. Transactions of

---

[2060] ITA 1961, Section 269UA, Exh. C-252.

[2061] R-Rejoinder, ¶ 391.

[2062] *Ibid*.

[2063] *Ibid*.

[2064] CBDT, Circular No. 495, "Explanatory Notes on the Provisions of the Finance Act, 1987", dated 22 September 1987, Exh. R-137 (emphasis added); R-Rejoinder, ¶ 386.

the nature referred to above are not required to be registered under the Registration Act, 1908. <u>Such arrangements confer the privileges of ownership without transfer of title in the building and are a common mode of acquiring flats particularly in multi-storeyed constructions in big cities.</u> The definition also does not cover cases where possession is allowed to be taken or retained in part performance of a contract, of the nature referred to in s. 53A of the Transfer of Property Act, 1882. New subcls. (v) & (vi) have been inserted in s. 2(47) to prevent avoidance of capital gains liability by recourse to transfer of rights in the manner referred to above.

11.2 <u>The newly inserted sub-cl. (vi) of s. 2(47) has brought into the ambit of "transfer", the practice of enjoyment of property rights through what is commonly known as Power of Attorney arrangements.</u> The practice in such cases is adopted normally where transfer of ownership is legally not permitted. A person holding the power of attorney is authorised the powers of owner, including that of making construction. The legal ownership in such cases continues to be with the transferor.

11.3 These amendments shall come into force w.e.f. 1st April, 1988 and will accordingly apply to the asst. yr. 1988-89 and subsequent year…

1643. There is no indication, in the CBDT or elsewhere in the record, that in 2006 the legislative intent for Section 2(47)(vi) was to capture indirect transfers of contractual rights in PSC assets.

1644. In its final submissions on this point,[2065] Respondent does not rely on the definition of immovable property found at Article 6(2)(b) of the India UK-DTAA, and rightly so. Article 6(1) of the UK-India DTAA provides that "[i]ncome from immovable property *may* be taxed in the Contracting State in which such property is situated."[2066] In turn, Article 6(2)(a) provides that "[t]he term 'immovable property' shall, subject to the provisions of sub-paragraph (b) of this paragraph, be defined in accordance with the law of the Contracting State in which the property in question is situated." Accordingly, both the chargeability to tax and the definition of immovable property must be determined by Indian law. The chargeability to tax is allegedly found in Section 2(47)(vi) in relation to Sections 5 and 9 of the ITA 1961. As to the definition of immovable property, Explanation 1 to Section 2(47)(vi) is unequivocal in that "[f]or the purposes of sub-clauses (v) and (vi), "immovable property" *shall have the same meaning* as in clause (d) of section 269UA" (emphasis added). Section 269UA thus constitutes a *lex specialis* definition of immovable property for purposes of Section 2(47)(vi). Consequently, the Respondent cannot import into Section 2(47)(vi) the wider definition of immovable property contained at Article 6(2)(b) the UK-India DTAA (which mirrors the OECD Model Tax Convention). While this provision does state that the term "immovable property" "shall in any case include […] rights to variable or fixed payments as consideration for the working of, or the right to work, mineral deposits, sources and other natural resources", [2067] the definition of immovable property at Section 269UA(d)

---

[2065]  R-PHB, ¶ 299.

[2066]  UK-India DTAA, RLA-45, Article 6(1): "Income from immovable property may be taxed in the Contracting State in which such property is situated."

[2067]  *Id*., Article 6(2) provides:

prevails as *lex specialis*. The Respondent recognises this, as it expressly argues that, applying the UK-India DTAA "[t]he only relevant question […] is and remains whether India's domestic law – section 2(47)(vi) read with section 269UA(d) – applied to the PSCs."[2068]

1645.  As discussed above, the definition of immovable property at Section 269UA(d) cannot be interpreted to include contractual rights in PSCs without distorting its text. This is confirmed by the fact that so far as the record in this arbitration reveals, the Respondent has never attempted to interpret it in this manner until this case.

1646.  For the reasons set out above, the Tribunal finds that the Respondent has failed to prove that the 2006 Transactions would have been taxable as indirect transfers of immovable property in 2006. The Tribunal thus rejects the Respondent's second defence and will now address the merits of the Claimants' FET claim.

### e.   Did the 2006 Transactions breach Indian securities and exchange laws?

1647.  In the context of its jurisdictional objections and of its tax abuse defence, the Respondent has raised a separate argument: that the 2006 Transactions breached Indian securities and exchange laws (specifically, the SEBI DIP Guidelines). As discussed in Section VI.C.1.c(ii) above, the Tribunal found that, even if such breach was established, it would not deprive it of jurisdiction, but would be a matter for the merits.[2069] The Tribunal addresses this argument below.

### (i)   The Respondent's position

1648.  Up until the hearing, it was unclear whether the Respondent was making an affirmative case of breach of the SEBI DIP Guidelines. In its Rejoinder, the Respondent stated that the 2006 Transactions involved a "*potential* non-compliance" with the regulatory requirements contained in those Guidelines that was "currently under review by SEBI, and *potentially* constitutes a further violation of Indian law, which would also take CUHL's purported investment outside the definition of Article 1(b) of the BIT."[2070] However, in its Answers to the Tribunal's questions (submitted with its Post-Hearing Brief), the Respondent confirmed that, indeed, it was making such an affirmative argument.[2071]

---

"(2)  (a) The term "immovable property" shall, subject to the provisions of sub-paragraph (b) of this paragraph, be defined in accordance with the law of the Contracting State in which the property in question is situated.

(b)  The term "immovable property" shall in any case include property accessory to immovable property, livestock and equipment used in agriculture and forestry, rights to which the provisions of general law respecting landed property apply, usufruct of immovable property and rights to variable or fixed payments as consideration for the working of, or the right to work, mineral deposits, sources and other natural resources. Ships and aircraft shall not be regarded as immovable property."

[2068]  R-PHB, ¶ 302.

[2069]  See Section VI.C.1.c(ii) above.

[2070]  R-Rejoinder, ¶ 125(c) (emphasis added).

[2071]  Respondent's Answers to the Tribunal's Questions, ¶ 18.

1649. According to the Respondent, the evidence that emerged during the course of the arbitration, and in particular during Ms Brown's cross-examination at the Evidentiary Hearing, "establishes a *prima facie* case of violation of the Minimum Promoter Contribution (MPC) requirement under the SEBI DIP Guidelines." [2072] As previously explained,[2073] the promoter of an IPO (in this case, CUHL) must contribute at least 20% in the IPO vehicle, and this contribution must be done in cash; share swaps not being allowed. The Respondent contends that, when implementing Plan C, the Claimants exploited the proviso to SEBI Rule 4.9.1 in order to circumvent the MPC: while, formally, CUHL made a cash contribution of the expected 20% of the post-IPO value of CIL (that was funded through the Daylight Loan), that cash was used by CIL to buy the last tranches of CIHL from CUHL on that same day, and hence left CIL (and India) on that same day. The result of this round-tripping, so argues the Respondent, was very much like the share swap that was prohibited in the first place.[2074]

1650. The Respondent argues that "[t]his attempted 'exploitation' of the SEBI Rules", and in particular the Daylight Loan component of it, was never brought to SEBI's attention.[2075] Given the "untested" and "unprecedented" nature of this scheme, the Claimants should have sought definitive guidance from SEBI under the SEBI (Informal Guidance) Scheme, but did not do so.[2076] The Respondent submits that "it is now for SEBI to consider further action on this account. *Prima facie*, the scheme used certainly does not comply with the spirit of the SEBI Rules, nor with the letter of it, and it must be open to very real doubt whether SEBI would have accepted it had it been properly disclosed to it."[2077]

1651. If SEBI should find that there has been a breach of its Guidelines, the Respondent explains that, at the domestic level, SEBI is empowered to take serious action against the issuing entity or the intermediary, including (i) ordering the refund of any money raised under an issue to the investor; (ii) preventing the entity from accessing the capital markets for a certain period; (iii) directing the stock-exchange to prevent the listing or trading of the company; and (iv) suspending or cancelling the intermediary's certificate of registration.[2078]

1652. In the context of this arbitration, the Respondent submits that the Claimants' *prima facie* violation of the SEBI Guidelines has three consequences:

---

[2072] *Ibid.*

[2073] See Section VII.A.3.c(v)(2) above.

[2074] Respondent's Answers to the Tribunal's Questions, ¶ 18, referring to email trail from Ashish Patil to Jann Brown and others with subject "FW: RBI and Daylight" dated 6 to 9 September 2006, Exh. R-100A, p. 7; Transcript, Evidentiary Hearing, Day 5, 103:19-104:21 (Mr Moollan/Ms Brown).

[2075] Respondent's Answers to the Tribunal's Questions, ¶ 19.

[2076] *Id.*, ¶ 19, referring to email trail from David Kahn to Jann Brown with subject "Investment Commission note (comments) dated 30 October 2006, Exh. R-133; RSM, Structure Concept Paper 16 June 2006, Exh. CWS-Brown-51A.

[2077] Id., ¶ 20.

[2078] *Id.*, ¶¶ 21-23, citing SEBI (DIP) Guidelines, Exh. R-134, ss. 17.1 and 17.2.

a.   First, it amounts to a violation of Indian law that takes the Claimants' investment outside the scope of Article 1(b) of the Treaty. In other words, as explained in Section VI.C.1.c(ii) above, the Claimants have not made an investment in accordance with Indian law, and accordingly the Tribunal lacks jurisdiction to hear this dispute.[2079]

b.   Second, "the high degree of artificiality of the scheme used to 'comply' with the MPC requirement in order to avoid the payment of the capital gains tax on pre-IPO gains expressly identified by RSM on Plans A and B also feeds directly into the Indian test for tax abuse – as set out in *Vodafone* – and CUHL's purported investment separately contravened Article 1(b) of the BIT because it was not made in accordance with Indian law but was an integral part of an unlawful tax abusive scheme." [2080]

c.   More generally, the circumstances of the Daylight Loan contradict Ms Brown's assertions that the 2006 Transactions were "conservative" and/or "designed with a view to avoiding the circumvention of any regulatory requirement", or that Cairn acted transparently vis-à-vis the Indian authorities.[2081]

### (ii)   The Claimants' position

1653.   The Claimants assert that (at least up until the Evidentiary Hearing) the Respondent had not affirmatively alleged that the Claimants failed to comply with SEBI regulations. It notes that the Respondent referred to its breach as "potential" in its Rejoinder and indicated that it was currently under review by SEBI. However, the Respondent did not raise this matter during the Evidentiary Hearing, nor has SEBI raised the issue with the Claimants, which suggests that there has been no such violation.[2082]

1654.   Even had there been a violation of the MPC requirement, the Claimants submit that it is "irrelevant for this arbitration":[2083]

a.   It would have no relevance to the Tribunal's jurisdiction, because it does not relate to the acquisition or establishment of an investment, nor is it sufficiently grave to render Cairn's entire investment in India illegal. While SEBI is empowered to sanction violations of the DIP Guidelines, none of those remedies entail the cancellation of the shares subscribed by CUHL or otherwise render the subscription invalid or voidable.[2084]

b.   The purported violation of the MPC Requirement is also irrelevant to the Respondent's tax abuse claim. The Respondent is confusing compliance with a

---

[2079]   *Id.*, ¶ 24.

[2080]   *Ibid*.

[2081]   *Id.*, ¶ 25; R-PHB, ¶¶ 31-32.

[2082]   Claimants' Answers to the Tribunal's Questions, ¶ 10.

[2083]   *Id.*, ¶ 10; C-PHB, ¶ 296.

[2084]   Claimants' Answers to the Tribunal's Questions, ¶ 12.

regulatory requirement with a colourable device designed to avoid tax. According to the Claimants, "[n]o tax benefit was gained by the circular flow of funds (using the cash contributed by CUHL in satisfaction of the minimum promoter's contribution, to purchase CIHL shares from CUHL) or the fact that this cash was funded by a loan."[2085] The only benefit of this structure was to comply with the MPC Requirement.[2086] While the Daylight Loan meant "cash going in a circle in one day" and in that sense might be characterised as "a device for meeting the MPC requirement", it was approved by SEBI, and cannot be characterised as a colourable device for tax purposes.[2087]

1655.   In any event, the Claimants deny that they have breached the SEBI DIP Guidelines. According to the Claimants, the Guidelines do not impose any restriction as to how the funds contributed towards the MPC requirement may be used.[2088] The Claimants maintain that they disclosed the entire structure of the transaction to SEBI and that SEBI accepted it.[2089] More specifically, the Claimants assert that, over a series of meetings with SEBI officials and presentations to SEBI, they disclosed the following points:[2090] (i) that the 2006 Transactions involved the indirect transfer of Indian assets;[2091] (ii) that the IPO proceeds would be used to purchase shares in CIHL;[2092] and (iii) that the cash used for the MPC would be "round-tripped" (i.e., contributed by CUHL into CIL, and then used by CIL to purchase shares of CIHL from CUHL).[2093]

1656.   While the Claimants do not affirmatively assert that they disclosed that the cash that would be used to comply with the MPC Requirement would be procured by means of a loan, they argue that "there is good reason to believe that SEBI was made aware of the loan as well."[2094]

---

[2085]   C-PHB, ¶ 296.

[2086]   *Ibid*.

[2087]   Transcript, Hearing on Closing Arguments, Day 1, 196:2-197:5 (Mr McNeill).

[2088]   Claimants' Answers to the Tribunal's Questions, ¶ 11; C-PHB, Section VI.C.

[2089]   Transcript, Hearing on Closing Arguments, Day 1, 196:17-18; 197:2-5 (Mr McNeill).

[2090]   C-PHB, ¶ 293.

[2091]   *Ibid.,* citing Cairn Energy, Presentation to SEBI dated 27 June 2006, Exh. CWS-Brown-53, p. 8; Letter from DSP Merrill Lynch Limited, ABN AMRO Securities (India) Private Limited and JM Morgan Stanley Private Limited to SEBI dated 12 October 2006 (enclosing CIL DRHP) [Without Annexures], Exh. CWS-Brown-70, p. 1.

[2092]   *Id.*, ¶¶ 293, 302-304 citing Letter from DSP Merrill Lynch Limited, ABN AMRO Securities (India) Private Limited and JM Morgan Stanley Private Limited to SEBI dated 12 October 2006 (enclosing CIL DRHP) [Without Annexures], Exh. CWS-Brown-70, p. 31; "Cairn India's IPO plans may not be all that slick" (Economic Times, 15 September 2006), Exh. C-578.

[2093]   *Id.*, ¶¶ 293, 297-301, citing Letter from DSP Merrill Lynch Limited, ABN AMRO Securities (India) Private Limited and JM Morgan Stanley Private Limited to SEBI dated 12 October 2006 (enclosing CIL DRHP) [Without Annexures], Exh. CWS-Brown-70, pp. 2, 3 (cover letter); Email from Cairn Energy to Merrill Lynch dated 12 September 2006, Exh. C-470; Letter from DSP Merrill Lynch to SEBI dated 2 November 2006, Exh. CWS-Brown-156; Letter from SEBI to DSP Merrill Lynch, ABN Amro Securities (India) and JM Morgan Stanley dated 15 November 2006, Exh. CWS-Brown-157, p. 5; Transcript, Evidentiary Hearing, Day 5, 222:18-223:8; 265:4-14 (Ms Brown).

[2094]   C-PHB, ¶ 297.

1657. The Claimants explain that Cairn intended to utilise the proviso to Section 4.9.1 of the SEBI DIP Guidelines, which provided that funds contributed towards the MPC would not have to be held in escrow if "the promoters' contribution has been brought prior to the public issue and has already been deployed by the company" (so long as a cash flow statement is provided).[2095] The question then arose as to whether the "public issue" would be deemed to have occurred on the date of the filing of the DRHP, or on the date of the filing the RHP, as this would set the cut-off date for the deployment of funds. Since the top up of the share price would be contributed after the filing of the DRHP, and Cairn did not have sufficient cash or facilities to allow this portion to be kept in escrow, the interpretation of this provision became crucial.[2096]

1658. Mr Ashish Patil of Merrill Lynch met with SEBI in September 2006, and confirmed that the cut-off date for deployment of the funds was the date of filing of the RHP, not that of the DRHP.[2097] According to the Claimants, while there are no minutes of this meeting, "at a minimum Mr Patil must have explained that CIL planned to deploy the promoter's contribution to purchase CIHL shares and that it sought to utilise the proviso to Section 4.9.1 of the DIP guidelines to deploy the funds prior to the public issue because Cairn's debt facilities did not allow the funds to be tied up for longer than overnight."[2098] The Claimants further assert that this was the sole issue on which Cairn sought SEBI's concurrence, which was granted.[2099]

### (iii)   The Tribunal's analysis

1659. Late in the proceedings, the Respondent confirmed that it affirmatively argues that the Claimants breached the SEBI DIP Guidelines when implementing the 2006 Transactions (in particular, with respect to the MPC Requirement). The consequences of this purported violation are, according to the Respondent, three-fold:

   a.   It renders CUHL's investment illegal, and therefore outside of the scope of Article 1(b) of the BIT, thus precluding the Tribunal's jurisdiction over CUHL's claims;

   b.   It is further proof that the 2006 Transactions were tax abusive, as Plan C was achieved by putting in place an artificial device (the round-tripping of funds through the Daylight Loan) which either breached the SEBI DIP Guidelines or their spirit, since its result was very similar to a share swap, which would not have complied with the MPC Requirement.

   c.   It is evidence that, contrary to the Claimants' contentions, the 2006 Transactions sought to circumvent Indian regulatory requirements.

---

[2095]   *Ibid.,* citing SEBI DIP Guidelines, 2000 [excerpt], Exh. C-111, § 4.9.1.

[2096]   C-PHB, ¶ 297, citing Email trail from Ashish Patil to Jann Brown and others with subject "Re: RBI and Daylight" dated 9 September 2006, Exh. R-100A.

[2097]   *Id.,* ¶ 298, citing Email from Cairn Energy to Merrill Lynch dated 12 September 2006, Exh. C-470.

[2098]   *Id.,* ¶ 299.

[2099]   *Ibid.,* citing Letter from DSP Merrill Lynch to SEBI dated 2 November 2006, Exh. CWS-Brown-156; Letter from SEBI to DSP Merrill Lynch, ABN Amro Securities (India) and JM Morgan Stanley dated 15 November 2006, Exh. CWS-Brown-157, p. 5.

1660. As anticipated in Section VI.C.1.c(ii), the Tribunal does not consider that, if proven, a violation of the SEBI DIP Guidelines would render it without jurisdiction. For an illegality to have the effect of depriving the Tribunal of jurisdiction, it must render the investment unlawful or invalid.[2100] As the Respondent has explained, the domestic consequences of a violation of the SEBI DIP Guidelines include severe sanctions to the issuer or the intermediary, but none of them would have the effect of cancelling CUHL's shares in CIL, or rendering their subscription invalid or voidable. Specifically, the SEBI (DIP) Guidelines, Sections 17.1 and 17.2 (Exh. R-134) provide as follows:

> 17.1: In case of violation of these Guidelines, the Board may in the interest of the securities market and in the interest of the investors may pass the following directions under section 11B:
>
> (a)  directing the persons concerned to refund any money collected under an issue to the investors with or without requisite interest, as the case may be.
>
> (b)  directing the persons concerned not to access the capital market for a particular period.
>
> (c)  directing the stock exchange concerned not to list or permit trading in the securities.
>
> (d)  directing the stock exchange concerned to forfeit the security deposit deposited by the issuer company.
>
> (e)  any other direction which the Board may deem fit and proper in the circumstances of the case.
>
> […]
>
> 17.2  Action against intermediaries
>
> 17.2.1  The Board may initiate action including for suspension or cancellation of certificate of registration of any intermediary who fails to exercise due diligence or who fails to comply with the obligations entrusted under the guidelines or who is alleged to have violated any of these Guidelines.
>
> […]

1661. Accordingly, even if proven, a violation of the SEBI DIP Guidelines would not render CEP's or CUHL's investment unlawful or invalid as a matter of Indian law.

1662. Nor is the Tribunal persuaded that a purported violation of the SEBI DIP Guidelines by the Claimants would have relevance to the merits of the claims. In particular, as discussed in Section VII.A.3.c(v)(2) above, the Tribunal has found that the Claimants' alleged exploitation of the SEBI DIP Guidelines does not qualify as an artificial device that would be indicative of tax avoidance. Indeed, even if the Daylight Loan had violated the MPC Requirement, this would not have made the choice of Plan C2 tax avoidant.

---

[2100]   See Section VI.C.1.c(ii) above.

1663. In any event, such evidence as is on the record indicates that the Claimants did not violate the SEBI DIP Guidelines. The DIP Guidelines do not appear to impose any restrictions on how the MPC is to be used, other than the escrow requirement at Section 4.9.1, and even that requirement will not apply "where the promoters' contribution has been brought prior to the public issue and has already been deployed by the company", provided that a cash flow statement is included in the offer document.[2101]

1664. Importantly, despite its stressing the artificiality of the Daylight Loan transactions in its Rejoinder to the Updated Statement of Reply, at the hearing, and in its Post-Hearing Brief, the Respondent adduced no evidence from SEBI that it considered that the Claimants violated the DIP Guidelines, whether by using the Daylight Loan to fund the MPC, round-tripping the funds on the same day, or deploying the MPC on that same day to purchase shares in CIHL.[2102] The Tribunal accepts that this aspect of the Claimants' structure was not known to the Respondent's counsel when they filed the Statement of Defence, but it was known from the document production process that occurred prior to the filing of the Rejoinder and the Daylight Loan figured prominently in that pleading.[2103] From the document production phase and as discussed further below, India became aware of Mr Anish Patil's liaising with SEBI on Cairn's behalf.[2104] There was thus an opportunity to adduce evidence from SEBI as to its view of the transaction from a regulatory perspective, specifically whether it violated the regulations or not, whether the details of the round-tripping were made known to it, and so on. There was also an opportunity for the Respondent to adduce evidence of fact in support of its claims about the Claimants' interactions with SEBI. It could for example have sought witness testimony from the official(s) who met with Mr Patil of Merrill Lynch in September 2006 as to their recollection of their dealings with him.

1665. Given how central the allegations of artificiality were, it was not enough to first allege *possible* violations of the SEBI regulations and then contend, without adducing evidence of fact from the relevant agency and/or its officials that the regulations *were* breached,

---

[2101] SEBI DIP Guidelines, Exh. C-111, Section 4.9.1, provides: "Promoters shall bring in the full amount of the promoters' contribution including premium at least one day prior to the issue opening date (which shall be kept in an escrow account with a Scheduled Commercial Bank and the said contribution/ amount shall be released to the company along with the public issue proceeds.)

(Provided that, where the promoters' contribution has been brought prior to the public issue and has already been deployed by the company, the company shall give the cash flow statement in the offer document disclosing the use of such funds received as promoters' contribution)."

[2102] To the best of the Tribunal's knowledge, SEBI has never taken action against the Claimants for any alleged illegality in organising the IPO. The Tribunal observes that the most that the Respondent could argue in its PHB and Responses to Tribunal Questions was that it was "…making such an argument in light of the evidence which emerged in this arbitration, and in particular of the cross-examination of Ms Brown; none of which was before SEBI at the time and which SEBI should now be given an opportunity to consider to decide compliance and sanctions issues. That evidence establishes a prima facie case of violation of the Minimum Promoter Contribution (MPC) requirement under the SEBI DIP Guidelines." (Respondent's Answers to the Tribunal's Questions, ¶ 18), and that "[i]n light of the evidence that has emerged during the course of the hearing – it is now for SEBI to consider further action on this account. Prima facie, the scheme used certainly does not comply with the spirit of the SEBI Rules, nor with the letter of it, and it must be open to very real doubt whether SEBI would have accepted it had it been properly disclosed to it." (*Id.*, ¶ 20).

[2103] R-Rejoinder, ¶ 126.

[2104] *Id.*, ¶¶ 126, 129, 335.

or expert evidence to the same effect. In these circumstances, the Tribunal considers that the Respondent has not discharged the burden of proof.

1666. Such evidence as is on the record of this arbitration shows that SEBI was aware of the round-tripping to purchase shares of CIHL and did not object to it.

1667. First, it is clear from the record that the Claimants requested the application of the proviso of Section 4.9.1 in order to avoid the escrow requirement and be able to deploy the MPC prior to the public issue. In particular, the letter from Merrill Lynch, ABN AMRO and Morgan Stanley to SEBI of 12 October 2006 attaching the DRHP stated:

> Currently, based on the estimated post issue capital of CIL, CUHL has subscribed to the minimum 20% promoter contribution at a certain price per share. It undertakes to bring in accordance with Clause 4.6.2 of the DIP Guidelines additional premium in respect of the said shares for them to be eligible as the minimum promoter contribution. CUHL proposes to contribute the additional premium before the RHP is filed with the Registrar of Companies. CIL seeks consent to further deploy the said additional premium towards paying the purchase consideration for the acquisition of shares of CIHL rather than putting the same in escrow. The details of the payment of additional premium and further deployment certified by the Statutory Auditors of the Company will be disclosed in the RHP.[2105]

1668. Another letter from Merrill Lynch, ABN AMRO and Morgan Stanley to SEBI of 2 November 2006 repeated essentially the same statement, explaining that this was the only point on which Cairn sought SEBI's "concurrence".[2106] While the Claimants do not expressly refer to the proviso in Section 4.9.1, the reference to deploying the MPC rather than putting it in escrow is a clear reference to that proviso.

1669. In its response, SEBI took note of this request and did not object to it.[2107] Given that in this same letter SEBI highlighted certain "deficiencies/instances of non-compliance of SEBI guidelines and instructions […] which are required to be rectified/complied with", the Tribunal interprets this as an approval.

1670. It was also apparent from the correspondence cited above that the MPC would be "round-tripped", and that the result would closely resemble a share swap: CUHL would contribute the MPC into CIL, obtaining CIL shares in return, and in turn CIL would

---

[2105] Letter from DSP Merrill Lynch Limited, ABN AMRO Securities (India) Private Limited and JM Morgan Stanley Private Limited to SEBI dated 12 October 2006 (enclosing CIL DRHP), Exh. CWS-Brown-70, p. 3 (cover letter).

[2106] Letter from DSP Merrill Lynch to SEBI dated 2 November 2006, Exh. CWS Brown-156.

[2107] Letter from SEBI to DSP Merrill Lynch, ABN Amro Securities (India) and JM Morgan Stanley dated 15 November 2006, Exh. CWS-Brown-157, p. 5 ("In view of the letter of [Lead Managers] dated November 2, 2006 seeking concurrence of SEBI only in respect of the utilization of promoters' contribution, the same has been taken note of and [Lead Managers] may ensure disclosure in the RHP in respect of all other matters.").

"deploy" those funds to acquire CIHL shares from CUHL.[2108] SEBI seems to have understood and approved of how the Claimants planned to use the MPC.

1671. What is less clear is whether the Claimants disclosed to SEBI that the MPC funds to be round-tripped would be obtained through the Daylight Loan, i.e., a loan to be disbursed and repaid on the same date. The Claimants assert that, in a meeting with SEBI in September 2006, Mr Patil of Merrill Lynch "must have explained that CIL planned to deploy the promoter's contribution to purchase CIHL shares and that it sought to utilise the proviso to Section 4.9.1 of the DIP guidelines to deploy the funds prior to the public issue because Cairn's debt facilities did not allow the funds to be tied up for longer than overnight."[2109] Referring to certain meetings with SEBI, Ms Brown also testified that she was "pretty sure" that Cairn had disclosed the Daylight Loan to SEBI, but had no evidence for that.[2110]

1672. As noted above, the evidence in the record is insufficient to make a definitive finding on this point; however, for present purposes it is unnecessary to do so. Leaving the paucity of evidence to one side, the Respondent has not pointed to any provision of SEBI's regulations prohibiting the MPC from being funded with borrowed funds. Nor has the Respondent shown that deploying the funds on the same day in which they were received would breach the proviso at Section 4.9.1 of the SEBI DIP Guidelines. In other words, even if the Respondent is right that the Claimants did not disclose the Daylight Loan to SEBI (a point of fact which the Tribunal does not need to determine), that would not in itself imply a violation of the SEBI DIP Guidelines.

1673. For the reasons set out above, the Tribunal finds that the Respondent has not established that the 2006 Transactions were carried out in breach of the SEBI DIP Guidelines.

### f.   Did the 2012 Amendment and its application to the Claimants breach FET?

1674. Having dismissed the Respondent's first two defences and its SEBI argument, the Tribunal now turns to the Claimants' primary case on FET, namely, that the Respondent breached its FET obligation by retroactively applying the 2012 Amendment to the Claimants. According to the Claimants, the fiscal measures identified in Section VII.A.3.a above were applied retroactively in violation of the fundamental principles of legal stability, reasonableness, and protection of legitimate expectations. The Claimants

---

[2108] While the excerpt quoted above does not state that CIL would acquire CIHL shares from CUHL, this was explained in the previous page of that same letter as follows: "CIL was incorporated on August 21, 2006 and has had no operating history. The Company has executed agreements with Cairn Energy PLC, Cairn UK Holdings Limited ("CUHL") and Cairn India Holdings Limited ("CIHL") pursuant to which it has/shall acquire shares of CIHL. The consideration for the acquisition of the shares of CIHL will be funded through a combination of cash and shares. The cash element comprises (a) the promoter contribution as set out in the Draft Red Herring Prospectus ("DRHP"); (b) proceeds of the Pre IPO placement; (c) and partially through the proceeds of the IPO. The other element of the consideration for the acquisition is the issue of shares of CIL to CUHL, the current holding company of CIHL. The allotment of such shares will be completed on or prior to the allocation of shares in the IPO in accordance with Clause 8.7.1 of the SEBI DIP Guidelines." (Letter from DSP Merrill Lynch Limited, ABN AMRO Securities (India) Private Limited and JM Morgan Stanley Private Limited to SEBI dated 12 October 2006, Exh. CWS-Brown-70, p. 2).

[2109] C-PHB, ¶ 299.

[2110] Transcript, Evidentiary Hearing, Day 5, 222:18-223:8; 265:4-19 (Mr Moollan/Ms Brown).

also argue that the Respondent has applied the fiscal measures in a manner that is arbitrary, discriminatory and inconsistent with obligations of good faith.

1675.  The Tribunal has already found that the Respondent's fiscal measures were premised on the 2012 Amendment, and that they involved the retroactive application of a tax law that did not previously reach the transaction at issue. The Tribunal must thus determine whether, by retroactively taxing the CIHL Acquisition, or because of the manner in which the Respondent's fiscal measures were applied, the Respondent has breached its FET obligation.

1676.  As noted in paragraph 1071 above, the Tribunal is mindful that the question is not in itself whether the 2012 Amendment was retroactive but whether that Amendment (and its application to the Claimants) violated the BIT. As the Respondent has put it, "[t]he correct approach is to identify the content of the relevant standards under the BIT and to assess the measure against those standards, including all its features, including its alleged retroactivity".[2111] That said, the Tribunal has already found on the facts that the 2012 Amendment substantively modified the law retroactively, and more specifically, that it imposed a new tax burden retroactively. As a result, when assessing the measures (i.e., the 2012 Amendment itself and the fiscal measures against the Claimants) the first question before the Tribunal is whether retroactive taxation is compatible with the FET standard, and if so, whether it must be exercised within certain limits to achieve such compatibility.

1677.  To address this question, the Tribunal will first analyse the content of the FET standard, in particular in respect of retroactive taxation (i). It will then determine whether the impugned measures were consistent with the limits set by the FET standard (ii).

### (i)    The FET standard

1678.  The Tribunal will first address the relevance of Indian constitutional law to determine breaches of the FET standard (Section (1) below). In this context, it will address the Respondent's outstanding request that adverse inferences be drawn from Mr Salve SA's withdrawal from the Claimants' counsel team. It will then turn to the Respondent's argument that the FET standard reflects the minimum standard of treatment under customary international law (Section (2) below). The Tribunal will then establish the general contours of the FET standard (Section (3) below), before addressing the FET standard in the context of retroactive taxation (4).

*(1)    Relevance of Indian constitutional law*

1679.  The Parties disagree on the relevance of Indian law, and more particularly, Indian constitutional law, on the question of whether retroactive taxation is permissible under the FET standard and if so, subject to what limits. The Respondent has made much of the fact that the Claimants did not challenge the constitutionality of the 2012 Amendment before the Indian courts.

1680.  So far as the record of this proceeding shows, to date, there has been no determination as to the constitutionality or not of the 2012 Amendment by any Indian court. Despite

---

[2111]   Respondent's Answers to the Tribunal's Questions, ¶ 121.

this, the Tribunal has examined the caselaw filed in this proceeding (although it has not received any expert opinion on the constitutional question) and has reviewed the general rules and principles that the Indian courts have used to deal with retroactive amendments of the tax laws. As in Indian tax and corporations law, there is considerable English law influence in the general approach to retroactivity. But in one material respect, namely in the application of its Constitution, Indian law appears to afford a further protection against retroactivity to the taxpayer than does English law. [2112]

1681. In the non-constitutional law context, the Indian and English courts seem to approach retroactivity similarly. In *CIT v. Vatika Township Private Ltd.* (discussed below),[2113] the Supreme Court of India, sitting as the Constitutional Court, cited English decisions in support of its general pronouncements on the general rule against the retroactive application of legislation.

---

[2112] The Tribunal has observed that there is some consistency of approach in the legal systems of the two States party to the BIT. Both countries adhere to the doctrine of Parliamentary supremacy, which requires the courts to give effect to Parliament's will. Hence the common law of both countries have developed various interpretative rules to attempt to rein in an apparent excess of retroactive effect. For example, in *L'Office Cherifien des Phosphates v. Yamashita-Shinnion Steamship Co Ltd.* [1994] 1 AC 486 (HL), Lord Mustill formulated the test as being: "whether the consequences of reading the statute with the suggested degree of retrospectivity are so unfair that the words used by Parliament cannot have been intended to means what they might appear to say." (Lord Mustill at p 525, quoted in David Williams in CLA-381, Hans Gribnau, Melvin Pauwels, *Retroactivity of Tax Legislation*, (EATLP International Tax Series, 2013), p. 397. In addition, in England and Wales, Parliament itself has, through the *Interpretation Act, 1968*, section 16, set out a series of presumptions to soften the rigour of legislation that repeals prior legislation. See in this respect, Williams at pp. 390-391.

The Supreme Court of India adverted to the issue of parliamentary supremacy in *Govinddas v. Income Tax Officer*, MANU/SC/0248/1975: (1976) 1 SCC 906, a case cited with approval in *Vatika Township Private Ltd.*, (2015) 1 SCC 1, Exh. R-26:

> The general rule as stated by Halsbury in Vol. 36 of the Laws of England (3rd Edn.) and reiterated in several decisions of this Court as well as English courts is that all statutes other than those which are merely declaratory or which relate only to matters of procedure or of evidence are prima facie prospectively [sic] and retrospective operation should not be given to a statute so as to affect, alter or destroy an existing right or create a new liability or obligation unless that effect cannot be avoided without doing violence to the language of the enactment. If the enactment is expressed in language which is fairly capable of either interpretation, it ought to be construed as prospective only.

However, unlike the United Kingdom, India has a written constitution that protects certain fundamental freedoms. The courts are thus empowered to strike down legislation if it breaches a citizen's constitutional rights. In this sense, the Indian courts have a broader power to control retroactive legislation than do the English courts. In the United Kingdom, in addition to the Rees Principles employed by Parliament as a "policy base" and the March 2011 "protocol" applicable to retroactive or retrospective tax announcements (see Exh, CLA-60, Phillip Baker QC, "Retroactive Tax Legislation" at 781 in this respect), the English courts have employed human rights conventions to which the UK is a party as a check on parliamentary supremacy. But short of the protection that international law affords, as Williams noted, when discussing the "Reasons for lack of judicial limits to retroactivity," the position under English law is simple: "Parliament is sovereign." See David Williams' chapter on the United Kingdom in CLA-381, Hans Gribnau, Melvin Pauwels, *Retroactivity of Tax Legislation*, (EATLP International Tax Series, No. 9,, 2013), 389 at 397. In India, by contrast, Parliament is the ultimate interpreter of its own acts, but that power is subject to judicial supervision under the Constitution.

[2113] Exh. R-26.

1682.  As in many other well-developed legal systems, Indian law seeks to limit how far Parliament can go when making a statute retroactive (while at the same time recognising that parliamentary supremacy is an important feature of English law, from which much Indian law is derived). This is common ground between the Parties. The Respondent itself has acknowledged that the Indian courts have permitted retroactive legislation only "within defined bounds."[2114] For their part, the Claimants have directed the Tribunal to cases where the Indian courts have struck down retroactive legislation enacted by Parliament when the court concluded that it had gone too far. The question remains what is "going too far". Unsurprisingly, the analysis is a fact-driven one; but the Tribunal can glean from the authorities that a retroactive tax that imposes an unforeseen financial burden on a taxpayer or widens the meaning of a term so as to subject an assessee to taxation that it could not have contemplated at the time of the transaction is grounds for striking down such legislation.[2115]

1683.  The record suggests that Indian courts will tolerate retroactivity when the burden of the application of the tax law could have been foreseen or when, for one reason or another – often involving drafting problems, a legislative "fix" is required to clarify Parliament's intention. The Tribunal found Mr Datar SA's submission on "small repairs" (i.e., where there are inadvertent errors in statutory drafting which need correcting) to be indicative of the kind of clarifications which will be readily accepted by the courts. The Claimants have conceded that the courts will accept what appears to be a somewhat more aggressive form of retroactivity in connection with retroactive "validation" laws whereby Parliament fixes a judicially-identified defect by enacting legislation to provide that taxes that would otherwise be considered in law to have been levied unlawfully can be considered to be have been lawfully collected and therefore no refunds will be given.[2116] The Claimants have also accepted that there are cases where Parliament has found it necessary to clarify its intent.[2117]

1684.  It is this latter type of retroactive legislation that the Respondent has contended supports the 2012 Amendment.[2118] In the Tribunal's understanding of the Indian case authorities, the courts will consider a claim that Parliament has clarified something which needed to be clarified, but they do not accept such a claim at face value; that is, they will determine for themselves whether the claim that the amendment is clarificatory is in substance correct.

1685.  As discussed above,[2119] when considering amendments that are said to be clarificatory, Indian law considers such factors as whether the purported clarification imposed a financial burden for the first time, or expanded the reach or meaning of a term such as to capture transactions that were not previously within its scope, or whether the amendment is irrational, arbitrary, or unreasonable -- factors that international tribunals

---

[2114]  R-SoD, ¶¶ 155-156.

