**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CAIRN ENERGY PLC and
CAIRN UK HOLDINGS LIMITED,

*Petitioners*,

v.

REPUBLIC OF INDIA,

*Respondent*.

Case No. 1:21-cv-00396-RJL

**STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF**
**THE REPUBLIC OF INDIA'S MOTION TO STAY**

**WHITE & CASE**

Carolyn B. Lamm (D.C. Bar No. 221325)
Nicolle Kownacki (D.C. Bar No. 1005627)
David Riesenberg (D.C. Bar No. 1033269)
701 Thirteenth Street, N.W.
Washington, D.C. 20005
Phone: (202) 626-3600
Fax:    (202) 639-9355

August 13, 2021

*Counsel for the Republic of India*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................................... iii

PRELIMINARY STATEMENT ................................................................................................... 1

BACKGROUND ........................................................................................................................... 5

     A.   The 1994 Treaty Between India and the United Kingdom ....................................... 5

     B.   The 2006 Divestment .............................................................................................. 8

     C.   The 2014 Tax Assessment ...................................................................................... 9

     D.   The 2016 Arbitration ............................................................................................. 11

     E.   The 2021 Litigation in Multiple Jurisdictions Worldwide .................................... 12

ARGUMENT ............................................................................................................................... 13

I.     Judicial Economy Will Be Served by a Stay ................................................................. 14

II.    International Comity Supports a Stay Until the Dutch Litigation Concludes .............................. 18

III.   The Balance of Hardships Overwhelmingly Favors a Stay ........................................... 19

CONCLUSION ............................................................................................................................ 23

CERTIFICATE OF SERVICE ................................................................................................... 24

## **TABLE OF AUTHORITIES**

**Page(s)**

### CASES

*9REN Holding S.A.R.L. v. Kingdom of Spain*,
No. 19-CV-1871 (TSC), 2020 U.S. Dist. LEXIS 180117
(D.D.C. Sept. 30, 2020) ...............................................................................14, 19

*Am. Life Ins. Co. v. Stewart*,
300 U.S. 203 (1937).......................................................................................................4

*Baker Marine, Ltd. v. Chevron, Ltd.*,
191 F.3d 194 (2d Cir. 1999)........................................................................................16

*Belize Soc. Dev. Ltd. v. Gov't of Belize*,
668 F.3d 724 (D.C. Cir. 2012) ...................................................................................13

*Boger v. Citrix Sys.*,
No. 8:19-cv-01234-PX, 2020 U.S. Dist. LEXIS 71072
(D. Md. Apr. 22, 2020) ...............................................................................................21

*Cef Energia, B.V. v. Italian Republic*,
No. 19-CV-3443 (KBJ), 2020 U.S. Dist. LEXIS 130291
(D.D.C. July 23, 2020)....................................................................................4, 13, 14

*Clinton v. Jones*,
520 U.S. 681 (1997).....................................................................................................13

*Corporación Mexicana de Mantenimiento Integral. S. de R.L. de C.V. v. Pemex
Exploración y Producción (Corporación Mexicana)*,
No. 10-4656, 2012 U.S. App. LEXIS 27054
(2d Cir. Feb. 16, 2012)................................................................................................17

*Cube Infrastructure Fund v. Kingdom of Spain*,
No. 20-CV-1708 (EGS) (D.D.C. May 17, 2021) ...................................................13

*Divx, LLC v. Netflix, Inc.*,
No. CV 19-1606 PSG, 2020 U.S. Dist. LEXIS 100327
(C.D. Cal. May 11, 2020) ...........................................................................................21

*Eiser Infrastructure Ltd. v. Kingdom of Spain*,
No. 1:18-cv-1686 (CKK) (D.D.C. June 4, 2021).......................................14, 16

*Getma Int'l v. Republic of Guinea*,
142 F. Supp. 3d 110 (D.D.C. 2015) ..............................................................4, 14, 20

*Getma Int'l v. Republic of Guinea*,
  191 F. Supp. 3d 43 (D.D.C. 2016), *aff'd* 862 F.3d 45 (D.C. Cir. 2017) ..................................17

*Gretton Ltd. v. Republic of Uzbekistan.*,
  No. 18-CV-1755 (JEB), 2019 U.S. Dist. LEXIS 18990
  (D.D.C. Feb. 6, 2019) ........................................................................................................14, 17

*Hulley Enters. v. Russian Fed'n*,
  211 F. Supp. 3d 269 (D.D.C. 2016) ....................................................................3, 14, 15, 18

*Hulley Enters. v. Russian Fed'n*,
  502 F. Supp. 3d 144 (D.D.C. 2020) ........................................................................... *passim*

*IBT/HERE Empl. Reps.' Council v. Gate Gourmet Div. Ams.*,
  402 F. Supp. 2d 289 (D.D.C. 2005) ................................................................................14

*Infrared Envtl. Infrastructure GP Ltd. v. Kingdom of Spain*,
  No. 20-817 (JDB), 2021 U.S. Dist. LEXIS 120489
  (D.D.C. June 29, 2021) ..................................................................................................14, 19

*Infrastructure Servs. Luxembourg S.a.r.l. v. Kingdom of Spain*,
  No. 1:18-CV-1753(EGS) (D.D.C. July 15, 2020) ................................................................14

*Karkey Karadeniz v. Islamic Republic of Pakistan*,
  No. 1:18-cv-01461(RJL) (D.D.C. July 24, 2019) ................................................................14

*Laker Airways Ltd. v. Sabena, Belgian World Airlines*,
  731 F.2d 909 (D.C. Cir. 1984) ........................................................................................18

*Landis v. North American Co.*,
  299 U.S. 248 (1936) .................................................................................................4, 13, 22

*Masdar Solar & Wind Coop. U.A. v. Kingdom of Spain*,
  397 F. Supp. 3d 34 (D.D.C. 2019) ............................................................................. *passim*

*Naegele v. Albers*,
  355 F. Supp. 2d 129 (D.D.C. 2005) ...............................................................................3, 14

*NextEra Energy Global Holdings B.V. v. Kingdom of Spain*,
  No. 19-CV-1618 (TSC), 2020 U.S. Dist. LEXIS 180119
  (D.D.C. Sept. 30, 2020) .................................................................................................14, 15

*Novenergia II – Energy & Env't (SCA) v. Kingdom of Spain*,
  No. 18-CV-01148 (TSC), 2020 U.S. Dist. LEXIS 12794
  (D.D.C. Jan. 27, 2020) ..............................................................................................4, 20, 22

*Process & Indus. Devs. v. Fed. Republic of Nigeria*,
　962 F.3d 576 (D.C. Cir. 2020) ................................................................................2

*Qxmédical, LLC v. Vascular Sols., LLC*,
　No. 17-CV-1969, 2020 U.S. Dist. LEXIS 118305
　(D. Minn. July 7, 2020) ........................................................................................21

*\*RREEF Infrastructure (G.P.) Ltd. v. Kingdom of Spain*,
　No. 1:19-CV-3783 (CJN), 2021 U.S. Dist. LEXIS 63261
　(D.D.C. Mar. 31, 2021) .................................................................................. *passim*

