**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CAIRN ENERGY PLC and
CAIRN UK HOLDINGS LIMITED,

*Petitioners*,

v.

REPUBLIC OF INDIA,

*Respondent*.

Case No. 1:21-cv-00396-RJL

**STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF**
**THE REPUBLIC OF INDIA'S MOTION TO DISMISS**

**WHITE & CASE**
Carolyn B. Lamm (D.C. Bar No. 221325)
Nicolle Kownacki (D.C. Bar No. 1005627)
David Riesenberg (D.C. Bar No. 1033269)
701 Thirteenth Street, N.W.
Washington, D.C. 20005
Phone: (202) 626-3600
Fax:    (202) 639-9355

August 13, 2021

*Counsel for the Republic of India*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. iii

PRELIMINARY STATEMENT ........................................................................................ 1

BACKGROUND .............................................................................................................. 5

    A.    The 1993 and 1994 Treaties Between India and the United Kingdom .................... 5

    B.    The 2006 Divestment ............................................................................................. 6

    C.    The 2014 Tax Investigation and Assessment ........................................................ 11

    D.    The 2016 Arbitration ............................................................................................. 13

ARGUMENT ................................................................................................................... 14

I.    India Did Not Offer to Arbitrate Petitioners' Dispute, and Did Not Exclude Judicial Review of the Arbitrators' Competence ...................................................... 15

    A.    India Did Not Offer to Arbitrate Tax Disputes ..................................................... 17

    B.    India Did Not Offer to Arbitrate Disputes Involving Illegal Investments, Such as Petitioners' Abusive Tax-Avoidance Structure ..................................................... 20

    C.    India Did Not Offer to Arbitrate Disputes Involving Petitioners' "Divestments" or "Returns" ............................................................................................................... 24

    D.    The Parties Did Not Exclude Judicial Review of the Existence of an Arbitration Agreement ............................................................................................................... 25

II.    India Has Not Waived Its Sovereign Immunity .............................................................. 31

CONCLUSION ................................................................................................................ 33

CERTIFICATE OF SERVICE ........................................................................................ 35

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*AT&T Techs. v. Communs. Workers of Am.*,
   475 U.S. 643 (1986)..........................................................................................4, 17

*Belize Soc. Dev., Ltd. v. Gov't of Belize*,
   794 F.3d 99 (D.C. Cir. 2015).....................................................................30

*Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*,
   734 F.3d 1175 (D.C. Cir. 2013)................................................................14

*\*BG Grp. PLC v. Republic of Argentina*,
   572 U.S. 25 (2014)............................................................................3, 16, 28

*Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*,
   137 S. Ct. 1312 (2017)............................................................................1

*Chevron Corp. v. Republic of Ecuador*,
   795 F.3d 200 (D.C. Cir. 2015)................................................................2, 15

*Citigroup Glob. Mkts. v. Abbar*,
   761 F.3d 268 (2d Cir. 2014).....................................................................29

*\*Creighton Ltd. v. Gov't of Qatar*,
   181 F.3d 118 (D.C. Cir. 1999)..........................................................31, 33

*DDK Hotels, LLC v. Williams-Sonoma*,
   No. 20-2748-cv, 2021 U.S. App. LEXIS 21862
   (2d Cir. July 23, 2021)............................................................................3, 26

*FAA v. Cooper*,
   566 U.S. 284 (2012)................................................................................32

*First Options of Chicago, Inc. v. Kaplan*,
   514 U.S. 938, (1995)......................................................................3, 26, 28

*FSP, Inc. v. Societe Generale*,
   No. 02-CV-4786, 2005 U.S. Dist. LEXIS 3081
   (S.D.N.Y. Feb. 25, 2005)........................................................................29

*Granite Rock Co. v. Int'l Brotherhood of Teamsters*,
   561 U.S. 287 (2010)................................................................................2

*Howsam v. Dean Witter Reynolds,*
   537 U.S. 79 (2002) ................................................................................................28

*Hulley Enters. v. Russian Fed'n,*
   211 F. Supp. 3d 269 (D.D.C. 2016) .....................................................................16

*Infrared Envtl. Infrastructure GP Ltd. v. Kingdom of Spain,*
   No. 20-CV-817 (JDB), 2021 U.S. Dist. LEXIS 120489
   (D.D.C. June 29, 2021) .....................................................................................4, 16

*Ivanenko v. Yanukovich,*
   995 F.3d 232 (D.C. Cir. 2021) .............................................................................31

*Kilburn v. Socialist People's Libyan Arab Jamahiriya,*
   376 F.3d 1123 (D.C. Cir. 2004) ...........................................................................15

*LLC SPC Stileks v. Republic of Moldova,*
   985 F.3d 871 (D.C. Cir. 2021) .........................................................................26, 28

*Pearce v. E.F. Hutton Grp., Inc.,*
   828 F.2d 826 (D.C. Cir. 1987) .............................................................................29

*Peterson v. Royal Kingdom of Saudi Arabia,*
   416 F.3d 83 (D.C. Cir. 2005) ...............................................................................14

*Phoenix Consulting, Inc. v. Republic of Angola,*
   216 F.3d 36 (D.C. Cir. 2000) ...........................................................................14, 15

*Process & Indus. Devs. v. Fed. Republic of Nigeria,*
   962 F.3d 576 (D.C. Cir. 2020) .......................................................................1, 5, 33

*Raymond James Fin. Servs. v. Cary,*
   709 F.3d 382 (4th Cir. 2013) ...............................................................................29

*Samantar v. Yousuf,*
   560 U.S. 305 (2010) ...........................................................................................14

*Saudi Arabia v. Nelson,*
   507 U.S. 349 (1993) ...........................................................................................14

*Schwartz v. Chow,*
   867 A.2d 230 (D.C. 2005) ...................................................................................28

*Tatneft v. Ukraine,*
   771 F. App'x 9 (D.C. Cir. 2019) .......................................................................5, 33

*UBS Sec. LLC v. Voegeli,*
   684 F. Supp. 2d 351 (S.D.N.Y. 2010) .................................................................29

*World Wide Minerals, LTD. v. Republic of Kazakhstan*,
   296 F.3d 1154 (D.C. Cir. 2002) ..................................................................31

## FEDERAL STATUTES AND RULES

28 U.S.C. § 1604 .........................................................................................14

*28 U.S.C. § 1605 ................................................................................ *passim*

28 U.S.C. § 1606 .........................................................................................14

28 U.S.C. § 1607 .........................................................................................14

Fed. R. Civ. P. 12 ..........................................................................................1

## OTHER AUTHORITIES

1961 Income Tax Act .....................................................................................3

   Section 293 ..............................................................................................19

   *Section 9(1)(i) ..........................................................................11, 12, 22, 23

1993 UK-India Double Taxation Avoidance Agreement ...............................6

   Article 27 .............................................................................................6, 17

   Article 30 ................................................................................................18

Andreas Börner, Article III, *in Recognition and Enforcement of Foreign Arbitral
   Awards: A Global Commentary on the New York Convention* (Herbert
   Kronke, et al. eds., 2010) .......................................................................32

*Bhavesh Lakhani v. State of Maharashtra,*
   (2009) 9 SCC 551 ¶ 46 (India) ...............................................................20

*Chloro Controls (India) Private Ltd. v. Severn Trent
   Water Purification Inc. and Orgs.*
   (2013) 1 SCC 641 (India) ...................................................................3, 27

Convention on the Recognition and Enforcement of Foreign Arbitral Awards,
   June 10, 1958, 21 U.S.T. 2517 .................................................................1

   Article V ...................................................................................................1

   Article I(3) ..............................................................................................32

*Dallah Real Estate and Tourism Holding Co. v. The Ministry of Religious Affairs,*
 *Gov't of Pakistan,*
 (2010) UKSC 46 (United Kingdom)................................................................3, 27

Dutch Civil Code, art. 1052(1) ...........................................................................27

Finance Act 2012, Ch. III § 4(a) .........................................................................12

H.R. Rep. 1487, 94th Cong. (1976) .....................................................................30

H.R. Rep. No. 91-1181 (1970)..............................................................................32

India-UK Agreement for the Promotion and Protection of Investments,
 March 14, 1994 .......................................................................................................3

 *Article 1(b) ................................................................................. passim*

 Article 4 ...........................................................................................25

 Article 7 ...........................................................................................25

 *Article 9 ...................................................................................... passim*

 *Article 21 ..............................................................................25, 26, 27

N.Y.S.E. Const. Art. XI ......................................................................................28

N.Y.S.E. R. 600(a)...............................................................................................28

Pieter Sanders, *Commentary on UNCITRAL Arbitration Rules,* 2 Y.B. COM.
 ARB. 172, (Pieter Sanders ed., 1977) ...............................................................28

*Republic of Ecuador/Chevron Corp.,*
 HR, 24 Sept. 2014,
 First Chamber No. 13/04679 (EV/LZ) (Neth.) .............................................14, 27

S. Rep. No. 91-702, 91st Cong. (1970)...............................................................32

S. Rep. No. 94-1310, 94th Cong. (1976) ............................................................30

*Salini Costruttori S.p.A. and Italstrade S.p.A. v. Kingdom of Morocco,*
 ICSID Case No. ARB/00/4, 23 July 2001,
 42 I.L.M. 609 (2003)........................................................................................24

UNCITRAL R., art. 21(1)................................................................................ 25-26

Vienna Convention on the Law of Treaties,
  May 23, 1969, 1155 U.N.T.S. 331 ...................................................................................17

  Article 31 ......................................................................................................................17

  Article 46 .................................................................................................................19, 20

W. Mark C. Weidemaier, *Sovereign Immunity and Sovereign Debt*,
  2014 U. Ill. L. Rev. 67 (2014)......................................................................................32

*Authorities upon which counsel chiefly relies are marked with an asterisk.*

The Republic of India ("India") respectfully submits this Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(1).  This Court lacks subject-matter jurisdiction under the Foreign Sovereign Immunities Act ("FSIA") because India never waived its sovereign immunity and, likewise, never offered—let alone agreed—to arbitrate the present dispute with Petitioners.  India also never "clearly and unmistakably" excluded judicial review or delegated exclusive competence to decide these questions to any arbitral tribunal, for the reasons detailed below.  Petitioners thus cannot satisfy any exception to sovereign immunity, in particular under 28 U.S.C. §§ 1605(a)(1) and (a)(6).

