# Exhibit 9

to the Expert Opinion of
Justice (Retired) Pradeep Nandrajog

dated August 13, 2021



SCC Online Web Edition, Copyright © 2021
Page 1    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-----------------------------------------------------------------------------------------------------------------------------------------------------

### (2012) 6 Supreme Court Cases 613

(BEFORE S.H. KAPADIA, C.J. AND K.S.P. RADHAKRISHNAN AND SWATANTER KUMAR, JJ.)

a

VODAFONE INTERNATIONAL HOLDINGS BV . . Appellant;

*Versus*

UNION OF INDIA AND ANOTHER . . Respondents.

Civil Appeal No. 733 of 2012†, decided on January 20, 2012

b    A. **Income Tax — Non-residents/Offshore transactions — Taxation of —** Need for certainty in law to encourage foreign direct investment (FDI) — (1) *Look at* principle and (2) Judicial Anti-Avoidance Rules (JAAR) — (3) *Limitation of benefits* (LOB) principle and (4) *look through* principle — Application of — Need for clear incorporation of Principles (3) & (4) in legislation and treaties as against there being no such requirement for

c    application of Principles (1) and (2) by court — Limited scope of judicial intervention even in applying Principle (2) i.e. JAAR — Need for court to apply *look at* principle i.e. to look at impugned transaction as a whole and not adopt a dissecting approach, followed by application of JAAR thereupon, if still warranted *after* application of *look at* principle — *Look through* principle or LOB principle cannot be applied in absence of specific legislative incorporation thereof — Held, certainty and stability form basic

d    foundation of any fiscal system — Tax policy certainty is crucial for taxpayers, including foreign investors, to make rational economic choices in the most efficient manner — It also helps Revenue in enforcing provisions of taxing laws — Constitution of India — Arts. 265 and 14 — Income Tax Act, 1961, Ss. 9, 195 and 163

B. **Income Tax — Tax Planning/Tax Avoidance or Tax evasion —**
e    General Anti-Avoidance Rules (GAAR)/Judicial Anti-Avoidance Rules (JAAR) — Invocation of GAAR like *look through* and limitation of benefits (LOB) vis-à-vis invocation of JAAR like *substance over form*, *nature and character of transaction*, piercing corporate veil, true beneficial ownership or alter ego, participative investment, preordained transaction and fiscal nullity read with *look at* principle — Held, said GAAR may be invoked by

f    Revenue only when expressly incorporated in legislation or treaty — However, said JAAR may be invoked if Revenue, after first applying *look at* test to the transaction upon a review of all the facts and circumstances surrounding impugned transaction, still establishes at threshold that dominant purpose of impugned transaction or holding structure is a sham or tax evasion

g    C. **Income Tax — Tax Planning/Tax Avoidance —** Meaning and permissibility of — Distinction from tax evasion, explained — Principles and tests to be applied by court/Revenue to determine whether a transaction amounts to genuine tax planning or is a colourable device meant to evade tax — Matters to be considered by court/Revenue — Legal position in India and England extensively surveyed and summarised

h
    † Arising out of SLP (C) No. 26529 of 2010. From the Judgment and Order dated 8-9-2010 of the High Court of Bombay in WP No. 1325 of 2010



SCC Online Web Edition, Copyright © 2021
Page 2        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
------------------------------------------------------------------------------------------------------------------------------------------------

— Invocation of General Anti-Avoidance Rules (GAAR) like *look through* and limitation of benefits (LOB) vis-à-vis invocation of Judicial Anti-Avoidance Rules (JAAR) like *substance over form, nature and character of transaction,* piercing corporate veil, true beneficial ownership or alter ego, participative investment, preordained transaction and fiscal nullity if still warranted *after* application of *look at* principle

— Cardinal importance for impugned transaction to have some genuine corporate, commercial, economic or business purpose to establish its legitimacy as a tax planning device

— Application of these principles in context of foreign direct investment (FDI) — Diversification of corporate holding structure to take advantage of tax havens for tax planning purposes — Permissibility of — Exit by one foreign investor coupled with continuity of business by transferee investor, as strong indicium of legitimacy of transaction

— *Firstly*, reiterated (*per curiam*), legitimate avoidance of tax liability i.e. strategic tax planning is permissible provided it is within framework of law — It is only colourable devices, dubious methods and subterfuges to evade tax which are impermissible — A subject is not to be taxed by inference or analogy, but only by the plain words of a statute applicable to facts and circumstances of each case — It is a cornerstone of the law that every taxpayer is entitled to arrange his affairs so that his taxes shall be as low as possible and he is not bound to choose that pattern which will replenish Treasury — Fact that motive for a transaction is to avoid tax does not invalidate it unless a particular enactment so provides; but it is essential that the transaction has some economic or commercial substance

— *Secondly*, held (*per curiam*), to determine whether a transaction or device is legitimate or colourable, it is task of Revenue and court to ascertain true legal nature of transaction concerned by first applying *look at* principle i.e. by looking at the entire impugned transaction as a whole and not by adopting a dissecting approach nor by looking at the impugned transaction isolated from the context to which it properly belongs — Revenue or court cannot start with question as to whether transaction was a tax evasion device but should first apply *look at* test to ascertain its true legal nature — If, upon application of *look at* test Revenue still establishes abuse or intent to evade tax, then abovestated JAAR may be applied — JAAR can be applied even in the absence of any statutory authorisation to that effect (*see for details, Sixthly, below*) — However, court may apply GAAR like *look through* principle or limitation of benefits (LOB) principle only if statute or treaty concerned expressly incorporates said principle(s)

— *Thirdly*, in context of FDI the above principles (in *Secondly*) amount to determining if transaction is a *participative investment* in which case it shall qualify as legitimate tax planning, or it is a *preordained tax evading transaction* in which case it shall be struck down as a colourable device — Holistic view of transaction is to be adopted so as not to discourage genuine FDI into India — For a transaction to be a declared a fiscal nullity there should be a set of preordained steps inserted for no commercial purpose



SCC Online Web Edition, Copyright © 2021
Page 3   Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source:  Supreme Court Cases
-----------------------------------------------------------------------------------------------------------------------------------------------------------

     — *Fourthly*, to determine whether a transaction/FDI is legitimate/participative or colourable/preordained Revenue/courts must consider following parameters: (i) duration and timing of coming into existence of holding structure or part thereof via which FDI in question entered India; (ii) period of business operation in India; (iii) generation of taxable revenues in India; (iv) time of exit from India; and (v) continuity of business on exit in India — Existence of stable business over a period of time is an indication of participative investment

     — *Fifthly*, exit right secured by a foreign investor by itself, and exit thereupon from India does not necessarily lead to inference of tax evasion when transaction otherwise appears bona fide — Exit is an important right of an investor in every strategic investment — Exit by one investor coupled with continuity of business by transferee investor is an important tell-tale circumstance which indicates legitimate commercial/business substance of the transaction, indicating its nature as a legitimate participative investment venture

