# Exhibit 10

to the Expert Opinion of
Justice (Retired) Pradeep Nandrajog

dated August 13, 2021

## THE HIGH COURT OF DELHI AT NEW DELHI

%                                             Judgment delivered on: 19.11.2015

+      **ITA 130/2001**

**COMMISSIONER OF INCOME TAX DELHI-I**          ..... Appellant

versus

**M/S ABHINANDAN INVESTMENT LTD.**          ..... Respondent

**Advocates who appeared in this case:**

For the Appellant          : Mr. Rohit Madan, Senior Standing counsel with
                             Mr. Zoheb Hossain.
For the Respondent          : Mr. Ajay Vohra, Senior Advocate with Ms.
                             Kavita Jha.

**CORAM:**
**DR. JUSTICE S. MURALIDHAR**
**MR. JUSTICE VIBHU BAKHRU**

### JUDGMENT

**VIBHU BAKHRU, J**

1.     This is an appeal filed by the Revenue under Section 260A of the
Income Tax Act, 1961 (hereafter 'Act') impugning an order dated 12th
January, 2001 passed by the Income Tax Appellate Tribunal (hereafter
'ITAT') in ITA No. 5425(Del)/94. The said appeal (ITA 5425(Del)/94) was
preferred by the Assessee against an order dated 18th July, 1994 passed by
Commissioner of Income Tax (Appeals) [hereafter 'CIT(A)'] whereby the
Assessee's appeal against an assessment order dated 22nd April, 1993,
passed by the Assessing Officer (hereafter 'AO') in respect of Assessment

Year 1992-93, was rejected.

2.      The controversy involved in the present case relates to a loss of Rs.1,68,59,360/- claimed by the Assessee in respect of renunciation of rights to subscribe to partly convertible debentures (hereafter 'PCD') of M/s Jindal Iron & Steel Co. Ltd. (hereafter 'JISCO'). The Assessee was entitled to these rights by virtue of holding shares of JISCO which were acquired by the Assessee at an approximate average cost of Rs. 6.86 per share (The documents filed by the Assessee indicate that the Assessee had acquired 1,04,150 nos. of shares at the aggregate consideration of Rs.7,14,900/-). As against the aforesaid cost actually paid, the Assessee had claimed a cost of acquisition of rights entitlement to subscribe to PCDs at the rate of Rs. 200 per share of JISCO on the basis of which such rights were acquired.

3.      According to the Revenue, the transaction was entered into solely for the purpose of contriving a loss by unjustifiably relying on a decision of the Supreme Court in ***Dhun Dadabhoy Kapadia vs. CIT***: **(1967) 63 ITR 657 (SC).**

4.      The present appeal was admitted by this Court on 12th October, 2004

and the following questions of law were framed for determination:-

> "1. Whether the Income Tax Appellate Tribunal was right in holding that the sale consideration received by the assessee by transfer of shares and sale of right entitlement of Partly Convertible Debentures (PCD) is income from capital gains and not income from business?
>
> 2. Whether the Income Tax Appellate Tribunal was right in holding that the assessee had incurred loss on sale of its entitlement to acquire partly convertible debentures and the assessee is entitled to set off the alleged loss from the capital gains/income earned by the assessee?"

5.      The present appeal was heard alongwith *CIT v. M/s Sun Investments Ltd.*: **ITA 91/2002** and *CIT v. M/s Stainless Investment Ltd.*: **ITA 305/2002** in respect of companies which also belong to the Jindal Group and where similar issues were involved.  The learned counsel for the parties argued that the present appeal be considered as a lead matter and a decision in the appeal would also cover the issue involved in *M/s Sun Investments Ltd. (supra)* and *M/s Stainless Investment Ltd. (supra)*.

6.      Briefly stated the relevant facts necessary to address the aforesaid questions are as under:-

6.1     The Assessee is one of the companies belonging to the Jindal Group and was incorporated in the year 1983. The Jindal Group is mainly engaged

in manufacturing and production of ferrous metal and alloys. JISCO & Jindal Strips Limited (hereafter 'JSL') and Saw Pipes Ltd. are among the principal manufacturing companies of the Jindal Group. In addition to the manufacturing concerns, Jindal Group also includes investment companies – such as the Assessee – which, *inter alia*, hold shares of the other manufacturing companies.

6.2    It is not disputed that the investment companies within the Group are under an overall common management and that the registered offices of some of the investment companies are located in residential flats occupied by employers/employees of other Group Companies. The Assessee noted that the Assessee was incorporated on 6th April, 1983 and its Directors were Sajjan Kumar Jindal s/o Shri O.P. Jindal and Anand Prakash Garg (who was an employee of JSL).  At the initial stage, 1,20,000 equity shares of Rs.10/- each amounting to Rs.12 lacs were offered to the public for subscription.  A few years later, by a letter dated 31st March, 1987, the Assessee Company declared that 50% of the public issue i.e. Rs.6 lacs was its income.  This declaration was made under an amnesty scheme available at the material time.

6.3    During the initial assessment year i.e. AY 1984-85, the Assessee

company made investments in shares of the following companies:-

(i)     JSL, 79,800 equity shares.

(ii)    Nalwa Steels Ltd., 50,000 equity shares

(iii)   JISCO 3,50,000 equity shares

At the material time, the shares of the aforesaid companies were not quoted at the stock exchange.

6.4     The AO noted that in the previous year relevant to AY 1988-89, the shares of JSL were quoted at the Delhi Stock Exchange.  The Assessee had further purchased 7500 shares of JISCO during the said year at Rs.1,35,000/- and the same were reflected in the closing stock at a value of Rs.97,500/-.  The Assessee company further made a purchase of 40,000 shares of JISCO on 31st July, 1992 at a consideration of Rs.1,20,00,000/- i.e. Rs.300/- per share and sold 1,40,000 shares on 9th March, 1993 at a total price of Rs.3.92 crores i.e. Rs.280/- per share to JSL.

6.5     On 4th April, 1991 the Directors of the Assessee company passed a resolution to the effect that the shares and debentures held in various companies which were shown as stock-in-trade were to be now reflected as

investment as the said securities were intended to be retained on a long term basis.

