# Exhibit 9

to Expert Opinion of Sudipto Sarkar SA

dated August 13, 2021



SCC Online Web Edition, Copyright © 2021
Page 1        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-----------------------------------------------------------------------------------------------------------------------------

400                          SUPREME COURT CASES                          [1970

on managerial or supervisory work and are not workmen is correct, because
they all also draw a salary in excess of Rs. 500/- per mensem.

### 4.  District Sales Representatives

**36.**  The case of the last category, viz., District Sales Representatives
could not be seriously pressed by Mr. Chari before us.  He did state that his
claim is that they are employed to do clerical work; but the facts make it
manifest that District Sales Representative. is  principally employed for the
purpose of promoting sales of the Company.  His main work is to do canvass-
ing and obtain orders.  In that connection, of course, he has to carry on some
correspondence, but that correspondence is incidental to the main work of
pushing sales of the Company.  In connection with promotion of sales, he has
to make recommendations for  selection of agents and dealers; extension or
curtailment of credit facilities to agents, dealers and customers ; investments
on capital and revenue in the shape of facilities at Agents' premises or retail
outlets and selection of suitable sites for retail outlets to maximise sales and
negotiations for terms of new sites.  He is, in fact, Company's representative
in his district responsible for  all matters affecting the  Company's interests and,
in particular, the profitable sale of all its products.  His case was urged pri-
marily on the basis of the argument advanced by Mr. Chari that the definition
of ''workman'' is now exhaustive and every employee of an industry must be
classed amongst one of the four classes described in the definition of workman.
We have already given our reasons for rejecting this submission.  The case of
District Sales Representative is clearly that of a person who cannot fall within
any of the four classes, because his work cannot be held to be either manual,
clerical, technical or supervisory.  The work of canvassing and promoting sales
cannot be included in any of these four classifications.  He is, therefore, not a
workman at all within the principal part of the definition, and the decision of
the Tribunal is correct.

**37.**  As a result, both the appeals are partly allowed, and the decision of
the Tribunal is varied to the extent indicated above.  In the circumstances of
this case, we direct parties to bear their own costs in both the appeals.

------

### 1970(3) Supreme Court Cases 400

*(From Delhi and Gujarat High Courts)*

[BEFORE M. HIDAYATULLAH, C. J. AND J. C. SHAH, V. RAMASWAMI, G. K. MITTER,
AND A. N. GROVER, JJ.]

MAGANBHAI ISHWARBHAI PATEL ETC.                    ..    Appellants;

*Versus*

UNION OF INDIA AND ANOTHER†                        ..    Respondents.

AND

MANIKANT TIWARI ETC.                               ..    Petitioners ;

*Versus*

UNION OF INDIA AND ANOTHER, ETC.‡                  ..    Respondents.

Civil Appeals Nos. 1528, 1900 and 2118 of 1968 and Writ Petitions Nos. 109,
234, 402, 403, and 409 of 1968, decided on January 9, 1969

†Appeal by Special Leave from the Order, dated the 18th March, 1969 of the Gujarat
High Court in Special Civil Application No. 365 of 1968.

‡Appeals from the Judgment and Order dated the 14th May, 1968 of the Delhi High
Court in Civil and Writ Petitions Nos. 343 and 294 of 1968 respectively, and Petition (under
Article 32 of the Constitution of India) for enforcement of the Fundamental Rights.



SCC Online Web Edition, Copyright © 2021
Page 2        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source:  Supreme Court Cases

-----------------------------------------------------------------------------------------------------------------------

**Constitution of India—Cession of Indian Territory—Articles 1, 3, 73, 253—Schedule VII, List I, Entries 14 and 15.**

**International Boundary Dispute—Submission to Arbitration Tribunal—Whether award of tribunal is binding on the parties—Whether ratification by Parliament and amendment of the Indian Constitution necessary—Practice in America and U. K.—Indian precedents.**

**Constitution of India—Fundamental Rights under Article 19(1)(d), (e) and (f)—Writ remedy under Article 32—Whether all petitioners have locus standi to maintain the petition—This case is not to be a precedent—Mandamus cannot issue, if the petitioner's rights are not directly and substantially invaded or are in imminent danger of being so invaded.**

It is the petitioners' claim that the disputed territory in the Rann of Kutch is a part of India and it has been so from the establishment of the two dominions in India, that India has exercised effective administrative control over it and that giving up a claim to it involves cession of Indian Territory which can only be effected by a constitutional amendment and not by a mere executive order.        (Para 22)

Many of the petitioners claimed that their fundamental rights under Article 19(1)(d), (e) and (f)were affected. This had not been proved. Hidayatullah observed : "The only person who can claim deprivation of fundamental right is Mr. Madhu Limaye, although in his case also the connection was temporary and almost ephemeral. However we decided to hear him . . . . But we are not to be taken as establishing a precedent for this Court which declines to issue a writ of mandamus except at the instance of a party whose fundamental rights are directly and substantially invaded or are in imminent danger of being so invaded".        (Para 21)

*Per* Hidayatullah, C. J. :—

(*i*) A treaty really concerns the political rather than the judicial wing of the State. When a treaty or an award after arbitration comes into existence, it has to be implemented and this can only be if all the three branches of Government to wit the Legislative, the Executive and the Judiciary or any of them possess the power to implement it. If there is any deficiency in the constitutional system it has to be removed and the State must equip itself with the necessary power.        (Para 24)

The practice in America and U.K. compared.

*Refers to :*

*Foster* v. *Neilson*, 2 Peters 253.
                    (Paras 25 to 33)

(*ii*) Unless there be a law conflicting with the treaty the treaty must stand.        (Para 29)

*Relies on :*

*Parlement Belge case*, 4 PD 129, on appeal 5 PD 197.

*Refers to :*

*Walker* v. *Baird*, LR (1937) AC 326 at 347.

*Attorney General for Canada* v. *Attorney General for Ontario*, LR (1892) AC 491.

(*iii*) The Constitution of India did not include any clear directions about treaties such as is found in the United States of America and the French Constitutions. (Articles 1, 3, 73, 253, Sch. 7, List I, Entries 14 and 15 referred to). The problem of cession of Indian Territories dealt with in judgments below :—

*Midanpore Zemindari Co. Ltd.* v. *Province of Bengal and Others*, (1949) FLJ 139 : (1949) FCR 309 ; *Foster* v. *Globe Venture Syndicate Ltd.*, LR (1900) Ch 811 ; *Dutt Development*



SCC Online Web Edition, Copyright © 2021
Page 3          Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------------------

*Coy.* v. *Kilantan Government,* LR (1924) AC 797 ; *The Berubari Union and Exchange of Enclaves,* 1960—SCJ 933 : (1960) 3 SCR 250 ; *Rao Sahib Ram Jawaya Kapur* v. *The State of Punjab,* (1955) 2 SCR 225 : 1955 SCJ 504 : AIR 1955 SC 540 ; *Ram Kishore Sen & Others* v. *Union of India,* (1966) 1 SCR 430 : AIR 1966 SC 644.          (Paras 34 to 43)

(*iv*) Who in the State can be said to possess Plenum dominium depends upon the Constitution and the nature of adjustment, unlike the United States of America where the Constitution is defined in express terms, in India one has to go by inferences from the Constitution, the circumstances and precedents.

The Second Berubari Case, (1966) 1 SCR 430 *relied on.*

The precedents are clear that no cession of Indian Territory can take place without a constitutional amendment.          (Para 44)

(*v*) Must a boundary dispute and its settlement by an arbitral tribunal be put on the same footing. An agreement to refer the dispute regarding boundary involves the ascertainment and representation on the surface of the earth by a boundary line dividing two neighbouring countries and the very fact of referring such a dispute implies that the Executive may do such acts as are necessary for permanently fixing the boundary. The settlement of a boundary dispute cannot therefore be held to be a cession of territory. It contemplates a line of demarcation on the surface of the earth. It only seeks to reproduce a line, a statutable boundary and it is so fixed. The case is one in which each contending State is uncertain of its rights and therefore consents to the appointment of an arbitral machinery. Such a case is plainly distinguishable from a case of cession of territory known to be Home Territory.          (Para 44)

(*vi*) The argument that if power to settle boundaries be conceded to the Executive it might cede some vital part of India is to take an extreme

view of things. The same may be said of Parliament itself but it is hardly to be imagined, that such gross abuse of power is ever likely. Ordinarily an adjustment of a boundary which international law regards as valid between two nations should be recognised by the Courts and the implementation thereby can always be with the Executive unless a clear case of cession is involved when parliamentary intercession can be expected and should be had. This has been the custom of nations whose Constitutions are not sufficiently elaborate on this subject.          (Para 44)

(*vii*) With regard to Kanjarkot which is to the South of Rahim ka Bazar no case was made out. The location of the boundary at the southern fringe of Bhara Banni and Chhadpet was no more than fixing a true boundary, according to the Tribunal. It is well within terms of reference and the decision being a true marking out of a disputed boundary does not amount to cession of these areas so as to attract a constitutional amendment.          (Para 55)

*Island of Palams case,* (Award dated 4th April 1928 ; 2 Int. Arb. Award 867), *refers to.*

*Minquiers and Ecrehes case.*

The petitions are *dismissed.*

*Per Shah, J.*          (concurring).

(*viii*) The effect of Article 253 is that if a treaty agreement or convention with a foreign state deals with a subject within the competence of the State Legislature, the Parliament alone has, notwithstanding Article 246(3), the power to make laws to implement the treaty, agreement or convention or any decision made at any international conference, association or other body. In terms the article deals with Legislative power ; thereby power is conferred upon the Paliament which it may not otherwise possess. But it does not seek to circumscribe the extent of the power

SCC Online Web Edition, Copyright © 2021
Page 4      Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases



conferred by Article 73. If in consequence of the exercise of Executive power, rights of citizens or others are restricted or infringed or laws modified the exercise of power must be supported by legislation; where there is no such restriction infringement of the rights or modification of the laws, the Executive is competent to exercise the power.                    (Para 81)

(ix) The award does no more than define on the surface of the earth a boundary which at all material times remained indefinite because of the nature of the terrain, the shifting nature of the border of what was called Rann, the highly discrepant and conflicting claims made from time to time by the British authorities as well as the Kutch State authorities before the State merged with Dominion of India in 1948, and the persistent refusal of the British authorities though there were several occasions to demarcate the boundary between Sind and the Rann of Kutch.          (Para 101)

Appeals and petitions dismissed.

*Advocates who appeared in this case :*

*I. N. Shroff,* Advocate, for appellant (in C. A. No. 1528 of 1968 ;

*.J. S. Bobde, G. L. Sanghi, V. K. Sanghi* and *S. S. Khanduja,* Advocates for Appellant

(in C. A. No. 1900 of 1968) ;

*C. B. Agarwala,* Senior Advocate, (*Virendra Kumar, S. S. Pareikh, Miss. Uma Mehta* and *S. S. Khanduja,* Advocates) for appellant (in C. A. No. 2118 of 1968).

*Petitioner in person,* (in W. P. No. 109 of 1968) ;

*Petitioner in person,* (in W. P. No. 234 of 1968).

*Petitioner in person,* (in W. P. No. 402 of 1968) ;

*C. B. Agarwala,* Senior Advocate, for Petitioner (*B. N. Antani* and *R. K. Bhatt,* Advocates with him (in W. P. No. 408 of 1968) ;

*A. S. Bobde,* and *S. S. Khanduja,* Advocates for petitioner (in W. P. No. 409 of 1968) ;

*C. K. Daphtary* and *B. Sen,* Senior Advocates (*R. H. Dhebar* and *S. P. Nayar,* Advocates with them) for Union of India (in C. As. Nos. 1528, 1900 and 2118 of 1968) and W. P. Nos. 234, 402 and 403 of 1968) ;

*G. R. Rajagopal,* Senior Advocate, (*R. H. Dhebar* and *S. P. Nayar,* Advocates with him) for Union of India (in W. P. No. 109 of 1968) ;

*C. K. Daphtary,* and *B. Sen,* Senior Advocates (*A. Sreedharan Nambiar, R. H. Dhebar* and *S. P. Nayar,* Advocates, with them) for Union of India (in W. P. No. 409 of 1968).

*R. H Dhebar* and *S.P. Nayar,* Advocates, for State of Gujarat.

The majority Judgment was delivered by

HIDAYATULLAH, C. J., (On behalf of himself, Ramaswami, Mitter and Grover, JJ).—These are five writ petitions under Article 32 of the Constitution and three appeals against the decisions of the High Courts of Gujarat and Delhi. The writ petitions have been filed by Mr. Manikant Tiwari (W.P. No. 109 of 1968), Mr. Shiv Kumar Sharma (W.P. No. 234 of 1968), Mr. Madhu Limaye (W.P. No. 402 of 1968), Mr. Gulabshanker Amritlal Dholakia (W.P. No. 403 of 1968) and Mr. Node Sadi Rau (W.P. No. 409 of 1968). The appeals from the Delhi High Court's common judgment, 14th May, 1968, on certificate are by Mr. Shiv Kumar Sharma (C.A. No. 2118 of 1968) and Major Ranjit Singh (C.A. No. 1900 of 1968) and the appeal from the decision of the Gujarat High Court is in a writ petition filed by Mr. Maganbhai Ishwarbhai Patel (C.A. No. 1528 of 1968). The Gujarat High Court, on 18th March, 1968, dismissed the petition summarily and the appeal is by Special Leave of this Court. This judgment will dispose of all of them.

2. The several petitioners seek a writ of mandamus or any other appropriate writ or order or direction under Article 32 of the Constitution to restrain the Government of India from ceding without the approval of Parliament the areas in the Rann of Kutch known as Kanjarkot, Chhadbet, Dhara-



SCC Online Web Edition, Copyright © 2021
Page 5        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------

banni, Priol Valo Kun and two inlets on either side of Tharparkar to Pakistan as awarded to it in the award, 19th February, 1968, of the Indo-Pakistan Western Boundary Case Tribunal. Mr. I.N. Shroff (C.A. No. 1528 of 1968), Mr. A.S. Bodhe (C.A. No. 1900 of 1968) and Mr. C.B. Agarwala (W.P. No. 403 of 1968) represented three such petitioners. Mr. Shiv Kumar Sarma, Mr. Madhu Limaye and Mr. Manikant Tiwari argued their own matters. The Union of India was represented by Mr. C. K. Daphtary, former Attorney-General of India, who had also conducted the case for India before the Tribunal.

**3.** The Indian Independence Act of 18th July, 1947 (an Act of the British Parliament), created from 15th August, 1947, two dominions known as India and Pakistan. By the same statute the paramountcy of the British Crown over the States of Kutch, Santalpur, Tharad, Suigam, Wav and Jodhpur lapsed and they soon acceded to and merged with India. The former British Indian Province of Sind was included in Pakistan while the Presidency of Bombay was part of India. Between these two lies the Great Rann of Kutch, Sind abutting on the North and West and the Indian mainland on the South and East.