[2115]  See, e.g., *Jayam and Company v. Assistant Commissioner & Snr.*, (2016) 2 SCC 125, Exh. C-614, ¶ 19 and *Shew Bagwan Goenka v. Commercial Tax Office and Others*, (1973) 32 STR 368, Exh. C-296, ¶ 15.

[2116]  C-PHB, ¶ 91.

[2117]  *Id.*, ¶ 92.

[2118]  R-SoD, ¶ 117; R-PHB, ¶ 46.c.

[2119]  See Section VII.A.3.b above.

such as the present one have also had occasion to consider when applying the FET standard.

1686.  It has already been noted that the Indian courts reserve to themselves the power to scrutinise any claim that a retroactive act is truly clarificatory. Summarising the Indian authorities, Mr Datar SA submitted that this third set of circumstances deals with ambiguities in the legislation, supplying "an obvious meaning/omission or clearer meaning if a provision of principal legislation which is already implied." In this situation, the courts focus on the "actual substance" of the amendment and do not accept at face value a statement from Parliament that the retroactive amendment was "for the removal of doubts." Thus, a key question in the inquiry concerns the ascertainment of the legislative intent which existed at the time of the provision's drafting.[2120]

1687.  The Tribunal has already determined that the 2012 Amendment was, as a matter of fact, retroactive, not clarificatory. An unanswered question is whether this retroactivity meets the test of constitutionality under Indian law. The Respondent argues that this question is relevant for the Tribunal's inquiry, while the Claimants submit that the Tribunal need not answer this question to resolve the treaty claims before it.

1688.  The Tribunal agrees with the Claimants that, whether the 2012 Amendment is constitutional, or whether retroactive taxation in general is permissible in India, is not determinative of the position at international law. While a judicially declared determination of the 2012 Amendment's constitutionality or lack thereof might be an element among others to consider when determining whether the measure meets the FET standard, it would not, on its own, be dispositive of that question. By entering into the BIT, India agreed to assume certain international obligations towards investors of the UK. The Tribunal's task is to determine whether India's measures violated any of those obligations vis-à-vis the Claimants. Despite the Respondent's arguments to the contrary, this determination is not contingent on the 2012 Amendment's constitutionality. This holds true irrespective of whether the requirements of Indian constitutional law are congruent with those of the BIT or not. If the two standards are indeed congruent, then the analysis of compatibility of the contested measures with the BIT should suffice without the need for the Tribunal to rule separately on the issue of constitutionality. Likewise, if they are not, the Tribunal need only assess the issue of compliance with the BIT and may dispense with deciding the issue of constitutionality.

1689.  The Respondent's reliance on passages from the decisions of investment treaty tribunals for the proposition that the investor should accept the law of the host State as found at the time of making the investment proceeds from a misconception in the following respect.[2121] These passages express the well-established principle that the investor should comply with the requirements of domestic law when establishing its investment and conducting the ensuing business; they do not suggest that the substantive protections offered by investment treaties are confined to those of domestic law or are unavailable if the impugned measures appear to be compatible with domestic law. Such an interpretation would reduce the FET standard to an "umbrella clause" in the sense that the State would only promise to observe its existing domestic constitutional protections

---

[2120]  C-PHB, ¶ 92; Transcript, Evidentiary Hearing, Day 2, 252:9-17 (Mr Datar).

[2121]  R-PHB, ¶ 359.

which would be elevated to the level of the treaty. While the legal framework in which an investor invests might very well be relevant to determining its legitimate expectations, on well-established principle, a measure's lawfulness at domestic law does not necessarily mean that the measure is lawful at international law. [2122] Thus, it is not true that the host State's conduct must be measured solely by domestic law standards in order to determine whether there has been a breach of the treaty. As discussed below, such an approach departs from the existing investment treaty jurisprudence and is untenable given the object and purpose of the BIT and its substantive protections.

1690.  As mentioned above, India and the UK entered into the BIT with the aim of "fostering greater investment by investors of one State in the territory of the Other State".[2123] As discussed in the preceding section, this purpose is achievable by offering investors and investments a degree of protection that is greater than that which exists in the absence of the BIT. The BIT does not simply replicate the existing level of protection under domestic law. It offers independent, although not wholly unrelated, international standards of protection in order to stimulate the growth of the cross-border investment, i.e., to convince investors that might not otherwise have invested in the host State to do so in light of the protection offered by the treaty.

1691.  Therefore, when making an investment, the foreign investor is entitled to rely on the available international standards of protection, including those offered under the BIT, independently of those found under domestic law. For instance, if domestic law allows takings of property without effective and adequate compensation, e.g. because compensation is provided in a non-convertible national currency, it will not be a valid defence for the State to contend that the investor knew about the law when making its investment and therefore has no right to claim compensation in a convertible currency. The investor has a self-standing right to receive effective and adequate compensation under the BIT and can rely on this right independently of the protections offered under municipal legislation.

1692.  Similarly, the Claimants have a self-standing right under the BIT to be treated fairly and equitably. As explained further below, this includes the right to some degree of legal certainty and predictability, such protections to be weighed against the State's actions taken to promote a public purpose. If the Indian Constitution were to allow retroactive taxation to an extent that fails to satisfy the BIT's requirement of legal certainty and predictability, India would not be able to rely on its municipal law to justify this failure. Accordingly, the relevant legal question for this Tribunal is whether the 2012 Amendment was compatible with the BIT, not whether it was compatible with the requirements of the Constitution.

1693.  This is not to suggest that the question of violation of the BIT must be determined completely in isolation from domestic law. As discussed in Section V.B above, a host of legal questions, such as, for instance, whether the investor has acquired certain contractual or property rights, must be determined primarily under domestic law. In

---

[2122]  ILC Articles on State Responsibility, Article 3 ("The characterization of an act of a State as internationally wrongful is governed by international law. Such characterization is not affected by the characterization of the same act as lawful by internal law.")

[2123]  UK-India BIT, CLA-1, Preamble.

addition, the operation of domestic remedies and the conduct of the courts and tribunals that administer such remedies can be of assistance in adjudging whether the State has complied with its international obligations. A finding of the 2012 Amendment's constitutionality (or not) would also provide some evidence possibly relevant to the application of the treaty standards, but ultimately, the level of reasonableness, legal certainty and procedural fairness required under the FET standard are matters of international law and should be answered by interpreting the relevant FET provision, pursuant to the rules of treaty interpretation, if this obligation is found in the applicable BIT. The Respondent's submission that determining the scope of the FET standard hinges upon the question of constitutionality of the 2012 Amendment is thus rejected.

1694. For these reasons, the Tribunal concludes that it need not enter into the issue of constitutionality of the 2012 Amendment. Even if the 2012 Amendment was found to be constitutional under Indian law, the Tribunal would still have to examine the measure and its application to the Claimants against the BIT's FET obligation. The Tribunal can thus dispense with addressing India's various procedural objections and reservations concerning evidence and pleadings on the issue of constitutionality of the 2012 Amendment, as they have no impact on the Tribunal's decision on the merits of this case.

1695. The Tribunal will address however an application from the Respondent that remains pending, and which the Tribunal has reserved for decision in this Award; it is the Respondent's request that the Tribunal draw adverse inferences from the withdrawal of a member of the Claimants' counsel team, Mr Harish Salve SA, as well as the Respondent's objection to the Tribunal's decision not to order the production of certain documents related to this withdrawal. The background to this application and objection can be summarised as follows:

    a.    The Respondent has argued that Mr Salve SA has conceded that the 2012 Amendment was constitutional,[2124] and that this alleged concession binds the Claimants.[2125]

---

[2124] The Respondent has cited, *inter alia,* to the following statements by Mr Salve in this arbitration: "Let me tell you very honestly, let me tell you very honestly why. We have three broad grounds on which we have challenged. We cannot, before the statutory authorities, say the law is unconstitutional. Besides, we don't want to, because that, according to us, is a very thin challenge in India." (Transcript, RIM Hearing, 29:21-30:1 (Mr Salve)); "The speech has constitutional overtone because this was actually introducing the Finance Bill in Parliament. The day the Finance Bill comes into Parliament its rates become enforceable. Look at what it says in paragraph 10. 'The sovereign right of the Government to undertake retrospective legislation is unquestioned.' He's right." (Transcript, RIM Hearing, 205:1-8 (Mr Salve)). The Respondent also alleges that Mr Salve has recognized "the longstanding history of frequent retroactive taxation in India" in his academic writings (RCom-278, citing Salve, Retrospective Taxation, Exh. R-148), and that after the judgment of the Supreme Court in Vodafone he conceded that all issues before the Supreme Court (including the interpretation of the fourth limb of section 9.1(i) of the ITA 1961) were not settled and 'could have gone either way' (RCom-78, ¶ 21(a), citing Samar Srivastave and KP Narayana Kumar, "A Salve for a Taxing Moment: The Vodafone Inside Story", (Forbes India, 2012) available at http://www.forbesindia.com/article/boardroom/asalve-for-a-taxing-moment-the-vodafone-insidestory/ 32186/1, Exh. R-211).

[2125] R-Rejoinder, ¶¶ 7-9; RCom-238, ¶ 4.

b.   Mr Salve withdrew from the case shortly prior to the Evidentiary Hearing. The Respondent submitted that "this decision should lead to adverse inferences being drawn against the Claimants' case."[2126] The Claimants requested the Tribunal to dismiss the Respondent's request, noting that Mr Salve's withdrawal from the case was due to his "unavailability in the lead up to the hearings."[2127] The Respondent then requested the Claimants to produce the correspondence between the Claimants and Mr Salve as to the reasons for his withdrawal,[2128] arguing that the Claimants had waived privilege on the reasons for that departure.[2129] The Claimants objected to this request.[2130] The Respondent sought an order to produce from the Tribunal and requested it to draw adverse inferences from the Claimants' refusal to produce.[2131]

c.   The Tribunal denied the request to produce, finding that (i) the Claimants had represented that their correspondence between Mr Salve "fully confirm[ed] that Mr Salve was dismissed due to his lack of availability to prepare for the August hearing";[2132] (ii) that the Claimants were willing to have that correspondence verified by a confidentiality expert;[2133] and (iii) that the reasons as to why Mr Salve withdrew from the case were not material to the outcome of the case.[2134]

d.   The Respondent lodged a formal protest against the Tribunal's decision,[2135] and maintained "its application that inferences adverse to the Claimants be drawn from [the] dismissal [of Mr Salve]".[2136]

---

[2126]   RCom-238, ¶ 4.

[2127]   CCom-223.

[2128]   As noted by the Tribunal, "the Respondent's production request does not seek documents evidencing further statements from Mr Salve on the constitutionality of the 2012 Amendment; it seeks the correspondence between a party and its counsel with respect to the reasons why that party has decided to terminate that counsel's engagement (or, alternatively, the reasons why that counsel has decided to withdraw his representation)." AT-224, p. 7.

[2129]   RCom-378, ¶ 14.

[2130]   The Claimants argued that the Respondent had given no reason for its request, other than to assert that the Claimants had waived privilege and should support their statements with evidence. However, the Claimants submitted that they were "entirely free to choose their counsel and have no obligation to produce correspondence with their former counsel evidencing the reasons for his departure, simply because the Respondent has made incendiary claims in this regard based on nothing but bare conjecture." That being said, having reviewed the relevant correspondence, Claimants' counsel "represent[ed] that it fully confirm[ed] that Mr Salve was dismissed due to his lack of availability to prepare for the August hearing." Should the Respondent be unwilling to accept this representation, the Claimants stated that they would be willing to provide the documents to the confidentiality expert for confirmation. (CCom-232, ¶¶ 14-17).

[2131]   RCom-278.

[2132]   CCom-232, ¶ 16.

[2133]   Id., ¶ 17.

[2134]   AT-224, pp. 7-8.

[2135]   RCom-306.

[2136]   RCom-318.

1696. The Tribunal confirms its decision to deny production of the correspondence between the Claimants and Mr Salve. The reasons why Mr Salve withdrew from the arbitration are not material to the outcome of the case. Even if Mr Salve had indeed withdrawn because of differences of opinion with the Claimants arising from his statements inside or outside of this arbitration, this has no bearing on whether the 2012 Amendment is compatible with the BIT. Further, as noted above the Claimants represented that the correspondence confirmed that Mr Salve had withdrawn due to his lack of availability, and were willing to have the documents examined by a confidentiality expert, an offer that the Respondent declined.

1697. As to the Respondent's request for adverse inferences, the Respondent has requested the Tribunal to "draw adverse inferences, as part of its final award, from the departure of Mr Salve from this arbitration, and – in particular – place full and proper weight on the statements made by Mr Salve (in and outside of this arbitration) which contradict the Claimants' position in this arbitration, including but not limited to: (i) Mr Salve's concession of constitutionality of the 2012 Clarification; (ii) Mr Salve's concessions as to the longstanding history of frequent retroactive taxation in India in his article of 2014 (Exh. R-148); [and] Mr Salve's concession immediately after the judgment of the Supreme Court in *Vodafone* that all issues before the Supreme Court (including the interpretation of the fourth limb of section 9.1(i) of the ITA 1961) was not settled and 'could have gone either way' (Exh. R-211)." [2137]

1698. The Tribunal denies the Respondent's request. The Respondent's argument appears to be that, because Mr Salve withdrew from this arbitration, it necessarily follows that his position on the constitutionality of the 2012 Amendment was contrary to the Claimants' interests; otherwise, he would have remained in the arbitration. There is a leap of logic in this reasoning. There are many reasons why counsel might cease to represent a party. Differences of opinion may certainly be one of them, but in this case, the Claimants have represented that Mr Salve's departure was due to his lack of availability, and the Respondent declined the opportunity to have a confidentiality expert verify the veracity of this representation. Further, the Claimants have averred that they have "never taken [the] position" that the 2012 Amendment is unconstitutional in India, their position being that the success or failure of any challenge to the constitutionality of the 2012 Amendment would have no bearing its lawfulness under the BIT's standards. [2138]

1699. More importantly, the Tribunal finds that the adverse inferences that the Respondent wishes the Tribunal to draw are not material to the outcome of the case. The Tribunal has no difficulty recognising that, indeed, Mr Salve did make certain statements as to the constitutionality of the 2012 Amendment and other statements related to possibility of success of the *Vodafone* case. To the extent that they were given outside of this arbitration, [2139] these statements constitute his personal opinion, which cannot bind the

---

[2137] RCom-278, ¶ 21(a)(iii).

[2138] CCom-223; C-Updated Reply, ¶ 475.

[2139] For instance, in his academic writings (e.g., Salve, Retrospective Taxation, Exh. R-148), or in interviews to the press (e.g., Samar Srivastave and KP Narayana Kumar, "A Salve for a Taxing Moment: The Vodafone Inside Story", (Forbes India, 2012), available at http://www.forbesindia.com/article/boardroom/asalve-for-a-taxing-moment-the-vodafone-insidestory/32186/1, Exh. R-211).

Claimants simply because they engaged Mr Salve. To the extent that Mr Salve made these statements in his submissions as counsel for the Claimants in this arbitration,[2140] the Tribunal does not need to determine whether they amount to a concession. Given the Tribunal's finding that the constitutionality of the 2012 Amendment is not material to its task, even if Mr Salve were taken to have conceded that point, this would not be dispositive of the Tribunal's inquiry. Thus, even if Mr Salve's departure was due to the fact that he made the statements in question, the Tribunal cannot draw any inferences from the fact of that departure.

1700. Finally, the Respondent also stated that it "will specifically request that the Tribunal hold and declare, as part of its final award, that it is not open to the Claimants to renege on the concession made by it through Counsel as to the constitutionality of the 2012 Clarification."[2141] The Respondent did not include this request in its updated request for relief.[2142] In any event, as the Tribunal has found that any concessions on the constitutionality of the 2012 Amendment would have no impact on its analysis, the Tribunal denies the Respondent's request.

*(2)    Is the FET standard equivalent to the minimum standard of treatment in customary international law?*

1701. The Respondent has argued that the "the FET standard reflects, or is at least tied to, the minimum standard of treatment under customary international law".[2143] If the Respondent's argument is that the reference to "fair and equitable treatment" in Article 3(2) should be construed as a *renvoi* to the MST, so that the content of the FET standard should be equivalent to the content of the MST, the Tribunal cannot concur. Pursuant to the rules of interpretation of treaties set out in the VCLT, "[a] treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose."[2144] Unlike certain other investment treaties (e.g., NAFTA), the language of Article 3(2) of the UK-India BIT does not refer to international law or to the minimum standard of treatment. This suggests that the Contracting Parties did not intend to limit the scope of the FET standard to the minimum standard of treatment under customary international law.

1702. The BIT is a treaty that protects investments with the aim of "fostering *greater* investment by investors of one State in the territory of the Other State"; it acknowledges that "the encouragement and reciprocal protection under international agreement of such investment will be conducive to the stimulation of individual business initiative and will increase prosperity in both States".[2145] Such purpose is achievable by offering more protection than is already available under customary international law. Given the overarching object and purpose of the BIT, and absent clear limiting language, it can safely be concluded that the Contracting States intended to offer more than the already

---

[2140]  E.g., Mr Salve's statements at the RIM Hearing quoted at p. 472 n. 2124 above.

[2141]  RCom-278, ¶ 21(b).

[2142]  RCom-334.

[2143]  R-SoD, ¶ 267; see also R-Rejoinder, ¶¶ 825-834.

[2144]  VCLT, RLA-58, Article 31(1).

[2145]  UK-India BIT, CLA-1, Preamble.

available minimum standard of protection to the qualifying investors and investments (although the Tribunal recognises that a right of standing which is conferred upon a private party to enforce a customary international law rule or standard is in itself of significant value). The Tribunal also finds that a difference must be drawn between treaties that expressly refer to the MST under customary international law (such as NAFTA), and those (such as this one) which refer only to "fair and equitable treatment". In accordance with the principle of *effet utile*, the use of this different wording must have some meaning.

1703. The Respondent has argued that recent State practice confirms that States that agreed to establish an FET obligation in fact meant it to be limited to the MST. The Tribunal is not persuaded. Simply because certain States have clarified *their* intent does not mean that *all* States are bound by that clarification. The Respondent has provided no appropriate evidence that this was the Contracting Parties' shared intent.

1704. The Tribunal thus concludes that the FET standard contained in Article 3(2) of the BIT is an autonomous standard and does not as a general proposition operate a *renvoi* to the MST.[2146] This does not mean however that it may not share elements with the MST. As

---

[2146] In saying this, the Tribunal notes that the Respondent has asserted that the BIT, one of many to which the United Kingdom is a party, reflects the influence of the 1967 OECD Draft Convention on the Protection of Foreign Property: Text with Notes and Comments (RLA-87). The significance of this point lies in the fact that the draft Convention itself used the words "fair and equitable treatment" and the Notes and Comments to Article 1 of the draft Convention stated that: "The phrase 'fair and equitable treatment', customary in relevant bilateral agreements, indicates the standard set by international law for the treatment due by each State with regard to the property of foreign nationals. … The standard required conforms in effect to the 'minimum standard' which forms part of customary international law." (emphasis added) (RLA-87). The Respondent observed further that two officials involved in the negotiation of UK BITs adverted to the draft Convention's influence on the British approach to the development of its own draft BIT: "In the formulation of the [United Kingdom's] draft Agreement for the Protection and Promotion of Investments … careful regard was paid to the work done … by the Organisation for Economic Cooperation and Development, which led to the OECD Draft Convention on the Protection of Foreign Property." (See RLA-88, Eileen Denza and Shelagh Brooks, "Investment Protection Treaties: United Kingdom Experience" (1987) 36 International and Comparative Law Quarterly 908, 910.) Thus, the argument goes, although the UK BITs employ the phrase "fair and equitable treatment", in view of the OECD draft Convention's influence on British investment treaty-making practice, and that Convention's essentially equating FET to the minimum standard of treatment (MST), it follows that the Tribunal should be similarly guided in its interpretation of the 1994 India-UK BIT.

The Denza and Brooks article, the historical accuracy of which the Tribunal has no reason to doubt, does not qualify as *travaux préparatoires* within the meaning of the Vienna Convention. Nor have any such materials developed by the Contracting Parties to the present Treaty been submitted into the record of this arbitration, which would show that the negotiators expressed a shared understanding (or even exchanged views) that FET, as used in Article 3, was to be understood in the light of the 1967 OECD draft Convention's commentary. In short, there is no evidence that FET is to be interpreted other than in accordance with Articles 31 and 32 of the Vienna Convention, which in the absence of (i) proper *travaux préparatoires*, (ii) a subsequent agreement between the Parties regarding the interpretation of the Treaty or the application of its provisions, (iii) evidence of a subsequent practice of the Parties which establishes the agreement of the Parties regarding the Treaty's interpretation, or (iv) evidence that a special meaning is to be given to FET showing that a different meaning than that borne by the plain meaning of the text, mandates the interpreter to give effect to the plain meaning of the words used in the Treaty.

The Tribunal notes further that in the over half-century since the OECD draft Convention was formulated, many investment treaties between pairs and groupings of States have been elaborated and a fair number of those have been the subject of arbitral consideration. Some States have been careful to expressly link FET to the MST or to customary international law generally. Most States have opted to simply provide for FET. The

the Respondent has correctly pointed out, the history of how the FET standard has been included in investment treaties suggests that the FET standard was inspired by the MST. As discussed further below, the FET standard and the MST standards share certain core elements. Indeed, as noted by Newcombe and Paradell, "fair and equitable treatment has been interpreted to include, at the very least, the protections afforded by the minimum standard of treatment."[2147]

1705. As a result, the Tribunal must examine the BIT's FET standard (and in particular, the compatibility of retroactive taxation with that standard) independently from the minimum standard of treatment under customary international law. This is not to suggest that the Tribunal will disregard general international law. As discussed below, pursuant to Article 31(3)(c) of the VCLT, when interpreting a treaty the Tribunal shall take into account, together with the context, "any relevant rules of international law applicable in the relations between the [Contracting Parties]".

*(3)    General contours of the FET standard*

1706. The FET standard is contained in Article 3(2) of the BIT and is, like in many other investment treaties, broadly worded. It requires that "Investments of Investors of each Contracting Party shall at all times be accorded fair and equitable treatment".

1707. It is common ground that the breadth of the FET standard does not allow the Tribunal to decide the dispute *ex aequo et bono*.[2148] While its language may appear vague, this does not mean that the provision has no independent legal content. As noted in *Mondev*, the Tribunal "may not simply adopt its own idiosyncratic standard of what is 'fair' or 'equitable', without reference to established sources of law."[2149] As further clarified and

---

absence of linkages of FET to customary international law has led many tribunals to hold that an unqualified FET standard is an "autonomous" one that has a more substantial content than the Minimum Standard of Treatment. The present Tribunal, faced with a large body of admittedly non-binding precedent, agrees that it must give effect to the ordinary meaning of the words "fair and equitable" unless there is an accepted interpretative basis for doing otherwise. Hence it adopts the view that Article 3 of the Treaty contains an autonomous standard.

All of that said, the Tribunal considers that the debate as to the degree of overlap between an autonomous standard of FET and the minimum standard of treatment, or put another way, the differences between them, is in the present day context somewhat academic given the cross-fertilisation of approaches taken under differently worded treaties. Indeed, it is noteworthy that NAFTA awards rendered by tribunals that are instructed to apply the MST and rules of customary international law, such as *Waste Management II*, which summarised prior decisions of tribunals applying that standard with a view toward describing an emerging general standard under the NAFTA, have been cited with approval by many tribunals (including the present one) charged with applying an autonomous FET standard. What the Tribunal can say with confidence is that although there has been a substantial convergence between these two formulations, as a matter of pure treaty interpretation, "fair and equitable treatment", unlinked to the minimum standard of treatment or customary international law, is a more capacious formulation.

[2147]   Andrew Newcombe and Lluis Paradell, *Law and Practice Of Investment Treaties*, (Wolters Kluwer, 2009), RLA-102, p. 235 . The Tribunal notes that RLA-102 does not contain the quoted excerpts, which the Tribunal has obtained from a complete version of the treatise.

[2148]   *Saluka Investments B.V. v. Czech Republic*, UNCITRAL, Partial Award, 17 March 2006, CLA-44, ¶ 284.

[2149]   *Mondev International Ltd. v. United States of America*, ICSID Case No. ARB(AF)/99/2, Award, 11 October 2002, CLA-51, ¶ 119. The Tribunal notes that *Mondev* was referring to Article 1105 of NAFTA, which although it contains the terms "fair and equitable treatment" has since been interpreted by the NAFTA Free

confirmed by the *ADF* tribunal, this means that "any general requirement to accord "fair and equitable treatment" […] must be disciplined by being based upon State practice and judicial or arbitral case law or other sources of customary or general international law."[2150]

1708.  In order to ascertain the content of the FET obligation contained in the BIT, the Tribunal must interpret Article 3(2) of the BIT in accordance with the rules of treaty interpretation contained in the VCLT.[2151] Pursuant to the General Rule of Interpretation in Article 31.1 of the VCLT, "[a] treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose." The three main elements – ordinary meaning, context, and object and purpose – must be assessed in conjunction for a comprehensive interpretation.

1709.  The ordinary meaning of the terms "fair and equitable" does not provide sufficient clarity. As noted by the *Saluka* tribunal, these terms "can only be defined by terms of almost equal vagueness",[2152] such as "'just', 'even-handed', 'unbiased', 'legitimate'".[2153] While it is indisputable that these terms point the interpreter to a standard of fairness, a literal interpretation does not assist much beyond this in establishing its normative content. [2154]

1710.  The Tribunal must thus assess the ordinary meaning of the terms in their context and in the light of the object and purpose of the BIT. Starting first with its object and purpose, the title and Preamble of the BIT provide some guidance. The BIT is an international agreement between the UK and India "for the Promotion and Protection of Investments", and its Preamble records the following overarching motives:

   a.   The desire "to create conditions favourable for fostering greater investment by investors of one State in the territory of the Other State;" and

   b.   The recognition "that the encouragement and reciprocal protection under international agreement of such investment will be conducive to the stimulation of individual business initiative and will increase prosperity in both States."[2155]

---

Trade Commission to be limited to the MST. FTC Interpretive Note of 31 July 2001, http://www.sice.oas.org/tpd/nafta/ Commission/CH11understanding_e.asp.

[2150]  *ADF Group Inc. v. United States of America*, ICSID Case No. ARB (AF)/00/1, Award, 9 January 2003, ¶ 184. Here again the discussion was on NAFTA Article 1105 and the Tribunal considers that the same reasoning applies to the interpretation of Article 3(2) of the BIT.

[2151]  While India is not a party to the VCLT, its main provisions concerning the interpretation of treaties are considered part of customary international law. In any event, India has itself relied on the VCLT in its submissions. See R-PHB, ¶ 56.

[2152]  *Saluka Investments B.V. v. Czech Republic*, UNCITRAL, Partial Award, 17 March 2006, CLA-44, ¶ 297.

[2153]  *MTD Equity Sdn Bhd and MTD Chile SA v. Chile*, ICSID Case No. ARB/01/7, Award, 25 May 2004, ¶ 113.

[2154]  Stephan Schill, "Fair and Equitable Treatment under Investment Treaties as an Embodiment of the Rule of Law", 3(5) TDM (December 2005), CLA-66, p. 6.

[2155]  UK-India BIT, CLA-1, Preamble.

1711. While the object and purpose of the BIT is undoubtedly the promotion and protection of investments, the BIT's ultimate aim is to encourage foreign investment, stimulate business and increase prosperity in both States. As is now widely accepted, this "calls for a balanced approach to the interpretation of the Treaty's substantive provisions for the protection of investments."[2156] The protection granted to foreign investments must thus be coherent with the State's policy objectives for economic growth.

1712. Pursuant to Article 31.1 of the VCLT, the terms "fair and equitable treatment" should also be placed in their context. A systematic interpretation of a treaty under the General Rule of Interpretation implies considering the interaction of the terms, not only their internal context, i.e., with the other terms of the Treaty, but also their external context, i.e., with other rules of international law.[2157] In particular, pursuant to Article 31.3(c) of the VCLT, "[t]here shall be taken into account, together with the context […] any relevant rules of international law applicable in the relations between the parties."

1713. Tribunals and commentators have understood the reference to the "relevant rules of international law" as a reference to sources of international law as set out in Article 38 of the ICJ Statute.[2158] These sources include treaties establishing rules expressly recognised by the contesting states, customary international law, and "the general principles of law recognized by civilized nations".[2159] Judicial decisions and "the

---

[2156] *Saluka Investments B.V. v. Czech Republic*, UNCITRAL, Partial Award, 17 March 2006, CLA-44, ¶ 300.

[2157] VCLT, RLA-58, Article 31.2, provides: "The context for the purpose of the interpretation of a treaty shall comprise, in addition to the text, including its preamble and annexes:

(a) Any agreement relating to the treaty which was made between all the parties in connexion with the conclusion of the treaty;

(b) Any instrument which was made by one or more parties in connexion with the conclusion of the treaty and accepted by the other parties as an instrument related to the treaty."

Article 31.3 further provides: "There shall be taken into account, together with the context:

(a) Any subsequent agreement between the parties regarding the interpretation of the treaty or the application of its provisions;

(b) Any subsequent practice in the application of the treaty which establishes the agreement of the parties regarding its interpretation;

(c) Any relevant rules of international law applicable in the relations between the parties."

[2158] Oliver Dorr, Kirsten Schmalenbach, *Vienna Convention on the Law of Treaties: A Commentary*, (Springer, 2012), pp. 561-63; Richard Gardiner, *Treaty Interpretation*, (Oxford, 2008), pp. 260-63.

[2159] Article 38.1 of the ICJ Statute provides: "The Court, whose function is to decide in accordance with international law such disputes as are submitted to it, shall apply:

(a) international conventions, whether general or particular, establishing rules expressly recognized by the contesting states;

(b) international custom, as evidence of a general practice accepted as law;

(c) the general principles of law recognized by civilized nations;

(d) subject to the provisions of Article 59, judicial decisions and the teachings of the most highly qualified publicists of the various nations, as subsidiary means for the determination of rules of law.|

teachings of the most highly qualified publicists of the various nations" may also serve as subsidiary means for the determination of rules of law.[2160]

1714. It is important to bear in mind that recourse to the relevant rules of international law is (with the exception of the reference to judicial decisions and commentary) not a supplementary, but a primary means of treaty interpretation. When interpreting a treaty provision, the Tribunal cannot look at its terms in isolation; it must ascertain their meaning in their context within the relevant treaty and in the broader context of international law. This is consistent with the exhortations of the *Mondev* and *ADF* tribunals quoted at paragraph 1707 above: when establishing the content of the BIT's standards, the Tribunal must abandon its own personal view as to what is "fair and equitable", and instead turn to what these principles have been understood to mean in accordance with the relevant sources of international law.

1715. In the case of the FET standard and of investment protection standards in general, the most useful guidance can often be found in general principles of law. Other sources of international law, such as treaties and customary international law, traditionally regulate State-to-State affairs and offer limited guidance as to the particularities of the relationship between an individual and the State. General principles of law, in turn, have emerged mostly in the context of municipal laws and contain various principles of individual-to-State relations that are usually at stake in the context of investment protection.[2161] This includes core principles such as the rule of law, legal certainty, transparency and predictability, non-arbitrariness and non-discrimination. For instance, the principle of protection of legitimate expectations, which is commonly employed by investment treaty tribunals, may be understood to have found its way into the core of the FET standard precisely as a general principle of law common to many municipal laws, at least as to a general proposition, the exact contours of which are far less clear.[2162] Indeed, some commentators have argued that the FET standard reflects general principles of law,[2163] while others argue that the FET standard "should properly be understood as an embodiment of the concept of the rule of law (or *Rechtsstaat* in the German, *état de droit* in the French tradition)".[2164]

1716. Judicial practice and in particular the decisions of other investment tribunals interpreting similar standards may also assist the Tribunal in establishing the content of the FET

---

[2160]   *Ibid.*

[2161]   See Andenas, Fitzmaurice, Tanzi, and Wouters (eds), *General Principles and the Coherence of International Law* (Brill Nijhoff, 2018).

[2162]   Josef Ostřanský, "An Exercise in Equivocation: A Critique of Legitimate Expectations As a General Principle of Law Under the Fair and Equitable Treatment Standard", in Andenas, Fitzmaurice, Tanzi, and Wouters (eds), *General Principles and the Coherence of International Law* (Brill Nijhoff 2018).

[2163]   Andrew Newcombe and Lluís Paradell, *Law and Practice of Investment Treaties: Standards of Treatment*, (Kluwer Law International; Kluwer Law International 2009) pp. 271, 279 (citing Ioana Tudor, *The Fair and Equitable Treatment Standard in the International Law of Foreign Investment* (Oxford: Oxford University Press, 2008), p. 85-104).

[2164]   Stephan Schill, "Fair and Equitable Treatment under Investment Treaties as an Embodiment of the Rule of Law", 3(5) (5) TDM (December 2005), CLA-66, p. 9.

standard. However, as the Respondent has emphasised,[2165] decisions of other investment tribunals are not binding on this Tribunal. Article 38.1(d) of the ICJ Statute makes it clear that judicial decisions are only "subsidiary means for the determination of rules of law."[2166] While this Tribunal may turn to them for guidance if it considers them persuasive, especially if they form part of a general trend that is not dependent on the specific terms of an applicable BIT, the legal content of the FET standard must be established on the basis of the elements set out in Article 31.1 of the VCLT, i.e., the ordinary meaning of the treaty's terms, their context, and their object and purpose. When considering their context, the Tribunal must take into account any other relevant rules of international law, including general principles of law.

1717. Resorting to general principles of law to establish the content of the FET standard is, in the Tribunal's view, an appropriate methodology to establish its normative content. Not only is it consistent with the mandate of Article 31 of the VCLT to consider sources of international law when interpreting Article 3(2) of the BIT; it also provides objective guidelines that restrain the Tribunal from applying its own subjective interpretation of the terms "fair" and "equitable". One caveat must be borne in mind: the analysis should remain at the level of general principles and avoid focusing on idiosyncratic regulations that particular jurisdictions may have come up with in order to address specific needs.

1718. An analysis of investment law jurisprudence suggests that investment treaty tribunals have, whether expressly or implicitly, drawn upon certain core general principles of law when determining the content of the FET standard. For example, the tribunal in *Rumeli v. Kazakhstan* stated that:

> [T]he fair and equitable treatment standard encompasses *inter alia* the following concrete principles: - the State must act in a transparent manner; - the State is obliged to act in good faith; - the State's conduct cannot be arbitrary, grossly unfair, unjust, idiosyncratic, discriminatory, or lacking in due process; - the State must respect procedural propriety and due process. The case law also confirms that to comply with the standard, the State must respect the investor's reasonable and legitimate expectations".[2167]

1719. Along the same lines, the tribunal in *Lemire v. Ukraine* identified the following elements as part of the FET standard:

> - whether the State has failed to offer a stable and predictable legal framework; - whether the State made specific representations to the investor; - whether due process has been denied to the investor; - whether there is an absence of transparency in the legal procedure or in the actions of the State; - whether there has been harassment, coercion, abuse of power

---

[2165] Respondent's Answers to the Tribunal's Questions, ¶ 4.

[2166] ICJ Statute, Article 38.1(d); see also Respondent's Answers to the Tribunal's Questions, ¶¶ 4-5.

[2167] *Rumeli Telekom A.S. and Telsim Mobil v. Kazakhstan*, ICSID Case No. ARB/05/16, Award, 29 July 2008, ¶ 609.

or other bad faith conduct by the host State; - whether any of the actions of the State can be labeled as arbitrary, discriminatory or inconsistent.[2168]

1720. Similarly, the tribunal in *Bayindir v. Pakistan* concluded the FET standard included "the obligation to act transparently and grant due process, to refrain from taking arbitrary or discriminatory measures, from exercising coercion or from frustrating the investor's reasonable expectations with respect to the legal framework affecting the investment".[2169]

1721. The *Micula* tribunal, where two of the present arbitrators sat, distinguished, for analytical purposes, three broad categories of conduct that might breach the FET standard: "(i) conduct that is substantively improper (because it is arbitrary, unreasonable, discriminatory or in bad faith), (ii) conduct that violates legitimate expectations relied upon by the investor (including here the […] stability 'strand'), and (iii) conduct that is procedurally improper." [2170]

1722. In sum, investment tribunals have identified the following core principles of the FET standard: "(1) the requirement of stability, predictability and consistency of the legal framework, (2) the principle of legality, (3) the protection of investor confidence or legitimate expectations, (4) procedural due process and denial of justice, (5) substantive due process or protection against discrimination and arbitrariness, (6) the requirement of transparency and (7) the requirement of reasonableness and proportionality."[2171]

1723. The Respondent submits that the "core" or "dominant" element of the FET standard is legitimate expectations, and that the other principles identified above are "residual elements". The Tribunal cannot concur. Nothing in the text of the BIT states this explicitly, nor is it implicit in the wording of the provision. Moreover, it is well-accepted that applying the FET standard is a fact-driven exercise. Legitimate expectations might be the relevant analytical tool in some cases, but it is not to be considered the primary tool. Many awards have found a breach of FET based on arbitrariness, discrimination, administrative indifference or capriciousness, inconsistency of governmental action, lack of even-handedness or propriety in governmental action, and so on. Thus, the Tribunal cannot accept that the doctrine of legitimate expectations is to be treated as essentially co-extensive with the ambit of FET.

1724. To the contrary, it is widely understood that "[a]t a minimum, fair and equitable treatment of investments requires treatment in accordance with the minimum standard

---

[2168] *Lemire v. Ukraine*, ICSID Case No. ARB/06/18, Decision on Jurisdiction and Liability, 14 January 2010, ¶ 284; see also *Bosh International Inc. and B&P Ltd. Foreign Investments Enterprise v. Ukraine*, ICSID Case No. ARB/08/11, Award, 25 October 2012, ¶ 212.

[2169] *Bayindir Insaat Turizm Ticaret ve Sayani A.Ş. v. Pakistan*, ICSID Case No. ARB/03/29, Award, 27 August 2009, ¶ 178; see also *Biwater Gauff (Tanzania) v. Tanzania*, ICSID Case No. ARB/05/22, Award, 24 July 2008, ¶ 602.

[2170] *Ioan Micula, et al v. Romania*, ICSID Case No. ARB/05/20, Final Award, 11 December 2013, CLA- 23, ¶ 520.

[2171] Stephan Schill, "Fair and Equitable Treatment under Investment Treaties as an Embodiment of the Rule of Law", 3(5) TDM (December 2005), CLA-66, p. 11.

of treatment."[2172] Newcombe and Paradell, writing in 2009, note that "[n]o IIA awards nor any commentator have suggested that fair and equitable treatment provides less favourable treatment than the minimum standard of treatment."[2173] The Tribunal has likewise never encountered such a suggestion. The MST "is a floor below which treatment of foreign investors must not fall, even if a government were not acting in a discriminatory manner."[2174] It is the minimum level of fairness that a State must accord to investors.