*Seneca Nation of Indians v. U.S. Dep't of Health & Human Servs.*,
　144 F. Supp. 3d 115 (D.D.C. 2015) .....................................................................18

*Stati v. Republic of Kazakhstan*,
　No. 14-CV-1638 (ABJ) (ZMF), Min. Order
　(D.D.C. Aug. 15, 2017) ........................................................................................14

*Stati v. Republic of Kazakhstan*,
　199 F. Supp. 3d 179 (D.D.C. 2016) .....................................................................14

*\*Termorio S.A. E.S.P. v. Electranta S.P.*,
　487 F.3d 928 (D.C. Cir. 2007) ....................................................................1, 15, 16

*Thai-Lao Lignite (Thail.) Co. v. Gov't of the Lao People's Democratic Republic*,
　864 F.3d 172 (2d Cir. 2017) .................................................................................16

*\*Unión Fenosa Gas, S.A. v. Arab Republic of Egypt*,
　No. 18-CV-2395 (JEB), 2020 U.S. Dist. LEXIS 98645
　(D.D.C. June 4, 2020) ........................................................................5, 14, 19, 21

*Valores Mundiales, S.L. v. Bolivarian Republic of Venezuela*,
　1:19-cv-00046(KBJ)(RMM), Min. Order, (D.D.C. Nov. 17, 2020).......................14

## FEDERAL STATUTES AND RULES

28 U.S.C. § 1605..........................................................................................................1

Fed. R. Civ. P. 60.......................................................................................................16

## OTHER AUTHORITIES

1961 Income Tax Act....................................................................................................6

　Section 9(1)(i) ........................................................................................................9, 10

　Section 246A.............................................................................................................6

Section 293 ..................................................................................................................6

1993 UK-India Double Taxation Avoidance Agreement, art. 27 ...................................6

Convention on the Recognition and Enforcement of Foreign Arbitral Awards,
June 10, 1958, 21 U.S.T. 2517 .................................................................................1, 2

   *Article V(1)(e) .....................................................................................12, 13, 15, 17

Dutch Code of Civil Procedure, art. 1065 .....................................................................2

Finance Act 2012, ch. III, § 4(a) .................................................................................10

India-UK Agreement for the Promotion and Protection of Investments,
March 14, 1994 .............................................................................................................5

   Article 1 ......................................................................................................................7

   *Article 9 ...........................................................................................................6, 7, 11

Ministry of Health and Family Welfare, *COVID-19 Statistics*,
https://www.mohfw.gov.in (last visited Aug. 10, 2021) .............................................21

*Authorities upon which counsel chiefly relies are marked with an asterisk.*

The Republic of India ("India") respectfully moves this Court to stay the present litigation for the duration of the ongoing litigation in the Netherlands to annul ("set aside") the arbitration award (the "Award") at issue in this case.[1]  The Netherlands was the place of the underlying arbitration (the "seat" or "primary jurisdiction"), and a district court "normally may not enforce an arbitration award that has been lawfully set aside" by the courts at the seat of arbitration. *Termorio S.A. E.S.P. v. Electranta S.P.*, 487 F.3d 928, 935 (D.C. Cir. 2007).

As further detailed below, India's Motion to Stay is justified by judicial economy, international comity, and the balance of hardships, including the devastating impact of the COVID-19 pandemic.  India therefore asks this Court to apply the same reasoning and issue the same relief as in <u>seventeen</u> previous rulings in this District.  In those analogous proceedings to enforce international arbitration awards, this Court has routinely granted the motions to stay submitted by Egypt, Guinea, Italy, Kazakhstan, Pakistan, Russia, Spain, Uzbekistan, and Venezuela, while parallel set-aside or annulment proceedings were underway in the primary jurisdiction (much as in the present litigation).  Here, India should also receive the same relief that was previously granted to those other foreign sovereign States, including because India is presently burdened with fighting a grave public health crisis.

## PRELIMINARY STATEMENT

Petitioners Cairn Energy PLC and Cairn UK Holdings Limited ("Petitioners") are seeking to collect more than US$ 1.2 billion from India in accordance with the Award rendered by an arbitral tribunal seated in the Netherlands.  In support of this effort, Petitioners have submitted a petition requesting this Court to confirm and enforce the Award under the Convention on the

---

[1]   India has also filed today a Motion to Dismiss for Lack of Subject Matter Jurisdiction ("Motion to Dismiss" or "MTD") under the Foreign Sovereign Immunities Act ("FSIA"), because India never waived sovereign immunity or offered to arbitrate this dispute, as required under the relevant subsections of 28 U.S.C. § 1605.

Recognition and Enforcement of Foreign Arbitral Awards ("New York Convention"). Pet. 38–39 (ECF No. 1).

In response, India has filed a Motion to Dismiss for lack of subject-matter jurisdiction under the FSIA. Separately, in parallel annulment litigation before the Dutch courts, India is presently challenging the enforceability of the Award on multiple grounds under Article 1065 of the Dutch Code of Civil Procedure ("DCCP"), relating generally to India's fiscal sovereignty. India's Writ of Summons, March 22, 2021 ("Writ") ¶¶ 127, 413 (Declaration of Professor Albert Jan van den Berg ("Van den Berg Decl.") Ex. 1).

There is a substantial degree of overlap between the arguments raised in India's Motion to Dismiss in this U.S. litigation and in India's Writ of Summons in the Dutch litigation, as detailed below in Table 1:

| Table 1 – Overlapping Issues in the Dutch Writ and U.S. Motion to Dismiss[2] | | |
|---|---|---|
| **Overlapping Issue** | **Dutch Litigation** | **U.S. Litigation** |
| India never offered or agreed to arbitrate tax disputes under the bilateral investment treaty. | Writ ¶¶ 146–52 | MTD, p. 17-20 |
| India never offered or agreed to arbitrate disputes concerning any illegal tax-avoidance structure under the bilateral investment treaty. | Writ ¶¶ 340–43 | MTD, pp. 20-24 |
| India never offered or agreed to arbitrate disputes concerning a "divestment" or "returns" under the bilateral investment treaty. | Writ ¶¶ 382–86 | MTD, pp. 24-25 |

---

[2]   Table 1 addresses only the "overlapping issues" reflected in the Writ and the pending Motion to Dismiss, as filed today. Table 1 does not comprehensively address all the overlapping issues that would likely arise in India's potential Opposition to the Petition under the Federal Arbitration Act ("FAA") and the New York Convention. *See Process & Indus. Devs. v. Fed. Republic of Nigeria*, 962 F.3d 576, 585 (D.C. Cir. 2020) ("[T]he FAA … does not prevent a foreign sovereign from seeking what the FSIA guarantees—resolution of an immunity assertion before the sovereign can be compelled to defend the merits.").