## PRELIMINARY STATEMENT

Petitioners seek to confirm an arbitration award (the "Award," ECF No. 1-2) rendered on December 21, 2020, in which three arbitrators seated in the Netherlands ordered India to pay more than $1.2 billion to Petitioners, plus interest and attorneys' fees.  India disputes the validity of the Award based upon multiple grounds set forth under Article V of the Convention on Recognition and Enforcement of Foreign Arbitral Awards ("New York Convention"), June 10, 1958, 21 U.S.T. 2517, many of which grounds overlap with India's set-aside challenges in the parallel Dutch annulment litigation.  *See* India's Mot. to Stay ("MTS"), Table 1 & Part E ("The 2021 Litigation in Multiple Jurisdictions Worldwide").

As a foreign sovereign State, however, India is first entitled to "a threshold determination of immunity" under the FSIA "before the sovereign can be compelled to defend the merits" of its challenges under the New York Convention.  *Process & Indus. Devs. v. Fed. Republic of Nigeria* ("*P&ID*"), 962 F.3d 576, 585 (D.C. Cir. 2020) (citations and quotation marks omitted).  The FSIA codifies sovereign immunity from suit, which must be adjudicated "as near to the outset of the case as is reasonably possible."  *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312, 1317 (2017).

In the present motion, India seeks dismissal of this action for lack of subject-matter jurisdiction under the FSIA.  Although Petitioners have purported to invoke two alleged exceptions to India's immunity under the FSIA, *see* Pet. ¶¶ 9-10 (citing 28 U.S.C. §§ 1605(a)(1) and (a)(6)), neither exception applies in the present case, as detailed below.

First, Petitioners purport to invoke the "arbitration" exception under 28 U.S.C. § 1605(a)(6).  The present case, however, does not involve any "agreement made by the foreign state" or "award made pursuant to such an agreement to arbitrate," as required under § 1605(a)(6). "Arbitration is strictly a matter of consent . . . and thus is a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration."  *Granite Rock Co. v. Int'l Brotherhood of Teamsters*, 561 U.S. 287, 299 (2010) (emphasis in original) (internal citations and quotation marks omitted).  In the present case, India never even offered—let alone agreed— to arbitrate the present dispute with Petitioners.  The "preponderance of the evidence" set forth below is sufficient to rebut Petitioners' "prima facie showing" as to any purported arbitration agreement.  *Chevron Corp. v. Republic of Ecuador*, 795 F.3d 200, 205 (D.C. Cir. 2015) (describing the burden-shifting framework applicable to such an analysis).

Specifically, Petitioners' dispute concerns whether the Government of India was entitled under Indian law to tax Petitioners' capital gains of $5.5 billion, which were realized in connection with an initial public offering ("IPO") on the India stock market in 2006.  Writ of Summons ("Writ") ¶ 32 (Declaration of Prof. Albert Jan van den Berg ("Van den Berg Decl."), Ex. 1); Award ¶ 902 (ECF No. 1-2).  Petitioners intentionally camouflaged the capital gains using a number of artificial financial devices—including, most egregiously, a pair of "Daylight Loans," by which Petitioners funneled billions of dollars in cash into and then out of India within 24 hours.  Writ ¶ 374.  Due to Petitioners' subterfuge, the relevant Indian authorities did not discover the capital

gains until 2014—after their suspicions were aroused by references to Petitioners in the Offshore Leaks Database (a database similar to the Panama Papers).  Writ ¶ 47.  Finally, in 2016, India exercised its sovereign power of taxation under the Constitution of India and the 1961 Income Tax Act ("IT Act"), and imposed a lawful tax assessment ordering Petitioners to pay approximately $1.6 billion in 2016.  Writ ¶¶ 3, 45.

Petitioners sought to challenge the tax assessment by commencing international arbitration against India in the Netherlands.  Award ¶ 179.  Petitioners purported to "accept" India's standing offer to arbitrate under a bilateral investment treaty ("BIT"), the 1994 India-UK Agreement for the Promotion and Protection of Investments ("India-UK BIT") (ECF No. 1-3).  *See, e.g.*, *BG Grp. PLC v. Republic of Argentina*, 572 U.S. 25, 42 (2014) (describing "how an offer to arbitrate in an investment treaty can be accepted, such as through an investor's filing of a notice of arbitration").  Significantly, the present case does not present "clear and unmistakable evidence" that the parties intended to delegate the question of the arbitrators' competence <u>exclusively</u> to the arbitrators under *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).  The question of whether India offered to arbitrate a dispute such as the one here is therefore a matter for this Court to decide now, as detailed below in Part I.D. [1]

---

[1]     Although the India-UK BIT references the 1976 UNCITRAL Arbitration Rules, which contain a so-called "competence-competence" clause, such clauses do "not, *per se*, demonstrate clear and unmistakable evidence of the parties' intent to delegate threshold questions of arbitrability to the arbitrator where other aspects of the contract create ambiguity as to the parties' intent."  *DDK Hotels, LLC v. Williams-Sonoma*, Inc., No. 20-2748-cv, 2021 U.S. App. LEXIS 21862, at *22 (2d Cir. July 23, 2021).  In the present case, the competence-competence clause must be interpreted in light of the fact that <u>all three relevant jurisdictions</u> (India, the United Kingdom, and the Netherlands) recognize the doctrine of "competence-competence" as permitting judicial review after the arbitration is completed.  *E.g.*, *Chloro Controls (India) Private Ltd. v. Severn Trent Water Purification Inc. and Orgs.*, (2013) 1 SCC 641 ¶ 129 (India) (Sarkar Op., Ex. 34) ("The arbitrators are to be not the sole judge but first judge, of their jurisdiction."); *Dallah Real Estate and Tourism Holding Co. v. The Ministry of Religious Affairs, Gov't of Pakistan*, (2010) UKSC 46 ¶¶ 25-26, 84-86 (Sarkar Op., Ex. 52) ("[T]he last word as to whether or not an alleged arbitral tribunal actually has jurisdiction will lie with a court . . . .").  As the Second Circuit has explained in *DDK Hotels*, 2021 U.S. App. LEXIS 21862, at *22, "context matters," and the three relevant jurisdictions' unanimous understanding of competence-competence is a critical part of that "context."

In particular, Petitioners' purported "acceptance" failed to correspond to at least three material terms of India's standing offer to arbitrate. First, India's offer did not contemplate arbitration of tax disputes, which are governed by a distinct India-UK treaty negotiated in parallel to the 1994 BIT—as would have been objectively evident to UK negotiators at all times, especially given that tax disputes are excluded from arbitration under India's 1961 Income Tax Act. IT Act § 293 (Declaration of Carolyn B. Lamm ("Lamm Decl."), Ex. 4); Expert Opinion of Sudipto Sarkar SA ("Sarkar Op.") ¶¶ 12-18. Second, India's offer to arbitrate also explicitly excluded arbitration of disputes concerning investments made in violation of "the national laws" of India, including the abusive offshore structure engineered by Petitioners in 2006—which had the dominant purpose of tax avoidance, and was thus unlawful. India-UK BIT, art. 1(b); Expert Opinion of Justice (Ret.) Pradeep Nandrajog ("Nandrajog Op.") ¶ 7. Third, India's offer of arbitration also extended only to disputes concerning an "investment," and thus did not contemplate Petitioners' dispute over a "divestment" or any dispute concerning the "returns" (*i.e.*, capital gains) generated thereby. Writ § IV.C(iv). All three of these material deficiencies in Petitioners' purported "acceptance" are further detailed below in Part I of this Motion to Dismiss, as well as in the Writ of Summons filed in the Dutch annulment proceedings. Writ §§ IV.B-C, V. These three material deficiencies prevented any arbitration agreement from being concluded by Petitioners' purported "acceptance," in accordance with the fundamental principle that "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT&T Techs. v. Communs. Workers of Am.*, 475 U.S. 643, 648 (1986).

Accordingly, in the absence of "any putative offer to arbitrate" this dispute with Petitioners, "the dominoes begin to fall." *Infrared Envtl. Infrastructure GP Ltd. v. Kingdom of Spain*, No. 20-CV-817, 2021 U.S. Dist. LEXIS 120489, at *13 (D.D.C. June 29, 2021) ("If there was no

agreement to arbitrate, the . . . tribunal never had jurisdiction, its award is not enforceable, and therefore it is not entitled to full faith and credit in this Court."). Of particular importance for present purposes, the absence of any "agreement made by the foreign state . . . to submit to arbitration" or "award made pursuant to such an agreement to arbitrate" also has consequences under the FSIA, inasmuch as Petitioners' invocation of the arbitration exception must be rejected under 28 U.S.C. § 1605(a)(6).