     — *Sixthly*, so as to invoke JAAR of "substance over form", "nature and character of transaction", "piercing of corporate veil", "true beneficial ownership or alter ego" and fiscal nullity, onus is on Revenue to establish that dominant purpose of transaction or holding structure is a sham or tax evasion — This must be done by first applying the *look at* test (*see for details Secondly, above*) upon a review of all the facts and circumstances surrounding impugned transaction and adopting a holistic view — Existence of a genuine corporate or business purpose as the basis for impugned transaction is evidence that impugned transaction is not a colourable or artificial device — However, stronger the evidence of colourable device, more compelling must be the corporate business purpose underlying the impugned transaction to overcome evidence of a colourable device — For instance, if it is established that corporate holding structure is being used for circular trading, round tripping, bribery or has no real commercial/business worth or purpose, then Revenue may resort to the abovesaid JAAR and impose tax ignoring titular entity

     — *Seventhly*, it is a common practice in international law, which is the basis of international taxation, for foreign investors to invest in Indian companies through an interposed foreign holding or operating company, such as a Cayman Islands or Mauritius-based company (i.e. tax haven based companies) for both tax and business purposes — Tax havens may be utilised by diversification of corporate structure for sound commercial and legitimate tax planning reasons — To prevent tax avoidance, proper course is to update laws — However, courts and Revenue authorities can go behind outward cloak and investigate real purpose — Burden to prove that corporate restructuring is not for bona fide purpose, is on Revenue (again, principles in *Secondly* and *Sixthly* become applicable)

     — *Eighthly*, (*per Radhakrishnan, J.*), *abus de droit* "abuse of rights doctrine", not to be imported into India

     — Thus, on facts held (*per curiam*), impugned transaction between HTIL and appellant VIH, when *looked at*, not a sham nor tax evasion device nor a preordained tax evasive transaction nor a fiscal nullity as it was entered into for a genuine business/commercial purpose — These business/commercial purposes, explained in detail — It was a bona fide participative



SCC Online Web Edition, Copyright © 2021
Page 4        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source:  Supreme Court Cases
-----------------------------------------------------------------------------------------------------------------------------------------------------

investment which had to be viewed holistically — Hutchison structure had genuine business presence in India for a fairly long time, invested significantly in India and contributed significantly to Indian revenues — Revenue overlooked fact that the impugned share purchase agreement dt. 11-2-2007 (SPA) between HTIL to VIH was a single transaction involving transfer of CGP share alone — Separate values could not therefore be assigned to different rights and benefits flowing from it (none of which were property rights other than the share itself), nor could the transfer of some underlying asset situate in India be divined, as erroneously contended by Revenue and held by High Court (see for details *Shortnote V*) — Lastly, Hutchison's exit from India could not be doubted as a tax evasion device when control of telecom business in India which stood transferred from Hutchison to Vodafone via the impugned transaction, had been continued by Vodafone, and continued to contribute significantly to Indian economy and Indian revenues thereafter — Thus, it could not be said that the intervened entity CGP had no business or commercial purpose in execution of impugned SPA  — Income Tax Act, 1961, S. 9(1)(i) sub-clause (4) and Ss. 5(2)(b), 6(3) and 2(14) & (42)

D. **Income Tax — Tax Planning/Tax Avoidance or Tax evasion — General Anti-Avoidance Rules (GAAR)/Judicial Anti-Avoidance Rules (JAAR) — Judicial initiative in India** — Held, GAAR are already in place by means of legal precedents in India — GAAR therefore not a new concept for India — Deficiencies in present Indian concept and its effect — Lack of clarity and absence of appropriate statutory and treaty provisions regarding circumstances in which JAAR like *substance over form, nature and character of transaction,* piercing corporate veil, true beneficial ownership or alter ego, participative investment, preordained transaction and fiscal nullity would apply, held, has generated litigation

E. **Income Tax — Non-residents/Offshore transactions — Tax haven or financial haven — Shell company — Meanings of, explained** (*per Radhakrishnan, J.*) — Tax havens are places where there is considerable latitude in taxation — Shell company (a pejorative usage) exists on paper only and is used for investment purpose principally to evade tax

F. **Income Tax — Tax Planning/Tax Avoidance or Tax evasion — Foreign investments in India — Sources of — Overseas companies — Misuse of — Need for updation of laws — Creation of adequate regulatory mechanism to prevent tax evasion — Offshore Finance Centres (OFC) — Joint Ventures (JVs) — Wholly owned subsidiaries (WOS) — What are — Permissibility in law — Uses and misuses highlighted** — Vodafone-Hutchison offshore deal regarding CGP sale which led to transfer of controlling interest in Hutch/ Vodafone India, held (*per Radhakrishnan, J.*), exposes loopholes in existing Indian set up through which foreign companies could dodge tax authorities — Besides, there must be certainty in foreign investment policy — Appropriate regulatory measures therefore urgently needed — India can take benefit from experience of other countries and bring its laws in tune with present day realities                               (Paras 183 to 186, 251 and 252)

G. **Industry, Trade, Development and Business Laws — Foreign Trade and Investment — Foreign direct investment (FDI) — Provision for exit option — Judicial Anti-Avoidance Rules (JAAR) — Applicability of —**



SCC Online Web Edition, Copyright © 2021
Page 5    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-----------------------------------------------------------------------------------------------------------------------------------------------------

a   Judicial review — Scope of — Held (*per curiam*), exit is an important right of an investor in every strategic investment — Exit coupled with continuity of business is an important tell-tale circumstance which indicates legitimate commercial/business substance of the transaction, indicating its nature as a legitimate participative investment venture — A foreign investor protects himself by providing exit route on account of several business reasons, primarily to withdraw his capital if unfavourable circumstances develop in foreign land — Such a decision being for purely commercial purposes, is generally not susceptible to judicial review (but see *Shortnote C, Secondly*

b   and *Sixthly* for extent, mode and manner of judicial intervention permissible) — Public Law and Private Law — Limits of Public Law — Administrative Law — Judicial Review — Limits of judicial review

   H. Income Tax — Corporate taxation — Holding structures — Subsidiaries — Taxation of company, shareholders, holding company and subsidiaries, all individually and independently — Holding structures —

c   Legal basis — Separate entity principle, explained — Subsidiaries — Misuse of, for tax evasion and other fraudulent purposes — Court's duty to intervene — Incorporated company as a legal person different from its shareholders — Subsidiary too an independent legal person — Company's income different from shareholders' income — Problems arising in existing legal set-up — Tax havens like Cayman Islands, Mauritius, etc. being misused to some extent by corporate world for tax evasion — Existing legal

d   position extensively explained (*per curiam*) — Loopholes, pointed out — Companies Act, 1956, Ss. 4, 12, 34 and 36