6.6    During the relevant financial year, the Assessee sold an aggregate of 60,000 (sixty thousand) equity shares of JSL for a consideration of Rs.1,72,60,000/- (Rs. One crore seventy two lacs sixty thousand). The Assessee declared that the said transaction has resulted in income by way of long term capital gains amounting to Rs.91,31,500/- (Rs. Ninety one lacs thirty one thousand five hundred).

6.7    During the relevant period, JISCO floated a rights issue of PCDs.  In terms of the said issue, the Assessee was, *inter alia*, entitled to subscribe to five PCDs for every four shares held by the Assessee. The PCDs were to be converted to one share of JISCO. The rights issue opened on 14th February, 1992.

6.8    The Assessee renounced its entitlement for subscribing to 1,29,688 PCDs in favour of JSL on 15th February, 1992 i.e. one day after the rights issue opened for subscription.

6.9    The shares of JISCO were quoted at a cum rights price of Rs.625/- on 3rd January, 1992 and were quoted at Rs.425/- per share ex rights on 6th

January, 1992.

6.10   On the basis of the aforesaid drop in prices, the Assessee claimed that the cost of acquisition of the rights was Rs.200/- per PCD.  The rights to subscribe to PCDs were sold by the Assessee to JSL at a consideration of Rs.30 per PCD at an aggregate consideration of Rs.38,90,640/- (1,29,688 PCDs @ 30 per PCD). Thus, the Assessee claimed that it had incurred a loss of Rs.1,68,59,360/-. This was computed by calculating the dimunition in value of 1,03,750 shares of JISCO - on the basis of which the Assessee acquired the right to subscribe to 1,29,688 PCDs - computed at Rs. 200 per share.

6.11   The AO noted that the consideration for renunciation of rights had not been received in the financial year. The AO further noted that the renunciation of right forms was quoted on the stock exchange at a price ranging from Rs.260 to Rs.280 per PCD and, thus, had concluded that the sale was made below the market price.

6.12   The AO had noted that the sale proceeds received by the Assessee for sale of shares held by the Assessee in JSL during the relevant period amounting to Rs.1,72,60,000/- was advanced by the Assessee as a loan to

JSL on 12th September, 1991.

6.13   The AO also noted that similar transactions had been entered into by other investment companies of the group, namely, Nalwa Investment Co. Ltd., Jindal Equipment and Leasing Co. Ltd., Sun Investment Ltd., Mansarovar Investment Ltd. and Stainless Investment Ltd.   All the aforesaid companies sold shares of JISCO, JSL or Saw Pipes Ltd. and had earned substantial income. In order to reduce the taxable profits, these companies had renounced rights to subscribe to securities in favour of other companies belonging to the same group at a price much below the market value and, further, on the basis of the notional cost of acquisition, claimed a loss which was sought to be set off from the profits earned from the sale of shares of JSL, JISCO and/or Saw Pipes Ltd. The AO noted that the Assessee could not provide any reason for selling the rights to subscribe to PCDs at below the market price. He also observed that the transactions entered into with JSL had effectively ensured that the shares of JISCO resulting from subscription to the PCDs remained within the Group.  The AO also observed that, in fact, the Assessee had practically funded the purchase of the PCDs by JSL by advancing the funds received by the Assessee from sale of the shares of JSL, to JSL. On the basis of the above

facts observed by the AO, he concluded that the transfer of shares held by the Assessee from the stock-in-trade to investments; further renunciation of rights at below the market price; and the renunciation of rights to subscribe PCDs were sham transactions to purchase losses.  He also concluded that the transactions were not in aid of the Assessee's business or its stated object of holding investments on a long term basis.

6.14   Aggrieved by the assessment made by the AO, the Assessee appealed before the CIT(A).  The CIT(A) rejected the appeals of the Assessee and held that it was amply clear from the behavior of the Assessee that it had entered into *"collusive transactions alongwith sister concerns and was indulging in such transactions regularly to evade proper payment of tax"*. The CIT(A) had further held that the principle laid down by the Supreme Court in the case of the ***McDowell & Co. v. CIT***: **154 ITR 148 (SC)** was fully applicable in the facts of the present case.

6.15  On a further appeal by the Assessee, the ITAT accepted the Assessee's contention and, consequently, the loss claimed by the Assessee on the renunciation of rights to subscribe to PCDs of JISCO was allowed to be set off against the profits made by the Assessee.  The ITAT was of the view that the shares of JSL or JISCO held by the Assessee were

investments and not trading assets. Consequently, it held that the Assessee was entitled to compute the cost of acquisition of rights to subscribe to PCDs in accordance with the Supreme Court's decision in ***Dhun Dadabhoy Kapadia (supra)***. The ITAT further held that the Assessee had sold shares of JSL in order to subscribe to the PCDs of JISCO. It reasoned that each PCD of JISCO was for a sum of Rs.110/- and this would have involved expenditure of Rs.1.5 crores, which the Assessee would not be in the position to make if it did not sell 60,000 shares of JSL. The Tribunal concluded that the sale of shares of JSL by the Assessee was to preserve its assets and the sale of shares of JSL indicated that the Assessee was interested to buy the PCDs of JISCO.

### *Submissions*

7.     Mr Rohit Madan, Learned counsel appearing for the Revenue contended that the Tribunal had grossly erred in not appreciating that the AO had found the transactions to be a device to evade tax.  He further pointed out that although the ITAT had observed that the Assessee had sold the shares of JSL as it was interested in subscribing to the rights issue floated by JISCO, the facts indicated quite to the contrary. He submitted that admittedly the Assessee had not subscribed to the rights issue but on

the contrary had sold the rights entitlement at a fraction of its market value to JSL.  He further submitted that prior to this transaction the Assessee had also advanced the funds received by it from sale of shares of JSL to JSL. He argued that the ITAT had grossly erred in not considering the factual position.