**4.** The Rann is a vast expanse of water and desert. For part of the year even the desert is covered by water. At other times it is either soft mud or land with grass. No one ordinarily lives in that area which the onagers roam at large.

**5.** It appears that from July, 1948, Diplomatic Notes were exchanged between the two Governments with regard to the boundary between the areas known as Gujarat and West Pakistan. The difference led to open hostilities in April, 1965. On 30th June, 1965, the two Governments reached an agreement which read :

### "*Constitution of the Tribunal, Proceedings*

On 30th June, 1965, the Government of India and the Government of Pakistan concluded an Agreement, reading as follows :

Whereas both the Governments of India and Pakistan have agreed to a cease-fire and to restoration of the status quo as at Ist January, 1965, in the area of the Gujarat-West Pakistan border, in the confidence that this will also contribute to a reduction of the present tension along the entire Indo-Pakistan border ;

Whereas it is necessary that after the status quo has been established in the aforesaid Gujarat-West Pakistan border area, arrangements should be made for determination and demarcation of the border in that area ;

Now, therefore, the two Governments agree that the following action shall be taken in regard to the said area :

Article 1 :

There shall be an immediate cease-fire with effect from 00·30 hour GMT on Ist July, 1965.

Article 2

On the cease-fire :

(*i*) All troops on both sides will immediately begin to withdraw ;

SCC Online Web Edition, Copyright © 2021
Page 6          Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-----------------------------------------------------------------------------------------------------------------------------------



(3)s.c.c.]    MAGANBHAI ISHWARBHAI *v.* UNION OF INDIA (*Hidayatullah, C. J.*)    405

(*ii*) This process will be completed within seven days ;.

(*iii*) Indian police may then reoccupy the post at Chhad Bet in strength no greater than that employed at the post on 31st December, 1964 ;

(*iv*) Indian and Pakistan police may patrol on the tracks on which they were patrolling prior to 1st January, 1965, provided that their patrolling will not exceed in intensity that which they were doing prior to 1st January, 1965, and during the monsoon period will not exceed in intensity that done during the monsoon period of 1964 ;

(*v*) If patrols of Indian and Pakistan police should come into contact they will not interfere with each other, and in particular will act in accordance with West Pakistan-India border grounds-rules agreed to in January, 1960 ;

(*vi*) Officials of the two Governments will meet immediately after the cease-fire and from time to time thereafter as may prove desirable in order to consider whether any problems arise in the implementation of the provisions of paragraphs (*iii*) to (*v*) above and to agree on the settlement of any such problems.

Article 3

(*i*) In view of the fact that :

(*a*) India claims that there is no territorial dispute as there is a well-established boundary running roughly along the northern edge of the Rann of Kutch as shown in the pre-partition maps, which needs to be demarcated on the ground ;

(*b*) Pakistan claims that the border between India and Pakistan in the Rann of Kutch runs roughly along the 24th parallel as is clear from several pre-partition and post-partition documents and therefore the dispute involves some 3,500 square miles of territory ;

(*c*) At discussions in January, 1960, it was agreed by Ministers of the two Governments that they would each collect further data regarding the Kutch-Sind boundary and that further discussions would be held later with a view to arriving at a settlement of this dispute, as soon as officials have finished the task referred to in Article 2 (*vi*), which in any case will not be later than one month after the cease-fire, Ministers of the two Governments will meet in order to agree on the determination of the border in the light of their respective claims, and the arrangements for its demarcation. At this meeting and at any proceedings before the Tribunal referred to in Article 3(*ii*) and (*iv*) below, each Government will be free to present and develop their case in full.

(*ii*) In the event of no agreement between the Ministers of the two Governments on the determination of the border being reached within two months of the cease-fire, the two Governments shall, as contemplated in the Joint Communique of 24th October,

SCC Online Web Edition, Copyright © 2021
Page 7        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases



-----------------------------------------------------------------------------------------------------------------------------------

1959, have recourse to the Tribunal referred to in (*iii*) below for determination of the border in the light of their respective claims and evidence produced before it and the decision of the Tribunal shall be final and binding on both the parties.

(*iii*) For this purpose there shall be constituted, within four months of the cease-fire, a Tribunal consisting of three persons, none of which would be a national of either India or Pakistan. One member shall be nominated by each Government and the third member, who will be the Chairman, shall be jointly selected by the two Governments. In the event of the two Governments failing to agree on the selection of the Chairman within three months of the cease-fire, they shall request the Secretary-General of the United Nations to nominate the Chairman.

(*iv*) The decision of the Tribunal referred to in (*iii*) above shall be binding on both Governments and shall not be questioned on any ground whatsoever. Both Governments undertake to implement the findings of the Tribunal in full as quickly as possible and shall refer to the Tribunal for decision any difficulties which may arise between them in the implementation of these findings. For that purpose the Tribunal shall remain in being until its findings have been implemented in full.''

The cease-fire came into effect as provided in Article 1 of the Agreement.

6. As a result of this agreement the Government of India nominated Ambassador Ales Bebler, Judge of the Constitutional Court of Yugoslavia, the Government of Pakistan nominated Ambassador Nasollah Entezam of Iran and former President of the General Assembly of the United Nations. The two Governments having failed to agree on the selection of the Chairman of the Tribunal, the Secretary-General of the United Nations, under the power reserved by sub-paragraph (*iii*) of Article 3 of the Agreement, nominated Judge Gunnar Lagergren, now President of the Court of Appeal for Western Sweden. In the course of the hearing a compromise on the procedure for the demarcation of the boundary was settled. Memorials, Counter-Memorials and Final Memorials were submitted along with numerous maps and documents. The oral hearings began on 15th September, 1966, and continued with some breaks till 14th July, 1967. During the hearing about 10,000 pages of minutes and Verbatim Records were made and about 350 maps were exhibited.

7. At an early stage in the hearing Pakistan raised the question that the dispute be decided ex aequo et bono which request was opposed by India. The Tribunal did not find that the Agreement of 30th June, 1965, authorised it 'clearly and beyond doubt to adjudicate ex aequo et bono'. The parties did not confer this power by a special compromise even thereafter.

8. The case on the part of India was propounded with the aid of Map A which was a mosaic of Indian Maps B-44, B-37, B-19 and B-20. Pakistan claimed the boundary as marked on Map B. The award has delineated the boundary in Map C. Maps A and B and C form part of the Award. In describing the matter in dispute the Tribunal observed :

India claimed that :

'The Tribunal determine the alignment of the entire boundary between West Pakistan and Gujarat from the point at which the blue dotted

SCC Online Web Edition, Copyright © 2021
Page 8         Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases



-------------------------------------------------------------------------------------------------------------------------

(3)S.C.C.]   MAGANBHAI ISHWARBHAI *v.* UNION OF INDIA (*Hidayatullah, C. J.*)   407

line meets the purple line in Indian Map B-44 in the west to the north-eastern trijunction in the east—as it appears in the Indian Maps B-44, B-37, B-19 and B-20 where the correct alignment is shown by appropriate boundary symbols.'

The Government of Pakistan claimed that :

"The Tribunal determine that the border between India and Pakistan is that which is marked with green-yellow, thick broken line in the Pakistan Claim Map.

    *     *     *     *     *          *"

**9.**   It is common ground that the Gujarat-West Pakistan boundary stretches from the mouth of the Sir Creek in the west to a point on the Jodhpur boundary in the east.   The parties agree that the Western Terminus of the boundary to be determined by the Tribunal is the point at which the blue dotted line meets the purple line as depicted in Indian Map B-44 and the Pakistan Resolution Map, and that the Eastern Terminus of the same boundary is a point situated 825.8 metres below pillar 920 on the Jodhpur boundary as depicted in Pakistan Map-137.

**10.**   This agreement leaves out of the matters submitted to the Tribunal the portion of the boundary along the blue dotted line, as depicted in Indian Map B-44 and the Pakistan Resolution Map, as well as the boundary in the Sir Creek.   The blue dotted line is agreed by both parties to form the boundary between India and Pakistan.   In view of the aforesaid agreement, the question concerning the Sir Creek part of the boundary is left out of consideration.

**10-A.**   The dispute thus remained with regard to the boundary outside these agreements.   The Tribunal described this dispute in the following words :

"From the Western Terminus, the boundary claimed by India takes off to the north and that claimed by Pakistan to the south ; and from the Eastern Terminus, the boundary claimed by India takes off to the south-west while the boundary claimed by Pakistan turns south-east.

Both parties agree that before Independence the boundaries between the Province of Sind, on the one hand, and one or more of the Indian States on the other hand, were conterminous.   Therefore, in the disputed region, apart from India and Pakistan, there is no other State that does or could have sovereignty.   There is between India and Pakistan a conterminous boundary today, whether or not there was at all times a conterminous boundary between Sind and the Indian States.

Pakistan contends that, should the Tribunal find that the Province of Sind and the Indian States were not fully conterminous, then the area between Sind and these States would be an 'undefined area' falling outside the scope of the Indian Independence Act, 1947.   In such an event, the conterminous boundary between India and Pakistan would have to be determined by the Tribunal on the basis of rules and principles applicable in such circumstances.

Pakistan adds that the evidence produced by it in this case is in support of its principal submission, although some of it could also be used in support of its alternative submission.

SCC Online Web Edition, Copyright © 2021
Page 9      Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source:  Supreme Court Cases



-------------------------------------------------------------------------------------------------------------------------

408                         SUPREME COURT CASES                         [1970

Both parties agree that the Rann was not a 'tribal area' as defined in Section 311 of the Government of India Act, 1935.

Each party states that the boundary claimed by it is the traditional, well-established and well-recognised boundary.''

**11.** Pakistan thus claimed in addition to the establishment of a median line roughly along the 24th parallel, what it called 'the upper lands in dispute' and the north-western part of it which it called 'the jutting triangle.' These included Dhara Banni, Chhadbet, Pirol Valo Kun, Kanjarkot, Vighokot and Sarfbela and these were said to be not part of the Rann. India on the other hand stated that the Rann means the Rann lying to the east of the vertical line and to the south of the horizontal line as depicted in Map A. Pakistan maintained that the Rann lay to the east of what was once known as the Khori river and that the lands were part of Sind and referred to the same as 'the delta lands'.

**12.** The above in brief is the outline of the dispute as presented to the Tribunal. Although the award of the Tribunal is before us it was necessary to make this brief mention because we are required to reach a decision whether this was a clear case of cession of territory following the award, which it is claimed makes it incumbent for the executive authority in India to obtain the approval of Parliament by suitable amendment of our Constitution, before effectuating the award.

**13.** The Tribunal was not unanimous in its decision. Judge Ales Bebler accepted almost in its entirety the claim of India. Ambassador Nusrollah Entezam upheld the Pakistani claim. The Chairman then delivered his opinion. On the propounding of his opinion Ambassador Entezam gave his opinion as follows :

Opinion of Mr. Entezam :

''In an early stage I considered that Pakistan had made out a clear title to the northern half of the area shown in the Survey Maps as the Rann. I have now had the advantage of reading the opinion of the learned Chairman, and in the light of it I concur in and endorse the judgment of the learned Chairman.''

The Tribunal thereupon ruled thus :

''The alignment of the boundary described in the opinion of the Chairman and endorsed by Mr. Entezam has obtained the required majority. It is therefore the boundary determined by the Tribunal.''

The Chairman prefaced his conclusions by observing :

''For the reasons now given, and with due regard to what is fair and reasonable as to details I conclude on the great issue before me that the boundary between India and Pakistan lies as follows    Reference is made here to the Award Map (Map C). Because of the imprecise topographical features in the region and the impossibility of exactly delimiting many acts of State authority, the boundary must sometimes be represented by approximate straight lines.''

**14.** The Chairman then indicated the exact location of the boundary determined by him which was also delineated by him on the Map C. The new boundary begins at the northern tip of the Khori Creek and after going straight up north reaches the main land of Sind and then follows roughly

SCC Online Web Edition, Copyright © 2021
Page 10        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases



-----------------------------------------------------------------------------------------------------------------

(3)s.c.c.]   MAGANBHAI ISHWARBHAI *v.* UNION OF INDIA (*Hidayatullah, C. J.*)   409

the configuration of the land till it comes south of Rahim ki Bazar. It thus follows Erskine's Survey. Thereafter instead of following the mainland it dips to the south-east just south of Sadariajagot and then goes up north-west to join the mainland and to follow the boundary symbols. In the triangle so formed is situated the Kanjarkot area which is the first limb of the disputed territory brought to the fore before us. After following the line of the mainland and the existing boundary symbols, the new boundary again dips to the south-east to a point a little north of the 24th parallel and runs parallel to it thus embracing Dharabanni and Chhadbet to Pakistan. Thereafter it goes north to join the mainland of Sind again and follows the boundary symbols which it follows till it reaches the Nagar Parkar area. This is a kind of a peninsula jutting to the south. On the west and east sides of Nagar Parkar there are two narrow but deep inlets. The new boundary instead of running along the banks of the inlets jumps across the two inlets at their southern extremities, thus including them in Pakistan. The inlets, therefore, are the fourth and fifth limbs of the disputed territory of India which the petitioners claim has been lost to India by the Award. The new boundary thence proceeds along the mainland till it reaches the demarcated boundary at the Jodhpur end from where the boundary is not in dispute just as the boundary from Sir Creek to Khori Creek has not been in dispute.

**15.** In drawing up the border the Tribunal based itself on much historical matter and old maps. In the opinions of Judge Ales Bebler and the Chairman (Ambassador Entezam concurring with the Chairman) this historical material has been differently interpreted but we are not concerned with it. The reference was also not decided as a cartographic dispute. It was settled by an ad hoc award. No special reasons were given by the Chairman why he included 350 square miles in Pakistan when he dipped the boundary to the south into the Rann of Kutch except when he came to consider the question of the two inlets on the two sites of Nagar Parkar. In this connection he observed :

"The two deep inlets on either side of Nagar Parkar will constitute the territory of Pakistan. Already in 1855, the Deputy Commissioner of Thar Parkar pointed out that if these inlets were to be considered Kutch territory,

(*a*) glance at the map will show that Parkar would be a peninsula almost entirely surrounded by Kutch territory. The Kutch State could erect fortifications and establish Customs houses at places situated many miles within the district for instance, close to Veerawah, or on some of the roads which, crossing inlets of the Rann, lead from one part of this district to another."

(Pak. Doc. B-9).

**16.** In my opinion it would be inequitable to recognise these inlets as foreign territory. It would be conducive to friction and conflict. The paramount consideration of promoting peace and stability in this region compels the recognition and confirmation that this territory also be regarded as such. The points where the boundary will thus cut off the two inlets are these :

"At the western inlet, the boundary will leave the boundary symbols indicated on Indian Map B-34 at the point marked thereon as '26', more precisely where the cart track is indicated as departing from the edge of the Rann in a south-easterly direction. This point is indicated as Point 'L' on Map C on the other side of the inlet, the point will be

SCC Online Web Edition, Copyright © 2021
Page 11      Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source:  Supreme Court Cases
-----------------------------------------------------------------------------------------------------------------------



410                    SUPREME COURT CASES                    [1970

that where the camel track is indicated on Indian Map B-34 to reach the edge of the Rann; that point is indicated as point 'M' on Map C. Between points 'L' and 'M', the boundary shall be a straight line.