1725. According to the formulation in *Waste Management II*, this minimum is breached by conduct that is "arbitrary, grossly unfair, unjust or idiosyncratic, is discriminatory and exposes the claimant to sectional or racial prejudice, or involves a lack of due process leading to an outcome which offends judicial propriety — as might be the case with a manifest failure of natural justice in judicial proceedings or a complete lack of transparency and candour in an administrative process."[2175] All of the principles embodied in this formulation – freedom from arbitrariness and discrimination, fairness, due process, transparency – are likewise core principles of the FET standard. Indeed, *Waste Management II* has been cited with approval by tribunals applying an autonomous FET standard precisely because it captures some of the core elements that are shared between the FET standard and the MST. These principles cannot be called "residual elements" of an obligation by a State to grant "fair and equitable treatment." If anything, they are its essence. The fact that they might be invoked less frequently by investors in investment cases does not reduce their value to residual elements.

1726. The Tribunal concludes that conduct contrary to one or more of the core principles discussed above may breach the FET standard. A State may breach its FET obligation if its conduct is arbitrary, unreasonable, discriminatory, involves a lack of due process or a denial of justice, or is otherwise grossly unfair or unjust. It may also breach its FET obligation if it undermines the principles of reasonable stability or predictability or in violation of the investor's legitimate expectations. The Tribunal addresses this point in more detail in Section VII.A.3.f(i)(4) below.

1727. Determining what are the core principles of the FET standard is, however, not sufficient to make a judgment on whether that standard has been met. As the *Mondev* tribunal correctly pointed out, "[a] judgment of what is fair and equitable cannot be reached in the abstract; it must depend on the facts of the particular case."[2176] Further, as noted in *Crystallex*, while the consideration of the various elements of the standard are useful for analytical purposes, "it is the overall evaluation of the state's conduct as 'fair and

[2172] Andrew Newcombe and Lluis Paradell, *Law and Practice Of Investment Treaties*, (Wolters Kluwer, 2009), RLA-102, pp. 277-278.The Tribunal notes that RLA-102 does not contain the quoted excerpt, which the Tribunal has obtained from a complete version of the treatise.

[2173] *Ibid.*

[2174] *S.D. Myers, Inc. v. Canada*, UNCITRAL, Partial Award, 13 November 2000, ¶ 259.

[2175] *Waste Management v.* Mexico (II), ICSID Case No. ARB(AF)/00/3, Award, 30 April 2004, RLA-92, ¶ 98.

[2176] *Mondev International Ltd. v. United States of America*, ICSID Case No. ARB(AF)/99/2, Award, 11 October 2002, CLA-51, ¶ 118. See also *M.C.I. Power Group L.C. and New Turbine, Inc. v. Republic of Ecuador*, ICSID Case No. ARB/03/6, Award, 31 July 2007, ¶ 370; *Ioan Micula, et al v. Romania*, ICSID Case No. ARB/05/20, Final Award, 11 December 2013, CLA- 23, ¶ 505.

equitable' that is the ultimate object of the Tribunal's examination."[2177] To quote the *GAMI* tribunal, "[i]t is the record as a whole – not dramatic incidents in isolation – which determines whether a breach of international law has occurred."[2178]

*(4)    The FET standard in the context of retroactive taxation*

1728.   The Tribunal now turns to the crucial question of whether retroactive taxation may breach the FET standard.

1729.   For the Respondent, absent a legitimate expectation of tax stability (generated by a specific commitment of the State not to tax retroactively), retroactive taxation cannot breach the FET standard. This is essentially because (i) there is no rule of customary international law prohibiting retroactive taxation, and (ii) retroactive taxation is permissible in India subject to certain constitutional limitations.

1730.   The Tribunal has already addressed point (ii) in Section VII.A.3.f(i)(1) above. Whether or not retroactive taxation is permissible in India does not mean that it is lawful under international law. Even if the 2012 Amendment had been declared constitutional by the Indian Supreme Court, this Tribunal would have had to assess whether it conformed with the BIT's standards, in particular the FET standard. While a judicially declared constitutionality of the 2012 Amendment would be an element to take into account when determining if the measure meets the FET standard, it would not, on its own, answer that question.

1731.   As to the Respondent's point (i), recorded above at paragraph 1006, whether customary international law prohibits retroactive taxation is not of primary relevance to the present case, which is governed primarily by a specific international treaty. While customary international law may be used as a source of rules applicable in the relations between the Parties pursuant to the rule of systematic interpretation of treaties under Article 31(3)(c) of the VCLT, the protection offered by the FET provision is now not considered to be confined to customary international law except in treaties that specify the minimum standard of treatment in accordance with customary international law. (In the same sense, the ICJ found in 2018 that the doctrine of "legitimate expectations" is not to be found in general rules of international law, but can be found in the FET standard of investment treaties (as the Respondent has accepted in the present case).[2179]) The FET standard in the UK-India BIT is a specific bilaterally agreed standard of treatment that the Contracting Parties committed to accord to investments of investors of the other Contracting Party in their territory. As a conventional international rule unlinked to customary international law, it takes precedence over any customary (or less rigorous

---

[2177]   *Crystallex International Corporation v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB(AF)/11/2, Award, 4 April 2016, CLA-19, ¶ 545.

[2178]   *GAMI Investments, Inc. v. Mexico*, UNCITRAL, Final Award, 15 November 2004, ¶ 103.

[2179]   *Obligation to Negotiate Access to the Pacific Ocean*, (*Bolivia v. Chile*), Judgement, I.C.J. Reports 505, 1 October 2018, ¶ 162: "The Court notes that references to legitimate expectations may be found in arbitral awards concerning disputes between a foreign investor and the host State that apply treaty clauses providing for fair and equitable treatment. It does not follow from such references that there exists in general international law a principle that would give rise to an obligation on the basis of what could be considered a legitimate expectation. Bolivia's argument based on legitimate expectations thus cannot be sustained."

general) international law standard, as discussed in Section VII.A.3.f(i)(2) above with the possible exception of a rule of a *jus cogens*.

1732. The Tribunal's task is to assess whether the specific retroactive taxation measures at issue here breach the FET obligation contained at Article 3(2) of the BIT. To do so, the Tribunal must examine the measure complained of (here, the enactment of the 2012 Amendment and its application to the Claimants) and determine whether it complies with the core principles of fairness that the FET standard embodies.

1733. In line with the discussion in Section VII.A.3.f(i)(3) above, in the Tribunal's view the correct analytical approach is to interpret the content of the BIT's FET standard in accordance with the rules of interpretation of the VCLT, seeking guidance from other sources of international law (and in particular general principles of law) to determine whether India's obligation to accord "fair and equitable treatment" to the Claimants' investments implies an obligation not to tax them retroactively. Stated differently, the first question that the Tribunal must answer is the following: do the core principles of fairness that make up the BIT's FET standard prohibit retroactive taxation? If they do, is that prohibition absolute?

1734. The Tribunal believes that it is treading new ground. There are very few investment treaty cases dealing with retroactivity in general, and to the Tribunal's knowledge, none that deal with retroactive taxation in particular. Commentary assessing retroactivity in light of the FET standard is also scarce. This does not mean, however, that the FET standard has no content in this respect; it simply means that the compatibility of retroactive taxation with BIT standards such as FET has yet to be tested. As discussed in the previous section, to establish whether retroactive taxation is compatible with the FET standard the Tribunal will look primarily to general principles of law recognised by civilised nations, as developed in domestic law and by other international tribunals, for guidance.

1735. Before doing so, the Tribunal wishes to refer to a finding in another investment treaty case which the Tribunal thinks sheds light on the issues before it. International tribunals have recognised that disputes over contestable issues of municipal law between the executive and a foreign investor are not *per se* internationally unlawful. As the *EnCana* tribunal observed, specifically with respect to the area of tax law enforcement and allegations of expropriation, much depends on how the State reacts if it has, in good faith, taken a contestable position of municipal law before its own courts but then loses:

> … there is … a difference between a questionable position taken by the executive in relation to a matter governed by the local law and a definitive determination contrary to law. In terms of the BIT the executive is entitled to take a position in relation to claims put forward by individuals, even if that position may turn out to be wrong in law, provided it does so in good faith and stands ready to defend its position before the courts. Like private parties, governments do not repudiate obligations merely by contesting their existence. An executive agency does not expropriate the value represented by a statutory obligation to make a payment or refund by mere refusal to pay, provided at least that (a) the refusal is not merely wilful, (b)

the courts are open to the aggrieved private party, (c) the courts' decisions are not themselves overridden or repudiated by the State.[2180]

1736.   The Tribunal observes that *EnCana* concerned a dispute as to the availability (or not) of VAT tax refunds. That matter had been examined by the local courts before it was raised to the level of international jurisdiction. The tribunal noted that the issue before it did not concern any requirement to exhaust local remedies (as that was not required under the BIT); it just so happened that on the facts before it, the parties had litigated the matter before the claimant initiated the treaty arbitration.[2181] It was within this factual context that the tribunal made the finding quoted above.

1737.   The present Tribunal finds some guidance in the conditions stated at the end of the passage. The question of whether Section 9(1)(i) could reach indirect transfers of capital assets situated in India was a contestable question of law which, it appears, was taken in good faith in *Vodafone*.[2182] The ITD's view of Section 9(1)(i) was tested and found to be incorrect by the Supreme Court of India. In the Tribunal's view, Parliament then exercised its legislative power to override or repudiate the Supreme Court's judgment in *Vodafone*. This had immediate consequences, not only for Vodafone itself, but for other companies which had organised their tax affairs in a similar fashion as Vodafone had and which would have been able to rely on the Supreme Court's ruling to defend their own positions vis-à-vis the ITD. The effect of the 2012 Amendment was to render taxable transactions that were previously non-taxable.

1738.   There are other sources of guidance available to the Tribunal in addition to *EnCana*. The Respondent has submitted that the Tribunal may not seek guidance from the practice and jurisprudence of different municipal jurisdictions or other international adjudicative bodies in respect of retroactive taxation, as this would amount to deciding *ex aequo et bono*.[2183] The Tribunal is not persuaded. It is not improper for a treaty tribunal to seek guidance from the practice and jurisprudence of municipal legal systems in order to identify the general principles that are relevant for the interpretation of treaty terms in a specific context. Indeed, as the Respondent has noted, the decisions of domestic courts are "evidence for the existence of State practice and *opinio juris*", and "may also serve as a subsidiary means for determining the rules of international law."[2184] There is no reason why they should not play the same role with respect to general principles of law. As discussed above, pursuant to Article 31.3(c) of the VCLT and Article 38.1(c) of the ICJ Statute, these general principles are a source of international

---

[2180]   *EnCana Corporation v. Republic of Ecuador*, UNCITRAL, LCIA Case No. UN3481, Award, 3 February 2006, ¶ 194 (emphasis added).

[2181]   *Id.*, at p. 56 n. 138: "…the Tribunal's holding on this narrow point does not, in our view, amount to reimposing a requirement of the exhaustion of local remedies which the BIT does not as a general matter require. The question is not whether the claim is admissible but whether the relevant rights have been expropriated as a matter of substance."

[2182]   There does not appear to be any suggestion by the Supreme Court that the position taken by the Commissioner was not in good faith.

[2183]   Transcript, Hearing on Closing Arguments, Day 2, 142:7-21 (Mr Moollan).

[2184]   Respondent's Answers to the Tribunal's Questions, ¶ 9 referring to Report of the International Law Commission on the Work of its Sixty-Eighth Session (2016), UN Doc A/71/10 (2016), RLA-275, p. 109.

law, which can guide the Tribunal's interpretation of the FET standard. The Respondent has also acknowledged that "the decisions of other international courts and tribunals […] are valuable as a 'subsidiary means' for determining the existence of a rule of customary international law."[2185] Accordingly, there is no reason why the Tribunal should not seek guidance from the jurisprudence of international adjudicatory bodies, such as the ECtHR, to determine the existence of general principles of law.

1739. As discussed in Section VII.A.3.f(i)(3) above, investment treaty tribunals have recognised that the FET standard guarantees a treatment that is in line with general principles of substantive and procedural fairness.[2186] While it is not possible to list exhaustively all relevant principles, the Tribunal finds that the following are particularly pertinent when assessing whether retroactive taxation is "fair and equitable" in accordance with the BIT's standard.

1740. _Legal certainty / stability / predictability:_ One of the main characteristics and functions of the law is to allow individuals to predict the legal consequences of their conduct. Multiple tribunals have found this general principle to form part of the FET standard.[2187] The cases that express some doubt about the value of this principle do so not by denying that the principle forms part of the FET standard, but rather by cautioning that it should not be understood to be an absolute rule, which would be tantamount to freezing the legal framework.[2188] As explained below, the investor's interest in legal certainty should be balanced against the State's power to regulate in the public interest.

1741. The principle of legal certainty is widely recognised as a fundamental component of the rule of law which, in turn, has long been recognised by international law. The ICJ adverted to it in the _Asylum_ case, when it spoke of "arbitrary action" being "substituted for the rule of law".[2189] Likewise, in the _ELSI_ case, a Chamber of the ICJ, relying upon the _Asylum_ case, spoke of arbitrariness as being "not so much something opposed to a rule of law, as something opposed to the rule of law," going on to see arbitrariness as "a wilful disregard of due process of law, an act which shocks, or at least surprises, a sense of juridical propriety."[2190] The use of "rule of law" as a foundational concept in these judgments has in turn been reflected in investment treaty jurisprudence.[2191]

---

[2185] Respondent's Answers to the Tribunal's Questions, ¶ 4 referring to Report of the International Law Commission on the Work of its Sixty-Eighth Session (2016), UN Doc A/71/10 (2016), RLA-275, pp. 76-79.

[2186] _Saluka Investments B.V. v. Czech Republic_, UNCITRAL, Partial Award, 17 March 2006, CLA-44, ¶ 307; _Ioan Micula, et al v. Romania_, ICSID Case No. ARB/05/20, Final Award, 11 December 2013, CLA- 23, ¶ 525.

[2187] _CMS Gas Transmission Company v. Republic of Argentina_, ICSID Case No. ARB/01/8, Award, 12 May 2005, ¶¶ 274-280; _Murphy Exploration and Production Company International v. Republic of Ecuador_ (II), PCA Case No. 2012-16 (formerly AA 434), Partial Final Award, 6 May 2016, ¶¶ 205-208.

[2188] _BG Group Plc. v. Republic of Argentina_, UNCITRAL, Award, 24 December 2007, ¶¶ 298, 307, 310.

[2189] _Asylum Case (Colombia v. Peru)_, Judgment, I.C.J. Reports 1950, p. 284.

[2190] _Case concerning Elettronica Sicula, S.p.A._ (_ELSI_) (_United States v. Italy_), I.C.J. Reports 1989, p. 15, ¶ 128.

[2191] _Chevron Corporation and Texaco Petroleum Corporation v. The Republic of Ecuador_ (II), PCA Case No.2009-23, Second Partial Award on Track II, 30 August 2018, ¶¶ 9.16-9.19, _Joseph Charles Lemire v. Ukraine_, ICSID Case No. ARB/06/18, Decision on Jurisdiction and Liability, 14 January 2010, ¶¶ 262-263,

1742. While the precise definition of "rule of law" (roughly translated as "*Rechtsstaat*" in German, "*État de droit*" in French, "*Estado de Derecho*" in Spanish) can vary depending on the jurisdiction, or depending on whether emphasis is placed on formal or substantive aspects, the European Commission for Democracy through Law (also known as the "Venice Commission")[2192] observes that, at its essence, "the notion of the Rule of Law requires a system of certain and foreseeable law, where everyone has the right to be treated by all decision-makers with dignity, equality and rationality and in accordance with the laws, and to have the opportunity to challenge decisions before independent and impartial courts through fair procedures."[2193]

1743. The notion of the rule of law "is a concept of universal validity".[2194] The "need for universal adherence to and implementation of the Rule of Law at both the national and international levels" was recognised by all Member States of the United Nations in the General Assembly Resolution 60/1 in 2005.[2195] The General Assembly has adopted further resolutions, including the 2012 Declaration of the High-level Meeting on the Rule of Law, recognising that the "Rule of Law applies to all States equally, and to international organizations" and that it "belong[s] to the universal and indivisible core values and principles of the United Nations."[2196]

1744. The Report on the Rule of Law prepared by the UN Secretary General for the Security Council lists several indicators of the rule of law:

> [The Rule of Law] refers to [...] adherence to the principles of supremacy of law, equality before the law, accountability to the law, ***fairness in the application of the law***, separation of powers, participation in decision-making, ***legal certainty***, avoidance of arbitrariness and procedural and legal transparency.[2197]

1745. Similarly, a comprehensive checklist of the principles of the rule of law prepared by the Venice Commission lists the following five main benchmarks of the rule of law: (i) legality, (ii) legal certainty, (iii) prevention of abuse (or misuse) of powers, (iv) equality

---

*Glencore International A.G. and C.I. Prodeco S.A. v. Republic of Colombia*, ICSID Case No. ARB/16/6, Award, 27 August 2019, ¶¶ 1446, 1450.

[2192] The European Commission for Democracy through Law (the "Venice Commission"), is an independent consultative body set up in 1990 by the Council of Europe to advise on issues of constitutional law, including the functioning of democratic institutions and fundamental rights, electoral law and constitutional justice. *See* https://www.coe.int/en/web/human-rights-rule-of-law/venice-commission. As a body of the Council of Europe, it is formed by Western and Eastern European States. The full list of member states can be found at: https://www.coe.int/en/web/about-us/our-member-states.

[2193] The Rule of Law Checklist of the Venice Commission, Adopted by the Venice Commission at its 106th Session, 11-12 March 2016, ¶ 15.

[2194] *Id.*, ¶ 9.

[2195] United Nations General Assembly Resolution 60/1 (2005).

[2196] United Nations General Assembly Resolution 66/102 (2011); Report of the United Nations High-level Meeting on the Rule of Law, 24 September 2012.

[2197] Report of the UN Secretary-General to the Security Council, UN Doc. S/2004/616 (2004), ¶ 6 (emphasis added).

before the law and non-discrimination, and (vi) access to justice.[2198] While the Venice Commission primarily studies the rule of law in Europe, it has clarified that the rule of law is a universal principle.[2199]

1746. As is evident from these checklists, legal certainty is an essential component of the rule of law. This was expressly recognised by the Indian Supreme Court in *Vodafone*, which concluded its reasoning with the following statements:[2200]

> FDI flows towards location with a strong governance infrastructure which includes enactment of laws and how well the legal system works. ***Certainty is integral to rule of law***. ***Certainty and stability form the basic foundation of any fiscal system.*** Tax policy certainty is crucial for taxpayers (including foreign investors) to make rational economic choices in the most efficient manner. Legal doctrines like "Limitation of Benefits" and "look through" are matters of policy. It is for the Government of the day to have them incorporated in the Treaties and in the laws so as to avoid conflicting views. Investors should know where they stand. It also helps the tax administration in enforcing the provisions of the taxing laws. […]

1747. That the principle of legal certainty is part of the universally recognised principles of the rule of law is also recognised by scholarly writings. One of the most prominent definitions of the rule of law by Lord Bingham identifies legal certainty and more specifically the general rule of non-retroactivity of law as part of the overarching principle of the rule of law:

> All persons and authorities within the State, whether public or private, should be bound by and entitled to the benefit of laws publicly made, taking effect (generally) in the future and publicly administered in the courts.[2201]

1748. The Parties both acknowledge the validity of the concepts of the rule of law and the principles of legal certainty, stability or predictability, although they dispute their exact scope and applicability, as discussed further below.

1749. In light of the above, the Tribunal finds that the manifestations of the foundational concept of rule of law such as the principle of legal certainty qualify as "general principles of law recognized by civilized nations" for purposes of Article 38.1(c) of the ICJ Statute, and may thus guide the Tribunal in determining the content of the FET standard contained in an international treaty, irrespective of the background or political stance of the Contracting States.

---

[2198] The Rule of Law Checklist of the Venice Commission, Adopted by the Venice Commission at its 106th Session, 11-12 March 2016.

[2199] *Id.*, ¶ 32 ("Since the Venice Commission is a body of the Council of Europe, the checklist emphasises the legal situation in Europe, as expressed in particular in the case-law of the European Court of Human Rights and also of the Court of Justice of the European Union within its specific remit. The Rule of Law is however a universal principle, and this document also refers, where appropriate, to developments at global level as well as in other regions of the world, in particular in part III enumerating international standards.").

[2200] *Vodafone International Holdings B.V. v. Union of India & Anr.* [2012] 6 SCC 613, Exh. C-59, ¶ 91.

[2201] Thomas Bingham, *The Rule of Law* (Allen Lane, 2010).

1750. As the Parties acknowledge, the principle of legal certainty is particularly relevant in the context of retroactive legislation.[2202] The Claimants submit that "retroactive legislation that imposes fresh obligations in respect of past events is fundamentally contrary to the very essence and purpose of the rule of law."[2203] They add that "[f]undamental to the rule of law is the recognition that citizens should be able to understand the obligations and sanctions that the legal system imposes on them and to rely on clear rules to guide their actions. Retroactive laws that change the legal consequences of past transactions are inimical to this norm because they deny individuals the ability to conform their conduct to the law and to forecast the benefits or penalties associated with their actions."[2204] While they acknowledge that not all retroactivity is wrongful, they argue (citing the Shome Committee) that "retrospective application of tax law should occur in exceptional or rarest of rare cases, and with particular objectives".[2205] According to the Shome Committee, only the following types of retroactive laws are acceptable: "those that

> (1) correct apparent mistakes/anomalies of the statute;
>
> (2) remove technical defects, particularly in procedure, which had vitiated the substantive law;
>
> (3) protect the tax base from highly abusive tax planning schemes that have the main purpose of avoiding tax, without economic substance; and
>
> (4) [are meant to] expand the tax base."[2206]

1751. According to the Claimants, as the 2012 Amendment "imposed a fresh tax burden on past transactions in a targeted manner, [it] is of the variety that is the most offensive to notions of fairness and the rule of law."[2207]

1752. As to the principle of legal certainty / stability / predictability, the Claimants submit that "the notion that the legal framework into which an investor entrusts its investment must be knowable, stable, and capable of being complied with" is "[a]t the core of the FET standard".[2208] Citing *Vodafone*, the Claimants submit that "[c]ertainty and stability form the basic foundation of any fiscal system".[2209]

1753. The Respondent, for its part, does not contest the concept of rule of law or the principle of legal certainty. Rather, it argues that the Claimants' references to the rule of law are

---

[2202] Melvin Pauwels, "Retroactive and Retrospective Tax Legislation", (2013), ¶ 2.2.4.1, in Hans Gribnau, Melvin Pauwels, *Retroactivity of Tax Legislation* (EATLP International Tax Series, 2013), CLA-381.

[2203] C-SoC, ¶¶ 294, 325.

[2204] *Id.*, ¶ 329.

[2205] *Id.*, ¶ 333, citing Expert Committee, Draft Report on Retrospective Amendments Relating to Indirect Transfer (2012), Exh. C-56, p. 30.

[2206] *Ibid.*

[2207] C-SoC, ¶ 335.

[2208] C-SoC, ¶ 337.

[2209] *Vodafone International Holdings B.V. v. Union of India & Anr.* [2012] 6 SCC 613, Exh. C-59, ¶ 91.

"an unprincipled appeal to prejudice", and that the concepts of legality and rule of law cannot be understood in a vacuum.[2210] The Respondent contends that "the fact that retroactive law, and in particular retroactive taxation, exists under (perhaps) every system of law shows that there is no bar on retroactivity whether on the basis that it may breach the "principle of legality" (even if one were to assume that this term has the same meaning in all legal systems) or the rule of law."[2211] According to the Respondent, each State must decide how to reconcile the various principles involved. In the absence of a customary international law rule prohibiting retroactive legislation, "it is clear that, per se, retroactive civil (i.e., not criminal) legislation does not breach the principle of legality."[2212] To the contrary: the Respondent submits that "retroactivity is consistent with the principle of legality in circumstances where such legislation is compliant with applicable legal principles in the relevant jurisdiction."[2213] Here, the adoption of the 2012 Amendment was guided by legal principles and is subject to the control of such principles by the Supreme Court of India (which the Claimants have not invoked.)[2214]

1754. Similarly, the Respondent does not deny the existence of the principle of legal certainty, or of the related principles of stability and predictability. However, it submits that the principle of certainty is not absolute, and States should be guided by legal principles when legislating retroactively. In the case of retroactive taxation in particular, any balancing exercise between competing interests should take into account the circumstances, including the use of loopholes or tax abuse.[2215] Here, the Respondent alleges that there were clear and transparent legal principles in place regarding the use by the Indian Parliament of its power to tax retroactively.[2216]

1755. The Respondent also argues that there is no self-standing obligation of "stability" under the FET standard; instead, the FET standard "balances any legitimate expectation of stability on the part of the investor with the State's legitimate policy interests and its sovereign rights to regulate."[2217] For the Respondent, the notion of "predictability", forms part of the notion of stability.

1756. On this basis, the Respondent submits that where the jurisdiction in question has an established practice of retroactive legislation that is subject to constitutional control (as is the case here), "as long as the legislation meets the standards of that jurisdiction, it does not breach the principle of legality."[2218] Nor, in the absence of a legitimate

---

[2210] Respondent's Answers to the Tribunal's Questions, ¶ 135. The Tribunal understands that the Respondent's comments on the principle of legality apply *mutatis mutandis* to the notion of rule of law.

[2211] *Ibid.*

[2212] *Ibid.*

[2213] Respondent's Answers to the Tribunal's Questions, ¶ 137.

[2214] *Ibid*.

[2215] Respondent's Answers to the Tribunal's Questions, ¶ 136, citing Hans Gribnau, "Legal Certainty: A Matter of Principle", RLA-364, Hans Gribnau and Melvin Pauwels, *Retroactivity of Tax Legislation* (EATLP International Tax Series, 2013), CLA-381, 69, p. 93.

[2216] *Ibid.*

[2217] R-PHB, ¶ 515.

[2218] Respondent's Answers to the Tribunal's Questions, ¶ 136.

expectation, will it breach the principle of stability / predictability.[2219] While a retroactive law may breach one of the "residual elements" of the FET standard (e.g., because it is arbitrary or not reasonably related to any rational governmental purpose), most constitutional systems will strike down that legislation. If they do not, the retroactive legislation "may still fall foul of the residual treaty standard", and if there is an allegation of denial of justice the entire domestic legal system dealing with this question would fall afoul of international law. [2220] In the present case, there is no indication that the Indian constitutional system would not strike down arbitrary or unreasonable retroactive legislation, and there has been no allegation of denial of justice.[2221]

1757.   On the basis of the Parties' submissions and the authorities reviewed above, the Tribunal finds that the principle of legal certainty (and its corollaries, stability and predictability) provides significant guidance when determining whether retroactive taxation is compatible with the FET standard provided at Article 3(2) of the BIT. As the Rule of Law Checklist of the Venice Commission makes clear, one of the essential elements of the principle of legal certainty is precisely that "[p]eople must be informed in advance of the consequences of their behaviour" and that laws should "enable legal subjects to regulate their conduct in conformity with it."[2222] For this reason, the rule is that the law operates prospectively. By their very nature, retroactive laws do not allow individuals to predict the legal consequences of their conduct. An individual that is subjected to retroactive legislation is thus deprived of the ability to make an informed choice and plan his/her activities in consideration of the legal consequences of his/her conduct, for the simple reason that it is impossible to alter events or actions that have already occurred. Thus, in accordance with the principle of legal certainty, the general rule in a system governed by the rule of law is that the law applies prospectively. Subject to exceptions where this is justified by a specific public purpose as discussed below, the retroactive application of legislation constitutes a fundamental affront to the principle of legal certainty and runs afoul of the guarantee of predictability of the legal environment.

1758.   This is indeed the case in India, where the starting point is that legislation typically speaks prospectively. For obvious reasons of fairness and the foundational consideration that a person ought to be able to discover and understand the law which is applicable to his/her acts so as to be able to comply with it, retroactivity is considered to be an exception to the strong presumption that when Parliament speaks through legislation, it speaks prospectively. As Sikri, J. (writing for the Constitutional Court) noted in *CIT v. Vatika Township Private Ltd.*:

> 31. Law passed today cannot apply to the events of the past. If we do something today, we do it keeping in view the law of today and in force and not tomorrow's backward adjustment of it. Our belief in the nature of the law is founded on the bed rock that every human being is entitled to

---

[2219]   R-PHB, ¶ 515.

[2220]   Respondent's Answers to the Tribunal's Questions, ¶ 138.

[2221]   *Id.*, ¶ 138.

[2222]   The Rule of Law Checklist of the Venice Commission, Adopted by the Venice Commission at its 106th Session, 11-12 March 2016, ¶¶ 58, 62.

arrange his affairs by relying on the existing law and should not find that his plans have been retrospectively upset. This principle of law is known as *lex prospicit non respicit*: law looks forward not backward. As was observed in *Phillips v. Eyre* (1870) LR 6 QB 1, a retrospective legislation is contrary to the general principle that legislation by which the conduct of mankind is to be regulated when introduced for the first time to deal with future acts ought not to change the character of past transactions carried on upon the faith of the then existing law.

32. The obvious basis of the principle against retrospectivity is the principle of 'fairness', which must be the basis of every legal rule as was observed in the decision reported in *L'Office Cherifien des Phosphates v. Yamashita-Shinnihon Steamship Co. Ltd.* (1994) 1 AC 486. Thus, legislations which modified accrued rights or which impose obligations or impose new duties or attach a new disability have to be treated as prospective unless the legislative intent is clearly to give the enactment a retrospective effect; unless the legislation is for purpose of supplying an obvious omission in a former legislation or to explain a former legislation. We need not note the cornucopia of case law available on the subject because aforesaid legal position clearly emerges from the various decisions and this legal position was conceded by the counsel for the parties...[2223]

1759.  The Tribunal agrees with this statement of the general principle, which is congruent with the general principle of legal certainty in the broader international context.[2224]

1760.  That said, as both Parties have rightly noted, the principles of legal certainty / stability / predictability do not warrant an absolute prohibition of all sorts of retroactive legislation. In criminal law, non-retroactivity is often considered as an absolute rule due to the manifest injustice of subjecting a person to criminal liability for acts which were not crimes at the time of their making. To quote Lord Bingham, "…on this point the law is and has long been clear: you cannot be punished for something which was not criminal when you did it.…"[2225] However, "outside the criminal field, a retroactive limitation of the rights of individuals or imposition of new duties may be permissible, but *only* if in the public interest and in conformity with the principle of proportionality."[2226] As explained in more detail below, this means that (i) the retroactive application of a new regulation is only justified when the prospective application of that regulation would not achieve the specific public purpose sought, and (ii) the importance of that specific public purpose must manifestly outweigh the prejudice suffered by the individuals affected by the retroactive application of the regulation. To take the example of taxation, the public purpose that justifies virtually any tax legislation – raising funds for governmental purposes and services – does not suffice to justify the retroactive application of a new tax regulation. Otherwise, States would always be permitted to retroactively increase or

---

[2223] *Commissioner of Income Tax v. Vatika Township Private Ltd.*, [2015] 1 SCC 1, Exh. R-26, ¶ 31.

[2224] The Tribunal notes further that the Constitutional Court differentiated between retroactivity which confers a benefit on individuals without inflicting a detriment on others or the public at large (which is viewed favourably) and retroactivity which imposes a burden or liability on certain persons (which leads in favour of prospectivity of application, if possible). *Id.*, ¶¶ 33-34.

[2225] Thomas Bingham, *The Rule of Law*, (Allen Lane, 2010), p. 74.

[2226] The Rule of Law Checklist of the Venice Commission, Adopted by the Venice Commission at its 106th Session, 11-12 March 2016, ¶ 62 (emphasis added).

establish new tax burdens on past transactions in an attempt to raise extra funds for the budget. It does not require a long explanation that accepting such a system would erode the legal certainty and the rule of law.

1761. _Respect of legitimate expectations:_ This principle stands for the proposition that the State should respect its specific commitments in reliance on which the investor has made its investment. As discussed in Section VII.A.2 above, the Respondent argues that, absent a legitimate expectation grounded in a specific commitment by the State, investors in India assume the risk of retroactive legislation, in particular because it is permissible under Indian constitutional law.

1762. The Tribunal considers the existing investment treaty jurisprudence on 'legitimate expectations' to be of limited assistance in the present inquiry.

1763. The cases on which India has relied in respect of legitimate expectations and the permissible limits of regulation (including the heavily relied upon passages from _Masdar Solar_) relate to prospective legislation.[2227] The Tribunal does not consider that they are of assistance to deciding the rather unusual case of retroactive tax legislation which is before it.

1764. For their part, the Claimants claimed to have had a legitimate expectation that the "settled" understanding as to Section 9(1)(i)'s operation would not be upset.[2228] But this too runs into difficulties due to the special nature of taxation law enforcement.

1765. An income tax law is a law of general application whose application depends upon the circumstances of each taxpayer. In a system of self-assessment, where the authorities do not examine the vast majority of transactions that are or may be taxable, relying instead upon the taxpayer's good faith assessment of its tax situation (subject, of course, to audit), the idea of a taxpayer's having a legitimate expectation that it will not be taxed or that it will be taxed in a certain way tends to break down in the absence of an advance ruling granted by the tax authorities. Although the Tribunal has satisfied itself that Section 9(1)(i) of the ITA did not reach indirect transfers of assets situate in India, it is reluctant to accept the Claimants' contention that even in the absence of any ruling or representation by the relevant office of the ITD, the law was so clearly "settled" as to be capable of generating a legitimate expectation of non-taxability in all circumstances.

1766. The reason for the Tribunal's hesitation is twofold. First, there was no authoritative judicial ruling at the time of the Transaction that definitively held that Section 9(1)(i) must be read literally.[2229] The best evidence that the law was not so clearly settled is the fact that in _Vodafone_ the Bombay High Court interpreted Section 9(1)(i) expansively

---

[2227] R-PHB, ¶¶ 342-350.

[2228] C-Updated Reply, ¶540.

[2229] Mr Salve SA, who was counsel to Vodafone in the appeal to the Supreme Court, himself stated after the Supreme Court overturned the High Court that: "The tax authorities had prepared well and argued well. It was not one of the cases where it was open and shut on any issue. In fact, when I came out of the court, I said it could go either way." Exh. R-211, Samar Srivastave and KP Narayana Kumar, "A Salve for a Taxing Moment: The Vodafone Inside Story", (Forbes India, 2012), available at http://www.forbesindia.com/article/boardroom/a-salve-for-a-taxing-moment-the-vodafoneinside-story/321861.

(only to be later overturned by the Supreme Court). The absence of any litigation over the meaning of the provision from 1961 until *Vodafone* could have led the Indian tax advisory profession to gain some comfort that Section 9(1)(i) bore the meaning that they thought it had (and that was consistent with the advice received by Claimants), and which the Supreme Court later confirmed was the case. But that alone cannot sustain a legitimate expectation of the type asserted by the Claimants.

1767. In the Tribunal's view, the correct way to describe the situation at the time of the 2006 Transactions is as follows: The law stood as it did; it was transparent (i.e., published, discoverable, and knowable); taxpayers, lawyers and accountants could take note of it; and the latter could consult and apply it in their advice. The evident absence of any ITD challenges to indirect transfers (up to 2007),[2230] and the history of the ITA and the ITD's attempt to introduce the DTC 2009 and 2010 in the preceding years[2231] could increase the level of confidence in the Indian tax advisory profession that indirect transfers were not taxable, but the fact of the matter was that the courts had not yet confirmed that to be the case. In short, beyond the terms of the Act itself, there was no statement, representation or act on the Respondent's part from which an assurance could be discerned.

1768. Secondly, the Tribunal recognises that the tax authorities and indeed the courts of a State can sometimes develop new and more expansive views as to the ambit or meaning of a law in light of changed circumstances. Indeed, both Parties in the present arbitration have described *Vodafone* as a "test case" (although they differed as to the consequences that flow from that description).[2232] The implication of a "test case" is that an issue of law is finely balanced and a court could go either way, and further that the court's decision may serve as a guide to the likely treatment of other parties who are in a similar situation. In addition, as already noted, while the law is impersonal and of general application, its specific application depends upon facts which are peculiar to each taxpayer (or non-taxpayer, as the case may be) and sometimes structures depend upon "judgment calls" about which reasonable people can differ. Thus, some structures may "work", while others may not. The caution shown in both the advice of Ernst & Young and RSM as to the possibility that the ITD might challenge a Mauritian structure for lacking substance is a recognition that the tax authorities can sometimes take a view on a structure and aggressively pursue it. As *Twin Star* shows, such efforts can gain judicial benediction.

---

[2230] See Section II.C above.

[2231] *Ibid.*

[2232] R-Rejoinder, ¶ 28(a) ("The Claimants constantly repeat that "*Vodafone* was a test case". Insofar as this is meant to convey the impression that the Indian tax authorities had accepted, or were bound by, a narrow interpretation of section 9(1)(i), that is factually and legally incorrect. But *Vodafone* was certainly a test case in the sense that, prior to the Supreme Court's ruling in 2012, no Court anywhere in India had given an interpretation of section 9(1)(i) which supports the Claimants' case. Prior to the *Vodafone* Supreme Court decision the position was – on any meaning of the term – not settled as a matter of Indian law; as the Claimants would have found out (assuming they were not perfectly aware of the same) if they had cared to ask their accountants and transactional lawyers to provide a proper opinion on their proposed avoidance of payment of any capital gains tax anywhere in the world on the capital gains of approximately USD 5 billion they had made in India.").

1769. Thus, where a private party such as CEP engages professional advisors to guide it in planning a transaction, especially when various iterations of plans which did identify taxability were considered and discarded and a structure that did not identify taxability was eventually arrived at, it seems to the Tribunal that it is not possible to impute to the ITD a kind of *de facto* approval of Cairn's advisors' views arising from the general state of the law, even if combined with various regulatory approvals given by other arms of the State which were not specifically charged with applying India's capital gains law.

1770. To be clear, the Tribunal is not to be taken as saying that legitimate expectations can never play a role in a taxation dispute. For example, it has little doubt that a legitimate expectation can be created when a taxpayer who is uncertain as to the taxability or not of a proposed transaction obtains an advance ruling of non-taxability (or taxability at a certain rate) from the authorities. Were the authorities to later reverse course, dashed expectations could very well support a successful claim of breach of FET. Assuming full and correct disclosure of the details of the transaction, such a taxpayer would be entitled to rely upon an advance ruling. The requisite degree of specificity of assurance by the authorities to the investor would be present to found a legitimate expectation because the authorities would have turned their minds to the specific circumstances of the taxpayer and applied the law to it. (The Respondent argues as much in criticising the Claimants for failing to get an advance ruling on the taxability of the 2006 Transaction. Obviously, this did not occur and the situation with which the Tribunal is concerned lies a long way from a dispute over express assurances given by government officials or even expressed in detailed legislative schemes such as have been at issue in various renewable energy claims.)