Where such overlapping issues arise in parallel litigation, this Court has previously found such circumstances to be "paradigm example[s] of . . . case[s] warranting a stay." *Hulley Enters. v. Russian Fed'n* ("*Hulley II*"), 502 F. Supp. 3d 144, 154 (D.D.C. 2020) (extending stay pending Dutch annulment litigation); *Hulley Enters. v. Russian Fed'n* ("*Hulley I*"), 211 F. Supp. 3d 269, 282 (D.D.C. 2016) (granting original stay pending Dutch annulment litigation). Further, this Court has regularly observed that "'litigating essentially the same issues in two separate forums is not in the interest of judicial economy or in the parties' best interests.'" *Masdar Solar & Wind Coop. U.A. v. Kingdom of Spain*, 397 F. Supp. 3d 34, 40 (D.D.C. 2019) (quoting *Naegele v. Albers*, 355 F. Supp. 2d 129, 141 (D.D.C. 2005)).

In sharp contrast to this common-sense observation, Petitioners have adopted a wasteful and disorderly approach to this litigation while the annulment litigation remains ongoing. Reportedly, Petitioners have commenced proceedings against India in <u>at least nine</u> jurisdictions simultaneously. As Petitioners' counsel reportedly told *Reuters*, "Cairn has already filed cases in local courts in the United States, UK, France, Netherlands, Singapore and Quebec to enforce the arbitration award." Van den Berg Decl. ¶ 10, Ex. 5 (quoting *Reuters*). Other media outlets have also reported Petitioners' supposed commencement of proceedings in Japan, the United Arab Emirates, and Cayman Islands. *Id.*[3]

In Petitioners' view, apparently, these multiple national courts should all proceed to consider the validity of the Award simultaneously, despite the obvious risk of conflicting decisions and duplicative waste of resources. This Court, however, has consistently rejected such an approach—by staying U.S. litigation to await the results of annulment proceedings at the seat of arbitration. "To put it simply, this is a litigation quagmire that a stay would forestall . . . ." *Hulley*

---

[3]    India has not received service of process with respect to many of these alleged proceedings, and hereby reserves all rights with respect to these or any other proceedings commenced by Petitioners and related entities.

*II*, 502 F. Supp. 3d at 156, 162 (explaining that "[s]tays have generally been found warranted to avoid this litigation quagmire").

The legal framework applicable to this Court's evaluation of this Motion to Stay is set forth in *Landis v. North American Co.*, 299 U.S. 248, 254 (1936),[4] which applies wherever this Court exercises its inherent power to stay proceedings during parallel litigation in another forum. *See also Am. Life Ins. Co. v. Stewart*, 300 U.S. 203, 215 (1937) ("In the exercise of a sound discretion [the court] may hold one lawsuit in abeyance to abide the outcome of another, especially where the parties and the issues are the same.") (citing *Landis*, 299 U.S. at 248). Applying this framework, this Court routinely considers the issues of judicial economy, the balance of hardships, and international comity in evaluating whether or not to stay litigation. All three factors weigh heavily in favor of staying the present U.S. enforcement proceedings while the annulment litigation is pending in the Netherlands. Here, there is no basis for denying that the Dutch judgment "could significantly impact this litigation," for multiple reasons explained fully below. *RREEF Infrastructure (G.P.) Ltd. v. Kingdom of Spain*, No. 1:19-CV-3783 (CJN), 2021 U.S. Dist. LEXIS 63261, at *8 (D.D.C. Mar. 31, 2021). Indeed, if this Court were to enforce the Award, and the Dutch courts later set it aside, this would necessarily "result in 'more expensive litigation involving more complex issues.'" *Cef Energia, B.V. v. Italian Republic*, No. 19-CV-3443 (KBJ), 2020 U.S. Dist. LEXIS 130291, at *15 (D.D.C. July 23, 2020) (quoting *Getma Int'l v. Republic of Guinea*, 142 F. Supp. 3d 110, 114 (D.D.C. 2015)).

---

[4]   The present stay is to be evaluated under *Landis*, 299 U.S. at 254, as a matter of this Court's inherent authority, rather than under Article VI of the New York Convention. This is because "this Court has not ruled on its jurisdiction in this case and thus is not in a position to issue a stay pursuant to the New York Convention." *Hulley II*, 502 F. Supp. 3d at 153 (citations and quotations omitted); *see also Cef Energia*, No. 19-cv-3443 (KBJ), 2020 U.S. Dist. LEXIS 130291, at *13 (D.D.C. July 23, 2020) ("This Court is considering Italy's motion to stay 'under its inherent powers[,]' rather than Article VI of the Convention, because the Court's own jurisdiction has yet to be established.") (quoting *Novenergia II – Energy & Env't (SCA) v. Kingdom of Spain*, No. 18-CV-01148 (TSC), 2020 U.S. Dist. LEXIS 12794, at *6 (D.D.C. Jan. 27, 2020)).

Finally, a stay of these U.S. proceedings is further necessitated by the tragic recent events in India resulting from the COVID-19 pandemic.  Last year, this Court found that the effects of COVID-19 on the Republic of Egypt, among other factors, was a strong justification for staying a closely analogous case.  *See Unión Fenosa Gas, S.A. v. Arab Republic of Egypt,* No. 18-CV-2395 (JEB), 2020 U.S. Dist. LEXIS 98645, at *13 (D.D.C. June 4, 2020) (granting stay in light of the "ongoing COVID-19 pandemic" and resulting financial crisis in Egypt).  The dire situation currently facing India—with respect to both the public-health component and the related economic burden—far surpasses the situation in Egypt in 2020.  This is not a time for India to be embroiled in duplicative litigation around the globe and, therefore, this Court should exercise its discretion to minimize the strain upon the people of India.

## BACKGROUND

For the purposes of this Motion to Stay, a brief summary of this dispute's factual and procedural background is provided below.  Further details are set forth in India's Motion to Dismiss and supporting materials, including in the Writ of Summons submitted in the Dutch litigation.  MTD 5-13; Writ § II; Van den Berg Decl. ¶¶ 4–5.

### A.    The 1994 Treaty Between India and the United Kingdom

On March 14, 1994, the High Commissioner of India and the UK's Secretary of State for Foreign and Commonwealth Affairs signed the Agreement for the Promotion and Protection of Investments, which was a so-called bilateral investment treaty ("India-UK BIT").  (ECF No. 1-3).  Significantly, as explained in the Expert Opinion submitted by Mr. Sudipto Sarkar SA, the Parliament of India never ratified the BIT.  Expert Opinion of Sudipto Sarkar SA ("Sarkar Op.") ¶ 11; *see also* Instrument of Ratification of the India-UK BIT (Declaration of Carolyn Lamm ("Lamm Decl."), Ex. 1).

Under Article 9 of the BIT, India and the UK each offered to arbitrate certain disputes commenced by "an investor of . . . the other Contracting Party in relation to an investment." India-UK BIT, art. 9. By signing the BIT, however, India did not somehow extend a boundless, open-ended offer to arbitrate <u>all</u> disputes with UK investors. To the contrary, India's offer to arbitrate excluded at least three categories of disputes relevant to the present case, as detailed below.

<u>First</u>, India did not offer to arbitrate tax disputes under the BIT. Tax disputes are a special category of disputes addressed in a separate treaty, the 1993 UK-India Double Taxation Avoidance Agreement ("DTAA"), which—unlike many other double taxation treaties—excludes any option for arbitration. *See* 1993 DTAA, art. 27 (Lamm Decl., Ex. 2 at 26–27). India and the UK supplemented the DTAA with a 2004 Memorandum of Understanding ("MOU") regarding the dispute-resolution procedure, confirming implicitly that neither India nor the UK understood the 1994 BIT to render superfluous either the 1993 DTAA or its dispute-resolution procedure. 2004 MOU (Lamm Decl., Ex. 3 at 3–5). Indeed, the 1994 BIT and the 1993 DTAA were negotiated contemporaneously, and thus must be understood as complementing one another. MTD 18.