Relatedly, Petitioners also have failed to identify any waiver of India's immunity, as required under 28 U.S.C. § 1605(a)(1). Petitioners have misconstrued dicta from *Tatneft v. Ukraine*, 771 F. App'x 9, 10 (D.C. Cir. 2019), as purportedly suggesting that India waived immunity merely by signing the New York Convention—*i.e.*, whether or not India also purportedly agreed to arbitrate. Pet. ¶10. "But *Tatneft* was an unpublished disposition, so it does not bind" courts in future cases, as the D.C. Circuit emphasized in *P&ID*, 962 F.3d at 584. Indeed, the New York Convention never even mentions sovereign immunity, let alone any waiver. Nor did Congress ever make any suggestion that the United States was also waiving sovereign immunity when considering whether to ratify the New York Convention in 1970. India's signing of the New York Convention, therefore, cannot establish any waiver under § 1605(a)(1).

Accordingly, absent any applicable exception to India's sovereign immunity, this case should be dismissed in its entirety for lack of subject-matter jurisdiction under the FSIA.

## BACKGROUND

### A.   The 1993 and 1994 Treaties Between India and the United Kingdom

On March 14, 1994, the High Commissioner of India and the UK's Secretary of State for Foreign and Commonwealth Affairs signed the India-UK BIT. India-UK BIT at 15; Writ ¶ 206. The BIT was never ratified by the Parliament of India.

Under Article 9 of the BIT, India and the United Kingdom each offered to arbitrate their disputes with "an investor of . . . the other Contracting Party in relation to an investment." India-UK BIT, art. 9. By signing the BIT, however, India did not somehow extend an "open-ended" offer to arbitrate all conceivable disputes with UK investors, regardless of the subject-matter. To the contrary, India's offer to arbitrate excluded at least three categories of disputes relevant to the present case, as detailed below in Parts I-A, I-B, and I-C.

In summary, India never offered to arbitrate tax disputes under the BIT, given that tax disputes are addressed in a separate treaty, the 1993 India-UK Double Taxation Avoidance Agreement ("DTAA"), which was later confirmed to remain in effect by a 2004 Memorandum of Understanding and a set of 2013 amendments. In any event—representatives of the Executive lacked competence to subject India to the arbitration of tax disputes absent ratification by Parliament. In addition, as reflected in Article 1(b) of the BIT, India never offered to arbitrate disputes relating to economic rights that were not established or acquired "in accordance with the national laws of India," such as abusive offshore structures established for the purpose of unlawful tax avoidance. Finally, India offered to arbitrate only disputes relating to genuine "investments," rather than disputes relating to <u>divestments</u> (*i.e.*, the extraction of value from the Indian economy) or "returns" on investments (*i.e.*, "capital gains" under Article 1(e) of the BIT). The relevance of these three categorical exclusions from India's offer of arbitration is demonstrated below.

### B.     The 2006 Divestment

In 2004, Cairn Energy PLC ("CEP"), a Scottish company that explored and exploited oil and gas fields in India, discovered three major oil fields in the northern Indian State of Rajasthan. Award ¶ 23. One of these oil fields constituted "the largest onshore discovery in India in over two decades." *Id.* Eager to capitalize on India's natural resources, CEP implemented an aggressive tax avoidance strategy in 2006 to divest and extract maximum profits from India's economy, while

Petitioners avoided paying any kind of capital gains tax worldwide (the "2006 Divestment").   Writ § II.A(i)(b).

To execute the 2006 Divestment, CEP arranged a formally complex series of artificial share swaps amongst multiple related offshore shell companies registered in multiple jurisdictions.   Writ ¶ 30.   The actual economic substance of these convoluted transactions, however, was relatively simple.   That is, CEP transferred the shares pertaining to economically valuable Indian assets (*i.e.*, the oil fields), which were originally held by offshore (non-Indian) companies, and indirectly transferred these shares to a newly established Indian company known as Cairn India Limited ("CIL").   As a purely formal matter, these share swaps transferred the valuable Indian assets at the company level, rather than at the asset level.   Writ ¶¶ 30-31.   The new Indian company, CIL, then used the value of these Indian assets to raise billions of dollars on the Indian stock market through an initial public offering ("IPO"), while avoiding the payment of capital gains tax anywhere in the world.   Writ ¶¶ 32, 41.

In India, the lawfulness of tax planning—and the unlawfulness of abusive tax avoidance—is evaluated using the "dominant purpose" test.   Nandrajog Op. ¶ 7.   The dominant purpose of Petitioners' share swaps was to transfer the Indian assets to CIL (indirectly) without paying tax on capital gains of approximately $ 5.5 billion realized during such transfer.   Writ ¶ 59.   This amount included, in addition to the gains earned by Cairn UK Holdings Limited ("CUHL")from the share swaps, a further $ 1.35 billion extracted from India in the form of a dividend payment to CIL's shareholders.   Writ ¶ 30.   This money was raised using Indian assets (oilfields) from the Indian public on the Indian stock market, but no capital gains tax was ever paid on such amount.

As confirmed by Petitioners' own witnesses and accepted by the Tribunal,[2] the most crucial aspects of the 2006 Divestment were as follows:

(i) **Step 1 – Transferring Indian Assets to the Scottish Subsidiary (Writ ¶ 30(i); Award ¶¶ 34-35)**: In June 2006, CEP established CUHL as a Scottish company and transferred indirect ownership of all of CEP's Indian assets to CUHL.  That is, each of CEP's Indian assets was owned indirectly through one of 27 subsidiaries (incorporated in the UK or in other offshore jurisdictions).  The shares of all 27 subsidiaries were transferred directly or indirectly from CEP to CUHL, as part of a "share swap" whereby CUHL issued its own shares to CEP as consideration.

(ii) **Step 2 – Transferring Indian Assets to the Jersey Subsidiary (Writ ¶ 30(ii); Award ¶¶ 36-37)**: Between August and September 2006, the Scottish subsidiary (CUHL) then transferred the shares in each of the 27 subsidiaries to a new offshore company established in Jersey, Cairn India Holdings Limited ("CIHL").  As consideration, the Jersey subsidiary (CIHL) also performed a second share swap—issuing its own shares to the Scottish subsidiary (CUHL).

(iii) **Step 3 – Establishing the Indian Subsidiary for the IPO (Writ ¶ 30(iii); Award ¶ 38)**: An Indian company, CIL, was established in August 2006.  Under Indian law, only Indian companies' shares can be offered in IPOs on the Indian stock market.  It was therefore understood that CIL would ultimately issue new shares to Indian stock market investors based on the value of the Indian assets—and particularly the three major oil fields discovered in Rajasthan.

---

[2]   Although the various parties and the Tribunal have described the "six steps" of the 2006 Divestment using different terms, the core factual details are substantially the same.  *Compare* Award ¶ 30 *with* Writ ¶ 29.

(iv) **Step 4 – Round-Tripping the Cash from the Daylight Loans into India and Out of India  (Writ ¶ 30(iv); Award ¶¶ 43, 59, 62)**: The next step was for indirect ownership of the Indian assets held through the Jersey subsidiary (CIHL) to be moved to the Indian subsidiary (CIL) in preparation for the IPO.  To camouflage the capital gains, CEP obtained two massive "Daylight Loans" from Citibank, both of which had to be paid back within 24 hours on, respectively, October 12, 2006 and November 22, 2006.  The first Daylight Loan was worth approximately $1.1 billion, and the second Daylight Loan was worth approximately $392 million.  The cash was transferred from Citibank to CEP, and then (ultimately) to the Indian subsidiary (CIL) through an intra-group loan (from CEP to CUHL) and a subscription agreement (between CUHL, CIHL, and CIL).  The Indian subsidiary (CIL) then used the two tranches of cash in October 2006 and November 2006 as consideration to purchase two tranches of shares of the Jersey subsidiary (CIHL) from the Scottish subsidiary (CUHL).  In the Tribunal's own words, "the cash provided by the Daylight Loan . . . entered and exited India on the same day".  Award ¶¶ 60-61.  At the end of Step 4, CIL had obtained approximately 21.8% of CIHL in exchange for cash from the Daylight Loans, and concluded a Share Purchase Deed on October 12, 2006, to obtain the remaining 78.2% of CIHL.

(v) **Step 5 – Conducting the IPO on the Indian Stock Exchange (Writ ¶ 30(v); Award ¶ 67):** Between December 11 and 15, 2006, CIL issued new shares on the Indian stock market.  The IPO raised $ 1.98 billion from the Indian investing public.  Critically, the fundamental basis for CIL's value was the Indian oil-producing assets held through the Jersey subsidiary (CIHL), to which CIL acquired indirect rights solely through the process described above as Step 4.

(vi) **Step 6 – Completing the Share Transfer and Extracting Dividends from the Indian Economy (Writ ¶ 30(vi); Award ¶ 68, 71)**: Finally, on December 20 and 29, 2006, pursuant to the Share Purchase Deed concluded on October 12, 2006, CIL acquired two more tranches of CIHL shares from CUHL.  The first tranche was obtained as part of another share swap, whereby CIL issued its own shares to CUHL.  The second tranche was obtained in exchange for cash equal to $1.35 billion (out of the total of $1.98 billion) obtained from the IPO.  These funds were paid to CEP as a dividend from CUHL, and approximately $940 million was paid to foreign shareholders as a dividend from CEP.