   I. Corporate Laws — Company Law — Corporate structure — Holding structures — Subsidiaries — Reasons for creation of — Modes by which corporate holding structure consisting of parent/holding company and subsidiaries might come into existence — Efficient management of business

e   through smaller entities having their own legal existence — Permissibility in law to have sub-entities — Working of corporate group as a family — Principle of internal co-relation — Explained in detail — Companies Act, 1956, Ss. 4, 12, 34, 36 and 394

   J. Corporate Laws — Company Law — Corporate structure — Subsidiary vis-à-vis parent/holding company — Control exercised by

f   parent/holding company — Effect, if any, (1) on subsidiary's independent legal existence, and (2) on determination of residence of parent company or subsidiary, for tax purposes — Absolute or persuasive control — Determination of — Effect of absolute control being exercised by parent/holding company over subsidiary where subsidiary can be considered a "puppet" — Position in general, and with regard to multinational companies (MNCs)/transnational companies (TNCs) — Impact of extent of

g   control on taxation — Separate existence of subsidiary if to be ignored where control is all pervasive (on the legal nature of controlling interest in a company see *Shortnote Z*)

   — Subsidiary, held, despite control exercised by parent/holding company, retains its own legal existence and ownership of its own assets because Directors of subsidiary owe responsibility to their own company

h   rather than to parent/holding company — Besides, assets of subsidiary, on winding up, vest in liquidator and not in parent/holding company —


SCC Online Web Edition, Copyright © 2021
Page 6    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-----------------------------------------------------------------------------------------------------------------------------------------------------

Steering interference by parent company is decisive test to determine whether subsidiary is a puppet of parent company — Close cooperation between parent and subsidiary is desirable, yet in law, subsidiary is bound to protect its own interests — Subsidiaries of multinational companies do enjoy a great deal of autonomy in countries where they operate but it may not be so in case of one-man parent company

— Hence, ordinarily, residence of both parent company and subsidiary company(ies) for tax purposes shall be taken to be place where they are incorporated or registered

— However, where subsidiary's Executive Directors' competencies are transferred to other persons/bodies or where subsidiary's Executive Directors' decision-making has become fully subordinate to parent/holding company with consequence that subsidiary's Executive Directors are no more than puppets, then the turning point in respect of subsidiary's place of residence comes about, (or parent company could be deemed to be a resident of place where downstream subsidiary is incorporated, which was Revenue's key argument in present case)

— On facts held, parent company HTIL, enjoyed only persuasive control over downstream Indian subsidiary HEL — HEL was therefore not a mere puppet — Separate existence of HEL could therefore not be ignored for purpose of determining tax liability of its offshore holding companies, HTIL and appellant herein, VIH i.e. HTIL/VIH could not be held to have a tax presence in India based on the contention that HEL was their puppet in India — Companies Act, 1956 — Ss. 4, 12, 34, 36 and 456 — Income Tax — Corporate taxation — Income Tax Act, 1961, Ss. 9, 163 and 195

K. Income Tax — Tax residence — Corporate taxation — Holding structure — Determination of residence of upstream parent company or downstream subsidiary for tax purposes — Key factor would be if one is "puppet" of another i.e. there is no genuine separate existence of one of them — Companies Act, 1956, S. 34

L. Corporate Laws — Company Law — Multinational companies (MNCs)/Transnational companies (TNCs) — Subsidiaries — Operations of — Held, have to conform to local laws and therefore must, and usually do, have autonomy, and exist as independent legal entities — Companies Act, 1956, Ss. 4, 12, 34 and 36

M. Corporate Laws — Company Law — Corporate structure — Holding company — Definition — Holding company is a company having sufficient shares power to control affairs of a subsidiary including appointment of Directors, though holding company and subsidiary company retain their independent and separate legal existence — Companies Act, 1956, Ss. 4, 12, 34 and 36

N. Accounts, Accountants and Accountancy — Corporate accounts — Accounts of parent company and its subsidiaries — Composite accounts and separate accounts — Parameters laid down (*per Radhakrishnan, J.*) — Companies Act, 1956, Ss. 209 and 4

This matter concerned a tax dispute involving the Vodafone Group with the Indian Tax Authorities (the Revenue) in relation to the acquisition by Vodafone International Holdings BV (VIH) a company resident for tax purposes in the



SCC Online Web Edition, Copyright © 2021
Page 7    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-----------------------------------------------------------------------------------------------------------------------------------------------------

*a* Netherlands, of the entire share capital of CGP Investments (Holdings) Ltd. (CGP) a company resident for tax purposes in the Cayman Islands (CI) vide the share purchase agreement (SPA) dated 11-2-2007, by purchasing the sole 100% share in CGP (the CGP share) from Hutchison Telecommunications International Ltd. (CI) (HTIL), also incorporated in the Cayman Islands and a part of the Hutchison Group (HTIL), whose stated aim, according to the Revenue, was "acquisition of 67% controlling interest in HEL", HEL being a company resident for tax purposes in India, which was disputed by the appellant saying that VIH had agreed to acquire companies which in turn controlled a 67% interest, but not

*b* controlling interest in Hutchison Essar Ltd. (HEL).

According to the appellant, CGP indirectly held through other companies 52% shareholding interest in HEL as well as options to acquire a further 15% shareholding interest in HEL, subject to relaxation of FDI norms. The remaining 33% in HEL was held by Essar Group (Essar), an Indian business conglomerate. In short, the Revenue sought to tax the capital gains arising from the sale of the share capital of CGP on the basis that CGP, whilst not a tax resident in India,

*c* held the underlying Indian assets.

Rejecting all the contentions of the Revenue and allowing the appeal, the Supreme Court

*Held* :

*Per Kapadia, C.J. (for himself and Kumar, J.; Radhakrishnan, J., concurring)*

*d* **The Look At Principle**

FDI flows towards locations with a strong governance infrastructure which includes enactment of laws and how well the legal system works. Certainty is integral to the rule of law. Certainty and stability form the basic foundation of any fiscal system. Tax policy certainty is crucial for taxpayers (including foreign investors) to make rational economic choices in the most efficient manner. Legal doctrines like "*limitation of benefits*" and "*look through*" are matters of policy. It

*e* is for the Government of the day to have them incorporated in the treaties and in the laws so as to avoid conflicting views. Investors should know where they stand. It also helps the tax administration in enforcing the provisions of the taxing laws. The question of providing a "*look through*" in the statute or in the treaty is a matter of policy. It is to be expressly provided for in the statute or in the treaty. Similarly, *limitation of benefits* has to be expressly provided for in the

*f* treaty. Such clauses cannot be read into the section by interpretation.