8.    Mr Madan further argued that the Assessee had passed a resolution for transferring the shares in question from stock-in-trade to investments in the balance sheet as on 31st March, 1992 solely for the purpose of taking benefit of the decision of the Supreme Court in *Dhun Dadabhoy Kapadia (supra)*.  He contended that the shares in question had been held by the Assessee as stock-in-trade and the resolution to transfer them to investments was taken only once the Assessee contemplated sale of the said shares. He contended that this was apparent from the fact that the shares in JSL were sold within the same financial year – FY 1991-92.  He argued that the resolution was part of a device to avoid tax.

9.    Countering the arguments advanced on behalf of the Revenue, Mr Vohra, learned Senior Counsel appearing on behalf of the Assessee submitted that the resolution dated 4th April, 1991 was *bonafide* as it was always the intention of the Assessee to hold shares of the Group Companies

on a long term basis.  He further submitted that transferring the shares from stock-in-trade to investments in the books was not relevant for the purposes of claiming the loss on renunciation of rights to subscribe to the PCDs of JISCO. He contended that whether the shares in question were held as stock-in-trade or as investments, the Assessee would, in either case, be entitled to claim the loss on renunciation of its rights to subscribe to the PCDs of JISCO.  He relied upon the decision of the Bombay High Court in *CIT v. K.A. Patch*: **(1971) 81 ITR 413 (Bom)** in support of his contention that the method of calculation of loss on renunciation of rights would remain the same even in a case where the rights in favour of the Assessee result by virtue of shares held as stock-in-trade.

10.     Mr Vohra contended that the ratio of the decision in case of ***Dhun Dadabhoy Kapadia*** (*supra*) was squarely applicable to the facts of the present case. He submitted that the transaction for the sale of rights entitlement by the Assessee could not be termed as a sham transaction as the same had been given effect to. He submitted that the rights renunciated by the Assessee in favour of JSL had been exercised by JSL and JSL had subscribed to the PCDs of JISCO which were subsequently issued and registered in the name of JSL. He earnestly argued that in the

circumstances, the transaction of sale of rights in question could not be considered as a paper or a sham transaction. He referred to the decision of the Madras High Court in *M.V. Valliappan v, ITO*: **(1988) 170 ITR 238 (Mad)** in support of its contention that the principles enunciated by the Supreme Court in **McDowell** (*supra*) were not applicable in the facts of the present case.

11.     Mr Vohra argued that the transaction of sale of rights to subscribe to the PCDs had been accepted by the AO as the consideration received by the Assessee was reflected in the Profit & Loss Account of the Assessee and the AO had accepted the same. He said that in the circumstances, it was not open for the AO to disallow the loss as this would amount to disallowing the deduction on account of cost of acquisition. He submitted that if the transaction was held to be a sham transaction, then the consideration received by the Assessee also ought to have been reduced from the profits declared by the Assessee. Mr Vohra conceded that this argument had not been urged by the Assessee in the alternative at any stage – neither before the AO nor at any later stage – as the Assessee was consistently canvassing that the transaction in question was a genuine transaction.

*Reasoning and Conclusion*

*Question No.(i)*

12.   The first question relates to the issue as to whether the income from sale of shares of JSL and the rights entitlement of the PCDs is chargeable as Capital Gains or Income from Business and Profession.

13.   The Assessee, in its submissions filed before the CIT(A), had explained that up to the AY 1991-92, the Assessee had two types of holdings: one as current assets held as 'stock-in-trade' and the second as 'investments'.   Admittedly, as on 31st March, 1991, the Assessee held shares of the value of Rs. 18.59 lacs as investments and Rs. 82.55 lacs as stock-in-trade. According to the Assessee, the Board of Directors had on 4th April, 1991 decided to retain the investments held as stock-in-trade on a "long term basis" and accordingly passed a resolution to that effect. The relevant extract from the minutes of the meeting held on 4th April, 1991 is as under:-

> "RESOLVED THAT the shares and debentures of Rs. 82,55,810/- (Rupees eighty two lakhs fifty thousand eight hundred ten only) held by the company as stock-in-trade, valued at cost or market price whichever is lower as at 31st March, 1991

be and are hereby transferred from stock-in-trade to investments in the Balance sheet as at 31-3-1992."

14.    The AO held that the actions of the Assessee after 4th April, 1991 did not reflect any change in the intention of the Assessee as the Assessee had effected the maximum amount of sales during the year in question. The AO was of the view that the Assessee's claim that the shares were to be retained as investments was a sham. According to him, the said claim was designed to evade tax due on income from sale of shares of JSL and further claim a loss on renunciation of rights to subscribe to PCDs of JISCO. The Assessee's contention that it was entitled to claim a business loss on account of sale of rights to subscribe to PCDs of JISCO by following the method of computing cost of acquisition as approved by the Supreme Court in *Dhun Dadabhoy Kapadia (supra)* was also rejected by the AO. The CIT(A) also upheld the decision of the AO. The ITAT noted that there were very few transactions in the shares in question since the incorporation of the Assessee and concluded that the Assessee had held shares in JSL and JISCO in order to maintain control over the companies and not for the purposes of trading in those shares.

15.    It is important to note that the Assessee itself had disclosed the shares held by it in JISCO - on the basis of which the Assessee was entitled to subscribe to the PCDs - as stock-in-trade upto AY 1991-92. It is also relevant to note that the Assessee had purchased 7500 shares of JISCO in the financial year relevant to the assessment year 1988-89 for a consideration of Rs.1,35,000/- which was reflected as a part of the closing stock at a value of Rs.97,500/-. Thus, it appears that the Assessee had booked a loss for the AY 1988-89 on account of the difference in the purchase value and the value at which the closing stock had been valued. This would be impermissible if the Assessee had treated the shares of JISCO as an investment. The shares of JSL were also reflected as stock-in-trade in the balance sheet as on 31st March, 1991. The AO had observed that even during the assessment year in question, the Assessee had continued to reflect the dividends as being received from trading assets. In any event, since the Assessee had, admittedly, held the shares in question as stock-in-trade, it would not be open for the Assessee to contend to the contrary.