The boundary will cross the eastern inlet at its narrowest point in a straight line between points 'N' and 'C' marked on Map 'C'.

In straightening the line to avoid a jagged boundary the Chairman gave the following reasons :

"The boundary marked by symbols along the outer edges of the peninsula of Nagar Parkar and up to the Eastern Terminus is a jagged one. As such it is unsuitable and impracticable as an international boundary. The boundary shall accordingly lie in conformity with the depiction on Map C between the outer points on jutting-out tongues of land from point 'M' and until the Eastern Terminus, marked as 'ET' on Map C.

At no point between the two Terminii shall the alignment of the boundary as above described be such as to include in India territory not claimed by India, as defined by the depiction India's claim line on Map A.

It might be added that the boundary proposed by me for the greater part of its length roughly coincides with the boundary proposed by my learned colleague, Mr. Bebler."

**17.** This in brief is the decision of the Tribunal. We now proceed to the consideration of the matters before us.

**18.** There are seven parties before us seeking to restrain the Government of India from making over the areas of Kanjarkot, Dharabanni, Chhadbet and the two inlets to Pakistan by sheer executive act and insist that the necessary change can only be effected by a constitutional amendment of the territories of India as indicated in the Constitution. It may be pointed out that none of the petitioners contends that the Award should be rejected. This is as it should be. India was voluntarily a party to an agreement pledging its honour to respect the Award. According to J.H. Rolston (International Arbitrations from Athens to Locarno) pacific settlement of international disputes through a binding award on the basis of an undertaking voluntarily accepted is founded on the same principles as are to be found in the concept of Arbitrations in Municipal Law. The history of such arbitrations begins in modern times from the Jay Treaty between Great Britain and the United States of America of 19th November, 1794, to settle the boundary disputes after Independence in 1776 through Mixed Commissions. The Commissions settled the exact position of the Sainte Croix River and the decision was regarded by both sides "as final and conclusive so that the same shall never thereafter be called in question or made the subject of dispute or difference between them". The rules of such arbitrations were settled by the Alabama Arbitrations in 1871 and the basis of the rules is the maxim Pacta Sunt Servanda. Indeed the Hague Convention of 1907 (Article 37) contained the rule :

"Recourse to arbitration implies an engagement to submit loyally to Awards."

**19.** There have been innumerable arbitrations between nations. Several books contain surveys of these arbitrations and awards. Stuyt lists 407 between 1794 and 1938 and writers like Moore, La Fontaine, Lapradelle, Darby,

SCC Online Web Edition, Copyright © 2021
Page 12        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases



-------------------------------------------------------------------------------------------------------------------

**(3)s.c.c.]   MAGANBHAI ISHWARBHAI v. UNION OF INDIA (*Hidayatullah, C. J.*)   411**

etc. have made other compilations, the most complete being by Moore. Nantwi brings the list down to 1967 and also lists separately the awards which were not complied with. An examination of such awards only reveals that generally an award is not accepted when the terms of submission are departed from or there are fatal omissions, contradictions or obscurities or the arbitrators substantially exceed their jurisdiction. None of these factors obtains here. Since the award has been accepted by our Government it is binding. The parties also do not want that it be rejected. The only question raised in these matters is how it is to be implemented.

**20.** Before we deal with the problem we wish to say something about the standing of the petitioners since it appears to us that most of them have no direct interest to question the action of Government or to raise any controversy regarding the implementation of the Award.

**21.** Before the hearing commenced we questioned each petitioner as to the foundation of his claim. We discovered that most of the petitioners had no real or apparent stake in the areas now declared to be Pakistan territory. These persons claim that they had and still have the fundamental rights guaranteed to them by Article 19(1)(*d*),(*e*) and (*f*), that is to say, the right to travel, to reside or settle down, or to acquire, and hold property in these areas. None of them has so far made any move in this direction but their apprehension is that they will be deprived of these rights in the future. This, in our judgment, is too tenuous a right to be noticed by the Court in administering the law and still less in enforcing fundamental rights. When we communicated our view at an earlier hearing, some more petitioners came forward. Mr. Madhu Limaye puts forward the supporting plea that he had attempted to penetrate this area to reconnoitre possibilities for settlement, but was turned back. In this way he claims that he had attempted to exercise his fundamental rights and they were infringed. Another party claims to have had a lease of grass lands some ten years ago in this area and he is now to be deprived of the rights to obtain a similar lease. Lastly, one of the parties puts forward the plea that he lives in the adjoining territory and thus has interest in the territories proposed to be ceded to Pakistan. These petitioners too have very slender rights, if at all. The only person who can claim deprivation of fundamental rights is Mr. Madhu Limaye, although in his case also the connection was temporary and almost ephemeral. However, we decided to hear him and as we were to decide the question we heard supplementary arguments from the others also to have as much assistance as possible. But we are not to be taken as establishing a precedent for this Court which declines to issue a writ of mandamus except at the instance of a party whose fundamental rights are directly and substantially invaded or are in imminent danger of being so invaded. From this point of view we would have been justified in dismissing all petitions except perhaps that of Mr. Madhu Limaye. We may now proceed to the consideration of the rival contentions.

**22.** The petitioners attempt to establish that this territory is a part of India and has always been so from the establishment of the two Dominions, that India has exercised effective administrative control over it and that giving up a claim to it involves a cession of Indian territory which can only be effected by a constitutional amendment. As to the details of the steps which, in the petitioners' view establish these facts, we shall come later. This in very brief is the gist of the petitioners' case. The reply on behalf of the Government of India is equally brief. It is that no cession of territory is involved. Since the boundary was always uncertain owing to the shifting

SCC Online Web Edition, Copyright © 2021
Page 13        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source:  Supreme Court Cases



-------------------------------------------------------------------------------------------------------------------------

nature of the sea and sands and that the effective administrative control amounted to no more than establishing a police outpost with a personnel of 171 persons for watch and ward and that too after the exchange of Diplomatic Notes began and that the dispute concerns the settlement of boundary which was uncertain. It is thus contended that the true areas of Pakistan and India have now been demarcated without cession of what may be called undisputed Indian Territory. According to the Government of India the Award itself is the operative treaty and after demarcation of the boundary it will only be necessary to exchange letters recognising the established border. The case lies within this narrow compass.

23. Before we deal with the points in dispute and the materials relied upon by the rival parties in support thereof we wish to say a few words on the implementation of treaties in general and arbitration awards in boundary disputes in particular. The practice of countries is different but the diverse possible approaches to the question appear from an examination of the practice obtaining in the United States, France, the United Kingdom and in British India. An examination of these practices will enable us to see how the matter is to be viewed in this case and in the context of our Constitution and the existing rulings of this Court.

24. A treaty really concerns the political rather than the judicial wing of the State. When a treaty or an award after arbitration comes into existence, it has to be implemented and this can only be if all the three branches of Government to wit the Legislature, the Executive and the Judiciary, or any of them, possess the power to implement it. If there is any deficiency in the constitutional system it has to be removed and the State must equip itself with the necessary power. In some jurisdictions the treaty or the compromise read with the Award acquires full effect automatically in the Municipal Law, the other body of Municipal Law notwithstanding. Such treaties and awards are 'self-executing'. Legislation may nevertheless be passed in aid of implementation but is usually not necessary.

25. In the United States of America a treaty concluded with a foreign State by the President of the United States alone, without the consent of the Senate, is not, according to their Constitution, binding upon the Nation and the foreign power derives no rights under it (*See* Mc Nair : Law of Treaties, page 80, quoting from Crandall : Treaties, Making and Enforcement, Chapter XIV). As Chief Justice Taft puts it : A treaty is the supreme law and a treaty may repeal a statute and vice versa. It is only when the terms of a treaty require that a law must be passed that it has to be so passed : *Foster* v. *Nielsen*.[1] See also Dickinson : Law of Nations 1057.

26. The position regarding the United States is quite clear. In other nations different practices exist. In the French Constitution of the 4th October, 1958, (Title VI) Article 52 enables the President to negotiate and ratify treaties and he is informed of the negotiation of any international agreement not subject to ratification. Article 53 names the treaties that require ratification by law. They, inter alia, involve the cession, exchange or addition of territory. They take effect only after having been ratified or approved. No cession, exchange or addition of territory is valid without the consent of the populations concerned. However it is not laid down how consent is to be obtained. Treaties or agreements regularly ratified or approved have, from the time of publication, an authority superior to that of laws, provided,

1.  2 Peters 253.

SCC Online Web Edition, Copyright © 2021
Page 14        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases



-------------------------------------------------------------------------------------------------

in the case of each agreement or treaty, that it is applied also by the other party (Article 55). If the Constitutional Council consulted by the President of the Republic, the Prime Minister or the President of either assembly, has declared that an international obligation includes a clause contrary to the Constitution, authorisation to ratify or approve it may be accorded only after revision of the Constitution (Article 54). The Constitution thus makes provision for all contingencies. Even though the Kings of France had power expressly conferred by the Constitutional Charter of 1830, the French jurists denied the jurisdiction and power to the King to cede territory.

27. The English practice has, like all other British Institutions, grown with time. Blackstone has the following remark :

> "Whatever contracts he (the sovereign) engages in, no other power in the kingdom can legally delay, resist or annul."

Kent in his Commentaries (Vol. I, Page 175, 10th Edition) says :

> "The power competent to bind the nation by treaty may alienate the public domain and property by treaty."

Forsyth in his Opinions gives the reason that if the Nation has conferred upon its supreme executive without reserve the right of making treaties, the alienation is valid because it is then made by the reputed will of the Nation. England, however, soon began to make a distinction between territory ceded as a free gift in time of peace without a treaty and that ceded as a result of a war. Forsyth asked the question whether the Crown had the power to alienate British territory by treaty, not following the close of a war—as for instance, by a commercial treaty and answered that the proposition seemed questionable. He observed :

> "I should doubt very much whether the Crown, without the authority of Parliament, would have the *legal power* to cede by treaty the Channel Islands to France, there having been no war, and the cession not being made as part of the adjustment of a quarrel between the two countries."

Without a treaty the power to cede territory in time of peace was always denied. Forsyth cites Grotius de jure Belliect Pacis, (Volume II, c. 6, Sections 3-8) Puffendorf, Volume VIII, c. 12, Vattel Volume I, c. 20, Section 224, c. 21, Section 260, Livy Volume IV, c. 2, Section 11 and Phillimore, Part III, c. 14 Sections 261, 262.

28. At the time of the cession of East Florida to Spain Lord Loughborough maintained that the Crown possessed no prerogative to cede British Territory to a foreign State without authority of Parliament but Lord Thurlow (Lord Chancellor) said that this was based on 'the lucubrations and fancies' of foreign writers which he rejected. However Britain was then at war with Spain and the cession was under a treaty of peace. In 1863, the House of Commons debated the transfer of Ionian Islands. Lord Palmerston observed :

> "But with regard to cases of territory acquired by conquest during war, and not ceded by treaty, and which are not therefore British freehold, and all possessions that have been ceded by treaty and held as possessions of British Crown, there is no question that the Crown may make a treaty alienating such possessions without the consent of Parliament."

SCC Online Web Edition, Copyright © 2021
Page 15        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-----------------------------------------------------------------------------------------------------------------------



414                    SUPREME COURT CASES                    [1970

Lord Palmerston cited the examples of Senegal, Minorca, Florida and Isles of Banca. (*See* Hansard Part : Debates, Volume CLXIX, pages 230-231). These were however cessions made by treaties of peace at the end of wars.

**29.**  Lord McNair gives the settled law of modern times. According to him in the United Kingdom the concurrence of Parliament must always be obtained except in a very small number of cases. He opines that if the Courts are required *to assist in the implementation*, a law must obviously be found for Courts' act only in accordance with law. If a law is obligatory obviously Parliament must have a say because no law can be passed except by Parliament. However, even if a law be required, and yet the Crown enters into a treaty, the Courts take the act as final unless a law stands in the way. In other words unless there be a law conflicting with the treaty, the treaty must stand. In this connection it is profitable to read what Lord Phillimore (then Sir Robert Phillimore) said in the *Parliament Belge case.*[2] That case was reversed on appeal in 5 P.D. 197 but on another point. See also *Walker* v. *Baird.*[3] As was observed by Lord Atkin in *Attorney-General for Canada* v. *Attorney-General for Onterio,*[4] the position may be summed up thus : there is a distinction between (1) the formation, and (2) the performance of the obligation. The first is an executive act, the second a legal act *if a law is required*. The performance then has no force apart from a law that is to say unless Parliament assents to it and Parliament then accords its approval to the first executive act. The treaties created by executive action bind the contracting parties and, therefore, means must be found for their implementation within the law. This is illustrated by a few examples. The Executive authority in the State cannot acquire new rights against the citizens by making treaties with foreign powers. Therefore whenever peace treaties involved municipal execution many statutes had to be passed. Again new offences cannot be created by the mere fact of conventions entered into with other powers. Both principles obtain in India. The Indian statute book contains numerous examples of conventions which have led to the passing of Municipal Laws. The Civil Court Manual devotes many pages to such statutes, too numerous to be mentioned here and the penal law of India also affords examples. One such is the law against obscenity in India which was the direct result of a convention. In the United Kingdom there is almost a binding convention that cession of British territory requires approval of Parliament in the form of a statute but it must clearly have been the freehold of Britain.

**30.**  But even here parliamentary sanction is not required for cession or abandonment of territory acquired previously by conquest or cession or otherwise wrongly in British possession. The cases of abandonment by the Crown of sovereignty over the various mandated territories are in point. Many of them were given up without an Act of Parliament. The protocol respecting the boundary between Tanganayika territory and the Belgian mandated territory of Runnda-Urandi on 5th August, 1924, involving a small territory was never enacted as a law. In 1925 it was ruled that cession of territory which never formed part of a self-governing dominion was a royal prerogative although it was desirable that approval of Parliament be obtained. A giving up of doubtful claims to territory is not considered to be of the same standing as a cession of territory known to be that of the Crown. The tendency however is to have parliamentary sanction when British territory is ceded. This is provided in the very treaty itself and it is made subject to Parliament's

---

2.  4 PD 129 on appeal 5 PD 197.                4.  LR (1892) AC 491.
3.  LR (1937) AC 326 at 347.

SCC Online Web Edition, Copyright © 2021
Page 16        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases



---

approval. The present practice of the Crown is to obtain either prior sanction of Parliament or to seek ratification after it. This is done by laying the treaty on the table of both Houses for 21 days, after which time it is treated as ratified.