1771. Accordingly, the Tribunal does not intend to base its decision on an application of the 'legitimate expectations' doctrine. Having said that, the doctrine, which is aimed at protecting an investor's reliance upon assurances or representations as to how the State will act in the future, does share some common ground with the principle of legal certainty which is, in the Tribunal's view, the correct principle to apply in the present case.

1772. In the Tribunal's view, the Supreme Court's ruling in *Vodafone* settled any outstanding doubts as to the correct interpretation of Section 9(1)(i). The Court having interpreted the Act in a manner that was consistent with the advice which RSM had given the Claimants in 2006, the principle of legal certainty should entitle them to rely upon such a ruling to the extent that it supported the lawfulness of their transaction. Even in a legal system which permits some forms of retroactive amendment of the law, the principle of legal certainty should protect an investor from a post-judgment legislative interpretation which holds the opposite of what the court found and goes further to prescribe it retroactively, thus rendering taxable transactions that were non-taxable at the time of their making.

1773. It goes without saying that the Claimants were not parties to *Vodafone* and obviously the Supreme Court did not pass on the specifics of the structure which CEP ultimately settled upon. The Tribunal recognises that the Respondent has sought to distinguish the facts of the present case from *Vodafone*. The Tribunal cannot but agree that the facts are different and it cannot rule out the possibility that the Delhi High Court (or the Supreme Court, were the matter to go further) could attach significance to certain facts or see a

gloss in the Indian caselaw which has not been apparent from the evidence that has been put before this Tribunal. But the *Vodafone* judgment was a binding interpretation of Indian law which vindicated RSM's view that indirect transfers were not captured by Section 9(1)(i) and that was the law of the land until Parliament intervened. The Tribunal has found, on a balance of probabilities, having regard to the facts and such Indian caselaw as has been put before it, that the structure adopted by Cairn was not the result of abusive tax planning. It follows that the structure must be viewed as legitimate tax planning. With that predicate in mind, even if Indian constitutional law were to hold the amendment lawful, the Tribunal considers that the 2012 Amendment significantly changed the application of Indian law to the Claimants' detriment and further that this change breached the principle of legal certainty.

1774. In this connection, the Tribunal found some assistance in Philip Baker QC's short discussion of retroactive tax legislation, in which he discussed the treatment of such legislation by different countries and under international human rights conventions such as Article 1 of the First Protocol to the European Convention on Human Rights ("ECHR").[2233]

1775. Noting that retroactivity and retrospectivity in tax legislation "both undermine legitimate expectations where the taxpayer has either anticipated a particular tax outcome for previously earned income, or, in the case of retrospective legislation, anticipates a particular future outcome," Baker accepts that neither is objectionable "where the taxpayer, viewed realistically, had no legitimate expectation of the previous outcome", i.e., "where the avoidance was so abusive that no reasonable taxpayer, properly advised, could have had a legitimate expectation of enjoying the fruits of the avoidance."[2234] (Based on what the Tribunal has already found, Baker's test, the "no reasonable taxpayer, properly advised, could have had a legitimate expectation of enjoying the fruits of the avoidance" test, has not been transgressed in the present case such that a basis for permissible retroactive legislation would be met.)

1776. In his concluding comments, Baker made an observation of relevance to the legislative reaction to the Supreme Court's judgment in *Vodafone*:

> Retroactive tax legislation which fails to grandfather final and binding court decisions is a clear breach of human rights norms: it infringes the right to a fair trial and the right to enjoyment of possessions, or the freedom from arbitrary misappropriation. It is a failure to respect the rule of law, and therefore contrary to the principles of law recognised by all civilised nations….[2235]

1777. This statement is of course of greatest relevance to the situation in which the successful litigant, Vodafone, found itself, but Baker's comment has salience for other foreign investors which, like Vodafone, structured their exits from India based on an understanding of the meaning and application of Section 9(1)(i) that the Supreme Court

---

[2233] Philip Baker QC, "Retroactive Tax Legislation", 6(48) International Taxation 780 (June 2012), CLA-60, p. 781.

[2234] *Id.*

[2235] *Id.*, p. 784.

later confirmed. The Tribunal considers that the change to the reach of Section 9(1)(i) after the Supreme Court issued a definitive interpretation of the provision, made retroactive to 1962, not only directly affected Vodafone but also adversely affected other foreign investors such as Cairn which had similarly ordered their affairs in line with the view that the law applicable at the time of their transactions did not reach indirect transfers.

1778. The Tribunal now turns to other investment treaty cases. As already noted, investment treaty jurisprudence on retroactivity is scarce. Despite this, the few cases on record that address the issue of retroactivity confirm that retroactivity may breach the FET standard. In *ATA v. Jordan*,[2236] Jordan had amended its arbitration law so that arbitration agreements that had served as basis for an arbitration award were statutorily extinguished if the award was later annulled by the courts.[2237] An ICSID tribunal found that Jordan had violated the relevant FET standard when, applying this new extinction provision to ATA, it invalidated an arbitration agreement that had been concluded between the investor and a State-controlled entity.[2238] While, using the terminology discussed in Section VII.A.3.c(i) above, the Tribunal understands that the Jordanian law had immediate or retrospective (rather than retroactive) effect,[2239] the *ATA* tribunal characterised the law as retroactive.[2240] The Respondent argues that this situation differed from the present case because the Jordanian State-controlled entity had made a specific commitment *vis-à-vis* ATA in the form of a contract and the arbitration agreement. This distinction is unavailing. For obvious reasons, the arbitration agreement, apart from being a contractual commitment, which bound the State-controlled entity and not the State itself, does not constitute a specific commitment that the law applicable to that agreement will not change. No such specific commitment or a stabilisation guarantee was granted by Jordan. However, given the immediate/retrospective nature of the change in law (which the tribunal characterised as "retroactive"), no specific commitment was required to engage Jordan's liability under the BIT. According to the tribunal:

> By virtue of Article II of the New York Convention, Jordan's State courts are required to "recognize an agreement in writing under which the parties undertake to submit to arbitration", and in such circumstances to "refer the parties to arbitration, unless it finds that the said agreement is null and void, inoperative or incapable of being performed". There has never been any allegation in this case by either party that the Arbitration Agreement at

---

[2236] *ATA Construction, Industrial and Trading Company v. The Hashemite Kingdom of Jordan*, ICSID Case No. ARB/08/2, Award, 18 May 2010, CLA-230.

[2237] *Id.*, ¶ 116.

[2238] *Id.*, ¶¶ 121-129.

[2239] The Tribunal notes that the amendment to the arbitration law operated with immediate effect, i.e., it applied prospectively but affected all situations created prior to its enactment. This effect is equivalent to the strict notion of retrospectivity discussed in Section VII.A.3.c(i) above, which the Tribunal has decided to refer to as immediate effect to avoid confusion.

[2240] *ATA Construction, Industrial and Trading Company v. The Hashemite Kingdom of Jordan*, ICSID Case No. ARB/08/2, Award, 18 May 2010, CLA-230, ¶¶ 126 ("The retroactive effect of the Jordanian Arbitration Law, which extinguished a valid right to arbitration deprived an investor such as the Claimant of a valuable asset in violation of the Treaty's investment protections"); see also ¶ 128, quoted below.

issue was per se "null and void, inoperative or incapable of being performed". It is arguable (but the Tribunal takes no position on the point) that the extinguishment rule might be deemed to be prospectively compatible with Article II insofar as parties electing Jordan as the venue for an arbitration or electing Jordanian law as the law of the arbitration had notice of the rule and accepted it. <u>Retroactivity is the problem here. The new rule should cover only those arbitration agreements concluded after the coming into force of the Jordanian Arbitration Law in 2001 and not arbitration agreements existing before the 2001 Law came into force</u>, such as the Arbitration Agreement at issue in this proceeding.[2241]

1779. This reasoning holds true even if one ignores the fact that ATA's contractual counterparty was a State-controlled entity. Even if ATA had entered into the arbitration agreement with a private entity (the way Cairn entered into the 2006 Transactions with its subsidiaries), absent a specific justification, under the *ATA* tribunal's reasoning it would have been impermissible for the State to substantially change the legal consequences of that past transaction by introducing a law with immediate/retrospective effect.

1780. If the *ATA* tribunal found a law of immediate effect to be objectionable because it did not grandfather previously acquired contractual rights, it is reasonable to presume, *a fortiori*, that it would have found full retroactivity (i.e., a situation where a new law changes the content of the law in the past) to have been as or more objectionable.

1781. The tribunal in *Bilcon v. Canada* also stated, albeit in *obiter*, that retroactivity might amount to a breach of the MST. This suggests that, in principle, non-retroactivity, much like due process, is a separate limitation on the State's power to regulate, distinct from any limitations that may separately arise from the State's earlier specific assurances:

> [B]reaches of the international minimum standard might arise in some special circumstances—such as changes in a legal or policy framework that have retroactive effect, are not proceeded by reasonable notice, are aimed or applied in a discriminatory basis <u>or</u> are contrary to earlier specific assurances by state authorities that the regulatory framework would not be altered to the detriment of the investor.[2242]

1782. Importantly, the *Bilcon* tribunal was scrutinising Canada's measures under the customary international law minimum standard of treatment, which, as explained above, is a somewhat less rigorous standard than the unqualified FET standard contained in Article 3(2) of the BIT.

1783. Certain commentators have also opined that retroactivity may run afoul of the FET standard even absent specific commitments. For instance, Professor Schill writes that "where a foreign investor merely relies on the general legal framework without any specific commitments or intention on behalf of the host state to attract foreign investors,

---

[2241] *Id*., ¶ 128 (emphasis added).

[2242] *William Ralph Clayton, William Richard Clayton, Douglas Clayton, Daniel Clayton and Bilcon of Delaware Inc. v. Government of Canada*, UNCITRAL, PCA Case No. 2009-04, Award on Jurisdiction and Liability, 17 March 2015, CLA-22, ¶ 572 (emphasis added).

the concept of legitimate expectations may only have a more marginal scope of application", and "will mostly come into play with respect to legislation with a retroactive [e]ffect."[2243]

1784. As to the Respondent's argument that retroactivity is legitimate under Indian law, as the Respondent itself recognises, this is only the case if certain constitutional limitations are met. As discussed above, even absent a specific commitment from the State, an investor in India is entitled to trust that, as a general rule, the law will apply prospectively. Even where retroactive legislation is arguably frequent, as the Respondent contends is the case in India, retroactive legislation requires a specific justification. As the Shome Committee recognised, the "retrospective application of tax law should occur in exceptional or rarest of rare cases, and with particular objectives".[2244]

1785. Accordingly, investors in India should be able to expect that they will not be taxed retroactively unless the amendment addresses "small repairs",[2245] together with a specific policy justification that does not unduly adversely affect parties that ordered their affairs in accordance with the previous understanding of the law, and of course provided that constitutional safeguards are respected. Equally so, an investor who is protected under a bilateral investment treaty containing an FET standard is entitled to expect that any retroactive legislation will not breach the core principles encompassed in that standard (in particular, legal certainty, predictability and legitimate expectations). In other words, the fact that investors should be "on notice" when they invest that retroactive legislation is lawful in India will not deprive them of protection against retroactive legislation that goes beyond the limits permitted by the FET standard. What appears to be permitted in India and at the same time compatible with FET is "some" retroactivity of a relatively minor character, but not "any" retroactivity: the investor and, any law-abiding person more generally, has a protection against retroactivity exceeding certain limits.

1786. Thus, when scrutinising retroactive changes to the legal framework, the search for specific commitments is of limited relevance. Rather, as a result of the principles of legal certainty / stability / predictability, investors have an expectation that, even absent specific assurances, existing laws and regulations will be applied as they stand at the time when the legally relevant transaction takes place and in compliance with the then-existing regulatory framework. While, as discussed below, this principle is not absolute, it is the general rule.

1787. *Reasonableness and non-arbitrariness:* It is undisputed that States have the power to take measures in pursuance of a public purpose. At the same time, their measures are required to be for a public purpose.[2246] This entails not only a requirement that the

---

[2243] Stephan Schill, "Fair and Equitable Treatment under Investment Treaties as an Embodiment of the Rule of Law", 3(5) TDM (December 2005) Exh CLA-66, p. 28.

[2244] Expert Committee, Draft Report on Retrospective Amendments Relating to Indirect Transfer (2012), Exh. C-56, p. 30.

[2245] See Section VII.A.3.f(i)(1) above.

[2246] This is explicitly stated in cases of expropriation (see Article V of the BIT), and is implicit in the assessment of reasonableness or proportionality of measures alleged to be in breach of FET.

State's policy be rational and non-arbitrary, but also that the measure in question bear a reasonable relationship with that policy.[2247] While the Parties dispute whether the requirement that a measure be "reasonable" goes beyond its rationality, it is undisputed that the requirement of reasonableness encapsulates at least that the measure be reasonably related to a rational policy.[2248]

1788. The Respondent is right when it argues that the principle of legal certainty and predictability cannot be understood in absolute terms and should instead be balanced against the State's power to act in pursuance of the public purpose. This is precisely why, as discussed below, certain types of retroactive regulations might be justified when the State has a particular purpose that justifies that particular form of retroactivity. When balancing the State's public purpose and the investor's interests, the principle of proportionality becomes relevant.[2249] Under this principle, the measures should not be more burdensome for the individual's rights and interests than required by the pursued public purpose, especially if a less burdensome measure would be available to satisfy the same public purpose.[2250]

* * *

1789. Having the above principles in mind, the Tribunal will carry out a balancing exercise between India's public policy objectives, on the one hand, and the Claimants' interest

---

[2247] *Saluka Investments B.V. v. Czech Republic*, UNCITRAL, Partial Award, 17 March 2006, CLA-44, ¶ 307 ("any differential treatment of a foreign investor must not be based on unreasonable distinctions and demands, and must be justified by showing that it bears a reasonable relationship to rational policies not motivated by a preference for other investments over the foreign-owned investment"); *AES Summit Generation Limited and AES-Tisza Erömü Kft v. Hungary*, ICSID Case No. ARB/07/22, Award, 23 September 2010, RLA-270 ¶¶ 10.3.7-9 ("There are two elements that require to be analyzed to determine whether a state's act was unreasonable: the existence of a rational policy; and the reasonableness of the act of the state in relation to the policy. A rational policy is taken by a state following a logical (good sense) explanation and with the aim of addressing a public interest matter. Nevertheless, a rational policy is not enough to justify all the measures taken by a state in its name. A challenged measure must also be reasonable. That is, there needs to be an appropriate correlation between the state's public policy objective and the measure adopted to achieve it. This has to do with the nature of the measure and the way it is implemented").

[2248] See, e.g., C-Reply, n. 537; C-PHB, ¶ 374; R-PHB, ¶¶ 523-525. The Respondent has also argued that the Claimants did not plead that the 2012 Amendment was "unreasonable" until the Evidentiary Hearing. In AT-232, the Tribunal disagreed with this assessment, and found that the arguments on this point made by the Claimants at the Evidentiary Hearing "f[e]ll within the scope of permissible pleading" (AT-232, p.5). In any event, this does not preclude the Tribunal from assessing the various strands of the FET standard, and as reflected above, the Parties partially agree on the meaning of this strand.

[2249] *Occidental Petroleum Corporation and Occidental Exploration and Production Company v. Republic of Ecuador*, ICSID Case No. ARB/06/11, Award, 5 October 2012, ¶¶ 427, 452; *Electrabel S.A. v. Republic of Hungary*, ICSID Case No. ARB/07/19, Award, 25 November 2015, ¶ 179; *LG&E Energy Corp., LG&E Capital Corp. and LG&E International Inc. v. Argentine Republic*, ICSID Case No. ARB/02/1, Decision on Liability, 3 October 2006, ¶ 195; *Continental Casualty Company v. Argentine Republic*, ICSID Case No. ARB/03/9, Award, 5 September 2008, ¶ 232; R. Kläger, 'Fair and Equitable Treatment' in International Investment Law (2011, Cambridge), pp. 128, 236-245.

[2250] *Electrabel S.A. v. Republic of Hungary*, ICSID Case No. ARB/07/19, Award, 25 November 2015, ¶ 179. By way of a simple example, if the State decides to eliminate harmful effects of a chemical substance that is released in the environment during a certain mining activity, it would be disproportionate for the State to revoke the investor's mining concession or to ban the mining activity outright, provided that the release of the relevant chemicals could reasonably be prevented by imposing less burdensome measures upon the investor, such as practice regulations.

in benefitting from the values of legal certainty and predictability, on the other. In conducting this exercise, the Tribunal should take into account the fact that India has given no specific assurances against the enactment of retroactive legislation. However, as explained above, this is of limited importance in the present case, given that the principles of legitimate expectations and respect of specific assurances have primarily been developed in the context of prospective regulatory changes. The proper legal principle to apply in a jurisdiction governed by the rule of law, in the Tribunal's view, is that of legal certainty: the general rule is that laws should apply prospectively; thus, except for specific cases where retroactivity is compatible with the rule of law, any individual is entitled to assume that the State will not legislate retroactively even absent a specific commitment.

1790. Having set out the core principle it considers relevant to assessing the compatibility of retroactive taxation with the FET standard, the Tribunal now turns to how these principles apply in practice. As already noted, the principle of legal certainty is not absolute. For the reasons that follow, when balancing the Claimants' interest of legal certainty against the Respondent's power to regulate in the public interest, the Tribunal must examine whether India's decision to apply its fiscal measures retroactively was justified by a specific purpose that India could not attain by applying that measure prospectively. In other words, given the degree to which retroactivity upsets legal certainty, the State should have a specific and compelling public policy objective that warrants not only the regulatory change in general, but also the retroactive application of that change. In other words, to justify legislating with retroactive effects, a State must be facing a situation where the new rule would not fulfil its purpose (i.e., not fully attain the public interest being pursued) if its effects were only prospective. This means that the public purpose that justifies the adoption of a new law will usually be insufficient to justify the retroactivity of that law; there must be an additional public purpose that justifies applying that new law retroactively.

1791. In the context of fiscal measures, this means that a public purpose that typically justifies prospective tax measures, such as increasing the taxable base and fiscal income, does not in and of itself suffice to justify the measure's retroactive application.[2251] The goal of protecting and enhancing the public treasury is present in any attempt by a government to raise revenue. Instead, there must be an identifiable and specific public purpose justifying why it would not suffice to apply the measure prospectively, and why the State has deemed it necessary to apply it to past transactions.

1792. This is the approach towards retroactive taxation under Article 1 of Protocol 1 of the ECHR. The Baker article, to which the Tribunal has previously referred, concludes, after analysing the ECHR's jurisprudence on retroactive taxation, that:

> Such [retroactive tax] legislation is not *per se* an infringement of the Convention. However, it will be zealously scrutinized to ensure that it can be justified. *The government concerned will need to show why the objective could only be attained by introducing retrospective provisions.*[2252]

---

[2251] Melvin Pauwels, "Retroactive and Retrospective Tax Legislation", (2013), ¶ 2.2.3.3, in Hans Gribnau, Melvin Pauwels, *Retroactivity of Tax Legislation* (EATLP International Tax Series, 2013), CLA-381.

[2252] Philip Baker, "Retrospective tax legislation and the European Convention on Human Rights", (British Tax Review, 2005), RLA-291, p. 8 (emphasis added).

1793.  The practice of various jurisdictions that have grappled with the same balancing exercise in the context of retroactive taxation supports this conclusion. While that practice is not uniform as to the specific occasions at which retroactive taxation is allowed, the general rule is that retroactivity should be specifically justified by a compelling public purpose.[2253]

1794.  The Respondent argues in this respect that investment treaty tribunals cannot second-guess a State's policy decisions.[2254] The Tribunal agrees that, as a general matter, it is not its role to question the policy decisions of a State. As discussed in Section VII.A.3.f(i)(5) below, it is for this reason, among others, that the Tribunal cannot find fault with the Respondent's decision to expand the source rule and tax indirect transfers. This is a policy decision which falls squarely within India's sovereign powers and on which this Tribunal will not comment. However, this is not a matter of absolute, unquestioning deference and there are limits on it. Measures harming or impairing the rights and interests of foreign investors must be for a public purpose. While as a general matter it is not for investment treaty tribunals to question the wisdom of the public purpose chosen, tribunals do have the duty to determine whether a *bona fide* public purpose exists in the first place. When assessing the legitimacy of retroactive legislation, however, the Tribunal must determine whether the departure from the principle of legal certainty is justified by an additional public purpose that cannot be met without the measure being given retroactive effect. In other words, the retroactive nature of the measure requires that the Tribunal be allowed to assess the sufficiency of the specific policy objective sought by the measure.

1795.  Turning now to the specific public purposes that could justify retroactive taxation, the practice of various municipal jurisdictions points to the following non-exhaustive circumstances:

1796.  *Combatting abusive practices:* A major justification invoked in respect of retroactive taxation is the State's power to combat tax abuse.[2255] In particular, where taxpayers exploit an inadvertent legislative loophole in a manner that is abusive and manifestly contrary to the object and purpose of the tax law, the State may be justified to close such a loophole with a retroactive effect and without breaching its own law or applicable international law. The specific purpose that this retroactivity achieves in such a case is to discourage and prevent a future abusive utilisation of similar loopholes by taxpayers. In other words, the legislator is warning taxpayers that actively seeking and exploiting

---

[2253]  Hans Gribnau, Melvin Pauwels, *Retroactivity of Tax Legislation* (EATLP International Tax Series, 2013), CLA-381, see, e.g.,: for UK – RLA-282, for Germany – RLA-302, S. 3.8.5.2, for Italy - RLA-303, S. 3.11.4.1, for The Netherlands – RLA-304, S. 3.13.2.2; *Carlton*, US Supreme Court, US 26, 114 SCt 2018, cited at RLA-225, n. 25.

[2254]  R-Rejoinder, ¶¶ 777-785, citing in *inter alia Mamidoil Jetoil Greek Petroleum Products S.A. v. Albania*, ICSID Case No ARB/11/24, Award, 30 March 2015, CLA-150, ¶ 789; *Sergei Paushok, CJSC Golden East Company and CJSC Vostokneftegaz Company v. The Government of Mongolia*, Award on Jurisdiction and Liability, 28 April 2011, RLA-189, ¶¶ 299, 321, 328.

[2255]  Philip Baker, "Retrospective tax legislation and the European Convention on Human Rights", (British Tax Review, 2005), RLA-291; Hans Gribnau, Melvin Pauwels, *Retroactivity of Tax Legislation* (EATLP International Tax Series, 2013), CLA-381, see, e.g.,: for UK – RLA-282, for Germany – RLA-302, S. 3.8.5.2., for Italy - RLA-303, S. 3.11.4.1, for The Netherlands – RLA-304, S. 3.13.2.2.J.W.

tax loopholes does not pay off, since the State may shut them off with retroactive effect and the taxpayers will not benefit, even temporarily, from their own wrongful conduct. In addition to this specific public purpose, retroactive taxation of abusive transactions is also less intrusive on taxpayers' interests of legal certainty and predictability, since taxpayers that actively engage in abusive practices can hardly have a legitimate interest to benefit from their conduct.[2256]

1797. The European Commission of Human Rights expressed similar views when scrutinising the permissibility of the UK's retroactive taxation of transactions whereby solicitors entered into sham partnership agreements with their clients (commodity futures dealers) in order to offset the trading loss against the solicitors' earnings. The Commission held that the retroactive legislation "was enacted to counteract a specific form of tax avoidance", and that "the only way in which this particular form of artificial tax avoidance could be combatted effectively was by making s. 31 retrospective."[2257]

1798. _Correcting inadvertent technical errors:_ When new legislation is adopted, its application in practice may reveal errors of a technical nature. In some jurisdictions, the legislator is empowered to correct such errors with retroactive effect. [2258] Here too, the specific purpose served by retroactivity is a preventive one – taxpayers should be made aware that exploiting technical legislative errors does not pay off. According to the ECtHR, "[t]here is in fact an obvious and compelling public interest to ensure that private entities do not enjoy the benefit of a windfall in a changeover to a new tax-payment regime and do not deny the Exchequer revenue simply on account of inadvertent defects in the enabling legislation".[2259]

1799. This is a narrow exception, which is not applicable to the present case. However, it confirms that retroactivity needs a specific justification.

1800. _Avoiding the "announcement effect":_ Another narrow exception under which retroactive taxation is allowed, or at least more generously accepted, relates to the so-called "announcement effect". When a new draft tax law is announced for discussion, taxpayers may react in anticipation of the law's adoption in a way that could render the new law nugatory.[2260] If such is the case, the legislator may give the new law a limited retroactive effect to the date of its first announcement. However, taxpayers are usually warned in advance, i.e., at the time of the first announcement of the law, that the law will be adopted with retroactive effect. This narrow exception, while inapplicable to the present case, also demonstrates that a retroactive tax is generally required to have a specific justification. It also suggests that, as far as practicable, the State should

---

[2256] Philip Baker QC, "Retroactive Tax Legislation", 6(48) International Taxation 780 (June 2012), CLA-60, p. 781.

[2257] _A, B, C and D v. UK_, quoted at Philip Baker, "Retrospective tax legislation and the European Convention on Human Rights", (British Tax Review, 2005), RLA-291.

[2258] James Hollis, The UK Retroactive Correction of Repo Tax Legislation, 2011, RLA-225.

[2259] Philip Baker, "Retrospective tax legislation and the European Convention on Human Rights", (British Tax Review, 2005), RLA-291, p. 4.

[2260] Hans Gribnau, Melvin Pauwels, _Retroactivity of Tax Legislation_ (EATLP International Tax Series, 2013), CLA-381, see, for UK – RLA-282, for Germany – RLA-302, S. 3.8.5.2, for Italy - RLA-303, S. 3.11.4.1, for The Netherlands – RLA-304, S. 3.13.2.2.

endeavour to mitigate the unpredictable effects of new legislation, in this case by giving an advance warning of the impending retroactive legislation contemplated.

\* \* \*

1801.  While it is not realistic to list all possible scenarios in which retroactive taxation may be justified, the above examples from the jurisprudence of municipal and international courts demonstrate that the appropriate balance between the individual's interests of legal certainty / stability / predictability, on the one hand, and the State's power to regulate in the public interest, on the other, should be struck by reference to the principles of reasonableness and proportionality, bearing in mind that the Tribunal is *ad hoc*, not part of the judicial machinery of the State, and not vested with a legislative or policy-making power. This balancing may be achieved by assessing the specific reasons given to justify the retroactive application of tax measures. If no viable "retroactivity-specific" justification exists, the measures will likely constitute an unreasonable and disproportionate interference with the taxpayer's interest of legal certainty. Such measures will also be contrary to the FET standard, interpreted in line with those general principles in accordance with Article 31.3(c) of the VCLT.

1802.  Retroactive taxation may also violate FET for other reasons, for instance, if it is arbitrary, unreasonable, discriminatory, or otherwise violates other "strands" of the FET standard. For present purposes, the Tribunal has focused exclusively on the circumstances in which retroactivity *per se* will violate the FET standard; whether it violates FET for other reasons is a factual matter that will depend on all the circumstances surrounding the measure.

*(5)    The FET standard in the context of indirect transfers*

1803.  The Respondent has also submitted that the taxation of indirect transfers does not breach the FET standard. It argues in this respect that there is "no rule of customary international law prohibiting the taxation of indirect offshore indirect transfers, whether retroactive or otherwise, or limiting States' sovereignty in that respect."[2261] Nor are there, in the Respondent's submission, any rules of public international law establishing the principle of separate corporate personality or the situs of shares.

1804.  The Tribunal does not understand the Claimants' case to be that the taxation of indirect transfers *per se* is a breach of the BIT. While the Claimants do indeed complain that the 2012 Amendment "fundamentally departs from longstanding principles applicable to the taxation of non-residents",[2262] they do not argue that this alleged deviation from the norm is *per se* objectionable; their argument is rather that, by imposing it retroactively, the Respondent breached the BIT. Indeed, the Claimants have clarified that their quarrel is with the retroactive application of the 2012 Amendment, not with India's decision to tax indirect transfers.[2263]

---

[2261]  R-Rejoinder, ¶¶ 730-755.

[2262]  C-SoC, ¶ 298.

[2263]  C-Reply, ¶ 17; Transcript, Evidentiary Hearing, Day 1, 61:8-63:10 (Mr McNeill).

1805. For the sake of completeness, the Tribunal agrees with the Respondent that the taxation of indirect transfers does not in itself breach the BIT's FET standard. Leaving aside the issue of retroactivity and retrospectivity, prospective taxation, to the extent that it is not confiscatory and satisfies the other international law requirements, is one of the sovereign prerogatives of the State. Even if the policy justification for increased taxation was exclusively one of revenue maximisation, it is the State's policy choice.

1806. Of course, taxation with immediate effect that does not grandfather rights or legal situations that have already been established may also affect investors, as was the case in *Burlington v. Ecuador*.[2264] Whether or not prospective fiscal measures breach international (including treaty) standards will depend on the circumstances of each case and the treaty in question.

### (ii) Did the retroactive taxation of the CIHL Acquisition breach the BIT's FET standard?

1807. As established in Section VII.A.3.b(iii) above,[2265] the Respondent imposed capital gains tax on the CIHL Acquisition retroactively. The Respondent enacted the 2012 Amendment, which substantively amended the scope and content of Section 9(1)(i) of the ITA 1961 retroactively. This amendment made several of the 2006 Transactions taxable events when, at the time at which they occurred, they were not taxable. The Respondent then proceeded to tax the CIHL Acquisition (the transfer by CUHL to CIL of shares in CIHL) on the basis of the 2012 Amendment, and to enforce the tax assessment against the Claimants' assets.

1808. In line with its conclusions in the preceding sections, the question that the Tribunal must answer is whether the Respondent had a specific justification for enacting retroactive tax legislation and for applying it to the Claimants, i.e., beyond the legitimate purpose of providing revenues for India's general budget.

1809. One justification that the Respondent has advanced in respect of the 2012 Amendment is that it adjusted its law to the emerging economic reality that resulted from the proliferation of multinational corporations and their utilisation of so-called tax havens. This emerges, *inter alia*, from the speech of the Finance Minister during the Parliamentary debates on the adoption of the 2012 Amendment:

> There cannot be a situation where somebody will make money on an asset located in India and will not pay tax either to India or to the country of its origin by making some arrangements to certain tax haven areas, to certain tax haven locations through a complicated setting up of a series of subsidiaries, and having huge capital gains on the assets located in India. We cannot declare India as a tax haven simply to attract the foreign investment. I want foreign investment for technology, for development, for resources. Either you pay tax here or you pay tax in your own country with

---

[2264] *Burlington Resources Inc v. Ecuador,* ICSID Case No ARB/08/5, Decision on Liability, 14 December 2012, RLA-123.

[2265] See Section VII.A.3.b(iii) above.

which we have a Double Taxation Avoidance Agreement. It is as simple as that.[2266]

1810. As discussed above, the Claimants do not impugn, and the Tribunal does not purport to second-guess, the wisdom of the Indian policy-maker as to the line that it drew between the interest of attracting foreign investment and that of collecting taxes on capital gains generated by indirect transfers of Indian assets. It is undisputed that when India adopted the ITA in 1961, its economic reality did not involve a recurring practice of indirect transfers through foreign-incorporated companies. According to the Respondent, the need to capture the practice of indirect transfers arose after Indian economy was liberalised in the early 1990s. India, like any State, was fully entitled to adapt its legislation to newly emerging circumstances (e.g., the practice of indirect transfers). The question is not whether the taxation of indirect transfers was justified; it is whether the Respondent was justified in introducing it retroactively. The Tribunal does not find that the need to adapt to an increase on foreign investment and the indirect transfers that they entailed justifies amending the scope of Section 9(1)(i) retroactively. The public purpose sought was to increase the revenue by making indirect transfers taxable; this does not in itself justify the retroactivity of the 2012 Amendment.

1811. Another justification that the Respondent has alluded to is that the retroactive application of the 2012 Amendment was justified to combat tax avoidance, in particular the abusive exploitation by investors such as the Claimants of the practice of indirect transfers.

1812. The Claimants rightly concede that a "recognized justification for retroactive tax measures is the need to combat tax abuses."[2267] The question is whether the retroactive taxation must target systemic abuse, or whether it is sufficient that it targets specific abuse. In this case, the Respondent rightly has not argued that it enacted the 2012 Amendment to combat tax avoidance by the Claimants specifically. Indeed, as the Tribunal has found in Section VII.A.3.a(ii) above, the FAO did not tax the Claimants on a theory of tax avoidance. It has not been suggested that the 2012 Amendment was enacted to sanction the Claimants for their specific abuse. In any event the Tribunal has found that the 2006 Transactions were not tax avoidant.

1813. The Respondent's argument appears to be that it passed the 2012 Amendment to combat systemic tax abuse by foreign investors engaging in indirect transfers "and not paying tax anywhere in the world."[2268] However, the Respondent has failed to prove a case of systemic abuse by foreign investors. First, the Respondent itself argues that it had very rarely seen an indirect transfer. It can thus hardly allege that investors were systemically abusing indirect transfers. Second, the Respondent has argued that it has always had the necessary tools to fight tax evasion on abusive transactions on the basis of the principle of "substance over form". Accordingly, an abusive transaction would provide the tax authorities with a distinct legal basis to tax the transaction and even impose punitive

---

[2266] Shri Pranab Mukherjee, Minister of Finance, Transcript of Speech before Lok Sabha (Parliament), 7 May 2012, Exh. R-165, pp. 30-31.

[2267] Claimants' Answers to the Tribunal's Questions, ¶ 84.

[2268] R-Rejoinder, ¶ 28(a).

measures. Although the Tribunal has found that the DRP Decision's suggestion that the 2006 Transactions could be taxed as abusive avoidance has not been made out, the Decision nevertheless shows that, if proven, "tax abuse and the operation of the substance over form doctrine [could provide] a possible additional basis of taxation".[2269]

1814. Thus, it is hard to see how the 2012 Amendment would be necessary to combat even a systemic abuse. Rather than combat tax avoidance, the Respondent's policy justification seems to have been to expand the source rule and maximise the revenue recoverable from capital gains experienced by multinational companies irrespective of where the gain arose so long as it had a significant connection with India. While, as discussed above, this is a valid policy justification for prospective taxation, it is insufficient to justify retroactive legislation. As the Tribunal has found in Section VII.A.3.b(iii) above, the meaning of Section 9(1)(i) prior to the 2012 Amendment was clear on its face: indirect transfers were not subject to capital gains tax. Given such clear law, the fact that the Claimants and other foreign investors who indirectly owned assets in India through a series of subsidiaries should engage in indirect transfers without paying tax cannot be characterised as abusive, or the exploitation of a loophole. The Tribunal recalls in particular that, according to a 1957 CBDT circular (the applicability of which has not been contested by the Respondent), "shares, stock, debentures or debenture stock in a company are located at the place where the company is incorporated."[2270]

1815. A further reason supporting the Tribunal's conclusion that the Respondent's policy justification was not to combat tax abuse is this: the methodology of Explanations 4 and 5 of the 2012 Amendment is not consistent with a policy of combatting tax abuse. The 2012 Amendment does not target foreign investors who evade or wrongly avoid taxes; it applies to any indirect transfer, whether tax abusive or not. Its goal is to tax transactions which indirectly involve the transfer of assets situated in India, regardless of whether they have been taxed elsewhere.[2271]

1816. For these reasons, the Tribunal concludes that the Respondent did not have a specific public purpose that would justify applying the 2012 Amendment to past transactions. As a result, the Respondent's retroactive application of the 2012 Amendment to the CIHL Acquisition failed to balance, or at least adequately to balance, the Claimants' protected interest of legal certainty / stability / predictability on the one hand, and the Respondent's power to regulate in the public interest on the other. By retroactively applying, without a specific justification, a new tax burden on a transaction that was not taxable at the time it was carried out, the Respondent deprived the Claimants of their ability to plan their activities in consideration of the legal consequences of their conduct, in violation of the principle of legal certainty, which the Tribunal considers to be one of

---

[2269]   R-PHB, ¶ 146(c), referring to Directions of the DRP under Section 144C(5) of the ITA 1961 of 31 December 2015, Exh. C-264, pp. 37-38.

[2270]   CBDT Circular dated 28 September 1957 dealing with the exclusion of assets or debts outside of India for purposes of wealth tax, Exh. C-140, section 1594.

[2271]   Although the Respondent has argued that investors from countries who have signed a DTAA with India would be taxed only once, this argument requires the existence of a DTAA, and leaves other investors defenceless.

the core elements of the FET standard, and of the rule of law more generally. In the words of the ICJ in *ELSI*, this unjustified retroactivity is "not so much something opposed to a rule of law, as something opposed to the rule of law", and "shocks, or at least surprises, a sense of juridical propriety".[2272] Having considered the full factual record of this case, the Tribunal finds that the retroactive taxation of the CIHL Acquisition was, to quote *Waste Management II*, "grossly unfair."[2273] The Tribunal thus concludes that the Respondent breached its obligation under Article 3(2) of the BIT to accord the Claimants' investments FET.

1817. Having reached this conclusion, the Tribunal need not address whether the Respondent has also breached the FET standard by, *inter alia*, allegedly targeting the Claimants and their investment at the time of imposing or enforcing its tax demand, or by conduct that was otherwise unreasonable or arbitrary. These discrete allegations of FET violations have no separate impact on the quantum of the Claimants' damages claim. The Tribunal therefore dispenses with addressing them.[2274] Nor does the Tribunal need to address the Claimants' argument that the Respondent breached Article 3(1) of the Treaty.

### g.   Have the Claimants proved an international wrong?

1818. As discussed in Section VI.C.4.a above, the Respondent has argued that the claims are inadmissible because the Claimants "have not made appropriate use of the dispute settlement procedures available to them under the ITA and generally under Indian law", which "means that various questions which are essential to the task of this Tribunal in determining the Claimants' claims have not yet been ventilated before and clarified by the bodies which are best qualified to answer those questions (i.e., the Indian courts)".[2275] The Respondent's argument is that "an investor cannot prove an international wrong based on lower tier decisions of the State's administrative and judicial authorities, without taking appropriate action to test those decisions before the system of law designed for that purpose, i.e. (in the present case) the Indian judicial system".[2276]

1819. The Tribunal has found that this is not properly an objection to the admissibility of the claims, but rather a defence on the merits. The claims are ripe for adjudication; the question is rather whether the Claimants have "proved an international wrong".[2277] The Tribunal will thus address it now.