Moreover, the arbitration of tax disputes has been prohibited for decades under Section 293 of India's 1961 Income Tax Act ("IT Act"). IT Act § 293 (Lamm Decl., Ex. 4); Sarkar Op. ¶¶ 12–24. Under Indian statutory law, the only lawful procedure for challenging the validity of taxation measures is established under Chapter XX of the IT Act. *See* IT Act Ch. XX, § 246A (Lamm Decl., Ex. 5); Sarkar Op. ¶ 18. The BIT was never ratified by the Parliament of India, and subjecting India to the arbitration of tax disputes would have been beyond the competence of the representatives of the Executive (such as the High Commissioner who signed the BIT). It therefore was objectively evident in 1994 that India was not offering to arbitrate tax disputes with UK investors under the BIT. MTD 19-20.

<u>Second</u>, as noted above, India's offer to arbitrate extended only to disputes related to "an investment."   Article 1(b) of the BIT expressly limited the term, "investment," to cover only property rights or other economic rights established "in accordance with the national laws" of India.   India-UK BIT, art. 1(b).   Any rights that were established in violation of Indian law, therefore, were excluded from India's offer to arbitrate.   This would include any violations of the 1961 Income Tax Act and/or India's laws prohibiting the avoidance of capital gains tax, as detailed further below and in India's Motion to Dismiss.

<u>Third</u>, the term, "investment," under Article 1(b) of the India-UK BIT necessarily had to be understood both in light of its ordinary meaning and in the context of the other definitions set forth under Article 1.   Writ ¶¶ 319–27.   The term, "investment," therefore, could not be understood as encompassing corporate structures devised solely for the purpose of <u>divestment</u>—that is, the liquidation of assets and extraction of cash proceeds from the Indian economy.   Writ ¶¶ 393–402. Permitting arbitration under the BIT of disputes concerning divestment of assets could not possibly be reconciled with the BIT's object and purpose—<i>i.e.</i>, the promotion of <u>investment</u>, and not the draining of capital from the respective economies of the Contracting Parties.   Writ ¶¶ 400–02. Relatedly, the concept of "investments" under Article 1(b) of the BIT had to be understood as distinct from the separately defined concept of "returns" under Article 1(e).   The latter term related to "the monetary amounts yielded by an investment such as . . . <u>capital gains</u>."   India-UK BIT, art.1(e).   Because the BIT's Article 9 references only disputes pertaining to an "investment," and not disputes pertaining to "returns" (such as "capital gains") any dispute relating specifically to "capital gains" realized by an investor would necessarily be excluded from any purported offer to arbitrate under the BIT.

The relevance of these three categories of excluded disputes is demonstrated below,

inasmuch as the present dispute fell within all three categories—thus removing this case from India's offer of arbitration under the India-UK BIT.

### B.    The 2006 Divestment

In 2004, Cairn Energy PLC ("Cairn"), a Scottish company, discovered three major oil fields in the northern Indian State of Rajasthan.  Award ¶ 23 (ECF No. 1-2).  One of these oil fields constituted "the largest onshore discovery in India in over two decades."  *Id.*  Eager to capitalize on India's natural resources, Cairn implemented an aggressive tax avoidance strategy in 2006 to divest and extract maximum profits from India's economy while enabling Cairn to avoid the payment of any capital gains tax worldwide (the "2006 Divestment").  Writ § II.A(i)(b).

To execute the 2006 Divestment, Cairn arranged a formally complex series of artificial share swaps amongst multiple offshore shell companies, while preparing for an initial public offering ("IPO") on the Indian stock market.  Writ ¶ 30.  As a result of these share swaps, Cairn and its related entities realized capital gains amounting to US$ 5.5 billion.  Writ ¶ 32.  Under Indian law, these capital gains necessarily incurred tax liability of US$ 1.6 billion.  Writ ¶¶ 3, 45.

Cairn and its related shell companies, however, camouflaged the capital gain by employing several artificial features, including most egregiously the two so-called "Daylight Loans," whereby Cairn funneled billions of dollars in cash into and out of India within 24-hour periods.  Writ ¶ 374.  Even more outrageously, Cairn also <u>failed to file any tax return</u> for the relevant tax year—a tax year involving a massive IPO and multibillion-dollar share swaps.  Writ ¶¶ 53–55.  This tactic prevented the Indian tax authorities from learning about the actual economic substance of the 2006 Divestment for the purposes of any potential tax assessment under the 1961 Income Tax Act.  *Id.*

The possibility that India would impose capital gains tax upon Cairn based upon the transactions underlying the 2006 Divestment was not only objectively foreseeable—it was subjectively foreseen.  Specifically, in a presentation on May 3, 2006, Cairn considered two

potential approaches to executing the 2006 Divestment—labeled "Plan A" and "Plan B." Writ ¶¶ 365–67. As Cairn's accountants warned in the presentation, both Plan A and Plan B would indeed expose Cairn to capital gains tax. Writ ¶ 368. The accountants proposed, however, to implement the 2006 Divestment using a third, even more aggressive approach, the so-called "Plan C," which would incorporate the "unique and untested" device of the Daylight Loans, as well as a number of other artificial features. Writ ¶¶ 373–74. The accountants' proposal was that "Plan C" would shield the 2006 Divestment from capital gains tax, although there was no identifiable precedent whereby the Indian tax authorities had ever endorsed such aggressive tax avoidance. Writ ¶ 374.

It is worth emphasizing that the applicable provision of Indian tax legislation—as it read already in 2006—had a broad scope. Section 9(1)(i) of the 1961 Income Tax Act provided that income taxable in India includes "all income accruing or arising, whether directly or indirectly, through or from any business connection in India, or through or from any property in India, or through or from any asset or source of income in India, or through the transfer of a capital asset situate in India." IT Act § 9(1)(i) (Lamm Decl., Ex. 10). India has consistently explained that this broad provision, first enacted in 1961, necessarily contemplated imposing capital gains tax upon the economic substance of the 2006 Divestment. Writ ¶¶ 48, 93 438.

C.    The 2014 Tax Assessment

In April 2013, an organization known as the International Consortium of Investigative Journalists ("ICIJ") published the "Offshore Leaks Database," a searchable "list of offshore companies and the beneficial owners behind them," which was generally comparable to the "Panama Papers" or certain Wikileaks databases. Writ ¶ 47. While reviewing the Offshore Leaks Database, the Indian tax authorities discovered the name of the Chairman of Cairn's Corporate Advisory Board, and began to research and analyze certain suspicious aspects of Cairn's financial statements. *Id.* Initially suspecting that Cairn had engaged in a 2013 restructuring involving a

"massive write-off" reflecting potentially "inflated value[s]," the Indian tax authorities carefully

began to evaluate Cairn's pre-2013 tax documentation.  Award ¶ 150.  In the course of doing so,

the Indian tax authorities discovered that one of the relevant companies, Cairn UK Holdings

Limited ("CUHL"), had not filed any tax return for the year pertaining to the IPO.  Writ ¶¶ 46–47.