As the Tribunal ultimately concluded during the arbitration, Cairn and its related entities realized capital gains amounting to US$ 5.5 billion.  Award ¶ 1453.  Under Indian law, these capital gains necessarily incurred tax liability of US$ 1.6 billion.  Writ ¶¶ 3, 45.  Cairn camouflaged the capital gains, however, by employing certain artificial financial instruments including—most egregiously—the so-called "Daylight Loans."  Writ ¶ 374.  Cairn also <u>failed to file any tax return</u> for the relevant tax year—a tax year involving a massive IPO and multibillion-dollar share swaps.  Writ ¶¶ 53-55.  These tactics prevented the Indian tax authorities from learning about the actual economic substance of the 2006 Divestment for the purposes of any potential tax assessment under the 1961 Income Tax Act.  *Id.*

The possibility that India would impose capital gains tax upon the transactions underlying Petitioners' 2006 Divestment was not only objectively foreseeable—it was subjectively foreseen.  Specifically, in a presentation on May 3, 2006, Cairn considered two potential approaches to executing the 2006 Divestment—labeled "Plan A" and "Plan B."  Writ ¶¶ 365-67.  As Cairn's accountants warned in the presentation, both Plan A and Plan B would indeed expose Cairn to

capital gains tax.  Writ ¶ 368.  The accountants proposed, however, to implement the 2006 Divestment using a third, even more aggressive approach, the so-called "Plan C," which would incorporate the "unique and untested" device of the Daylight Loans, as well as a number of other artificial features.  Writ ¶¶ 373-74.  The accountants' proposal was that "Plan C" would shield the 2006 Divestment from capital gains tax, although there was no identifiable precedent whereby the Indian tax authorities had ever endorsed such aggressive tax avoidance.  Writ ¶ 374.

It is worth emphasizing that the applicable provision of Indian tax legislation—as it read already in 2006—had a broad scope.  Specifically, Section 9(1)(i) of the 1961 Income Tax Act provided that the income taxable in India includes "<u>all income accruing or arising, whether directly or indirectly</u>, through or from <u>any business connection in India</u>, or through or from <u>any property in India</u>, or through or from <u>any asset or source of income in India</u>, or through <u>the transfer of a capital asset situate in India</u>."  IT Act § 9(1)(i) (Lamm Decl., Ex. 10).  India has consistently explained that this broad provision, first enacted in 1961, necessarily contemplated imposing capital gains tax upon the 2006 Divestment by virtue of its economic substance.  It is fundamentally irrelevant whether, from a purely formal perspective, Cairn structured the transaction as a series of share swaps between a non-Indian company and an Indian company because—in economic substance—the plain language of the 1961 Income Tax Act was directly applicable to Petitioners' indirect transfer of assets located in India.  Writ ¶¶ 375-78; Nandrajog Op. ¶ 8.

### C.    The 2014 Tax Investigation and Assessment

In April 2013, an organization known as the International Consortium of Investigative Journalists ("ICIJ") published the "Offshore Leaks Database," a searchable "list of offshore companies and the beneficial owners behind them," which was generally comparable to the "Panama Papers" or certain Wikileaks databases.  Writ ¶ 47.  While reviewing the Offshore Leaks

Database, the Indian tax authorities discovered the name of the Chairman of Cairn's Corporate Advisory Board, and began to research and analyze certain suspicious aspects of Cairn's financial statements.  *Id.*  Initially suspecting that Cairn had engaged in a 2013 restructuring involving a "massive write-off" and reported an "inflated value," the Indian tax authorities carefully began to evaluate Cairn's pre-2013 tax documentation.  Writ ¶ 150.  In the course of doing so, the Indian tax authorities discovered that one of the relevant shell companies, CUHL, had not filed any tax return for the year pertaining to the IPO.  Writ ¶ 47.

In January 2014, the Indian tax authorities instructed CUHL to file the missing tax return. Writ ¶ 46.  After reviewing the relevant documentation, the Indian tax authorities concluded that the share swaps underlying the 2006 Divestment gave rise to taxable capital gains under Section 9(1)(i) of the 1961 Income Tax Act—*i.e.*, indirect transfers of capital assets derived from Indian natural resources.  Writ ¶ 48.

In addition to the plain text of the 1961 Income Tax Act, reproduced above, the Indian tax authorities' conclusion was supported by two "Explanations" enacted by the Parliament of India in 2012.  Neither of these Explanations constituted <u>amendments</u> to the pre-existing law—and, indeed, both Explanations were explicitly styled as <u>clarifications</u>, rather than as amendments:

> Explanation 4.—For the removal of doubts, it is hereby clarified that the expression "through" shall mean and include and shall be deemed to have always meant and included "by means of", "in consequence of" or "by reason of".

> Explanation 5.—For the removal of doubts, it is hereby clarified that an asset or a capital asset being any share or interest in a company or entity registered or incorporated outside India shall be deemed to be and shall always be deemed to have been situate in India, if the share or interest derives, directly or indirectly, its value substantially from the assets located in India.

Act No. 23 of 2012 ("Finance Act 2012"), ch. III, § 4(a) (Lamm Decl., Ex. 6).

As indicated by their explicit terms, these Explanations were included for the "removal of doubts," and merely "clarified" pre-existing law.  *Id.*  These explanations thus memorialized an

interpretation of Section 9(1)(i) of the Income Tax Act—which was already foreseeable (and actually foreseen) when Cairn engaged in the 2006 Divestment. Writ ¶ 48.

After completing the relevant assessment, the Indian tax authorities directed CUHL to satisfy the unpaid capital gains tax resulting from the 2006 Divestment and the underlying tax-avoidant restructurings. Writ ¶ 45. The tax was ultimately levied on CUHL by the Income Tax Department's Final Assessment Order of January 25, 2016. *Id.* CUHL's shares in CIL were subsequently sold to satisfy the unpaid capital gains tax. Award ¶ 205.

### D.  The 2016 Arbitration

Even before the Indian tax authorities had issued the final tax assessment, Petitioners commenced arbitration against India on September 22, 2015, in order to recover compensation equal to the payable taxes. Award ¶ 179. Petitioners alleged that this dispute purportedly fell within India's offer to arbitrate under Article 9 of the 1994 India-UK BIT. *Id.* Petitioners thus purported to accept India's standing offer to arbitrate, even though—as Part I explains below—India's offer had excluded: (1) tax disputes, (2) disputes relating to investments made in violation of Indian law, and (3) disputes relating to either "divestments" or "returns," rather than genuine "investments." .

India objected to the Tribunal's jurisdiction on the basis that Petitioners had failed to accept the offer of arbitration according to its plain terms—*i.e.*, by attempting to arbitrate disputes that fell outside the offer to arbitrate. The Tribunal disregarded India's arguments and improperly upheld its own jurisdiction. Award ¶ 792. The Tribunal similarly rejected India's substantive defenses and concluded that India breached the Fair and Equitable Treatment standard under the India-UK BIT when it issued the final assessment order in relation to the 2006 Divestment. Award ¶ 1816. Shockingly, the Tribunal endorsed the 2006 Divestment as a "triumph of form over substance," although the Supreme Court of India has adopted precisely the opposite principle

("substance over form") as the foundation of its jurisprudence on tax avoidance.  Writ ¶ 1588;

Nandrajog Op. ¶ 7.

In its deeply flawed Award, the Tribunal directed India to pay damages and interest in

excess of US$ 1.2 billion together with interest, as well as US$ 22 million for arbitration and legal

costs.  Award ¶ 2032.  India filed the Writ of Summons in the Dutch Court of Appeal on the basis

that—regardless of the UNCITRAL Arbitration Rules' competence-competence clause—the

parties' shared expectation under Dutch law (as well as under both Indian law and English law)

was that "the question whether a valid arbitration agreement has been concluded ultimately is

referred to the courts."  *Republic of Ecuador/Chevron Corp.*, HR, 24 Sept. 2014, First Chamber

No. 13/04679 (EV/LZ) (Neth.) ¶ 4.2 (Van den Berg Decl., Ex. 3).

## ARGUMENT

The FSIA provides the exclusive basis for subject-matter jurisdiction over an action against

a foreign sovereign State.  *Samantar v. Yousuf*, 560 U.S. 305, 314 (2010) (citing *Argentine

Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989)); *Peterson v. Royal Kingdom

of Saudi Arabia*, 416 F.3d 83, 86 (D.C. Cir. 2005) ("In the United States, there is only one way for

a court to obtain jurisdiction over a foreign state and it is not a particularly generous one—the

FSIA.").  Under the FSIA, a foreign sovereign is immune from all actions in the United States

unless one of the narrow enumerated exceptions to immunity is satisfied.  *See* 28 U.S.C. §§ 1604–

07; *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993).  "[T]he FSIA begins with a presumption of

immunity, which the plaintiff bears the initial burden to overcome by producing evidence that an

exception applies[.]"  *Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*, 734 F.3d 1175,

1183 (D.C. Cir. 2013).  If no statutory exception applies, the district court lacks subject-matter

jurisdiction over the case. *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 39 (D.C. Cir. 2000).

Under the FSIA, however, this Court may not assert jurisdiction "merely by assuming the truth of the facts alleged by the plaintiff." *Phoenix Consulting*, 216 F.3d at 40. Rather, the Court "must go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss." *Id.*; *see Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1131 (D.C. Cir. 2004) (courts must "ferret out the facts pertinent to jurisdiction" under the FSIA).

In the present case, Petitioners have invoked two alleged exceptions to India's immunity, including the "arbitration" exception under 28 U.S.C. §1605(a)(6) and the "waiver" exception under §1605(a)(1). Neither exception applies in the present case, as detailed below.