(Paras 180 and 93)

The correct legal position can be stated as follows. The principle in *Westminster*, 1936 AC 1 (HL), is that given that a document or transaction is genuine, the court cannot go behind it to some supposed underlying substance. The said principle has been reiterated in subsequent English judgments as "the cardinal principle". *Ramsay*, 1982 AC 300 (HL), held that *Westminster case* did

*g* not compel the court to *look at* a document or a transaction isolated from the context to which it properly belonged. It is the task of the court to ascertain the legal nature of the transaction and while doing so it has to *look at* the entire transaction as a whole and not to adopt a dissecting approach. In the present case, the Revenue has adopted a dissecting approach at the Department level. *Ramsay case* did not discard *Westminster case* but read it in the proper context

*h* by which a "device" which was colourable in nature had to be ignored as a fiscal nullity. *Thus, Ramsay case lays down a principle of statutory interpretation rather than an over-arching anti-avoidance doctrine imposed upon tax laws.*


SCC Online Web Edition, Copyright © 2021
Page 57    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-----------------------------------------------------------------------------------------------------------------------------------------------------------

*a*   with legal independence vis-à-vis their shareholders/participants. It is fairly well accepted that a subsidiary and its parent are totally distinct taxpayers. Consequently, the entities subject to income tax are taxed on profits derived by them on stand-alone basis, irrespective of their actual degree of economic independence and regardless of whether profits are reserved or distributed to the shareholders/participants. Furthermore, shareholders/participants that are subject to (personal or corporate) income tax, are generally taxed on profits

*b*   derived in consideration of their shareholding/participations, such as capital gains. Nowadays, it is fairly well settled that for tax treaty purposes a subsidiary and its parent are also totally separate and distinct taxpayers.

**73.** It is generally accepted that the group parent company is involved in giving principal guidance to group companies by providing general policy guidelines to group subsidiaries. However, the fact that a parent company

*c*   exercises shareholder's influence on its subsidiaries does not generally imply that the subsidiaries are to be deemed residents of the State in which the parent company resides. Further, if a company is a parent company, that company's executive director(s) should lead the group and the company's shareholder's influence will generally be employed to that end. This obviously implies a restriction on the autonomy of the subsidiary's executive

*d*   Directors. Such a restriction, which is the inevitable consequence of any group structure, is generally accepted, both in corporate and tax laws.

**74.** However, where the subsidiary's executive Directors' competences are transferred to other persons/bodies or where the subsidiary's executive Directors' decision making has become fully subordinate to the holding company with the consequence that the subsidiary's executive Directors are

*e*   no more than puppets then the turning point in respect of the subsidiary's place of residence comes about. Similarly, if an actual controlling non-resident enterprise (NRE) makes an indirect transfer through "abuse of organisation form/legal form and without reasonable business purpose" which results in tax avoidance or avoidance of withholding tax, then the Revenue may disregard the form of the arrangement or the impugned action

*f*   through use of non-resident holding company, recharacterise the equity transfer according to its economic substance and impose the tax on the actual controlling non-resident enterprise. Thus, whether a transaction is used principally as a colourable device for the distribution of earnings, profits and gains, is determined by a review of all the facts and circumstances surrounding the transaction. It is in the above cases that the principle of

*g*   lifting the corporate veil or the doctrine of substance over form or the concept of beneficial ownership or the concept of alter ego arises. There are many circumstances, apart from the one given above, where separate existence of different companies, that are part of the same group, will be totally or partly ignored as a device or a conduit (in the pejorative sense).

**75.** The common law jurisdictions do invariably impose taxation against

*h*   a corporation based on the legal principle that the corporation is "a person" that is separate from its members. It is the decision of the House of Lords in



SCC Online Web Edition, Copyright © 2021
Page 58    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-----------------------------------------------------------------------------------------------------------------------------------------------------

*Salomon* v. *Salomon and Co. Ltd.*[8] that opened the door to the formation of a corporate group. If a "one man" corporation could be incorporated, then it would follow that one corporation could be a subsidiary of another. This legal principle is the basis of *holding structures*.

76. It is a common practice in international law, which is the basis of international taxation, for foreign investors to invest in Indian companies through an interposed foreign holding or operating company, such as a Cayman Islands or Mauritius-based company for both tax and business purposes. In doing so, foreign investors are able to avoid the lengthy approval and registration processes required for a direct transfer (i.e. without a foreign holding or operating company) of an equity interest in a foreign invested Indian company. However, taxation of such holding structures very often gives rise to issues such as double taxation, tax deferrals and tax avoidance.

77. In this case, we are concerned with the concept of General Anti-Avoidance Rule (GAAR). In this case, we are not concerned with treaty shopping but with the anti-avoidance rules. The concept of GAAR is not new to India since India already has a judicial anti-avoidance rule, like some other jurisdictions. Lack of clarity and absence of appropriate provisions in the statute and/or in the treaty regarding the circumstances in which judicial anti-avoidance rules would apply has generated litigation in India.

78. Holding structures are recognised in corporate as well as tax laws. Special purpose vehicles (SPVs) and holding companies have a place in legal structures in India, be it in company law, the Takeover Code under SEBI[*] or even under the income tax law.

79. When it comes to taxation of a holding structure, at the threshold, the burden is on the Revenue to allege and establish abuse, in the sense of tax avoidance in the creation and/or use of such structure(s). In the application of a judicial anti-avoidance rule, the Revenue may invoke the "substance over form" principle or "piercing the corporate veil" test only after it is able to establish on the basis of the facts and circumstances surrounding the transaction that the impugned transaction is a sham or tax avoidant. To give an example, if a structure is used for circular trading or round tripping or to pay bribes then such transactions, though having a legal form, should be discarded by applying the test of fiscal nullity. Similarly, in a case where the Revenue finds that in a holding structure an entity which has no commercial/business substance has been interposed only to avoid tax then in such cases applying the test of fiscal nullity it would be open to the Revenue to discard such interpositioning of that entity. However, this has to be done at the threshold.

80. In this connection, we may reiterate the *"look at"* principle enunciated in *Ramsay*[5] in which it was held that the Revenue or the Court must *look at* a document or a transaction in a context to which it properly belongs to. It is the task of the Revenue/Court to ascertain the legal nature of

---

8 1897 AC 22 : (1895-99) All ER Rep 33 (HL)
* **Ed.**: Securities and Exchange Board of India (Substantial Acquisition of Shares and Takeovers) Regulations, 2011
5 *Ramsay (W.T.) Ltd.* v. *IRC*, 1982 AC 300 : (1981) 2 WLR 449 : (1981) 1 All ER 865 (HL)


SCC Online Web Edition, Copyright © 2021
Page 59    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
------------------------------------------------------------------------------------------------------------------------------------------------------


VODAFONE INTERNATIONAL HOLDINGS BV v. UNION OF INDIA 671
*(Kapadia, C.J.)*

the transaction and while doing so it has to *look at* the entire transaction as a whole and not to adopt a dissecting approach. The Revenue cannot start with the question as to whether the impugned transaction is a tax deferment/saving device but that it should apply the "*look at*" test to ascertain its true legal nature [see *Craven* v. *White (Stephen)*[7] which further observed that genuine strategic tax planning has not been abandoned by any decision of the English Courts till date].