16.    The ITAT proceeded on the basis that it was always the intention of the Assessee to hold the shares in question as investments and not to trade

in them. In our view, this is unsustainable because the Assessee had itself reflected the shares in question as stock-in-trade. The Assessee had also further valued the closing stock at cost or market value, whichever was lower; undisputedly, this treatment could only be accorded to shares held as stock-in-trade and not as investment. It appears that the Assessee had also booked losses in its books on account of reduction in the market value of shares of JISCO as it is not disputed that the 7,500 shares purchased by the Assessee in AY 1988-89 at a consideration of Rs. 1,35,000/- were reflected as a part of closing stock at a value of Rs. 97,500/-. The AO observed that the Assessee had also unequivocally stated - in a note submitted for claiming deduction under Section 80M of the Act in the previous year relevant to the AY 1990-91 that it was, *inter alia,* engaged in sale and purchase of shares. The resolution purportedly passed by the Board of Directors of the Assessee on 4th April, 1991 also recorded that the shares and debentures *"valued at cost or market value, whichever is lower as on 31st March 1991"* be transferred from stock-in-trade to investments. Thus, it was not the Assessee's case that the said shares be treated as investments from the date they were purchased but were to be retained as investments after the date of the purported resolution. The resolution would have

otherwise clearly stated so and the shares would be transferred at cost and not at cost or market value whichever was lower.

17.   Thus, the principal issue to be addressed is whether the Assessee intended to retain the shares in question as investments for the previous year 1991-92 relevant to the AY 1992-93 or was the resolution dated 4th April, 1991 only a self serving document to enable the Assessee to claim the profits from sale of shares as Capital Gains.

18.   First of all, it is necessary to note that although the resolution dated 4th April, 1991 specifically stated that the shares and debentures of Rs.82,55,810/- be transferred to investments in the Balance Sheet as on 31st March, 1992; 60,000 shares of JSL were sold in August 1991, that is, within a few months after the passing of the purported resolution and much prior to the end of the financial year. Thus, the said 60,000 shares of JSL, which were reflected as stock-in-trade, were never reflected as investments in the balance sheet as on 31st March, 1992. Secondly, none of the statutory filings with the Registrar of Companies reflected the shares in question as stock-in-trade prior to the transactions of sale of shares in question as the same were sold prior to the end of the financial year. Thirdly, the Assessee was not a widely-held company. Although, its shares were offered to

public, 50% of the capital raised had been surrendered as undisclosed income of the Assessee; the clear import being that the shareholding was fictitious and undisclosed income of the promoters.

19.    In the above circumstances, the AO was rightly skeptical as to the resolution dated 4th April, 1991 and found it necessary to examine the actions of the Assessee. It was at once apparent that the actions of the Assessee were not in conformity with the purported resolution dated 4th April, 1991. Whilst the resolution indicated that the Board of Directors had decided to retain the shares and debentures held by it as investments on a long term basis, substantial shares of JSL were sold within four months thereafter. To ascertain the *bonafides* of the sale, a Director of the Assessee was asked the reason for the sale of shares. He responded by stating that *"so far as I remember the company sold the shares for want of liquidity for repayment of loans and for meeting other liabilities of the company"*. This was not true. The sale proceeds of shares of JSL were not used to liquidate the liabilities but substantial amounts were advanced to JSL. The AO also noted that sale transactions entered during the year in question involved the maximum amount since the incorporation of the Assessee.

20.   It is also relevant to note that the Assessee further acquired 40,000 shares of JISCO in July 1992, that is, within a few months of selling its rights to subscribe to the PCDs – and consequently acquire the shares of JISCO – at a fraction of the market value. These shares were purchased at the rate of Rs.300/- per share. Thereafter, within the same financial year, the Assessee sold 1,40,000/- shares of JISCO to JSL at Rs. 280/- per share. This transaction also did not reflect the Assessee's intention to hold shares and debentures on a long term basis. The AO thus concluded – in our opinion rightly so – that the resolution was a sham and the actions of the Assessee were contrary to the Board resolution produced by the Assessee.

21.   Curiously, the ITAT reasoned that the shares of JSL were sold to raise funds to enable the Assessee to subscribe to the rights issue of PCDs of JISCO and held as under:

> "The reasons for selling these shares were that assessee company became entitled to subscription to the convertible debentures of JISCO. Each debenture issued by JISCO was for a sum of Rs. 110/- and an investment in debentures would have involved approximate of Rs. 1.5. Crore and if the assessee company would not have sold its 60,000 shares, then the company has to part away its fixed assets, as the company's total share capital was merely of the sum of Rs. 20 lacs with a back up of reserves and surplus in the sum of Rs. 34.84 lacs. Accordingly the company instead of parting away a substantial portion of its properties sold these shares. Therefore, the

intention of the company was clear that the company was interested to buy convertible debentures of JISCO"

22.     This is palpably erroneous. There was no cogent material before the ITAT to arrive at the above conclusion. This was also contrary to the statement of the Assessee's director who was examined by the AO. Most importantly, the Assessee did not utilize the sale proceeds of 60,000 JSL shares (Rs.1,72,60,000/-) to subscribe to the PCDs of JISCO but sold the rights to JSL for a fraction of its value. The ITAT also failed to appreciate the reasons that had prompted the AO and the CIT(A) to hold that the shares of JSL and JISCO could not be considered as investments.

23.     The Assessee appears to have claimed a change in the nature of his holdings depending on the tax incidence in the year in question; in AY 1988-89 the Assessee reflected to shares of JISCO purchased in that year at below cost – treating them to be stock-in-trade and in AY 1992-93 sought to treat them as investments to avoid tax on the gains. None of the Assessee's actions in the previous year 1991-92 indicated any change in the Assessee's intention regarding its holding in shares and debentures. The ITAT observed that there were hardly any transactions in the past and on that basis concluded that the Assessee was in substance an investment

company. However, the ITAT failed to appreciate that the Assessee had consciously held itself out as a company engaged in sale and purchase of shares; it was also assessed on the income earned from business and also claimed deduction on account of business expenses incurred by the Assessee. The shares in question were, concededly, held as stock-in-trade. All that happened in the year in question is that the Assessee sold substantial shares and renounced rights to subscribe to PCDs contrary to its stated intention of holding the same on a long term basis.