**31.** Although the practice since 1924 is to submit treaties to Parliament by laying them on the table of the two Houses (known as the Ponsonby rule), there have been in the past numerous instances of treaties implemented by the Crown *without reference to Parliament*. These exceptions were connected with circumstances of convenience and public policy that is to say to avert a war, for consideration of territory or for rectification of boundaries. A few examples of such action *in time of peace* may be given. In 1824 in treaty with Netherlands, Great Britain ceded Sumatra and the settlement of Bencollen. In 1859-60 the Bay Islands were transferred to Honduras. In 1867 in treaty with Netherlands an exchange of territory took place. The Orange River Territory was transferred by an Order in Council. In 1697 by the Treaty of Reyswick Hudson Bay territory was given back to the French. In 1813 by the Treaties of Stockholm the Island of Guadelope was ceded to Spain. A cession of Mosquito Shore was made to Nicaragua. All these were in time of peace and without any reference to Parliament : See Hertslett's Treaties.

**32.** In British India Section 113 of the Indian Evidence Act of 1872 created a presumption in favour of such transfer which on the issue of a notification was to be held by Courts to be valid. In 1872 Scindia was given the pergannah of Broach. In 1803 Pudokottah State was ceded the District of Kullanelly in Tanjore. In 1806 Sambalpur was given to the Maharaja of Nagpur and in 1871 Scindia was given certain villages in Jhansi. [See Aitcheson's Treaties, Volume 3 (page 331)], Volume 4 (page 214) and (99)]. All these were without intervention of Parliament.

**33.** It will thus appear that there is no settled practice. The least that can be said is that cession in time of war in the United Kingdom can always be made by the Crown but in time of peace it can only be made by parliamentary sanction whether obtained directly or under the Ponsonby rule. In British India parliamentary sanction was not necessary. In *Damodar Gordhan* v. *Deoram Kanji*,[5] it was laid down that :

> "The general and abstract doctrine laid down by the High Court at Bombay that it is beyond the power of the British Crown without the consent of the Imperial Parliament to make a cession of territory within the jurisdiction of any of the British Courts in India, in time of peace, to a foreign power, is erroneous."

**34.** The question is one of domestic as well as International Law and we have been at pains to set down the practice of some countries and that obtaining in British India before dealing with this problem in the light of our Constitution and the facts obtaining here. It will appear from the other analysis that the United States of America and the French Constitutions have a clear guidance on the subject. In England, as no written Constitution exists, difference is made between treaties of peace when the Crown acts without obtaining the approval of Parliament and cession in peace time when such approval must be had. But even so a distinction is made in the case of British possessions abroad and the United Kingdom. Again a difference is made in cases involving minor changes where boundaries have to be ascertained and adjusted. In British India advantage was taken of Section 113 of

5. LR (1876) I AC 332.

SCC Online Web Edition, Copyright © 2021
Page 17        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-------------------------------------------------------------------------------------------------------------------



416                    SUPREME COURT CASES                    [1970

the Evidence Act in cases of cessions to Native States, Prince or Ruler. That section is now obsolete and has been omitted in Burma and Ceylon but is still borne on our statute, although no longer required. We may now pass on to the Indian Constitution and the facts of this case to see how it views this matter.

**35.**   The Constitution did not include any clear direction about treaties such as is to be found in the United States of America and the French Constitutions. Article 1 of the Constitution defined the territory of India. It provides that India shall be a Union of States. In the Constitution as originally enacted First Schedule classified States as A, B, C and D. After the Seventh Amendment in 1956 it is now provided that the States and the territories thereof shall be as specified in the First Schedule. Clause (3) of the First Article was also amended by the Seventh Amendment but as the amendment is not material we may read here that clause as it is today. It reads :

> "(3) The territory of India shall comprise—
>> (a) the territories of the States ;
>> (b) the Union territories specified in the First Schedule ; and
>> (c) such other territories as may be acquired."

Article 3 enables Parliament by law to alter the boundaries of the existing States and it includes the power (b) to increase the area of any State (c) diminish the area of any State or to alter the name of any State. Then there are items Nos. 14 and 15 in the Seventh Schedule which provide as follows :

> "14.   Entering into treaties and agreements with foreign countries and implementing of treaties, agreements and conventions with foreign countries.
>
> 15.   War and peace."

These entries enable laws to be enacted on these topics. They are to be read with Article 253 which occurs in Part XI (Relations between the Union and the States) Chapter I (Legislative Relations) and is headed Distribution of Legislative Powers. It provides :

> "253.   Notwithstanding anything in the foregoing provisions of this Chapter, Parliament has power to make any law for the whole or any part of the territory of India for implementing any treaty, agreement or convention with any other country or countries or any decision made at any international conference, association or other body."

In point of fact it adds nothing to the Legislative Entries 14 and 15 above quoted but confers exclusive power of law-making upon Parliament. As the marginal note correctly represents the idea underlying the article it may be read—Legislation for giving effect to International agreements and the article only says that Parliament is the authority to make such laws. In addition to these provisions we must also take into account Article 73(1) which lays down the executive power of the Union. It reads :

> "73.   (1) Subject to the provisions of this Constitution, the executive power of the Union shall extend—
>> (a) to the matters with respect to which Parliament has power to make laws ; and

SCC Online Web Edition, Copyright © 2021
Page 18       Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-------------------------------------------------------------------------------------------------------------------------



(3)S.C.C.]   MAGANBHAI ISHWARBHAI *v.* UNION OF INDIA (*Hidayatullah, C. J.*)   417

(*b*) to the exercise of such rights, authority and jurisdiction as are exercisable by the Government of India by virtue of any treaty or agreement :

Provided that the executive power referred to in sub-clause (*a*) shall not, save as expressly provided in this Constitution or in any law made by Parliament, extend in any State to matters with respect to which the Legislature of the State has also power to make laws.''

**36.** The question is if a law and/or a constitutional amendment is necessary for implementing the Award.

**37.** Before we deal with the facts of the case before us and the argument for and against executive action we may consider here a few cases of this Court in which a problem of cession of Indian Territory had previously arisen because both sides seek to apply those cases to the facts here.

**38.** It is convenient to view these cases in the order in which they were decided. In *Midnapore Zemindary Co. Ltd.* v. *Province of Bengal and Others,*[6] this question was not directly in issue. There were observations which are pertinent and must be borne in mind.

**39.** It was observed that disputes as to boundaries between two independent States cannot be the subject of enquiry of Municipal Courts exercising jurisdiction in either State. The Federal Court relied upon the statement of the law by Oppenheim, (International Law, 7th Edition, Volume I, page 408) that ''State territory is an object of the Law of Nations, because the latter recognises the supreme authority of every State within its territory''. The Federal Court quoted with approval the dictum of Farwell, J., in *Foster* v. *Globe Venture Syndicate Ltd.,*[7] which reads :

''Sound policy appears to me to require that I should act in union with the Government on such a point as that. Assuming that the Foreign Office have already satisfied themselves that the territory in question is within the dominion of Morocco, and have applied to the Sultan of Morocco for redress in any given matter, it would surely be improper that I, sitting here as a Judge of the High Court, should, in the face of that act of Her Majesty, hold as a matter of fact that the territory in question was not within the dominion of the Sultan of Morocco. I should be contravening the act of Her Majesty acting as a Sovereign in a matter which is within the cognizance of Her Majesty's Foreign Office.''

This statement of the law had the full approval of Viscount Finlay in *Dutt Development Co.* v. *Kilantan Government,*[8] where consultation between Court and Government was advocated. This case does not help us to solve the problem but it shows that Municipal Courts should be slow to interfere.

**40.** A similar question like the present arose *In re* ; *The Berubari Union and Exchange of Enclaves,*[9] on a reference by the President of India to this Court of certain questions concerning the Berubari Union and the exchange of certain enclaves. As a result of the Radcliffe Award dated 12th August, 1947, Berubari Union was included in West Bengal and was treated as such. Certain boundary disputes having arisen from interpretation of the Radcliffe award, the two Dominions referred the dispute to another Tribunal presided

6.  (1949) FLJ 139 : 1949 FCR 309.          8.  LR (1924) AC 797.
7.  LR (1909) Cb 811.                        9.  (1960) SCJ 933 : (1960) 3 SCR 250.

SCC Online Web Edition, Copyright © 2021
Page 19        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases



-------------------------------------------------------------------------------------------------------------------------------

418                          SUPREME COURT CASES                          [1970

over by Lord Justice Algot Bagge for decision. The Bagge Tribunal gave
its award on 26th January, 1950. Subsequently the question of Berubari
Union was raised by Pakistan in 1952 and on 10th September, 1958, the
Prime Ministers of India and Pakistan entered into an agreement between East
and West Bengal, which involved transfer of Berubari Union to Pakistan.
Simultaneously an agreement to exchange certain enclaves took place also.
This is known as the Indo-Pakistan Agreement.  Section 290 of the Govern-
ment of India Act, 1935, had provided that His Majesty could by Order in
Council increase or diminish the area of any Province or alter the boundary
of any Province and the Extra-Provincial Jurisdiction Act of 1947 gave the
necessary power in that behalf.  The question arose whether the inauguration of
the Constitution had led to any change.  These questions were referred to
this Court by the President.  They were :

> "(1) Is any legislative action necessary for the implementation
> of the agreement relating to Berubari Union ?
>
> (2) If so, is a law of Parliament relatable to Article 3 of the
> Constitution sufficient for the purpose or is an amendment of the
> Constitution in accordance with Article 368 of the Constitution ne-
> cessary in addition to or in the alternative ?
>
> (3) Is a law of Parliament relatable to Article 3 of the Constitu-
> tion sufficient for implementation of the agreement relating to Ex-
> change of Enclaves or is an amendment of the Constitution in
> accordance with Article 368 of the Constitution necessary for the
> purpose, in addition to or in the alternative ?"

This Court gave the following answers :

> "*Question* 1.  Yes.
>
> *Question* 2.  (*a*) A law of Parliament relatable to Article 3 of the
> Constitution would be incompetent ;
>
> (*b*) A law of Parliament relatable to Article 368 of the Constitution
> is competent and necessary ;
>
> (*c*) A law of Parliament relatable to both Article 368 and Article 3
> would be necessary only if Parliament chooses first to pass a law amend-
> ing Article 3 as indicated above ; in that case, Parliament may have to pass
> a law on those lines under Article 368 and then follow it up with a law
> relatable to the amended Article 3 to implement the agreement.
>
> *Question* 3.  Same as answers (*a*), (*b*) and (*c*) to *Question* 2."

The contention on behalf of the Union was that the Indo-Pakistan Agreement
regarding Berubari Union only ascertained and delineated the exact boundary
and did not involve alteration of territorial limits of India or alienation or
cession of Indian territory.  The exchange of enclaves was also described as
a part of the general and broader agreement about Berubari Union and
incidental to it.  According to the Union Government the Indo-Pakistan
Agreement could be implemented by executive action alone without Parlia-
mentary legislation whether with or without a constitutional amend-
ment.  Reliance was placed on the observations of Mukherjee, C. J., in *Rai
Sahib Ram Jawaya Kapur* v. *The State of Punjab*,[10] where dealing with the limits

10.  (1955) SCJ 504 : (1955) 2 MLJ  SC 59 : (1955) 2 SCR 225.

SCC Online Web Edition, Copyright © 2021
Page 20        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases



-------------------------------------------------------------------------------------------------------------------

within which the Executive Government can function, the learned Chief Justice said :

> "That the executive function comprised both the determination of the policy as well as the carrying it into execution. This evidently includes the initiation of legislation, maintenance of order, the promotion of social and economic welfare, the direction of foreign policy, in fact the carrying on or supervision of the general administration of the State."

**41.** The Court posed the question whether the Indo-Pakistan Agreement had purported to settle a boundary dispute or to divide the disputed territory half and half. The Court found the latter as there was no attempt in the said Agreement to read or interpret the Awards previously given in that dispute. This Court rejected the contention that it was a pure ascertainment of boundary between the two countries. On the other hand, the Indo-Pakistan Agreement ceded territory of India to Pakistan. This conclusion was reached in respect of the Berubari Union as well as the enclaves. Since the Berubari Union was treated after the two Awards as part of India its cession would have altered the content of Entry 13 of the First Schedule to the Constitution and an amendment was held necessary. Once the argument that this was a case of marking a boundary on the surface of the earth was rejected this Court considered the steps necessary to make cession of Indian territory. As a result the 9th Amendment to the Constitution was enacted from 28th December, 1960.

**42.** The matter came again in another form before this Court in *Ramkishore Sen and Others* v. *Union of India*,[11] which is known popularly as the *Berubari II case* (supra). It was a writ petition filed in the Calcutta High Court and the appeal was brought to this Court. It was filed by six residents of the District of Jalpaiguri. The complaint was that the village of Chilhati (among others) was being transferred to Pakistan as a result of the agreement between India and Pakistan and the action was illegal. The main point argued in the petition was that Chilhati was not covered either by the Indo-Pakistan Agreement or the 9th Amendment. According to those petitioners it was not competent to transfer Chilhati without first amending the Constitution. The case before the High Court and in this Court was that a part of Chilhati village situated in Debiganj Police Station was a part of Chilhati in Jalpaiguri District. This Court observed :

> "There is no doubt that if a small portion of land admeasuring about 512 acres which is being transferred to Pakistan is a part of Chilhati situated within the jurisdiction of Debiganj Thana, there can be no valid objection to the proposed transfer. It is common ground that the village of Chilhati in the Debiganj Thana has been allotted to Pakistan ; and it appears that through inadvertence, a part of it was not delivered to Pakistan on the occasion of the partition which followed the Radcliffe Award. It is not surprising that in dividing territories under the Radcliffe Award, such a mistake should have occurred ; but it is plain that what the respondents now propose to do is to transfer to Pakistan the area in question which really belongs to her."

It was then contended that even though that part ought to have been originally transferred to Pakistan under the Radcliffe Award, it having become part of India could not be ceded without the procedure laid down in *Berubari I case* (supra)

11. (1966) 1 SCR 430.



SCC Online Web Edition, Copyright © 2021
Page 21       Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-------------------------------------------------------------------------------------------------------------

420                           SUPREME COURT CASES                           [1970

As this portion was being administered as part of West Bengal under Entry 13 in the First Schedule it was part of the territory which immediately before the commencement of the Constitution was West Bengal. This Court observed :

> "It is true that since this part of Chilhati was not transferred to Pakistan at the proper time, it has been regarded as part of West Bengal and administered as such. But the question is : does this fact satisfy the requirement of Entry 13 on which the argument is based ? In other words, what is the meaning of the clause 'the territories which were being administered as if they formed part of that Province'. ; what do the words 'as if' indicate in the context?''

Explaining the phrase 'as if they formed part of that Province' this Court looked into the history of this Province. Clauses (a) and (b) of Section 290-A of the Government of India Act, 1935, may be reproduced :

> "Administration of certain Acceding States as a Chief Commissioner's Province or as part of a Governor's or Chief Commissioner's Province—(1) Where full exclusive authority, jurisdiction and powers for and in relation to governance of any Indian State or any group of such States are for the time being exercisable by the Dominion Government, the Governor-General may by order direct—

> > (a) that the State or the group of States shall be administered in all respects as if the State or the group of States were a Chief Commissioner's Province ; or

> > (b) that the State or the group of States shall be administered in all respects as if the State or the group of States formed part of a Governor's or a Chief Commissioner's Province specified in the Order."