1820. The Tribunal recognises that, in certain extreme circumstances, a failure to challenge a measure before domestic *fora* (whether administrative or judicial) could amount to

---

[2272] *Case concerning Elettronica Sicula, S.p.A.* (*ELSI*) (United States v. Italy), I.C.J. Rep. (1989), ¶ 128.

[2273] *Waste Management v. Mexico (II)*, ICSID Case No ARB(AF)/00/3, Award, 30 April 2004, RLA-92, ¶ 98.

[2274] For the same reason, the Tribunal does not need to address the Respondent's objection that the Claimants' arguments on unreasonableness or discrimination in the enforcement of the tax assessment had not been pleaded until the Evidentiary Hearing.

[2275] R-PHB, ¶ 43.

[2276] R-Rejoinder, ¶ 52.

[2277] See Section VI.C.4 above.

evidence that the severity of the measure does not reach the level of a treaty violation.[2278] However, this is not the case here.

    a.    First, the measures in question (in particular, the 2012 Amendment and the FAO) are not acts of maladministration of a lower official. The 2012 Amendment is a law of general application passed by Parliament. The FAO, which applied this law to the Claimants, was the result of a formal tax assessment procedure that went through different stages of approval at the administrative level: the DAO was confirmed by the DRP, and the FAO was confirmed by the ITAT on its main points.

    b.    Second, the Claimants have challenged the measures imposed at various stages in the proceedings. They first challenged the DAO before the DRP, and then challenged the FAO before the ITAT and domestic courts.[2279] Both Parties have appealed the ITAT order to Indian courts, and the matter is now before the Delhi High Court.[2280] It is thus factually incorrect to say, as the Respondent contends, that the Claimants "have not made appropriate use of the dispute settlement procedures available to them under the Income Tax Act and generally under Indian law".[2281] The Claimants have not exhausted the local remedies to their ultimate end-stage and are in fact still in court;[2282] however, they definitely have made and are making use of such remedies.

    c.    Third, the FAO and related enforcement measures have had tangible consequences on the Claimants' investments. The Respondent has forcibly sold virtually all of CUHL's shares in CIL/VIL and has garnished CUHL's dividends to pay off the tax demand. This is not a situation that can be easily reversed by a higher official overturning a lower official's decision.

1821.    As a result, in the words of *Generation Ukraine*, the Claimants have not "seize[d] upon an act of maladministration, no matter how low the level of the relevant governmental authority", nor have they "abandon[ed] [their] investment without any effort at overturning the administrative fault".[2283] This is not a situation where the investor failed to seek clarifications on the measure imposed on it;[2284] to the contrary, the record shows that the Claimants have vigorously challenged the measure before the relevant administrative and judicial courts. The Claimants are therefore not precluded from "claim[ing] an international delict".[2285]

---

[2278]  *Generation Ukraine v. Ukraine,* ICSID Case No. ARB/00/9, Award, 16 September 2003, RLA-43, ¶ 20.30; *Feldman v. Mexico*, ICSID Case No. ARB(AF)/99/1, Award, 16 December 2002, RLA-44, ¶ 114.

[2279]  See Section II.E.

[2280]  *Ibid*.

[2281]  R-PHB, ¶ 43.

[2282]  As discussed in Section VI.C.4 above, this is irrelevant from the perspective of admissibility as the Treaty contains no rule of exhaustion of local remedies.

[2283]  *Generation Ukraine v. Ukraine*, ICSID Case No. ARB/00/9, Award, 16 September 2003, RLA-43, ¶ 20.30.

[2284]  *Feldman v. Mexico*, ICSID Case No. ARB(AF)/99/1, Award, 16 December 2002, RLA-44, ¶ 114.

[2285]  *Generation Ukraine v. Ukraine*, ICSID Case No. ARB/00/9, Award, 16 September 2003, RLA-43, ¶ 20.30.

1822. The Respondent's argument seems to be that the Claimants' failure to challenge the constitutionality of the 2012 Amendment before the Indian courts must have consequences for their claims of breach of the BIT. However, as discussed in Section VI.C.4.c above, this is not dispositive of whether the 2012 Amendment (as applied to the Claimants) amounts to an *international* wrong. The Tribunal has concluded that, irrespective of whether it is constitutional in India, the 2012 Amendment changed the law retroactively without a specific policy purpose that could justify that retroactivity, and as a result undermined the principle of legal certainty in a disproportionate manner, breaching the BIT's FET standard. Whether or not the 2012 Amendment is constitutional in India would not change this conclusion.

1823. For these reasons, the Tribunal dismisses the Respondent's defence on the merits, and finds that the measures imposed on the Claimants are of sufficient severity to constitute a violation of FET.

## B.     The Claimants' remaining claims

1824. In addition to their FET claim, the Claimants have argued that the Respondent has breached the following provisions of the BIT:[2286]

    a.    Article 3(1), by failing to create favourable conditions for the Claimants' investments;

    b.    Article 5, by unlawfully expropriating CUHL's investment in CIL/VIL without providing fair and equitable compensation, and subjecting the Claimants' investment to measures having an effect equivalent to expropriation; and

    c.    Article 7 (which enshrines the Claimants' right to "the unrestricted transfer of their investments and returns"[2287]), by depriving CUHL of the ability to sell its remaining shares in CIL/VIL and to repatriate the proceeds, as well as the dividends that have accrued in respect of such shares.

1825. In light of the Tribunal's conclusion that the Respondent's fiscal measures breached the BIT's FET standard, the Tribunal does not need to address the Claimants' remaining claims. Each of these claims arises from the same facts, namely the retroactive application of the 2012 Amendment to the Claimants through the FAO, which had the effect of imposing a tax, interest and penalties on the Claimants, and the subsequent enforcement measures imposed on the Claimants. As discussed in Section VIII below, the Claimants request the same relief for each of these claims (or at least, relief that does not go beyond what is already been claimed for the FET claim[2288]). Thus, even if the Tribunal were to find that these claims have merit, this would not affect the Tribunal's

---

[2286]  C-SoC, ¶ 296.

[2287]  UK-India BIT, CLA-1, Article 7.

[2288]  The Claimants do not spell out whether, for instance, a standalone breach of Article 7 would have caused the same harm as a breach of Articles 3 or 5, but what is clear is that they do not request compensation beyond what they claim for breaches of Article 3 and Article 5.

assessment of the appropriate reparation. Accordingly, any legal findings on these matters is unnecessary.[2289]

## VIII.   REPARATION

1826.  The Tribunal has found that the Respondent has breached Article 3(2) of the Treaty by failing to treat the Claimants' investments fairly and equitably. As reparation, the Claimants request the relief that is quoted in Section IV.A above, as specified in their final request for relief of 14 December 2018. As explained in Section A below, in addition to monetary relief, the Claimants request declaratory and injunctive relief.[2290]

1827.  The Respondent objects to several aspects of the Claimants' request for relief, including the quantification of its alleged loss. However, with the development of the factual background of the case since the commencement of these proceedings, the margin of the Parties' disagreement on quantification issues has gradually reduced.

1828.  Each Party relies on a valuation expert to support its position on quantum. The Claimants base their position on several expert reports produced by Mr Richard Boulton QC of FTI Consulting,[2291] while the Respondent relies on the expert evidence of Mr Jostein Kristensen of Oxera Consulting.[2292] The experts have also produced a joint statement of 28 November 2018 (the "Joint Statement"), setting out the common and diverging points in their calculations and assumptions that they have been instructed to rely upon.[2293] The Joint Statement presents the most up to date views of the two experts on most issues,[2294] and comprehensively covers the issues of quantification that need to be resolved in this arbitration.

1829.  As in the above sections, the Tribunal first briefly summarises the Parties' positions and then sets out its analysis.

## A.     The Claimants' position

1830.  The Claimants claim that they are entitled to full compensation for their losses resulting from the Respondent's imposition and enforcement of an internationally unlawful (retroactive) tax demand under the 2012 Amendment and the FAO.[2295] According to the

---

[2289]  A similar approach was followed, e.g., in *Ioan Micula, et al v. Romania*, ICSID Case No. ARB/05/20, Final Award, 11 December 2013, CLA- 23, ¶¶ 873-874.

[2290]  The Claimants' request for monetary and injunctive relief is the same regardless of the Treaty breach alleged. See ¶ 631 above.

[2291]  Mr Boulton's reports are dated 28 June 2016, 23 June 2017 and 3 August 2018. He has also prepared a memorandum dated 20 December 2017, and a letter dated 21 September 2018, which updated the calculations set out in his third report.

[2292]  Mr Kristensen's reports are dated 4 February 2017, 17 April 2018 and 28 September 2018.

[2293]  Joint Statement between Messrs Richard Boulton and Jostein Kristensen of 28 November 2018 ("Quantum Experts' Joint Statement").

[2294]  Quantum Experts' Joint Statement, ¶ 1.4.

[2295]  C-Updated Reply, ¶¶ 673-674.

Claimants, the Respondent does not dispute the application of the principle of full reparation under the international law standard of *Chorzów Factory*, according to which compensation should "wipe out all the consequences of the illegal act and re-establish the situation which would, in all probability, have existed if that act had not been committed."[2296]

1831. On the Claimants' interpretation, full reparation requires the recovery of any economic losses that the Claimants could have avoided in the absence of the Respondent's unlawful actions and that the Respondent either withdraw the unlawful tax demand under the FAO or extinguish its results with the payment of compensation sufficient to make them whole.[2297] In the present case, the Claimants aver that full compensation should at least cover the following items:

    a.    The proceeds that the Claimants would have received had they been able to sell the CIL shares in 2014;

    b.    The tax refunds due to CUHL in respect of its prior sales of CIL shares to Vedanta and Petronas;

    c.    Interest at the statutory rate applicable to tax returns in India, both pre- and post-award, or, in the alternative, at the Claimants' cost of borrowing on a compounded basis; and

    d.    The amount equivalent to the tax that would accrue on the compensation awarded to the Claimants.[2298]

1832. <u>First</u>, with respect to the proceeds of the potential sale of the CIL shares in 2014, the Claimants submit that it was their "clear and documented intention to sell all of the CIL shares in 2014."[2299] However, the Respondent attached and subsequently liquidated those shares when enforcing its unlawful tax demand, and thereby prevented the Claimants from realising the benefits of their investment.

1833. Mr Boulton estimates that, had the Claimants not been prevented from selling the CIL shares in 2014, they would have received net proceeds of US$ 984.2 million.[2300] The relatively minor difference between these numbers, so say the Claimants, is due to the experts' disagreement on the methodology of calculating market impact costs, otherwise referred to as slippage costs.[2301] These costs represent a reduction of the share sale price resulting from offering significant quantities of shares for sale in the market.

---

[2296] C-PHB, ¶ 719, citing *Case Concerning the Factory at Chorzów*, PCIJ Ser. A, No. 17, CLA-18, p. 47.

[2297] *Ibid*.

[2298] *Id.*, ¶ 718.

[2299] *Id.*, ¶ 720, citing Boulton ER1, ¶¶ 3.9-3.18.

[2300] Quantum Experts' Joint Statement, Table 2-1.

[2301] *Id.*, Table 1-1, issue 1.

    a.    Mr Boulton estimates the market impact costs at 0.15%, in reference to an upper range (favourable to the Respondent) of the percentage of reduction applied to the volume weighted average price ("VWAP") of the CIL shares during (i) CUHL's sale of CIL shares in January 2014 prior to the buyback, and (ii) CIL's purchase of CIL shares from other buyers during the buyback.[2302]

    b.    In turn, Mr Kristensen relies on what the Claimants call "favourable outliers and arbitrary adjustments" and arrives at 0.20% during the buyback and at 0.40% thereafter.[2303]

1834.    According to the Claimants, the Tribunal should favour Mr Boulton's approach as it best reflects the existing evidence of the actual market impact cost in the relevant period.

1835.    Second, the Claimants claim compensation for the tax refund due to CUHL with respect to its 2011 sale of CIL shares to Vedanta. According to the Claimants, on 19 December 2016, the Commissioner of Income Tax issued an appellate order indicating that the applicable rate of capital gains tax for CUHL's 2011 sale of CIL shares to Vedanta should have been 10%, not 20%.[2304] The resulting tax refund was nominally issued to CUHL and garnished by the Tax Recovery Officer, who initially applied an offset of INR 1593.99 crore towards the tax demand arising from the 2006 Transaction.[2305] However, according to the Claimants, the Respondent has accepted that this amount was incorrectly calculated, as (i) it included statutory interest through January 2016, while the garnishment occurred in June 2017, and (ii) tax was withheld on the statutory interest at the general rate of 42%, rather than at the applicable rate of 15% under the UK-India DTAA.[2306] The corrected amount as of June 2017 (as accepted by both Parties[2307]) is INR 1769.45 crore.

1836.    The Claimants further contend that CUHL successfully challenged the capital gains tax rate applicable to its 2009 sale of CIL shares to Petronas, with the consequence that a refund of the overpayment is due in the amount of INR 41.00 crore plus interest from April 2010 (adding up to INR 59.13 crore as of November 2018).[2308] While the ITD has

---

[2302]  C-PHB, ¶ 722, citing Boulton ER1, ¶¶ 5.6-5.15.

[2303]  *Id.*, ¶ 723, citing Second Expert Report of Mr Jostein Kristensen ("Kristensen ER2"), Table 2.1.

[2304]  C-Updated Reply, ¶ 254; Order of the Commissioner of Income Tax (Appeals) dated 19 December 2016, Exh. C-319.

[2305]  C-Updated Reply, ¶¶ 252-253; Notice of Demand from the Tax Recovery Officer to CUHL dated 16 June 2017, Exh. RB-43.

[2306]  C-PHB, ¶ 729.

[2307]  *Ibid.*; Third Expert Report of Mr Jostein Kristensen ("Kristensen ER3"), ¶ 3.3. The Claimants note that the Respondent disagrees on the characterisation and rate of interest that applies after the date of garnishment. C-PHB, ¶ 729.

[2308]  C-PHB, ¶ 730; *Cairn UK Holdings Limited v. Director of Income-Tax* [2013] Writ Petition (Civil) No. 6752/2012 dated 7 October 2013, Exh. CWS-Brown-108; Calculation of refund due in respect of share sales to Petronas, Exh. RB-78; Claimants' email of 4 December 2018 (CCom-261).

neither issued nor garnished this refund, according to the Claimants, the Respondent has accepted that this unpaid refund is recoverable as losses in the arbitration.[2309]

1837.  Third, the Claimants oppose the alternative loss scenarios proposed by the Respondent. In particular, the Claimants reject as unrealistic the Respondent's contention that Cairn may still regain control of the unsold portion of the attached assets and that the proceeds from the sale of those assets should be deducted from the estimate of the proceeds in the But For Scenario. The Claimants explain that the Respondent has already liquidated nearly all of these assets and kept the proceeds as a measure of enforcement of its unlawful tax demand.[2310]

1838.  Similarly, the Claimants contend that the Respondent's mitigation scenario, whereby the Claimants would have been able to sell the CIL shares in 2014 by providing an alternative security (e.g., a bank guarantee), is misconceived for at least the following reasons:

   a.  First, the option of providing an alternative security was not legally viable. The Claimants explain that the mechanism under Section 281B of the ITA to lift a provisional attachment via a bank guarantee was created through an amendment that did not come into effect until June 2016.[2311] The 1993 and 2011 circulars cited by Mr Puri in support of the Respondent's position are unavailing, since they apply to a post-demand scenario, as opposed to when the assets are subject to a provisional attachment pending the assessment proceedings, as was the Claimants' case in 2014.[2312]

   b.  The Respondent's mitigation scenario is also financially unviable. In particular, since Cairn was a medium-sized company in the UK without an investment grade credit rating,[2313] the only way the Claimants could have obtained the bank guarantee was providing a cash collateral equal to the full amount of the guarantee.[2314] However, the Claimants assert that they had neither the cash nor the operating assets to do so.[2315]

---

[2309]  C-PHB, ¶ 730, citing Kristensen ER3, ¶ 1.12 ("I am instructed to include this in my assessment of the Claimants' losses as at 31 July 2018.").

[2310]  Id., ¶ 732, citing Quantum Experts' Joint Statement, ¶¶ 1.9-1.10.

[2311]  Second Witness Statement of Mr James Smith ("Smith WS2"), ¶¶ 10-11; Third Expert Report of Mr Richard Boulton QC ("Boulton ER3"), p. 16 n. 56; Income Tax Simplification Committee, Report dated 15 January 2016 [excerpt], Exh. C-553; the ITA 1961, Exh. C-569, s. 281B.

[2312]  Instruction No. 1914 of the CBDT, ¶ C(ii) ("CBDT Guidelines for Stay of Demand"), Exh. Puri-26; Section 281 of the ITA 1961 – Certain transfers to be void – Guidelines for prior permission under section 281 to create a charge on the assets of business, Circular No. 4 of 2011, dated 19 July 2011 ("CBDT Circular No. 4 of 2011"), Exh. Puri-27, ¶ 3(iii) (allowing the use of a bank guarantee "[i]f there is a disputed demand outstanding").

[2313]  Transcript, Evidentiary Hearing, Day 7, 109:1-11 (Mr Smith).

[2314]  Smith WS2, ¶¶ 13, 24; Transcript, Evidentiary Hearing, Day 7, 109:1-11, 121:9-24 (Mr Smith); Email from James Smith to Rahul Saraf (Citibank) dated 18 September 2016, Exhibit CWS-Smith-1, pp. 1-2.

[2315]  C-PHB, ¶ 735.

    c.    In any event, the Claimants contend that, even if they had been able to obtain a bank guarantee, the significant costs of doing so would have likely negated any economic benefit of receiving the shares.[2316] In order for a mitigation to have occurred, one has to assume that the bank guarantee and the subsequent sales could have occurred promptly after the shares were attached. According to the Claimants, that is why the Respondent instructed its expert to assume that it would have taken only two months to make the necessary arrangements for the bank guarantee and fifteen days to release the shares, to allow him to avoid the decline in the share price.[2317] The record shows, however, that obtaining a bank guarantee would have likely taken significantly longer.[2318]

    d.    Nor is there any merit to the Respondent's suggestion that the Claimants would have achieved a gain in the mitigation scenario that could have been offset against other heads of claim. This argument rests on the assumption that the immediate sale of the CIL shares would have been at a higher price in the mitigation scenario than in the but-for scenario.[2319] While this potentially could have been argued with the information that is available now, the Claimants could not have known this fact at the time. Therefore, for the Claimants, the Respondent's mitigation scenario is a stark example of hindsight bias.[2320]

1839.    The Claimants thus fully reject the Respondent's mitigation scenario. They add that the mitigation defence is also wrong as a matter of law, since even if one were to assume that the Claimants would have held on to the CIL shares, it does not mean that the Respondent would not have enforced its unlawful tax demand against some other of the Claimants' assets.[2321]

1840.    <u>Fourth</u>, the Claimants submit that full compensation should include pre-award interest that will compensate them for their inability to use their funds resulting from the application of India's unlawful tax demand.[2322] As to the interest rate, the Claimants make the following arguments:

    a.    The Claimants' primary position is that interest should be computed based on the statutory rate of interest applicable to tax refunds in India, which is 0.5% per month, in INR terms, calculated on a simple basis. According to the Claimants, this rate best reflects the Indian legislature's view as to the appropriate

---

[2316] *Id.*, ¶ 736, citing Smith WS2, ¶ 33.

[2317] Kristensen ER2, ¶¶ 1.9, 4.7.

[2318] Second Expert Report of Mr Richard Boulton QC ("Boulton ER2"), ¶¶ 9.9-9.10. According to the Claimants, it took India a month just to reply to CUHL's 2016 letter proposing the terms of the bank guarantee, and even then it was a rejection of the proposal; see Letter from CUHL to Assistant Commissioner of Income Tax, Circle 1(2)(1), International Taxation, New Delhi, Exh. R-42; Letter from Assistant Commissioner of Income Tax, Circle 1(2)(1), International Statement of Defense Taxation, New Delhi to CUHL, Exh. R-43.

[2319] Quantum Experts' Joint Statement, Table 1-1, Issue 3.

[2320] C-PHB, ¶ 739.

[2321] *Id.*, ¶ 739 *in fine*.

[2322] C-SoC, ¶¶ 402-406.

compensation due to a person kept from the use of his/her money due to the application of a tax demand that is eventually determined to be unlawful.[2323]

b.  In the alternative, the Claimants request interest to be awarded at a market-based rate on a compounded basis. In particular, they seek interest at the rate of their borrowing cost, which should be based on LIBOR. This rate, so say the Claimants, would compensate them for the cost of needing to take out loans to finance their business, as it occurred in 2018,[2324] and for the cost associated with being unable to pay off existing debt.[2325]

c.  In turn, the Claimants oppose the Respondent's proposal to calculate interest at a "risk-free" rate by reference to one-month US Treasury bills. According to the Claimants, such rate would not fully compensate the Claimants for the time value of their money as it ignores the risks that the Claimants are facing in the pre-award period, including the risk of India's default. In any event, the Respondent's use of a particularly low (at times negative) rate of one-month US Treasury bills is especially inappropriate because it: (i) fails to account for the fact that the Claimants were unwillingly put in the position of a lender to the Indian Government, not the US government, and (ii) uses a short-term maturity and does not compensate the Claimants for not having access to their funds over the long-term.[2326]

d.  Finally, according to the Claimants, the Parties agree that interest on the tax refund on CUHL's sale of CIL shares to Vedanta in 2011 should be calculated at the statutory rate of 0.5% per month, in INR terms, on a simple basis, and on the original principal amount of INR 1395.74 crore. However, the Respondent instructed Mr Kristensen that the amount of interest should be adjusted downward for the amount of tax that would be withheld on the interest in India.[2327] According to the Claimants, this has no rational basis, since this tax refund has already been garnished in India in 2017 and India has no continuing right to tax it. Adjusting the interest for hypothetical Indian tax would amount to a double-counting of tax: once in the calculation of the interest and once upon the receipt of the interest in the UK.[2328]

e.  As for the tax refund relating to the sale of CIL shares to Petronas in 2009, the Claimants submit that, although that refund has been withheld from the Claimants, it has not been garnished by India. As a consequence, it is continuing to earn

---

[2323]  C-PHB, ¶ 741.

[2324]  Cairn Energy, Half-Year Report Announcement dated 11 September 2018, Exh. C-591; Boulton ER2, ¶¶ 7.12-7.14.

[2325]  C-PHB, ¶ 742; Boulton ER2, ¶ 7.16.

[2326]  Id., ¶¶ 743-747.

[2327]  Quantum Experts' Joint Statement, Table 1-1, Issue 7.

[2328]  C-PHB, ¶ 749.

interest that is taxable in India. The Claimants claim interest recoverable on this tax on a net-of-tax basis.[2329]

1841. <u>Fifth</u>, the Claimants seek to be compensated for the UK corporate tax payable on the potential damages award that they would not have had to pay but for the Respondent's unlawful conduct. They explain that if the Respondent had not prevented them from selling the CUHL shares in 2014, CUHL would have entirely disposed of its stake in CIL by May 2014, and that sale would have been exempt from the UK capital gains tax under the UK Substantial Shareholding Exemption ("SSE"), applicable to shareholders holding more than 10% of equity.[2330] In turn, the Claimants assert that damages awards are taxable in the UK at the corporate tax rate, which is currently 19%. Thus, to ensure that the Claimants are fully compensated for their losses, the Claimants claim that the amount awarded be increased to an amount securing that, once corporate tax is deducted, the Claimants receive the net amount of the damages awarded. The Claimants propose the following formula for this purpose:

$$Gross\ amount\ awarded = \frac{net\ compensation\ Claimants\ will\ receive}{1 - prevailing\ UK\ corporate\ tax\ rate}$$

1842. Thus, assuming the prevailing UK corporate tax rate remains at the rate of 19% at the time of the Award, the Claimants assert that the net compensation be multiplied by 1.2345, to determine the gross amount that should be awarded.[2331]

1843. <u>Sixth and finally</u>, the Claimants request that the Tribunal order the Respondent to withdraw its outstanding unlawful tax demand. If the Tribunal is not so minded, however, the Claimants request additional compensation that would allow the outstanding amount due on the tax demand to be extinguished by way of offset, together with an amount equivalent to any tax incurred in respect of such compensation. With respect to this latter issue of tax, the Claimants explain that the amount of the tax demand is subject to appeal in India and may change based on the outcome of those appeals, and there is a significant uncertainty as to whether the UK tax authorities will agree not to tax the offset payment.[2332]

1844. The Claimants emphasise that this is a "critical issue" for them. Indeed, if the ITD were to be successful in the pending appeals in Indian courts and reinstates a tax demand of over US$ 7 billion, UK corporate tax at 19% on an award offsetting that amount would

---

[2329] *Id.*, ¶ 750.

[2330] *Id.*, ¶¶ 751-752; Schedule 7AC of the Taxation of Chargeable Gains Act, 1992, Exhibit DR-5, p. 1036; Boulton ER1, ¶ 4.24; Kristensen ER2, p. 47 n. 109.

[2331] C-PHB, ¶¶ 751-755.

[2332] *Id.*, ¶ 757 (The Claimants note that "[e]ven if the awarded amount is paid directly to the Tax Department, it would still *prima facie* be treated as income chargeable to tax in the UK at the same rate referred to above (19%), and no obvious exclusion applies. However, the UK tax authorities may agree not to tax it on the basis, for example, that in substance the Claimants are receiving no benefit but rather having a liability deemed to be contrary to international law cancelled. Unfortunately, the UK tax authorities will not provide any ruling or guidance on the taxability or otherwise of any such payment in advance of the award, and therefore an application can be made only after an award is issued.").

effectively negate the entire award of compensation for loss of the CIL shares. Therefore, the Claimants request that the Tribunal put in place a mechanism to ensure that funds will be available (exclusively) for the payment of tax, in the event that the UK tax authorities determine to tax the offset payment. The Claimants thus submit that it "needs to be clear that in such circumstances the Respondent would be responsible for any resulting tax payments in the UK."[2333]

1845. The Claimants propose several options to address this uncertainty. One option is to award, for this head of claim, "an amount equal to the tax demand outstanding as of the date of the award (subject to further liabilities arising if the tax demand is ever increased due to the tax department's appeals), as well as require the Respondent to provide a bank guarantee for the amount of the tax gross-up, or alternatively to pay that tax gross-up amount into escrow […]".[2334] They maintain, however, that it would be preferable if the Tribunal avoids the uncertainty and addresses the outstanding tax demand by declaring it contrary to international law and orders India to withdraw it, rather than through an offsetting payment.[2335]

## B.   The Respondent's position

1846. The Respondent opposes the Claimants' request for relief and their quantification of their alleged damages. While the Respondent accepts that, as a matter of principle, the applicable standard is that of full reparation,[2336] it submits that any alleged loss incurred by Cairn would in fact arise in discharge of CUHL's tax liability in India. The Respondent does not accept that the Tribunal has jurisdiction to determine, for instance, whether the tax demand is valid, whether interest and penalties are payable and/or whether Cairn is entitled to a refund of capital gains tax in respect of its share sales to Vedanta Resources Plc. The Respondent therefore avers that the Claimants have not suffered a loss in the "proper sense of the term".[2337]

1847. In addition to this general reservation, the Respondent also challenges the Claimants' quantification of the alleged loss on multiple counts.

1848. First, with respect to the Claimants' ability to regain control of their assets, the Respondent's position in the Statement of Defence was that, at that stage, CUHL had not been deprived of either the CIL dividends or its ability to sell the CIL shares.[2338] However, due to developments thereafter, including the ITAT's confirmation of the FAO and the enforcement of the FAO against the CIL shares and dividends, "the Respondent accepts that, at present, for the purposes of the Actual Scenario, the

---

[2333]   *Id.*, ¶ 758.

[2334]   *Id.*, ¶ 759.

[2335]   *Id.*, ¶ 760.

[2336]   R-SoD, ¶ 342; R-Rejoinder, ¶ 911.

[2337]   R-Rejoinder, ¶ 910.

[2338]   R-SoD, ¶¶ 346-349.

Claimants do not have possession or control of the CIL shares or dividends and the value of these assets is accordingly not deductible from the Claimants' alleged losses."[2339]

1849. That said, the Respondent nevertheless maintains that (i) the Claimants could have sold the CIL shares prior to 26 July 2017 (when they were attached), and (ii) CIL could have remitted the dividends to CUHL before receipt of the notice under Section 226(3) of the ITA dated 16 June 2017.[2340]

1850. Second, the Respondent contends that the Claimants could have mitigated their alleged losses by disposing of the CIL shares in early 2014, despite the Section 281B Order. In reliance on Mr Puri's witness statement, the Respondent contends that it was open to CUHL to dispose of its shares by furnishing an unconditional and irrevocable bank guarantee of the sum equivalent to the outstanding demand or value of the shares attached, whichever was less.[2341] According to India, Section 281 of the ITA has, since 1961, provided for a possibility of transfers of property with the prior permission of the Assessing Officer during the pendency of tax proceedings. Circular No. 1914 of 1993 and Circular No. 4 of 2011 in turn specify that the Assessing Officer may require the assessee to present a suitable security (e.g., a bank guarantee) to obtain the permission.[2342] The Respondent contends that Mr Smith of Cairn accepted at the Evidentiary Hearing that the Section 281B Order dated 22 January 2014,[2343] which attached the CIL shares, expressly acknowledged the possibility that CUHL could seek the "prior sanction" of the Assessing Officer.[2344]

1851. In reliance on Mr Kristensen's expert evidence, the Respondent argues that the cost of obtaining a bank guarantee, depending on the cash/loan ratio funding for the escrow account, and considering the hedging cost and arrangement fees, would be between US$ 41.5 million and US$ 47.2 million.[2345] On the assumption that CUHL would have managed to obtain permission to sell the shares and would have in fact sold them between April and July 2014, Mr Kristensen estimates that the Claimants would have achieved net proceeds of US$ 1,042.6 million.[2346] This is some US$ 59.4 million higher than the net proceeds that the Claimants would have achieved in the But For Scenario if the CIL shares had been sold between January and May 2014.[2347] This improvement of net proceeds outweighs the costs of obtaining the security, with the consequence that the Claimants would have suffered no loss in the mitigation scenario. For this reason, the Respondent maintains that the Claimants' damages in respect of the CIL shares

---

[2339] R-Rejoinder, ¶ 920.

[2340] *Id.*, ¶ 921; Warrant of Attachment of Movable Property dated 26 July 2017, Exh. C-383; Notice of Demand under Section 226(3) of the ITA 1961 dated 16 June 2017, Exh. C-326; Letter from VIL to CUHL re Notice under Section 226(3) of the ITA 1961 dated 17 June 2017, Exh. C-328.

[2341] Puri WS1, ¶ 101; R-Rejoinder, ¶ 934.

[2342] CBDT Guidelines for Stay of Demand, Exh. Puri-26; CBDT Circular No 4 of 2011, Exh. Puri-27.

[2343] Order under Section 281B of the ITA 1961 dated 22 January 2014, Exh. C-11.

[2344] Transcript, Evidentiary Hearing, Day 7, 110:25-112:12.

[2345] Kristensen ER2, ¶¶ 4.23-4.25.

[2346] *Id.*, ¶ 4.29.

[2347] *Id.*, ¶ 4.30 and Table 4.5.

should be capped at between US\$ 7.6 million to US\$ 13.3 million (exclusive of pre-award interest).[2348]

1852. <u>Third</u>, the Respondent challenges the Claimants' calculation of the market impact costs (slippage costs) in the But For Scenario. Mr Kristensen calculates the slippage costs based on the Indian stock exchange data of the actual sales of CIL shares during January 2014. He adopts the higher range of these data (0.20%) in order to account for the fact that, in the But For Scenario, the average daily trading volume of the CIL shares would have been larger than it was recorded in January 2014.[2349] In addition, Mr Kristensen estimates that, upon the termination of the CIL Buy-Back Programme, the slippage costs would increase. As a result, Mr Kristensen estimates the gross proceeds for the sale of CIL shares in the But For Scenario to be US\$ 996.3 million, compared with Mr Boulton's estimate of US\$ 997.3 million.[2350]

1853. <u>Fourth</u>, the Respondent disagrees with the Claimants' claim for pre-award interest. By reference to Mr Kristensen's expert opinion, the Respondent maintains that the appropriate rate for pre-award interest is a risk-free rate, corresponding to yields on 1 month US Treasury Bills. According to the Respondent, such rate reflects and compensates the time value of money but does not reflect any compensation for risk that the Claimants have not borne since the alleged dispossession of their assets by India.[2351] As Mr Kristensen explains, "the Claimants were not exposed to any risk associated with investing the net proceeds from the sale of the CIL Shares from 23 January 2014 since they did not receive these sales proceeds in 2014."[2352] In his view, Mr Boulton does not rely on any factual evidence to support his position that the Claimants bore risks above the risk-free rate.

1854. As to the Claimants' suggestion to use the Respondent's own cost of borrowing as a proxy for the pre-award interest rate, Mr Kristensen points out that the Respondent did not invest the CIL Shares in its own activities. He adds that if the Tribunal were to find that the Respondent is solvent at the time of the award and that the Respondent did not owe a debt to the Claimants before the date of award, the Claimants should not be entitled to a premium for past default risk that it did not bear.[2353] For these reasons, India maintains that its cost of borrowing is not an appropriate measure of compensation for the time value of a sum that the Tribunal may award to the Claimants.

1855. The Respondent further submits that interest should be simple, since there is no consistent practice of investment treaty tribunals to support an award of compound interest.[2354]

---

[2348]   R-Rejoinder, ¶¶ 939-943.

[2349]   *Id.*, ¶ 926.

[2350]   Kristensen ER2, Table 2.1.

[2351]   R-Rejoinder, ¶ 931; Kristensen ER2, ¶¶ 2.26-2.35.

[2352]   Quantum Experts' Joint Statement, Table 1-1, Issue 5.

[2353]   *Ibid.*

[2354]   R-SoD, ¶ 343; R-PHB, ¶ 576.

1856. <u>Fifth</u>, the Respondent opposes what it calls the Claimants' additional claim in respect of alleged damages reflecting the principal tax demand together with interest and penalties that have accrued or may accrue on it. According to the Respondent:

    a.   This part of the claim was completely misconceived and/or premature since, if the tax demand is not withdrawn, an issue will arise as to whether CIL (now Vedanta) or CUHL will bear the loss as a matter of fact and law;

    b.   The value of the CIL shares and dividends should be deducted from this claim; and

    c.   In any event, even if the Claimants were entitled to claim damages for any sums, to which the Respondent may be liable in respect of the tax demand, such damages would be limited to the Claimants' actual exposure in India, namely (i) the value of the CIL shares which have been attached; (ii) the value of the accrued CIL dividends; and (iii) the CGT Refund.[2355]

1857. <u>Sixth and finally</u>, the Respondent contends that the Claimants' claim related to the tax gross up for the UK corporate tax is "not properly before" the Tribunal, since the Claimants had not pleaded it before their PHB and India did not "have an opportunity to respond".[2356] For this reason, the Respondent did not address the issue of tax gross up at the hearing on closing arguments.[2357]

## C.   The Tribunal's analysis

1858. The Tribunal will first lay out the applicable legal principles (Section 1). It will then address the Respondent's general objection against the Claimants' request for relief (Section 2). The Tribunal will then assess each of the Claimants' heads of claim other than declaratory relief (Section 3).

### 1.   Applicable legal principles

1859. As the Respondent has put it, "there is little difference between the parties as to the principles of international law governing compensation."[2358] The Parties agree that the standard of compensation for violations of international law is the customary international law principle of full reparation,[2359] which was articulated by the PCIJ in the *Factory at Chorzów* case as follows:

> The essential principle contained in the actual notion of an illegal act – a principle which seems to be established by international practice and in particular by the decisions of arbitral tribunals – is that reparation must, as far as possible, wipe out all the consequences of the illegal act and reestablish the situation which would, in all probability, have existed if that

---

[2355] R-Rejoinder, ¶¶ 944-946.

[2356] Transcript, Hearing on Closing Arguments, Day 1, 5:1-11.

[2357] *Id.*, 5:5 ("We don't want to lose time on it now.").

[2358] R-Rejoinder, ¶ 911.

[2359] C-SoC, ¶¶ 395-401; C-PHB, ¶¶ 718-719; R-SoD, ¶ 342; R-Rejoinder, ¶ 911.

> act had not been committed. Restitution in kind, or, if this is not possible, payment of a sum corresponding to the value which a restitution in kind would bear; the award, if need be, of damages for loss sustained which would not be covered by restitution in kind or payment in place of it – such are the principles which would serve to determine the amount of compensation due for an act contrary to international law.[2360]

1860. The Parties disagree however on the characterisation of certain heads of claim as compensable losses, as well as in their quantification.

1861. The Tribunal has found that, by enacting the 2012 Amendment and applying it to the Claimants retroactively through the FAO and related enforcement measures, the Respondent acted contrary to its obligation under Article 3(2) of the BIT to accord to the Claimants' investments FET. The Tribunal must now award relief that will "wipe out" the consequences of India's breach of the BIT and place the Claimants in the position they would have been had that breach not been committed. In other words, the Tribunal must award relief to the Claimants that will place them in a position as if the 2012 Amendment, the FAO and the Respondent's related enforcement measures had never been applied to them. This involves comparing what happened in reality (the "Actual Scenario") with "the situation which would, in all probability, have existed if that act had not been committed"[2361] (the "But For Scenario"). The difference between both will be the measure of the Claimants' damages.

1862. In determining the relief that will re-establish the Claimants to the But For Scenario, the Tribunal is mindful that the Respondent is only under an obligation to repair "the injury *caused* by the internationally wrongful act", which includes "any damage, whether material or moral, caused by the internationally wrongful act".[2362] As the Commentary to the ILC Articles on State Responsibility explains, it is only "the injury resulting from and ascribable to the wrongful act, rather than any and all consequences flowing from an internationally wrongful act"[2363] which must be repaired.

1863. The Tribunal will keep these principles in mind when assessing the Claimants' heads of claim.

### 2.   The Respondent's general objection

1864. Before addressing the specific points of divergence between the Parties and their experts, the Tribunal will examine the general objection that the Respondent formulated in the quantum section of its Rejoinder in the following terms:

---

[2360] *Case Concerning the Factory at Chorzów*, PCIJ Ser. A, No. 17, CLA-18, p. 47.

[2361] *Ibid*.

[2362] International Law Commission, Draft Articles on Responsibility of States for Internationally Wrongful Acts, with commentaries (2001), Text adopted by the International Law Commission at its fifty-third session, in 2001, and submitted to the General Assembly as a part of the Commission's report covering the work of that session (A/56/10). Yearbook of the International Law Commission, 2001, vol. II, Part Two, ("ILC Articles on State Responsibility"), Article 31 (emphasis added).