In January 2014, the Indian tax authorities instructed CUHL to file the missing tax return.

Writ ¶ 46.  After reviewing the relevant documentation, the Indian tax authorities concluded that

the share swaps underlying the 2006 Divestment gave rise to taxable capital gains under Section

9(1)(i) of the 1961 Income Tax Act—*i.e.*, indirect transfers of capital assets derived from Indian

natural resources.  Writ ¶ 48.

In addition to the plain text of the 1961 Income Tax Act, the Indian tax authorities'

conclusion was supported by two "Explanations" enacted by the Parliament of India in 2012.

Neither of these Explanations constituted amendments to the pre-existing law—and, indeed, both

Explanations were explicitly styled as clarifications, rather than as amendments:

> Explanation 4.—For the removal of doubts, it is hereby clarified that the expression
> "through" shall mean and include and shall be deemed to have always meant and
> included "by means of", "in consequence of" or "by reason of".
>
> Explanation 5.—For the removal of doubts, it is hereby clarified that an asset or a
> capital asset being any share or interest in a company or entity registered or
> incorporated outside India shall be deemed to be and shall always be deemed to
> have been situated in India, if the share or interest derives, directly or indirectly, its
> value substantially from the assets located in India.

Finance Act 2012, ch. III, § 4(a) (Lamm Decl., Ex. 6).  As indicated by their explicit terms, these

Explanations were included for the "removal of doubts," and merely "clarified" pre-existing law.

*Id.*  These explanations thus memorialized an interpretation of Section 9(1)(i) of the Income Tax

Act—which was already foreseeable (and actually foreseen) when Cairn engaged in the 2006

Divestment.  Writ ¶ 48.

After completing the relevant assessment, the Indian tax authorities directed CUHL to satisfy the unpaid capital gains tax resulting from the 2006 Divestment and the underlying tax-avoidant restructurings.  Writ ¶ 45.  The tax was ultimately levied on CUHL by the Income Tax Department's Final Assessment Order of January 25, 2016.  *Id.*  CUHL's shares in CIL were subsequently sold to satisfy the unpaid capital gains tax.  Award ¶ 205.

### D.   The 2016 Arbitration

Even before the Indian tax authorities had issued the final tax assessment, Petitioners commenced arbitration against India on September 22, 2015, in order to recover compensation equal to the payable taxes.  Award ¶ 179.  Petitioners alleged that this dispute purportedly fell within India's offer to arbitrate under Article 9 of the India-UK BIT.  *Id.*  Petitioners thus purported to accept India's standing offer to arbitrate, even though—as explained above in Part A—India's offer had excluded: (1) tax disputes, (2) disputes relating to purported rights obtained in violation of Indian law, and (3) disputes relating to either "divestments" or "returns," rather than genuine "investments."  MTD 13.

India objected to the Tribunal's jurisdiction on the basis that Petitioners had failed to accept the offer of arbitration according to its plain terms—*i.e.*, by attempting to arbitrate a dispute falling outside the offer to arbitrate.  The Tribunal disregarded India's arguments and improperly upheld its own jurisdiction.  Award ¶ 792.  The Tribunal similarly rejected India's substantive defenses and concluded that India breached the "Fair and Equitable Treatment" standard under the India-UK BIT.  Award ¶ 1816.  Shockingly, the Tribunal endorsed the 2006 Divestment as a "triumph of form over substance," although the Supreme Court of India has adopted precisely the opposite principle ("substance over form") as the foundation of its jurisprudence on tax avoidance.  Award ¶ 1588.  In its deeply flawed Award, the Tribunal directed India to pay damages and interest in

excess of US$ 1.2 billion together with interest, as well as US$ 22 million for arbitration and legal costs.  Award ¶ 2032.

### E.    The 2021 Litigation in Multiple Jurisdictions Worldwide

On March 22, 2021, India timely commenced annulment proceedings in the Court of Appeal of The Hague, which constitutes the "competent authority" to set aside the Award under Article V(1)(e) of the New York Convention because The Hague was the seat of the arbitration. Writ ¶¶ 122–26.  India has advanced various procedural and substantive grounds for contesting the award under Dutch law, including, *inter alia*, that (1) India never offered to arbitrate a tax dispute, (2) India never offered to arbitrate disputes that did not involve a protected "investment," including any illegal transactions, "divestments," or "returns," and (3) the Award violates the transnational public policy against double non-taxation.  Writ §§ IV.B-C, V.  The degree of overlap between the Dutch annulment litigation and this U.S. enforcement litigation is further illustrated above in Table 1.

Petitioners, however, refuse to agree to a stay of this U.S. enforcement action while the Dutch annulment proceedings are resolved.  Rather, Petitioners are seeking enforcement of the Award—reportedly—in numerous jurisdictions worldwide.  Van den Berg Decl. ¶ 10.  Petitioners have also initiated parallel enforcement proceedings against third parties, including an action against Air India, Ltd. ("Air India"), which seeks a declaratory judgment finding Air India jointly and severally liable for the amounts under the Award, despite Air India's status as a wholly separate legal entity.  *Cairn Energy PLC v. Air India Ltd.*, 1:21-CV-04375 (S.D.N.Y.).  Notably, as explained below in Parts I and III, any property seized or compensation paid during the course of this worldwide enforcement campaign would need to be restored to India if the Dutch litigation is successful—a disruptive and unnecessary waste of resources, especially during a serious public health crisis.

Petitioners' approach is even more senseless in light of the extensive degree of overlap—as detailed above in Table 1—between the issues raised in the ongoing Dutch annulment litigation and all or most of the enforcement actions.  Both the Dutch and U.S. litigation, for example, raise complex legal questions pertaining to the interpretation of the India-UK BIT, the consideration of whether tax disputes and illegal investments fall within the offer of arbitration, the application of Indian tax law, and numerous public policy considerations.  MTD 15-25; Writ §§ IV-V.  Under Article V(1)(e) of the New York Convention, moreover, a judgment setting aside the Award in the Netherlands will be virtually dispositive in most of the jurisdictions where enforcement actions have been brought.  The Dutch litigation remains active and ongoing, however, and its final outcome remains unknown.

## ARGUMENT

This Court "has broad discretion to stay proceedings as an incident to its power to control its own docket." *Clinton v. Jones*, 520 U.S. 681, 706 (1997) (citing *Landis*, 299 U.S. at 254).  In determining whether to grant a stay, a court should "weigh competing interests and maintain an even balance between the court's interests in judicial economy and any possible hardship to the parties." *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 668 F.3d 724, 732–33 (D.C. Cir. 2012) (quotation and citation omitted).  In cases such as the present, this Court also has also repeatedly acknowledged the significance of "the interest of international comity."  *Hulley II*, 502 F. Supp. 3d at 158; *Cef Energia*, 2020 U.S. Dist. LEXIS 130291, at *22.