## I.    India Did Not Offer to Arbitrate Petitioners' Dispute, and Did Not Exclude Judicial Review of the Arbitrators' Competence

In relevant part, the text of the FSIA's arbitration exception under §1605(a)(6) provides as follows:

> "A foreign state shall not be immune from the jurisdiction of courts of the United States . . . in any case . . . in which the action is brought, either to enforce <u>an agreement made by the foreign state</u> with or for the benefit of a private party to submit to arbitration all or any differences which have arisen or which may arise between the parties with respect to a defined legal relationship . . . or to confirm <u>an award made pursuant to such an agreement to arbitrate</u>, if . . . the agreement or award is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards . . . ."

28 U.S.C. §1605(a)(6) (emphases added).

Accordingly, "[i]f there is no arbitration agreement . . . , the District Court lacks jurisdiction over the foreign state and the action must be dismissed" under §1605(a)(6). *Chevron Corp.*, 795 F.3d at 204.

Petitioners invoke the 1994 India-UK BIT as the purported arbitration agreement.  It is important to emphasize, however, that the BIT is "an investment treaty" containing "a dispute-resolution provision" applicable to certain categories of disputes between either of the two States parties and "an investor from the other."  *BG Grp.*, 572 U.S. at 28.  The Supreme Court first analyzed such a treaty in *BG Group* in 2014, where all three opinions—majority, concurrence, and dissent—confirmed unanimously that a BIT is typically <u>not</u> an agreement to arbitrate between the disputing parties.  *See generally id.*

To the contrary, as *BG Group* explained, a BIT typically contains a respondent State's standing "offer" to arbitrate, which the claimant investor may "accept" by submitting a notice of arbitration—thus concluding the arbitration agreement at the same moment that the arbitration commences.  *See BG Grp.*, 572 U.S. at 42 (explaining "how an <u>offer</u> to arbitrate in an investment treaty can be <u>accepted</u>, such as through an investor's filing of a notice of arbitration") (emphasis added); *see also id.* at 46 (Sotomayor, J., concurring in part) ("[T]he treaty is <u>not an already agreed-upon arbitration provision</u> between known parties, but rather a nation state's <u>standing offer</u> to arbitrate with an amorphous class of private investors.") (emphasis added); *id.* at 53 (Roberts, C.J., dissenting) (explaining that the BIT's arbitration clause "constitutes only a unilateral <u>standing offer</u> . . . an offer to submit to arbitration where certain conditions are met") (emphasis added).  In the years since *BG Group*, therefore, this Court has also referred frequently to the "offer-and-acceptance mechanism" set forth in BITs and other investment treaties.  *E.g.*, *Infrared Envtl. Infrastructure GP Ltd.*, 2021 U.S. Dist. LEXIS 120489, at *5-6 (explaining that "the offer-and-acceptance mechanism" involves "<u>a standing offer</u> by state parties to arbitrate disputes which investors may <u>accept</u> by submitting their consent to arbitration") (emphasis added); *Hulley Enters.*

*v. Russian Fed'n*, 211 F. Supp. 3d 269, 274 (D.D.C. 2016) (referring to the "standing offer by parties . . . to arbitrate disputes arising under the treaty") (emphasis added).

As detailed below in Parts I-A, I-B, and I-C, Petitioners' request for arbitration fell outside of India's standing offer for at least three distinct reasons.  Accordingly, because Petitioners' acceptance failed to correspond to India's standing offer of arbitration, no agreement was ever formed—and India thus retains immunity from this Court's jurisdiction under the FSIA.  Finally, as explained in Part I-D, the evidence in this case demonstrates that the parties' intent was never to delegate the question of arbitrability exclusively to the arbitrators.  To the contrary, the parties fully understood that judicial review would remain available with respect to questions pertaining to the arbitrators' jurisdiction.  Accordingly, because the parties never evinced a clear and unmistakable intent to arbitrate tax disputes, it remains this Court's role to refuse enforcement. "[A] party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."  *AT&T Techs. v. Communs. Workers of Am.*, 475 U.S. 643, 648 (1986).

## A.     India Did Not Offer to Arbitrate Tax Disputes

The 1994 India-UK BIT does not contain any offer for India to arbitrate disputes arising from taxation measures, such as Petitioners' dispute concerning the validity of India's assessment of capital gains tax.   This conclusion is inescapable when the BIT is read together with the 1993 India-UK Double Taxation Avoidance Agreement ("DTAA"), the 2004 MOU demonstrating the continued applicability of the 1993 DTAA, and numerous related statements by the Government of India, as well as India's long-standing statutory law prohibiting the arbitration of tax disputes.

First, pursuant to Article 31(3)(c) of the Vienna Convention on the Law of Treaties ("VCLT"), the 1994 BIT must be interpreted in accordance with "any relevant rules of international law applicable in the relations between the parties."  Writ ¶¶ 240, 252.  This category includes the principle of fiscal sovereignty embodied in the 1993 DTAA, Article 27 of which

establishes a distinct dispute-resolution mechanism for tax disputes known as the "Mutual Agreement Procedure," which does not contemplate arbitration.  *See* 1993 DTAA, art. 27 (Lamm Decl., Ex. 2 at 26-27).  It is the 1993 DTAA that specifically addresses tax disputes—including disputes over capital gains tax and double non-taxation—whereas the 1994 BIT is a general instrument applying to property disputes and economic rights more broadly.  Writ ¶¶ 257-58.  It is thus self-evident that India and the UK intended for the Mutual Agreement Procedure under the 1993 DTAA to apply to disputes such as the present one, and not the more general arbitration procedure established under the 1994 BIT.

In the Award, the Tribunal incorrectly applied a different principle—the principle of *lex posterior*—on the supposed basis that "the UK-India DTAA predates the BIT," such that "the BIT would derogate from the UK-India DTAA, and not vice versa."  Award ¶ 804.  The two States' conduct, however, has repeatedly demonstrated that neither India nor the United Kingdom understood the BIT as superseding the DTAA's Mutual Agreement Procedure.  That is, the parties negotiated the 1993 DTAA and 1994 BIT in parallel during the same years, and the earlier agreement did not even come into effect until April 6, 1994, after the latter agreement was already concluded on March 14, 1994.  *See* Art. 30, DTAA.  This demonstrates how unlikely it was that the latter agreement was intended to supersede or invalidate the earlier agreement.  Moreover, the 1993 DTAA was later supplemented with a Memorandum of Understanding ("2004 MOU") confirming the continued applicability of the DTAA's Mutual Agreement Procedure, as well as with further treaty amendments in 2013.  2004 MOU (Lamm Decl., Ex. 3); 2013 Protocol Amending the Double Taxation Agreement Between the United Kingdom and the Republic of India (Lamm Decl., Ex. 9).

The above conclusion is further confirmed by consistent statements by Indian public officials for more than two decades—beginning even before the 1994 BIT was concluded. *See* Telefax from Department of Economic Affairs to India's Ambassador to the Netherlands, October 1994, ("[W]e do not wish taxation matters to come within the purview of the Bilateral Investment Protection Agreement . . . .") (Van den Berg Decl., Ex. 7); Telefax from Department of Economic Affairs to India's Ambassador to the Germany, July 1995 ("[A]ll domestic tax laws would be outside the scope of such [BITs] . . . [because] tax matters are inherently specialised matters which should be the subject of separate bilateral Agreements and ought not to form part of [a BIT].") (Van den Berg Decl., Ex. 8); Message from Director of Foreign Investment to the Joint Secretary for Foreign Trade and Investment, 1998 ("[T]axation matters are appropriately addressed under the Double Taxation Avoidance Agreement between the two countries and there should be no overlap between DTAA and BIPA provisions.") (Van den Berg Decl., Ex. 9); Joint Interpretative Statements for Indian Bilateral Investment Treaties dated 8 February 2016 ("In the treaties which are silent on inclusion or exclusion of taxation measures from scope, it is implied that such treaties, do not apply to any law or measure regarding taxation including measures taken to enforce taxation obligations.") (Van den Berg Decl., Ex. 10); Joint Interpretive Notes between the Respondent and the Government of Bangladesh dated 4 October 2017, following the conclusion of the India-Bangladesh BIT (confirming the 2016 joint interpretation) (Van den Berg Decl., Ex. 11).

Second, and relatedly, Indian law prohibits arbitration of tax disputes under Section 293 of the 1961 Income Tax Act, and provides a statutory mechanism for challenging tax assessments under Chapter XX thereof.  Sarkar Op. ¶ 18.  Under Indian constitutional law, including the principle of separation of powers, the Executive could not amend or diverge from these statutory provisions in a bilateral treaty with the United Kingdom—given that this bilateral treaty was never

19

ratified by Parliament.  Sarkar Op. ¶ 34.  As the Indian Supreme Court held explicitly in 2009, long before Petitioners attempted purportedly to accept any offer of arbitration, it has been "well known" for decades under Indian law that in case "a conflict arises between a treaty and the domestic law or a municipal law, the latter shall prevail."  Sarkar Op. ¶ 32 (quoting *Bhavesh Lakhani v. State of Maharashtra*, (2009) 9 SCC 551 ¶ 46 (India)).