**81.** Applying the above tests, we are of the view that every strategic foreign direct investment coming to India, as an investment destination, should be seen in a holistic manner. While doing so, the Revenue/courts should keep in mind the following factors: the concept of participation in investment, the duration of time during which the holding structure exists; the period of business operations in India; the generation of taxable revenues in India; the timing of the exit; the continuity of business on such exit.

**82.** In short, the onus will be on the Revenue to identify the scheme and its dominant purpose. The corporate business purpose of a transaction is evidence of the fact that the impugned transaction is not undertaken as a colourable or artificial device. The stronger the evidence of a device, the stronger the corporate business purpose must exist to overcome the evidence of a device.

**Whether Section 9 is a "look through" provision as submitted on behalf of the Revenue?**

**83.** According to the Revenue, if its primary argument (namely, that HTIL has, under the SPA, directly extinguished its property rights in HEL and its subsidiaries) fails, even then in any event, income from the sale of the CGP share would nonetheless fall within Section 9 of the Income Tax Act, 1961 as that section provides for a "*look through*". In this connection, it was submitted that the word "through" in Section 9 inter alia means "in consequence of". It was, therefore, argued that if transfer of a capital asset situate in India happens "in consequence of" something which has taken place overseas (including transfer of a capital asset), then all income derived even *indirectly* from such transfer, even though abroad, becomes taxable in India. That, even if control over HEL were to get transferred in consequence of transfer of the CGP share outside India, it would yet be covered by Section 9.

**84.** We find no merit in the above submission of the Revenue.

**85.** At the outset, we quote hereinbelow the following sections of the Income Tax Act, 1961:

"**5.** *Scope of total income*.—     *       *       *

(2) Subject to the provisions of this Act, the total income of any previous year of a person who is a non-resident includes all income from whatever source derived which—

(*a*) is received or is deemed to be received in India in such year by or on behalf of such person; or

---
[7] 1989 AC 398 : (1988) 3 WLR 423 : (1988) 3 All ER 495 (HL)




SCC Online Web Edition, Copyright © 2021
Page 60        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-----------------------------------------------------------------------------------------------------------------------------------------------------

(*b*) accrues or arises or is deemed to accrue or arise to him in India during such year;

\*            \*            \*

**9.** *Income deemed to accrue or arise in India*.—(1) The following incomes shall be deemed to accrue or arise in India—

(*i*) all income accruing or arising, whether directly or indirectly, through or from any business connection in India, or through or from any property in India, or through or from any asset or source of income in India, or through the transfer of a capital asset situate in India."

**86.** Section 9(1)(*i*) gathers in one place various types of income and directs that income falling under each of the sub-clauses shall be deemed to accrue or arise in India. Broadly there are four items of income. The income dealt with in each sub-clause is distinct and independent of the other and the requirements to bring income within each sub-clause, are separately noted. Hence, it is not necessary that income falling in one category under any one of the sub-clauses should also satisfy the requirements of the other sub-clauses to bring it within the expression "income deemed to accrue or arise in India" in Section 9(1)(*i*).

**87.** In this case, we are concerned with the last sub-clause of Section 9(1)(*i*) which refers to income arising from "transfer of a capital asset situate in India". Thus, charge on capital gains arises on transfer of a capital asset situate in India during the previous year. The said sub-clause consists of three elements, namely, transfer, existence of a capital asset, and situation of such asset in India. All three elements should exist in order to make the last sub-clause applicable. Therefore, if such a transfer does not exist in the previous year no charge is attracted. Further, Section 45 enacts that such income shall be deemed to be the income of the previous year in which transfer took place. Consequently, there is no room for doubt that such transfer should exist during the previous year in order to attract the said sub-clause.

**88.** The fiction created by Section 9(1)(*i*) applies to the assessment of income of non-residents. In the case of a resident, it is immaterial whether the place of accrual of income is within India or outside India, since, in either event, he is liable to be charged to tax on such income. But, in the case of a non-resident, unless the place of accrual of income is within India, he cannot be subjected to tax.

**89.** In other words, if any income accrues or arises to a non-resident, directly or indirectly, outside India is fictionally deemed to accrue or arise in India if such income accrues or arises as a sequel to the transfer of a capital asset situate in India. Once the factum of such transfer is established by the Department, then the income of the non-resident arising or accruing from such transfer is made liable to be taxed by reason of Section 5(2)(*b*) of the Act. This fiction comes into play only when the income is not charged to tax on the basis of receipt in India, as receipt of income in India by itself attracts tax whether the recipient is a resident or non-resident. This fiction is brought in by the legislature to avoid any possible argument on the part of the non-resident vendor that profit accrued or arose outside India by reason of the contract to sell having been executed outside India. Thus, income accruing or arising to a non-resident outside India on transfer of a capital asset situate in


SCC Online Web Edition, Copyright © 2021
Page 61      Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-----------------------------------------------------------------------------------------------------------------------------------------------------


VODAFONE INTERNATIONAL HOLDINGS BV v. UNION OF INDIA    673
*(Kapadia, C.J.)*

a    India is fictionally deemed to accrue or arise in India, which income is made liable to be taxed by reason of Section 5(2)(*b*) of the Act. This is the main purpose behind enactment of Section 9(1)(*i*) of the Act.

    **90.** We have to give effect to the language of the section when it is unambiguous and admits of no doubt regarding its interpretation, particularly when a legal fiction is embedded in that section. A legal fiction has a limited scope. A legal fiction cannot be expanded by giving purposive interpretation

b    particularly if the result of such interpretation is to transform the concept of chargeability which is also there in Section 9(1)(*i*), particularly when one reads Section 9(1)(*i*) with Section 5(2)(*b*) of the Act. What is contended on behalf of the Revenue is that under Section 9(1)(*i*) it can "*look through*" the transfer of shares of a foreign company holding shares in an Indian company and treat the transfer of shares of the foreign company as equivalent to the transfer of the shares of the Indian company on the premise that

c    Section 9(1)(*i*) covers direct and *indirect transfers* of capital assets.