24.    In view of the above, the income received by the Assessee from sale of shares of JSL and the renunciation of rights to subscribe to the PCDs of JISCO was rightly held by the AO as business income and not income under the head capital gains. As discussed later, the Assessee could not have claimed any business income on account of renunciation of rights to subscribe to the PCDs.

25.    The first question is, accordingly, answered in affirmative, in favour of the Revenue and against the Assessee.

26.    There is yet another aspect of the matter that requires to be noted. Assuming *arguendo* that the Assessee's claim that it had transferred shares

and debentures from stock-in-trade to investment during the year in question is accepted; even then, the Assessee could not claim the gains from sale of shares of JSL as long term capital gains as the shares in question were not held as capital assets prior to 4th March, 1991.

27.    "Capital asset" is defined under Section 2(14) of the Act and the relevant extract of said definition is as under:-

> "(*14*) [*"capital asset" means—*
>  (a)  *property of any kind held by an assessee, whether or not connected with his business or profession;*
> (b)  *any securities held by a Foreign Institutional Investor which has invested in such securities in accordance with the regulations made under the Securities and Exchange Board of India Act, 1992 (15 of 1992),*
> *but does not include—*
>  (i)  *any stock-in-trade [other than the securities referred to in sub-clause (b)]*], consumable stores or raw materials held for the purposes of his business or profession;
> xxx"

28.    Undisputedly, the Assessee had held the shares in question as stock-in-trade prior to 4th April, 1991 and had claimed that it had decided to retain the shares and debentures as investments thereafter. In the circumstances, the Assessee could not in any event include the period prior to 4th April, 1991 for the purpose of considering the shares in JSL as long term capital assets. The shares of JSL in question were sold within a period of four

months of 4th April, 1991 and thus could not be considered as long term capital assets.

29.    In addition to the above, a question may arise as to the computation of the cost of acquisition of an asset which was earlier held as stock-in-trade and subsequently converted as an investment. The conversion of stock-in-trade into investments would not immediately yield any business income/loss as an Assessee cannot be held to trade with itself [see: **_Kikabhai Premchand v. CIT_: (1953) 24 ITR 506 (SC)**].  However, it is possible to contend that once the asset is sold, the income or loss resulting therefrom would subsume within it the business income/loss at the time of conversion from stock-in-trade to capital asset. Thus, in the year in which the asset is sold, the income/loss attributable to the period for which the asset was held as stock-in-trade may have to be ascertained and taxed as such.  In other words, the difference between the value at which the asset was held as stock-in-trade and the market value on the date of its conversion as investment would have to be treated as business income/loss and the difference between the market value of the asset as on the date of conversion and the value at which it is sold would be in the nature of capital gains.  However, we must add that none of the counsel addressed

any arguments on this issue. In the circumstances we do not consider it appropriate to finally decide the same and leave the question open to be decided in an appropriate case.

**Question No. (ii)**

30.    The second question relates to whether the Assessee could claim that it has incurred a loss on the sale of its right to subscribe to the PCDs of JISCO and further set off the said loss against the other income from capital gains.

31.    First and foremost, the controversy to be addressed is whether the transaction of renunciation of rights for subscribing to PCDs of JISCO was a colourable device to contrive an artificial loss?

32.    Concededly, the rights to subscribe to the PCDs had been sold by the Assessee at a price which was significantly lower than the market price. The rights renunciation forms were quoted in the stock market at a price ranging from Rs.260 to Rs.280; yet, the Assessee had sought to transfer the same at a fraction of its market value. Further, the Assessee had also not received the consideration for same within the relevant financial year. Clearly, if the business purpose of the Assessee was to sell one of its assets,

it would have done so at the best possible price and terms. However, in the present case, the Assessee had chosen not to do so. In the circumstances, the AO had called upon the Assessee to explain the reason for transferring its rights at below the market price but had received no response to the said query. It is, thus, apparent that the transfer of rights was not for a business purpose. At any rate, the Assessee could not provide any explanation for the same. Importantly, the rights were renounced to JSL which was a related concern.

33.    It is also relevant to note that the Assessee had sold shares of JSL and advanced the funds received therefrom to JSL. The ITAT had observed that the shares of JSL were sold to raise funds to subscribe to the rights issued to PCDs of JISCO. However, the Assessee had not subscribed to those shares but had also renounced its rights in favour of JSL. There is no explanation provided by the Assessee whatsoever for entering into this transaction.

34.    It is important to note that the aforesaid transaction had not resulted in any real loss to the Assessee. Admittedly the price paid by the Assessee for purchase of shares of JISCO was less than the consideration received by the Assessee (Rs.30/- per PCD) for renouncing its rights to subscribe to

PCDs of JISCO.  Thus, against the cost of acquisition of less than Rs.10/-
per share, the Assessee continued to retain the holding (albeit at an ex-right
value) and was also entitled for the apparent sale consideration of Rs.30/-
per right to subscribe to a PCD. However, despite not incurring any real
loss, the Assessee had claimed a loss of Rs.1,68,59,360/- for renunciation
of its rights to subscribe to 1,29,688 PCDs. The question whether such loss
could be claimed by the Assessee is a separate matter; but, in our view, it
cannot be disputed that such loss could at best be described as notional.

35.    The transaction of renunciation of rights in favour of JSL ensured
that the right to subscribe remained within the group. Thus, looking at the
transaction at a group level, it is apparent that the right to subscribe to the
PCDs and consequently acquire further shares of JISCO was not alienated
and remained within the Jindal Group.

36.    It is also necessary to note that several companies of the group
entered into similar transactions, thus, ensuring that the Rights Issue
remained within the Jindal Group and funds for subscription of those rights
were also made available from the entities within the Group.  Plainly, the
only purpose for executing transactions of renunciation of rights was to

contrive a loss; there was no other purpose for entering into the transactions in question and none has been canvassed before us.