The Court concluded thus :

> "In view of this constitutional background, the words 'as if' have a special significance. They refer to territories which originally did not belong to West Bengal but which became a part of West Bengal by reason of merger agreements. Therefore, it would be impossible to hold that a portion of Chilhati is a territory which was administered as if it was a part of West Bengal. Chilhati may have been administered as a part of West Bengal ; but the said administration cannot attract the provisions of Entry 13 in the First Schedule, because it was not administered as if it was a part of West Bengal within the meaning of that entry. The physical fact of administering the said area was not referable to any merger at all ; it was referable to the accidental circumstance that the said area had not been transferred to Pakistan as it should have been. In other words, the clause 'as if' is not intended to take in cases of territories which are administered with the full knowledge that they do not belong to West Bengal and had to be transferred in due course to Pakistan. The said clause is clearly and specifically intended to refer to territories which merged with the adjoining States at the crucial time, and so, it cannot include a part of Chilhati that was administered by West Bengal under the circumstance to which we have just referred. That is why we think Mr. Mukerjee is not right in contending that by reason of the fact that about 512 acres of Chilhati were not transferred to Pakistan and continued to be administered by the West Bengal Government, that area became a part of

SCC Online Web Edition, Copyright © 2021
Page 22        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases



-------------------------------------------------------------------------------------------------------------------------------

(3)s.c.c.]   MAGANBHAI ISHWARBHAI v. UNION OF INDIA *(Hidayatullah, C. J.)*   421

West Bengal within the meaning of Entry 13, Schedule I. The West Bengal Government knew all the time that it was an area which belonged to Pakistan and which had to be transferred to it. That is, in fact, what the respondents are seeking to do; and so, it would be idle to contend that by virtue of the accidental fact that this area was administered by West Bengal, it has constitutionally and validly become a part of West Bengal itself. That being so, there can be no question about the constitutional validity of the proposed transfer of this area to Pakistan. What the respondents are seeking to do is to give to Pakistan what belongs under the Radcliffe Award.''

**43.** These two cases did not really decide the point we are called upon to decide. The *First Berubari case* (supra) dealt with transfer of territory which was de facto and de jure Indian territory and therefore as the extent of Indian territories as defined in Article 1 read with the First Schedule was reduced a constitutional amendment was held necessary. The second case concerned territory which was de facto under the administration by India but being de jure that of Pakistan, transfer of that territory which was not a part of Indian territory was held not to require a constitutional amendment. Neither case dealt with a boundary dispute although in the first case the case from Australia was distinguished on the ground that that case concerned the demarcation of boundaries pure and simple. However it was not said that for adjustment of boundaries a constitutional amendment was not required. Neither case adverted to the practice of nations particulary Britain, nor attempted to interpret the relation of Articles 1, 253 and 73 of the Constitution read with Items 14 and 15 of List I of Schedule VII. The only thing that can be said is that this Court leaned in favour of a constitutional amendment in all cases where admitted territory of India was being ceded but not where the cession was of territory of a foreign power but de facto in possession of India. On which side must a border dispute fall is the question for our decision. The petitioners claim that this will fall in the dictum of the *First Berubari case* (supra). The Union Government claims that it is analogous to the case of Chilhati in the *Second Berubari case* (supra).

**44.** The question is one of authority. Who in the State can be said to possess plenum dominium depends upon the Constitution and the nature of the adjustment. As to *the necessity* of it, the Courts must assume it as a matter of law. It is scarcely to be thought that the validity of the action can ever depend upon the judgment of a court. Therefore all argument that the action of Government to go to arbitration was not proper must cease. Unlike the United States of America where the Constitution is defined in express terms, we in our country can only go by inferences from our Constitution, the circumstances and the precedents. The precedents of this Court are clear only on one point, namely, that no cession of Indian territory can take place without a constitutional amendment. Must a boundary dispute and its settlement by an arbitral tribunal be put on the same footing? An agreement to refer the dispute regarding boundary involves the ascertainment and representation on the surface of the earth a boundary line dividing two neighbouring countries and the very fact of referring such a dispute implies that the Executive may do such acts as are necessary for permanently fixing the boundary. A settlement of a boundary dispute cannot, therefore, be held to be a cession of territory. It contemplates a line of demarcation on the surface of the earth. It only seeks to reproduce a line, a statutable boundary, and it is so fixed. The

SCC Online Web Edition, Copyright © 2021
Page 23       Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-------------------------------------------------------------------------------------------------------------------------



422                        SUPREME COURT CASES                    [1970

case is one in which each contending State ex facie is uncertain of its own rights and therefore consents to the appointment of an arbitral machinery. Such a case is plainly distinguishable from a case of cession of territory known to be home territory. The argument that if power to settle boundaries be conceded to the Executive, it might cede some vital part of India is to take an extreme view of things. The same may even be said of Parliament itself but it is hardly to be imagined that such gross abuse of power is ever likely. Ordinarily a boundary which International Law regards as valid between two nations, should be recognised by the Courts and the implementation thereof can always be with the Executive unless a clear case of cession is involved when Parliamentary inter-cession can be expected and should be had. This has been the custom of nations whose Constitutions are not sufficiently elaborate on this subject.

**45.** The argument on behalf of the petitioners is intended to prove that the areas of Kanjarkot, Dharabanni and Chhadbet and two inlets on either side of Nagar Parkar are Indian territory. From this it follows that a constitutional amendment as was laid down in the *First Berubari case* (supra) is a condition precedent for the implementation of the Award. The argument, therefore, follows closely the reasoning in that case. It is contended that Article 1 read with the First Schedule to the Constitution made Kutch into Part C State and under the Second Paragraph of Part C itself its territory comprised all territories which by virtue of an order made under Section 290-A of the Government of India Act, 1935, were immediately before the commencement of the Constitution, being administered as if they were a Chief Commissioner's Province of the same name. We have shown that the meaning of the phrase 'as if they were a Chief Commissioner's Province of the same name' must be understood as was laid down in the *Second Berubari case* (supra). Learned Counsel attempted to challenge that decision but we consider ourselves bound by that decision. The petitioners must establish that this area was a part of Kutch.

**46.** The petitioners, therefore, trace the history of Kutch. Kutch is described in the White Paper on Indian States as follows :

"118.    Another important State which was taken over under Central administration was Kutch. This State has an area of 17,249 sq. miles of which 8,461 miles is inhabited by a population of a little over half a million. The remaining area is occupied by what is known as the Rann of Kutch which is covered by water during most part of the year. In view of the geographical situation of the State and the potentialities of this area, the development of which will require a considerable amount of money as well as technical assistance, which neither the State by itself nor the State of Saurashtra with which it was possible to integrate this State could provide, it was decided that the best solution for this State would be to treat it as a centrally administered unit. An agreement (Appendix XXIX) was accordingly signed by the Ruler on 4th May, 1948 and the administration was taken over by a Chief Commissioner on behalf of the Dominion Government on 1st June, 1949."

This only gives the area but not the boundaries. The Kutch Merger Agreement is like any other merger agreement and was executed by the Maharao of Kutch on 4th May, 1948. It gives no clue to the boundaries and also leaves the matter at large. Immediately after Kutch was taken over by Chief Commissioner on 1st June, 1949. On 29th July, 1949, the States Merger (Chief Commissioners' Provinces) Order, 1949, was passed. It provided inter alia :



SCC Online Web Edition, Copyright © 2021
Page 24        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------------------------

"2. (1)(c) The parts of States specified in the Second Schedule to this Order shall be administered in all respects as if they were a Chief Commissioner's Province, and shall be known as the Chief Commissioner's Province of Kutch."

The parts of States comprising Kutch were given as follows :

"(*i*) The State of Kutch, excluding the area known as Kutchigarh situate in Okhamandal.

(*ii*) The part of the United State of Saurashtra which is comprised in the Adhoi Mahal of Morvi, consisting of the seven villages Adhoi, Dharna, Gamdan, Halara, Lakhpat, Rampur and Vasatava."

Here again the boundaries are not mentioned.

**47.** All that we know of Kutch from these documents is that it had an area of 17,249 sq. miles of which 8,788 sq. miles were inhabited. Obviously this is most inconclusive from our point of view since the White Paper is completely silent about boundaries.

**48.** The later history of Kutch is also not helpful. On 1st November, 1956, Kutch became a part of Bombay State. The States Reorganisation Act referred to 'the existing State of Kutch' which did not advance matters any nearer certainty than before. On 'st May, 1960, the Bombay Reorganisation Act made the area known as Kutch a part of the State of Gujarat State. Therefore none of these documents is of any help in determining boundaries or that the disputed areas were definitely a part of India.

**49.** There is also no evidence of administration in Dhara Banni and Chhadbet. No revenue administration, establishment of Courts, Offices, schools, etc., is proved. The Chairman found some evidence of administrative control of Sind which contradicted the Indian case. The evidence of leases was held to be contradicted by other evidence. The 1957 elections show that a polling station was located at Chhadbet but the voters were the personnel of the Watch and Ward force. Indeed the Census of India (1961) shows the same 171 persons who belonged to the Watch and Ward personnel. Kanjarkot had almost no evidence in its favour and Mr. Madhu Limaye frankly admitted this fact. The other petitioners gave no evidence about it.

**50.** No doubt, Pandit Jawaharlal Nehru on 3rd March, 1956, and Shri Lal Bahadur Shastri on 11th May, 1965, asserted that the area belonged to India but that was only a statement and cannot be held to be of an evidentiary character. We were bound to make such a statement if we were at all to lay claim to it. After all the other side was making a similar claim and even a short skirmish also took place. This cannot be treated as definite evidence.

**51.** In support of the case the petitioners took us still further back into history. The definition of boundaries of Sind in 1935 by the Surveyor-General was in general terms. It did not show whether Kanjarkot, Dhara Banni and Chhadbet were excluded from Sind altogether. The Index Map prepared at the time was not annexed to the Order in Council. This Index Map was relied upon by Ambassador Ales Bebler who gave opinion for us but was not accepted by the Chairman and Ambassador Nasrollah Entezam. This was probably because the Mosaic Map which is Map A on which India rested the claim did not show a continuous boundary along the entire length.



SCC Online Web Edition, Copyright © 2021
Page 25          Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-----------------------------------------------------------------------------------------------------------------------------

The statistical abstracts of India and Pakistan which were sought to supplement the Map before us only give areas and not boundaries and are, therefore, inconclusive.

**52.** The claim of Kutch State in 1914 when it attempted to enlarge the Rann of Kutch at the cost of Sind was not successful. A compromise was the foundation of 'a friendly understanding' and not the settlement of a boundary. The Macdonald line that was then determined represents the uncontested portion of the boundary. It was then attempted to get a confirmation of the Kutch-Sind boundary but no boundary was settled. It appears that the Rann itself was treated as excluded from Kutch. Indeed the Government of Bombay continued to so regard it.

**53.** The fight before the Tribunal, therefore, became a cartographic tussle. Over 350 maps were exhibited by the parties and many of these maps conflicted. Maps have been used in such cases but the source of information on which the map is based is always doubtful and maps are contradictory. One cannot go by one set only. In this view of the matter our reliance on Maps B-32, 34, 35, 36, and 37 became ineffective. The disputed area was about 3,500 sq. miles. Out of this about 350 sq. miles were included in Pakistan.

**54.** We are not sitting in appeal over the Award of the Tribunal. Our interpretation of the maps and facts of history is really not called for. All that we can determine is whether there is concrete and solid evidence to establish that these areas belonged to India. If we could reach this conclusion there may be something to be said applying the *First Berubari case* (supra). Otherwise we must hold that there was a disputed boundary and this was the occasion for marking out the final boundary on the surface of the earth. In our opinion this is what was done. We cannot go entirely by that India pressed before the Tribunal. That is only one part of the matter. The conditions existing prior to the Award were :

    (*a*) that there was a break of hostilities ;

    (*b*) that then there was a cease-fire because the dispute was to be decided by arbitration ;

    (*c*) that both sides put forward their claims ;

    (*d*) that there was no clear evidence of demarcation of a boundary acceptable to the parties now or in the past ;

    (*e*) that the claim Map of India did not show a continuous boundary along all the border ;

    (*f*) that the area is in different State at different seasons in the year, for part of the year it is water and for the remaining part it is land. While it is the former it may be regarded as a part of the Rann and while it is land it may well be regarded as a part of Sind.

**55.** Viewed from this angle the contention in this case comes to this ; Does India Cede undisputed Indian territory or is it the settlement of a disputed boundary ? With regard to Kanjarkot which is to the south of Rahim ka Bazar no case was made out at all except assertions that it is Indian territory in which at least Mr. Madhu Limaye (who argued the case very fully and with considerable ability) did not join. With regard to Dhara Banni and Chhadbet

SCC Online Web Edition, Copyright © 2021
Page 26        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases



-------------------------------------------------------------------------------------------------------------------

it is clear that Map A (the claim map of India) does not show the border from Manjeet where the boundary determined by the Tribunal leaves the mainland to a point just west of the point where the boundary determined by the Tribunal again joins the mainland. To the south of this missing boundary lie Dhara Banni and Chhadbet. It is, therefore, clear that at least in this part, India was not certain of the boundary. No doubt some other maps show a continuous boundary even there, but other maps negative it. In other words the exact location of the boundary was an open question. Dhara Banni and Chhadbet are contiguous with the mainland in some seasons although they are inundated at other times and become indistinguishable from the Rann. In these circumstances the location of the boundary at the southern fringe of Dhara Banni and Chhadbet was no more than fixing a true boundary, according to the Tribunal. It was well within the terms of reference and the decision being a true marking out of a disputed boundary does not amount to cession of these three areas so as to attract a constitutional amendment.

**56.** As regards the two inlets, their area is said to be less than 25 square miles. They are extremely narrow at their southern extremities and really represent deep indentations in land. At the narrow points roads run across them and they are Pakistan's roads. Treating the inlets as inland waters, the Tribunal determined the boundary in such a way as to give them to Pakistan. The reasons given by the Tribunal have been reproduced above by us. We cannot say that this will mean a cession of Indian territory. There was a genuine dispute regarding the title to these inlets whatever India may have thought about them. The decision of the Tribunal is a decision on a disputed boundary and does not attract a constitutional amendment.

**57.** The only evidence was this area (which is otherwise uninhabited) was in parts occupied by an Indian security force. The existence of these Watch and Ward Officers or the establishment of a polling booth for them at election time cannot connote administration such as would make them territory of India. The Diplomatic Notes began soon after the establishment of the two Dominions and the occupation may have meant de facto control but there was no proof of de jure occupation or any other administration.