[2363] *Id.*, Commentary to Article 31, ¶ 9.

> At the outset, it is noted that any alleged "loss" to the Claimants on either of its formulations, would in fact arise in discharge of CUHL's tax liability in India. The Respondent does not accept that the Tribunal has jurisdiction to determine, for instance, whether the tax demand is valid, whether interest and penalties are payable and/or whether Cairn is entitled to a refund of capital gains tax in respect of its "off the market" share sales to Vedanta Resources plc ("the CGT Refund"). The Respondent therefore avers that the Claimants have not suffered a "loss" in the proper sense of the term.[2364]

1865.   The Tribunal is not persuaded that it faces a jurisdictional obstacle to determine the reparation due to the Claimants. As set out elsewhere in this Award, the Tribunal has repeatedly observed that it is neither an Indian tax authority nor is it an Indian court; and it has taken note of the domestic proceedings currently before the Delhi High Court. Accordingly the Tribunal has examined Indian law only to the extent necessary to determine whether the Respondent's defences to the alleged breaches of the Treaty could be made out. The Tribunal's determinations are thus confined to holding that the Respondent's imposition and enforcement of the retroactive tax demand under the 2012 Amendment and the FAO was contrary to the BIT.

1866.   As the Tribunal has found that India has breached the BIT, India bears international responsibility and the ensuing duty of reparation. As discussed above, it is common ground[2365] that this entails the obligation to re-establish the Claimants to "the situation which would, in all probability, have existed if [the wrongful act] had not been committed."[2366]

1867.   In this context, any pronouncements that the Tribunal may make on the likelihood of the Claimants' receiving certain proceeds but for India's internationally wrongful act constitute determinations of fact falling under the Tribunal's discretion in assessing the loss. When exercising this discretion, the Tribunal does not encroach on the mandate of municipal organs by determining whether sums were due and payable under the applicable municipal law. Instead, the Tribunal examines whether the Claimants have established with sufficient evidence that, but for the imposition and enforcement of its internationally unlawful tax demand under the FAO and the 2012 Amendment, they would have received certain funds, or would not have been deprived of others.

1868.   The Tribunal thus dismisses the Respondent's general objection and will now proceed to establishing the reparation due to the Claimants.

### 3.   The Claimants' requests for relief

1869.   The Tribunal will address the Claimants' requests for relief in the order that appears most logical to it.

---

[2364]   R-Rejoinder, ¶ 910.

[2365]   SoD, ¶ 342; R-Rejoinder, ¶ 911; C-Updated Reply, ¶ 675.

[2366]   *Case Concerning the Factory at Chorzów*, PCIJ Ser. A, No. 17, CLA-18, p. 47.

### a.   Withdrawal of the tax demand

1870.  The Claimants request the Tribunal to order the Respondent to withdraw its unlawful tax demand for the 2006 Transactions under the FAO.[2367] The relevant part of the request for relief reads as follows:

> [T]he Claimants respectfully request that the Arbitral Tribunal […]
>
> 6. **DECLARE** that the tax demand against the Claimants in respect of AY 2007-08, as set forth in the FAO (the "**Demand**"), is inconsistent with the Treaty and the Claimants are relieved from any obligation to pay it, and **ORDER** the Respondent to neutralise the continuing effect of the Demand, either by:
>
> a) permanently withdrawing the Demand, and refraining from seeking to recover further the alleged tax liability or any interest and/or penalties arising from this alleged liability through any other means; or (at the Respondent's option[2368]),
>
> b) paying an amount equal to the amount due on the Demand outstanding as of the date of the award, and any amounts that may subsequently become due thereon (whether for interest, penalties, or otherwise), by way of offset against the Demand, such that the monetary award in the Claimants' favour has the effect of fully satisfying and extinguishing the Demand, leaving no amount due from the Claimants, and further complying with the terms of Paragraph 7 below;[2369]

1871.  The Respondent does not specifically challenge the Tribunal's authority to order the withdrawal of the tax demand as set out in paragraph 6(a) of the Claimants' request for relief. It opposes the Claimants' alternative request for relief in paragraph 6(b) for the set off payment of the amount due on the tax demand outstanding as of the date of the Award, and any amounts that may subsequently become due.[2370]

1872.  As set out above, the Tribunal has concluded that, by imposing and enforcing the tax demand as set out in the FAO against CUHL, India violated the BIT. As a result, the Respondent is under a duty to make reparation for its internationally wrongful act. The Tribunal is satisfied that its jurisdiction to resolve the present dispute includes the power to order the Respondent, as a measure of restitution, to withdraw its internationally unlawful tax demand. Article 34 of the ILC Articles on State Responsibility provides that "full reparation […] shall take the form of restitution, compensation and

---

[2367]  C-Updated Reply, ¶ 709(e).

[2368]  Claimants' Updated Request for Relief, p. 4 n. 4 ("The Claimants are content to allow the Respondent to choose the manner in which the Demand is neutralised (i.e. either through withdrawing it or through an offset), so long as provision is made to ensure that an offset, if chosen, does not leave the Claimants shouldering a burdensome tax liability in the UK. Accordingly, the latter option (b) is made contingent on compliance with the terms of Paragraph 7.") ("C-Updated Request for Relief").

[2369]  *Id.*, ¶ 6 (C-Updated Request for Relief, ¶ 7 concerns the issue of tax gross up, which is dealt with in a separate subsection below.).

[2370]  Other than the preliminary objections (E.g., non-arbitrability) that have been disposed of above.

satisfaction, either singly or in combination […]".[2371] The Commentary explains that "[w]iping out all the consequences of the wrongful act may thus require some or all forms of reparation to be provided, depending on the type and extent of the injury that has been caused."[2372] Indeed, in the *Factory at Chorzów* case the PCIJ favoured restitution as the preferred form of reparation, with compensation to be granted only if restitution was not possible.[2373]

1873. The Tribunal finds further support in multiple decisions of investment tribunals that it is within a treaty tribunal's power to award restitution as a modality of reparation.[2374] The present BIT contains no provision that would derogate from this general rule, providing that "[t]he decision of the arbitral tribunal shall be final and binding and the parties shall abide by and comply with the terms of its award", without specifying or restricting the form that such award may take. [2375]

1874. Some tribunals have refrained from awarding restitution when they have found that it would be materially impossible or disproportionately burdensome for the respondent State compared to other modalities of reparation.[2376] In the present case, the Tribunal sees no obvious impediment that would prevent the Respondent from withdrawing its internationally unlawful tax demand under the FAO.

1875. In turn, granting the Claimants' alternative request for the payment of "an amount equal to the amount due on the Demand outstanding as of the date of the award, and any amounts that may subsequently become due thereon"[2377] may raise multiple difficulties in respect of legal certainty and possible double recovery. Indeed, after the Tribunal has handed down its Award, it will become *functus officio*, with the consequence that the Parties can no longer address to it any disagreements that might arise as to the future amounts that may become due if India chooses not to withdraw its tax demand.

1876. Moreover, the request for the Respondent to pay, by way of offset, any amounts that may become subsequently due would be premature and insufficiently substantiated until and unless such amounts actually become due. Therefore, the Tribunal finds it more

---

[2371] ILC Articles on State Responsibility, Article 34.

[2372] *Id.*, Commentary to Article 34, ¶ 2.

[2373] *Case Concerning the Factory at Chorzów*, PCIJ Ser. A, No. 17, CLA-18, p. 47 ("Restitution in kind, or, if this is not possible, payment of a sum corresponding to the value which a restitution in kind would bear; the award, if need be, of damages for loss sustained which would not be covered by restitution in kind or payment in place of it—such are the principles which should serve to determine the amount of compensation due for an act contrary to international law.") (emphasis added).

[2374] *Bernhard von Pezold and others v. Republic of Zimbabwe*, ICSID Case No. ARB/10/15, Award, 28 July 2015, ¶¶ 693-717; *Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain*, ICSID Case No. ARB/14/1, Award, 16 May 2018, ¶¶ 558-559, 562-563; *CMS Gas Transmission Company v. Republic of Argentina*, ICSID Case No. ARB/01/8, Award, 12 May 2005, ¶ 400; *LG&E Energy Corp., LG&E Capital Corp. and LG&E International Inc. v. Argentine Republic*, ICSID Case No. ARB/02/1, Award, 25 July 2007, ¶ 31.

[2375] UK-India BIT, CLA-1, Article 9(3)(c)(v).

[2376] *Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain*, ICSID Case No. ARB/14/1, Award, 16 May 2018, ¶¶ 558-559, 562-563; *Infrastructure Services Luxembourg S.à.r.l. and Energia Termosolar B.V. (formerly Antin Infrastructure Services Luxembourg S.à.r.l. and Antin Energia Termosolar B.V.) v. Kingdom of Spain*, ICSID Case No. ARB/13/31, Award, 15 June 2018, ¶ 636.

[2377] C-Updated Request for Relief, ¶ 6(b).

appropriate to discharge its mandate to resolve the present dispute finally and definitively by opting for the Claimants' request for relief at para. 6(a), and not providing the choice between restitution and the alternative set-off payment as set out in the Claimants' request for relief at para. 6(b).

1877. For these reasons, the Tribunal grants the request in 6(a) of the Claimants' Request for Relief, and declares that the tax demand against the Claimants in respect of AY 2007-08, as set forth in the FAO (the "Demand") is inconsistent with the BIT and the Claimants are relieved from any obligation to pay it. In addition, the Tribunal orders the Respondent to withdraw the Demand permanently and refrain from seeking to recover the alleged tax liability or any interest and/or penalties arising from the Demand. Having opted for the remedy of restitution, the Claimants' request for relief no. 7 concerning the tax gross up for any future offsetting of the tax liability is rendered moot.

1878. The Tribunal notes that the withdrawal of the tax demand by the Respondent will not suffice to provide full reparation for the Claimants' loss. In addition, the Claimants have suffered monetary loss due to the Respondent's enforcement of its internationally unlawful tax demand against the Claimants' various assets in India. In the sections that follow, the Tribunal determines the compensation for that loss.

### b.   Proceeds from the sale of CIL shares

1879. The Claimants claim compensation for the value of the CIL shares that India seized and sold in enforcement of its tax demand under the FAO. They assert that, but for the Respondent's unlawful conduct, CUHL would have disposed of the CIL shares in early 2014 (in CIL's Buy-Back Programme).[2378]

1880. At the outset, the Respondent objects to the Claimants' characterisation of this head of claim as a compensable loss. The Respondent contends that the Claimants could have regained control of their shares (Section (i)). It argues that, had they taken certain mitigation measures, the Claimants could have proceeded with the sale of CIL shares (Section (ii)). The Tribunal will address the Respondent's defences before addressing the Claimants' claim (Section (iii)).

### (i)   Did the Claimants have the possibility to regain possession or control of their assets?

1881. In its initial written submissions, the Respondent contended that any compensation awarded to the Claimants would need to take into account the possibility that the Claimants could regain control of their remaining assets in India. The Respondent's expert calculated that, if CUHL were to regain control of its shares in CIL/VIL and were to sell them on 31 March 2018, it could achieve net proceeds ranging from US$ 801.8 million to US$ 806.7 million.[2379] The Tribunal understands that the Respondent's argument is that the Claimants' damages should be reduced in this amount.

---

[2378] *Id.*, ¶ 3(a).

[2379] Kristensen ER2, Section 3.

1882. However, due to developments thereafter, including the ITAT's confirmation of the FAO and the enforcement of the FAO against the CIL shares and dividends, "the Respondent accepts that, at present, for the purposes of the Actual Scenario, the Claimants do not have possession or control of the CIL shares or dividends and the value of these assets is accordingly not deductible from the Claimants' alleged losses."[2380]

1883. Despite this, the Respondent nevertheless maintains that (i) the Claimants could have sold the CIL shares prior to 26 July 2017 (when they were attached),[2381] and (ii) CIL could have remitted the dividends to CUHL before receipt of the notice under Section 226(3) of the ITA dated 16 June 2017.[2382]

1884. The Tribunal recalls that, following the merger between CIL and VIL (which became effective on 11 April 2017),[2383] the latter's ordinary shares replaced CIL shares on a 1:1 ratio. Thus, CUHL 184,125,764 shares in CIL were exchanged for 184,125,764 in VIL.[2384] CUHL also became entitled to 736,503,056 preference shares in VIL.[2385] Thereafter, the Respondent started selling CUHL's shares in VIL, and as of November 2018, the Respondent had sold approximately 99% of those shares.[2386] In addition, on 22 October 2018, VIL redeemed the preference shares and paid the proceeds directly to the Respondent.[2387] In these circumstances, the Tribunal considers that the possibility of the Claimants' regaining the control of their assets in India to be too remote and speculative to be considered for the quantification of damages.

1885. As for the Respondent's arguments concerning the possibility of the Claimants selling the CIL shares prior to 26 July 2017 and the possibility of receiving dividends from CIL prior to 16 June 2017, they pertain to mitigation. The Tribunal will thus address them below.

### (ii)   Mitigation

1886. The Respondent contends that the Claimants should have mitigated the alleged loss that ensued from the enforcement of the tax demand against the CIL shares. In particular, the Respondent argues that (i) had CUHL provided an alternative security to the tax authorities, such as a bank guarantee, it would have been able to obtain an authorisation to sell its shares in CIL despite the Section 281B Order[2388] (the "Share Sale Mitigation

---

[2380] R-Rejoinder, ¶ 920.

[2381] Warrant of Attachment of Movable Property dated 26 July 2017, Exh. C-383.

[2382] Notice of Demand under Section 226(3) of ITA 1961 dated 16 June 2017, Exh. C-326; Letter from VIL to CUHL re Notice under Section 226(3) of the 1961 dated 17 June 2017, Exh. C-328.

[2383] CCom-96, p. 1 n. 1.

[2384] Boulton ER1, ¶ 1.4; Boulton ER3, ¶ 2.13; Kristensen ER2, ¶ 3.8.

[2385] Boulton ER3, ¶ 2.13; Kristensen ER2, ¶ 3.8.

[2386] Respondent's email of 27 November 2018 (RCom-317).

[2387] Letter from the Tax Recovery Officer to VIL dated 12 October 2018, Exh. C-658.

[2388] The Tribunal understands that the Respondent's argument is that the Claimants could have sold these shares at least prior to their final attachment on 26 July 2017. See R-Rejoinder, ¶ 921, referring to Warrant of Attachment of Movable Property dated 26 July 2017, Exh. C-383.

Scenario") and (ii) CIL could have remitted the dividends to CUHL before receipt of the notice under Section 226(3) of the ITA dated 16 June 2017[2389] (the "Dividend Mitigation Scenario").

1887. As an initial matter, the Tribunal notes that, while the Claimants bear the burden of proving their loss, it is for the Respondent to prove the assertions or defences that it pleads, such as its mitigation defence.[2390] To discharge that burden, the Respondent must show that the Claimants could reasonably have avoided the loss. To borrow the words of the tribunal in *Clayton v. Canada*:

> The duty to mitigate applies if: (i) a claimant is unreasonably inactive following a breach of treaty; or (ii) a claimant engages in unreasonable conduct following a breach of treaty.[2391]

1888. A mitigation defence is difficult to prove, given that it is in a claimant's own best interest to minimise its loss. As a rule, it will require sufficient evidence to show that a claimant's conduct (action or inaction) following the Respondent's breach was unreasonable, abusive or against its own economic interests.[2392] For this reason, tribunals are seldom persuaded by speculative options of mitigation that are proposed in hindsight. The reasoning of the tribunal in *Magyar Farming v. Hungary* illustrates this point:

> [M]itigating the loss was primarily in the Claimants' interest. Absent compelling evidence to the contrary, the Tribunal is not prepared to speculate whether the Claimants should have exercised a better business judgment […].[2393]

1889. Having studied the Parties' positions and the evidence in the record, the Tribunal considers that India has not demonstrated that the Claimants have failed to mitigate their loss, or that there was a breach of their duty to do so.

1890. With respect to the Share Sale Mitigation Scenario, the Respondent has not established that the Claimants could have reasonably sold their shares in CIL/VIL after those shares were provisionally attached by the Section 281B Order on 22 January 2014, nor that any such sale would have mitigated their losses.

1891. The Tribunal recalls that the Section 281B Order provisionally froze CUHL's remaining equity shares in CIL, as well as any dividends payable by CIL to CUHL.[2394] The

---

[2389] Notice of Demand under Section 226(3) of the ITA 1961 dated 16 June 2017, Exh. C-326; Letter from VIL to CUHL re Notice under Section 226(3) of the ITA 1961 dated 17 June 2017, Exh. C-328.

[2390] *AIG Capital Partners, Inc. and CJSC Tema Real Estate Company v. Republic of Kazakhstan*, ICSID Case No. ARB/01/6, Award, 7 October 2003, ¶ 10.6.4.4.

[2391] *William Ralph Clayton and others v. Government of Canada*, PCA Case No. 2009-04, Award on Damages, 10 January 2019, ¶ 204.

[2392] *Magyar Farming Company Ltd, Kintyre Kft and Inicia Zrt v. Hungary*, ICSID Case No. ARB/17/27, Award, 13 November 2019, ¶ 427.

[2393] *Ibid.*

[2394] Section 281B Order of 22 January 2014, Exh. C-11.

Respondent's mitigation scenario assumes, first, that the Claimants would have been able to obtain a costly alternative security, and second, that the Indian tax authorities would have exercised their discretion and released the CIL shares. The Claimants' witness, Mr James Smith, testified that the only way in which the Claimants could have obtained such security, i.e., a bank guarantee was by providing a cash collateral equal to the full amount of the guarantee,[2395] and that the Claimants had neither the cash nor the operating assets to do so.[2396] While the Respondent and its expert have disputed this statement, arguing that a full cash guarantee might not have been necessary,[2397] the cost of obtaining such a collateral would have been significant.[2398]

1892. Had the Claimants managed to obtain this collateral, this did not guarantee the release of the shares, which still depended on the ITD's discretion. The record shows that the mechanism under Section 281B of the ITA to lift a provisional attachment through a bank guarantee was created through an amendment that did not come into effect until June 2016.[2399] The 1993 and 2011 circulars cited by Mr Puri apply to a post-demand scenario, not to a provisional attachment.[2400] While it is possible that the ITD could have applied a similar rationale to the Claimants, this would have still depended on the ITD's discretion.

1893. Third, the Respondent's mitigation scenario relies on inadmissible hindsight. The Respondent's mitigation scenario assumes that the Claimants would have sold the CIL shares between April and July 2014, instead of between January and May 2014 (as the Claimants' But For Scenario assumes). According to the Respondent, this would have generated proceeds some US$ 59.4 million higher than the net proceeds that the Claimants would have achieved in the But For Scenario.[2401] The price dynamics of the CIL shares are shown on this chart:[2402]

---

[2395] Smith WS2 ¶¶ 13, 24; Transcript, Evidentiary Hearing, Day 7, 109:1-11, 121:9-24 (Mr Smith); Email from James Smith to Rahul Saraf (Citibank) dated 18 September 2016, Exh. CWS-Smith-1, pp. 1-2.

[2396] Smith WS2, ¶ 13.

[2397] R-Rejoinder, ¶ 939(a); Kristensen ER2, Section 4.

[2398] Mr Kristensen estimates that arrangement fees would have ranged from US$ 2.3 million (on the basis of a 25% escrow provision), to US$ 0 (on the basis of a 100% escrow provision); see Kristensen ER2, Table 4.1. However, all of these fees would have required 25% to 100% of the notional value of the shares to have been deposited in escrow, which would have significantly increased the cash required to obtain the collateral.

[2399] Smith WS2, ¶¶ 10-11; Boulton ER3, p. 16 n.56; Income Tax Simplification Committee, Report dated 15 January 2016 [excerpt], Exh. C-553; the ITA 1961, Exh. C-569, s. 281B.

[2400] CBDT Guidelines for Stay of Demand, Exh. Puri-26; CBDT Circular No. 4 of 2011, ¶ 3(iii) dated 19 July 2011, Exh. Puri-27 (allowing the use of a bank guarantee "[i]f there is a disputed demand outstanding")

[2401] R-Rejoinder, ¶¶ 939-943.

[2402] Quantum Experts' Joint Statement, Table 1-1, issue 3.



1894. However, the reasonableness of the Claimants' conduct must be assessed by the information and data that was available to them when they allegedly failed to mitigate their loss. In early 2014 (i.e., when the Respondent alleges that the Claimants should have obtained an alternative security), the Claimants could not have known how the CIL shares price would have evolved. It would be a misinterpretation of the duty of mitigation if the Tribunal were to find that the Claimants were obliged to pursue the costly and burdensome process of obtaining an alternative security, when this effort may well have turned out to be entirely futile, or – for all the Claimants knew at the time – could have even exacerbated the loss, for which they would possibly have ended up without any remedy.

1895. Finally, even if the Tribunal were to assume that: (i) the Claimants would (and should) have provided a costly alternative security, (ii) the Indian tax authorities would have exercised their discretion by swiftly releasing the CIL shares, and (iii) the Claimants would have sold the shares when the prices were at their highest, the Tribunal nevertheless fails to see how this would have resulted in the mitigation of the overall loss. It appears obvious that, in that scenario, the Respondent would have enforced its subsequent tax demand precisely against the security that the Claimants would have furnished in exchange of the CIL shares.

1896. As to the Respondent's Dividend Mitigation Scenario, the Tribunal understands the Respondent's position to be that, between 1 April 2016 (upon the expiration of the Section 281B Notice)[2403] and 16 June 2017 (date of the Section 226(3) notice to VIL

---

[2403]   Letter from the Office of the Assistant Commissioner of Income Tax, Circle 1(2)(1), International Taxation, New Delhi, of 30 December 2016, to the Commissioner of Income Tax, International Taxation-1, New Delhi, attached to RCom-60.

requiring VIL to pay to the ITD any amount due from VIL to CUHL),[2404] CIL/VIL was free to remit the dividends to CUHL. As discussed in Section III above, the Respondent has asserted in this arbitration that, between these dates, no attachment was in force, and release the dividends to CUHL was an internal matter between CUHL and CIL/VIL.[2405] The record shows that the Claimants made significant efforts to obtain this release (including by requesting and obtaining an order from this Tribunal allowing the Claimants to share with CIL/VIL certain statements made by the Respondent in this arbitration)[2406] but CIL/VIL refused to release the dividends for reasons that are disputed and irrelevant here. In the circumstances, the Tribunal finds that the Claimants reasonably attempted to mitigate their losses, and should not be blamed for the failure of these efforts.

1897. For all these reasons, the Tribunal rejects the Respondent's mitigation defences. The Tribunal will thus not reduce the compensation for the Claimants' alleged loss on that account.

### (iii)   Valuation of the CIL shares

1898. The Claimants claim compensation for the value of the CIL shares that India seized and sold in enforcement of its unlawful tax demand under the FAO. They assert that, but for the Respondent's unlawful conduct, CUHL would have disposed of the CIL shares in early 2014 and recovered the proceeds. They thus claim compensation equivalent to "the net proceeds that would have been earned from the planned 2014 sale of CIL shares".[2407]

1899. It is undisputed that, in the Actual Scenario, CUHL lost control of its shares in CIL as a result of the Respondent's fiscal measures, and that by November 2018 the Respondent has sold 99% of those shares. The Tribunal has also found that the Claimants could not reasonably have regained control of those shares, nor could they reasonably have obtained their release and sold them to mitigate their damages.

1900. As to the But For Scenario, the Tribunal finds that the Claimants have established that, had the Respondent not attached those shares in January 2014 and commenced the tax assessment proceedings that culminated in the FAO and the enforcement measures, the Claimants would have sold those shares back to CIL or to other buyers starting in January 2014. CEP's board meeting minutes and other internal company documents confirm that Cairn intended to sell approximately 6 to 6.5% of CIL's share capital in

---

[2404]   Notice of Demand under Section 226(3) of the ITA 1961 dated 16 June 2017, Exh. C-326; Letter from VIL to CUHL re Notice under Section 226(3) of the ITA 1961 dated 17 June 2017, Exh. C-328.

[2405]   See Section III. See also PO7, and Letter from the Office of the Assistant Commissioner of Income Tax, Circle 1(2)(1), International Taxation, New Delhi, of 30 December 2016, to the Commissioner of Income Tax, International Taxation-1, New Delhi, attached to RCom-60 (stating that "the provisional attachment order u/s 281B on dividend expired on 31 March 2016 and as on date there is no attachment in force. The decision to release the dividend to CUHL is an internal matter between two companies and the same may be dealt accordingly.")

[2406]   See PO7.

[2407]   C-Updated Request for Relief, ¶ 3(a).

CIL's Buy-Back Programme,[2408] and to dispose of the remainder of its shares thereafter.[2409] While CIL's Buy-Back Programme was scheduled to start on 23 January 2014,[2410] CUHL started the sale process on 15 January 2014, and by 22 January 2014 it had sold approximately 12.04 million shares.[2411] By 22 January 2014, date of the Section 281B Notice, CUHL held 184.13 million shares in CIL (approximately 9.6% of CIL's total shareholding).[2412] The Section 281B Notice, which provisionally froze CUHL's shares in CIL and related dividends,[2413] was what prevented CUHL from continuing with the planned sale of its shares.

1901. The Tribunal thus agrees with the Claimants that the measure of their damages with respect to CUHL's shares in CIL corresponds to the net proceeds that CUHL would have obtained by selling CIL's shares starting in January 2014. Indeed, this appears to be common ground among the experts: assuming that CUHL does not regain control of CIL's shares, both experts calculate the Claimants' losses on the basis of the net proceeds that CUHL would have received but for the sale of those shares if they had started to sell them from 23 January 2014 onwards.[2414]

1902. Mr Boulton estimates the net proceeds from the sale of the CIL shares at US\$ 984.2 million, while Mr Kristensen calculates them at US\$ 983.2 million.[2415] The difference between the calculations of the two experts is due to market impact costs (or slippage costs). It is common ground that, when calculating the net proceeds that the Claimants would have generated by selling the CIL shares in 2014, a certain discount should be applied to account for the market impact of offering significant quantities of shares for

---

[2408] Cairn Board Meeting Minutes, 19 November 2013, Exh. RB-10, p. 1; Paper for Cairn Board, 19 November 2013, Exh. RB-11, p. 3; Cairn Board Meeting Minutes, 4 December 2013, Exh. RB-12, p. 2; Paper for Treasury Sub-Committee, 22 January 2014, Exh. RB-23, p. 2; Email from J. Smith to J. Brown, 10 January 2014, Exh. RB-24; Email chain regarding progress of CIL share sale, 15 January 2014, Exhibit RB-18, pp. 1, 5. At the time, CUHL held approximately 10.3% of CIL's share capital, but under the terms of the Buy-Back Programme it would have been unable to sell the entirety of its shareholding back to CIL; *see* Boulton ER1, ¶ 3.14.

[2409] Cairn Board Meeting Minutes, 4 December 2013, Exh. RB-12, p. 2.

[2410] CIL, Public Announcement, 14 January 2014, Exh. RB-13, ¶ 2.3.

[2411] Boulton ER1, ¶ 3.15, citing Citi LOE, 15 January 2014, Exh. RB-16; Citi Contract Notes, 16 January 2014 to 22 January 2014, Exh. RB-2; Citi LOE, 21 January 2014, Exh. RB-17; Citi Contract Notes, 16 to 22 January 2014, Exh. RB-2; Email chain regarding progress of CIL share sale, 15 January 2014, Exh. RB-18, p. 23.

[2412] Boulton ER1, ¶ 3.16.

[2413] Order under Section 281B of the ITA 1961 dated 22 January 2014, Exh. C-11.

[2414] Quantum Experts' Joint Statement, Table 2-1; Boulton ER1, ¶¶ 4.23-4.24; Kristensen ER2, ¶ 1.12. These calculations assume that the Claimants would have sold the shares between January and May 2014. Kristensen ER2, ¶ 2.36, Table 2.3; Adjusted Appendix 8 – 1 (RB2), Exh. Kristensen-18. The Tribunal notes that Mr Kristensen has also calculated a mitigation scenario in which the shares were sold between April and July 2014 (Kristensen ER2, ¶¶ 4.27-4.32, Tables 4.5, 4.6), but for the reasons stated in Section VIII.C.3.b(ii) the Tribunal dismisses this calculation.

[2415] Quantum Experts' Joint Statement, Table 2-1.

sale at once.[2416] What the Parties and their experts disagree on is the appropriate methodology for calculating the market impact costs.

1903. Having reviewed the expert evidence and the Parties' positions, the Tribunal is convinced that Mr Boulton's calculation is more reliable because it contains a conservative assessment of the market impact costs based on reliable evidence of the actual sales of CIL shares in 2014.

1904. In particular, Mr Boulton's calculation of the market impact costs at 0.15% relies on the percentage of reduction applied to the VWAP of the CIL shares during the actual transaction of (i) CUHL's sale of CIL shares in January 2014 prior to the buyback, and (ii) CIL's purchase of CIL shares from other buyers during the buyback.[2417] The Tribunal is not persuaded by Mr Kristensen's criticism of Mr Boulton's methodology on the basis that it "reflects price movements from any number of factors other than the CIL/CUHL trades in question".[2418] While there are likely multiple factors affecting the price of share sales, especially of this magnitude, it is not readily apparent why such other factors would necessarily be different from the factors that would affect the sale of CIL shares in the But For Scenario.

1905. In any event, Mr Boulton adopted a conservative approach by taking the upper range of market impact costs that he observed on both instances of actual sales, which is favourable to the Respondent.[2419] This would reduce the impact that any other variables would have on the share price in that period.

1906. In turn, Mr Kristensen bases his estimate of the slippage costs on an analysis of the data from the Indian stock exchanges.[2420] However, as Mr Boulton notes, to implement Mr Kristensen's approach with the requisite precision, "information on not only the price at which Cairn sold its shares on each day in January 2014, but on the price of CIL shares immediately prior to Citi placing its sell orders" would be required.[2421] Yet, Mr Kristensen's reports do not contain reliable evidence on the latter information.

1907. What is more, when analysing the available data from the Indian stock exchanges, Mr Kristensen appears to have adopted clear outliers that result in higher slippage cost calculation. Namely, as seen in the chart below, his estimate of 0.20% is based on the highest figure observed out of 97,375 data points.[2422]

---

[2416]   *Id.*, Table 1-1, issue 1.

[2417]   C-PHB, ¶ 722, citing Boulton ER1, ¶¶ 5.6-5.15.

[2418]   Quantum Experts' Joint Statement, Table 1-1, issue 1.

[2419]   *Ibid*.

[2420]   *Ibid*.

[2421]   *Ibid*.

[2422]   C-PHB, ¶¶ 723-725; Quantum Experts' Joint Statement, Table 1-1, issue 1 (Mr Boulton's comments on Mr Kristensen's approach).



**Figure 4-2: Market impact costs of all trades in January 2014, as calculated by Mr Kristensen's statistical code, by day**

Source: Appendix 4-2.

1908. Similarly, the Tribunal sees no reliable evidence or analytical support for Mr Kristensen's estimation of the slippage costs after the buyback at 0.40% by doubling the 0.20%, which was itself an outlier.

1909. For these reasons, the Tribunal finds Mr Boulton's estimation of the market impact costs (slippage costs) more reliable, with the result that the amount of net proceeds that the Claimants would have received from the sale of CIL shares in the But For Scenario should be estimated at US$ 984.2 million. More specifically, on the basis of Mr Boulton's calculations, the Claimants request compensation in an amount of US$ 984,228,273.[2423] However, as noted at paragraph 1959 below, this amount is made up of five sets of proceeds, the sum of which amounts to US$ 984,228,274. Accordingly, for purposes of consistency, the Tribunal will award the Claimants US$ 984,228,274 as compensation for the value of the CIL shares.

### c. Compensation for tax refunds

1910. The Claimants next claim compensation for certain tax refunds which they claim they would be entitled to but for India's imposition and enforcement of the unlawful tax demand under the FAO. The Claimants formulate this claim in the following terms:

> [T]he Claimants respectfully request that the Arbitral Tribunal render an award in the Claimants' favour and: [...]

---

[2423]   Claimants' Updated Request for Relief, ¶ 3(a).

3. **ORDER** the Respondent to compensate the Claimants in an amount equal to the total harm suffered by the Claimants as a result of its breaches of the Treaty, in the following amounts:

[…]

b) The **USD equivalent of INR 17,694,496,971** (converted on the date of the award) for the withheld tax refund due with respect to AY 2012-13 (i.e. share sales to Vedanta), plus pre-award interest from 30 June 2017; and

c) The **USD equivalent of INR 584,316,952** (converted on the date of the award) for the withheld tax refund due with respect to AY 2010-11 (i.e. share sales to Petronas), plus pre-award interest from 30 June 2017.[2424]

1911. Before addressing the issues of causation and quantification, the Tribunal must consider the Respondent's reservation with respect to the tax refund for the share sales to Vedanta.[2425] India argues that the Tribunal does not have jurisdiction to determine whether the tax refund was due and, in any event, the ITD was entitled to set off any refund against the CUHL's tax liability in relation to the 2006 Transactions.[2426]

1912. As set out above, the Tribunal does not purport to determine whether a tax refund was due as a matter of Indian law. Compensation should restore the Claimants, as far as possible, into the position that they would have occupied but for India's unlawful tax demand under the FAO. The key question that the Tribunal must ask itself is whether, absent the Respondent's breaches, the Claimants would have received the refunds they claim.

1913. With respect to the refund related to CUHL's share sale to Vedanta in 2011, the Tribunal notes that on 19 December 2016, the Commissioner of Income Tax issued an appellate order indicating that the applicable rate of capital gains tax should have been 10%, not 20%.[2427] The resulting tax refund was nominally issued to CUHL and garnished by the Tax Recovery Officer, who applied an offset towards the tax demand arising from the 2006 Transaction.[2428] The Tribunal finds that this is sufficient to establish that, but for the Respondent's unlawful tax demand, the Claimants would have been entitled to receive the refund. While India's garnishment and offsetting of the tax refunds against its tax demand may have been in accordance with Indian law, this does not change the fact that the Claimants would have recovered the relevant tax refunds but for the Respondent's internationally unlawful tax demand.

---

[2424] C-Updated Request for Relief, ¶¶ 3(b), 3(c).

[2425] The Tribunal notes that the Respondent has not made the same reservation with respect to the refund related to the sale to Petronas in 2009.

[2426] R-Rejoinder, ¶¶ 910, 943.

[2427] C-Updated Reply, ¶ 254; Order of the Commissioner of Income Tax (Appeals) dated 19 December 2016, Exh. C-319.

[2428] C-Updated Reply, ¶¶ 253-55; Notice of Demand from the Tax Recovery Officer to CUHL dated 16 June 2017, Exh. RB-43.

1914. As to the refund related to CUHL's sale to Petronas in 2009, the Tribunal notes that the Delhi High Court determined in 2013 that the applicable tax rate should have been 10% and not 20%.[2429] While the ITD has not issued a refund (nor has it garnished it), the Claimants have argued that, due to India's tax demand, the Claimants have no reasonable prospect of recovering that refund. Given the Respondent's garnishment of the Vedanta refund, the Tribunal agrees. In any event, the Respondent appears to accept that this refund is due, as it has instructed its expert to include it in his assessment of the Claimants' losses.[2430] The Tribunal thus finds that, absent the Respondent's unlawful tax demand, the Claimants would have received the Petronas refund.

1915. For these reasons, the Tribunal considers that compensation for the tax refunds as set out at paragraphs 3(b) and 3(c) of the Claimants' Request for Relief is due.

1916. The Parties' experts agree on the quantification of these two categories of refunds. The following table from their Joint Statement shows, however, that a limited disagreement arises in respect of the appropriate exchange rate at the time of the calculation:[2431]

## 2. Cairn's loss where it does not regain control of the CIL Shares

Table 2-1: Experts' calculations of Cairn's loss in the scenario where Cairn does not regain control of the CIL Shares, as at 31 July 2018

| | Calculation Guide | Mr Boulton USD m | Mr Kristensen USD m | Notes |
|---|---|---|---|---|
| Proceeds from share sales | [A] | 997.3 | 996.3 | (1) |
| Costs associated with share sales | [B] | (3.0) | (3.0) | (2) |
| Foreign exchange costs | [C] | (10.1) | (10.1) | (3) |
| **Net proceeds (before interest)** | **[D]=[A]+[B]+[C]** | **984.2** | **983.2** | |
| Pre-award interest on net proceeds to 31 July 2018 | [E] | 159.1 / 233.2* | 19.0** | (4) |
| Tax refund due to Cairn (share sales to Vedanta Resources)*** | [F] | 258.1 | 257.5 | (5) |
| Tax refund due to Cairn (share sales to Petronas) | [G] | 8.5 | 8.5 | (6) |
| Pre-award interest on tax refund due to Cairn from 1 July 2017 to 31 July 2018 (share sales to Vedanta Resources) | [H] | 13.2 | 11.2 | (7) |
| **Total losses (including pre-award interest)** | **[I]=[D]+[E]+[F]+[G]+[H]** | **1,423.2 / 1,497.3** | **1,279.5** | |

Note *: Mr Boulton calculates pre-award interest on the net proceeds to Cairn of: (i) USD 159.1m, using an interest rate that is consistent with the rate the Claimants pay on their debt, and (ii) USD 233.2m, using an interest rate that is consistent with the statutory rate applicable to tax refunds in India. ** Under Mr Kristensen's calculations, the pre-award interest is lower by $0.2m on a simple interest basis for the net proceeds from the sale of the CIL Shares. *** Mr Kristensen's calculations are based on an INR USD FX rate of 68.71 (source: Thomson Reuters) whereas Mr Boulton's calculations are based on an exchange rate of 68.55 (source: Oanda).
Source for RB calculations: RB Letter to the Tribunal of 21 September 2018: Table A1-1; A1.3 to A1.6, footnote 16.
Source for JK calculations: JK2, Table 2.2, Table 2.3; JK3, Table 3.1.

1917. The Tribunal need not resolve the disagreement on the INR/US$ exchange rate as of 31 July 2018, since the Claimants request the rate to be identified on the date of the Award. To remain conservative, the Tribunal will opt for Mr Kristensen's source, which is INR/US$ FX rate according to Thomson Reuters.

1918. As of the date of this award, the INR/US$ exchange rate according to Thomson Reuters – the source used by the Respondent's expert – is US$ 0.0136.[2432] Therefore the US$

---

[2429] *Cairn UK Holdings Limited v. Director of Income-Tax* [2013] Writ Petition (Civil) No. 6752/2012 dated 7 October 2013, Exh. CWS-Brown-108.

[2430] Kristensen ER3, ¶ 1.12 ("I am instructed to include this in my assessment of the Claimants' losses as at 31 July 2018.").

[2431] Quantum Experts' Joint Statement, p. 15.