The Motion to Stay should be granted pending the resolution of the Dutch annulment litigation, which is likely to alter (or render entirely moot) many of the legal and factual questions in this case.  In at least seventeen previous rulings,[5] this Court has stayed proceedings in essentially

---

[5]    *See Cube Infrastructure Fund v. Kingdom of Spain*, No. 20-CV-1708 (EGS), Mem. Op. and Order, ECF No. 24, (D.D.C. May 17, 2021); *RREEF Infrastructure (G.P.) Ltd. v. Kingdom of Spain*, No. 1:19-CV-03783 (CJN), 2021

identical circumstances, where a foreign sovereign State has requested a stay pending the results of annulment or set-aside proceedings in another forum.  The same relief should be granted in the present case.

## I.      Judicial Economy Will Be Served by a Stay

As this Court has repeatedly emphasized, "'litigating essentially the same issues in two separate forums is not in the interest of judicial economy or in the parties' best interests.'"  *Masdar Solar*, 397 F. Supp. 3d at 40 (quoting *Naegele*, 355 F. Supp. 2d at 141); *see also Infrared Envtl. Infrastructure GP Ltd. v. Kingdom of Spain*, No. 20-817 (JDB), 2021 U.S. Dist. LEXIS 120489, at *16 (D.D.C. June 29, 2021) (granting stay on the basis of judicial economy); *Hulley II*, 502 F. Supp. 3d at 161 (same); *9REN Holding S.A.R.L. v. Kingdom of Spain*, No. 19-cv-1871 (TSC), 2020 U.S. Dist. LEXIS 180117, at *6 (D.D.C. Sept. 30, 2020) (same); *NextEra Energy Glob. Holdings B.V. v. Kingdom of Spain*, No. 19-cv-1618 (TSC), 2020 U.S. Dist. LEXIS 180119, at *6 (D.D.C. Sept. 30, 2020) (granting stay on this basis); *Cef Energia, B.V. v. Italian Republic*, No. 19-cv-3443 (KBJ), 2020 U.S. Dist. LEXIS 130291, at *15 (D.D.C. July 23, 2020) (same); *IBT/HERE Empl. Reps.' Council v. Gate Gourmet Div. Ams.*, 402 F. Supp. 2d 289, 293 (D.D.C. 2005) (same).

---

U.S. Dist. LEXIS 63261, at *8 (D.D.C. Mar. 31, 2021); *Valores Mundiales, S.L. v. Bolivarian Republic of Venezuela*, 1:19-cv-00046(KBJ)(RMM), Min. Order, (D.D.C. Nov. 17, 2020); *NextEra Energy Global Holdings B.V. v. Spain*, No. 19-CV-1618 (TSC), 2020 U.S. Dist. LEXIS 180119, at *6 (D.D.C. Sept. 30, 2020); *9REN Holding S.A.R.L. v. Spain*, No. 19-CV-1871 (TSC), 2020 U.S. Dist. LEXIS 180117, at *6 (D.D.C. Sept. 30, 2020);; *Cef Energia, B.V. v. Italian Republic*, No. 19-CV-3443 (KBJ), 2020 U.S. Dist. LEXIS 130291, at *13-14 (D.D.C. July 23, 2020); *Eiser Infrastructure Ltd. v. Kingdom of Spain*, No. 1:18-CV-1686 (CKK), Order Staying Case, ECF No. 51, (D.D.C. Feb. 13, 2020); *Infrastructure Servs. Luxembourg S.a.r.l. v. Kingdom of Spain*, No. 1:18-CV-1753 (EGS),  Min. Order, (D.D.C. July 15, 2020); *Hulley II*, 502 F. Supp. 3d at 158; *Unión Fenosa Gas S.A. v. Arab Republic of Egypt*, No. 18-CV-2395 (JEB), 2020 U.S. Dist. LEXIS 98645, at *5-6, *15 (D.D.C. June 4, 2020); *Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain*, No. 1:18-CV-2254 (JEB), Order 1-2, ECF No. 29, (D.D.C. Sept. 18, 2019);  *Karkey Karadeniz v. Islamic Republic of Pakistan*, No. 1:18-cv-01461(RJL), Min. Order, (D.D.C. July 24, 2019); *Gretton Ltd. v. Republic of Uzbekistan*., No. 18-CV-1755 (JEB), 2019 U.S. Dist. LEXIS 18990, at *19-20 (D.D.C. Feb. 6, 2019); *Stati v. Republic of Kazakhstan*, No. 14-CV-1638 (ABJ) (ZMF), Min. Order, (D.D.C. Aug. 15, 2017); *Stati v. Republic of Kazakhstan*, 199 F. Supp. 3d 179, 193 (D.D.C. 2016); *Hulley*, 211 F. Supp. 3d at 288; *Getma Int'l v. Republic of Guinea*, 142 F. Supp. 3d 110, 119 (D.D.C. 2015).

This common-sense principle is exemplified by the present case.  In light of the extensive overlap of issues between the parallel Dutch and U.S. proceedings, judicial economy favors a stay in at least three different respects.

First, a successful annulment in the Netherlands would likely render the Award unenforceable under Article V(1)(e) of the New York Convention, thus significantly reducing the scope of the task facing this Court.  *Hulley II.*, 502 F. Supp. 3d at 154 (explaining that, "[i]f the Dutch courts, which have primary jurisdiction, set aside the Awards, resolving jurisdictional issues in this case may be a fruitless exercise") (quotation and citation omitted).  Under Article V(1)(e), "a secondary Contracting State normally may not enforce an arbitration award that has been lawfully set aside by a 'competent authority' in the primary Contracting State."  *TermoRio*, 487 F.3d at 935.  As the D.C. Circuit has explained, "an arbitration award <u>does not exist</u> to be enforced in other Contracting States if it has been lawfully 'set aside' by a competent authority in the State in which the award was made."  *Id.* at 936 (emphasis added).  Consequently, if the Dutch courts rule in favor of India based upon any of the grounds asserted in India's Writ under the applicable Dutch statute, Petitioners will have "no cause of action" in the U.S. litigation.  *Hulley I*, 211 F. Supp. 3d at 282.

Even if India is not successful or only partially successful in the annulment proceedings, the annulment decision in the Dutch litigation would nonetheless assist this Court in analyzing the overlapping issues in this case "at a minimum, by virtue of [its] persuasive value."  *RREEF Infrastructure*, 2021 U.S. Dist. LEXIS 63261, at *8 (quoting *Hulley I*, 211 F. Supp. 3d at 284) (granting a stay); *Masdar Solar*, 397 F. Supp. 3d at 40 (same); *NextEra*, 2020 U.S. Dist. LEXIS 180119, at *6 (same).

15

Second, a stay will also conserve judicial resources by safeguarding any judgment of this Court from remand and reconsideration.  If the U.S. enforcement action proceeds before the Dutch courts render a final decision, any judgment issued by this Court remains vulnerable to being upended in the event that the Award is ultimately annulled in the Netherlands.  *See TermoRio S.A. E.S.P.*, 487 F.3d at 936 ("'mechanical application of domestic arbitral law'" to a foreign award that is subsequently set aside "'would seriously undermine finality and regularly produce conflicting judgments'") (quoting *Baker Marine, Ltd. v. Chevron, Ltd.*, 191 F.3d 194, 197 n.2 (2d Cir. 1999)).