Although the Tribunal simply refused to consider the relevance of Indian law on the arbitration of tax disputes, in fact this point has specific legal consequences under Article 46 of the Vienna Convention on the Law of Treaties.  That provision explicitly authorizes India to "invoke the fact that its consent to be bound by a treaty has been expressed in violation of its internal law regarding competence to conclude treaties" in instances where, as here, "that violation was manifest and concerned a rule of its internal law of fundamental importance."  Article 46(1) VCLT.  As Mr. Sarkar explains, both the separation of powers and the hierarchy of legal norms are fundamentally important principles of Indian constitutional law.  Sarkar Op. ¶ 25.  The UK negotiators undoubtedly understood this Indian constitutional principle—subjectively, as well as objectively because the UK applies precisely the same principle in accordance with the Westminster model of democracy (which India inherited from the UK).  Writ ¶¶ 217-18.

Accordingly, based upon the relationship between the 1993 DTAA and the 1994 BIT, as well as the applicable Indian law prohibiting the arbitration of tax disputes, India did not extend any standing offer to arbitrate this tax dispute with Petitioners.

### B.   India Did Not Offer to Arbitrate Disputes Involving Illegal Investments, Such as Petitioners' Abusive Tax-Avoidance Structure

Nor did India consent to arbitrate disputes arising out of an investor's tax avoidant conduct. Article 1(b) of the BIT contained an express legality condition: "[an] 'investment' means every kind of asset established or acquired, including changes in the form of such investment, <u>in</u>

accordance with the national laws of the Contracting Party in whose territory the investment is made[.]" BIT, art. 1(b).  As the lawfulness of the tax avoidant transactions is matter affecting the existence of a protected "investment" under Article 1(b) of the BIT, it is one of the necessary conditions for India's consent to arbitrate under Article 9.  It therefore has never been disputed by Petitioners that the legality of Petitioners' investment is a jurisdictional condition under the BIT, and therefore is a condition of India's offer to arbitrate.  Award ¶¶ 709-710; Writ ¶¶ 315-317.

Petitioners' 2006 Divestment was not established "in accordance with the national laws" of India.  Writ ¶¶ 314-15.  This series of transactions—pursuant to which CUHL and its alleged investment came into existence and CEP's investment changed in form—were part of an abusive tax avoidance scheme on the part of Cairn, directed at siphoning off billions of dollars from India's economy, without paying the due capital gains tax.  Writ ¶¶ 374-75.  This was a gross violation of Indian tax laws, thereby depriving Cairn's alleged investments of any protection under the India-UK BIT.

As explained by Mr. Justice Nandrajog, India's anti-avoidance rules rely upon the doctrine of "substance over form."  Writ ¶¶ 344-45; Nandrajog ¶¶ 7, 11.  To assess whether a transaction is tax avoidant or not, the relevant test that is applied under Indian law is the "dominant purpose" test, which entails an inquiry into whether the dominant purpose of the structure used for the transaction was the avoidance of tax or if it was a legitimate business purpose.  If the dominant intention behind the transaction is proven to be tax avoidance, that will suffice for the purposes of applying the "substance over form" doctrine.  Writ ¶¶ 344-45; Nandrajog ¶¶ 7, 11.

In the present case, the tax-avoidant purpose of the 2006 Divestment is demonstrated by both subjective and objective evidence. Writ § II.A(ii)(b); Nandrajog ¶¶ 10-11.  This is demonstrated by the following evidence, among other factors.

First, it is evident that Petitioners subjectively chose "Plan C" in order to avoid capital gains tax. The economic substance of the 2006 Divestment was simple—effectively, Petitioners sought to transfer oil-producing asset from non-Indian companies to an Indian company in order to facilitate an IPO based on the Indian assets' value. Writ ¶¶ 373-74. Petitioners' accounting advisors identified three potential methods of executing this transaction. Writ ¶ 368. According to Petitioners' advisors, "Plan A" and "Plan B" both would entail "an exposure to capital gains tax in India." *Id.* Any reasonable person would have understood, therefore, that a third version of achieving the same economic substance—Petitioners' "Plan C"—would also necessarily be subject to capital-gains tax under a "substance over form" approach. Writ ¶ 373.

Second, Petitioners employed distinctly artificial mechanisms—*i.e.*, action with no economic purpose—in order to implement the 2006 Divestment. Most obviously, the Daylight Loans involved the round tripping of cash worth almost $1.5 billion into and out of India within two 24-hour periods on October 12, 2006 and November 22, 2006. Writ ¶ 374. Based on the basic economic pointlessness of the Daylight Loans, any reasonable person would have understood that the 2006 Divestment was an artificial transaction, the form of which did not match its genuine economic substance. Nandrajog Op. ¶¶ 10-11. Indeed, in their internal documents, Petitioners and their advisors explicitly acknowledged that the Daylight Loans were "unique and untested" and entailed a serious risk that the "cash [might] [] get stuck in India". Writ ¶ 374.

Third, great weight must be given to the simple fact that Petitioners ultimately paid no capital gains tax anywhere in the world—despite raising $ 1.98 billion from the Indian investing public, and promptly extracting $1.35 billion from the Indian economy. Writ ¶ 357. Given the fact that CUHL's transactions for the facilitation of these cash flows resulted in capital gains of $ 5.5 billion, it is simply absurd for such massive transactions to avoid capital gains tax entirely.

Writ ¶¶ 53-54.  Any objectively reasonable person would necessarily anticipate that such a result is incompatible with the "substance over form" approach to anti-tax-avoidance doctrines.

Fourth, given the broad language of Section 9(1)(i) of the 1961 Income Tax Act, as it stood in 2006, any reasonable person would have understood that CUHL needed to file a tax return for the relevant time period.  IT Act § (9)(1)(i) (Lamm Decl., Ex. 10) (providing that the income taxable in India includes "all income accruing or arising, whether directly or indirectly, through or from any business connection in India, or through or from any property in India, or through or from any asset or source of income in India, or through the transfer of a capital asset situated in India."  (emphasis added)).  Petitioners' witness suggested in her declaration that CUHL had not filed any tax return "on the advice of its accounting experts because . . . there was no taxable event in 2006."  Brown ¶ 111 (Van den Berg Decl., Ex. 12).  On its face, however, Section 9(1)(i) of the 1961 Income Tax Act, as it stood in 2006, was applicable to CUHL's transactions (*e.g.*, as reflecting "income," "business connection in India," "property in India," and "the transfer of a capital asset situated in India") in particular because this provision had consistently been interpreted by Indian courts in a purposive manner.  IT Act § (9)(1)i) (Lamm Decl., Ex. 10). Failure to file a tax return in India was necessarily strategic—and, indeed, this strategy was successful for nearly seven years, inasmuch as the Indian tax authorities were unaware of Petitioners' massive capital gains until the 2014 investigation.

Fifth, even the Tribunal's own findings confirm the artificiality of the 2006 Divestment. The Tribunal specifically endorsed the 2006 Divestment as a "triumph of form over substance." Writ ¶ 378.  This finding can only confirm that a transaction is taxable in a system that applies the opposite rule, such as the Indian anti-tax-avoidance system: "substance over form."  Writ ¶¶ 344-45; Nandrajog ¶ 7, 11.

Given that any reasonable person would have recognized the possibility that the 2006 Divestment would be subject to capital gains tax, and that Petitioners took multiple careful measures to avoid paying capital gains tax (and even to avoid detection by the tax authorities), the 2006 Divestment must necessarily be understood as an unlawful, abusive, and tax-avoidant transaction. Such a transaction is necessarily not "in accordance with the national laws of the Contracting Party in whose territory the investment is made," as required by Article 1(b) of the UK-India BIT. India therefore never offered to arbitrate any disputes arising from such a transaction, and Petitioners' attempt to "accept" such a purported offer could not form any arbitration agreement.

### C. India Did Not Offer to Arbitrate Disputes Involving Petitioners' "Divestments" or "Returns"

Petitioners contend that an agreement to arbitrate was formed pursuant to Article 9 of the BIT. Pet. ¶¶ 10, 70. Under the BIT, however, India only consented to arbitrate disputes that involved an "investment" as defined by Article 1(b) of the Treaty. To accept India's offer under Article 9(b), an investor had to bring a dispute grounded in an "investment" that was "established" or "acquired" in India. India-UK BIT, art. 1(b).

Petitioners' intra-group transactions do not fall within the definition of an "investment" as contemplated by Article 1(b). Rather, they constitute a divestment—an extraction or removal—of economic capital from India. Writ § IV.C(iv). It is an inherent characteristic of an investment that a capital contribution is transferred <u>into</u> the host State. Writ ¶ 400; *Salini Costruttori S.p.A. and Italstrade S.p.A. v. Kingdom of Morocco* (Decision on Jurisdiction), ICSID Case No. ARB/00/4, 23 July 2001, 42 I.L.M. 609, 609-624 (2003) (explaining that a "contribution" of capital is fundamentally part of the nature of an investment) (Lamm Decl., Ex. 11). In the present case, however, the opposite occurred. As a result of the Daylight Loans and intra-group

transactions, Petitioners systematically divested their stake in India's oil and gas business while reaping gains amounting to approximately US$ 5.5 billion—much of which was distributed to Petitioners' shareholders.  Award ¶ 1453.  The 2006 Divestment, then, was carried out with the aim of divesting (*i.e.* removing) Petitioners' interests from the Indian economy.  The present dispute, therefore, did not fall within India's standing offer to arbitrate under Article 9 of the BIT.