    **91.** For the above reasons, Section 9(1)(*i*) cannot by a process of interpretation be extended to cover *indirect transfers* of capital assets/property situate in India. To do so, would amount to changing the content and ambit of Section 9(1)(*i*). We cannot rewrite Section 9(1)(*i*). The legislature has not used the words *indirect transfer* in Section 9(1)(*i*). If the word *indirect* is read into

d    Section 9(1)(*i*), it would render the express statutory requirement of the fourth sub-clause in Section 9(1)(*i*) nugatory. This is because Section 9(1)(*i*) applies to transfers of a capital asset *situate in India*. This is one of the elements in the fourth sub-clause of Section 9(1)(*i*) and if indirect transfer of a capital asset is read into Section 9(1)(*i*) then the words *capital asset situate in India* would be rendered nugatory. Similarly, the words "underlying asset"

e    do not find place in Section 9(1)(*i*). Further, "transfer" should be of an asset in respect of which it is possible to compute a capital gain in accordance with the provisions of the Act. Moreover, even Section 163(1)(*c*) is wide enough to cover the income whether received directly or indirectly. Thus, the words "directly or indirectly" in Section 9(1)(*i*) go with the "income" and not with "the transfer of a capital asset (property)".

f    **92.** Lastly, it may be mentioned that the Direct Taxes Code (DTC) Bill, 2010 proposes to tax income from transfer of shares of a foreign company by a non-resident, where at any time during 12 months preceding the transfer, the fair market value of the assets in India, owned directly or indirectly, by the company, represents at least 50% of the fair market value of all assets owned by the company. Thus, the DTC Bill, 2010 proposes taxation of

g    offshore share transactions. This proposal indicates in a way that *indirect transfers* are not covered by the existing Section 9(1)(*i*) of the Act. In fact, the DTC Bill, 2009 expressly stated that income accruing even from *indirect* transfer of a capital asset situate in India would be deemed to accrue in India. These proposals, therefore, show that in the existing Section 9(1)(*i*) the word *indirect* cannot be read on the basis of purposive construction.

h    **93.** The question of providing "*look through*" in the statute or in the treaty is a matter of policy. It is to be expressly provided for in the statute or in the treaty. Similarly, *limitation of benefits* has to be expressly provided for



SCC Online Web Edition, Copyright © 2021
Page 62   Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-----------------------------------------------------------------------------------------------------------------------------------------------------

in the treaty. Such clauses cannot be read into the section by interpretation. For the foregoing reasons, we hold that Section 9(1)(*i*) is not a "look through" provision.

### *Transfer of HTIL's property rights by extinguishment?*

**94.** The primary argument advanced on behalf of the Revenue was that the SPA, commercially construed, evidences a transfer of HTIL's property rights by their extinguishment. That, HTIL had, under the SPA, directly extinguished its rights of control and management, which are property rights, over HEL and its subsidiaries and, consequent upon such extinguishment, there was a transfer of capital asset situated in India.

**95.** In support, the following features of the SPA were highlighted:

(*i*) The right of HTIL to direct a downstream subsidiary as to the manner in which it should vote. According to the Revenue, this right was a property right and not a contractual right. It vested in HTIL as HTIL was a parent company i.e. a 100% shareholder of the subsidiary;

(*ii*) According to the Revenue, the 2006 Shareholders/Framework Agreements had to be continued upon transfer of control of HEL to VIH so that VIH could step into the shoes of HTIL. According to the Revenue, such continuance was ensured by payment of money to AS and AG by VIH failing which AS and AG could have walked out of those agreements which would have jeopardised VIH's control over 15% of the shares of HEL and, consequently, the stake of HTIL in TII would have stood reduced to minority;

(*iii*) Termination of IDFC Framework Agreement of 2006 and its substitution by a fresh framework agreement dated 5-6-2007, as warranted by SPA;

(*iv*) Termination of term sheet agreement dated 5-7-2003. According to the Revenue, that term sheet agreement was given effect to by Clause 5.2 of the SPA which gave Essar the right to tag along with HTIL and exit from HEL. That, by a specific settlement agreement dated 15-3-2007 between HTIL and Essar, the said term sheet agreement dated 5-7-2003 stood terminated. This, according to the Revenue, was necessary because the term sheet bound the parties;

(*v*) The SPA ignores legal entities interposed between HTIL and HEL enabling HTIL to directly nominate the Directors on the Board of HEL;

(*vi*) Qua management rights, even if the legal owners of HEL's shares (Mauritius entities) could have been directed to vote by HTIL in a particular manner or to nominate a person as a Director, such rights existed dehors the CGP share;

(*vii*) Vide Clause 6.2 of the SPA, HTIL was required to exercise voting rights in the specified situations on the diktat of VIH ignoring the legal owner of the CGP share [H<small>TIHL</small> (BVI)]. Thus, according to the Revenue, HTIL ignored its subsidiaries and was exercising the voting rights qua the CGP and the HEL shares directly, ignoring all the intermediate subsidiaries which are 100% held and which are non-operational. According to the Revenue, extinguishment took place



SCC Online Web Edition, Copyright © 2021
Page 63        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-----------------------------------------------------------------------------------------------------------------------------------------------------

dehors the CGP share. It took place by virtue of various clauses of SPA as HTIL itself disregarded the corporate structure it had set up;

(*viii*) As a holder of 100% shares of downstream subsidiaries, HTIL possessed *de facto control* over such subsidiaries. Such *de facto control* was the subject-matter of the SPA.

**96.** At the outset, we need to reiterate that in this case we are concerned with the sale of shares and not with the sale of assets, itemwise. The facts of this case show sale of the entire investment made by HTIL, through a top company viz. CGP, in the Hutchison structure. In this case we need to apply the "*look at*" test. In the impugned judgment, the High Court has rightly observed that the arguments advanced on behalf of the Department vacillated. The reason for such vacillation was adoption of "*dissecting approach*" by the Department in the course of its arguments. *Ramsay*[5] enunciated the *look at* test. According to that test, the task of the Revenue is to ascertain the legal nature of the transaction and, while doing so, it has to *look at* the entire transaction holistically and not to adopt a dissecting approach.

**97.** One more aspect needs to be reiterated. There is a conceptual difference between a *preordained transaction* which is created for tax avoidance purposes, on the one hand, and a transaction which evidences *investment to participate* in India. In order to find out whether a given transaction evidences a preordained transaction in the sense indicated above or *investment to participate*, one has to take into account the factors enumerated hereinabove, namely, duration of time during which the holding structure existed, the period of business operations in India, generation of taxable revenue in India during the period of business operations in India, the timing of the exit, the continuity of business on such exit, etc.

**98.** Applying these tests to the facts of the present case, we find that the Hutchison structure has been in place since 1994. It operated during the period 1994 to 11-2-2007. It has paid income tax ranging from Rs 3 crores to Rs 250 crores per annum during the period 2002-2003 to 2006-2007. Even after 11-2-2007, taxes are being paid by VIH ranging from Rs 394 crores to Rs 962 crores per annum during the period 2007-2008 to 2010-2011 (these figures are apart from indirect taxes which also run in crores). Moreover, the SPA indicates "continuity" of the telecom business on the exit of its predecessor, namely, HTIL. Thus, it cannot be said that the structure was created or used as a sham or tax avoidant. It cannot be said that HTIL or VIH was a "fly by night" operator/short-time investor.