37.     It has been argued on behalf of the Assessee that it was open for the Assessee to enter into such transactions to mitigate its tax liability. However, we are not persuaded to accept this contention.

38.     It is now well established that although tax planning is permissible but a colorable device to avoid payment of tax would be impermissible. Justice Chinnappa Reddy in his concurring opinion in *Mcdowell (supra)* had held that *"in our view the proper way to construe a taxing statute, while considering a device to avoid tax, is not to ask whether the provisions should be construed literally or liberally, nor whether the transaction is not unreal and not prohibited by the statute, but whether the transaction is a device to avoid tax, and whether the transaction is such that the judicial process may accord its approval to it"*. Justice Reddy was of the opinion that it is up to the Court to take stock to determine the nature of new and sophisticated legal devices to avoid tax and expose the same for what they really are and refuse to give "judicial benediction". Justice Ranganath Misra speaking for the majority held that *"tax planning may be legitimate provided it is within the framework of law.  Colourable devices cannot be*

*part of tax planning and it is wrong to encourage or entertain the belief that it is honourable to avoid the payment of tax by resorting to dubious method.   It is the obligation of every citizen to pay the taxes honestly without resorting to subterfuges".*

39.    The decision of the Constitution Bench of the Supreme Court in ***Mcdowell*** *(supra)* has been explained by the Supreme Court in its later decisions. In one of the more recent decisions, ***Vodafone International Holdings B.V. v. Union of India and Anr.***: **(2012) 341 ITR 1 (SC),** the Supreme Court held that the opinion of Justice Chinnappa Reddy must be read in conjunction with the observation of Justice Ranganath Misra (i.e. the majority opinion). In ***Union of India v Azadi Bachao Andolan***: **(2003) 263 ITR 706 (SC)**, the Supreme Court held that the above view of Justice Chinnappa Reddy was a far cry from the majority opinion and further concluded that the decision in ***Mcdowell*** (*supra*) cannot be read as laying down that every attempt at tax planning was illegitimate and must be ignored.

40.    The Supreme Court in ***Azadi Bachao Andolan*** (*supra*) approved the following passage from the decision of the Gujarat High Court in ***Banyan and Berry v. Commissioner Of Income Tax***: **(1996) 222 ITR 831 (Guj)**:-

"The court nowhere said that every action or inaction on the part of the taxpayer which results in reduction of tax liability to which he may be subjected in future, is to be viewed with suspicion and be treated as a device for avoidance of tax irrespective of legitimacy or genuineness of the act ; an inference which unfortunately, in our opinion, the Tribunal apparently appears to have drawn from the enunciation made in McDowell's case [1958] 154 ITR 148 (SC). The ratio of any decision has to be understood in the context it has been made. The facts and circumstances which lead to McDowell's decision leave us in no doubt that the principle enunciated in the above case has not affected the freedom of the citizen to act in a manner according to his requirements, his wishes in the manner of doing any trade, activity or planning his affairs with circumspection, within the framework of law, unless the same fall in the category of colourable device which may properly be called a device or a dubious method or a subterfuge clothed with apparent dignity."

41.    Indisputably, the Assessee is at liberty to arrange its affairs in a manner so as to mitigate its tax liability. Every action of the Assessee aimed at reduction of tax liability cannot be viewed with suspicion by the Revenue. The decision in the case of *Mcdowell* (*supra*) insofar as it relates to the issue of tax avoidance has now been explained to apply only to limited situations where an Assessee creates a colourable device or enters into a sham transaction to evade the tax, which is otherwise payable by him.

42.     In _**Commissioner of Income Tax v. Sakarlal Balabhai**_**: (1968) 69 ITR 186 (Guj),** the Gujarat Court explained the meaning of tax avoidance and observed that _"Tax avoidance postulates that the assessee is in receipt of amount which is really and in truth his income liable to tax but on which he avoids payment of tax by some artifice or device....."_.  The Court further explained that such artifice or device may assume diverse forms but _"there must be some artifice or device enabling the Assessee to avoid payment of tax on what is really and in truth his income"_.

43.     Thus, whilst it is settled that the legitimacy of real transactions cannot be questioned merely for the reason that the same result in mitigating the Assessee's tax liability, the Courts have also held that the colourable devices or subterfuges to evade tax would be impermissible.

44.     The Supreme Court in _**Vodafone International Holdings B.V.**_ (_supra_), _inter alia_, considered the issue whether transaction pertaining to sale of shares of a non-resident holding company which resulted in transferring the controlling interest in downstream Indian subsidiary, was a device to evade tax.  In that context, the Supreme Court observed that _"whether a transaction is used principally as a colourable device for the distribution of earnings, profits and gains, is determined by a review of all_

*the facts and circumstances surrounding the transaction"*. The Court held that if an actual controlling Non-Resident Enterprise (NRE) makes an indirect transfer through abuse of organization form/legal form and without reasonable business purpose, which results in tax avoidance then the Revenue may disregard the form of the arrangement and recharacterize the equity transfer according to its economic substance.  The Court accepted the principle that transaction done without reasonable purpose but only for avoidance of legitimate tax by using a corporate form can be ignored. However, in the facts of that case, the Court came to the conclusion that the corporate structure was not created for avoidance of tax but for other genuine business purposes.

45.    It follows from the aforesaid decision that in order to examine whether a transaction is a device or a subterfuge the answer to the question whether the transaction has any reasonable business purpose would be a vital consideration.  Clearly, the use of corporate form to evade tax would be impermissible and it is, thus, necessary in the facts of the present case to look at the transactions entered into by the Assessee and other companies of the Jindal Group.  It is at once clear that shares of listed corporate entities of the Group were sold and funds were raised.  The sale of these shares had

resulted in substantial capital gains in the hands of the investment companies of the Jindal Group including the Assessee and the investment companies were liable to pay tax on the gains so made.  In order to avoid paying the tax, the investment companies including the Assessee entered into transactions for renunciation of rights with related companies of the same group. These incestuous transactions were for no other business purpose but to contrive a loss in the hands of the companies such as the Assessee who had incurred a tax liability on account of the gains made.  It is claimed that the transactions of sale of rights entitlement had resulted in a tax loss, although no real loss had been incurred by these companies inasmuch as the consideration received for sale of rights exceeded the original cost of their principal investment. The funds received from sale of shares which had resulted in capital gains – in the case of the Assessee the sale of shares of JSL – were transferred to other related companies including for the purposes of subscription of the rights renounced by the investment companies.  In the case of the Assessee, the sale proceeds of the shares of JSL were loaned to JSL, thus, enabling JSL to subscribe to the rights that were sold by the Assessee at a fraction of its market value. Viewed from the perspective that all companies were related and a part of

the Jindal Group, the rights to subscribe to PCDs were not alienated and remained within the Group. The corporate structure of the entities within the group was used for contriving the transactions which would conjure a tax loss in the hands of the companies - including the Assessee - which had incurred a tax liability.