**58.** Sovereignty over an area is always a matter of inference. As Judge Huber puts it in the *Island of Palma's case* :

> "Manifestations of territorial sovereignty assume, it is true, different forms, according to time and space. Although continuous in principle, sovereignty cannot be exercised in fact at every moment on every point of a territory. The intermittance and discontinuity compatible with the maintenance of the right necessarily differ according as inhabited or uninhabited regions are involved ..." (Award, dated 4th April, 1928, 2 Int. Arb. Awards 867).

**59** Garrisoning of an area (a point noted in the International Court of Justice in 1953 in the *Minquiers and Ecrchos case*. (ICJ Reports, page 78) may be one kind of evidence. But this applied to both sides. Unless they displayed real existence of sovereignty over the area, none could be said to be in occupation de jure. Hence the propounding of so many maps and documents. If we were sitting in appeal on the award of the Tribunal we might have formed a different opinion of the material but we are not. The fact remains that India undertook to be bound by the award, pledging the national honour and we must implement the award. The only question is as to the steps to be taken.

**60.** On the whole, therefore, we are of opinion that this reference began in a boundary dispute after open hostilities and was decided as such. In which

SCC Online Web Edition, Copyright © 2021
Page 27        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases



-----------------------------------------------------------------------------------------------------------------

426                          SUPREME COURT CASES                          [1970

case it cannot be said that there will be a cession of Indian territory and the rule earlier laid down by us applies. If no constitutional amendment is required the power of the Executive, which extends to matters with respect to which Parliament has power to make laws, can be exercised to correct boundaries now that they have been settled. The decision to implement the Award by exchange of letters, treating the Award as an operative treaty after the boundary has been marked in this area, is within the competence of the Executive wing of Government and no constitutional amendment is necessary.

**61.** The petitions and the appeals fail and will be dismissed but there will be no order about costs.

The concurring Judgment was delivered by

   SHAH, J.—I agree with the learned Chief Justice.

**63.** The controversy raised in this group of writ petitions and appeals lies within a narrow compass ; whether the award, dated 19th February, 1968, of the Indo-Pakistan Western Boundary Case Tribunal may be implemented by a constitutional amendment and not otherwise. The claimants—I use that expression to refer compendiously to the appellants and the petitioners—urge that the award may be implemented only by an amendment modifying the relevant provisions in Schedule I to the Constitution, because in giving effect to the award of the Tribunal, cession of Indian territory is involved and the Executive is incompetent to cede Indian territory without the authority of a constitutional amendment. The Union of India contends that the Award merely fixes or demarcates the boundary between the State of Gujarat in India and West Pakistan regarding which there were disputes and much friction, and by the Award no cession of Indian territory is contemplated, and for implementing it amendment of the Constitution is not needed.

**64.** The Great Rann of Kutch lies between the mainland of Sind (which is now part of Pakistan) and the mainland of Kutch— a district of the State of Gujarat. It has a peculiar surface : it is marshy land : for about four months in the year large parts of the Rann are covered with the waters of the Arabian Sea rushing through the Khori Creek. It is however not fit for navigation. During the rest of the year it is muddy or dry land, but not dry enough for farming. From the very nature of the terrain, the boundaries of the Rann are shifting its extent depending upon the violence of the natural elements in different years. The northern boundary of the Rann has, on account of its inhospitable terrain and nomadic population on the fringe with no prospect of cultivation, remained ill-defined. Between 1816 and 1819 the Indian State of Kutch passed under the domination of the East India Company and the integrity of its territory was guaranteed by the East India Company by the treaty of 1819. In 1843 Sir Charles Napier annexed the territory of Sind, and made it into a Governor's Province, which was later turned into a Division of the Province of Bombay. Kutch continued to be ruled by the Maharao, the British authorities having posted a Political Agent at the capital of the State.

**65.** In 1855 the Department of Survey of India commenced a revenue and topographical survey of the Province of Sind. The survey, called the Macdonald Survey, was completed in 1870, and survey maps were prepared and published in 1876. It is not clear whether the southern boundaries of the Sind villages shown in the maps were village boundaries, or a boundary conterminous between the territory of Sind and Kutch State.

**66.** The next survey was undertaken under Major Pullan in 1879 and was completed in 1886. Under this project survey of the State of Kutch was

SCC Online Web Edition, Copyright © 2021
Page 28    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-----------------------------------------------------------------------------------------------------------------



(3)s.c.c.]    MAGANBHAI ISHWARBHAI *v.* UNION OF INDIA (*Shah, J.*)    427

undertaken. The northern boundary of Kutch State roughly tallied with the Macdonald alignment of the Sind boundary. The relevant maps were published in 1882.

**67.** Another survey of a part of the boundary on the Sind side was undertaken in 1904-05 by C. F. Erskine. The alignment of the boundary with a few corrections tallied with the Macdonald alignment. This survey was intended to be a checking survey and related to the western region extending up to a point near Rahim ki Bazar.

**68.** About the year 1907-08 the Commissioner of Sind raised certain disputes relating to encroachments on the territory under his administration by the Maharao of Kutch. The Government of India made an enquiry and a resolution, dated 24th February, 1914, was issued by the Government of the Province of Bombay of which Sind was then a Division. By the resolution the disputed area was divided by a new alignment which was partly identical with the claim made by the Kutch State along the Sir Creek from its mouth to its extremity and then slightly departed from it. In the other regions the alignment of the Macdonald Survey was adhered to. To the resolution was annexed a map on which the rectified boundary was shown. A Secretary in the Foreign Department of the Government of India recorded that ''the Government of India observe with satisfaction that the dispute between the Sind authorities and the Kutch Durbar has been settled by a compromise agreeable to both parties and are pleased to accord their sanction to the rectification of the boundary line proposed in paras 9 and 10''. To the letter of the Secretary to the Government of Bombay, Political Department, consent to the rectification of the boundary was evidenced by a letter of the Maharao under his own signature. Pursuant to this resolution in 1924, pillars were fixed up to a point known as the Badin-Jati-Rann tri-junction.

**69.** In 1935 the new Province of Sind was constituted. By the Government of India (Constitution of Sind) Order, 1936, it simply provided therein that—''In the Act and this Order, Sind means the territory known at the date of this Order as the Division of Sind, and the boundaries of that Division shall be the boundaries of Sind''.

**70.** It was originally intended to set out by a Schedule to the Order the boundary of Sind, and an Index Map was prepared by the Surveyor-General for that purpose. By a communication from the Secretary of State for India in Council, it was recommended that a Schedule to the Order defining the boundary was not necessary and the Governor-General accepted that suggestion.

**71.** The fourth survey—called the Ormaston Survey—was commenced in 1938-39 : it was intended to be a survey of the eastern part of the Tharparkar District. This survey adopted the alignment of the Macdonald Survey in that region showing a conterminous boundary between Sind and the State of Western India (now within the State of Gujarat).

**72.** With the enactment of Indian Independence Act, 1947 (X and XI Geo. VI, c. 30), the paramountcy of the British power lapsed, and two independent Dominions of India and Pakistan were carved out with effect from the appointed day. By Section 2(2) of the Act the territories of Pakistan were to be—

    ''(a)    *    *    *    *    *    *

    (b) the territories which, at the date of the passing of this Act, are included in the Province of Sind * * * and

SCC Online Web Edition, Copyright © 2021
Page 29        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases



-----------------------------------------------------------------------------------------------------

428                    SUPREME COURT CASES                    [1970

     (*c*)     *      *      *      *      *      * "

On 4th May, 1948, the State of Kutch merged with the Dominion of India and by Article 1 of the Agreement of Merger the Maharao ceded to the Dominion of India full and exclusive authority over the governance of the State.   On 1st June, 1949, the administration was taken over by the Government of India, and the territory was constituted into a Chief Commissioner's Province under Section 2(1)(c) of the States Merger (Chief Commissioner's Province) Order, 1949. Under the Constitution the territory became a Part 'C' State.   Its extent was determined by the 2nd paragraph in Part C to Schedule I of the Constitution as "territories which by virtue of the order made under Section 290-A of the Government of India Act, 1935, were immediately before the commencement of the Constitution being administered, as if they were a Chief Commissioner's Province of the same name".   By Section 8(1)(*e*) of the States Reorganisation Act, 1956, the territory of the Part C State of Kutch was incorporated with the State of Bombay, and by Section 3(*a*) of the Bombay Reorganisation Act, 1960, it was included in the newly formed State of Gujarat.

**73.**   From July 1948 and onwards diplomatic notes were exchanged between the Governments of India and Pakistan concerning the boundary between the two countries in the Gujarat West Pakistan Sector.   The dispute led to great tension between India and Pakistan resulting in armed conflict in April, 1965.   By an agreement dated 30th June, 1965, the Government of India and the Government of Pakistan concluded an agreement for setting up machinery "for determination and demarcation of the border" in the area of Gujarat-West Pakistan.   The agreement in so far as it is relevant provides :

    *Article* 1—"There shall be an immediate cease-fire with effect from 00·30 hours GMT on 1st July, 1965.

    *Article* 2—*      *      *      *      *      *

    *Article* 3—(*i*) In view of the fact that :

        (*a*) India claims that there is no territorial dispute as there is a well-established boundary running roughly along the northern edge of the Rann of Kutch as shown in the pre-partition maps, which needs to be demarcated on the ground.

        (*b*) Pakistan claims that the border between India and Pakistan in the Rann of Kutch runs roughly along the 24th parallel as is clear from several pre-partition and post-partition documents and therefore the dispute involves some 3,500 square miles of territory.

    (*c*)  *      *      *      *      *      *

    (*ii*) In the event of no agreement between the Ministers of the two Governments on the determination of the border being reached within two months of the cease-fire. the two Governments shall, as contemplated in the Joint Communique of 24th October, 1959, have recourse to the Tribunal referred to in (*iii*) below for determination of the border in the light of their respective claims and evidence produced before it and the decision of the Tribunal shall be final and binding on both the parties.

    (*iii*) For this purpose there shall be constituted, within four months of the cease-fire, a Tribunal consisting of three persons, none of whom

SCC Online Web Edition, Copyright © 2021
Page 30        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases



-------------------------------------------------------------------------------------------------------------------------

(3)S.C.C.]        MAGANBHAI ISHWARBHAI *v.* UNION OF INDIA (*S̄.2h, J.*)        429

would be a national of either India or Pakistan. One member shall be nominated by each Government and the third member, who will be the Chairman, shall be jointly selected by the two Governments. In the event of the two Governments failing to agree on the selection of the Chairman within three months of the cease-fire, they shall request the Secretary-General of the United Nations to nominate the Chairman.

   (*iv*) The decision of the Tribunal referred to in (*iii*) above shall be binding on both Governments, and shall not be questioned on any ground whatsoever. Both Governments undertake to implement the findings of the Tribunal in full as quickly as possible and shall refer to the Tribunal for decision any difficulties which may arise between them in the implementation of these findings. For that purpose the Tribunal shall remain in being until its findings have been implemented in full.''

The Ministerial Conference contemplated to be held did not take place, and the two Governments decided to have recourse to the Tribunal to be constituted under Article 3(*iii*) of the agreement. A Tribunal of three members, one appointed by each State and the Chairman nominated by the Secretary-General of the United Nations Organization was set up. The agreement between the two States was reached purely as an executive act, and no legislative sanction was obtained by the Government of the Union of India to its implementation.

   **74.** The respective claims before the Tribunal by India and Pakistan are set out in paragraph 3(1) of the agreement and at pages 7, 8 and 9 of the introductory part of the award which apparently had the concurrence of all the members of the Tribunal. On behalf of the Government of India it was submitted that the boundary lay as detailed in Map 'A' annexed to the award which is a mosaic of Indian Maps B-44, B-37, B-19 and B-79. It was common ground between the two Governments that "the Gujarat-West Pakistan boundary stretches from the mouth of the Sir Creek in the west to a point on the Jodhpur boundary in the east. The parties agree that the Western Terminus of the boundary to be determined by the Tribunal is the point at which the blue dotted line meets the purple line as depicted in Indian Map B-44 and the Pakistan Resolution Map, and that the Eastern Terminus of the same boundary is a point situated 825.8 metres below pillar 920 or the Jodhpur boundary as depicted in Pakistan Map 137. This agreement leaves out of the matters submitted to the Tribunal the portion of the boundary along the blue dotted line, as depicted in Indian Map B-44 and the Pakistan Resolution Map, as well as the boundary on the Sir Creek. The blue dotted line is agreed by both parties to form the boundary between India and Pakistan. In view of the aforesaid agreement the question concerning the Sir Creek part of the boundary is left out of consideration.

   **75.** It was also common ground that "before Independence the boundaries between the Province of Sind, on the one hand, and one or more of the Indian States which lay on the opposite side of the Great Rann, on the other hand, were conterminous. Therefore, in the disputed region, apart from India and Pakistan, there is no other State that does or could have sovereignty. There is between India and Pakistan a conterminous boundary today, whether or not there was at all times a conterminous boundary between Sind and the Indian States''.

The contention raised by Pakistan was :

   ''(*a*) That during and also before the British period, Sind extended to the south into the Great Rann up to its middle and at all relevant times

SCC Online Web Edition, Copyright © 2021
Page 31        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source:  Supreme Court Cases



-------------------------------------------------------------------------------------------------------------------

exercised effective and exclusive control over the northern half of the Great Rann;

(*b*) that the Rann is a 'marine feature' (used for want of a standard term to cover the different aspects of Rann). It is a separating entity lying between the States abutting upon it. It is governed by the principles of the median line and of equitable distribution, the belts in the Rann being governed by the principle of the "nearness of shores";

(*c*) that the whole width of the Rann (without being a condominium formed a broad belt of boundary between territories on opposite sides; that the question of reducing this wide boundary to a widthless line, though raised, has never been decided; that such widthless line would run through the middle of the Rann and that the Tribunal should determine the said line."

Pakistan accordingly claimed that the border of Sind extended up to the boundary shown by the thick green dotted line in Map 'B'.

It was agreed by both the Governments that "should the Tribunal find that the evidence establishes that the disputed boundary between India and Pakistan lies along a line different from the claim lines of either party, the Tribunal is free to declare such a line to be the boundary.

The award to be made by the Tribunal was, it was agreed, to operate as a self, executing arrangement; it was not only to declare the boundary, but to provide for fixing its location on site. It was agreed between the Agents of India and Pakistan that—

"1.   The basis of demarcation shall be the alignment of the boundary as delineated by the Tribunal on maps to be annexed to the Award. Each Government should be supplied with two sets of these maps duly authenticated by the Tribunal.

2.      *          *          *          *          *          *

3.   The Representatives of the two Governments shall meet at Delhi not later than two weeks after the Award is rendered to discuss and decide upon the following matters :

(*i*) The strength of the team. (It is not possible to give the exact number of personnel composing the team at this stage as the strength of the team will depend upon the alignment of the boundary and the quantum of work involved which can be ascertained only after the Award is rendered).