[2432] https://www.reuters.com/markets/currencies.

equivalents that the Tribunal will award for the tax refunds of INR 17,694,496,971 and INR 584,316,952 are US$ 240,645,158.81 and US$ 7,946,710.55 respectively.

### d. UK corporation tax

1919. In addition to the net proceeds of the CIL shares, the Claimants claim compensation for corporation tax that they will allegedly have to pay in the UK on the amount awarded by the Tribunal, at the 19% corporate rate. They explain that, if they had sold the CIL shares in 2014, they would have been exempt from paying UK capital gains tax under the SSE, applicable to shareholders holding more than 10% of the equity throughout a 12-month period.[2433] As a result, provided that CUHL sold its shares within a year of falling below a 10% shareholding, it could have sold its shares in CIL free from UK capital gains tax.[2434] According to the Claimants, the Parties' experts agree that "but for India's attachment of the shares, CUHL would have entirely disposed of its stake in CIL by May 2014, easily within the one-year window for the sales to benefit from the SSE", and that CUHL would have sold its CIL shares via on market transactions (including through CIL's Buy-Back Programme), so this sale would not have been subject to capital gains tax in India.[2435] The Claimants thus allege that, in the But For Scenario, the sale of CIL shares would have been free from tax.[2436]

1920. However, in the Actual Scenario the Claimants were unable to sell their shares[2437] and claim compensation in an equivalent amount to the net proceeds they would have obtained from their sale. The Claimants assert that "awards of damages are taxable in the U.K. at the corporate tax rate, which is currently 19%."[2438] Thus, "[t]o ensure that the Claimants are fully compensated for their losses, and do not receive 19% less than they would have but for the Respondent's treaty breaches, the amount awarded must be increased to an amount that, once corporate tax at the prevailing rate is deducted, will be equal to the damages due to the Claimants."[2439] The Claimants provide the following formula to calculate this gross-up: "[a]ssuming the prevailing UK corporate tax rate remains 19% at the time of the Award, the net compensation due to the Claimants should be multiplied by 1/(1-19%), or 1.2345, to determine the gross amount that should be awarded."[2440]

1921. The Respondent has not addressed the substance of this claim. It made a reservation at the hearing on closing submissions that this claim is "not properly before" the Tribunal, arguing that the Claimants had not pleaded it before their PHB and India did not "have

---

[2433] Schedule 7AC of the Taxation of Chargeable Gains Act, 1992, Exh. DR-5, p. 1036; Boulton ER1, ¶ 4.24.

[2434] C-PHB, ¶ 751.

[2435] *Id.*, ¶ 753.

[2436] The Tribunal understands that this is with the exception of Indian Securities Transaction Tax, which Mr Boulton has deducted from his valuation of the proceeds of the sale of the shares. See Boulton ER1, Appendix 8-1.

[2437] 99% of which were sold by the Respondent to pay off the tax demand.

[2438] C-PHB, ¶ 754.

[2439] *Ibid.*

[2440] *Id.*, ¶ 755.

an opportunity to respond".[2441] The Claimants responded that the claim for tax "gross up" had been part of their request for relief from the beginning of the arbitration, and that both experts had addressed it.[2442]

1922. The Tribunal finds that the Claimants' tax gross up claim is admissible. The Claimants' request for relief included a claim for "an amount equivalent to any tax incurred in respect of the compensation due to the Claimants" as early as the ToA and the Statement of Claim.[2443] In the Statement of Claim, the Claimants further explained:

> [T]he Claimants may incur tax on any award of damages for all harm suffered (including but not limited to harm suffered by the tax demand and the shares seized). Thus, an award that seeks to remedy the harm caused by India must account for any such tax that the Claimants may have to pay on the award of damages.[2444]

1923. In their Updated Reply, the Claimants once again expressly requested that any award of damages be grossed up,[2445] and submitted that "[t]o restore the Claimants to the financial position they would have been in had India not enforced its Retroactive Amendment against them, the award of damages would need to be increased by an amount equivalent to Cairn's tax liability in respect of any award."[2446]

1924. In turn, Mr Boulton addressed this claim in his First Report, as follows:

> I have been instructed that Cairn would not have been required to pay UK tax on the proceeds that it would have received from the sale of its shares in CIL in the But For Scenario. I understand from Cairn that it may, however, be required to pay UK tax if it was to receive an award of damages relating to the proceeds it would have received from the sale of its shares in CIL in the But For Scenario. In those circumstances, the loss that I have calculated would not fully compensate Cairn for the loss it has suffered, since Cairn would pay tax on the award of damages, but would not have paid tax on the sale of the CIL shares. To put Cairn back into the financial position it would have been in absent the CIL Shares being frozen, the award of damages would need to be increased by the amount of UK tax that Cairn would pay in the event of an award, to be calculated at a future date.[2447]

1925. The Tribunal thus finds that the Claimants' tax gross up claim was made in a timely manner and is thus admissible.

---

[2441] Transcript, Hearing on Closing Arguments, Day 1, 5:1-11.

[2442] Claimants' letter of 12 March 2019 (CCom-289); ToA, ¶¶ 3.3.1(c), 3.3.2(g), referring to C-SoC, ¶ 448(c), 449(g); C-Reply, ¶ 626(d); C-Updated Reply, ¶ 703(d).

[2443] ToA, ¶¶ 3.3.1(c) 3.3.2(g); C-SoC, ¶¶ 448(c), 449(g).

[2444] C-SoC, ¶ 425.

[2445] C-Updated Reply, ¶ 703(d) containing a claim for "an amount equivalent to any tax incurred, in any relevant jurisdiction, in respect of the compensation due to the Claimants."

[2446] *Id.,* ¶ 700.

[2447] Boulton ER1, ¶ 2.13.

1926. Whether the Claimants have sufficiently substantiated their claim is another matter. While the Claimants have always requested a tax gross up of any compensation awarded to them, they only specified its legal source and quantum in their PHB. It was only then that the Claimants alleged that an award of damages would be subject to UK corporation tax at a rate of 19%.[2448] Even then, the Claimants did not point to any evidence showing that UK corporation tax applies to the entirety of the damages award.[2449]

1927. The passages of the Parties' expert reports highlighted by the Claimants do not support their tax gross up claim.[2450] Paragraphs 5.37 to 5.40 of Mr Boulton's Second Expert Report address a different subject, namely, the UK capital gains tax that would have applied to the capital gain that the Claimants would have realised in the Actual Scenario, had they regained control of the CIL shares back in 2017. Mr Boulton does not purport to opine on the applicability of UK tax on a potential award of compensation for the total value of the CIL shares. His calculations on UK capital gains tax in his Second Report are thus irrelevant to determine the quantum of any tax gross up to be made to an award of damages. Indeed, the UK capital gains tax calculated by Mr Boulton would not apply on the entirety of the amount of the purchase price that the Claimants would have received by selling the CIL shares, but only to the capital gain.[2451]

1928. Similarly, while it is true that Mr Kristensen endorsed Mr Boulton's calculation, he was again referring to the situation in which Cairn would be required to pay UK capital gains tax if it regained control of the CIL shares and sold them.[2452] Mr Kristensen did not address the applicability of UK corporation tax to the amount potentially awarded by the Tribunal as a compensation for the net proceeds of the CIL shares.

1929. In the circumstances, the Tribunal cannot grant the Claimants the relief requested. The Claimants are not only requesting that the compensation paid to them be free from tax; they are requesting the Tribunal to "gross up" any compensation awarded at a rate of 19%. Having reviewed the evidence and submissions, the Tribunal finds that the

---

[2448]   C-PHB, ¶ 754.

[2449]   "Rates and allowances: Corporation Tax", Gov.uk (accessed 21 April 2017), Exh. RB-61, merely states at p. 4 that "If you sell or dispose of a business asset, you'll need to pay Corporation Tax on any profits." If UK corporation tax were to apply, this document supports the Claimants' submission that the applicable rate would be 19%. The Tribunal also notes that John Trenor, "Guide to Damages in International Arbitration", Global Arbitration Review (2016), Exh. RB-67, contains an article that addresses the taxation of international arbitration awards in the UK (James Nicholson and Sara Selvarajah, "Taxation and Currency Issues in Damages Awards"). However, neither the Parties nor their experts have relied on this article for the Claimants' tax gross up claim, and neither will the Tribunal. In any event, the Tribunal notes that this article would not have supported the proposition that a 19% corporation tax would apply to the entirety of the compensation awarded to the Claimants for the value of the CIL shares.

[2450]   Claimants' letter of 12 March 2019 (CCom-289), ¶¶ 6-7.

[2451]   See Boulton ER2, Table 5-3 (applying UK tax at a 19% corporation tax rate to the capital gain of US$ 304.3 million, rather than to the entire amount of net proceeds from the sale CIL shares which he estimated at US$ 738.7 million for this scenario). Likewise, Mr Boulton's calculations in Boulton ER3 (where he states that he has "been instructed by Shearman & Sterling to include this UK capital gains tax liability in my calculation of Cairn's losses") also refer to UK capital gains tax that would have applied to the gain made by CUHL for the sale of the CIL shares, not on the total value of the CIL shares. See Boulton ER3, ¶¶ 2.13-2.17.

[2452]   Kristensen ER2, ¶ 3.32.

Claimants have not established with a sufficient degree of certainty (indeed, they have not even made a *prima facie* case) that they are likely to incur the UK corporation tax on the totality of the amount awarded for the proceeds of the CIL shares. The record simply does not contain sufficient expert or documentary evidence that would establish that such tax would apply, and if so, that it would apply to the entirety of the compensation that the Tribunal awards to the Claimants for the proceeds of the CIL shares.[2453]

1930. For these reasons, the Tribunal dismisses the Claimants' tax gross up claim for compensation for the UK corporation tax as contained in paragraph 3(a) of the Claimants' request for relief.

### e.   Request for an award net of Indian taxes

1931. In their Updated Request for Relief, the Claimants request the Tribunal to "DECLARE that the award of damages has been calculated on a net-of-Indian-tax basis, and that, accordingly, India may not deduct taxes in respect of payment thereof".[2454]

1932. While the Claimants did not formally articulate this request in their submissions, the Tribunal finds that it is appropriate to grant it with respect to certain amounts claimed, for the following reasons.

1933. First, as noted above, the Claimants have argued from their Statement of Claim that "an award that seeks to remedy the harm caused by India must account for any such tax that the Claimants may have to pay on the award of damages."[2455] In their Updated Statement of Reply, the Claimants requested "an amount equivalent to any tax incurred, in *any relevant jurisdiction*, in respect of the compensation due to the Claimants."[2456]

1934. Second, the Respondent did not object to any of these prayers for relief in respect to Indian taxes (whether in the Statement of Claim, the Updated Statement of Reply, or the Claimants' Updated Request for Relief); in contrast, it expressly objected to the Claimants' request for a gross-up in respect of UK corporation tax.[2457]

1935. Third, it emerges from the record that certain amounts have been calculated net of taxes and should be granted net of Indian taxes to make the Claimants whole.

1936. With respect to the proceeds from the CIL shares, it is undisputed that, in the But For Scenario, CUHL would have been able to sell the entirety of its shares in CIL via on-market transactions,[2458] and as a result the sale would not have been subject to capital

---

[2453]   Indeed, the Claimants have acknowledged that "the UK tax authorities may agree not to tax such an award", although they argue that this is uncertain. See C-PHB, ¶ 757.

[2454]   C-Updated Request for Relief, ¶ 8.

[2455]   C-SoC, ¶ 425.

[2456]   C-Updated Reply, ¶ 703(d) (emphasis added).

[2457]   Transcript, Hearing on Closing Arguments, Day 1, 4:14-5:4; Respondent's email of 18 January 2019 (RCom-357).

[2458]   Boulton ER1, ¶ 4.24; Kristensen ER2, n. 109.

gains tax in India. Further, both experts have calculated the net proceeds of the sale of the CIL shares in the But For Scenario, i.e., after deducting the costs of the sale, including the applicable Indian Securities Transaction Tax.[2459] It follows that, to fully repair the harm suffered by the Claimants for not being able to sell those shares, the amount awarded in this respect should be granted net of Indian taxes.

1937. With respect to the compensation awarded with respect to the tax refunds, it is necessary to distinguish the two sets of refunds requested.

1938. With respect to the refund related to the sale of CIL shares to Petronas, it is evident from the Claimants' calculations[2460] (which Mr Boulton adopts[2461] and Mr Kristensen agrees with[2462]) that this amount has been calculated on a net of tax basis.

1939. With respect to the refund related to the sale of CIL shares to Vedanta, as discussed in Section (g) below, while it also appears that the principal amount of the refund has been calculated on a net of tax basis,[2463] the total refund calculated by Mr Boulton contains an element of interest which he has calculated on a pre-tax basis[2464] and which, as discussed below, the Tribunal is granting on a pre-tax basis. As a result, the Tribunal cannot declare that compensation for the Vedanta tax refund is net of Indian tax.

### f.   Interest

1940. It is uncontroversial that an award of interest is required to compensate the Claimants for their inability to use the funds that India seized for the enforcement of its internationally unlawful tax demand.[2465] The Claimants claim both pre-award and post-award interest on all amounts awarded, namely on compensation for the value of the CIL shares (i) and on the tax refunds (ii).

---

[2459]   Boulton ER1, Appendix 8-1; Boulton ER2, ¶¶ 5.2-5.3; Kristensen ER2, ¶ 2.23; Quantum Experts' Joint Statement, p. 16.

[2460]   Exh. RB-78.

[2461]   Boulton ER3, ¶¶ 2.25-2.26.

[2462]   Quantum Experts' Joint Statement, p. 17.

[2463]   Calculation of refund due in respect of share sales to Vedanta Resources, Exh. RB-74; Adjusted Appendix 8 attached to Kristensen ER3, Exh. Kristensen-50.

[2464]   Quantum Experts' Joint Statement, p. 17 (where Mr Boulton states: "Consistent with my other calculations of pre-award interest, I do not deduct tax in my calculations."); Kristensen ER3, ¶ 3.3.

[2465]   *Factory at Chorzów*, PCIJ Ser. A, No. 17, CLA-18, p. 47; See also, James Crawford, *The International Law Commission's Articles on State Responsibility* (Cambridge University Press, 2002) [extracts], CLA-61, p. 68, Article 38(1); *Crystallex International Corporation v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB(AF)/11/2, Award, 4 April 2016, CLA-19, ¶ 932.

**(i)     Compensation for the value of the CIL shares**

*(1)     Interest rate*

1941.   The Claimants request pre- and post-award interest at the same rate.[2466] They propose two alternative rates:

> a) a rate consistent with the statutory rate applied to tax refunds in India (0.5% per month, in INR terms, without compounding) (the **"Statutory Rate"**); or,
>
> b) in the **alternative**, (i) in respect of the lost net proceeds under Paragraph 3(a), at a rate consistent with the interest rate the Claimants pay on their debt (USD 1-month LIBOR plus a monthly margin of 0.23%, compounded monthly); and (ii) in respect of the tax refunds under Paragraphs 3(b) and (c), at the Statutory Rate;

1942.   With respect to the net proceeds from the sale of the CIL shares that the Claimants ought to have received in 2014, the Claimants primarily claim interest at the Respondent's statutory rate applicable to tax refunds. They submit that this rate best reflects the Indian legislature's view as to the appropriate compensation due to a person kept out of his/her money due to the application of a tax demand that is eventually determined to be unlawful.[2467]

1943.   The Tribunal is not persuaded. The purpose of an award of interest is to compensate the Claimants for the time value of the money that they were unlawfully deprived of. Such compensation should account for the likely use to which the Claimants would have put the relevant amounts, but for the Respondent's unlawful conduct. At no point in the But For scenario would the Claimants earn a return on the CIL share proceeds at India's statutory interest rate.

1944.   The Claimants submit that the Indian statutory rate would account for the fact that they were forced to lend money to the Respondent, from which the Respondent benefited. While this may be true, the purpose of an award of interest is to make the Claimants whole, not to eliminate the Respondent's enrichment *per se*. As the tribunal in *Vestey v. Venezuela* held, "reparation focuses on making the victim whole; it is not concerned with the possible enrichment of the Respondent."[2468] Earlier, the tribunal in *SPP v. Egypt* emphasised the same point, holding that "the measure of compensation should reflect the claimant's loss rather than the defendant's gain."[2469]

1945.   For these reasons, the Tribunal does not consider that India's statutory interest rate should apply to the amount corresponding to the proceeds of the CIL shares.

---

[2466]   C-Updated Request for Relief, ¶¶ 4-5.

[2467]   C-PHB, ¶ 741.

[2468]   *Vestey Group Ltd v. Bolivarian Republic of Venezuela,* ICSID Case No. ARB/06/4, Award, 15 April 2016, ¶ 440.

[2469]   *Southern Pacific Properties (Middle East) Limited v. Arab Republic of Egypt*, ICSID Case No. ARB/84/3, Award, 20 May 1992, RLA-74, ¶247.

1946. By contrast, the Tribunal does find it reasonable to apply the Claimants' borrowing rate, as the Claimants suggest in the alternative. As Mr Boulton explains:

> [T]his interest rate represents the costs Cairn would have incurred had they borrowed to fund investments, which they could otherwise have funded using the proceeds from the share sale. Alternatively, this approach can be understood as assuming that in the absence of an award of damages, the claimant has borrowed funds to make good their loss, or has lost an opportunity to pay off existing debt. [2470]

1947. According to Mr Boulton, "[i]f, on the facts, a claimant would have paid off debt, or raised less debt, then the delay in the payment of an award has resulted in additional cost to the claimant above the risk free rate."[2471] However, in his experience a borrowing rate "is often applied without taking account of a claimant's actual borrowing position, with an implicit assumption that the claimant has, or could have, changed its funding position absent a delay in the payment of damages." [2472]

1948. The Claimants are a sizeable group of companies, which unsurprisingly borrows from financial institutions, and hence constantly incurs a borrowing cost.[2473] The Claimants could have alleviated this cost in the But For Scenario had they received the proceeds of the CIL shares in time.

1949. Mr Boulton uses a rate of US$ 1-month LIBOR plus a monthly margin of 0.23%, which he has obtained from the Claimants' 2014 Debt Facility Agreement with BNP Paribas and other banks.[2474] Mr Boulton explains that, while the Debt Facility Agreement lists the annual margin on the debt (2.75%), Cairn could elect to pay interest every one, three or six months. Mr Boulton uses a monthly margin of 0.23%, but has not substantiated this choice.[2475] While the Tribunal considers that the annual margin on the Claimants' borrowing rate is reasonable and corresponds to the practice of investment treaty tribunals,[2476] it is not persuaded that it is appropriate to calculate interest monthly. The

---

[2470] Boulton ER2, ¶ 7.14.

[2471] *Id.*, ¶ 7.15.

[2472] *Id.*, ¶ 7.16.

[2473] For instance, on 30 June 2018 the Claimants' loans and borrowings amounted to US$ 121.2 million. Cairn Energy, Half-Year Report Announcement dated 11 September 2018, Exh. C-591, p. 32.

[2474] 2014 Debt Facility Agreement with BNP Paribas and other banks, Exh. RB-37, s. 1.1, "Applicable Margin" definition, p. 2.

[2475] Boulton ER1, n. 92.

[2476] *Crystallex International Corporation v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB(AF)/11/2, Award, 4 April 2016, ¶ 938; *Standard Chartered Bank (Hong Kong) Limited v. United Republic of Tanzania II*, ICSID Case No. ARB/15/41, Award, 11 October 2019, ¶ 525; *Magyar Farming Company Ltd, Kintyre Kft and Inicia Zrt v. Hungary*, ICSID Case No. ARB/17/27, Award, 13 November 2019, ¶ 431; *National Grid PLC v. Argentine Republic*, UNCITRAL, Award, 3 November 2008, CLA-32, ¶ 294; *Rumeli Telekom A.S. and Telsim Mobil Telekomikasyon Hizmetleri A.S,. v.Republic of Kazakhstan*, ICSID Case. No. ARB/05/16, Award, 29 July 2008, CLA-35, ¶ 769; *PSEG Global, Inc., The North American Coal Corporation, and Konya Ingin Electrik Üretim ve Ticaret Limited Sirketi v. Republic of Turkey*, ICSID Case No. ARB/02/5, Award, 19 January 2007, CLA-42, ¶ 348.

Tribunal will thus apply interest on a semi-annual basis, at US$ 6-month LIBOR plus a six-month margin of 1.375%.

1950. The Respondent in turn suggests that the appropriate rate for pre-award interest is the risk-free rate, corresponding to the yield on one-month US Treasury Bills. Having found that, in the But For Scenario, the Claimants would have alleviated their borrowing cost, the Tribunal does not consider that the risk-free interest is appropriate for the CIL share proceeds. In any event, the Tribunal finds that a US-denominated risk-free interest rate is inappropriate, in circumstances where the Claimants are bearing the risk that India, not the US, might default on its payment obligation.

1951. The Tribunal will thus apply pre- and post-award the Claimants' borrowing cost at a rate of US$ 6-month LIBOR plus a six-month margin of 1.375%.

*(2)*    *Compounding*

1952. The Parties further dispute whether the interest should be simple or compounded.

1953. The Claimants submit that "interest is not an award in addition to reparation; it is rather a component of full reparation and gives effect to that principle."[2477] They argue that, in modern economic reality, only an award of compound interest will make them whole, and note that numerous investment tribunals have awarded compound interest.[2478]

1954. The Respondent argues that "[t]here is no consistent practice on this issue, and the practice of numerous investment tribunals, including in tax-related cases, is to award simple rather than compound interest."[2479] It thus submits that simple interest should be awarded.

1955. The Tribunal agrees with the Claimants that interest is a component of full reparation. Pursuant to Article 38(1) of the ILC Articles on State Responsibility:

---

[2477]   C-SoC, ¶ 403.

[2478]   *Id.*, ¶¶ 404-406, citing *Compañía de Aguas delAconquija S.A. and Vivendi Universal S.A. v. Argentine Republic*, ICSID Case No. ARB/97/3, Award, 20 August 2007, CLA-39, ¶ 9.2.4-9.2.6; *Gemplus, S.A., SLP, S.A. and Gemplus Industrial, S.A. de C.V. v. United Mexican States*, ICSID Case No.ARB(AF)/04/3 & ARB(AF)/04/4, Award, 16 June 2010, CLA-28, Part 16 ¶ 26; *Compañía del Desarrollo de Santa Elena S.A. v. Republic of Costa Rica*, ICSID Case No. ARB/96/1, Award, 17 February 2000, CLA-53, ¶¶ 101, 104; *BG Group Plc. v. Argentine Republic*, ad hoc (UNCITRAL), Final Award, 24 December 2007, CLA-37, ¶ 456.

[2479]   R-SoD, ¶ 343, citing the practice of the Iran-US Claims Tribunal, in Charles Brower and Jason Brueschke, The Iran – United States Claims Tribunal (1998), RLA-132,  p. 629; see also *Hulley Enterprises Ltd v. The Russia Federation*, UNCITRAL, PCA Case No. 2005-03, Final Award, 18 July 2014), RLA-46, ¶ 1689; *Franck Charles Arif v. Republic of Moldova*, ICSID Case No. ARB/11/23, Award, 8 April 2013, RLA-133, ¶ 619; *RosInvestCoUK Ltd v. The Russian Federation*, SCC Case No. V079/2005, Award, 12 November 2010, RLA-134, ¶¶ 689-690; *Saipem SpA v. The People's Republic of Bangladesh*, ICSID Case No. ARB/05/7, Award, 30 June 2009, RLA-135, ¶¶ 211-212; *Duke Energy Electroquil Partners & Electroquil SA v. Republic of Ecuador*, ICSID Case No. ARB/04/19, Award, 18 August 2008, RLA-90, ¶ 473; *Archer Daniels Midland Company and Tate & Lyle Ingredients Americas, Inc. v. The United Mexican States*, ICSID Case No. ARB(AF)/04/5, Award, 21 November 2007, RLA-136, ¶¶ 296-298; *Occidental Exploration and Production Company v. The Republic of Ecuador*, LCIA Case No. UN3467, Final Award, 1 July 2004), CLA-48, ¶ 217; *CME Czech Republic BV v. The Czech Republic*, UNCITRAL, Final Award, 14 March 2003, RLA-1, ¶¶ 642-648; *Marvin Roy Feldman Karpa v. United Mexican States*, ICISD Case No. ARB(AF)/99/1, Award, 16 December 2002, RLA-44, ¶¶ 205-206.

> Interest on any principal sum due under this chapter shall be payable when necessary in order to ensure full reparation. The interest rate and mode of calculation shall be set so as to achieve that result. [2480]

1956. In accordance with the principle of full reparation, an award of interest must put the Claimants in the position they would have been had the breach not occurred. An award of interest aims to compensate a claimant for having been deprived of funds that it could have either invested, or used to pay off existing debts or avoid new ones. In today's economy, this means that the claimant had to forgo earning compound interest or was forced to pay it. As noted in *Continental Casualty*, "compound interest reflects economic reality in modern times": [t]he time value of money in free market economies is measured in compound interest; simple interest cannot be relied upon to produce full reparation for a claimant's loss occasioned by delay in payment[.]"[2481]

1957. Here, the Tribunal has decided that it is appropriate to award interest at the Claimants' borrowing rate, which compensates the Claimants for forcing them to borrow funds (or preventing them from paying off debt) which they would not have borrowed (or would have paid off) absent the breach. Unsurprisingly, the Claimants' current debt obligations involve paying compound interest.[2482] It follows that only an award of compound interest will make the Claimants whole.

1958. Mr Boulton has compounded interest monthly.[2483] However, as noted above, Mr Boulton has not substantiated why he has chosen a monthly interest period, and the Tribunal is not persuaded that monthly compounding is warranted. The Tribunal considers that six-month compounding is more appropriate, and in line with investment treaty jurisprudence.[2484]

*(3)    Dies a quo and dies ad quem*

1959. The Claimants request that pre-award interest on the proceeds of the CIL shares be applied on five sets of proceeds from the following dates:

> i.    For the US$ 64,708,741 / INR 4,049,953,454 in lost net proceeds incurred in January 2014, pre-award interest from 31 January 2014;

---

[2480]   ILC Articles on State Responsibility, Article 38(1).

[2481]   *Continental Casualty v. The Argentine Republic*, ICSID Case No. ARB/03/9, Award, 5 September 2008, ¶ 309.

[2482]   2014 Debt Facility Agreement with BNP Paribas and other banks, Exh. RB-37, Section 11.1.3.

[2483]   Boulton ER1, ¶ 8.4.

[2484]   See, e.g., *Joseph Charles Lemire v. Ukraine*, ICSID Case No. ARB/06/18, Award, 28 March 2011, CLA-25, ¶ 361; *Ioannis Kardassopoulos and Ron Fuchs v. Republic of Georgia*, ICSID Case No. ARB/05/18 & ARB/07/15, Award, 3 March 2010, CLA-29, ¶ 667; *National Grid PLC v. Argentine Republic*, UNCITRAL, Award, 3 November 2008, CLA-32, ¶ 294; *Rumeli Telekom A.S. and Telsim Mobil Telekomikasyon Hizmetleri A.S,. v.Republic of Kazakhstan*, ICSID Case. No. ARB/05/16, Award, 29 July 2008, CLA-35, ¶ 769; *PSEG Global, Inc., The North American Coal Corporation, and Konya Ingin Electrik Üretim ve Ticaret Limited Sirketi v. Republic of Turkey*, ICSID Case No. ARB/02/5, Award, 19 January 2007, CLA-42, ¶ 348.

    ii.    For the US$ 303,352,155 / INR 18,855,870,450 in lost net proceeds incurred in February 2014, pre-award interest from 28 February 2014;

    iii.    For the US$ 313,076,958 / INR 19,110,209,298 in lost net proceeds incurred in March 2014, pre-award interest from 31 March 2014;

    iv.    For the US$ 191,695,557 / INR 11,590,076,641 in lost net proceeds incurred in April 2014, pre-award interest from 30 April 2014;

    v.    For the US$ 111,394,863 / INR 6,675,894,425 in lost net proceeds incurred in May 2014, pre-award interest from 31 May 2014. [2485]

1960. The Tribunal has accepted Mr Boulton's assumptions with respect to the timing of the sale of the CIL Shares in the But For Scenario. The Tribunal further notes that Mr Kristensen has opined that "Mr Boulton's assumptions regarding the timing and volume of the sale in the but-for scenario are not unreasonable."[2486]

1961. The Tribunal further notes that Mr Boulton "begin[s] calculating interest on Cairn's losses in the month after they were incurred",[2487] and that he does so on a monthly basis at the end of each calendar month.[2488] While the Tribunal understands that in the But For Scenario, shares would have been sold on a rolling (possibly daily) basis, the Tribunal considers that it is reasonable for interest to start running at the end of the month on the proceeds of shares sold that month.

1962. Accordingly, the Tribunal will award interest on the dates requested by the Claimants above.

1963. The Claimants also request post-award interest. It is widely accepted that, to achieve full reparation, interest will accrue until the date of full payment. The ILC Articles on State Responsibility expressly state that "[i]nterest runs from the date when the principal sum should have been paid until the date the obligation to pay is fulfilled."[2489] Accordingly, interest will run until the Award is paid in full.

## (ii)   Interest applicable to the tax refunds

*(1)   Interest rate*

1964. The Parties' experts disagree on the interest applicable to the tax refunds that Cairn would have received in the absence of India's unlawful tax demand.[2490] While both Parties' experts appear to agree that the applicable rate is the Indian statutory rate

---

[2485]   C-Updated Request for Relief, ¶ 3(a)(i-v).

[2486]   Kristensen ER1, ¶ 3.13.

[2487]   Boulton ER1, Note to Table 8-1.

[2488]   Boulton ER1, Appendix 8-1.

[2489]   ILC Articles on State Responsibility, Article 38(2).

[2490]   Quantum Experts' Joint Statement, Table 2-1.1, issue 7.

applicable to tax refunds,[2491] Mr Kristensen notes that the tax refund for the share sales to Vedanta at INR 17,694,496,971 already includes interest up to 30 June 2017, i.e., when the tax refund was offset against the tax demand of the FAO. Mr Kristensen explains that the Claimants apply India's statutory rate from 30 June 2017 onwards without accounting for the fact that this amount would have been subject to a further tax in India.[2492] Mr Kristensen thus applies an adjusted rate to take this into account.[2493] Mr Boulton does not oppose the substance of the criticism, but merely asserts that he has been "instructed to calculate pre-award interest on the tax refund from 1 July 2017 onwards, using the statutory rate applicable to tax refunds in India."[2494]

1965.   The Tribunal disagrees with the interest rates applied by both experts. As the Tribunal explained above, the purpose of interest is to make the Claimants whole for the time value of the money that they ought to have received but for the Respondent's unlawful conduct. Therefore, an award of interest should compensate the Claimants for the value that they would have realised on their tax refunds, if India had not offset them against its unlawful tax demand. Had India not offset the tax refund against the unlawful tax demand on 30 June 2017, the Claimants would have received the amounts corresponding to the refund.

1966.   The Tribunal is not persuaded that, thereafter, the Claimants would have earned interest on that amount at India's statutory interest rate (whether on a before or after-tax basis). There is no rational explanation for such an assumption. Instead, as with the proceeds of the CIL shares, the Claimants would have likely alleviated their borrowing cost by using their tax refunds. Therefore, the Tribunal is not persuaded that the Claimants are entitled to interest at a rate higher than their borrowing cost on their entitlement to the tax refunds. The Tribunal will thus apply to the tax refunds the same interest rate it has applied to the proceeds of the CIL Shares, i.e., US\$ 6-month LIBOR plus a six month margin of 1.375%.

*(2)   Compounding*

1967.   For the same reasons set out in Section VIII.C.3.f(i)(2) above, the interest on the compensation for the tax refunds shall be compounded every six months.

*(3)   Dies a quo and dies ad quem*

1968.   The Claimants have requested that interest start to run on the tax refunds from 30 June 2017.[2495] Both experts calculate interest from that date (i.e., as of 1 July 2017).[2496] The Tribunal will thus award interest on the tax refunds as of 1 July 2017.

1969.   For the same reasons given in Section VIII.C.3.f(i)(3) above, interest will accrue on these amounts until they are fully paid.

---

[2491]   *Ibid.*

[2492]   Kristensen ER3, ¶ 3.3.

[2493]   *Ibid.*, 3.

[2494]   Quantum Experts' Joint Statement, Table 2-1.1, issue 7.

[2495]   C-Updated Request for Relief, ¶ 3(b) and (c).

[2496]   Quantum Experts' Joint Statement, Table 2-1.

## IX.   Costs

1970.   The Tribunal now turns to the Parties' requests for relief on costs. After summarising the Parties' positions (Sections A and B below) and setting out the quantum of the various costs of the proceedings (Section C), the Tribunal will address their allocation (Section D).

## A.   The Claimants' position

### 1.   Allocation of costs

1971.   The Claimants seek the payment of all their costs and fees incurred in this arbitration, amounting to US$ 26,159,184.91.[2497]

1972.   The Claimants submit that, in accordance with the UNCITRAL Rules, the "costs of arbitration" as defined in Article 38, "are in principle to be borne by the unsuccessful party, subject to the Tribunal's discretion to consider other circumstantial factors", while the apportionment of "legal costs" as referred in Article 40, is "discretionary 'taking into account the circumstances of the case.'"[2498]

1973.   Based on the above principles, and taking into account of other factors considered by tribunals in apportioning costs, the Claimants submit that they should be awarded all their costs incurred in this arbitration.[2499] In particular, the Claimants argue that (i) they expect to prevail in the arbitration overall; (ii) they were successful in the vast majority of disputed issues that arose in the course of the arbitration; and (iii) the Respondent engaged in behaviour that greatly expanded the time and costs needed to resolve the dispute.[2500]

1974.   <u>First</u>, the Claimants contend that if, they prevail on issues of jurisdiction and merits, they should be awarded their full costs in this arbitration (including arbitration costs and legal costs), as this would be "necessary to restore Cairn to the position it would have enjoyed had the [Respondent] not breached the [BIT]."[2501] This is consistent with the "'general practice' in international arbitration that a successful party should recover its Costs", as well as the principle set out in the *Chorzow Factory* case that "an arbitral award should wipe out all consequences of the breaches."[2502]

1975.   <u>Second</u>, the Claimants submit that they should be awarded their costs because they were successful in the vast majority of disputed issues that arose in the proceedings, including

---

[2497]   Claimants' Schedule of Costs ("C-Schedule of Costs"); Claimants' email of 28 September 2020 (CCom-313).

[2498]   Claimants' Submission on Costs ("C-Submission on Costs"), ¶ 2.

[2499]   *Id.*, ¶ 4; C-Updated Request for Relief, ¶ 11.

[2500]   C-Submission on Costs, ¶ 7.

[2501]   *Id.*, ¶ 2.

[2502]   *Id.*, ¶ 3.

the Respondent's Stay Application and Application for Bifurcation.[2503] In response to the Respondent's argument that both applications were well-founded and justified, the Claimants emphasise that this "was not a partial victory or a mixed result in any sense."[2504] Rather, the Tribunal "rejected [the Respondent's Stay Application] under every single one of the four factors that comprise the test for staying an arbitration", and also rejected the Respondent's Application for Bifurcation "in its entirety."[2505]

1976. Although the Tribunal denied their RIM, the Claimants maintain that it nevertheless would be a "mistake" to award the Respondent the costs incurred in relation thereto.[2506] This is because despite the fact that it had the discretion[2507] to suspend the enforcement measures that it put in place, the Respondent still "willfully" sold virtually all of CUHL's shares in CIL before and during the Merits Hearing, in violation of its obligation under PO9 to refrain from aggravating the dispute.[2508] Moreover, the Claimants argue that if the Tribunal "decides that India breached the BIT through its retroactive tax measures, then the enforcement actions taken in furtherance of those measures [namely the recovery procedures against CUHL] were likewise unlawful."[2509]

1977. <u>Third</u>, the Claimants contend that the Tribunal should take account of the fact that the Respondent engaged in behaviour that greatly expanded the time and costs needed to resolve the dispute. In particular, the Claimants allege that the Respondent:

a.   "[S]ought and obtained (or granted itself) an extension for virtually every single submission it made, large or small", including for its objections to jurisdiction and admissibility and responses to the Claimants' document requests;[2510]

b.   Made a tactical decision to delay the filing of its Application for Bifurcation until the evening before the hearing on its Stay Application, ignoring four prior requests by the Tribunal to file it as soon as possible;[2511]

c.   Obstructed the document production process by refusing without any reasonable justification[2512] to produce responsive documents,[2513] and its "insistence that it was entitled to three rounds of document requests";[2514]

---

[2503]   *Id.*, ¶¶ 7-12; Claimants' Reply Submission on Costs ("C-Reply Submission on Costs"), ¶¶ 3-8.

[2504]   C-Reply Submission on Costs, ¶ 3.

[2505]   *Id.*, ¶¶ 3, 8.

[2506]   C-Submission on Costs, ¶ 14.

[2507]   C-Reply Submission on Costs, ¶¶ 13-16.

[2508]   C-Submission on Costs, ¶¶ 15, 17.

[2509]   *Id.*, ¶ 16.

[2510]   *Id.*, ¶¶ 18-24.

[2511]   C-Reply Submission on Costs, ¶¶ 9-11.

[2512]   *Id.*, ¶ 21.

[2513]   C-Submission on Costs, ¶ 28. See also C-Reply Submission on Costs, ¶ 21.

[2514]   C-Submission on Costs, ¶¶ 20, 27.

    d.    "[M]ade an excessive number of requests and submissions in this arbitration, many of which were unsolicited, and most of which were rejected by the Tribunal";[2515]

    e.    Made constantly shifting and often incoherent defences, including with respect to why the 2006 Transactions was supposedly a tax sham, that ultimately caused what were relatively straightforward issues in this arbitration to become more numerous and complex;[2516]

    f.    Submitted two expert reports on US tax law that, in the Claimants' view, were irrelevant to the resolution of the issues before the Tribunal.[2517]

1978. This behaviour, the Claimants contend, placed significant additional burdens on the Parties and the Tribunal, deprived the Claimants of relevant evidence, and substantially contributed to the costs incurred in the arbitration.[2518] In addition, the Respondent's delays caused the Evidentiary Hearing to be adjourned by seven months, from January 2018 to August 2018.[2519] The Claimants note that the Respondent acknowledged that any procedural delays could be addressed by an award on costs,[2520] and submit that the Respondent should now compensate them for this delay.[2521]

### 2.    Reasonableness of costs

1979. The Claimants submit that the amount of their total incurred costs "is reasonable in light of the vast number and complexity of the jurisdictional and merits issues raised by India".[2522]

1980. The Claimants reject the Respondent's contention that the Claimants' costs were "excessive" compared to its own "reasonable" costs, and that the Tribunal should therefore limit costs awarded to the Claimants to the amount expended by the Respondent.[2523] The Claimants observe that, according to the statistics relied on by the Respondent's own statistics, both Parties' costs are about three times the historical average costs expended by investors and respondent States.[2524] The Claimants further note that their costs are "hardly excessive when compared to the claim value of US$ 1.4 billion, the value of the assets that were seized by India, and the tax assessment

---

[2515]  *Id.*, ¶ 30.