Case law shows the wisdom of staying U.S. enforcement proceedings during parallel annulment or set-aside proceedings.  In *Thai-Lao Lignite (Thail.) Co. v. Gov't of the Lao People's Democratic Republic*, 864 F.3d 172, 178-79 (2d Cir. 2017), the Second Circuit upheld the district court's recognition of a Malaysian arbitral award under the New York Convention.  Shortly thereafter, the Malaysian courts set aside the Malaysian arbitral award under Malaysian law.  *Id.* at 180.  The U.S. district court was thus obliged to vacate its prior judgment under Rule 60(b)(5) of the Federal Rules of Civil Procedure.  *Id.* at 180–81.  The U.S. proceedings then returned for a second time to the Second Circuit, where vacatur was affirmed—but not until after the *Thai-Lao Lignite* case had wasted the U.S. courts' time and resources for seven years.  *Id.* at 191.

There are many such examples.  In the recent *Eiser* case, a district judge prudently stayed enforcement while a parallel annulment was pending, and the petitioner ultimately withdrew the U.S. enforcement proceeding after the annulment was successful.  *Eiser Infrastructure Ltd. v. Kingdom of Spain*, No. 1:18-cv-1686 (CKK) (D.D.C. June 4, 2021), Stipulation of Dismissal at 2, ECF No. 63 ("Due to the annulment of the Award, the Parties agree that this case is now moot.").  Another district judge imposed a stay "pending the outcome of Guinea's attempt to have the award

annulled," which was ultimately successful—thus leading to refusal of enforcement under Article V(1)(e) of the New York Convention.  *See Getma Int'l v. Republic of Guinea*, 191 F. Supp. 3d 43, 45, 55 (D.D.C. 2016), *aff'd* 862 F.3d 45, 50 (D.C. Cir. 2017).  In a third case, the Second Circuit was compelled to remand a judgment of enforcement, because, while the appeal was pending, a court of the primary jurisdiction set aside the award after the U.S. district court had enforced it. *Corporación Mexicana de Mantenimiento Integral. S. de R.L. de C.V. v. Pemex Exploración y Producción (Corporación Mexicana)*, No. 10-4656, 2012 U.S. App. LEXIS 27054, at *2 (2d Cir. Feb. 16, 2012) (remanding case to determine the relevance of a judgment annulling the underlying arbitral award).

In light of these cautionary tales, courts in this District have consistently embraced the more prudent approach—stay pending set-aside.  *See RREEF Infrastructure*, 2021 U.S. Dist. LEXIS 63261, at *8 ("If this Court were to affirm an award that [the parallel proceeding] later annuls, '[m]ore expensive litigation involving more complex issues would result.'") (quoting *Getma Int'l*, 142 F. Supp. at 114); *Hulley II*, 502 F. Supp. 3d  at 155 ("[A]ny decision predicated even remotely on [an undecided annulment proceeding]…would necessarily result in more litigation than otherwise would occur if the instant proceedings were halted pending the outcome of Dutch litigation."); *Gretton Ltd. v. Republic of Uzbekistan*, No.18-1755(JEB), 2019 U.S. Dist. LEXIS 18990, at *11 (D.D.C. Feb. 6, 2019) ("If the Court were to side with [one of the parties] now and then [the other party] were to win on appeal in [the primary jurisdiction], [the parties] could well be back in a U.S. court . . . litigating some of the issues raised in this case all over again. That is hardly the kind of efficient dispute resolution that arbitration is meant to serve.").  A stay thus provides the best means of conserving judicial resources and mitigates the risk of issuing a decision that is subsequently undermined by set-aside in the Netherlands.

Third, a stay will prevent the type of "'fractured and disorderly' and unnecessary litigation" presently pursued by Petitioners, but disfavored by this Court. *Hulley I*, 211 F. Supp. 3d at 285 (quoting *Seneca Nation of Indians v. U.S. Dep't of Health & Human Servs.*, 144 F. Supp. 3d 115, 118–19 (D.D.C. 2015)).  Indeed, this Court consistently has found that litigating the same issues in <u>two</u> jurisdictions does not serve judicial economy. *See Masdar Solar*, 397 F. Supp. 3d at 40. Petitioners, by comparison, are seeking enforcement of the Award in <u>numerous jurisdictions</u> simultaneously—before the Dutch courts have had an opportunity to determine the validity of the Award.  This type of "litigation quagmire" is disfavored. *Hulley II*, 502 F. Supp. 3d at 156 ("Absent a stay, history may be forced to repeat itself with yet additional litigation to retrieve seized property.  To put it simply, this is a litigation quagmire that a stay would forestall . . . .").

Considerations of judicial economy, therefore, will be best served by a stay of proceedings in this case.

## II.    International Comity Supports a Stay Until the Dutch Litigation Concludes

This case has no connection to the United States.  Rather, it involves a Dutch arbitration regarding India's fiscal sovereignty under a treaty between India and the United Kingdom.

This Court's premature intervention into this dispute, therefore, would be contrary to international comity.  As emphasized in *Masdar Solar*:

> Interests of comity . . . are especially strong where a foreign parallel proceeding is ongoing . . . and there is a possibility that the award will be set aside, since a court may be acting improvidently by enforcing the award prior to the completion of the foreign proceedings.

397 F. Supp. 3d at 40 (emphasis in original) (internal citation omitted); *see also Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 937 (D.C. Cir. 1984) (explaining that the "central precept of comity . . . fosters international cooperation and encourages reciprocity, thereby promoting predictability and stability through satisfaction of mutual expectations"); *Hulley II*, 502

F. Supp. 3d  at 158 ("the interest of international comity and orderly litigation are best served by imposing a stay pending final judgment in the primary jurisdiction on a set-aside proceeding").

The concerns expressed in *Masdar Solar* are directly at play here.  Any decision in the present case will require this Court to determine a number of dispositive issues that are currently before the Court of Appeal of The Hague, including whether India agreed to arbitrate with Cairn. It would be contrary to the precept of international comity for this Court to "wade into this territory unnecessarily," as held repeatedly in prior decisions.  *Masdar Solar*, 397 F. Supp. 3d at 40; *see also Infrared*, 2021 U.S. Dist. LEXIS 120489, at *15 (same); *9REN Holdings*, 2020 U.S. Dist. LEXIS 180117, at *6 (same).  This consideration is particularly acute given that the United States is not a party to the India-UK BIT and lacks the Dutch courts' interest as the seat of the underlying arbitration.

In the present case, therefore, this Court should likewise stay the present litigation to avoid the possibility of conflicting judgments in violation of the principle of international comity.

## III.    The Balance of Hardships Overwhelmingly Favors a Stay

The possible hardships to each party also favor India, which will be significantly burdened in several respects absent a stay.

First, India would suffer severe hardship if it is unjustifiably compelled to pay more than US$ 1.2 billion, given that a judgment of set-aside under any of the multiple grounds asserted by India in the Dutch courts would eliminate India's liability for any damages.  The size of the purported Award and the fact that it is yet subject to reversal weighs in favor of a stay.  *See Unión Fenosa Gas, S.A*, 2020 U.S. Dist. LEXIS 98645, at *12–13 (concluding, with respect to an award of US$ 2 billion, that "[t]he Court is loath to plunge so deeply into a sovereign's treasury . . . if there is a chance that the award might be set aside or mitigated to some extent").