Relatedly, the BIT clearly distinguishes between an "investment," as defined by Article 1(b), and "returns," as defined by Article 1(e).  The definition of "returns" includes "the monetary amounts yielded by an investment such as . . . capital gains."  BIT, art. 1(e) (emphasis added).  It is indisputable that Petitioners sought to challenge India's tax assessment on their capital gains— therefore, on their "returns"—by initiating the underlying arbitration.   But India did not offer to arbitrate "returns."   Under the BIT, the protections regarding "most-favored nation treatment," under Article 4(2) and the right to repatriation of investments and returns under Article 7 expressly apply to both "investments" and "returns."  *See* BIT arts. 4(2), 7.  The other standards of protection under the BIT, including the arbitration provision in Article 9, only apply to protected "investments" and thus omit coverage of "returns."  Writ ¶ 101.  India therefore did not expressly or impliedly agreed to arbitrate disputes resulting from returns such as the capital gains that accrued as a result of the 2006 Divestment.

### D.    The Parties Did Not Exclude Judicial Review of the Existence of an Arbitration Agreement

Two additional points should be made regarding the framework applicable to this Court's analysis in the present case.

First, the India-UK BIT references the UNCITRAL Arbitration Rules, which contain a so-called "competence-competence" clause under Article 21(1).  Specifically, this clause provides that "[t]he arbitral tribunal shall have the power to rule on objections that it has no jurisdiction,

including any objections with respect to the existence or validity of the arbitration clause or of the separate arbitration agreement."   UNCITRAL Rules, art. 21(1).   In two previous decisions, the D.C. Circuit has acknowledged that at least some "parties' adoption of UNCITRAL's arbitration rules" may indeed be "clear and unmistakable evidence that the parties agreed to arbitrate arbitrability."   *LLC SPC Stileks v. Republic of Moldova*, 985 F.3d 871, 879 (D.C. Cir. 2021) (quoting *Chevron*, 795 F.3d at 204).   In both of those cases, the D.C. Circuit found that subsequent judicial review of the arbitrators' conclusions regarding their own arbitral jurisdiction was therefore precluded under *First Options*, 514 U.S. at 944.   The D.C. Circuit's conclusions in *Stileks* and *Chevron*, however, are not dispositive in the present case.

This is because, in the present case, there is ample evidence that the specific parties before this Court—including both India and Petitioners—shared a distinct understanding of Article 21(1) of the UNCITRAL Arbitration Rules.   "[C]ontext matters," as the Second Circuit recently explained, because "[i]ncorporation of such rules into an arbitration agreement does not, per se, demonstrate clear and unmistakable evidence of the parties' intent to delegate threshold questions of arbitrability to the arbitrator where other aspects of the contract create ambiguity as to the parties' intent."   *DDK Hotels, LLC v. Williams-Sonoma*, Inc., No. 20-2748-cv, 2021 U.S. App. LEXIS 21862, at *22 (2d Cir. July 23, 2021) (emphasis added).   "Where . . . the arbitration agreement is narrower, vague, or contains exclusionary language suggesting that the parties consented to arbitrate only a limited subset of disputes, incorporation of rules that empower an arbitrator to decide issues of arbitrability, standing alone, does not suffice to establish the requisite clear and unmistakable inference of intent to arbitrate arbitrability."   *Id.* at *24.

In the present case, a key aspect of the context is how the concept of "competence-competence" has been consistently understood in the parties' home jurisdictions (India and the

UK) and in the seat of arbitration (the Netherlands).  That is, since before Petitioners' arbitration against India began in 2015, all three relevant jurisdictions unanimously interpreted an arbitral tribunal's "power to rule on objections that that it has no jurisdiction" to mean only that the arbitral tribunal <u>need not wait</u> for a court's eventual assessment of the arbitral tribunal's jurisdiction <u>before arbitration can begin</u>.  This did not mean, however, that judicial review would be precluded <u>after arbitration is completed</u>, as detailed below.  It is therefore this Court's role to evaluate the explicit terms of the 1994 BIT, the 1993 DTAA, the 2004 MOU, and the other legal instruments pertaining to India's offer to arbitrate, as described above.

Specifically, the U.K. Supreme Court held in 2010 that "the concept of competence-competence . . . says nothing about judicial review," and that "[a]n arbitral tribunal's decision as to the existence of its own jurisdiction cannot therefore bind a party who has not submitted the question of arbitrability to the tribunal."  *Dallah Real Estate and Tourism Holding Co. v. The Ministry of Religious Affairs, Gov't of Pakistan*, (2010) UKSC 46 ¶¶ 25-26, 84-86 (Sarkar Op., Ex. 52)  (emphasis added).  In 2013, the Indian Supreme Court likewise held that, in accordance with "the principle of 'Kompetenz kompetenz,'" the arbitral tribunal must "rule on its own jurisdiction and at the first instance," but "[t]he arbitrators are to be not the sole judge but first judge, of their jurisdiction."  *Chloro Controls (India) Private Ltd. vs. Severn Trent Water Purification Inc. and Orgs.*, (2013) 1 SCC 641 ¶ 129 (India) (Sarkar Op., Ex. 34) (emphasis added). Most recently, in 2015, the Dutch Supreme Court likewise explained that "the question whether a valid arbitration agreement has been concluded ultimately is referred to the courts," even though Article 1052(1) of the Dutch Code of Civil Procedure explicitly acknowledges that any Dutch arbitral tribunal possesses "jurisdiction . . . to determine its own jurisdiction" at the outset of arbitration. *Republic of Ecuador/Chevron Corp.*, HR, 24 Sept. 2014, First Chamber No. 13/04679

(EV/LZ) (Neth.) ¶ 4.2 (Van den Berg Decl., Ex. 3).  As observed by the Dutch scholar, Professor Peter Sanders, who was a principal drafter of the Dutch arbitration statute and a special advisor to UNCITRAL: "[T]he final word on the competence of arbitrators still remains with the Court." Pieter Sanders, *Commentary on UNCITRAL Arbitration Rules*, 2 Y.B. COM. ARB. 172, 196-97 (Pieter Sanders ed., 1977) (Van den Berg Decl., Ex. 2).

Accordingly, regardless of what Article 21(1) of the UNCITRAL Arbitration Rules may have potentially meant for other parties in other cases, *e.g.*, *Stileks*, 985 F.3d at 879, the context surrounding the arbitration in the present case shows that neither India nor Petitioners understood the competence-competence clause to preclude judicial review.  The present case therefore does not present "clear and unmistakable evidence" that the parties intended to delegate the question of the arbitrators' competence <u>exclusively</u> to the arbitrators under *First Options*, 514 U.S. at 944.

<u>Second</u>, the arguments presented above in Parts I-A, I-B, and I-C are fundamentally directed toward the existence of an agreement to arbitrate, rather than the scope of any such purported agreement.  This is because BITs are not the only type of instrument where a potential respondent extends a standing offer to arbitrate "with an amorphous class" of prospective claimants.  *Cf. BG Grp.*, 572 U.S. at 46 (Sotomayor, J., concurring in part).  For example, both the federal courts and the D.C. courts have identified many instances where professional licensees— especially lawyers and financial professionals—extend standing offers to arbitrate certain categories of disputes with their "clients" or "customers."[3]

Indeed, all attorneys licensed in the District of Columbia have extended standing offers to arbitrate "disputes over fees" with "client[s]" under Rule XIII of the D.C. Bar Rules.  *Schwartz v.*

---

[3]   Precedents concerning arbitration cases against professional licensees have been directly applied in BIT disputes, as the Supreme Court illustrated in *BG Group*, 572 U.S. at 39, by explicitly evaluating the Argentina-UK BIT under the "ordinary intent-determining framework" set forth in *Howsam v. Dean Witter Reynolds*, 537 U.S. 79, 83-85 (2002), a case involving an arbitration between a licensed investment advisor and a client.

*Chow*, 867 A.2d 230, 232 n.7 (D.C. 2005) ("Rule XIII provides that an attorney who is a member of the District of Columbia Bar 'shall be deemed to have agreed to arbitrate disputes over fees for legal services . . . when such arbitration is requested by a present or former client . . . .'").  Similarly, as observed by the D.C. Circuit, licensed members of the New York Stock Exchange ("NYSE") have extended standing offers to arbitrate disputes with "customers" that arise "in connection with the business of such members."  *Pearce v. E.F. Hutton Grp., Inc.*, 828 F.2d 826, 828 (D.C. Cir. 1987) (analyzing Article XI of the NYSE Constitution and NYSE Rule 600(a)).  Analogous standing offers have been extended by licensees of the Financial Industry Regulatory Authority ("FINRA") and the National Association of Securities Dealers ("NASD").  *UBS Sec. LLC v. Voegeli*, 684 F. Supp. 2d 351, 355 n.7 (S.D.N.Y. 2010) ("Like FINRA Rule 12200, NASD Rule 10301(a) required arbitration of 'any dispute . . . between a customer and a member . . . arising in connection with the business of such member . . . upon the demand of the customer.'").

Over decades, therefore, the federal courts have developed a substantial body of case law analyzing these standing offers to arbitrate.  Where the claimant's purported acceptance—the "demand for arbitration"—fails to correspond to the material terms of the standing offer, then <u>no arbitration agreement comes into existence</u>.  *E.g.*, *Citigroup Glob. Mkts. v. Abbar*, 761 F.3d 268, 274 (2d Cir. 2014) ("Because the parties here are disputing the existence of an obligation to arbitrate, not the scope of an arbitration clause, the general presumption in favor of arbitration does not apply"); *Raymond James Fin. Servs. v. Cary*, 709 F.3d 382, 386 (4th Cir. 2013) ("[The respondent] agreed to arbitrate disputes with its customers, not with those who fall outside that category. . . .  Whether appellants are customers thus relates to 'the <u>existence</u> of a contract to arbitrate,' not the 'scope' of that potential agreement.") (emphasis in original); *FSP, Inc. v. Societe Generale*, No. 02-CV-4786, 2005 U.S. Dist. LEXIS 3081, at *15 (S.D.N.Y. Feb. 25, 2005) ("[T]he

Court must still examine [the] answer and counterclaims to make a threshold determination of whether they legitimately raise matters that are properly subject to NYSE arbitration.").  This is particularly relevant in the present case, as explained above, because the terms of the 1994 BIT, the 1993 DTAA, the 2004 MOU, and the other legal instruments reflect that India never offered to arbitrate the present dispute.  Nor did the parties clearly and unmistakably agree to an exclusive delegation of the decision on arbitrability to the arbitrators.