**99.** If one applies the *look at* test discussed hereinabove, without invoking the dissecting approach, then, in our view, extinguishment took place because of the transfer of the CGP share and not by virtue of various clauses of SPA. In a case like the present one, where the structure has existed for a considerable length of time generating taxable revenues right from 1994 and where the court is satisfied that the transaction satisfies all the parameters of "participation in investment" then in such a case the court need not go into

---

5 *Ramsay (W.T.) Ltd.* v. *IRC*, 1982 AC 300 : (1981) 2 WLR 449 : (1981) 1 All ER 865 (HL)


SCC Online Web Edition, Copyright © 2021
Page 64         Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
------------------------------------------------------------------------------------------------------------------------------------------------------

676                    SUPREME COURT CASES                (2012) 6 SCC

the questions such as de facto control versus legal control, legal rights versus practical rights, etc.

**100.** Be that as it may, did HTIL possess a legal right to appoint Directors onto the board of HEL and as such had some "property right" in HEL? If not, the question of such a right getting "extinguished" will not arise. A legal right is an enforceable right. Enforceable by a legal process. The question is what is the nature of the "control" that a parent company has over its subsidiary. It is not suggested that a parent company never has control over the subsidiary. For example, in a proper case of "lifting of corporate veil", it would be proper to say that the parent company and the subsidiary form one entity. But barring such cases, the legal position of any company incorporated abroad is that its powers, functions and responsibilities are governed by the law of its incorporation. No multinational company can operate in a foreign jurisdiction save by operating independently as a "good local citizen".

**101.** A company is a separate legal persona and the fact that all its shares are owned by one person or by the parent company has nothing to do with its separate legal existence. If the owned company is wound up, the liquidator, and not its parent company, would get hold of the assets of the subsidiary. In none of the authorities have the assets of the subsidiary been held to be those of the parent unless it is acting as an agent. Thus, even though a subsidiary may normally comply with the request of a parent company it is not just a puppet of the parent company. The difference is between having power or having a persuasive position. Though it may be advantageous for parent and subsidiary companies to work as a group, each subsidiary will look to see whether there are separate commercial interests which should be guarded.

**102.** When there is a parent company with subsidiaries, is it or is it not the law that the parent company has the "power" over the subsidiary. It depends on the facts of each case. For instance, take the case of a one-man company, where only one man is the shareholder perhaps holding 99% of the shares, his wife holding 1%. In those circumstances, his control over the company may be so complete that it is his alter ego. But, in case of multinationals it is important to realise that their subsidiaries have a great deal of autonomy in the country concerned except where subsidiaries are created or used as a sham. Of course, in many cases the courts do lift up a corner of the veil but that does not mean that they alter the legal position between the companies.

**103.** The Directors of the subsidiary under their articles are the managers of the companies. If new Directors are appointed even at the request of the parent company and even if such Directors were removable by the parent company, such Directors of the subsidiary will owe their duty to their companies (subsidiaries). They are not to be dictated by the parent company if it is not in the interests of those companies (subsidiaries). The fact that the parent company exercises shareholders' influence on its subsidiaries cannot obliterate the decision-making power or authority of its (subsidiary's) Directors. They cannot be reduced to be puppets. The decisive criterion is whether the parent company's management has such steering interference with


SCC Online Web Edition, Copyright © 2021
Page 85        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-----------------------------------------------------------------------------------------------------------------------------------------------------

VODAFONE INTERNATIONAL HOLDINGS BV v. UNION OF INDIA            697
*(Radhakrishnan, J.)*

<span style="margin-left:2em">a</span> acquisition of 100% interest in CGP and granting an option by Vodafone to Indian Continent Investment Ltd. over a 5.6% stake in Bharti Airtel Ltd. Bharti Infotel and Bharti Airtel conveyed their no-objection to Vodafone purchasing direct or indirect interest in HEL.

**199.** Vodafone and HTIL then entered into a share and purchase agreement (SPA) on 11-2-2007 whereunder HTIL had agreed *to procure the transfer of share capital of CGP by HTIBVI, free from all encumbrances and together with all rights attaching or accruing together with assignments of loan interest*. HTIL on 11-2-2007 issued a side letter to Vodafone inter alia stating that, out of the purchase consideration, up to US $80 million could be paid to some of its Indian partners. HTIL had also undertaken that Hutchison Telecommunication (India) Ltd. (HTM), Omega and GSPL, would enter into an agreed form "IDFC Transaction Agreement" as soon as practicable. On 11-2-2007, HTIL also sent a disclosure letter to Vodafone in terms of Clause 9.4 of SPA — vendor warranties relating to consents and approvals, wider group companies, material contracts, permits, litigation, arbitration and governmental proceedings to limit HTIL liability.

**200.** Vodafone on 12-2-2007 made a public announcement to the Securities and Exchange Commission, Washington (SEC), London Stock Exchange and HK Stock Exchange stating that *it had agreed to acquire a controlling interest in HEL for a cash consideration of US $11.1 billion*. HTIL Chairman sent a letter to the Vice-Chairman of Essar Group on 14-2-2007 along with a copy of press announcement made by HTIL, setting out the principal terms of the *intended sale of HTIL of its equity and loans in HEL, by way of sale of the CGP share and loan assignment to VIH*.

**201.** Vodafone on 20-2-2007 filed an application with Foreign Investment Promotion Board (FIPB) requesting it to take note of and grant approval under Press Note 1 *to the indirect acquisition by Vodafone of 51.96% stake in HEL through an overseas acquisition of the entire share capital of CGP from HTIL*. HTIL made an announcement on HK Stock Exchange regarding the intended use of proceeds from sale of HTIL's interest in HEL viz. declaring a special dividend of HK $6.75 per share, HK $13.9 billion to reduce debt and the remainder to be invested in telecommunication business, both for expansion and towards working capital and general policies. Reference was also made to the sale share and sale loans as being the entire issued share capital of CGP and the loans owned by CGP/Array to an indirect WOS.

**202.** AG on 2-3-2007 sent a letter to HEL confirming that he was the *exclusive beneficial owner of his shares and was having full control over related voting rights. Further, it was also stated that AG had received credit support, but primary liability was with his companies. AS also sent a letter on 5-3-2007 to FIPB confirming that he was the exclusive beneficial owner of his shares and also of the credit support received*. Essar had filed objections with FIPB on 6-3-2007 to HTIL's proposed sale and on 14-3-2007, Essar withdrew its objections.