46.     In **Azadi Bachao Andolan** *(supra)*, the Supreme Court had cautioned that the word 'sham' and 'device' are not intended to be used *"as magic mantras or catchall phrases to defeat or nullify the effect of a legal situation."* In **Snook vs. London and West Riding Investments Ltd.**: **(1967) 1 All ER 518 (CA)**, the Court had held *"that for acts or documents to be a "sham", with whatever legal consequences follow from this, all the parties thereto must have a common intention that the acts or documents are not to create the legal rights and obligations which they give the appearance of creating."* Clearly, the colourable device or a sham transaction would include a transaction and device which purport to show a situation which is much different from the substance of the transaction.  In the present case, the transaction of sale of rights entitlement purports to indicate an alienation of a right while in fact at a group level, there has been no alienation of any rights.  The transactions have been so executed to ensure

that the rights remained within the Jindal Group. The registered office of the company is at office of JSL; the Board of Directors consists of Sajjan Kumar Jindal s/o Shri O.P. Jindal and Anand Prakash Garg (who was an employee of JSL). Such transactions which are for the sole purpose of contriving a loss cannot in our view be described other than a colourable device.

47.    In our view, the AO had rightly found the transaction of sale of rights as a transaction for purchasing taxable losses for the purposes of evading tax. It has been argued that the Assessee had in fact relinquished its rights to subscribe to PCDs and the transaction had been implemented by JSL subscribing to the PCDs and in the circumstances, it could not be disputed that the transaction was genuine. It was contended that such transaction were permissible in law and, therefore, the tax effect of such transactions would necessarily follow. It was further contended on behalf of the Assessee that it is permissible for an Assessee to part with its asset with a view to book a loss. In our view, it cannot be disputed that in a case where an Assessee transfers its income producing asset, there could be no objection by the Revenue on the ground that the same had resulted in reducing the tax liability of an Assessee. However, this would not hold

good if it is found that the Assessee alongwith its inter-related parties that implemented transactions for no commercial purpose but to create a tax loss while at the same time ensuring that the benefits of the assets remain within the group. This would be an abuse of the corporate form and such transactions, even though implemented, cannot be considered to be other than a colourable device for avoidance of tax.

48.   As explained by the Supreme Court in *Vodafone International Holdings B.V. (supra)* the question whether a scheme is a colourable or an artificial device would have to be considered in the context of the surrounding facts. In the present case, the facts clearly indicative the transaction to be a part of a scheme, the sole purpose of which is to evade tax payable on the gains made on sale of certain shares of JSL.  Several companies within the group have adopted a similar stratagem to avoid tax on the gains made by them. In our view, this stratagem cannot be considered as legitimate and the ITAT erred in not holding so.

49.   It is argued that it was also incumbent upon the AO to reduce the sale consideration reflected by the Assessee in its profit and loss account if the AO held the transaction of sale of rights entitlement to be a sham or a colourable device. We are also unable to accept this argument as no such

contention was advanced even before the CIT(A) or the ITAT. The Assessee had simply declared profits as per its profit and loss account for charge of tax no claim for rendering the profits had been made and there is no reason for the AO to reduce the same. No alternative arguments had been advanced before the AO. The Assessee had claimed a notional capital loss which the AO found to be contrived. And, as indicated above, the AO rightly rejected the loss claimed by the Assessee.

50.    In view of our decision, the loss claimed by the Assessee was a contrived loss and the transaction of renunciation of rights in question was a colourable device to claim such loss, it is not necessary for us to decide the issue whether such loss could be set off against Assessee's business income.   However, as the Counsel have addressed arguments on the said issue, we deem it appropriate to consider the same.

51.    The Assessee has relied upon the decision in the case of ***Dhun Dadabhoy Kapadia*** (*supra*) to contend that the Assessee could calculate its income/ loss from renunciation of rights to subscribe to PCDs of JISCO by claiming the cost of acquisition of the rights entitlement as the difference in cum-right price and an ex-right price of shares of JISCO.  It has also been contended that the method of computation of cost of acquisition as

approved by the Supreme Court in **Dhun Dadabhoy Kapadia** (*supra*) would also be applicable for computing business profits/losses.  In that case the Assessee had inherited 710 shares of Tata Iron Steel and Co. Ltd. (TISCO) in the year 1954.  In the financial year 1956-57 – the previous year relevant to the concerned Assessment Year - TISCO floated a rights issue in terms of which its existing shareholders were entitled to purchase one new ordinary share for every ordinary share held by them as on 26th April, 1956 at a price of Rs.105 per share (face value of Rs. 75 and a premium of Rs. 30). Thus, the Assessee – who was not a dealer in the shares – became entitled to subscribe to 710 ordinary shares of TISCO. She did not subscribe to her entitlement but sold her entitlement to subscribe 710 shares of TISCO for a consideration of Rs.45,262.50/-. It is important to note that there was no dispute between the Assessee and the Revenue that the amount received was taxable as capital gains.  It is, in those circumstances, that the Court considered the Assessee's plea that the depreciation in the value of the quoted cum rights price of TISCO shares be considered as cost of acquisition of the rights entitlement. Indisputably, the issue of rights shares would result in dilution of the equity capital of TISCO and thus reduce the value of the existing shareholding.  The reduction in the

value of the shares – which was computed at the difference between the cum-right price and ex-right price of TISCO shares – was claimed to be the cost of acquisition of the rights and the same was accepted.  The contention of the Revenue that the cost of acquisition should be taken as Nil was rejected as the Court held that the Assessee would suffer some loss in the value of her existing shareholding by reason of increase in the issued share capital of TISCO. It was necessary to determine the cost of acquisition of the rights entitlement for the capital gains to be computed.   It is also relevant to bear in mind that in a later case, **_CIT v. B.C.  Srinivasa Setty_**: **(1981) 128 ITR 294 (SC)**, the Supreme Court had held that if a cost of acquisition of an asset could not be determined, the charge of tax would itself fail.