(*ii*) The design and specifications of the boundary pillars and traverse pillars, the number and spacing of pillars. (The design and specifications of the boundary pillars will depend upon the alignment of the boundary and the nature of the terrain. The pillars may be of cement concrete, stone or masonry according to the requirements of the terrain).

(*iii*) Detailed operational instructions for the guidance of the field staff. (Such operational instructions have to be necessarily finalised only after the nature of the alignment is known).

(*iv*) Any other matter which requires consideration for effective demarcation work.

SCC Online Web Edition, Copyright © 2021
Page 32        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases



-------------------------------------------------------------------------------------------------------------------------------

4.   If the Representatives of the two Governments do not agree upon any of the above matters either Government shall immediately report to the Tribunal the matters in difference for the decision of the Tribunal.

5.        *        *        *        *        *        *

6.   The first task of the demarcation team shall be to ascertain if any control points exist and are available.   These control points should be supplemented, wherever necessary, in order to determine the pillar positions on the ground in accordance with the alignment of the boundary. If control points do not exist or are not available, a fresh series of triangulation or traverse will be carried out and control points determined and the pillar positions located with the help of the points.

7.   Simultaneously with the location of the pillar positions, pillars shall be emplaced at each position.        ×        ×        ×''

**76.**   The award was published by the Tribunal on 19th February, 1968. By the decision of the Chairman of the Tribunal (Judge Gunnar Lagergren) with whom Ambassador Nasrollah Entezam agreed and Ambassador Ales Babler disagreed in part, the boundary was aligned from point W. T. to E. T. in Map 'C'.   It is unnecessary to set out the detailed description of the boundary.   The claim of the Government of India to the Rann was accepted.   The claim of the Government of Pakistan to approximately 3,500 square miles out of the Great Rann was rejected except as to 350 square miles, of which more than 325 square miles are found beyond the Rann or on which the Maharao had not exercised sovereign authority.   The Tribunal unanimously accepted the claim that the Great Rann of Kutch was part of the territory of the State of Kutch and is now Indian territory. But the majority of the Tribunal accepted the claim of Pakistan, substantially to the following three sectors :

(1) Marginal area south of Rahim ki Bazar, marked by B, C, D in Map 'C' ; this may be called the Kanjarkot Sector ;

(2) The area marked in the Map 'C' by letters E, F, G, H, K which may be called Dhara Banni and Chhad Bet Sector ;

(3) Two inlets which practically encircle Nagar Parkar which have apparently characteristic features of the Rann but are still declared to be within the border of Pakistan by drawing straight lines from points L to M and N to O in Map 'C'.

The reasons for declaring the first two sectors as Pakistan territory are set out (at Page 152 of the printed award) by the Chairman Judge Gunnar Lagergren as follows :

''Reviewing and appraising the combined strength of the evidence relied upon by each side as proof or indication of the extent of its respective sovereignty in the region, and comparing the relative weight of such evidence, I conclude as follows.   In respect of those sectors of the Rann in relation to which no specific evidence in the way of display of Sind authority, or merely trivial or isolated evidence of such a character, supports Pakistan's claim, I pronounce in favour of India.   These sectors comprise about ninety per cent. of the disputed territory.   However, in respect of sectors where a continuous and for the region intensive Sind activity, meeting with no effective opposition from the Kutch side, is established, I am of the opinion that Pakistan has made out a better and superior title.   This refers to a marginal area south of Rahim ki Bazar,

SCC Online Web Edition, Copyright © 2021
Page 33        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases



--------------------------------------------------------------------------------

432                    SUPREME COURT CASES                    [1970

including Pirol Valo Kun, as well as to Dhara Banni and Chhad Bet, which on most maps appear as an extension of the mainland of Sind.''
About item (3) Judge Gunnar Lagergren was of the view that to prevent friction and conflict the inlets should not be declared Kutch territory.

**77.** The effect of an international treaty on the rights of citizens of the States concerned in the agreement is stated in Oppenheim's International Law, 8th Edn., at page 40 thus :

"Such treaties as affect private rights and, generally, as required for their enforcement by English Courts a modification of common law or of a statute must receive parliamentary assent through an enabling Act of Parliament. To that extent binding treaties which are part of International Law do not form part of the law of the land unless expressly made so by the Legislature.''

And at Page 924 it is stated :

"The binding force of a treaty concerns in principle the contracting States only, and not their subjects. As International Law is primarily a law between States only and exclusively, treaties can normally have effect upon States only. This rule can, as has been pointed out by the Permanent Court of International Justice, be altered by the express or implied terms of the treaty, in which case its provisions become self-executory. Otherwise, if treaties contain provisions with regard to rights and duties of the subjects of the contracting States, their Courts, officials, and the like, these States must take steps as are necessary according to their Municipal Law, to make these provisions binding upon their subjects, Courts, officials, and the like.''

In Wade and Phillips' Constitutional Law, 7th Edn., it is stated at Page 274 :

"At first sight the treaty-making power appears to conflict with the constitutional principle that the Queen by prerogative cannot alter the law of the land, but the provisions of a treaty duly ratified do not by virtue of the treaty alone have the force of Municipal Law. The assent of Parliament must be obtained and the necessary legislation passed before a Court of law can enforce the treaty, should it conflict with the existing law.''

On Page 275 it is stated that "treaties which, for their execution and application in the United Kingdom, require some addition to, or alteration of, the existing law'' are treaties which involve legislation. The statement made by Sir Robert Phillimore, Judge of the Admiralty Court in *The Parliament Belge* (supra)—[though the ultimate decision was revised by the Court of Appeal on another point vide (1880) 5 PD 197] in dealing with the effect of a ''Convention regulating Communication by Post'' signed and ratified in 1876 which purported to confer upon Belgian mail steamers immunity of foreign warships is appropriate :

"If the Crown had power without the authority of Parliament by this treaty to order that the Parlement Belge should be entitled to all the privileges of a ship of war, then the warrant, which is prayed for against her as a wrong-doer on account of the collision, cannot issue, and



SCC Online Web Edition, Copyright © 2021
Page 34        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------------------------------

the right of the subject, but for this order unquestionable, to recover damages for the injuries done to him by her is extinguished.

**78.** This is a use of the treaty-making prerogative of the Crown which I believe to be without precedent, and in principle contrary to the laws of the Constitution.

**79.** In *Walker* v. *Baird*(supra), the Judicial Committee, affirming the decision of the Supreme Court of Newfoundland, observed that the plea of act of State raised in an action for trespass against the Captain of a British fishery vessel who was authorised by the Commissioners of the Admiralty to superintend the execution of an agreement between the British Crown and the Republic of France, which provided that no new Lobster factory shall be established on a certain part of the coast of Newfoundland could not be upheld.

**80.** The Judicial Committee in *Attorney-General for Canada* v. *Attorney-General for Ontario and Others* (supra), made some observations in the context of a rule applicable within the British Empire, which are pertinent :

"It will be essential to keep in mind the distinction between (1) the formation, & (2) the performance, of the obligations constituted by a treaty, using that word as comprising any agreement between two or more sovereign States. Within the British Empire there is a well-established rule that the making of a treaty is an executive act, while the performance of its obligations if they entail alteration of the existing domestic law, requires legislative action. Unlike some other countries, the stipulations of a treaty duly ratified do not within the Empire, by virtue of the treaty alone, have the force of law. If the national Executive, the Government of the day, decide to incur the obligations of a treaty which involve alteration of law they have to run the risk of obtaining the assent of Parliament to the necessary statute or statutes. * * Parliament, no doubt, * * * has a constitutional control over the Executive ; but it cannot be disputed that the creation of the obligations undertaken in treaties and the assent to their form and quality are the function of the Executive alone. Once they are created, while they bind the State as against the other contracting parties, Parliament may refuse to perform them and so leave the State in default."

These observations are valid in the context of our constitutional set up. By Article 73, subject to the provisions of the Constitution, the executive power of the Union extends to the matters with respect to which the Parliament has power to make laws. Our Constitution makes no provision making legislation a condition of the entry into an international treaty in times either of war or peace. The executive power of the Union is vested in the President and is exercisable in accordance with the Constitution. The Executive is qua the State competent to represent the State in all matters international and may by agreement, convention or treaties incur obligations which in international law are binding upon the State. But the obligations arising under the agreement or treaties are not by their own force binding upon Indian nationals. The power to legislate in respect of treaties lies with the Parliament under Entries 10 and 14 of List I of the Seventh Schedule. But making of law under that authority is necessary when the treaty or agreement operates to restrict the rights of citizens or others or modifies the laws of the State. If the rights of the citizens or others which are justiciable are not affected, no legislative measure is needed to give effect to the agreement or treaty.



SCC Online Web Edition, Copyright © 2021
Page 35        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-----------------------------------------------------------------------------------------------------------------

434                    SUPREME COURT CASES                    [1970

**81.** The argument raised at the Bar that power to make treaty or to implement a treaty, agreement or convention with a foreign State can only be exercised under authority of law, proceeds upon a misreading of Article 253. Article 253 occurs in Chapter I of Part XI of the Constitution which deals with legislative relations—Distribution of Legislative Powers. By Article 245 the territorial operation of legislative power of the Parliament and the State Legislatures is delimited, and Article 246 distributes legislative power subject-wise between the Parliament and the State Legislatures. Articles 247, 249 250, 252 and 253 enact some of the exceptions to the rule contained in Article 246. The effect of Article 253 is that if a treaty, agreement or convention with a foreign State deals with a subject within the competence of the State Legislature, the Parliament alone has, notwithstanding Article 246(3), the power to make laws to implement the treaty, agreement or convention or any decision made at any international conference, association or other body. In terms, the Article deals with legislative power : thereby power is conferred upon the Parliament which it may not otherwise possess. But it does not seek to circumscribe the extent of the power conferred by Article 73. If, in consequence of the exercise of executive power, rights of the citizens or others are restricted or infringed, or laws are modified, the exercise of power must be supported by legislation : where there is no such restriction, infringement of the right or modification of the laws, the Executive is competent to exercise the power.

**82.** It may be recalled that clause 3(*iv*) of the Agreement included a covenant that the decision of the Tribunal shall be binding on both the Governments. The power of the Executive to enter into that covenant cannot also be challenged, and was not challenged. It was conceded that if the contention based on Article 253 was not accepted, the award of the Tribunal by majority of two (Judge Gunnar Lagergren with whom Ambassador Nasrollah Entezam agreed) was binding upon the Government of India. It was accepted that as an international agreement between the two States represented by their executive Governments it became binding between the two States as expressly undertaken. No argument was urged that there exist any grounds which may justify the Union of India from declining to implement the agreement. The award of the Tribunal has, it was conceded, to be implemented as an international obligation. Counsel who represented the claimants, and claimants who argued their cases, before us adopted an eminently fair attitude. It was not urged that the award was not binding upon the Union of India ; their plea urged with moderation was that insofar as the award affected the territorial limits of India, it required a constitutional amendment.

**83.** It was not suggested that apart from the claim to exercise rights to move freely throughout the territory of India under Article 19(1)(*d*), and to reside and settle in any part of the territory of India under Article 19(1)(*e*) any other right of any individual citizen was likely to be infringed by the implementation of the award. The nature of the terrain of the disputed territory precludes any other claim being made. There are no local residents, no private property and no agriculture. For four months in the year it is mostly under water, for the rest of the year it is marshy land. But it was claimed that every individual citizen of India is entitled to exercise the privileges under clauses (*d*) and (*e*) of Article 19(1) in respect of territory between the boundary shown in Map 'A' annexed to the award, and the boundary delineated by Map 'C' which represents, in the view of the Tribunal, the border between the two States, is Indian territory and deprivation of the rights of the citizens under Article 19(1)(*d*) and (*e*) can only be achieved if the cession of



Case 1:21-cv-00396-RJL Document 20-9 Filed 08/14/21 Page 37 of 42

SCC Online Web Edition, Copyright © 2021
Page 36          Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

------------------------------------------------------------------------------------------------------

(3)s.c.c.]      MAGANBHAI ISHWARBHAI *v.* UNION OF INDIA (*Shah, J.*)      435

what is now part of the territory of India be ceded under the sanction of a constitutional amendment. Mr. Linaye, petitioner in Writ Petition No. 402 of 1968, claimed that he made an attempt to enter the territory which under the award falls within the Pakistan Border, and was prevented by the security police from entering that area. The only question to be determined therefore is whether in implementing the award, the executive Government is ceding territory of India to Pakistan.

**84.** I have set out the terms of the agreement and the disputes raised by the two States in some detail. A review of the terms of the agreement, the unanimous introductory part of the award and the terms of the agreement relating to the implementation of the award and of the final award, make it abundantly clear that the dispute related to the boundary between the two States ; it was referred as a boundary dispute, the respective claims urged were about the location of the boundary line, and the operative part of the award declared the alignment of the boundary which has under the terms of the agreement relating to the procedure for demarcation to be fixed by pillars on the alignment.

**85.** Settlement of dispute which relates to the alignment of an undefined boundary between two States involves no cession of territory by either State. In the advice rendered to the President in a reference made to this Court under Article 143 in *In re The Berubari Union and Exchange of Enclaves* (supra), this Court was called upon to determine the true nature of the agreement between the Prime Ministers of India and Pakistan—each Prime Minister acting on behalf of his Government—of both September, 1958, for a division of the Berubari Union in the State of West Bengal and exchange of certain enclaves and whether the agreement may be implemented otherwise than by a constitutional amendment. This Court held that the agreement between the two Prime Ministers did not seek to interpret the Radcliffe Award or to determine the boundary between the two States. It was agreed by the two Prime Ministers that a part of the Berubari Union which was allotted to India under that Award and was in occupation of India was to be ceded to Pakistan and enclaves within Pakistan but in occupation of India de jure were to be exchanged for similar enclaves of Pakistan within Indian territory. This Court advised the President that the agreement could be implemented under the authority of a constitutional amendment only. The Parliament then enacted the Constitution (Ninth Amendment) Act, 1960, assuming power to implement the agreement and the two other agreements, dated 23rd October, 1959 and 11th January, 1960. Another matter arising out of those agreements between the two Prime Ministers was brought before this Court by an appeal from an order passed by the High Court of Calcutta in a writ petition : *Ram Kishore Sen and Others* v. *Union of India and Others* (supra). It was proposed pursuant to the Constitution (Ninth Amendment) Act, 1960, to transfer, among other territory, a part of the village of Chilahati in the occupation of the State of West Bengal in India. A petition filed in the High Court of Calcutta challenging the validity of the proposed transfer to Pakistan on the ground that village Chilahati which was part of the Indian territory could not be transferred by the Government of India. The High Court of Calcutta rejected the petition. In appeal to this Court it was urged, inter alia, that the disputed part of the village Chilahati though allotted to Pakistan was not delivered to Pakistan and had become part of the State of West Bengal, because it was being administered as if it formed part of the territory of West Bengal within the meaning of Entry 13, Part A, Schedule I as amended by the Constitution (Amendment of the First and Fourth Schedules) Order, 1950. The Court held that the proposed transfer of a part of

SCC Online Web Edition, Copyright © 2021
Page 37          Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases



-------------------------------------------------------------------------------------------------------------------------

436                    SUPREME COURT CASES                    [1970

the village of Chilahati, which was allotted to Pakistan under the Radcliffe
Award but was not delivered, and continued to remain administered as a part
of the State of West Bengal, was not constitutionally invalid.