[2516]  *Id.*, ¶¶ 32-36.

[2517]  *Id.*, ¶ 37. See also C-Reply Submission on Costs, ¶¶ 32-34.

[2518]  C-Submission on Costs, ¶¶ 18, 27, 29, 31, 36.

[2519]  *Id.*, ¶ 27.

[2520]  *Id.*, ¶ 22, citing PO8, ¶ 12(b), referring to RCom-99 of 3 May 2017, ¶ 8.

[2521]  *Id.*, ¶ 27.

[2522]  *Id.*, ¶ 38.

[2523]  C-Reply Submission on Costs, ¶¶ 22, 24.

[2524]  *Id.*, ¶¶ 22-23.

itself".[2525] Moreover, according to the study relied upon by the Respondent,[2526] claimants typically incur greater party costs than respondents, and as such, the Claimants maintain that "there is no basis to impose the fee cap that is requested by the Respondent."[2527]

1981. The Claimants also defend the engagement of their various quantum, tax, and legal experts, all of which the Respondent challenged as unnecessary and wasteful. In particular, the Claimants maintained that their engagement of:

    a.    KPMG, their existing Indian tax advisors, was justified "[i]n a case involving a multi-billion-dollar tax assessment under Indian Income Tax Act (and where the [ITD] had never suggested that its tax legislation be interpreted in such novel manner until it brought a 'test case' against Vodafone in August 2007")";[2528]

    b.    FTI and Richard Boulton QC, their quantum experts, was not too early, and that since the decision to address quantum issues at a separate hearing (which only came about because the Respondent's actions necessitated a further updated report on quantum) was only taken on the first day of the Merits Hearing, it is misleading to suggest that their time spent preparing for that hearing was ill-spent and cannot be claimed;[2529]

    c.    Mr Gardiner QC, their English tax law expert, is justified given his experience in comparative tax law and the fact that the "foundational principles of Indian tax law, and indeed the entire Indian tax code, derive from English law".[2530]

1982. With respect to the Respondent's costs, the Claimants object to the claim for INR 10,654,300 of "internal" costs "incurred towards Salaries and foreign Deputation of officers/officials of Government of India working on the Case".[2531] The Claimants note that they have not made an analogous claim for the costs of their personnel who worked on this matter, but should the Tribunal determine such costs to be appropriate, they request leave to submit an analogous claim.[2532]

---

[2525] *Id.*, ¶ 25.

[2526] Matthew Hodgson, "Costs in Investment Treaty Arbitration: The Case for Reform" (2014) 11(1) Transnational Dispute Management, RLA-459.

[2527] C-Reply Submission on Costs, ¶ 24.

[2528] *Id.*, ¶ 26.

[2529] *Id.*, ¶¶ 27-28.

[2530] *Id.*, ¶¶ 29-31.

[2531] Claimants' Responsive Submission on Costs ("C-Responsive Submission on Costs"), ¶ 2.

[2532] C-Responsive Submission on Costs, ¶ 2.

B.     **The Respondent's position**

1.     **Allocation of costs**

1983.   The Respondent seeks the payment of all its costs and fees[2533] incurred in this arbitration amounting to INR 353,361,528, GBP 5,773,618, EUR 276,232, and US$ 2,714,107.[2534]

1984.   The Respondent submits that the allocation of costs in this arbitration is governed by Article 9(3)(c)(vii) of the BIT as "supplemented by" Articles 38 to 40 of the UNCITRAL Rules.[2535]

1985.   With respect to Article 9(3)(c)(vii), the Respondent contends that, while it "lays down a starting point" pursuant to which each party bears its own legal costs and an equal share of the tribunal and administrative costs, "the third sentence gives the Tribunal the usual discretion to order that a higher proportion of all the costs […] is to be borne by one Party."[2536] Further, Articles 38 and 40 of the UNCITRAL Rules establish a presumption that the unsuccessful party will bear the costs of arbitration as identified in Article 40(1) (excluding legal costs as defined in Article 38(e)), although the Tribunal may ultimately apportion all costs differently "if it determines that apportionment is reasonable, taking into account the circumstances of the case."[2537]

1986.   According to the Respondent, the "circumstances of the case", which include the conduct of the Parties, the nature and complexity of the legal issues in dispute, and the reasonableness of the Parties' legal and other costs, "justify a decision by the Tribunal to order the relief that the Respondent seeks."[2538]

1987.   The Respondent maintains that the conduct of the Parties warrants a costs award in its favour because:

a.     The Claimants' claim is "ill-conceived and should never have been brought, because it is evident that the Respondent always had the power to levy capital gains tax on the 2006 Transactions, with or without the 2012 Clarification to the Income Tax Act";[2539]

b.     This case "should never have been brought separately from the *Vedanta Resources Ltd v India* arbitration" because even though the Respondent's ITD issued two tax demands, as is usual in such cases, both disputes arise out of the application by the Respondent of the same tax measure to the same transaction; and the

---

[2533]   Respondent's Submission on Costs ("R-Submission on Costs"), ¶ 2.

[2534]   Respondent's Schedule of Costs (Updated), 9 October 2020 ("R-Updated Schedule of Costs").

[2535]   R-Submission on Costs, ¶¶ 4-5, 8.

[2536]   *Id.*, ¶ 7.

[2537]   *Id.*, ¶¶ 12-13.

[2538]   *Id.*, ¶¶ 14, 16.

[2539]   *Id.*, ¶ 17.

Claimants' refusal to deal with "the two demands in as harmonious and coordinated a manner as possible", has resulted in parallel burdensome claims and the duplication of costs;[2540]

c.   The Claimants engaged in "highly aggressive tax behaviour" and "an egregious abuse in their structure of the 2006 Transactions", without informing and involving the Indian authorities in the structuring and implementation of that scheme;[2541]

d.   The Claimants were not forthright about the structure of the 2006 Transactions, withholding significant documents from production until late 2017, and causing the Respondent to have to "extract the relevant information from the Claimants almost on a document-by-document basis";[2542]

e.   "[O]ne of the root causes" of delays in these proceedings is the Claimants' "ill-conceived" RIM, which was filed at a time when they "knew that the Respondent was deeply engaged with hearings in the *Vedanta* case", required extensive correspondence, briefing, including a one-day hearing, and negatively impacted the Parties' efforts at document production, all of which disproportionately impacted the Respondent as a "developing world democracy";[2543]

f.   The Respondent successfully defended the Claimants' RIM (and therefore requests an award of all costs incurred thereon, "irrespective of the Tribunal's ultimate order on costs");[2544] and

g.   The Respondent and its counsel team have "at all times acted conscientiously and in compliance with their professional and ethical standards of conduct", "consistently advanced well-founded legal arguments", and "rightly insisted on the full factual record being made available to the Tribunal (as is obvious from the revelations contained in the belatedly disclosed documents which contradicted Ms Brown's written evidence)."[2545]

1988.   In addition, the Respondent contends that the fact that the Claimants' claims have "presented important and complex questions of Indian as well as public international law" justifies an award of costs in their favour.[2546]

1989.   The Respondent also rejects the Claimants' submissions on costs in their entirety.

---

[2540]   *Id.*, ¶ 18.

[2541]   *Id.*, ¶ 19.

[2542]   *Id.*, ¶ 20; Respondent's Rejoinder Submission on Costs ("R-Rejoinder Submission on Costs"), ¶ 25.

[2543]   R-Submission on Costs, ¶ 21.

[2544]   *Id.*, ¶ 22.

[2545]   *Id.*, ¶ 23.

[2546]   *Id.*, ¶ 24.

1990. With respect to the Claimants' submission that they expect to prevail in the arbitration overall, the Respondent considers it "premature, presumptuous, inappropriate, and wrong" since "[t]hese matters are currently *sub judice* before the Tribunal".[2547] In any event, the Respondent "has every confidence that it will successfully defend the Claimants' misconceived claim."[2548]

1991. The Respondent also disputes the Claimants' contention that they "succeeded on almost all disputed issues"[2549], arguing that:

    a.    While the Tribunal did not grant the Respondent's Stay Application, it was not entirely devoid of merit. In fact, because the Claimants and Vedanta were pursuing essentially the same claim in two separate actions, the Respondent's Stay Application was entirely legitimate and necessary to avoid the risk of contradictory decisions and the duplication of costs and effort;[2550]

    b.    While the Tribunal did not grant the Respondent's Application for Bifurcation, it did note that "the Respondent has put forward serious arguments in support of its Application" and that it "could not exclude that the Respondent's objections might be successful."[2551] The Respondent also rejects the Claimants' allegation that it deliberately delayed submitting its Application for Bifurcation, maintaining that given the constraints it faced as a developing country, "it was entirely legitimate to refuse to be railroaded by the Claimants into filing its Application for Bifurcation earlier than was required", and that in any event, if did file its Application "substantially earlier than was required under the UNCITRAL Rules";[2552]

    c.    The Claimants' unsuccessful RIM was "unmeritorious and should never have been made", especially since the Claimants had, but failed to pursue, the option of approaching the Indian courts to seek a stay of the enforcement of the tax demand.[2553] Absent such a stay from its own courts, the Respondent maintains that it has no discretion with respect to the enforcement measures because it "has a duty to act in accordance with its tax legislation".[2554] Moreover, the Respondent did not, as the Claimants contend, aggravate the dispute by selling CUHL's shares in CIL.[2555] Rather, the Tribunal expressly contemplated in its PO9 that the Respondent would dispose of the shares, and in fact rejected the RIM on the basis

---

[2547] Respondent's Responsive Submission on Costs ("R-Responsive Submission on Costs"), ¶ 4.

[2548] *Ibid*.

[2549] *Ibid*.

[2550] R-Responsive Submission on Costs, ¶ 8; R-Rejoinder Submission on Costs, ¶¶ 7-10.

[2551] R-Responsive Submission on Costs, ¶ 9.

[2552] *Ibid*; R-Rejoinder Submission on Costs, ¶ 11.

[2553] R-Responsive Submission on Costs, ¶¶ 13-14; R-Rejoinder Submission on Costs, ¶¶ 16, 22.

[2554] R-Responsive Submission on Costs, ¶ 14; R-Rejoinder Submission on Costs, ¶ 16.

[2555] R-Responsive Submission on Costs, ¶¶ 11, 13.

that any harm caused by such sales was fully reparable by an award of damages";[2556]

1992. The Respondent further objects to the Claimants' various complaints concerning the Respondent's document production. The Respondent contends that the delays in document production were caused by the Claimants themselves through their withholding of key information regarding the structuring of their 2006 Transactions,[2557] as well as the filing of their RIM "precisely at the time when it knew that the Respondent would be heavily engaged in preparing for and attending" a hearing in the *Vedanta* arbitration".[2558] The Respondent also asserts that given the asymmetry in resources between the Parties, "the document production burden on the Claimants was substantially less than that on the Respondent."[2559] With respect to the Respondent's alleged non-production of documents, the Respondent reiterates that despite their exhaustive searches of its files and records, they were unable to locate those documents for which the Claimants fault it for not producing.[2560]

1993. The Respondent disagrees that it made an excessive number of unsolicited submissions and submits that, to the extent that it sent a higher number of emails and letters in the proceeding, the Claimants' conduct made it necessary.[2561] In particular, the Respondent argues that it (i) filed new document requests after the document phase should have been concluded because of deficiencies in the Claimants' document production,[2562] (ii) sought to submit an additional pleading after the conclusion of the Evidentiary Hearing because the Claimants disrupted the orderly flow of the hearing,[2563] and (iii) requested the production of Appendices V and VI of the Project Sapphire Presentation because the Claimants had waived privilege over part of Appendix VI.[2564]

1994. The Respondent also disputes the Claimants' assertion that it made "constantly shifting and often incoherent" defences, and contends instead that it was the Claimants that introduced an entirely new argument in their updated Reply that the Respondent should be estopped from relying on certain defences.[2565] To the extent that the Respondent's defence based on tax abuse evolved, it was because the Claimants had not been forthright in disclosing the true nature of the 2006 Transactions.[2566]

---

[2556] *Id.*, ¶¶ 11-12.

[2557] *Id.*, ¶ 17.

[2558] *Id.*, ¶ 16.

[2559] *Ibid.*

[2560] *Id.*, ¶ 17.

[2561] *Id.*, ¶ 19.

[2562] *Id.*, ¶ 19(a).

[2563] *Id.*, ¶ 19(b).

[2564] *Id.*, ¶ 19(c).

[2565] *Id.*, ¶ 20.

[2566] *Id.*, ¶ 21.

1995. Finally, while the Claimants object to the relevance of Professor Rosenbloom's expert testimony, the Respondent maintains that they only submitted this testimony because of the Claimants' decision to submit Mr Gardiner QC's "two wholly irrelevant (and misleading) 'expert reports' on English law".[2567]

### 2.    Reasonableness of costs

1996. The Respondent submits that its costs are "entirely reasonable and to be expected in a large and complex case such as the present, which has been aggressively prosecuted by the Claimants, and which has, correspondingly, required a vigorous and strong defence."[2568]

1997. In response to the Claimants' objection to the Respondent's claim for its "Other Expenses", the Respondent maintains that they are "relatively modest" and "evidently 'reasonable'" within the meaning of Article 38(e) of the UNCITRAL Rules.[2569] The Respondent further contends that States are permitted to claim salary costs incurred by government lawyers working on investment treaty cases, and that in any event, these "Other Expenses" include costs incurred by witnesses and are therefore recoverable under Article 38(d) of the UNCITRAL Rules.[2570]

1998. The Respondent also rejects the Claimants' contention that the testimony provided by Professor Rosenbloom, a US tax law expert, was irrelevant. In the Respondent's view, the fact that Professor Rosenbloom was not an Indian tax law expert was inconsequential because he was opining on, among other things, whether there is any customary international law standard regarding retroactive taxation, the taxation of indirect transfers, or the retroactive taxation of indirect transfers.[2571] Moreover, the Respondent notes that, unlike Mr Gardiner QC, he did not "pretend[] to be a master of Indian Tax law by virtue of his supposed extensive knowledge of English Tax Law".[2572]

1999. With respect to the Claimants' costs, the Respondent submits that they are "remarkably excessive by any measure, even in this complex dispute", and "dwarf[]" both that of the Respondent, as well as the average costs incurred by claimants in investment treaty cases.[2573] The Respondent also rejects the Claimants' attempt to justify their costs by comparing them to the value of their claim. In the Respondent's view, the value of the Claimants' claim "has no direct correlation with the complexity of the dispute" nor the reasonableness of the Claimants' legal costs, especially since their counsel were not being paid on a contingency fee basis.[2574]

---

[2567]   *Ibid.*

[2568]   R-Submission on Costs, ¶ 25.

[2569]   Respondent's Reply Submission on Costs ("R-Reply Submission on Costs"), ¶ 2(a).

[2570]   R-Reply Submission on Costs, ¶ 2(b)-(c).

[2571]   R-Rejoinder Submission on Costs, ¶ 51.

[2572]   *Id.*, ¶ 50.

[2573]   R-Responsive Submission on Costs, ¶ 24, relying on Matthew Hodgson, "Costs in Investment Treaty Arbitration: The Case for Reform" (2014) 11(1) Transnational Dispute Management, RLA-459.

[2574]   R-Rejoinder Submission on Costs, ¶ 28.

2000. In addition, the Respondent objects to certain fees and expenses incurred by the Claimants as "unreasonable" and that therefore "must be disregarded entirely",[2575] including:

   a.   The fees and expenses of KPMG, which the Respondent claims was not justified "[g]iven the[ir] use of specialist Indian tax lawyers such as Mr Harish Salve QC and Mr Arvind Datar", and that "any contribution [KPMG] actually made to the proceedings is not discernible by reference to any work product".[2576] The Respondent also disputes the Claimants' justification that KPMG's advice was required because the case involved a novel interpretation of the ITA, maintaining instead that the law was not settled and it was the Claimants that relied on "novel" advice when structuring their "tax abusive transaction";[2577]

   b.   The fees and expenses related to domestic proceedings which, in the Respondent's view, does not qualify as costs of these arbitral proceedings under Article 38 of the UNCITRAL Rules;[2578]

   c.   The fees of FTI Consulting and Mr Richard Boulton QC for the initial pleadings and Evidentiary Hearing because "no material quantification was required" during the initial stage, and the presence of quantum experts was not required for the Evidentiary Hearing given that they were initially not due to testify until Day 9, and the Tribunal decided on a different procedure on Day 1.[2579] The Respondent also rejects the Claimants' implication that its actions necessitated Mr Boulton QC's Third Report and thereby, the separate quantum hearing, contending instead that it was the Claimants' own decision to task Mr Boulton QC with preparing his Third Report on the eve of the hearing "well beyond the scope of what was consented to by the Respondent and agreed by the Tribunal";[2580]

   d.   The fees of Mr Gardiner QC who, according to the Respondent, "had absolutely no relevant evidence to give to the Tribunal, as he is an English lawyer",[2581] and has "no expertise whatsoever in Indian law or public international law".[2582] Rather, the Respondent maintains that Mr Gardiner QC was "hired to develop a theory which bears no relation to the decided cases in th[e] field" of Indian tax law;[2583]

---

[2575] R-Responsive Submission on Costs, ¶ 25.

[2576] *Id*., ¶ 25(a). See also R-Rejoinder Submission on Costs, ¶¶ 32, 36.

[2577] R-Rejoinder Submission on Costs, ¶¶ 32-34.

[2578] R-Responsive Submission on Costs, ¶ 25(b).

[2579] *Id*., ¶ 25(c).

[2580] R-Rejoinder Submission on Costs, ¶¶ 38-42.

[2581] R-Responsive Submission on Costs, ¶ 25(d).

[2582] R-Rejoinder Submission on Costs, ¶¶ 43, 45.

[2583] *Id*., ¶¶ 44-48.

    e.     The fees of Ms Brown and Z-Axis which, in the Respondent's view, do not qualify as reasonable costs under Articles 38 and 40 of the UNCITRAL Rules.[2584]

## C.    Quantification of arbitration costs

### 1.    Cost advances

2001.    In accordance with Article 41 of the UNCITRAL Rules and Section 14.2 of the ToA, the Claimants and the Respondent have deposited a total of US$ 4,231,915.40 (US$ 2,116,915.40[2585] by the Claimants; US$ 2,115,000.00 by the Respondent), to cover the Arbitration Costs.

### 2.    Tribunal and administrative costs

2002.    The Tribunal members have collectively spent a total of 4193.24 hours as follows: Mr Stanimir A. Alexandrov, 901 hours; Mr J. Christopher Thomas QC, 1064.24 hours; and Mr Laurent Lévy, 2228 hours. In the ToA, it was agreed that the Tribunal would be compensated at an hourly rate of US$ 700 exclusive of VAT, where applicable.

2003.    The Secretary and Assistant to the Tribunal, Ms Sabina Sacco and Mr David Khachvani collectively spent a total of 1995.5 hours. In the ToA, it was agreed that they would be compensated at an hourly rate of US$ 300 exclusive of VAT, where applicable.

2004.    The Tribunal, Secretary, and Assistant have incurred expenses in the amount of US$ 122,587.50.

2005.    The PCA has charged fees in the amount of US$ 129,365.99 for the administration of the case and its registry services.

2006.    Other costs, such as hearing expenses, including IT costs, catering and court reporting services, as well as courier, printing, and telecommunications costs, amount to US$ 225,530.10.

2007.    Based on the above figures, the tribunal and administrative costs, comprising the items covered in Articles 38(a) to (c) of the UNCITRAL Rules, total US$ 4,011,400.83. As a result, the unexpended balance of the deposit amounts to US$ 220,514.57.

---

[2584]   R-Responsive Submission on Costs, ¶ 25(e).

[2585]   The Claimants deposited an additional EUR 1,680 to cover the full costs of court reporting services rendered at the hearing in Paris on 18 April 2016. See PCA letter to the Parties dated 18 May 2016. The EUR 1,680 was converted to US$ 1,915.40 at the prevailing exchange rate and deposited in the case account managed by the PCA. In the Claimants' Statement of Costs, the EUR 1,680 was converted to US$ 1,848.00, based on a slightly different exchange rate, resulting in a small discrepancy between the Claimants' Statement of Costs and the actual case account.

2008. In accordance with Article 41(5) of the UNCITRAL Rules and Section 14.5 of the ToA, the PCA shall render an accounting to the Parties of the deposits received after the issuance of this Award, and return the unexpended balance to the Parties.[2586]

### 3. The Claimants' statement of costs

2009. The Claimants seek the payment of all their costs and fees incurred in this arbitration amounting to US$ 26,159,184.91, the breakdown of which is as follows:[2587]

| Category | Amount (US$) |
|---|---|
| Cost Advances | 2,116,848.00[2588] |
| Legal Fees and Expenses | 20,127,778.83 |
| Experts' Costs | 3,712,062.00 |
| Witness Costs | 42,981.84 |
| Other Fees | 159,514.24 |
| **Total** | **26,159,184.91** |

2010. The Claimants' (i) legal fees and expenses include that of Quinn Emanuel Urquhart & Sullivan, LLP, Shearman & Sterling LLP, Cleber Advocaten, Shepherd and Wedderburn LLP, S&R Associates, Platinum Partners, Blackstone Chambers and the Chambers of Arvind Datar; (ii) experts' costs include the fees and expenses of Mr John Gardiner QC, FTI Consulting, and Mr Richard Boulton QC; (iii) witness costs include the fees and expenses of Ms Janice Brown; and (iv) other costs include travel costs and costs associated with the Claimants' presentation at the Evidentiary Hearing.[2589]

### 4. The Respondent's statement of costs

2011. The Respondent seeks the payment of all its costs and fees[2590] incurred in this arbitration amounting to INR 353,361,528, GBP 5,773,618, EUR 276,232, and US$ 2,714,107, the breakdown of which is as follows:[2591]

---

[2586]  The PCA shall return US$ 1,915.40 to the Claimants, to account for the Claimants having paid advances, the amount of which exceed the Respondent's by that difference: US$ 2,116,915.40 - US$ 2,115,000.00 = US$ 1,915.40 and the remaining share of the deposit to the Parties in equal shares.

[2587]  C-Submission on Costs, ¶ 47, Exh. B; Claimants' email of 28 September 2020 (CCom-313).

[2588]  This figure reflects the amount reflected in the Claimants' Statement of Costs, which is slightly different from the amount in the case account. See p. 559 n. 2585 above.

[2589]  C-Submission on Costs, ¶¶ 42-46.

[2590]  R-Submission on Costs, ¶ 2.

[2591]  R-Updated Schedule of Costs.

| Category | Amount (INR) | Amount (GBP) | Amount (EUR) | Amount (US$) |
|---|---|---|---|---|
| Cost Advances | - | - | - | 2,115,000 |
| Legal Fees and Expenses | 342,707,228 | 5,282,832 | 276,232 | - |
| Experts' Fees and Expenses | - | 490,786 | - | 599,107 |
| Other Expenses | 10,654,300 | - | - | - |
| **Total** | **353,361,528** | **5,773,618** | **276,232** | **2,714,107** |

2012. The category of "Other Expenses" amounting to INR 10,654,300 reflects "the costs incurred by the Respondent in having to pay the salaries of several of its officials who have been dedicated to the Cairn arbitration proceeding since it was commenced in late 2015, and who have consequently been diverted from their usual duties, as well as the expenses incurred by relevant officials attending the several hearings that have been held in this matter, as well as attending meetings with counsel."[2592]

## D.   The Tribunal's analysis

### 1.   Key legal provisions

2013. Article 9(3)(c)(vii) of the BIT, which addresses the allocation of costs of arbitration arising out of a dispute, provides, in relevant part, as follows:

> **Settlement of Disputes between an Investor and a Host State**
>
> [...]
>
> (3) Where the dispute is not referred to international conciliation, or where it is so referred but conciliation proceedings are terminated other than by the signing of a settlement agreement, the dispute may be referred to arbitration as follows:
>
> [...]
>
> (c) to an <u>ad hoc</u> arbitral tribunal by either party to the dispute in accordance with the Arbitration Rules of the United Nations Commission on International Trade Law, 1976. In respect of such arbitral proceedings, the following shall apply:
>
> [...]
>
> (vii) Each party concerned shall bear the cost of its own arbitrator and its representation in the arbitral proceedings. The cost of the Chairman in discharging his arbitral function and the remaining costs of the tribunal shall be borne equally by the parties concerned. The tribunal may, however, in its decision direct that a higher proportion of costs shall be borne by one of the two parties, and this award shall be binding on both parties.

---

[2592]   R-Submission on Costs, ¶ 27(b).

2014. Articles 38 of the UNCITRAL Rules, which also apply in accordance with Article 9(3)(c) of the BIT, defines the "costs of arbitration" as follows:

> The arbitral tribunal shall fix the costs of arbitration in its award. The term "costs" includes only:
>
> (a) The fees of the arbitral tribunal to be stated separately as to each arbitrator and to be fixed by the tribunal itself in accordance with article 39;
>
> (b) The travel and other expenses incurred by the arbitrators;
>
> (c) The costs of expert advice and of other assistance required by the arbitral tribunal;
>
> (d) The travel and other expenses of witnesses to the extent such expenses are approved by the arbitral tribunal;
>
> (e) The costs for legal representation and assistance of the successful party if such costs were claimed during the arbitral proceedings, and only to the extent that the arbitral tribunal determines that the amount of such costs is reasonable;
>
> (f) Any fees and expenses of the appointing authority as well as the expenses of the Secretary-General of the Permanent Court of Arbitration at The Hague.

2015. The principle governing the allocation of the costs of arbitration, according to Article 40 of the UNCITRAL Rules, is that:

> (1) Except as provided in paragraph 2, the costs of arbitration shall in principle be borne by the unsuccessful party. However, the arbitral tribunal may apportion each of such costs between the parties if it determines that apportionment is reasonable, taking into account the circumstances of the case.
>
> (2) With respect to the costs of legal representation and assistance referred to in article 38, paragraph (e), the arbitral tribunal, taking into account the circumstances of the case, shall be free to determine which party shall bear such costs or may apportion such costs between the parties if it determines that apportionment is reasonable.

2016. Pursuant to Article 40 of the UNCITRAL Rules, a distinction is drawn between the costs of legal representation and assistance referred in Article 38(e) of the UNCITRAL Rules ("Legal Costs") and the other costs of the arbitration referred in Article 38(a)-(c), (d) and (f). The costs referred in Article 38(a)-(c) are hereafter referred to as "Arbitration Costs". The Legal Costs and the Arbitration Costs are collectively hereafter referred to as the "Costs of Arbitration".

## 2.    Allocation of costs of arbitration

2017. Article 9(3)(c)(vii) of the BIT concerns the allocation of the Costs of Arbitration. While it provides that each party shall bear its own Legal Costs and share the Arbitration Costs

in equal shares, it also goes on to state that "[t]he tribunal may, however, in its decision direct that a higher proportion of costs shall be borne by one of the two parties, and this award shall be binding on both parties."

2018.   Since it ultimately affords the Tribunal the discretion to apportion a higher proportion of costs to one party, the Tribunal does not consider Article 9(3)(c)(vii) to be in conflict with Articles 40(1) and (2) of the UNCITRAL Rules, which also apply in this arbitration pursuant to Article 9(3)(c).

2019.   Article 40(1) of the UNCITRAL Rules prescribes the principle of "costs follow the event" in relation to the Arbitration Costs, but also that "the arbitral tribunal may apportion each of such costs between the parties if it determines that apportionment is reasonable, taking into account the circumstances of the case." Article 40(2) of the Rules concerning Legal Costs does not specifically prescribe "costs follow the event" principle, leaving the apportionment of the Legal Costs to the discretion of the Tribunal.

2020.   The Tribunal notes that, in comparison with Article 40(1), Article 40(2) of the UNCITRAL Rules appears to afford the Tribunal a greater measure of discretion with respect to the allocation of the Legal Costs. Nevertheless, the Tribunal is of the view that the general principle that the "costs follow the event," save for exceptional circumstances, applies equally with respect to the Legal Costs. The rationale for this principle, that applies to both Arbitration and Legal Costs, is that a party should not be forced to bear the costs of proceedings it was obliged to initiate to protect its investment (in the case of a prevailing claimant) or compelled to participate in (in the case of a respondent).

2021.   Based on the above, the Tribunal considers that the Claimants are entitled to recovery of the majority of their Arbitration and Legal Costs. The Claimants have prevailed in this arbitration, as the Tribunal has found that the Respondent has breached its obligation to accord FET to the Claimants' investment under Article 3(2) of the BIT. In addition, the Claimants have succeeded in respect of both the Respondent's Stay Application and Application of Bifurcation, the former of which, in particular, resulted in significant Legal Costs to the Claimants (i.e., US$ 1,159,585.68).

2022.   In addition, the Tribunal does not consider there to be any exceptional circumstances in this case that would warrant a departure from the principle of "costs follow the event". Despite the length of these proceedings, in the Tribunal's view the Claimants did not generally, if at all, engage in behaviour that increased the time and costs required to resolve the dispute. To the contrary, the Tribunal considers that the Respondent made numerous unsolicited submissions and additional document requests outside of the agreed-upon procedure that added to the cost and length of proceedings.

2023.   The Tribunal has also reviewed the amounts incurred by the Claimants and, with the exception of the costs indicated in paragraphs 2025.a to 2025.c below, considers them reasonable in light of the extensive and complex nature of these proceedings.

2024.   For these reasons, the Tribunal considers it appropriate to apply in general the principle of "costs follow the event" to all categories of costs referred to in Article 38 of the UNCITRAL Rules, including Arbitration Costs and Legal Costs.

2025. Notwithstanding this conclusion, the Tribunal sees justification for reducing the quantum of the Claimants' Legal Costs to a certain limited extent. Specifically:

    a.  First, given that the Claimants were unsuccessful in their RIM application, the Tribunal considers that they should bear responsibility for the Legal Costs that they incurred in relation thereto, as well as for the Respondent's Legal Costs related to its defence from this application.

    b.  Second, the Tribunal is of the view that the Claimants' costs relating to domestic proceedings in India, comprising of the fees and expenses of KPMG and S&R Associates and amounting to US$ 357,373.00, do not qualify as Legal Costs under Article 38(e) of the UNCITRAL Rules, as they are not "costs for legal representation and assistance of the successful party" in this arbitration.

    c.  Third, the Tribunal does not consider, as a general matter, that the Claimants have demonstrated how the fees and expenses of KPMG have been necessary in the pursuit of their claims in this arbitration, accordingly decides that they shall bear their fees and expenses, amounting to US$ 809,649.00.[2593]

2026. The Claimants have reserved their right to claim for the time spent on their defence by its employees if the Tribunal were minded to grant Respondent's relief for compensation of the time spent by its officials. The Tribunal will not grant the Respondent's relief in this regard and confirms that the Claimants were right not to claim compensation for their employees' time.

2027. Bearing each of these considerations in mind, and exercising the discretion that is provided by the BIT and the UNCITRAL Rules, the Tribunal apportions the costs of the proceedings as follows:

    a.  The Respondent shall bear the entirety of the Arbitration Costs, as fixed in paragraph 2007 above (i.e., US$ 4,011,400.83) and shall reimburse US$ 2,005,700.42 to the Claimants for the costs met from the Claimants' share of the deposit;

    b.  The Respondent shall bear all of the Claimants' Legal Costs (i.e., US$ 24,042,336.91), except for those incurred in relation to the RIM (US$ 1,245,657.43) and the domestic legal proceedings (US$ 357,373.00), as well as KPMG (US$ 809,649.00), and shall thus pay US$ 21,629,657.48 to the Claimants.

2028. In turn, the Claimants shall reimburse the Respondent for its Legal Costs related to the RIM. The Respondent has made the following claims related to the RIM:[2594]

---

[2593] Excluding KPMG's fees and expenses related to domestic proceedings.

[2594] Table prepared by the Tribunal on the basis of the R-Updated Schedule of Costs.

| Counsel Type → | FOREIGN COUNSEL | | | | INDIAN COUNSEL | |
|---|---|---|---|---|---|---|
| Phase ↓ | CLAIM (in GBP) | AMOUNT PAID (in GBP) | CLAIM (in EUR) | AMOUNT PAID (in EUR) | CLAIM (in INR) | AMOUNT PAID (in INR) |
| Submissions on the Claimants' Request for Interim Measures (the Claimants' Request was suspended on 16 May 2016 (CCom-14)) | 91,577 | 91,577 | - | - | 4,980,794 | 4,880,794 |
| Submissions on the Claimants' Request for Interim Measures, preparing for and attending Hearing on the Request for Interim Measures; Submissions on Document Production | 867,240 | 836,266 | 59,901 | 59,750 | 67,191,131 | 66,145,645 |

2029.  In the last line of the table above, the Respondent has included, together with its costs related to the RIM, its costs of the document production phase. The RIM required several submissions and an in-person hearing; in turn, the document production phase was lengthy and required much correspondence. All things considered, the Tribunal estimates that half of the costs noted in the last line of the above table would have been devoted to the RIM. By contrast, the Tribunal does not consider it appropriate to award costs related to the time spent by the Respondent's officials.

2030.  Accordingly, the Claimants will reimburse the Respondent the following amounts on account of their Legal Costs related to the RIM:

    a.  GBP 525,197.00, which on 21 December 2020 amount to US$ 697,304.06;[2595]

    b.  EUR 14,975.00, which on 21 December 2020 amount to US$ 18,300.95;[2596] and

    c.  INR 38,576,360.00, which on 21 December 2020 amount to US$ 524,638.50.[2597]

2031.  Accordingly, the Respondent shall pay the Claimants a total amount of US$ 20,389,413.97 (US$ 21,629,657.48 minus US$ 1,240,243.51).

---

[2595]  The Thomson Reuters GBP/US$ exchange rate on 21 December 2020 was US$ 1.3277.

[2596]  The Thomson Reuters EUR/US$ exchange rate on 21 December 2020 was US$ 1.2221.

[2597]  The Thomson Reuters INR/US$ exchange rate on 21 December 2020 was US$ 0.0136.

## X.   DECISION

2032.   For the foregoing reasons, the Tribunal:

    1.   DECLARES that it has jurisdiction over the Claimants' claims and that the Claimants' claims are admissible;

    2.   DECLARES that the Respondent has failed to uphold its obligations under the UK- India BIT and international law, and in particular, that it has failed to accord the Claimants' investments fair and equitable treatment in violation of Article 3(2) of the Treaty; and finds it unnecessary to make any declaration on other issues for which the Claimants request relief under paragraph 2(a), (c) and (d) of the Claimants' Updated Request for Relief.[2598]

    3.   ORDERS the Respondent to compensate the Claimants for the total harm suffered by the Claimants as a result of its breaches of the Treaty, in the following amounts:

        a.   US$ 984,228,274.00 for the net proceeds that would have been earned from the planned 2014 sale of CIL shares, plus interest at a rate of US$ 6-month LIBOR plus a 6-month margin of 1.375%, compounded semi-annually on the net proceeds, from the following dates and until full payment thereof:

            i.   For the US$ 64,708,741.00 in lost net proceeds incurred in January 2014, pre-award interest from 31 January 2014;

            ii.   For the US$ 303,352,155.00 in lost net proceeds incurred in February 2014, pre-award interest from 28 February 2014;

            iii.   For the US$ 313,076,958.00 in lost net proceeds incurred in March 2014, pre-award interest from 31 March 2014;

            iv.   For the US$ 191,695,557.00 in lost net proceeds incurred in April 2014, pre-award interest from 30 April 2014;

            v.   For the US$ 111,394,863.00 in lost net proceeds incurred in May 2014, pre-award interest from 31 May 2014;

        The Tribunal DENIES the Claimants' request for US$ 230,868,360.00 for the loss of the exemption from UK corporation tax;

        b.   US$ 240,645,158.81 for the withheld tax refund due with respect to AY 2012-13 (i.e., share sales to Vedanta), plus interest at a rate of US$ 6-month LIBOR plus a 6-month margin of 1.375%, compounded semi-annually from 30 June 2017 until full payment thereof; and

---

[2598]   C-Updated Request for Relief.

    c.   US$ <u>7,946,710.55</u> for the withheld tax refund due with respect to AY 2010-11 (i.e., share sales to Petronas), plus interest at a rate of US$ 6-month LIBOR plus a 6-month margin of 1.375%, compounded semi-annually from 30 June 2017 until full payment thereof;

4.    DECLARES that the amounts awarded under paragraphs 3(a) and 3(c) above have been calculated on a net-of-Indian-tax basis, and that, accordingly, India may not deduct taxes in respect of payment thereof. The Tribunal DENIES this request for relief with respect to the amounts awarded under paragraph 3(b) above;

5.    DECLARES that the tax demand against the Claimants in respect of AY 2007-08, as set forth in the FAO (the "Demand") is inconsistent with the Treaty and the Claimants are relieved from any obligation to pay it, and ORDERS the Respondent to neutralise the continuing effect of the Demand, by permanently withdrawing the Demand and refraining from seeking to recover further the alleged tax liability or any interest and/or penalties arising from this alleged liability through any other means. The Claimants' request under para. 6(b) of their Updated Request for Relief is therefore rendered moot;

6.    DECLARES that, as paragraph 6(b) of the Claimants' Updated Request for Relief has been rendered moot, the Claimants' request at paragraph 7 of their Updated Request for Relief (for a declaration that the Respondent is liable to compensate the Claimants for UK corporation tax paid by the Claimants on amounts awarded under Paragraph 6(b) of their Updated Request for Relief, as well as the Claimants' request for an order to pay into an escrow account an amount necessary to meet the estimated UK corporation tax due under Paragraph 6(b)) has likewise been rendered moot;

7.    DECLARES that the Respondent's arguments on unlawful tax avoidance and Section 2(47)(vi) of the ITA are not found to be grounds for the Demand and, in any event, are not substantiated on the merits; and

8.    ORDERS the Respondent to pay the Claimants' costs of arbitration and legal representation in connection with these arbitration proceedings, in the following amounts:

    a.   US$ 2,005,700.42 as reimbursement for the Arbitration Costs; and

    b.   US$ 20,389,413.97 towards their legal costs incurred in the arbitration proceedings.

Seat of arbitration: The Hague, the Netherlands

Date: 21 December 2020

_____        _____
**Mr Stanimir A. Alexandrov**         **Mr J. Christopher Thomas QC**

_____
**Mr Laurent Lévy**
**Presiding Arbitrator**