19

<u>Second</u>, without a stay, India will be forced to expend significant resources challenging the validity of and defending against the purported award—in multiple forums.  In this regard, courts have noted that a foreign State would "undeniably be burdened by having to attack the validity of [an] arbitral award in two forums" simultaneously, particularly where the primary jurisdiction is outside of the United States.  *Masdar Solar*, 397 F. Supp. 3d at 40.  As stated above, India would not only have to challenge the validity of the Award in the United States and the Netherlands, but also in the numerous additional forums in which Cairn has commenced enforcement actions.  Van den Berg Decl. ¶ 10.

<u>Third</u>, courts in this District have consistently recognized the "very real harm" of a foreign State's assets being seized during the potential execution of a judgment where the primary jurisdiction's courts could later "determine that the award was improper."  *Getma*, 142 F. Supp. 3d at 118 (quoting *Jorf Lasfar Energy Co., S.C.A. v. AMCI Exp. Corp.*, No. 05-CV-0423, 2005 U.S. Dist. LEXIS 34969, at *10 (W.D. Pa. Dec. 22, 2005)); *see also RREEF Infrastructure*, 2021 U.S. Dist. LEXIS 63261, at *8  ("if the Court were to confirm the award now, Spain could face the arduous task of trying to recover seized assets if its annulment application before the ICSID proves successful."); *Novenergia II – Energy & Env't (SCA) v. Kingdom of Spain*, No. 18-CV-01148 (TSC), 2020 U.S. Dist. LEXIS 12794, at *10 (D.D.C. Jan. 27, 2020) ("[T]he risk of premature enforcement could result in [a foreign State] trying to recover assets seized during this action if it were to prevail in the [set aside] proceedings."); *Masdar Solar*, 397 F. Supp. 3d at 40 (emphasizing the burden to a foreign State arising from "ultimately having to recover assets seized during this action should the annulment proceeding go its way").  If the Court were prematurely to confirm the Award, which the Dutch courts may later annul, India would face the onerous task

of trying to recover seized assets.  *Hulley II*, 502 F. Supp. 3d at 156 (describing "costly proceedings to retrieve the property when the Awards were set aside by the Dutch District Court").

Fourth, the hardships resulting from the COVID-19 pandemic also weigh heavily in favor of a stay.  *See Unión Fenosa Gas, S.A*, 2020 U.S. Dist. LEXIS 98645, at *13–15 (warning against premature enforcement of an arbitral award "during a period of immense uncertainty" stemming from "an unprecedented global pandemic").  A global health crisis is not the right moment to engage in "unnecessary expenditure of time and money on discovery," as many courts have noted. *Boger v. Citrix Sys.*, No. 8:19-cv-01234-PX, 2020 U.S. Dist. LEXIS 71072, at *4 (D. Md. Apr. 22, 2020) (granting stay due, in part, to "unprecedented disruption because of the COVID-19 pandemic"); *see also Qxmédical, LLC v. Vascular Sols., LLC*, No. 17-CV-1969 (PJS/TNL), 2020 U.S. Dist. LEXIS 118305, at *4 (D. Minn. July 7, 2020) (granting stay in part because of "the impact of the COVID-19 pandemic on the Court's operations"); *Divx, LLC v. Netflix, Inc.*, No. CV 19-1606 PSG, 2020 U.S. Dist. LEXIS 100327, at *6–7 (C.D. Cal. May 11, 2020) (granting stay and noting that "[t]he coronavirus pandemic is also a relevant consideration").

Although India has started to turn the corner in reducing the number of new cases and increasing the number of vaccinated individuals, COVID-19 has taken a grave toll on the country. India has more than 30 million confirmed cases and more than 420,000 deaths.  Gov't of India Ministry of Health and Family Welfare, *COVID-19 Statistics*, https://www.mohfw.gov.in (last visited Aug. 10, 2021) (Lamm Decl., Ex. 7).  The global pandemic has also strained India's economy.  India's gross domestic product ("GDP") is estimated to contract 7.3% in fiscal year 2020-2021—its first economic contraction since 1979.  Gov't of India Public Debt Management Quarterly Report (June 2021) ¶ 1.2 (Lamm Decl., Ex. 8)  Relatedly, India's fiscal profile has been

harmed by the ongoing pandemic, with the public debt growing nearly 23% between April 2020 and March 2021, according to recent statistics. *Id.* ¶ 2.1.

In these unprecedented circumstances, extracting nearly US$ 1.2 billion from India—in particular when those funds could ultimately be returned to India—before the Dutch proceedings run their course is likely to have considerable ramifications. Fundamentally, a premature enforcement in this case would result in significant and unjustifiable harm to India, at a time when its resources are already spread thin due to the global pandemic.

Conversely, Cairn will experience no substantial hardship from staying proceedings until clarity emerges from the set-aside proceedings in the Netherlands. Cairn can be expected to assert an "interest in expeditiously collecting an award." *Masdar Solar*, 397 F. Supp. 3d at 40. But this interest is not dispositive where, as described above, "hasty enforcement . . . present[s] a 'clear case of hardship or inequity,'" *id.* (citing *Landis*, 299 U.S. at 255). In any event, post-award interest can easily compensate for any delay should Cairn succeed in the set-aside proceedings. *RREEF Infrastructure*, 2021 U.S. Dist. LEXIS 63261, at *8–9 (holding any interest in "quickly collecting [an] arbitral award" is "less acute" where interest continues to accrue on the award); *Novenergia II*, 2020 U.S. Dist. LEXIS 12794, at *9–11 (finding that set-aside proceedings lasting more than four years did not outweigh hardships on foreign State and that any delay in obtaining the award could be compensated with interest).

The Court, therefore, should conclude that the balance of hardships overwhelmingly weighs in favor of a stay.

## **CONCLUSION**

For the reasons stated above, India respectfully requests that the Court stay this U.S. litigation pending resolution of the set-side proceedings in the Dutch courts.

Dated:   August 13, 2021          Respectfully submitted,
       Washington, DC

**WHITE & CASE**

*/s/  Carolyn B. Lamm*          .
Carolyn B. Lamm (D.C. Bar No. 221325)
Nicolle Kownacki (D.C. Bar No. 1005627)
David P. Riesenberg (D.C. Bar No. 1033269)
701 Thirteenth Street, NW
Washington, DC  20005
Telephone:      + 1 202 626 3600
Facsimile:      + 1 202 639 9355
clamm@whitecase.com

*Counsel for the Republic of India*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on August 13, 2021, the foregoing document was filed using the CM/ECF system, which will send notification of the filing to counsel of record who are registered CM/ECF users.

*/s/ Carolyn B. Lamm*

Carolyn B. Lamm (D.C. Bar No. 221325)

**WHITE & CASE**
701 Thirteenth Street, NW
Washington, DC  20005
Telephone:     + 1 202 626 3600
clamm@whitecase.com

*Counsel for the Republic of India*

24