In accordance with the case law concerning standing offers to arbitrate, therefore, this Court must also determine whether the parties entered into an agreement to arbitrate, when Petitioners purported to accept the offer of arbitration under Article 9 of the 1994 India-UK BIT. If the Court ultimately concludes that no arbitration agreement exists, then §1605(a)(6) cannot provide any basis for this Court's subject-matter jurisdiction as to claims against India under the FSIA.  *See Belize Soc. Dev., Ltd. v. Go'vt of Belize*, 794 F.3d 99, 102, 103 (D.C. Cir. 2015) (explaining that the court "would not be bound to honor the arbitral tribunal's determinations" if the court itself concluded that the "arbitration provision of the contract is void" under the FSIA).

*             *             *

In light of the above, India's standing offer of arbitration in Article 9 of the BIT did not correspond to Petitioners' acceptance, such that no arbitration agreement was ever formed.  The present case, therefore, does not fall within the FSIA's arbitration exception under 28 U.S.C. §1605(a)(6).  Accordingly, this Court should dismiss the present action for lack of subject-matter jurisdiction.

## II.   India Has Not Waived Its Sovereign Immunity

Petitioners' invocation of the waiver exception is equally inapposite here.  Pet. ¶10.  Under the FSIA, a foreign state may waive its sovereign immunity "either explicitly or by implication." 28 U.S.C. § 1605(a)(1).

In the D.C. Circuit, both explicit and implicit waivers are construed "narrowly."  *See World Wide Minerals, LTD. v. Rep. of Kazakhstan,* 296 F.3d 1154, 1162 (D.C. Cir. 2002) ("[E]xplicit waivers of sovereign immunity are narrowly construed in favor of the sovereign and are not enlarged beyond what the language requires." (citation and quotation marks omitted)); *Creighton Ltd. v. Gov't of Qatar*, 181 F.3d 118, 122 (D.C. Cir. 1999) (explaining that implicit waivers are likewise construed narrowly).

Because Petitioners have failed to identify any explicit waiver of immunity (*see* Pet. ¶10), this Court need only evaluate Petitioners' arguments regarding a purported implicit waiver. Congress anticipated only three forms of implicit waiver under § 1605(a)(l): (1) waiver by arbitration agreement, (2) waiver by choice-of-law provision, and (3) waiver by answering a complaint without asserting sovereign immunity.  H.R. Rep. 1487, 94th Cong. 2d Sess., 18 (1976); Sen. Rep. 1310, 94th Cong. 2d Sess., 18 (1976).  The D.C. Circuit recently confirmed that only these "three circumstances" can provide the requisite evidence of a foreign state's intent to effect an implied waiver of sovereign immunity.  *Ivanenko v. Yanukovich*, 995 F.3d 232, 239 (D.C. Cir. 2021) (emphasis added) (citation and quotation marks omitted); *see also World Wide Minerals*, 296 F.3d at 1161 n.11 ("[C]ourts have been reluctant to stray beyond these examples when considering claims that a nation has implicitly waived its defense of sovereign immunity." (citation and quotation marks omitted)).  Accordingly, because Petitioners have not and cannot identify any of these three scenarios—*i.e.*, any arbitration agreement, choice-of-law provision, or litigation

conduct—demonstrating India's implicit waiver of immunity, this Court must reject Petitioners' invocation of the waiver exception under §1605(a)(1).

Petitioners maintain, however, that India implicitly waived its sovereign immunity by signing the New York Convention. Pet. ¶10. This argument is untenable. The Convention does not even <u>mention</u> sovereign immunity, let alone any waiver. The Convention's fundamental purpose, moreover, was to govern the arbitration of "commercial" disputes involving ordinary, commercial entities—*i.e.*, not sovereign entities entitled to immunity. *E.g.*, art. I(3), New York Convention. Accordingly, neither the text, nor the context, nor the object and purpose of the New York Convention suggest any intent by the drafter or signatory States to address issues of sovereign immunity, as academic writers have confirmed. Andreas Börner, Article III, *in Recognition And Enforcement of Foreign Arbitral Awards: A Global Commentary on the New York Convention*, 126 (Herbert Kronke, et al. eds., 2010) ("The Convention does not contain any specific rules of international law regarding immunity in [recognition] proceedings."); W. Mark C. Weidemaier, *Sovereign Immunity and Sovereign Debt*, 2014 U. Ill. L. Rev. 67, 77 (2014) ("The New York Convention … does nothing to lift a sovereign's immunity from suit or execution.").

Indeed, if joining the New York Convention waived the States parties' sovereign immunity, such a waiver would apply equally to the United States' own immunity from suit. Such waivers, however, must also be "unambiguously expressed." *FAA v. Cooper*, 566 U.S. 284, 291 (2012) ("For the same reason that we refuse to enforce a waiver that is not unambiguously expressed in the statute, we also construe any ambiguities in the scope of a waiver in favor of the sovereign."). That standard is not met here—indeed, if the New York Convention were even plausibly to be construed as a waiver of immunity, then the U.S. legislative history concerning ratification would analyze or at least refer to the topic. But the Congressional record is entirely

silent, thus demonstrating the inherent improbability of Petitioners' argument.  *See generally* S. Rep. No. 91-702 (1970) (never addressing any waiver of the United States' sovereign immunity); H.R. Rep. No. 91-1181 (1970) (same).

Finally, Petitioners cite dicta from a single case, *Tatneft*, 771 F. App'x at 10, suggesting that signing the New York Convention alone waives sovereign immunity.  As the D.C. Circuit has recently emphasized, however, "*Tatneft* was an unpublished disposition, so it does not bind" this Court in the present case.  *P&ID*, 962 F.3d at 583-84 (observing that there is no binding precedent interpreting the New York Convention itself to be a waiver of sovereign immunity).

In any event, contrary to Petitioners' argument, even the *Tatneft* panel did not rely <u>solely</u> on Ukraine's ratification of the New York Convention to determine whether Ukraine had implicitly waived immunity. The *Tatneft* case involved a straightforward application of *Creighton Ltd. v. Qatar*, which recognized a waiver of sovereign immunity only where <u>two</u> separate and distinct requirements had been satisfied: (1) "the defendant sovereign was . . . a signatory to the [N.Y.] Convention" and also (2) "had agreed . . . to arbitrate in the territory" of another signatory. 181 F.3d at 123.  *Tatneft* could not and did not dispense with the second requirement under *Creighton—* <u>an agreement to arbitrate</u>.  In the present case, as explained above in Part I, no such agreement to arbitrate exists, such that India's signature of the New York Convention itself cannot have independently resulted in any waiver under the FSIA.

Accordingly, this Court should also reject Petitioners' purported invocation of the waiver of foreign sovereign immunity under § 1605(a)(1).

## <u>CONCLUSION</u>

For the reasons stated above, India respectfully requests that the Petition be dismissed with prejudice for lack of subject matter jurisdiction under the FSIA.

Dated:   August 13, 2021
        Washington, DC

Respectfully submitted,

**WHITE & CASE**

/s/  Carolyn B. Lamm                       ,
Carolyn B. Lamm (D.C. Bar No. 221325)
Nicolle Kownacki (D.C. Bar No. 1005627)
David P. Riesenberg (D.C. Bar No. 1033269)
701 Thirteenth Street, NW
Washington, DC  20005
Telephone:      + 1 202 626 3600
Facsimile:      + 1 202 639 9355
clamm@whitecase.com

*Counsel for the Republic of India*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 13, 2021 a true and correct copy of the Statement of Points and Authorities in Support of the Republic of India's Motion to Dismiss was served by electronic filing on the following counsel of record:

Mark McNeill (*Pro Hac Vice*)
Dennis H. Hranitzky (*Pro Hac Vice*)
Debra O'Groman (*Pro Hac Vice*)
QUINN EMANUEL URQUHART &
SULLIVAN LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Emails: markmcneill@quinnemanuel.com
dennishranitzky@quinnemanuel.com
debraogorman@quinnemanuel.com

Florentina Dragulescu Field
(DC Bar No. 1531549)
QUINN EMANUEL URQUHART &
SULLIVAN LLP
1300 I Street NW, Suite 900
Washington, District of Columbia 20005
Email: florentinafield@quinnemanuel.com

*Counsel for Cairn Energy PLC and Cairn
UK Holdings Limited*

**WHITE & CASE**LLP

/s/ *Carolyn B. Lamm*
Carolyn B. Lamm (D.C. Bar No. 221325)
Nicolle Kownacki (D.C. Bar No. 1005627)
David Riesenberg (D.C. Bar No. 1033269)
**WHITE & CASE**
701 Thirteenth Street, NW
Washington, DC 20005
Telephone: (202) 626-3600
Facsimile: (202) 639-9355

*Counsel for the Republic of India*