**203.** FIPB on 14-3-2007 sent a letter to HEL pointing out that in filing of HTIL before the US SEC in Form 6-K in the month of March 2006, it had



SCC Online Web Edition, Copyright © 2021
Page 86          Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source:  Supreme Court Cases
-----------------------------------------------------------------------------------------------------------------------------------------------------

been stated that HTIL Group would continue *to hold an aggregate interest of 42.34% of HEL* and an additional indirect interest through JV companies being non-wholly owned subsidiaries of HTIL which hold an aggregate of 19.54% of HEL and, hence, the combined holding of HTIL Group would then be 61.88%. Reference was also made to the communication dated 6-3-2007 sent to FIPB wherein it was stated *that the direct and indirect FDI by HTIL would be 51.96%* and, hence, was asked to clarify that discrepancy. Similar letter dated 14-3-2007 was also received by Vodafone.

204. On 14-3-2007, HEL wrote to FIPB stating that the discrepancy was because of the difference in US GAAP and Indian GAAP declarations and that the combined holding for US GAAP purposes was 61.88% and for Indian GAAP purposes was 51.98%. *It was pointed out that Indian GAAP number accurately reflected the true equity ownership and control position.* On 14-3-2007 itself, HEL wrote to FIPB confirming that *7.577% stake in HEL was held legally and beneficially by AS and his wife and 4.78% stake in HEL was held legally and beneficially by AG.* Further, it was also pointed out that *2.77% stake in HEL through Omega and SMMS was legally and beneficially owned by IDFC Ltd.*, IDFC Private Equity Ltd. and SSKI Corporate Finance Ltd. Further, it was also pointed out that articles of association of HEL did not give any person or entity any right to appoint Directors, however, in practice six Directors were from HTIL, four from Essar, two from TII and TII had appointed AG and AS. On credit support agreement, it was pointed out that no permission of any regulatory authority was required.

205. Vodafone also wrote to FIPB on 14-3-2007 confirming that *VIH's effective shareholding in HEL would be 51.96% i.e. Vodafone would own 42% direct interest in HEL through its acquisition of 100% of CGP* Investments (Holdings) Ltd. (CGPIL) and through CGPIL Vodafone would also own 37% in TII which in turn owned 20% in HEL and 38% in Omega which in turn owned 5% in HEL. It was pointed out that both TII and Omega were Indian companies and those investments combined would give Vodafone a *controlling interest of 52% in HEL. Further, it was pointed out that HTIL's Indian partners AG, AS, IDFC who between them held a 15% interest in HEL on aggregate had agreed to retain their shareholding with full control including voting rights and dividend rights.*

206. HTIL, Essar Teleholding Ltd. (ETL), Essar Communication Ltd. (ECL), Essar Tele Investments Ltd. (ETIL), Essar Communications (India) Ltd. (ECIL) signed a settlement agreement on 15-3-2007 regarding Essar Group's support for completion of the proposed transaction and covenant not to sue any Hutchison Group company, etc., in lieu of payment by HTIL of US $373.5 million after completion and a further US $41.5 million after second anniversary of completion. In that agreement, HTIL had agreed to dispose of its direct and indirect equity, loan and other interests and rights in and related to HEL, to Vodafone pursuant to the SPA. HTIL had also agreed to pay US $415 million to Essar in return of its acceptance of the SPA between HTIL and Vodafone. On 15-3-2007 a deed of waiver was entered into between Vodafone and HTIL, whereby Vodafone had waived some of the


SCC Online Web Edition, Copyright © 2021
Page 87    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
------------------------------------------------------------------------------------------------------------------------------------------------------


warranties set out in Paras 7.1(*a*) and 7.1(*b*) of Schedule 4 of the SPA and covenanted that till payment of HTIL under Clause 6.1(*a*) of the settlement agreement of 30-5-2007, Vodafone should not bring any claim or action. On 15-3-2007 a circular was issued by HTIL including the report of Somerley Ltd. on the settlement agreement between HTIL and Essar Group.

**207.** V<small>IH</small>BVI, Essar Tele Holdings Ltd. (ETH) and ECL entered into a term sheet agreement on 15-3-2007 for regulating the affairs of HEL and the relationship of its shareholders including setting out V<small>IH</small>BVI's right as a shareholder of HEL to nominate eight persons out of twelve to the Board of Directors, requiring Vodafone to nominate Director to constitute a quorum for Board meetings and get RoFR over shares owned by Essar in HEL. Term sheet also stated that Essar had a TAR in respect of Essar's shareholding in HEL, should any Vodafone Group shareholding sell its share or part thereof in HEL to a person not in a Vodafone Group entity. VIH and Vodafone Group Plc. (as guarantor of VIH) had entered into a "*put option*" agreement on 15-3-2007 with ETH, ECL (Mauritius), requiring VIH to purchase from Essar Group shareholders all the option shares held by them. The Joint Director of Income Tax (International Taxation), in the meanwhile, issued a notice dated 15-3-2007 under Section 133(6) of the Income Tax Act calling for certain information regarding sale of stake of Hutchison Group HK in HEL, to Vodafone Group Plc.

**208.** HTIL, on 17-3-2007, wrote to AS confirming that HTIL *has no beneficial or legal or other rights in AS's TII interest or HEL interest*. Vodafone received a letter dated 19-3-2007 from FIPB seeking clarifications on the circumstances under which Vodafone had agreed to pay consideration of US $11.08 billion *for acquiring 67% of HEL when the actual acquisition was only 51.96%* as per the application. Vodafone on 19-3-2007 wrote to FIPB stating that it had agreed to acquire from *HTIL interest in HEL which included 52% equity shareholding for US $11.08 billion which price included control premium, use and rights to Hutch brand in India, a non-compete agreement with Hutch Group, value of non-voting, non-convertible preference shares, various loans obligations and entitlement and to acquire further 15% indirect interest in HEL*, subject to Indian foreign investment rules, which together equated to about 67% of the *economic value of HEL*.

**209.** V<small>IH</small>BVI and Indian Continent Investors Ltd. (ICIL) had entered into an SHA on 21-3-2007 whereby V<small>IH</small>BVI had to sell 10,64,70,268 shares in Bharti Airtel to ICIL for a cash consideration of US $1,626,930.881 (which was later amended on 9-5-2007).

**210.** HEL on 22-3-2007 replied to the letter of 15-3-2007, issued by the Joint Director of Income Tax (International Taxation) furnishing requisite information relating to HEL clarifying that it was neither a party to the transaction nor would there be any transfer of shares of HEL. HEL received a letter dated 23-3-2007 from the Additional Director of Income Tax (International Taxation) intimating that both Vodafone and Hutchison Telecom Group announcements/press releases/declarations had revealed that HTIL *had made substantive gains and consequently HEL was requested to*