52.    The issue that arises for consideration now is whether the aforesaid method of determining the cost of acquisition of rights entitlement could also be applied to cases where the principal shareholding was not held as an investment or a capital asset but as stock-in-trade.  The Bombay High Court in **_K.A. Patch_** (*supra*) had accepted the Assessee's contention and held that the principles accepted by the Supreme Court for determining the cost of acquisition of a rights entitlement for the purposes of computing capital

gains would also be applicable for computing business profits. We, respectfully, are unable to concur with this view for several reasons. First of all, for the reason that the commercial and accounting principles for computing trading income/loss are materially different from the principles that may be applied by an ordinary person, who is not a trader, for calculating gains on capital assets. A taxpayer, who is not engaged in trading, does not prepare a trading account in respect of a capital asset held by him. It may be open for an Assessee who is not a trader – such as in the case of **Dhun Dadabhoy Kapadia** (*supra*) to claim that its cost of acquisition be computed on the basis of what could reasonably be perceived as cost of acquisition. However, for a trader, the costs incurred by him are subsumed in his trading account, which is mandatorily required to be drawn up. It is neither necessary nor an accounting practice to determine profit and loss on each piece of trading asset that is sold. Therefore, there is no necessity or occasion for trader to separately determine the cost of acquisition of each item of goods sold by him; he is only required to prepare a trading account while reflecting the aggregate sales and purchases. Thus, in a case of a trader, the principle of ascertaining notional cost attributable to the rights entitlement is neither necessary nor apposite.

53.    Secondly, the trading account maintained by a trader is drawn up to present a true and fair picture of his trading activities. The account includes an inbuilt mechanism for capturing the revenue and the real cost incurred by the trader. Both the revenue and costs are recognized by following the accounting standards – which are mandatorily required to be adhered to in case of companies – or accepted accounting practices.   Typically, a trading account would include Opening Stock,  which would be the same as the Closing Stock of the preceding year and would be valued at cost or market price, whichever is lower.  The purchases made during the year would also be debited to the trading account.  All revenues earned by the Assessee as well as the closing stock would be reflected as a credit in the trading account.  The closing stock would be the stock-in-trade in the hands of the Assessee as on the closing date and would typically be valued at market price or cost whichever is lower. The balancing figure between the debit side or credit side of the leading account would reflect the gross profit or loss. The gross profit would be further reduced by other expenses incurred by the trader to arrive at his net profit or loss. In the case of shares held as stock-in- trade, the consideration for sale of rights entitlement would indisputably be a trading receipt which would be credited to the trading

account. The cost incurred by the Assessee would be naturally subsumed in the value of the closing stock, assuming that the shares on the basis of which rights entitlement has been granted to an Assessee are still retained by him at the end of the closing period.  In the present case, the Assessee has, admittedly, credited the income from sale of rights entitlement in the Profit and Loss Account.  Undisputedly, all costs incurred by the Assessee as well as the value of closing stock have also been taken into account by the Assessee. Although the Assessee has sought to transfer the shares of JISCO from stock-in-trade to its investment, it is important to note that such transfer has also been made on cost or market price whichever is lower as is evident from the tenor of the resolution dated 4th April, 1991; this is, indisputably, the principle on which closing stock-in-trade is valued. Thus, plainly, the Profit and Loss Account of the Assessee would indisputably reflect its income.  The same has also been audited.  In our view, there is no scope to provide for a deduction of notional business loss which is neither incurred by the Assessee nor recorded in its audited books of accounts on the basis of notional costs of acquisition which are neither incurred by the Assessee, nor form a part of its audited accounts.  In our view, it would be erroneous to impute notional cost after the Assessee has

drawn up its Profit and Loss Account in accordance with the mandatory accounting standards and in accordance with the provisions of Section 211 of the Companies Act, 1956.

54.     Thirdly, for the reason that the Assessee has, admittedly, not incurred the cost of acquisition as claimed by the Assessee, in our view, it would be impermissible for an Assessee to inflate its cost of trading by costs that are neither incurred nor paid.

55.     In case the Assessee had actually paid the cum rights price of Rs.625/- for purchase of the shares, the reduction in value of the shares on an ex-right basis would be duly reflected in the value of the closing stock. The Assessee not having paid the price of Rs.625/- cannot claim a loss on account of a drop in its price.  Surely, a trader cannot claim that he has lost more than the cost incurred.

56.     If the Assessee felt it was necessary to reduce the value of its shares of JISCO held by it on account of alienation of the rights entitlement, an appropriate proportionate amount could be reduced from the cost of closing stock. The CIT(A) has examined the issue in some detail and had concluded that if the Assessee did desire to record a diminution in the value

of its holding on account of rights issued, it could do so by proportionally reducing the value of its shareholding in the same proportion as the drop in price of quoted shares. In other words, it could reduce the cost of shares of JISCO in the same proportion as the diminution in the value of the price of its shares on account of the shares being traded on an ex rights basis, that is, the cost of shares of JISCO could be reduced by applying a factor of 425/625 – ex-right price divided by cum-right price.

57.    In view of the above, the second question is also answered in negative, in favour of the Revenue and against the Assessee.

58.    The appeal is, accordingly, allowed. However, in the circumstances, the parties are left to bear their own costs.

                                                          **VIBHU BAKHRU, J**


                                                          **S. MURALIDHAR, J**

**NOVEMBER 19, 2015**
**RK**