**86.** In *In re The Berubari Union and Exchange of Enclaves,* (supra) there was no
question of demarcation of a disputed boundary : it was a case of pure cession
of Indian territory. *Ram Kishore Sen and Others case,* (supra) which dealt, among
others, with the cession of 500 *acres* of Chilahati village related to transfer of
territory which though temporarily under Indian administration had never
become Indian territory. The principle of the *First Berubari case,* (supra) has no
application here and the principle of the *Second Berubari case,* (supra) is against
the contention raised by the claimants.

**87.** But the claimants urge that by the alignment of the boundary under
the award, territory which is Indian is now declared foreign territory, and it
cannot be implemented without the authority of an amendment modifying
the boundary of the State of Gujarat in which is now included the Rann of
Kutch.

**88.** Now the alignment of the boundary under the award deviates from
the alignment claimed by the Government of India before the Tribunal in
three important respects which have already been set out. The Tribunal was
of the view, on a consideration of the maps produced, that there did not
exist at any time relevant to the proceedings a historically recognized and well-
established boundary in the three sectors. About the Kanjarkot Sector the
Chairman observed :

> "The evidence shows that Kutch did not make any appearance in
> this area until 1946, and then only abortive attempts were made by the
> sons of the lessee, Node Sadi Rau, to go there in order to collect Panchari.
> They reported that they did not even dare to stay overnight in the place.
> While no specific evidence has been submitted which proves any activities
> undertaken by Sind subjects in Pirol Valo Kun, the reports of the Kutch
> lessees establish that Sind inhabitants engaged in grazing there."

And further observed at Page 151 :

> "In a sector bounded to the south by the southern limit of Pirol
> Valo Kun, not only is there a total absence of effective Kutch activity,
> but there is a consistent exercise of sovereign rights and duties by Sind
> authorities, and activities of residents of Sind, in one instance, taking the
> form of a permanent settlement at Shakur".

The territory in this sector is contiguous to and in fact is an extension of
the mainland of Sind and apart from the survey maps there is no evidence that
it is part of the Great Rann of Kutch. No serious argument was advanced to
establish that on Kanjarkot, the Kutch State at any time exercised sovereign
authority.

**89.** About the Dhara Banni and Chhad Bet Sector Judge Gunnar Lager-
gren observed (at page 141) :

> "........on the evidence on record it may be taken as positively
> established that, in this century, prior to independence, outside Dhara
> Banni and Chhad Bet (which will be treated presently), the police and
> criminal jurisdiction of Sind authorities over disputed territory extended,

SCC Online Web Edition, Copyright © 2021
Page 38        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases



-------------------------------------------------------------------------------------------------------------------

in the sector between the eastern loop and Dhara Banni, to Ding, Vigho-kot and Biar Bet. There is, however, no evidence which affirmatively proves in a conclusive fashion that the jurisdiction of Sind police and Sind Courts encompassed areas west of the eastern loop, or east of Chhad Bet. Conversely, no proof is offered that Kutch either assumed or exercised such jurisdiction over any part of the disputed territory (leaving aside Dhara Banni and Chhad Bet)."

He again observed (at page 144) :

"......I deem it established that, for well over one hundred years, the sole benefits which could be derived from those areas are employed by inhabitants of Sind. It is not suggested that the grazing as such was subject to British taxation. Such limited evidence as there is on record seems, however, to justify the assumption that the task of maintaining law and order was discharged by the Sind authorities ; it is not even suggested that the authorities of Kutch at any time viewed such a task as forming part of their duties. * * * Whatever other Government functions were required with respect to these outlying grazing grounds, on which herds of cattle were from time to time shepherded, were apparently undertaken by Sind. Thus, the births, deaths and epidemics-occurring there were recorded by the *Taluka* Office in Diplo. It is not shown that Kutch at any time established a Thana on Chhad Bet."

He finally observed (at page 151) .

"The remaining sector within the area described above in which authority, in this instance exclusively for the protection of activities of private individuals, is shown to have been displayed by Sind authorities in a manner which is not sporadic but consistent and effective, is Dhara Banni and Chhad Bet."

As stated earlier, the activities undertaken by Kutch in these areas cannot be characterised as continuous and effective exercise of jurisdiction. By contrast, the presence of Sind in Dhara Banni and Chhad Bet partakes of characteristics which, having regard to the topography of the territory and the desolate character of the adjacent inhabited region, come as close to effective peaceful occupation and display of Government authority as may reasonably be expected in the circumstances. Both the inhabitants of Sind who openly used the grazing grounds for over one hundred years and the Sind authorities must have acted on the basis that Dhara Banni and Chhad Bet were Sind territory.

**90.** The claimants urged that the territory in this sector belonged to the Kutch State and that claim was supported by survey maps, correspondence between the officials of Kutch State and the British Administration, assertions made in the annual administration reports for 75 years before 1947, statistical abstracts relating to British India, Bombay Administration Reports, Gazetteers, Memoranda on Indian States and a number of official publications, and by the Resolution of the Government of Bombay, dated 24th February, 1914. It would be a fruitless exercise to enter upon this historical material. The survey and other maps do not lay down a uniform or consistent alignment. Macdonald Survey appears to align the boundary of Sind, towards the north even of Rahim ki Bazar which is admittedly on the mainland of Sind, and was never claimed as part of the Rann. This lends support to the view that the Macdonald Survey Report was rough, and was intended to be a topographical map. The maps prepared at the later surveys follow, with some variations

SCC Online Web Edition, Copyright © 2021
Page 39        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases



-------------------------------------------------------------------------------------------------------------

and rectifications, the Macdonald Survey alignment, but those survey maps also do not indicate an international boundary. About Pullan's Survey it may be observed that Pullan himself stated that he had "carefully abstained from lying down" or suggesting a boundary (vide Resolution of the Government of Bombay, 3rd July, and 7th August, 1885). The attitude adopted by the Government of Bombay which is set out in the resolution was that they "did not desire" that any "question of boundaries in the Rann between the Province of Sind and Kutch" should be raised. Erskine's Survey also is open to the criticism that as an officer of the Sind Government he made statements in his letter, dated 23rd November, 1905, disowning any intention to determine the boundary of the Rann of Kutch. The maps prepared in the Erskine Survey were not accepted as evidencing a boundary. Even the Maharao of Kutch did not agree to accept the alignment. By the resolution of 1914, it does appear that an attempt was made to resolve the dispute about certain disputed pockets, between the British authorities governing Sind and the Maharao of Kutch. But a review of the correspondence of 1905, followed by erection of pillars up to the western tri-junction, and establishment of a Customs line in 1934—appear to suggest that the boundary east of the tri-junction was in a state of uncertainty. Conflicting claims were made from time to time by the British authorities and the Maharao of Kutch ; and about the exercise of sovereign rights over the areas now in dispute the evidence is very scrappy and discrepant. An attempt to determine how far general statements of claim and refusal thereof were applicable to the sector now in dispute would serve no useful purpose. Different positions were adopted by the officers of the Government of India according as the exigencies of a particular situation demanded. The statements or assertions do not evidence an existing state of affairs, they were only made to support or resist claims then made, or to serve some immediate purpose. The claimants before us were unable to pinpoint any definite and reliable piece of evidence which established the exercise of sovereign authority by the Maharao of Kutch over the second sector.

**91.** It is true that the territory of the entire State of Kutch merged with the Dominion of India. That territory was treated as Indian territory and was at first governed as a separate administrative unit. But unless it be established that the disputed sectors were part of the Kutch State, no firm conclusion can be drawn from the agreement of merger.

**92.** Undoubtedly the Government of India claimed at all material times the territory in sectors (1) and (2). In respect of the Kanjarkot sector there is no evidence of exercise of sovereign authority by the Maharao of Kutch at any point of time. The section is apparently contiguous to and an extension of the mainland of Sind. It is not shown that it has the characteristics of the Rann terrain. The Dhara Banni and Chhadbet sector is also apparently an extension of the mainland of Sind. There is no reliable evidence about the enjoyment of the benefits of the land in the sector by the inhabitants of Kutch. Evidence of the exercise of suzerainty by the Maharao of Kutch over that sector is also sadly lacking. The sector has more pronounced features of the Rann terrain, but it appears also to be contiguous to the mainland of Sind. Even granting that the evidence about the exercise of sovereign authority by the British authorities governing Sind since 1843 over the Rann of Kutch is inconclusive, the claim by Indian citizens to exercise fundamental rights in respect of the territory in that sector may be entertained only if it be established that the territory is found to be originally governed by the Maharao of Kutch. On that part of the claim concrete evidence is wanting.



SCC Online Web Edition, Copyright © 2021
Page 40        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------------------------------

**93.** It was contended that the total area of Kutch according to the White Paper of Indian States was 17,249 square miles out of which the area of the Kutch mainland was 8,461 square miles and the balance was 8,788 square miles which consists of the Great and Little Ranns of Kutch. In the Kutch Administration Report for 1910-11 and thereafter the area of Kutch was stated to be "7,616 miles" and it was stated that "the Rann also belongs to the Maharao". In 1931 a correction was introduced that the area of the State was 8,249.5 square miles exclusive of the Rann of Kutch which belongs to the Kutch State territory. The Bombay Administration Reports from 1871-72 to 1923-24 give varying figures as the area of Kutch and make a general statement that the Rann of Kutch belongs to the State. The statement in the Imperial Gazetteers of 1881, 1885, 1908, 1909 contain statements about the areas which are so discrepant that no reliance can be placed upon them. Similarly the recitals about the extent of the Rann, in the Gazetteers of the Bombay Presidency are also imprecise. The only safe conclusion that can be drawn from these documents is that the Rann was part of Kutch State but do not lend any assistance in determining the northern boundary of the Rann.

**94.** It is stated in the affidavit of Mr. Dholakia that the area of the Kutch District was 16,567·3 square miles inclusive of 9,000 square miles of Rann territory. But evidently the area of the Rann is a rough estimate.

**95.** In the census of 1941 the area of Kutch was shown as 8,461 square miles and in 1951 Census as 16.724 square miles inclusive of Rann. There is no evidence that the figures are based upon any precise survey in the context of an accepted boundary.

**96.** The census of 1961 shows that there were 171 residents in the Chhad Bet. But these consist exclusively of the Border Guards posted in that area. It is conceded that there is no local population in Chhad Bet and Dhara Banni. The inclusion of Chhad Bet in the area within a polling station for the 1967 General Elections also supports merely an assertion that it was claimed to be Indian territory. It is not evidence of the fact that it was territory over which the Maharao of Kutch exercised sovereign rights and which by merger of the territory became Indian territory.

**97.** The evidence on which reliance was mainly placed in support of the claim was the conflicting alignments in the survey and other maps, the claims made by the Maharao of Kutch and the Government of India which were not accepted. Exercise of de facto authority over the territory in the sectors after the dispute took concrete form is evidence of an assertion merely and not evidence of pre-existing sovereign rights. The merger of the State of Kutch with the Dominion of India does not result in vesting of sovereign authority over the territory of the two sectors, unless the suzerainty of the State of Kutch is established. The boundary between the two States was indefinite and by the award of the Tribunal the true boundary of India and Pakistan is determined ; the award does not purport to, nor does it operate as giving rise to, an obligation to cede Indian territory.

**100.** The two inlets which practically encircle Nagar Parkar are declared to be within Pakistan border on the ground that it would be inequitable to recognise those inlets as foreign territory. It was said by the Chairman of the Tribunal that the existence of such foreign territory may be "conducive to friction and conflict". Regarding the two inlets the position is different since the ultimate decision of the Tribunal is founded on considerations of expediency and not on strict determination of rights. We have no power to sit in appeal over the decision of the Tribunal. The ground on which the award is made



SCC Online Web Edition, Copyright © 2021
Page 41      Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------------------------

against the claim made by the Government of India does not strengthen the rights of the claimant to relief. Unless there is evidence to show that the inlets were territory over which the Maharao of Kutch had sovereign rights, acceptance of the award is not required to be implemented by the constitutional amendment. The total area of the inlets, we are informed by Counsel on both sides, does not exceed 25 square miles. In the turbulent times which preceded the occupation of Sind by the East India Company in 1843 or even thereafter it is unlikely that authority was exercised by the Maharao of Kutch over these inlets. It appears from some of the maps that at the extremities the inlets are very narrow ; and roads cross these inlets from Nagar Parkar, which is of the shape of a peninsula into the mainland of Sind. It is difficult to accept that at any time effective sovereign authority could have been exercised over these inlets by the Maharao of Kutch. There is no evidence of exercise of any such right, before or after the occupation of Sind. There being no evidence of exercise of sovereign authority by the Maharao of Kutch, this Court cannot treat it as part of Indian territory.

**101.** On that view the claim made by the claimants that in implementing the award of the International Tribunal an attempt is made to cede any part of the territory which formed part of the State of Kutch before 1948, or was in de facto occupation and in respect of which sovereign authority was exercised by the Maharao of Kutch. The award does no more than define on the surface of the earth a boundary which has at all material times remained indefinite, because of the nature of the terrain, the shifting nature of the border of what was called Rann, the highly discrepant and conflicting claims made from time to time by the British authorities as well as the Kutch State authorities before the State merged with the Dominion of India in 1948, and the presistent refusal of the British authorities, though there were several occasions to demarcate the boundary between Sind and the Rann of Kutch.

**102.** The appeals and the writs are dismissed.

**103.** There will be no order as to costs in the appeals and the writ petitions.

———

### 1970(3) Supreme Court Cases 440
#### (From Madras High Court)
[BEFORE A. N. RAY AND I. D. DUA, JJ.]

PREM LATA AGARWAL                                    .. Appellant ;
*Versus*
LAKSHMAN PRASAD GUPTA AND OTHERS            .. Respondents.

Civil Appeal No. 350 of 1970, decided on April 23, 1970

**Limitation Act, 1908 (9 of 1908)—Section 15(1)—Connotation of "Prescribed"—Section 48, C. P. C., Applicability.**

**Limitation Act, (1908)—Section 14—Applicability of—Good faith and due diligence if made out—Constitution of India—Article 136—New plea—Abandonment of plea in Lower Court.**

**Code of Civil Procedure, 1908 (5 of 1908)—Section 11—Res judicata Principle—Applicability to execution proceedings.**

**Code of Civil Procedure, 1908 (5 of 1908)—Section 38—Simultaneous execution if competent.**

(*i*) The expression 'prescribed' would apply not only to limitation prescribed in the first schedule to Limitation Act but also to limitation prescribed in general statutes like the Code of Civil Procedure.