# Exhibit 11

to Expert Opinion of Sudipto Sarkar SA

dated August 13, 2021



SCC Online Web Edition, Copyright © 2021
Page 1        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------------------------------

# SUPREME COURT CASES
## 1975
### SUPPLEMENT VOLUME

#### 1975 (Supp.) **Supreme Court Cases 1**

SMT. INDIRA NEHRU GANDHI
   (In C.A. No. 887 of 1975)
SHRI RAJ NARAIN (In C. A. No. 909 of 1975)    ...    Appellants;

*Versus*

SHRI RAJ NARAIN AND ANOTHER
   (In C. A.No.887 of 1975)
SMT. INDIRA NEHRU GANDHI
   (In C. A. No. 909 of 1975)    ...    Respondents.

Civil Appeals Nos. 887 and 909 of 1975†, decided on November 7, 1975

#### STATEMENT OF FACTS AND ARGUMENTS

1. The appeal and the cross appeal arose out of the dispute as to the validity of the election of Smt. Indira Nehru Gandhi from the Rae Bareli constituency in the General Parliamentary Elections of 1971. The respondent was the nearest rival and he successfully challenged the election in the High Court which gave its verdict on June 12, 1975. Of the seven grounds on which the election was challenged, the trial Judge upheld the challenge on only two grounds. Hence the cross-appeal by the respondent.

2. The High Court held the successful candidate guilty of two corrupt practices : Firstly, she obtained the assistance of the gazetted officers of the Government of Uttar Pradesh for furthering her election prospects ; and secondly, she obtained the assistance of Shri Yashpal Kapoor, a gazetted officer in the Government of India holding the post of Officer on Special Duty in the Prime Minister's Secretariat, for furthering the same purpose. Acting under Section 8-A of the Act the learned Judge declared that the successful candidate would stand disqualified for a period of six years from June 12, 1975 being the date of the judgment. The High Court awarded costs to the election petitioner.

3. The other five grounds of challenge were : (1) The successful candidate procured the assistance of the armed forces for arranging her flights by Air Force aeroplanes and helicopters ; (2) Her election agent, Shri Yashpal Kapoor, and others distributed clothes and liquor to induce the voters to vote for her ; (3) She and her election agent made appeals to the religious symbol of cow and calf ; (4) Her election agent and others procured vehicles for the free conveyance of voters to the polling stations ; and (5) She and her election agent incurred and authorized expenditure in violation of Section 77(3) of the Act read with Rule 90 of the Conduct of Elections Rules, 1961. Grounds (1), (2) and (4) were given up in appeal for the reason that the evidence on record was not likely to be accepted by the Supreme Court in proof thereof.

4. To include the expenditure incurred by the party of the successful candidate in the expenditure incurred by her the defeated candidate relied in

†Appeals from the Judgment and Order dated June 12, 1975 of the Allahabad High Court in Election Petition No. 5 of 1971.

SCC Online Web Edition, Copyright © 2021
Page 2        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

---

the trial Court on the Supreme Court decision in **Kanwar Lal Gupta** v. **Amarnath Chawla,** [(1975)3 SCC 646]. The effect of that decision however stood nullified by the Representation of the People (Amendment) Ordinance, 1974 replaced by Act 58 of 1974 which added an Explanation to Section 77(1). The defeated candidate's writ petition in the High Court against the constitutionality of the Ordinance and the Act was dismissed. His appeal to Division Bench, by consent of parties, was heard by the Supreme Court.

5.  During the pendency of the cross-appeal. Parliament passed the Election Laws (Amendment) Act, 40 of 1975, which came into force on August 6, 1975 and it virtually sealed the controversy in the appeal and the cross-appeal by amending the provisions of law retrospectively and expressly governing the appeals pending in the Supreme Court.

6.  On August 10, 1975 the Constitution (Thirty-ninth Amendment) Act was passed. It introduced two new articles in the Constitution : Articles 71 and 329A ; and it put in the Ninth Schedule three Acts : (i) The Representation of the People Act, 43 of 1951 ; (ii) The Representation of the People (Amendment) Act, 58 of 1974 ; and (iii) The Election Laws (Amendment) Act, 40 of 1975. The new Article 71 which replaced its precursor empowers the Parliament to pass laws regulating the elections of the President and the Vice-President, including the making of a provision for the decision of disputes relating to their election. Article 329A has six clauses out of which the first three deal with the future election to the Parliament of persons holding the office of Prime Minister or Speaker at the time of the election or who are appointed to these offices after their election to the Parliament. These clauses aim at depriving the courts of their jurisdiction to try election petitions in which the election of the Prime Minister or the Speaker to the Parliament is challenged. Clause 4 frees the disputed election of the Prime Minister and the Speaker to the Parliament from the restraints of all election laws. It declares such election as valid notwithstanding any judgment. Clause 5 ordains that any appeal or cross appeal pending before the Supreme Court shall be disposed of on the assumption that the judgment under appeal is void, that the findings contained in the judgment never had any existence in the eye of law and that the election declared void by the judgment shall continue to be valid in all respects. Clause 6 provides that Article 329A shall have precedence over the rest of the Constitution. Constitutionality of clause (4) above was under determination.

7.  The defeated candidate challenges the constitutionality of the Thirty-ninth Amendment and of Acts 58 of 1974 and 40 of 1975 on the basis of the basic structure doctrine enunciated in the **Kesavananda Bharati case** [(1973) 4 SCC 225]. The arguments of Mr. Shanti Bhushan, Counsel for the respondent, re the validity of Thirty-ninth Amendment may be summed up thus : (i) The Thirty-ninth Amendment affects the basic structure or framework, or the institutional pattern adopted by the Constitution and is therefore beyond the amending power conferred by Article 368. It destroys the identity of the Constitution. (ii) Separation of powers is a basic feature of the Constitution and therefore every dispute involving the adjudication of legal rights must be left to the decision of the Judiciary. Clause (4) of Article 329A introduced by the Thirty-ninth Amendment takes away that jurisdiction of the courts and is therefore void. (iii) The function of the Legislature is to legislate and not decide private disputes. In the instant case Parliament has transgressed its constituent function by adjudicating upon a private dispute. (iv) Democracy is an essential feature of the Constitution. Free and fair elections are indispensable for the successful working of any democratic government. By providing that the election of the Prime Minister shall not be open to challenge and shall continue to be valid despite the judgment of the Allahabad High Court holding that the election is vitiated by corrupt practices, Parliament has destroyed the very core of democracy. (v) Equality is an essential feature of a Republican Constitution. The Thirty-ninth Amendment puts the Prime Minister and the Speaker above the law and beyond


SCC Online Web Edition, Copyright © 2021
Page 3        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-----------------------------------------------------------------------------------------------------------------


the reach of the equality principle. The classification made by the Thirty-ninth Amendment bears no nexus with the sort of immunity granted to two high personages, from the operation of election laws. (vi) Rule of law and judicial review are also basic features of the Constitution. To free certain persons from the constraints of law and to place their conduct beyond judicial review is to destroy the identity of the Constitution. No freedom is secure without the court to protect it. The organic balance between the three branches, the Legislature, the Executive and the Judiciary, is upset by eroding the authority of the Supreme Court in a vital matter like elections. And the rule of law is abrogated by providing that the election of the Prime Minister shall continue to be valid and will be open to no challenge before any court or any authority whatsoever. (vii) The concept of political justice recognized by the Preamble is violated by the Thirty-ninth Amendment. The Constitution can always be subverted by revolutionary methods. The question is whether it is permissible to the Parliament to use the legitimacy of constitutional provisions for effecting revolutionary changes. (viii) The constituent power partakes of legislative power and can only be exercised within the highest ambit of the latter power. Therefore, even with a two-third majority, the constituent body cannot exercise executive or judicial power. The constituent body can make changes in the conditions of the exercise of judicial power but it cannot usurp that power; and lastly (ix) The question in the **Fundamental Rights case** was whether Parliament can, in the exercise of its power of amendment abridge or take away fundamental rights and whether there are any inherent or implied limitations on the Parliament's power of amendment. In other words, the question was whether the power of amendment can be exercised so as to destroy or mutilate the basic structure of the Constitution. The **Fundamental Rights case** did not involve the consideration of the question as to what the power of amendment comprehends. Matters such as declaring who has won and who has lost an election are matters clearly outside the scope of the amending power under Article 368, which means and implies the power to alter the fundamental instrument of country's governance.

8. The second ground of challenge to clause (4) of Article 329A was that constitution of the House which passed the Constitution (Thirty-ninth Amendment) Act is illegal. It is said that a number of members of Parliament of the two Houses were detained by executive order after June 26, 1975. These persons were not supplied any grounds of detention or given any opportunity of making a representation against their detention. Unless the President convenes a session of the full Parliament by giving to all members thereof an opportunity to attend the session and exercise their right of speech and vote, the convening of the session will suffer from illegality and unconstitutionality and cannot be regarded as a session of the two Houses of Parliament. The mere fact that a person may be deprived of his right to move any court to secure his release from such illegal detention by means of a presidential order under Article 359 does not render the detention itself either legal or constitutional. The important leaders of the House have been prevented from participation. Holding of the session and transacting business are unconstitutional.

9. Attacking the validity of the Amendment Act 58 of 1974 and Amendment Act 40 of 1975 the contention of the defeated candidate is that when the power of amending the Constitution cannot be exercised to damage or destroy the basic features of the Constitution or the essential elements of the basic structure or framework thereof, the limitations on the exercise of legislative power will arise not only from the express limitations contained in the Constitution, but also from necessary implication either under articles or even in the preamble of the Constitution. That if the democratic way of life through parliamentary institutions based on free and fair elections is a basic feature which cannot be destroyed or damaged by amendment of the Constitution, it cannot similarly be destroyed or damaged by any legislative measure.

10. The reasons for it are: First, the power to resolve doubts and disputes about the validity of elections to Parliament and State Legislatures


SCC Online Web Edition, Copyright © 2021
Page 4       Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-----------------------------------------------------------------------------------------------------------------

**4**                              SUPREME COURT CASES                    1975 Supp SCC

has been vested by the Constitution in the judicial organ competent to decide election petitions and, therefore, it is not open to the Legislature to take away and interfere with these exclusive functions of the Judiciary by any legislation amending the law governing the election adjudicated by the Judiciary. Second, the insertion of these Acts in the Ninth Schedule will not confer any immunity on the legislative measure if basic features of the Constitution are damaged or destroyed on the ground that the provisions contravene Part III of the Constitution. Third, any provision in the legislative measures which has the effect of bringing about unfairness between different rival candidates in the matter of election is discriminatory and it not only contravenes Article 14 but also violates the implied limitation on legislative power relating to free and fair elections. Fourth, any amendment of the law with retrospective operation governing an election which has already been held necessarily introduces an element of unfairness and brings about a denial of equality among rival candidates. Fifth, the deeming clause introduced in the 1951 Act by Sections 6(b) and 8(a) and (b) of the Amendment Act, 1975 and the device of conclusive proof adopted by Section 8(c) in the Amendment Act, 1975 are unconstitutional encroachments on judicial power. Sixth, power conferred by an enactment including a constitutional enactment has to be so exercised as to give effect to the guiding principles of the basic norms of that legislation and not so as to militate against those guiding principles or basic norms.

11. The definition of "candidate" is amended by the Amendment Act, 1975. The contentions of the respondent on the amendment of the definition of "candidate" are these. The expression "returned candidate" is descriptive of the person and the corrupt practices mentioned in Section 123 of the 1951 Act in relation to a candidate will not be confined to corrupt practices committed with reference to the definition of "candidate". Corrupt practices alleged in relation to candidates will be relatable to any period and will not be confined to corrupt practices alleged between the date of nomination and the date of election. If corrupt practices are committed by candidates who eventually become returned candidates such corrupt practices will be offences within the meaning of Section 123 of the 1951 Act without any reference to the time of commission.

12. Counsel on behalf of the respondent also contended as follows. The basis of fair and free elections is that the election of a candidate will be avoided if any corrupt practice has been committed by the candidate by or with the knowledge and consent of that candidate. The acts of a candidate may be either anterior to the date of nomination or it may be subsequent to the date of nomination. Therefore, the Amendment Act, 1975 destroys and damages free and fair elections by allowing candidates to commit corrupt practices prior to the date of nomination.

13. The Amendment Act, 1975 is also challenged as falling within the vice of delegated legislation by the amendments inserted as Explanation 3 to Section 77 of the 1951 Act and the insertion of the proviso to Section 123(7) of the 1951 Act.

14. The device of conclusive proof which is introduced to add Explanation 3 to Section 123(7) of the 1951 Act with regard to the date with effect from which the person ceased to be in service is said to be an encroachment on judicial power.

15. Section 8(a) of the Amendment Act, 1975 which adds a proviso to Section 123 of the 1951 Act to the effect that no symbol allotted under this Act to a candidate shall be deemed to be a religious symbol or a national symbol for the purposes of this clause is attacked as legalising religious symbols and thus offending secularism.

16. Section 10 of the Amendment Act, 1975 which enacts that the amendments shall have retrospective effect is challenged as retrospectively legalising a void election.


SCC Online Web Edition, Copyright © 2021
Page 5          Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-----------------------------------------------------------------------------------------------------------------------

17. In view of the challenge by the respondent to the constitutional validity of the Amendment Acts, 1974 and 1975, notice was given to the Attorney General.

18. The learned Attorney General contended that : (i) The majority decision in the **Fundamental Rights case** is not an authority for the proposition that there could be no free or fair elections without judicial review. The Constitutions and laws of several countries leave the decision of election disputes to the judgment of the Legislatures themselves. The history of the Representation of the People Act, 1951 as also various articles in our Constitution show that judicial review can be excluded in appropriate cases as a matter of policy. (ii) That validation of elections is a process well-known to democratic forms of Government. (iii) That a law may be constitutional even if it relates to a single individual if on account of special reasons, the single individual could be treated as a class by himself. (iv) That it is clear from Articles 326 and 327 of the Constitution that the Constitution-makers thought that as a matter of high policy elections ought to be dealt with by the Constitution itself by ordinary legislation passed within the framework of the Constitution. How much of elections should be dealt with by the Constitution and how much should be relegated to ordinary legislation is not a matter for the courts to decide. If the constituent body thought that the offices of the Prime Minister and the Speaker are important enough to be dealt with by the Constitution itself in the matter of their elections to the Parliament, it cannot be said that the decision is frivolous or without jurisdiction ; and that (v) The contention that the Thirty-ninth Amendment is not an exercise of constituent power should not be allowed to be taken up because every possible aspect of the matter was argued in **Sankari Prasad's case** [1952 SCR 89] and the **Fundamental Rights case** [(1973) 4 SCC 225]. The basic question involved in these cases was as to what is the meaning of the word 'amendment'. The argument now is that there is a further limitation on the amending power. If it is the same question and has been decided, it cannot be reopened by saying that the question has a new aspect which was not considered then. If the question is new, the principle of the **Fundamental Rights case** cannot be extended any further. Therefore, the constituent power must be held to be a plenary power on which the only limitation is as regards the inviolability of the basic structure.

19. The learned Solicitor General who continued the unfinished arguments of the learned Attorney General urged that (i) Article 14 is founded on a sound public policy recognised and followed in all civilised States. The exclusion of judicial review does not by itself mean the negation of equality. Article 31B which on the face of it denied equality to different sections of the community attained the ideal of economic justice by bringing about economic equality. Article 33 also shows that the demands of public problems may require the adjustments of Fundamental Rights for ensuring greater equality. (ii) What a Constitution should contain depends on what permanency is intended to be accorded to a particular provision included in the Constitution. (iii) Exclusion of judicial review is at least permissible in those fields where originally the Constitution did not provide for or contemplate judicial review (iv) If the election law does not apply, as it ceases to apply by virtue of Article 329A(4) it is the function of the legislature to declare whether or not a particular election is good or bad ; and that (v) Rule of law is not a part of the basic structure of the Constitution and apart from Article 14, our Constitution recognises neither the doctrine of equality nor the rule of law.

20. Shri A. K. Sen who appeared for the appellant Smt. Indira Gandhi defended the Thirty-ninth Amendment by contending that (i) The Amendment follows the well-known pattern of all validation Acts by which the basis of judgments or orders of competent courts and tribunals is changed and the judgments and orders are made ineffective. (ii) The effect of validation is to change the law so as to alter the basis of any judgment, which might have



SCC Online Web Edition, Copyright © 2021
Page 6          Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases


---------------------------------------------------------------------------------------------------------------

**6**                    SUPREME COURT CASES                    **1975 Supp SCC**

been given on the basis of old law and thus to make the judgment ineffective.
(iii) A formal declaration that the judgment rendered under the old Act is
void, is not necessary.  If the matter is pending in appeal, the appellate Court
has to give effect to the altered law and reverse the judgment.  If the matter is not
pending in appeal, then the judgment ceases to be operative and binding as
res judicata.  (iv) The rendering of a judgment ineffective by changing its
basis by legislative enactment is not an encroachment on judicial power but
a legislation within the competence of the legislature rendering the basis of
the judgment non est.  (v) The constituent power has retrospectively changed
the law in so far as it relates to election.  The constituent authority could
have left the application of the changed law either to Parliament or to any
other body.  But it has chosen to assume the duty of determination in this
particular case for itself.  (vi) The determination of election disputes and
the validity of election is not an exercise of judicial power.  This
function may be left either to courts, properly so called or to tribunals or
to other bodies including the legislature itself.  (vii) The rigid separation of
powers as it obtains in the United States or in a lesser degree under the
Australian Constitution does not apply to India.  Many powers, which are
strictly judicial, have been excluded from the purview of the courts.  There
is, therefore, no question of any separation of powers being involved in matters
concerning elections and election petitions.  (viii) There is no question of
separation of powers when the constituent authority exercises either a power
which is allocated to the Legislature, or to the Executive or to the Judiciary
under the Constitution.  In the hands of the constituent authority there is
no demarcation of powers.  But the demarcation emerges only when it leaves
the hands of the constituent authority through well-defined channels into
demarcated pools.  The constituent power is independent of the fetters of
limitations imposed by separation of powers in the hands of the organs of the
Government, amongst whom the supreme authority of the State is allocated.
(ix) The constituent power springs as the fountainhead and partakes of
sovereignty and is the power which creates the organs and distributes the
powers.  Therefore, in a sense, the constituent power is all-embracing and is
at once judicial, executive and legislative.  It is, in a sense, a "super power".
(x) Even if the preamble lays down as its objective the attainment of equality,
the Thirty-ninth Constitution Amendment does not violate the said concept of
equality as the same is based on a rational classification and has a reasonable nexus
with the object of the Amendment.  (xi) The preamble to the Constitution
only refers to securing "equality of status and opportunity".  Equality of
status and opportunity has got many facets :  some of these facets are guaran-
teed as fundamental rights under Articles 14 and 19 of the Constitution.  These
facets alone can be considered to be basic features of the Constitution, assum-
ing that equality was a basic feaure of the Constitution.  (xii) "Free and
fair elections" does not postulate that there must be a constitutional provision
for determining election disputes by a separate tribunal or court.  (xiii) The
Thirty-ninth Amendment Act does not affect the structure of a Republican
Democracy, assuming that the same is a basic feature of the Constitution.  The
validation of one election does not alter the character of the democracy ; and
(xiv) A constitutional amendment need not necessarily relate to the structural
organisation of the State.

21.  Shri Jagannath Kaushal supported the arguments of Shri Sen by
citing pragmatic illustrations.  He placed before the Court statistics showing that
a very small percentage of election petitions succeed eventually which, accord-
ing to him, is evidence that such petitions are used by defeated candidates
as an instrument of oppression against successful candidates.  Parliament,
therefore, wanted to save high personages from such harassment.  A law may
benefit a single individual and may still be valid.  According to Shri Kaushal,
the judgment of the Allahabad High Court became a nullity by reason of
that Court ceasing retrospectively to have jurisdiction over the dispute and a
judgment which is nullity need not be set aside.  It cannot even be challenged
in a collateral proceeding.


SCC Online Web Edition, Copyright © 2021
Page 7        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases



---

## PART I—VALIDITY OF CLAUSE (4) OF ARTICLE 329A

**Constitution of India—Article 368—Exercise of constituent power by Parliament—Constitution (Thirty-ninth) Amendment Act, 1975—Section 4—Validity of clause (4) of Article 329A inserted by Section 4—Determination of an election dispute by Parliament if falls outside the exercise of amending power under Article 368.**

**A. Test of destruction or damage to the basic structure or basic features of the Constitution as laid down in the Kesavananda Bharati case.**

**(1) Approach to the validity of clause (4) of Article 329A in the background of the Kesavananda Bharati case—Constitution of India, Article 141.**

### Per Ray, C.J.

The hearing has proceeded on the assumption that it is not necessary to challenge the majority view in *Kesavananda Bharati case.*                    (Para 16)

*Kesavananda Bharati* v. *State of Kerala*, 1973 Supp SCR 1 : (1973) 4 SCC 225, *followed.*

### Per Khanna, J.

(*a*) For the purpose of the present case, we shall have to proceed in accordance with the law as laid down by the majority in the *Kesavananda Bharati case.*                    (Para 175)

(*b*) The Supreme Court is not concerned with the wisdom behind or the propriety of the impugned constitutional amendment. These are matters essentially for those who are vested with the authority to make the constitutional amendment. All that the Supreme Court is concerned with is the constitutional validity of the impugned amendment.

Therefore the question as to whether such a matter, in view of the normal concept of constitutional law, can strictly be the subject of a constitutional amendment need not be gone into. It may be assumed that such a matter can validly be the subject-matter of a constitutional amendment.                    (Paras 176 & 210)

(*c*) I cannot accede to the submission that in construing clause (4) of Article 329A, the court should take into account the facts of the appellant's case. This is contrary to all accepted norms of construction.                    (Para 204)

### Per Mathew, J.

I proceed on the assumption that the law as laid down by the majority in the *Kesavananda Bharati case* should govern the decision here, although I did not share the view of the majority.                    (Para 264)

### Per Beg, J.

(*a*) This Bench of five judges is bound by the majority view in *Kesavananda Bharati case.*                    (Para 520)

(*b*) An inquiry into the merits is not irrelevant if the very nature and purpose of the exercise of a power are put in issue by both sides.                    (Para 394)

Hence I regard the nature and merits of the case decided to be of crucial importance not only in considering the validity of the Thirty-ninth Amendment and of the Acts of 1974 and 1975, but also in the wider interests of justice which are bound to be served by the vindication of the case of the party which should, on merits, win.                    (Para 391)

**[Ed. : *Views on the merits of the case considered in Part III of the headnote.*]**




SCC Online Web Edition, Copyright © 2021
Page 8        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-----------------------------------------------------------------------------------------------------

**8**                         SUPREME COURT CASES                  **1975 Supp SCC**

**Part I—Validity of cl. (4) of Art. 329A** (*contd.*)

It was, therefore, absolutely essential for the Supreme Court to call upon the parties defending or assailing the Thirty-ninth Amendment and the Acts of 1974 and 1975, to go into the merits of the cases of the two sides and the findings given by the trial Judge so as to enable the Court to see how far these findings were justifiable under the law as it stood even before the amendments by the Acts of 1974 and 1975, how they were affected by these amendments, and how they were related to the validity of Section 4 of the Thirty-ninth Amendment.                                                         (Para 391)

### Per Chandrachud, J.

(*a*) By Article 141 of the Constitution, the law declared by the Supreme Court is binding on all courts within the territory of India. The law declared by the majority of 7 : 6 in the *Fundamental Rights case* must therefore be accepted dutifully and without reserve as good law. The history of law courts abounds with memorable decisions based on a thin majority.                                                       (Paras 650 and 653)

(*b*) What the Constitution ought to contain is not for the courts to decide. The touchstone of the validity of a constitutional amendment is firstly whether the procedure prescribed by Article 368 is strictly complied with and secondly whether the amendment destroys or damages the basic structure of the Constitution. The subject-matter of constitutional amendments is a question of high policy and courts are concerned with the interpretation of laws, not with the wisdom of the policy underlying them.        (Para 661)

(*c*) The validity of what is brought into the Constitution has to be judged by different standards.                                                                              (Para 662)

(*d*) The fear of perversion is no test of power.                            (Para 661)

(*e*) The practice of the Supreme Court is that in constitutional matters one must decide no more than is strictly necessary for an effective adjudication of the points arising in any case. By that test, a numerically substantial part of the Thirty-ninth Amendment has to be deferred for consideration to a future occasion. The court is clearly not concerned in these appeals with the new Article 71 introduced by the amendment. It is only concerned with clauses (4) to (6) of the new Article 329A.                           (Para 659)

(2) **Determination of the rule(s) laid down in Kesavananda Bharati case—Basic or essential features of our Constitution spelt out in that case—Whether that case involved a consideration of what the power of constitutional amendment comprehends.**

**Preamble—Declarations made in—Nature of—Preamble if a source of any of the basic features.**

### Per Khanna, J.

(*a*) The proposition that the power of amendment under Article 368 does not enable Parliament to alter the basic structure or framework of the Constitution was laid down by the Supreme Court by a majority of 7 : 6 in the case of *Kesavananda Bharati* v. *State of Kerala*. It was held that the words "amendment of the Constitution" in Article 368 could not have the effect of destroying or abrogating the basic structure of the Constitution.        (Para 175)

(*b*) As regards what was laid down by me in the *Kesavananda Bharati case* I find it difficult to read anything in my judgment to justify a conclusion that according to my judgment in that case no fundamental right is part of the basic structure of the Constitution.                                                                            (Para 251)

What has been laid down in that judgment is that no article of the Constitution is immune from the amendatory process because of the fact that it relates to a fundamental right and is contained in Part III of the Constitution. It was also held that a constitutional amendment under Article 368 does not constitute "law" as mentioned in Article 13.


SCC Online Web Edition, Copyright © 2021
Page 9        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases



-------------------------------------------------------------------------------------------------------------------

### Part I—Validity of cl. (4) of Art. 329A (*contd.*)

I also did not agree with the view taken in the case of *Golaknath* that there was a limitation on the power of Parliament to amend the provisions of Part III of the Constitution so as to abridge or take away the fundamental rights. I thereafter dealt with the scope of the power of amendment under Article 368 and the connotation of the word "amendment". (Para 251)

*I. C. Golaknath* v. *State of Punjab*, (1967) 2 SCR 762; and *Kesavananda Bharati* v. *State of Kerala*, (1973) 4 SCC 225, 767-70 (paras 1426, 1434 & 1435) and conclusion on p. 824, para 1537, *referred to.*

No distinction was made by me so far as the ambit and scope of the power of amendment is concerned between a provision relating to fundamental rights and provisions dealing with matters other than fundamental rights. The limitation inherent in the word "amendment" according to which it is not permissible by amendment of the Constitution to change the basic structure of the Constitution was to operate equally on articles pertaining to fundamental rights as on other articles not pertaining to those rights. (Para 251)

### Per Mathew, J.

(*a*) Under the rule laid down by the majority in the *Kesavananda Bharati case* if by clause (4) of Article 329 A, any essential feature of the democratic republican structure of our polity as visualized by the Constitution has been damaged or destroyed, the clause would be ultra vires the Constitution. (Paras 264 & 265)

In the *Kesavananda Bharati case*, a majority of seven judges held that the power conferred under Article 368 of the Constitution was not absolute. They took the view that, by an amendment, the basic structure of the Constitution cannot be damaged or destroyed. And, as to what are the basic structures of the Constitution, illustrations have been given by each of these judges. There was no consensus that democracy is a basic structure of the Constitution. (Para 264)

The inhibition to destroy or damage the basic structure by an amendment of the Constitution flows from the limitation on the power of amendment under Article 368 read into it by the majority in *Kesavananda Bharati case* because of their assumption that there are certain fundamental features in the Constitution which its makers intended to remain there in perpetuity. (Para 345)

(*b*) Even though an Act is put in the Ninth Schedule by a constitutional amendment, its provisions would be open to attack on the ground that they destroy or damage the basic structure if the fundamental right or rights taken away or abrogated pertains or pertain to basic structure. But the Act cannot be attacked for a collateral reason, namely, that the provisions of the Act have destroyed or damaged some other basic structure, say, for instance, democracy or separation of powers. (Para 353)

*Kesavananda Bharati* v. *State of Kerala*, (1973) 4 SCC 225, *followed.*

(*c*) The preamble, though a part of the Constitution, is neither a source of power nor a limitation upon that power. The preamble sets out the ideological aspirations of the people. The essential features of the great concepts set out in the preamble are delineated in the various provisions of the Constitution. It is these specific provisions in the body of the Constitution which determine the type of democracy which the founders of that instrument established ; the quality and nature of justice, political, social and economic which was their desideratum, the content of liberty of thought and expression which they entrenched in that document, the scope of equality of status and of opportunity which they enshrined in it. These specific provisions enacted in the Constitution alone can determine the basic structure of the Constitution as established. These specific provisions, either separately or in combination determine the content of the great concepts set out in the preamble. It is impossible to spin out any concrete concept of basic structure out of the gossamer concepts set


SCC Online Web Edition, Copyright © 2021
Page 10      Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------------

### Part I—Validity of cl. (4) of Art. 329A (*contd.*)

out in the preamble. The specific provisions of the Constitution are the stuff from which the basic structure has to be woven.                    (Para 345)

### Per Beg, J.

(*a*) Neither the question whether "constituent power" itself contained judicial power within its fold nor the question whether "constituent power" operated on a plane or in a sphere which excluded altogether what could be done through ordinary legislation were under consideration in *Kesavananda Bharati case*.                    (Para 596)

(*b*) According to the majority view in *Kesavananda Bharati case*, the Preamble furnishes the yardstick to be applied even to constitutional amendments.                    (Para 622)

(*c*) Supremacy of the Constitution is part of the basic structure.                    (Para 521)

### Per Chandrachud, J.

(*a*) The principle emerging from the majority decision in the *Fundamental Rights case* is that Article 368 does not confer power on the Parliament to alter the basic structure or framework of the Constitution.                    (Paras 651 & 661)

An inquiry as to which features of the Constitution form the basic structure of the Constitution according to the majority decision in the *Fundamental Rights case* is both fruitless and irrelevant. The ratio of the majority decision is not that some named features of the Constitution are a part of its basic structure but that the power of amendment cannot be exercised so as to damage or destroy the essential elements or the basic structure of the Constitution, whatever these expressions may comprehend. What the judges of the majority in *Kesavananda Bharati* stated are merely illustrations of what constitutes the basic structure and are not intended to be exhaustive.                    (Para 663)

For determining whether a particular feature of the Constitution is a part of its basic structure, one has perforce to examine in each individual case the place of the particular feature in the scheme of our Constitution, its object and purpose, and the consequences of its denial on the integrity of the Constitution as a fundamental instrument of the country's governance.                    (Para 663)

The theory of basic structures has to be considered in each individual case, not in the abstract, but in the context of the concrete problem.                    (Para 667)

The basic features enumerated in the *Kesavananda Bharati case* are enough to dispose of the present case.                    (Para 664)

'Basic structure', by the majority judgment, is not a part of the fundamental rights nor indeed a provision of the Constitution. The theory of basic structure is woven out of the conspectus of the Constitution and the amending power is subjected to it because it is a constituent power. 'The power to amend the fundamental instrument cannot carry with it the power to destroy its essential features'—this, in brief, is the arch of the theory of basic structure. It is wholly out of place in matters relating to the validity of ordinary laws made under the Constitution.                    (Para 691)

(*b*) It is difficult to subscribe to the view that the Preamble of the Constitution holds the key to its basic structure or that the Preamble is too holy to suffer a human touch. Constitutions are written, if they are written, in the rarefied atmosphere of high ideology, whatever be the ideology. Preambles of written Constitutions are intended primarily to reflect the hopes and aspirations of people. They resonate the ideal which the Nation seeks to achieve, the target, not the achievement. In parts, therefore they are metaphysical like slogans.                    (Para 665)

The Preamble, generally, uses words of "passion and power" in order to move the hearts of men and to stir them into action. Its own meaning and implication being in doubt the Preamble cannot affect or throw light on the meaning of the enacting words of the


SCC Online Web Edition, Copyright © 2021
Page 11     Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source:  Supreme Court Cases

-----------------------------------------------------------------------------------------------------------

### Part I—Validity of cl. (4) of Art. 329A (*contd.*)

Constitution. Therefore, though our Preamble was voted upon and is a part of the Constitution, it is really "a preliminary statement of the reasons" which made the passing of the Constitution necessary and desirable. The Preamble of our Constitution cannot be regarded as a source of any prohibitions or limitations.                    (Paras 665 and 671)

*Attorney General* v. *Prince Ernest Augustus of Hanover*, 1957 AC 436, *referred.*

*In re Berubari Union & Exchange of Enclaves*, (1960)3 SCR 250 : AIR 1960 SC 845, *relied on.*

(3) Whether the inclusion of clause (4) of Article 329A by Thirty-ninth Amendment affects the basic structure or framework or the institutional pattern adopted by the Constitution and is destructive of the identity of the Constitution.

(i) Rule of law if part of the basic features of our Constitution—If affected by freeing certain persons from the constraints of law and by placing their conduct beyond judicial review—If affected by fact of determination of a dispute by non-application of any norm or law whatsoever.

[**Ed.** *Judicial review and equality though aspects of Rule of Law discussed separately*]

(ii) Judicial review if a basic feature of the Constitution—Protection of fundamental freedoms by judicial review—Whether the organic balance between the three branches, the Legislature, the Executive and the Judiciary upset by eroding the authority of the Supreme Court in a vital matter like elections under Articles 329(b) and 136—Consideration of resolution of election disputes in other democracies.

(iii) Democracy and free and fair elections if au essential feature of our Constitution—Whether destroyed by providing that the election of the Prime Minister shall not be open to challenge and shall continue to be valid despite the adverse judgment of the High Court—In so judging the validity of the election without ascertaining the facts and without applying the relevant law the amendment whether damaged the concept of fair and free elections.

(iv) Separation of powers if a basic structure of Indian Constitution—If applies to exercise of constituent power—Whether affected by the taking away of the jurisdiction of courts by clause (4) of Article 329A—Role of independent Judiciary if changed by denying the Supreme Court the jurisdiction to adjudicate upon a particular case—Parliament if usurped judicial power.

(v) Equality before the law if a basic and essential feature of our Constitution —Whether destroyed by putting the Prime Minister and the Speaker above the law and beyond the reach of the principle of equality—Classification made by Thirty-ninth Amendment if justified—Whether there is any rational basis for differentiation between persons holding high offices and other persons elected to Parliament — Classification if bears any nexus with the sort of immunity granted to the Prime Minister and the Speaker from the operation of election laws—Constitution of India, Article 14.

(vi) Political justice as proclaimed in the Preamble if part of the basic structure—Whether damaged by clause (4) of Article 329A.

## Per Ray, C. J.

### *Rule of Law*

The power of the Legislature to validate matters which have been found by judgments or orders of competent courts and tribunals to be invalid or illegal is a well-known pattern. The Legislature validates acts and things done by which the basis of judgments or orders of competent courts and tribunals is changed and the judgments and orders are made


SCC Online Web Edition, Copyright © 2021
Page 12        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-------------------------------------------------------------------------------------------------------

### Part I—Validity of cl. (4) of Art. 329A (contd.)

ineffective. Such rendering of a judgment ineffective by changing its basis by legislative enactment is not an encroachment on judicial power but a legislation within the competence of the Legislature rendering the basis of the judgment *non est*. So where invalid elections declared by reason of corrupt practices have been validated by changing the definition of corrupt practices in the Representation of the People Act, 1951 retrospectively the original judgment is rendered ineffective.                                                 (Paras 38 to 40)

*Kanta Kathuria* v. *Manak Chand Surana*, (1970) 2 SCR 835 : (1969) 3 SCC 268, relied on.

*Abeyesekera* v. *Jayatilake*, 1932 AC 260 ; *Piare Dusadh* v. *King Emperor*, 1944 FCR 61 : AIR 1944 FC 1 ; *Basanta Chandra Ghose* v. *King Emperor*, 1944 FCR 295 : AIR 1944 SC 86, *referred to.*

But the validation of the appellant's election by clause (4) of Article 329A was not by applying any law and therefore it offended Rule of Law.                 (Para 59)

#### *Judicial Review*

Judicial review is one of the distinctive features of the American Constitutional Law. In America equal protection of the laws is based on the concept of due process of law. These features are not in our Constitution.                                        (Para 43)

Judicial review in India is not to be founded on any article similar to the American Constitution. In the Australian Constitution also the judicial power is located in the court.                                                                              (Para 46)

Judicial review in many matters under statute may be excluded. In many cases special jurisdiction is created to deal with matters assigned to such authorities. A special forum is even created to hear election disputes. A right of appeal may be conferred against such decision.                                                           (Para 32)

If Parliament acts as the forum for determination of election disputes it may be a question of parliamentary privilege and the courts may not entertain any review from such decisions. That is because the exercise of power by the Legislature in determining disputed elections may be called legislative power. A distinction arises between what can be called the traditional judicial determination by courts and tribunals on the one hand and the peculiar jurisdiction by the Legislature in determining controverted elections on the other.                                                                       (Para 32)

Judicial review in election disputes is not a compulsion. Judicial review of decisions in election disputes may be entrusted by law to a judicial tribunal. If it is to a tribunal or to the High Court the judicial review will be attracted either under the relevant law providing for appeal to the Supreme Court or Article 136 may be attracted. Under Article 329(b) the contemplated law may vest the power to entertain election petitions in the House itself which may determine the dispute by a resolution after receiving a report from a special committee. In such cases judicial review may be eliminated without involving amendment of the Constitution.                                      (Para 52)

The Constitution permits by amendment exclusion of judicial review of a matter if it is necessary to give effect to the directive principles of State policy. A similar power may be available when such exclusion is needed in the larger interest of the security of the State.                                                                     (Para 52)

Article 33 excludes judicial review in matters relating to the armed forces. Article 262(2) excludes jurisdiction of courts in water disputes. The amending body has excluded judicial review in Articles 31A, 31B and 31C.                   (Paras 53 & 54)

#### *Democracy and free and fair elections*

It is not possible to hold that the concept of free and fair elections is a basic structure.                                                                          (Para 55)




SCC Online Web Edition, Copyright © 2021
Page 13          Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------

## Part I—Validity of cl. (4) of Art. 329A (*contd.*)

In cases of disputes as to election, the concept of free and fair elections means that disputes are fairly and justly decided. Decisions in election disputes may be made by the Legislature itself or may be made by courts or tribunals on behalf of the Legislature or may be made by courts and tribunals on their own exercising judicial functions.          (Para 55)

The concept of free and fair elections is worked out by the Representation of the People Act. The Act provides a definition of "corrupt practice" for the guidance of the court. In making the law the Legislature acts on the concept of free and fair elections. In any legislation relating to the validity of elections the concept of free and fair elections is an important consideration. In the process of election the concept of free and fair elections is worked out by formulating the principles of franchise, and the free exercise of franchise.          (Para 55)

### *Separation of powers*

(*a*) The doctrine of separation of powers is carried into effect in countries like America, Australia. In our Constitution there is separation of powers in a broad sense. But the larger question is whether there is any doctrine of separation of powers when it comes to exercise of constituent power. The doctrine of separation of powers as recognised in America is not applicable to our country.          (Para 46)

*In re Delhi Laws Act*, 1951 SCR 747 : AIR 1951 SC 332 ; *Jayantilal Shodhan* v. *F. N. Rana*, (1964) 5 SCR 294 : AIR 1964 SC 648 ; *Chandra Mohan* v. *State of U. P.*, (1967) 1 SCR 77 : AIR 1966 SC 1987 and *Udai Ram Sharma* v. *Union of India*, (1968) 3 SCR 41 : AIR 1968 SC 1138, *relied on.*

The constituent power is independent of the doctrine of separation of powers. The constituent power is sovereign. It is the power which creates the organs and distributes the powers.          (Para 48)

The rigid separation of powers as under the American Constitution or under the Australian Constitution does not apply to our country. Many powers which are strictly judicial have been excluded from the purview of the courts. The whole subject of election has been left to courts traditionally under the Common Law and election disputes and matters are governed by the Legislature. The question of the determination of election disputes has particularly been regarded as a special privilege of Parliament in England. It is a political question in the United States. Under our Constitution, Parliament has inherited all the privileges, powers and immunities of the British House of Commons. In the case of election disputes Parliament has defined the procedure by law. It can at any time change that procedure and take over itself the whole question. There is, therefore, no question of any separation of powers being involved in matters concerning elections and election petitions.          (Para 47)

(*b*) Though no express mention is made in our Constitution of vesting the Judiciary the judicial power as is to be found in the American Constitution, a division of the three main functions of Government is recognised in our Constitution. Judicial power in the sense of the judicial power of the State is vested in the Judiciary. Similarly, the Executive and the Legislature are vested with powers in their spheres. Judicial power has lain in the hands of the Judiciary prior to the Constitution and also since the Constitution. It is not the intention that the powers of the Judiciary should be passed to or be shared by the Executive or the Legislature or that the powers of the Legislature or the Executive should pass to or be shared by the Judiciary.          (Para 60)

(*c*) To accept the theory of basic structures or basic features as a limitation on ordinary legislative powers will be an encroachment or the separation of powers.          (Para 136)



SCC Online Web Edition, Copyright © 2021
Page 14        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-----------------------------------------------------------------------------------------------------------------------

14                    **SUPREME COURT CASES**              1975 Supp SCC

### Part I—Validity of cl. (4) of Art. 329A (contd.)

#### Equality

In America equal protection of laws is based on the concept of due process of law. This feature is not in our Constitution.                                      (Para 43)

Exclusion of the operation of the equality principle from some fields is constitutionally possible.                                      (Para 54)

There is liberty to Legislature to classify to establish equality. When Article 31A and 31B eliminated judicial review the meaning was not that the Legislature would go on discriminating. The task of classification can be left to the Legislature. It is the very nature of legislation that classification must be in public interest. That body conclusively makes classification for the purpose of applying the principles of equality.                                      (Paras 52 and 53)

The exclusion of judicial review does not mean that principles of equality are violated. It only means that the appropriate body making the law satisfied itself and determines conclusively that principles of equality have not·been violated. If judicial review is excluded the court is not in a position to conclude that principles of equality have been violated.                                      (Para 52)

So there is no discrimination if classification on rational basis is made for determination of disputes relating to persons holding the office of Prime Minister or the Speaker.   (Para 61)

### Per Khanna, J.

#### Rule of Law

Rule of law postulates that the decisions should be made by the application of known principles and rules and in general such decisions should be predictable and the citizen should know where he is. If a decision is taken without any principle or without any rule, it is not predictable and such decision is the antithesis of a decision taken in accordance with the rule of law.                                      (Para 205)

#### Judicial review

It is not necessary in a democratic set-up that disputes relating to the validity of the elections must be settled by courts of law. There are many countries like France, Japan, and the United States of America where consistently with the democratic set-up the determination of such controversies is by Legislature or by authorities other than the courts.                                      (Para 207)

#### Democracy and free and fair elections

All the seven Judges who constituted the majority in *Kesavananda Bharati case* where also agreed that democratic set-up was part of the basic structure of the Constitution. Democracy postulates that there should be periodical elections, so that people may be in a position either to re-elect the old representatives or, if they so choose, to change the representatives and elect in their place other representatives. Democracy further contemplates that the elections should be free and fair, so that the voters may be in a position to vote for candidates of their choice. Democracy can indeed function only upon the faith that elections are free and fair and not rigged_ and manipulated, that they are effective instruments of ascertaining popular will both in reality and form and are not mere rituals·calculated to generate illusion of defence to mass opinion. Free and fair elections require that the candidates and their agents should not resort to unfair means or malpractices as may impinge upon the process of free and fair elections. Also disputes, which arise with regard to the validity of elections should be resolved.                                      (Para 198)

So, unless there be a machinery for resolving an election dispute and for going into the allegations that elections were not free and fair being vitiated by malpractices, the provision that a candidate should not resort to malpractices would be in the nature of a mere pious



SCC Online Web Edition, Copyright © 2021
Page 15        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------

## Part I—Validity of cl. (4) of Art. 329A (*contd.*)

wish without any legal sanction. It is further plain that if the validity of the election of a candidate is challenged on some grounds, the said election can be declared to be valid only if a forum for going into those grounds is provided and a law for adjudicating upon those grounds prescribed.                    (Para 199)

Besides other things, election laws lay down a code of conduct in election matters and prescribe, what may be called, rules of electoral morality. Election laws also contain a provision for resolving disputes and determination of controversies which must inevitably arise in election matters as they arise in other spheres of human activity. The object of such a provision is to enforce rules of electoral morality and to punish deviance from the prescribed code of conduct in election matters. To confer an absolute validity upon the election of one particular candidate and to prescribe that the validity of that election shall not be questioned before any forum or under any law would necessarily have the effect of saying that howsoever gross may be the improprieties which might have vitiated that election, howsoever flagrant may be the malpractices which might have been committed on behalf of the returned candidate during the course of the election and howsoever foul and violative of the principles of free and fair elections may be the means which might have been employed for securing success in that election, the said election would be nonetheless valid and it would not be permissible to complain of those improprieties, malpractices and unfair means before any forum or under any law with a view to assail the validity of that election. Any provision which brings about that result is subversive of the principle of free and fair election in a democracy. The fact that the candidate concerned is the Prime Minister of the country or the Speaker of the lower House of Parliament would, if anything, add force to the above conclusion because both these offices represent the acme of the democratic process in a country.                    (Paras 200 & 202)

That in fact the elections of the incumbents of the two offices were not vitiated by any impropriety, malpractice or unfair means is not relevant or germane to the question namely, as to what is the effect of clause (4) of Article 329A.                    (Para 202)

The vice of declaration contained in part (*iii*) of clause (4) *viz.* that notwithstanding any order made by any court declaring the election void, such election will continue to be valid is aggravated by the fact that such a declaration is made after the High Court which was then seized of jurisdiction had found substance in some of the grounds advanced by the respondent and had consequently declared the election of the appellant to be void. To put a stamp of validity on the election of a candidate by saying that the challenge to such an election would not be governed by any election law and that the said election in any case would be valid and immune from any challenge runs counter to accepted norms of free and fair elections in all democratic countries.                    (Paras 203 & 185)

*Marbury* v. *Madison*, (1803) 1 Cr 137, 163 and *United States* v. *Lee*, 106 US 196, 220, *referred to.*

The effect of impugned clause (4) is to take away both the right and the remedy to challenge the election of the appellant. Such extinguishment of the right and remedy to challenge the validity of the election is incompatible with the process of free and fair elections. Free and fair elections necessarily postulate that if the success of a candidate is secured in elections by means which violate the principle of free and fair elections, the election should on that account be liable to be set aside and be declared to be void. To extinguish the right and the remedy to challenge the validity of an election would necessarily be tantamount to laying down that even if the election of a candidate is vitiated by the fact that it was secured by flagrant violation of the principles of free and fair elections, the same would still enjoy immunity from challenge and would be nonetheless valid. Clause (4) of Article 329A can, therefore, be held to strike at the basis of free and fair elections.                    (Para 206)



SCC Online Web Edition, Copyright © 2021
Page 16          Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------------

### Part I—Validity of cl. (4) of Art. 329A (contd.)

Clause (4) of Article 329A is struck down on the ground that it violates the principle of free and fair elections which is an essential postulate of democracy and which in its turn is a part of the basic structure of the Constitution inasmuch as (1) it abolishes the forum without providing for another forum for going into the dispute relating to the validity of the election of the appellant and further prescribes that the said dispute shall not be governed by any election law and that the validity of the said election shall be absolute and not consequently be liable to be assailed, and (2) it extinguishes both the right and the remedy to challenge the validity of the aforesaid election.                                    (Para 213)

The different parts of clause (4) are so integrally connected and linked with each other that it is not possible to sever them and uphold the validity of part of it after striking down the rest of it.   Clause (4) should therefore be struck down in its entirety.               (Para 211)

#### Separation of powers

A declaration that an order made by a court of law is void is normally part of the judicial function and is not a legislative function. Although there is in the Constitution of India no rigid separation of powers, by and large the spheres of judicial function and legislative function have been demarcated and it is not permissible for the Legislature to encroach upon the judicial sphere. It has accordingly been held that a Legislature while it is entitled to change with retrospective effect the law which formed the basis of the judicial decision, it is not permissible to the Legislature to declare the judgment of the court to be void or not binding.                                                          (Para 190)

However, the question remains if the rule applies to constituent power also. No view however need be expressed on this point.                              (Paras 192 and 194)

*Shri Prithvi Cotton Mills Ltd.* v. *Broach Borough Municipality*, (1969) 2 SCC 283; *Janapada Sabha, Chhindwara* v. *Central Provinces Syndicate Ltd.*, (1970) I SCC 509; *Municipal Corpn. of City of Ahmedabad* v. *New Shorock Spg. & Wvg. Co. Ltd.*, (1970) 2 SCC 280 and *State of T. N.* v. *M. Rayappa Gounder*, (1971) 3 SCC 1, *relied on.*

#### Equality

Here so far as the dispute relating to the election of the appellant is concerned, neither the previous law governing the election of persons holding the office of the Prime Minister is to apply to it nor the future law to be framed under clause (1) of Article 329A governing the election of persons holding the office of Prime Minister is to apply to this dispute. Likewise, the previous forum for adjudicating upon the election dispute which went into the matter, has been divested of its jurisdiction with retrospective effect and, at the same time, no jurisdiction has been vested in any other forum to go into the matter.  The present is not a case of change of forum.  It is, on the contrary, one of the abolition of forum. As such, the question as to whether the office of Prime Minister constitutes a class by itself loses much of its significance in the context of the controversy with which the court is concerned.                                                                       (Para 209)

Since it is not permissible to change the basic structure of the Constitution, whenever the authority concerned deems it proper to make such an amendment, it cannot do so and circumvent the bar to the making of such an amendment by confining it to one case.                                                                             (Para 210)

### Per Mathew, J.

#### Rule of law

In the opinion of some of the judges constituting the majority in *Kesavananda Bharati case* rule of law is a basic structure of the Constitution apart from democracy.     (Para 335)

The rule of law postulates the pervasiveness of the spirit of law throughout the



SCC Online Web Edition, Copyright © 2021
Page 17        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------------------------------------

## Part I—Validity of cl. (4) of Art. 329A (*contd.*)

whole range of government in the sense of excluding arbitrary official action in any sphere.                                                                    (Para 336)

'Rule of law' is an expression to give reality to something which is not readily expressible.                                                                (Para 336)

*Jaisinghani* v. *Union of India*, (1967) 2 SCR 703, 718 : AIR 1967 SC 1427 : 65 ITR 34, *explained.*

There is a genuine concept of rule of law and that concept implies equality before the law or equal subjection of all classes to the ordinary law.        (Para 341)

And, if rule of law is to be basic structure of the Constitution, one must find specific provisions in the Constitution embodying the constituent elements of the concept.                                                                    (Para 341)

To be a basic structure, it must be a terrestrial concept having its habitat within the four corners of the Constitution. The provisions of the Constitution were enacted with a view to ensure the rule of law. Even if it be assumed that rule of law is a basic structure, the meaning and the constituent elements of the concept must be gathered from the enacting provisions of the Constitution. The equality aspect of the rule of law and of democratic republicanism is provided in Article 14.                    (Para 341)

So, the concept of equality which is basic to rule of law and that which is regarded as the most fundamental postulate of republicanism are both embodied in Article 14. If, according to the majority in *Kesavananda Bharati case* Article 14 does not pertain to basic structure of the Constitution, which is the other principle of equality incorporated in the Constitution which can be a basic structure of the Constitution or an essential feature of democracy or rule of law?                                            (Para 342)

It is impossible to enunciate the rule of law which has as its basis that no decision can be made unless there is a certain rule to govern the decision.    (Para 340)

*Basheshar Nath* v. *C. I. T.*, 1959 Supp 1 SCR 528 : AIR 1959 SC 149 and *State of Bengal* v. *Anwar Ali Sarkar*, 1952 SCR 284 : AIR 1952 SC 74 : 1952 Cri LJ 510, *referred to.*

*Democracy*

There was consensus amongst the judges forming the majority in *Kesavananda Bharati case* that democracy is a basic structure of the Constitution.     (Para 264)

It is difficult to understand, when the amending body expressly excluded the operation of all laws relating to election petitions and matters connected therewith by the first part of clause (4), what ideal norms of free and fair elections it had in view in adjudging the validity of the election of the appellant. One cannot conceive of any pre-existing ideal norms of election apart from the law enacted by the appropriate Legislatures. If the amending body evolved new norms for adjudging the validity of the particular election, it was the exercise of a despotic power and that would damage the democratic structure of the Constitution.                                                (Para 305)

If the facts are not admitted, the Legislature cannot determine them except by employing judicial process.                                                (Para 315)

*Abeyesekera* v. *Jayatilake*, 1932 AC 260 ; *Piare Dusadh* v. *King Emperor*, 1944 FCR 61 : AIR 1944 FC 1 ; *Kanta Kathuria* v. *Manak Chand Surana*, (1969) 3 SCC 268 and *State of Orissa* v. *Bhupendra Kumar Bose*, 1962 Supp 2 SCR 380 : AIR 1962 SC 945, *distinguished.*

If clause (4) was an exercise in legislative validation without changing the law which made the election invalid, when there ought to have been an exercise of judicial power of ascertaining the adjudicative facts and applying the law, the clause would damage the democratic structure of the Constitution, as the Constitution visualizes the resolution



SCC Online Web Edition, Copyright © 2021
Page 18        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-----------------------------------------------------------------------------------------------------

### Part I—Validity of cl. (4) of Art. 329A (contd.)

of an election dispute by a petition presented to an authority exercising judicial power. (Para 308)

If Article 329(*b*) envisages the resolution of an election dispute by judicial process by a petition presented to an authority as the appropriate Legislature may by law provide, a constitutional amendment cannot dispense with that requirement without damaging an essential feature of democracy, *viz.*, the mechanism for determining the real representative of the pepole in an election as contemplated by the Constitution. (Para 308)

Even if the exercise of despotic discretion such as clause (4) of Article 329A is regarded as an amendment of the Constitution, the amendment would damage or destroy an essential feature of democracy as established by the Constitution, namely, the resolution of election disputes by an authority by the exercise of judicial power by ascertaining the adjudicative facts and applying the relevant law for determining the real representative of the people. (Para 327)

#### Separation of powers

The doctrine of separation of powers which is directed against the concentration of the powers in the same hand has no application as such when the question is whether an amending body can exercise judicial power. In other words, the doctrine is directed against the concentration of the sovereign powers in one or other organ of Government. It was not designed to limit the power of a constituent body. (Para 321)

Whereas in the United States of America and in Australia, the judicial power is vested exclusively in courts, there is no such exclusive vesting of judicial power in the Supreme Court of India and the courts subordinate to it. So that by passing a law within its competence, Parliament can vest judicial power in any authority for deciding a dispute or vest a part of that power in itself for resolving a controversy. And if the amending body exercised judicial power in adjudging the validity of the election, it cannot be said that by that act, it has damaged a basic structure of the Constitution embodied in the doctrine of separation of powers. (Paras 322 & 323)

Even so, the question will remain whether it could exercise judicial power without passing a law enabling it to do so. (Para 322)

The doctrine of separation of powers which is directed against the concentration of the whole or substantial part of the judicial power in the Legislature or the Executive would not be a bar to the vesting of such a power in itself. But, until a law is passed enabling it to do so, its potential judicial power would not become actual. (Para 323)

Clause (4) of Article 329A was legislation *ad hominem* directed against the course of the hearing of the appepals on merits as the appeal and the cross appeal were to be disposed of in accordance with that clause and not by applying the law to the facts as ascertained by the court. This was a direct interference with the decision of these appeals by the Supreme Court on their merits by a legislative judgment. (Para 302)

#### Equality

The majority in *Kesavananda Bharati case* did not hold that Article 14 pertains to the basic structure of the Constitution. The majority upheld the validity of the first part of Article 31C; this would show that a constitutional amendment which takes away or abridges the right to challenge the validity of an ordinary law for violating the fundamental right under that article would not destroy or damage the basic structure. The only logical basis for supporting the validity of Articles 31A, 31B and the first part of 31C is that Article 14 is not a basic structure. (Para 330)

Equality is a multi-coloured concept incapable of a single definition. It is a notion of many shades and connotations. The preamble of the Constitution guarantees equality



SCC Online Web Edition, Copyright © 2021
Page 19        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases


-----------------------------------------------------------------------------------------------------

### Part I—Validity of cl. (4) of Art. 329A (*contd.*)

of status and of opportunity. They are nebulous concepts. They cannot provide a solid foundation to rear a basic structure.                    (Para 334)

The types of equality which our democratic republic guarantees are all subsumed under specific articles of the Constitution like Articles 14, 15, 16, 17, 25, etc., and there is no other principle of equality which is an essential feature of our democratic polity.                    (Para 334)

Counsel for the respondent however, submitted that even if Article 14 does not pertain to basic structure, equality is an essential feature of democracy and rule of law.                    (Para 331)

[**Ed.** *See* discussion on this point under "Rule of Law" (supra).]

## Per Beg, J.

### Rule of law

The high office of the original respondent, far from disabling the Supreme Court from investigating the allegations of corrupt practices and abuse of constitutional power, ought to provide a good ground for the Court to go into the merits of the case if it is not really deprived of its jurisdiction to do that by Section 4 of the Thirty-ninth Amendment. This follows from the rule of law.                    (Para 391)

The jurisdiction of the Supreme Court to try this case on merits cannot be taken away without injury to the basic postulates of the rule of law and of justice within a politically democratic constitutional structure.                    (Para 623)

### Judicial review

Courts, however, have to test the legality of laws, whether purporting to be ordinary or constitutional, by the norms laid down in the Constitution. This follows from the supremacy of the Constitution, which is part of the basic structure.           (Paras 622 and 521)

### Separation of powers

Separation of powers is a part of the basic structure of our Constitution.         (Para 521)

*Kesavananda Bharati* v. *State of Kerala*, 1973 Supp SCR 1 : (1973) 4 SCC 225, *relied on.*

The Constitution is a document recording an act of entrustment and conveyance by the people of India, the political sovereign, of legal authority to act on its behalf to a "Sovereign Democratic Republic". This Constitution has a basic structure comprising the three organs of the Republic: the Executive, the Legislature, and Judiciary. It is through each of these organs that the Sovereign Will of the People has to operate and manifest itself and not through only one of them. Neither of these three separate organs of the Republic can take over the function assigned to the other. This is the basic structure or scheme of system of Government of the Republic laid down in this Constitution whose identity cannot, according to the majority view in *Kesavananda Bharati case* be changed even by resorting to Article 368.                    (Para 555)

### Supremacy of the Constitution

Supremacy of the Constitution is also part of the basic structure.      (Paras 521 and 571)

*Kesavananda Bharati* v. *State of Kerala*, 1973 Supp SCR 1 : (1973) 4 SCC 225, *relied on.*

### Political Justice

The Supreme Court cannot, consistently with the objects of justice, including what is claimed as "political justice", which are parts of what is called the "basic structure", deny the right to claim an adjudication from the Court on exclusively legal issues (not political ones) between the majority party and the minority groups of parties, however


SCC Online Web Edition, Copyright © 2021
Page 20        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

----------------------------------------------------------------------------------------------------

### Part I—Validity of cl. (4) of Art. 329A (contd.)

large and legally right the majority party may be and however small and legally wrong the minority groups or parties may be.                                               (Para 623)

What is involved is the right of the election-petitioner to be heard on merits and the power of the Supreme Court to look into the merits of the case in order to determine whether the election-petitioner's grievances could have any real legal foundations. This is a basic consideration which must compel the Court in the light of the principles laid down in *Kesavananda Bharati case*, to hold that the Court must look into his grievances and determine, for itself, where his case stood on the law before it was amended. Its jurisdiction, at any rate, cannot be barred without creating the impression that what the election-petitioner calls "political justice" is being denied to him.                                               (Para 625)

### Per Chandrachud, J.

Clauses (4) and (5) of Article 329A are unconstitutional and therefore void.  (Para 696)

#### *Rule of Law and Equality*

If there be any unamendable features of the Constitution on the score that they form a part of the basic structure of the Constitution, they are that : (*i*) India is a Sovereign Democratic Republic; (*ii*) Equality of status and opportunity shall be secured to all its citizens; (*iii*) The State shall have no religion of its own and all persons shall be equally entitled to freedom of conscience and the right freely to profess, practise and propagate religion and that (*iv*) the Nation shall be governed by a Government of laws, not of men. These are the pillars of our constitutional philosophy, the pillars, therefore, of the basic structure of the Constitution.                                               (Para 664)

*Kesavananda Bharati v. State of Kerala*, 1973 Supp SCR 1 : (1973) 4 SCC 225, *relied on.*

The rule of law means that the exercise of powers of government shall be conditioned by law and that subject to the exceptions to the doctrine of equality, no one shall be exposed to the arbitrary will of the Government.                                               (Para 681)

Our Constitution exists and must continue to exist. It guarantees equality before law and the equal protection of laws to everyone. The denial of such equality, as modified by the judicially evolved theory of classification, is the very negation of rule of law.                                               (Para 681)

*Anwar Ali Sarkar v. State of W. B.*, 1952 SCR 284 : AIR 1952 SC 75, *referred to.*

It is the common man's sense of justice which sustains democracies and there is a fear that the Thirty-ninth Amendment, by its impugned part, may outrage that sense of justice. Different rules may apply to different conditions and classes of men and even a single individual may, by his uniqueness, form a class by himself. But in the absence of a differentia reasonably related to the object of the law, justice must be administered with an even hand to all.                                               (Para 680)

It follows that clauses (4) and (5) of Article 329A are arbitrary and are calculated to damage or destroy the rule of law.                                               (Para 681)

#### *Judicial review*

It is difficult to accept the contention that Articles 329A(4) and (5) are unconstitutional on the ground that by those provisions, the election of the Prime Minister is placed beyond the purview of courts.                                               (Para 670)

The Constitution, as originally enacted, expressly excluded judicial review in a large variety of important matters. Articles 31 (4), 31(6), 136(2), 227(4), 262(2) and 329(*a*) are some of the instances in point. True, that each of these provisions has a purpose behind it but these provisions show that the Constitution did not regard judicial review as an indispensable measure of the legality or propriety of every determination.                                               (Para 666)



SCC Online Web Edition, Copyright © 2021
Page 21        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------------------------------------

### Part I—Validity of cl. (4) of Art. 329A (*contd.*)

By Article 103(1), any question arising under Article 102 as to whether a member of the Parliament has become subject to any disqualification has to be referred to the President whose decision is final. The President is required by Article 103(2) to obtain the opinion of the Election Commission and act according to its opinion. Thus, in a vital matter pertaining to the election for membership of the Parliament, the framers of the Constitution had left the decision to the judgment of the Executive.                    (Para 666)

Since the Constitution, as originally enacted, did not consider that judicial power must intervene in the interests of purity of elections, judicial review cannot he considered to be a part of the basic structure in so far as legislative elections are concerned. (Para 667)

The problem here is whether under our Constitution, judicial review was considered as an indispensable concomitant of elections to country's legislatures. The answer, plainly, is no.                    (Para 667)

#### Democracy

The contention that 'Democracy' is an essential feature of the Constitution is unassailable. It is therefore necessary to see whether the impugned provisions of the Thirty-ninth Amendment damage or destroy that feature.                    (Para 672)

If the democratic form of government is the cornerstone of our Constitution, the basic feature is the broad form of democracy that was known to our Nation when the Constitution was enacted, with such adjustments and modifications as exigencies may demand but not so as to leave the mere husk of a popular rule. Democracy is not a dogmatic doctrine and no one can suggest that a rule is authoritarian because some rights and safeguards available to the people at the inception of its Constitution have been abridged or abrogated or because, as the result of a constitutional amendment, the form of government does not strictly comport with some classical definition of the concept.                    (Para 672)

The needs of the Nation may call for severe abnegation, though never the needs of the rulers and evolutionary changes in the fundamental law of the country do not necessarily destroy the basic structure of its government. What does the law live for, if it is dead to living needs? We cannot therefore, as lawyers and judges, generalize on what constitutes 'Democracy' though we all know the highest form of that idealistic concept—the state of bliss—in political science.                    (Para 672)

The question for consideration is whether the provisions contained in Articles 329A(4) and (5) are destructive of the democratic form of government.                    (Para 673)

The comparison has to be between the pre-Thirty-ninth Amendment period and the post-Thirty-ninth Amendment period in the context of our Constitution.                    (Para 673)

It is difficult to accept that the impugned provisions destroy the democratic structure of our government. The rule is still the rule of the majority despite the Thirty-ninth Amendment and no law or amendment of the fundamental instrument has provided for the abrogation of the electoral process.                    (Para 675)

Several articles of the Constitution on which democracy functions remain unimpaired.                    (Para 675)

#### Separation of Powers

I prefer to examine the validity of clause (4) of Article 329A in isolation, that is, divorced from considerations arising from theory of separation of powers.                    (Para 661)

The argument directed at showing the invalidation of the Thirty-ninth Amendment on the ground that it abrogates the principle of 'Separation of Powers' is replete with many possibilities since it has several sidelights.                    (Para 682)

The American Constitution provides for a rigid separation of governmental powers


SCC Online Web Edition, Copyright © 2021
Page 22      Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------

### Part I—Validity of cl. (4) of Art. 329A (contd.)

into three basic divisions—the executive, legislative and judicial. It is an essential principle of that Constitution that powers entrusted to one department should not be exercised by any other department. The Australian Constitution follows the same pattern of distribution of powers. Unlike these Constitutions, the Indian Constitution does not expressly vest the three kinds of power in three different organs of the State. But the principle of separation of powers is not a magic formula for keeping the three organs of the State within the strict confines of their functions.                                                                  (Para 684)

*Panama Refining Co.* v. *Ryan*, 293 US 388, 440 and *In re Delhi Laws Act*, 1951 SCR 747, 964 : AIR 1951 SC 332, *referred to.*

The existence, and the limitations on the powers of three departments of government are due to the normal process of specialisation in governmental business which becomes more and more complex as civilization advances. The Legislature must make laws, the Executive enforce them and the Judiciary interpret them because they have in their respective fields acquired an expertise which makes them competent to discharge their duly appointed functions.                                                                  (Para 685)

The political usefulness of the doctrine of separation of powers is now widely recognized though a satisfactory definition of the three functions is difficult to evolve. But the function of the Parliament is to make laws, not to decide cases.                                                   (Para 686)

The reason of this restraint is not that the Indian Constitution recognizes any rigid separation of powers. Plainly, it does not. The reason is that the concentration of powers in any one organ may, by upsetting that fine balance between the three organs, destroy the fundamental premises of a democratic government to which we are pledged.                  (Para 687)

In a federal system which distributes powers between three co-ordinate branches of government, though not rigidly, disputes regarding the limits of constitutional power have to be resolved by courts and therefore, as observed by Paton, "the distinction between judicial and other powers may be vital to the maintenance of the Constitution itself".                                                                                                               (Para 687)

No Constitution can survive without a conscious adherence to its fine checks and balances. Just as courts ought not to enter into problems entwined in the "political thicket", Parliament must also respect the preserve of the courts. The principle of separation of powers is a principle of restraint which has in it the precept, innate in the prudence of self-preservation that discretion is the better part of valour. Courts have by and large come to check their valorous propensities.                                              (Para 688)

In the name of the Constitution, the Parliament may not also turn its attention from the important task of legislation to deciding court cases for which it lacks the expertise and the apparatus. If it gathers facts, it gathers facts of policy. If it records findings, it does so without a pleading and without framing any issues. And worst of all, if it decides a court case, it decides without hearing the parties and in defiance of the fundamental principles of natural justice.                                                                       (Para 688)

In the instant case the Parliament has withdrawn the application of all laws whatsoever to the disputed election and has taken upon itself to decide that the election is valid. Clause (5) commands the Supreme Court to dispose of the appeal and the cross-appeal in conformity with the provisions of clause (4) of Article 329A, that is, in conformity with the "judgment" delivered by the Parliament.                                                         (Para 689)

The Parliament, by clause (4) of Article 329A, has decided a matter of which the country's courts were lawfully seized.                                                              (Para 689)

The exercise by the Legislature of what is purely and indubitably a judicial function is impossible to sustain in the context even of our co-operative federalism which contains no rigid distribution of powers but which provides a system of salutary checks and balances.                                                                                                             (Para 689)

SCC Online Web Edition, Copyright © 2021
Page 23        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

## Part I—Validity of cl. (4) of Art. 329A *(contd.)*

### Equality

Generality and equality are two indelible characteristics of justice administered according to law. The Preamble to our Constitution by which the people of India resolved solemnly to secure to all its citizens equality of status and opportunity finds its realization in an ampler measure in Article 14 which guarantees equality before the law and the equal protection of laws to all persons, citizens and non-citizens alike. Equality is the faith and creed of our democratic republic and without it, neither the Constitution nor the laws made under it could reflect the common conscience of those who owe allegiance to them. And if they did not, they would fail to command respect and obedience without which any Constitution would be doomed to founder on the rocks of revolution. A Constitution which, without a true nexus, denies equality before the law to its citizens may in a form thinly disguised, contain reprisals directed against private individuals in matters of private rights and wrongs. *(Para 677)*

Article 329A(4) makes the existing election laws retrospectively inapplicable, in a very substantial measure, to the parliamentary elections of the Prime Minister and the Speaker. The inapplicability of such laws creates a legal vacuum because the repeal, so to say, of existing laws is only a step-in-aid to free the election from the restraints and obligations of all election laws, indeed of all laws. The plain intendment and meaning of clause (4) is that the election of the two personages will be beyond the reach of any law, past or present. What follows is a neat logical corollary: The election of the Prime Minister could not be declared void, as there was no law to apply to that election; the judgment of the Allahabad High Court declaring the election void is itself void; and, the election continues to be valid as it was before the High Court pronounced its judgment. *(Para 678)*

These provisions are an outright negation of the right of equality conferred by Article 14, a right which more than any other is a basic postulate of our Constitution. It is true that the right, though expressed in an absolute form, is hedged in by a judge-made restriction that it is open to the Legislature to make a reasonable classification so that the same law will not apply to all persons alike or different laws may govern the rights and obligations of different persons falling within distinct classes. *(Para 679)*

Under the principle of equality classification must be founded on an intelligible differentia which distinguishes those who are grouped together from those who are left out and that the differentia must have a rational relation to the object sought to be achieved by the particular law. *(Para 680)*

The first test may be assumed to be satisfied since there is no gainsaying that in our system of Government, the Prime Minister occupies a unique position. But what is the nexus of that uniqueness with the law which provides that the election of the Prime Minister and the Speaker to the Parliament will be above all laws, that the election will be governed by no norms or standards applicable to all others who contest that election and that an election declared to be void by a High Court judgment shall be deemed to be valid, the judgment and its findings being themselves required to be deemed to be void? Such is not the doctrine of classification and no facet of that doctrine can support the favoured treatment accorded by the Thirty-ninth Amendment to two high personages. *(Para 680)*

Different rules may apply to different conditions and classes of men and even a single individual may, by his uniqueness, form a class by himself. But in the absence of a differentia reasonably related to the object of the law, justice must be administered with an even hand to all.

### Political Justice

Equally, there is no substance in the contention that the relevant clauses of the Thirty-ninth Amendment are in total derogation of 'political justice' and are accordingly unconstitutional. The concept of political justice of which the Preamble speaks is too vague and



SCC Online Web Edition, Copyright © 2021
Page 24          Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------------------------------------------

### Part I—Validity of cl. (4) of Art. 329A *(contd.)*

nebulous to permit by its yardstick the invalidation of a constitutional amendment.          (Para 671)

(4) **Constituent power under Article 368—Nature of—Whether purely of legislative nature, restricted to ordering the organisational matters concerning the country's governance or an amalgam of legislative, executive and judicial power —Power under constituent power to alter the conditions for the exercise of judicial power whether extends to withdrawing to itself the judicial power and exercising it—Independently of the basic structure theory whether clause (4) of Article 329A can be struck down on ground of being ultra vires the constituent power— Parliament if transgressed its constituent function in adjudicating upon a private dispute—Real nature of clause (4) of Article 329A—Whether in fact only a judgment or sentence because no general law laid down—Clause (4) of Article 329A whether therefore fails to satisfy the test of being a law, much less a constitutional law, which alone could be made in exercise of power under Article 368**

If **judicial power could be exercised by Parliament, did Parliament ascertain the facts and apply the relevant law—Denial of natural justice**

**Sovereignty, sovereign power and constituent power—Supremacy of the Constitution—Basis of**

**Retrospective effect if can be given to constitutional amendments**

### Per Ray, C. J.

(*a*) The constituent power is *sui generis*. It is different from legislative power. The position of unlimited law-making power is the criterion of legal sovereignty. The constituent power is sovereign because the Constitution flows from the constituent power.          (Para 49)

The constituent power is independent of the doctrine of separation of powers. The constituent power is sovereign. It is the power which creates the organs and distributes the powers.          (Para 48)

There is no doubt that the constituent power is not the same as legislative power. The distinction between constituent power and legislative power is always to be borne in mind because the constituent power is higher in norm. Constituent power is not the same as ordinary law-making power. The constituent power is sovereign. Law-making power is subject to the Constitution.          (Paras 51, 57 and 61)

When the constituent power exercises powers the constituent power comprises legislative, executive and judicial powers. All powers flow from the constituent power through the Constitution to the various departments or heads. In the hands of the constituent authority there is no demarcation of powers. It is only when the constituent authority defines the authorities or demarcates the areas that separation of power is discussed.          (Para 48)

In legislative processes there may be judicial process.          (Para 50)

Parliament may create forum to hear election disputes. Parliament may itself hear election disputes. If Parliament acts as the forum for determination of election disputes it may be a question of parliamentary privileges and the court may not entertain any review from such decisions. That is because the exercise of power by the Legislature in determining disputed elections may be called legislative power. Whichever body will hear election disputes will have to apply norms. Norms are legal standards.          (Paras 61 and 32)

(*b*) Clause (4) in Article 329A has done four things. First, it has wiped out not merely the judgment but also the election petition and the law relating thereto. Secondly, it has deprived the right to raise a dispute about the validity of the election by not having


SCC Online Web Edition, Copyright © 2021
Page 25      Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------------------

### Part I—Validity of cl. (4) of Art. 329A (*contd.*)

provided another forum.   Third, there is no judgment to deal with and no right or dispute to adjudicate upon.   Fourth, the constituent power of its own legislative judgment has validated the election.                                                                      (Para 56)

If no law prior to the Constitution (Thirty-ninth Amendment) Act will apply to election petitions or matters connected therewith the result is that there is not only no forum for adjudication of election disputes but that there is also no election petition in the eye of law.   The insurmountable difficulty is in regard to the process and result of validating the election by clause (4).                                                          (Para 58)

Every organ of the State has to ascertain facts which make the foundation of its own decision.   That the validation of the election is itself the law or that the constituent power applied its own norms to the election petition is unacceptable.   If the election petition itself did not have any existence in law there was no petition which could be looked into by the constituent power.   If there was no petition no norms could be applied to the election dispute.   The dispute has to be seen.   The dispute has to be adjudicated upon.                                                          (Paras 51 and 58)

Clause (4) of Article 329A in the present case in validating the election has passed a declaratory judgment and not a law.   The legislative judgment in clause (4) is an exercise of judicial power.   The constituent power can exercise judicial power but it has to apply law.   The validation of the election is not by applying legal norms.   Nor can it be said that the validation of election in clause (4) is by norms set up by the constituent power.                                                          (Paras 62 & 63)

Clause (5) in Article 329A states that an appeal against any order of any court referred to in clause (4) pending, before the commencement of the Constitution (Thirty-ninth Amendment) Act, 1975, before the Supreme Court, shall be disposed of in conformity with the provisions of clause (4).   The appeal cannot be disposed of in conformity with the provisions of clause (4) inasmuch as the validation of the election cannot rest on clause (4).                                                          (Para 64)

Clause (4) suffers from these infirmities.   First, the forum might be changed but another forum has to be created.   If the constituent power became itself the forum to decide the disputes the constituent power by repealing the law in relation to election petitions and matters connected therewith did not have any petition to seize upon to deal with the same.   Secondly, any decision is to be made in accordance with law.   Parliament has power to create law and apply the same.   In the present case, the constituent power did not have any law to apply to the case, because the previous law did not apply and no other law was applied by clause (4).   The validation of the election in the present case is, therefore, not by applying any law and it, therefore, offends rule of law.      (Para 59)

### Per Khanna, J.

Clause (4) of Article 329A consists of four parts :

(*i*) No law made by Parliament before the commencement of the Constitution (Thirty-ninth Amendment) Act, 1975 in so far as it relates to the election petitions and matters connected therewith shall apply or shall be deemed ever to have applied to or in relation to the election of any such person as is referred to in clause (1) to either House of Parliament ;

(*ii*) and such election shall not be deemed to be void or ever to have become void on any ground on which such election could be declared to be void or has before such commencement been declared to be void under any such law ;

(*iii*) and notwithstanding any order made by any court before such commencement declaring such election to be void, such election shall continue to be valid in all respects ;

(*iv*) and any such order and any finding in which such order is based shall be and shall be deemed always to have been void and of no effect.      (Para 185)



SCC Online Web Edition, Copyright © 2021
Page 26        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------------------------------------------------

### Part I—Validity of cl. (4) of Art. 329A *(contd.)*

In so far as part *(i)* is concerned, it relates to a matter which can be the subject of an ordinary legislation or a constitutional amendment. A law in the above terms can validly be made by a Legislature as well as by a constituent authority. The fact that the above law would have retrospective effect would not detract from the competence of the Legislature or constituent authority to make such a law. It is permissible for a Legislature to make a law with retrospective effect. The power of a Legislature to make a law with retrospective effect is not curtailed or circumscribed by the fact that the subject-matter of such retrospective law is a matter relating to an election dispute. If a Legislature can pass legislation in respect of matters relating to an election dispute with a retrospective effect, the constituent authority, which is a kind of super-Legislature, would *a fortiori* be entitled to do so. (Para 186)

*State of Orissa* v. *Bhupendra Kumar Bose*, 1962 Supp 2 SCR 380 : AIR 1962 SC 945; *Kanta Kathuria* v. *Manak Chand Surana*, (1969) 3 SCC 268, *relied on.*

The effect of part *(i)* of clause (4) is that the High Court was divested of the jurisdiction to decide the dispute relating to the election of the appellant with a retrospective effect. The law under which the election of the appellant was declared to be void as a result of the amendment was also made inapplicable with retrospective effect to the dispute relating to the election of the appellant. The resultant effect of the amendment thus was that the order by which the election of the appellant was declared to be void and the finding on which such order was based were rendered to be void and of no effect. (Para 188)

Part *(ii)* of clause (4) spells out the consequence which flows from part *(i)* of the clause. The same, to some extent, appears to be true of part *(iv)* of clause (4). If the previous law in so far as it relates to the election petitions and matters connected therewith was not to apply to the election of the appellant, the High Court shall be deemed to have had no jurisdiction to decide the election petition challenging the election of the appellant. Another aspect of part *(iv)* of clause (4) relates to the question as to whether it is open to the constituent authority to declare an order and a finding of the High Court to be void and of no effect or whether such a declaration can be made only either in separate judicial proceedings or in proceedings before a higher court. (Paras 187 to 189)

By part *(iii)* it is declared that the election of the appellant shall continue to be valid in all respects. Such a declaration would not follow from part *(i)* of the clause. It would not also follow from part *(ii)* and part *(iv)* of the clause which, in effect represented the consequences flowing from part *(i)*. The declaration made in part *(iii)* of clause (4) that the election of the appellant was to be valid in all respects was tantamount in the very nature of things to the repelling of the grounds advanced by the respondent to challenge the election of the appellant. Question therefore arises as to what, if any, was the law which was applied in repelling the grounds advanced by the respondent to challenge the election of the appellant. So far as the existing law relating to election disputes was concerned, part *(i)* of clause (4) expressly stated that such a law would not apply to the petition filed by the respondent to challenge the election of the appellant. This means that the provisions of the Representation of the People Act were not to apply to the petition filed by the respondent against the appellant. This also means that the amending Acts 58 of 1974 and 40 of 1975 were not to apply to the dispute relating to election of the appellant. (Para 195)

The dispute relating to the election of the appellant is also not to be governed by law which is to be enacted under clause (1) of Article 329A. Such a law would apply only to future elections. The result is that so far as the dispute relating to the election of the appellant is concerned, a legal vacuum came into existence. It was open to the constituent authority to fill that vacuum by prescribing a law which was to govern the dispute arising out of the petition filed by the respondent to challenge the election of the appellant. The constituent authority, however, did not do so and straightaway proceeded



SCC Online Web Edition, Copyright © 2021
Page 27        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------------

### Part I—Validity of cl. (4) of Art. 329A (*contd.*)

to declare the election of the appellant to be valid. There is nothing in clause (4) to indicate that the constituent authority applied any law in declaring the election of the appellant to be valid and if so, what was that law. The position which thus emerges is that according to clause (4) no law was to apply for adjudicating upon the challenge to the election of the appellant and the same was in terms of part (*iii*) to be valid in all respects.
(Paras 196 and 197)

The vice of clause (4) of Article 329A is not merely that it makes the previous law contained in the R. P. Act as amended by Acts 58 of 1974 and 40 of 1975 inapplicable to the challenge to the election of the appellant, it also makes no other election law applicable for resolving that dispute. The further vice from which the said clause suffers is that it not merely divests the previous authority, namely, the High Court of its jurisdiction to decide the dispute relating to the election of the appellant, it confers no jurisdiction on some other authority to decide that dispute. Without even prescribing a law and providing a forum for adjudicating upon the grounds advanced by the respondent to challenge the election of the appellant, the constituent authority has declared the election of the appellant to be valid.
(Para 201)

### Per Mathew, J.

(*a*) The expression "sovereign" has theological and religious overtones.        (Para 281)

Sovereign is not a 'mortal God' and can express himself or itself only in the manner and form prescribed by law and can be sovereign only when he or it acts in a certain way also prescribed by law, then perhaps the use of the expression will have no harmful consequence. 'Legal sovereignty' is a capacity 'to determine the actions of persons in certain intended ways by means of *a law*.... where the actions of those who exercise the authority, in those respects in which they do exercise it, are not subject to any exercise by other persons of the kind of authority which they are exercising.'
(Para 281)

The constituent power is the power to frame a Constitution. The people of India, in the exercise of that power, framed the Constitution and it enacts the basic norms. By that instrument, the people conferred on the amending body the power to amend by way of addition, variation or repeal of any of its provisions.
(Para 280)

The point to be kept in mind is that the amending body which exercises the constituent power of the legal sovereign, though limited by virtue of the decision in *Kesavananda Bharati case* can express itself only by making laws.
(Para 282)

The distinction between constitutional law and ordinary law in a rigid Constitution like ours is that the validity of the constitutional law cannot be challenged whereas that of ordinary law can be challenged on the touchstone of Constitution. But constitutional law is as much law as ordinary law.
(Para 283)

The constituent power, no doubt, is all-embracing, comprising within its ambit the judicial, executive and legislative powers. But if the constituent power is a power to frame or amend a Constitution, it can be exercised only by making laws of a particular kind.
(Para 322)

The possession of power is distinct from its exercise. The possession of legislative power by the amending body would not entitle it to pass an ordinary law, unless the Constitution is first amended by passing a constitutional law authorizing it to do so. In the same way, the possession of judicial power by the amending body would not warrant the exercise of the power, unless a constitutional law is passed by the amending body enabling it to do so. Until that is done, its potential judicial power would not become actual.
(Para 323)

If the basic postulate that a sovereign can act only by enacting laws is correct, then that is a limitation upon his power to do anything he likes. The classical statement of


SCC Online Web Edition, Copyright © 2021
Page 28      Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------------------

### Part I—Validity of cl. (4) of Art. 329A (contd.)

Sir Owen Dixon may be rephrased thus : *The law that a sovereign can act only by law is supreme but as to what may be done by a law so made, the sovereign is supreme over the law.* Of course, this is subject to the theory of basic structure. In other words, even though a sovereign can act only by making law, the law he so makes may vest the authority to exercise judicial power in himself; without such law he cannot exercise judicial power.                     (Para 326)

    Hidayatullah, J. in *Golaknath* v. *State of Punjab*, AIR 1967 SC 1643, *relied on.*

    (b) At the time our Constitution was framed, the decision of an election dispute had ceased to be a privilege of the House of Commons in England and therefore, under Article 105(3), it could not be a privilege of Parliament in this country.                     (Para 270)

    An election dispute has a public aspect in that it is concerned more with the right of a constituency to be represented by a particular candidate. But it does not follow from the public character of the controversy that there is no *lis* between the parties to the election contest, and that the *lis* can be resolved otherwise than by ascertaining the facts relating to the election, and applying the relevant law.                     (Para 276)

    When a dispute is raised as regards the validity of the election of a particular candidate, the authority entrusted with the task of resolving the dispute must necessarily exercise a judicial function, for, the process consists of ascertaining the facts relating to the election and applying the law to the facts so ascertained. In other words, it is obvious that a power must be lodged somewhere to judge the validity of the election. In whichever authority the power is lodged, the nature of the function is such that it requires a judicial approach. It cannot be resolved on considerations of political expediency.                     (Para 269)

    *Durga Shankar Mehta* v. *T. R. Singh*, (1955) 1 SCR 267, *referred to.*

    Judicial power is the exercise of a power on the basis of pre-existing law. The amending body, when it declared the election of the appellant to be valid in clause (4) of Article 329A, had to ascertain the adjudicative facts and apply the relevant norm for adjudging its validity. If, however, the amending body did not ascertain the facts relating to the election and apply the relevant norm, the declaration of the validity of the election was a fiat of a *sui generis* character of the amending body.                     (Paras 277 & 267)

    *United Engineering Workers' Union* v. *Devanayagam*, 1968 AC 356.

    The exercise of judicial power can result only in a judgment or sentence. A Constitution cannot consist of a string of isolated dooms. A judgement or sentence which is the result of the exercise of judicial power or of despotic discretion is not a law as it has not got the generality which is an essential characteristic of law.                     (Paras 322 & 283)

    *Liyanage* v. *Queen*, (1967) 1 AC 259, 291, *relied on.*

    If the amending body really exercised judicial power, that power was exercised in violation of the principles of natural justice of *audi alteram partem.* Even if a power is given to a body without specifying that the rules of natural justice should be observed in exercising it, the nature of the power would call for its observance. There is nothing on the face of the amendment to show that the amending body ascertained the facts of the case or applied any norms for determining the validity of the election. Under Article 368 the amending body was not competent to pass an ordinary law with retrospective effect to validate the election.                     (Para 303)

    There is also nothing to show that the amending body validated the election with reference to any change of the law which formed the foundation of the judgment.     (Para 307)

    In sum, our Constitution, by Article 329(*b*) visualizes the resolution of an election dispute on the basis of a petition presented to such authority and in such manner as the appropriate Legislature may, by law provide. The nature of the dispute raised in an election petition is such that it cannot be resolved except by judicial process, namely, by



SCC Online Web Edition, Copyright © 2021
Page 29          Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

### Part I—Validity of cl. (4) of Art. 329A (*contd.*)

ascertaining the facts relating to the election and applying the pre-existing law; when the amending body held that the election of the appellant was valid, it could not have done so except by ascertaining the facts by judicial process and by applying the law. The result of this process would not be the enactment of constitutional law but the passing of a judgment or sentence. The amending body, though possessed of judicial power, had no competence to exercise it, unless it passed a constitutional law enabling it to do so. If, however, the decision of the amending body to hold the election of the appellant valid was the result of the exercise of an 'irresponsible despotic discretion' governed solely by what it deemed political necessity or expediency, then, like a bill of attainder, it was a legislative judgment disposing of a particular election dispute and not the enactment of a law resulting in an amendment of the Constitution.                                                              (Para 327)

*Durga Shankar Mehta* v. *Thakur Raghuraj Singh,* (1955) 1 SCR 267; *Barry* v. *United States Ex. Rel. Cunningham,* 73 L Ed 867, *relied on.*

*Madhav Rao Scindia* v. *Union,* (1971) 1 SCC 85 and *U. S.* v. *Brown,* 381 US 437, *referred to.*

The decision of the amending body cannot be regarded as an exercise in constituent legislative validation of an election for these reasons: firstly, there can be no legislative validation of an election when there is dispute between the parties as regards the adjudicative facts; the amending body cannot gather these facts by employing legislative process; they can be gathered only by judicial process. Secondly, the amending body must change the law retrospectively so as to make the election valid, if the election was rendered invalid by virtue of any provision of the law actually existing at the time of election; Article 368 does not confer on the amending body the competence to pass any ordinary law whether with or without retrospective effect. Clause (4) expressly excluded the operation of all laws relating to election petitions to the election in question. Therefore, the election was held to be valid not by changing the law which rendered it invalid. Thirdly, the cases cited for the appellant are cases relating to legislative validation of invalid elections or removal of disqualification with retrospective effect. Being cases of legislative validation, or removal of disqualifications by Legislature, they are not liable to be tested on the basis of the theory of basic structure, which is applicable only to constitutional amendments. Fourthly, there was no controversy in those cases with regard to adjudicative facts: if there was controversy with regard to these facts, it is very doubtful whether there could be legislative validation of an election by changing the law alone without ascertaining the adjudicative facts by judicial process.                                                              (Para 327)

*Abeyesekera* v. *Jayatilake,* 1932 AC 260; *Piare Dusadh* v. *King Emperor,* 1944 FCR 61: AIR 1944 FC 1; *Kanta Kathuria* v. *Manak Chand Surana,* (1969) 3 SCC 268 and *State of Orissa* v. *Bhupendra Kumar Bose,* 1962 Supp 2 SCR 380: AIR 1962 SC 945, *referred to.*

Hence clause (4) of Article 329A is bad for the above reasons. Clauses (1) to (3) of Article 329A are severable but no opinion is expressed on their validity as it is not necessary for deciding this case.                                                              (Para 343)

### Per Beg, J.

(*a*) The contention that the constituent power is above the Constitution or lies "outside" the Constitution is not supported by earlier cases. In fact, in neither of the two cases of *Golaknath* and *Kesavananda Bharati* was the question raised or considered at all by the Supreme Court whether the amending power or the "constituent power" itself constituted such an amalgamated concentration of power, said to be distributed by the Constitution between the three different organs of State at a "subsequent stage" whatever this may mean. Such a contention cannot be accepted.                                                              (Para 520)

The theory that there should be a separation of functions between the making of laws, the execution of laws, and the application of laws, after ascertaining facts satisfactorily, is not new. It is embedded in our own best traditions. It is dictated, if by nothing else, by


SCC Online Web Edition, Copyright © 2021
Page 30          Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------------------------------------------

## Part I—Validity of cl. (4) of Art. 329A *(contd.)*

common sense and the principle of division of labour, without an application of which efficient performance of any duties cannot be expected.                                    (Para 533)

On certain clear matters of principle underlying the Constitution, no reasonable person could entertain two views as to what was or could really be intended by the Constitution-makers. One of these matters, clear beyond the region of all doubt, seems to be that the judicial and law-making functions, however broadly conceived, could not possibly have been meant to be interchangeable. They are not incapable of distinction and differentiation, in any constitutionally prescribed sphere of operation of power including that of "constituent power".                                                                                                                      (Para 541)

Judicial review of all law-making, whether it appertains to the sphere of fundamental law or of ordinary law, is traceable to the doctrine of judicial control by reference to certain basic principles, contained in a Constitution and considered too inviolable to be easily alterable. It may be that this doctrine is unsuitable for our country at a time when it is going through rapid socio-economic transformation. Nevertheless, so long as the doctrine is found embodied in our Constitution, one cannot refuse to recognise it.                    (Para 549)

It is true that there is no mention or vesting of judicial power, as such, in the Supreme Court by any article of our Constitution, but, can it be denied that what vests in the Supreme Court and High Courts is really judicial power? The Constitution undoubtedly specifically vests such power, that is to say, power which can properly be described as "judicial power", only in the Supreme Court and in the High Courts and not in any other bodies or authorities, whether executive or legislative, functioning under the Constitution. Could such a vesting of power in Parliament have been omitted if it was the intention of Constitution-makers to clothe it also with any similar judicial authority or functions in any capacity whatsoever?                                                                                              (Para 551)

The claim, therefore, that an amalgam or some undifferentiated residue of inherent power, incapable of precise definition and including judicial power, vests in Parliament in its role as a constituent authority, cannot be substantiated by a reference to any article of the Constitution whatsoever, whether substantive or procedural. Because the constituent power necessarily carries with it the power to constitute judicial authorities, it cannot also, by implication, mean that the Parliament, acting in its constituent capacity, can exercise the judicial power itself directly without vesting it in itself first by an amendment of the Constitution.                                                                                              (Para 552)

*(b)* The absence of any quasi-judicial procedure, from the comprehensively framed procedural provisions of Article 368, seems extremely significant. It indicates that it was the clear intention of Constitution-makers that no judicial or quasi-judicial function could be performed by Parliament whilst operating in the special constituent field of law-making. An omission to provide any quasi-judicial procedure in Article 368, which, apparently, furnishes a self-contained code, means that no such power was meant to be included here at all. Proper exercise of judicial power is inseparable from appropriate procedure.                                                                                              (Para 576)

It is true that, in the exercise of the law-making constituent power, brought in by Section 8 of the Indian Independence Act, the legislatures could be armed with judicial powers as well if appropriate laws were made to that effect. But, as no law, either constitutional or ordinary was passed, preceding Thirty-ninth Amendment, to repeal the Act of 1951 and then to vest a judicial power in Parliament, so as to enable it to take over and decide election disputes itself directly, clause (4) of Article 329A, if it contained certain provisions on the assumption that such a judicial power was already there in Parliament, could not be valid as a piece of mere law-making.                    (Para 583)

*Tilkayat Shri Govindlalji Maharaj v. State of Rajasthan,* (1964) 1 SCR 561, 591, *distinguished.*

*Queen v. Burah,* 5 IA 178, *referred to.*



SCC Online Web Edition, Copyright © 2021
Page 31          Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------

### Part I—Validity of cl. (4) of Art. 329A (*contd.*)

It is not possible to contend, by resorting to some concept of a succession to the powers of the medieval "High Court of Parliament" in England, that a judicial power also devolved upon our Parliament through the Constituent Assembly, mentioned in Section 8 of the Indian Independence Act of 1947.                                (Para 591)

Whatever view one may take of any other powers of Parliament, by reason of Article 105(3) of the Constitution, it cannot be seen how exercise of the jurisdiction to determine an election dispute, which was, in accordance with Article 329(*b*), already vested in the High Court by the Act of 1951 for all elections to the House of the People, could not only be taken away by a constitutional amendment, purporting to repeal retrospectively the provisions of the Act of 1951, a piece of ordinary legislation, in their application to a particular class of cases, but at the same time, making a declaration of the rights of the parties to a judgment, without first performing a judicial function also which was not included in the "constituent" or any other law-making power.                (Para 594)

*Kielley* v. *Carson*, 4 Moore PC 63, *referred to.*

As the constitutional provisions compel the Court to hold that no form of judicial or quasi-judicial power is included in the "constituent power", contained in Article 368 of the Constitution, no further question need really be considered by the Court if it was to hold that the insertion of clause (4) in Article 329A necessarily involved, as a condition precedent to the making of the declaration found at the end of it, the performance of a quasi-judicial or judicial function. But, the Court could not go so far as that. The Act of 1951, enacted under the provisions of Article 329(*b*) of the Constitution, provided a procedure which could not be circumvented. This procedure was certainly applicable until August 10, 1975 when the Thirty-ninth Amendment received Presidential assent. Rights of appeal under Section 116A of the Act having been invoked by the original respondent as well as by the election-petitioner, and the operation of the High Court's order having been suspended, the position was, in the eyes of law, that the election dispute was continued by a proceeding, exclusively prescribed by Article 329(*b*) for the resolution of the dispute, pending in the Supreme Court. Despite the impression created by the terms of the declaration at the end of clause (4) of Article 329A and the opening statement of the Counsel for the original respondent, the Court cannot assume that Parliament took over the case into its own hands to decide it and to incorporate the result in the form of Article 329A(4) so that this may take the place of a possible judgment of the Supreme Court. Parliament could not be deemed to be unaware of the bar created by Article 329(*b*) and the 1951 Act.                (Para 599)

There is no provision anywhere for the exercise of overriding judicial or quasi-judicial powers by Parliament. It is difficult to conceive a case being considered by Parliament and the ratifying Legislatures as a case on trial. Parliament could not, therefore, be assumed to have withdrawn and then to have decided a particular case in a particular way by applying its own norms. It is presumed to know the law. Ostensibly, Article 329A(4) is part of an amendment of the Constitution for the purposes found in the statement of objects and reasons. Only the declaration given at the end of it suggests that, in the course of it, the effect upon the case before the Supreme Court was considered and dealt with.                (Para 603)

One of the basic principles is that just as courts are not constitutionally competent to legislate under the guise of interpretation, so also neither the Parliament nor any State Legislature, in the purported exercise of any kind of law-making power, perform an essentially judicial function by virtually withdrawing a particular case, pending in any court, and taking upon itself the duty to decide it by an application of law or its own standards to the facts of that case. This power must at least be first constitutionally taken away from the court concerned and vested in another authority before it can be lawfully exercised by that other authority. It is not a necessary or even a natural incident of a "constituent power".                (Para 392)


SCC Online Web Edition, Copyright © 2021
Page 32      Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------------------------------------------------------

### Part I—Validity of cl. (4) of Art. 329A (contd.)

While creation and annulment of all general norms, whether basic or not so basic, is essentially a legislative function, their interpretation and application to findings reached, after a correct ascertainment of facts involved in an individual case, by employing the judicial technique, is really a judicial function. Neither of the three constitutionally separate organs of State can, according to the basic scheme of our Constitution today, leap outside the boundaries of its own constitutionally assigned sphere or orbit of authority into that of the other. This is the logical and natural meaning of the principle of supremacy of the Constitution. An inquiry into the merits is not irrelevant if the very nature and purpose of the exercise of a power are put in issue by both sides.        (Paras 392 and 394)

(e) Sovereignty and exercise of sovereign power are distinct.                (Para 525)

Our concepts of sovereignty must accord with the needs of the people of our country.                                                         (Para 569)

In India it is the Constitution and not the constituent power which is supreme, in the sense that the constitutionality of the Constitution cannot be called in question before the Supreme Court but the exercise of the constituent power can be, so the Court has to judge the validity of exercise of constituent power by testing it on the anvil of constitutional provisions. According to the majority view in *Kesavananda Bharati case*, the test can be found primarily in the Preamble to our Constitution.                    (Para 621)

*Liyanage* v. *Queen*, (1967) 1 AC 259, *referred to.*

Courts, however, have to test the legality of laws, whether purporting to be ordinary or constitutional, by the norms laid down in the Constitution. This follows from the supremacy of the Constitution.                                          (Para 622)

The term "sovereign" is only used in the preamble of our Constitution. The Supreme Court, exercising the powers vested in it under the Constitution to declare the law of the land, cannot go behind the clear words of the Constitution contained in the preamble on such a matter. One has to presume that the Constitution was actually made by the people of India by virtue of their political sovereignty which enabled them to create a legally Sovereign Democratic Republic to which they consigned or entrusted, through the Constitution, the use of sovereign power to be exercised, in its different forms, by the three different organs of Government, each acting on behalf of the whole people, so as to serve the objects stated in the preamble. This reference to "the people of India" is much more than a legal fiction. It is an assertion in the basic legal instrument for the governance of this country of fact of a new political power. The legal effect of the terms of the instrument is another matter.                              (Paras 553 and 554)

Sovereignty, as the power of taking ultimate or final decisions on broad politico-legal issues involved in any proposed changes in the law, becomes divisible. The people are not excluded from the exercise of it. They participate in all the operations of the Republic through the organs of the State. They bind themselves to exercise their individual and collective rights and powers only in the ways sanctioned and through agencies indicated by the Constitution. The Republic is controlled and directed by the Constitution to proceed towards certain destinations and for certain purposes only. The power to change even the direction and purposes is itself divided in the sense that a proposed change, if challenged, must be shown to have the sanction of all the three organs of the Republic, each applying its own methods and principles and procedure for testing the correctness or validity of the measures. This result, whether we like it or not, necessarily follows from our present constitutional structure and scheme. If the judicial power operates here like a brake or a veto, it is not one which can be controlled by any advice or direction to the Judiciary as is the case in totalitarian regimes. In our system, which is democratic, its exercise is left to the judicial conscience of each individual judge. This is also a basic and distinguishing feature of Democracy.                                                (Para 555)



SCC Online Web Edition, Copyright © 2021
Page 33      Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source:  Supreme Court Cases

-------------------------------------------------------------------------------------------------------------------------

### Part I—Validity of cl. (4) of Art. 329A (*contd.*)

Inasmuch as the Constitution is the instrument which regulates the distribution between and exercise of sovereign power, by the three organs of the State, and it is there constantly to govern and to be referred to and to be appealed to in any and every case of doubt and difficulty, it could itself, conceptually, be regarded as the true or "ultimate" sovereign, that is to say, sovereign as compared with "immediate" sovereignty of an organ of the Republic acting within its own sphere and at its own level.                    (Para 556)

Of course, inasmuch as the power of altering every feature of the Constitution remains elsewhere politically, the Constitution is neither the ultimate "political" sovereign nor a legally unalterable and absolute sovereign. All constitutional and "legal" sovereigns are necessarily restrained and limited sovereigns.                    (Para 557)

The will of the people is inseparable from a Constitution which enables it to be expressed and then to govern. The Constitution neither is nor can be sovereign in the sense that the people who made it cannot unmake it or change it. It only prescribes the correct mode of doing everything, including that of changing the very system of Government. It is only in this sense that it can be "sovereign" or "supreme" and rule the life of a nation.                    (Para 563)

No simple theory of sovereignty fits the complex facts of modern life. Every theory of today, ultimately, rests on concepts more refined than the physical or spiritual might of some ruler, in whom executive, legislative, and judicial powers coalesce to take away all legal distinctions between them. Even if that was ever the concept of sovereignty anywhere, it was certainly not that of our Constitution-makers and it is not ours today.                    (Para 565)

*Cooper* v. *Wandsworth Board of Works*, (1863) 14 CB (NS) 180, *referred to.*

As between the sovereignty of the amending article and the sovereignty of the Constitution there should be little doubt that lawyers should and would prefer the sovereignty or supremacy of the whole Constitution rather than of any part of it. On the fact of it, it appears more reasonable and respectable to swear allegiance to the the whole Constitution, as we actually do, rather than to Article 368 or to the amending powers contained in it. If there is a part of our Constitution which deserves greater devotion than any other part of it, it is certainly the Preamble to our Constitution. The concept of the supremacy of the Constitution is, undoubtedly, more suited to the needs of our country than any other so far put forward. It not only places before us the goals towards which the nation must march but it is meant to compel our Sovereign Republic, with its three organs of Government to proceed in certain directions. It assumes that each organ of State will discharge its trust faithfully.                    (Paras 566 & 569)

The doctrine of the supremacy or sovereignty of the Constitution was adopted by a Bench of seven learned Judges of the Supreme Court in *Special Reference No. 1 of 1964*. The principle of the supremacy of the Constitution was then declared by the majority of the learned Judges of the Supreme Court in *Kesavananda Bharati case* to be a part of the basic structure of the Constitution. The theory of the supremacy of the Constitution is thus not a new one at all. It is inherent in the very concept of "the auguster thing" which lies behind Parliament or king and is sought to be embodied in the Constitution of a country.                    (Paras 571 to 574)

*Special Reference No. 1 of 1964*, (1965) 1 SCR 413, *relied on.*

The "constituent power" is still bound by the exclusively prescribed procedure to "amend by way of addition, variation, or repeal" any provision of the Constitution. It is entirely a law-making procedure elaborately set out in clause (2) of Article 368.     (Para 576)

There are scattered dicta in the judgments of the Supreme Court speaking of the "sovereignty of the people" which can only be related to the political sovereignty of the people recognised by the preamble to our Constitution where the people are described as the



SCC Online Web Edition, Copyright © 2021
Page 34        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------

### Part I—Validity of cl. (4) of Art. 329A (*contd*)

Constitution-makers who gave the Constitution unto themselves. This, however, does not mean that the people retained unto themselves any residue of legal sovereignty. They did not prescribe, apart from dividing the exercise of sovereign power roughly between the three organs of the Republic, each with its own modus operandi, any other or direct method, such as Initiative or Referendum, for exercising their politically sovereign power. (Para 578)

The people entrusted to the three organs of the Sovereign Democratic Republic they constituted the exercise of three aspects of sovereign power on behalf of the people. This seems to be the only way of reconciling the idea of a sovereign people, in the political sense, and the sovereignty of the Republic, represented by a legally supreme Constitution, so that the "sovereign" powers of each of the three organs of the Republic had to be exercised in conformity with the mandates, both positive and negative, express and implied, of the Constitution. This concept may be described as one of the "supremacy of the Constitution" instead of "sovereignty" of the Constitution because of the theoretical, speculative and "emotive" clouds which have gathered around the term "sovereignty". (Para 578)

(d) To give clause (4) of Article 329A its natural and literal meaning would mean that Parliament, in its constituent capacity, had functioned as though it was a direct court of appeal from a judgment of the High Court while an appeal in the last court is pending —a procedure which has not been shown to have been followed so far in any case brought to the notice of the Supreme Court either decided in this country or anywhere else in the world, all the cases cited to support such a view being distinguishable on facts and law applicable. And in so doing all laws prior to the Thirty-ninth Amendment, relating to election petitions and "matters connected therewith", which must include the grounds given in Section 100 of the Representation of the People Act, 1951, were neither to be applied nor ever deemed to have applied to the case. This surely meant that they must be "deemed" not to have been applied by Parliament itself, according to the well known rule of construction that a legal fiction, introduced by a deeming provision, must be carried to its logical conclusion. (Paras 514 and 515)

*East End Dwellings Co. Ltd.* v. *Finsbury Borough Council*, 1952 AC 109, *relied on.*

The essence of judicial or quasi-judicial function is the application of a law which is already given by the law-making authority to the judicial or quasi-judicial authority to apply. This law has to be applied to certain findings after determining the disputed questions of fact in a manner which must conform to the canons of natural justice. (Para 518)

### Per Chandrachud, J.

I find it contrary to the basic tenets of our Constitution to hold that the amending body is an amalgam of all powers—legislative, executive and judicial. "Whatever pleases the emperor has the force of law" is not an article of democratic faith. The basis of our Constitution is a well planned legal order, the presuppositions of which are accepted by the people as determining the methods by which the functions of the government will be discharged and the power of the State shall be used. (Para 690)

Every citizen has a stake in legislative elections for, his social and economic well-being depends upon the promises and performance of the legislators. Such elections, and more so the election of the Prime Minister who is at least *primus inter pares,* can legitimately form the subject-matter of a constitutional provision. (Para 662)

The choice of the subject for constitutional amendment here cannot be characterized as trifling, frivolous or outside the framework of a copious Constitution. In fact, it is wrong to think that elections to the country's Legislatures are a private affair of the contestants. They are matters of public interest and national importance. (Para 662)



SCC Online Web Edition, Copyright © 2021
Page 35        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

---

**Part I—Validity of cl. (4) of Art. 329A** *(contd.)*

(e) **Constitution (Thirty-ninth) Amendment Act, 1975—Section 5—Validity of granting constitutional immunity to the Representation of the People (Amendment) Act, 1974 (58 of 1974) and the Election Laws (Amendment) Act, 1975 (40 of 1975) by inserting them in the Ninth Schedule.**

### Per Ray, C.J.

The view of seven Judges in *Kesavananda Bharati's case* is that Article 31-B is a constitutional device to place the specified statutes in the schedule beyond any attack that these infringe Part III of the Constitution. The Twenty-ninth Amendment was affirmed in *Kesavananda Bharati's case* by majority of seven against six Judges. Therefore the protection accorded by the Thirty-ninth Amendment is valid and immunises Acts 58 of 1974 and 40 of 1975.

(Paras 152 & 153)

(f) **Article 329A—Clause (1)—Exception clause in—Effect of—**(Per Khanna, J.)

(Paras 174 & 175)

**B. Constitution of India—Articles 79, 81 & 122(1) and 105(3)— Constitutionality of the session of Parliament in which Constitution Thirty-ninth (Amendment) Act, 1975 was passed—Detention of a number of members of Parliament if vitiated the session by denying such members the opportunity to attend the session and to exercise their right of free speech and vote—Convening a session of full Parliament whether essential—Legality of the detention of such members if can be challenged—Right of participation of some members in the proceedings of Parliament whether interfered with contrary to Article 105(3) of the Constitution—Constitution of India, Article 85—Effect of.**

### Per Ray, C.J.

When a member is excluded from participating in the proceedings of the House, that is a matter concerning Parliament and the grievance of exclusion is in regard to proceedings within the walls of Parliament. In regard to rights to be exercised within the walls of the House, the House itself is the judge.

(Para 69)

*Bradlaugh* v. *Gosset*, 12 QBD 271 and *Shirley's case*, 1 Hatsell 157, *relied on.*

The Composition of Parliament is not dependent on inability of a member to attend for whatsoever reason. The purpose of Article 85 is to give effect to the collective right of the House which represents the nation to be called as often as the situation demands, and in any case the interval between two sessions must not exceed six months.

(Para 74)

Article 85 is not a provision regarding the constitution of Parliament but of holding of sessions.

(Para 77)

Assuming a conflict were to arise between the privileges of a member under Article 105(3) and the functions of the House to assemble under Article 85 the privilege of the member will not prevail. The detention of members of Parliament is by a statutory authority in the exercise of his statutory powers.

(Para 74)

The detention under MISA cannot be challenged by collateral attack on the ground of deprivation of their participation in the parliamentary proceedings.

(Para 76)

The privilege of freedom from arrest is limited to civil causes, and has not been allowed to interfere with the administration of criminal justice or emergency legislation.

(Para 80)

*Special Reference No. 1 of 1964,* (1965) 1 SCR 413 : AIR 1965 SC 745 and *Wilke's case,* 19 State Tr 981, *referred to.*


SCC Online Web Edition, Copyright © 2021
Page 36     Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------------------------

### Part I—Validity of cl. (4) of Art. 329A (contd.)

*K. Anandan Nambiar* v. *Chief Secretary, Govt. of Madras,* (1966) 2 SCR 406 : AIR 1966 SC 657 : 1966 Cri LJ 586, *followed.*

For the purposes of Article 105(3) a conviction under penal laws or detention under Emergency laws must be deemed to be valid till it is set aside.                          (Para 75)

So it cannot be said that there was no valid session of Parliament.                    (Para 87)

Also it is not open to the respondent to challenge the orders of detention collaterally. The principle is that what is directly forbidden cannot be indirectly achieved.          (Para 87)

### Per Khanna, J.

The proposition that a member of Parliament cannot claim immunity from being detained under a law relating to preventive detention does not now admit of much doubt. The privilege of freedom from arrest is limited to civil causes, and has not been allowed to interfere with the administration of criminal justice or emergency legislation.          (Para 178)

*K. Anandan Nambiar* v. *Chief Secretary, Govt. of Madras,* (1965) 2 SCR 406 : AIR 1966 SC 657 : 1966 Cri LJ 586, *relied on.*

Question as to whether a member of Parliament has been validly detained under a law relating to preventive detention cannot be collaterally raised in proceedings like the present wherein the court is concerned with the validity of a Constitution Amendment Act and an Act to amend the Representation of the People Act. Till such time as a finding is recorded in appropriate proceedings about the validity of the detention of the members of Parliament, the court would have to proceed upon the assumption that the detention has not been shown to be invalid.                          (Paras 179 & 180)

The contention that the sittings of the two Houses of Parliament in which the impugned Acts were passed were not valid essentially relates to the validity of the proceedings of the two Houses of Parliament. These are matters which are not justiciable and pertain to the internal domain of the two Houses. Ofcourse, the courts can go into the question as to whether the measures passed by Parliament are constitutionally valid. The court cannot, however, go into the question as to whether the sittings of the Houses of Parliament were not constitutionally valid because some members of those Houses were prevented from attending and participating in the discussions in those Houses.                          (Para 180)

*Special Reference No. 1 of 1964,* (1965) 1 SCR 413 : AIR 1965 SC 745, *distinguished.*

It is a right of each House of Parliament to be the sole judge of the lawfulness of its own proceedings. Therefore, the courts cannot go into the lawfulness of the proceedings of the Houses of Parliament.                          (Para 181)

*Bradlaugh* v. *Gossett,* (1883-84) 12 QBD 271, *relied on.*

Also, the act of detaining a person is normally that of an outside agency and not that of the House of Parliament. It would certainly look anomalous if the act of an outside agency which might ultimately turn out to be not legal could affect the validity of the proceedings of the House of Parliament or could prevent that House from assembling and functioning.                          (Para 182)

Besides, in the face of the publication in the Gazette of the Election Laws Amendment Act, 1975 (Act 40 of 1975) and the Constitution (Thirty-ninth Amendment) Act, 1975 the Court must assume that those two Acts were duly passed.                          (Para 183)

*Marshall Field & Co.* v. *John M. Clark,* 143 US 649 and *Oscar Leser* v. *J. Mercer Garnett,* 66 L Ed 505, *relied on.*

Hence, the constitutional validity of the Constitution Amendment Act and the 1975 Act amending the Representation of the People Act cannot be assailed on the ground that some members of Parliament were prevented because of their detention from attending and participating in the proceedings of the respective Houses of Parliament.                          (Para 184)


SCC Online Web Edition, Copyright © 2021
Page 37      Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------------------

## Part I—Validity of cl. (4) of Art. 329A *(contd.)*

### Per Mathew, J.

The rules which identify the sovereign are as important as the institution so identified. If this is so, it is open to the court to see whether a Parliament has been properly summoned in order to decide the question whether a measure passed by it answers the description of a statute or an Act and that parliamentary roll, if such a thing exists, is not conclusive.
(Para 370)

It would be strange if a statutory authority, by an order which turns out to be illegal could prevent the Houses of Parliament from meeting as enjoined by Article 85. If a statutory authority passes an illegal order of detention and thus prevents a member of Parliament from attending the House, how can the proceedings of Parliament become illegal for that reason ? It is the privilege of Parliament to secure the attendance of persons illegally detained. But what would happen if the privilege is not exercised by Parliament ? The proceedings of Parliament would not become illegal for that reason.
(Para 376)

*K. A. Nambiar* v. *Chief Secretary, Govt. of Madras*, (1966) 2 SCR 406 : AIR 1966 SC 657 : 1966 Cri LJ 586 and *Edinburgh & Dalkeith Ry.* v. *Wauchope*, (1842) 8 Cl & F 710, 724, *relied on.*

*Bradlaugh* v. *Gossett*, 12 QBD 271, 285-286 and *Ashby* v. *White*, (1703) 14 St Tr 695, *referred to.*

Unless it is established that the proclamation made by the President under Article 352 or the suspension under Article 359 of the remedy for enforcement of fundamental rights is unconstitutional, it is impossible to hold that the President has, in any way, illegally prevented the release of these members from the supposed illlegal detention so as to make a session of Parliament unconstitutional, in consequence of the inability of those members to attend the session.
(Para 377)

In other words, the President, in performing his constitutional function under these articles has not authorized the illegal detention of any person let alone any member of Parliament or unconstitutionally prevented the release from custody of any member. He has only discharged his constitutional functions. If this be so, it is difficult to hold that the session in which the amendments were passed was illegally convened. The challenge to the validity of the amendments on this score must be overruled. (Para 377)

### Per Beg, J.

Article 122 of the Constitution prevents the Supreme Court from going into any question relating to irregularity of proceedings "in Parliament".
(Para 506)

All that the Supreme Court can look into, in appropriate cases, is whether procedure which amounts to legislation or, in the case of a constitutional amendment, which is prescribed by Article 368 of the Constitution, was gone through at all. As a proof of that, however, it will accept, as conclusive evidence, a certificate of the Speaker that a Bill has been duly passed.
(Para 507)

*State of Bihar* v. *Kameshwar*, AIR 1952 SC 252, 266 : 1952 SCR 889 and *M. S. M. Sharma* v. *Sri Krishna*, AIR 1960 SC 1186, 1189 : (1961) 1 SCR 96, *relied on.*

As regards the validity of the detentions of the members of Parliament, that cannot be questioned automatically or on the bare statement by Counsel that certain members of Parliament are illegally detained with some ulterior object. The enforcement of fundamental rights is regulated by Article 32 and 226 of the Constitution and the suspension of remedies under these articles is also governed by appropriate constitutional provisions. Their legality and regularity cannot be collaterally assailed by mere assertions made by Counsel.
(Para 509)


SCC Online Web Edition, Copyright © 2021
Page 38        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------------------------

**Part I—Validity of cl. (4) of Art. 329A** *(contd.)*

### Per Chandrachud, J.

There is no merit in the contention that the constitutional amendment is bad because it was passed when some members of the Parliament were in detention. The legality of the detention orders cannot be canvassed in these appeals collaterally. And from a practical point of view, the presence of 21 members of the Lok Sabha and 10 members of the Rajya Sabha who were in detention could not have made a difference to the passing of the amendment.                                                      (Para 695)

## PART II—VALIDITY OF ACTS 58 of 1974 & 40 OF 1975

**A. Constitution of India—Articles 245 & 246—Ordinary legislation passed by Parliament whether also subject to the basic structure or basic features doctrine propounded in the Kesavananda Bharati case.**

[*Ed.* For the various contentions on this point see the Statement of Facts and Arguments, *supra* p. 3 paras 9 & 10].

**Effect of placing ordinary legislation in the Ninth Schedule through a constitutional amendment—Grant of immunity.**

### Per Ray, C. J.

The contentions of the respondent that the Amendment Acts of 1974 and 1975 are subject to basic features or basic structure or basic framework fails on two grounds. First, legislative measures are not subject to the theory of basic features or basic structure or basic framework. Second, the majority view in *Kesavananda Bharati case* is that the Twenty-ninth Amendment which put the two statutes in the Ninth Schedule and Article 31B is not open to challenge on the ground of either damage to or destruction of basic features, basic structure or basic framework or on the ground of violation of fundamental rights. This is because the view of seven Judges in *Kesavananda Bharati case* is that Article 31B is a constitutional device to place the specified statutes in the schedule beyond any attack that these infringe Part III of the Constitution. The Twenty-ninth Amendment was affirmed in *Kesavananda Bharati case* by majority of seven against six Judges.                    (Paras 153 and 152)

The respondent's contentions that ordinary legislative measures are subject like Constitution Amendments to the restrictions of not damaging or destroying basic structure or basic features are utterly unsound. To contend that legislative measures are subject to restrictions of the theory of basic structures or basic features is to equate legislative measures with Constitution Amendments.                                              (Para 132)

Articles 245 and 246 give plenary powers to Legislatures to legislate. The only prohibition is with reference to the provisions of the Constitution. The Constitution is the conclusive instrument by which powers are affirmatively created or negatively restricted. The only relevant test for the validity of a statute made under Article 245 is whether the legislation is within the scope of the affirmative grant of power or is forbidden by some provision of the Constitution.                                                      (Para 133)

To accept the basic features or basic structures theory with regard to ordinary legislation would mean that there would be two kinds of limitations for legislative measures. One will pertain to legislative power under Articles 245 and 246 and the legislative entries and the provision in Article 13. The other would be that no legislation can be made as to damage or destroy basic features or basic structures. This will mean rewriting the Constitution and robbing the Legislature of acting within the framework of the Constitution. No legislation can be free from challenge on this ground even though the legislative measure is within the plenary powers of the Legislature.                                                      (Para 134)


SCC Online Web Edition, Copyright © 2021
Page 39        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases


-----------------------------------------------------------------------------------------------------

### Part II—Validity of Acts 58 of 1974 & 40 of 1975 (*contd.*)

The theory of basic structures or basic features is an exercise in imponderables. Basic structures or basic features are indefinable. The legislative entries are the fields of legislation. The pith and substance doctrine has been applied in order to find out legislative competency and eliminate encroachment on legislative entries. If the theory of basic structures or basic features will be applied to legislative measures it will denude Parliament and State Legislatures of the power of legislation and deprive them of laying down legislative policies. This will be encroachment on the separation of powers.                    (Para 136)

The constitutional validity of a statute depends entirely on the existence of the legislative power and the express provision in Article 13. Apart from the limitation the Legislature is not subject to any other prohibition.                    (Para 137)

The theory of implied limitations on the power of amendment of the Constitution has been rejected by seven Judges in *Kesavananda Bharati case.* Our Constitution has not adopted the due process clause of the American Constitution. Reasonableness of legislative measures is unknown to our Constitution. The Constitution has denied due process as a test of invalidity of law.                    (Para 135)

*A. K. Gopalan* v. *State of Madras,* 1950 SCR 88 : AIR 1950 SC 27 : 51 Cri LJ 1383, *referred to.*

### Per Khanna, J.

In view of my finding that the provisions of Act 40 of 1975 have not been shown to impinge upon the process of free and fair elections and thereby to strike at the basic structure of the Constitution, it is not necessary to deal with the argument that validity of Act 40 of 1975 cannot be assailed on the ground that it strikes at the basic structure of the Constitution.                    (Para 239)

### Per Mathew, J.

The test of the theory of basic structure will apply only to constitutional amendments.                    (Para 315)

The inhibition to destroy or damage the basic structure of the Constitution is not present so far as the power of Parliament or State Legislatures to pass laws is concerned. Articles 245 and 246 give the power and also provide the limitation upon the power of these organs to pass laws. It is only the specific provisions enacted in the Constitution which could operate as limitation upon that power.                    (Para 345)

The norms of election set out by Parliament or State Legislatures tested in the light of the provisions of the Constitution or necessary implications therefrom constitute the law of the land. That law cannot be subject to any other test, like the test of free and fair elections in an ideal democracy.                    (Para 345)

An ordinary law cannot be declared invalid for the reason that it goes against the vague concepts of democracy; justice—political, economic and social; liberty of thought, belief and expression; or equality of status and opportunity, or some invisible radiation from them.                    (Para 346)

One cannot test the validity of an ordinary law with reference to the essential elements of an ideal democracy. It can be tested only with reference to the principles of democracy actually incorporated in the Constitution. Nor can it be tested on the touchstone of justice.                    (Paras 346 & 347)

Liberty of thought, expression, belief, faith and worship are not absolute concepts. They are emotive words. They mean different things to different people. Equality of status and of opportunity are concepts laden with emotional overtones. In their absoluteness they are incapable of actual realisation. The enacting provisions in the body of the Constitu-



SCC Online Web Edition, Copyright © 2021
Page 40        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source:  Supreme Court Cases

-------------------------------------------------------------------------------------------------------------------------

## Part II—Validity of Acts 58 of 1974 & 40 of 1975 (*contd.*)

tion alone give concrete shape to these ideas and it is on the basis of these provisions that the validity of ordinary law should be tested.
(Para 347)

Like other laws made by Parliament or State Legislatures, the laws made under Articles 327 and 328 are liable to be tested by Part III of the Constitution or any other provision of the Constitution; but it is difficult to see how these laws could be challenged on the ground that they do not conform to some ideal notions of free and fair elections to be evolved by the court from out of airy nothing.
(Para 349)

*Kesavananda Bharati* v. *State of Kerala*, (1973) 4 SCC 225, *explained.*

The doctrine of the 'spirit' of the Constitution *is a slippery slope.* The courts are not at liberty to declare an Act void, because, in their opinion, it is opposed to the *spirit* of democracy or republicanism supposed to pervade the Constitution but not expressed in words. When the fundamental law has not limited, either in terms or by necessary implication, the general powers conferred upon the Legislature, one cannot declare a limitation under the notion of having discovered some ideal norm of free and fair elections.
(Para 350)

There is no support from the majority in *Kesavananda Bharati case* for the proposition advanced that an ordinary law, if it damages or destroys basic structure should be held bad or for the proposition that a constitutional amendment putting an Act in the Ninth Schedule would make the provisions of the Act vulnerable for the reason that they damage or destroy a basic structure constituted not by the fundamental rights taken away or abridged but some other basic structure. And, in principle, there is no reason for accepting the correctness of the proposition.
(Para 356)

The concept of a basic structure as brooding omnipresence in the sky apart from the specific provisions of the Constitution constituting it is too vague and indefinite to provide a yardstick to determine the validity of an ordinary law.
(Para 357)

Even though an Act is put in the Ninth Schedule by a constitutional amendment, its provisions would be open to attack on the ground that they destroy or damage the basic structure if the fundamental right or rights taken away or abrogated pertains or pertain to basic structure. But the Act cannot be attacked, for a collateral reason, namely that the provisions of the Act have destroyed or damaged some other basic structure, say, for instance, democracy or separation of powers.
(Para 353)

So if it be assumed that these election laws amendment Acts, even after they were put in the Ninth Schedule by constitutional amendment remained open to attack for contravention, if any, of the fundamental rights, these Acts would not be open to attack on the ground that their provisions destroyed or damaged an essential feature of democracy, namely, free and fair elections. The Acts remain part of the ordinary law of the land. They did not attain the status of constitutional law merely because they were put in the Ninth Schedule. The utmost that can be said is that even after putting them in the Ninth Schedule, their provisions would be open to challenge on the ground that they took away or abrogated all or any of the fundamental rights and therefore damaged or destroyed a basic structure if the fundamental rights or right taken away or abrogated constitute or constitutes a basic structure.
(Para 358)

### Per Beg, J.

Does the "basic structure" of the Constitution test only the validity of a constitutional amendment or also ordinary laws? It does both because ordinary law-making itself cannot go beyond the range of constituent power.
(Para 622)

As Act 40 of 1975, has been placed by Section 5 of the Thirty-ninth Amendment in the protected Ninth Schedule of the Constitution, it becomes immune from an attack on ground of violation of any fundamental rights. After the practically unanimous opinion of the Supreme Court in *Kesavananda Bharati case* that such an immunisation of an enactment is constitution-



SCC Online Web Edition, Copyright © 2021
Page 41        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases


## Part II—Validity of Acts 58 of 1974 & 40 of 1975 (*contd.*)

ally valid, a similar attack cannot be brought in through the backdoor of a "basic structure" of the Constitution.

(Para 475)

### Per Chandrachud, J.

The constitutional amendments may, on the ratio of the *Fundamental Rights case,* be tested on the anvil of basic structure. But apart from the principle that a case is only an authority for what it decides, it does not logically follow from the majority judgment in the *Fundamental Rights case* that ordinary legislation must also answer the same test as a constitutional amendment.

(Para 691)

Ordinary laws have to answer two tests for their validity : (1) The law must be within the legislative competence of the Legislature as defined and specified in Chapter I, Part XI of the Constitution and (2) it must not offend against the provisions of Articles 13 (1) and (2) of the Constitution.

(Para 691)

There is no paradox, because certain limitations operate upon the higher power for the reason that it is a higher power. The two powers, though species of the same genus, operate in different fields and are therefore subject to different limitations.

(Para 692)

No objection can be taken to the constitutional validity of the two impugned Acts on the ground that they damage or destroy the basic structure. The power to pass these Acts could be exercised retrospectively as much as prospectively.

(Para 693)

**B. Election—Constitutionality of the Representation of the People (Amendment) Act (58 of 1974) and the Election Laws (Amendment) Act (40 of 1975)—Whether the basic structure and basic features theory if applicable if violated—Effect of placing the Acts in the Ninth Schedule by Section 5 of the Constitution (Thirty-ninth) Amendment Act, 1975—Act 40 of 1975 whether passed at an illegal session of Parliament.**

**Validating nature of Amending Act 40 of 1975—Constitutionality—Whether an encroachment on judicial power—Enactment of a conclusive evidence or conclusive proof clause whether constitutional.**

**Retrospective effect to the Amending Acts—Validity—Retrospectivity whether offends Article 14—Possibility of abuse**

**Fixation of date from which a person to be deemed a "candidate" whether offends Article 14—Comparison with English Law—R. P. A. 1951, Section 79(b) (after its amendment by Act 40 of 1975) and Section 123(7) Proviso**

**Date from which resignation of government servant effective—Whether providing a conclusive presumption an encroachment on judicial power—R. P. A., 1951, Section 123 Explanation (3).—Grant of immunity to government servants acting in discharge of official duty during electioneering—Whether constitutional—R. P. A., 1951, Section 123(7) Proviso**

**Expenditure incurred or facilities accorded by government servants in discharge of official duty not part of expenditure—Addition of Explanation 3 to Section 77 of R. P. A . 1951**

**Excessive delegation—Absence of any guiding principles with regard to official duty or nature of expenditure in Explanation 3 to Section 77 and Proviso to Section 123(7) of R. P. A., 1951 as amended—Administrative Law**

**Allotment of symbol made conclusive against its infirmity—Constitutionality—R. P. A., 1951, Section 123(3) Proviso**



SCC Online Web Edition, Copyright © 2021
Page 42        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

**Part II—Validity of Acts 58 of 1974 & 40 of 1975** *(contd.)*

**Per Ray, C. J.**

The amendments made to the 1951 Act by the Amendment Acts, 1974 and 1975 are to give effect to certain views expressed by the Supreme Court in preference to certain views departed from or otherwise to clarify the original intention. It is within the powers of Parliament to frame laws with regard to elections. Parliament has power to enumerate and define election expenses. Parliament has power to lay down limits on election expenses. Parliament has power to state whether certain expenses can be included or may be excluded from election expenses. Parliament has power to adopt conclusive proof with regard to matters of appointment, resignation or termination of service. Parliament has power to state what can be considered to be office of profit. Parliament has power to state as to what will and what will not constitute corrupt practice. Parliament has power to enact what will be the ground for disqualification. Parliament has power to define "candidate". Parliament has power to state what symbols will be allotted to candidates at election. These are all legislative policies.                    (Para 137)

The conclusive evidence or conclusive proof clause is an accepted legislative measure.                    (Para 138)

There is a well-known pattern of all validation Acts by which the basis of judgments or orders of competent courts and tribunals is changed and the judgments and orders are made ineffective.                    (Para 138)

The rendering of a judgment ineffective by changing the basis by legislative enactment is not encroachment on judicial power because the legislation is within the competence of the Legislature.                    (Para 138)

*M. P. V. Sundararamier & Co.* v. *State of A. P.*, 1958 SCR 1422 : AIR 1958 SC 468 : 9 STC 298, *relied on.*

The changes effected by the Amendment Acts, 1974 and 1975 apply to all and there is no discrimination. Retrospective legislation is not by itself discrimination. The changes introduced to the 1951 Act apply to all.                    (Para 61)

Any law that can be made prospectively can be made with retrospective operation. Giving retrospective effect to legislative amendment is accepted to be valid exercise of legislative power. The power of the Legislature to pass a law includes a power to pass it retrospectively.                    (Paras 138 & 139)

Retrospective legislation in election matters has been upheld.                    (Paras 39 & 40)

*Kanta Kathuria* v. *Manak Chand Surana*, (1969) 3 SCC 268, *followed.*

*Matajog Dubey* v. *H. C. Bhari*, (1955) 2 SCR 925 : AIR 1956 SC 44, *followed.*

*Gwalior Rayon Silk Mfg. & Wvg. Co. Ltd.* v. *Asstt. Commissioner of Sales Tax*, (1974) 4 SCC 98, 116, *relied on.*

The contention of the respondent that the expression "returned candidate" is descriptive of the expression "candidate" will rob Section 100 of its content. The word "candidate" in relation to various electoral offences shows that he must be a candidate at the time of the offence. Time is necessary for fixing the offences.                    (Para 141)

The 1951 Act uses the expression "candidate" in relation to several offences for the purpose of affixing liability with reference to a person being a candidate. If no time be fixed with regard to a person being a candidate it can be said that from the moment a person is elected he can he said to hold himself out as a candidate for the next election. The definition in the English Act cannot be of any aid to the construction of the 1951 Act.                    (Para 146)

The 1951 Act specifies what election expenses are of a candidate. The statute specifies time in regard to a candidate. That time cannot be enlarged or reduced. The holding



SCC Online Web Edition, Copyright © 2021
Page 43        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

### Part II—Validity of Acts 58 of 1974 & 40 of 1975 (*contd.*)

out by a person of candidature was a flexible and elastic idea. The date of nomination is definite and doubtless. Different views may be taken as to the time of holding out. The Legislature has now set the matter at rest.                                   (Para 147)

Official duty will be for security, law and order, and matters in aid of public purpose. These duties will be in connection with election.                                   (Para 149)

The act must bear such a relation to the duty that the person could lay a reasonable claim, but not a pretended fanciful claim, that he did it in the course of the performance of his duty. Where a power is conferred or a duty imposed by statute or otherwise, and there is nothing said expressly inhibiting the exercise of the power or the performance of the duty by any limitations or restrictions, it is reasonable to hold that it carries with it the power of doing all such acts or employing such means as are reasonably necessary for such execution, because it is a rule that when the law commands a thing to be done it authorises the performance of whatever may be necessary for executing its command. There is no vice of delegation in the statutes.                                   (Paras 150 and 151)

### Per Khanna, J.

I hold that the provisions of Act 40 of 1975 are valid and do not suffer from any constitutional infirmity.                                   (Para 239)

A Legislature has, except in a matter for which there is prohibition like the one contained in Article 20(1) of the Constitution, the power to make laws which are prospective in operation as well as laws which have retrospective operation. There is no limitation on the power of the Legislature in this respect. Essentially it is a matter relating to the capacity and competence of the Legislature.                                   (Para 227)

It is also permissible to amend a law which is basis of the decision of a court with retrospective effect and rely upon the provisions of the amended law in appeal against the above decision of the court. The court of appeal in such an event gives full effect to the amended law even though such amendment has been made after the decision of the original court.                                   (Para 227)

Election laws are a part of the normal legislative process and what is permitted in the matter of ordinary legislation would also be permissible in the matter of legislation relating to elections unless there be some provision in the Constitution which forbids such a course.
                                   (Paras 227 & 230)

*State of Orissa* v. *Bhupendra Kumar Bose,* 1962 Supp 2 SCR 380: AIR 1962 SC 945; *Kanta Kathuria* v. *Manak Chand Surana,* (1969) 3 SCC 268 and *Abeyesekera* v. *Jayatilake,* 1932 AC 260, *relied on.*

The retrospective operation of the relevant provisions of Act 40 of 1975 does not affect free and fair elections. The said provisions of Act 40 of 1975 are general in terms and would apply to all election disputes which may be pending either in the High Court or in appeal before the Supreme Court or which may arise in future. It is no doubt true that the retrospective operation of an amending Act has the effect of placing one of the parties to the dispute in a more advantageous position compared to others but that is inevitable in most of the amendments with retrospective operation.                                   (Para 232)

*Harbhajan Singh* v. *Mohan Singh,* (1974) 2 SCC 364, *relied on.*

Whenever a Legislature makes a law or amends a law, it has to indicate the time from which it would come into effect. This is essentially a matter for the Legislature and the Court cannot substitute its own opinion for that of the Legislature. The fact that the change in law is made applicable to pending cases and the classification treats the decided cases as belonging to one category and pending cases as belonging to another category is not offensive to Article 14. Nor can the court interfere on the score of the propriety of giving retrospective



-----------------------------------------------------------------------------------------------------

### Part II—Validity of Acts 58 of 1974 & 40 of 1975 (*contd.*)

effect to an amendment made in an election law. Indeed, the question of propriety is a matter which is entirely for the Legislature to think of and decide. It cannot affect the validity of the law.

(Para 232)

*Anant Mills* v. *State of Gujarat*, (1975) 2 SCC 175, *relied on*.

In case the provisions of the amended law are abused, the Supreme Court would not be helpless in the matter. The proper course in such an event would be to strike down the action taken under the amended law and not the law itself.

(Para 233)

The change in the definition of the word "candidate" does not impinge upon the process of free and fair elections. The fact that as a result of the above change, we have to take into account only the prejudicial activity of the candidate or his election agent from the date of the nomination of the candidate and not from the date he holds himself out as a candidate does not affect the process of free and fair elections. It is necessary while dealing with corrupt practice relating to elections to specify the period within which the impugned act, alleged·to constitute corrupt practice should have been done. As a result of the amendment, the Legislature has fixed the said period to be as from the date of nomination instead of the period as from the date on which the candidate with the election in prospect began to hold himself out as a prospective candidate. As a result of the change in the definition of candidate, the Legislature has fixed a definite date, *viz.*, that of nomination, instead of the earlier time which had an element of indefiniteness and uncertainty about it for finding as to when a person became a candidate. Certainty is an essential desideratum in law and any amendment of law to achieve that object is manifestly a permissible piece of legislation. The choice of date was a matter for the Legislature to decide and the court cannot substitute its own opinion for that of the Legislature in this respect, more so, when whatever be the choice of date, has aspects of both pros and cons.

(Para 235)

The choice of date as a basis for classification cannot always be dubbed as arbitrary even if no particular reason is forthcoming for the choice unless it is shown to be capricious or whimsical in the circumstances. When it is seen that a line or a point there must be and there is no mathematical or logical way of finding it precisely, the decision of the Legislature or its delegate must be accepted unless one can say that it is very wide of any reasonable mark.

(Para 235)

*Union of India* v. *Parameswaran Match Works*, (1975) 1 SCC 305, 311, *relied on*.

Laying down a rule of conclusive presumption in a statute with a view to remove uncertainty with regard to the date of the taking effect of appointment or resignation of a government employee cannot be characterised as an assumption of judicial power by the Legislature.

(Para 236)

Another object of the change effected by Act 40 of 1975 is that a candidate who is bound, in view of para 8 of the Election Symbols (Reservation and Allotment) Order, 1968 to use the party symbol allotted by the Election Commission and who cannot use any other symbol, shall not suffer and be guilty of corrupt practice under Section 123(3) of the R. P. Act because of the use of that symbol. It is to be assumed that the Election Commission which is an independent body, would act fairly and properly and would not allot a symbol, which is a religious symbol, to a party or a candidate. The object of the new provision is that a candidate should not be penalised because of such an error on the part of the Election Commission. This object does not suffer from any unconstitutionality.

(Para 236)

I hold that the provisions of Act 40 of 1975 are valid and do not suffer from any constitutional infirmity.

(Para 239)

If, however, because of doing something conceived in public interest, advantage may also possibly accrue to a candidate, it will have to be regarded as incidental and would not detract from action taken under the above provision being in public interest. As against


SCC Online Web Edition, Copyright © 2021
Page 45        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases


### Part II—Validity of Acts 58 of 1974 & 40 of 1975 *(contd.)*

that, any action taken with a view to further the personal interest of a candidate should not be allowed to be camouflaged as an action taken in public interest. Care must be taken to ensure that public interest is not allowed to degenerate into a cloak for furtherance of the personal interests of a candidate in an election. The discharge or purported discharge of official duty must necessarily have public interest and not the personal interest of a candidate as its basis. In case there is abuse of the above provision, the proper course, as already mentioned, would be to strike down the action taken under the proviso and not the proviso itself.                                      (Para 237)

#### Per Mathew, J.

Retrospective operation of law in the field of election has been upheld by the Supreme Court. Retrospective operation of any law would cause hardship to some persons or other. This is inevitable; but that is no reason to deny to the Legislature the power to enact retrospective law.                                      (Para 360)

*Kanta Kathuria* v. *Manak Chand Surana,* (1969) 3 SCC 268, *relied on.*

There can be no doubt that Section 100(1)(*b*), when it speaks of commission of corrupt practice by a returned candidate, it can only mean commission of corrupt practice by a candidate before he became a returned candidate. Any other reading of the sub-section would be absurd. But there is no such compulsion to read the word 'candidate' in Section 123(7) in the same manner.                                      (Para 382)

It is the context that gives colour to a word. A word is not crystal clear.          (Para 382)

The Legislature must fix some point of time before which a person cannot be a 'candidate' in an election, and, a wide latitude must be given to the Legislature in fixing that point.                                      (Para 383)

*Union of India* v. *Parameswaran Match Works,* (1975) 1 SCC 305, *relied on.*

The learned Chief Justice has also dealt with the contention urged for respondent that Clause 8(*b*) of the Election Laws Amendment Act, 1975 suffers from the vice of excessive delegation and is arbitrary. I agree with his reasoning for repelling the same.          (Para 385)

#### Per Chandrachud, J.

The argument regarding the invalidity of the Representation of the People (Amendment) Act 58 of 1974, and of the Election Laws (Amendment) Act 40 of 1975 has no substance.                                      (Para 691)

## PART III—CHARGES OF COMMISSION OF CORRUPT PRACTICES

**Election—Corrupt practices—Findings of the High Court of commission of corrupt practices by the appellant if can be sustained on the facts—Whether can be sustained in view of the changes effected retrospectively in the Representation of the People Act, 1951 by Acts 58 of 1974 and 40 of 1975—Also in such changed position in law whether the plea of defeated candidates of other charges of commission of corrupt practices can be allowed—R. P. A., 1951, Section 123(3), (5), (6) and (7).**

**Date from which the appellant is to be regarded as a "candidate"—Effect of change in the definition of "candidate".**

**Assistance of Government Servant, viz. Yashpal Kapur whether obtained for furtherance of election prospects—Date from which his resignation became effective—Effect of change in law by Act 40 of 1975.**

**Assistance of officers of the State Government if procured and utilised in the construction of rostrums etc. and for supply of power for meetings.**


SCC Online Web Edition, Copyright © 2021
Page 46        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------------

**Part III—Charges of commission of corrupt practices** (*contd.*)

Expenditure incurred by the appellant if exceeded the prescribed limit—Expenditure incurred by the political party and friends whether to be included—Kanwar Lal Gupta's case—Effect of amendment by Act 58 of 1974—Other items of expenses alleged by the defeated candidate whether true.

Election symbol of cow and calf of the appellant whether a religious symbol—Effect of the amendment made by Act 40 of 1975—Constitution of India, Article 324—Rules 5 and 10 of the Conduct of Elections Rules, 1961—Election Symbols (Reservation and Allotment) Order, 1968.

The High Court found :

(1) that the appellant has to be regarded as a candidate from December 29, 1970 as she held herself out on that date as a candidate ;

(2) that the appellant obtained and procured the assistance of Yashpal Kapur for the furtherance of her election prospects when Yashpal Kapur was serving as a gazetted officer with the Government of India. The High Court found that Yashpal Kapur's resignation from his service though submitted on January 13, 1971 did not become effective until January 25, 1971 when it was notified, and that Yashpal Kapur under the instructions of the appellant delivered election speech on January 7, 1971 at Munshi Ganj and another speech at Kalan on January 19, 1971 ; and

(3) that the appellant and her election agent Yashpal Kapur procured and obtained the assistance of the officers of the State Government, particularly, the District Magistrate, the Superintendent of Police, the Executive Engineer, P. W. D. and the Engineer to Hydel Department for the construction of rostrums and arrangement for supply of power for loudspeakers at meetings addressed by the appellant on February 1, 1971 and February 25, 1971 and further that the said assistance was for furtherance of the prospects of election of the appellant.

The defeated candidate in cross-appeal challenged the findings of the High Court and contended that :

(1) High Court should have held that the election expenses of the appellant exceeded the limit ;

(2) that the symbol of cow and calf was a religious symbol and the appellant committed corrupt practice as defined in Section 123(3) of the 1951 Act ; and

(3) that the voters were being conveyed to the polling stations free of charge on vehicles hired and procured by Yashpal Kapur.

**Per Ray, C. J.**

In view of the conclusion that the appeal cannot be disposed of in conformity with clause (4) of Article 329A, it was necessary to hear the appeals on other grounds in accordance with the provisions of the 1951 Act and the Amendment Acts, 1974 and 1975. Since the validity of the Amendment Acts, 1974 and 1975 is upheld they can be applied and the findings of the High Court considered.                    (Paras 65 and 100)

(*a*) In view of the provisions introduced by the Amendment Act, 1975, the appellant will be regarded as a candidate only from February 1, 1971, namely, the date when she has been duly nominated as a candidate at her election, and, therefore, the finding of the High Court cannot be sustained. Also the finding of the High Court that Yashpal Kapur delivered election speeches on January 7, 1971 and January 19, 1971 under instructions of the appellant cannot be supported because the appellant was not a candidate either on January 7, 1971 or on January 19, 1971. The present definition of "candidate" which has retrospective effect excludes completely acts by candidate prior to the date he is nominated as a candidate. The finding of the High Court that the appellant held herself



SCC Online Web Edition, Copyright © 2021
Page 47         Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source:  Supreme Court Cases

-----------------------------------------------------------------------------------------------------------------------

## Part III—Charges of commission of corrupt practices (*contd.*)

out to be a candidate from December 29, 1970 is set aside because the law is that the appellant became a candidate only with effect from the date of nomination which was February 1, 1971.                              (Paras 93, 97 and 157)

(*b*) The second finding by the High Court with regard to the resignation of Yashpal Kapur not to be effective until January 25, 1971 is displaced by legislative change by the Amendment Act, 1975.                                  (Para 94)

The effect of Explanation (3) at the end of Section 123(7) of the 1951 Act incorporated by the notification dated January 25, 1971 in the Gazette dated February 6, 1971 makes the fact of the resignation of Yashpal Kapur from his service fully effective from January 14, 1971. Therefore, from January 14, 1971 Yashpal Kapur was not a government servant.                                                 (Para 96)

The finding of the High Court that the resignation of Yashpal Kapur did not become effective until it was notified in the Gazette is also set aside because under the law the resignation became effective from January 14, 1971.                       (Para 157)

(*c*) As regards the third finding by the High Court that the appellant and her election agent Yashpal Kapur procured and obtained the assistance of the officers of the State Government, the proviso to Section 123(7) added by the Amendment Act of 1975, shows that where persons in the service of the Government in the discharge of official duty make any arrangement or provide any facility or do any act or thing in relation to a candidate, such arrangements and facilities shall not be deemed to be assistance for furtherance of the prospect of the candidate's election. Therefore, the service rendered by government servants for construction of rostrums and arrangements for supply of power for loudspeakers according to the contention of the appellant could not be considered as assistance for the furtherance of the prospects of the election of the appellant.                          (Paras 98 & 99)

The finding of the High Court that the appellant committed corrupt practice in breach of Section 123(7) of the 1951 Act is also repelled by the legislative changes and is, therefore, set aside.                                        (Para 157)

(*d*) On the question of election expenses the defeated candidate alleged that the election expenses of the appellant, inter alia, were Rs. 1,28,700 on account of hiring charges of vehicles, Rs. 43,230 on account of cost of petrol and diesel; Rs. 9,900 on account of payments made to the drivers of the vehicles. The respondent further alleged that the appellant spent Rs. 1,32,000 on account of construction of rostrums for public meetings on February 1, 1971 and February 25, 1971.                             (Para 102)

The changes in law effected by the Amendment Acts, 1974 and 1975 totally repel the submissions on behalf of the respondent.                          (Para 113)

The High Court found that the election expenses furnished by the appellant were Rs. 12,892.97. The High Court added another sum of Rs. 18,183.50. The three items which were added by the High Court where cost of erection of rostrums amounting to Rs. 16,000, cost incurred in installation of loudspeakers amounting to Rs. 1,951 and cost for providing car transport to respondent No. 1 amounting to Rs. 232.50. The total election expenses found by the High Court came to Rs. 31,976.47 which was below the prescribed limit of Rs. 35,000. With regard to hiring charges of vehicles the High Court found that the respondent did not examine any witness to indicate as to whether the vehicles were used only for party propaganda or they were used in connection with the election of the appellant. The High Court further found that the documents which were relied on by the respondent did not establish that the vehicles had been engaged or used in connection with the election work of the appellant. The amount of Rs. 16,000 which was added by the High Court on account of cost of erection of rostrums cannot be included in the election expenses of the appellant by reason of addition of Explanation 3 to Section 77 of the 1951 Act by the Amendment Act, 1975.                (Paras 103 to 107)



SCC Online Web Edition, Copyright © 2021
Page 48      Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------------------------

**Part III—Charges of commission of corrupt practices** (*contd.*)

Again by reason of the proviso added to Section 123(7) by the Amendment Act, 1975, arrangements made or facilities provided or any act done by a Government Servant belonging to the class mentioned there in the discharge of official duty shall not be deemed to be assistance for furtherance of the prospects of that candidate's election. Hence services rendered by government servants for the erection of rostrums and for supply of power for loudspeakers cannot be deemed to be assistance for the furtherance of the prospects of that candidate's election.                                      (Para 108)

There is no pleading in the election petition that the appellant authorised incurring expenditure by a political party. There is no pleading that any amount has been paid by the political party, and there are no findings by the High Court in the present appeals that any expenses by a political party were authorised by the appellant. There is also no finding in the present appeals that any expenses incurred by a political party can be identified with the election of the appellant.                                    (Paras 109 & 113)

Further by reason of Explanation 1 which was inserted at the end of Section 77 of the 1951 Act by Amendment Act, 1974 any expenditure incurred or authorised in connection with the election of a candidate by a political party or by any other association or body of persons or by an individual other than the candidate or his election agent shall not be deemed to be and shall not ever be deemed to have been expenditure in connection with the election incurred or authorised by the candidate or by his election agent. So the ruling in *Kanwar Lal Gupta's case* is no longer good law because of the legislative changes.      (Paras 110 & 113)

In any case the expenditure must be by the candidate himself and any expenditure in his interest by others (not his agent within the meaning of the term of the Election Laws) is not to be taken note of.                                          (Para 116)

*Kanwar Lal Gupta* v. *Amarnath Chawla*, (1975) 3 SCC 646, *distinguished*.

Expenditure incurred by a political party in connection with the election of the candidates of the party is not a part of the election expenses of the candidate. Similarly, participation in the programme of activity organised by a political party will not fall within the election expenses of the candidate of the party. A candidate is not required to disavow or denounce the expenditure incurred or authorised by the political party because the expenditure is neither incurred nor authorised by the candidate. One can disavow what would be ascribed to be incurred or authorised by one. In the case of expenses of a political party there is no question of disavowing expenditure incurred or authorised by the political party. Allegations that election expenses are incurred or authorised by a candidate or his agent will have to be proved. Authorisation means acceptance of the responsibility. Authorisation must precede the expenditure. Authorisation means reimbursement by the candidate or election agent of the person who has been authorised by the candidate or by election agent of the candidate to spend or incur. In order to constitute authorisation the effect must be that the authority must carry with it the right of reimbursement.            (Paras 119 & 121)

*Hans Raj* v. *Pt. Hari Ram*, 40 ELR 125 (SC); *Ram Dayal* v. *Brijraj Singh*, (1969) 2 SCC 218; *Shah Jayantilal Ambalal* v. *Kasturilal Nagindas Doshi*, 42 ELR 307 (SC); *Rananjaya Singh* v. *Baijnath Singh*, (1955) 1 SCR 671 : AIR 1954 SC 749 : 10 ELR 129, *relied on*.

*Magraj Patodia* v. *R. K. Birla*, (1970) 2 SCC 888, *referred to*.

(*e*) The power to specify permissible symbols is vested by Rule 5 in the Election Commission. The choice of candidates is limited to the symbol specified by the Election Commission. The Election Symbols (Reservation and Allotment) Order, 1968 was made in exercise of the power conferred by Article 328 of the Constitution read with Rule 5 and Rule 10 of the Conduct of Elections Rules and all other powers enabling in this behalf. Clause 17 of the Election Symbols (Reservation and Allotment) Order, 1968 provides that the Commission shall by notification in the Gazette of India publish lists specifying national parties and the symbols respectively reserved for them etc. There can, therefore, be no doubt that the


SCC Online Web Edition, Copyright © 2021
Page 49      Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

### Part III—Charges of commission of corrupt practices (*contd.*)

power of evolving permissible symbols is exclusively vested in the Election Commission.   It is under their direction that the Returning Officer has to make allotments and allotments are made in terms of Clauses 5, 6 and 8.   Therefore, in the matter of evolving of the permissible symbols, the jurisdiction is vested in the Election Commission.                  (Paras 154 & 155)

It is impossible to hold that because one party has not been given the symbol of cow, calf and milkmaid, therefore, the symbol of cow and calf becomes a religious symbol.   The High Court on the evidence adduced by the respondent rightly came to the conclusion that there was no evidence to prove that the cow and calf is a religious symbol.                  (Para 156)

### Per Khanna, J.

The constitutionality of Act 40 of 1975 is upheld.                  (Para 215)

The grounds on which the High Court has declared the election of the appellant to be void no longer hold good for declaring the said election to be void.                  (Para 224)

(*a*) In view of the amended definition of the word "candidate", it would have to be taken that the appellant became a candidate only on February 1, 1971.   There is nothing to indicate that the word "candidate" in clause (7) of Section 123 has been used merely to identify the person who has been or would be subsequently nominated as a candidate.   The result is that even if the finding of the High Court that the appellant obtained and procured the assistance of Yashpal Kapur during the period from January 7 to 24, 1971 were assumed to be correct, the appellant shall not be deemed to have committed corrupt practice under Section 123(7) of the R. P. Act.   But Yashpal Kapur in view of the newly added explanation, shall be taken to have ceased to be in government service with effect from January 14, 1971.   Any assistance of Yashpal Kapur which the appellant was alleged to have obtained or procured on or after January 14, 1971 would not, therefore, make her guilty of corrupt practice under Section 123(7) of the R. P. Act.                  (Paras 221 & 218)

(*b*) The appellant can still be not guilty of the commission of corrupt practice under Section 123(7) of the R. P. Act in view of the new proviso which has been inserted at the end of clause (7) of Section 123.                  (Para 222)

(*c*) It has been argued by the respondent that the words "in the discharge or purported discharge of his official duty" in the above mentioned proviso have reference only to statutory duty and not to other duty performance of which takes place in pursuance of administrative instructions.   There is nothing in the above proviso to confine the words "official duty" to duty imposed by statute.   Official duty would include not merely duties imposed by statutes but also those which have to be carried out in pursuance of administrative instructions.                  (Para 223)

(*d*) There is no cogent evidence to show that the 23 vehicles were used for the election of the appellant.   It is no doubt true that the said 23 vehicles were used by the District Congress Committee, Rae Bareli for election work in the three parliamentary constituencies, *viz.*, Rae Bareli, Amethi and Ram Sanehi Ghat.   The record is, however, silent on the point as to what extent they were used in Rae Bareli parliamentary constituency.   It is no doubt true that by using a vehicle for the furtherance of the prospects of candidates in more than one constituency one should not be allowed circumvent the salutary provisions of the R. P. Act in this respect.   To prevent such circumvention, it is essential that evidence should be led to show as to what was the extent of the user of the vehicle in the constituency concerned.                  (Paras 243 & 245)

*Hans Raj* v. *Pt. Hari Ram*, 40 ELR 125 (SC), *relied on.*

There is no cogent evidence whatsoever that any expense was incurred for engaging workers for the election work of the appellant.   The case of the appellant is that her workers did the work voluntarily and without receipt of any remuneration.                  (Para 245)


SCC Online Web Edition, Copyright © 2021
Page 50          Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-----------------------------------------------------------------------------------------------------

**Part III—Charges of commission of corrupt practices** (*contd.*)

The findings of the High Court on telephone charges and other expenses cannot be assailed.                                                                                  (Para 248)

As the election expenses of the appellant have not been shown to exceed the prescribed limit of Rs. 35,000, the question of invoking and going into the validity of Act 58 of 1974 does not arise. Nor is it necessary to express an opinion about the view taken in *Kanwarlal* v. *Amarnath Chawla* in view of the fact that even after applying the rule laid down in that case, the total election expense of the appellant has not been shown to exceed the prescribed limit.                                                                                  (Para 249)

*Kanwarlal Gupta* v. *Amarnath Chawla*, (1975) 3 SCC 646, *referred to.*

(*e*) In view of the insertion of the proviso to clause (3) of Section 123 by Act 40 of 1975 the symbol of cow and calf which was allotted to the appellant shall not be deemed to be a religious symbol or a national symbol for the purpose of Section 123(3) of the R. P. Act. The appellant as such cannot be deemed to have committed a corrupt practice under Section 123(3) of the R. P. Act by use of the symbol of cow and calf. Also regarding the use of the symbol of cow and calf the matter, is now covered by the amendment made in Section 123 (3) of the R. P. Act by Section 8 of Act 40 of 1975.                            (Paras 225 & 250)

### Per Mathew, J.

Even if it be assumed that the finding of the High Court that the appellant obtained or procured the assistance of Shri Yashpal Kapur during the period from January 7 to 24, 1971 is correct, the appellant shall not be deemed to have committed corrupt practice under Section 123(7) of the Representation of the People Act, 1951, as she became a candidate only on February 1, 1971.                                                           (Para 385)

In the cross appeal, the only question raised was about the correctness of the finding of the High Court that the appellant has not exceeded the prescribed limit of election expense. For the reasons given by Khanna, J. in his judgment, I hold that the finding of the High Court on this issue was correct.                                         (Para 386).

If the Election Laws Amendment Act, 1975, is valid, the appeal has to be allowed. I would, therefore, set aside the findings of the High Court against the appellant and allow the appeal without any order as to costs.                                          (Para 386)

### Per Beg, J.

The findings of the learned trial Judge, have been dealt with in greater length and depth for several reasons. Firstly, the nature of the attack upon the *bona fides* of the amendments made, although ordinarily not even entertainable, having been permitted due to the constitutional importance and gravity of the allegations made and this question could not be satisfactorily dealt with without considering the nature of the findings and the evidence at some length for the satisfaction that no such question could possibly arise here. Secondly, if the amendments were made necessary for reasons brought out fully only by dealing with facts and findings in this case they could not give rise to any grounds to suggest that there was anything wrong in making amendments to remove such reasons. Therefore, it was necessary to go into these for determining whether the amendments are good. Thirdly, even if the amendments are valid, one had to be satisfied that the tests of corrupt practices alleged are not fulfilled despite the concession of the election-petitioner's learned Counsel that this would be the position. Fourthly, the learned Judge has made certain manifest errors in appraising the evidence and interpreting the law which call for rectification by the Supreme Court as no other authority can properly do this.                    (Para 476)

(*a*) The learned Judge was overlooking the context, the probabilities, the natural course of events in such a case, the legal and logical relevance and effect of what he thought was decisive, and, finally, the importance of the statement of the Prime Minister herself on this question, supported by complete absence of any evidence to show that she had herself made



SCC Online Web Edition, Copyright © 2021
Page 51      Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------------

## Part III—Charges of commission of corrupt practices *(contd.)*

any clear and decisive statement in any speech or conversation which could shake her stand, that her final decision and unequivocal act was the filing of a nomination paper as a candidate on February 1, 1971 at Rae Bareli. According to the findings of the learned Judge himself, the question of the Prime Minister holding herself out as a candidate for the Rae Bareli constituency became quite immaterial after January 25, 1971, and, on the findings reached the whole question becomes unimportant.                    (Para 451)

The amendment of Section 79(*b*) by Act 40 of 1975 appears to be within the unquestionable powers of Parliament to legislate, either prospectively or retrospectively, with regard to election matters. It is not capable of being interpreted as an attack on free and fair elections. It is important to bear in mind that courts cannot take upon themselves the task of laying down what electoral laws should be.                    (Para 460)

*S. Khader Sheriff* v. *Munnuswami Gounder,* (1955) 2 SCR 469, *J. P. Rawat* v. *Krishna Dutt Paliwal,* 20 ELR 443 (All), *Haji Abdul Wahid* v. *B. V. Keskar,* 21 ELR 409 (All) and *K. K. Mishra* v. *Barawali Babu,* 38 ELR 451 (Ori), *relied on.*

(*b*) On the terms of Section 123(7) the following three types of cases of actual obtaining of assistance, as distinguished from abetment or attempting to obtain it, can be legally set up either exclusively, or, alternatively, against a candidate: firstly, a direct obtaining of it by the act of the candidate himself; secondly, an indirect or vicarious procurement of it by the acts of a duly constituted agent; and, thirdly, an indirect or vicarious procurement of it by the acts of a person who, though not a duly constituted agent, becomes constructively an agent, for the purpose of some particular aid obtained, because it was assented to by the candidate at a time which must, ordinarily, be before the aid is given, so that the person through whom assistance is obtained is a constructive agent for this particular aid at the time when it is given. The term procurement should, strictly speaking, apply only in the last two types of cases. A reference to Section 100(1)(*b*) further emphasises the position that a corrupt practice for which the High Court is to declare an election void must have been committed either "by a returned candidate or his election agent or by any other person with the consent of the returned candidate or his election agent". A case falling under Section 100(1)(*d*)(*ii*) of a "a corrupt practice committed in the interests of a candidate by an agent other than his election agent" is very different and postulates: firstly, a corrupt practice which can be committed only by an agent, and, secondly, the existence of such an agent. A case falling under Section 100(1)(*d*) requires also proof of the further fact that the result of the election was materially affected by the corrupt practice.                    (Para 405)

The deliberately given "direction" by the appellant to Yashpal Kapur had to be proved on the case set up.                    (Para 406)

The corrupt practice defined in Section 123(7) could not be committed by any person before there was a "candidate" for an election.                    (Para 407)

The trial Judge erred in assuming the existence of *actus reus.*                    (Para 410)

*Y. S. Parmar* v. *Hira Singh,* 1959 Supp 1 SCR 213 criticised; *Satya Dev Bushahri* v. *Padam Dev,* 10 ELR 214: AIR 1959 SC 315 *relied on.*

*Bubhai Vallabhdas Gaudhi* v. *P. H. Modi,* 36 ELR 108 (Guj) and *Haji Abdul Wahid* v. *B. V. Keskar,* 21 ELR 409 *referred to.*

Shri Kapur was not asked to do anything at all in connection with her election by the Prime Minister herself, but he had decided to take interest in it voluntarily as he had some political ambitions and, therefore, he had asked the Prime Minister to be relieved of his office in her Secretariat with effect from January 14, 1971.                    (Para 426)

There is no evidence whatsoever that Shri Kapur was constituted a sort of general de facto agent of the Prime Minister even before he became her election agent on February 2, 1971.                    (Para 437)

On the conclusions reached by the learned Judge himself, the acts of Shri Kapur between the period January 25, 1971 and February 6, 1971 the date of the publication of



SCC Online Web Edition, Copyright © 2021
Page 52        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------

### Part III—Charges of commission of corrupt practices *(contd.)*

the notification, could not be taken into account as no corrupt practice could possibly exist in that period, due to the participation of Shri Kapur in any election work. And, with regard to the two earlier periods, beginning with January 7, 1971, no corrupt practice could be committed by the original respondent vicariously due to anything done by Shri Kapur, even if one were to apply the law as it existed before the amendments of the Act.   (Para 442)

*Edwards M. Edwards* v. *United States*, 26 L Ed. 31 ; *Raj Kumar* v. *Union of India*, (1968) 3 SCR 857 : AIR 1969 SC 180 ; *Raj Narain* v. *Indira Gandhi* (1972) 3 SCC 850 ; *Rustom Satin* v. *Sampoornanand*, 20 ELR 2211 (All), *J. P. Rawat* v. *L.D. Paliwal*, 20 ELR 443 (All) ; *Hafiz Mohd Ibrahim* v. *Election Tribunal*, 13 ELR 262 (All) and *Ram Phal* v. *Brahm Prakash*, 23 ELR 92 (Punj), *referred to.*

It is the act of solicitation for the aid of the officials mentioned in Section 123(7), whether successful or not, and not the mere fact that certain advantages flow quite naturally and conventionally from the occupation of an office, without any solicitation, or the mere fact that some assistance is voluntarily given by some one to an election campaign which is penalised by the provision. The trial Judge erred in assuming the existence of actus reus.
(Para 406)

(c) It would be extending the scope of Section 123(7) too wide to hold that the facilities automatically provided by the State to the Prime Minister, by virtue of his or her office, are also struck by a provision directed against solicitation of official aid and assistance by candidates.   (Para 466)

*Motilal* v. *Mangla Prasad*, AIR 1958 All 794 ; *Biresh Mishra* v. *R. N. Sharma*, 17 ELR 243 (All) and *Sheopat Singh* v. *Ram Pratap*, (1965) 1 SCR 175 : AIR 1965 SC 677, *explained.*

The amendment by adding a proviso to Section 123(7) is merely clarificatory of the state of law as it really was even before the amendment.   (Para 473)

There is no attack on the validity of Section 123(7) of the Act as it existed before the amendment. Hence, there could be no challenge to the validity of the amendment if it does not, change the law but merely clarifies it.   (Para 474)

Learned Counsel for the election-petitioner contended that, as a candidate at an election, the Prime Minister and an ordinary candidate should enjoy equal protection of the laws and should be afforded equal facilities irrespective of the office occupied by one of two or more candidates. Such an attack upon the validity of this amendment seems to be possible only under the provisions of Article 14 of the Constitution. But, as Act 40 of 1975 has been placed by Section 5 of the Thirty-ninth Amendment in the protected Ninth Schedule of the Constitution, it becomes immune from such an attack. After the practically unanimous opinion of the Supreme Court in *Kesavananda Bharati's case*, that such an immunisation of an enactment from an attack based upon an alleged violation of the chapter on fundamental rights in constitutionally valid, a similar attack cannot be brought in through the backdoor of a "basic structure" of the Constitution. Moreover, this particular amendment has nothing to do with damage to any part of the "basic structure" of the Constitution. Even if an attack on the ground of a violation of Article 14 were open today, the occupation of such a high and important office as that of the Prime Minister of this country, with all its great hazards and trials, would provide a rational basis for reasonable classification in respect of advantages possessed by a Prime Minister as a candidate at an election due to arrangements made necessary by considerations of safety and protection of the life and person of the Prime Minister. Hence, there is no sustainable ground of attack at all on the validity of this provision.   (Para 475)

(d) It is true that the case set up is that the prescribed limit of expenditure was exceeded and the case is so stated that items beyond the list could conceivably be added. Nevertheless, unless and until there is a plea that whatever was spent by the Congress (R) party, either as an express or implied agent of the original respondent, this loophole left in the petition would not suffice.   (Para 492)


SCC Online Web Edition, Copyright © 2021
Page 53      Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------------------------------------

### Part III—Charges of commission of corrupt practices (*contd.*)

The mandatory provision of Section 83(1)(*b*) has not been followed.

The amendment made by Act 58 of 1974, by adding the explanation (1) to Section 77(1) of the Act, could be justified as merely an attempt to restore the law as it had been understood to be previous to decision of the Supreme Court in *Kanwarlal Gupta's case.* (Para 494)

*Rananjaya Singh* v. *Baijnath Singh*, (1955) 1 SCR 671 : AIR 1954 SC 749 : 10 ELR 129 ; *Ram Dayal* v. *Brijraj Singh*, (1969) 2 SCC 218 ; *Magraj Patodia* v. *R. K. Birla*, (1970) 2 SCC 888 ; *B. Rajagopala Rao* v. *N. G. Ranga*, (1970) 3 SCC 576 ; *Hans Raj* v. *Pt. Hari Ram*, 40 ELR 125 (SC) ; *Shah Jayantilal Ambalal* v. *Kasturilal Nagindas Doshi*, 42 ELR 307 (SC) ; *and Samant N. Balakrishna* v. *George Fernandez*, (1969) 3 SCC 238, relied on.

There is no case or evidence before the Court that the Congress party was the agent, express or implied, of the original respondent or acting as the channal through which any money whatsoever was spent by the original respondent. The petition could not possibly succeed on the ground of exceeding election expenses. The law requires proof of circumstances from which at least implied authorisation can be inferred. (Para 502)

The third and the last and a subsidiary submission on behalf of the election-petitioner, on election expenses, was that Shri Dal Bahadur Singh not having been produced by the original respondent, some sort of presumption arises against the original respondent.

A presumption may arise against a successful candidate from the non-production of available evidence to support his version. Such a presumption, under Section 114 Evidence Act, it has to be remembered, is always optional and one of fact, depending upon the whole set of facts. It is not obligatory. (Para 503)

*M. Chenna Reddy* v. *Ramchandra Rao*, 40 ELR 390 (SC), referred to.

(*e*) The symbol of cow and calf is not a religious symbol. (Para 481)

*Bhartendra Singh* v. *Ramsahai Pandey*, AIR 1972 MP 167 ; *Shital Prasad Misra* v. *Nitiraj Singh Chaudhary*, M. P. Gaz. 23.6.1971, Pt. I, p. 809, paras 18 to 23 ; *Sri Prasanna Das Damodar Das Palwar* v. *Indu Lal Kanhaiya Lal Yajnik*, Guj. Gaz., dt. 20-7-1972. Pt. 4C, p. 1042, 1355-1362 ; *Shah Jayantilal Ambalal* v. *Kasturilal Nagindas Doshi*, 36 ELR 188 (Guj HC) ; *Baijnath Singh Vaidya* v. *R. P. Singh*, 36 ELR 327 (All HC) ; *Bishambhar Dayal* v. *Raj Rajeshwar*, 39 ELR 363 (All HC) ; *Dinesh Dangi* v. *Daulat Ram*, 39 ELR 463 (Raj HC) ; *Shyam Lal* v. *Musa Din*, 37 ELR 67 (All HC) ; *B. P. Maurya* v. *Prakash Vir Shastri*, 37 ELR 137 (All HC) ; *Sahodra Rai* v. *Ram Singh Aharwar*, 37 ELR 176 (MP HC) ; *Vishwanath Pd.* v. *Salamatullah*, 27 ELR 145 (All HC) ; *Lachhi Ram* v. *J. P. Mukhariya*, 9 ELR 149 (Election Tribunal), referred to.

In addition, Section 8 of the Act 40 of 1975 has made the position on this point also very clear by inserting a proviso. (Para 482)

As in the case of other amendments, this amendment was also challenged on behalf of the election-petitioner on the ground that it could be misused. Attacks made on such sweeping suggestions of likelihood of misuse, in future, cannot possibly succeed. It has been repeatedly laid down by the Supreme Court that the possibility of misuse of a power given by a statute cannot invalidate the provision conferring the power. (Para 483)

*B. N. Khare* v. *State of Delhi*, 1950 SCR 519 : AIR 1950 SC 211 ; *State of W. B.* v. *Anwar Ali Sarkar*, 1952 SCR 284 : AIR 1952 SC 75 ; *R. K. Dalmia* v. *Justice S. R. Tendolkar*, 1959 SCR 279 : AIR 1958 SC 538 ; *T. K. Musaliar* v. *Venkitachalam*, (1955) 2 SCR 1196 : AIR 1956 SC 246 ; *Chitralekha* v. *State of Mysore*, (1964) 6 SCR 368 : AIR 1964 SC 1823 ; and *M. R. Deka* v. *N. E. F. Rly.*, (1964) 5 SCR 683 : AIR 1964 SC 600, relied on.

### Per Chandrachud, J.

Acts 58 of 1974 and 40 of 1975 effectively put an end to the two appeals before the Supreme Court for they answer the totality of the objections which were raised by the defeat-



SCC Online Web Edition, Copyright © 2021
Page 54        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------------------------------------------

**Part III—Charges of commission of corrupt practices** (*contd.*)

ed candidate against the election of the appellant. The basis of the findings on which the High Court held against the successful candidate is removed by Act 40 of 1975 retrospectively.                    (Para 694)

Findings recorded by the High Court in favour of the appellant are amply borne out by the evidence. The expenses incurred by the political party together with the expenses incurred by her are not shown to exceed the prescribed ceiling. Apart from that, Act 58 of 1974 makes that issue academic.                    (Para 694)

Were the law as it is under the amendments introduced by that Act, the High Court could not have held that the election is vitiated by the two particular corrupt practices.                    (Para 694)

In regard to the cross-appeal filed by the respondent his counsel thought that a part of it escapes through the crevices in the Act but I see no substance in that contention either.                    (Para 694)

## PART IV—MISCELLANEOUS

**A. Jurisprudence—Kelsen's pure theory of law—For judicial function there must exist a general norm the application of which results in an individual norm—The result of a purported legislative act must be a norm of general application.**

### Per Ray, C. J.

The legal order is a system of general and individual norms connected with each other according to the principle that law regulates its own creation. Each norm of this order is created according to the provisions of another norm and ultimately according to the provisions of the basic norm constituting the unity of this system, the legal order. A norm belongs to a certain legal order, because it is created by an organ of the legal community constituted by this order. Creation of law is application of law. The creation of a legal norm is normally an application of the higher norm, regulating its creation. The application of higher norm is the creation of a lower norm determined by the higher norm. A judicial decision is an act by which a general norm, a statute, is applied but at the same time an individual norm is created binding one or both parties to the conflict. Legislation is creation of law. Taking it into account is application of law. The higher norm may determine the organ and the procedure by which a lower norm and the contents of the lower norm are created. For a norm the creation of which is not determined at all by another norm cannot belong to another legal order. The individual creating a norm cannot be considered the organ of the legal community, his norm-creating function cannot be imputed to the community, unless in performing the function he applies a norm of the legal order constituting the community. Every law-creating act must be a law-applying act. It must apply a norm preceding the act in order to be an act of the legal order or the community constituted by it. When settling a dispute between two parties a court applies a general norm or statutory or customary law. Simultaneously, the court creates an individual norm providing that a definite sanction shall be executed against a definite individual. The individual norm is related to the general norm as the statute is related to the Constitution. The judicial function is thus like legislation, both creation and application of law. The judicial function is ordinarily determined by the general norms both as to procedure and as to the contents of the norm to be created, whereas legislation is usually determined by the Constitution only in the former respect.

The general norm which attaches abstractly determined consequences, has to be applied to concrete cases in order that the sanction determined in abstract may be ordered and executed in concrete. The two essential elements of judicial functions are to apply a pre-existing general norm in which a certain consequence is attached to certain conditions.





SCC Online Web Edition, Copyright © 2021
Page 55        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------------------------------------------------

### Part IV—Miscellaneous (*contd.*)

The existence of the concrete conditions in connection with the concrete consequence are what may be called individualization of the general and abstract norm to the individual norm of the judicial decision. (Paras 33 and 34)

The hierarchical structure of the legal order of a State is that the Constitution is the highest level within national law. The Constitution in the formal sense is a solemn document containing a set of legal norms which may be changed only when special prescriptions are observed. The purpose of special prescriptions is to render the change of these norms more difficult by regulating the manner and form of these amendments. The Constitution consists of those rules which regulate the creation of the general legal norms, in particular, the creation of statutes. It is because of the material Constitution that there is a special form for constitutional law. It there is a constitutional form then Constitution laws must be distinguished from ordinary laws. The material Constitution may determine not only the organs and procedure of legislation, but also, to some degree, the contents of future laws. The Constitution can negatively determine that the laws must not have a certain content *e. g.* that the Parliament may not pass any statute which restricts religious freedom. In this negative way not only contents of statutes but of the other norms of legal order, judicial and administrative decisions likewise, may be determined by the Constitution. The Constitution can also positively prescribe certain contents of future statutes. (Para 132)

### Per Khanna, J.

Law normally connotes a rule or norm which is of general application. It may apply to all the persons or class of persons or even individuals of a particular description. Law prescribes the abstract principles by the application of which individual cases are decided. Law, however, is not what Blackstone called "a sentence". According to Roscoe Pound, law, as distinguished from laws, is the system of authoritative materials for grounding or guiding judicial and administrative action recognized or established in a politically organized society. Law is not the same as judgment. Law lays down the norm in abstract terms with a coercive power and sanction against those guilty of violating the norm, while judgment represents the decision arrived at by the application of law to the concrete facts of a case. (Para 210)

Constitutional law relates to the various organs of a State; it deals with the structure of the Government, the extent of distribution of its powers and the modes and principles of its operation. The Constitution of India is so detailed that some of the matters which in a brief Constitution are dealt with by statutes form the subject-matter of various articles of our Constitution. There is, however, in a constitutional law, as there is in the very idea of law, some element of generality or general application. It also carries with it a concept of its applicability in future to situations which may arise in that context. (Para 210)

### Per Mathew, J.

A law and a particular command are distinguished in the following manner : a law obliges *generally* the members of a given community, or a law obliges *generally* persons of a given class. A particular command obliges a *single* person or persons, whom it determines *individually.* (Para 284)

The end product of the exercise of judicial power is a judgment or sentence and not a law. (Para 284)

According to Patterson, the generality of a law depends upon its being applicable to an indefinite number of human beings and that is the most significant aspect of law. An ordinary judgment of a court is *not law* as a judgment applies only to a limited number of individuals, the parties to the case. He disagreed with Dr. Kelsen's statement that the judicial decision is an individual legal norm as the expression 'individual legal norm' is a self-contradiction. (Para 295)


SCC Online Web Edition, Copyright © 2021
Page 56       Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------------------

**Part IV—Miscellaneous** (*contd.*)

Kelsen made no distinction between law-creation and law-application. According to him, every act of applying the law involved the creation of norms. In his view, there was no distinction between creation and application of law, an unacceptable view in the light of clear distinction made by the decisions of the Supreme Court between legislative and judicial functions.                                                                    (Para 289)

**B. Penal Code, 1860—Sections 171-A to 171-I—Offences under—Comparison with the Representation of the People Act, 1951**

**Per Ray, C. J.**

A significant distinction arises between the electoral offences under the 1951 Act and the offences under Sections 117-A to 171-I of the Indian Penal Code, namely, that the 1951 Act uses the the word "candidate" or his election agent with reference to various offences whereas the Indian Penal Code does not use the word "candidate" in relation to commission of any offence. Any person may fall within the offences of bribery, undue influence, personation at elections within the provisions of the Indian Penal Code or for false statement or illegal payments in connection with any election or failure to keep election accounts.                                                            (Paras 141 & 145)

**C. Practice and procedure—Supreme Court should not decide incidental or collateral matters canvassed during arguments (Per Khanna, J.)**                                                                    (Para 204)

**D. Interpretation of Statutes—Broad meaning—Widely worded statute cannot be interpreted narrowly because of the facts of an individual case (Per Khanna, J.)**                                                (Para 204)

**E. Constitutional interpretation—Liberal interpretation—Limits of**

**Per Khanna, J.**

Although the provisions of a constitutional amendment should be construed in a fair and liberal spirit, such liberal spirit should not be carried by the court to the extent of discovering the application of a dormant and latent law in the declaration of the validity of an election even though there is not even a remote indication of such a law in the impugned provision.                                                            (Para 205)

**F. Interpretation of Statutes—Definition clause—Application of if mandatory wherever that word appears in the statute**

**Per Khanna, J.**

A definition clause in a statute is a legislative device with a view to avoid making different provisions of the statute to be cumbersome. Where a word is defined in the statute and that word is used in a provision to which that definition is applicable, the effect is that wherever the word defined is used in that provision, the definition of the word gets substituted. Where, however, the definition is preceded by the words "unless the context otherwise requires" the connotation is that normally it is the definition given in the section which should be applied and given effect to. This normal rule may, however, be departed from if there be something in the context to show that the definition should not be applied. (Paras 218 & 219)

**G. Evidence Act, 1872—Section 60—Hearsay—Report of correspondent appearing in newspaper—Cannot be relied on if such correspondent not examined. (Per Khanna, J.)**                                    (Para 244)

**H. Judicial process—Adjudicative facts and legislative facts—Judicial process and legislative action—Distinction**


SCC Online Web Edition, Copyright © 2021
Page 57          Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

### Part IV—Miscellaneous *(contd.)*

### Per Mathew, J.

"Adjudicative facts are facts about the parties or their activities, businesses and properties usually answering the questions of who did what, where, when, how, why, with what motive or intent; adjudicative facts are roughly the kind of facts that go to a jury in a jury case. Legislative facts do not usually concern the immediate parties but are general facts which help the tribunal decide questions of law, policy and discretion. Facts pertaining to the parties and their activities, that is, adjudicative facts, are intrinsically the kind of facts that ordinarily ought not to be determined without giving the parties a chance to know and to meet any evidence that may be unfavourable to them, that is, without providing the parties an opportunity for trial." (Para 267)

A judicial inquiry investigates, declares and enforces liabilities as they stand on present or past facts and under laws supposed already to exist. This is its purpose and end. Legislation, on the other hand, looks to the future and changes existing conditions by making a new rule, to be applied thereafter to all or some part of those subject to its power. Judicial power is the exercise of a power on the basis of pre-existing law. (Paras 276 & 277)

According to the historic analysis, the essence of the distinction between legislative power and judicial power is that the Legislature makes new law which becomes binding on all persons over whom the Legislature exercises legislative power: the Judicature applies already existing law in the resolution of disputes between particular parties; and judges may not deviate from this duty. (Para 278)

Though neither for logic nor in language has the boundary between legislation and adjudication ever been rigidly and clearly drawn, the distinction between the two is well established. (Para 278)

### I. Election—Election Trial—Corrupt practices—Proof of mens rea and actus reus—Presence of—Strict interpretation of statutory provision relating to corrupt practices—Interpretation of Statutes—Penal statutes—R. P. A., 1951, Section 123(7)

### Per Beg, J.

The logical consequence of placing a charge of corrupt practice on the same footing as a criminal charge is an obligation to interpret the words which define it strictly and narrowly. Indeed, any natural and ordinary interpretation on the words "obtaining or procuring or abetting or attempting" must carry with it the imperative requirement that the candidate concerned or his agent must have intentionally done an act which has the effect contemplated by Section 123(7), R. P. A. 1951. In other words, a "mens rea" or a guilty mind as well as an "actus reus" or a wrongful act must occur to produce the result contemplated by law. So far as election expenses are concerned, it is possible to conceive that even an unintentional result (*i. e.* expenses "incurred" exceeding the prescribed limit) may be enough so that a duty to prevent this result may be there in law. But, Section 123(7) requires actual intended acts of "obtaining" or "procuring" or attempting or abetting. For Section 123(7) results are immaterial. (Para 409)

*Dr. Y. S. Parmar* v. *Hira Singh*, AIR 1959 SC 244: 1959 Supp 1 SCR 213, *dissented from.*

*Satya Dev Bushahri* v. *Padam Dev*, 10 ELR 103: AIR 1955 SC 5: (1955) 1 SCR 561 and *Mahendra Kumar* v. *Vidyavati*, 10 ELR 214: AIR 1956 SC 315, *relied on.*

*Babubhai Vallabhdas Gandhi* v. *Piloo Homi Mody*, 36 ELR 108, 123-124 (Guj HC) and *Haji Abdul Wahid* v. *B. V. Keskar*, 21 ELR 409, 432, *referred to.*



SCC Online Web Edition, Copyright © 2021
Page 58          Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------

**Part IV—Miscellaneous** (*contd.*)

### J. Election Trial—Corrupt practices—Proof of—Circumstantial evidence—Conclusive nature of essential

**Per Beg, J.**

Allegations of corrupt practice in the course of an election must be judged by the same standards as a criminal charge. And, no rule of evidence, in judging guilt on a criminal charge, is more firmly rooted than that no charge, resting on circumstantial evidence, could be held to be proved beyond reasonable doubt unless the chain of circumstances is so complete and so connected with the charge that it leaves no other reasonable hypothesis open for the court to adopt except that the offender had committed the offence alleged.                                        (Para 412)

### K. Constitution of India—Article 14—Nature of—Equality between unequals not contemplated

**Per Beg, J.**

It is not the function of courts to embark on attempts to achieve what is only in the power of Parliament to accomplish, that is to say, to bring about equality of conditions where the law permits justifiable discrimination. To treat unequally situated and circumstanced persons as though they were equals in the eyes of law for all purposes is not really to satisfy the requirements of the equality contemplated by the Constitution. (Para 477)

### L. Constitutional interpretation—Expressio unius est exclusio alterius—Application of

**Per Beg, J.**

The well-recognised rule of construction of statutes, which must apply to the interpretation of the Constitution as well, is: "Expressio unius est exclusio alterius". From this is derived the subsidiary rule that an expressly laid down mode of doing something necessarily prohibits to doing of that thing in any other manner.                (Para 587)

### M. Words and Phrases—"Incur"—Meaning of

**Per Ray, C. J.**

The word "incur" according to the dictionary meaning means to become liable to. The word "incur" means to undertake the liability even if the actual payment may not be made immediately. The undertaking of the responsibility for the expenditure concerned may be either by the candidate or his election agent. Again, a candidate is also to be deemed responsible for the expenditure if he has authorised a particular expenditure to be made by someone else on his behalf.                          (Para 148)

*Advocates who appeared in this case* :

*A. K. Sen, J. N. Kaushal, D. P. Singh,* Senior Advocates (*J. B. Dadachanji, R. H. Dhebar, Madur Gujadhur, U. C. Agarwal, Yogeshwar Prasad, H. K. L. Bhagat, Sudhir Bera, K. P. Bhandari* and *Mrs. Anjali K. Verma,* Advocates with them), for the Appellant (In C. A. No. 887/75) and Respondent No. 1 (In C. A. No. 909/75) ;

*Shanti Bhushan,* Senior Advocate (*J. P. Goyal, R. C. Dwivedi. R. C. Srivastava, Pranab Chatterji, S. S. Khanduja, E. C. Agarwala, C. K. Ratnaparkhi, M. C Gupta, T. N. Porwar, U. N. R. Rao, S. K. Garg, B. Soloman, K. C. Dua, Raghunath Singh* and *Sripal Singh,* Advocates, with him), for the Appellant (In C. A. No. 909/75) and for Respondent No. 1 (in C. A No. 887/75) ;

*Niren De,* Attorney-General of India, *Lal Narain Sinha,* Solicitor-General for India and *V. A. Seyid Mohammed,* Senior Advocate (*R. N. Sachthey, P. P. Rao, Miss Sumitra Chakravarty* and *S. P. Nayar,* Advocates with him), for the Attorney-General of India.


SCC Online Web Edition, Copyright © 2021
Page 59        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------------------

The Judgments of the Court were delivered by

RAY, C. J.—In Civil Appeal No. 887 of 1975 the appellant is Indira Nehru Gandhi and the respondent is Raj Narain. Civil Appeal No. 909 of 1975 is the cross objection of the respondent. On July 14, 1975 it was directed that both the appeals would be heard together. The appeals arise out of the judgment of the High Court of Allahabad dated June 12, 1975. The High Court held that the appellant held herself out as a candidate from December 29, 1970 and was guilty of having committed corrupt practice by having obtained the assistance of gazetted officers in furtherance of her election prospects. The High Court further found the appellant guilty of corrupt practice committed under Section 123(7) of the Representation of the People Act, 1951 hereinafter referred to as the 1951 Act by having obtained the assistance of Yashpal Kapur a gazetted officer for the furtherance of her election prospects. The High Court held the appellant to be disqualified for a period of six years from the date of the order as provided in Section 8(*a*) of the 1951 Act. The High Court awarded costs of the election petition to the respondent.

2. It should be stated here that this judgment disposes of both the appeals. Under directions of this Court the original record of the High Court was called for. The appeal filed by the respondent with regard to issues Nos. 2, 4, 6, 7 and 9 formed the subject-matter of cross objections in Civil Appeal No. 909 of 1975. The cross objections are the same which form grounds of appeal filed by the respondent in the High Court at Allahabad against an order of dismissal of Civil Misc. Writ No. 3761 of 1975 filed in the High Court at Allahabad.

3. The Constitution (Thirty-ninth Amendment) Act, 1975 contains three principal features. First, Article 71 has been substituted by a new Article 71. The new Article 71 states that subject to the provisions of the Constitution, Parliament may by law regulate any matter relating to or connected with the election of a President or Vice-President including the grounds on which such election may be questioned.

4. The second feature is insertion of Article 329A in the Constitution. Clause 4 of Article 329A is challenged in the present appeals. There are six clauses in Article 329A.

5. The first clause states that subject to the provisions of Chapter II of Part V [except sub-clause (*e*) of clause (1) of Article 102] no election to either House of Parliament of a person who holds the office of Prime Minister at the time of such election or is appointed as Prime Minister after such election ; and to the House of the People of a person who holds the office of Speaker of that House at the time of such election or who is chosen as the Speaker for that House after such election ; shall be called in question, except before such authority [not being any such authority as is referred to in clause (*b*) of Article 329] or body and in such manner as may be provided for by or under any law made by Parliament and any such law may provide for all other matters relating to doubts and disputes in relation to such election including the grounds on which such election may be questioned.

6. Under the second clause the validity of any such law as is referred to in clause (1) and the decision of any authority or body under such law shall not be called in question in any court.

7. The third clause states that where any person is appointed as Prime Minister or, as the case may be, chosen to the office of the Speaker of the



SCC Online Web Edition, Copyright © 2021
Page 60        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------------------------------------------

House of the People, while an election petition referred to in Article 329(*b*) in respect of his election to either House of Parliament or, as the case may be, to the House of the People is pending, such election petition shall abate upon such person being appointed as Prime Minister or, as the case may be, being chosen to the office of the Speaker of the House of the People, but such election may be called in question under any such law as is referred to in clause (1).

**8.** The fourth clause which directly concerns the present appeals states that no law made by Parliament before the commencement of the Constitution (Thirty-ninth Amendment) Act, 1975, in so far as it relates to election petitions and matters connected therewith, shall apply or shall be deemed ever to have applied to or in relation to the election of any such person as is referred to in clause (1) to either House of Parliament and such election shall not be deemed to be void or ever to have become void on any ground on which such election could be declared to be void under any such law and notwithstanding any order made by any court, before such commencement, declaring such election to be void, such election shall continue to be valid in all respects and any such order and any finding on which such order is based shall be and shall be deemed always to have been void and of no effect.

**9.** The fifth clause states that any appeal or cross appeal against any such order of any court as is referred to in clause (4) pending immediately before the commencement of the Constitution (Thirty-ninth Amendment) Act, 1975, before the Supreme Court shall be disposed of in conformity with the provisions of clause (4).

**10.** The sixth clause states that the provisions of this article shall have effect notwithstanding anything contained in the Constitution.

**11.** The third feature in the Constitution (Thirty-ninth Amendment) Act is that in the Ninth Schedule to the Constitution after Entry 86 and before the explanation several Entries Nos. 87 to 124 inclusive are inserted. The Representation of the People Act, 1951, the Representation of the People (Amendment) Act, 1974 and the Election Laws (Amendment) Act, 1975 are mentioned in Entry 87.

**12.** The respondent contends that the Representation of the People (Amendment) Act, 1974 and the Election Laws (Amendment) Act, 1975 referred to as the Amendment Acts, 1974 and 1975 do not enjoy constitutional immunity because these Acts destroy or damage basic structure or basic features.

**13.** In view of the challenge by the respondent to the constitutional validity of the Amendment Acts, 1974 and 1975, notice was given to the Attorney General.

**14.** The appeals were to be heard on August 11, 1975. In view of the Constitution (Thirty-ninth Amendment) Act, 1975 which came into existence on August 10, 1975 the hearing was adjourned till August 25, 1975.

**15.** The constitutional validity of clause (4) of Article 329A falls for consideration. Clause (4) of Article 329A is challenged on two grounds. First, it destroys or damages the basic features or basic structure of the Constitution. Reliance is placed in support of the contention on the


SCC Online Web Edition, Copyright © 2021
Page 61        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source:  Supreme Court Cases


-------------------------------------------------------------------------------------------------------------------------

majority view of seven learned Judges in *His Holiness Kesavananda Bharati Sripadagalavaru* v. *State of Kerala*[1].

**16.** It should be stated here that the hearing has proceeded on the assumption that it is not necessary to challenge the majority view in *Kesavananda Bharati's case* (supra). The contentions of the respondent are these: First, under Article 368 only general principles governing the organs of the State and the basic principles can be laid down. An amendment of the Constitution does not contemplate any decision in respect of individual cases. Clause (4) of Article 329A is said to be exercise of a purely judicial power which is not included in the constituent power conferred by Article 368.

**17.** Second, the control over the result of the elections and on the question whether the election of any person is valid or invalid is vested in the Judiciary under the provisions of Article 329 and Article 136. The jurisdiction of judicial determination is taken away, and, therefore, the democratic character of the Constitution is destroyed.

**18.** Third, the amendment destroys and abrogates the principle of equality. It is said that there is no rational basis for differentiation between persons holding high offices and other persons elected to Parliament.

**19.** Fourth, the rule of law is the basis for democracy and judicial review. The fourth clause makes the provisions of Part VI of the Representation of the People Act inapplicable to the election of the Prime Minister and the Speaker.

**20.** Fifth, clause (4) destroys not only judicial review but also separation of power. The order of the High Court declaring the election to be void is declared valid (*sic* void). The cancellation of the judgment is denial of political justice which is the basic structure of the Constitution.

**21.** The second ground is that the constitution of the House which passed the Constitution (Thirty-ninth Amendment) Act is illegal. It is said that a number of members of Parliament of the two Houses were detained by executive order after June 26, 1975. These persons were not supplied any grounds of detention or given any opportunity of making a representation against their detention. Unless the President convenes a session of the full Parliament by giving to all members thereof an opportunity to attend the session and exercise their right of speech and vote, the convening of the session will suffer from illegality and unconstitutionality and cannot be regarded as a session of the two Houses of Parliament. The mere fact that a person may be deprived of his right to move any court to secure his release from such illegal detention by means of a Presidential order under Article 359 does not render the detention itself either legal or constitutional. The important leaders of the House have been prevented from participation. Holding of the session and transacting business are unconstitutional.

**22.** Under the first ground these are the contentions. The Constitution Amendment affects the basic structure of institutional pattern adopted by the Constitution. The basic feature of separation of powers with the role of independence of Judiciary is changed by denying jurisdiction of this Court to test the validity of the election. The essential feature of democracy will be destroyed if power is conceded to Parliament to declare the elections void according to law under which it has been held to be valid. This is illustrated by saying that Parliament can by law declare the election of persons

1.   1973 Supp SCR 1 : (1973) 4 SCC 225.


SCC Online Web Edition, Copyright © 2021
Page 62        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------------------------

against the predominant ruling party to be void. If the majority party controls the Legislature and the Executive, the Legislature could not have any say as to whether the Executive was properly elected. Free and fair elections are part of democratic structure and an election which has been held to be invalid for violation of the principles of free and fair elections and by commission of corrupt practices is validated. The basic structure of equality is violated by providing that those who hold office of Prime Minister and Speaker are above law although election laws were there. The persons who will hold the office of Prime Minister and Speaker have been free from those laws and they are not under rule of law and there is no judicial review with regard to their elections.

23. The nature of the constituent power is legislative. The constituent power cannot exercise judicial power. Exercise of judicial power or of a purely executive power is not power of amendment of the Constitution. The Constitution may be amended to change constitutional provisions but the constituent power cannot enact that a person is declared to be elected. The consequence of change of law may be that the decision given by a court under the law as it stood will not stand.

24. The respondent contends that judicial review is an essential feature of basic structure because of the doctrine of separation of powers for these reasons: Judicial review is basic structure in the matter of election to ensure free, fair and pure election. In the American and the Australian Constitutions the judicial power of the State is located in the Judiciary. There is no such provision in our Constitution. The Executive, the Legislature and the Judiciary are all treated under our Constitution with respective spheres. The jurisdiction of this Court and of High Courts under our Constitution is dealt with by articles under the heads of the Union Judiciary and the State Judiciary. Under Article 136 any tribunal or court is amenable to the jurisdiction of this Court. The corollary drawn from this is that if under clause (4) of Article 329A of the Thirty-ninth Amendment the power of judicial review is taken away it amounts to destruction of basic structure.

25. In England formerly Parliament used to hear election disputes. In 1870 Parliament found that because of political factions it would be better to leave the task of deciding controverted elections to judges. Parliament delegated its power of deciding controverted elections to courts. Under the English law the courts hear and make a report to Parliament. In America each House shall be the judge of the elections, returns and qualifications of its own members. That is Article 1, Section 5 of the American Constitution. In Australia any question of a disputed election to either House shall be determined by the House in which the question arises. Under the German Federal Republic Constitution the Legislature decides whether a person has lost his seat. Against the decision of the Bundestag an appeal shall lie to the Federal Constitutional Court.

26. The view of Story on the American Constitution is that the power to judge elections, returns and qualifications of the members of each House composing the Legislature is to be lodged in the Legislature. Story says that no other body can be so perpetually watchful to guard its own rights and privileges from infringement. (See *Story*, page 585).

27. In *Corpus Juris* Vol. 16 (1956) it is said that the Judiciary cannot exercise powers which are to be found in the other two departments of Government which are normally legislative or powers which are generally executive in their nature. All matters relating to or affecting elections are


SCC Online Web Edition, Copyright © 2021
Page 63          Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases


-------------------------------------------------------------------------------

political questions and, as such, are not questions for the Judiciary. All matters relating to or affecting elections are, in the absence of controlling constitutional or statutory provisions to the contrary, political questions and, as such, are not questions for the Judiciary. So, subject to express constitutional restrictions, all matters relating to the holding of elections and determining their results, including contests are political questions (pp. 691, 692, 710).

**28.** In *Corpus Juris* Vol. 29 (1965) it is stated that under constitutional provision conferring on the Legislature the power to determine by law, before what authority, and in what manner the trial of contested elections shall be conducted, the Legislature is given broad power. A constitutional provision authorising the Legislature to provide for the mode of contesting elections in all cases not otherwise specifically provided for in the Constitution itself confers on the Legislature adequate authority to provide for all election contests and to determine where and by what means election contests shall be conducted. The right to contest an election is not a common law right. Elections belong to the political branch of the Government, and, in the absence of the special constitutional or statutory provisions, are beyond the control of the judicial power (Sections 245, 246). A contested election case is a proceeding in which the public is interested, since it is for the public good. An election contest is not merely a proceeding for the adjudication and settlement of the private rights of rival claimants to an office. It is the public interest, not the parties' claims, which is the paramount legislative concern (Section 247).

**29.** In America disputed elections are decided by the Legislature. In *Taylor* v. *Beckham*[2] the American Supreme Court held that a determination of an election contest for the office of the Governor is a political question and is not justiciable. In *Truman H. Newberry* v. *United States of America*[3] the American Supreme Court held that the manner of elections can be controlled. In *David S. Barry* v. *United States of America Ex. Rel. Thomas W. Cunningham*[4] the decision of the American Supreme Court in *Charles W. Baker* v. *Joe C. Carr*[5] was referred to in order to find out as to what aspects of elections would be justiciable and not a political question. In *Baker* v. *Carr* (supra) the delimitation of constituencies was held to be a justiciable issue. In *Julian Bond* v. *James 'Sloppy' Floyd*[6] the exclusion of an elected representative because of his statement attacking the Vietnam policy was held to be justiciable on the ground that it was not within the jurisdiction of the Legislature to find out whether a member was sincere in regard to his oath of the Legislature. In *Adam Clayton Powell* v. *John W. McCormack*[7] the disqualification by the House of a Congressman on the basis of qualification on the ground which was not in the Constitution was held to be justiciable. The Federal District Court has jurisdiction over the subject-matter of controversies arising under the Constitution. The conferment of power on each House in America to be a judge of elections is an exclusive ground of power and constitutes the House to be the sole and ultimate tribunal.

**30.** The American decisions show that if the House claims additional power to disqualify a member on the ground other than those stated in the Constitution judicial review against disqualification would be available. In *Bond's case* (supra) disqualification was on an unconstitutional ground that his statement on Vietnam policy was a matter of free speech and expression.

2.   44 L Ed 547.
3.   65 L Ed 913.
4.   73 L Ed 867.

5.   7 L Ed 2d 663.
6.   17 L Ed 2d 235.
7.   23 L Ed 2d 491.


SCC Online Web Edition, Copyright © 2021
Page 64          Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-----------------------------------------------------------------------------------------------------------------------------

The court did not decide an election dispute but as a custodian of judicial power judged whether the House was acting within its power.

**31.** Parliament itself can also hear election disputes. That was the English practice until the Grenville Act, 1868 when Parliament conferred power on courts. Before 1770, controverted elections were tried by the whole House of Commons as party questions. The House found that the exercise of its privilege could be submitted to a tribunal constituted by law to secure impartiality in the administration of justice according to the laws of the land. In 1868 the jurisdiction of the House in the trial of controverted elections was transferred by statute to the courts of law. The present procedure is contained in the English Representation of the People Act, 1949. The trial is confided to judges selected from the Judiciary. Provision is made in each case for constituting a rota from whom these judges are selected. The House has no cognizance of these proceedings until their determination when the judges certify their determination, in writing, to the Speaker, which is final to all intents and purposes. Trial is not a proceeding of the House. The judges are to make a report in any case where charge has been made in the petition of corrupt and illegal practice. Provision is also made for the trial of a special case. All certificates and reports of the election court are entered in the journals of the House. Under Section 124(5) of the English Representation of the People Act, 1949, it is the duty of the House to make orders for carrying the determination of the judges into execution.

**32.** Judicial review in many matters under statute may be excluded. In many cases special jurisdiction is created to deal with matters assigned to such authorities. A special forum is even created to hear election disputes. A right of appeal may be conferred against such decision. If Parliament acts as the forum for determination of election disputes it may be a question of parliamentary privilege and the courts may not entertain any review from such decisions. That is because the exercise of power by the Legislature in determining disputed elections may be called legislative power. A distinction arises between what can be called the traditional judicial determination by courts and tribunals on the one hand and the peculiar jurisdiction by the Legislature in determining controverted elections on the other.

**33.** The legal order is a system of general and individual norms connected with each other according to the principle that law regulates its own creation. Each norm of this order is created according to the provisions of another norm and ultimately according to the provisions of the basic norm constituting the unity of this system, the legal order. A norm belongs to a certain legal order, because it is created by an organ of the legal community constituted by this order. Creation of law is application of law. The creation of a legal norm is normally an application of the higher norm, regulating its creation. The application of higher norm is the creation of a lower norm determined by the higher norm. A judicial decision is an act by which a general norm, a statute, is applied but at the same time an individual norm is created binding one or both parties to the conflict. Legislation is creation of law. Taking it into account is application of law. The higher norm may determine the organ and the procedure by which a lower norm and the contents of the lower norm are created. For a norm the creation of which is not determined at all by another norm cannot belong to another legal order. The individual creating a norm cannot be considered the organ of the legal community, his norm-creating function cannot be imputed to the community, unless in performing the function he applies a norm of


SCC Online Web Edition, Copyright © 2021
Page 65        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source:  Supreme Court Cases


-----------------------------------------------------------------------------------------------------------

INDIRA NEHRU GANDHI *v.* RAJ NARAIN (*Ray, C. J.*)        39

the legal order constituting the community.  Every law–creating act must be a law-applying act.  It must apply a norm  preceding  the act in order to be an act of the legal order or the community constituted by it.  When settling a dispute between two parties a court applies a  general norm or  statutory or customary law.  Simultaneously,  the court  creates  an individual norm providing that a definite sanction shall be executed against  a definite individual. The individual norm is related to the  general  norm as the statute is related to the Constitution.  The judicial function is thus like legislation,  both creation and application of law.  The judicial  function  is ordinarily determined by the general norms both as to procedure and as to the contents of the norm to be created, whereas  legislation  is  usually  determined by the Constitution only in the former respect

**34.**  The  general  norm  which  attaches  abstractly  determined  consequences, has to be applied to concrete cases  in order  that the sanction determined  in  abstract  may  be  ordered  and executed  in  concrete.  The  two essential  elements  of  judicial  functions  are  to  apply a pre-existing general norm in which a certain consequence is attached to  certain conditions.  The existence  of  the  concrete  conditions in connection with the concrete consequence are what may be called  individualization  of  the general and abstract norm to the individual norm of the judicial decision.

**35.**  The contention is that the constituent power is an exercise  in legislative process.  The constituent power, it  is said,  can  exercise legislative as well as judicial and executive powers.  It is said that if a  legislation can validate a matter declared invalid by a  judgment the constituent power may equally do so.  Special emphasis is laid on Article 102(1)(*e*) of the Constitution which is amended by the Constitution (Thirty-ninth Amendment) Act.  Article 102(1)(*e*) speaks of disqualification by certain laws.  The constitutional amendment  seeks to amend  Article 102 and remove the disqualification in the  case of the  Prime  Minister  and the Speaker.  Reliance was placed on the decisions in *Abeyesekera* v.  *Jayabilake*[8] and  *Piare Dusadh* v. *King Emperor*[9], that an amendment is supportable to invalidate a judgment.

**36.**  *Abeyesekera's case* (supra)  is  an  authority  for the proposition that the legal infirmity can be removed  and  active indemnity  can  be  passed  to relieve from penalties incurred.

**37.**  In *Piare Dusadh's case* (supra)  the Special Criminal Courts (Repeal) Ordinance, 1943 which conferred validity and full effectiveness  on sentences passed by special courts which functioned  under the Special Criminal Courts Ordinance,  1942  was challenged.  It was argued in *Piare Dusadh's case* that the  1943  Ordinance  attempted  to exercise judicial power.  The Federal Court did not accept the  contention on  the ground that  in India the Legislature has enacted laws providing  that suits which had  been dismissed on a particular view of the law must be restored  and  retried.  Our Federal Court said that Parliament simply takes  up  certain determinations  which exist in fact, though made without authority, and  prescribes  not  that  they  shall be acts done by a board of review, but that they shall be  treated as they  would be treated if they were such acts.  The sections do not  constitute an exercise of the judicial power.  The Legislature had  not  attempted to decide the question of the  guilt  or innocence of any of the accused.  That question had as a matter of fact been decided  by  tribunals which were directed to follow a certain judicial procedure.  Our Federal Court held  that once the decisions of the special courts were held  void for want of jurisdiction the Legislature created those special courts and  authorised  them to try cases and pass

8.  1932 AC 260.                 9.  1944 FCR 61 : AIR 1944 FC 1.



SCC Online Web Edition, Copyright © 2021
Page 66          Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------

sentences. The Legislature gave jurisdiction to the courts to pass the sentences. The ordinance did not exercise any judicial power because the sentences in due course were subject to an appeal and review by the regular courts of the land.

**38.** The power of the Legislature to validate matters which have been found by judgments or orders of competent courts and tribunals to be invalid or illegal is a well-known pattern. The Legislature validates acts and things done by which the basis of judgments or orders of competent courts and tribunals is changed and the judgments and orders are made ineffective. All the sales tax validation cases, the election validation cases are illustrations of that proposition. The present appeals are not of the type of providing indemnity against penalties or determining existing facts to be treated in accordance with change of law.

**39.** The effect of validation is to change the law so as to alter the basis of any judgment, which might have been given on the basis of old law and thus make the judgment ineffective. A formal declaration that the judgment rendered under the old Act is void, is not necessary. If the matter is pending in appeal, the appellate Court has to give effect to the altered law and reverse the judgment. The rendering of a judgment ineffective by changing its basis by legislative enactment is not an encroachment on judicial power but a legislation within the competence of the Legislature rendering the basis of the judgment *non est*. If a competent court has found that a particular tax or levy has been imposed by a law, which is void because the Legislature passing the law was not competent to pass the law, then the competent Legislature has validated the tax or levy by a validation Act involving a re-enactment of the invalid law. Where the competent Legislature has passed a law which is contrary to any of the fundamental rights in Part III of the Constitution and the law has been declared void by a competent court, the appropriate Legislature has passed a retrospective law validating the actions taken under the old invalid law by curing the defects in the old law so as to make the new law consistent with Part III of the Constitution.

**40.** Where invalid elections declared by reason of corrupt practices have been validated by changing the definition of corrupt practices in the Representation of the People Act, 1951 retrospectively the original judgment is rendered ineffective. (See *Kanta Kathuria* v. *Manak Chand Surana*[10]).

**41.** Our Federal Court in *Basanta Chandra Ghose* v. *King Emperor*[11], dealt with the validity and effect of Ordinance No. 3 of 1944. One of the objects of that ordinance was to enact a presumption in the ordinance itself in favour of detention orders to preclude their being questioned in courts of law and to take away or limit the power of the High Court to make orders under Section 491 of the Criminal Procedure Code. The third object of the ordinance was challenged on the ground that Section 10(2) of the ordinance which provided that if at the commencement there is pending in any court any proceeding by which the validity of an order having effect by virtue of Section 6 as if it had been made under this ordinance is called in question, that proceeding is hereby discharged. Section 10(2) of the ordinance was challenged on the ground that this was in abrogation of judicial power by legislative authority. It was said that the legislative authority only passed the law and the disposal of the particular case could remain the function of the court. Section 10(2) of the ordinance was said not to leave it to the

10. (1970)2 SCR 835 : (1969)3 SCC 268.
11. 1944 FCR 295 : AIR 1944 FC 86 : 23 Pat 678.


SCC Online Web Edition, Copyright © 2021
Page 67        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases


------------------------------------------------------------------------------

court to apply the rule of law to the decision of cases but to discharge all pending proceedings. Our Federal Court noticed the distinction between a legislative act and the judicial act, and said "a direction such a proceeding is discharged is clearly a judicial act and not an enactment of law". In *Piare Dusadh's case* (supra) the latter ordinance provided that the decisions of the earlier tribunals which were negatived by a decision of the Federal Court should be treated as decisions of duly constituted tribunals. That was held not to constitute a judicial power by the ordinance-making authority. In *Basanta Chandra Ghose's case* (supra) the Federal Court held Section 10(2) of the ordinance to be a direct disposal of cases by the Legislature itself. *Basanta Chandra Ghose's case* was decided on the ground that the section in the ordinance discharged the proceedings. There was nothing left to the court.

**42.** Counsel on behalf of the respondent contended that the constituent power could deal with amendments of the Constitution, but could not exercise constituent power in relation to validating an election.

**43.** Judicial review is one of the distinctive features of the American Constitutional Law. In America equal protection of the laws is based on the concept of due process of law. These features are not in our Constitution.

**44.** In *Bond's case* (supra) the House claimed additional power to disqualify a member on grounds other than those stated in the Constitution. It was conceded there as it will appear at page 244 of the report that judicial review against the disqualification decreed by the House would be available if a member was excluded on racial ground or other unconstitutional grounds. The House claimed that the ground on which Bond was disqualified was not an unconstitutional ground. The court held that there was no distinction between a disqualification decreed by the House on racial grounds and one alleged to violate the right of free speech. The court concluded that Bond was deprived of his constitutional rights guaranteed by the First Amendment by the disqualification decreed by the House. This was not a case of deciding an election dispute by the House and the court sitting on appeal on the decision of the House. This is a case where a disqualification was imposed on unconstitutional grounds, thereby affecting the fundamental rights of Bond. This is not an authority for the proposition that the decision of the House on an election dispute would be open to judicial review.

**45.** The case of *Powell* v. *McCormack* (supra) is also one of disqualification by the House of a Congressman on the basis of qualification which the House added to those specified in the Constitution. In other words, the House purported to unseat a member by disqualifying him on a ground not given in the Constitution. This was not a case of deciding an election dispute. Under the statute in question the Federal District Court had jurisdiction over all civil actions where controversy arises under the Constitution. This was a case entertained on the ground that exclusion of a member of the House was unconstitutional. This case is an authority for the proposition that if a power is committed to a particular organ, the court cannot adjudicate upon it. Where a power is exercised by one organ, which is not committed to that particular organ of the State and such exercise of power is violative of a constitutional provision the matter becomes cognizable by courts. The Court held that a question of unconstitutional exclusion of a member is not barred from judicial review as a political question.

**46.** Judicial review is not to be founded on any article similar to the American Constitution. In the Australian Constitution also the judicial

SCC Online Web Edition, Copyright © 2021
Page 68        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------

power is located in the court. The doctrine of separation of powers is carried into effect in countries like America, Australia. In our Constitution there is separation of powers in a broad sense. But the larger question is whether there is any doctrine of separation of powers when it comes to exercise of constituent power. The doctrine of separation of powers as recognised in America is not applicable to our country. (See *In re Delhi Laws Act*[12]; *Jayantilal Shodhan* v. *F. N. Rana*[13]; *Chandra Mohan* v. *State of U. P.*[14]; and *Udai Ram Sharma* v. *Union of India*[15].)

47. The rigid separation of powers as under the American Constitution or under the Australian Constitution does not apply to our country. Many powers which are strictly judicial have been excluded from the purview of the courts. The whole subject of election has been left to courts traditionally under the Common Law and election disputes and matters are governed by the Legislature. The question of the determination of election disputes has particularly been regarded as a special privilege of Parliament in England. It is a political question in the United States. Under our Constitution Parliament has inherited all the privileges, powers and immunities of the British House of Commons. In the case of election disputes Parliament has defined the procedure by law. It can at any time change that procedure and take over itself the whole question. There is, therefore, no question of any separation of powers being involved in matters concerning elections and election petitions.

48. When the constituent power exercises powers the constituent power comprises legislative, executive and judicial powers. All powers flow from the constituent power through the Constitution to the various departments or heads. In the hands of the constituent authority there is no demarcation of powers. It is only when the constituent authority defines the authorities or demarcates the areas that separation of power is discussed. The constituent power is independent of the doctrine of separation of powers. The constituent power is sovereign. It is the power which creates the organs and distributes the powers.

49. The constituent power is *sui generis*. It is different from legislative power. The position of unlimited law-making power is the criterion of legal sovereignty. The constituent power is sovereign because the Constitution flows from the constituent power.

50. In Article 329A an exercise of judicial power is the question for determination. In legislative processes there may be judicial process. If the Legislature has to fix the amount or lay down the principle for fixation of amount the question will arise as to whether this is exercise of judicial power. The determination of the amount will involve judicial procedure. When the Legislature determines the amount the fixation of amount is purely by legislative process. But in doing so the Legislature takes into account factors relevant to individual properties.

51. Every organ of the State has to ascertain facts which make the foundation of its own decision. The Executive usually collects its materials through its departments. The Judiciary acts in a field where there are two or more parties before it and upon evidence placed before it pronounces its verdict according to principles of natural justice. The Legislature is entitled

12. 1951 SCR 747, 965-66 : AIR 1951 SC 332.
13. (1964) 5 SCR 294 : AIR 1964 SC 648.
14. (1967) 1 SCR 77, 87 : AIR 1966 SC

1987 : (1967) 1 Lab LJ 412.
15. (1968) 3 SCR 41, 67 : AIR 1968 SC 1138.


SCC Online Web Edition, Copyright © 2021
Page 69      Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

to obtain information from any source. The Legislature may call witnesses. The rule of *audi alteram partem* is not applicable in a legislative process. Legislation is usually general. It may sometimes be for special reasons an individual case. There is no doubt that the constituent power is not the same as legislative power. The distinction between constituent power and legislative power is always to be borne in mind because the constituent power is higher in norm.

52. Judicial review in election disputes is not a compulsion. Judicial review of decisions in election disputes may be entrusted by law to a judicial tribunal. If it is to a tribunal or to the High Court the judicial review will be attracted either under the relevant law providing for appeal to this Court or Article 136 may be attracted. Under Article 329(*b*) the contemplated law may vest the power to entertain election petitions in the House itself which may determine the dispute by a resolution after receiving a report from a special committee. In such cases judicial review may be eliminated without involving amendment of the Constitution. The Constitution permits by amendment exclusion of judicial review of a matter if it is necessary to give effect to the directive principles of State policy. A similar power may be available when such exclusion is needed in the larger interest of the security of the State. In either case the exclusion of judicial review does not mean that principles of equality are violated. It only means that the appropriate body making the law satisfied itself and determines conclusively that principles of equality have not been violated. That body conclusively makes classification for the purpose of applying the principles of equality. It is said that in this class of cases the answer to the question of the validity of the classification rests on factors to which the court has no access and the materials may be of highly confidential nature and the decision has to be on a matter of political necessity. If judicial review is excluded the court is not in a position to conclude that principles of equality have been violated.

53. Equality of status as well as equality of opportunity is a fundamental right in Articles 14 and 16 of the Constitution. It also means equality before law and equal protection of the laws. Equality is spoken in the Preamble. There is liberty to Legislature to classify to establish equality. When Articles 31A and 31B eliminated judicial review the meaning was not that the Legislature would go on discriminating. The task of classification can be left to the Legislature. It is the very nature of legislation that classification must be in public interest. The amending body has excluded judicial review in Articles 31A, 31B and 31C.

54. Exclusion of the operation of the equality principle from some fields is constitutionally possible. Article 33 excludes judicial review in matters relating to the armed forces. Article 262(2) excludes jurisdiction of courts in water disputes.

55. Decisions in election disputes may be made by the Legislature itself or may be made by courts or tribunals on behalf of the Legislature or may be made by courts and tribunals on their own exercising judicial functions. The concept of free and fair election is worked out by the Representation of the People Act. The Act provides a definition of "corrupt practice" for the guidance of the court. In making the law the Legislature acts on the concept of free and fair election. In any legislation relating to the validity of elections the concept of free and fair elections is an important consideration. In the process of election the concept of free and fair election is worked out by formulating the principles of franchise, and the free exercise of franchise. In cases of disputes as to election, the concept of


SCC Online Web Edition, Copyright © 2021
Page 70          Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------

free and fair election means that disputes are fairly and justly decided.
Electoral offences are statutory ones. It is not possible to hold that the
concept of free and fair election is a basic structure, as contended for by the
respondent. Some people may advocate universal franchise. Some people
may advocate proportional representation. Some people may advocate
educational qualifications for voters. Some people may advocate property
qualifications for voters. Instances can be multiplied on divergence of views
in regard to qualifications for voters, qualifications of members, forms of
corrupt practices. That is why there is law relating to and regulating
elections.

**56.** Clause (4) in Article 329A has done four things. First, it has wiped
out not merely the judgment but also the election petition and the law rela-
ting thereto. Secondly, it has deprived the right to raise a dispute about the
validity of the election by not having provided another forum. Third, there
is no judgment to deal with and no right or dispute to adjudicate upon.
Fourth, the constituent power of its own legislative judgment has validated
the election.

**57.** At the outset it has to be noticed that constituent power is not the
same as ordinary law-making power. On behalf of the appellant it was
rightly contended that if any amendment of Article 102(1)(e) of the Constitution
had to be made, it had to be made by amendment of the Constitution. The
matter does not rest there.

**58.** If no law prior to the Constitution (Thirty-ninth Amendment) Act
will apply to election petitions or matters connected therewith the result is
that there is not only no forum for adjudication of election disputes but that
there is also no election petition in the eye of law. The insurmountable
difficulty is in regard to the process and result of validating the election by
clause (4). Two answers were given on behalf of the appellant. One was
that the validation of the election is itself the law. The other was that the
constituent power applied its own norms to the election petition. Both the
answers are unacceptable. If the election petition itself did not have any
existence in law there was no petition which could be looked into by the
constituent power. If there was no petition to look into it is difficult to
comprehend as to what norms were applied to the election dispute. The
dispute has to be seen. The dispute has to be adjudicated upon.

**59.** Clause (4) suffers from these infirmities. First, the forum might be
changed but another forum has to be created. If the constituent power be-
came itself the forum to decide the disputes the constituent power by repeal-
ing the law in relation to election petitions and matters connected therewith
did not have any petition to seize upon to deal with the same. Secondly, any
decision is to be made in accordance with law. Parliament has power to
create law and apply the same. In the present case, the constituent power
did not have any law to apply to the case, because the previous law did not
apply and no other law was applied by clause (4). The validation of the
election in the present case is, therefore, not by applying any law and it,
therefore, offends rule of law.

**60.** It is true that no express mention is made in our Constitution of
vesting the Judiciary the judicial power as is to be found in the American
Constitution. But a division of the three main functions of Government
is recognised in our Constitution. Judicial power in the sense of the judicial
power of the State is vested in the Judiciary. Similarly, the Executive and
the Legislature are vested with powers in their spheres. Judicial power has


SCC Online Web Edition, Copyright © 2021
Page 71          Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source:  Supreme Court Cases


-----------------------------------------------------------------------------------------------------------------------------

lain in the hands of the Judiciary prior to the  Constitution  and also since the Constitution.   It is not the intention that the powers of the  Judiciary  should be passed  to  or  be shared by the Executive or the  Legislature  or  that  the powers of the Legislature or the Executive should pass to or be  shared by the Judiciary.

**61.**   The constituent power is sovereign.   Law-making power is subject to the Constitution.   Parliament may create forum to hear election  disputes. Parliament may itself hear election disputes.   Whichever body will hear election disputes will have to apply norms.   Norms are legal standards.   There is no discrimination if classification on rational basis is made for determination of disputes relating to persons holding  the office of  Prime  Minister or  the Speaker.   The changes effected by the  Amendment Acts', 1974 and 1975 apply to all and there is  no  discrimination.   Retrospective legislation is not by  itself  discrimination.   The  changes  introduced  to  the 1951 Act apply to all.

**62**   Clause (4) of  Article 329A in  the  present  case  in  validating  the election has passed a  declaratory  judgment  and  not a law.   The legislative judgment in Clause (4) is an exercise of judicial power.  The constituent power can exercise judicial power but it has to apply law.

**63.**   The  validation of the election is not by applying legal norms.   Nor can it be said that the validation of election in Clause (4) is by  norms  set up by the constituent power.

**64.**   Clause (5) in Article 329A states that an appeal against any order of any court referred to in Clause (4) pending, before the commencement of the Constitution  (Thirty-ninth  Amendment)  Act,  1975, before the Supreme Court,  shall  be disposed of  in conformity with the provisions of Clause (4). The appeal cannot be disposed of in conformity  with the provisions of Clause 4 inasmuch as the validation of the election cannot rest on Clause (4).

**65.**   In view of the conclusion that the appeal cannot be  disposed  of  in conformity with Clause (4), it is necessary to hear the appeals on other grounds in accordance with the provisions of the 1951 Act and the  Amendment  Acts, 1974 and 1975.

**66.**   The second contention of the respondent is that the  session  of  the Lok Sabha  and the Rajya Sabha is invalid for these reasons.   If the Executive illegally and unconstitutionally detains any person  the  detention  affects the  validity of the proceedings.   A number of members of Parliament of the two Houses, namely, the Lok Sabha and the Rajya Sabha were  detained  by executive orders after  June 26, 1975 and before the summoning of a session of the two Houses of Parliament.   Parliament commenced the  session  on July 21, 1975.   None of the  members  of Parliament were either supplied any grounds of detention or given any opportunity  to  make  any  representation  against  their detention.   The President who was the authority  to summon a session of Parliament issued the Presidential  Order  under  Article 359 of the Constitution on June 27, 1975.   The right of the detained members of Parliament to move any court  for  the  enforcement  of  their  fundamental  right  under  Article 22  of  the  Constitution was taken away by the executive order of the President who became a party to  the  unconstitutional and  illegal  detention of the members of Parliament by preventing them from securing their release.

**67.**   The  constitutional  position  of  the two  Houses  of Parliament is governed by the provisions of Articles 79 and 81 of the Constitution.   The



SCC Online Web Edition, Copyright © 2021
Page 72        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------

respondent contends that unless the President convenes a session of the full Parliament by giving to all members thereof an opportunity to attend the session and exercise their right of speech and vote, the convening of the session will suffer from illegality and unconstitutionality and cannot be regarded as a session of the two Houses of Parliament. Any business transacted in a session of such truncated House cannot, therefore, be regarded in law as a session of a House.

**68.** The mere fact that a person who is under unconstitutional and illegal detention may be deprived of his right to move a court to secure his release from such illegal detention by means of a Presidential Order under Article 359 is said by the respondent not to render the detention of a person either legal or coi ·titutional, and, therefore, such a detenu must be provided an opportunity to participate in the proceedings of the House. It is emphasised by the respondent that when important leaders of different parties are unconstitutionally prevented from participating in the session of the House, a session cannot be held for deliberations in which different members influence the views of others by their own participation. If in the holding of a session and in transacting business therein, the provisions of the Constitution are not complied with, this is said to amount to illegality or unconstitutionality and not a mere procedural irregularity within the meaning of Article 122(1) of the Constitution.

**69.** The essence of the respondent's contention is that the right of participation of some members of the House of Parliament in the proceedings of Parliament under Article 105(3) of the Constitution has been interfered with. When a member is excluded from participating in the proceedings of the House, that is a matter concerning Parliament and the grievance of exclusion is in regard to proceedings within the walls of Parliament. In regard to rights to be exercised within the walls of the House the House itself is the judge. (See *May's Parliamentary Practice*, 18th Ed., pp. 82-83, 12 QBD 271, 285-286).

**70.** In *Bradlaugh* v. *Gossett*[16] Bradlaugh claimed to make affirmation instead of taking the oath. He was permitted to make the affirmation "subject to any liability by statute", and took his seat. Upon an action for penalties it was decided, finally by the House of Lords, that Bradlaugh had not qualified himself to sit by making the affirmation. On re-election, he attempted to take the oath, but was prevented by order of the House which eventually directed the Serjeant to exclude him from the House until he undertook to create no further disturbance. Bradlaugh then brought an action against the Serjeant in order to obtain a "declaration that the order of the House was beyond the power and jurisdiction of the House and void, and an order restraining the Serjeant at Arms from preventing Bradlaugh by force from entering the House". It was held that the Court had no power to restrain the executive officer of the House from carrying out the order of the House. The reason is that the House is not subject to the control of the courts in the administration of the internal proceedings of the House.

**71.** If an outside agency illegally prevents a member's participation the House has the power to secure his presence. In 1543 Ferrers a member was arrested in London. The House, on hearing of his arrest, ordered the Serjeant to go to the Compter and demand his delivery. The Serjeant was resisted by the city officers, who were protected by the sheriffs. The

16. 12 QBD 271.


SCC Online Web Edition, Copyright © 2021
Page 73        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

--------------------------------------------------------------------------------

INDIRA NEHRU GANDHI *v.* RAJ NARAIN (*Ray, C. J.*)        47

Commons laid their case before the Lords. They ordered the Serjeant to repair to the sheriffs, and to require the delivery of Ferrers without any writ or warrant. The Lord Chancellor had offered them a writ of privilege but they refused it. The sheriffs in the meantime had surrendered the prisoner. This practice of releasing members by a writ of privilege continued but no writ was to be obtained.

**72.** The present mode of releasing arrested members goes back to *Shirley's case*[17]. In 1603 Shirley was imprisoned in the Fleet, in execution, before the meeting of Parliament. The Commons first tried to bring him into the House by habeas corpus, and then sent the Serjeant to demand his release. The warden refused to give up his prisoner. At length the warden delivered up the prisoner.

**73.** An Act 1 James 1, c. 13 was passed, which while it recognised the privilege of freedom from arrest, the right of either House of Parliament to set a privileged person at liberty, and the right to punish those who make or procure arrests, enacted that after such time as the privilege of that session in which privilege is granted shall cease, parties may sue and execute a new writ. In 1700 an Act was passed which while it maintained the privilege of freedom from arrest with more distinctness than the Act 1 James 1 c. 13, made the goods of privileged persons liable to distress infinite and sequestration, between a dissolution or prorogation and the next meeting of Parliament, and during adjournments for more than fourteen days.

**74.** The composition of Parliament is not dependent on inability of a member to attend for whatsover reason. The purpose of Article 85 is to give effect to the collective right of the House which represents the nation to be called as often as the situation demands, and in any case the interval between two sessions must not exceed six months. Assuming a conflict were to arise between the privileges of a member under Article 105(3) and the functions of the House to assemble under Article 85 the privilege of the member will not prevail. The detention of members of Parliament is by a statutory authority in the exercise of his statutory powers.

**75.** The suspension under Article 359 of the remedy for the enforcement of fundamental rights is dependent on a Proclamation of Emergency under Article 352. Parliament has the power not to approve of the Proclamation, and, thereafter the emergency shall cease to operate. The contention of the respondent means that Parliament cannot meet even so as to withhold approval of the emergency and thus terminate the suspension of the members' right of moving the court. The Constitution provides for proclamation of emergency, the suspension of the remedy under Article 359 for enforcement of fundamental rights enabling even detention of members of Parliament when necessary. Article 85 is not suspended. The six months rule is obligatory. It follows that the members' right under Article 105 are not available under a detention in these circumstances. For the purposes of Article 105(3) a conviction under penal laws or detention under emergency laws must be deemed to be valid till it is set aside.

**76.** When under Article 359 the President during the operation of a Proclamation of Emergency by order declares that the right to move any court for the enforcement of rights conferred by Part III shall remain suspended and persons who are members of House of Parliament are in detention under orders made under the Maintenance of Internal Security Act, the

17. 1 Hatsell 157.



SCC Online Web Edition, Copyright © 2021
Page 74        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------------

**48**                          SUPREME COURT CASES                    **1975 Supp SCC**

detention cannot be challenged by collateral attack on the ground of deprivation of their participation in the parliamentary proceedings. The challenge will be questioning the detention on the ground that the detention is in violation of Articles 19, 21 and 22.

**77.** Article 85 provides that not more than six months shall intervene between the two sessions of Parliament. Article 85 is not a provision regarding the constitution of Parliament but of holding of sessions. The powers, privileges and immunities of Parliament and its members as provided in Article 105 are that they shall be such as may be defined by Parliament by law, and, until so defined, shall be those of the House of Commons of the Parliament of the United Kingdom.

**78.** In *Special Reference No. 1 of 1964*[18], it was held that the court could entertain a petition under Article 226 on the ground that the imposition of penalty by the Legislature on a person who is not a member of the Legislature or issuing process against such person ·for its contempt committed outside the four walls of the House.

**79.** The scope of the parliamentary privilege of freedom from arrest has been defined positively and negatively. The positive aspect of the privilege is expressed in the claim of the Commons to freedom from arrest in all civil actions or suits during the time of Parliament and during the period when a member was journeying or returning from Parliament. The privilege has been defined negatively in the claim of the Commons which specifically excepted treason, felony and breach or surety of the peace.

**80.** The privilege of freedom from arrest is limited to civil causes, and has not been allowed to interfere with the administration of criminal justice or emergency legislation. (See *May's Parliamentary Practice*, 18th Ed., at p. 100). In early times the distinction between "civil" and "criminal" was not clearly expressed. The development of the privilege has shown a tendency to confine it more narrowly to cases of a civil character and to exclude not only every kind of criminal case, but also cases which, while not strictly criminal, partake more of a criminal than of a civil character. This development is in conformity with the principle laid down by the Commons in a conference with the Lords in 1641 : "Privilege of Parliament is granted in regard of service of the Commonwealth and is not to be used to the danger of the Commonwealth."

**81.** In *Wilkes' case*[19], it was resolved by both Houses on November 29, 1763 that the privilege of Parliament does not extend to the case of writing and publishing seditious libels, nor ought to be allowed to obstruct the ordinary course of the laws in the speedy and effectual prosecution of so heinous and dangerous an offence. "Since that time", the Committee of Privileges said in 1831, "it has been considered as established generally, that privilege is not claimable for any indictable offence."

**82.** These being the general declarations of the law of Parliament, the House will not allow even the sanctuary of its walls to protect a member from the process of criminal law, although a service of a criminal process on a member within the precincts of Parliament, whilst the House is sitting without obtaining the leave of the House, would be a breach of privilege.

---

18. (1965) 1 SCR 413: AIR 1965 SC          19. 19 State Tr 981.
    745.


SCC Online Web Edition, Copyright © 2021
Page 75      Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------------------

**83.** The committal of a member in England for high treason or any criminal offence is brought before the House by a letter addressed to the Speaker by the committing judge or magistrate. Where a member is convicted but released on bail pending an appeal, the duty of the Magistrate to communicate with the Speaker does not arise. No duty of informing the Speaker arises in the case of a person who while in prison under sentence of a court is elected as a member of Parliament. In the case of detention of members under Regulation 14B of the Defence of Realm Regulations in England, the communication was made to the Speaker by a letter from the Chief Secretary to the Lord Lieutenant of Ireland which was read to the House by the Speaker. The detention of a member under Regulation 18B of the Defence (General) Regulations, 1939, made under the Emergency Powers (Defence) Acts, 1939 and 1940, led to the Committee of Privileges being directed to consider whether such detention constituted a breach of the privileges of the House; the committee reported that there was no breach of privilege involved. In the case of a member deported from Northern Rhodesia for non-compliance with an order declaring him to be a prohibited immigrant, the Speaker held there was no prima facie case of breach of privilege. (See *May's Parliamentary Practice* 18th Ed., p. 103).

**84.** In *K. Anandan Nambiar* v. *Chief Secretary, Government of Madras*[20], the petitioners who were members of Parliament and detained by orders passed by the State Government under Rule 30(1)(*b*) of the Defence of India Rules, 1962 challenged the validity of the orders of detention on the ground that Rule 30(1)(*b*) was not valid because "a legislator cannot be detained so as to prevent him from exercising his constitutional rights as such legislator while the legislative chamber to which he belongs is in session". The State raised a preliminary objection that the petitions were incompetent in view of the order issued by the President under Article 359(1) suspending the rights of any person to move any court for the enforcement of rights conferred by Articles 14, 21 and 22. This Court held that the validity of the Act, rule or order made under the Presidential Order could not be questioned on the ground that they contravene Articles 14, 21 and 22.

**85.** The petitioners also contended in *Nambiar's case* (supra) that Rule 30(1)(*b*) under which the orders of detention had been passed was invalid on grounds other than those based on Articles 14, 19, 21 and 22. This Court held that if that plea was well-founded, the last clause of the Presidential Order was not satisfied, and, therefore, the bar created by it suspending the citizen's fundamental rights under Articles 14, 21 and 22 could not be pressed into service by the respondents.

**86.** Articles 79, 85, 86, 100(1) and 105(3) were considered in *Nambiar's case* (supra) in relation to rights of members of Parliament, and it was held that the totality of rights cannot claim the status of fundamental rights and freedom of speech on which reliance was placed is a part of the privileges falling under Article 105. The reason is that freedom from arrest under a detention order is not recognised as a privilege which can be claimed by members of House of Commons in England. This Court then posed the question that if a claim for freedom from arrest by a detention order could not be sustained under the privileges of the members of Parliament whether it could be sustained on the ground that it is a constitutional right which could not be contravened. The statement in *May's Parliamentary Practice* 7th Ed. at p. 78 which is to be found in the 18th Edition at p. 100 that the privilege

20. (1966) 2 SCR 406 : AIR 1966 SC 657 : 1966 Cri LJ 586.


SCC Online Web Edition, Copyright © 2021
Page 76        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source:  Supreme Court Cases

-------------------------------------------------------------------------------------------------------------------

50                          SUPREME COURT CASES                    1975 Supp SCC

of freedom from arrest is limited to civil causes, and has not been allowed to interfere with the administration of criminal justice or emergency legislation was accepted as the basis of two propositions laid down in *Nambiar's case*. First, Articles 79, 85, 86, 100 and 105 cannot be construed to confer any right as such on individual members or impose any obligation on them. It is not as if a member of Parliament is bound to attend the session, or is under an obligation to be present in the House when the President addresses it. The context in which these articles appear shows that the subject-matter of these articles is not the individual rights of the members of Parliament, but they refer to the right of the President to issue a summons for the ensuing session of Parliament or to address the House or Houses. Second, the freedom of speech to which Article 105 refers would be available to a member of Parliament when he attends the session of the Parliament. If the order of detention validly prevents him from attending a session of Parliament, no occasion arises for the exercise of the right of freedom of speech and no complaint can be made that the said right has been invalidly invaded.

**87.** The second ground of challenge that there was no valid session of the House cannot be accepted for the reasons given above. It has also to be stated that it is not open to the respondent to challenge the orders of detention collaterally. The principle is that what is directly forbidden cannot be indirectly achieved.

**88.** The High Court found first that the appellant has to be regarded as a candidate from December 29, 1970 as she held herself out on that date as a candidate. The second finding is that the appellant obtained and procured the assistance of Yashpal Kapur for the furtherance of her election prospects when Yashpal Kapur was serving as a gazetted officer with the Government of India. The High Court found that Yashpal Kapur's resignation from his service though submitted on January 13, 1971 did not become effective until January 25, 1971 when it was notified. The further finding by the High Court is that Yashpal Kapur under the instructions of the appellant delivered election speech on January 7, 1971 at Munshi Ganj and another speech at Kalan on January 19, 1971. The third finding by the High Court is that the appellant and her election agent Yashpal Kapur procured and obtained the assistance of the officers of the State Government, particularly, the District Magistrate, the Superintendent of Police, the Executive Engineer, P. W. D. and the Engineer to Hydel Department for the construction of rostrums and arrangement for supply of power for loudspeakers at meetings addressed by the appellant on February 1, 1971 and February 25, 1971 and further that the said assistance was for furtherance of the prospects of election of the appellant. The High Court found the appellant guilty of corrupt practice under Section 123(7) of the 1951 Act. The High Court declared the election of the appellant to be void. The High Court also held the appellant to be disqualified for a period of six years from the date of the order.

**89.** The definition of "candidate" in Section 79(*b*) of the 1951 Act until the amendment thereof by the Election Laws (Amendment) Act, 1975 was as follows :

'Candidate' means a person who has been or claims to have been duly nominated as a candidate at any election and any such person shall be deemed to have been a candidate as from the time when, with the election in prospect, he began to hold himself out as a prospective candidate.


SCC Online Web Edition, Copyright © 2021
Page 77    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases



-------------------------------------------------------------------------------------------------------------------------------------

**90.** This definition has now been substituted by Section 7 of the Amendment Act, 1975, as follows:

'Candidate' means a person who has been or claims to have been duly nominated as a candidate at any election.

**91.** Section 10 of the Amendment Act, 1975 further enacted that the amendments shall have retrospective operation so as to apply to and in relation to any election held before the commencement of the Amendment Act, 1975 on August 6, 1975 to either House of Parliament or to either House or the House of the Legislature of a State, inter alia, (*iv*) in respect of which appeal from any order of any High Court made in any election petition under Section 98 or Section 99 of the 1951 Act is pending before the Supreme Court immediately before such commencement.

**92.** Section 9 of the Amendment Act, 1975 has substituted clause (*a*) in Section 171A of the Indian Penal Code and a "candidate" means for the purpose of Section 171A of the Indian Penal Code a person who has been nominated as a candidate at any election. Previously the definition of "candidate" in Section 171A of the Indian Penal Code was the same as in Section 79(*b*) of the 1951 Act prior to the amendment thereof by the Amendment Act, 1975. In Section 171A of the Indian Penal Code there was a proviso to the effect that candidate would mean a person who holds himself out as a prospective candidate provided he is subsequently nominated as a candidate.

**93.** Relying on the provisions introduced by the Amendment Act, 1975, it is contended on behalf of the appellant that she will be regarded as a candidate only from February 1, 1971, namely, the date when she has been duly nominated as a candidate at her election, and, therefore, the finding of the High Court cannot be sustained. It is also contended by the appellant that the finding of the High Court that Yashpal Kapur delivered election speeches on January 7, 1971 and January 19, 1971 under instructions of the appellant cannot be supported because the appellant was not a candidate either on January 7, 1971 or on January 19, 1971.

**94.** The second finding by the High Court with regard to the resignation of Yashpal Kapur not to be effective until January 25, 1971 is contended to be displaced by legislative change by the Amendment Act, 1975. Section 8(*b*) of the Amendment Act, 1975 has introduced Explanation (3) at the end of Section 123(7) of the 1951 Act. This amendment has retrospective operation.

**95.** The Explanation is as follows:

"(3) For the purposes of clause (7), notwithstanding anything contained in any other law, the publication in the Official *Gazette* of the appointment, resignation, termination of service, dismissal or removal from service of a person in the service of the Central Government (including a person serving in connection with the administration of a Union territory) or of a State Government shall be conclusive proof—

(*i*) of such appointment, resignation, termination of service, dismissal or removal from service, as the case may be, and

(*ii*) where the date of taking effect of such appointment, resignation, termination of service, dismissal or removal from service, as the case may be, is stated in such publication, also of the fact that such person was appointed with effect from the said date, or in the



SCC Online Web Edition, Copyright © 2021
Page 78       Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------

case of resignation, termination of service, dismissal or removal from service, such person ceased to be in such service with effect from the said date."

**96.** The effect of Explanation (3) at the end of Section 123(7) of the 1951 Act incorporated by the notification dated January 25, 1971 in the *Gazette* dated February 6, 1971 makes the fact of the resignation of Yashpal Kapur from his service fully effective from January 14, 1971. It is, therefore, contended that from January 14, 1971 Yashpal Kapur was not a government servant.

**97.** To constitute a corrupt practice within the meaning of Section 123 (7) of the 1951 Act the act complained of must be an act of obtaining or procuring of assistance of the categories of government servants mentioned therein by the candidate or his election agent or by any other person with the consent of the candidate or his election agent. Section 100(1)(*b*) of the 1951 Act enacts that if the High Court is of opinion that any corrupt practice has been committed by a returned candidate or his election agent or by any other person with the consent of a returned candidate or his election agent, the High Court shall declare the election of the returned candidate to be void. A returned candidate is defined in Section 79(*f*) of the 1951 Act to mean a candidate whose name has been published under Section 67 of the 1951 Act as duly elected. A returned candidate in order to be guilty of a corrupt practice within the meaning of Section 123(7) of the 1951 Act must be guilty of any of the acts mentioned in the different sub-sections of Section 123 as a candidate. The appellant contends that the appellant was not a candidate on January 7, 1971 or January 19, 1971 and there could not be any procuring or obtaining of any assistance by the appellant as a candidate or by anybody else with the consent of the appellant. All the sub-sections of Section 123 of the 1951 Act refer to the acts of a candidate or his election agent or any other person with the consent of the candidate or his election agent. The present definition of "candidate" which has retrospective effect is contended to exclude completely acts by candidate prior to the date he is nominated as a candidate.

**98.** The third finding by the High Court that the appellant and her election agent Yashpal Kapur procured and obtained the assistance of the officers of the State Government, particularly, the District Magistrate, the Superintendent of Police, the Executive Engineer, P. W. D. and the Engineer to Hydel Department for construction of rostrums and arrangement for supply of power for loudspeakers for their assistance for furtherance of the prospects of the election of the appellant has to be tested in the light of the provisions contained in Section 123(7) of the 1951 Act. Under the said provision obtaining or procuring by candidate or his agent any assistance for the furtherance of the prospect of that candidate from gazetted officers is corrupt practice. The Amendment Act, 1975 by Section 8 thereof has added a proviso to Section 123(7) of the 1951 Act. The proviso is as follows :

"Provided that where any person, in the service of the Government and belonging to any of the classes aforesaid, in the discharge or purported discharge of his official duty, makes any arrangements or provides any facilities or does any other act or thing, for, to, or in relation to any candidate or his agent or any other person acting with the consent of the candidate or his election agent, (whether by reason of the office held by the candidate or for any other reason), such arrangements,



SCC Online Web Edition, Copyright © 2021
Page 79          Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases


-------------------------------------------------------------------------------------------------------------------

facilities or act or thing shall not be deemed to be assistance for the furtherance of the prospects of that candidate's election."

**99.** The proviso aforesaid shows that where persons in the service of the Government in the discharge of official duty make any arrangement or provide any facility or do any act or thing in relation to a candidate, such arrangements and facilities shall not be deemed to be assistance for furtherance of the prospect of the candidate's election. Therefore, the service rendered by government servants for construction of rostrums and arrangements for supply of power for loudspeakers according to the contention of the appellant could not be considered as assistance for the furtherance of the prospects of the election of the appellant.

**100.** The contentions of the appellant can succeed if the Amendment Acts of 1974 and 1975 are valid. The respondent has challenged the constitutional validity of these Acts. Therefore, that question has to be examined before the appellant's contentions can be answered.

**101.** The respondent in cross-appeal challenged the findings of the High Court on issue No. 9 and contended that the High Court should have held that the election expenses of the appellant exceeded the limit. The respondent also challenged the finding of the High Court with regard to issue No. 6 and contended that the High Court should have held that the symbol of cow and calf was a religious symbol and the appellant committed corrupt practice as defined in Section 123(3) of the 1951 Act. The respondent did not press issues No. 4 and 5 which related to distribution of quilts, blankets, dhoties and liquor. The respondent also abandoned issue No. 7 which related to voters being conveyed to the polling stations free of charge on vehicles hired and procured by Yashpal Kapur.

**102.** The issue pressed by the respondent was that the appellant and her election agent Yashpal Kapur incurred or authorised expenditure in excess of the amount prescribed by Section 77 of the 1951 Act read with Rule 90. The respondent alleged that the election expenses of the appellant, inter alia, were Rs. 1,28,700 on account of hiring charges of vehicles, Rs. 43,230 on account of cost of petrol and diesel; Rs. 9,900 on account payments made to the drivers of the vehicles. The respondent further alleged that the appellant spent Rs. 1,32,000 on account of construction of rostrums for public meetings on February 1, 1971 and February 25, 1971. The respondent contended that the findings of the High Court should be reversed.

**103.** The High Court found that the election expenses furnished by the appellant were Rs. 12,892.97. The High Court added another sum of Rs. 18,183.50. The three items which were added by the High Court were cost of erection of rostrums amounting to Rs. 16,000, cost incurred in installation of loudspeakers amounting to Rs. 1,951 and cost for providing car transport to respondent No. 1 amounting to. Rs. 232.50. The total election expenses found by the High Court came to Rs. 31,976.47 which was below the prescribed limit of Rs. 35,000.

**104.** With regard to hiring charges of vehicles the High Court found that the respondent did not examine any witness to indicate as to whether the vehicles were used only for party propaganda or they were used in connection with the election of the appellant. The High Court further found that the documents which were relied on by the respondent did not establish that the vehicles had been engaged or used in connection with the election work of the appellant.


SCC Online Web Edition, Copyright © 2021
Page 80      Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------------------

**105.** The respondent repeated the following contentions which had been advanced before the High Court. Dal Bahadur Singh, President, District Congress Committee wrote a letter to the District Election Officer intimating that 23 vehicles had been engaged by the District Congress Committee for election work in Rae Bareli, Amethi and Ram Sanehi Ghat constituencies, and, therefore, the vehicles should be derequisitioned. Dal Bahadur Singh thereafter wrote a note to Yashpal Kapur and requested that the letter be sent to the District Election Officer to that effect. Yashpal Kapur wrote a letter to the District Election Officer and repeated the prayer contained in Dal Bahadur Singh's letter. It was, therefore, contended that because Yashpal Kapur was the election agent of the appellant and he moved for the derequisition of the vehicles it should be inferred that the vehicles were engaged for the election of the appellant. Yashpal Kapur said that the vehicles were used in the three parliamentary constituencies. The High Court rightly held that the evidence did not establish that the vehicles had been used for the election work of the appellant. The High Court also correctly found that there was no evidence to show that Yashpal Kapur made any propaganda from the vehicles in any manner for the purpose of the election.

**106.** With regard to the expenses for the erection of rostrums the respondent contended that the appellant's election expenses should include Rs. 1,32,000 as the costs for erection of rostrums for the meetings on February 1, 1971 and the meeting on February 25, 1971. The High Court held that Rs. 16,000 could only be added to the election expenses of the appellant consisting of Rs. 6,400 for four rostrums and Rs. 9,600 for six rostrums.

**107.** The amount of Rs. 16,000 which was added by the High Court on account of cost of erection of rostrums cannot be included in the election expenses of the appellant by reason of amendment to Section 77 of the 1951 Act by the Amendment Act, 1975. Explanation 3 has been added as follows :

> "For the removal of doubt, it is hereby declared that any expenditure incurred in respect of any arrangements made, facilities provided or any other act or thing done by any person in the service of the Government and belonging to any of the classes mentioned in clause (7) of Section 123 in the discharge or purported discharge of his official duty as mentioned in the proviso to that clause shall not be deemed to be expenditure in connection with the election incurred or authorised by a candidate or by his election agent for the purposes of this sub-section."

**108.** By the Amendment Act, 1975 a proviso has been added to Section 123(7) of the 1951 Act to the effect that arrangements made or facilities provided there in the discharge of official duty shall not be deemed to be assistance for futherance of the prospects of that candidate's election. All these amendments have retrospective operation. Therefore, the cost of rostrums cannot be added to the election expenses of the appellant. Services rendered by government servants for the erection of rostrums and for supply of power for loudspeakers cannot be deemed to be assistance for the furtherance of the prospects of that candidate's election.

**109.** The respondent contended that Exhibit 118 which was the bank account of the District Congress Committee showed on the one hand that there was deposit of Rs. 69, 930 on March 4, 1971 and on the other there


SCC Online Web Edition, Copyright © 2021
Page 81          Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------------------------------------------

was a withdrawal of Rs. 40,000 on March 4, 1971 and of Rs. 25,000 on March 6, 1971, and, therefore, the sum of Rs. 65,000 should be added to the election expenses of the appellant. When it was put to Yashpal Kapur that the sums of Rs. 40,000 and Rs. 25,000 were withdrawn by Dal Bahadur Singh, Yashpal Kapur said that he was not aware of it. There is no pleading in the election petition that the appellant authorised incurring expenditure by a political party. There is no pleading that any amount has been paid by the political party. There is no complaint in the petition about the sum of Rs. 65,000 or the sum of Rs. 69,930. Yashpal Kapur denied knowledge of Rs. 70,000. The appellant was not asked a single question. There is no evidence to identify any of these payments with the election of the appellant.

110. It is appropriate at this stage to refer to the amendment which was introduced by the Amendment Act, 1974. The appellant relies on the provision to show that expenses incurred or authorised by a political party cannot be included in election expenses. Explanation 1 which was inserted at the end of Section 77 of the 1951 Act by Amendment Act, 1974 is that any expenditure incurred or authorised in connection with the election of a candidate by a political party or by any other association or body of persons or by an individual other than the candidate or his election agent shall not be deemed to be and shall not ever be deemed to have been expenditure in connection with the election incurred or authorised by the candidate or by his election agent.

111. A proviso was also added to the aforesaid Explanation 1 by the Amendment Act, 1974. The proviso stated that nothing contained in the Explanation shall affect (*a*) any judgment, order or decision of the Supreme Court whereby the election of a candidate to the House of the People or to the Legislative Assembly of a State has been declared void or set aside before the commencement of the Representation of the People (Amendment) Ordinance, 1974; (*b*) any judgment, order or decision of a High Court whereby the election of any such candidate has been declared void or set aside before the commencement of the said Ordinance if no appeal has been preferred to the Supreme Court against such judgment, order or decision of the High Court before such commencement and the period of limitation for filing such appeal has expired before such commencement.

112. Explanation 2 which was added to Section 77 of the 1951 Act by the Amendment Act, 1974 is as follows:

> For the purposes of Explanation 1 "political party" shall have the same meaning as in the Election Symbols (Reservation and Allotment) Order, 1968, as for the time being in force.

113. Counsel for the respondent relied on the recent decision of this Court in *Kanwar Lal Gupta* v. *Amarnath Chawla*[21] in support of the proposition that there has been no change in law and if expenses incurred by a political party can be identified with the election of a candidate then that expenditure is to be added to the election expenses of a candidate as being authorised by him. There are no findings by the High Court in the present appeals that any expenses by a political party were authorised by the appellant. There is also no finding in the present appeals that any expenses incurred by a political party can be identified with the election of the appellant. The changes in law affected by the Amendment Acts, 1974 and 1975 totally repel the submissions on behalf of the respondent. Expenses incurred or authorised

21. (1975) 3 SCC 646.



SCC Online Web Edition, Copyright © 2021
Page 82          Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source:  Supreme Court Cases

-------------------------------------------------------------------------------------------------------------------

in connection with the election of a candidate by a political party shall not be deemed to be and shall not ever be deemed to have been expenditure in connection with the election incurred or authorised by the candidate. Furthermore, the ruling in *Kanwar Lal Gupta's case* (supra) is no longer good law because of the legislative changes.

**114.** Counsel for the respondent contended that the judgment of the High Court should be reversed with regard to election expenses of the appellant on three counts. First, Exhibit 118 shows that the sum of Rs. 65,000 which was drawn by the Congress Committee should have been held by the High Court on a reasonable inference to have been spent by the District Congress Committee as having been authorised by the election agent of the appellant. Second, the High Court has not taken into account expenses of the election agent at 12 meetings other than the meetings addressed by the appellant and has also not taken into account the telephone expenses of the election agent. The telephone expenses amounted to Rs. 836·85 between January 11, 1971 and February 10, 1971 and a further sum of Rs. 2,514 for the period February 11, 1971 to March 15, 1971. Third, it is said that there were 5000 polling booths and if 20 workers were required per booth then 10,000 workers would be required and the only inference is that an amount in excess was spent for workers with the authority of the election agent.

**115.** In issue No. 9 there was no amount alleged with regard to telephone bills or election meetings under the heading of alleged election expenses. There was no allegation to that effect in the petition. With regard to expenses for the alleged 12 meetings addressed by the election agent the evidence of Yashpal Kapur is that he addressed about a dozen meetings and he did not include in the election return the expenses incurred for installation of loudspeakers because the expenditure was not incurred by him. He also said that he did not include in the election return the expenses incurred over the construction of platforms because the meetings were arranged by the District Congress Committee. No allegations were made in the petition with regard to any alleged sum of money on account of election meetings where the election agent spoke. The High Court rightly said that the telephone expenses and expenses for meetings could not be taken into consideration because no suggestion of the case was made until the stage of arguments.

**116.** The respondent's submission is that the appellant was the Prime Minister at the time of the election, and, therefore, there was a big campaign and the expenses were enormous. That will mean little. Expenses incurred or authorised by a political party are under the Amendment Act, 1974 not to be deemed to be expenditure in connection with the election incurred or authorised by the candidate or by his election agent for the purposes of Section 77 of the 1951 Act. The part played by a political party in connection with candidates of the party at the election particularly in relation to expenditure incurred by the political party with regard to candidates of the party has been the subject of some decisions of this Court. This Court has observed that expenditure must be by the candidate himself and any expenditure in his interest by others (not his agent within the meaning of the term of the Election Laws) is not to be taken note of. Where vehicles were engaged by the Congress Committee and used by the candidate, the amount spent by the Congress Committee could not be taken to be included in the expenditure of the candidate's election expenses (See *Hans Raj* v. *Pt. Hari Ram*[22]).

22.  40 ELR 125 (SC).



SCC Online Web Edition, Copyright © 2021
Page 83          Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

**117.** Expenses incurred by a political party in support of its candidates have been held by this Court not to fall within the mischief of Section 123 (6) of the 1951 Act (see *Shah Jayantilal Ambalal* v. *Kasturilal Nagindas Doshi*[23]). In *Rananjaya Singh* v. *Baijnath Singh*[24] this Court pointed out that expenses must be incurred or authorised by the candidate or his agent. In that case the manager, the assistant manager, 20 ziladars and their peons were alleged to have worked for the election of the appellant. This Court held that the employment of extra persons and the incurring or authorising of extra expenditure was not by the candidate or his election agent. The extra men employed and paid were in the employment of the father of the appellant. This Court said that the position in law could not be at all different if the father had given those employees a holiday on full pay and they voluntarily worked in connection with the election of the appellant. Persons who volunteer to work cannot be said to be employed or paid by the candidate or by his election agent.

**118.** In *Ram Dayal* v. *Brijraj Singh*[25] the appellant challenged the election of the respondent on the ground that the Maharaja and the Rajmata of Gwalior had helped the respondent's election in a number of ways and acted as his agents and the respondent incurred considerable expenditure which exceeded the limit. This Court found that assuming the expenditure was incurred by the Maharaja and the Rajmata of Gwalior for the purpose of canvassing votes, in the absence of any evidence to show that the Maharaja and the Rajmata acted as election agents or that the expenditure was authorised by the respondent, it was not liable to be included in the election expenses.

**119.** On behalf of the respondent it was said relying on the decision of this Court in *Kanwar Lal Gupta's case* (supra) that if the candidate takes advantage of expenditure incurred by the political party in connection with the election of the candidate or participates in the programme of activity or fails to disavow the expenditure the candidate cannot escape the rigour of the ceiling by saying that he has not incurred the expenditure but his political party has done so. Expenditure incurred by a political party in connection with the election of the candidates of the party is not a part of the election expenses of the candidate. Similarly, participation in the programme of activity organised by a political party will not fall within the election expenses of the candidate of the party. A candidate is not required to disavow or denounce the expenditure incurred or authorised by the political party because the expenditure is neither incurred nor authorised by the candidate. One can disavow what would be ascribed to be incurred or authorised by one. In the case of expenses of a political party there is no question of disavowing expenditure incurred or authorised by the political party.

**120.** The decision in *Kanwar Lal Gupta's case* (supra) was based on an observation extracted from the decision of this Court in *Maghraj Patodia* v. *R. K. Birla*[26]. In *Maghraj Patodia's case* (supra) the allegations were that the respondent had been put up by one of the wealthiest business houses in the country which owned or controlled a large number of companies and during the election campaign vast material and human resources of these companies were drawn upon by the respondent. This Court dismissed the appeal on


SCC Online Web Edition, Copyright © 2021
Page 84        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------

the ground that the appellant had failed to establish that expenditure in excess of the prescribed limit was incurred by the respondent. In *Maghraj Patodia's case* there is an observation that expenses incurred by a political party to advance the prospects of the candidates put up by it without more do not fall within Section 77 of the 1951 Act. The words "something more" were construed by Counsel for the respondent to mean that if a candidate takes advantage of expenditure incurred or authorised by a political party such expenses could be attributed to a candidate. The Amendment Act, 1974 has added Explanation 1 to Section 77 of the 1951 Act which shows that expenditure incurred or authorised in connection with the election of a candidate by the political party shall not be deemed to be expenditure incurred or authorised by the candidate or his election agent.

121. Allegations that election expenses are incurred or authorised by a candidate or his agent will have to be proved. Authorisation means acceptance of the responsibility. Authorisation must precede the expenditure. Authorisation means reimbursement by the candidate or election agent of the person who has been authorised by the candidate or by the election agent of the candidate to spend or incur. In order to constitute authorisation the effect must be that the authority must carry with it the right of reimbursement.

122. For the foregoing reasons the contentions of the respondent that the appellant exceeded the limit of election expenses fail.

123. The respondent contended that the amendments by the Amendment Acts of 1974 and 1975 are constitutionally invalid. It may be stated here that the Constitution (Thirty-ninth Amendment) Act, 1975 in Section 5 thereof enacts that in the Ninth Schedule to the Constitution after Entry 86, inter alia, the following entries shall be inserted, namely :

87. The Representation of the People Act, 1951 (Central Act 43 of 1951) ; The Representation of the People (Amendment) Act, 1974 (Central Act 58 of 1974) ; and the Election Laws (Amendment) Act, 1975 (Central Act 40 of 1975).

124. The contention of the respondent is that when the power of amending the Constitution cannot be exercised to damage or destroy the basic features of the Constitution or the essential elements of the basic structure or framework thereof, the limitations on the exercise of legislative power will arise not only from the express limitations contained in the Constitution, but also from necessary implication either under articles or even in the preamble of the Constitution. This contention on behalf of the respondent is expanded to mean that if the democratic way of life through parliamentary institutions based on free and fair elections is a basic feature which cannot be destroyed or damaged by amendment of the Constitution, it cannot similarly be destroyed or damaged by any legislative measure.

125. These reasons were submitted by the respondent. First, the power to resolve doubts and disputes about the validity of elections of Parliament and State Legislatures has been vested by the Constitution in the judicial organ competent to decide election petitions and, therefore, it is not open to the Legislature to take away and interfere with these exclusive functions of the Judiciary by any legislation amending the law governing the election adjudicated by the Judiciary. Second, the insertion of these Acts in the Ninth Schedule will not confer any immunity on the legislative


SCC Online Web Edition, Copyright © 2021
Page 85          Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-----------------------------------------------------------------------------------------------------

measure if basic features of the Constitution are damaged or destroyed on the ground that the provisions contravene Part III of the Constitution. Third, any provision in the legislative measures which has the effect of bringing about unfairness between different rival candidates in the matter of election is discriminatory and it not only contravenes Article 14 but also violates the implied limitation on legislative power relating to free and fair elections. Fourth, any amendment of the law with retrospective operation governing an election which has already been held necessarily introduces an element of unfairness and brings about a denial of equality among rival candidates. Fifth, the deeming clause introduced in the 1951 Act by Sections 6(*b*) and 8(*a*) and (*b*) of the Amendment Act, 1975 and the device of conclusive proof adopted by Section 8(*c*) in the Amendment Act, 1975 are unconstitutional encroachments on judicial power. Sixth, power conferred by an enactment including a constitutional enactment has to be so exercised as to give effect to the guiding principles of the basic norms of that legislation and not so as to militate against those guiding principles or basic norms.

126. The definition of "candidate" is amended by the Amendment Act, 1975. The contentions of the respondent on the amendment of the definition of "candidate" are these. The expression "returned candidate" is descriptive of the person and the corrupt practices mentioned in Section 123 of the 1951 Act in relation to a candidate will not be confined to corrupt practices committed with reference to the definition of "candidate". Corrupt practices alleged in relation to candidates will be relatable to any period and will not be confined to corrupt practices alleged between the date of nomination and the date of election. If corrupt practices are committed by candidates who eventually become returned candidates such corrupt practices will be offences within the meaning of Section 123 of the 1951 Act without any reference to the time of commission.

127. Counsel on behalf of the respondent also contended as follows. The basis of fair and free elections is that the election of a candidate will be avoided if any corrupt practice has been committed by the candidate by or with the knowledge and consent of that candidate. The acts of a candidate may be either anterior to the date of nomination or it may be subsequent to the date of nomination. Therefore, the Amendment Act, 1975 destroys and damages free and fair election by allowing candidates to commit corrupt practices prior to the date of nomination.

128. The Amendment Act, 1975 is also challenged as falling within the vice of delegated legislation by the amendments inserted as Explanation 3 to Section 77 of the 1951 Act and the insertion of the proviso to Section 123(7) of the 1951 Act. These provisions have already been noticed. Broadly stated expenditure incurred by persons in government service will not be deemed to be for furtherance of the candidate's election. The contentions are these. No guidelines have been laid down as to what expenditure can be incurred or what facilities can be made, what acts or things can be done. Delegation cannot include the change of policy. Policy must be clearly laid down in the Act for carrying into effect the objectives of the legislation. The Legislature must declare the policy. Any duty can be assigned, any facility in connection with the election can be asked for by the party in power to be done for the candidate. The official duty opens a wide power of instructions to government servants who may be asked to assist candidates by canvassing, influencing which will damage fair elections.


SCC Online Web Edition, Copyright © 2021
Page 86          Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-------------------------------------------------------------------------------------------------

**129.** The device of conclusive proof which is introduced to add Explanation 3 to Section 123(7) of the 1951 Act with regard to the date with effect from which the person ceased to be in service is said to be an encroachment on judicial power.

**130.** Section 8(*a*) of the Amendment Act, 1975 which adds a proviso to Section 123 of the 1951 Act to the effect that no symbol allotted under this Act to a candidate shall be deemed to be a religious symbol or a national symbol for the purposes of this clause is attacked as legalising religious symbols and thus offending secularism.

**131.** Section 10 of the Amendment Act, 1975 which enacts that the amendments shall have retrospective effect is challenged as retrospectively legalising a void election. These submissions are made. If this power is upheld there can be a legislative measure to avoid valid elections. The distinction between law-abiding persons and lawless persons is eliminated. One person has not been given the opportunity of spending money at the time of election but the other is retrospectively given the advantage of spending in excess and thereafter of avoiding the effect of excess expenses by validation.

**132.** The contentions on behalf of the respondent that ordinary legislative measures are subject like Constitution Amendments to the restrictions of not damaging or destroying basic structure, or basic features are utterly unsound. It has to be appreciated at the threshold that the contention that legislative measures are subject to restrictions of the theory of basic structures or basic features is to equate legislative measures with Constitution Amendment. The hierarchical structure of the legal order of a State is that the Constitution is the highest level within national law. The Constitution in the formal sense is a solemn document containing a set of legal norms which may be changed only when special prescriptions are observed. The purpose of special prescriptions is to render the change of these norms more difficult by regulating the manner and form of these amendments. The Constitution consists of those rules which regulate the creation of the general legal norms, in particular, the creation of statutes. It is because of the material Constitution that there is a special form for constitutional law. If there is a constitutional form then constitution laws must be distinguished from ordinary laws. The material Constitution may determine not only the organs and procedure of legislation, but also, to some degree, the contents of future laws. The Constitution can negatively determine that the laws must not have a certain content *e. g.* that the Parliament may not pass any statute which restricts religious freedom. In this negative way not only contents of statutes but of the other norms of legal order, judicial and administrative decisions likewise, may be determined by the Constitution. The Constitution can also positively prescribe certain contents of future statutes. This may be illustrated with reference to the provisions in Article 22 that no person who is arrested shall be detained in custody without being informed, as soon as may be, of the grounds for such arrest nor shall he be denied the right to consult, and to be defended by, a legal practitioner of his choice.

**133.** Articles 245 and 246 give plenary powers to Legislatures to legislate. The only question is whether any provision of the Constitution is violated. The power of plenary body is not to be construed like the power of a delegate. The largest kind of power will be attributed to Legislature. The only prohibition is with reference to the provisions of the Constitution.


SCC Online Web Edition, Copyright © 2021
Page 87          Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source:  Supreme Court Cases

-----------------------------------------------------------------------------------------------------------------

The Constitution is the conclusive instrument by which powers are affirmatively created or negatively restricted. The only relevant test for the validity of a statute made under Article 245 is whether the legislation is within the scope of the affirmative grant of power or is forbidden by some provision of the Constitution.

**134.** To accept the basic features or basic structures theory with regard to ordinary legislation would mean that there would be two kinds of limitations for legislative measures. One will pertain to legislative power under Articles 245 and 246 and the legislative entries and the provision in Article 13. The other would be that no legislation can be made as to damage or destroy basic features or basic structures. This will mean rewriting the Constitution and robbing the Legislature of acting within the framework of the Constitution. No legislation can be free from challenge on this ground even though the legislative measure is within the plenary powers of the Legislature.

**135.** The theory of implied limitations on the power of amendment of the Constitution has been rejected by seven Judges in *Kesavananda Bharati's case* (supra). Our Constitution has not adopted the due process clause of the American Constitution. Reasonableness of legislative measures is unknown to our Constitution. The crucial point is that unlike the American Constitution where rights are couched in wide general terms leaving it to the courts to evolve necessary limitations our Constitution has denied due process as a test of invalidity of law. In *A. K. Gopalan* v. *State of Madras*[27], due process was rejected by clearly limiting the rights acquired and by eliminating the indefinite due process. Our Constitution contemplates that considerations of justice or general welfare might require restriction on enjoyment of fundamental rights.

**136.** The theory of basic structures or basic features is an exercise in imponderables. Basic structures or basic features are indefinable. The legislative entries are the fields of legislation. The pith and substance doctrine has been applied in order to find out legislative competency, and eliminate encroachment on legislative entries. If the theory of basic structures or basic features will be applied to legislative measures it will denude Parliament and State Legislatures of the power of legislation and deprive them of laying down legislative policies. This will be encroachment on the separation of powers.

**137.** The constitutional validity of a statute depends entirely on the existence of the legislative power and the express provision in Article 13. Apart from the limitation the Legislature is not subject to any other prohibition. The amendments made to the 1951 Act by the Amendment Acts, 1974 and 1975 are to give effect to certain views expressed by this Court in preference to certain views departed from or otherwise to clarify the original intention. It is within the powers of Parliament to frame laws with regard to elections. Parliament has power to enumerate and define election expenses. Parliament has power to lay down limits on election expenses. Parliament has power to state whether certain expenses can be included or may be excluded from election expenses. Parliament has power to adopt conclusive proof with regard to matters of appointment, resignation or termination of service. Parliament has power to state what can be considered to be office of profit. Parliament has power to state as to what will and

---

27.  1950 SCR  88 : AIR 1950 SC 27 : 51 Cri LJ 1383.


SCC Online Web Edition, Copyright © 2021
Page 88        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases


-------------------------------------------------------------------------------

**62**                              SUPREME COURT CASES                    **1975 Supp SCC**

what will not constitute corrupt practice. Parliament has power to enact what will be the ground for disqualification. Parliament has power to define "candidate". Parliament has power to state what symbols will be allotted to candidates at election. These are all legislative policies.

**138.** The conclusive evidence or conclusive proof clause is an accepted legislative measure. Similarly, giving retrospective effect to legislative amendment is accepted to be valid exercise of legislative power. The well-known pattern of all validation Acts by which the basis of judgments or orders of competent courts and tribunals is changed and the judgments and orders are made ineffective is to be found in *M. P. V. Sundararamier & Co.* v. *State of A. P.*[28]. The power of the Legislature to pass a law includes a power to pass it retrospectively. An important illustration with reference to retrospective legislation in regard to election is the decision of this Court in *Kanta Kathuria's case* (supra). Kanta Kathuria was disqualified by reason of holding an office of profit. First the ordinance and later the Act was passed to nullify the decision of the High Court. The ordinance as well as the Act stated that notwithstanding any judgment or order of any court of tribunal, the officer shall not be disqualified or shall be deemed never to have disqualified the holders thereof as a member of the Legislative Assembly. The rendering of a judgment ineffective by changing the basis by legislative enactment is not encroachment on judicial power because the legislation is within the competence of the Legislature.

**139.** A contention was advanced that the legislative measure could not remove the disqualification retrospectively, because the Constitution contemplates disqualification existing at certain time in accordance with law existing at that time. One of the views expressed in that case is that Article 191 recognises the power of the Legislature of the State to declare by law that the holder of the office shall not be disqualified for being chosen as a member. Power is reserved to the Legislature of the State to make the declaration. There is nothing in the Article to indicate that this declaration cannot be made with retrospective effect. The Act was held not to be ineffective in its retrospective operation on the ground that it is well recognised that Parliament and State Legislatures can make their laws operate retrospectively. Any law that can be made prospectively can be made with retrospective operation. It is said that certain kinds of laws cannot operate retrospectively. That is *ex post facto* legislation. The present case does not fall within that category. Reference may be made to *May's Parliamentary Practice*, 17th Ed., p. 515 where instances are given of validation of election by the British Parliament.

**140.** This Court in *Jumuna Prasad Mukhariya* v. *Lachhi Ram*[29] rejected the contention advanced there that Sections 123(5) and 124 (5) of the 1951 Act interfered with a citizen's fundamental right 'to freedom of speech. This Court said that these laws do not stop a man from speaking. They merely prescribe conditions which must be observed if one wants to enter Parliament. The right to stand as a candidate and to contest an election is not a common law right. It is a special right created by statute which can only be exercised on the conditions laid down by the statute. The Fundamental Rights chapter has no bearing on a right like this created by a statute relating to election.

**141.** The contention on behalf of the respondent that the amendment of the definition of "candidate" has damaged or destroyed basic structure is

-------------------------------------------------------------------------------

28. 1958 SCR 1422 : AIR 1958 SC 468 : 9        29. (1955)1 SCR 608 : AIR 1954 SC 686.
    STC 298.


SCC Online Web Edition, Copyright © 2021
Page 89          Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------------------------

untenable. There is no basic structure or basic feature or basic framework with regard to the time when under the election laws a person is a candidate at the election. The contention of the respondent that the expression "returned candidate" is descriptive of the expression "candidate" will rob Section 100 of its content. The word "candidate" in relation to various electoral offences shows that he must be a candidate at the time of the offence. Time is necessary for fixing the offences. A significant distinction arises between the electoral offences under the 1951 Act and the offences under Sections 171-A to 171-I of the Indian Penal Code, namely, that the 1951 Act uses the word "candidate" or his election agent with reference to various offences whereas the Indian Penal Code does not use the word "candidate" in relation to commission of any offence. Any person may fall within the offences of bribery, undue influence, personation at elections within the provisions of the Indian Penal Code or for false statement or illegal payments in connection with any election or failure to keep election accounts.

**142.** The English Representation of the People Act, 1949 called the English Act was relied on by the respondent to show that the word "candidate" in the 1951 Act should have the same meaning as in the English Act and there should be no limitation as to time in relation to a candidate. "Candidate" is defined in Section 103 of the English Act in relation to parliamentary election to mean a person who is elected to serve in Parliament or a person who is nominated as a candidate at the election or is declared by himself or by others to be a candidate on or after the day of the issue of the writ for the election, or after the dissolution or vacancy in consequence of which the writ was issued. The electoral offences under the English Act speak of a person to be guilty of corrupt practices of bribery as mentioned in Section 99, of treating as mentioned in Section 100 and of undue influence as mentioned in Section 101 of the English Act. These sections in the English Act speak of a person and do not use the expression "candidate".

**143.** Where a candidate is elected the English definition gives no commencing date as from which his candidature has commenced; whereas, if he be not elected, he is not a candidate until he has been nominated, or is declared to be a candidate on or after the dissolution or vacancy. A candidate who is elected is accordingly a "candidate" as soon as he has entered upon his election campaign, and has made it known that he intends to present himself as a candidate at the ensuing election, he may thus become a candidate before the dissolution of Parliament, and may be unseated for bribery or treating committed months or even years before the vacancy or election, for such acts are offences at common law. With respect to illegal practices, which are purely statutory offences, it would seem that a narrower construction will prevail, and that a candidate will not be held responsible for payments etc., made before he is a candidate in point of fact, and which payments only become illegal practices by reason of his subsequently becoming a candidate (See *Parker's Conduct of Parliamentary Elections*, 1970 Ed., pages 52–53).

**144.** It has been held in England that a candidate may be unseated for bribery or treating committed months or even years before the vacancy or election (*Youghal*[30]; *Bodwin*[31]). The present position under the English Act is stated in *Parker's Conduct of Parliamentary Elections* 1970 Ed. at p. 330

-----------------------------

30. 1 O'M & H 295.                    31. 5 O'M & H 230.




SCC Online Web Edition, Copyright © 2021
Page 90        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------

to be that since the corrupt practice under consideration is purely a statutory offence, which only becomes a corrupt practice by reason of the person in whose support the prohibited expenses were incurred subsequently becoming a candidate, the candidate may not be held responsible. In *Norwich*[32] the question was considered in relation to the responsibility of a candidate for payments which only became illegal practices by reason of his subsequently becoming a "candidate" as defined by statute, and it was held that he was not liable. The liability of a candidate under the English Act, particularly, with regard to election expenses as laid down in Section 63 of the English Act is regarded as open to doubt until the point is settled by the decision of an election court.

145. Sections 171-A to 171-I of the Indian Penal Code and the provisions contained in Sections 125 to 136 of the 1951 Act follow the pattern of English Acts, namely, Statutes 17 & 18 Victoria, Chapter CII (1853-54); Statutes 21 & 22 Victoria, Chapter LXXXVII (1858) and Statutes 46 & 47 Victoria, Chapter LI (1882). These English Statutes make certain acts punishable as corrupt practice when they relate to persons other than candidates or voters. Section II of 17 & 18 Victoria Chapter CII enacts that the persons mentioned therein shall be deemed guilty of bribery and punishable in accordance with the provisions of the Act. The words used there are "every person" who shall do the acts mentioned therein shall be punishable. In these sections dealing with the acts of persons other than candidates and voters no time is mentioned. On the other hand, Section IV of Statutes 17 & 18 Victoria Chapter CII makes certain acts of voters and candidates corrupt practice. Section IV of the aforesaid English Statute enacts that every candidate at an election who shall corruptly by himself, or by or with any person or by any other ways or means on his behalf, at any time, either before, during, or after any election, directly or indirectly give or provide, or cause to be given or provided any expenses incurred for any meat, drink, entertainment, etc. shall be deemed guilty of an offence of treating. In these sections when the acts of voters and candidates are made punishable the words used are "before or during any election, directly or indirectly or at any time either before, during or after any election" in Section IV of the Act. These words make acts of voters or candidates committed before or during an election also corrupt practice. Without these words, acts of the candidate made punishable under the English Statutes would only be the acts committed by the candidate after he becomes a candidate.

146. The 1951 Act uses the expression "candidate" in relation to several offences for the purpose of affixing liability with reference to a person being a candidate. If no time be fixed with regard to a person being a candidate it can be said that from the moment a person is elected he can be said to hold himself out as a candidate for the next election. The definition in the English Act cannot be of any aid to the construction of the 1951 Act.

147. The contention of the respondent is that if a candidate is free to spend as much as a candidate likes before the date of nomination a great premium would be placed on free use of money before the date of nomination. The 1951 Act specifies what election expenses are of a candidate. The statute specifies time in regard to a candidate. That time cannot be enlarged or reduced. The holding out by a person of candidature

---

32. 54 LT 627.



SCC Online Web Edition, Copyright © 2021
Page 91          Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------------------

was a flexible and elastic idea. The date of nomination is definite and doubtless. Different views may be taken as to the time of holding out. The Legislature has now set the matter at rest.

**148.** The word "incur" according to the dictionary meaning means to become liable to. The word "incur" means to undertake the liability even if the actual payment may not be made immediately. The undertaking of the responsibility for the expenditure concerned may be either by the candidate or his election agent. Again, a candidate is also to be deemed responsible for the expenditure if he has authorised a particular expenditure to be made by someone else on his behalf.

**149.** The contention on behalf of the respondent is that the Amendment Acts of 1974 and 1975 fall within the vice of delegated legislation because there are no guiding principles with regard to official duty or nature of expenditure in Explanation 3 to Section 77 of the 1951 Act and in the proviso to Section 123 (7) of the 1951 Act. Official duty will be a duty in law. Official duty will be duty under administrative directions of the Executive. Official duty will be for security, law and order, and matters in aid of public purpose. These duties will be in connection with election. To illustrate, Section 197 of the Criminal Procedure Code speaks of official duty.

**150.** This Court in *Matajog Dobey* v. *H. C. Bhari*[33] interpreted the words "official duty" to have reasonable connection between the act and the discharge of duty. The act must bear such relation to the duty that the person could lay a reasonable claim, but not a pretended fanciful claim, that he did it in the course of the performance of his duty. Where a power is conferred or a duty imposed by statute or otherwise, and there is nothing said expressly inhibiting the exercise of the power or the performance of the duty by any limitations or restrictions, it is reasonable to hold that it carries with it the power of doing all such acts or employing such means as are reasonably necessary for such execution, because it is a rule that when the law commands a thing to be done, it authorises the performance of whatever may be necessary for executing its command.

**151.** There is no vice of delegation in the statutes.

"Delegation is not the complete handing over or transference of a power from one person or body of persons to another. Delegation may be defined as the entrusting, by a person or body of persons, of the exercise of a power residing in that person or body of persons to another person or body of persons, with complete power of revocation or amendment remaining in the grantor or delegator. It is important to grasp the implications of this, for, much confusion of thought has unfortunately resulted from assuming that delegation involves or may involve, the complete abdication or abrogation of a power. This is precluded by the definition. Delegation often involves the granting of discretionary authority to another, but such authority is purely derivative. The ultimate power always remains in the delegator and is never renounced." (See *Gwalior Rayon Silk Mfg. (Wvg.) Co. Ltd.* v. *Assistant Commissioner of Sales Tax*[34]).

---

33. (1955) 2 SCR 925 : AIR 1956 SC 44 :          34. (1974) 4 SCC 98, 116.
    28 ITR 941 : 1956 Cri LJ 140.


SCC Online Web Edition, Copyright © 2021
Page 92        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------------------------------------------

**152.** The Constitution Twenty-ninth Amendment Act was considered by this Court in *Kesavananda Bharati's case* (supra). The Twenty-ninth Amendment Act inserted in the Ninth Schedule to the Constitution Entries 65 and 66 being the Kerala Land Reforms Act, 1969 and the Kerala Land Reforms Act, 1971. This Court unanimously upheld the validity of the Twenty-ninth Amendment Act. The unanimous view of this Court in *Kesavananda Bharati's case* is that Article 31-B is not open to challenge. Six Judges held that the Twenty-ninth Amendment Act would be ineffective to protect the impugned Act if they took away the fundamental rights. Six Judges took the view that the Twenty-ninth Amendment Act is valid and further that Article 31-B has been held by this Court to be independent of Article 31-A and that Article 31-B protects scheduled Acts and Regulations and none of the scheduled Acts and Regulations is deemed to be void or ever to have become void on the ground of contravention of any fundamental rights. Article 31-B gives a mandate and complete protection from the challenge of fundamental rights to the scheduled Acts and Regulations. The view of seven Judges in *Kesavananda Bharati's case* is that Article 31-B is a constitutional device to place the specified statutes in the Schedule beyond any attack that these infringe Part III of the Constitution. The Twenty-ninth Amendment is affirmed in *Kesavananda Bharati's case* by majority of seven against six Judges.

**153.** The contentions of the respondent that the Amendment Acts of 1974 and 1975 are subject to basic features or basic structure or basic framework fails on two grounds. First, legislative measures are not subject to the theory of basic features or basic structure or basic framework. Second, the majority view in *Kesavananda Bharati's case* (supra) is that the Twenty-ninth Amendment which put the two statutes in the Ninth Schedule and Article 31-B is not open to challenge on the ground of either damage to or destruction of basic features, basic structure or basic framework or on the ground of violation of fundamental rights.

**154.** The symbol allotted to the party of the appellant was characterised by the respondent as a religious symbol. Under Article 324 the superintendence, direction and control of elections to Parliament, is vested in the Election Commission. Rule 5 of the Conduct of Elections Rules, 1961 states that the Election Commission shall, by notification in the Gazette of India and in the Official Gazette of each State, specify the symbols that may be chosen by candidates at elections in parliamentary or assembly constituencies and the restrictions to which their choice shall be subject. Rule 10(4) of the 1961 Rules aforesaid states that at an election in a parliamentary or assembly constituency, where a poll becomes necessary, the returning officer shall consider the choice of symbols, expressed by the contesting candidates in their nomination papers and shall, subject to any general or special direction issued in this behalf by the Election Commission allot a different symbol to each contesting candidate in conformity, as far as practicable with his choice. It is, therefore, apparent that the power to specify permissible symbols is vested by Rule 5 in the Election Commission. The choice of candidates is limited to the symbol specified by the Election Commission. The Election Symbols (Reservation and Allotment) Order, 1968 was made in exercise of the power conferred by Article 328 of the Constitution read with Rule 5 and Rule 10 of the Conduct of Elections Rules and all other powers enabling in this behalf.

**155.** Clause 17 of the Election Symbols (Reservation and Allotment) Order, 1968 provides that the Commission shall by notification in the


SCC Online Web Edition, Copyright © 2021
Page 93      Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------------------------------------------------------

Gazette of India publish lists specifying national parties and the symbols respectively reserved for them etc. There can, therefore, be no doubt that the power of evolving permissible symbols is exclusively vested in the Election Commission. It is under their direction that the Returning Officer has to make allotments and allotments are made in terms of Clauses 5, 6 and 8. Therefore, in the matter of evolving of the permissible symbols, the jurisdiction is vested in the Election Commission. If a candidate displays in addition to the allotted symbol an additional symbol which may have a special appeal on grounds of religion to a particular community, then the Court will be entitled to go into this question.

**156.** With regard to the symbol of cow and calf being a religious symbol it was said on behalf of the respondent that the Akhil Bhartiya Ram Rajya Parishad asked for cow, calf and milkmaid symbol and were refused. They were given the symbol of a ''Rising Sun''. It is impossible to hold that because one party has not been given the symbol of cow, calf and milkmaid, therefore, the symbol of cow and calf becomes a religious symbol. The High Court on the evidence adduced by the respondent rightly came to the conclusion that there was no evidence to prove that the cow and calf is a religious symbol. The High Court rightly held that cow and calf is not a religious symbol.

**157.** The finding of the High Court that the appellant held herself out to be a candidate from December 29, 1970 is set aside because the law is that the appellant became a candidate only with effect from the date of nomination which was February 1, 1971. The finding of the High Court that the resignation of Yashpal Kapur did not become effective until it was notified in the Gazette is also set aside because under the law the resignation became effective from January 14, 1971. The finding of the High Court that the appellant committed corrupt practice in breach of Section 123(7) of the 1951 Act is also repelled by the legislative changes and is, therefore, set aside. The order of disqualification of the appellant is also set aside.

**158.** For the foregoing reasons the contentions of the appellant succeed and the contentions of the respondent fail. The appeal is accepted. The judgment of the High Court appealed against is set aside. The cross objection of the respondent is dismissed. There will be no order as to costs.


KHANNA, J. **(concurring)**—Civil Appeal No. 887 of 1975 has been filed by Smt. Indira Nehru Gandhi (hereinafter referred to as the appellant) against the judgment of the Allahabad High Court whereby election petition filed by Shri Raj Narain respondent No. 1 (hereinafter referred to as the respondent) to question the election of the appellant to the Lok Sabha from Rae Bareli parliamentary constituency was allowed and the election of the appellant was declared void. The appellant was found guilty of having committed corrupt practices under Section 123(7) of the Representation of the People Act, 1951 (hereinafter referred to as the R. P. Act) and as such was stated to be disqualified for a period of six years in accordance with Section 8A of the R. P. Act. Cross Appeal No. 909 of 1975 has been filed by Shri Raj Narain against the judgment of the High Court in so far as it decided certain issues against the respondent.

**160.** The President of India called upon different constituencies in the country to elect members to the Lok Sabha by notification dated


SCC Online Web Edition, Copyright © 2021
Page 94        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------------------------------------

January 27, 1971 under Section 14(2) of the R. P. Act. Last date for filing nomination papers was fixed as February 3, 1971 for Rae Bareli constituency by the Election Commission. The appellant filed her nomination paper on February 1, 1971. The appellant was for a number of years before the election Prime Minister of India and is since then continuing to hold that office. Yashpal Kapur, who was previously a gazetted officer in the Government of India holding the post of Officer on Special Duty in the Prime Minister's Secretariat and who subsequently submitted his resignation, was appointed the election agent of the appellant. The signed form about the appointment of Yashpal Kapur as election agent was submitted to the Returning Officer on February 4, 1971, the date of scrutiny. The date on which Yashpal Kapur submitted his resignation and the same became effective is, however, a matter of controversy between the parties. The appellant, who was a candidate of the Indian National Congress (R), was allotted the party symbol of cow and calf. Polling took place in the first week of March on March 1, March 3 and March 5, 1971. The appellant and the respondent were the principal contestants. There were two other candidates but we are not concerned with them. The result of the election was declared on March 10, 1971. The appellant got 1,83,309 votes, while the respondent secured 71,499 votes and the former was declared elected. The respondent thereafter filed election petition on April 24, 1971 to challenge the election of the appellant. Apart from some grounds which were not pressed, the election of the appellant was assailed on the following grounds :

(1) The appellant held herself out as a prospective candidate from the Rae Bareli constituency immediately after the dissolution of the Lok Sabha on December 27, 1970, and for furtherance of her election prospects, she obtained and procured the assistance of Yashpal Kapur who was at that time holding the post of Officer on Special Duty. The appellant thus committed corrupt practice under Section 123(7) of the R. P. Act.

(2) The appellant and her election agent procured the assistance of members of armed forces of the Union for furtherance of her election prospects inasmuch as the members of the armed forces arranged planes and helicopters of the Air Force at her instance for her flights to enable her to address meetings in her constituency. The appellant thereby committed corrupt practice under Section 123(7) of the R. P. Act.

(3) The appellant and her election agent obtained the assistance of a number of gazetted officers and members of the police force for the furtherance of her election prospects inasmuch as the services of the District Magistrate, Superintendent of Police, Rae Bareli and the Home Secretary, Uttar Pradesh Government were utilised for the purposes of the construction of rostrums and installation of loud-speakers at various places within the constituency where the appellant addressed her election meetings as also for the purpose of making arrangements of barricading and posting of police personnel on the routes by which the appellant was to travel in her constituency and at the places where she was to address meetings, in order to give publicity to her visits and thus attract large crowds. The appellant was thereby stated to have committed corrupt practice under Section 123(7) of the R. P. Act.

(4) Yashpal Kapur, election agent of the appellant and her other


SCC Online Web Edition, Copyright © 2021
Page 95        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

agents with the consent of Yashpal Kapur, freely distributed quilts, blankets, dhotis and liquor among the voters to induce them to vote for her and thereby the appellant committed corrupt practice of bribery under Section 123(1) of the R. P. Act.

(5) The appellant and her election agent made extensive appeals to the religious symbol of cow and calf and thereby committed corrupt practice under Section 123(3) of the R. P. Act.

(6) Yashpal Kapur and some other persons with his consent hired and procured a number of vehicles for the free conveyance of electors to the polling stations and thereby committed corrupt practice under Section 123(5) of the R. P. Act.

(7) The appellant and her election agent incurred or authorised expenditure in contravention of Section 77 of the R. P. Act and thereby committed corrupt practice under Section 123(6) of the R. P. Act.

**161.** The appellant in her written statement denied the various allegations levelled against her and pleaded that Yashpal Kapur resigned from his post on January 13, 1971 and his resignation was accepted with effect from January 14, 1971. Notification dated January 25, 1971 was issued by the Prime Minister's Secretariat in that connection. It was added that P. N. Haksar, then Secretary to the Prime Minister, told Yashpal Kapur on the same day on which the resignation was tendered that it was accepted and that formal orders would follow. Yashpal Kapur became the election agent of the appellant on February 4, 1971. During the period he was a gazetted officer in the Government of India, he did not do any work in furtherance of the appellant's election prospects. Regarding the use of planes and helicopters of the Air Force, the appellant admitted that on February 1, 1971 she went by an Indian Air Force plane from Delhi to Lucknow from where she went by car to Rae Bareli, addressing meetings en route. It was further admitted that on February 24, 1971 the appellant went by helicopter of the Indian Air Force to Gonda on regular party work and that from there she went by car to Lucknow, Unnao and Rae Bareli addressing public meetings in several constituencies besides her own. The appellant referred to the Pillai Committee Report and the Office Memoranda issued by the Government of India and asserted that the aforesaid flights were made by her in accordance with them. It was added that under the rules, bills for those flights were to be paid by the All India Congress Committee and most of them had already been paid. According to the appellant, neither she nor did her election agent solicit, require or order the use of Air Force planes and the Government of India provided the planes as part of their normal duty. The appellant denied having obtained the assistance of the District Magistrate and the Superintendent of Police, Rae Bareli as also that of the Home Secretary, U. P. Government for any of the purposes mentioned in the petition. The appellant in this context referred to the instructions issued by the Comptroller and Auditor General of India. She pleaded that arrangements for posting of police on the routes which she followed and the arrangements of rostrums were made by the State Government itself in compliance with those instructions. In regard to the loudspeakers, she pleaded that those were arranged by the District Congress Committee and not by the officers of the State Government. It was denied that any directions or instructions in that regard were issued by the appellant or her election agent. The allegations regarding the distribution of blankets,


SCC Online Web Edition, Copyright © 2021
Page 96          Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------

dhotis and liquor were stated to be absolutely false. As regards the symbol of cow and calf, the appellant stated that it was not a religious symbol and that it was wrong that extensive appeals were made by her or her election agent to that symbol. The appellant added that she and her election agent merely informed the voters that the symbol of the Indian National Congress (R) was cow and calf and that the voting mark should be put against that symbol. The decision of the Election Commission allotting the symbol of cow and calf to her party was final and the same could not, according to the appellant, be made a ground of attack nor could the court go into that question. The allegation regarding hiring and procuring of vehicles and the use thereof for conveyance of the voters to the polling stations was described by the appellant as false. Likewise, she denied the allegation that she or her election agent incurred expenditure in excess of the prescribed limit.

162. Following issues were framed in the case :

"(1) Whether respondent No. 1 obtained and procured the assistance of Yashpal Kapur in furtherance of the prospects of her election while he was still a gazetted officer in the service of Government of India ? If so, from what date ?

(2) Whether at the instance of respondent No. 1 members of the armed forces of the Union arranged Air Force planes and helicopters for her, flown by members of the armed forces, to enable her to address election meetings on February 1, 1971 and February 25, 1971, and if so, whether this constituted a corrupt practice under Section 123(7) of the Representation of the People Act ?

(3) Whether at the instance of respondent No. 1 and her election agent Yashpal Kapur, the District Magistrate of Rae Bareli, the Superintendent of Police of Rae Bareli and the Home Secretary of U. P. Government arranged for rostrums, loudspeakers and barricades to be set up and for members of the police force to be posted in connection with her election tour on February 1, 1971 and February 25, 1971 ; and if so, whether this amounts to a corrupt practice under Section 123(7) of the Representation of the People Act ?

(4) Whether quilts, blankets, dhotis and liquor were distributed by agents and workers of respondent No. 1, with the consent of her election agent Yashpal Kapur, at the places and on the dates mentioned in Schedule A of the petition in order to induce electors to vote for her ?

(5) Whether the particulars given in paragraph 10 and Schedule A of the petition are too vague and general to afford a basis for allegations of bribery under Section 123(1) of the Representation of the People Act ?

(6) Whether by using the symbol of cow and calf, which had been allotted to her party by the Election Commission in her election campaign the respondent No. 1 was guilty of making an appeal to a religious symbol and committed a corrupt practice as defined in Section 123(3) of the Representation of the People Act ?

(7) Whether on the dates fixed for the poll voters were conveyed to the polling stations free of charge on vehicles hired and procured for the purpose by respondent No. 1's election agent Yashpal Kapur, or other persons with his consent, as detailed in Schedule B to the petition ?


SCC Online Web Edition, Copyright © 2021
Page 97      Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------

(8) Whether the particulars given in paragraph 12 and Schedule B of the petition are too vague and general to form a basis for allegations regarding a corrupt practice under Section 123(5) of the Representation of the People Act?

(9) Whether respondent No. 1 and her election agent Yashpal Kapur incurred or authorised expenditure in excess of the amount prescribed by Section 77 of the Representation of the People Act, read with Rule 90, as detailed in para 13 of the petition?

(10) Whether the petitioner had made a security deposit in accordance with the rules of the High Court as required by Section 117 of the Representation of the People Act?

(11) To what relief, if any, is the petitioner entitled?"

Subsequent to the framing of the above issues, the following three additional issues were framed in pursuance of the judgment of this Court in an appeal against an interlocutory order of the High Court:

"(1) Whether respondent No. 1 obtained and procured the assistance of Yashpal Kapur in furtherance of the prospects of her election while he was still a gazetted officer in the service of the Government of India? If so, from what date?

(2) Whether respondent No. 1 held herself out as a candidate from any date prior to February 1, 1971 and, if so, from what date?

(3) Whether Yashpal Kapur continued to be in the service of Government of India from and after February 14, 1971 or till which date?"

**163.** During the pendency of the election petition in the High Court, Section 77 of the R. P. Act was amended by an Ordinance which was subsequently replaced by Act 58 of 1974 (hereinafter referred to as the 1974 amending Act or Act 58 of 1974). The said amending Act inserted two explanations at the end of sub-section (1) of Section 77 of the R. P. Act. The material part of the explanations reads as under:

"**Explanation 1.**—Notwithstanding any judgment, order or decision of any court to the contrary, any expenditure incurred or authorised in connection with the election of a candidate by a political party or by any other association or body of persons or by any individual (other than the candidate or his election agent) shall not be deemed to be, and shall not ever be deemed to have been, expenditure in connection with the election incurred or authorized by the candidate or by his election agent for the purposes of this sub-section:
Provided          *          *          *          *

**Explanation 2.**—For the purposes of Explanation 1, 'political party' shall have the same meaning as in the Election Symbols (Reservation and Allotment) Order, 1968, as for the time being in force."

The above amendment in Section 77 had a bearing on the allegation which was the subject-matter of issue No. 9. The respondent filed writ petition challenging the validity of the amending Act.

**164.** The High Court decided issues Nos. 2, 4, 6 and 7 in favour of the appellant and against the respondent. Issues Nos. 5, 8 and 10 were found in favour of the respondent and against the appellant. On issue No. 9 the finding of the High Court was that the total amount of expenditure incurred or authorized by the appellant or her election agent.


SCC Online Web Edition, Copyright © 2021
Page 98        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------

together with the expenditure proved to have been incurred by the party or by the State Government in connection with the appellant's election amounted to Rs. 31,976·47 which was sufficiently below the prescribed limit of Rs. 35,000. The appellant as such was held not guilty of any corrupt practice under Section 123(6) of the R. P. Act. As the respondent was found to have failed to prove that the expenses of the appellant or her election agent, together with the expenses found to have been incurred by the political party and the State Government in connection with the appellant's election exceeded the prescribed limit, the High Court held that no ground had been made out for inquiring into the validity of the 1974 amending Act. The writ petition filed by the respondent was accordingly dismissed.

165. On additional issue No. 2, the finding of the High Court was that the appellant held herself out as a candidate from the Rae Bareli parliamentary constituency on December 29, 1970. Issue No. 3 was decided by the High Court against the appellant. It was held that the appellant obtained the assistance of the officers of the U. P. Government, particularly the District Magistrate, Superintendent of Police, the Executive Engineer, P. W. D. and the Engineer, Hydel Department for construction of rostrums and arrangement of supply of power for loud-speakers in the meetings addressed by her on February 1, 1971 and February 25, 1971 in furtherance of her election prospects. The appellant, as such, was found guilty of corrupt practice under Section 123(7) of the R. P. Act. On additional issue No. 3, the High Court found that Yashpal Kapur continued to be in the service of the Government of India till January 25, 1971, which was the date of the notification regarding the acceptance of Yashpal Kapur's resignation. The High Court referred to the fact that according to the notification resignation of Yashpal Kapur had been accepted with effect from January 14, 1971 and observed that the order accepting the resignation was passed on January 25, 1971 and till that order was passed, the status of Yashpal Kapur continued to remain that of a government servant despite the fact that when that order was passed it was given retrospective effect so as to be valid from January 14, 1971. As regards issue No. 1 and additional issue No. 1, the High Court held that the appellant obtained and procured the assistance of Yashpal Kapur during the period from January 7 to 24, 1971 when Yashpal Kapur was still a gazetted officer in the service of the Government of India in the furtherance of her election prospects.

166. As a result of its findings on issue No. 3, issue No. 1 read with additional issue No. 1, additional issue No. 2 and additional issue No. 3, the High Court allowed the petition and declared the election of the appellant to the Lok Sabha to be void. The appellant was found guilty of having committed corrupt practice under Section 123(7) of the R. P. Act by having obtained the assistance of gazetted officers of the U. P. Government, viz., the District Magistrate and the Superintendent of Police, Rae Bareli, the Executive Engineer, PWD, Rae Bareli and Engineer, Hydel Department, Rae Bareli in furtherance of her election prospects. The appellant was further found guilty of having committed another corrupt practice under Section 123(7) of the R. P. Act by having obtained the assistance of Yashpal Kapur, a gazetted officer in the Government of India holding the post of Officer on Special Duty in Prime Minister's Secretariat, for the furtherance of her election prospects. The appellant, it was accordingly observed, stands disqualified for a period of six years


SCC Online Web Edition, Copyright © 2021
Page 99      Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------

from the date of the order in accordance with Section 8A of the R. P. Act. The writ petition, as mentioned earlier, was dismissed.

**167.** An appeal against the judgment of the learned Single Judge of the High Court dismissing the writ petition is pending before the High Court.

**168.** During the pendency of these appeals, Parliament passed the Election Laws (Amendment) Act, 1975 (Act 40 of 1975) (hereinafter referred to as 1975 amending Act or Act 40 of 1975) and the same was published in the Gazette of India Extraordinary dated August 6, 1975. Section 2 of the 1975 amending Act substituted a new section for Section 8A in the Act. According to the new section, the case of every person found guilty of a corrupt practice by an order under Section 99 shall be submitted as soon as may be, after such order takes effect to the President for determination of the question as to whether such person shall be disqualified and if so, for what period, not exceeding six years. It is also provided that the person who stands disqualified may before the expiry of the period of disqualification submit a petition to the President for the removal of such disqualification for the unexpired portion of the said period. The President shall then give his decision on such petition after obtaining the opinion of the Election Commission and in accordance with such opinion. Sections 3, 4 and 5 of the 1975 amending Act deal with other consequential matters relating to disqualification, and it is not necessary for the purpose of the present case to go into them. Sections 6 and 7 amended Sections 77 and 79 of the R. P. Act and we shall refer to them presently. Same is the position of Section 8 of the amending Act which introduced changes in Section 123 of the R. P. Act. Section 9 amended Section 171A of the Indian Penal Code. Section 10 gives retrospective effect to Sections 6, 7 and 8. Sections 6, 7, 8, 9 and 10 of Act 40 of 1975 read as under :

"6. In Section 77 of the principal Act, in sub-section (1),—

(a) for the words 'the date of publication of the notification calling the election', the words 'the date on which he has been nominated' shall be substituted ;

(b) after Explanation 2, the following Explanation shall be inserted, namely :

'**Explanation 3.**—For the removal of doubt, it is hereby declared that any expenditure in respect of any arrangements made, facilities provided or any other act or thing done by any person in the service of the Government and belonging to any of the classes mentioned in clause (7) of Section 123 in the discharge or purported discharge of his official duty as mentioned in the proviso to that clause shall not be deemed to be expenditure in connection with the election incurred or authorized by a candidate or by his election agent for the purposes of this sub-section.'

7. In Section 79 of the principal Act, for clause (b), the following clause shall be substituted, namely :

(b) 'candidate' means a person who has been or claims to have been duly nominated as a candidate at any election.'

8. In Section 123 of the principal Act,—

(a) in clause (3), the following proviso shall be inserted at


SCC Online Web Edition, Copyright © 2021
Page 100    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------------------

the end, namely :

'Provided that no symbol allotted under this Act to a candidate shall be deemed to be a religious symbol or a national symbol for the purposes of this clause.' ;

(b) in clause (7), the following proviso shall be inserted at the end, namely :

'Provided that where any person, in the service of the Government and belonging to any of the classes aforesaid, in the discharge or purported discharge of his official duty, makes any arrangements or provides any facilities or does any other act or thing, for, to, or in relation to, any candidate or his agent or any other person acting with the consent of the candidate or his election agent, (whether by reason of the office held by the candidate or for any other reason), such arrangements, facilities or act or thing shall not be deemed to be assistance for the furtherance of the prospects of that candidate's election.';

(c) in the Explanation at the end, the following shall be added, namely :

'(3) For the purposes of clause (7), notwithstanding anything contained in any other law, the publication in the Official Gazette of the appointment, resignation, termination of service, dismissal or removal from service of a person in the service of the Central Government (including a person serving in connection with the administration of a Union territory) or of a State Government shall be conclusive proof—

(i) of such appointment, resignation, termination of service, dismissal or removal from service, as the case may be, and

(ii) whether the date of taking effect of such appointment, resignation, termination of service, as the case may be, is stated in such publication, also of the fact that such person was appointed with effect from the said date, or in the case of resignation, termination of service, dismissal or removal from service, such person ceased to be in such service with effect from the said date.'

9. In the Indian Penal Code, in Section 171A, for clause (a), the following clause shall be substituted, namely :

'(a) 'candidate' means a person who has been nominated as a candidate at any election.'

10. The amendments made by Sections 6, 7 and 8 of this Act in the principal Act shall also have retrospective operation so as to apply to and in relation to any election held before the commencement of this Act to either House of Parliament or to either House or the House of the Legislature of a State—

(i) in respect of which any election petition may be presented after the commencement of this Act ; or

(ii) in respect of which any election petition is pending in any High Court immediately before such commencement ; or


SCC Online Web Edition, Copyright © 2021
Page 101        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------------------------

     (iii) in respect of which any election petition has been decided by any High Court before such commencement but no appeal has been preferred to the Supreme Court against the decision of the High Court before such commencement and the period of limitation for filing such appeal has not expired before such commencement ; or

     (iv) in respect of which appeal from any order of any High Court made in any election petition under Section 98 or Section 99 of the principal Act is pending before the Supreme Court immediately before such commencement."

**169.** It is submitted by Mr. Shanti Bhushan on behalf of the respondent that the amendments made in the R. P. Act have an impact upon five out of the seven grounds which were set up by the respondent to assail the election of the appellant.

**170.** On August 10, 1975 the Constitution (Thirty-ninth Amendment) Act, 1975 was published. A number of constitutional changes were made by the Constitution Amendment Act. We are, however, concerned with Section 4 of the Constitutional Amendment Act which inserted Article 329A in the Constitution after Article 329. Article 329A reads as under :

     "**329A. Special provision as to elections to Parliament in the case of Prime Minister and Speaker.**—(1) Subject to the provisions of Chapter II of Part V [Except sub-clause (e) of clause (1) of Article 102], no election—

     (a) to either House of Parliament of a person who holds the office of Prime Minister at the time of such election or is appointed as Prime Minister after such election ;

     (b) to the House of the People of a person who holds the office of Speaker of that House at the time of such election or who is chosen as the Speaker for that House after such election ;

shall be called in question, except before such authority [not being any such authority as is referred to in clause (b) of Article 329] or body and in such manner as may be provided for by or under any law made by Parliament and any such law may provide for all other matters relating to doubts and disputes in relation to such election including the grounds on which such election may be questioned.

     (2) The validity of any such law as is referred to in clause (1) and the decision of any authority or body under such law shall not be called in question in any court.

     (3) Where any person is appointed as Prime Minister or, as the case may be, chosen to the office of the Speaker of the House of the People, while an election petition referred to in clause (b) of Article 329 in respect of his election to either House of Parliament or, as the case may be, to the House of the People is pending, such election petition shall abate upon such person being appointed as Prime Minister or, as the case may be, being chosen to the office of the Speaker of the House of the People, but such election may be called in question under any such law as is referred to in clause (1).

     (4) No law made by Parliament before the commencement of the Constitution (Thirty-ninth Amendment) Act, 1975, in so far as it relates to election petitions and matters connected therewith, shall apply or shall be deemed ever to have applied to or in relation to


Case 1:21-cv-00396-RJL Document 20-11 Filed 08/14/21 Page 103 of 289
SCC Online Web Edition, Copyright © 2021
Page 102    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-----------------------------------------------------------------------------------------------

76                          SUPREME COURT CASES                    1975 Supp SCC

the election of any such person as is referred to in clause (1) to
either House of Parliament and such election shall not be deemed to
be void or ever to have become void on any ground on which such
election could be declared to be void or has, before such com-
mencement, been declared to be void under any such law and not-
withstanding any order made by any court, before such commence-
ment, declaring such election to be void, such election shall continue
to be valid in all respects and any such order and any finding on
which such order is based shall be and shall be deemed always to
have been void and of no effect.

(5) Any appeal or cross appeal against any such order of any
court as is referred to in clause (4) pending immediately before the
commencement of the Constitution (Thirty-ninth Amendment) Act,
1975, before the Supreme Court shall be disposed of in conformity
with the provisions of clause (4).

(6) The provisions of this article shall have effect notwithstanding
anything contained in this Constitution."

**171.** Section 5 of the above Constitution Amendment Act inserted in
the Ninth Schedule to the Constitution a number of enactments including
the R. P. Act as also Acts 58 of 1974 and 40 of 1975.

**172.** At the hearing of the appeal Mr. Sen on behalf of the appellant
has relied upon clause (4) of the new Article 329A and has contended
that that clause clearly applies to the present case. It is urged that in
view of that clause no law made by Parliament before the coming into
force of the Constitution (Thirty-ninth Amendment) Act, 1975, i.e., before
August 10, 1975, in so far as it relates to the election petitions and matters
connected therewith shall apply or shall be deemed ever to have applied
to or in relation to the election to the Lok Sabha of the appellant who
being Prime Minister is one of the persons referred to in clause (1) of
that article. It is further submitted that in view of that clause, the
election of the appellant shall not be deemed to be void or ever to have
become void on any ground on which such election could be declared to
be void or has before such commencement been declared to be void
under any such law. Mr. Sen also adds that notwithstanding the order
made by the High Court before such commencement declaring the election
of the appellant to be void, her election shall continue to be valid in
all respects and any such order and any finding on which such order
is based shall be and shall be deemed always to have been void and of
no effect. Submission is consequently made that in view of the mandate
contained in clause (5) of the article, the appeal filed by the appellant
and the cross appeal filed by the respondent should be disposed of in
conformity with the provisions of clause (4).

**173.** In reply Mr. Shanti Bhushan on behalf of the respondent has
not controverted, and in our opinion rightly, the stand taken by Mr. Sen
that clause (4) of the article applies to the facts of the present case. He,
however, contends that Section 4 of the Constitution Amendment Act
which has inserted Article 329A in the Constitution is invalid. The
validity of the above constitutional amendment has been challenged by
Mr. Shanti Bhushan on the following two grounds :

(1) The above constitutional amendment affects the basic structure
or framework of the Constitution and is, therefore, beyond the amend-
ing power under Article 368.


SCC Online Web Edition, Copyright © 2021
Page 103    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------------------

(2) The Constitution Amendment Act was passed in a session of Parliament after some members of Parliament had been unconstitutionally detained and thus illegally prevented from influencing the views of other members present at the time the above Act was passed. This ground, it is urged, also affects the validity of the amending Act 40 of 1975.

**174.** Article 329A deals with election to either House of Parliament of a person who holds the office of Prime Minister at the time of such election or is appointed as Prime Minister after such election and to the House of the People of a person who holds the office of Speaker of that House at the time of such election or who is chosen as the Speaker for that House after such election. According to clause (1) of Article 329A, no election of persons mentioned above shall be called in question, except before such authority or body and in such manner as may be provided for by or under any law made by Parliament. It is made clear that the authority before which such election shall be called in question would not be the one as is referred to in clause (b) of Article 329. The law to be made by Parliament under clause (1) may provide for all other matters relating to doubts and disputes in relation to such election including the grounds on which such election may be questioned. The above law shall be subject to the provisions of clause (1) of Article 102 except sub-clause (e). The law made under clause (1) cannot, therefore, remove the disqualification for being chosen a member of either House of Parliament because of that person holding an office of profit or because of his unsoundness of mind or because of his being an undischarged insolvent or because of his being not a citizen of India, or because of his having voluntarily acquired the citizenship of a foreign State, or because of his being under any acknowledgment of allegiance or adherence to a foreign State, as contemplated by sub-clauses (a) to (d) of clause (1) of Article 102 of the Constitution. The law made under clause (1) of Article 329A would not, however, be subject to clause (e) of clause (1) of Article 102, according to which a person shall be disqualified for being chosen as and for being, a member of either House of Parliament if he is so disqualified by or under any law made by Parliament. According to clause (2) of Article 329A, the validity of a law referred to in clause (1) and the decision of any authority or body under such law shall not be called in question in any court. Clause (3) provides for the abatement of an election petition which is pending in respect of the election of any person who is appointed as Prime Minister or chosen as Speaker of the House of the People during the pendency of the petition. It is further provided that the election of such person can be called in question under any such law as is referred to in clause (1) of Article 329A. Clause (4) is the crucial clause for the present case. According to this clause, no law made by Parliament before the commencement of the Constitution (Thirty-ninth Amendment) Act in so far as it relates to election petitions and matters connected therewith, shall apply or shall be deemed ever to have applied to or in relation to the election of any of the persons mentioned above to either House of Parliament. The remaining part of the clause deals with some further matters. It is provided in clause (4) that the election of the aforesaid persons shall not be deemed to be void or ever to have become void on any ground on which such election could be declared to be void or has, before such commencement, been declared to be void under any such law. It is further provided that notwithstanding any order made by any court


SCC Online Web Edition, Copyright © 2021
Page 104          Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------------------------------------------------

before the commencement of the Constitution (Thirty-ninth Amendment) Act declaring such election to be void, such election shall continue to be valid in all respects and any such order and any finding on which such order is based shall be and shall be deemed always to have been void and of no effect. According to clause (5), any appeal or cross appeal against any such order as is referred to in clause (4) pending immediately before the commencement of the Constitution (Thirty-ninth Amendment) Act, before the Supreme Court shall be disposed of in conformity with the provisions of clause (4). Clause (6) states that the provisions of Article 329A shall take effect notwithstanding anything contained in the Constitution.

**175.** The proposition that the power of amendment under Article 368 does not enable Parliament to alter the basic structure of framework of the Constitution was laid down by this Court by a majority of 7 to 6 in the case of **His Holiness Kesavananda Bharati** v. **State of Kerala**[35]. Apart from other reasons which were given in some of the judgments of the learned Judges who constituted the majority, the majority dealt with the connotation of the word "amendment". It was held that the words "amendment of the Constitution" in Article 368 could not have the effect of destroying or abrogating the basic structure of the Constitution. Some of us who were parties to that case took a different view and came to the conclusion that the words "amendment of the Constitution" in Article 368 did not admit of any limitation. Those of us who were in the minority in **Kesavananda's case** (supra) may still hold the same view as was given expression to in that case. For the purpose of the present case, we shall have to proceed in accordance with the law as laid down by the majority in that case.

**176.** Before dealing with the question as to whether the impugned amendment affects the basic structure of the Constitution, I may make it clear that this Court is not concerned with the wisdom behind or the propriety of the impugned constitutional amendment. These are matters essentially for those who are vested with the authority to make the constitutional amendment. All that this Court is concerned with is the constitutional validity of the impugned amendment.

**177.** I may first deal with the second contention advanced by Mr. Shanti Bhushan. According to him, the impugned constitutional amendment and the amending Act of 1975 were passed in sessions of Parliament wherein some members, including the respondent, could not be present because they had been illegally detained. The fact that those measures were passed by the requisite majority has not been questioned by the learned Counsel but he submits that if the above mentioned members had not been detained and had not been prevented from attending the sittings of Parliament, they could have influenced the other members and as such it is possible that the impugned Constitution Amendment Act and the 1975 R. P. Amending Act might not have been passed. Mr. Shanti Bhushan accordingly asserts that the sittings of the Houses of Parliament in which the above mentioned two measures were passed were not legal sittings. Any measure passed in such sittings, according to the learned Counsel, cannot be considered to be a valid piece of constitutional amendment or statutory amendment.

---

35. 1973 Supp SCR 1 : (1973) 4 SCC 225.


SCC Online Web Edition, Copyright © 2021
Page 105    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------------------------------------------------------------

**178.** There is, in my opinion, no force in the above submission. The proposition that a member of Parliament cannot claim immunity from being detained under a law relating to preventive detention does not now admit of much doubt. The privileges, powers and the immunities of the members of the two Houses of Indian Parliament as well as of the Indian Legislatures are the same as those of the members of the House of Commons as they existed at the time of the commencement of the Constitution. The position about the privileges of the members of the House of Commons as it obtained in the United Kingdom at the relevant time has been stated in **Erskine May's Parliamentary Practice**, 18th Ed. (p. 100) as under :

> "The privilege of freedom from arrest is limited to civil causes, and has not been allowed to interfere with the administration of criminal justice or emergency legislation."

The above observations were relied upon by this Court in the case of **K. Anandan Nambiar** v. **Chief Secretary, Government of Madras**[36]. The petitioners in that case were members of Parliament. They were detained by orders passed by the State Government under Rule 30(1)(b) of the Defence of India Rules, 1962. They challenged the validity of the orders of detention, inter alia, on the ground that Rule 30(1)(b) was invalid because a legislator cannot be detained so as to prevent him from exercising his constitutional rights as legislator while the legislative chamber to which he belongs is in session. This Court rejected that contention and held that the true constitutional position is that so far as a valid order of detention is concerned, a member of Parliament can claim no special status higher than that of an ordinary citizen and that he is as much liable to be arrested and detained under it as any other citizen. It was also held that if an order of detention validly prevents a member from attending a session of Parliament, no occasion would arise for the exercise by him of the right of freedom of speech.

**179.** Question as to whether a member of Parliament has been validly detained under a law relating to preventive detention can, in my opinion, be appropriately gone into in proceedings for a writ of habeas corpus. Such question cannot be collaterally raised in proceedings like the present wherein the court is concerned with the validity of a Constitution Amendment Act and an Act to amend the Representation of the People Act. In deciding a case before it the court should decide matters which arise directly in the case. A court should resist the attempt of a party to induce it to decide a matter which though canvassed during arguments is only incidental and collateral and can appropriately be dealt with in separate proceedings.

**180.** The contention advanced by Mr. Shanti Bhushan that the sittings of the two Houses of Parliament in which the impugned Acts were passed were not valid essentially relates to the validity of the proceedings of the two Houses of Parliament. These are matters which are not justiciable and pertain to the internal domain of the two Houses. Of course, the courts can go into the question as to whether the measures passed by Parliament are constitutionally valid. The court cannot, however, go into the question as to whether the sittings of the Houses of Parliament were not constitutionally valid because some members of those Houses were prevented from attending and participating in the discussions in those

36.   (1966) 2 SCR 406 : AIR 1966 SC 657 : 1966 Cri LJ 586.


SCC Online Web Edition, Copyright © 2021
Page 106    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------------------------------

Houses. It has not been disputed before us, as already mentioned, that the impugned Constitution Amendment Act and the statutory amendment Act were passed by the requisite majority. It is not the case of the respondent that the number of the detained members of Parliament was so large, that if they had voted against the impugned measures, the measures would not have been passed. Indeed, according to the affidavit filed during the course of arguments, the number of members of the Lok Sabha who were detained was 21 and of the Rajya Sabha the number was 10. An amendment of the Constitution under Article 368, it is noteworthy, has apart from the requirement in certain cases of ratification by the State Legislatures, to be passed in each House of Parliament by majority of the total membership of that House and by a majority of two-thirds of the members of that House present and voting. According to clause (1) of Article 100 of the Constitution, save as otherwise provided in this Constitution, all questions at any sitting of either House or joint sitting of the Houses shall be determined by a majority of votes of the members present and voting, other than the Speaker or person acting as Chairman or Speaker. The Chairman or Speaker, or person acting as such, shall not vote in the first instance, but shall have and exercise a casting vote in the case of an equality of votes. Clause (2) of that article provides that either House of Parliament shall have power to act notwithstanding any vacancy in the membership thereof, and any proceedings in Parliament shall be valid notwithstanding that it is discovered subsequently that some person who was not entitled so to do sat or voted or otherwise took part in the proceedings. Further, it is provided in clause (1) of Article 122 that the validity of any proceedings in Parliament shall not be called in question on the ground of any alleged irregularity of procedure. All this would show that the framers of the Constitution were anxious to ensure that the procedural irregularities and other grounds like those mentioned in clause (2) of Article 100 should not vitiate the validity of proceedings of Parliament and that it would not be permissible to call in question those proceedings on such grounds. The observations on page 456 in the case of **Special Reference No. 1 of 1964**[37] that if the impugned proceedings of a Legislature are illegal and unconstitutional and not merely irregular, the same can be scrutinised in a court of law do not, in my opinion, warrant the inference that a court can hold the proceedings of a Legislature to be not valid and constitutional by going into the question as to whether the detention of any member who was prevented from being present in the sitting of the Legislature was or was not in accordance with law. The acceptance of the above submission of Mr. Shanti Bhushan would necessarily result in a situation that whenever a law is made by Parliament, it would be open to a person affected by that law to question the validity of that law by asking the court to examine the validity of detention of each of the members of Parliament who were under detention at the time the said law was passed even though those members do not themselves assail the validity of their detention. It is plain that it would not be possible for the court in such collateral proceedings to record a finding about the validity of the detention of the members because the full material having a bearing on the validity of the detention would normally be, apart from the authority passing the order for detention, only with the person ordered to be detained or his friends and relatives. It would plainly be hazardous to record a finding without such material

37.   (1965) 1 SCR 413 : AIR 1965 SC 745.


SCC Online Web Edition, Copyright © 2021
Page 107          Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------------------

and a court of law, in my opinion, should decline to record such a finding in collateral proceedings. Till such time as a finding is recorded in appropriate proceedings about the validity of the detention of the members of Parliament, the court would have to proceed upon the assumption that the detention has not been shown to be invalid.

**181.** According to clause (3) of Article 105 of the Constitution, to which a short reference has been made earlier, the powers, privileges and immunities of each House of Parliament, and of the members and the committees of each House, shall be such as may from time to time be defined by Parliament by law, and, until so defined, shall be those of the House of Commons of the Parliament of the United Kingdom, and of its members and committees, at the commencement of this Constitution. No law contemplated by clause (3) has been made by the Parliament in India and as such we have to find out the powers, privileges and immunities of the House of Commons in the United Kingdom at the relevant time. In the case of **Bradlaugh** v. **Gossett**[38] the plaintiff, having been returned as member for the borough of Northampton, required the Speaker of the House of Commons to call him to the table for the purpose of taking oath. In consequence of something which had transpired on a former occasion the Speaker declined to do so. The House of Commons then upon motion resolved "that the Serjeant-at-Arms do exclude Mr. Bradlaugh (the plaintiff) from the House until he shall engage not further to disturb the proceedings of the House". In an action against the Serjeant-at-Arms praying for an injunction to restrain him from carrying out the resolution, the court held that this being a matter relating to the internal management of the procedure of the House of Commons, the court had no power to interfere. Dealing with the rights to be exercised within the walls of the House, Stephen, J. observed that those rights must be dependent upon the resolutions of the House. He also added that there was no appeal from the decision of the House of Commons. Stephen, J. in the course of the judgment also observed :

> ". . . for the purpose of determining on a right to be exercised within the House itself, and in particular the right of sitting and voting, the House and the House alone could interpret the statute but . . . as regarded rights to be exercised out of and independently of the House, such as the right of suing for a penalty for having sat and voted, the statute must be interpreted by this Court independently of the House."

The above passage has been cited on page 83 in **Erskine May's Parliamentary Practice**, 18th Ed. with a view to show that it is a right of each House of Parliament to be the sole judge of the lawfulness of its own proceedings. It would follow from the above that the courts cannot go into the lawfulness of the proceedings of the Houses of Parliament.

**182.** The act of detaining a person is normally that of an outside agency and not that of the House of Parliament. It would certainly look anomalous if the act of an outside agency which might ultimately turn out to be not legal could affect the validity of the proceedings of the House of Parliament or could prevent that House from assembling and functioning.

**183.** The matter can also be looked at from another angle. Gazette

38. (1883-84) 12 QBD 271.


SCC Online Web Edition, Copyright © 2021
Page 108    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------------------------------------------------------

copies of the Election Laws Amendment Act, 1975 (Act 40 of 1975) and the Constitution (Thirty-ninth Amendment) Act, 1975 have been produced before us. In the face of the publication in the Gazette of the above mentioned two Acts this Court must assume that those two Acts were duly passed. It may be pertinent in this context to refer to the position in the United States where it was laid down in the case of **Marshall Field & Co.** v. **John M. Clark**[39] as under :

> "The signing by the Speaker of the House of Representatives, and by the President of the Senate, in open session, of an enrolled bill, is an official attestation by the two houses that such bill has passed Congress ; and when the bill, thus attested receives the approval of the President, and is deposited in the public archives, its authentication as a bill that has passed Congress is complete and unimpeachable.    An enrolled Act thus authenticated is sufficient evidence of itself that it passed. Congress."

In the case of a constitutional amendment which requires ratification by the States, the position was stated by Brandeis, J. in the case of **Oscar Leser** v. **J. Mercer Garnett**[40] as follows :

> "The proclamation by the Secretary certified that, from official documents on file in the Department of State, it appeared that the proposed Amendment was ratified by the Legislatures of thirty-six States, and that it 'has become valid to all intents and purposes as a part of the Constitution of the United States'.    As the Legislatures of Tennessee and of West Virginia had power to adopt the resolutions of ratification, official notice to the Secretary, duly authenticated, that they had done so, was conclusive upon him, and, being certified to by his proclamation, is conclusive upon the courts."

**184.** I am, therefore, of the view that the constitutional validity of the Constitution Amendment Act and the 1975 Act amending the Representation of the People Act cannot be assailed on the ground that some members of Parliament were prevented because of their detention from attending and participating in the proceedings of the respective Houses of Parliament.

**185.** We may now deal with clause (4) of Article 329A which has been added by the Constitution (Thirty-ninth Amendment) Act, 1975. It is necessary to clarify at the outset that we are concerned in the present case only with the constitutional validity of clause (4) and not with that of the other clauses of that article. I, therefore, express no opinion about the validity of the other clauses of Article 329A. Clause (4) consists of four parts :

> (i) No law made by Parliament before the commencement of the Constitution (Thirty-ninth Amendment) Act, 1975 in so far as it relates to the election petitions and matters connected therewith shall apply or shall be deemed ever to have applied to or in relation to the election of any such person as is referred to in clause (1) to either House of Parliament ;

> (ii) and such election shall not be deemed to be void or ever to have become void on any ground on which such election could be declared to be void or has before such commencement been declared to be void under any such law ;

39.   143 US 649.                          40.   66 L Ed 505.


SCC Online Web Edition, Copyright © 2021
Page 109    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------------------------------------------------

(iii) and notwithstanding any order made by any court before such commencement declaring such election to be void, such election shall continue to be valid in all respects ;

(iv) and any such order and any finding on which such order is based shall be and shall be deemed always to have been void and of no effect.

**186.**  In so far as part (i) is concerned, I find that it relates to a matter which can be the subject of an ordinary legislation or a constitutional amendment.  According to this part, no law made by Parliament before the commencement of the Constitution (Thirty-ninth Amendment) Act, 1975 in so far as it relates to the election petitions and matters connected therewith shall apply and shall be deemed ever to have applied to or in relation to the election of any such person as is referred to in clause (1) to either House of Parliament.  A law in the above terms can validly be made by a Legislature as well as by a constituent authority.  The fact that the above law would have retrospective effect would not detract from the competence of the Legislature or constituent authority to make such a law.  It is well-settled that it is permissible for a Legislature to make a law with retrospective effect.  The power of a Legislature to make a law with retrospective effect is not curtailed or circumscribed by the fact that the subject-matter of such retrospective law is a matter relating to an election dispute (see **State of Orissa** v. **Bhupendra Kumar Bose**[41] and **Kanta Kathuria** v. **Manak Chand Surana**[42]).  Detailed reference to these cases would be made at the appropriate stage subsequently.  If a Legislature can pass legislation in respect of matters relating to an election dispute with a retrospective effect, the constituent authority, which is a kind of super-Legislature, would **a fortiori** be entitled to do so.

**187.**  Part (ii) of clause (4) spells out the consequence which flows from part (i) of the clause.  If the previous law in so far as it relates to the election petitions and matters connected therewith was not to apply to the election of the Prime Minister and the Speaker, it would necessarily follow that the election of the appellant who was the Prime Minister would not be deemed to be void or ever to have become void on the ground on which such election could be declared to be void or has before such commencement been declared to be void under any such law.

**188.**  The same, to some extent, appears to be true of part (iv) of clause (4).  If the previous law in so far as it relates to the election petitions and matters connected therewith was not to apply to the election of the appellant, the High Court shall be deemed to have had no jurisdiction to decide the election petition challenging the election of the appellant.  The effect of part (i) of clause (4) is that the High Court was divested of the jurisdiction to decide the dispute relating to the election of the appellant with a retrospective effect.  The law under which the election of the appellant was declared to be void as a result of the amendment was also made inapplicable with retrospective effect to the dispute relating to the election of the appellant. The resultant effect of the amendment thus was that the order by which the election of the appellant was declared to be void and the finding on which such order was based were rendered to be void and of no effect.

41.  1962 Supp 2 SCR 380 : AIR 1962 SC 945.        42.  (1970) 2 SCR 835 : (1969) 3 SCR 268.


SCC Online Web Edition, Copyright © 2021
Page 110      Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------------

**189.** Another aspect of part (iv) of clause (4) relates to the question as to whether it is open to the constituent authority to declare an order and a finding of the High Court to be void and of no effect or whether such a declaration can be made only either in separate judicial proceedings or in proceedings before a higher court.

**190.** A declaration that an order made by a court of law is void is normally part of the judicial function and is not a legislative function. Although there is in the Constitution of India no rigid separation of powers, by and large the spheres of judicial function and legislative function have been demarcated and it is not permissible for the Legislature to encroach upon the judicial sphere. It has accordingly been held that a Legislature while it is entitled to change with retrospective effect the law which formed the basis of the judicial decision, it is not permissible to the Legislature to declare the judgment of the court to be void or not binding (see **Shri Prithvi Cotton Mills Ltd. v. Broach Borough Municipality**[43], **Janapada Sabha, Chhindwara v. The Central Provinces Syndicate Ltd.**[44], **Municipal Corporation of the City of Ahmedabad v. New Shorock Spg. & Wvg. Co. Ltd.**[45] and **State of Tamil Nadu v. M. Rayappa Gounder**[46]).

**191.** The position as it prevails in the United States, where guarantee of due process of law is in operation, is given on pages 318-19 of Vol. 46 of the **American Jurisprudence 2d** as under :

> "The general rule is that the Legislature may not destroy, annul, set aside, vacate, reverse, modify, or impair the final judgment of a court of competent jurisdiction, so as to take away private rights which have become vested by the judgment. A statute attempting to do so has been held unconstitutional as an attempt on the part of the Legislature to exercise judicial power, and as a violation of the constitutional guarantee of due process of law. The Legislature is not only prohibited from reopening cases previously decided by the courts, but is also forbidden to affect the inherent attributes of a judgment. That the statute is under the guise of an act affecting remedies does not alter the rule. It is worthy of notice, however, that there are cases in which judgments requiring acts to be done in the future may validly be affected by subsequent legislation making illegal that which the judgment found to be legal, or making legal that which the judgment found to be illegal.

> **10. Judgment as to public right.**

> With respect to legislative interference with a judgment, a distinction has been made between public and private rights under which distinction a statute may be valid even though it renders ineffective a judgment concerning a public right. Even after a public right has been established by the judgment of the court, it may be annulled by subsequent legislation."

**192.** Question arises whether the above limitation imposed upon the Legislature about its competence to declare a judgment of the court to be void would also operate upon the constituent authority ?

43. (1970) 1 SCR 388, 392 : (1969) 2 SCC 283.
44. (1970) 3 SCR 745, 751 : (1970) 1 SCC 509.
45. (1971) 1 SCR 288 : (1970) 2 SCC 280.
46. (1971) 3 SCC 1.


SCC Online Web Edition, Copyright © 2021
Page 111    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------------------------

**193.** View has been canvassed before us that the answer to the above question should be in the negative. Although normally a declaration that the judgment of a court is void can be made either in separate proceedings or in proceedings before the higher court, there is, according to this view, no bar to the constituent authority making a declaration in the constitutional law that such an order would be void especially when it relates to a matter of public importance like the dispute relating to the election of a person holding the office of Prime Minister. The declaration of the voidness of the High Court judgment is something which can ultimately be traced to part (i). Whether such a declaration should be made by the court or by the constituent authority is more, it is urged, a matter of the mechanics of making the declaration and would not ultimately affect the substance of the matter that the judgment is declared void. According to Article 31B, without prejudice to the generality of the provisions contained in Article 31A, none of the Acts and Regulations specified in the Ninth Schedule nor any of the provisions thereof shall be deemed to be void, or ever to have become void, on the ground that such Act, Regulation or provision is inconsistent with, or takes away or abridges any of the rights conferred by, any provisions of this part, and notwithstanding any judgment, decree or order of any court or tribunal to the contrary, each of the said Acts and Regulations shall, subject to the power of any competent Legislature to repeal or amend it, continue in force. The effect of the above article, it is pointed out, is that even if a statute has been declared to be void on the ground of contravention of fundamental rights by a court of law, the moment that statute is specified by the constituent authority in the Ninth Schedule to the Constitution, it shall be deemed to have got rid of that voidness and the order of the court declaring that statute to be void is rendered to be of no effect. It is not necessary in such an event to make even the slightest change in the statute to rid it of its voidness. The stigma of voidness attaching to the statute because of contravention of fundamental rights found by the court is deemed to be washed away as soon as the statute is specified by the constituent authority in the Ninth Schedule and the judgment of the court in this respect is rendered to be inoperative and of no effect. In the case of **Don John Douglas Liyauge** v. **Queen**[47] the Judicial Committee struck down as ultra vires and void the provisions of the Criminal Law (Special Provisions) Act, 1962 on the ground that they involved the usurpation and infringement by the Legislature of the judicial powers· inconsistent with the written constitution of Ceylon. Their Lordships, however, expressly referred on page 287 to the fact that the impugned legislation had not been passed by two-thirds majority in the manner required for an amendment of the Constitution contained in Section 29(4) of the Constitution. It was observed :

> "There was speculation during the argument as to what the position would be if Parliament sought to procure such a result by first amending the Constitution by a two-thirds majority. But such a situation does not arise here. In so far as any Act passed without recourse to Section 29(4) of the Constitution purports to usurp or infringe the judicial power it is ultra vires."

The above observations, it is urged, show that the restriction upon the Legislature in encroaching upon judicial sphere may not necessarily hold good in the case of constituent authority.

47.  1967 AC 259.


SCC Online Web Edition, Copyright © 2021
Page 112    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-----------------------------------------------------------------------------------------------------------------------

**194.** The above contention has been controverted by Mr. Shanti Bhushan and he submits that the limitation on the power of the Legislature that it cannot declare void a judgment of the court equally operates upon the constituent authority. It is urged that the constituent authority can only enact a law in general terms, even though it be a constitutional law. The constituent authority may also, if it so deems proper change the law which is the basis of a decision and make such change with retrospective effect, but it cannot, according to the learned Counsel, declare void the judgment of the court. Declaration of voidness of a judgment, it is stated, is a judicial act and cannot be taken over by the constituent authority. Although Legislatures or the constituent authority can make laws, including those for creation of courts, they cannot, according to the submission, exercise judicial functions by assuming the powers of a super court in the same way as the courts cannot act as a super Legislature. It is, in my opinion, not necessary to dilate upon this aspect and express a final opinion upon the rival contentions, because of the view I am taking of part (iii) of clause (4).

**195.** We may now come to part (iii) of clause (4). By part (iii) it is declared that the election of the appellant shall continue to be valid in all respects. Such a declaration would not follow from part (i) of the clause. It would not also follow from part (ii) and part (iv) of the clause which, as mentioned earlier, in effect represented the consequences flowing from part (i). The election to the Lok Sabha of the appellant, who was the Prime Minister, was challenged on the ground that she or her election agents had been guilty of some malpractices. The declaration that her election was to be valid in all respects necessarily involved the process of going into the grounds on which her election had been assailed and holding those grounds to be either factually incorrect or to be of such a nature as in law did not warrant the declaration of her election to be void. The case of the appellant is that some of the grounds mentioned against her were factually incorrect and in respect of those grounds the findings of the High Court is against the respondent and in her favour. In respect of some other grounds, except in one or two matters there is not much divergence between the appellant and the respondent on the question of facts. The point of controversy between the parties mainly is that, according to the respondent, those facts constituted corrupt practice as defined in Section 123 of the R. P. Act, while according to the appellant those facts did not constitute corrupt practice. In any case, according to the appellant in view of the amendment made in the R. P. Act by amending Acts 58 of 1974 and 40 of 1975, these facts did not constitute corrupt practice. The declaration made in part (iii) of clause (4) that the election of the appellant was to be valid in all respects was tantamount in the very nature of things to the repelling of the grounds advanced by the respondent to challenge the election of the appellant. Question therefore arises as to what, if any, was the law which was applied in repelling the grounds advanced by the respondent to challenge the election of the appellant. So far as the existing law relating to election disputes was concerned, part (i) of clause (4) expressly stated that such a law would not apply to the petition filed by the respondent to challenge the election of the appellant. This means that the provisions of the Representation of the People Act were not to apply to the petition filed by the respondent against the appellant. This also means that the amending Acts 58 of 1974 and 40 of 1975 were not to apply to the dispute relating to election of the appellant.


SCC Online Web Edition, Copyright © 2021
Page 113      Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------------------------------

**196.** The dispute relating to the election of the appellant is also not to be governed by law which is to be enacted under clause (1) of Article 329A. Such a law would apply only to future elections. The result is that so far as the dispute relating to the election of the appellant is concerned, a legal vacuum came into existence. It was open to the constituent authority to fill that vacuum by prescribing a law which was to govern the dispute arising out of the petition filed by the respondent to challenge the election of the appellant. The constituent authority, however, did not do so and straightaway proceeded to declare the election of the appellant to be valid. There is nothing in clause (4) to indicate that the constituent authority applied any law in declaring the election of the appellant to be valid and if so, what was that law.

**197.** I am unable to accede to the argument that the constituent authority kept in view the provisions of the R.P. Act as amended by Acts 58 of 1974 and 40 of 1975 and their impact on the challenge to the election of the appellant in declaring the election of the appellant to be valid. The difficulty in accepting this argument is that in part (i) of clause (4) the constituent authority expressly stated that the previous law, namely, the R.P. Act as amended in so far as it related to election petitions and matters connected therewith was not to apply so far as the challenge to the election of the appellant was concerned. It is also difficult to agree that the constituent authority took into account some other unspecified law or norm in declaring the election of the appellant to be valid. As mentioned earlier, there is nothing in clause (4) to indicate that the constituent authority took into account some other law or norm and if so, what that law or norm was. The position which thus emerges is that according to clause (4) no law was to apply for adjudicating upon the challenge to the election of the appellant and the same was in terms of part (iii) to be valid in all respects. The question with which we are concerned is whether the provisions of clause (4) of Article 329A by which the constituent authority in effect prescribed that no election law was to govern the challenge to the election of the appellant and that the same in any case was to be valid in all respects is a permissible piece of constitutional amendment or whether it is void on the ground that it affects the basic structure of the Constitution.

**198.** This Court in the case of **Kesavananda Bharati** (supra) held by majority that the power of amendment of the Constitution contained in Article 368 does not permit altering the basic structure of the Constitution. All the seven Judges who constituted the majority were also agreed that democratic set-up was part of the basic structure of the Constitution. Democracy postulates that there should be periodical elections, so that people may be in a position either to re-elect the old representatives or, if they so choose, to change the representatives and elect in their place other representatives. Democracy further contemplates that the elections should be free and fair, so that the voters may be in a position to vote for candidates of their choice. Democracy can indeed function only upon the faith that elections are free and fair and not rigged and manipulated, that they are effective instruments of ascertaining popular will both in reality and form and are not mere rituals calculated to generate illusion of defence to mass opinion. Free and fair elections require that the candidates and their agents should not resort to unfair means or malpractices as may impinge upon the process of free and fair elections. Even in the absence of unfair means and malpractices, some-


SCC Online Web Edition, Copyright © 2021
Page 114      Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------------------------

times the result of an election is materially affected because of the improper rejection of ballot papers.   Likewise, the result of an election may be materially affected on account of the improper rejection of a nomination paper.   Disputes, therefore, arise with regard to the validity of elections.   For the resolving of those disputes, the different democratic countries of the world have made provisions prescribing the law and the forum for the resolving of those disputes.   To give a few examples, we may refer to the United Kingdom where a parliamentary election petition is tried by two judges on the rota for the trial of parliamentary election petitions in accordance with the Representation of the People Act, 1949.   Section 5 of Article 1 of the U.S. Constitution provides that each House (Senate and the House of Representatives) shall be the judge of the elections, returns and qualifications of its own members.   Section 47 of the Australian Constitution provides that until the Parliament otherwise provides, any question respecting the qualification of a senator or of a member of the House of Representatives, or respecting a vacancy in either House of Parliament, and any question of a disputed election to either House, shall be determined by the House in which the question arises.   Article 55 of the Japanese Constitution states that each House shall judge disputes related to qualifications of its members.   However, in order to deny a seat to any member, it is necessary to pass a resolution by a majority of two-thirds or more of the members present.   Article 46 of the Iceland Constitution provides that the Althing itself decides whether its members are legally elected and also whether a member is disqualified.   Article 64 of the Norwegian Constitution states that the representatives elected shall be furnished with certificates, the validity of which shall be submitted to the judgment of the Storting.   Article 59 of the French Constitution provides that the Constitutional Council shall rule, in the case of disagreement, on the regularity of the election of deputies and senators.   Article 41 of the German Federal Republic Constitution states that the scrutiny of elections shall be the responsibility of the Bundestag.   It shall also decide whether a deputy has lost his seat in the Bundestag.   Against the decision of the Bundestag an appeal shall lie to the Federal Constitutional Court.   Details shall be regulated by a federal law.   According to Article 66 of the Italian Constitution, each Chamber decides as to the validity of the admission of its own members and as to cases subsequently arising concerning ineligibility and incompatibility.   In Turkey Article 75 provides inter alia that it shall be the function of Supreme Election Board to review and pass final judgment on all irregularities, complaints and objections regarding election matters during and after elections.   The function and powers of the Supreme Election Board shall be regulated by law.   Article 53 of the Malaysian Constitution provides that if any question arises whether a member of a House of Parliament has become disqualified for membership, the decision of that House shall be taken and shall be final.

**199.**   Not much argument is needed to show that unless there be a machinery for resolving an election dispute and for going into the allegations that elections were not free and fair being vitiated by malpractices, the provision that a candidate should not resort to malpractices would be in the nature of a mere pious wish without any legal sanction.   It is further plain that if the validity of the election of a candidate is challenged on some grounds, the said election can be declared to be valid only if we provide a forum for going into those grounds and prescribe a law for adjudicating upon those grounds.   If the said forum finds


SCC Online Web Edition, Copyright © 2021
Page 115    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------------------------------------------------

that the grounds advanced to challenge the election are not well-founded or are not sufficient to invalidate the election in accordance with the prescribed law or dismisses the petition to challenge the election on some other ground, in such an event it can be said that the election of the returned candidate is valid.

**200.** Besides other things, election laws lay down a code of conduct in election matters and prescribe, what may be called, rules of electoral morality. Election laws also contain a provision for resolving disputes and determination of controversies which must inevitably arise in election matters as they arise in other spheres of human activity. The object of such a provision is to enforce rules of electoral morality and to punish deviance from the prescribed code of conduct in election matters. It is manifest that but for such a provision, there would be no sanction for the above code of conduct and rules of electoral morality. It is also plain that nothing would bring the code of conduct into greater contempt and make a greater mockery of it than the absence of a provision to punish its violation. The position would become all the more glaring that even though a provision exists on the statute book for punishing violation of the code of conduct in election matters, a particular election is made immune and granted exemption from the operation of such a provision.

**201.** The vice of clause (4) of Article 329A is not merely that it makes the previous law contained in the R.P. Act as amended by Acts 58 of 1974 and 40 of 1975 inapplicable to the challenge to the election of the appellant, it also makes no other election law applicable for resolving that dispute. The further vice from which the said clause suffers is that it not merely divests the previous authority, namely, the High Court of its jurisdiction to decide the dispute relating to the election of the appellant, it confers no jurisdiction on some other authority to decide that dispute. Without even prescribing a law and providing a forum for adjudicating upon the grounds advanced by the respondent to challenge the election of the appellant, the constituent authority has declared the election of the appellant to be valid.

**202.** To confer an absolute validity upon the election of one particular candidate and to prescribe that the validity of that election shall not be questioned before any forum or under any law would necessarily have the effect of saying that howsoever gross may be the improprieties which might have vitiated that election. howsoever flagrant may be the mal-practices which might have been committed on behalf of the returned candidate during the course of the election and howsoever foul and violative of the principles of free and fair elections may be the means which might have been employed for securing success in that election, the said election would be nonetheless valid and it would not be permissible to complain of those improprieties, malpractices and unfair means before any forum or under any law with a view to assail the validity of that election. Not much argument is needed to show that any provision which brings about that result is subversive of the principle of free and fair election in a democracy. The fact that the candidate concerned is the Prime Minister of the country or the Speaker of the lower House of Parliament would, if anything, add force to the above conclusion because both these offices represent the acme of the democratic process in a country. That in fact the elections of the incumbents of the two offices were not vitiated by any impropriety, malpractice or unfair means is not


SCC Online Web Edition, Copyright © 2021
Page 116      Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------------------------------------------

relevant or germane to the question with which we are concerned, namely, as to what is the effect of clause (4) of Article 329A.

**203.** The vice of declaration contained in part (iii) of clause (4) regarding the validity of the election of the appellant is aggravated by the fact that such a declaration is made after the High Court which was then seized of jurisdiction had found substance in some of the grounds advanced by the respondent and had consequently declared the election of the appellant to be void. To put a stamp of validity on the election of a candidate by saying that the challenge to such an election would not be governed by any election law and that the said election in any case would be valid and immune from any challenge runs counter to accepted norms of free and fair elections in all democratic countries. In the case of **Marbury** v. **Madison**[48] Marshall, C.J. said that "the government of the United States has been emphatically termed a government of laws and not of men". In **United States** v. **Lee**[49] Samuel Miller, J. observed that "no man is so high that he is above the law . . . All . . . officers are creatures of the law and are bound to obey it". Although the above observations were made in the context of the U.S. Constitution, they, in my opinion, hold equally good in the context of our Constitution.

**204.** It has been argued on behalf of the appellant that the grounds on account of which the election of the appellant had been held to be void by the High Court were of a technical nature. I need not express any opinion about this aspect of the matter at this stage but, assuming it to be so, I find that clause (4) of Article 329A is so worded that however serious may be the malpractices vitiating the election of the Speaker or the Prime Minister, the effect of clause (4) is that the said election would have to be treated as valid. I cannot accede to the submission that in construing clause (4) we should take into account the facts of the appellant's case. This is contrary to all accepted norms of construction. If a clause of a Constitution or a statutory provision is widely worded, the width of its ambit cannot be circumscribed by taking into account the facts of an individual case to which it applies. As already mentioned, clause (4) deals with the past election not merely of the Prime Minister but also of the Speaker. So far as the election of the Speaker is concerned, we do not know as to whether the same was ever challenged and, if so, on what grounds, and whether such a dispute is still pending.

**205.** Another argument advanced in support of the validity of the amendment is that we should take it that the constituent authority constituted itself to be the forum for deciding the dispute relating to the validity of the election of the appellant, and after considering the facts of the case, declared the election of the appellant to be valid. There is, however, nothing before us as to indicate that the constituent authority went into the material which had been adduced before the High Court relating to the validity of the election of the appellant and after considering that material held the election of the appellant to be valid. Indeed, the statement of objects and reasons appended to the Constitution (Thirty-ninth Amendment) Bill makes no mention of this thing. In any case, the vice of clause (4) would still lie in the fact that the election of the appellant was declared to be valid on the basis

48.  (1803) 1 Cr 137, 163.                        49.  106 US 196, 220.



SCC Online Web Edition, Copyright © 2021
Page 117    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------------------------------

that it was not to be governed by any law for settlement of election disputes. Although the provisions of a constitutional amendment should be construed in a fair and liberal spirit, such liberal spirit should not be carried by the court to the extent of discovering the application of a dormant and latent law in the declaration of the validity of an election even though there is not even a remote indication of such a law in the impugned provision. Rule of law postulates that the decisions should be made by the application of known principles and rules and in general such decisions should be predictable and the citizen should know where he is. If a decision is taken without any principle or without any rule, it is not predictable and such decision is the antithesis of a decision taken in accordance with the rule of law.

**206.** The matter can also be looked at from another angle. The effect of impugned clause (4) is to take away both the right and the remedy to challenge the election of the appellant. Such extinguishment of the right and remedy to challenge the validity of the election, in my opinion, is incompatible with the process of free and fair elections. Free and fair elections necessarily postulate that if the success of a candidate is secured in elections by means which violate the principle of free and fair elections, the election should on that account be liable to be set aside and be declared to be void. To extinguish the right and the remedy to challenge the validity of an election would necessarily be tantamount to laying down that even if the election of a candidate is vitiated by the fact that it was secured by flagrant violation of the principles of free and fair election, the same would still enjoy immunity from challenge and would be nonetheless valid. Clause (4) of Article 329A can, therefore, be held to strike at the basis of free and fair elections.

**207.** I agree that it is not necessary in a democratic set-up that disputes relating to the validity of the elections must be settled by courts of law. There are many countries like France, Japan, and the United States of America where consistently with the democratic set-up the determination of such controversies is by Legislature or by authorities other than the courts. The question with which we are concerned, however, is whether it is permissible in a democratic set-up that a dispute with regard to the validity of a particular election shall not be raised before any forum and shall not be governed by law and whether such an election can be declared, despite the existence of a dispute relating to its validity, to be valid by making the existing law relating to election disputes not applicable to it and also by not applying any other election law to such a dispute. The answer to such a question, for the reasons given earlier by me, should be in the negative.

**208.** Reference to the election of the US President made by Mr. Sen is also not helpful to him. It is clear from observations on pages 47-50 of the **American Commonwealth** by Bryce, 1912 Ed. and Sections 5, 6 and 15 of the **United States Code** (1970 Ed.) that there is ample provision for the determination of such disputes after the poll. The fact that such determination of the dispute is before the declaration of the result would not detract from the proposition that it is essential for free and fair elections that there should be a forum and law for the settlement of such disputes relating to the validity of the election.

**209.** Argument has also been advanced that the offices of the

SCC Online Web Edition, Copyright © 2021
Page 118    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------

Prime Minister and Speaker are of great importance and as such they constitute a class by themselves. This argument, in my opinion, would have relevance if instead of the law governing disputes relating to the election of other persons, another law had been prescribed to govern the dispute relating to the election of a person who holds the office of the Prime Minister or Speaker. As it is, what we find is that so far as the dispute relating to the election of the appellant is concerned, neither the previous law governing the election of persons holding the office of the Prime Minister is to apply to it nor the future law to be framed under clause (1) of Article 329A governing the election of persons holding the office of Prime Minister is to apply to this dispute. Likewise, the previous forum for adjudicating upon the election dispute which went into the matter, has been divested of its jurisdiction with retrospective effect and, at the same time, no jurisdiction has been vested in any other forum to go into the matter. The present is not a case of change of forum. It is, on the contrary, one of the abolition of forum. As such, the question as to whether the office of Prime Minister constitutes a class by itself loses much of its significance in the context of the controversy with which we are concerned.

**210.** It has been argued in support of the constitutional validity of clause (4) that as a result of this amendment, the validity of one election has been preserved. Since the basic structure of the Constitution, according to the submission, continues to be the same, clause (4) cannot be said to be an impermissible piece of constitutional amendment. The argument has a seeming plausibility about it, but a deeper reflection would show that it is vitiated by a basic fallacy. Law normally connotes a rule or norm which is of general application. It may apply to all the persons or class of persons or even individuals of a particular description. Law prescribes the abstract principles by the application of which individual cases are decided. Law, however, is not what Blackstone called "a sentence". According to Roscoe Pound, law, as distinguished from laws, is the system of authoritative materials for grounding or guiding judicial and administrative action recognized or established in a politically organized society (see page 106, **Jurisprudence,** Vol. III). Law is not the same as judgment. Law lays down the norm in abstract terms with a coercive power and sanction against those guilty of violating the norm, while judgment represents the decision arrived at by the application of law to the concrete facts of a case. Constitutional law relates to the various organs of a State ; it deals with the structure of the Government, the extent of distribution of its powers and the modes and principles of its operation. The Constitution of India is so detailed that some of the matters which in a brief Constitution like that of the United States of America are dealt with by statutes form the subject-matter of various articles of our Constitution. There is, however, in a constitutional law, as there is in the very idea of law, some element of generality or general application. It also carries with it a concept of its applicability in future to situations which may arise in that context. If there is amendment of some provision of the Constitution and the amendment deals with matters which constitute constitutional law, in the normally accepted sense, the court while deciding the question of the validity of the amendment would have to find out, in view of the majority opinion in **Kesavananda Bharati's case** (supra), as to whether the amendment affects the basic structure of the Constitution. The constitutional amendment contained in clause (4) with which we are concerned in the present


SCC Online Web Edition, Copyright © 202
Page 119    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------

case is, however, of an altogether different nature. Its avowed object is to confer validity on the election of the appellant to the Lok Sabha in 1971 after that election had been declared to be void by the High Court and an appeal against the judgment of the High Court was pending in this Court. In spite of our query, we were not referred to any precedent of a similar amendment of any Constitution of the world. The uniqueness of the impugned constitutional amendment would not, however, affect its validity. If the constituent authority in its wisdom has chosen the validity of a disputed election as the subject-matter of a constitutional amendment, this Court cannot go behind that wisdom. All that this Court is concerned with is the validity of the amendment. I need not go into the question as to whether such a matter, in view of the normal concept of constitutional law, can strictly be the subject of a constitutional amendment. I shall for the purpose of this case assume that such a matter can validly be the subject-matter of a constitutional amendment. The question to be decided is that if the impugned amendment of the Constitution violates a principle which is part of the basic structure of the Constitution, can it enjoy immunity from an attack on its validity because of the fact that for the future, the basic structure of the Constitution remains unaffected. The answer to the above question, in my opinion, should be in the negative. What has to be seen in such a matter is whether the amendment contravenes or runs counter to an imperative rule or postulate which is an integral part of the basic structure of the Constitution. If so, it would be an impermissible amendment and it would make no difference whether it relates to one case or a large number of cases. If an amendment striking at the basic structure of the Constitution is not permissible, it would not acquire validity by being related only to one case. To accede to the argument advanced in support of the validity of the amendment would be tantamount to holding that even though it is not permissible to change the basic structure of the Constitution, whenever the authority concerned deems it proper to make such an amendment, it can do so and circumvent the bar to the making of such an amendment by confining it to one case. What is prohibited cannot become permissible because of its being confined to one matter.

**211.** Lastly, question arises whether we should strike down clause (4) in its entirety or in part. So far as this aspect is concerned, I am of the view that the different parts of clause (4) are so integrally connected and linked with each other that it is not possible to sever them and uphold the validity of part of it after striking down the rest of it. It would indeed be unfair to the appellant if we were to uphold the first part of clause (4) and strike down other parts or even part (iii). As would be apparent from what follows hereafter, the election of the appellant is being upheld by applying the provisions of the R. P. Act as amended by Act 40 of 1975. Such a course would not be permissible if we were to uphold the validity of the first part of clause (4) and strike down the other parts. We would also in that event be creating a vacuum which is the very vice for which we are striking down clause (4). I am, therefore, of the view that clause (4) should be struck down in its entirety.

**212.** In view of my finding that clause (4) strikes at the basic structure of the Constitution, it is not necessary to go into the question as to whether, assuming that the constituent authority took it upon itself to decide the dispute relating to the validity of the election of the appellant, it was necessary for the constituent authority to hear the parties concerned before it declared the election of the appellant to be valid and thus in

SCC Online Web Edition, Copyright © 2021
Page 120    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases



effect repelled the challenge of the respondent to the validity of the appellant's election.

**213.** As a result of the above, I strike down clause (4) of Article 329A on the ground that it violates the principle of free and fair elections which is an essential postulate of democracy and which in its turn is a part of the basic structure of the Constitution inasmuch as (1) it abolishes the forum without providing for another forum for going into the dispute relating to the validity of the election of the appellant and further prescribes that the said dispute shall not be governed by any election law and that the validity of the said election shall be absolute and not consequently be liable to be assailed, and (2) it extinguishes both the right and the remedy to challenge the validity of the aforesaid election.

**214.** We may now deal with Appeal No. 887 of 1975 filed by the appellant. So far as this appeal is concerned, it has been argued by Mr. Sen on behalf of the appellant that the grounds on which the election of the appellant has been declared by the High Court to be void no longer hold good in view of the amendment in the R. P. Act by Act 40 of 1975. As against that, Mr. Shanti Bhushan on behalf of the respondent has assailed the validity of Act 40 of 1975. In the alternative, Mr. Shanti Bhushan contends that even if the validity of Act 40 of 1975 were to be upheld, the grounds on which the election of the appellant has been declared to be void would still hold good.

**215.** The question as to whether Act 40 of 1975 is not vitiated by any constitutional infirmity would be dealt with by me subsequently. For the time being I would proceed upon the basis that the statutory amendment in the R. P. Act by Act 40 of 1975 is constitutionally valid.

**216.** Section 10 of Act 40 of 1975, which has been reproduced earlier, makes it clear, inter alia, that the provisions of Sections 6, 7 and 8 of that Act shall have retrospective operation, so as to apply to or in relation to any election held before the commencement of this Act, to either House of Parliament in respect of which appeal from any order of any High Court made in any election petition under the R. P. Act is pending before the Supreme Court immediately before such commencement. It is, therefore, obvious that the provisions of Sections 6, 7 and 8 of Act 40 of 1975 would be attracted to this case. One of the questions which actually arose for determination before the High Court was as to what was the date on which the appellant held herself out as a candidate. According to the written statement filed on behalf of the appellant, she held herself out as a candidate from the Rae Bareli constituency on February 1, 1971 when she filed her nomination paper. As against that, the case of the respondent was that the appellant held herself out as a candidate from that constituency on December 27, 1970 when the Lok Sabha was dissolved. The finding of the High Court is that the appellant held herself out as a candidate from the Rae Bareli constituency on December 29, 1970 when she addressed a press conference. The question as to when the appellant held herself out as a candidate from the Rae Bareli constituency has now become purely academic in view of the change in the definition of the word "candidate" as given in clause (b) of Section 79 of the R. P. Act by Act 40 of 1975. According to the original definition,

"unless the context otherwise requires, 'candidate' means a person who


SCC Online Web Edition, Copyright © 2021
Page 121    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

has been or claims to have been duly nominated as a candidate at any election and any such person shall be deemed to have been a candidate as from the time when, with the election in prospect, he began to hold himself out as a prospective candidate."

The new definition states that "unless the context otherwise requires, 'candidate' means a person who has been or claims to have been duly nominated as a candidate at any election". The question as to when a person holds himself out as candidate, therefore, loses its importance in the context of the new definition.

**217.** One of the grounds which weighed with the High Court in declaring the election of the appellant to be void was that the appellant committed corrupt practice under Section 123(7) of the R.P. Act inasmuch as she obtained and procured the assistance, for the furtherance of her election prospects, of Yashpal Kapur during the period from January 7 to 24, 1971 when Yashpal Kapur was still a gazetted officer in the service of the Government of India.

**218.** According to clause (7) of Section 123 of the R.P. Act, the following act shall constitute corrupt practice under that clause :

"The obtaining or procuring or abetting or attempting to obtain or procure by a candidate or his agent or, by any other person with the consent of a candidate or his election agent, any assistance (other than the giving of vote) for the furtherance of the prospects of that candidate's election, from any person in the service of the Government and belonging to any of the following classes, namely :—

(a)   gazetted officers ;

(b)   stipendiary judges and magistrates ;

(c)   members of the armed forces of the Union ;

(d)   members of the police forces ;

(e)   excise officers ;

(f)   revenue officers other than village revenue officers known as lambardars, malguzars, deshmukhs or by any other name, whose duty is to collect land revenue and who are remunerated by a share of, or commission on, the amount of land revenue collected by them but who do not discharge any police function ; and

(g)   such other class of persons in the service of the Government as may be prescribed.

*Explanation.*—(1) In this section the expression 'agent' includes an election agent, or polling agent and any person who is held to have acted as an agent in connection with the consent of the candidate.

(2) For the purposes of clause (7), a person shall be deemed to assist in the furtherance of the prospects of a candidate's election if he acts as an election agent."

Perusal of the above clause shows that what constitutes corrupt practice under the above clause is the obtaining or procuring or abetting or attempting to obtain or procure by a candidate or his agent or by any person with the consent of a candidate or his election agent any assistance (other than the giving of vote) for the furtherance of the prospects



Case 1:21-cv-00396-RJL   Document 20-11   Filed 08/14/21   Page 123 of 289

SCC Online Web Edition, Copyright © 2021
Page 122     Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------

of the candidate's election from any person in the service of the Government and belonging to any of the classes specified therein. It is, in my opinion, essential that at the time the impugned act, namely, the obtaining or procuring or abetting or attempting to obtain or procure the assistance of a government servant is done, the person doing the act must be a candidate or his agent or any other person with the consent of a candidate or his election agent. Candidate in this clause would mean a person who has been or who claims to have been duly nominated as a candidate at the election. I am unable to accede to the submission of Mr. Shanti Bhushan that the word "candidate" has been used merely to identify the person who is duly nominated as a candidate at an election and that the word "candidate", as mentioned in clause (7), would also include a person who, after the commission of the corrupt practice specified in that clause, is subsequently nominated as a candidate. The amended definition reproduced above shows that unless context otherwise requires, candidate means a person who has been or claims to have been duly nominated as a candidate at an election. To accede to the submission of Mr. Shanti Bhushan would be tantamount to reading in the definition of the word "candidate" in addition to the words "who has been or claims to have been duly nominated" also the words "who is subsequently nominated as a candidate". There is nothing to indicate that the word "candidate" in clause (7) of Section 123 has been used merely to identify the person who has been or would be subsequently nominated as a candidate. A definition clause in a statute is a legislative device with a view to avoid making different provisions of the statute to be cumbersome. Where a word is defined in the statute and that word is used in a provision to which that definition is applicable, the effect is that wherever the word defined is used in that provision, the definition of the word gets substituted. Reading the word "candidate" in Section 123(7) of the R.P. Act in the sense in which it has been defined as a result of the amendment made by Act 40 of 1975, I find that the only reasonable inference is that the person referred to as a candidate in that clause should be a person who has been or claims to have been duly nominated as a candidate at an election and not one who is yet to be nominated.

**219.** Mr. Shanti Bhushan has invited our attention to clause (b) of Section 100(1) of the R.P. Act wherein it is stated that subject to the provisions of sub-section (2) the High Court is of the opinion that any corrupt practice has been committed by a returned candidate or his election agent or by any other person with the consent of a returned candidate or his election agent, the High Court shall declare the election of the returned candidate to be void. "Returned candidate" has been defined in clause (f) of Section 79 to mean, unless the context otherwise requires, a candidate whose name has been published under Section 67 as duly elected. It is urged that as the corrupt practice referred to in clause (b) of Section 100(1) of the R.P. Act would in the very nature of things have to be committed by the returned candidate before his name was published under Section 67 as duly elected, the words "returned candidate" in clause (b) of Section 100(1) must be taken to have been used with a view to identify the person who subsequently became a returned candidate. It is urged that if while dealing with corrupt practice committed by a candidate before he became a returned candidate in the context of Section 100(1)(b), it is permissible to hold that the words "returned candidate" are intended to identify the person who subse-


SCC Online Web Edition, Copyright © 2021
Page 123      Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source:  Supreme Court Cases

quently became a returned candidate, the same criterion should apply when construing the word "candidate" in Section 123 of the R.P. Act. This contention, in my opinion, is devoid of force. The definition of the words "returned candidate" and "candidate" given in Section 79 of the R.P. Act are preceded by the words "unless the context otherwise requires". The connotation of the above words is that normally it is the definition given in the section which should be applied and given effect to. This normal rule may, however, be departed from if there be something in the context to show that the definition should not be applied. So far as clause (b) of Section 100(1) is concerned, the context plainly requires that the corrupt practice referred to in that clause should have been committed by the candidate before he became a returned candidate, or by his agent or by any other person with his consent or that of his election agent. The compulsion arising from the context which is there in clause (b) of Section 100(1) of the R.P. Act is singularly absent in Section 123(7) of the R.P. Act. There is nothing in the context of the latter provision which requires that we should not give full effect to the new definition of the word "candidate".

**220.** Reference has also been made by Mr. Shanti Bhushan to observations on pages 222-3 of Vol. 14 of **Halsbury's Laws of England,** Third Edition, according to which a candidate at a general election may be guilty of treating even though the treating took place before the dissolution of Parliament and consequently before he came within the statutory definition of a candidate. These observations have been made in the context of the statutory provisions in the United Kingdom. Those provisions were couched in a language substantially different from that in which the provisions of the R.P. Act in India are couched and as such, in my opinion, not much assistance can be derived from those observations.

**221.** As the appellant filed her nomination paper on February 1, 1971, in view of the amended definition of the word "candidate", it would have to be taken that the appellant became a candidate only on February 1, 1971. The result is that even if the finding of the High Court that the appellant obtained and procured the assistance of Yashpal Kapur during the period from January 7 to 24, 1971 were assumed to be correct, the appellant shall not be deemed to have committed corrupt practice under Section 123(7) of the R.P. Act. As regards the assistance of Yashpal Kapur which the appellant is alleged to have obtained and procured after January 14, 1971, the controversy stands resolved also by another amendment. According to the case of the appellant, Yashpal Kapur, tendered his resignation by letter, dated January 13, 1971, with effect from January 14, 1971. The High Court found that Yashpal Kapur continued to be in the service of the Government of India till January 25, 1971 which was the date of the notification regarding the acceptance of Yashpal Kapur's resignation. According to the said notification, the President was pleased "to accept the resignation of Shri Y.P.R. Kapoor, Officer on Special Duty in the Prime Minister's Secretariat, with effect from the forenoon of the 14th January, 1971". The explanation which has been added to Section 123 of the R.P. Act makes it clear, inter alia, that for the purpose of clause (7), notwithstanding anything contained in any other law, the publication in the official gazette of the resignation and termination of service of a person in the service of the Central Government shall be conclusive proof of his resignation and termination of service and where the date of taking effect of this resignation or termination

SCC Online Web Edition, Copyright © 2021
Page 124          Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------------

of service is stated in such publication, also of the fact that such person ceased to be in such service with effect from the said date. Yashpal Kapur in view of the newly added explanation, shall be taken to have ceased to be in government service with effect from January 14, 1971. Any assistance of Yashpal Kapur which the appellant was alleged to have obtained or procured on or after January 14, 1971 would not, therefore, make her guilty of corrupt practice under Section 123(7) of the R.P. Act.

222. Another ground on which the High Court declared the election of the appellant to be void was that she committed corrupt practice under Section 123(7) of the R. P. Act inasmuch as she obtained the assistance of the officers of the U.P. Government, particularly the District Magistrate, Superintendent of Police, the Executive Engineer, P.W.D. and the Engineer, Hydel Department for construction of rostrums and arrangement of supply of power for loudspeakers in the meetings addressed by her on February 1, 1971 and February 25, 1971 in furtherance of her election prospects. It is not disputed that what was done by the above mentioned officers was in pursuance of official directions and in the discharge or purported discharge of the official duties. This is indeed clear from letter dated November 19, 1969 from the Government of India, Ministry of Home Affairs to all State Governments wherein there is reference to rule (6) of the Rules and Instructions for the Protection of the Prime Minister and it is stated :

"As the security of the Prime Minister is the concern of the State all arrangements for putting up the rostrum, the barricades, etc. at the meeting place, including that of an election meeting will have to be made by the State Government concerned. . . .

\*          \*          \*          \*          \*

In the case of election meetings, all expenditure on police, setting up of barricades and taking lighting arrangements will be borne by the State Government while expenditure on the public address system and any decorative arrangements will be the responsibility of the political party concerned. (The expenditure on all these items, may in the first instance be borne by the State Government and then recovered from the political parties concerned.) In regard to the rostrum only 25% of the cost of the rostrum or Rs.2500·00 whichever is less, shall be contributed by the party as the rostrum has to be of certain specifications because of security considerations."

Assuming that the finding of fact recorded by the High Court in this respect is correct, the appellant can still be not guilty of the commission of corrupt practice under Section 123(7) of the R. P. Act in view of the new proviso which has been inserted at the end of clause (7) of Section 123 and which reads as under :

"Provided that where any person, in the service of the Government and belonging to any of the classes aforesaid, in the discharge or purported discharge of his official duty, makes any arrangements or provides any facilities or does any other act or thing, for, to or in relation to any candidate or his agent or any other person acting with the consent of the candidate or his agent or any other person acting with the consent of the candidate or his election agent, (whether by reason of the office held by the candidate or for any other reason), such arrangements, facilities or act or thing shall not be


SCC Online Web Edition, Copyright © 2021
Page 125    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------------------------------------------------

deemed to be assistance for the furtherance of the prospects of that candidate's election."

The above proviso has also a direct bearing on the allegation of the respondent that the appellant committed corrupt practice under Section 123(7) of the R. P. Act inasmuch as she or her election agent procured the assistance of members of armed forces of the Union for furtherance of her election prospects because of the fact that the members of the armed forces arranged planes and helicopters of the Air Force for her flights to enable her to address meetings in her constituency.

**223.** It has been argued by Mr. Shanti Bhushan that the words "in the discharge or purported discharge of his official duty" in the above mentioned proviso have reference only to statutory duty and not to other duty performance of which takes place in pursuance of administrative instructions. I find it difficult to accede to the above submission as there is nothing in the above proviso to confine the words "official duty" to duty imposed by statute. Official duty would include not merely duties imposed by statutes but also those which have to be carried out in pursuance of administrative instructions.

**224.** Mr. Shanti Bhushan during the course of arguments made it plain that apart from his submission with regard to the validity of Act 40 of 1975, his objection relating to the applicability of Act 40 of 1975 was confined to two matters, namely, the connotation of the word "candidate" and the meaning to be attached to official duty. Both these objections have been found by me to be not tenable. I would, therefore, hold that subject to the question as to whether the provisions of Act 40 of 1975 are valid, the grounds on which the High Court has declared the election of the appellant to be void no longer hold good for declaring the said election to be void.

**225.** We may also before dealing with the validity of Act 40 of 1975 refer to one other change brought about by that Act which has a bearing upon the present case. It was the case of the respondent that the appellant and her election agent made extensive appeals to the religious symbol of cow and calf and thereby committed corrupt practice under Section 123(3) of the R. P. Act. Corrupt practice has been defined in that provision as under :

"(3) The appeal by a candidate or his agent or by any other person with the consent of a candidate or his election agent to vote or refrain from voting for any person on the ground of his religion, race, caste, community or language or the use of, or appeal to religious symbols or the use of, or appeal to, national symbols, such as the national flag or the national emblem, for the furtherance of the prospects of the election of that candidate or for prejudicially affecting the election of any candidate."

It is the common case of the parties that the symbol of cow and calf was allotted to the Congress party by the Election Commission. The learned Counsel for the respondent stated during the course of arguments in the High Court that he confined his case only to the use of the symbol of cow and calf. The learned Counsel gave up that part of the case of the respondent wherein it had been alleged that appeals were made to the religious symbol of cow and calf by the appellant. The following proviso has now been inserted in clause (3) of Section 123 by Section 8


SCC Online Web Edition, Copyright © 2021
Page 126     Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

---

of Act 40 of 1975 :

> "Provided that no symbol allotted under this Act to a candidate shall be deemed to be a religious symbol or a national symbol for the purposes of this clause."

It is, therefore, apparent in view of the above proviso that the symbol of cow and calf which was allotted to the appellant shall not be deemed to be a religious symbol or a national symbol for the purpose of Section 123(3) of the R. P. Act. The appellant as such cannot be deemed to have committed a corrupt practice under Section 123(3) of the R. P. Act by use of the symbol of cow and calf.

**226.** In assailing the validity of Act 40 of 1975 Mr. Shanti Bhushan has referred to Section 10 of that Act, according to which the amendments made by Sections 6, 7 and 8 of the Act in the R. P. Act shall have retrospective operation, so as to apply to any election held before the commencement of the Act in respect of which an election petition is pending or in respect of which appeal from any order of the High Court is pending immediately before the commencement of Act 40 of 1975. It is urged that a change in the election law with retrospective effect strikes at the principle of free and fair elections. Retrospective operation of the amending Act, according to the learned Counsel, has the effect of condoning what was at the time it was committed a corrupt practice.

**227.** I have given the matter my earnest consideration, and am of the opinion that there is no substance in the above contention. A Legislature has, except in a matter for which there is prohibition like the one contained in Article 20(1) of the Constitution, the power to make laws which are prospective in operation as well as laws which have retrospective operation. There is no limitation on the power of the Legislature in this respect. Essentially it is a matter relating to the capacity and competence of the Legislature. Although most of the laws made by the Legislature have a prospective operation, occasions arise quite often when necessity is felt of giving retrospective effect to a law. This holds good both in respect of a principal Act as well as in respect of an amending Act. If the provisions of an Act passed by the Legislature are not violative of the provisions of the Constitution, those provisions shall have to be given effect to and the fact that the operation of the Act is prospective or retrospective would make no difference. It is also permissible to amend a law which is basis of the decision of a court with retrospective effect and rely upon the provisions of the amended law in appeal against the above decision of the court. The court of appeal in such an event gives full effect to the amended law even though such amendment has been made after the decision of the original court. The one field in which it is not permissible to make a law with retrospective effect is contained in clause (1) of Article 20, according to which no person shall be convicted of any offence except for violation of a law in force at the time of the commission of the act charged as an offence, nor be subjected to a penalty greater than that which might have been inflicted under the law in force at the time of the commission of the offence. Apart from the field in which there is a constitutional prohibition for giving retrospective effect to a law, power of making amendment in law with retrospective effect has now become a part of normal legislative process. Question then arises as to whether in spite of the general competence of the Legislature to


SCC Online Web Edition, Copyright © 2021
Page 127        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------------------------------

make a law with retrospective effect, is the Legislature rendered incompetent to make a law with retrospective effect in election matters? The answer to this question, in my opinion, should plainly be in the negative. Election laws are a part of the normal legislative process and what is permitted in the matter of ordinary legislation would also be permissible in the matter of legislation relating to elections unless there be some provision in the Constitution which forbids such a course. We have not been referred to any provision in the Constitution which has the effect of creating a bar in the way of the Legislature making a law relating to elections with retrospective operation. If a party seeks to carve out an exception to the normal rule, it can do so only on the basis of some cogent ground. No such ground has been brought to our notice. The matter indeed is not res integra because there have been two cases wherein this Court has upheld the validity of the law making amendments in election laws with retrospective effect.

**228.** The first such case was **State of Orissa** v. **Bhupendra Kumar Bose** (supra). It arose out of elections to the Cuttack Municipality held in December, 1957 to March, 1958 as a result of which 27 appellants were declared elected as councillors. The respondent, who was defeated at the elections, filed a writ petition before the High Court challenging the elections. The High Court held that the electoral rolls had not been prepared in accordance with the provisions of the Orissa Municipalities Act, 1950, as the age qualification had been published too late thereby curtailing the period of claims and objections to the preliminary roll to 2 days from 21 days as prescribed. The High Court consequently set aside the elections. The State took the view that the judgment affected not merely the Cuttack Municipality but other municipalities also. Accordingly, the Governor promulgated an Ordinance validating the elections to the Cuttack Municipality and validating the electoral rolls prepared in respect of various municipalities. The respondent thereupon filed a writ petition before the High Court contending that the Ordinance was unconstitutional. The High Court struck down the Ordinance. One of the grounds which weighed with the High Court in striking down the Ordinance was that it contravened Article 14 of the Constitution. The State and the councillors came up in appeal to this Court. It was held by this Court that the Ordinance was valid and that it successfully cured the invalidity of the electoral rolls and of elections to the Cuttack Municipality. The Ordinance was further held not to offend Article 14 of the Constitution as its object was not only to save the elections to the Cuttack Municipality but also to other municipalities whose validity might be challenged on similar grounds. The Ordinance, in the opinion of the Court, did not single out the respondent for discriminatory treatment. Gajendragadkar, J. (as he then was) speaking for the Constitution Bench of this Court observed:

> "The Cuttack municipal elections had been set aside by the High Court and if the Governor thought that in the public interest, having regard to the factors enumerated in the preamble to the Ordinance, it was necessary to validate the said elections, it would not necessarily follow that the Ordinance suffers from the vice of contravening Article 14."

It was further observed:

> "Therefore, if the infirmity in the electoral rolls on which the


SCC Online Web Edition, Copyright © 2021
Page 128      Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-----------------------------------------------------------------------------------------------------------------------

decision of the High Court in the earlier writ petition was based, had not been applicable to the electoral rolls in regard to other municipalities in the State of Orissa, then it may have been open to the Governor to issue an Ordinance only in respect of the Cuttack municipal elections, and if, on account of special circumstances or reasons applicable to the Cuttack municipal elections, a law was passed in respect of the said elections alone, it could not have been challenged as unconstitutional under Article 14. Similarly, if Mr. Bose was the only litigant affected by the decision and as such formed a class by himself, it would have been open to the Legislature to make a law only in respect of his case. But as we have already pointed out, the Ordinance does not purport to limit its operation only to the Cuttack Municipality ; it purports to validate the Cuttack municipal elections and the electoral rolls in respect of other municipalities as well. Therefore, we are satisfied the High Court was in error in coming to the conclusion that Section 4 contravenes Article 14 ·of the Constitution."

**229.** In **Kanta Kathuria** v. **Manak Chand Surana** (supra) the dispute related to the election of the appellant to the Rajasthan Legislative Assembly. The appellant in that case had been appointed as a Special Government Pleader to represent the State of Rajasthan in an arbitration case. The appellant then stood for election to the State Legislative Assembly and was declared elected. The election of the appellant was challenged inter alia on the ground that the appellant held an office of profit within the meaning of Article 191(1) of the Constitution. The High Court set aside the election of the appellant. The appellant then came up in appeal to this Court. During the pendency of the appeal, Rajasthan Act 5 of 1969 was passed declaring among others that the holder of the office of Special Government Pleader was not disqualified from being chosen or for being a member of the State Legislative Assembly. The Act was made retrospective and removed the appellant's disqualification retrospectively. On the question as to whether the appellant was holding an office of profit and hence was disqualified, Sikri, Ray and Reddy, JJ. held that the appellant was not holding an office of profit. Hidayatullah, C.J. and Mitter, J., however, held that the High Court was right in holding that the appellant held an office of profit. All the five Judges constituting the Constitution Bench were, however, unanimous on the point that the Act of 1969 had removed the disqualification of the appellant retrospectively. Hidayatullah, C.J. speaking for himself and Mitter, J. observed :

"It is also well-recognised that Parliament and Legislatures of the States can make their laws operate retrospectively. Any law that can be made prospectively may be made with retrospective operation except that certain kinds of laws cannot operate retroactively. This is not one of them.

This position being firmly grounded we have to look for limitations, if any, in the Constitution. Article 191 (which has been quoted earlier) itself recognises the power of the Legislature of the State to declare by law that the holder of an office shall not be disqualified for being chosen as a member. The article says that a person shall be disqualified if he holds an office of profit under the Government of India or the Government of any State unless that office is declared by the Legislature not to disqualify the holder. Power is thus reserved to the Legislature of the State to make the


SCC Online Web Edition, Copyright © 2021
Page 129    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source:  Supreme Court Cases

declaration.  There is nothing in the words of the article to indicate that this declaration cannot be made with retrospective effect."

It was further observed :

"Regard being had to the legislative practice in this country and in the absence of a clear prohibition either express or implied we are satisfied that the Act cannot be declared ineffective in its retrospective operation."

Sikri, J. (as he then was) speaking for himself, Ray, J. (as he then was) and Jaganmohan Reddy, J. dealt with the matter in the following words :

"Mr. Chagla, learned Counsel for the respondent, contends that the Rajasthan State Legislature was not competent 'to declare retrospectively' under Article 191(1)(a) of the Constitution.  It seems to us that there is no force in this contention.  It has been held in numerous cases by this Court that the State Legislatures and Parliament can legislate retrospectively subject to the provisions of the Constitution.  Apart from the question of fundamental rights, no express restriction has been placed on the power of the Legislature of the State, and we are unable to imply, in the context, any restriction.  Practice of the British Parliament does not oblige us to place any implied restriction.  We notice that the British Parliament in one case validated the election : [**Erskine May's Treatise on the Law, Privileges Proceedings & Usage of Parliament** — Seventeenth Edition (1964)]—

'After the general election of 1945 it was found that the persons elected for the Coatbridge Division of Lanark and the Springbourn Division of Glassgow were disqualified at the time of their election because they were members of tribunals appointed by the Minister under the Rent of Furnished Houses Control (Scotland) Act, 1943, which entitled them to a small fee in respect of attendance at a tribunal.  A Select Committee reported that the disqualification was incurred inadvertently, and in accordance with their recommendation the Coatbridge and Springbourn Elections (Validation) Bill was introduced to validate the irregular elections [H. C. Deb. (1945-46) 414, c. 564-6].  **See also** H. C. 3 (1945-46) ;  **ibid.** 71 (1945-46) and **ibid.** 92 (1945-46).'

We have also noticed two earlier instances of retrospective legislation, e.g., the House of Commons (Disqualification) Act, 1813 (**Halsbury's Statutes of England** p. 467) and Section 2 of the Re-election of Ministers Act. 1919 (**ibid.** p. 515).

Great stress was laid on the word 'declare' in Article 191(1)(a), but we are unable to imply any limitation on the powers of the Legislature from this word.  Declaration can be made effective as from an earlier date."

**230.**  The above two authorities of this Court clearly lend support for the view that it is permissible to amend a law relating to elections with retrospective operation.  Mr. Shanti Bhushan has criticised the observations of Sikri, J. reproduced above on the score that in the United Kingdom amendments in election law have not been made to affect pending proceedings in courts.  This is essentially a matter for the Legislature to decide, this does not affect the competence of the Legislature to make a change in election law with retrospective effect.


SCC Online Web Edition, Copyright © 2021
Page 130      Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------------------------------------------------------

In any case, the proposition of law laid down in the case of **Kanta Kathuria** (supra) is binding upon us and I do not find any reason to detract either from the soundness of the view expressed therein or its binding effect.

**231.** The Privy Council also upheld in the case of **Areyesekera** v. **Jayalilake**[50] an Order in Council giving retrospective effect to an election law in Ceylon. This question arose in the following circumstances. An Order in Council of 1923 made provision as to the Legislative Council in Ceylon, but reserved to His Majesty power to revoke, alter or amend the Order. The appellant, as common informer, brought an action to recover penalties under the Order from the respondent, who he alleged had sat and voted after his seat had become vacant under its provisions by reason of his having a pecuniary interest in a contract with the Government. In 1928, after the action had been brought, but before its trial, an amending Order in Council was made providing that the action should be dismissed; it also amended the Order of 1923 so as to except the office held by the respondent from its operation. It was held that the Order of 1928 was valid, having regard to the power reserved by the Order of 1923, and was an effective defence to the action, although it was retrospective in its operation. Lord Darling in the above context observed :

> "It was argued that the Order in Council of November 1, 1928, was ultra vires as affecting to take away rights already in existence, thus having a retrospective action. The effect, however, of the Order of 1928, as expressed on the face of it, was no more than an act of indemnity and relief in respect of penalties incurred. It may be true that 'not Jove himself upon the past hath power', but legislators have certain the right to prevent, alter or reverse the consequences of their own decrees. There is no necessity to give instances to prove that they have frequently done so ; even going so far as to restore the heritable quality to blood which had been deprived of its virtue by acts of attainder."

**232.** I am not impressed by the argument that retrospective operation of the relevant provisions of Act 40 of 1975 affects free and and fair elections. The said provisions of Act 40 of 1975 are general in terms and would apply to all election disputes which may be pending either in the High Court or in appeal before the Supreme Court or which may arise in future. It is no doubt true that the retrospective operation of an amending Act has the effect of placing one of the parties to the dispute in a more advantageous position compared to others but that is inevitable in most of the amendments with retrospective operation. This Court in the case of **Harbhajan Singh** v. **Mohan Singh**[51] dealt with the provisions of Section 3 of the Punjab Pre-emption (Repeal) Act, 1973, according to which on and from the date of commencement of that Act, no court shall pass a decree in any suit for pre-emption. This Court held that the above provision was also applicable to appeals which were pending at the commencement of that Act as an appeal was in the nature of a rehearing, and as such even if the suit had been decreed by the trial Court, the suit was liable to be dismissed because of the coming into force of the Punjab Pre-emption (Repeal) Act during the pendency of the appeal. It is plain that only those vendees obtained the benefit of the above Act who had filed appeals against the decree

50.   1932 AC 260.                              51.   (1974) 2 SCC 364.


SCC Online Web Edition, Copyright © 2021
Page 131      Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source:  Supreme Court Cases

-------------------------------------------------------------------------------------------------------------

awarded against them in pre-emption suit.  Vendees in other cases who did not file appeal against the decrees awarded against them in view of the then existing law had to lose the purchased property and thus be at a disadvantage.  That fact, however, did not prevent this Court from giving effect to the amendment.  Whenever a Legislature makes a law or amends a law, it has to indicate the time from which it would come into effect.  This is essentially a matter for the Legislature and the Court cannot substitute its own opinion for that of the Legislature. The fact that the change in law is made applicable to pending cases and the classification treats the decided cases as belonging to one category and pending cases as belonging to another category is not offensive to Article 14 (see **Anant Mills** v. **State of Gujarat**[52]).  Nor can the court interfere on the score of the propriety of giving retrospective effect to an amendment made in an election law.  Indeed, the question of propriety is a matter which is entirely for the Legislature to think of and decide. It cannot affect the validity of the law.  This Court in the case of **Kanta Kathuria** (supra) expressly rejected the contention that amendment in election law was void because it gave advantage to a party.  Hidayatullah, C.J. observed in this context :

> "It is true that it gave an advantage to those who stand when the disqualification was not so removed as against those who may have kept themselves back because the disability was not removed.  That might raise questions of the propriety of such retrospective legis- lation but not of the capacity to make such laws."

Likewise, Sikri, J. expressly rejected the contention that retrospective amendment in election law was bad because it was not a healthy practice and because such a course was liable to be abused in the following words :

> "The apprehension that it may not be a healthy practice and this power might be abused in a particular case are again no grounds for limiting the powers of the State Legislature."

**233.**   The above observations also provide an answer to the conten- tion of Mr. Shanti Bhushan that the provisions of the amendment made by Act 40 of 1975 can be abused.  I may state that in case the provi- sions of the amended law are abused, and some of the instances of abuse were visualized by Mr. Shanti Bhushan during the course of arguments, this Court would not be helpless in the matter.  The proper course in such an event would be to strike down the action taken under the amended law and not the law itself.

**234.**   Reference was also made by Mr. Shanti Bhushan to the effect of retrospective amendment in cases which may arise under Section 123(1) of the R. P. Act.  We are in the present case not concerned with Section 123(1) of the R. P. Act and consequently it is not necessary to express any opinion with regard to the impact of the amend- ment upon Section 123(1) of the R. P. Act.  Nor is it necessary to express opinion on the point as to whether it is permissible to make a law which has the effect of creating a corrupt practice or disqualification retrospectively and thus unseating a returned candidate as such a question does not arise in this case.

**235.**   The change in the definition of the word "candidate" to which our attention has been invited by Mr. Shanti Bhushan does not


SCC Online Web Edition, Copyright © 2021
Page 132        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-----------------------------------------------------------------------------------------------------------------------

impinge upon the process of free and fair elections. The fact that as a result of the above change, we have to take into account only the prejudicial activity of the candidate or his election agent from the date of the nomination of the candidate and not from the date he holds himself out as a candidate does not affect the process of free and fair elections. It is necessary while dealing with corrupt practice relating to elections to specify the period within which the impugned act, alleged to constitute corrupt practice should have been done. As a result of the amendment, the Legislature has fixed the said period to be as from the date of nomination instead of the period as from the date on which the candidate with the election in prospect began to hold himself out as a prospective candidate. It is common experience that the date from which a candidate holds himself out as a prospective candidate is often a matter of controversy between the parties. The result is that an element of indefiniteness and uncertainty creeps in in finding the date from which a person can be said to be candidate. As a result of the change in the definition of candidate, the Legislature has fixed a definite date, viz., that of nomination, instead of the earlier time which had an element of indefiniteness and uncertainty about it for finding as to when a person became a candidate. Certainty is an essential desideratum in law and any amendment of law to achieve that object is manifestly a permissible piece of legislation. The choice of date was a matter for the Legislature to decide and the court cannot substitute its own opinion for that of the Legislature in this respect, more so, when whatever be the choice of date, has aspects of both pros and cons. The date of nomination is normally, as in the present case, about a month before the date of polling and it is plain that most of the acts of corrupt practice are committed during this period. In any case, as mentioned above, the court cannot substitute its own opinion for that of the Legislature in the choice of date. The choice of date, as observed in the case of **Union of India** v. **M/s. Parameswaran Match Works**[53] as a basis for classification cannot always be dubbed as arbitrary even if no particular reason is forthcoming for the choice unless it is shown to be capricious or whimsical in the circumstances. When it is seen that a line or a point there must be and there is no mathematical or logical way of finding it precisely, the decision of the Legislature or its delegate must be accepted unless we can say that it is very wide of any reasonable mark.

**236.** One of the objects of the change effected by Act 40 of 1975 is to remove the uncertainty and set at rest the controversy as to what would be the precise date of a person in the service of the Central Government ceasing to be in such service in case he tenders his resignation. The amended law makes it clear that where the date of taking effect of the resignation is stated in the publication in the Official Gazette, it shall be that date. Similarly, in the case of appointment of a person, the date of taking effect of such appointment shall be the date mentioned in the publication in the Official Gazette in case such a date is stated in such publication. The fact that the new provision creates a conclusive presumption with regard to the date of taking effect of appointment or resignation does not mean, as is sought to be argued on behalf of the respondent, that there has been an encroachment by the Legislature upon the judicial sphere. Laying down a rule of conclusive presumption in a statute with a view to remove uncertainty with regard to the date of the

53. AIR 1974 SC 2349 : (1975) 1 SCC 305, 311.



SCC Online Web Edition, Copyright © 2021
Page 133    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------

taking effect of appointment or resignation of a government employee cannot be characterised as an assumption of judicial power by the Legislature. Another object of the change effected by Act 40 of 1975 is that a candidate who is bound, in view of para 8 of the Election Symbols (Reservation and Allotment) Order, 1968 to use the party symbol allotted by the Election Commission and who cannot use any other symbol, shall not suffer and be guilty of corrupt practice under Section 123(3) of the R. P. Act because of the use of that symbol. It is to be assumed that Election Commission which is an independent body, would act fairly and properly and would not allot a symbol, which is a religious symbol, to a party or a candidate. The fact that the allotted symbol was one of those suggested by the party concerned would not relieve the Election Commission of its duty to see that it does not allot a religious symbol to that party. Assuming that the Election Commission makes an error of judgment in this respect and allots a symbol which, in fact, is a religious symbol, the object of the new provision is that a candidate should not be penalised because of such an error on the part of the Election Commission. The third object of the change effected by Act 40 of 1975 is that a candidate should not suffer or be held guilty of corrupt practice because of any act done by any person in the service of the Government and belonging to any of the classes mentioned in Section 123(7) of the R. P. Act in the discharge or purported discharge of his official duty. None of the three objects mentioned above has any taint of unconstitutionality and I find it difficult to hold that the impugned provisions impinge upon the principle of free and fair elections.

**237.** So far as the newly added proviso to Section 123(7) is concerned, it may be stated that the act in the discharge or purported discharge of official duty of the government employees referred to above would in the very nature of things have to be of a kind which is germane to their official duties. It may include steps taken by the government employees for maintenance of law and order or in connection with the security of a candidate or other persons. It would not, however, include canvassing or doing such acts which may properly be considered to be part of the election propaganda for furtherance of the prospects of a candidate's election. In taking action under the above provision, it must be borne in mind as stated on page 152 of **Free Elections** by W. J. M. Mackenzie that in the last resort

> "the system of free elections depends on a certain separation of powers between administrators (or policemen) and politicians : there must be some public sense that police and administration serve the public, not the party leaders."

What would be permissible under the above provision would be that which is conceived to be done in public interest and not something conceived to be done in the personal interest of a candidate. In spite of some difficulty which may arise in borderline cases, this distinction must be borne in mind. If, however, because of doing something conceived in public interest, e.g., as in the present case the security arrangement for the person holding the office of the Prime Minister, some advantage may also possibly accrue to a candidate, it will have to be regarded as incidental and would not detract from action taken under the above provision being in public interest. As against that, any action taken with a view to further the personal interest of a candidate should not be allowed to be camouflaged as an action taken in public interest. Care must be taken to

SCC Online Web Edition, Copyright © 2021
Page 134    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

ensure that public interest is not allowed to degenerate into a cloak for furtherance of the personal interests of a candidate in an election. The discharge or purported discharge of official duty must necessarily have public interest and not the personal interest of a candidate as its basis. The courts while dealing with the newly added proviso to Section 123(7) should construe it, if reasonably possible, in such a manner as would sustain the validity of that proviso. In case there is abuse of the above provision, the proper course, as already mentioned, would be to strike down the action taken under the proviso and not the proviso itself.

**238.** One other change brought about by Act 40 of 1975 is the addition of an explanation in Section 77 of the R. P. Act. According to the new explanation, any expenditure incurred in respect of any arrangements made, facilities provided or any other act or thing done by any person in the service of the Government and belonging to any of the classes mentioned in clause (7) of Section 123 in the discharge or purported discharge of his official duty as mentioned in the proviso to that clause shall not be deemed to be expenditure in connection with the election incurred or authorized by a candidate or by his election agent for the purposes of Section 77(1). The validity of the above explanation in a great measure is linked with the validity of the new proviso to Section 123(7) of the R. P. Act, and for the reasons stated for upholding the proviso to Section 123(7), the new explanation to Section 77, it seems, may have also to be upheld. It is not necessary to dilate upon this aspect because even without invoking the aid of the new explanation to Section 77, the High Court has found, and I see no reason to disturb that finding, that the total expenses incurred by the appellant were less than the prescribed limit.

**239.** Argument has also been advanced that validity of Act 40 of 1975 cannot be assailed on the ground that it strikes at the basic structure of the Constitution. Such a limitation, it is submitted, operates upon an amendment of the Constitution under Article 368 but it does not hold good when Parliament enacts a statute in exercise of powers under Article 245 of the Constitution. In view of my finding that the provisions of Act 40 of 1975 with which we are concerned have not been shown to impinge upon the process of free and fair elections and thereby to strike at the basic structure of the Constitution, it is not necessary to deal with the above argument. I would, therefore, hold that the provisions of Act 40 of 1975 with which we are concerned are valid and do not suffer from any constitutional infirmity.

**240.** We may now deal with Cross Appeal No. 909 of 1975. Mr. Shanti Bhushan has not pressed the challenge to the findings of the High Court on issues Nos. 4 and 7. He has, however, assailed the finding of the High Court on issue No. 9 whereby the High Court held that the appellant incurred an expenditure of Rs. 31,976·47 on her election as against the prescribed limit of Rs. 35,000. In Ex. 5, return of her election expenses, the appellant showed her total election expenses to be Rs. 12,892·97. The respondent in para 13 of the election petition alleged that the appellant and her election agent had incurred expenditure much beyond the prescribed limit of Rs. 35,000 and thereby committed corrupt practice under Section 123(6) of the R. P. Act. The respondent gave some items of the expenditure which were alleged to have been incurred by the appellant and her election agent but were not shown in the return


SCC Online Web Edition, Copyright © 2021
Page 135      Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------------------------------------------------

of the election expenses. The material items with which we are now concerned were as under :

|  |  |  |
|---|---|---|
| (i) | The hiring charges of the vehicles specified in para 13(1)       .. .. .. | over Rs. 1,28,700 |
| (ii) | Cost of petrol and diesel for the vehicles specified in para 13(1)       .. .. | over Rs.  43,230 |
| (iii) | Payments made to the drivers of vehicles specified in para 13(1)       .. .. | over Rs.   9,900 |
| (iv) | Repairing and servicing charges of vehicles specified in para 13(1)       .. .. | over Rs.   5,000 |
| (v) | Payments made to the workers engaged for the purpose of election propaganda       .. | over Rs.   6,600 |
| (vi) | Expenses on the erection of rostrums for the public meetings addressed by the appellant in the constituency on February 1 and 25, 1971       .. .. | over Rs. 1,32,000 |
| (vii) | Expenses on arrangement of loudspeakers for the various election meetings of the appellant addressed on February 1 and 25, 1971       .. .. .. | over Rs.   7,000 |
| (viii) | Expenses on motor transport for the conveyance of the appellant and her party to the place of her election meetings on February 1 and 25, 1971       .. | over Rs.   2,000 |

The High Court held that the respondent had failed to prove the first five items. As regards the expenses for the erection of rostrums for the public meetings addressed by the appellant on February 1 and 25, 1971, the High Court found that four meetings were addressed by the appellant in the constituency on February 1 and six meetings on February 25, 1971. The cost of a rostrum in each meeting came to Rs. 1,600. The total expenses of the ten rostrums thus came to Rs. 16,000 and the same, it was held, was liable to be added to the amount shown in the return of election expenses of the appellant. The amount of Rs. 16,000 included the money paid by the District Congress Committee as its share of the cost of rostrums. Regarding the expenses of loudspeakers, the High Court found that the total expense of Rs. 800 had been incurred on the installation of loudspeakers in the meetings addressed by the appellant on February 1 and 25, 1971. In addition to that, the High Court added Rs. 1,151 as cost of energy supplied for the functioning of the loudspeakers. The total amount which was added to the election expenses of the appellant on account of the loudspeakers thus came to Rs. 1,951. An amount of Rs. 232·50 was found by the High Court to have been incurred by the appellant for her transport on February 1 and 25, 1971. Adding the aggregate of Rs. 16,000, Rs. 1,951 and Rs. 232·50, in all Rs. 18,183·50, to the figure of Rs. 12,892·97 which had been shown by the appellant in her return, the total expense incurred by the appellant on her election was found by the High Court to be Rs. 31,976·47.

**241.** In appeal before us Mr. Shanti Bhushan has assailed the finding of the High Court in so far as the High Court has not accepted the case of the respondent that the appellant incurred expenses on the


SCC Online Web Edition, Copyright © 2021
Page 136      Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------

cost of hiring, petrol and the salary of the drivers for 23 vehicles. It may be mentioned that the respondent in para 13 of the election petition referred to 32 vehicles which were alleged to have been hired by the appellant, but both before the High Court and in appeal before us, learned Counsel for the respondent has confined his argument to 23 vehicles.

**242.** To appreciate the point of controversy between the parties, it may be necessary to set out some material facts. Section 160 of the R. P. Act provides inter alia that if it appears to the State Government that in connection with an election held within the State, any vehicle is needed or is likely to be needed for the purpose of transport of ballot boxes to or from any polling station, or transport of members of the police force for maintaining order during the conduct of such election, or transport of any officer or other person for performance of any duties in connection with such election, the Government may by order in writing requisition such vehicle, provided that no vehicle which is being lawfully used by a candidate or his agent for any purpose connected with the election of such candidate shall be requisitioned until the completion of the poll at such election. It appears that 23 vehicles, described at some places as cars and at other places as jeeps, were requisitioned by the district authorities Rae Bareli for election purposes under the above provision. On February 23, 1971 Dal Bahadur Singh, who was the President of the District Congress Committee, Rae Bareli, addressed a letter to the District Officer, Rae Bareli, praying that the above mentioned 23 vehicles, of which the numbers were given, had been taken by the District Congress Committee, Rae Bareli, for the parliamentary constituencies of Rae Bareli, Amethi and Ram Sanehi Ghat. There are, it may be stated, seven assembly constituencies in Rae Bareli district. Out of them, five assembly constituencies constitute Rae Bareli parliamentary constituency. One of the assembly constituencies in Rae Bareli district is part of Ram Sanehi Ghat parliamentary constituency, while the seventh assembly constituency is part of Amethi parliamentary constituency. On February 24, 1971, a reply was sent on behalf of the District Election Officer to Dal Bahadur Singh regarding the latter's request for release of 23 vehicles. It was pointed out in the reply that it was not possible to release the vehicles in favour of any party for election purposes. At the same time, it was mentioned that the question of releasing of the vehicles could be considered at the request of a candidate or his election agent. On receipt of the above reply, Dal Bahadur Singh sent the same to Yashpal Kapur on February 24, 1971 along with note A43, the material part of which reads as under :

> "You are requested to kindly write a letter with your recommendation to the Election Officer so that the cars taken by the District Congress Committee may be released. I have tried to find out Shri Vidyadhar Vajpayee who is contesting the election from Amethi parliamentary constituency and Shri Baiznath Kureel who is contesting the election from Ram Sanehi parliamentary constituency, but they are not available. You are, therefore, requested to write the above letter to the District Election Officer positively so that the election work of all the three parliamentary constituencies which is going on, on behalf of District Congress Committee, may not suffer."

On February 25, 1971 Yashpal Kapur addressed a letter to the District Officer, Rae Bareli, stating that the 23 vehicles in question had been


SCC Online Web Edition, Copyright © 2021
Page 137    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

----------------------------------------------------------------------------------------------------------------------

taken by the District Congress Committee, Rae Bareli, for the three parliamentary constituencies of Rae Bareli, Amethi and Ram Sanehi Ghat. The District Officer was requested to release the 23 vehicles without delay. Yashpal Kapur also enclosed with that letter the note of Dal Bahadur Singh. The 23 vehicles, it would appear, were thereafter released by the District Election Officer. The appellant, in para 17(b) of her written statement, admitted that those 23 vehicles were used by the District Congress Committee, Rae Bareli for election work in the three parliamentary constituencies of Rae Bareli, Amethi and Ram Sanehi Ghat. The High Court, in not accepting the case of the respondent in respect of the 23 vehicles, observed that there was nothing to show that the above mentioned vehicles had been obtained on hire or were obtained gratis. There was also, according to the High Court, no cogent material to show that the said vehicles had been engaged and used in connection with election work of the appellant.

**243.** Mr. Shanti Bhushan, while assailing the finding of the High Court, has submitted that, as five out of the seven assembly constituencies in Rae Bareli district were in Rae Bareli parliamentary constituency, five-seventh of the expenses incurred on the said 23 vehicles should be added to the election expenses of the appellant. I find it difficult to accede to the above submission because of the paucity of the material on record. There is no cogent evidence to show that the 23 vehicles in question were used for the election of the appellant. It is no doubt true that the said 23 vehicles were used by the District Congress Committee, Rae Bareli for election work in the three parliamentary constituencies, viz., Rae Bareli, Amethi and Ram Sanehi Ghat. The record is, however, silent on the point as to what extent they were used in Rae Bareli parliamentary constituency. One can in the above context visualise three possibilities :

(i) As the appellant, who was the Prime Minister of the country, was contesting from Rae Bareli constituency, the District Congress Committee concentrated its attention on that constituency and used the 23 vehicles mostly for the election work in that constituency.

(ii) As the appellant had a mass appeal the District Congress Committee office bearers thought that the Rae Bareli constituency was very safe and, therefore, concentrated attention on the other two parliamentary constituencies and used the 23 vehicles mostly for those two constituencies.

(iii) Equal attention was paid to all the three constituencies and there was proportionate use of the vehicles for the three constituencies.

Mr. Shanti Bhushan would have us to accept the first or the third possibility and would rule out the second. If so, it was, in my opinion, essential for the respondent to lead some evidence regarding the use of the 23 vehicles. He did nothing of the kind. Neither the owners nor the drivers of those vehicles were examined as witnesses. There was also, as mentioned earlier, no other cogent evidence to show that those vehicles or any of them were used for the appellant's election in the Rae Bareli constituency, and if so, to what extent. The respondent himself did not come into the witness box to substantiate the charge against the appellant regarding the use of the 23 vehicles. The fact that Dal Bahadur Singh was not examined as a witness on behalf of the appellant would not warrant the filling in of the gaps and lacunae in the evidence adduced by the respondent by a process akin to guess work. It is no doubt true


® SCC Online Web Edition, Copyright © 2021
Page 138        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
True Print™

-----------------------------------------------------------------------------------------------------

that by using a vehicle for the furtherance of the prospects of candidates in more than one constituency one should not be allowed to circumvent the salutary provisions of the R. P. Act in this respect. To prevent such circumvention, it is essential that evidence should be led to show as to what was the extent of the user of the vehicle in the constituency concerned. In **Hans Raj** v. **Pt. Hari Ram**[54] a jeep hired by the Congress Committee during elections was used in more than one constituency, including that of the returned candidate who was a Congress nominee. Question arose as to whether the expense incurred in connection with that jeep could be included in the election expenses of the returned candidate. While answering the question in the negative, Hidayatullah, C.J. observed :

> "The bill stands in the name of the Congress Committee and was presumably paid by the Congress Committee also. The evidence, however, is that this jeep was used on behalf of the returned candidate and to that extent we subscribe to the finding given by the learned Judge. Even if it be held that. the candidate was at bottom the hirer of the jeep and the expenditure on it must be included in his account, the difficulty is that this jeep was used also for the general Congress propaganda in other constituencies. As we stated, the jeep remained in Chalet and at Mubarakpur. No doubt Chalet is the home town of the returned candidate and his office was situated at Mubarakpur but that does not indicate that the jeep was used exclusively on his account. The petrol chart shows that petrol was bought at several pumps, both inside the constituency and outside. This shows, as does the evidence, that the jeep was used not only in this constituency but also in the other constituencies. If this be true, then, it is almost impossible on the evidence as it exists in this case to decide how much of the use went for the benefit of the returned candidate and  how much for the use of candidates in the other constituencies also put up by the Congress Committee. In this situation it is difficult to say that the whole of the benefit of the jeep went to the returned candidate and once we hold that the entire benefit did not go to him, we are not in a position to allocate the expenses between him and the other candidates in the other constituencies."

**244.** Reference has also been made during the course of arguments by Mr. Shanti Bhushan to some entries in a register of the Congress Committee. The High Court declined to place any reliance on those entries as those entries had not been proved. I see no cogent ground to take a different view. Our attention has been invited by Mr. Shanti Bhushan to a report in issue dated January 22, 1971 of **Swatantra Bharat** wherein there was a reference to the Personal Secretary of the Prime Minister having reached Rae Bareli with a caravan of 70 motor vehicles. No reliance can be placed upon that report as the correspondent who sent that report was not examined as a witness.

**245.** The other difficulty which I find in accepting the submission of Mr. Shanti Bhushan in respect of 23 vehicles is that there is no evidence to show that any payment was made for the use of the above mentioned vehicles. There is also nothing to show that those vehicles were engaged on hire. As mentioned earlier, the owners and drivers of those vehicles were not examined as witnesses. I, therefore, find no

---

54. 40 ELR 125 (SC).


SCC Online Web Edition, Copyright © 2021
Page 139    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------------------------------

sufficient ground to interfere with the finding of the High Court in respect of the above mentioned 23 vehicles.

**246.** Mr. Shanti Bhushan has next assailed the finding of the High Court in so far as it has held that the respondent has failed to prove that the appellant incurred an expense of Rs. 6,600 on workers engaged for the purposes of election propaganda. I, however, find no infirmity in the finding of the High Court in this respect as there is no cogent evidence whatsoever that any expense was incurred for engaging workers for the election work of the appellant. The case of the appellant is that her workers did the work voluntarily and without receipt of any remuneration.

**247.** Apart from challenging the findings of the High Court in respect of 23 vehicles and the alleged payment to workers, Mr. Shanti Bhushan has also referred to some other circumstances with a view to show that the election expenses of the appellant exceeded the prescribed amount of Rs. 35,000. It has been pointed out that a cheque for Rs. 70,000 was sent by the Provincial Congress Committee to Dal Bahadur Singh, President of the District Congress Committee, Rae Bareli, and the same was credited in Dal Bahadur Singh's account after deducting of the bank charges on March 4, 1971. Dal Bahadur Singh withdrew out of that amount Rs. 40,000 and Rs. 25,000 on March 4 and 6, 1971, respectively nearabout the days of polling. It is urged that the said amount must have been spent for the purpose of the elections. There was no reference to the said amount of Rs. 70,000 in the petition. There is also no reference to the amount of Rs. 70,000 in the judgment of the High Court or in the grounds of appeal. As such, I am of the view that the respondent should not be allowed to set up a case against the appellant on the basis of the bank entries in the account of Dal Bahadur Singh. Reference has further been made by Mr Shanti Bhushan to the expenses which were alleged to have been incurred on the telephone charges and the meetings addressed by Yashpal Kapur. The High Court rejected the submission in this respect on behalf of the respondent in the following words :

> "Learned Counsel for the petitioner urged that from the evidence on record, it transpires that expenditure was also incurred on the telephone connection and telephone charges ; on the meetings addressed by Sri Yashpal Kapur within the constituency during the period of election ; on the election material viz., pamphlets, posters, etc. and on the lighting arrangements made for some meetings addressed by the respondent No. 1. According to learned Counsel, these expenses are also liable to be added to the election expenses of the respondent No. 1. None of these expenses were, however, pleaded in the petition. In fact, till the commencement of the arguments in the case, the respondent No. 1 could not even anticipate that the petitioner shall rely on these expenses for the purpose of his case. It will, therefore, be prejudicial to the interest of respondent No. 1 if the aforesaid expenses are taken into consideration. The submission made by learned Counsel for the petitioner is accordingly negatived."

I am in full agreement with the above observations of the High Court and find no cogent ground to take a different view.

**248.** It may be stated that in view of the new explanation added to Section 77 of the R. P. Act by Act 40 of 1975, the amount of

SCC Online Web Edition, Copyright © 2021
Page 140      Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------

Rs. 12,000 which represented 75 per cent of the expenditure incurred on the construction of 10 rostrums borne by the Government, cannot be included in the total election expenses of the appellant. The High Court was also inclined to hold that the said amount of Rs. 12,000 could not be included in the appellant's expenses. The High Court, however, included the total amount of Rs. 16,000 in the election expenses of the appellant upon the assumption that the appellant had not disavowed that expenditure. Be that as it may, the fact remains that the High Court has found on issue No. 9 that the total expenses incurred by the appellant on her election have not been shown to exceed the prescribed limit. I find no cogent reason to interfere with that finding.

**249.** I also agree with the High Court that as the election expenses of the appellant have not been shown to exceed the prescribed limit of Rs. 35,000, the question of invoking and going into the validity of Act 58 of 1974 does not arise. Nor is it necessary to express an opinion about the view taken in **Kanwarlal** v. **Amarnath Chawla**[55] in view of the fact that even after applying the rule laid down in that case, the total election expense of the appellant has not been shown to exceed the prescribed limit.

**250.** So far as the finding of the High Court on issue No. 6 regarding the use of the symbol of cow and calf is concerned, the matter, as already discussed earlier, is now covered by the amendment made in Section 123(3) of the R. P. Act by Section 8 of Act ·40 of 1975.

**251.** There was a controversy during the course of arguments on the point as to whether I have laid down in my judgment in **Kesavananda Bharati's case** (supra) that fundamental rights are not a part of the basic structure of the Constitution. As this controversy cropped up a number of times, it seems apposite that before I conclude I should deal with the contention advanced by learned Solicitor General that according to my judgment in that case no fundamental right is part of the basic structure of the Constitution. I find it difficult to read anything in that judgment to justify such a conclusion. What has been laid down in that judgment is that no article of the Constitution is immune from the amendatory process because of the fact that it relates to a fundamental right and is contained in Part III of the Constitution. It was also held that a constitutional amendment under Article 368 does not constitute "law" as mentioned in Article 13. I also did not agree with the view taken in the case of **Golaknath**[56] that there was a limitation on the power of Parliament to amend the provisions of Part III of the Constitution so as to abridge or take away the fundamental rights. I thereafter dealt with the scope of the power of amendment under Article 368 and the connotation of the word "amendment" and said in this context : (SCC p. 767, para 1426)

> "I am further of the opinion that amendment of the Constitution necessarily contemplates that the Constitution has not to be abrogated but only changes have to be made in it. The word 'amendment' postulates that the old Constitution survives without loss of identity despite the change and continues even though it has been subjected to alterations. As a result of the amendment, the old Constitution cannot be destroyed and done away with ; it is retained though in the amended form. What then is meant by the retention of the old

55.  (1975) 3 SCC 646.                    56.  (1967) 2 SCR 762 : AIR 1967 SC 1643.


SCC Online Web Edition, Copyright © 2021
Page 141    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

Constitution? It means the retention of the basic structure or framework of the old Constitution. A mere retention of some provisions of the old Constitution even though the basic structure or framework of the Constitution has been destroyed would not amount to the retention of it the old Constitution. Although it is permissible under the power of amendment to effect changes, howsover important, and to adapt the system to the requirements of changing conditions, it is not permissible to touch the foundation or to alter the basic institutional pattern. The words 'amendment of the Constitution' with all their wide sweep and amplitude cannot have the effect of destroying or abrogating the basic structure or framework of the Constitution. It would not be competent under the garb of amendment, for instance, to change the democratic government into dictatorship or hereditary monarchy nor would it be permissible to abolish the Lok Sabha and the Rajya Sabha. The secular character of the State according to which the State shall not discriminate against any citizen on the ground of religion only cannot likewise be done away with. Provision regarding the amendment of the Constitution does not furnish a pretence for subverting the structure of the Constitution nor can Article 368 be so construed as to embody the death-wish of the Constitution or provides sanction for what may perhaps be called its lawful harakiri. Such subversion or destruction cannot be described to be amendment of the Constitution as contemplated by Article 368."

It was further observed by me : (SCC p. 770, para 1435)

"The word 'amendment' in Article 368 must carry the same meaning whether the amendment relates to taking away or abridging fundamental rights in Part III of the Constitution or whether it pertains to some other provision outside Part III of the Constitution. No serious objection is taken to repeal, addition or alteration of provisions of the Constitution other than those in Part III under the power of amendment conferred by Article 368. The same approach, in my opinion, should hold good when we deal with amendment relating to fundamental rights contained in Part III of the Constitution. It would be impermissible to differentiate between scope and width of power of amendment when it deals with fundamental rights and the scope and width of that power when it deals with provisions not concerned with fundamental rights.

It would appear from the above that no distinction was made by me so far as the ambit and scope of the power of amendment is concerned between a provision relating to fundamental rights and provisions dealing with matters other than fundamental rights. The limitation inherent in the word "amendment" according to which it is not permissible by amendment of the Constitution to change the basic structure of the Constitution was to operate equally on articles pertaining to fundamental rights as on other articles not pertaining to those rights. This was further made clear by the following observations on page 688 : (SCC p. 769, para 1434)

"Subject to the retention of the basic structure or framework of the Constitution, I have no doubt that the power of amendment is plenary and would include within itself the power to add, alter or repeal the various articles including those relating to fundamental rights."

Proposition (vii) of the summary of my conclusions on page 758 of the


SCC Online Web Edition, Copyright © 2021
Page 142    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------

116                      SUPREME COURT CASES              1975 Supp SCC

judgment also bears it out and the same reads as under: (SCC
p. 824, para 1537)

"(vii) The power of amendment under Article 368 does not include
power to abrogate the Constitution nor does it include the power
to alter the basic structure or framework of the Constitution.
Subject to the retention of the basic structure or framework
of the Constitution, the power of amendment is plenary and includes
within itself the power to amend the various articles of the Constitu-
tion, including those relating to fundamental rights as well as those
which may be said to relate to essential features. No part of a
fundamental right can claim immunity from amendatory process by
being described as the essence or core of that right. The power
of amendment would also include within itself the power to add,
alter or repeal the various articles."

**252.** It has been stated by me on page 685 (SCC p. 767) of the
judgment (already reproduced above) that the secular character of the
State, according to which the State shall not discriminate against any
citizen on the ground of religion only cannot likewise be done away with.
The above observations show that the secular character of the Constitution
and the rights guaranteed by Article 15 pertain to the basic structure
of the Constitution. The above observations clearly militate against the
contention that according to my judgment fundamental rights are not a
part of the basic structure of the Constitution. I also dealt with the
matter at length to show that the right to property was not a part of
the basic structure of the Constitution. This would have been wholly
unnecessary if none of the fundamental rights was a part of the basic
structure of the Constitution.

**253.** Before parting with this case I must acknowledge the assistance
we received from the learned Counsel for the parties as also from
learned Attorney General and Solicitor General in resolving the points
of controversy. In spite of the political overtones, the case was argued
forcefully yet without generating any heat and in an atmosphere of
befitting calmness. It has been said by Holmes, J. that great cases like
hard cases make bad law. For great cases are called great, not by
reason of their real importance in shaping the law of the future, but
because of some accident of immediate overwhelming interest, which
appeals to the feelings and distorts the judgment. These immediate interests
exercise a kind of hydraulic pressure (**National Securities Co.** v. **U. S.**[57]).
It, therefore, became essential to rid the case of all the embellishments
resulting from the political overtones and to bring it to a level which
is strictly judicial, so that the various constitutional and legal aspects
of the matter may be examined in a dispassionate atmosphere. Learned
Counsel for the parties made a significant contribution towards the attain-
ment of this objective. It may not be inappropriate in the above context
to reproduce what was said by one of us (Khanna, J.) in **Kesavananda
Bharati's case** (supra) at page 755 : (SCC p. 821, para 1535)

"That all constitutional interpretations have political consequences
should not obliterate the fact that the decision has to be arrived at
in the calm and dispassionate atmosphere of the court room, that
judges in order to give legitimacy to their decision have to keep aloof
from the din and controversy of politics and that the fluctuating

57. (1904) 193 US 197, 400-1.


SCC Online Web Edition, Copyright © 2021
Page 143    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------------------------------------------

fortunes of rival political parties can have for them only academic interest. Their primary duty is to uphold the Constitution and the laws without fear or favour and in doing so, they cannot allow any political ideology or economic theory, which may have caught their fancy, to colour the decision."

**254.** As a result of the above, I accept Appeal No. 887 of 1975 filed by Shrimati Indira Nehru Gandhi, set aside the judgment of the High Court in so far as it has found the appellant guilty of corrupt practice under Section 123(7) of the R. P. Act and has declared her election to the Lok Sabha to be void. The order that the appellant shall accordingly stand disqualified for a period of six years as provided in Section 8A would also consequently be set aside. The election petition filed by the respondent shall stand dismissed. Appeal No. 909 of 1975 filed by Shri Raj Narain is dismissed. Looking to all the circumstances, more particularly the fact that the election petition filed by the respondent is being dismissed because of changes made in law during the pendency of the appeal, the parties are directed to bear their own costs throughout.

MATHEW, J. (*concurring*)—In the election petition filed by the respondent in Civil Appeal No. 887 of 1975 (hereinafter referred to as 'respondent'), seven charges of corrupt practice were made against the appellant therein (hereinafter called the 'appellant') and it was prayed that the election of the appellant be set aside. The learned Judge who tried the petition found that two of the charges had been made out but that the rest of the charges were not substantiated. He set aside the election of the appellant with the result that the appellant incurred the disqualification for a period of six years as visualized in Section 8A of the Representation of the People Act, 1951. It is against this judgment that Civil Appeal No. 887 of 1975 has been filed.

**256.** The respondent has filed a cross appeal (Civil Appeal No. 909 of 1975) challenging the findings of the High Court in respect of the other charges of corrupt practice.

**257.** During the pendency of these appeals, the Parliament passed the Election Laws (Amendment) Act, 1975 on August 6, 1975 by which certain amendments were made in the provisions of the Representation of the People Act, 1951, and the Indian Penal Code.

**258.** On August 10, 1975, the Parliament, in the exercise of its constituent power, passed the Constitution (Thirty-ninth Amendment) Act, 1975 (hereinafter referred to as the 'Amendment'). By the amendment, Article 71 of the Constitution was substituted by a new article and that article provided by clause (1) that, subject to the provisions of the Constitution, Parliament may, by law, regulate any matter relating to or connected with the election of a President or Vice-President, including the grounds on which such election may be questioned. By clause (2) of the article it was provided that all doubts and disputes arising out of or in connection with the election of a President or Vice-President shall be inquired into and decided by such authority or body in such manner as may be provided for by or under any law referred to in clause (1). Clause (3) stated that the validity of any such law referred to in clause (1) and the decision of any authority or body under such law shall not be called in question in any court.


SCC Online Web Edition, Copyright © 2021
Page 144     Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------------------------------------------------

**259.** By clause (4) of the amendment, Article 329-A was inserted reading as follows :

"**329-A. Special provision as to elections to Parliament in the case of Prime Minister and Speaker.**—(1) Subject to the provisions of Chapter II of Part V [except sub-clause (e) of clause (1) of Article 102], no election—

(a) to either House of Parliament of a person who holds the office of the Prime Minister at the time of such election or is appointed as Prime Minister after such election ;

(b) to the House of the People of a person who holds the office of a Speaker of that House at the time of such election or who is chosen as the Speaker for that House after such election ;

shall be called in question except before such authority [not being any such authority as is referred to in clause (b) of Article 329] or body and in such manner as may be provided for by or under any law made by Parliament and any such law may provide for all other matters relating to doubts and disputes in relation to such election including the grounds on which such election may be questioned.

(2) The validity of any such law as is referred to in clause (1) and the decision of any authority or body under such law shall not be called in question in any court.

(3) Where any person is appointed as Prime Minister or, as the case may be, chosen to the office of the Speaker of the House of the People, while an election petition referred to in clause (b) of Article 329 in respect of his election to either House of Parliament or, as the case may be, to the House of the People is pending, such election petition shall abate upon such person being appointed as Prime Minister or, as the case may be, being chosen to the office of the Speaker of the House of the People, but such election may be called in question under any such law as is referred to in clause (1).

(4) No law made by Parliament before the commencement of the Constitution (Thirty-ninth Amendment) Act, 1975, in so far as it relates to election petitions and matters connected therewith shall apply or shall be deemed ever to have applied to or in relation to the election of any such person as is referred to in clause (1) to either House of Parliament and such election shall not be deemed to be void or ever to have become void on any ground on which such election could be declared to be void, or has, before such commencement, been declared to be void under any such law and notwithstanding any order made by any court, before such commencement, declaring such election to be void, such election shall continue to be valid in all respects and any such order and any finding on which such order is based shall be and shall be deemed always to have been void and of no effect.

(5) Any appeal or cross appeal against any such order of any court as is referred to in clause (4) pending immediately before the commencement of the Constitution (Thirty-ninth Amendment) Act, 1975 before the Supreme Court shall be disposed of in conformity with the provisions of clause (4).

(6) The provisions of this article shall have effect notwithstanding anything contained in this Constitution."

**260.** The respondent contended that clause (4) of Article 329A [hereinafter referred to as 'clause (4)'] is invalid for the reason that some of the basic structures of the Constitution have been damaged by its enactment.


SCC Online Web Edition, Copyright © 2021
Page 145      Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-------------------------------------------------------------------------------------------------

INDIRA NEHRU GANDHI *v.* RAJ NARAIN (*Mathew, J.*)      119

**261.** The argument was that although the amending body could declare that the election of the appellant shall not be deemed to be void and the judgment of the High Court to be void on the basis that no law relating to election petition and matters connected therewith would apply to the election, yet the amending body could not have held the election to be valid as it did not ascertain the facts relating to the election and apply the relevant law to them. Counsel submitted that by its very nature, an election dispute in a democratic system of government raises questions which can be decided only by the exercise of judicial power ; that by retrospectively rendering the forum for investigation into the complaints regarding the validity of the election of the appellant *coram non judice*, and by the amending body judging its validity without ascertaining the facts and applying the relevant law, the amendment has fundamentally damaged an essential feature of the democratic structure of the Constitution, namely, free and fair election.

**262.** Counsel also submitted that equality and rule of law are essential features of democracy ; that clause (4), by dispensing with the application of the law relating to election petition and matters connected therewith to the appellant, made an unreasonable classification among persons similarly situated with reference to the purpose of the law.

**263.** The further submission was, that separation of powers is a basic structure of the Constitution and that if it be supposed that the amending body ascertained the facts regarding the election of the appellant and applied the relevant law, the exercise of that power by the amending body would offend the doctrine of separation of powers and that, at any rate, this process would not result in an amendment of the Constitution by enacting a law, but only in the passing of a judgment or sentence which can never be characterized as a law, let alone a law relating to the Constitution of India.

**264.** In *His Holiness Kesavananda Bharati Sripadagalavaru* v. *State of Kerala*[58] (hereinafter referred to as '*Bharati's case*'), a majority of seven judges held that the power conferred under Article 368 of the Constitution was not absolute. They took the view that, by an amendment, the basic structure of the Constitution cannot be damaged or destroyed. And, as to what are the basic structures of the Constitution, illustrations have been given by each of these judges. They include supremacy of the Constitution, democratic republican form of government, secular character of the Constitution, separation of powers among the Legislature, Executive and Judiciary, the federal character of the Constitution, rule of law, equality of status and of opportunity ; justice, social, economic and political ; unity and integrity of the nation and the dignity of the individual secured by the various provisions of the Constitution. There was consensus among these judges that democracy is a basic structure of the Constitution. I proceed on the assumption that the law as laid down by the majority in that case should govern the decision here, although I did not share the view of the majority.

**265.** Therefore, if by clause (4), any essential feature of the democratic republican structure of our polity as visualized by the Constitution has been damaged or destroyed, the clause would be ultra vires the Constitution.

**266.** One way of looking at the first part of clause (4) is that the amending body has, with retrospective effect, repealed the law relating to election petition in respect of the persons specified in clause (1) and hence the judgment rendered on the basis of the previous law relating to election petition became

58. 1973 Supp SCR 1 : (1973) 4 SCC 225.


SCC Online Web Edition, Copyright © 2021
Page 146      Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------------------------

automatically void, and the amending body was merely stating the consequence of the retrospective repeal of the law and therefore the declaration that the judgment was void was not an exercise of judicial function. On the other hand, it might be possible to view the first part of clause (4) as an exercise of judicial power for the reason that, even assuming that by virtue of the retrospective repeal of the law relating to election petition, there was no jurisdiction in the High Court to entertain or try the election petition and pass the judgment, a repeal *simpliciter* did not render the judgment *ipso facto* void and therefore, in making the declaration that the judgment was void, the amending body was performing a function which has traditionally been in the province of court.

**267.** Be that as it may, I feel no doubt that the amending body, when it declared the election of the appellant to be valid, had to ascertain the adjudicative facts[59] and apply the relevant norm for adjudging its validity. If, however, the amending body did not ascertain the facts relating to the election and apply the relevant norm, the declaration of the validity of the election was a fiat of a *sui generis* character of the amending body.

**268.** The concept of democracy as visualized by the Constitution presupposes the representation of the people in Parliament and State Legislatures by the method of election. And, before an election machinery can be brought into operation, there are three requisites which require to be attended to, namely, (1) there should be a set of laws and rules making provisions with respect to all matters relating to, or in connection with, elections, and it should be decided as to how these laws and rules are to be made ; (2) there should be an executive charged with the duty of securing the due conduct of elections ; and (3) there should be a judicial tribunal to deal with disputes arising out of or in connection with elections. Articles 327 and 328 deal with the first of these requisites, Article 324 with the second and Article 329 with the third requisite (see *N. P. Ponnuswami* v. *Returning Officer, Namakkal Constituency*[60]).

**269.** Article 329(*b*) envisages the challenge to an election by a petition to be presented to such authority as the Parliament may, by law, prescribe. A law relating to election should contain the requisite qualifications for candidates, the method of voting, definition of corrupt practices by the candidates and their election agents, the forum for adjudication of election disputes and other cognate matters. It is on the basis of this law that the question whether there has been a valid election has to be determined by the authority to which the petition is presented. And, when a dispute is raised as regards the validity of the election of a particular candidate, the authority entrusted with the task of resolving the dispute must necessarily exercise a judicial function, for, the process consists of ascertaining the facts relating to the election and applying the law to the facts so ascertained. In other words, it is obvious that a power must be lodged somewhere to judge the validity of the election, for, otherwise,

---

59. "Adjudicative facts are facts about the parties or their activities, businesses and properties usually answering the questions of who did what, where, when, how, why, with what motive or intent ; adjudicative facts are roughly the kind of facts that go to a jury in a case. Legislative facts do not usually concern the immediate parties but are general facts which help the tribunal decide questions of law, policy and discretion.

Facts pertaining to the parties and their activities that is, adjudicative facts, are intrinsically the kind of facts that ordinarily ought not to be determined without giving the parties a chance to know and to meet any evidence that may be unfavourable to them, that is, without providing the parties an opportunity for trial." (see K. C. Davis : "*The Requirements of a Trial-type Hearing*", 70 Harv L Rev 193, 199).

60. 1952 SCR 218, 229 : AIR 1952 SC 64 : 1 ELR 133.


SCC Online Web Edition, Copyright © 2021
Page 147    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------------------------

INDIRA NEHRU GANDHI *v.* RAJ NARAIN (*Mathew, J.*)    121

there would be no certainty as to who were legitimately chosen as members, and any intruder or usurper might claim a seat and thus trample upon the privileges and liberties of the people. Indeed, elections would become, under such circumstances, a mockery. In whichever authority the power is lodged, the nature of the function is such that it requires a judicial approach. It cannot be resolved on considerations of political expediency.

**270.** It was contended for the appellant that, in England, it was the House of Commons which originally decided election disputes concerning its members, that it was only in 1770 that the function was delegated to committees and, therefore, Parliament is the proper forum for deciding election disputes of its members as it is one of its privileges. I think, at the time our Constitution was framed, the decision of an election dispute had ceased to be a privilege of the House of Commons in England and therefore, under Article 105(3), it could not be a privilege of Parliament in this country.

**271.** Before the year 1770, controverted elections were tried and determined by the whole House of Commons as mere party questions upon which the strength of contending factions might be tested.

> "In order to prevent so notorious a perversion of justice, the House consented to submit the exercise of its privilege to a tribunal constituted by law, which, though composed of its own members, should be appointed so as to secure impartiality and the administration of justice according to the laws of the land under the sanction of oaths."

The principle of the Grenville Act, and of others which were passed at different times since 1770, was the selection by lot of committees for the trial of election petitions. And, at present, by Part III of the Representation of the People Act, 1949, the trial of controverted elections is confided to judges selected from the Judiciary in the appropriate part of the United Kingdom. Provision is made in each case for constituting a rota from whom these judges are selected. The House has no cognizance of these proceedings until their determination, when the judges certify their determination. The judges are to make a report in any case where a charge has been made in the petition of corrupt and illegal practice having been committed at an election ; and they may also make a special report on any matter arising which they think should be submitted to the House.[61]

**272.** Article 1, Section 5(1) of the Constitution of the United States of America provides that each House shall be the judge of the elections, returns and qualifications of its own members.

**273.** In whichever body or authority the jurisdiction is vested, the exercise of the jurisdiction must be judicial in character. This Court has held that in adjudicating an election dispute an authority is performing a judicial function and a petition for leave to appeal under Article 136 of the Constitution would lie to this Court against the decision notwithstanding the provisions of Article 329(*b*) (see *Durga Shankar Mehta* v. *Thakur Raghuraj Singh*[62]).

**274.** In *Barry* v. *United States Ex. Rel. Cunningham*[63], it was held that in exercising the power to judge of the election returns and qualifications of members, the Senate acts as a judicial tribunal.

61. See *Erskine May's Parliamentary Practice*, 18th edition (1971), pp. 29-31.

62. (1955)1 SCR 267 : AIR 1954 SC 520 : 9 ELR 494.

63. 73 L Ed 867.


SCC Online Web Edition, Copyright © 2021
Page 148      Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------

**275.** It might be that if the adjudication of election disputes in respect of its members had been vested in each of the Houses of Parliament by the Constitution, the decision of the House would have been final. That would have been on the basis of the doctrine of the political question, namely, that the function has been exclusively committed textually to another agency. I am aware that the doctrine of political question has no hospitable quarter in this Court since the decision in *Madhav Rao Scindia* v. *Union*[64]. But I venture to think that the doctrine alone can explain why the courts abstain from interfering with a verdict on an impeachment of the President for violation of the Constitution, a function essentially judicial.[65]

**276.** An election dispute has a public aspect in that it is concerned more with the right of a constituency to be represented by a particular candidate. But it does not follow from the public character of the controversy that there is no *lis* between the parties to the election contest, and that the *lis* can be resolved otherwise than by ascertaining the facts relating to the election, and applying the relevant law :

"A judicial inquiry investigates, declares and enforces liabilities as they stand on present or past facts and under laws supposed already to exist. This is its purpose and end. Legislation, on the other hand, looks to the future and changes existing conditions by making a new rule, to be applied thereafter to all or some part of those subject to its power."[66]

**277.** The Privy Council had occasion to consider this question in *United Engineering Workers' Union* v. *Devanayagam*[67]. The judgment of the majority was delivered by Lord Dilhorne. Lord Guest and Lord Devlin dissented. The question in the case was whether the President of a labour tribunal in Ceylon was the holder of a judicial office. If so, as the man in question had not been appointed in the way the Constitution of Ceylon required for appointments of judicial officers, whether the tribunal was without jurisdiction. It is clear from the judgment of their Lordships of the minority that judicial power is the exercise of a power on the basis of pre-existing law. At pp. 384-385, their Lordships said :

"Another characteristic of the judicial power is that it is concerned with existing rights, that is, those which the parties actually have at the inception of the suit and not those which it may be thought they ought to have ; it is concerned with the past and the present and not with the future."

**278.** According to the historic analysis, the essence of the distinction between legislative power and judicial power is that the Legislature makes new law which becomes binding on all persons over whom the Legislature exercises legislative power : the Judicature applies already existing law in the resolution of disputes between particular parties ; and judges may not deviate from this duty. This view of the distinction between the obligation to apply and enforce rules and a discretion to modify rules or make new rules was at one time applied uncompromisingly in describing functions as legislative or judicial. Thus De Lolme said that courts of equity as then existing in England had a legislative function. They are, he said, a kind of inferior experimental Legislature, continually employed in finding out and providing law remedies for those new species of cases for which neither the courts of common law, nor the Legis-

64.  AIR 1971 SC 530 : (1971)1 SCC 85 :
       (1971)3 SCR 9.
65.  *See* Wechsler : *Toward Neutral Principles
       of Constitutional Law*, 73 Harv L Rev 1,
7-9.
66.  Justice Holmes in *Prentis* v. *Atlantic
       Coast Line Co.*, 211 US 210, 226.
67.  1968 AC 356.


SCC Online Web Edition, Copyright © 2021
Page 149    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------------------------

lature have as yet found it convenient or practicable to establish any.[68] Though this would show that neither for logic nor in language has the boundary between legislation and adjudication ever been rigidly and clearly drawn, the distinction between the two is well established.

**279.** If, therefore, the decision of the amending body that the election of the appellant was valid was the result of the exercise of judicial power or of despotic discretion governed solely by considerations of political expediency, the question is, whether that decision, though couched in the form of an enactment, can be characterized as an amendment of the Constitution.

**280.** The constituent power is the power to frame a Constitution. The people of India, in the exercise of that power, framed the Constitution and it enacts the basic norms. By that instrument, the people conferred on the amending body the power to amend by way of addition, variation or repeal any of its provisions (Article 368). It is not necessary to go in detail into the question whether the power to amend is coextensive with the constituent power of the people to frame a Constitution. In *Bharati's case,* I said[69] :

> "......under the Indian Constitution, the original sovereign—the people—created, by the amending clause of the Constitution, a lesser sovereign, almost coextensive in power with itself. This sovereign, the one established by the revolutionary act of the full or complete sovereign has been called by Max Radin, the "pro-sovereign", the holder of the amending power under the Constitution."

**281.** I fully appreciate that 'sovereign', if conceived of as an omnipotent being, has no existence in the real world. Several thoughtful writers have deprecated the use of the expression in legal discussion as it has theological and religious overtones. Nevertheless, as the practice has become inveterate, it will only create confusion if any departure is made in this case from the practice. If it is made clear that sovereign is not a 'mortal God' and can express himself or itself only in the manner and form prescribed by law and can be sovereign only when he or it acts in a certain way also prescribed by law, then perhaps the use of the expression will have no harmful consequence.

> " 'Legal sovereignty' is a capacity to determine the actions of persons in certain intended ways by means of *a law....*where the actions of those who exercise the authority, in those respects in which they do exercise it, are not subject to any exercise by other persons of the kind of authority which they are exercising."[70]

**282.** The point to be kept in mind is that the amending body which exercises the constituent power of the legal sovereign, though limited by virtue of the decision in *Bharati's case* (supra), can express itself only by making laws.

**283.** The distinction between constitutional law and ordinary law in a rigid Constitution like ours is that the validity of the constitutional law cannot be challenged whereas that of ordinary law can be challenged on the touchstone of Constitution. But constitutional law is as much law as ordinary law. A Constitution cannot consist of a string of isolated dooms. A judgment or sentence which is the result of the exercise of judicial power or of despotic discretion is not a law as it has not got the generality which is an essential characteristic of law. A despotic decision without ascertaining the facts of a

68. See *The Constitution of England,* New Ed. (1800) p. 149.
69. 1973 Supp SCR 1, 794 : (1973) 4 SCC 225, 850 (para 1615).

70. *See* W. J. Rees : "*The Theory of Sovereignty Restated*" in *Mind,* Vol. lix (1950) quoted at p. 68 of '*In Defense of Sovereignty*', Ed. W. J. Stankiewicz.


SCC Online Web Edition, Copyright © 2021
Page 150     Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------

case and applying the law to them, though dressed in the garb of law, is like a bill of attainder. It is a legislative judgment.

**284.** According to Blackstone, a law and a particular command are distinguished in the following manner : a law obliges *generally* the members of a given community, or a law obliges *generally* persons of a given class. A particular command obliges a *single* person or persons, whom it determines *individually*. Most of the laws established by political superiors are, therefore, *general* in a two-fold manner : as enjoining or forbidding generally acts of kinds or sorts ; and as binding the whole community, or, at least, whole classes of its members. He then said [71]:

> "Therefore, a particular act of the Legislature to confiscate the goods of Titus, or to attaint him of high treason, does not enter into the idea of a municipal law : for the operation of this act is spent upon Titus only and has no relation to the community in general : it is rather a sentence than a law."

This passage was cited with approval by the Privy Council in *Liyanage* v. *Queen*[72] to show that the end product of the exercise of judicial power is a judgment or sentence and not a law.

**285.** St. Thomas Aquinas (after considering the views of Aristotle, St. Augustine and the opinions of jurists in pandects) has said that since the end of law is common good the law should be framed not for private benefit but for the common good of all citizens.[73]

**286.** Rousseau wrote [74]:

> "When I say that the object of laws is always general, I mean that the law considers subjects collectively and actions as abstract ; never a man as an individual, nor an action as particular.... neither is what the sovereign himself orders about a particular object a law but a decree ; not an act of sovereignty, but of magistracy."

**287.** Austin draws an explicit distinction between 'laws' and 'particular commands'. Where a command, he says, obliges *generally* to acts or forbearances of a *class*, a command is a law or rule. But where it obliges to a *specific* act or forbearance, a command is occasional or particular.[75]

**288.** Kelsen, after noting the distinction made by Austin has observed :

> "We can of course recognize as law only general norms. But there is no doubt that law does not consist of general norms only. Law includes individual norms, i. e., norms which determine the behaviour of one individual in one non-recurring situation and which therefore are valid only for one particular case and may be obeyed or applied only once."

According to him, such norms are valid law because they are parts of the legal order as a whole in exactly the same sense as those general norms on the basis of which they have been created. He said that particular norms are the decisions of courts as far as their binding force is limited to the particular case at hand and that a judge who orders a debtor *A* to return $ 1000 to his creditor *B* was passing a law.[76]

---

71. *See* Blackstone: *Commentaries*, Vol. 1, p. 44.
72. (1967) 1 AC 259, 291.
73. *See* "*The Treatise on Law*", Gateway Edition (1970), p. 87.

74. *Contract Social*, Bk. II, Chap. VI.
75. *See Austin's Jurisprudence*, 2nd ed., Vol 1, p. 18.
76. Kelsen: *General Theory of Law and State*, (1961), p. 38.


SCC Online Web Edition, Copyright © 202
Page 151      Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------------------

**289.** It may be noted that Kelsen made no distinction between law-creation and law-application. According to him, every act of applying the law involved the creation of norms. In his view, there was no distinction between creation and application of law, a view I find difficult to accept in the light of clear distinction made by the decisions of this Court between legislative and judicial functions.

**290.** A statute is a general rule. A resolution by the Legislature that a town shall pay one hundred dollars to Timothy Coggan is not a statute.[77]

**291.** The mere fact that an Act to indemnify *A* or an Act sanctioning a pension to the Speaker is passed by the House of Commons in England should not lead us to conclude that it is law.

"The English Legislature was originally constituted, not for legislative, but for financial purposes. Its primary function was, not to make laws, but to grant supplies."[78]

**292.** J. C. Carter has said that statute books contain vast masses of matter which, though in the form of laws, are not laws in the proper sense, that these consist in the making of provisions for the maintenance of public works of the State, for the building of asylums, hospitals, school buses, and a great variety of similar matters, and that this is but the record of actions of the State in relation to the *business* in which it is engaged. According to him, the State is a great public corporation which conducts a vast mass of business, and the written provisions for this, though in the form of laws, are not essentially different from the minutes of ordinary corporate bodies recording their actions.[79]

**293.** Walter Bagehot has said :

"An immense mass, indeed of the legislation is not, in the proper language of jurisprudence, legislation at all. A law is a *general command applicable to many cases.* The 'special acts' which crowd the statute book and weary parliamentary committees are applicable to one case only. They do not lay down rules according to which railways shall be made, but enact that such and such a railway shall be made from this place to that place, and they have no bearing on any other transaction."[80]

"When the authors of books on jurisprudence write about law, when professional lawyers talk about law, the kind of law about which they are mainly thinking is that which is found in Justinian's Institutes, or in the Napoleonic Codes, or in the New Civil Code of the German Empire, that is to say, *the legal rules which relate to contracts and torts, to property, to family relations and inheritance, or else to law of crimes as is to be found in a Penal Code.*"[81]

**294.** John Locke was of the view that

'legislative authority is to act in a particular way.... (and) those who wield this authority should *make only general rules.* They are to govern by promulgated established laws not to be varied in particular cases'[82].

77. John Chipman Gray : *Nature and Source of Law,* p. 161.
78. Courtenay Ilbert, *Legislative Methods and Forms,* (Oxford, 1901), p. 208.
79. *Law, Its Origin, Growth and Function* (New York and London, 1907), p. 116.
80. "*The English Constitution*" (1967),

World's Classics Edition (Oxford, 1928), p. 119.
81. *See* Courtenay Ilbert, *Legislative Methods and Forms,* (Oxford, 1901), p. 209.
82. *See* the passage quoted at p. 129 of Hayek : *Law, Legislation and Liberty.*


SCC Online Web Edition, Copyright © 2021
Page 152      Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------------

**295.** Perhaps the most exhaustive treatment of the question of the necessity for generality in law is to be found in *"Jurisprudence, Men and Ideas of the Law"* by Patterson (*see* Chapter V). According to him, the generality of a law depends upon its being applicable to an indefinite number of human beings and that is the most significant aspect of law. He said that an ordinary judgment of a court is *not law* as a judgment applies only to a limited number of individuals, the parties to the case. He disagreed with Dr. Kelsen's statement that the judicial decision is an individual legal norm as the expression 'individual legal norm' is a self-contradiction.

**296.** To Friedmann, the most essential element in the concept of law is a degree of generality :

> "The first desideratum of a system for subjecting human conduct to the governance of rules is an obvious one : there must be rules. This may be stated as a requirement of generality. Here as in so many other fields, John Austin's distinction was basically right, but too rigidly drawn."

Friedmann was of the view that a community which had no general prescription at all, but only an infinite multitude of individual commands, would not be regarded as having a legal order. It would dissolve into millions of individual relationships.[83]

**297.** For the purpose of this case I accept as correct the statement of Blackstone already quoted and approved by the Privy Council in *Liyanage* v. *Queen* (supra). I cannot regard the resolution of an election dispute by the amending body as law : It is either a judicial sentence or a legislative judgment like a Bill of Attainder.

**298.** It is no doubt true that the House of Commons in England used to pass bills of attainder. But the practice has fallen into desuetude, since the year 1696. A bill of attainder is a special act of the Legislature, as inflict capital punishments upon persons supposed to be guilty of high offences, such as treason and felony, without any conviction in the ordinary course of judicial proceedings. The Legislature assumes judicial magistracy, pronouncing upon the guilt of the party without any of the common forms and guards of trial, and satisfying itself with proofs, when such proofs are within its reach, whether they are conformable to the rules of evidence or not. In short, in all such cases, the Legislature exercises the highest power of sovereignty, and what may be properly deemed an irresponsible despotic discretion, being governed solely by what it deems political necessity or expediency, and too often under the influence of unreasonable fears, or unfounded suspicions.[84]

**299.** In *U. S.* v. *Brown*[85] the Supreme Court of United States of America stated that the main reason why the power to pass bill of attainder was taken away from the Congress was :

> "Everyone must concede that a legislative body, from its numbers and organisation, and from the very intimate dependence of its members upon the people, which renders them liable to be peculiarly susceptible to popular clamour, is not properly constituted to try with coolness, caution, and impartiality a criminal charge, especially in those cases in which the

83. Friedmann : *"Legal Theory"* 5th ed., pp. 15-16. *See also* : Lon L. Fuller : *"The Morality of Law"*, pp. 46-49.
84. *See* : J. Story, *Commentaries on the Cons-*

*titution of the United States* (Boston, 1833), S. 1338.
85. 381 US 437.


SCC Online Web Edition, Copyright © 2021
Page 153    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------------------------

INDIRA NEHRU GANDHI *v.* RAJ NARAIN (*Mathew, J.*)         127

popular feeling is strongly excited—the very class of cases most likely to be prosecuted by this mode."[86]

Much the same reason will apply to the resolution of an election dispute by an amending body as it consists, in all democratic countries, of an assembly of persons like Parliament.

**300.** In *Liyanage* v. *Queen* (supra) the appellants had been charged with offences arising out of an abortive *coup d'etat* on January 27, 1962. The story of the *coup d'etat* was set out in a White Paper issued by the Ceylon Government. On March 16, 1962 the Criminal Law (Special Provisions) Act was passed and it was given retrospective effect from January 1, 1962. The Act was limited in operation to those who were accused of offences against the State in or about January 27, 1962. The Act legalised the imprisonment of the appellants while they were awaiting trial, and modified a section of the Penal Code so as to enact *ex post facto* a new offence to meet the circumstances of the abortive *coup*. The Act empowered the Minister of Justice to nominate the three judges to try the appellants without a jury. The validity of the Act was challenged as well as the nomination which had been made by the Minister of Justice of the three judges. The Ceylon Supreme Court upheld the objection about the vires of some of the provisions of the Act as well as the nomination of the judges. Subsequently, the Act was amended and the power of nomination of the judges was conferred on the Chief Justice. The appellants having been convicted at the trial before a court of three judges nominated under the amended Act, went up in appeal before the Judicial Committee. It was contended that the Acts of 1962 offended against the Constitution in that they amounted to a direction to convict the appellants or to a legislative plan to secure the conviction and severe punishment of the appellants and thus constituted an unjustifiable assumption of judicial power by the Legislature, or an interference with judicial power which was outside the Legislature's competence.

**301.** The Privy Council said in the course of their judgment that the pith and substance of the law enactments was a legislative plan *ex post facto* to secure the conviction, that although legislation *ad hominem* which is directed to the course of particular proceedings may not always amount to an interference with the functions of the Judiciary, but in the present case they had no doubt that there was such interference ; that it was not only the likely but

---

86. *See* Cooley, *Constitutional Limitations*,
    pp. 536-537, 8th ed., (1927).\*\*
\*\* Macaulay's account of the attainder of Sir John Fenwick in 1696, the last in the history of the House of Commons, is particularly vivid :
    "Some hundreds of gentlemen, every one of whom had much more than half made up his mind before the case was open, performed the office both of judge and jury. They were not restrained, as a judge is restrained, by the sense of responsibility........They were not selected, as a jury is selected, in a manner which enables a culprit to exclude his personal and political enemies. The arbiters of the prisoner's fate came in and went out as they chose. They heard a fragment here and there of what was said against him, and a fragment here and there of what was said in his favour. During the progress of the bill they were exposed to every species of influence. One member might be threatened by the electors of his borough with the loss of his seat...... In the debates arts were practised and passions excited which are unknown to well constituted tribunals, but from which no great popular assembly divided into parties ever was or ever will be free." [IX Macaulay : *History of England*, p. 207 (1900)].


SCC Online Web Edition, Copyright © 202
Page 154    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------------

the intended effect of the impugned enactments and that it was fatal to their validity. They further said that the true nature and purpose of these enactments were revealed by their conjoint impact on the specific proceedings in respect of which they were designed, and they took their colour, in particular from the alterations they purported to make as to their ultimate objective—the punishment of those convicted—and that these alterations constituted a grave and deliberate incursion into the judicial sphere and then, they quoted with approval the observations of Blackstone already referred to.[87] These observations have great relevance to the case in hand. True it is that their Lordships did not decide the question whether by a constitutional amendment the result could have been achieved or not.

302. At the time when the amendment was passed, the appeal filed by the appellant and the cross appeal of the respondent were pending before the Supreme Court. Clause (4) was legislation *ad hominem* directed against the course of the hearing of the appeals on merits as the appeal and the cross appeal were to be disposed of in accordance with that clause and not by applying the law to the facts as ascertained by the court. This was a direct interference with the decision of these appeals by the Supreme Court on their merits by a legislative judgment.

303. If the amending body really exercised judicial power, that power was exercised in violation of the principles of natural justice of *audi alteram partem*. Even if a power is given to a body without specifying that the rules of natural justice should be observed in exercising it, the nature of the power would call for its observance.

304. The Solicitor General contended that the amending body, in declaring that the election was valid, was exercising its constituent legislative power ; that legislative power does not adjudicate but only creates validity, even retrospectively, by enacting a law with that effect ; that validation is law-making ; that it alters the legal position by making new law and that validation may take place before or after a judgment. He said that by the repeal of the provisions of the Representation of the People Act, 1951, the amending body had wiped out not only the election petition but also the judgment of the High Court and has deprived the respondent of the right to raise any dispute as regards the validity of the election of the appellant and, therefore, there was no dispute to be adjudicated upon by the amending body. He also said—I think, in the alternative—that although the law relating to election petitions and other matters connected therewith was dispensed with in respect of the appellant, the amending body had the ideal norms of fair and free election in its view for adjudging the validity of the election. He submitted that it was open to the amending body to gather facts from any source and as the facts collected by the High Court were there factually, the amending body looked into them and applied the ideal norms of election for adjudging its validity.

305. It is difficult to understand, when the amending body expressly excluded the operation of all laws relating to election petition and matters connected therewith by the first part of clause (4), what ideal norms of free and fair election it had in view in adjudging the validity of the election of the appellant. I cannot conceive of any pre-existing ideal norms of election apart from the law enacted by the appropriate Legislatures. If the amending body evolved new norms for adjudging the validity of the particular election, it was the exercise of a despotic power and that would damage the democratic structure of the Constitution.

87. *See* Blackstone : *Commentaries*, Vol. I, p. 44.


SCC Online Web Edition, Copyright © 2021
Page 155    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------------------------------

INDIRA NEHRU GANDHI *v.* RAJ NARAIN (*Mathew, J.*)      129

**306.** Quite apart from it, there is nothing on the face of the amendment to show that the amending body ascertained the facts of the case or applied any norms for determining the validity of the election. I do not think that under Article 368 the amending body was competent to pass an ordinary law with retrospective effect to validate the election. It can only amend the Constitution by passing a law of the rank of which the Constitution is made of.

**307.** There is also nothing to show that the amending body validated the election with reference to any change of the law which formed the foundation of the judgment. The cases cited by the Solicitor General to show that a competent Legislature has power to validate an invalid election do not indicate that there can be a validation without changing the law which invalidated the election. Nor do I think that a contested election can be validated without an authority applying the new law to the facts as ascertained by judicial process. If the court which ascertained the facts and applied the law was rendered *coram non judice*, the facts ascertained by it have ceased to be facts. There are no absolute or immediately evident facts. Only by being first ascertained through legal procedure are facts brought into the sphere of law or, we may say, though it may sound paradoxical, that the competent organ legally creates facts. The courts perform a constitutive function in ascertaining facts. There is no fact 'in itself' that *A* has killed *B*. There is only somebody's belief or knowledge. They are all private opinions without relevance. Only establishment by a competent organ has legal relevance.[88] And, when that organ was rendered *coram non judice*, and its judgment declared void, the facts created by it perished. They ceased to be facts. Adjudicative facts of an election dispute cannot be gathered by legislative process behind the back of the parties ; they can be gathered only by judicial process. The amending body did not ascertain the facts by resorting to judicial process.

**308.** If clause (4) was an exercise in legislative validation without changing the law which made the election invalid, when there ought to have been an exercise of judicial power of ascertaining the adjudicative facts and applying the law, the clause would damage the democratic structure of the Constitution, as the Constitution visualizes the resolution of an election dispute by a petition presented to an authority exercising judicial power. The contention that there was no election dispute as clause (4) by repealing the law relating to election petition had rendered the petition filed by the respondent *non est*, if allowed, will toll the death knell of the democratic structure of the Constitution. If Article 329(*b*) envisages the resolution of an election dispute by judicial process by a petition presented to an authority as the appropriate Legislature may by law provide, a constitutional amendment cannot dispense with that requirement without damaging an essential feature of democracy, viz., the mechanism for determining the real representative of the people in an election as contemplated by the Constitution.

**309.** All the cases cited by the Solicitor General pertain either to legislative validation of a void election by applying a new law to undisputed facts or to the removal of an admitted disqualification by a law with retrospective effect.

**310.** In *Abeyesekera* v. *Jayatilake*[89], the facts were : An order in council of 1923 made provision as to the Legislative Council in Ceylon, but reserved to His Majesty power to revoke, alter or amend the order. The appellant, as common informer, brought an action to recover penalties under the Order

-------------------------------------------------------------------------------------------------------

88. *See* Kelsen · *General Theory of Law and State*, p. 136.      89. 1932 AC 260.


SCC Online Web Edition, Copyright © 2021
Page 156     Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------------------------------------------

from the respondent, who he alleged had sat and voted after his seat had become vacant under its provisions by reason of his having a pecuniary interest in a contract with the Government.   In 1928, after the action had been brought but before its trial, an amending Order in Council was made which provided :

> "If any such action or legal proceeding has been or shall be instituted, it shall be dismissed and made void, subject to such order as to costs as the Court may think fit to make."

It also amended the Order of 1923 so as to except the office held by the respondent from its operation.   The Privy Council held that the Order of 1928 was valid, having regard to the power reserved by the Order of 1923, and was an effective defence to the action, although it was retrospective in its operation and that this was no exercise of judicial power.   The direction to dismiss must be understood in the light of an earlier provision in the same Order in Council which amended the law on which the proceeding was founded ; the dismissal was thus the result of the change in the law and all that the later clause showed was that the change was to have retrospective effect and govern the rights of parties even in pending proceedings.   The decision would be helpful here only if and in so far as the provision in clause (4) had followed from a change in any rule of law.

**311.** The decision in *Piare Dusadh* v. *King Emperor*[90] concerned the validation of a sentence imposed by a special criminal court which was held to have no jurisdiction to try the case by an order of a court.   By a validation Act, the jurisdiction was conferred with retrospective effect on the special criminal court and the sentence imposed by it was made lawful.   It was held that there was no exercise of any judicial power by the legislating authority.

**312.** In *Kanta Kathuria* v. *Manak Chand Surana*[91], the appellant, a government advocate stood for election to the State Legislative Assembly of Rajasthan and was declared elected.   The election was challenged and the ground of challenge was that the appellant held an office of profit within the meaning of Article 191 of the Constitution.   The High Court set aside the election for that reason.   While the appeal was pending in this Court, Rajasthan Act 5 of 1969 was passed declaring among others that the holder of the office of a Special Government Pleader was not disqualified from being chosen or for being a member of the State Legislative Assembly ; and, by Section 2(2), the Act was made retrospective removing the appellant's disqualification retrospectively.   It was held that Act 5 of 1969 had removed the disqualification retrospectively, that Parliament and the State Legislatures can legislate retrospectively subject to the provisions of the Constitution, that no limitation on the powers of the Legislature to make a declaration validating an election could be put, and that, by enacting the impugned Act, the disqualification if any which existed in the 1951 Act had been removed.

**313.** In *State of Orissa* v. *Bhupendra Kumar Bose*[92], the facts were as follows : Elections were held for the Cuttack municipality and 27 persons were declared elected as councillors.   One *B*, who was defeated at the elections, filed a writ petition before the High Court challenging the elections.   The High Court held that the electoral rolls had not been prepared in accordance with the provisions of the Orissa Municipalities Act, 1950, as the age qualification had been published too late thereby curtailing the period of claims and objections to the preliminary roll to 2 days from 21 days as prescribed ; consequently,

90.   1944 FCR 61 : AIR 1944 FC 1.
91.   (1970) 2 SCR 835 : (1969) 3 SCC 268.
92.   1962 Supp 2 SCR 380 : AIR 1962 SC 945.


SCC Online Web Edition, Copyright © 2021
Page 157    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

---

the High Court set aside the elections.    The State took the view that the judgment affected not merely the Cuttack municipality but other municipalities also. Accordingly, the Governor promulgated an Ordinance validating the elections to the Cuttack municipality and validating the electoral rolls prepared in respect of other muncipalities.    Thereupon, *B* filed a writ petition before the High Court contending that the Ordinance was unconstitutional.    The High Court found that the Ordinance contravened Article 14 of the Constitution, that it did not successfully cure the invalidity and that it offended Article 254(1) of the Constitution as it was inconsistent with many Central Acts falling in the concurrent list and was unconstitutional.    The State and the councillors appealed and challenged the findings of the High Court.

**314.** This Court held that Section 3(1) of the Ordinance effectively removed the defects in the electoral rolls found by the High Court by its judgment and that it successfully cured the invalidity of the electoral roll and of the elections to the Cuttack municipality.

**315.** The Solicitor General also cited other decisions to show that a Legislature can validate proceedings rendered invalid by judgment of court. As I said, they all involved substitution of new law with retrospective effect for the old one and the basic facts were all taken to have been admitted or not controverted.    If the facts are not admitted, the Legislature cannot determine them except by employing judicial process.    Besides, those cases being cases of legislative validation, need not pass the test of the theory of basic structure which, I think, will apply only to constitutional amendment.

**316.** Counsel for the appellant also brought to the notice of the Court certain election validation Acts passed by the House of Commons in England. These Acts removed with retrospective effect disqualifications of members of Parliament.    In none of these cases was an election which was being contested validated by Parliament.    Nor can these instances of legislative removal of disqualification furnish any assistance to this Court for the reason that in England there is no theory of basic structure operating as a fetter on the power of Parliament.

**317.** It was argued for the respondent that if the amending body exercised judicial power and held the election of the appellant valid, its act was unconstitutional also on the ground it damaged another basic structure of the Constitution, namely, the doctrine of separation of powers.

**318.** The major problem of human society is to combine that degree of liberty without which law is tyranny with that degree of law without which liberty becomes licence ; and, the difficulty has been to discover the practical means of achieving this grand objective and to find the opportunity for applying these means in the ever-shifting tangle of human affairs.    A large part of the effort of man over centuries has been expended in seeking a solution of this great problem.    A region of law, in contrast to the tyranny of power, can be achieved only through separating appropriately the several powers of government.    If the law-makers should also be the constant administrators and dispensers of law and justice, then, the people would be left without a remedy in case of injustice since no appeal can lie under the fiat against such a supremacy. And, in this age-old search of political philosophers for the secret of sound government, combined with individual liberty, it was Montesquieu who first saw the light.    He was the first among the political philosophers who saw the necessity of separating judicial power from the executive and legislative branches of government.    Montesquieu was the first to conceive of the three functions of government as exercised by three organs, each juxtaposed against others.


SCC Online Web Edition, Copyright © 2021
Page 158    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------

132                     **SUPREME COURT CASES**                    1975 Supp SCC

He realised that the efficient operation of government involved a certain degree of overlapping and that the theory of checks and balances required each organ to impede too great an aggrandizement of authority by the other two powers. As Holdsworth says, Montesquieu convinced the world that he had discovered a new constitutional principle which was universally valid. The doctrine of separation of governmental powers is not a mere theoretical, philosophical concept. It is a practical, work-a-day principle. The division of Government into three branches does not imply, as its critics would have us think, three watertight compartments. Thus, legislative impeachment of executive officers or judges, executive veto over legislation, judicial review of administrative or legislative actions are treated as partial exceptions which need explanation.[93]

319. There can be no liberty where the legislative and executive powers are united in the same person or body of magistrates, or, if the power of judging be not separated from the legislative and executive powers. Jefferson said :

> All powers of government—legislative, executive and judicial—result in the legislative body. The concentration of these powers in the same hands is precisely the definition of despotic government. It will be no alleviation that these powers will be exercised by a plurality of hands and not by a single person. One hundred and seventy-three despots would surely be as oppressive as one.[94]

And, Montesquieu's own words would show that where the whole power of one department is exercised by the same hands which possess the whole power of another department, the fundamental principles of a free Constitution are subverted. In *Federalist No. 47*, James Madison suggests that Montesquieu's doctrine did not mean that separate departments might have "no partial agency in or no control over the acts of each other". His meaning was, according to Madison, no more than that one department should not possess the *whole* power of another.

320. The Judiciary, said the *Federalist*, is beyond comparison the weakest of the three departments of power. It has no influence over either the sword or the purse ; no direction either of the strength or of the wealth of the society and can take no active resolution whatever. It may truly be said to have neither force nor will, but merely judgment. Of the three powers Montesquieu said, the Judiciary is in some measure next to nothing. If he realised the relative weakness of the Judiciary at the time he wrote, it is evidence of his vision that he appreciated the supreme importance of its independence. There is no liberty, he said, if the judicial power be not separated from the legislative and executive.

321. But this doctrine which is directed against the concentration of these powers in the same hand has no application as such when the question is whether an amending body can exercise judicial power. In other words, the doctrine is directed against the concentration of these sovereign powers in one or other organ of Government. It was not designed to limit the power of a constituent body.

322. Whereas in the United States of America and in Australia, the judicial power is vested exclusively in courts, there is no such exclusive resting of judicial power in the Supreme Court of India and the courts subordinate to it. And if the amending body exercised judicial power in adjudging the validity

---

93. *See* generally : "*The Doctrine of Separation of Powers and its present day signifi-* | *cance*" by T. Vanderbilt.
94. *See* Jefferson : *Works* : 3, 223.


SCC Online Web Edition, Copyright © 2021
Page 159      Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases


-------------------------------------------------------------------------------

of the election, it cannot be said that by that act, it has damaged a basic structure of the Constitution embodied in the doctrine of separation of powers. Even so, the question will remain whether it could exercise judicial power without passing a law enabling it to do so. As I said, the exercise of judicial power can result only in a judgment or sentence. The constituent power, no doubt, is all-embracing, comprising within its ambit the judicial, executive and legislative powers. But if the constituent power is a power to frame or amend a Constitution, it can be exercised only by making laws of a particular kind.

323. The possession of power is distinct from its exercise.[95] The possession of legislative power by the amending body would not entitle it to pass an ordinary law, unless the Constitution is first amended by passing a constitutional law authorizing it to do so. In the same way, the possession of judicial power by the amending body would not warrant the exercise of the power, unless a constitutional law is passed by the amending body enabling it to do so. Until that is done, its potential judicial power would not become actual. Nobody can deny that by passing a law within its competence, Parliament can vest judicial power in any authority for deciding a dispute or vest a part of that power in itself for resolving a controversy, as there is no exclusive vesting of judicial power in courts by the Constitution. The doctrine of separation of powers which is directed against the concentration of the whole or substantial part of the judicial power in the Legislature or the Executive would not be a bar to the vesting of such a power in itself. But, until a law is passed enabling it to do so, its potential judicial power would not become actual.

324. Lord Coke objected to the exercise of judicial power by James I for pragmatic reasons. Much of what Lord Coke said[96] can be applied to Parliament when it seeks to exercise that power in its constituent capacity.

325. A sovereign in any system of civilized jurisprudence is not like an oriental despot who can do anything he likes, in any manner he likes and at any time he likes. That the Nizam of Hyderabad had legislative, judicial and

95. *See* Jacques Maritain: "*Man and State*", pp. 101-102; also the judgment of Hidayatullah, J. in *Golaknath v. Punjab*, (1967) 2 SCR 762 : AIR 1967 SC 1643.

96. On Sunday morning, November 10, 1607, there was a remarkable interview in Whitehall between Sir Edward Coke, Chief Justice of the Common Pleas, and James I. We have only Coke's account of the interview and not the King's, but there is no reason to doubt its essential authenticity. The question between them was whether the King, in his own person might take what causes he pleased from the determination of the judges and determine them himself. This is what Coke says happened: "Then the King said that he thought the law was founded upon reason and that he and others had reason as well as the Judges; to which it was answered by me, that true it was that God had endowed His Majesty with excellent science and great endowments of nature, but His Majesty was not learned in the laws of his realm of England, and causes which concern the life, or inheritance, or goods, or fortunes of his subjects, are not to be decided by natural reason but by the artificial reason and judgment of law, which law is an act which requires long study and experience before that a man can attain to the cognisance of it; and that the law was the golden metwand and measure to try the causes of the subjects; and which protected His Majesty in safety and peace: with which the King was greatly offended, and said, that then he should be under the law, which was treason to affirm, as he said: to which I said that Bracton saith, *quod Rex non debet esse sub-homine sed sub Deo et lege.*" It would be hard to find a single paragraph in which more of the essence of English constitutional law and history could be found. The King ought not to be under a man, *non debet esse sub-homine,* but under God and the law, *sed sub Deo et lege.* (See R. F. V. Heuston : *Essays in Constitutional Law,* Second Edition, pp. 32-33).


SCC Online Web Edition, Copyright © 2021
Page 160     Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

True Print

-------------------------------------------------------------------------------

executive powers and could exercise any one of them by a *firman* has no relevance when we are considering how a pro-sovereign—the holder of the amending power—in a country governed by a Constitution should function. Such a sovereign can express 'himself' only by passing a particular kind of law ; and not through sporadic acts. 'He' cannot pick and choose cases according to his whim and dispose them of by administering 'cadi-justice' ; nor can the amending body, as already noticed, pass an ordinary law, as Article 368 speaks of the constituent power of amending by way of addition, variation or repeal, any provision of the Constitution in accordance with the procedure laid down in that article. An ordinary law can be passed by it only after amending the provisions of the Constitution authorizing it to do so.

**326.** If the basic postulate that a sovereign can act only by enacting laws is correct, then that is a limitation upon his power to do anything he likes. If I may rephrase the classical statement of Sir Owen Dixon : *The law that a sovereign can act only by law is supreme but as to what may be done by a law so made, the sovereign is supreme over that law*[97]. Of course, this is subject to the theory of basic structure. In other words, even though a sovereign can act only by making law, the law he so makes may vest the authority to exercise judicial power in himself ; without such law he cannot exercise judicial power.

**327.** The result of the discussion can be summed up as follows : Our Constitution, by Article 329(*b*) visualizes the resolution of an election dispute on the basis of a petition presented to such authority and in such manner as the appropriate Legislature may, by law, provide. The nature of the dispute raised in an election petition is such that it cannot be resolved except by judicial process, namely, by ascertaining the facts relating to the election and applying the pre-existing law ; when the amending body held that the election of the appellant was valid, it could not have done so except by ascertaining the facts by judicial process and by applying the law. The result of this process would not be the enactment of constitutional law but the passing of a judgment or sentence. The amending body, though possessed of judicial power, had no competence to exercise it, unless it passed a constitutional law enabling it to do so. If, however, the decision of the amending body to hold the election of the appellant valid was the result of the exercise of an 'irresponsible despotic discretion' governed solely by what it deemed political necessity or expediency, then, like a bill of attainder, it was a legislative judgment disposing of a particular election dispute and not the enactment of a law resulting in an amendment of the Constitution. And, even if the latter process (the exercise of despotic discretion) could be regarded as an amendment of the Constitution, the amendment would damage or destroy an essential feature of democracy as established by the Constitution, namely, the resolution of election dispute by an authority by the exercise of judicial power by ascertaining the adjudicative facts and applying the relevant law for determining the real representative of the people. The decision of the amending body cannot be regarded as an exercise in constituent legislative validation of an election for these reasons : firstly, there can be no legislative validation of an election when there is dispute between the parties as regards the adjudicative facts ; the amending body cannot gather these facts by employing legislative process ; they can be gathered only by judicial process. Secondly, the amending body must change the law retrospectively so as to make the election valid, if the election was rendered invalid by virtue of any provision of the law actually existing at the time of election ; Article 368 does not confer on the amending body the competence to pass any ordinary law whether with or without retrospective effect. Clause (4) expressly excluded

97. See "*Law and the Constitution*", 50 Law Quarterly Rev, 590, 604.


SCC Online Web Edition, Copyright © 2021
Page 161      Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------------------------

INDIRA NEHRU GANDHI *v.* RAJ NARAIN (*Mathew, J.*)      135

the operation of all laws relating to election petition to the election in question. Therefore, the election was held to be valid not by changing the law which rendered it invalid. Thirdly, the cases cited for the appellant are cases relating to legislative validation of invalid elections or removal of disqualification with retrospective effect. Being cases of legislative validation, or removal of disqualifications by Legislature, they are not liable to be tested on the basis of the theory of basic structure, which, I think, is applicable only to constitutional amendments. Fourthly, there was no controversy in those cases with regard to adjudicative facts : if there was controversy with regard to these facts, it is very doubtful whether there could be legislative validation of an election by changing the law alone without ascertaining the adjudicative facts by judicial process.

328. Then I come to the argument of Counsel that equality is a basic structure of the Constitution and that that has been damaged or destroyed by clause (4).

329. The Solicitor General submitted that the majority in *Bharati's case* (supra) did not hold that Article 14 pertains to the basic structure, that apart from Article 14, there is no principle of equality which is a basic structure of the Constitution and that it is not a chameleon-like concept which changes its colour with the nature of the subject-matter to which it is applied.

330. The majority in *Bharati's case* (supra) did not hold that Article 14 pertains to the basic structure of the Constitution. The majority upheld the validity of the first part of Article 31-C ; this would show that a constitutional amendment which takes away or abridges the right to challenge the validity of an ordinary law for violating the fundamental right under that article would not destroy or damage the basic structure. The only logical basis for supporting the validity of Articles 31-A, 31-B and the first part of 31-C is that Article 14 is not a basic structure.

331. Counsel for the respondent, however, submitted that even if Article 14 does not pertain to basic structure, equality is an essential feature of democracy and rule of law and that clause (4), by dispensing with the application of the law relating to election petition and matters connected therewith to the appellant and another has made an unreasonable distinction between persons similarly situated and has thereby damaged or destroyed that essential feature, and therefore, the clause is bad. He said that in so far as laws are general instructions to act or refrain from acting in certain ways in specified circumstances enjoined upon persons of a specified kind, they enjoin uniform behaviour in identical cases ; that to fall under a law is *pro tanto* to be assimilated to a single pattern ; and that a plea for rule of law in this sense is, in essence, a plea for life in accordance with laws as opposed to other standards, namely, the *ad hoc* dispensation from its operation. He argued that if some persons, for no stated reason, and in accordance with no rule, obtain exemption from the operation of law, while persons who are sufficiently similar in relevant characteristics are governed by it, that is manifestly unfair, for, to allow some persons to do that which is forbidden to all others is irrational.

332. Democracy proceeds on two basic assumptions : (1) popular sovereignty in the sense that the country should be governed by the representatives of the people ; that all power came from them ; at their pleasure and under their watchful supervision it must be held ; and (2) that there should be equality among the citizens in arriving at the decisions affecting them.[98]

98. *See* Robert A. Dahl : "*A Preface to Democratic Theory*", pp. 4-33 ; and

Bryce : "*Modern Democracies*", Vol. II p. 9.


SCC Online Web Edition, Copyright © 2021
Page 162      Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

**333.** Today, it is impossible to conceive of a democratic republican form of government without equality of citizens. It is true that in the republics of Athens and Rome there were slaves who were regarded as chattels. And, even in the United States of America, there was a republic even before the Negroes were enfranchised. Our Constitution envisages the establishment of a democratic republican form of government based on adult suffrage.

**334.** Equality is a multi-coloured concept incapable of a single definition. It is a notion of many shades and connotations. The preamble of the Constitution guarantees equality of status and of opportunity. They are nebulous concepts. And I am not sure whether they can provide a solid foundation to rear a basic structure. I think the types of equality which our democratic republic guarantees are all subsumed under specific articles of the Constitution like Articles 14, 15, 16, 17, 25 etc., and there is no other principle of equality which is an essential feature of our democratic polity.

**335.** In the opinion of some of the judges constituting the majority in *Bharati's case* (supra), rule of law is a basic structure of the Constitution apart from democracy.

**336.** The rule of law postulates the pervasiveness of the spirit of law throughout the whole range of government in the sense of excluding arbitrary official action in any sphere. 'Rule of law' is an expression to give reality to something which is not readily expressible. That is why Sir Ivor Jennings said that it is an unruly horse. Rule of law is based upon the liberty of the individual and has as its object, the harmonizing of the opposing notions of individual liberty and public order. The notion of justice maintains the balance between the two ; and justice has a variable content. Dicey's formulation of the rule of law, namely ,

> "the absolute supremacy or predominance of regular law, as opposed to the influence of arbitrary power, excluding the existence of arbitrariness, of prerogative, even of wide discretionary authority on the part of the government"

has been discarded in the later editions of his book. That is because it was realized that it is not necessary that where law ends, tyranny should begin. As Culp Davis said, where the law ends, discretion begins and the exercise of discretion may mean either beneficence or tyranny, either justice or injustice, either reasonableness or arbitrariness. There has been no government or legal system in world history which did not involve both rules and discretion. It is impossible to find a government of laws alone and not of men in the sense of eliminating all discretionary powers. All governments are governments of laws and of men. Jerome Frank has said :

> "This much we can surely say : For Aristotle, from whom Harrington derived the notion of a government of laws and not of men, that notion was not expressive of hostility to what today we call administrative discretion. Nor did it have such a meaning for Harrington."[99]

**733.** Another definition of rule of law has been given by Friedrich A. Hayek in his books : *"Road to Serfdom"* and *"Constitution of Liberty"*. It is much the same as that propounded by the Franks Committee in England [100] :

> "The rule of law stands for the view that decisions should be made by the application of known principles or laws. In general such decisions

<hr />

99. See *"If men were Angels"* (1942), p.      100. Report (1957), p. 6.
    203.


SCC Online Web Edition, Copyright © 202
Page 163    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------------------------

will be predictable, and the citizen will know where he is.  On the other hand there is what is arbitrary.  A decision may be made without principle, without any rules.  It is therefore unpredictable, the antithesis of a decision taken in accordance with the rule of law."

**338.**  This Court said in *Jaisinghani* v. *Union of India*[101] that the rule of law from one point of view means that decisions should be made by the application of known principles and rules, and, in general, such decisions should be predictable and the citizen should know where he is.

**339.**  This exposition of the rule of law is only the aspiration for an ideal and it is not based on any down-to-earth analysis of practical problems with which a modern Government is confronted.  In the world of action, this ideal cannot be worked out and that is the reason why this exposition has been rejected by all practical men.

**340.**  If it is contrary to the rule of law that discretionary authority should be given to government departments or public officers, then there is no rule of law in any modern State.  A judge who passes a sentence has no other guidance except a statute which says that the person may be sentenced to imprisonment for a term which may extend to, say, a period of ten years.  He must exercise considerable discretion.  The High Courts and the Supreme Court overrule their precedents.  What previously announced rules guide them in laying down the new precedents ?  A court of law decides a case of first impression ; no statute governs, no precedent is applicable.  It is precisely because a judge cannot find a previously announced rule that he becomes a legislator to a limited extent.  All these would show that it is impossible to enunciate the rule of law which has as its basis that no decision can be made unless there is a certain rule to govern the decision.[102]

**341.**  Leaving aside these extravagant versions of rule of law, there is a genuine concept of rule of law and that concept implies equality before the law or equal subjection of all classes to the ordinary law.  But, if rule of law is to be a basic structure of the Constitution, one must find specific provisions in the Constitution embodying the constituent elements of the concept.  I cannot conceive of rule of law as a twinkling star up above the Constitution.  To be a basic structure, it must be a terrestrial concept having its habitat within the four corners of the Constitution.  The provisions of the Constitution were enacted with a view to ensure the rule of law.  Even if I assume that rule of law is a basic structure, it seems to me that the meaning and the constituent elements of the concept must be gathered from the enacting provisions of the Constitution.  The equality aspect of the rule of law and of democratic republicanism is provided in Article 14.  Maybe, the other articles referred to do the same duty.

**342.**  Das, C. J. said that Article 14 combines the English doctrine of the rule of law and the equal protection clause of the Fourteenth Amendment to the American Federal Constitution.[103]  In *State of Bengal* v. *Anwar Ali Sarkar*[104], Patanjali Sastri, C. J. observed that the first part of the article which has been adopted from the Irish Constitution, is a declaration of equality of the civil rights of all persons within the territories of India and thus enshrines what American judges regard as the "basic principle of republicanism"[105] and

101. (1967) 2 SCR 703, 718 : AIR 1967 SC 1427 : 65 ITR 34.
102. See *"Discretionary Justice"* by K. C. Davis.
103. *Basheshar Nath* v. *C.I.T.*, 1959 Supp 1

SCR 528, 550-551 : AIR 1959 SC 149 : 35 ITR 190.
104. 1952 SCR 284, 293 : AIR 1952 SC 75 : 1952 Cri LJ 510.
105. cf. *Ward* v. *Flood*, 17 Am Rep 40 5.


SCC Online Web Edition, Copyright © 2021
Page 164        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------------------------

that the second part which is a corollary of the first is based on the last clause of the first section of the Fourteenth Amendment of the American Constitution. So, the concept of equality which is basic to rule of law and that which is regarded as the most fundamental postulate of republicanism are both embodied in Article 14. If, according to the majority in *Bharati's case* (supra), Article 14 does not pertain to basic structure of the Constitution, which is the other principle of equality incorporated in the Constitution which can be a basic structure of the Constitution or an essential feature of democracy or rule of law? However, it is unnecessary to pursue this aspect of the question as I have already given reasons to show clause (4) to be bad.

**343.** I think clause (4) is bad for the reasons which I have already summarized. Clauses (1) to (3) of Article 329-A are severable but I express no opinion on their validity as it is not necessary for deciding this case.

**344.** Then the question is, whether the Representation of the People (Amendment) Act, 1974, and the Election Laws (Amendment) Act, 1975, are liable to be challenged for the reason that they damage or destroy a basic structure of the Constitution. Counsel for the respondent submitted that, if, by a constitutional amendment, the basic structure of the Constitution cannot be destroyed or damaged, it would be illogical to assume that an ordinary law passed under a power conferred by that instrument can do so and since these Acts damage the concept of free and fair election, the Acts were bad.

**345.** I think the inhibition to destroy or damage the basic structure by an amendment of the Constitution flows from the limitation on the power of amendment under Article 368 read into it by the majority in *Bharati's case* (supra) because of their assumption that there are certain fundamental features in the Constitution which its makers intended to remain there in perpetuity. But I do not find any such inhibition so far as the power of Parliament or State Legislatures to pass laws is concerned. Articles 245 and 246 give the power and also provide the limitation upon the power of these organs to pass laws. It is only the specific provisions enacted in the Constitution which could operate as limitation upon that power. The preamble, though a part of the Constitution, is neither a source of power nor a limitation upon that power. The preamble sets out the ideological aspirations of the people. The essential features of the great concepts set out in the preamble are delineated in the various provisions of the Constitution. It is these specific provisions in the body of the Constitution which determine the type of democracy which the founders of that instrument established ; the quality and nature of justice, political, social and economic which was their desideratum, the content of liberty of thought and expression which they entrenched in that document, the scope of equality of status and of opportunity which they enshrined in it. These specific provisions enacted in the Constitution alone can determine the basic structure of the Constitution as established. These specific provisions, either separately or in combination determine the content of the great concepts set out in the preamble. It is impossible to spin out any concrete concept of basic structure out of the gossamer concepts set out in the preamble. The specific provisions of the Constitution are the stuff from which the basic structure has to be woven. The argument of Counsel for the respondent proceeded on the assumption that there are certain norms for free and fair election in an ideal democracy and the law laid down by Parliament or State Legislatures must be tested on those norms and, if found wanting, must be struck down. The norms of election set out by Parliament or State Legislatures tested in the light of the provisions of the Constitution or necessary implications therefrom constitute the law of the land. That law cannot be subject to any other test, like the test of free and fair election in an ideal democracy.


Case 1:21-cv-00396-RJL  Document 20-11  Filed 08/14/21  Page 166 of 289
SCC Online Web Edition, Copyright © 2021
Page 165    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases



-------------------------------------------------------------------------------------------------------------------

INDIRA NEHRU GANDHI *v.* RAJ NARAIN (*Mathew, J.*)    139

**346.** I do not think that an ordinary law can be declared invalid for the reason that it goes against the vague concepts of democracy ; justice, political, economic and social ; liberty of thought, belief and expression ; or equality of status and opportunity, or some invisible radiation from them.

> "......(N)o political terms have been so subjected to contradictory definitions as 'democracy' and 'democratic' since it has become fashionable and profitable for every and any State to style itself in this way.    The Soviet Union and communist States of Eastern Europe, the Chinese People's Republic, North Korea and North Vietnam all call themselves democracies. So does Nasser's Egypt ; so does General Stoessner's Paraguay ; so did Sukarno's Indonesia.    Yet, if anything is clear, it is that these States do not all meet the same definition of democracy."[106]

Definitions are important, for, they are responsible in the last analysis for our image of democracy.   The question is not only what does the word 'democracy' mean but also what is the thing.   And, when we try to answer this latter query, we discover that the thing does not correspond to the word.   So, although 'democracy' has a precise literal meaning, that does not really help us to understand what an actual democracy is.   In the real world, R. A. Dahl has pointed out that, democracies are 'polyarchies'.   The term democracy has not only a descriptive or denotative function but also a normative and persuasive function.   Therefore, the problem of defining democracy is two-fold, requiring both a descriptive and prescriptive function.   To avoid pitfalls, it is necessary to keep in mind two things—first, that a firm distinction should be made between the *is* and the *ought* of democracy, and, second, that the prescriptive and the descriptive definitions of democracy must not be confused, because the democratic ideal does not define the democratic reality and vice versa ; the real democracy is not and cannot be the same as the ideal one.[107] One cannot test the validity of an ordinary law with reference to the essential elements of an ideal democracy.   It can be tested only with reference to the principles of democracy actually incorporated in the Constitution.

**347.** Nor can it be tested on the touchstone of justice.   The modern Pilate asks : What is justice ? and stays not for an answer.   To Hans Kelsen, justice is an irrational ideal, and regarded from the point of rational cognition, he thinks there are only interests and hence conflict of interest.   Their solution, according to him, can be brought about by an order that satisfies one interest at the expense of the other or seeks to achieve a compromise between opposing interests.[108]   Mr. Allen has said that the concept of social justice is vague and indefinite.[109]   Liberty of thought, expression, belief, faith and worship are not absolute concepts.   They are emotive words.   They mean different things to different people.   Equality of status and of opportunity are concepts laden with emotional overtones.   In their absoluteness they are incapable of actual realisation.   The enacting provisions in the body of the Constitution alone give concrete shape to these ideas and it is on the basis of these provisions that the validity of ordinary law should be tested.

**348.** The democracy which our Constitution-makers established is based on the representation of the people in the law-making organs.   The method by which this representation has to be effectuated has been provided in the Constitution.   Part XV of the Constitution deals with the topic of elections.

106. *See* Finer : *Comparative Government*, 1970 pp. 62-63.

107. See *"Democratic Theory"* by Giovanni Sartori, Chapter I.

108. *"General Theory of Law and State"* (1946) p. 13.

109. *"Aspects of Justice"*, p. 31.


SCC Online Web Edition, Copyright © 2021
Page 166      Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------------------------------------------------

140                         SUPREME COURT CASES                    1975 Supp SCC

Article 326 provides that elections to the House of the People and to the legis-
lative assemblies of States should be on the basis of adult suffrage.   Articles
327 and 328 provide for making of laws with respect to all matters relating to,
or in connection with, elections to either House of Parliament or to the House
or either House of the Legislature of a State including the preparation of
electoral rolls, the delimitation of constituencies and all other matters necessary
for securing the due constitution of such House or Houses.   The validity of any
law relating to the delimitation of constituencies or the allotment of seats to
the constituencies, made or purporting to be made under Article 327 or Article
328 shall not be called in question in any court [see Article 329(*a*)].

349.   This would indicate that the Constitution has entrusted the task
of framing the law relating to election to Parliament, and, subject to the law
made by Parliament, to the State Legislatures.   An important branch of the
law which sounds in the area of free and fair election, namely, delimitation
of constituencies and allotment of seats to such constituencies is put beyond
the cognizance of court.   When it is found that the task of writing the legis-
lation on the subject has been committed to Parliament and State Legislatures
by the Constitution, is it competent for a court to test its validity on the basis
of some vague norms of free and fair election ?   I think not.   As I said, like
other laws made by Parliament or State Legislatures, the laws made under
Articles 327 and 328 are liable to be tested by Part III of the Constitution or
any other provision of the Constitution ; but it is difficult to see how these laws
could be challenged on the ground that they do not conform to some ideal notions
of free and fair election to be evolved by the court from out of airy nothing.

350.   The doctrine of the 'spirit' of the Constitution is a slippery slope.
The courts are not at liberty to declare an Act void, because, in their opinion,
it is opposed to the *spirit* of democracy or republicanism supposed to pervade
the Constitution but not expressed in words.   When the fundamental law has
not limited, either in terms or by necessary implication, the general powers
conferred upon the Legislature, we cannot declare a limitation under the notion
of having discovered some ideal norm : of free and fair election.

351.   Cooley has observed that courts are not at liberty to declare statutes
void because they appear to the minds of the judges to violate fundamental
principles of republican government, unless it shall be found that those prin-
ciples are placed beyond legislative encroachment by the Constitution.   The
principles of democratic republican government are not a set of inflexible rules ;
and unless they are specifically incorporated in the Constitution, no law can be
declared bad merely because the Court thinks that it is opposed to some impli-
cation drawn from the concept.[110]

352.   Counsel for the respondent relied upon the observations of Sikri,
C. J. at p. 216 (SCC p. 405, para 475), Shelat and Grover, JJ. at p. 292 (SCC p. 463,
para 608), Hegde and Mukherjea, JJ. at p. 355 (SCC p. 511, para 742) and Jagan-
mohan Reddy, J. at p. 556 (SCC p. 667, para 1212) in their judgments in *Bharati's
case* (supra) in support of his contention that when these Acts were put in the
Ninth Schedule by the constitutional amendment, their provisions became
vulnerable to attack if they or any one of them damaged or destroyed the basic
features of democracy or republicanism.

353.   Sikri, C. J. has said that the Constitution Twenty-ninth Amendment
Act, 1971, is ineffective to protect the impugned Acts there if they abrogate
or take away fundamental rights.   This would not show that the learned Chief

110.  See *Constitutional Limitations*, 8th Ed. Vol. 1, pp. 349-352.



SCC Online Web Edition, Copyright © 2021
Page 167      Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------------------------------------------------

INDIRA NEHRU GANDHI *v.* RAJ NARAIN (*Mathew, J.*)      141

Justice countenanced any challenge to an Act on the ground that the basic structure of the Constitution has been damaged or destroyed by its provisions not constituted by the fundamental rights abrogated or taken away.  In other words, if by taking away or abridging the fundamental rights, the basic structure of the Constitution is damaged or destroyed, then, according to the learned Chief Justice, the legislation would be vulnerable on that score, even though it is put in the Ninth Schedule by a constitutional amendment.  But it would not follow that an Act so put can be challenged for a reason not resulting from the taking away or abrogation of the fundamental right.  To put it differently, even though an Act is put in the Ninth Schedule by a constitutional amendment, its provisions would be open to attack on the ground that they destroy or damage the basic structure if the fundamental right or rights taken away or abrogated pertains or pertain to basic structure.  But the Act cannot be attacked, if I may say so, for a collateral reason, namely, that the provisions of the Act have destroyed or damaged some other basic structure, say, for instance, democracy or separation of powers.

**354.**  Shelat and Grover, JJ. have said in their judgment that the Twenty-ninth Amendment is valid, but the question whether the Acts included in the Ninth Schedule by that amendment or any provision of those Acts abrogates any of the basic elements of the constitutional structure or denudes them of their identity will have to be examined when the validity of those Acts comes up for consideration.  Similar observations have been  made by Hegde and Mukherjea, JJ. and by Jaganmohan Reddy, J. Khanna, J. only said that the Twenty-ninth Amendment was valid.

**355.**  It is rather strange that an Act which is put in the Ninth Schedule with a view to obtain immunity from attack on the ground that the provisions thereof violate the fundamental rights should suddenly become vulnerable on the score that they damage or destroy a basic structure of the Constitution resulting not from the taking away or abridgment of the fundamental rights but for some other reason.

**356.**  There is no support from the majority in *Bharati's case* (supra) for the proposition advanced by Counsel that an ordinary law, if it damages or destroys basic structure should be held bad or for the proposition that a constitutional amendment putting an Act in the Ninth Schedule would make the provisions of the Act vulnerable for the reason that they damage or destroy a basic structure constituted not by the fundamental rights taken away or abridged but some other basic structure.  And, in principle, I see no reason for accepting the correctness of the proposition.

**357.**  The Constitution-makers eschewed to incorporate the 'due process' clause in that instrument apprehending that the vague contours of that concept will make the court a third chamber.  The concept of a basic structure as brooding ominpresence in the sky apart from the specific provisions of the Constitution constituting it is too vague and indefinite to provide a yardstick to determine the validity of an ordinary law.

**358.**  So if it be assumed that these election laws amendment Acts, even after they were put in the Ninth Schedule by constitutional amendment remained open to attack for contravention, if any, of the fundamental rights, these Acts would not be open to attack on the ground that their provisions destroyed or damaged an essential feature of democracy, namely, free and fair election. The Acts remain part of the ordinary law of the land.  They did not attain the status of constitutional law merely because they were put in the Ninth Schedule. The utmost that can be said is, as I indicated, that even after putting them in


SCC Online Web Edition, Copyright © 202
Page 168      Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------------------------------------------------

the Ninth Schedule, their provisions would be open to challenge on the ground that they took away or abrogated all or any of the fundamental rights and therefore damaged or destroyed a basic structure if the fundamental rights or right taken away or abrogated constitute or constitutes a basic structure.

359. Counsel for the respondent then contended that retrospective operation has been given to the provisions of these Acts and that that would destroy or damage an essential feature of democracy viz., free and fair elections. The argument was that if one set of laws existed when an election was held and the result announced, you cannot thereafter substitute another set of laws and say that those laws must be deemed to have been in operation at the time when the election was held and the result announced, as that would lead to inequality, injustice and unfairness.

360. Retrospective operation of law in the field of election has been upheld by this Court [see *Kanta Kathuria* v. *Manak Chand* (supra)]. Retrospective operation of any law would cause hardship to some persons or other. This is inevitable ; but that is no reason to deny to the Legislature the power to enact retrospective law. In the case of a law which has retrospective effect, the theory is that the law was actually in operation in the past and if the provisions of the Acts are general in their operation, there can be no challenge to them on the ground of discrimination or unfairness merely because of their retrospective effect. In other words, if an Act cannot be challenged on the ground that its provisions are discriminatory or unreasonable if it is prospective in operation, those provisions cannot be attacked on these grounds merely because the provisions were given retrospective effect, unless there are special circumstances. I see no such special circumstances here.

361. I therefore hold that these Acts are not liable to be challenged on any of the grounds argued by Counsel.

362. Counsel for the respondent submitted that the session of Parliament in which the Election Laws Amendment Act, 1975 and the Thirty-ninth Amendment to the Constitution were passed was not properly convened and therefore the amendments were invalid.

363. The argument was that a number of members of the two Houses of Parliament were illegally detained by executive orders before the summoning of the two Houses and that was made possible by the President—the authority to summon the two Houses—making an order under Article 359 of the Constitution on June 27, 1975, which precluded these members from moving the court and obtaining release from illegal detention and attending the session. In effect, the contention of Counsel was that the authority to summon Parliament effectually prevented by its order made under Article 359, those members who were illegally detained from attending the session and, as the composition of the session was unconstitutional, any measure passed in the session would be bad. Reliance was placed by Counsel upon the decision in *A. Nambiar* v. *Chief Secretary*[111] in support of this proposition.

364. The question which fell for consideration in that case was whether, when a member of Parliament was convicted for a criminal offence and was undergoing a sentence in pursuance thereof, he has an unconditional right to attend a session of Parliament. This Court held that he had no privilege which obliged the court to release him from custody in order to enable him to attend the session. This decision has no relevance to the point in controversy here.

111. (1966)2 S CR 406 : AIR 1966 SC 657 : 1966 Cri LJ 586.


SCC Online Web Edition, Copyright © 2021
Page 169    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

**365.** In England, a member of Parliament who is convicted of a criminal offence and is undergoing sentence in pursuance to his conviction has no right or privilege to be released from custody for attending Parliament. The very same principle will apply in the case of a detention under an emergency regulation.[112]

**366.** In England, it was taken as settled that parliamentary roll is conclusive of the question that a bill has been passed by both Houses of Parliament and has received royal assent and no court can look behind the roll as such an inquiry would be an interference with the privilege of Parliament. Lord Campbell said in *Edinburgh & Dalkeith Ry.* v. *Wauchope*[113] :

> "I think it right to say a word or two upon the point that has been raised with regard to an Act of Parliament being held inoperative by a court of justice because the forms prescribed by the two Houses to be observed in the passing of a Bill have not been exactly followed.... I cannot but express my surprise that such a notion should have prevailed. There is no foundation for it. All that a court of justice can do is to look to the Parliamentary Roll. If from that it should appear that a Bill has passed both Houses and received the Royal Assent, no court of justice can inquire into the mode in which it was introduced in Parliament, nor into what was done previous to its introduction, or what passed in Parliament during its progress in its various stages through both Houses."

**367.** It has since been said that parliamentary roll is not conclusive, that when the jurisdiction of a court is invoked, it has power to determine whether everything necessary has been done for the production of a valid statute, that rule of law requires that the court should determine legal questions raised before it and if its jurisdiction is properly invoked, it has to answer the question whether the document is *a statute duly enacted by* a Parliament. The view as propounded has been summarized as follows :

> "(1) Sovereignty is a legal concept : the rules which identify the sovereign and prescribe its composition and functions are logically prior to it.
>
> (2) There is a distinction between rules which govern, on the one hand, (*a*) the composition, and (*b*) the procedure, and on the other hand (*c*) the area of power, of a sovereign Legislature.
>
> (3) The courts have jurisdiction to question the validity of an alleged Act of Parliament on grounds 2(*a*) and 2(*b*), but not on ground 2(*c*)."[114]

The reasons for the view are these : When the purported sovereign is anyone but a single actual person, the designation of him must include the statement of rules for the ascertainment of his will, and these rules, since their observance is a condition of the validity of his legislation, are rules of law logically prior to him.[115] The extraction of a precise expression of will from a multiplicity of human beings is, despite all the realists say, an artificial process and one which cannot be accomplished without arbitrary rules. It is therefore an incomplete statement to say that in a State such and such an assembly of human beings is sovereign. It can only be sovereign when acting in a certain way prescribed by law. At least some rudimentary manner and form is demanded

---

112. See *May's Parliamentary Practice*, 18th Ed., p. 103.
113. (1842) 8 Cl & F 710, 724.
114. *See* R. F. V. Heuston : *Essays in Constitutional Law*, Second edition, pp.

6-7.
115. *See* Latham : "*The Law and the Commonwealth*" (O. U. P. 1949), p. 523.


SCC Online Web Edition, Copyright © 2021
Page 170    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------------------------------

of it : the simultaneous incoherent cry of a rabble, small or large, cannot be law, for it is unintelligible.[116]

**368.** Sir Frederick Pollock has said that supreme legal power is in one sense limited by the rules which prescribe how it shall be exercised. Even if no constitutional rule places a limit or boundary to what can be done by sovereign legal authority, the organs which are to exercise it must be delimited and defined by rules.[117]

**369.** So, the questions to be asked are : how is Parliament composed ? How does Parliament express its will ?

**370.** The rules which identify the sovereign are as important as the institution so identified. If this is so, it is open to the court to see whether a Parliament has been properly summoned in order to decide the question whether a measure passed by it answers the description of a statute or an Act and that parliamentary roll, if such a thing exists, is not conclusive.

**371.** As to parliamentary roll, Heuston has said :

"The 'Parliamentary Roll', whatever exactly it may have been, disappeared in England a century ago, though even good authors sometimes write as if it still exists. Since 1849 there has been no 'Roll', simply two prints of the Bill on durable vellum by Her Majesty's Stationery Office, which are signed by the Clerk of the Parliaments and regarded as the final official copies. One is preserved in the Public Record Office and one in the library of the House of Lords."[118]

**372.** Article 122(1) provides that the validity of any proceedings in Parliament shall not be called in question on the ground of any alleged irregularity of procedure. So, even if there is any irregularity in the procedure in the passing of the statute, it is not open to a court to question its validity. But this is distinct from the question whether the two Houses have been properly summoned and the composition of the Session was proper.

**373.** The Solicitor General said that if a member is excluded from participating in the proceedings of a House, that is a matter concerning the privilege of that House as the grievance is one of exclusion from the proceedings within the walls of the House. And, in regard to the right to be exercised within the walls of the House, the House itself is the judge. He referred to *May's Parliamentary Practice* (18th Ed., pp. 82-83) and also to *Bradlaugh* v. *Gossett*[119] in this connection. He further said that if an outside agency illegally prevents a member from participating in the proceedings of the House, the House has power to secure his presence in the House and cited *May's Parliamentary Practice* (18th Ed., pp. 92-95) to support the proposition.

**374.** These passages throw no light on the question in issue here. Ever since the decision of Holt, C. J. in *Ashby* v. *White*[120] it has been settled that privilege is part of the common law and cannot affect rights to be exercised outside or independently of the House. Regularity of internal proceedings is one thing ; the constitutional rights of the subject are another ; and it is the latter which are in issue in a case where the question is whether the document is a statute.[121]

116. *See* Latham : *"What is an Act of Parliament?"* (1939) King's Counsel, p. 152.
117. *See* Geoffrey Marshall : *Constitutional Theory*, pp. 40-41.
118. *Essays in Constitutional Law*, p. 18 (2nd Ed.).
119. 12 QBD 271, 285-286.
120. (1703) 14 St Tr 695.
121. *See* Heuston : *Essays in Constitutional Law*, 2nd Ed., p. 22.


SCC Online Web Edition, Copyright © 2021
Page 171      Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

---

**375.** Article 85(1) provides that the President shall from time to time summon each House of Parliament to meet at such time and place as he thinks fit, but six months shall not intervene between its last sitting in one session and the date appointed for its first sitting in the next session.

**376.** The detention of these members of Parliament was by statutory authorities in the purported exercise of their statutory power. It would be strange if a statutory authority, by an order which turns out to be illegal, could prevent the Houses of Parliament from meeting as enjoined by Article 85. If a statutory authority passes an illegal order of detention and thus prevents a member of Parliament from attending the House, how can the proceedings of Parliament become illegal for that reason ? It is the privilege of Parliament to secure the attendance of persons illegally detained. But what would happen if the privilege is not exercised by Parliament ? I do not think that the proceedings of Parliament would become illegal for that reason.

**377.** The suspension of the remedy for the enforcement of fundamental rights by the order of the President under Article 359 is dependent upon a valid proclamation of emergency under Article 352. If a situation arose which authorized the President to issue a proclamation under Article 352, he could also suspend, under Article 359, the remedy to move the court to enforce the fundamental rights. These are the constitutional functions of the President and unless it is established that the proclamation made by the President under Article 352 or the suspension under Article 359 of the remedy for enforcement of fundamental rights is unconstitutional, it is impossible to hold that the President has, in any way, illegally prevented the release of these members from the supposed illegal detention so as to make a session of Parliament unconstitutional, in consequence of the inability of those members to attend the session. In other words, the President, in performing his constitutional function under these articles has not authorized the illegal detention of any person let alone any member of Parliament or unconstitutionally prevented the release from custody of any member. He has only discharged his constitutional functions. If this be so, it is difficult to hold that the session in which the amendments were passed was illegally convened. The challenge to the validity of the amendments on this score must be overruled.

**378.** Counsel for the respondent submitted that it is immaterial when a candidate committed a corrupt practice—whether it was before or after he became a candidate—and that an election would be set aside even if a person committed the corrupt practice before he became a candidate. Section 79(*b*) of the Representation of the People Act, 1951, defined the word 'candidate' as follows :

" 'candidate' means a person who has been or claims to have been duly nominated as a candidate at any election, and any such person shall be deemed to have been a candidate as from the time when, with the election in prospect, he began to hold himself out as a prospective candidate."

Clause 7 of the Election Laws (Amendment) Act, 1975, substituted the present definition in Section 79(*b*) which reads :

" 'candidate' means a person who has been or claims to have been duly nominated as a candidate at an election."

**379.** In support of the proposition that an election can be set aside even if a person has committed corrupt practice of bribery before he became a candidate, Counsel cited *Halsbury's Laws of England*, 3rd Ed., Volume 14, pages 222 (paragraph 386) and 218 (paragraph 380).


SCC Online Web Edition, Copyright © 2021
Page 172        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------------

**380.** These paragraphs state that in order to constitute the offence of bribery, it does not matter how long before an election a bribe is given, provided that the bribe is operative at the time of the election, and that, time is material only when considering the question of evidence.

**381.** Counsel further said that under Section 100 of the Representation of the People Act, 1951, an election is liable to be set aside if it is found under clause (*b*) of sub-section (1) of that section that a returned candidate has committed corrupt practice ; that *ex hypothesi*, a returned candidate cannot commit a corrupt practice, and therefore, it is not the description of a person as a returned candidate that is material.   He argued that if in Section 100(1)(*b*) the word 'returned candidate' is used not with the idea of indicating that a person should have committed corrupt practice after he became a returned candidate, there is no reason to think that the word 'candidate' in Section 123(7) has been used to show that the corrupt practice therein mentioned should have been committed after a person has become a 'candidate' in order that the election of the candidate might be set aside.

**382.** There can be no doubt that Section 100(1)(*b*), when it speaks of commission of corrupt practice by a returned candidate, it can only mean commission of corrupt practice by a candidate before he became a returned candidate.   Any other reading of the sub-section would be absurd.   But there is no such compulsion to read the word 'candidate' in Section 123(7) in the same manner.   It is the context that gives colour to a word.   A word is not crystal clear.   Section 79 of the Act indicates that the definitions therein have to be read subject to the context.

**383.** The Legislature must fix some point of time before which a person cannot be a 'candidate' in an election, and, a wide latitude must be given to the Legislature in fixing that point. In *Union of India* v. *M/s. Parameswaran Match Works*[122], this Court observed : (SCC p. 311, para 10)

> "The choice of a date as a basis for classification cannot always be dubbed as arbitrary even if no particular reason is forthcoming for the choice unless it is shown to be capricious or whimsical in the circumstances. When it is seen that a line or point there must be, and there is no mathematical or logical way of fixing it precisely, the decision of the Legislature or its delegate must be accepted unless we can say that it is very wide of the reasonable mark.   See *Louisville Gas Co.* v. *Alabama Power Co.*[123] per Justice Holmes."

**384.** The learned Chief Justice has, in his judgment, referred to the relevant English statutes and the decisions of the English courts bearing on this point and has pointed out the difference between the English law and the Indian law.   I do not consider it necessary to cover the same ground.   I agree with his conclusion on the point.

**385.** I would therefore hold that even if it be assumed that the finding of the High Court that the appellant obtained or procured the assistance of Shri Yashpal Kapur during the period from January 7 to 24, 1971, is correct, the appellant shall not be deemed to have committed corrupt practice under Section 123(7) of the Representation of the People Act, 1951, as she became a candidate only on February 1, 1971.   The learned Chief Justice has also dealt with the contention urged by Counsel for respondent that Section 8(*b*) of the Election Laws Amendment Act, 1975 suffers from the vice of excessive delegation and is arbitrary.   I agree with his reasoning for repelling the same.

122.   (1975) 1 SCC 305.                          123.   240 US 30, 32.


SCC Online Web Edition, Copyright © 2021
Page 173      Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------------------------------

**386.** There can be no dispute that if the Election Laws Amendment Act, 1975, is valid, the appeal has to be allowed. I would, therefore, set aside the findings of the High Court against the appellant and allow the appeal without any order as to costs. In the cross appeal, the only question raised was about the correctness of the finding of the High Court that the appellant has not exceeded the prescribed limit of election expense. For the reasons given by Khanna, J. in his judgment, I hold that the finding of the High Court on this issue was correct. In this view, I have no occasion to reach the other questions argued. I would dismiss the cross appeal without any order as to costs.

**387.** BEG, J. (*concurring*).—There are two Election Appeals Nos. 887 and 909 of 1975, before us under Section 116A of the Representation of the People Act of 1951 (hereinafter referred to as 'the Act'). They are directed against decisions on different issues contained in the same judgment of a learned Judge of the Allahabad High Court allowing an election petition filed by Shri Raj Narain (hereinafter referred to as the 'Election-Petitioner'), a defeated candidate at the election held in February, 1971, for the membership of the Lok Sabha or the House of the People, against Shrimati Indira Nehru Gandhi, the Prime Minister of India (hereinafter referred to as 'the Original Respondent'). The election-petitioner is the respondent in Appeal No. 887 of 1975 filed by the original respondent. He is the appellant in Appeal No. 909 of 1975 where the original respondent is the contesting respondent.

**388.** Before the election case, instituted on April 24, 1971, could be decided by the trial Court, an explanation was added to Section 77 (1) of the Act. It had some bearing on questions relating to the expenses incurred on the original respondent's election, sought to be raised by the election-petitioner, but, on findings of fact recorded by the trial Court, it became immaterial for the merits of the case and would continue to be that so long as the election-petitioner is unable to dislodge the trial Court's findings on election expenses. Other amendments were made by the Election Laws (Amendment) Act No. 40 of 1975 (hereinafter referred to as the 'Act of 1975'), notified on August 6, 1975, after the decision of the case by the learned Judge of the Allahabad High Court on June 12, 1975 and after the filing of the appeals before us. These amendments deal directly with several questions decided by the Allahabad High Court which were pending consideration before this Court. Finally, came the Constitution (Thirty-ninth) Amendment Act of 1975 (hereinafter referred to as the 'Thirty-ninth Amendment'), gazetted on August 10, 1975, just before the commencement of the hearing of the appeals by this Court.

**389.** It was submitted by the learned Counsel for the original respondent, in his opening address, that Section 4 of the Thirty-ninth Amendment, adding clause (4) to Article 329-A of the Constitution, meant that Parliament itself, acting in its constituent capacity, had taken the case in hand and had, after applying its own standards, decided it in favour of the original respondent so that the jurisdiction of this Court to go into the merits of the case was ousted by clause (4), read with clauses (5) and (6), sought to be added to Article 329-A of the Constitution. It was submitted by him that each one of the amendments of the Act was aimed at removing genuine uncertainties or doubts about what the law was so that it may be brought into line with what it had been previously understood to be as declared


SCC Online Web Edition, Copyright © 202
Page 174    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------

by this Court, or, in any case, with what Parliament, correctly exercising its unquestionable law-making powers, thought that it should be.

**390.** The constantly recurring and vehemently pressed theme of the arguments of the learned Counsel for the election-petitioner was that the context and the contents of the Acts of 1974 and 1975, and, after that, of Section 4 of the Thirty-ninth Amendment, clearly indicated that the whole object of the Acts of 1974 and 1975 and of the constitutional amendment was an oblique one : to deprive the election-petitioner of the remedies he had under the law against an election vitiated by corrupt practices, and of the benefits of a decision of the High Court in his favour by taking away its grounds and then the jurisdiction of courts, which existed at the time of the Thirty-ninth Amendment, to deal with the case so that this case may not, in any event, terminate in favour of the election-petitioner. It was repeatedly suggested by the learned Counsel for the election-petitioner, throughout his arguments, that the law-making powers had been really abused by a majority in Parliament for the purposes of serving majority party and personal ends which were constitutionally unauthorised. It was even alleged that the President of India had also become a party to the misuse of constitutional powers by passing an ordinance depriving courts of jurisdiction to entertain habeas corpus petitions so that members of Parliament belonging to opposition parties, detained under preventive detention laws, may not secure release and oppose proposals which became embodied in the 1975 Act and the Thirty-ninth Amendment. It is when the country is faced with issues of this nature that the constitutionally vital role of the Judicature, as a coordinate and independent organ of a democratic system of government, comes into prominence and has to be performed without fear or favour, affection or illwill, as the custodian of constitutionality.

**391.** In the circumstances indicated above, it seemed to me to be absolutely essential for us to call upon the parties defending or assailing the Thirty-ninth Amendment and the Acts of 1974 and 1975, to take us, inter alia, into the merits of the cases of the two sides and the findings given by the trying Judge so as to enable us to see how far these findings were justifiable under the law as it stood even before the amendments by the Acts of 1974 and 1975, how they were affected by these amendments, and how they were related to the validity of Section 4 of the Thirty-ninth Amendent. Speaking for myself, I clearly indicated to learned Counsel for the parties that I regard the nature and merits of the case decided to be of crucial importance not only in considering the validity of the Thirty-ninth Amendment and of the Acts of 1974 and 1975, but also in the wider interests of justice which are bound to be served by the vindication of the case of the party which should, on merits, win. Elementary considerations of justice required that the party with a better case should not be deprived of an opportunity of justifying its position, on facts and law touching the merits of the case, in the highest Court of the land, particularly when the original respondent, who happens to be the Prime Minister of this country, was accused of corrupt practices to secure her election and then of abuse of constitutional power and position to shield them. The high office of the original respondent, far from disabling this Court from investigating such allegations, ought to provide a good ground for this Court to go into the merits of the case if we are not really deprived of our jurisdiction to do that by Section 4 of the Thirty-ninth Amendment. This follows from the rule of law, as I understand it, embodied in our Constitution. National interests cannot, or at least, should not, I believe, suffer if justice and right, as determined by the highest Court in the country, prevail.


SCC Online Web Edition, Copyright © 202
Page 175    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

**392.** Citizens of our country take considerable pride in being able to challenge before superior courts even an exercise of constituent power, resting on the combined strength and authority of Parliament and the State Legislatures. This Court, when properly called upon by the humblest citizen, in a proceeding before it, to test the constitutional validity of either an ordinary statute or of a constitutional amendment, has to do so by applying the criteria of basic constitutional purpose and constitutionally prescribed procedure. The assumption underlying the theory of judicial review of all law-making, including fundamental law-making is that courts, acting as interpreters of what has been described by some political philosophers (see: Bosanquet's *"Philosophical Theory of the State"* Chap. V, pp. 96, 115) as the "Real Will" of the people, embodied in their Constitution and assumed to be more lasting and just and rational and less liable to err than their "General Will", reflected by the opinions of the majorities in Parliament and the State Legislatures for the time being, can discover for the people the not always easily perceived purposes of their Constitution. The courts thus act as agents and mouthpieces of the "Real Will" of the People themselves. Although judges, in discharging their onerous constitutional duties, cannot afford to ignore the limitations of the judicial technique and their own possibly greater liability to err than legislators could on socio-economic issues and matters of either social philosophy, or practical policy, or political opinion only, yet, they cannot, without violating their oaths of office, fail to elucidate and uphold a basic constitutional principle or norm unless compelled by the law of the Constitution to abstain from doing so. One of these basic principles seems to me to be that, just as courts are not constitutionally competent to legislate under the guise of interpretation, so also neither our Parliament nor any State Legislature, in the purported exercise of any kind of law-making power, perform an essentially judicial function by virtually withdrawing a particular case, pending in any court, and taking upon itself the duty to decide it by an application of law or its own standards to the facts of that case. This power must at least be first constitutionally taken away from the court concerned and vested in another authority before it can be lawfully exercised by that other authority. It is not a necessary or even a natural incident of a "constituent power". As Hans Kelsen points out, in his *"General Theory of Law and the State"* (see: p. 143), while creation and annulment of all general norms, whether basic or not so basic, is essentially a legislative function, their interpretation and application to findings reached, after a correct ascertainment of facts involved in an individual case, by employing the judicial technique, is really a judicial function. Neither of the three constitutionally separate organs of State can, according to the basic scheme of our Constitution today, leap outside the boundaries of its own constitutionally assigned sphere or orbit of authority into that of the other. This is the logical and natural meaning of the principle of supremacy of the Constitution.

**393.** Issues raised before us relating to the validity of the Thirty-ninth Amendment and the Acts of 1974 and 1975, were: What are the constitutional purposes and ambit of the "constituent power" found in Article 368 of our Constitution? Were they, in any way, exceeded by the constituent authorities in making the Thirty-ninth Amendment in an unauthorised manner, or, for objects which, however laudable, were outside the scope of Article 368? Was there any procedural irregularity in the composition of Parliament which could enable this Court to hold that there was a basic defect in the enactment of either the 1975 Act or of the Thirty-ninth Amendment?


SCC Online Web Edition, Copyright © 2021
Page 176    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases


-----------------------------------------------------------------------------------------

Whether provisions of the Acts of 1974 and 1975 are immune from attack even on the ground that they resulted in a departure from the "basic structure" of our Constitution as explained by this Court in *His Holiness Kesavananda Bharati Sripadagalavaru* v. *State of Kerala*[124], by having been included in the Ninth Schedule of our Constitution, which does protect them from a challenge on the ground of any contravention of Part III guaranteeing fundamental rights to citizens and other persons, or, in other words, were the limits of the basic structure only operative against constitutional amendments or apply to ordinary statutes as well? Are any of the provisions of the Acts of 1974 and 1975 void for departures from or damage to any part of the "basic structure" of our Constitution or for any other excess or misuse of law-making powers?

**394.** We do not, when such a case comes up before us, concern ourselves with the validity of provisions other than those which affect the case before us. Nor do we consider the objects of any provision, in vacuo, divorced from the facts of the case to be decided. Therefore, parties had to and did address us on the broad features of the findings given by the learned trial Judge and the nature of the evidence given to support them so that we may be able to decide, inter alia, whether any "validation" of the original respondent's election, which was the evident purpose of clause (4) of Article 329A, sought to be added by Section 4 of the Thirty-ninth Amendment, was at all necessary. If that election was not really void and had been wrongly held by the trial Court to be vitiated, it did not need to be validated at all. In that event, a purported validation would be an exercise in futility before this Court had decided these appeals. Could it not be said that the intended validation was premature inasmuch as it proceeded on a basically erroneous premise that the original respondent's election was invalid when the question of its validity was *sub judice* in this Court? How could such a premise be assumed to be correct before this Court had gone into merits and decided the appeals pending before it? Such an inquiry is not irrelevant if the very nature and purpose of the exercise of a power are put in issue by both sides.

**395.** If the existence of the judgment of the Allahabad High Court created the impression that it must be assumed to be correct even before this Court had pronounced upon the correctness of the judgment, the stay order given by this Court should have removed it. The legal effect of that stay order was that the trial Court's order, to use the language of Section 116A (4) of the Act, "shall be deemed never to have taken effect". It did not matter if the stay order, out of deference for existing precedents, had been framed in the form of a "conditioned" stay, that is to say, a stay in law and effect with certain conditions annexed. It was not a "conditional" stay. Indeed, having regard to the nature of the order the operation of which was to be stayed, there could be no "conditional" stay here. As to the legal effect of such a stay order, there is no doubt in my mind that, considering the clear words of Section 116A (4) of the Act, it deprived the order of the High Court of any operative force whatsoever during the pendency of these appeals. There could be really no binding precedent in discretionary matters depending on the facts and circumstances of each case. The operation of the judgment of the trial Court and the consequential orders are stayed only on "sufficient cause" shown on the facts of that case. In the case before us, the sufficient cause seems to me to be

124. 1973 Supp. SCR 1 : (1973) 4 SCC 225.


SCC Online Web Edition, Copyright © 2021
Page 177    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------------------------

apparent from a bare perusal of the judgment of the trial Court. As I have pointed out below, the judgment under appeal contains glaringly erroneous conclusions, reached by ignoring what has been repeatedly laid down in election cases by this Court, even if one were to assume, for the sake of argument, that all the findings of fact recorded by the trial Court, including some very questionable ones, on which its conclusions rest, were correct.

**396.** In a case where the bona fides of legislation and even of a constitutional amendment, is questioned on the ground of a suggested frightfulness in the facts of the case which Parliament and the ratifying State Legislatures are to be supposed, if we are to accept the suggestion, to have been acting in concert to prevent this Court from examining on merits, it was, I think, the duty of Counsel making any such suggestion to invite our attention to any fact not fully disclosed or discussed in the judgment under appeal at least when he was asked, as I repeatedly asked him in the course of his arguments extending over a period of about fifteen days out of a total period of hearing of the case for thirty-two days, how the trial Court's conclusions on the two matters, forming the subject-matter of Appeal No. 887 of 1975 of the original respondent, could possibly be justified. However, I have also satisfied myself, by going through the whole evidence on record on these two matters, which I shall presently deal with, that learned Counsel for the election-petitioner could not possibly usefully add anything to the replies he actually gave on the questions put to him on these matters and to the discussion of the whole evidence on these questions by the trial Court. I have taken pains to clarify this position as the learned Counsel for the election-petitioner, at the end of arguments of both sides, extending over thirty-two days of actual hearing, stated that he had argued on the assumption that we will be concerned only with the validity of the Thirty-ninth Amendment and the validity and correct interpretation of the Acts of 1974 and 1975. I think that it was made clear to him that we will have to enter into the merits if that was necessary, as I think it is, for judging whether amendments in law were either necessary or justified. Learned Counsel for the election-petitioner was not prevented from dealing with any question, whether of fact or law, which he may have wanted to raise. Learned Counsel for both sides had fully argued at least the election-petitioner's Appeal No. 909 of 1975 on facts and law. They had taken us sufficiently into facts and findings involved in the original respondent's Appeal No. 887 of 1975 to justify our dealing with all questions necessary to decide this appeal on merits also. Indeed, it is not necessary for us to go beyond findings of fact recorded by the learned Judge, as distinct from conclusions based upon them which are questions of law, to demonstrate the very palpable errors committed by the learned Judge on the two questions which are the subject-matter of Appeal No. 887 of 1975.

**397.** Shrimati Indira Nehru Gandhi was elected to the House of the People from the Rae Bareli constituency in Uttar Pradesh by an overwhelming majority of 1, 11, 800 votes against Shri Raj Narain. As is not unusual, the defeated candidate filed an election-petition under the Act making all kinds of allegations, including some quite extravagant ones, which formed the subject-matter of the first set of eleven issues framed on August 19, 1971. Thereafter, three additional issues were framed on April 27, 1973, when the question whether an amendment of the petition, sought after the period of limitation for filing a petition to challenge


SCC Online Web Edition, Copyright © 2021
Page 178     Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

---

the election had expired, should be permitted, had been finally decided by this Court in favour of Shri Raj Narain.

**398.** The issues framed give an idea of the cases set up on behalf of the two sides. They were:

## ISSUES

"1. Whether respondent No. 1 obtained and procured the assistance of Yashpal Kapur in furtherance of the prospects of her election while he was still a gazetted officer in the service of Government of India. If so, from what date?

2. Whether at the instance of respondent No. 1 members of the armed forces of the Union arranged Air Force planes and helicopters for her, flown by members of the armed forces, to enable her to address election meetings on February 1, 1971 and February 25, 1971, and if so, whether this constituted a corrupt practice under Section 123(7) of the Representation of the People Act?

3. Whether at the instance of respondent No. 1 and her election agent Yashpal Kapur, the District Magistrate of Rae Bareli, the Superintendent of Police of Rae Bareli and the Home Secretary of U. P. Government arranged for rostrums, loudspeakers and barricades to be set up and for members of the police force to be posted in connection with her election tour on February 1, 1971 and February 25, 1971; and, if so, whether this amounts to a corrupt practice under Section 123(7) of the Representation of the People Act?

4. Whether quilts, blankets, dhoties and liquor were distributed by agents and workers of respondent No. 1 with the consent of her election agent Yashpal Kapur, at the places and on the dates mentioned in Schedule A of the petition in order to induce electors to vote for her?

5. Whether the particulars given in paragraph 10 and Schedule A of the petition are too vague and general to afford a basis for allegations of bribery under Section 123(1) of the Representation of the People Act?

6. Whether by using the symbol cow and calf, which had been allotted to her party by the Election Commission in her election campaign the respondent No. 1 was guilty of making an appeal to a religious symbol and committed a corrupt practice as defined in Section 123(3) of the Representation of the People Act?

7. Whether on the dates fixed for the poll voters were conveyed to the polling stations free of charge on vehicles hired and procured for the purpose by respondent No. 1's election agent Yashpal Kapur, or other persons with his consent, as detailed in Schedule B to the petition?

8. Whether the particulars given in paragraph 12 and Schedule B of the petition are too vague and general to form a basis for allegations regarding a corrupt practice under Section 123(5) of the Representation of the People Act?

9. Whether respondent No. 1 and her election agent Yashpal Kapur incurred or authorised expenditure in excess of the amount prescribed by Section 77 of the Representation of the People Act, read with Rule 90, as detailed in para 13 of the petition?


SCC Online Web Edition, Copyright © 2021
Page 179    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------------

10.  Whether the petitioner had made a security deposit in accordance with the rules of the High Court as required by Section 117 of the Representation of the People Act ?

11.  To what relief, if any, is the petitioner entitled ?

### ADDITIONAL ISSUES

1.  Whether respondent No. 1, obtained and procured the assistance of Yashpal Kapur in furtherance of the prospects of her election while he was still a gazetted officer in the service of the Government of India.  If so, from what date ?

2.  Whether respondent No. 1 held herself out as a candidate from any date prior to February 1, 1971 and if so, from what date ?

3.  Whether Yashpal Kapur continued to be in the service of Government of India from and after January 14, 1971 or till which date ?

**399.**  The High Court trying the case had, in the course of a lengthy judgment, rejected the election-petitioner's case on issues Nos. 2, 4, 6, 7 and 9 of the first set of issues, after minutely and meticulously scrutinizing every material allegation of the election-petitioner and the evidence given in support of it on each of these issues.  Out of these, the election-petitioner, in his Cross Appeal No. 909 of 1975, has questioned the findings of the High Court only on issues Nos. 2, 4, 6, 7 and 9 set out above.  Issues Nos. 5, 8 and 10, decided in favour of the election-petitioner, were technical and are immaterial now.  It will be noticed that the additional issue No. 1, due to some error or oversight, is an exact and unnecessary repetition of the initial issue No. 1.  Additional issues numbered 2 and 3 are connected with and subsidiaries of the initially framed issues numbered 1 and 3.

**400.**  The learned trial Judge had accepted the election-petitioner's case on the material issues numbered 1 and 3 of the initially framed issues, and on the overlapping and subsidiary additional issues 1, 2 and 3.  He was of opinion that Shri Yashpal Kapur, a Central Government servant and a gazetted officer of the rank of an Under Secretary, deputed to serve in the Prime Minister's Secretariat as an Officer on Special Duty, had held his post until January 25, 1971, when his resignation, tendered on January 13, 1971, was accepted by the President of India with effect from January 14, 1971, by means of a notification published on February 6, 1971.  Consequently, the learned Judge set aside the election of the original respondent after holding that she was guilty of a "corrupt practice", as defined by Section 123(7) of the Act, on each of two grounds : firstly, that she must be deemed to have obtained the help of Shri Yashpal Kapur, in the furtherance of her election, before he had ceased to be a gazetted officer in government service, and after the original respondent had first held herself out, on December 29, 1970, as a candidate at the forthcoming election from the Rae Bareli constituency by answering in the negative a question put to her at a press conference in New Delhi inquiring whether she had decided to change her constituency from Rae Bareli in U. P. to Gurgaon in Haryana; and, secondly, that she must be deemed to have obtained the help of officials of the State of U. P. who got rostrums constructed for her election speeches and electricity provided and arrangements made for loudspeakers. The learned Judge declared her to be disqualified under Section 8 of the Act from holding her office for a period of six years from the date of his order dated June 12, 1975.  I deliberately employ the word


SCC Online Web Edition, Copyright © 202
Page 180      Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

"deemed" to describe the nature of the findings of the trial Judge on both these questions because the learned Judge had himself indicated that they were inferences based entirely on circumstantial and not on any direct evidence whatsoever of any instructions issued either by the original respondent or by her election agent during the period following December 29, 1970. Election Appeal No. 887 of 1975 was filed against decisions on these two questions and consequential orders of the learned trial Judge.

**401.** The law, as found in the Act of 1951 did not, unlike the English Act of 1949, make a distinction between corrupt practices and illegal practices. Section 123(7), as it has stood unamended, enumerates, as the last of the 7 classes of corrupt practice, as follows:

"*Section 123. (7)* The obtaining or procuring or abetting or attempting to obtain or procure by a candidate or his agent or, by any other person with the consent of a candidate or his election agent, any assistance other than the giving of vote for the furtherance of the prospects of that candidate's election, from any person in the service of the Government and belonging to any of the following classes, namely:—

   (*a*) gazetted officers;

   (*b*) stipendiary judges and magistrates;

   (*c*) members of the armed forces of the Union;

   (*d*) members of the police forces;

   (*e*) excise officers;

  (*f*) (*g*) *               *               *

*Explanation.*—(1) In this section the expression 'agent' includes an election agent, a polling agent and any person who is held to have acted as an agent in connection with the election with the consent of the candidate.

(2) For the purposes of clause (7), a person shall be deemed to assist in the furtherance of the prospects of a candidate's election if he acts as an election agent of that candidate."

**402.** It is clear that "the obtaining or procuring or abetting or attempting to obtain or procure" had to take place either by a candidate or by his agent or by somebody "with the consent of the candidate or his election agent". Until the candidate had appointed an election agent, the action of any other person could not constitute him automatically an agent so that he may, by doing something voluntarily, succeed in making the candidate vicariously liable for his own actions whether he was or was not a gazetted officer at the time when he committed the act complained of. The question of obtaining assistance through "an agent" or "other person with the consent of a candidate or his election agent" could only arise where such a case of obtaining assistance indirectly through others is set up but not otherwise.

**403.** On issue No. 1, the case set up in paragraph 5 of the petition is:

"Smt. Indira Nehru Gandhi obtained and procured the assistance of the said Shri Yashpal Kapur for the furtherance of prospects of her election from the constituency aforesaid inasmuch as the said Shri Yashpal Kapur was a gazetted officer in the service of Government of India when his assistance was obtained and procured.........The said


SCC Online Web Edition, Copyright © 2021
Page 181        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source:  Supreme Court Cases

> Shri Yashpal Kapur *on the direction of Smt. Indira Nehru Gandhi organized the electioneering work for her* in the constituency during the period commencing from December 12, 1970…………"

It is a case of liability resulting from an alleged "direction" given by Smt. Indira Nehru Gandhi herself to Shri Kapur.  No case of procurement of assistance of Shri Kapur through a third person is set up although the word "procured" is mechanically lifted from Section 123(7) and used.  On issue No. 3, the case set up in para 9 of the petition is that both Smt. Indira Gandhi and her election agent, Shri Kapur, "obtained and procured" the assistance of government officers, but no directions or orders given by anyone are mentioned there.  Issue No. 1 shows that the case which was put in issue and went on trial was whether the original respondent had herself issued some direction to Shri Kapur.  Issue No. 3 shows that what was in issue here was whether the government officers mentioned there rendered the assistance indicated there "at the instance" of the original respondent or her election agent.  The discussion of evidence and findings of the learned Judge, particularly on issue No. 1, show that the learned Judge had almost made out a new case for the election-petitioner and accepted it.  This was, on issue No. 1, whether Shri Kapur had done some acts in circumstances which justify the inference that he was constituted a de facto agent of the Prime Minister even before he was appointed her election agent on February 1, 1971, and, on issue No. 3, whether sending round of certain tour programmes with the approval of the Prime Minister, in the background of certain long standing instructions of the Comptroller and Auditor General, read with letters sent by the Government of India, as long ago as January 12, 1959 and November 19, 1969, amounted to "implied" directions by the Prime Minister or her election agent to the State Government to provide the facilities the government officials gave.  Now, whenever a case of a liability by "implication", where there is such a species of liability in law, comparable to a criminal liability, is to be fastened upon an individual, the prosecutor is to be expected, as a part of an elementary duty to give fair notice and a fair opportunity to meet what the individual has really to be made liable for, either because of some act or omission of the individual concerned, or, even more so, for that of an agent or another person for which there may be some sort of vicarious liability, from facts showing consent or agency, to give full particulars of circumstances from which such implications or vicarious liabilities may arise.  I do not find that this was done here.

**404**.  The law must lay down a duty to prevent, by taking some steps which are not taken, before a person is held liable for an omission.  And, there is a difference between omission to prevent the doing of something and actual consent to the doing of it.  I do not find, in the petition, any case of a liability from omissions to do something set up, obviously because the law does not impose upon the candidate the duty to prevent the giving of voluntary assistance by others whether officials or not.  Nor is there anywhere in the petition a case of procurement by consenting to aid obtained through others.  It has to be remembered that, on the language of Section 123(7), a liability is not created by merely not rejecting voluntarily given aid.  The candidate may not often be aware of the voluntarily given assistance so as to be able to reject it.  A case of consent which can be legally set up is only one of consenting to active obtaining or procurement by an agent or by some other person who becomes, for the purposes of the specific aid given and consented to, ordinarily prior to obtaining it, as good as an agent employed by the candidate.


SCC Online Web Edition, Copyright © 202
Page 182      Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------------------

**405.** On the terms of Section 123(7) the following three types of cases of actual obtaining of assistance, as distinguished from abetment or attempting to obtain it, can be legally set up either exclusively, or, alternatively, against a candidate firstly, a direct obtaining of it by the act of the candidate hi nself, secondly, an indirect or vicarious procurement of it by the acts of a duly constituted agent, and, thirdly, an indirect or vicarious procurement of it by the acts of a person who, though not a duly constituted agent, becomes constructively an agent, for the purpose of some particular aid obtained, because it was assented to by the candidate at a time which must, ordinarily, be before the aid is given, so that the person through whom assistance is obtained is a constructive agent for this particular aid at the time when it is given. The term procurement should, strictly speaking, apply only in the last two types of cases. A reference to Section 100(1)(b) further emphasises the position that a corrupt practice for which the High Court is to declare an election void must have been committed either "by a returned candidate or his election agent or by any other person with the consent of the returned candidate or his election agent". A case falling under Section 100(1)(d)(ii) of "a corrupt practice committed in the interests of a candidate by an agent other than his election agent" is very different and postulates : firstly, a corrupt practice which can be committed only by an agent, and, secondly, the existence of such an agent. A case falling under Section 10J(1)(d) requires also proof of further fact that the result of the election was materially affected by the corrupt practice.

**406.** As I read the petition, I find only the first of the three types of cases mentioned above set up exclusively on issue No. 1 because there are no particulars there which could apply to the other two types of cases. Obviously, the case set up was not of a corrupt practice by some act of a person to which the candidate became a party by merely giving consent in which case the circumstances from which the consent was to be inferred had to be indicated. It was a case of a direction given by the Prime Minister herself to Shri Kapur who, it had to be presumed for the purposes of such a case, would not have given the aid if the direction or order was not there. This deliberately given "direction" had to be proved on the case set up. On issue No. 3, the petition mentions only what was obtained, that is to say, the aid of the particular officers and the form it took, but, what caused that aid to be given or the means adopted to get it were not set up there. I think these distinctions should have been borne in mind. I shall indicate below how the learned Judge, in dealing with a case of the first type only falling under Section 100(1)(b) of the Act, found in issue No. 1, mixed up facts which could, strictly speaking, be relevant only in considering a case of one of the other two types. And, in deciding issue No. 3, what really and quite naturally flowed from and was the well understood appurtenant of the office of a Prime Minister, and, indeed, absolutely necessary for the due protection of the life and freedom of movement of the holder of that high office, was mistaken by the learned Judge to be the result of some kind of assumed solicitation for aid. What the learned Judge entirely missed was that it is the act of solicitation for the aid of the officials mentioned in Section 123 7), whether successful or not, and not the mere fact that certain advantages flow quite naturally and conventionally from the occupation of an office, without any solicitation, or the mere fact that some assistance is voluntarily given by someone to an election campaign which is penalised by the provision.

**407.** The definition given above in Section 123(7) meant, on an ordinary and natural interpretation of words used, that the corrupt practice


SCC Online Web Edition, Copyright © 2021
Page 183     Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------------------------

INDIRA NEHRU GANDHI *v.* RAJ NARAIN (*Beg, J.*)          157

defined there could not be committed by any person before there was a "candidate" for an election. Hence, it became necessary to examine the definition of a "candidate" found in Section 79(*b*) which laid down:

"79. In this part and in Parts VII and VIII, unless the context otherwise requires,

\*\*          \*\*          \*\*          \*\*          \*\*

(*b*) 'candidate' means a person who has been or claims to have been duly nominated a candidate at any election, and any such person shall be deemed to have been a candidate as from the time when, with the election in prospect, he began to hold himself out as a prospective candidate."

**408.** Section 123, defining corrupt practices, is found in Part VII of the Act. Therefore, the definition of candidate in Section 79, as it originally stood, was sought to be applied by the trial Court to determine whether the original respondent could have committed a corrupt practice at the time of the alleged commission of it. Before, however, I deal with that question, it is necessary to examine what "obtaining, or procuring or abetting or attempting" meant in the light of the law laid down repeatedly by this Court in cases of alleged corrupt practices.

**409.** The logical consequence of placing a charge of corrupt practice on the same footing as a criminal charge is obligation to interpret the words which define it strictly and narrowly. Indeed, any natural and ordinary interpretation on the words "obtaining or procuring or abetting or attempting" must carry with it the imperative requirement that the candidate concerned or his agent must have intentionally done an act which has the effect contemplated by Section 123(7). In other words, a "*mens rea*" or a guilty mind as well as an "*actus reus*" or a wrongful act must concur to produce the result contemplated by law. So far as election expenses are concerned, it is possible to conceive that even an unintentional result (i.e. expenses "incurred" exceeding the prescribed limit may be enough so that a duty to prevent this result may be there in law. But, Section 123(7) requires actual intended acts of "obtaining" or "procuring" or attempting or abetting. For Section 123(7) results are immaterial.

**410.** In the case before us, the petition contains, as I have indicated above, the necessary averment of a deliberate direction by the original respondent herself, so far as issue No. 1 is concerned, and of "obtaining" and "procuring" as regards issue No. 3. These are enough to denote the ingredients of a mens rea. But, one will search the evidence in vain for any indication of a mens rea or guilty intent on the part of the original respondent or of her election agent when she had appointed one. As regards both issues Nos. 1 and 3, the learned Judge seemed to think that Section 123(7) creates what is called an "absolute statutory liability", which does not require a mens rea although, in dealing with issue No. 2, he had himself, after citing the necessary authorities, taken the view that a mens rea was also essential. He had himself, in dealing with issue No. 2, distinguished *Dr. Y. S Parmar* v. *Hira Singh*[125], a decision with whose ratio decidendi I have never, with due respect, felt happy in so far as it meant that a corrupt practice under Section 123 (7) does not require proof of mens rea. It was decided on the strength of a statutory presumption. There were other decisions of the

125.  AIR 1959 SC 244 : 1959 Supp 1 SCR 213.


SCC Online Web Edition, Copyright © 2021
Page 184    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------

Supreme Court under earlier law showing that mere appointment of a government servant as a polling agent could not be corrupt practice (See : *Satya Dev Bushahri* v. *Padam Dev*[126], *Mahendra Kumar* v. *Vidyavati*[127]. *Dr. Parmar's case* (supra) had necessitated an amendment in clause (2) of Explanation 1 of Section 123 (7) of the Act so that a government servant, by merely acting as a polling agent, could not be "deemed" to have so acted as to further the prospects of a candidate's election.   The learned Judge had relied in his findings on issue No. 2, on *Babubhai Vallabhdas Gandhi* v. *Piloo Homi Modi*[128], and *Haji Abdul Wahid* v. *B. V. Keskar*[129].   But, when he came to issue No. 3, and, right at the end of his judgment, to issue No. 1, he appears to have overlooked the basic requirements of a mens rea and an actus reus, or, in any case, if he had these requirements in view, he erred in assuming that they existed here.   I think he gravely erred in holding that some "actus reus" of the original respondent lay buried beneath circumstances which seem to me to really point in the opposite direction.   Sometimes, even if direct evidence is lacking, circumstantial evidence, which inescapably points to a particular conclusion, may be even better.   But, where is that evidence here ?   I fail to see it and none was pointed out to us.

**411.**   Let me here quote the exact language used by the trial Judge himself in giving his findings on the first part (relating to December 27, 1970 to January 13, 1971) of issue No. 1 of the "first set" of issues combined with the issue No. 1 of the additional issues, both issues, for some inexplicable reason, being identically worded.   The learned Judge said :

"Learned Counsel for the respondent then urged that even accepting that Shri Yashpal Kapur delivered a speech at Munshiganj on January, 7, 1971 and that he canvassed support for the respondent in that speech, he was not an election agent on that date, and there is *no evidence of the fact that he had been instructed to do so by the respondent No. 1.* Learned Counsel stressed that, consequently, it should not be held on that basis that the respondent No. 1 obtained or procured the assistance of Shri Yashpal Kapur for the furtherance of her election prospects.

I have given my careful consideration to this argument as well, but I regret my inability to accept the same.   As also stated earlier, Shri Yashpal Kapur was occupying a position of trust and confidence with the respondent No. 1 since quite a long time.   During the period in question he was Officer on Special Duty in the respondent No. 1' s Secretariat. In 1967 he had resigned from his post for the sake of respondent No. 1 to be able to do her election work in the constituency.   After that was done, he was taken back in the respondent's Secretariat as Officer on Special Duty.   Respondent No. 1 held herself out as a candidate on December 29, 1971.   On January 5, 1971 Raja Dinesh Singh was sent to the constituency.   On January 7, 1971 Shri Yashpal Kapur visited Rae Bareli, and on the own admission of respondent No. 1, he did so with previous notice to the respondent No. 1.   The subsequent events also appear to be material, for, according to Shri Yashpal Kapur, immediately on return from Rae Bareli he held a talk with the respondent No. 1 on January 9 or 10, 1971, on January 13 he again resigned from the post and the same day set out once again for the constituency of the respondent No. 1.   It was again he who

126.  10 E L R  103 : AIR  1955  SC 5 :        128.  36 E L R 108,  123-124  (Guj HC).
      (1955) 1 SCR 561.                        129.  21 E L R 409,  432 (All HC).
127.  10 E L R  214 : AIR  1956  SC 315.



SCC Online Web Edition, Copyright © 202
Page 185    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------

was ultimately appointed election agent for the respondent No. 1. *It may be added that it was not possible to adduce any direct evidence on the point whether the respondent No. 1 instructed Shri Yashpal Kapur to go to Rae Bareli on January 7, 1971 for any election work. That can be inferred only on the basis of the surrounding circumstances.* I have already mentioned those circumstances above and to my mind *the only inference that can be drawn on the basis of those circumstances is that the respondent No. 1 went to Rae Bareli on the aforesaid date under instruction of the respondent No. 1 for doing preliminary work pertaining to her election.*

To sum, therefore, it is *satisfactorily proved* that the respondent No. 1 during the period ending on January 13, 1971, *obtained/procured the assistance of Shri Yashpal Kapur,* a gazetted officer in the Government of India for the furtherance of her election prospects, inasmuch as Shri Yashpal Kapur *was made to go to Rae Bareli on January 7, 1971 and deliver a speech at Shaheed Mela* in Munshiganj canvassing support for her candidature.''

**412.** Now, it is a well settled rule, repeatedly laid down by this Court, that allegations of corrupt practice in the course of an election must be judged by the same standards as a criminal charge. And, no rule of evidence, in judging guilt on a criminal charge, is more firmly rooted than that no charge, resting on circumstantial evidence, could be held to be proved beyond reasonable doubt unless the chain of circumstances is so complete and so connected with the charge that it leaves no other reasonable hypothesis open for the Court to adopt except that the offender had committed the offence alleged (See : e.g. *Smt. Om Prabha Jain* v. *Charan Das*[130]).

**413.** The learned Judge dealt with evidence on issue No. 1 relating to the activities of Shri Yashpal Kapur by dividing it into three periods : (1) from December 12, 1970 to January 13, 1971, when Shri Kapur had not resigned from government service ; (2) from January 14, 1971 to January 25, 1971, the period after Shri Kapur's resignation upto its acceptance by the President of India evidenced by a notification dated January 25, 1971 ; (3) from January 26, 1971 to February 6, 1971, the period after the acceptance of Shri Kapur's resignation and upto the date of the publication of it in the official gazette. The learned Judge considered only the first two periods material as he held the activities in the third period to be above board because Shri Kapur was free to do what he liked in this period. Hence, the fact that the original respondent appointed Shri Kapur her election agent on February 1, 1971 made no difference to the result in the third period. But, we will find that a very glaring feature of the findings relating to the first two periods is that the original respondent is held vicariously responsible without anything beyond the activities of Shri Yashpal Kapur and his position as an Officer on Special Duty in the Prime Minister's Secretariat to justify the inference that he had an express or implied authorisation or direction from the Prime Minister to do anything in general or in particular on her behalf for her election.

**414.** Let us take the first period. What was required to be approved, beyond all reasonable doubt, from the evidence on record on this part of the case, was that Shri Yashpal Kapur had been instructed or directed by the original respondent to render the help, if any, that he did give by the speech he was alleged to have made at a fair at Shaheed Mela (martyrs' fair) at Munshiganj in Rae Bareli on January 7, 1971, canvassing support for the original

130. AIR 1975 SC 1417, 1426.


SCC Online Web Edition, Copyright © 2021
Page 186          Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------------------------

respondent's election—an allegation which Shri Yashpal Kapur had denied in so far as any mention of the original respondent's candidature is concerned. Shri Kapur admitted that he had gone there with Shri Gulzarilal Nanda, a former Minister of the Central Government, but said that he had only, when called upon to do so, paid his tribute to the memory of the martyrs.

**415.** The learned Judge held that the recollection of Shri Yashpal Kapur about what he said at the Shaheed Mela on January 7, 1971 was less reliable than the statement of Shri Vidya Shankar Yadav (PW 43), an Advocate belonging to an opposition party, supported by his politcal coworker, Nankau Yadav (PW 28)—a witness who, in his transparent anxiety to appear truthful, went so far as to make the absurd assertion that he had not told anyone, before he appeared in the witness box, that he had attended the Shaheed Mela on January 7, 1971, and who could not remember either the date of his marriage or the dates of births of his children, but asserted that he had noted January 7, 1971 without even having ever talked on any previous occasion to anyone about this date if he is to be believed—and, by Shri R.K.Dixit (PW 31), a joint editor of a newspaper, who claimed to be present on the occasion and who, while reporting other facts and reasons in his newspaper for believing that the original respondent will stand from the Rae Bareli constituency, had not mentioned what he claimed, in the witness box, to have heard Shri Yashpal Kapur himself say at the Mela. Obviously, both these witnesses, if they were not committing perjury, did not have good memories on their own admissions. But, the learned Judge had believed them quite unhesitatingly although the meeting at Shaheed Mela, addressed by Shri Yashpal Kapur, had not even been given any prominence in the pleadings by being at least specifically mentioned in the petition.

**416.** The learned Judge disbelieved the evidence of the original respondent's witness Shri Sarju Prasad (RW 12), the headmaster of a school, who had denied that he ever accompanied Shri Nankau (PW 28) to the Shaheed Mela as claimed by Nankau. The ground for holding that Shri Sarju Prasad must be deposing falsely appears to me to be very unfair both to Shri Sarju Prasad and Shri Gaya Prasad Shukla, a Congressman, who was suspected, without the slightest foundation in evidence, of having induced Shri Sarju Prasad to give perjured evidence simply because Shri Gaya Prasad, who did not even appear as a witness, was a member of the Congress (R) party and was once connected with the school in which Shri Sarju Prasad served. The learned Judge said :

> "It is quite likely that once Nankau had conceded in cross-examination that Sarju Prasad had accompanied him to the Shaheed Mela, pressure was brought to bear on Sarju Prasad (RW 12) by Gaya Prasad Shukla in order to make him appear as a witness in the case and give evidence to contradict the testimony of Nankau. It is true that in his re-examination Sarju Prasad (RW 12) admitted that on the date on which he was examined as a witness in the case the school was being run by the Government under the control of the District Basic Education Officer. However, the association that Gaya Prasad Shukla had with the Pathshala in his capacity as Adhyaksha, and consequently with Sarju Prasad, who was a teacher in that Pathshala, could not have been wiped off overnight merely because the school was taken over by the Government to be run under its own officers."

**417.** The reasons given by the learned Judge for holding that it was



SCC Online Web Edition, Copyright © 2021
Page 187    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------------

"abundantly clear" that Shri Ram Pal (RW 13), another witness of Smt. Gandhi, was "also not a truthful witness", were :

> "Now, since Ramesh Chand Shukla Advocate is a resident of the same village where Ram Pal resided, and since he was an important worker for the respondent No. 1 during the election and was also her Pairokar at some stage, the possibility of Ram Pal having been pressurised by Shri Ramesh Chand Shukla cannot be excluded. Together with it there is also the fact that Shri Gaya Prasad Shukla, another important worker of the respondent No. 1, happened to be the Adhyaksha of the Zila Parishad during the period the witness was examined in the case. It is a matter of common knowledge that the Adhyaksha of the Zila Parishad always wields influence in the rural areas. It will not be out of place to add that when it was put to Ram Pal in cross-examination as to which party did Shri Ramesh Chand Shukla belong, he pleaded ignorance about it. It cannot be accepted for any moment that even though Shri Shukla resided in the village in which this witness resided, and even though Shri Shukla was such a prominent worker of the Congress party, Ram Pal would not have known about it."

**418.** I do not know how, when workers of the Congress party were divided into two camps and had been changing sides, from time to time, ignorance of a worker's precise party loyalties meant that Ram Pal was untruthful. If mere possibilities of being "pressurised" or biased were enough to tar a witness as untruthful, it is difficult to see how or why the witnesses of the election-petitioner, on whom lay the primary burden of proof, could escape similar treatment. V. S. Yadav, was, no doubt, an Advocate. But, he was not even paying income-tax. He felt free, on a working day in courts, to go to the Mela. He was enthusiastic enough as a member of an opposition party to object, according to himslf, to Shri Yashpal Kapur bringing in the candidature of the original respondent even at a meeting which, according to him, consisted mostly of Congress (R) sympathisers. Shri Yashpal Kapur was not so ignorant or inexperienced in election matters and could not be assumed, without any evidence to support the assumption, to be so imprudent as to make a speech when he would know that, as he was still a government servant this would be misinterpreted.

**419.** Let us, for the sake of argument, assume that Shri Yashpal Kapur had been overpowered by such a desire to exhibit an excessive zeal, which got the better of his prudence that he, believing that a publicly made gesture of his loyalty was needed on this particular occasion, cast all caution to the winds and, while paying the tribute he was called upon to pay to the memory of the martyrs, suddenly decided to jump into the electoral fray by making an appeal at the martyrs' mela to support Smt. Indira Gandhi, as though the speeches of all those local leaders who, in addition to Shri Gulzarilal Nanda, a former Minister, are said to have spoken there to the same effect, were not enough. What follows? It is here that we find the weakest link in the misty and fanciful chain of the learned Judge's logic. Where was the evidence that, whatever else Shri Yashpal Kapur may or may not have been supposed to do on his visit to Rae Bareli, this particular piece of "frolic", a term used by law relating to scope of authority, carried the "direction" of Smt. Indira Gandhi herself behind it? Indeed, there is not only not a jot of evidence to suggest that Shri Yashpal Kapur was actually asked by Smt. Gandhi to go to Rae Bareli to do anything for her election on this visit, but there is ample absolutely unshaken evidence of Shri Yashpal


SCC Online Web Edition, Copyright © 2021
Page 188      Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------

Kapur to the contrary, supported by the evidence of the Prime Minister herself, which the learned trial Judge had, for some reason entirely ignored. In any case, it is utterly unthinkable that the Prime Minister herself could have conceivably authorised Shri Kapur to go to Munshiganj and make a public speech, while he was still a government servant, to support her candidature. And, if he had no authority from her either to act generally or to do any particular act on her behalf, how could each and every action of Shri Kapur possibly make the Prime Minister legally liable vicariously for it?

**420.** The learned Judge, as is evident, from his summary of evidence and conclusions, relied on circumstantial evidence only. But, in order that the circumstances should have a conclusive effect, so as to exclude any reasonable hypothesis except that of guilt, they had to point in one direction only and in no other. What is the position that emerges from a consideration of the circumstances found and detailed by the learned Judge himself? It was held that Shri Yashpal Kapur was occupying a position of trust and confidence with the original respondent for quite a long time. Indeed, his evidence shows that he was so attached to the family of the original respondent and the political and national causes its members had represented that he was just the type of person who could, even without the slightest suggestion on the part of the original respondent, have voluntarily taken upon himself the duty to do whatever he could do in his private capacity to help her return at the election. Indeed, his private capacity, as a person attached to the family of the original respondent and to the causes espoused by its members, could very well be considered more important by him than his government service. And, this is exactly what the findings given by the learned Judge relating to services rendered by Shri Yashpal Kapur at the previous election of the original respondent, showing how he had resigned his post on a previous occasion, to help in her election, indicated.

**421.** In the passage from the judgment, quoted above, the learned Judge draws an inference of a previous instruction, from the Prime Minister to Shri Kapur, to say what he is alleged to have said in a speech, because, inter alia, Shri Kapur met the Prime Minister on his return from Rae Bareli! Again, the necessary inference of a previous intimation by Shri Kapur to the Prime Minister of his intention to visit Rae Bareli, could not be that there was any authority or direction given by the Prime Minister to Shri Kapur to do or to say anything on her behalf. All this would lie in the realm of pure conjecture and suspicion. It left other possible and more reasonable inferences wide open.

**422.** The learned Judge had himself held, so far as use of rostrums is concerned, that the Prime Minister sheds her personality, as the holder of her office, and assumes the role of a mere candidate as soon as she ascends a platform to make an election speech. But, when the learned Judge deals with the action of Shri Kapur, in making a speech from a platform at a martyrs' mela, because Shri Kapur is called upon to pay his tribute to the martyrs, he holds that not only must the capacity of a government servant unshakably stick to him, but that Shri Kapur must have been authorised by the Prime Minister herself knowing, as she did, that he was a government servant, to go and make a public speech at the mela and canvass for votes for her! I do not think that we can indulge in a flight of fancy which could be described as "flamboyant".

**423.** The uncontroverted evidence of Shri Kapur which had been ignored by the trial Judge was that it was the special business of this witness,


SCC Online Web Edition, Copyright © 2021
Page 189          Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------

INDIRA NEHRU GANDHI *v.* RAJ NARAIN (*Beg, J.*)          163

as an Officer on Special Duty in the Prime Minister's Secretariat, in his own words, "to deal with the representations received from public and other works of semi-political nature". It is difficult to understand how the occupant of such a difficult and responsible office as that of the Prime Minister of the numerically largest democracy in the world can possibly discharge his or her duties towards the public satisfactorily without the aid of such officers. Naturally, as the Prime Minister was contemplating standing for election from the Rae Bareli constituency, it would not be outside the scope of the duties of such an officer to attend especially to the complaints and representations from Rae Bareli. He stated that Shri Gulzarilal Nanda, who was then the Railway Minister, had received some representations from Rae Bareli. He also said that he had, from time to time, forwarded some representations to Shri Gulzarilal Nanda, who had asked him to accompany him to Rae Bareli. Therefore, apparently without being asked by the Prime Minister, but, after informing her of his intention to go with Shri Gulzarilal Nanda, the witness had, in the course of the performance of duties especially assigned to him since his appointment, visited Rae Bareli in the company of Shri Gulzarilal Nanda. This could not be outside the scope of his duties.

**424.** Again, without any contradiction from any evidence whatsoever, his statement, unquestioned also in cross-examination, was that the Prime Minister did not, at any time, ask him, in his own words, "either directly or indirectly to do anything pertaining to her election". The Prime Minister's replies to interrogatories served upon her show that she had no personal knowledge of what Shri Kapur did at Rae Bareli before he was appointed her election agent. It is also apparent from the evidence of this witness and of the Prime Minister herself that, when he expressed his desire on January 9 or 10, 1971, to the Prime Minister to resign from his post as Officer on Special Duty, she asked him to think over the matter as this would mean that he could not return to his post. He had earlier said that this decision was taken with a view to do work for the public in general and the Congress party in particular as he wanted to enter public life. It is clear that the Prime Minister had left the decision entirely to the free will and option of Shri Kapur who had been asked to ponder over it carefully. When Shri Kapur had informed the Prime Minister again on January 13, 1971 that he had reached his final decision, after due consideration, to resign from his post so as to be able to do public work, as he had political ambitions she had agreed to it and had asked him to see Shri P.N. Haksar, who was in charge of the Prime Minister's Secretariat. He informed Shri P.N. Haksar about this decision on the telephone and then met him an hour later on January 13, 1971 to submit his letter of resignation. Shri Haksar, relying upon Rule 3 of the Government of India Transaction of Business Rules, had orally accepted this resignation, as the head of the Prime Minister's Secretariat. He told Shri Kapur that he was a free man. Naturally, the necessary notification showing that Shri Kapur was relieved of his office with effect from January 14, 1971 was to follow.

**425.** The statement of Shri Kapur, supported by those of the Prime Minister and Shri P. N. Haksar, had been accepted by the trial Court as correct so far as tender of this resignation and its acceptance, in all the stages, followed by the notification in the gazette, went. The learned Judge held that the President gave his assent on January 25, 1971. Shri Kapur's letter of resignation must have been duly forwarded and was acted upon. This was the learned Judge's finding. Shri Kapur did not work in the

SCC Online Web Edition, Copyright © 2021
Page 190      Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------

Prime Minister's Secretariat after January 13, 1971 and he drew no salary as a government servant after that date. The notification in the gazette could not, according to rules, take place until Shri Kapur had handed over charge. He signed and completed the necessary papers relating to relinquishment of the charge of his office on January 13, 1971, but he put the date January 14, 1971 under his signature on the document evidencing a formal handing over of charge as it was to take effect from that date. The trial Court held that the resignation of Shri Kapur would be effective from January 25, 1971 notwithstanding the fact that his request to be relieved from office, with effect from January, 14, 1971, had been accepted and acted upon immediately by Shri P.N. Haksar as the official head of the Prime Minister's Secretariat. The papers were sent to the Secretariat of the President of India for completion of formalities. The formal Presidential sanction having been obtained, the notification, dated January 25, 1971, declaring the resignation of Shri Kapur to be effective from January 14, 1971, was published on February 6, 1971.

**426.** On the facts stated above, there could be no doubt whatsoever that Shri Kapur was not asked to do anything at all in connection with her election by the Prime Minister herself, but he had decided to take interest in it voluntarily as he had some political ambitions; and, therefore, he had asked the Prime Minister to be relieved of his office in her Secretariat with effect from Jaunary 14, 1971. It is unfortunate that the learned Judge thought that there was something almost sinister in Shri Kapur taking such interest in the election or in hoping to enter political life through absolutely legitimate means. There is not the slightest reason for anyone who fairly examines the evidence of Shri Kapur, supported by that of the Prime Minister and Shri P. N. Haksar, to doubt the motives or the veracity of Shri Kapur on this point. He frankly stated that his ambition was to enter political life. In any case, the motives of Shri Kapur were not on trial. If such assistance as he may have rendered was entirely voluntary, without any request or solicitation from the Prime Minister, I do not see how, on the view of the correct legal position stated above, it made any difference to the result even if Shri Kapur had continued to be a government servant upto November 25, 1971.

**427.** Shri P. N. Haksar was aware of and cited the applicable rule for a resignation by a temporary government servant, as Shri Kapur was, and stated also the practice followed, in his experience, in such cases. He, presumably thought that the resignation was effective from January 14, 1971. Shri Kapur also acted upon that assumption and in that belief. The Prime Minister, who could not be expected to examine *suo moto* the question whether Shri P. N Haksar and Shri Kapur were right in their beliefs about the effectiveness of the resignation, assumed that everything was alright. In any case, there could not possibly, on these facts, be any mens rea on her part.

**428.** The learned Judge having accepted, on the unimpeachable evidence of the date of notification of January 25, 1971, published in the official gazette on February 6, 1971, that Shri Kapur must have handed in his resignation in a letter of January 13, 1971, it is very difficult to see how one could possibly doubt the correctness of the statement of Shri P. N. Haksar that, as the Head of the Prime Minister's Secretariat, he had accepted the resignation orally and forwarded it on for necessary action. The resignation had taken place with the consent of the Prime Minister. It is inconceivable, in the circumstances, that Shri P. N. Haksar would not have


SCC Online Web Edition, Copyright © 2021
Page 191        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

as the Head of the Department in which Shri Kapur was working, agreed to relieve him of his duties by telling him that he was a free man, and, thereby, accepted his resignation. He, very honestly, stated that he does not remember whether he wrote anything on the margin of that letter. He must have made so many indorsements on so many letters and documents that it was expecting the impossible to hold that he must remember what he wrote on every one of them. The only other ground given by the learned Judge for doubting the correctness of this version, which completely accords with the natural and ordinary course of official business, was that the additional written statement, filed a year after the original written statement, mentions this fact for the first time. It seems to me that the learned Judge was carrying his suspicions to excessive lengths. The real question involved was the legal effect of the facts accepted by the learned Judge to be correct. These were: firstly, that such a letter of resignation was handed in on January 13, 1971 by Shri Kapur to Shri Haskar asking to be allowed to resign with effect from January 14, 1971; and, secondly, this very request was accepted by the President of India and incorporated in a notification, dated January 25, 1971.

**429.** The learned Judge had found Shri P. N. Haksar's statement, that such an oral acceptance, followed by the necessary notification afterwards, was "rather interesting", and, that the resignation could not be effective until January 25, 1971, the date of drafting the notification. But, what the learned Judge completely overlooked was that the notification itself made the resignation effective from January 14, 1971, the date from which Shri Kapur had neither worked in the Prime Minister's Secretariat nor drawn any salary. There was no plea anywhere, and there is no express finding on it, that the President's notification itself, which made the resignation effective from January 14, 1971, was invalid to the extent that it purported to give any retrospective effect to the resignation, in the sense that it made it effective from a date prior to its actual acceptance. The fact that it is made effective from January 14, 1971 shows that the letter must have reached the President's Secretariat with the request that this should be done. And, in the ordinary course of business, the head of the office concerned makes his indorsement on such letters.

**430.** The learned Judge had relied on Rule 5 of the Central Civil Services (Temporary Service) Rules, 1949, which runs as follows:

"5(*a*) The service of a temporary Government servant who is not in quasi-permanent service shall be liable to termination at any time by notice in writing given either by the Government servant to the appointing authority, or by the appointing authority to the Government servant.

(*b*) The period of such notice shall be one month, unless otherwise agreed to by the Government and by the Government servant:

Provided that the service of any such Government servant may be terminated forthwith by payment to him of a sum equivalent to the amount of his pay plus allowances for the period of the notice or as the case may be, for the period by which such notice falls short of one month or any agreed longer period."

**431.** The learned Judge had referred to *Halsbury's Laws of England*, Vol. V (Simond's Edn.) p. 61, where it was laid down that in a "corporation created by Statute for the discharge of public functions a member *may not* have an absolute right to resign at will, because the law *may cast*



SCC Online Web Edition, Copyright © 2021
Page 192        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------

a duty upon the person elected to a public office to act in that office in *public interest*". He also referred to an American case, *Edwards M. Edwards v. United States*[131], to the effect that only the appointing authority could have accepted the resignation of an occupant of a public office, and that, under the special provisions of the law, the holder of such an office could be subjected to a penalty for a wrongful refusal to perform the duties of his office. The desire or wish of the holder of the office had to give place to public interest in such special cases. It is clear that the cases cited could have no relevance whatsoever for an interpretation of Rule 5 set out above.

**432.** The learned Judge had then relied upon *Raj Kumar* v. *Union of India*[132], where this Court held that "normally, and, in the absence of any law or rule governing the conditions of his service to the contrary, it will not be open to the public servant to withdraw his resignation after it is accepted by the appropriate authority". In that case, there was a dispute between the government servant and the Union of India on the question whether the government servant concerned could withdraw his resignation after it was accepted. It was held that he could not. It was not a case of an agreement between the parties at all as to the date from which the resignation could effectively terminate service. It is true that, in *Raj Narain* v. *Smt. Indira Nehru Gandhi*[133], when this very matter came up to this Court, to decide whether an issue should be struck on it, this Court had sent back the matter to the High Court after holding that an issue should be framed to decide when Shri Kapur's resignation became effective and that this question "will have to be examined with reference to his conditions of service". Now, it is clear from the rule itself, that a condition of Shri Kapur's service was that the Government and the government servant could dispense with the period of notice if it was mutually agreed upon to do that. Rule 5 (*b*) makes that abundantly clear. The learned Judge, for some reason, completely overlooked this aspect.

**433.** Neither the Government nor the government servant is in a worse position than an ordinary master or servant on a matter governed by contract. In fact, Article 310 makes it clear that, in such a case, the tenure of office of a Central Government servant is "during the pleasure of the President". In the instant case, the President's pleasure was contained in the notification dated January 25, 1971 showing that the President had accepted the resignation of Shri Kapur with effect from the forenoon of January 14, 1971. And, this is what Shri Kapur himself wanted. Hence, there is no difficulty at all in accepting the correctness of a resignation effective from the date which both parties to the contract, on patent facts, had agreed to. No rights of an innocent third party were either involved or affected by such an acceptance of the resignation from the date immediately after the date on which Shri Kapur had tendered his resignation. That, as already pointed out, was also the date after which he had ceased to work or draw his salary. It is inconceivable that the law should thrust the status of a government servant upon one who does not want it, particularly when the Government also does not, in public interest, refuse to relieve him by making him stick to any terms to the contrary in his contract. Our law, on this point, is not so monstrous. The position accepted by the learned Judge appears to me to be quite indefensible. However, there was an amendment also in the law by Section 7 of Act 40

131. (1880) 26 Law Ed 31.
132. AIR 1969 SC 180: (1968) 3 SCR 857.
133. AIR 1972 SC 1302: (1972) 3 SCR 841: (1972) 3 SCC 850.



SCC Online Web Edition, Copyright © 2021
Page 193      Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-----------------------------------------------------------------------------------------------------

of 1975, adding the following at the end of the explanation to Section 123(7) of the Act :

"(3) For the purposes of clause (7), notwithstanding anything contained in any other law, the publication in the Official Gazette of the appointment, resignation, termination of service, dismissal or removal from service of a person in the service of the Central Government (including a person serving in connection with the administration of a Union territory) or of a State Government shall be conclusive proof—

(*i*) of such appointment, resignation, termination of service, dismissal or removal from service, as the case may be, and

(*ii*) where *the date* of taking effect of such appointment, resignation, termination of service, dismissal or removal from service, as the case may be, is stated in such publication, also of the fact that such person was appointed with effect from the said date, or in the case of resignation, termination of service, dismissal or removal from service, such person ceased to be in such service with effect from the said date."

434. I find that this amendment, which was made retrospective, by Section 10 of Act 40 of 1975, makes the legal position still clearer. The learned Counsel for the election-petitioner had assailed the validity of this amendment on the ground that powers conferred by it upon the Government are bound to be abused by those who hold the reins of Government. I am afraid I am unable to see any force in this contention. The presumption is that a bona fide use will be made of this power lodged in such responsible hands. If such powers are ever exercised in a mala fide manner, it is the particular exercise of the power that can be questioned and struck down. The provision does not become invalid merely because it could be abused as practically any provision of law can be by those who may want to do so.

435. I will next take up the period from January 14, 1971 upto January 25, 1971, when Shri Kapur is said to have gone and voluntarily worked at Rae Bareli, and to have done whatever he could to organise the conduct of the Prime Minister's election after his talks with the Prime Minister. The position with regard to allegations in this period is summarised as follows :

1. He is said to have either led or to have joined a procession of cars taken out on January 14, 1971 in the town of Rae Bareli as a part of the election campaign for the original respondent although Shri U. S. Yadav (PW 41), an advocate, who was a staunch S. S. P. worker, produced on behalf of the election-petitioner, clearly stated that he had not seen Shri Kapur in that procession which he watched but he had seen him only on February 15, 1971. The learned Judge, however, not only relied on the evidence of Shri R. K. Singh (PW 42) but also on that of Shri U. S. Yadav to hold that Shri Kapur must have been "associated with" the procession of people seen in cars and jeeps taken out on January 14, 1971 shouting Congress (R) party slogans to start off the election campaign.

2. On January 17, 1971, Shri Kapur is said to have participated in an election meeting held at the Clock Tower. On this allegation, the learned Judge accepted the evidence of Shri R. K. Dixit (PW 31), and Shri R. K. Singh, (PW 42), although both these witnesses only


SCC Online Web Edition, Copyright © 2021
Page 194      Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------

stated that some confusion took place at the meeting and Shri R. K. Dixit did not even remember whether any speech was made at all by Shri Kapur. Shri R. K. Singh also did not state that Shri Kapur actually made a speech but had said that "a disturbance took place when Shri Kapur wanted to deliver a speech..........as a result of which he could not do so". The learned Judge rejected the evidence of Shri V. C. Dwivedi (RW 18) supported by Shri Kapur (RW 32) himself, that Shri Kapur was not present at all at this meeting. However, on the evidence of the election petitioner's witnesses themselves, Shri Kapur could do nothing whatsoever in furtherance of the election of the original respondent at this meeting.

3. On January 19, 1971, Shri Kapur is said to have addressed a meeting at village Nihasta where he is said to have gone in the company of Prof. Sher Singh, a Minister of State in the Government of India. Although the tour programme of the Minister concerned showed that the Minister went to that village to inaugurate a telephone exchange on January 18, 1971, supported by the evidence of Jagannath Prasad (RW 16), a resident of village Nihasta, and K. D. Pandey (RW 17) Post Master, Sub Post Office, yet, the learned Judge preferred the evidence of Shri R. K. Singh (PW 42) for the election-petitioner despite the infirmity in this evidence that it was neither consistent with the tour programme of the Central Government Minister sent in advance for this function nor with the unshaken evidence of those who organised the function.

4. It was alleged that Shri Kapur on January 19, 1971, again in the company of Prof. Sher Singh, the Central Government Minister, mentioned above, attended a meeting held in Lalganj. So far as this particular allegation is concerned, the learned Judge thought that it could not be accepted because it was supported only by one highly partisan witness, Shri G. N. Pandey, against 4 faultless witnesses : Abdul Jabbar (RW 25), Fatesh Bahadur Singh (RW 26), Ishwar Chand (RW 27) and Ranjit Singh (RW 28).

5. On January 19, 1971, Shri Kapur was said to be present at the inaugural function of the telephone exchange at Behta Kalan and is said to have delivered a speech there. The learned trial Judge accepted the evidence of Pt. Shashank Misra (PW 32), admittedly a highly partisan witness, who was believed because of a question put to him in cross-examination suggesting that there was uproar when Shri Kapur started speaking so that nobody could hear what he said. The learned Judge held that this amounted to an admission of Shri Kapur's presence and participation in this meeting.

6. Shri Kapur was alleged to have delivered a speech on January 18, 1971 at the foundation laying ceremony of a new post office building at Rae Bareli in the company of Prof. Sher Singh, the Central Government Minister, mentioned above. This allegation was not accepted on the ground that it was not supported by any evidence whatsoever.

436. All that the witnesses could remember of Shri Kapur's speech, on each occasion, was that he supported the original respondent's candidature. Out of allegations of acts said to have been committed on 6 occasions by Shri Kapur in this period, the learned Judge found only 4 instances proved. Out of these, it was clear that Shri Kapur could not have


SCC Online Web Edition, Copyright © 202
Page 195    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

done anything in furtherance of the original respondent's election on January 17, 1971, when, according to the election-petitioner's witnesses, he was not even allowed to speak. Even if all the election-petitioner's witnesses accepted by the learned Judge are to be implicitly believed for this period the position is:

(*a*) On three occasions in this period, from January 14, 1971 to January 25, 1971, Shri Kapur is shown to have made a speech supporting the original respondent's candidature.

(*b*) There is no evidence whatsoever from any source that Shri Kapur did so on any of these three occasions either after having been requested by the original respondent to do so or with her knowledge or consent or approval.

(*c*) The only evidence in the case, on the decisive question, coming from the side of the original respondent, is that Shri Kapur did, whatever he did, entirely on his own initiative and in his private and individual capacity, without the slightest solicitation, request, or suggestion from the original respondent who did not even know what he was doing at Rae Bareli. And, this evidence, being uncontroverted, could not be rejected. In fact, it was not rejected by the trial Court. It was ignored by it presumably under an erroneous belief that it was not material.

437. There is no evidence whatsoever that Shri Kapur was constituted a sort of general de facto agent of the Prime Minister even before he became her election agent on January 2, 1971. Indeed, such a case, that Shri Kapur was constituted a de facto agent of the Prime Minister, and, if so, what was the scope of his authority, was not set up in the petition and was not put in issue. Therefore, there is no finding on it by the learned Judge. Could the Court then, without any proof of any specific request or solicitation or even knowledge of or consent to the doing of any particular acts Shri Kapur may have done in this period make the Prime Minister liable for them in any way? I think not. The election-petitioner had to be confined to the case he had set up. This, as already pointed out, could only be, on a fair reading of the petition on issue No. 1, one of specific authorisation of particular individual acts of Shri Kapur. Of this, there is not only no evidence whatsoever on record but the evidence is to the contrary.

438. Issue No. 1, as framed, and the form of findings given on it indicate that the learned Judge realized that the election-petitioner's case must be confined to proof of specific acts or statements of the original respondent herself which induced Shri Kapur, as a government servant, to give some assistance in furtherance of her election, but the discussion of evidence and the inferences which the learned Judge reached upon the circumstances found, indicated that the learned Judge thought that Shri Kapur was constituted a sort of de facto agent even before Shri Kapur was clothed with legal authority on February 1, 1971. This appears to me to be the underlying current of thought and reasoning of the learned Judge. Thus, the result was that what was really decided was the case of a de facto agency which was neither set up nor was the subject-matter of an issue. I, therefore, think that the principle that no amount of evidence could be looked into on a case not really set up was applicable here. It was quite unfair to expect the original respondent to meet a case not set up at all. Furthermore, the case of de facto agency was, in the circumstances of the particular case, only possible to set up if


SCC Online Web Edition, Copyright © 2021
Page 196          Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------

the Prime Minister had made some request to Shri Kapur to go and conduct the election campaign even before he was appointed her election agent on February 1, 1971. If this was not established by evidence on record, it could be said that the bottom was knocked out of even such a hypothetical case. Had a case of de facto agency been even argued, it is not conceivable that certain cases of Division Benches of the Allahabad High Court itself would not have been cited to show on what kind of evidence it could succeed.

**439.** In *Rustom Satin* v. *Dr. Sampoornanand*[134] it had been held by a Division Bench of the Allahabad High Court (V. Bhargava and J. N. Takru, JJ.), inter alia (at p. 243) :

> "So far as the election law in this country is concerned it is a creation of statute and as such has to be interpreted in accordance whith the provisions of that statute. Section 100 of the Act clearly refers to corrupt practices committed by four classes of persons only, viz., the candidate, his election agent, persons acting with the consent of the candidate or his election agent, and those acting without such consent. The corrupt practices committed by the first three classes of persons are covered by Section 100(1)(*b*), while those committed by persons falling in the fourth class are provided against in Section 100(1)(*d*)(*ii*)."

The same Bench of the Allahabad High Court in *J.P. Rawat* v. *K.D. Paliwal*[135] had held (at p. 456) :

> "...even in the case of admitted workers in whose case also general consent to work for the candidate may be implied, the consent of the returned candidate to corrupt practice or practices complained against have to be separately proved, and reliance upon general consent, express or implied, to work legitimately for the candidate is not deemed sufficient."

**440.** After January 14, 1971, the Prime Minister, like everyone else concerned, obviously believed that Shri Kapur was no longer a governmnet servant. As I have already pointed out, this was the legally correct assumption. Even if one were to assume, for the sake of argument, that this was not so and that the learned Judge had correctly held that Shri Kapur's resignation became effective from January 25, 1971, there could be no liability for a corrupt practice by merely permitting Shri Kapur to resign. The uncontroverted evidence is that, after resigning, Shri Kapur went to Rae Bareli voluntarily, without any request or suggestion made to him by the original respondent or by anybody else to go to Rae Bareli and work for her election. Even his appointment as the original respondent's election agent on February 1, 1971, according to Shri Kapur's evidence, was the result of a suggestion of Shri Dal Bahadur Singh at Rae Bareli, apparently during the Prime Minister's visit to her constituency.

**441.** Cases in which help rendered voluntarily by a government servant without any attempt by the candidate concerned to "obtain" or "procure" it were held not to constitute a "corrupt practice" of the candidate, whatever be the impropriety of it for the government servant himself, were completely overlooked by the learned Judge. In *Hafiz Mohd. Ibrahim* v. *Election Tribunal*[136] a Division Bench of Allahabad (Mootham, C.J. and

134.  20 ELR 221, 243 (All HC).            136.  13 ELR 262 (All HC).
135.  20 ELR 443, 456 (All HC).


SCC Online Web Edition, Copyright © 2021
Page 197      Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------

Mukerji, J.) had pointed out that a government servant has a "private personality" too.   Similar observations of Dua, J. are found in a Division Bench decision of the Punjab High Court (see : *Ram Phal* v. *Brahm Prakash*[137]).

**442.**  On the conclusions reached by the learned Judge himself, the acts of Shri Kapur between the period January 25, 1971 and February 6, 1971, the date of the publication of the notification, could not be taken into account as no corrupt practice could possibly exist in that period, due to the participation of Shri Kapur in any election work.   And, with regard to the two earlier periods, beginning with January 7, 1971, I am unable to see, for the reasons given above, how any corrupt practice could be committed by the original respondent vicariously due to anything done by Shri Kapur, even if one were to apply the law as it existed before the amendments of the Act.

**443.**  Another question, which I may now briefly consider, is the date from which the original respondent could be said to have held herself out as a candidate.   If she was not a "candidate" upto January 25, 1971, as defined by law, that would, in itself, be a sufficient ground for wiping out the effect of findings of the learned Judge on the two periods dealt with above.

**444.**  The learned Judge had inferred that the Prime Minister was a "candidate" from December 29, 1970 as she had held herself out as a candidate when she answered a question put to her on December 29, 1970 at a press conference at New Delhi.   The question and answer were as follows :

"Q.   A short while ago there was a meeting of the opposition leaders and there they said that the Prime Minister is changing her constituency from Rae Bareli to Gurgaon?

P. M.   No. I am not."

In the witness box, the Prime Minister disclosed that what she meant by the answer was that she would not contest from the Gurgaon constituency.   On further cross-examination, she stated :

"It is wrong to assume that while giving the reply marked 'B' in the transcript (Ext. 132) I conveyed that I was not changing my constituency from Rae Bareli at all and emphatically held out that I would contest election again from Rae Bareli.   In my opinion there is no basis for this assumption."

**445.**  The learned Judge had, in preference to the statement of the Prime Minister herself as to what she meant, together with the evidence given by her Secretariat that there were entreaties or offers to her from other constituencies that she should be their representative, relied on press reports and what members of other parties thought and did as a result of the above-mentioned statement of the Prime Minister on December 29, 1970.   The learned Judge also referred to paragraph 1(A) of the additional written statement which runs as follows :

"That in fact, there were offers, from other parliamentary constituencies in India, requesting this respondent to stand as a candidate for the Lok Sabha from those constituencies and *a final decision in regard to the constituency was announced by the All India Congress Committee only on January 29, 1971,* and she only held herself out as a candidate on filing her nomination at Rae Bareli on 1st of February, 1971 (emphasis mine)."

137.  23 ELR 92 (Punj HC).


SCC Online Web Edition, Copyright © 2021
Page 198    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------------------------

He had also referred to the visits made by Congress (R) leaders to Rae Bareli, particularly, Shri Dinesh Singh and Shri Gulzarilal Nanda and by Prof. Sher Singh.  He had not accepted the explanation that they had gone there of their own accord.

**446**.  The learned Judge had also considered several English authorities but had noted that the law here was not the same as in England.  It had been laid in *Munuswami Gounder* v. *Khader Shariff*[138], where it was said :

> "In this respect the law in this country makes a significant departure and that departure, in our opinion, again emphasises the application of vital democratic principle, in the light of differing conditions.  We may here note, briefly, a feature of the political practice in the United Kingdom, which repeatedly colours and influences the English cases, *viz.*, the fact that there a person is often adopted as a candidate by a political association, without any move on his behalf, until a particular stage when the adoption is formalised by his consent."

**447**.  I am unable to see what bearing the activities of opposition leaders and statements issued by them or press reports, with regard to the candidature of the original respondent No. 1 from the Rae Bareli constituency, had upon either an interpretation of her own statement of December 29, 1970, or the date on which she made a final decision to stand as a candidate from the Rae Bareli constituency or the communication of that decision by her to her constituency.  The material relied upon by the learned Judge consisted of speculation and hearsay coming from persons who were certainly interested in finding out which constituency the Prime Minister, who had a choice of Gurgaon, a constituency much nearer to New Delhi, and, possibly of other constituencies as well if she only wanted to change it.  Absence of proof of a desire to change the constituency is not proof of a positive "holding out".  It has been repeatedly laid down in decided cases on the point that what is relevant is not what other people think or say about what a possible candidate would do, but what the candidate concerned himself has said or done, so as to amount to "a holding out" as a candidate by the candidate from a particular constituency.  Mere speculation or rumour circulated by other persons interested in finding out the Prime Minister's constituency could only prove what their own expectations or beliefs were.  This type of "evidence", strictly speaking, could not even be admissible unless it could be related to something actually said or done by the candidate.  All that such "evidence" could prove was that people interested were speculating or indulging in guess-work.  It seems to me that the learned Judge did not take into consideration the tactics in the political game which, to some extent, every party participating in such a game adopts.  Some of these tactics are quite legitimate and honourable, but others are not.

**448**.  The learned Judge referred to the contents of a speech made by the Prime Minister at Coimbatore in South India, in the early part of January, 1971, castigating one of the tactics of the opposition parties in choosing Shri Raj Narain to oppose her, for purposes of maximum "mud slinging".  The learned Judge pointed out that the Prime Minister admitted, in her evidence, that she could have said this in her speech at Coimbatore.  She was not asked whether this amounted to holding herself out as a candidate from Rae Bareli constituency.  If such a question had been asked, there is little doubt that she could have explained the statement by the context in which it was made, just as she had given the precise meaning of her

---

138.  4 ELR 283, 292 (Election Tribunal).


SCC Online Web Edition, Copyright © 2021
Page 199    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

statement of December 29, 1970, in the context in which it was made. Apparently, the context of the statement made in early January in Coimbatore was that the opposition parties had chosen a candidate, who, in the opinion of Prime Minister, possessed certain capacity for "mud slinging" which others did not have. The apparent object of what she mentioned in the speech was to expose tactics of opposition parties in choosing such a candidate from a constituency from which they thought the Prime Minister must be standing. It was obviously meant to disparage such tactics and not to disclose her own intentions or future course of action. A healthy democratic practice or convention certainly is that the election of some candidates, of certain stature and standing or position in public life, is not contested. To point out that the opposition parties, far from intending to adopt such an attitude towards her, were busy devising methods of maligning her, could not reasonably be construed as a holding out of herself as a candidate from a particular constituency unless one was predisposed to put such a construction on every ambiguous statement of the Prime Minister, made anywhere after the dissolution of Parliament in December, 1970, until the election in the first week of March, 1971. Similarly, the context of the question of December 29, 1970, put to the Prime Minister at a conference at New Delhi, was that the members of the opposition parties thought that she may be contesting from Gurgaon. In the light of the opposition tactics, which the Prime Minister herself had referred to in her speech at Coimbatore, it was not unlikely that the Prime Minister would have preferred to keep her own intentions about the constituency, from which she would ultimately stand, either a closely guarded secret, or, at least, in a fluid state. In any case, it was not likely that she would announce her own intention very clearly to stand from any particular constituency until it was considered by her or by her political advisers to be politically expedient to do so. Again, it may be that the prospect of such a leader standing from a particular constituency was likely to have a politically exhilarating effect upon the workers or on party activities in that constituency. From such a point of view also, the Congress Party (R) of the Prime Minister may also have preferred that the Prime Minister should not announce her decision until the last moment. A disputed question of fact on such a matter could not possibly be determined by a court on evidence of guess-work or speculations of others which are, strictly speaking, not relevant. I have indicated here that if some guess-work were permissible, as it is to give its benefit to the person against whom circumstantial evidence is to be used, other possible explanations and interpretations were not excluded. The question had to be decided on proof of the actual statements and actions of the candidate herself which could amount to clear and unequivocal expressions of intention, showing a decision to stand from a particular constituency, meant primarily for the benefit of the voters of the particular constituency so chosen by a candidate. Where was that evidence here?

**449.** It seems to me that the learned Judge had given an exaggerated importance to what were either not strictly relevant or insignificant matters in preference to what could be and was decisive and unequivocal. I do not think that the answer of the Prime Minister at the Press Conference on December 29, 1970 or the contents of her speech in Coimbatore, in early January 1971, or even a declaration or announcement of the All India Congress Committee on January 29, 1971, assuming that there was such an announcement, could mean that the Prime Minister had herself finally decided to contest from the Rae Bareli constituency and had held herself out as a candidate for this constituency. This holding out had to take place by the Prime Minister herself and not by the Congress Committee. Even if the fact of a


SCC Online Web Edition, Copyright © 202
Page 200    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------

declaration made by the Congress Committee, on January 29, 1971, which is all that the written statement admits, proves that the Prime Minister was chosen by her party for this particular constituency on this date, her own decision on the matter could only come and was proved by her to have actually come later than that. This admission was, in my opinion, misconstrued by the learned Judge as a contradiction. In the absence of any evidence whatsoever which could conflict with the Prime Minister's statement about the actual date of her final decision to stand from this constituency, it seems to me that the learned Judge had no option reasonably open to him except to accept the correctness of the only and the best evidence on this question available in the case. The learned Judge in observing, quite unnecessarily, that his finding on this question was not going to be affected by the importance of the office held by the Prime Minister, seems, subconsciously, to have been so affected by it that he did not act on the normal rule that the best evidence of a person's state of mind is his or her own statements and actions and not of others. He seems to have felt that judicial independence consists in inverting this rule and judging the matter primarily from the evidence of the states of mind and opinions and actions of other individuals in the case of a Prime Minister of this country. I do not consider this to be a judicially correct approach.

**450.** The fact that the tour programmes were circulated in advance for the Rae Bareli district, in which the Prime Minister made electioneering speeches, could also not determine what the final declaration of intention by the Prime Minister was going to be in regard to the Rae Bareli constituency. It is not enough that the candidate should have by then formed an intention to stand from a particular constituency. There is a gap between intent and action which has to be filled by proof of either statements or of conduct which amount to unequivocal declarations made to voters in the constituency in order to amount to a "holding out" to them. This seems to me to be the clear position in the law as laid down by courts in this country on the meaning of Section 79(*b*) of the Act.

**451.** It is significant that despite the large number of speeches and statements the Prime Minister must have made throughout the country, in this period, not a single statement made by her could even be cited in which she had said before February 1, 1971, that she was standing as a candidate from the Rae Bareli constituency. It is possible, as I have indicated above, that this may be a part of the political game or permissible party tactics so as to keep opposition parties guessing. It seems to me that the learned Judge was overlooking the context, the probabilities, the natural course of events in such a case, the legal and logical relevance and effect of what he thought was decisive, and, finally, the importance of the statement of the Prime Minister herself on this question, supported by complete absence of any evidence to show that she had herself made any clear and decisive statement in any speech or conversation which could shake her stand, that her final decision and unequivocal act was the filing of a nomination paper as a candidate on February 1, 1971 at Rae Bareli. I may mention here that, according to the findings of the learned Judge himself, the question of the Prime Minister holding herself out as a candidate for the Rae Bareli constituency became quite immaterial after January 25, 1971, and, on the findings I have reached above, the whole question becomes unimportant. However, I will indicate some authorities which the learned Judge himself had noticed.


SCC Online Web Edition, Copyright © 2021
Page 201    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------

**452.** In *S. Khader Sheriff* v. *Munnuswami Gounder*[139], this Court said (at p. 473) :

"When, therefore, a question arises under Section 79(*b*) whether a person had become a candidate at a given point of time, what has to be seen is whether at that time he had clearly and unambiguously declared his intention to stand as a candidate, so that it could be said of him that he held himself out as a prospective candidate. That he has merely formed an intention to stand for election is not sufficient to make him a prospective candidate, because it is of the essence of the matter that he should hold himself out as a prospective candidate."

**453.** In *J. P. Rawat* v. *Krishna Dutt Paliwal*[140], a Division Bench of the Allahabad High Court (V. Bhargava and J. N. Takru, JJ.), following the decision of this Court in *S. Khader Sheriff's case* (supra) said (at p. 463) :

"The determining factor, therefore, is the decision of the candidate himself, not the act of other persons or bodies adopting him as their candidate."

**454.** In *Haji Abdul Wahid* v. *B. V. Keskar*[141], it was held by a Division Bench of the Allahabad High Court (R. N. Gurtu & S. N. Dwivedi, JJ.) :

"(*i*) that the purchase of the nomination forms and voters lists, could not amount to holding out as a candidate; (*ii*) the arranging of public meetings by the officials and the respondent's moving about in the constituency on the 15th and 16th could not by themselves amount to a holding out by the respondent as a prospective candidate on those days in the absence of evidence to show that the respondent had utilised those meetings and tours for the purpose of making utterances of an electioneering character."

**455.** In *K. K. Mishra* v. *Banamali Babu*[142], the Orissa High Court, relying upon the following observations of this Court in *S. Khader Sheriff's case* (supra), held that a holding out within the meaning of Section 79(*b*) must be by declaration of the candidate to an elector or to the electorate in a particular constituency and not to others :

"It may be that the holding out which is contemplated by that section is to the constituency; but if it is the Central Committee that has to decide who shall be adopted for election from the concerned constituency, any declaration made to the Committee is, in effect, addressed to the constituency through its accredited representative."

**456.** The view of the learned Judge appears to me to run counter to the weight of authorities cited above. In any case, if there was any uncertainty at all in the law, it has been removed by an amendment by Section 7 of Act No. 40 of 1975 so that Section 79(*b*) reads as follows :

" 'Candidate' means a person who has been or claims to have been duly nominated as a candidate at any election;"

**457.** Learned Counsel for the election-petitioner contended that this amendment, read with Section 10 of the Act 40 of 1975, would retrospectively alter the "rules of the game" and would be destructive of the concept of free and fair elections, if it means that a person is only a candidate after he

139.  (1955)2 SCR 469, 473 : AIR 1955 SC 775 : 11 ELR 208.
140.  20 ELR 443, 463 (All HC).
141.  21 ELR 409 (All HC).
142.  38 ELR 451, 475 (Ori HC).

SCC Online Web Edition, Copyright © 2021
Page 202    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

---

has been duly nominated and that he can indulge in any amount of corrupt practices until the day previous to his nomination.

**458.** Even if the present definition is a new one, it cannot be said to be arbitrary. The concept contained in it is found in the English definition which lays down (*Halsbury's Laws of England*—3rd Edn., Vol. 14, p. 162) :

> "....a candidate in relation to a parliamentary election means a person who is elected to serve in Parliament at the election or a person who is nominated as a candidate at the election, or is declared by himself or by others to be a candidate on or after the day of the issue of the writ for the election......"

The English definition is wider but contains, as its first part, the very concept found in our new definition of a "candidate".

**459.** Corrupt practices of a candidate cannot go unpunished, whether they are committed before or after he becomes a candidate, when they amount to acts which come within the purview of electoral offences dealt with by Chapter 3, Sections 125, 126, 127, 127(A) or Chapter 9A of the Indian Penal Code. Offences such as bribery, for purposes of either inducing persons to vote or not to vote or to stand or not to stand as candidates, undue influence, and personation, are all dealt with here. These should be sufficient deterrents against perversion of the electoral process by a prospective candidate, who wants to adopt corrupt and objectionable means for gaining success at the polls.

**460.** The amendment appears to me to be within the unquestionable powers of Parliament to legislate, either prospectively or retrospectively, with regard to election matters. I am unable to see how it is capable of being interpreted as an attack on free and fair elections, which, according to the learned Counsel for the election-petitioner, is part of the basic structure of the Constitution. I think it is important to bear in mind that courts cannot take upon themselves the task of laying down what electoral laws should be. The law-makers, assembled in Parliament, are presumed to know and understand their business of making laws for the welfare and well-being of the mass people of this country, for the protection of democracy and of free and fair elections, in accordance with the needs of the democratic process, better than courts know and understand these. It is only where a piece of legislation clearly infringes a constitutional provision or indubitably overrides a constitutional purpose or mandate or prohibition that courts can interfere. After having listened to the lengthy and vehement arguments of the election-petitioner, I fail to see any invalidity in this provision.

**461.** I will now take up issue No. 3 of the first set of issues on which, after rejecting the contention that the erection of barricades and the provision of the police force for security purposes by the Government of U. P., during the election tours of the Prime Minister on February 1, 1971 and February 25, 1971 in the Rae Bareli constituency, contravened Section 123(7), the learned Judge held that, nevertheless, the arrangements made by the District Magistrate of Rae Bareli, the Superintendent of Police, Rae Bareli, the Executive Engineer, P. W. D. and the Engineer, Hydel Department, for constructing rostrums and the supply of power for loudspeakers, on the instructions given by the State Government, was a corrupt practice struck by the provisions of Section 123(7) of the Act. As I have already indicated, the only evidence relied upon by the learned Judge for this extraordinary finding, after having rejected a similar allegation of a corrupt practice under issue No. 2, on



SCC Online Web Edition, Copyright © 2021
Page 203    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

account of provision of the Air Force planes and helicopters flown by members of the Air Force, on necessary official instructions, to enable the Prime Minister to go to places where she could address election meetings on February 1, 1971 and February 25, 1971, was that the visits of the Prime Minister to her constituency on these occasions were preceded by the issue from the Prime Minister's office of the tour programmes to the officials of the district through the State Government with the knowledge and consent of the Prime Minister. The State Government had acted in compliance with the instructions issued by the Comptroller and Auditor General of India in 1958, read with Rule 71(6) of what is known as the Blue Book. The relevant part of this rule reads as follows :

> "It has been noticed that the rostrum arrangements are not always properly made because the hosts are sometimes unable to bear the cost. As the security of the Prime Minister is the concern of the State, all arrangements for putting up the rostrum, the barricades etc. at the meeting place, including that of an election meeting, will have to be made by the State Government concerned."

**462.** The Government of India had also issued a letter (Ex. A.21) dated November 19, 1969 inviting the attention of the State Governments to Rule 71(6), mentioned above, and directing them to ensure that, whenever rostrums are constructed on such occasions, they should conform to certain specifications laid down with due regard to security considerations. The letter also directed the State Government to bill the political party concerned with expenses upto 25% of the cost of the rostrums or Rs. 25000, whichever is less. The letter also directed that extravagance in expenditure should be avoided.

**463.** It was proved by the evidence of Shri R. K. Kaul (PW 58) the Home Secretary in the Govt. of U. P., that rostrums and arrangements for barricading are made by the local officials employing contractors for the purpose, under instructions issued by the State Government. The reasoning adopted by the learned Judge, however, was that, as the Prime Minister's office had issued her tour programmes, with the approval of the Prime Minister, the result must be, in the language of the learned Judge himself :

> "......the tour programmes carried an implied direction that the State Government should also get constructed rostrums and arrange for public address system for the election meetings to be addressed by her on February 1, 1971 and February 25, 1971. It should be presumed that the respondent No. 1, as Prime Minister of this country, and with five years experience of that office behind her in 1971, also knew that the said work was to be done by the officers of the State Government."

**464.** This meant that the learned Judge was holding the Prime Minister herself responsible for instructing the State Govt. knowing that it will make the necessary arrangements through its servants. The case thus accepted, that the Prime Minister was employing the State Government as her agency in procuring the aid of the officers concerned, was neither set up nor put in issue. Apart from this objection, the learned Judge overlooked that the provisions of Section 123(7) were intended to prevent solicitation for aid and not sending of information to the State Govt. in the course of ordinary official business even if the candidate concerned knows that the State Govt. is bound, under the rules, to make the necessary arrangements dictated by the needs of security of the Prime Minister and convenience of the public.


SCC Online Web Edition, Copyright © 2021
Page 204      Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------

**465.** The view of the learned Judge involves holding that the "persona" (a term derived from the concept of the mask worn by Greek actors on the stage in a drama) of a candidate during an election must not only be different from that of the Prime Minister, but also that, when the two capacities are held by the same person, what is due to the occupant of the office of the Prime Minister must be withdrawn when the same person acts as a candidate. On a similar argument, with regard to use of helicopters and aeroplanes, the learned Judge himself had refused to acknowledge what amounts to a separable legal personality of a candidate in the eyes of law. The ground given for this difference between the use of aeroplanes and helicopters by the Prime Minister and the use of rostrums by her was that the former was more connected with the office or capacity of the Prime Minister and that the latter was exclusively meant for her use in the capacity of a candidate. Even if we were to recognise this distinction between the "persona" of the Prime Minister and that of a candidate, it is impossible to separate the special arrangements made for the security of the person of the Prime Minister from those to which she may be entitled as a candidate only. It is impossible to deny at any time the facilities and precautions meant for the person who holds the office of the Prime Minister to the person just because she also figures as a candidate at an election. So long as the person is the same what is meant for the person must be attributed to the persona or capacity of the Prime Minister and not to that of a candidate only. The learned Judge, however, thought that a candidate, who happens to hold the office of the Prime Minister of the country, is not entitled to the facilities or precautionary measures taken to protect the person of the holder of the office when electioneering as though the Prime Minister and the candidate were two different persons. He was unable to see that, so long as the person was the same, the distinction between the two capacities or personae, for the purposes for which facilities were given and protection provided, was both factually as well as legally impossible and quite immaterial.

**466.** I also think that the learned Judge erred in holding that such a case could be one of solicitation of official aid and assistance at all. It is a case in which certain precautions are taken and arrangements made almost "automatically", if one may use this word here, by officers of the State as a matter of duty towards the office held by a candidate who undoubtedly enjoys certain advantages which an ordinary candidate cannot have. It is as futile to complain of such a distinction made as it is to complain that a candidate possesses certain advantages at an election because of the personal services rendered to the country or distinctions achieved by the candidate. Again, there are advantages which attach themselves to a candidate because of that candidate's personal qualities, qualifications, capacities or background. The appurtenances of office or distinctions achieved are, in my opinion, comparable to such personal advantages in so far as they are not enjoyed because they are "obtained" or "procured". If such a result in law is unfair, it is not for courts to find a remedy by accepting the argument advanced before us also : that those who enjoy the benefits of office must be made to realize and suffer some of its handicaps. This clearly means that the benefit which law gives, without solicitation by the candidate, must be converted, by a judicial fiat, into a disadvantage and a handicap. It is for Parliament to step in and change the law if an alteration of it is considered necessary by it. The only change that need be made in the law, if that could be the Legislative intent, is to provide that the holder of any office for the time being would not be qualified to stand at an election. In that event, holders of all ministerial offices will have to resign before they offer


SCC Online Web Edition, Copyright © 2021
Page 205    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

themselves as candidates. But, such is not our law found in the 1951 Act or anywhere else. I think that it would be **extending the scope of Section 123(7)** too wide to hold that the facilities automatically provided by the State to the Prime Minister, by virtue of his or her office, are also struck by a provision directed against solicitation of official aid and assistance by candidates.

**467.** The learned Judge had mentioned a Division Bench decision of the Allahabad High Court in *Moti Lal* v. *Mangla Prasad*[143], where it was laid down:

"We think that the word 'obtain' in Section 123(7) has been used in the essence of the meaning which connotes purpose behind the action of the candidate. The word has not been used in the sub-section in the sense of a mere passive receipt of assistance without the candidate even being conscious of the fact that the assistance has been rendered. In order to bring the case under sub-section (7), it must be shown that the candidate did make some effort or perform some purposeful act in order to get the assistance."

**468.** He had also cited another Division Bench decision of the Allahabad High Court in *Biresh Mishra* v. *Ram Nath Sarma*[144], that:

"The words 'obtain' or 'procure' or 'abetting or attempting to obtain or procure' any assistance necessary imply some effort on the part of candidate or his agent. Mere passive receipt of assistance is not contemplated by the section."

**469.** I think that the import of such observations was clearly what has been laid down repeatedly by this Court and emphasized by me already—that a mens rea as well as an actus reus must be shown, on the evidence on record, before a candidate can be held guilty of a corrupt practice. In *Sheopat Singh* v. *Ram Pratap*[145], this Court held, in dealing with the allegation of corrupt practice under Section 123(4) of the Act, that mens rea was a necessary ingredient of the corrupt practice and that the doctrine of constructive knowledge was not applicable here.

**470.** In the case before us, the election-petitioner alleged a wrongfully "obtained and procured" assistance due to acts of the original respondent as well as her election agent Shri Yashpal Kapur. Hence, proof of actual mens rea as well as actus reus on the part of either the candidate herself or her election agent had to be given. This was not done. The election petition was, therefore, liable to be rejected on this ground alone.

**471.** If, however, there was any doubt or uncertainty on the matter, the view taken by the learned Judge had, at any rate, directed the attention of Parliament to the need for a clarification of the law which became necessary. It is not possible to object to the motives behind the legislation on this ground. Parliament could certainly set right a defect in law which may have come to its notice as a result of the learned Judge's interpretation of Section 123(7). The defect may be due to a possible ambiguity. In order to clarify the law, Section 7 of the Act 40 of 1975 inserted a proviso at the end of Section 123(7), which runs as follows:

"Provided that where any person, in the service of the Government and belonging to any of the classes aforesaid, in the discharge or purported discharge of his official duty, makes any arrangements or


SCC Online Web Edition, Copyright © 2021
Page 206    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------------

provides any facilities or does any other act or thing, for, to, or in relation to, any candidate or his agent or any other person acting with the consent of the candidate or his election agent, (whether by reason of the office held by the candidate or for any other reason), such arrangements, facilities or act or thing shall not be deemed to be assistance for the furtherance of the prospects of that candidate's election.''

**472.** The learned Counsel for the election-petitioner has, very fairly, conceded that, if this amendment, which is retrospective by reason of the operation of Section 10 of Act 40 of 1975, is valid, the decision of the learned Judge on the above mentioned issue No. 3 would not be sustainable. Such a concession, incidentally, means that whatever facilities were given to the Prime Minister by the construction of rostrums or provision of power for the loudspeakers, for which the party was also billed, at least to the extent of one-fourth of the expenses of the rostrums and wholly as regards the expenses of loudspeakers, were given by the officers concerned in the performance of their official duties. This is not the same thing as ''obtaining'' or ''procuring'' by solicitation.

**473.** Learned Counsel for the election-petitioner has, however, put forward the same objection to this retrospective amendment as the one against a change in the definition of ''candidate''. It appears to me that this amendment is merely clarificatory of the state of law as it really was even before the amendment. On the view I take, there is no question here of altering the ''rules of the game'' to the disadvantage of the election-petitioner. The disadvantage, if any, was there already because of the consequences which, I think, legally and naturally flow from the occupation of the high office of the Prime Minister of this country.

**474.** There is no attack on the validity of Section 123(7) of the Act as it existed before the amendment. Hence, there could be no challenge to the validity of the amendment if it does not, as I think it does not, change the law but merely clarifies it.

**475.** Learned Counsel for the election-petitioner contended that, as a candidate at an election, the Prime Minister and an ordinary candidate should enjoy equal protection of the laws and should be afforded equal facilities irrespective of the office occupied by one of two or more candidates. Such an attack upon the validity of this amendment seems to me to be possible only under the provisions of Article 14 of the Constitution. But, as Act 40 of 1975 has been placed by Section 5 of the Thirty-ninth Amendment in the protected Ninth Schedule of the Constitution, it becomes immune from such an attack. After the practically unanimous opinion of this Court in *Kesavananda Bharati's case* (supra), that such an immunisation of an enactment from an attack based upon an alleged violation of the chapter on fundamental rights is constitutionally valid, I do not think that a similar attack can be brought in through the backdoor of a ''basic structure'' of the Constitution. Moreover, I am unable to see how this particular amendment has anything to do with damage to any part of the ''basic structure'' of the Constitution. Even if an attack on the ground of a violation of Article 14 were open today, I think that the occupation of such a high and important office as that of the Prime Minister of this country, with all its great hazards and trials, would provide a rational basis for reasonable classification in respect of advantages possessed by a Prime Minister as a candidate at an election due to arrangements made necessary by considerations of safety and protection of the life and person of the Prime Minister. Hence, I am


SCC Online Web Edition, Copyright © 2021
Page 207    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------------------------------

INDIRA NEHRU GANDHI *v.* RAJ NARAIN (*Beg, J.*)    181

unable to see any sustainable ground of attack at all on the validity of this provision.

476. Before I proceed further, I may mention that I have dealt with the findings of the learned Judge, assailed by the original respondent's Appeal No. 887 of 1975, perhaps in greater length and depth, after going through the evidence in the case, than I had set out to do. I have done so for several reasons. Firstly, I think that the nature of the attack upon the bona fides of the amendments made, although ordinarily not even entertainable, having been permitted due to the constitutional importance and gravity of the allegations made, this question could not, in my opinion, be satisfactorily dealt with without considering the nature of the findings and the evidence at some length so as to satisfy myself that no such question could possibly arise here. Secondly, if the amendments were made necessary for reasons brought out fully only by dealing with facts and findings in this case, they could not give rise to any grounds to suggest that there was anything wrong in making amendments to remove such reasons. Therefore, I think, it was necessary to go into these for determining whether the amendments are good. Thirdly, even if the amendments are valid, we had to be satisfied that the tests of corrupt practices alleged are not fulfilled despite the concession of the election-petitioner's learned Counsel that this would be the position. Fourthly, I find that the learned Judge has made certain manifest errors in appraising the evidence and interpreting the law which call for rectification by this Court as no other authority can properly do this.

477. It appears to me, as already indicated by me, that the learned Judge was perhaps unduly conscious of the fact that he was dealing with the case of the Prime Minister of this country. He, therefore, as he indicated in his judgment, seemed anxious not to allow this fact to affect his judgment. Nevertheless, when it came to appraising evidence, it seems to me that, as I have already pointed out, he applied unequal standards in assessing its worth so as to largely relieve the election-petitioner of the very heavy onus of proof that lies on a party which challenges the verdict of the electors by allegations of corrupt practices. He also appeared to be attempting to achieve, by means of judicial interpretation, an equalisation of conditions under which, in his opinion, candidates should contest elections. I think that it is not the function of courts to embark on attempts to achieve what is only in the power of Parliament to accomplish, that is to say, to bring about equality of conditions where the law permits justificable discrimination. As this Court has repeatedly pointed out, to treat unequally situated and circumstanced persons as though they were equals in the eyes of law for all purposes is not really to satisfy the requirements of the equality contemplated by the Constitution.

478. As regards appraisal of evidence in such a case, I may point out that, in *Rahim Khan* v. *Khurshid Ahmed*[146], Krishna Iyer, J., speaking for this Court, said : (p. 666)

"An election once held is not to be treated in a lighthearted manner and defeated candidates or disgruntled electors should not get away with it by filing election petitions on unsubstantial grounds and irresponsible evidence, thereby introducing a serious element of uncertainty in the verdict already rendered by the electorate. An election is a politically sacred public act, not of one person or of one official, but of the collective will of the whole constituency. Courts naturally must respect

146. (1974) 2 SCC 660, 666, 672.


SCC Online Web Edition, Copyright © 2021
Page 208    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------------------------------------------------------

this public expression secretly written and show extreme reluctance to set aside or declare void an election which has already been held unless clear and cogent testimony compelling the Court to uphold the corrupt practice alleged against the returned candidate is adduced. Indeed, election petitions where corrupt practices are imputed must be regarded as proceedings of a quasi-criminal nature wherein strict proof is necessary. The burden is therefore heavy on him who assails an election which has been concluded."

This Court also said there (at p. 672) :

> "We regard it as extremely unsafe, in the present climate of kilkenny-cat election competitions and partisan witnesses wearing robes of veracity, to upturn a hard won electoral victory merely because lip service to a corrupt practice has been rendered by some sanctimonious witnesses. The Court must look for serious assurance, unlying circumstances or unimpeachable documents to uphold grave charges of corrupt practices which might not merely cancel the election result, but extinguish many a man's public life."

**479.** I will now take up the election-petitioner's Cross Appeal No. 909/75. Learned Counsel for the election-petitioner, very properly and frankly, conceded that he could not successfully assail the findings of the learned Judge on issues Nos. 4 and 7 relating to alleged distribution of quilts, blankets, dhotis, and liquor by workers of the original respondent or the alleged provision of free conveyance by vehicles said to have been hired by Shri Kapur. The evidence on these questions given by the election-petitioner was too flimsy and extravagant and was met by overwhelming evidence to the contrary given by respectable residents of localities in which the alleged corrupt practices are said to have taken place. No driver of any conveyance was produced. Nor was any person produced who had actually received any alleged gift or had consumed anything provided on behalf of the successful candidate.

**480.** As regards issue No. 2, relating to the use of aeroplanes and helicopters by the original respondent, which was not separately pressed evidently because it was covered by the amendment which was assailed by the election-petitioner, the reasons I have given on issue No. 3 for upholding the validity of the amendment relating to the services rendered by govt. officials and members of defence forces in due discharge of their duties are enough to cover the points raised.

**481.** As regards issue No. 6, relating to the adoption of the drawing of a cow and a calf as the symbol of the Congress (R) party of the original respondent, the finding of the trial Court, based on a large number of authorities, was that this is not a religious symbol. This question was directly decided in : *Bhartendra Singh* v. *Ramsahai Pandey*[147] ; *Shital Prasad Misra* v. *Nitiraj Singh Chaudhary*[148] decided by M. P. High Court on July 21, 1971 and *Sri Prasanna Das Damodar Das Palwar* v. *Indu Lal Kanhaiya Lal Yajnik*[149], decided on August 27, 1971, by the High Court of Gujarat. The learned Judge also cited the following cases where it was decided that a cow is not a religious symbol : *Shah Jayanthilal Ambalal* v. *Kasturilal Nagindas Doshi*[150], *Baijnath Singh Vaidya* v. *R. P. Singh*[151], *Bishambhar Dayal* v. *Raj Rajeshwar*[152], *Dinesh Dangi*

---

147.  AIR 1972 MP 167, 179.
148.  MP Gazette, 23-6-1971, Pt. 1, p. 809
        paras 18 to 23.
149.  Gujarat   Gazette   dt.   20-7-1972,

Pt 4C, p. 1042 at pp 1355 to 1362.
150.  36 ELR 188(Guj HC).
151.  36 ELR 327(All HC).
152.  39 ELR 363, 376 (All HC).


SCC Online Web Edition, Copyright © 202
Page 209        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------

*v. Daulat Ram*[153], *Shyam Lal* v. *Mansa Din*[154], *B. P. Mauriya* v. *Prakash Vir Shastri*[155], *Sahodra Rai* v. *Ram Singh Aharwar*[156], *Vishwanath Pd.* v. *Salamatullah*[157], *Lachhiram* v. *J. P. Mukhariya*[158].

**482.** In addition, Section 8 of the Act 40 of 1975 has made the position on this point also very clear by providing that, in Section 123 of the Act in clause (3), the following proviso shall be inserted at the end :

"Provided that no symbol allotted under this Act to a candidate shall be deemed to be a religious symbol or a national symbol for the purposes of this clause."

**483.** As in the case of other amendments, this amendment was also challenged on behalf of the election-petitioner on the ground that it could be misused. I am afraid that attacks on such sweeping suggestions of likelihood of misuse, in future, cannot possibly succeed. It has been repeatedly laid down by this Court that the possibility of misuse of a power given by a statute cannot invalidate the provision conferring the power. (See : *Dr. B. N. Khare* v. *State of Delhi*[159]; *State of W. B.* v. *Anwar Ali Sarkar*[160]; *R. K. Dalmia* v. *Justice Tendolkar*[161]; *T. K. Musaliar* v. *Venkitachalam*[162]; *Chitralekha* v. *State of Mysore*[163]; *M. R. Deka* v. *N.E.F. Rly*[164]. The occasion to complain can only arise when there is such alleged misuse. Even the possibility of such misuse of this power by so responsible an official as the Election Commissioner cannot be easily conceived of.

**484.** It was submitted that the Election Commissioner's decision on this question was unreasonable. The best class of evidence as to what is and what is not to be reasonably regarded as religious symbol, according to the customs, mores, traditions, and outlook of the people of a country at a certain time consists of contemporaneous decisions of courts. It is useless to quote passages from ancient texts about the sacredness of the cow in support of the use of the cow as a religious symbol today. The use of pictures of this excellent and useful animal is so frequently made today for commercial purposes or purposes other than religious that the representation of a cow and a calf cannot, except in some special and purely religious contexts, be held to have a religious significance. I, therefore, see no force at all in this submission of the election-petitioner.

**485.** The only question argued with some seriousness in the election-petitioner's appeal was that the election expenses, which form the subject-matter of issue No. 9, had exceeded the limit of authorised expenditure imposed by Section 77 of the Act read with Rule 90. On this issue, the learned Judge had considered every allegedly omitted item of expense very thoroughly and had reached the conclusion that the following 3 items, totalling upto Rs. 18,183.50, had to be added to the return of election expenses of the original respondent which mentioned items totalling upto Rs. 12,892.97. These were : (1) Cost of rostrums Rs. 16,000 ; (2) Cost of installation of loudspeakers Rs. 1,951 ; (3) Cost of providing transport for one journey by car Rs. 232.50.

153. 39 ELR 463, 476(Raj HC).
154. 37 ELR 67, 89 (All HC).
155. 37 ELR 137, 147(All HC).
156. 37 ELR 176, 188(MP HC).
157. 27 ELR 145, 186(All HC).
158. 9 ELR 149, 157 (Election Tribunal).
159. 1950 SCR 519, 562 : AIR 1950 SC 211.
160. 1952 SCR 284, 301 : AIR 1952 SC 75.
161. 1959 SCR 279, 306 : AIR 1958 SC 538.
162. (1955) 2 SCR 1196, 1239 : AIR 1956 SC 246.
163. (1964) 6 SCR 368, 382-383 : AIR 1964 SC 1823.
164. (1964) 5 SCR 683 : AIR 1964 SC 600.


SCC Online Web Edition, Copyright © 2021
Page 210    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------------

**486.** On this issue, the learned Judge's appreciation of evidence was not only very thorough and correct, but the application of the governing law on the subject also appears to me to be faultless. Ordinarily, we do not, sitting even in first appeals on questions of law as well as of fact in election cases, go into findings of fact arrived at without misapplication of law or errors of approach to evidence. In the case before us, two main questions and one subsidiary question, each of which is a mixed question of fact and law, which deserve consideration by this Court on this issue, have been raised before us. I will deal with these questions briefly seriatim.

**487.** The first question is : If the party, which a candidate represents, spends or others also spend some money on his or her election, is this expenditure one which can be or should be properly included in the statement of election expenses submitted by the candidate? Arguments before us have proceeded on the assumption made by both sides that some expenditure was incurred by the Congress (R) party and some expenditure must also have been incurred by those who either voluntarily helped or even thrust their supposed assistance, whether it was helpful or not, upon those managing the original respondent's election, which was not shewn as part of her election expenses. Is the successful candidate bound, under the law, to show this also as part of election expenses?

**488.** This question assumed special importance after the decision of this Court in *Kanwar Lal Gupta* v. *Amarnath Chawla*[165], where a Division Bench of this Court observed : (SCC p. 656, para 11)

"Now, if a candidate were to be subject to the limitation of the ceiling, but the political party sponsoring him or his friends and supporters were to be free to spend as mush as they like in connection with his election, the object of imposing the ceiling would be completely frustrated and the beneficent provision enacted in the interest of purity and genuineness of the democratic process would be wholly emasculated. The mischief sought to be remedied and the evil sought to be suppressed would enter the political arena with redoubled force and vitiate the political life of the country. The great democratic ideal of social, economic and political justice and equality of status and opportunity enshrined in the Preamble of our Constitution would remain merely a distant dream eluding our grasp. The legislators could never have intended that what the individual candidate cannot do, the political party sponsoring him or his friends and supporters should be free to do. That is why the legislators wisely interdicted not only the incurring but also the authorising of excessive expenditure by a candidate. When the political party sponsoring a candidate incurs expenditure *in connection with his election*, as distinguished from expenditure *on general party propaganda*, and the candidate knowingly takes advantage of it or participates in the programme or activity or fails to disavow the expenditure or consents to it or acquiesces in it, it would be reasonable to infer, save in special circumstances, that he impliedly authorised the political party to incur such expenditure and he cannot escape the rigour of the ceiling by saying that he has not incurred the expenditure, but his political party has done so. A party candidate does not stand apart from his political party and if the political party does not want the candidate to incur the disqualification, it must exercise control over the expenditure which may be incurred by it directly to promote the poll prospects of the

165. AIR 1975 SC 308, 315-316 : (1975) 3 SCC 646. 656.


SCC Online Web Edition, Copyright © 2021
Page 211    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------

candidate. The same proposition must also hold good in case of expenditure incurred by friends and supporters directly in connection with the election of the candidate."

**489**. After making the above-mentioned observations, the apparently broad sweep of the observations was limited as follows: (SCC p. 656, para 11).

"It may be contended that this would considerably inhibit the electoral campaign of political parties but we do not think so. In the first place, a political party is free to incur any expenditure it likes *on its general party propaganda* though, of course, in this area also some limitative ceiling is eminently desirable coupled with filing of return of expenses and an independent machinery to investigate and take action. It is only where expenditure is incurred which can be identified with the election of a given candidate that it would be liable to be added to the expenditure of that candidate as being impliedly authorised by him. Secondly, if there is continuous community involvement in political administration punctuated by activated phases of well-discussed choice of candidates by popular participation in the process of nomination, much of unnecessary expenditure which is incurred today could be avoided."

**490**. It is not necessary to quote further from the judgment which suggested taking of steps for reform of electoral machinery so as to ensure "choice of candidates by popular participation in the process of nomination", because that would take us into a territory beyond mere interpretation of the law as it exists. It is clear from the passages cited and later parts of the judgment that the earlier decision of this Court, requiring proof of authorisation by the candidate of the election expenditure for which he could be held responsible, and, in particular, *Rananjaya Singh* v. *Baijnath Singh*[166], which I shall refer to again a little later, are considered. It is enough to observe that the passages quoted above rest on the assumption that, where there are special circumstances in a case which constitute a political party an implied agent of the candidate himself, the candidate will be responsible. It was also suggested that a political party itself must exercise some control over the expenses of the candidate it sets up. The objection was to a candidate merely using the political party as a channel or cover for expenses incurred by the candidate himself. This explains the exclusion of expenses for "general party propaganda" from those for which the candidate is accountable and liable. Such expenses could be, it was held, properly incurred by the party itself, irrespective of the source from which the party obtained funds for carrying it on. What is declared to be expense incurred by the candidate is that expense which his party may incur either as an express or implied agent of the candidate and that only.

**491**. The difficulty which faces the election-petitioner at the outset in taking up a case of implied authorisation, on the strength of anything observed or decided by this Court in *Kanwarlal Gupta's case* (supra), is that no such case was set up here. The petition does not say that the local Congress (R) party was really an express or implied agent of the original respondent or that it had acted in a manner from which it could be inferred that the funds were really being supplied by the original respondent and were merely being spent by the party or its workers for the election under consideration. No facts or circumstances were at all indicated either in the petition or in evidence from which such inferences were possible. On the other hand, what is

166. (1955) 1 SCR 671 : AIR 1954 SC 749 : 10 ELR 129.



SCC Online Web Edition, Copyright © 2021
Page 212      Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

186                     SUPREME COURT CASES                  1975 Supp SCC

sought to be pointed out now in the case before us is that a sum of Rs. 70,000 was shown to have been received from some undisclosed sources by Shri Dal Bahadur Singh, the President of the District Congress Committee at Rae Bareli, and that a large part of it was shown, from entries in the bank account of the President of this Committee, to have been disbursed during or soon after the election. The responsibility of the District Congress Committee was, however, to carry on propaganda and supply information in three parliamentary constituencies. Neither party summoned Shri Dal Bahadur Singh to give evidence so that it could not be proved what proportion of any of this sum of Rs. 70,000 was spent and in what work and for which of the three parliamentary constituencies. All that was alleged, in paragraph 13 of the petition, is that the "expenditure incurred by the respondent No. 1, Smt. Indira Nehru Gandhi and/or her election agent Shri Yashpal Kapur was much more than Rs. 35,000 which was the permissible amount". After that, particulars of 11 items were given, out of which the first was hiring of 32 vehicles whose numbers are mentioned. There is no mention whatsoever in this list of any sum paid either by the original respondent or by anyone else on her behalf to Shri Dal Bahadur Singh or of any expense incurred on behalf of the original respondent by this gentleman. The principle that no amount of evidence can be looked into on a case not set up is sufficient to dispose of this evidence of a cheque of Rs. 70,000 received by Shri Dal Bahadur Singh.

**492.** It is true that the case set up is that the prescribed limit of expenditure was exceeded and the case is so stated that items beyond the list could conceivably be added. Nevertheless, unless and until there is a plea that something was spent by the Congress (R) party, either as an express or implied agent of the original respondent, this loophole left in the petition would not suffice. Section 83(1)(b) of the Act contains the mandatory provisions that the petition

"shall set forth full particulars of any corrupt practice that the petitioner alleges, including as full a statement as possible of the names of the parties alleged to have committed such corrupt practice and the date and place of the commission of each such practice."

**493.** The judgment of this Court in *Kanwarlal Gupta's case* (supra) discusses a number of cases decided by this Court which show that it is not enough to prove expenditure of money by a candidate's party or friends or relations. It must be also proved that this was expenditure authorised by the candidate and incurred as the candidate's express or implied agent. These cases were: *Rananjaya Singh v. Baijnath Singh*[167]; *Ram Dayal v. Brijraj Singh*[168]; *Magraj Patodia v. R. K. Birla*[169] and *B. Rajagopala Rao v. N. G. Ranga*[170].

**494.** After examining this catena of cases, I think, with great respect, that the decision of this Court in *Kanwarlal Gupta's case* (supra) could be understood to point in a direction contrary to that in which the previous cases were decided. Hence, it appears to me that the amendment made by Act 58 of 1974, by adding the explanation (1) to Section 77(1) of the Act, could be justified as merely an attempt to restore the law as it had been understood to be previous to decision of this Court in *Kanwarlal Gupta's case* (supra) :

"*Explanation 1.* Notwithstanding any judgment, order or decision of

167. (1955) 1 SCR 671: AIR 1954 SC 749: 10 ELR 129.

168. (1970) 1 SCR 530: (1969) 2 SCC 218.

169. (1971) 2 SCR 118: (1970) 2 SCC 688.

170. AIR 1971 SC 267: (1970) 3 SCC 576.



SCC Online Web Edition, Copyright © 2021
Page 213    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------------

any court to the contrary, any expenditure incurred or authorised in connection with the election of a candidate by a political party or by any other association or body of persons or by any individual (other than the candidate or his election agent) shall not be deemed to be, and shall not ever be deemed to have been, expenditure in connection with the election incurred or authorized by the candidate or by his election agent for the purposes of this sub-section :

Provided that nothing contained in this Explanation shall affect—

(*a*) any judgment, order or decision of the Supreme Court whereby the election of a candidate to the House of the People or to th Legislative Assembly of a State has been declared void or set aside before the commencement of the Representation of the People (Amendment) Ordinance, 1974 ;

(*b*) any judgment, order or decision of a High Court whereby the election of any such candidate has been declared void or set aside before the commencement of the said Ordinance if no appeal has been preferred to the Supreme Court against such judgment, order or decision of the High Court before such commencement and the period of limitation for filing such appeal has expired before such commencement.''

**495.** It appears to me that both parties to the case now before us were under the impression that the expenses incurred by a political party over its candidate's election was outside the prescribed limit which operated only against expenditure by a candidate himself. Hence, the petitioner had not pleaded expenses incurred by the party of the original respondent as expenses authorised by the original respondent. The test of authorisation would naturally be the creation of a liability to reimburse whoever spends the money and not necessarily the provision of money beforehand by the candidate on whose behalf it is spent. Nevertheless, the authorisation has to be set up and proved. In the written statement filed on behalf of the original respondent, it was very frankly admitted that some expenditure, incurred by the local Congress party itself, had not been shown as election expenses of the candidate herself. This was the position because, on the side of the original respondent also, the law was understood to be as it is found now clarified by the addition of an explanation to Section 77(1) of the Act.

**496.** The second question which arises for consideration is : if some expenses are shown or admitted to have been incurred by the candidate's party or third persons over the election of the successful candidate, is it possible to separate it from a total expenditure on more than one constituency by some process of estimation and apportionment? Of course, this question can only arise if it is first proved that whatever expenditure was incurred by candidate's party or by some other person, who may be a friend, a relation, or a sympathiser, was incurred in circumstances from which it can be inferred that the successful candidate would reimburse the party or person who incurred it. As I have already held, it is only then that expenditure could be held to be authorised by the candidate. It is not enough that some advantage accrued or expenditure was incurred within the knowledge of the candidate. This was very clearly brought out in *Rananjaya Singh* v. *Baijnath Singh* (supra). In this case, the Manager, Assistant Manager, 20 Ziladars, and peons of the proprietor of an estate in Uttar Pradesh had carried on election work, after having been given a holiday on full pay by the proprietor of the estate who was the father of the successful candidate. It was contended that

SCC Online Web Edition, Copyright © 2021
Page 214    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------------------------------------

inasmuch as these persons were virtually employees of the candidate himself, their salary for the day must be added to the list of election expenses. This Court repelled this contention on the ground that this extra expenditure had not been authorised by the candidate or his agent. Hence, it need not be shown as an item of election expense. Voluntary expenditure by friends, relations, or sympathisers and expenditure incurred by a candidate's party, without any request or authorisation by the candidate, has never been deemed to be expenditure by the candidate himself. [See : *Ram Dayal* v. *Brijraj Singh* (supra) ; *Magraj Patodia* v. *R. K. Birla* (supra)].

**497.** An attempt was then made to pass the responsibility on to the original respondent for the expenses of at least 23 vehicles whose numbers are mentioned in a letter dated February 25, 1971, written by Shri Kapur, who was then the original respondent's election agent, and sent to the District Officer, Rae Bareli, stating as follows :

> "Sir, I beg to say that the District Congress Committee, Rae Bareli has taken the following cars for election purposes in the three parliamentary constituencies, Rae Bareli, Amethi and Ram Sanehi Ghat. You may, therefore, kindly release them."

After giving numbers of the vehicles the letter proceeds :

> "It is therefore requested that the abovesaid cars may kindly be released without delay. The letter of the President of District Congress Committee about the abovesaid cars is enclosed herewith."

The letter of the President of the committee, mentioned by Shri Kapur, was a rather urgent request made to him by Shri Dal Bahadur Singh, on February 24, 1971 (Ex. A-43), after informing him that he is in difficulties as he had tried to find out unsuccessfully the whereabouts of Shri V. Vajpayee, who was contesting election from Amethi parliamentary constituency, and of Shri Baiznath Kureel, who was contesting the election from Ram Sanehi parliamentary constituency. He, therefore, asked Shri Kapur, the election agent of the original respondent, to send a letter to the District Officer, who had refused to release the vehicles without the endorsement of the candidate concerned or his or her election agent.

**498.** It is clear from the above-mentioned correspondence that Shri Kapur was not speaking on behalf of the other two candidates of adjoining parliamentary constituencies. He was not even undertaking to pay anything for the use of the vehicles on behalf of the original respondent. Shri Kapur also did not state that these vehicles were needed for work in the original respondent's constituency. He merely forwarded the letter with a request for compliance with what Shri D. B. Singh wanted. Shri Dal Bahadur Singh was concerned and entrusted with conducting electioneering work in three adjoining parliamentary constituencies successfully. He had, therefore, made a frantic appeal to Shri Kapur to come to his help. Shri Kapur, without concealing any fact, had sent this very letter with a request for the release of the vehicles to the District Officer concerned. On this evidence, the learned Judge came to the conclusion that it was not possible to say which vehicles, said to be jeeps, had been utilized for election work and in which constituency. The learned Judge after considering the evidence recorded the finding that it was not possible to hold that the 23 vehicles in question had been used exclusively for the purposes of the election of the original respondent and not for "general party propaganda purposes" for which the original respondent was not liable to pay.


SCC Online Web Edition, Copyright © 2021
Page 215      Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------------------------------

**499.** In *Hans Raj* v. *Pt. Hari Ram*[171], this Court in a similar situation said :

> "Whichever way one looks at the matter it is quite clear in view of the decision of this Court reported in *Rananjaya Singh* v. *Baijnath Singh* (supra) that the expenditure must be by the candidate himself and any expenditure in his interest by others (not his agents within the meaning of the term in the election law) is not to be taken note of. Here the hiring was by the Congress Committee which was not such an agent and therefore the amount spent by the Congress Committee cannot be taken as an amount which must compulsorily be included in the expenditure over the election by a candidate. If this be the position, we have to decide whether this amount spent on the jeeps must be taken to be an expenditure made by the candidate himself. Of that there is no evidence. The bill stands in the name of the Congress Committee and was presumably paid by the Congress Committee also. The evidence, however, is that this jeep was used on behalf of the returned candidate and to that extent we subscribe to the finding given by the learned Judge. Even if it be held that the candidate was at bottom the hirer of the jeep and the expenditure on it must be included in his account, the difficulty is that this jeep was used also for the general Congress propaganda in other constituencies."

**500.** In *Shah Jayantilal Ambalal* v. *Kasturilal Nagindas Doshi*[172], this Court held :

> "It is now well settled that expenses incurred by a political party in support of its candidates do not come within the mischief of Section 123 (6) read with Section 77 of the Act."

**501.** In *Samant N. Balkrishna* v. *George Fernandez*[173], this Court pointed out :

> "In India all corrupt practices stand on the same footing. The only difference made is that when consent is proved on the part of the candidate or his election agent to the commission of corrupt practice, that itself is sufficient. When a corrupt practice is committed by an agent and there is no such consent then the petitioner must go further and prove that the result of the election in so far as the returned candidate is concerned was materially affected."

**502.** However, as I have already held, there is no case or evidence before us that the Congress party was the agent, express or implied, of the original respondent or acting as the channel through which any money whatsoever was spent by the original respondent. The petition could not possibly succeed on the ground of exceeding election expenses. On the other hand, on the findings given by me above, the expenses on the construction of rostrums were also erroneously added by the learned Judge. In fact, it seems that other two items mentioned there were also wrongly added. Expenses of the installation and use of loudspeakers and the power supplied were certainly shown to have been borne by the Congress party itself. It is true that when elections of persons in the position of the Prime Minister or even of ministers, whether in the Central Government or a State Government, take place, a number of people come forward to either give or thrust their supposed aid in the election. It may be impossible for the candidate to refuse

---

171.  40 ELR 125, 128-129 (SC).
172.  42 ELR 307, 311 (SC).
173.  (1969)3 SCR 603, 637 : (1969)3 SCC 238.


SCC Online Web Edition, Copyright © 2021
Page 216      Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------------

it without offending them.  But it is also impossible for the courts to make the candidate himself or herself responsible so as to impose an obligation upon the candidate to find out what expenses incurred by them were and then to add these on to the candidate's account of expenses.  That would be, obviously, a most unfair result.  And, this is not what the law requires in this country.  The law requires proof of circumstances from which at least implied authorisation can be inferred.

**503.**  The third and the last and a subsidiary submission on behalf of the election-petitioner, on election expenses, was that, Shri Dal Bahadur Singh not having been produced by the original respondent, some sort of presumption arises against the original respondent.  I do not think that it is possible to shift a burden of the petitioner on to the original respondent whose case never was that Shri Dal Bahadur Singh spent any money on her behalf.  The case of *M. Chenna Reddy* v. *Ramchandra Rao*[174] was relied upon to submit that a presumption may arise against a successful candidate from the non-production of available evidence to support his version.  Such a presumption, under Section 114 Evidence Act, it has to be remembered, is always optional and one of fact, depending upon the whole set of facts.  It is not obligatory.

**504.**  In *Chenna Reddy's case* (supra), the evidence seemed to have resulted in a prima facie case whose effect the respondent had to get rid of.  In the case before us, the election-petitioner had summoned Shri M. L. Tripathi (PW 59), the Secretary of the District Congress Committee, who appeared with account books of the party at Rae Bareli.  The election-petitioner could get nothing useful out of his evidence.  Even if the election-petitioner did not, for some reason, desire to summon Shri Dal Bahadur Singh similarly, his Counsel could have requested the court to exercise its discretionary powers under Order XVI, Rule 14 C. P. C., but this was never done.  A presumption could not arise on the facts and circumstances of a case in which it could not be said that Shri Dal Bahadur Singh's evidence was necessary to discharge some burden of the original respondent.  The original respondent had discharged whatever onus lay upon her by producing her own election agent Shri Kapur, who had kept her accounts.  And, she had herself appeared in the witness box and faced a cross-examination which could not be held up as an example of complete fairness and propriety.  I do not quite understand what presumption could possibly arise, due to non-production of Shri Dal Bahadur Singh, against what part of her case, and to what effect.  It could certainly not be suggested that there was any duty on her part to repel some case never set up against her.  It was nobody's case that the local Congress party was her agent.

**505.**  I may now very shortly deal with the objection that, as a number of members of Parliament belonging to the opposition parties were in detention, under the preventive detention laws, which could not be questioned before courts of law, because of the declaration of the emergency by the President, there was a procedural defect in making the amendments of the Act of 1951 and the Thirty-ninth Constitutional Amendment.

**506.**  Article 122 of the Constitution prevents this Court from going into any question relating to irregularity of proceedings "in Parliament".  It reads as follows:

"122.  (1) The validity of any proceedings in Parliament shall not be called in question on the ground of any alleged irregularity of procedure.

174.  40 ELR 390, 415 (SC).



Case 1:21-cv-00396-RJL   Document 20-11   Filed 08/14/21   Page 218 of 289
SCC Online Web Edition, Copyright © 2021
Page 217    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------

(2) No officer or member of Parliament in whom powers are vested by or under this Constitution for regulating procedure or the conduct of business, or for maintaining order in Parliament shall be subject to the jurisdiction of any Court in respect of the exercise by him of those powers."

**507.** What is alleged by the election-petitioner is that the opposition members of Parliament, who had been detained under the preventive detention laws, were entitled to get notice of the proposed enactments and the Thirty-ninth Amendment, so as to be present "in Parliament", to oppose these changes in the law. I am afraid, such an objection is directly covered by the terms of Article 122 which debars every court from examining the propriety of proceedings "in Parliament". If any privileges of members of Parliament were involved, it was open to them to have the question raised "in Parliament". There is no provision of the Constitution which has been pointed out to us providing for any notice to each member of Parliament. That, I think, is also a matter completely covered by Article 122 of the Constitution. All that this Court can look into, in appropriate cases, is whether the procedure which amounts to legislation or, in the case of a constitutional amendment, which is prescribed by Article 368 of the Constitution, was gone through at all. As a proof of that, however, it will accept, as conclusive evidence, a certificate of the Speaker that a Bill has been duly passed. (See : *State of Bihar* v. *Kameshwar*[175])

**508.** Again, this Court has held, in *Sharma* v. *Sri Krishna*[176], that a notice issued by the Speaker of a Legislature for the breach of its privilege cannot be questioned on the ground that the rules of procedure relating to proceedings for breach of privilege have not been observed. All these are internal matters of procedure which the Houses of Parliament themselves regulate.

**509.** As regards the validity of the detentions of the members of Parliament, that cannot be questioned automatically or on the bare statement by Counsel that certain members of Parliament are illegally detained with some ulterior object. The enforcement of fundamental rights is regulated by Articles 32 and 226 of the Constitution and the suspension of remedies under these articles is also governed by appropriate constitutional provisions. Their legality and regularity cannot be collaterally assailed by mere assertions made by Counsel before us. I, therefore, overrule these objections to the validity of the amendments and the Thirty-ninth Amendment as we cannot even entertain them in this manner in these proceedings.

**510.** I will now turn to the validity of clause (4) of Article 329A sought to be added by Section 4 of the Thirty-ninth Amendment. I will quote the whole of Section 4 as some argument was advanced on the context in which clause (4) of Article 329A occurs. Section 4 reads as follows :

"4. In Part XV of the Constitution, after Article 329, the following article shall be inserted, namely :—

"329A. (1) Subject to the provisions of Chapter II of Part V [except sub-clause (*e*) of clause (1) of Article 102], no election—

(*a*) to either House of Parliament of a person who holds the office of Prime Minister at the time of such election or is appointed as Prime Minister after such election ;

175. AIR 1952 SC 252, 266 : 1952 SCR 889.
176. AIR 1960 SC 1186, 1189 : (1961) 1 SCR 96.


SCC Online Web Edition, Copyright © 2021
Page 218    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------------------------------------

*(b)* to the House of the People of a person who holds the office of Speaker of that House at the time of such election or who is chosen as the Speaker for that House after such election ;

shall be called in question, except before such authority [not being any such authority as is referred to in clause *(b)* of Article 329] or body and in such manner as may be provided for by or under any law made by Parliament and any such law may provide for all other matters relating to doubts and disputes in relation to such election including the grounds on which such election may be questioned.

(2) The validity of any such law as is referred to in clause (1) and the decision of any authority or body under such law shall not be called in question in any court.

(3) Where any person is appointed as Prime Minister or, as the case may be, chosen to the office of the Speaker of the House of the People, while an election petition referred to in clause *(b)* of Article 329 in respect of his election to either House of Parliament or, as the case may be, to the House of the People is pending, such election petition shall abate upon such person being appointed as Prime Minister or, as the case may be, being chosen to the office of the Speaker of the House of the People, but such election may be called in question under any such law as is referred to in clause (1).

(4) No law made by Parliament before the commencement of the Constitution (Thirty-ninth Amendment) Act, 1975, in so far as it relates to election petitions and matters connected therewith, shall apply or shall be deemed ever to have applied to or in relation to the election of any such person as is referred to in clause (1) to either House of Parliament and such election shall not be deemed to be void or ever to have become void on any ground on which such election could be declared to be void or has, before such commencement, been declared to be void under any such law and notwithstanding any order made by any court, before such commencement, declaring such election to be void, such election shall continue to be valid in all respects and any such order and any finding on which such order is based shall be and shall be deemed always to have been void and of no effect.

(5) Any appeal or cross appeal against any such order of any court as referred to in clause (4) pending immediately before the commencement of the Constitution (Thirty-ninth Amendment) Act, 1975, before the Supreme Court shall be disposed of in conformity with the provisions of clause (4).

(6) The provisions of this article shall have effect notwithstanding anything contained in this Constitution.''

**511.** Counsel for both sides are agreed that, for the purposes of the case before us, we need not consider the constitutional validity of clauses (1) to (3) of the newly introduced Article 329A of the Constitution. I will, therefore, concern myself only with the constitutional validity of clause (4) of Article 329A of the Constitution.

**512.** Learned Counsel for the election-petitioner contended that the constituent or amending power contained in Article 368 of our Constitution had been misused to achieve some purpose which was either outside the

 SCC Online Web Edition, Copyright © 2021
Page 219    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-----------------------------------------------------------------------------------------------------

article or which struck at the roots of the "basic structure" or "the essential features" of our Constitution. It was submitted that the amendment is invalid on an application of tests laid down by a majority of the 13 Judges who indicated certain basic and inviolable principles of our Constitution in *Kesavananda Bharati's case* (supra). It was contended that the newly added Article 329A(4) of the Constitution, far from constituting a constitutional law, which alone could be made under Article 368, did not even satisfy the tests of a law, inasmuch as it did not lay down any general rule applicable to all cases of a particular class but was really designed to decide one particular election case, which is now before us for hearing, in a particular way. According to learned Counsel, the amending bodies had, under the guise of an exercise of constituent power, really decided a particular election dispute arbitrarily without following the elementary principles of judicial procedure or applying any intelligible norms or principles of justice either as a court of law would have done or as any body of persons entrusted with the duty to decide a matter justly or quasi-judicially could possibly have done. The assumption underlying this argument was that setting aside the results of a judicially recorded judgment and order by declaring it void and the validation of an election held by a court of law to be invalid necessarily involves the adoption of a judicial or a quasi-judicial procedure if the results are to appear just and not violative of the basic principles of natural justice which must be held to be parts of the rule of law envisaged by our Constitution. What had been done by Clause 4, according to the learned Counsel for the election-petitioner, was nothing short of lifting and placing the elections of the first four dignitaries of State outside the range of questionability before any authority whatsoever either in the past, present, or future. As the only election out of those of these dignitaries still in dispute at the time of the passing of the Thirty-ninth Amendment was the election of the Prime Minister to the House of the People, now under consideration in the appeals before us, it was suggested that all this was done, wholly and solely, though indirectly, with the object of validating the Prime Minister's election as a member of the House of Representatives in 1971. It sought to place the Prime Minister and the Speaker in a separate class by themselves as candidates at a general election for the membership of the House of Representatives. It was urged that there could be no reasonable or logical nexus between the alleged objects of such a classification and the results of the amendment made. It was urged that, inasmuch as a Prime Minister holds the pivotal position in the governance of the country, there could not be a less and not more need to ensure that the election of the holder of such a high office to a parliamentary seat had been free from any corrupt practice. It was urged that the test and the procedure for determining whether the holder of such an exalted, responsible, and important office was duly elected as a member of Parliament could not, logically or reasonably, be different from that which ordinary members of the Parliament had to go through. It was pointed out that, in a case covered by this clause, there could be no consideration at all, if the amendment is upheld, of the validity of a past election by any authority in the future as all elections in this very special and exceptional class had been validated without any qualification and quite unconditionally. The effect was, it was urged, that the present Prime Minister was placed in a very privileged and exalted position which was not enjoyed by a past Prime Minister and which was not meant to be occupied by any future Prime Minister. Such a procedure and such a result, it was contended, made a mockery of the concept of free and fair elections under a democratic system. Furthermore, it was urged that it was destructive of the concepts of rule of law, of equality before law, and of just determination of judicially triable

SCC Online Web Edition, Copyright © 202
Page 220    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

---

disputes. Taking away of even the supervisory jurisdiction of superior courts in elections of certain class of dignitaries was characterised as a gross violation of a basic principle of our Constitution. It was also submitted that, if what was intended to be conveyed by the amendment was that Parliament had withdrawn the case before us from the sphere of judicial scrutiny and determination and had decided it itself, as was stated in his opening address by the learned Counsel for the original respondent, not merely was the basic constitutional principle of separation of powers set at naught but the primordial rule of natural justice, that no one should be a judge in his own cause, had been infringed inasmuch as the dispute was really between a majority party and the numerically minority groups or parties in the Houses of Parliament. No hearing could be given to leaders of the numerically minority groups of parties in Parliament because they were, it was submitted, illegally detained under preventive detention laws after a declaration of emergency by the President of India, with the result that members of Parliament who did not support the ruling party were denied access to courts so as to secure their release from detention and could not take part in proceedings which produced the Acts amending the Act of 1951, and, the Thirty-ninth Amendment. I have already dealt with and rejected the objection to the proceedings of the Houses of Parliament, on the collateral ground of allegedly illegal detentions of opposition leaders.

**513.** All the contentions of learned Counsel for the election-petitioners, apart from the alleged procedural defect in amending the Act of 1951 and the Constitution when a number of opposition members of Parliament are detained under the preventive detention laws, already dealt with by me, seemed directed towards producing two results either simultaneously or alternatively : firstly, to pursuade us to hold that the constituent power had been exceeded or sought to be utilised for extraneous purposes falling outside the purview of Article 368 of the Constitution altogether ; and, secondly, to convince us that the effects of the fourth clause of Article 329A must be such that, if this purported addition to our Constitution was upheld, the "basic structure" or the "basic features" or "the underlying principles" of our Constitution will be irreparably damaged so that it could not any longer be looked upon as the same Constitution. It was submitted that the majority view in *Kesavananda Bharati's case* (supra), which was binding upon us, will compel us to invalidate clause (4) of Article 329A. There was, in the course of arguments, considerable overlapping between tests and considerations appertaining to the purposes and those involving the effects, consequences, or implications of clause (4) if it was upheld. It was proposed that purposes should be ascertained and their validity determined, inter alia, in the light of the consequences and implications of upholding the validity of the impugned clause. Both sets of contentions involved a definition of the scope of Article 368 and a determination of the exact nature of the function actually performed by the constituent authorities in passing the impugned clause (4) of Article 329A.

**514.** We have heard the learned Attorney General and the learned Solicitor General of India, in defence of the fourth clause of Article 329A sought to be added by the Thirty-ninth Amendment, as well as Mr. A.K. Sen and Mr. Jagannath Kaushal, learned Counsel for the original respondent, who also supported the validity of the impugned clause. The first contention of the learned Counsel seemed directed towards inducing us not to look beyond the language to discover the purposes or the nature of the function performed in passing clause (4) of Article 329 or its effects. This contention had necessarily to rest upon the assumption that provisions of clauses (4) and (5)


SCC Online Web Edition, Copyright © 2021
Page 221      Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source:  Supreme Court Cases

and (6) of Article 329A, sought to be introduced by the Thirty-ninth Amendment, were valid and had the effect of depriving this Court of jurisdiction to determine the validity of clause (4) by exploring the purposes and objects which may lie behind the plain meaning of clause (4). Our difficulty, however, is that even an attempt to give its natural and literal meaning to every word used in clause (4), after hearing the statements made by learned Counsel supporting the Thirty-ninth Amendment, to the effect that Parliament had itself examined the validity of whatever order and findings on question of fact or law are referred to there, and had reached the conclusion that the order and each of the findings of fact on which it was based must be adjudged to be void and of no effect, baffles us very much. This could only mean that Parliament, in its constituent capacity, had functioned as though it was a direct court of appeal from a judgment of the High Court while an appeal in the last court is pending—a procedure which has not been shewn to have been followed so far in any case brought to our notice either decided in this country or anywhere else in the world, all the cases cited to support such a view being distinguishable on facts and law applicable.

515. In the circumstances of this case, set out above, the findings on contested questions of fact and law and the order indicated by clause (4) could only be those contained in the judgment under appeal by both sides before us. The language of clause (4) was, according to the submissions of learned Counsel supporting the amendment, itself meant to convey that, after going into the disputed questions of fact, the constituent bodies had reached the conclusion that the order and the findings must have no legal effect. Indeed the Solicitor-General went so far as to submit that Parliament must be deemed to be aware of the contents of the whole record of the proceedings in the High Court, including the pleadings, the evidence, and the findings in the judgment of the High Court, as these were all available to it. In other words, we must imagine and suppose that, whatever may be the actual position, Parliament had sat in judgment over the whole case as a court of appeal would have done. But, the impugned clause (4), if valid, would compel us to make a contrary assumption inasmuch as it declares that all laws prior to the Thirty-ninth Amendment, relating to election petitions and "matters connected therewith", which must include the grounds given in Section 100 of the Representation of the People Act, 1951, were neither to be applied nor ever de̦emed to have applied to such a case as the one before us. This surely meant that they must be "deemed" not to have been applied by Parliament itself, according to the well known rule of construction that a legal fiction, introduced by a deeming provision, must be carried to its logical conclusion and we must not allow our imagination to boggle at the consequences of carrying the fiction to its logical conclusions (See : *East End Dwellings Co. Ltd.* v. *Finsbury Borough Council*[177]).

516. At the same time, it was contended, and, this was especially emphasised by Mr. Jagannath Kaushal, that Parliament and the ratifying Legislatures of the States—participating in the Constitution-making process—had not applied any pre-existing norms but had merely declared and registered, almost automatically, without any need to consider anything further or to apply any law whatsoever to any facts, what followed from the abrogation of all pre-existing law, with its procedure and norms, so far as the election-petition against the original respondent was concerned. This meant that the constituent bodies, proceeding on the assumption that the High Court had rightly held the original respondent's election to be invalid by applying the

177.  1952 AC 109.



SCC Online Web Edition, Copyright © 2021
Page 222    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------

196                    **SUPREME COURT CASES**                    1975 Supp SCC

provisions of the 1951 Act, had considered it necessary to validate what really was invalid according to the 1951 Act. In view of what I have already held on merits, such an assumption, if it was there at all, could only be based on a misconception.

517. The conflicting points of view, advanced in support of the amendment, enabled the election-petitioner's Counsel to find support for his contention that the impugned clause (4) obviously meant that a considered judgment on, inter alia, disputed questions of fact, however erroneous, had been swept aside, quite unceremoniously, mechanically, and, without a semblance of a quasi-judicial procedure, by a purported exercise of constituent power by the constituent bodies, consisting of the two Houses of Parliament and the ratifying Legislatures of the various States. He urged that the alternative contentions of Mr. Kaushal constituted an admission that no procedure whatsoever, which could be considered either reasonable or appropriate for a judicial or quasi-judicial determination of any question of fact or law was followed. He contended that whichever of the two alternative contentions of Counsel supporting the Thirty-ninth Amendment was accepted by us, his submission, that the amendment was ultra vires, arbitrary, and improperly motivated was made out.

518. The essence of judicial or quasi-judicial function is the application of a law which is already given by the law-making authority to the judicial or quasi-judicial authority to apply. This law has to be applied to certain findings after determining the disputed questions of fact in a manner which must conform to the canons of natural justice. Learned Counsel for the election-petitioner contended that it was not necessary to go beyond clause (4) to reach the conclusion that what was being done was to decide a dispute which could, under the law as it existed till then, only be judicially determined in the mode prescribed by Article 329(b) read with the Act of 1951 which could not be circumvented even before Article 329A engrafted exceptions on it and the Act of 1951 had been repealed retrospectively in its application to the Prime Minister. The result of a sort of consolidated legislative-cum-adjudicatory function was sought to be embodied in Article 329A(4) by purported constitutional amendment. He contended that we were bound to consider and decide whether the "constituent power" contained in Article 368 of the Constitution was meant to be used in this manner. Such use would, he submitted, fall outside Article 368. Hence, he submitted, there was no need to resort to principles emerging from a consideration of what may be spoken of as the basic structure or essential features of the Constitution. It was enough if we held that "constituent power" did not cover such a use made of it. Learned Counsel for the election-petitioner had thus advanced an alternative contention based upon the meaning of the term "constituent power" introduced by the Twenty-fourth Amendment; and, in my opinion, we are dutybound to interpret Article 368 and determine the precise meaning of "constituent power" when properly called upon by a party before us to do so. Indeed, the very contention that we should so construe "constituent power" as to deny ourselves the jurisdiction to decide the validity of what was done under a purported exercise of such a power involves a determination of its meaning. I fail to see how our jurisdiction to do this could be barred by the provisions of the very amendment whose constitutional validity is challenged before us.

519. Learned Counsel supporting the Thirty-ninth Amendment, had, in defence of the amendment, advanced arguments which go beyond the position which was adopted to support the amendments considered by us in *Kesavananda Bharati's case* (supra). The new argument


SCC Online Web Edition, Copyright © 2021
Page 223     Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------------

now advanced to use the language of the Solicitor General in his last written submissions, is that the power of amendment under Article 368 is "the very original power of the people which is unbroken into the legislative and the executive and the judicial". He submitted that the implied limitations, to which the majority decision in *Kesavananda Bharati's case* (supra) has committed this Court for the time being, are no longer available when considering this "unbroken" power. Mr. A. K. Sen, learned Counsel for the original respondent, puts this very argument in the following words in his written submissions :

> "In the hands of the constituent authority there is no demarcation of powers. But the demarcation emerges only when it leaves the hands of the constituent authority through well defined channels into demarcated pools. The constituent power is independent of the fetters or limitations imposed by separation of powers in the hands of the organs of the Government amongst whom the supreme authority of the State is allocated.
>
> The constituent power is independent of the doctrine of separation of powers. Separation of powers is when the Constitution is framed laying down the distribution of the powers in the different organs such as the legislative, executive and the judicial power. The constituent power springs as the fountainhead and partakes of sovereignty and is the power which creates the organ and distributes the powers. Therefore, in a sense the constituent power is all-embracing and is at once judicial, executive and legislative, or in a sense super power. The constituent power can also change the system of checks and balances upon which the separation of powers is based."

**520.** The theory advanced before us may have been designed to escape the logical consequences of the majority view in *Kesavananda Bharati's case* (supra) which we cannot, sitting as a bench of five Judges in this Court, over-rule. The theory is, however, quite novel and has to be, I think dealt with by us. It postulates an undifferentiated or amorphous amalgam of bare power constituting the "constituent power". According to this theory, the power which constitutes does not need to be either constituted or prevented from exercising a power assigned by it already to a constituted authority. Hence, it is a power of a kind which is above the Constitution itself. If I am not mistaken, the learned Solicitor General did say that the constituent power lies "outside" the Constitution. In other words, it is independent and above the Constitution itself because it operates on the Constitution and can displace it with, so to say, one stroke of its exercise. I do not think that such an extreme theory could be supported by the citation of either the majority or minority views of judges, barring stray remarks made in other contexts, either in the *I. C. Golaknath v. State of Punjab's case*[178] or in the *Kesavananda Bharati's case.* In fact, in neither of these two cases was the question raised or considered at all by this Court whether the amending power or the "constituent power" itself constituted such an amalgamated concentration of power, said to be distributed by the Constitution between the three different organs of State at a "subsequent stage" whatever this may mean. The distribution of power of different kinds between the three organs was compared to delegation of authority to agents which could be withdrawn at any time by the constituent bodies.

**521.** If we were to accept the theory indicated above, it would make it unnecessary to have a Constitution beyond one consisting of a single sentence

178. (1967) 2 SCR 762 : AIR 1967 SC 1643.


SCC Online Web Edition, Copyright © 2021
Page 224      Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------------------------------------------

198                          **SUPREME COURT CASES**                    1975 Supp SCC

laying down that every kind of power is vested in the constituent bodies which may, by means of a single consolidated order or declaration of law, exercise any or all of them themselves whenever they please whether such powers be executive, legislative, or judicial. Could this be the ambit of "constituent power" in our Constitution? Would such a view not defeat the whole purpose of a Constitution? Does the whole Constitution so crumble and melt in the crucible of constituent power that its parts cannot be made out? Before we could accept a view which carries such drastic implications with it we will have to overrule the majority view in *Kesavananda Bharati's case* (supra). The majority view in that case, which is binding upon us, seemed to be that both the supremacy of the Constitution and separation of powers are parts of the basic structure of the Constitution.

**522.** If "constituent power", by itself, is so transcendental and exceptional as to be above the provisions of the Constitution itself, it should not, logically speaking, be bound even by the procedure of amendment prescribed by Article 368(2). I have not found any opinion expressed so far by any learned Judge of this Court to show that the constituent power is not bound by the need to follow the procedure laid down in Article 368(2) of the Constitution. Indeed, rather inconsistently with the theory of an absolute and unquestionable power in some undifferentiated or raw and unfettered form, operating from above and outside the Constitution, learned Counsel, supporting the impugned fourth clause in Article 329-A, concede that the constituent power is bound by the appropriate procedure laid down in Article 368 for the amendment of the Constitution. What they urge is that, subject to this procedure, which has been followed here, the constituent power cannot be questioned because it is a "sovereign power". The logical consequence of such an argument also is that the majority view in *Kesavananda Bharati's case* (supra) was erroneous. It also overlooks that judicial review of laws made by Parliament is always a review of an exercise of "sovereign power". It may be that the object of the learned Counsel in advancing this extraordinary theory was to induce us to refer this case to a much larger bench so that the majority view in *Kesavananda Bharati's case* may, if necessary, be overruled. I, however, doubt whether putting forward such extreme and untenable propositions is the best method of securing such a result.

**523.** I think that the possibly theoretical question indicated above, whatever may be the object of raising it, does deserve to be seriously considered and answered by us because it discloses a basic misconception. Therefore, I propose to consider it at a length which seems to me to be justified by our need to clarify our thinking on a basic or "key" concept without a final commitment to a particular view on it. Clearer thinking, by examining a basic theoretical question from every conceivable angle, leads, I believe, to that openmindedness which is needed by lawyers no less than by any other class today so that we may, contrary to our reputation, be responsive to the inevitable challenges of change. Justice Holmes once said:

> "Theory is the most important part of the dogma of law, as the architect is the most important man who takes part in the building of a house."
> [Holmes *Collected Papers*, (1921) p. 200].

**524.** It seems to me that the words "sovereignty" and "sovereign power", used repeatedly by learned Counsel defending the Thirty-ninth Amendment to describe the constituent power, should, for several good reasons, be avoided, so far as possible, by lawyers who seek that clarity of thought for which precision in language is the first requirement. One of these


SCC Online Web Edition, Copyright © 2021
Page 225   Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------

reasons was given by Lord Bryce [*Studies in "History and Jurisprudence"* (1901) (pp. 503-504)] :

> "The frontier districts, if one may call them so, of Ethics, of Law, and of political science have been thus infested by a number of vague or ambiguous terms which have produced many barren discussions and caused much needless trouble to students............ No offender of this kind has given more trouble than the so-called 'Doctrine of Sovereignty'."

Prof. Mellwain, however, opined :

> "But this very fact is proof of its vital importance in our modern world, and the wide variety of the views held concerning its essence, as well as the conflicting conclusions to which these views still lead, may furnish sufficient excuse for another attempt to clarify some of our ideas touching this central formula under which we try to rationalize the complicated facts of our modern political life."

Another reason for eschewing such expressions, so far as possible, is that they are "emotive" or of a kind about which Mr. Leonard Schapiro, (writing on *"Key Concepts in Political Science"* Series, at p. 7) rightly observed :

> "Emotive words such as 'equality', 'dictatorship', 'elite' or even 'power' can often, by the very passions which they raise, obscure a proper understanding of the sense in which they are, or should be, or should not be, or have been used. Confucius regarded the 'rectification of names' as the first task of government. 'If names are not correct, language will not be in accordance with the truth of things', and this in time would lead to the end of justice, to anarchy and to war."

At any rate, in America, the concept of State sovereignty, ranged against that of national sovereignty, did produce a civil war which is said to have been precipitated by the decision of the American Supreme Court in *Dred Scott v. Sandford*[179].

525. I must preface my observations here about the concept of "sovereignty" and exercise of "sovereign power", between which I make a distinction, with two kinds of explanation. The first kind involves an exposition of a functional or sociological point of view. I believe that every social, political, economic, or legal concept or doctrine must answer the needs of the people of a country at a particular time. I see the development of concepts, doctrines, and institutions as responses to the changing needs of society in every country. They have a function to fulfil in relation to national needs. The second type of explanation may be called historical or meant merely to indicate and illustrate notions or concepts put forward by thinkers at various times in various countries so as to appropriately relate them to what we may find today under our Constitution. We have to appreciate the chronology or stages of their development if we are to avoid trying to fit into our Constitution something which has no real relevance to it or bearing upon its contents or which conflicts with these. It must not, if I may so put it, be constitutionally "indigestible" by a Constitution such as ours. Of course, it is not a secret that we have taken some of the basic concepts of our Constitution from British and American Constitutions in their most developed stages. That too must put us on our guard against attempts to foist upon our Constitution something simply because it happens to be either a British or American concept of some particular period which could not possibly be found in it

179.   (1856) 19 How 393.


SCC Online Web Edition, Copyright © 2021
Page 226      Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------------------------------------------

today.   Therefore, both types of explanation appear to be necessary to an exposition of what may or may not be found in our Constitution.

**526.**   I certainly do not think that Judges of this Court have or should think that they have the power to consciously alter, under the guise of judicial interpretation, what the Constitution declares or necessarily implies even though our pronouncements, interpreting the Constitution, may have the effect of contributing something to the growth or even change of Constitutional Law by clearing doubts, removing uncertainties, or filling up of gaps to a limited extent.   If the law embodied in our Constitution, as declared by this Court, is not satisfactory, I do not think that we can or should even attempt to stand in the way of a change of any kind sought through appropriate constitutional means by the constitutionally appointed organs and agencies of the State.   If, however, this Court is asked to declare as valid what seems to it to fall clearly outside the ambit of the Constitution, and, indeed, what is even claimed to be operating from outside the Constitution and described as a supra-constitutional power, there may be no alternative left to it except to declare such a claim to be really outside the Constitution. If we were to do that we would only be accepting the professed basis of the claim without conceding its constitutional validity.   After all, we are really concerned with the questions of constitutional validity which can only be resolved by references to what the Constitution contains, either expressly or by a necessary implication, and not with what is beyond its range except in so far as this also may be necessary to explain what is or what is deemed to be a part of our Constitution

**527.**   The term "sovereign" is derived from the Latin word *"Superanus"* which was akin to "Suzerian" suggesting a hierarchy of classes which characterised ancient and medieval societies.   In its origin, it is an attribute assigned to the highest living human superiors in the political hierarchy and not some abstract quality of a principle or of a law contained in a document— a meaning, as will be shown here, which emerges clearly later.   In times of anarchic disorder or oppression, by local satraps or chieftains or barons or even bullies and criminals, ordinary mortals have sought the protection of those who could give it because of their superior physical might.   No book or document could provide them with the kind of help they needed.   They looked up to their "Sovereign liege and Lord", as the medieval monarch was addressed by his subjects, for protection against every kind of tyranny and oppression.

**528.**   The Greeks and Romans were not troubled by theories of "sovereignty" in a State.   The principle that Might was Right was recognised as the unquestioned legally operative principle at least in the field of their constitutional laws.   Greek philosophers had, however, formulated a theory of a Law of Nature which was, morally, above the laws actually enforced.   In later stages of Roman law, Roman jurists also, saturated with Greek notions of an ethically superior law of nature, said that the institution of slavery, which gave the owner of a slave theoretically absolute powers of life and death over the slave, just like the powers of a pater-familias over his children, was contrary to *jus naturale* although it was recognised by *jus gentium*, the laws of then civilised world.   Aristotle, in his analysis of forms of government, had emphasized the importance of the Constitution of a State as a test or determinant of sovereign power in the State.   And, Roman jurists had, indirectly, cleared the path for the rise of modern legalism and constitutionalism by rescuing law itself from the clutches of a superstitious reverence for



Case 1:21-cv-00396-RJL Document 20-11 Filed 08/14/21 Page 228 of 289
SCC Online Web Edition, Copyright © 2021
Page 227    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------------------------

customs, surrounded with ceremonial and ritualistic observances and cumbersome justice defeating formalism, through fiction and equity, and forged a secular and scientific weapon of socio-economic transformation. All this was very useful in preparing for an age in which secular law could displace religion as the "control of controls" (*see*: Julius Stone's *"Province & Function of Law"*, 1961 Edn., pp. 754, 767).

**529.** Romans not only clarified basic notions but developed a whole armoury of new forms in which law could be declared or made: Lex; Plebiscitum; Magistratuum Edicta; Senatusconsulta; Responsa Prudentium; Principum Placita. The last mentioned consisted of orders of Roman Emperors which were of various kinds, some of general application to cases of particular kinds and others for particular individual cases: Edicta, Decreta, Mandata, Rescripta. They had the "force of law" or "Lex" which could be roughly equated with our statutory law. "Decreta" were issued as decisions on individual disputes, in exercise of the Emperor's power "under" the authority of "Lex de Imperio", although "in the classical period it was firmly established that what the Emperor ordained had the force of law" (See: *R. W. Leage on Roman Law*, 1961, p. 32 Edn.). The point to note is that, even in the embryonic stages of government through legislation lawmaking and decision of individual cases are found distinctly separate.

**530.** After the break-up of the Roman empire, there were attempts in medieval Europe, both by the Church and the Kings, to develop spiritual and temporal means for checking wrong and oppression. Quests for the superior or a sovereign power and its theoretical justifications by both ecclesiastical and lay thinkers were parts of an attempt to meet this need. The claims of those who, as vicars of God on earth, sought to meddle with mundane and temporal affairs and acquire even political power and influence were, after a struggle for power, which took different forms in different countries, finally defeated by European kings with the aid of their subjects. Indeed, these kings tried to snatch, and not without success, to wear spiritual crowns which the roles of "defenders of the faith" carried with them so as to surround themselves with auras of divinity.

**531.** The theory of a legally sovereign unquestionable authority of the King, based on physical might and victory in battle, appears to have been developed in ancient India as well, by Kautilya, although the concept of a Dharma, based on the authority of the assemblies of those who were learned in the dharmashastras, also competed for control over exercise of royal secular power. High philosophy and religion, however, often seem to have influenced and affected the actual exercise of sovereign power and such slight law-making as the King may have attempted. The ideal King, in ancient India, was conceived of primarily as a Judge deciding cases or giving orders to meet specific situations in accordance with the dharmashastras. It also appears that the actual exercise of the power to administer justice was often delegated by the King to his judges in ancient India. Indeed, according to some, the theory of separation of powers appears to have been carried so far (See: K. P. Jayaswal in *"Manu and Yajnavalkya"—A basic History of Hindu Law*—1930 Edn., p. 82) that the King could only execute the legal sentence passed by the Judge.

**532.** We know that Semetic prophets, as messengers of God, also became rulers wielding both spiritual and political temporal power and authority although to Jesus Christ, who never sought temporal power, is ascribed the saying: "Render unto Caesar the things that are Caesar's



Case 1:21-cv-00396-RJL    Document 20-11    Filed 08/14/21    Page 229 of 289
SCC Online Web Edition, Copyright © 2021
Page 228    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------------------------------------

and to God things that are God's''.  According to the theory embodied in this saying, spiritual and temporal powers and authorities had to operate in different orbits of power altogether.  Another theory, however, was that the messenger of God had given the sovereign will of God Almighty which governed all matters and this could not be departed from by any human authority or ruler.  In the practical administration of justice, we are informed, Muslim caliphs acknowledged and upheld the jurisdiction of their Kazis to give judgment against them personally.  There is an account of how the Caliph Omar, being a defendant in a claim brought by a Jew for some money borrowed by him for purposes of State, appeared in person in the Court of his own Kazi to answer the claim.  The Kazi rose from his seat out of respect for the 'Caliph who was so displeased with this unbecoming conduct that he dismissed him from office.  [See : Sir A. Rahim's *''Muhammadan Jurisprudence''* (1958) p. 21].

**533.**  The theory, therefore, that there should be a separation of functions between the making of laws, the execution of laws, and the application of laws, after ascertaining facts satisfactorily, is not new.  It is embedded in our own best traditions.  It is dictated, if by nothing else, by common sense and the principle of division of labour, without an application of which efficient performance of any duties cannot be expected.

**534.**  We may now look back at the theory and practice of sovereignty in Europe.  There, wise kings, in the middle ages, sought the support of their subjects in gatherings or ''colloquia'', which, in the words of Mr. De Jouvenel (See : *''Sovereignty, an Inquiry into the Political Good''* p. 177), ''had the triple character of a session of justice, a council of State and the timid beginnings of a legislative assembly were the means by which the affairs of the realm came more and more into the hands of the King''.  He goes on to observe :

> ''The council of the King and the courts of justice progressively developed an independent life, the assembly remaining under the name of Parliament in England and States-General in France.''

**535.**  Bodin, writing in the reign of Henry III of France (1551 to 1589), viewed sovereignty as an absolute unlimited power which, though established by law, was not controlled by it.  According to him, under an ideal system sovereignty was vested in the King by divine right.  The King's word was law.  But, even according to Bodin, although the sovereign was free from the trammels of positive law, as he was above it, yet, he was ''bound by divine law and the law of nature as well as by the common law of nations which embodies principles distinct from these'' (See : Dunning's *''History of Political Theories Ancient & Medieval''* p. 28).  Hobbes, a century later continued this line of thinking on an entirely secular and non-moral plane.  He opined : ''Unlimited power and unfettered discretion as to ways and means are possessed by the sovereign for the end with a view to which civil society is constituted, namely, peace and escape from the evils of the state of nature'', in which the life of individuals was ''nasty, brutish, and short''.  Although, Hobbes visualised the existence of a social compact as the source of the authority of the sovereign, yet, he looked upon the compact only as a mode of surrender by the subjects of all their individual rights and powers to the sovereign who could be either an individual or a body of persons.  Subjects, according to him, had no right to rely upon the compact as a means of protection against the sovereign.  He provided the fullest theoretical foundations of a Machiavellian view of sovereignty.


SCC Online Web Edition, Copyright © 2021
Page 229    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

--------------------------------------------------------------------------------

**536.** As we know, in the 17th and 18th centuries, European monarchs came in sharp conflict with the representatives of their subjects assembled in "Parliament" in England and in the "States-General" in France. And, theories were put forward setting up, as against the claims of kings to rule as absolute sovereigns by indefeasible divine right, no lesser claims to inviolability and even divinity of the rights of the people. But, theories apart, practice of the art of government proves that the effective power to govern by the very nature of conditions needed for its efficient exercise, has had to be generally lodged in one or few especially in times of crisis, but not in all those who represent the people even under democratic forms of Government. Direct democracy, except in small city States such as those of ancient Greece, is not practically feasible.

**537.** Theories of popular sovereignty put forward by Locke and Rousseau came to the forefront in the 17th and 18th centuries—an era of revolutionary changes and upheavals. The theory of certain immutable individual natural rights, as the basis of a set of positive legal rights, essential and necessary to the fulfilment of the needs of human beings as individuals, was advanced by Locke. He visualised a social contract as a means of achieving the welfare of individuals composing Society. He also advocated separation of powers of government in a Constitution as a method of securing rights of individual citizens against even their own governments. Montesquieu elaborated this theory. The ideas of Rousseau were amongst those which contributed to produce that great conflagaration, the French Revolution, which was described by Carlyle as the "bonfire of feudalism". Government, according to Rousseau, in all its departments, was the agent of the General Will of the sovereign people whose welfare must always be its aim and object. But, the General Will for the time being was also liable to err about the particular means chosen to achieve the ends of good government. There was, according to Rousseau, also another part of the "General Will" which was more permanent and unerring and stable and decisive. He hinted that there was what Bosanquet (See : *The Philosophical Theory of the State*—Chap. V) called the "Real Will", the basis of which was found in Rousseau's philosophy. As pointed out by T. H. Green, in his *Lectures on "Principles of Political Obligation"* (1931 Edn., p. 82) Rousseau's theory of sovereignty was designed to bring out that :

> "There's on earth a yet auguster thing, veiled though it be, than Parliament and king."

T. H. Green said :

> "It is to this 'auguster thing', not to such supreme power as English lawyers held to be vested in 'Parliament and king', that Rousseau's account of the sovereign is really applicable."

**538.** The ideas of Rousseau were subsequently used by Hegelian and idealist political philosophers to deify the State as the repository of the "Real Will" of the people and by Marxists to build their theory of a dictatorship of the proletariat. But, the views of Locke and Montesquieu were sought to be given a practical form by American Constitution-makers, who imbued with them, devised a machinery for the control of sovereign power of the people placed in the hands of the three organs of State so that it may not be misused. Suspicion of governmental power and fear of its misuse, which characterised liberal democratic thinking, underlay the doctrine of separation of powers embodied in the American Constitution.

SCC Online Web Edition, Copyright © 2021
Page 230    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------

**539.** "The merits of democracy", according to Bertrand Russel (See : *Power : A New Social Analysis*" p. 187) "are negative : it does not insure good government, but it prevents certain evils." He pointed out (at p. 188) :

> "It is possible, in a democracy, for the majority to exercise a brutal and wholly unnecessary tyranny over a minority...........The safeguarding of minorities, so far as is compatible with orderly Government, is an essential part of the taming of power."

He also said (at p. 192) :

> "Where democracy exists, there is still need to safeguard individuals and minorities against tyranny, both because tyranny is undesirable in itself, and because it is likely to lead to breaches of order. Montesquieu's advocacy of the separation of legislative, executive, and judiciary, the traditional English belief in checks and balances, Bentham's political doctrines and the whole of nineteenth century liberalism, were designed to prevent the arbitrary exercise of power. But such methods have come to be considered incompatible with efficiency."

**540.** Some quite honest, upright, and intelligent people think that the inefficiency, the corruption, the expense, the waste of time and effort, and the delay in accomplishing what they regard as much too urgently needed socio-economic and cultural transformations of backward peoples today, involved in treading the democratic path, are so great that they would readily sacrifice at least some of the democratic processes and such safeguards against their misuse as separation of powers and judicial review are meant to provide. They would not mind taking the risk of falling into the fire to escape from what they believe to be a frying pan. Some may even agree with Bernard Shaw, who liked to look at everything turned upside down in attempts to understand them, that Democracy, with all its expensive and time-consuming accompaniments, is, even in the most advanced countries, only a method of deluding the mass of the people into believing that they are the rulers whilst the real power is always enjoyed by the few who must be judged by the results they produce and not by their professions. Others regard democracy as the only means of achieving the highest good and the greatest happiness of the greatest number. They consider its maintenance to be inextricably bound up with the preservation of the basic individual freedoms and a supporting mechanism or structure of checks and balances, separation of powers, and judicial review. What some believe to be obstacles to any real progress are looked upon by others as almost sacred institutions essential for the protection of their lives and liberties, hearths and homes, occupations and means of livelihood, religions, languages, and cultures. Inevitability of change is, according to some, the basic and inescapable law of all life, the only questions to be considered being its pace and direction : how soon or how late and whether the change is to be for the better or for the worse? "El Dorado", some believe, lies ahead. Our march towards it, they say, should be orderly and disciplined. To others all change is anathema as it is generally for the worse. The Golden Age, some believe, lay in the past. Salvation of mankind, they think, lies in a return to the imagined pristine virtues of that past. Some assert that certain amendments of our Constitution have "defaced and defiled" it (See : Mr. Palkhivala's *"Our Constitution Defaced and Defiled"*. Others maintain that these very amendments have made our Constitution a more potent instrument of those socio-economic and cultural transformations for which the Constitution was designed (See : Dr. V. A. Seyid Muhammad's *"Our Constitution for Haves or Havenots?"*).


SCC Online Web Edition, Copyright © 2021
Page 231    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

**541.** Judges must, no doubt, be impartial and independent. They cannot, in a period of intensified socio-economic conflicts, either become tools of any vested interests, or function, from the bench, as zealous reformers propagating particular causes. Nevertheless, they cannot be expected to have no notions whatsoever of their own, or to have completely blank minds on important questions indicated above which, though related to law, really fall outside the realm of law. They cannot dwell in ivory towers or confine their processes of thinking in some hermetically sealed chambers of purely legal logic artificially cut off from the needs of life around to which law must respond. Their differing individual philosophies, outlooks, and attitudes on vital questions, resulting from differences in temperament, education, tradition, training, interests and experiences in life, will often determine their honest choices between two or more reasonably possible interpretations of such words as "amendment" or "constituent power" in the Constitution. But, on certain clear matters of principle, underlying the Constitution, no reasonable person could entertain two views as to what was or could be really intended by the Constitution-makers. One of these matters, clear beyond the region of all doubt, seems to me to be that the judicial and law-making functions, however broadly conceived, could not possibly have been meant to be interchangeable. They are not incapable of distinction and differentiation, in any constitutionally prescribed sphere of operation of power including that of "constituent power". Each has its own advantages and disadvantages and its own natural modus operandi.

**542.** A lamentable example of what took place in the course of English constitutional history when a House of Commons, composed of very intelligent and learned people, one of whom, Holt, subsequently became a distinguished Chief Justice of England, took upon itself to sit in judgment on a decision of two Judges of the King's Bench Division, one of whom was suspected of being a partisan of Royal prerogative and power at a time when a struggle for supremacy between the competing legal claims of the King, as the titular sovereign, and those of the House of Commons, as representing the people, was still going on. In strict law, which was unwritten, the position on that problem of power was not quite clear at that time. The episode is thus described by Lord Denman, C. J. in *Stockdale* v. *Hansard*[180] (at p. 1163):

"The next case to which I advert in truth embraced no question of privilege whatever; but, as one of the highest authorities in the State has thought otherwise, I shall offer some comments upon it; I mean *Jay* v. *Topham*[181]. The House of Commons ordered the defendant, their serjeant at-arms, to arrest and imprison the plaintiff for having dared to exercise the common right of all Englishmen, of presenting a petition to the King on the state of public affairs at a time when no Parliament existed. For this imprisonment an action was brought. The declaration complained, not only of the personal trespass, but also of extortion of the plaintiff's money practised by defendant under colour of the Speaker's warrant. The plea of justification under that warrant, which could not possibly authorise the extortion, even if it could the arrest, was overruled by this Court, no doubt with the utmost propriety, for the law was clear; Lord Ellenborough points this out in the most forcible manner, in 14 East 109. Yet for this righteous judgment C. J. Pemberton and one of his brethren were summoned before the Convention Parliament, when they vindicated their conduct by unanswerable

180.   112 English Rep 1112, 1163.          181.   112 How St Tr 821.

SCC Online Web Edition, Copyright © 202
Page 232          Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------

reasoning, but were, notwithstanding, committed to the prison of Newgate for the remainder of the session. Our respect and gratitude to the Convention Parliament ought not to blind us to the fact that this sentence of imprisonment was *as unjust and tyrannical as any of those acts of arbitrary power for which they deprived King James of his Crown.* It gave me real pain to hear the Attorney-General contend that the two Judges merited the foul indignity they underwent, as they had acted corruptly in concert with the Duke of York. In support of this novel charge, he produced no evidence, nor any other reason but that the plea, as set out in Nelson's Abridgement [ 2 Nels. Abr. 1248. The plea there is that pleaded, not in *Jay* v. *Topham*, but in *Verdon* v. *Topham*. See 14 East 102 note (*a*)] appears to have been in bar, and not to the jurisdiction. But the Commons, who knew their own motives, made no such charge : the record produced there, on law, exhibits a bad plea for the reasons assigned by Lord Ellenborough ; and the judgment punished by the Commons could not have been different without a desertion of duty by the Judges.''

**543.** In *Stockdale* v. *Hansard* (supra) the action of the House of Commons, on *Jay* v. *Topham* (supra), was practically declared to be illegal or unconstitutional for arbitrariness. The sovereign British Parliament, however, did not alter but has acquiesced in the law as stated by Lord Denman who pointed out, by references to a number of precedents, that common law courts had continuously been determining questions relating to the very existence of an alleged privilege and defining its orbit on claims based on the ground of a parliamentary privilege. And, English courts have gone on doing this unhesitatingly after *Stockdale* v. *Hansard* (supra), just as they had done earlier, as a part of their function and duty to interpret and declare the law as it exists.

**544.** Let me go back a little further to the time when another English Chief Justice, Sir Edward Coke, who, on being summoned, with his brother Judges, by King James I, to answer why the King could not himself decide cases which had to go before his own courts of justice, asserted : "...no king after the conquest assumed to himself to give any judgment in any cause whatsoever, which concerned the administration of justice within this realm, but these were solely determined in the courts of justice". When the King said that "he thought the law was founded on reason, and that he and others had reason, as well as the Judges", Coke answered :

> "True it was, that God had endowed his Majesty with excellent science, and great endowments of nature; but his Majesty was not learned in the laws of his realm of England, and causes which concern the life, or inheritance, or goods, or fortunes of his subjects, are not to be decided by natural reason, but by the artificial reason and judgment of the law, which law is an act which requires long study and experience, before that a man can attain to the cognizance of it; and that the law was the golden metwand and measure to try the causes of the subjects; and which protected his Majesty in safety and peace. ("*The Higher Law—Background of American Constitutional Law*" by Edward S. Corwin, pp. 38-39).

**545.** We know that Coke even advanced the claim, in *Bonham's case*[188], that courts could invalidate Acts of Parliament if they contravened rules of natural justice such as that a man shall not be heard before he is condemned

**182.** (1610) 8 Co Rep 118.


SCC Online Web Edition, Copyright © 2021
Page 233    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------------------------------

or that he should be a judge in his own cause. As Ivor Jennings points out, in an appendix to "*The Law and the Constitution*" (5th Edn., 1959, p. 318) the theory of parliamentary sovereignty or supremacy could, by no means, be said to be firmly established in England in Coke's time.

**546.** Blackstone, while enunciating the theory of parliamentary sovereignty in the 19th century, as it was to be later expounded in the 20th century by Prof. A. V. Dicey, also claimed superiority for "the law of nature which was common to all mankind". He said about this law :

> "It is binding over all the globe, in all countries, and at all times : no human laws are of any validity if contrary to this; and such of them as are valid derive all their force and all their authority, mediately or immediately, from this original;" (See : Dicey—*Law of the Constitution*, p. 62).

**547.** It is a matter of legal and constitutional history that English judges finally rejected claims based upon vague philosophical concepts or upon a law of nature or appeals to the "Yet auguster thing" pitted against statutory law except in so far as certain rules of natural justice and reason could impliedly be read into Acts of Parliament due to absence of statutory prohibition and the need to observe them having regard to the character of the function required by a statute to be performed. Constitutional historians, such as Holdsworth, have pointed out how English common lawyers, some presiding as Judges over King's courts of justice, others sitting in Parliament as legislators, joined hands to evolve, sustain, and give life to principles of "Sovereignty of Parliament" and the "Rule of Law" as understood by them. Dicey asserted, in his "*Law of the Constitution*", that both these principles so operated as to reinforce each other instead of coming into conflict with each other. One wonders whether this could be said of later times when the need for more rapid transformations of social and economic orders, in an effort to build up a welfare State in Britain, led to serious curtailments of what were at one time considered natural and inviolable rights and to adoption of legislative devices such as Henry VIIIth clause. We know that these developments evoked a powerful protest from a Chief Justice of England, Lord Hewart, who wrote a book on the subject : "*New Depotism*". Today however, it cannot be said that the courts of justice in England do not see the implications of a welfare socialistic State which may demand the curtailment of liberties of subjects in many directions in order that the substance of democratic freedom, only attainable through removal of economic, social, and educational disparities and barriers, may be attained.

**548.** Willis, dealing with the development of American Constitutional Law, wrote about the claim of Coke, mentioned above, to invalidate Acts of Parliament by reference to certain fundamental principles of natural justice and of common law (See : *Willis on Constitutional Law*, 1936 Edn. p. 76) :

> "This dictum of Coke, announced in *Dr. Bohman's case*[183] was soon repudiated in England, but the doctrine announced in Coke's dictum found fertile soil in the United States and sprouted into such a vigorous growth that it was applied by the United States Supreme Court in the decision of cases coming before it; and it has been said that the doctrine of the supremacy of the Supreme Court is the logical conclusion of Coke's doctrine of control of the courts over legislation."

183. (1610) 8 Co Rep 118A.


SCC Online Web Edition, Copyright © 2021
Page 234    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------

**549.** It seems to me that judicial review of all law-making, whether it appertains to the sphere of fundamental law or of ordinary law, is traceable to this doctrine of judicial control by reference to certain basic principles, contained in a Constitution and considered too inviolable to be easily alterable. It may be that this doctrine is unsuitable for our country at a time when it is going through rapid socio-economic transformation. Nevertheless, so long as the doctrine is found embodied in our Constitution, we cannot refuse to recognise it.

**550.** In America, there was some doubt whether the doctrine of judicial review of all legislation naturally flowed out of the vesting of judicial power by Section 1 of Article 3 of their Constitution which says:

> "The judicial power of the United States shall be vested in one Supreme Court, and in such inferior Courts as the Congress may, from time to time, ordain and establish." (*Willis on Constitutional Law*, p. 1020).

There is no article there, like Article 13 of our Constitution, which declared any kind of legislation abridging or taking away fundamental rights to be "void". The doubt was not without substance. It was removed by Chief Justice Marshall whose judgment in *Marbury* v. *Madison*[184], firmly established the doctrine of judicial review and the supremacy of the Supreme Court of America, in the judicial field of interpretation, as the mouthpiece of the Constitution, and, therefore, of the "Real Will" of the people themselves. The Constitution, as the basic or fundamental law of the land, was to operate there as the touchstone of the validity of ordinary laws just as the validity of laws made by British colonial legislatures was tested by reference to the parental Act of the British Parliament.

**551.** Under our Constitution, by Article 141 of the Constitution, power is vested only in the Supreme Court and in no other organ or authority of the Republic to declare the law "which shall be binding on all Courts within the territory of India". Article 143 of the Constitution of India also shows that whenever questions of fact or law have either arisen or are likely to arise, the President of India may, in view of their public importance, seek the opinion of the Supreme Court, by a reference made to the Court. The procedure on such a reference is that of a judicial authority which hears those interested and then gives its opinion. Article 32 of the Constitution gives a wide power to the Supreme Court "to issue directions or orders or writs", which is larger than that of the British courts issuing prerogative writs, although it is confined to the enforcement of the rights conferred by Part III dealing with fundamental rights. The power of the High Courts of the various States under Article 226 of the Constitution to issue appropriate directions, orders, or writs "to any person or authority including in appropriate cases any Government", within the territories under its jurisdiction, extends to "any other purpose", that is to say, to purposes other than enforcement of fundamental rights. Article 227 also contains the power of a High Court to superintend the functioning of "all courts and tribunals" within its jurisdiction. These powers of the High Courts are subject to appeals to the Supreme Court, which is also a repository of a special jurisdiction under Article 136 to grant special leave to appeal "from any judgment, decree, determination, sentence or order in any cause or matter passed or made by any court or tribunal in the territory of India". It is true that there is no mention or vesting of judicial power, as such, in the

184. 1803 Cranch 137.


SCC Online Web Edition, Copyright © 202
Page 235    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------------------------

INDIRA NEHRU GANDHI *v.* RAJ NARAIN (*Beg, J.*)            209

Supreme Court by any article of our Constitution, but, can it be denied that what vests in the Supreme Court and High Courts is really judicial power? The Constitution undoubtedly specifically vests such power, that is to say, power which can properly be described as "judicial power", only in the Supreme Court and in the High Courts and not in any other bodies or authorities, whether executive or legislative, functioning under the Constitution. Could such a vesting of power in Parliament have been omitted if it was the intention of Constitution-makers to clothe it also with any similar judicial authority or functions in any capacity whatsoever?

552. The claim, therefore, that an amalgam or some undifferentiated residue of inherent power, incapable of precise definition and including judicial power, vests in Parliament in its role as a constituent authority, cannot be substantiated by a reference to any article of the Constitution whatsoever, whether substantive or procedural. Attempts are made to infer such a power from mere theory and speculation as to the nature of the "constituent power" itself. I do not think that, because the constituent power necessarily carries with it that power to constitute judicial authorities, it must also, by implication, mean that the Parliament, acting in its constituent capacity, can exercise the judicial power itself directly without vesting it in itself first by an amendment of the Constitution. The last mentioned objection may appear to be procedural only, but, as a matter of correct interpretation of the Constitution, and, even more so, from the point of view of correct theory and principle, from which no practice should depart without good reason, it is highly important.

553. This impels me to consider such theories of sovereignty as we may find embedded in our Constitution. It is noteworthy that the phrase "sovereignty and integrity of India" was inserted in 1963 in Article 19(2), (3) and (4), to denote the political independence and wholeness of the country, vis-à-vis other countries. It was also introduced in the oaths of "allegiance" to the Constitution prescribed in the Third Schedule indicating that the duty to uphold "the sovereignty and integrity of India" follows from a recognition of the supremacy of the Constitution. The term "sovereign" is only used in the preamble of our Constitution, which says:

"We, the people of India, having solemnly resolved to constitute India into *a Sovereign* Democratic Republic and to secure to all its citizens :

        *             *             *

        *             *             *

In our Constituent Assembly this twenty-sixth day of November, 1949 *do hereby adopt, enact and give to ourselves this Constitution.*"

554. This Court, exercising the powers vested in it under the Constitution to declare the law of the land, cannot go behind the clear words of the Constitution on such a matter. We have to presume that the Constitution was actually made by the people of India by virtue of their political sovereignty which enabled them to create a legally Sovereign Democratic Republic to which they consigned or entrusted, through the Constitution, the use of sovereign power to be exercised, in its different forms, by the three different organs of Government, each acting on behalf of the whole people, so as to serve the objects stated in the Preamble. This reference to "the people of India" is much more than a legal fiction. It is an assertion in the basic legal instrument for the governance of this country of the fact of a new political power. The legal effect of the terms of the instrument is another matter.



SCC Online Web Edition, Copyright © 202
Page 236          Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------

**555.**  It has been pointed out, in the *Kesavananda Bharati's case* (supra), that the preamble of our Constitution did not like that of the American Constitution, "walk before the Constitution", but was adopted after the rest of the Constitution was passed, so that it is really a part of the Constitution itself.  It means that the Constitution is a document recording an Act of entrustment and conveyance by the people of India, the political sovereign, of legal authority to act on its behalf to a "Sovereign Democratic Republic". "This Constitution" has a basic structure comprising the three organs of the Republic: the Executive, the Legislature, and the Judiciary.  It is through each of these organs that the Sovereign Will of the People has to operate and manifest itself and not through only one of them.  Neither of these three separate organs of the Republic can take over the function assigned to the other.  This is the basic structure or scheme of the system of Government of the Republic laid down in this Constitution whose identity cannot, according to the majority view in *Kesavananda Bharati's case* (supra), be changed even by resorting to Article 368.  It necessarily follows, from such a view, that sovereignty, as the power of taking ultimate or final decisions on broad politico-legal issues involved in any proposed changes in the law, becomes divisible. The People are not excluded from the exercise of it.  They participate in all the operations of the Republic through the organs of the State.  They bind themselves to exercise their individual and collective rights and powers only in the ways sanctioned and through agencies indicated by the Constitution. The Republic is controlled and directed by the Constitution to proceed towards certain destinations and for certain purposes only.  The power to change even the direction and purposes is itself divided in the sense that a proposed change, if challenged, must be shown to have the sanction of all the three organs of the Republic, each applying its own methods and principles and procedure for testing the correctness or validity of measure.  This result, whether we like it or not, necessarily follows from our present constitutional structure and scheme.  If the judicial power operates here like a brake or a veto, it is not one which can be controlled by any advice or direction to the Judiciary as is the case in totalitarian regimes.  In our system, which is democratic, its exercise is left to the judicial conscience of each individual judge. This is also a basic and distinguishing feature of democracy as Prof. Friedmann indicated in his *"Law in a Changing Society"* (p. 61) quoted by me in *Kesavananda Bharati's case* (at p. 859) (SCC p. 899, para 1794).

**556.**  In *Kesavananda Bharti's case* (supra),  I had approvingly quoted* the view of Prof.  Ernest Barker, who, in his *"Principles of Social and Political Theory"*, claiming to be elaborating the theory underlying the preamble to our own Constitution, pointed out that, inasmuch as the Constitution is the instrument which regulates the distribution between and exercise of sovereign power, by the three organs of the State, and it is there constantly to govern and to be referred to and to be appealed to in any and every case of doubt and difficulty, it could itself, conceptually, be regarded as the true or "ultimate" sovereign, that is to say, sovereign as compared with "immediate" sovereignty of an organ of the Republic acting within its own sphere and at its own level.

**557.**  Of course, inasmuch as the power of altering every feature of the Constitution remains elsewhere politically, the Constitution is neither the ultimate "political" sovereign nor a legally unalterable and absolute sovereign. All constitutional and "legal" sovereigns are necessarily restrained and limited sovereigns.  I thought and still think that such a working theory

---

*  SCC pp. 905, 907.



SCC Online Web Edition, Copyright © 2021
Page 237      Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------------------------

should be acceptable to lawyers, particularly as the dignitaries of State, including judges of superior courts, and all the legislators, who have to take oaths prescribed by the Third Schedule of our Constitution, swear "allegiance" to the Constitution as though the document itself is a personal ruler. This accords with our own ancient notions of the law as "The King of Kings" and the majesty of all that it stands for : The Rightfulness of the Ends as well as of the Means.

558. The theory outlined above would, of course, be unacceptable if sovereignty must necessarily be indivisible and located in a determinate living person or persons—a really medieval concept which is not generally employed today even to describe the titular hereditary monarchs as "sovereigns", although the dictionaries may still give the derivative meaning of "sovereign" as the human ruler. Modern theories of even political sovereignty advanced by the Pluralist School—e.g. Gierke, Duguit, McIver, Laski—look upon it as divisible and not as absolute and unlimited. Indeed they go to the extent of practically denuding sovereignty of all its customary connotations. Duguit abandons "sovereignty" as an obsolescent doctrine and displaces it by the ruling principle of "social solidarity". McIver thinks that the traditional concepts of sovereignty, dominated too long by legalistic Austinian views, needs to be discarded. His conclusion is that the State, with which doctrine of sovereignty has been bound up, is "the association of associations", merely regulates the "principles of association" or relations between individuals and associations in the interests of society as a whole. He wrote :

"At any moment the State is more the official guardian than the maker of the law. Its chief task is to uphold the rule of law, and this implies that it is itself also the subject of law, that it is bound in the system of legal values which it maintains." (See: R. M. McIver: "*The Modern State*" p. 478)

Laski, while mainly accepting this rather negative approach, reminiscent of 19th century liberalism, would accord the State a much more positive role in the interests not only of social order but also of socio-economic engineering and progress.

559. Marxists, who saw in the State and its laws and all institutions supporting an existing social order, the means of oppression and exploitation of the mass of the people, dreamt of the "withering away" of the State with its claims to 'sovereignty'. But, the Russian Revolution was followed by the vastly increased powers of the State run for the benefit of the proletariat. Nevertheless, the Constitution of the U.S.S.R. guarantees to citizens not merely fundamental rights, including the right to work, but has a special department of the Procurator General to enforce due observance of legality, according to the law of the Constitution, by all the functionaries of State. Article 104 of their Constitution reads :

"104. The Supreme Court of the U.S.S.R. is the highest judicial organ. The Supreme Court of the U.S.S.R. is charged with the supervision of the judicial activities of all the judicial organs of the U.S.S.R. and of the Union Republic within the limits established by law." (See : A Denisov, M. Kirichenko : *Soviet State Law*, p. 400)

560. It is true that legality is enforced in the U.S.S.R. not merely through the organs of the State but the vigilance of the Communist party which consists of selected persons keeping a watch on the policy of the State. A.Y. Vyshinski, however explained (See : *Fundamental Tasks of Soviet Law*, 1938) that Soviet "law can no more be reduced simply to policy than cause

SCC Online Web Edition, Copyright © 202
Page 238    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

can be identified with effect". Strict observance of "Socialist Legality", under the supremacy of the Constitution, is entrusted to the care of the State, with its three organs, the Communist Party, and the people of the U.S.S.R. (See : "*The Soviet Legal System*" by M/s. John N. Hazard and Issac Shapiro). Although Article 15 of the Constitution of the U.S.S.R. speaks of the "Sovereignty and Sovereign Rights" of the Union Republics, yet, it is made clear that these republics function subject to the supremacy of the Constitution. Hence, the supremacy of the Constitution is a principle recognised by the Constitution of the U.S.S.R. also as operating above and limiting the sovereignties of the socialist republics.

**561.** Gierke made a wide survey and a penetrating analysis of juristic thinking upto the end of the 19th century on sovereignty, derived, on the one hand, from theories of the sovereignty of the ruler, and, on the other, from theories of popular sovereignty. He observed (See : "*Natural Law and Theory of Society*" by Otto Gierke translated by Ernest Barker, Vol. I, p. 153) about the approach of Kant :

> "Kant sketches, indeed, an ideal constitutional State in which popular sovereignty is nominally present : but no living 'subject' of supreme authority is anywhere really to be found in this State. The 'bearers' of the different powers (legislative, executive and judicial) are supposed to govern, but each is *subject to a strict legal obligation appropriate to its own sphere*; and over them all, as the Sovereign proper, the abstract Law of Reason is finally enthroned."

He concluded (at p. 153) :

> "The history of the theory of constitutionalism shows how a doctrine derived from the principle of popular sovereignty could produce almost the same results as the other (and apparently opposite) system of thought which started from the principle of the sovereignty of the ruler. In the one case, just as in the other, the inviolability of sovereignty, and the unity of the personality of the State, are sacrificed, in order to attain the possibility of *a constitutional law which is binding even on the Sovereign.*"

**562.** A theory of a "Legal Sovereignty" must necessarily demarcate the sphere of its "legal" or proper operation as opposed to mere use of power either capriciously or divorced from human reason and natural justice. Ernest Barker's statement of it, quoted by me in *Kesavananda's case* (supra), seemed to me to satisfy this requirement. After pointing out that sovereignty, by which I understand one recognised by law, is limited both by its own "nature" as well as its "mode of action", it concludes : (at pp. 867-868) :

> "Sovereignty moves within the circle of the legal association, and only within that circle it decides upon questions of a legal order, and only upon those questions. Moving within that circle, and deciding upon those questions, sovereignty will only make legal pronouncements, and it will make them according to regular rules of legal procedure. *It is not a capricious power of doing anything in any way: it is a legal power of settling finally legal questions in a legal way.*"

There should be no difficulty in accepting such a theory if one can conceive of an ordered system or "government of laws" as opposed to a "government of men" placed beyond limitations of this kind. At any rate, it is implicit in the very idea of a Constitution. Our Constitution not only regulates the operations of the organs of State but symbolises the unity of the republic and contains the inspiring hopes and aspirations and cherished goals of all the efforts of the nation. It operates not merely through the law but also on the minds and feelings of the people.



SCC Online Web Edition, Copyright © 202
Page 239      Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

------------------------------------------------------------------------------------------------------------

**563.** Prof Willis, in his "*Constitutional Law of the United States*" advocates the doctrine of "sovereignty of the people" for which he finds support in Abraham Lincoln's well-known description of the American system as "a Government of the people, for the people, by the people" as well as in a number of pronouncements of the American Supreme Court. After considering and rejecting a whole host of theories of political philosophers and jurists, including those of Bodin, Hegel, Hooker, Hobbes, Locke, Rousseau, Fichte, Kant, Austin, Brown, Dicey, Willoughby, Duguit and Laski, he opines (at p. 51) :

> "As Dewey says, the forces which determine the government are sovereign. The effective social forces are not the Union, nor the States, nor the oligarchy of States, nor the organs of Government, nor the Constitution, nor natural law, but those forces which created these organisations and agents and institutions, and to whom they are all ultimately responsible."

According to him, the "Sovereignty of the People" which he advocates does not mean an anarchic license given to each individual or group to do as he or it pleases, but stands for the power of the people, "organised in Government to express and adjust their will either directly or through representatives". He explains, in the rest of his work, how the Government of the U. S. A., in the broader sense of all that social control which, operating through the three departments of State, has to take place in accordance with the Constitution. This concept of a nation "organised in Government" appears to me to clearly introduce the idea of a Constitution which lays down what that organisation is and how it must operate. Although Prof. Willis rejects the view that the Constitution is "sovereign", because it can be altered by the people, he is obliged to accept something resembling it because he sees that the "people", thought of as a mere aggregation or an amorphous mass, is too nebulous. Any satisfactory theory of sovereignty must account for the power of the people to act in certain ways or to move in certain directions. A 'hydra-headed' multitude or mass of people will not know how to act or in which direction to move. It is its "organisation" which provides that. And, its effort to organise itself and to rationalise will produce a Constitution for it which embodies its will as organised in the form of a government. The will of the people is thus inseparable from a Constitution which enables it to be expressed and then to govern. The Constitution neither is nor can be sovereign in the sense that the people who made it cannot unmake it or change it. It only prescribes the correct mode of doing everything, including that of changing the very system of Government. It is only in this sense that it can be "sovereign" or "supreme" and rule the life of a nation.

**564.** Another American writer, Willoughby, has put forward the view that sovereignty, as an attribute of the State, conceived of as a juristic entity apart from its governmental organs, cannot be legally limited. According to him, to limit it is to destroy it. He says (See : *Willoughby on "Fundamental Concepts of Public Law*"—Tagore Law Lectures, 1924, at p. 77) :

> "There would seem to be no more value in attaching legal rights and duties to the sovereign State than there is in predicating the attributes of goodness and justice of a Divine Being who is regarded as Himself the creator, by His own unrestrained will, of all distinctions between goodness and badness."

But, this seems more a metaphysical than a realistic, more amoral Hobbes-Machiavellian than a Dante-Gandhian stance. If one's concepts of the Divine Being are to be introduced into law, one could refer to those also which see Divinity only in that order and that Law which seems to pervade


SCC Online Web Edition, Copyright © 2021
Page 240        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------------

and govern the whole physical world and the universe. Indeed, there are judicial dicta to the effect that God Himself considered Himself bound by those elementary principles of justice whose love was planted in man by Him. In *Cooper* v. *Wandsworth Board of Works*[185], Byles, J. observed:

> "The laws of God and man both give the party an opportunity to make his defence, if he has any. I remember to have heard it observed by a very learned man, upon such an occasion, that even God himself did not pass sentence upon Adam before he was called upon to make his defence. 'Adam' (says God), 'where art thou? Has thou not eaten of the tree whereof I commanded thee that thou shouldst not eat?' And the same question was put to Eve also."

**565.** It is clear that no simple theory of sovereignty fits the complex facts of modern life. Every theory of today, ultimately, rests on concepts more refined than the physical or spiritual might of some ruler, in whom executive, legislative, and judicial powers coalesce to take away all legal distinctions between them. Even if that was ever the concept of sovereignty anywhere, it was certainly not that of our Constitution-makers and it is not ours today. Even Willoughby, dealing with constitutionalism (*Willoughby on "Nature of the State"* 1928, at p. 302) says:

> "The value of constitutional government is not that it places sovereignty in the hands of the people, but that it prescribes definite ways in which this sovereign power shall be exercised by the State."

Hence, he too admits that the Constitution does place some limitation on exercise of sovereign power. That seems to me to be the essence of a Constitution and the rationale of its existence.

**566.** Still another American writer, Orfield, in the course of his discussion (See: "*The Amending of the Federal Constitution*" by Lester B. Orfield 1971), of a number of concepts of sovereignty, seems sometimes to almost consider Article 5 of the American Constitution, containing the constituent power and its procedure, to be sovereign. He concludes his discussion on the subject as follows (at p. 166):

> "Each part of the amending body is subject to law, and may be altered or abolished. The amending body itself may be altered through the amending process, and limitations on the future amending capacity may be imposed. The amending body is an artificial sovereign deriving its being from a law in the form of Article Five. The amending groups hold office for but a short time, and may be supplanted by others in the elections in which an increasingly larger electorate participates. The theory of sovereignty, moreover, presupposes the continued orderly existence of the government. In case of a revolution the commands of the sovereign would be disregarded, and authority could no longer be ascribed to the amending body either in fact or in law. The moral, religious, physical, and other factual limitations on the supposed sovereign are so important that it may perhaps be correct to say that they are also legal limitations, as there comes a time when law and facts shade into one another. Finally, when it is remembered that throughout all history, American as well as European, there never has been a consensus as to the meaning of sovereignty, it seems that the term should be used only with the greatest circumspection."

185. (1863) 14 CB (NS) 180.


SCC Online Web Edition, Copyright © 2021
Page 241    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------

He rejects the concept of sovereignty of the people as too vague and meaningless. And, for the reasons given above, he rejects the theory of a sovereignty of the amending body. His final conclusion seems to be that it is better to avoid altogether entanglement in the concept of sovereignty. This view, however, overlooks the fact that lawyers need a working theory of sovereignty to be able to decide legal questions before them. As between the sovereignty of the amending article and the sovereignty of the Constitution there should be little doubt that lawyers should and would prefer the sovereignty or supremacy of the whole Constitution rather than of any part of it. On the face of it, it appears more reasonable and respectable to swear allegiance to the whole Constitution, as we actually do, rather than to Article 368 or to the amending powers contained in it. If there is a part of our Constitution which deserves greater devotion than any other part of it, it is certainly the preamble to our Constitution.

567. The American Court, in the context of the especially American conditions and needs, after leaning sometimes towards a recognition of "State Sovereignty" (See: *Ware* v. *Hylton*[186]; *Dred Scott* v. *Sandford*[187]) and at others towards a recognition of the dual system of Government which has prevailed in America (See: e.g. *Gibbus* v. *Ogden*[188]) has, on the whole opted for the "Sovereignty of the People" which unifies the nation (See e.g. *White* v. *Heart*[189]; *Keith* v. *Clark*[190]; *National Prohibition Cases*[191]).

568. I cannot, while I am on the subject of American conditions, resist the temptation to quote the trenchant comments of Prof. Willis on what he considers to be the dangers of the American system of government. He wrote (at pp. 68-69):

> "But the greatest danger in popular sovereignty does not lie in the intellectual field, but in the moral. While our intellectual level is not as high as it ought to be, our moral level is much lower than it can safely be if our form of government is to endure permanently. Millions of our citizens are already members of the criminal class. Millions of other citizens who are not yet members of the criminal class are in the economic world doing things just as bad as the things which members of the criminal class are doing. Millions of our people are concerned with their own selfish interests instead of the common good. Millions of our citizens are only too ready to ruin themselves and the rest of our people physically, intellectually, and morally by drugs and intoxicating liquors and vices. Our people do not seem to be much concerned with high ideals in any of the fields of human endeavour. Our people as a whole do not seem to be seriously concerned with social planning for the purpose of obtaining an ideal social order. They are more interested in rotation in office than they are in good government. They are more interested in winning law suits than in ideal system for the administration of justice. They are more interested in making fortunes in the practice of medicine than in the prevention of disease. They are more interested in profits in the business world than they are in a well-planned system of business organisation adapted to the needs of our social order. They are more interested in individualism than they are in collective planning for the good of all.
>
> The effects of the moral standards of our people are already manifest. As a result of our political and economic theories, there has developed a

---

186. (1876)3 Dall 199.
187. (1856)19 How 393.
188. (1824)9 Wheat 1.

189. (1871)13 Wall 646.
190. (1878)97 US 454.
191. (1920)253 US 350.


SCC Online Web Edition, Copyright © 2021
Page 242      Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------------------------

concentration of wealth unparalleled in human history. While on the whole the economic level is comparatively high in the United States, the difference between the wealth of the many and that of the few is startling. One-fourth of the families in the United States before the depression had incomes of less than $ 500 and two-thirds of the families in the United States incomes of less than $ 1,000, while 2 per cent of our population owned 65 per cent of the wealth. There were four men any one of whom had an income as large as five million of the poorest people in the United States. This concentration of wealth was probably one of the primary causes of the depression, and the depression has threatened our capitalistic system. This only shows the danger inherent in our political organisation."

**569.** If the people of an advanced country like the U. S. A., left entirely to the concept of popular sovereignty, have revealed the need for a more positive guiding or moulding role of their State so as to overcome the dangers adverted to by Prof. Willis, how much greater are the needs of a people potentially so great but actually so backward economically and educationally as ours, taken en masse, still are? Our concepts of sovereignty must accord with the needs of the people of our country. Our Constitution, which has been described by G. Austin as "the cornerstone of the Nation", was devised as a means to serve those needs. It has not only the elevating preamble, deserving the allegiance of every rational human being, but, unlike the American Constitution, the whole of Part IV of our Constitution which contains "Directive Principles of State Policy" to guide the future course of State action particularly in the legislative field. It is true that provisions of Part IV are not enforceable through the courts against the State, but they are declared as fundamental in the governance of the country and are used to interpret the Constitution and to fix its meaning. I think, from this point of view also, we can say that the concept of the supremacy of the Constitution is, undoubtedly, more suited to the needs of our country than any other so far put forward. It not only places before us the goals towards which the nation must march but it is meant to compel our Sovereign Republic, with its three organs of Government to proceed in certain directions. It assumes that each organ of State will discharge its trust faithfully. Can we deny it that supremacy which is the symbol and proof of the level of our civilisation?

**570.** I find that the doctrine of the supremacy or sovereignty of the Constitution was adopted by a Bench of seven learned Judges of this Court in *Special Reference No. 1 of 1964*[192], where Gajendragadkar, C. J., speaking for six learned Judges of this Court said (at p. 446) :

"In a democratic country governed by a written Constitution, it is the Constitution which is supreme and sovereign. It is no doubt true that the Constitution itself can be amended by the Parliament, but that is possible because Article 368 of the Constitution itself makes a provision in that behalf, and the amendment of the Constitution can be validly made only by following the procedure prescribed by the said article. That shows that even when the Parliament purports to amend the Constitution, it has to comply with the relevant mandate of the Constitution itself. Legislators, Ministers, and Judges all take oath of allegiance to the Constitution, for it is by the relevant provisions of the Constitution that they derive their authority and jurisdiction and it is

192. (1965) 1 SCR 413 : AIR 1965 SC 745.


SCC Online Web Edition, Copyright © 2021
Page 243    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------------------------

to the provisions of the Constitution that they owe allegiance. Therefore, there can be no doubt that the sovereignty which can be claimed by the Parliament in England, cannot be claimed by any Legislature in India in the literal absolute sense."

**571.** The principle of the supremacy of the Constitution was then declared by the majority of the learned Judges of this Court in *Kesavananda Bharati's case* (supra) to be a part of the basic structure of the Constitution. The minority opinion, while not specifically dissenting from this view, was that even what was considered by the majority to be a part of "basic structure" was alterable under Article 368. But, no judge of this Court has so far held that, without even attempting to change what may be the basic structure of Constitution itself, by appropriate amendments, judicial power could be exercised by Parliament under Article 368 on the assumption that it was already there.

**572.** M. C. Setalvad, a distinguished jurist of India, said (See: "The *Common Law of India*" Hamlyn Lectures, 12th series, 1960) (at pp. 174-175):

"The Constitution divides the functions of the Union into the three categories of executive, legislative and judicial functions following the pattern of the British North America Act and the Commonwealth of Australia Act. Though this division of functions is not based on the doctrine of separation of powers as in the United States yet there is a broad division of functions between the appropriate authorities so that, for example, the Legislature will not be entitled to arrogate to itself the judicial function of adjudication. 'The Indian Constitution has not indeed recognised the doctrine of separation of powers in its absolute rigidity but the functions of the different parts or branches of the Government have been sufficiently differentiated and consequently it can very well be said that our Constitution does not contemplate assumption, by one organ or part of the State, of functions that essentially belong to another.' (See: *Rai Saheb Ram Jawaya Kapur* v. *State of Punjab*[193]. This will no doubt strike one accustomed to the established supremacy of Parliament in England as unusual. In the course of its historical development Parliament has performed and in a way still performs judicial functions. Indeed the expression 'Court of Parliament' is not unfamiliar to English lawyers. However, a differentiation of the functions of different departments is an invariable feature of all written Constitutions. The very purpose of a written Constitution is the demarcation of the powers of different departments of government so that the exercise of their powers may be limited to their particular fields. In countries governed by a written Constitution, as India is, the supreme authority is not Parliament but the Constitution. Contrasting it with the supremacy of Parliament, Dicey has characterised it as the supremacy of the Constitution."

**573.** A. V. Dicey, the celebrated propounder of the doctrine of the sovereignty of Parliament, had criticized Austin for frequently mixing up "legal sovereignty" and "political sovereignty" (See: *Law of the Constitution* by A. V. Dicey, 10th Edn., p. 72). He contrasted the British principle of "Parliamentary Sovereignty" with what was described by him the "Supremacy of the Constitution" in America. He observed (at p. 165):

"But, if their notions were conceptions derived from English law, the great statesmen of America gave to old ideas a perfectly new expansion,

193.  (1955) 2 SCR 225, 235 : AIR 1955 SC 549.

SCC Online Web Edition, Copyright © 202<br>
Page 244    Friday, August 13, 2021<br>
Printed For: Mr. Wayne Page<br>
SCC Online Web Edition: http://www.scconline.com<br>
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------------------------------------

and for the first time in the history of the world formed a Constitution which should in strictness be 'the law of the land', and in so doing created modern federalism. For the essential characteristics of federalism—the supremacy of the Constitution the distribution of powers the authority of the Judiciary—reappear, though no doubt with modifications, in every true federal State.''

He said (at p. 144) :

"A federal State derives its existence from the Constitution, just as a corporation derives its existence from the grant by which it is created. Hence, every power, executive, legislative, or judicial, whether it belong to the nation or to the individual States, is subordinate to and controlled by the Constitution.''

He wrote about the American Supreme Court (at p. 159) :

"Of the nature and position of the Supreme Court itself this much alone need for our present purpose be noted. The court derives its existence from the Constitution, and stands therefore on an equality with the President and with Congress ; the members thereof (in common with every Judge of the Federal Judiciary) hold their places during good behaviour, at salaries which cannot be diminished during a judge's tenure of office.''

**574.** The theory of the supremacy of the Constitution is thus not a new one at all. It is inherent in the very concept of "the auguster thing" which lies behind Parliament or King and is sought to be embodied in the Constitution of a country. The judges, who are vested with the authority and charged with the duty to uphold the Constitution, do so as the mouth-pieces of what has been called the "Real Will" of the people themselves by political philosophers such as Bosanquet. That, as I have indicated earlier, is the theory underlying the system of judicial review. Such a system may delay changes but should not, I think, speaking entirely for myself, deny or defeat the right of the people to bring about any change, whether basic or not, in the Constitution. Indeed, in *Kesavananda Bharati's case* (supra), I indicated that I thought that the most proper and appropriate function of the amending power in a Constitution, which is also a part of the Constitution, and, indeed, its most potent part—was that of making basic changes so as to avert constitutional breakdowns and revolutions if possible. However, we are precluded from acting upon such a broad view of amending power in this case as we are bound by the majority opinion in *Kesavananda Bharati's case* that implied limitations of "a basic structure", operating from even outside this language of Article 368, as it stood before the Twenty-fourth Amendment, restrict its scope. These limitations must, however, be related to provisions of the Constitution.

**575.** It has not been argued before us that the introduction by the Twenty-fourth Amendment of the new clause (1) in Article 368, containing "constituent power", itself amplifies or increases the contents or changes the character of the power in Article 368 by making it a composite power so as to include a new type of judicial or quasi-judicial power also within its fold now. It is evident from the judgments of learned Judges of this Court in *Golaknath's case* (supra) that possible distinctions between amending power and "constituent power" and "sovereign power" figured prominently in arguments in that case. Wanchoo, J., in his minority opinion [see : (1967) 2 SCR at p. 833], said that it was not necessary, for the purposes of that case,


SCC Online Web Edition, Copyright © 2021
Page 245    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------------------------------------------

to decide whether the amending power was as wide as the "sovereign power" of the Constituent Assembly which had framed our Constitution. After all the discussion that had taken place then, came the Twenty-fourth Amendment. It does not use the words "sovereignty" or "sovereign power". I presume that the words "constituent power" were advisedly used in it so as to clarify the position and not to put in or to include anything beyond Constitution-making power in Article 368.

576. The "constituent power" is still bound by the exclusively prescribed procedure to "amend by way of addition, variation, or repeal" any provision of the Constitution. It is entirely a law-making procedure elaborately set out in clause (2). In fact, Article 368 contains so much of the fundamental law-making or legislative procedure that five judges of this Court, led by Subba Rao, C. J., opined in *Golaknath's case* (supra), that it was confined to procedure and did not contain at all the substantive power to amend. Clause (1) of Article 368, introduced by the Twenty-fourth Amendment, was, apparently, meant to remove this objection and to do no more. It could not be intended to pour some new amalgam of executive and judicial or quasi-judicial substantive powers into it also by some implication so as to do away with the very need for such an elaborate and carefully drawn up Constitution such as ours. The absence of any quasi-judicial procedure, from the comprehensively framed procedural provisions of Article 368, seems extremely significant. It indicates that it was the clear intention of Constitution-makers that no judicial or quasi-judicial function could be performed by Parliament whilst operating in the special constituent field of law-making. An omission to provide any quasi-judicial procedure in Article 368, which, apparently, furnishes a self-contained code, means that no such power was meant to be included here at all. Proper exercise of judicial power is inseparable from appropriate procedure.

577. Learned Counsel supporting the Thirty-ninth Amendment tried to find the meaning of "constituent power" in theoretical speculations about the meaning of "the sovereignty of the people", on the one hand, and the sovereignty of the medieval monarch, on the other, instead of looking to the legislative history of the "constituent power". I have, therefore, also referred to some of these theories and practices from ancient times so as to be able to indicate the precise significance or relevance of various concepts and decisions placed before us. These theories and practices could have only an indirect bearing on the meaning of the term "constituent power" in Article 368. They are more germane to a statement of a correct theory of sovereignty which underlies what has been called the "basic structure" of our Constitution.

578. There are scattered dicta in the judgments of this Court speaking of the "sovereignty of the people" which, in my opinion, can only be related to the political sovereignty of the people recognised by the preamble to our Constitution where the people are described as the Constitution-makers who gave the Constitution unto themselves. This, however, does not, in my opinion, mean that the people retained unto themselves any residue of legal sovereignty. They did not prescribe, apart from dividing the exercise of sovereign power roughly between the three organs of the Republic, each with its own modus operandi, any other or direct method, such as Initiative or Referendum, for exercising their politically sovereign power. The view I have tried to put forward in the foregoing pages is that the people entrusted to the three organs of the Sovereign Democratic Republic they constituted the exercise of three aspects of sovereign power on behalf of the people.


SCC Online Web Edition, Copyright © 202
Page 246      Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------------

This seems to me to be the only way of reconciling the idea of a sovereign people, in the political sense, and the sovereignty of the republic, represented by a legally supreme Constitution, so that the "sovereign" powers of each of the three organs of the republic had to be exercised in conformity with the mandates, both positive and negative, express and implied, of the Constitution. I would prefer to describe this concept as one of the "supremacy of the Constitution" instead of "sovereignty" of the Constitution because of the theoretical, speculative, and "emotive" clouds which have gathered around the term "sovereignty".

**579.** I have tried to point out that the term sovereignty in its origin is associated with the actual human ruler or authority wielding theoretically absolute or final powers. Political philosophers are particularly concerned with the problem of determining the location and manner of exercise of such powers if any. Jurists, however, have also occupied themselves with these problems partly because constitutional law, as Dicey once pointed out, has some overlapping territory with the political theory which underlies it. Some constitutional lawyers, such as Ivor Jennings, have said that it is flirtation with political theory which has brought into the juristic fold a term such as 'sovereignty'. On the other hand, political theorists, such as McIver, have blamed, far less justly, jurists like Austin for infecting political theory with legalistic authoritarian notions of sovereignty. Political theorists, in their attempts to understand and rationalize, and sometimes to justify or condemn a system are more concerned with the operations of all those socio-economic-cum-political forces which govern society. Law is, for them, one of these forces and reflects them. Lawyers have been compelled to 'flirt' (if I may employ the term used by Sir Ivor Jennings) with sovereignty, only because they have to look for some final authority which determines the validity of the claims they have to deal with. Political theory, faced with the complexities of modern life, finds location of sovereignty as a power concept too elusive and difficult a task to be satisfactorily carried out. Some of them would like to banish the term to the region of purely moral philosophy where it could be reserved for such freedom of thought and will and action as even the most powerful totalitarian State, employing all the techniques based on Prof. Pavlov's theories for purposes of propaganda, cannot take away from the individual. Others find it of use only in International Law to denote that independence of the national State and the freedom which it claims and is entitled to from outside interference. Jurists as well as practical lawyers have to be content with finding an ultimate measuring rod in a fundamental law which could test the validity of exercise of every kind of governmental power. Their quest for certainty is even more pressing and urgent than that of the political theorist. For their purposes, the supremacy of the Constitution, of which a very vital and necessary part is the constituent power, is sufficient. Of course, they have to determine the content of "constituent power" itself in the light of all relevant considerations which, as I have indicated above, may take us outside the ordinary range of Law. Nevertheless, our deviation from the orthodox canons of construction and interpretation, when faced with such a problem, must not be so wide as to rob our method of construction itself of legal propriety or give rise to the suspicion that we have ourselves clearly trespassed into the territory of law-making. The lines of demarcation, though difficult to draw sometimes, are, nevertheless, there.

**580.** I do not think that it is at all helpful to refer to certain authorities of this Court which were, rather surprisingly, relied upon by learned


Case 1:21-cv-00396-RJL   Document 20-11   Filed 08/14/21   Page 248 of 289
SCC Online Web Edition, Copyright © 2021
Page 247    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source:  Supreme Court Cases

-----------------------------------------------------------------------------------------------------

Counsel supporting the Thirty-ninth Amendment to discover the nature of the "constituent power" contained in Article 368.   I will content myself by citing a passage from the last of these cases relied upon which mentions the earlier cases of this Court also on the effect of a "firman", in *Tilkayat Shri Govindlalji Maharaj* v. *State of Rajasthan*[194].   Gajendragadkar, J., speaking for this Court, said (at p. 591) :

> "In appreciating the effect of this firman, it is first necessary to decide whether the firman is a law or not.   It is matter of common knowledge that at the relevant time the Maharana of Udaipur was an absolute monarch in whom vested all the legislative, judicial and executive powers of the State.   In the case of an absolute ruler like the Maharana of Udaipur, it is difficult to make any distinction between an executive order issued by him or a legislative command issued by him.   Any order, issued by such a ruler has the force of law and did govern the rights of the parties affected thereby.   This position is covered by decisions of this Court and it has not been disputed before us.  Vide *Madhaorao Phalke* v. *State of Madhya Bharat*[195] ; *Ameer-un-Nisa Begum* v. *Mahboob Begum*[196] and *Director of Endowments, Government of Hyderabad* v. *Akram Ali*[197]."

**581.**  It is evident, from the quotation, relied upon by the Solicitor-General, that this Court was not deciding whether the firman was even a "law" in the sense of a general norm which had to be applied to the decision of cases.   It was held that whatever be its juristic character, it had the "force of law" inasmuch as the ruler of Udaipur was an absolute ruler, who combined in his person the legislative, the judicial and executive authority of the State.   That was the Constitution of Udaipur.   The doctrine of separation of powers, in such a context, was really irrelevant.   Article 368 of our Constitution, however, is not a power acquired by our Republic by State succession from the powers of Indian ruling princes.   The legislative history behind it is entirely different.

**582.**  As a matter of legislative history, we will find the source of the "constituent power" in Sections 6 & 8 of the Indian Independence Act passed by the British Parliament.   Section 6 of that Act constituted a "Legislature" for each of two dominions set up with plenary powers of legislation.   The legislative powers of the Legislature of each dominion were so enlarged by Section 8 that it could frame the Constitution of the Dominion concerned.   This was a transfer of only a legislative power.   Section 8 said :

> "For the purpose of making provision as to the Constitution of the dominion, the Legislature of the dominion was recognised as the constituent assembly of the dominion."

These powers were "plenary" in the sense in which this term is used in *Queen* v. *Burah*[198], but they were confined to law-making and did not extend to adjudication or decision of individual cases which is certainly distinguishable from a law-making power.   For purposes other than framing of the Constitution, provisions of the Government of India Act operated until they were repealed and replaced by other relevant provisions.   Such was the process of a legislative succession through which institutional transformation or transition to a new but corresponding set of institutions was brought

194.  (1964) 1 SCR  561, 591 : AIR 1963
      SC 1638.
195.  (1961) 1 SCR 957 : AIR 1961 SC 298.
196.  AIR 1955 SC 352.
197.  AIR 1956 SC 60.
198.  5 IA 178 : ILR 4 Cal 172 : 3 CLR
      197(PC).


SCC Online Web Edition, Copyright © 2021
Page 248    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------

about. In the eyes of law, this was an evolutionary process through constitutional channels and not a revolutionary break with the past.

**583.** It is true that, in the exercise of the law-making constituent power, brought in by Section 8 of the Indian Independence Act, the Legislatures could be armed with judicial powers as well if appropriate laws were made to that effect. But, as no law, either constitutional or ordinary was passed, preceding Thirty-ninth Amendment to repeal the Act of 1951 and then to vest a judicial power in Parliament, so as to enable it to take over and decide election disputes itself directly. I do not see how clause (4) of Article 329A, if it contained certain provisions on the assumption that such a judicial power was already there in Parliament, could be valid as a piece of mere law-making. However, Counsel supporting the Thirty-ninth Amendment had submitted that Article 329A(4) evidenced and constituted an exercise of some "unbroken" or a combined legislative and judicial power—a proposition for which no precedent of any such consolidated action of a constituent body was cited from any part of the world. The firmans of former Indian ruling princes were hardly suitable or applicable precedents.

**584.** An attempt was made to convince us that what may not have been otherwise possible for Parliaments do became possible by invoking the presumed exercise of some judicial power imported by Article 105(3) of the Constitution which says:

"105. (3).......the powers, privileges and immunities of each House of Parliament, and of the members and the committees of each House, shall be such as may from time to time be defined by Parliament by law, and, until so defined, shall be those of the House of Commons of the Parliament of the United Kingdom, and of its members and committees, at the commencement of this Constitution."

**585.** I am unable to see how what was not conferred upon Parliament itself, in its constituent capacity, could be impliedly assumed to be there by virtue of certain "powers, privileges and immunities" which belong separately to each House of Parliament. Such a claim could not be based upon what is to be found directly in Article 368. It is sought to be derived from Article 105. This reasoning would, obviously, conflict with the provisions of Article 329 (*b*) of the Constitution which indicates that an election dispute can only be resolved by an election petition before a forum provided by an ordinary enactment. Article 329 (*b*) says:

329. (*b*) No election to either House of Parliament or to the House or either House of the Legislature of a State shall be called in question except by an election petition presented to such authority and in such manner as may be provided for by or under any law made by the appropriate Legislature."

**586.** In exercise of its powers under Article 329(*b*) our Parliament had enacted the Act of 1951. The procedure provided by the Act had the binding force of a constitutionally prescribed procedure. It could not be circumvented unless, with reference to cases covered by Article 329A(4), it had been first repealed. Only after such a repeal could any other forum or procedure be legally adopted. It could not be assumed, by reason of Article 105 (3), that the prescribed forum had shifted to Parliament itself, and that Parliament, in exercise of its constituent function, had both legislated and adjudicated. This is what we were asked to accept.


SCC Online Web Edition, Copyright © 202
Page 249    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------

**587.** The well recognised rule of construction of statutes, which must apply to the interpretation of the Constitution as well, is : "*Expressio unius est exclusio alterius*". From this is derived the subsidiary rule that an expressly laid down mode of doing something necessarily prohibits the doing of that thing in any other manner. The broad general principle is thus summarised in *Crawford's "Statutory Constructions"* (1940) at p.334 :

"Express Mention and Implied Exclusion (*Expressio unius est exclusio alterius.*—As a general rule, in the interpretation of statutes, the mention of one thing implies the exclusion of another thing. It therefore logically follows that if a statute enumerates the things upon which it is to operate, everything else must necessarily, and by implication, be excluded from its operation and effect. For instance, if the statute in question enumerates the matters over which a court has jurisdiction, no other matters may be included. Similarly, where a statute forbids the performance of certain things only those things expressly mentioned are forbidden. So also, if the statute directs that certain acts shall be done in a specified manner, or by certain person, their performance in any other manner than that specified, or by any other person than one of those named, is impliedly prohibited."

**588.** It is interesting to note that in the Australian Constitution, where there is Article 49, using language very similar to that of Article 105(3) of our Constitution, there is also a separate but differently cast Article 47 of the Australian Constitution corresponding to Article 329(*b*) of our Constitution. This article runs as follows :

"Article 47. Until the Parliament otherwise provides, any question respecting the qualification of a senator or of a member of the House of Representatives, or respecting a vacancy in either House of the Parliament, any question of a disputed election to either House, shall be determined by the House in which the question arises."

**589.** What is separately, expressly, and especially provided for by Article 329 (*b*) must necessarily fall outside the purview of Article 105(3) on the principle stated above. Moreover, Article 105(3) contained a temporary provision until other provision was made by Parliament in that bahalf. Appropriate provisions were enacted by the Act of 1951 in compliance with Article 329(*b*) because that was the proper article for it. It would be idle to contend that these provisions suddenly lapsed or ceased to exist as soon as Parliament took up consideration of the issues and the grounds of the decision on them by the High Court to which reference is made in Article 329A (4). Again, a purported exercise of power, in enacting Article 329A(4), could only be a law-making power and not any other power which could conceivably fall under Article 105, sub-Article (3). Nevertheless, it was suggested, by copious references to the origin of the power of the House of Commons to decide disputes relating to elections, that such a power exists in each House of our Parliament as its inherent power. Such an argument completely overlooks that, quite apart from the great difference made by providing both the forum and the procedure for deciding election disputes indicated by Article 329(*b*) of our Constitution, Article 105(3) itself could only refer to such powers as were still exercisable by the House of Commons at the time when our Constitution was passed. Long before that the House of Commons in England had ceased to decide election disputes itself. It had transferred this power to courts by statute and has not resumed it. In fact, the law enacted in the Representation of People Act, 1949, by the British Parliament confirmed this transfer or delegation of power. Section 107 of that Act makes it


SCC Online Web Edition, Copyright © 2021
Page 250       Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------

clear, like Article 329(*b*) of our Constitution, that the statutory remedies are the only ones open for election disputes.

**590.** The reason why the House of Commons itself saw the need for entrusting to a rota of High Court judges, the jurisdiction at one time exercised by it directly to determine its election disputes, is found thus stated by Blackstone, quoting *Erskine May's "Parliamentary Practice and Procedure"* (at pp. 153-155) :

"For a considerable time after the House had obtained this jurisdiction, controverted elections were tried by committees specially nominated, composed of privy councillors and burgesses, well qualified for the duties entrusted to them. But after 1672, it became an open committee, in which all who came had voices, and at length a hearing at the bar of the House was considered preferable to an inquiry by a committee. Here again, to use the words of Sir Erskine May, "the partiality and injustice of the judges was soon notorious. Parties tried their strength.........the friends of rival candidates canvassed and manoeuvred, and seats corruptly gained, were as corruptly protected or voted away. Such were the results of the usurpation of judicial functions by a popular body".

In order to remedy, if possible, these unquestionable evils, the statute 10 Geo. III c. 16, called from its author the Grenville Act, was passed in 1770, and the trial of election petitions transferred to a select committee of thirteen members, which it was thought would be 'a court independent of the House, though composed of its own members'. For a time there was a marked improvement in the decision of controverted elections. 'But too soon it became evident that corruption and party spirit had not been overcome. Crowds now attended the ballot, as they had previously come to the vote.........not to secure justice, but, to aid their own political friends.' The party, whether of the petitioner or sitting member, which attended in the greatest number inevitably had the numerical majority of names drawn for the committee, and from this list, the petitioner and sitting member struck out alternately one name until the committee was reduced to thirteen : the majority of the house was necessarily a majority of the committee. The result it was not difficult to foresee. Though the members' 'were sworn to do justice between the rival candidates, yet the circumstances under which they were notoriously chosen, their own party-bias, and a lax conventional morality...........favoured by the obscurity and inconsistencies of the election law, and by the conflicting decisions of incapable tribunals, led to this equivocal result : that the right was generally discovered to be on the side of the candidate who professed the same political opinions as the majority of the committee'.

By these means the majority of the House continued, with less directness and certainty, and perhaps with less open scandal, to nominate their own members, as they had done before the Grenville Act. And for half a century, this system with slight variations of procedure was suffered to prevail. In 1839, however, the ballot was at length superseded by Sir Robert Peel's Act, committees were reduced to six members, and nominated by an impartial body............the General Committee of Elections. The same principle of selection was adhered to in later Acts, with additional securities for impartiality, and the committee was finally reduced to five members. The evil was thus greatly diminished, but still the sinister influence of party was not wholly overcome. In the nomination of election committees, one party or the other necessarily had


SCC Online Web Edition, Copyright © 2021
Page 251      Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------

a majority of one, and though these tribunals undoubtedly became far more able and judicial, their constitution and proceedings often exposed them to imputation of political bias.

At length by the statute 31 & 32 Vict. c. 125, the trial of election petitions was transferred to certain of the puisne judges at Westminster, who are selected annually to form a rota for this specific purpose, and who inquire upon the spot in open court into the allegations of a petitioner, either claiming a seat, or alleging an undue return or election. *The decision of the judge*, who has power to reserve his judgment until he has consulted the Common Pleas division of the High Court, in which these proceedings are instituted, is *final to all intents and purposes*; *the House of Commons being bound to "give the necessary directions for confirming or altering the returns or for issuing a writ for a new election, or carrying such determination into execution as circumstances may require"*. And this abstract of the proceedings at elections of knights, citizens, and burgesses, concludes our inquiries into the laws and customs more peculiarly relative to the House of Commons."

**591.** I do not think that it is possible to contend, by resorting to some concept of a succession to the powers of the medieval "High Court of Parliament" in England, that a judicial power also devolved upon our Parliament through the Constituent Assembly, mentioned in Section 8 of the Indian Independence Act of 1947. As already indicated by me, the Constituent Assembly was invested with law-making and not judicial powers. Whatever judicial power may have been possessed once by English King, sitting in Parliament, constituting the highest Court of the realm in medieval England, have devolved solely on the House of Lords as the final court of appeal in England. "King in Parliament" had ceased to exercise judicial powers in any other way long before 1950. And, the House of Commons had certainly not exercised a judicial power as a successor to the one time jurisdiction of the "King in Parliament", with the possible exception of the power to punish for its contempts. I use the qualifying word "possible" because the more correct view of it today may be that this power is also, as it is considered in America, a mere incident of legislative power, necessary for the due performance of law-making functions and not an "inheritance".

**592.** In *Erskine May's Parliamentary Practice* (18th Edn.), after citing the opinions of judges, to whom a reference was made by the House of Lords in *Thorpe's case* (1451), that "Lex Parliamenti" seemed something as strange and peculiar as foreign law is for common law courts, it was explained (at page 187) :

"These views belonged to a time when the distinction between the judicial and legislative function of Parliament was undrawn or only beginning to be drawn, and when the separation of the Lords from the Commons was much less complete than it was in the seventeenth century. Views about the High Court of Parliament and its powers which were becoming antiquated in the time of Coke, continued to be repeated far into the eighteenth century, although after the Restoration principles began to be laid down which were more in accord with the facts of the modern Constitution. But much confusion remained which was not diminished by the use of the phrase 'privilege of Parliament'. This only means a body of rights common to both Houses, but it suggests joint action (or enforcement) by both Houses, as in legislation, whereas from *Ferrers case* in Henry VIII's reign, in 1543 each House enforced its own privileges separately.

SCC Online Web Edition, Copyright © 2021
Page 252    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------------------

'Three notions arise from this confusion of thought.

    1.   That the Courts, being inferior to the High Court of Parliament, cannot call in question the decision of either House on a matter or privilege.

    2.   That the *lex et consuetudo Parliamenti* is a separate law, and therefore unknown to the courts.

    3.   That a resolution of either House declaratory of privilege is a judicial precedent binding on the courts."

**593.** The confusions mentioned above misled some people in this country, due to the provisions of Article 194(3) of our Constitution, on the question whether a House of a Legislature had not only the power to punish a citizen for contempt but also to exercise what is really a judicial power to interpret and determine the ambit of its own jurisdiction. Gajendragadkar, C. J., speaking for this Court in *Special Reference No. 1 of 1964* (supra), rejected this claim and explained the English law on the subject. The learned Chief Justice pointed out the incidental character of any claim to a power, privilege, or immunity which could be covered by Article 194(3), a provision identically similar to Article 105(3). He pointed out that the only exception to this rule was the power to punish for its own contempt which, since the decision of Privy Council in *Kielley* v. *Carson*[199], could be thought of as a power of the House of Commons even acquired as a kind of "inheritance" from the powers once possessed by the High Court of Parliament in England. But, as all judicial or quasi-judicial power is, under our Constitution, expressly made exercisable under the supervision of the judicial organs of the State, it was held that a decision about the existence of the power to punish for contempt, on the facts of a particular case, is vested in the High Court. Even Sarkar, J., in his dissenting minority opinion, said (at p. 513):

    "I do not think that the House of Commons was itself ever a court. The history of that House does not support such a contention."

The result is similar to that in England where courts do determine the orbit of a claim to a power as a parliamentary preserve, on the facts of a case, although, once it is established that the claim is to a power confined to its proper sphere, they will not decide a mere question of its proper exercise.

**594.** Whatever view one may take of any other powers of Parliament, by reason of Article 105(3) of the Constitution, I am unable to see how exercise of the jurisdiction to determine an election dispute, which was, in accordance with Article 329(b), already vested in the High Court by the Act of 1951 for all elections to the House of the People, could not only be taken away by a constitutional amendment, purporting to repeal retrospectively the provisions of the Act of 1951, a piece of ordinary legislation, in their application to a particular class of cases, but at the same time, making a declaration given of the rights of the parties to a judgment, without first performing a judicial function also which was not included in the "constituent" or any other law-making power.

**595.** The question was not clearly raised before us whether a constitutional amendment could partially repeal the provisions of an ordinary piece of legislation, that is to say, the Act of 1951, in so far as its application to

199. 4 Moore PC 63.



SCC Online Web Edition, Copyright © 2021
Page 253    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

a certain class of cases is concerned. One of the submissions of the learned Counsel for the election-petitioner, however, was that, inasmuch as the Constitution lays down the norms to which ordinary legislation must conform, its proper sphere of operation is different from that of ordinary legislation which takes place under the provisions of Articles 245 to 255 of the Constitution. The argument seemed to be, that, if ordinary law-making and Constitution-making took place in different orbits or on different planes of law-making power what could be done by one method was necessarily prohibited by the other. Learned Counsel relied upon a number of passages from the judgment in *Kesavananda Bharati's case* (supra), and, in particular, on what Ray, J. (as he then was) said (at p. 386) : (SCC p. 535, para 834).

"The constituent power is *sui generis*. The majority view in *Golak Nath case* that Article 13(2) prevails over Article 368 was on the basis that there was no distinction between constituent and legislative power and an amendment of the Constitution was law and that such law attracted the opening words of Article 245 which in its turn attracted the provisions of Article 13(2). Parliament took notice of the two conflicting views which had been taken of the unamended Article 368, took notice of the fact that the preponder, judicial opinion, namely, the decision in *Shankari Prasad case*, *Sajjan Singh case* and the minority views of five learned Judges in *Golak Nath case* were in favour of the view that Article 368 contained the power of amendment and that power was the constituent power belonging to Parliament. Wanchoo, J. rightly said in *Golak Nath case* that the power under Article 368 is a constituent power to change the fundamental law, that is to say, the Constitution and is distinct from ordinary legislative power. So long as this distinction is kept in mind Parliament will have power under Article 368 to amend the Constitution and what Parliament does under Article 368 is not ordinary law-making which is subject to Article 13(2) or any other article of the Constitution. This view of Wanchoo, J. was adopted by Parliament in the Constitution Twenty-fourth Amendment Act which made explicit that under Article 368 Parliament has the constituent power to amend this Constitution."

596. On the other hand, learned Counsel defending the Thirty-ninth Amendment relied on a number of passages from various judgments, including mine, in *Kesavananda Bharati's case* (supra), indicating that at least the minority view there was that the power of amendment contained in Article 368, was only limited by the procedure laid down in Article 368(2) of the Constitution and nothing else. It is true that this is what was emphasized by several learned Judges, including myself, in dealing with a case where the real question was whether the constituent power embraced an amendment of the Constitution in such a way as to take away fundamental rights. But, neither the question whether "constituent power" itself contained judicial power within its fold nor the question whether "constituent power" operated on a plane or in a sphere which excluded altogether what could be done through ordinary legislation were under consideration in *Kesavananda Bharati's case* (supra). Some passages were cited from my judgment in that case indicating that the constituent plane of basic changes excluded the ordinary law-making plane of legislation, the two belonging, so to speak, to different spheres or orbits of operation. I think I had only cited Prof. Ernest Barker's statements of his theory some of which could convey that sense. But, I had not committed myself to a view on the question whether there was a limit on the subject-matter of constituent law-making.

SCC Online Web Edition, Copyright © 2021
Page 254      Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------------------------------------------------------

**597.** It could be and has been argued, not without force, that there are no legal limitations upon the subject-matter which may be considered fit for inclusion or incorporation in a Constitution. This is left to the good sense of the Constitution-makers. Constitutions differ greatly in this respect (See: *Wheare's "Modern Constitutions"* pp. 49 to 51). What may be the ideal, from this point of view, is not always the actual. Reference was also made in support of this submission to *Rottschaefer on "Constitutional Law"* (1939 Edn., p. 10). It is not necessary to pursue this question any further here.

**598.** I had said, in *Kesavananda Bharati's case* (supra) after dealing with amending power in Article 368, on the assumption that it was an exercise of a "sovereign power" (at p. 870):

"No doubt the judicial organ has to decide the question of the limits of a sovereign authority as well as that of other authorities in cases of dispute. But, when these authorities act within these limits, it cannot interfere."

In other words, I look upon a "sovereign power" itself, under the Constitution, as limited by the supremacy of the Constitution.

**599.** If the constitutional provisions compel us to hold, as I think they do, that no form of judicial or quasi-judicial power is included in the "constituent power" contained in Article 368 of the Constitution, no further question need really be considered by us if we were to hold that the insertion of clause (4) in Article 329A necessarily involved, as a condition precedent to the making of the declaration found at the end of it, the performance of a quasi-judicial or judicial function. But, I do not think that we could go so far as that. Legislative action can sometimes be made to serve as an unobjectionable substitute for what could and should, strictly and properly, be done judicially. But could this be done here without legally insurmountable difficulties?

**599-A.** The Act of 1951, enacted under the the provisions of Article 329(*b*) of the Constitution provided a procedure which could not be circumvented. This procedure was certainly applicable until August 10, 1975 when the Thirty-ninth Amendment received Presidential assent. Rights of appeal under Section 116-A of the Act having been invoked by the original respondent as well as by the election-petitioner, and the operation of the High Court's order having been suspended, the position was, in the eyes of law, that the election dispute was continued by a proceeding, exclusively prescribed by Article 329(*b*) for the resolution of the dispute, pending in this Court. I do not think, that despite the impression created by the terms of the declaration at the end of clause (4) of Article 329-A and the opening statement of the Counsel for the original respondent, we can assume that Parliament took over the case into its own hands to decide it and to incorporate the result in the form of Article 329A(4) so that this may take the place of a possible judgment of this Court. Parliament could not be deemed to be unaware of the bar created by Article 329(*b*) and the 1951 Act.

**600.** At one stage, Counsel supporting the Thirty-ninth Amendment said that the norms of the Act of 1951, together with the amendment of the Act in 1974 and the very recent ones of 1975, must have been present in the minds of members of Parliament and applied to the facts of the case. Such a contention, apart from overlooking the effect of the bar of Article 329(*b*), which operated against the case being taking up in Parliament directly until at least August 10, 1975, just as Section 107 of the British Representation of People Act, 1949, operates against the adoption of such a course in England, overlooked the legal effect of the deeming provision which, if valid, would repel such a submission of Counsel supporting the


SCC Online Web Edition, Copyright © 202
Page 255    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

Case 1:21-cv-00396-RJL   Document 20-11   Filed 08/14/21   Page 256 of 289

-----------------------------------------------------------------------------------------------------------

Thirty-ninth Amendment. The deeming provision appeared to be quite sweeping. It said :

> "No law made by Parliament before the commencement of the Constitution (Thirty-ninth Amendment) Act, 1975, in so far as it relates to election petitions and matters connected therewith, shall apply or shall be deemed ever to have applied to or in relation to the election of any such person as is referred to in clause (1) to either House of Parliament."

**601**. The effect of such a provision is thus stated, in the oft-quoted passage from *East End Dwellings Co. Ltd* v. *Finsbury Borough Council*[200] :

> "If you are bidden .to treat an imaginary state of affairs as real, you must surely, unless prohibited from doing so, also imagine as real the consequences and incidents which, if the putative state of affairs had. in fact existed must inevitably have flowed from or accompanied it........... The statute says that you must imagine a certain state of affairs ; it does not say that having done so, you must cause or permit your imagination to boggle when it comes to the inevitable corollaries of that state of affairs."

**602**. When the effect of Article 329(*b*) and of the deeming provision was pointed out to learned Counsel supporting the·fourth clause of Article 329A, they took up the position that Parliament must have applied its own norms. We, however, do not know at all and cannot guess what matters were considered or the norms applied by Parliament. No speeches made in Parliament on the proposed Thirty-ninth Amendment were cited before us by either side. We only know that the Objects and Reasons of the Thirty-ninth Amendment contain the following statements to show us why Article 329A (4) was believed to be necessary :

> "Article 71 of the Constitution provides that disputes arising out of the election of the President or Vice-President shall be decided by the Supreme Court The same article provides that matters relating to their election shall be regulated by a parliamentary law. So far as the Prime Minister and the Speaker are concerned, matters relating to their election are regulated by the provisions of the Representation of the People Act, 1951. Under this Act the High Court has jurisdiction to try an election petition presented against either of them.
>
> 2. The President, the Vice-President, the Prime Minister and the Speaker are holders of high offices. The President is not answerable to a court of law for anything done, while in office, in the exercise of his powers. *A fortiori* matters relating to his election should not be brought before a court of law but should be entrusted to a forum other than a court. The same reasoning applies equally to the incumbents of the office of Vice-President, Prime Minister and Speaker. It is accordingly proposed to provide that disputes relating to the election of the President and Vice-President shall be determined by a forum as may be determined by a parliamentary law. Similar provision is proposed to be made in the case of the election to either House of Parliament or, as the case may be, to the House of the People of a person holding the office of Prime Minister or the Speaker. It is further proposed to render pending proceedings in respect of such election under

200. 1952 AC 109.


SCC Online Web Edition, Copyright © 2021
Page 256       Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source:  Supreme Court Cases

-----------------------------------------------------------------------------------------------------------------

230                          **SUPREME COURT CASES**                          1975 Supp SCC

the existing law null and void.  The Bill also provides that the parliamentary law creating a new forum for trial of election matters relating to the incumbents of the high offices above-mentioned shall not be called in question in any court.''

**603.**  I think that this Statement of Objects and Reasons and other reasons mentioned above by me lend support to the submission, to which Mr. Kaushal confined himself whilst other Counsel supporting the validity of Article 329A (4) offered it only as an alternative submission.  This was that the whole procedure adopted and needed being a law-making procedure and nothing more there was no need to look for norms or for law applied as no judicial or quasi-judicial proceeding was involved.  This approach certainly avoids the extraordinary anomalies and results involved in the proposition that ''constituent power'' embraces some indefinable or ''unbroken'' power to override laws and to withdraw and decide all disputes, particularly in election matters, in Parliament itself.  As already indicated, there is no provision anywhere for the exercise of overriding judicial or quasi-judicial powers by Parliament.  It is difficult to conceive a case being considered by Parliament and the ratifying Legislatures as a case on trial.  Parliament could not, therefore, be assumed to have withdrawn and then to have decided a particular case in a particular way by applying its own norms.  It is presumed to know the law.  Ostensibly, Article 329A (4) is part of an amendment of the Constitution for the purposes found in the Statement of Objects and Reasons.  Only the declaration given at the end of it suggests that, in the course of it, the effect upon the case before us was considered and dealt with.

**604.**  If Article 329A (4) constituted only a piece of purported lawmaking, the next question, which deserves very serious consideration by us, is whether such purported law-making is not fully covered by the undoubted law-making power of Parliament to make law prospectively as well as retrospectively, inter alia, to get rid of the legal effect or result of a judgment considered erroneous by it or to retrospectively validate an election it considers valid whatever may be its reasons for reaching this conclusion.  I will answer this question after considering the relevant case law cited on the subject.

**605.**  A number of cases have been cited before us : some on retrospective validation of taxing provisions, by removing defects, others on removal of the basis of or grounds of decisions given by courts making their judgments ineffective, others affecting the jurisdiction of courts in cases pending, either in the original courts or in courts of appeal, so as to render proceedings infructuous, and still others curing legally defective appointments or elections.  It is not necessary to discuss these cases separately and individually as the principles laid down there are well recognised.  I will be content with mentioning the cases cited.  They were: *M. P. V. Sundararamier & Co. v. State of A. P.*[201]; *Vinod Kumar* v. *State of H. P.*[202]; *Jadab Singh* v. *H.P. Administration*[203]; *Udai Ram Sharma* v. *Union of India*[204]; *Rustom Cavasjee Cooper* v. *Union of India*[205]; *Jagannath* v. *Authorised Officer, Land Reforms*[206]; *Khyerbari*

201.  1958 SCR 1422 : AIR 1958 SC 468 : 9 STC 298.

202.  1959 Supp 1 SCR 160 : AIR 1959 SC 223.

203.  (1960) 3 SCR 755 : AIR 1960 SC 1008.

204.  (1968) 3 SCR 41 : AIR 1968 SC 1138.

204.  (1970) 3 SCR 530 : (1970) 1 SCC 248.

206.  (1972) 1 SCR 1055 : (1971) 2 SCC 893.


SCC Online Web Edition, Copyright © 2021
Page 257    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

*Tea Co. Ltd.* v. *State of Assam*[207] ; M/s. *Tirath Ram Rajindra Nath* v. *State of U. P.*[208] ; *Krishna Chandra Gangopadhyaya* v. *Union of India*[209] ; *Pandia Nadar* v. *State of Tamil Nadu*[210] ; *State of Orissa* v. *B. K. Bose*[211].

**606.** Cases were also cited where rights having been altered during the pendency of proceedings, courts had to give effect to the rights as altered, and judgments already given on the strength of the previous law had ceased to have a binding force as res judicata between parties or had to be set aside where appeals against them were pending. These were : *State of U.P.* v. *Raja Anand Brahma Shah*[212] ; *Shri Prithvi Cotton Mills Ltd.* v. *Broach Borough Municipality*[213] ; *Janapada Sabha, Chhindwara* v. *The Central Provinces Syndicate Ltd.*[214] ; *Municipal Corporation of the City of Ahmedabad* v. *New Shorock Spg. & Wvg. Co. Ltd.*[215] ; *State of Tamil Nadu* v. *M.R. Gounder*[216] ; *Amarjit Kaur* v. *Pritam Singh*[217] ; *Qudrat Ullah* v. *Municipal Board, Bareilly*[218].

**607.** Cases were also cited of the exercise of constitutional power of amendment, by placing Acts in the Ninth Schedule, under the provisions of Article 31B of the Constitution, such as *Jagannath* v. *Authorised Officer, Land Reforms*, (supra) so that Acts so included in the Ninth Schedule were immune from attack on the ground of alleged violation of any fundamental rights. It is not necessary to cite them as this is now a well recognised constitutional device whose validity has been upheld by this Court in *Kesavananda Bharati's case* (supra).

**608.** Our attention was especially invited to passages from *Udai Ram Sharma* v. *Union of India* (supra), where it was said (at page 54) :

"In our opinion no useful purpose will be served by referring to the clear demarcation between the judicial powers and legislative powers in America and attempt to engraft the said principle in the working of our Constitution. This development of the law, as pointed out in *A.K. Gopalan* v. *State*[219] was due to historical reasons."

**609.** After that, the following passage from the judgment of Das, J. in *A.K. Gopalan's case* (supra) was quoted (at page 55) :

"The Supreme Court of the United States, under the leadership of Chief Justice Marshall, assumed the power to declare any law unconstitutional on the ground of its not being in 'due process of law',.......It is thus that the Supreme Court established its own supremacy over the Executive and the Congress. In India the position of the Judiciary is somewhere in between the courts in England and the United States. While in the main leaving our Parliament and the State Legislatures supreme in their respective legislative fields, our Constitution has, by some of the articles, put upon the Legislature certain specified limitations...... Our Constitution, unlike the English Constitution, recognises the court's supremacy over the legislative authority, but such supremacy is a very

207. (1964) 5 SCR 975 : AIR 1964 SC 925.
208. AIR 1973 SC 405 : (1973) 3 SCC 585 : 1973 SCC (Tax) 300.
209. (1975) 2 SCC 302.
210. (1974) 2 SCC 539.
211. 1962 Supp 2 SCR 380 : AIR 1962 SC 945.
212. (1967) 1 SCR 362 : AIR 1967 SC 661.
213. (1970) 1 SCR 382, 392 : (1969) 2 SCC 283.
214. (1970) 3 SCR 745 : (1970) 1 SCC 509.
215. (1971) 1 SCR 288 : (1970) 2 SCC 280.
216. (1971) 3 SCC 1 : AIR 1971 SC 231.
217. (1974) 2 SCC 363.
218. (1974) 1 SCC 202.
219. 1950 SCR 88, 198 : AIR 1950 SC 27 : 51 Cri LJ 1383.


SCC Online Web Edition, Copyright © 2021
Page 258      Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------------------------------------------------------------

limited one, for it is confined to the field where the legislative power is circumscribed by limitations put upon it by the Constitution itself. Within this restricted field the Court may, on a scrutiny of the law made by the Legislature, declare it void if it is found to have transgressed the constitutional limitations."

**610.** In *Udai Ram Sharma's case* (supra), the following passage from *Willoughby's Constitution of the United States*, Second Edition, Vol. 3, was also cited:

> "If the Legislature would prescribe a different rule for the future from that which the courts enforce, it must be done by statute, and cannot be done by a mandate to the courts which leaves the law unchanged, but seeks to compel the courts to construe and apply it not according to the judicial, but according to the legislative judgment.........If the Legislature cannot thus indirectly control the action of the courts, by requiring of them a construction of the law according to its own views, it is very plain it cannot do so directly, by setting aside their judgments, compelling them to grant new trials, ordering the discharge of offenders, or directing what particular steps shall be taken in the progress of a judicial inquiry."

**611.** Willoughby's statement of law in the United States of America showing that retroactive legislation which does not impair vested or substantial rights or constitutional prohibitions, is permissible and his conclusion, relying on *Cooley's "Constitutional Limitations"*, was also quoted:

> "The Legislature does, or may, prescribe the rules under which the judicial power is exercised by the courts, and in doing so it may dispense with any of those formalities which are not essential to the jurisdiction of the court; and whatever it may dispense with by statute anterior to the proceedings, we believe it may also dispense with by statute after the proceedings have been taken, if the court has failed to observe any of those formalities. But it would not be competent for the Legislature to authorize a court to proceed and adjudicate upon the rights of parties, without giving them an opportunity to be heard before it and, for the same reason it would be incompetent for it, by retrospective legislation, to make valid any proceedings which had been had in the courts, but which were void for want of jurisdiction over the parties."

**612.** In *Udai Ram Sharma's case* (supra) an argument, based on some observations in *B.C. Ghose* v. *King Emperor*[220] was that the provisions of an amending Act amounted to passing a decree. But, this Court repelled this argument relying on principles laid down in *Queen* v. *Burah* (supra):

> "If what has been done is Legislation, within the general scope of the affirmative words which give the power, and if it violates no express condition or restriction by which that power is limited (in which category would, of course, be included any Act of the Imperial Parliament at variance with it), it is not for any court of justice to inquire further, or to enlarge constructively those conditions and restrictions."

**613.** A case strongly relied upon by learned Counsel supporting the validity of Article 329(4) was: *Kanta Kathuri* v. *Manak Chand Surana*[221]. In this case, decided by five Judges of this Court, there was unanimity on the conclusion that the State Legislature had power to retrospectively remove

220.  (1944) 6 FCR 295: AIR 1944 FC        221.  (1970) 2 SCR 835: (1969) 3 SCC
      86: 23 Pat 678.                             268.


SCC Online Web Edition, Copyright © 2021
Page 259    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

---

INDIRA NEHRU GANDHI *v.* RAJ NARAIN (*Beg, J.*)            233

the disqualification of a candidate.   The following quotation from the judgment (at page 851) shows the reasoning adopted (SCC p. 280, paras 37-40) :

"Mr. Chagla, learned Counsel for the respondent, contends that the Rajasthan State Legislature was not competent 'to declare retrospectively' under Article 191 (1)(*a*) of the Constitution. It seems to us that there is no force in this contention. It has been held in numerous cases by this Court that the State Legislatures and Parliament can legislate retrospectively subject to the provisions of the Constitution. Apart from the question of fundamental rights, no express restriction has been placed on the power of the Legislature of the State, and we are unable to imply, in the context, any restriction. Practice of the British Parliament does not oblige us to place any implied restriction. We notice that the British Parliament in one case validated the election : *Erskine May's Treatise on the Law, Privileges, Proceedings & Usage of Parliament*—Seventeenth Edition, (1964).

'After the general election of 1945 it was found that the persons elected for the Coatbridge Division of Lanark and the Springbourn Division of Glasgow were disqualified at the time of their election because they were members of tribunals appointed by the Minister under the Rent of Furnished Houses Control (Scotland) Act, 1943, which entitled them to a small fee in respect of attendance at a Tribunal. A Select Committee reported that the disqualification was incurred inadvertently, and in accordance with their recommendation the Coatbridge and Springbourn Elections (Validation) Bill was introduced to validate the irregular elections [H. C. Deb (1945-46) 414, c. 564-6]. See also H. C. 3 (1945-46), *ibid*, 71 (1945-46) and *ibid*. 92 (1945-46).'

We have also noticed two earlier instances of retrospective legislation, *e. g.* The House of Commons (Disqualification) Act, 1813 (*Halsbury's Statutes of England* p. 467) and Section 2 of the Re-election of Ministers Act, 1919 (*ibid.* p 515).

Great stress was laid on the word 'declared' in Article 191 (1)(*a*), but we are unable to imply any limitation on the powers of the Legislature from this word. Declaration can be made effective as from an earlier date.

The apprehension that it may not be a healthy practice and this power might be abused in a particular case are again no grounds for limiting the powers of the State Legislature."

614.   Another case on which a great deal of reliance was placed by Mr. A. K. Sen, was the case of the validation of the elections of *John Clarke George, Esquire, and Sir Roland Jennings, Knight*[222], by the British Parliament. Here, the two gentlemen named above were "discharged, freed and indemnified from all penal consequences whatsoever incurred by them respectively by sitting or voting as members of the Commons House of Parliament while holding their said offices". It was also declared that they "shall be deemed not to have been incapable of being elected members of the Commons House of Parliament, or to have been or to be incapable of sitting or voting as members thereof, by reason only of having at any time before the passing of this Act held office :

"(*a*) in the case of the said John Clarke George, as Director appointed by the Minister of Works of Scottish Slate Industries Limited,

222.  1955 Law Reports Statutes 4 Eliz. 2.

SCC Online Web Edition, Copyright © 202
Page 260          Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------------

234                    SUPREME COURT CASES               1975 Supp SCC

(*b*) in the case of the said Sir Roland Jennings, as Approved Auditor appointed under the Industrial and Provident Societies Act, 1893, and the Friendly Societies Act, 1896."

**615.** Learned Counsel for the election-petitioner replied that it is noticeable that no English case could be cited where any attempt was made by the British Parliament to circumvent Section 107 of the Representation of the People Act, 1949, which lays down :

"*Section 107. Method of questioning Parliamentary election.*—(1) No Parliamentary election and no return of Parliament shall be questioned except by a petition complaining of an undue election or undue return (hereinafter referred to as parliamentary election petition) presented in accordance with this Part of this Act.

(2) A petition complaining of no return shall be deemed to be a parliamentary election petition and the High Court may make such order thereon as they think expedient for compelling a return to be made or may allow the petition to be heard by an election court as provided with respect to ordinary election petitions."

**616.** He also submitted that, in none of the cases of validation, was any election dispute shewn to be pending. No judgment was actually set aside in contravention of the binding constitutionally prescribed procedure to decide such disputes. He submitted that, in the case of an election to a parliamentary seat in this country, this could be done by Parliament itself only after first repealing the application of the 1951 Act and amending Article 329 (*b*) in such a way as to vest the power in itself to decide the dispute.

**617.** Learned Counsel for the election-petitioner relied upon the following statement in the *American Jurisprudence*, 2nd Edn. Vol. 46, at page 318 :

"The general rule is that the Legislature may not destroy, annul, set aside, vacate, reserve, modify, or impair the final judgment of a court of competent jurisdiction, so as to take away private rights which have become vested by the judgment. A statute attempting to do so has been held unconstitutional as an attempt on the part of the Legislature to exercise judicial power, and as a violation of the constitutional guaranty of due process of law. The Legislature is not only prohibited from reopening cases previously decided by the courts, but is also forbidden to affect the inherent attributes of a judgment. That the statute is under the guise of an act affecting remedies does not alter the rule."

**618.** On the other hand, learned Counsel supporting the validity of Article 329A (4) relied on the following passage :

"It is worthy of notice, however, that there are cases in which judgments requiring acts to be done in the future may validly be affected by subsequent legislation making illegal that which the judgment found to be legal, or making legal that which the judgment found to be illegal."

They also pointed out :

"With respect to legislative interference with a judgment, a distinction has been made between public and private rights under which distinction a statute may be valid even though it renders ineffective a judgment concerning a public right. Even after a public right has been established by


SCC Online Web Edition, Copyright © 202
Page 261      Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------

the judgment of the court, it may be annulled by subsequent legislation."

**619.** It is contended that the election of a candidate is the result of the exercise of their rights of voting by the electorate. An election results from public action and produces a "public right" inasmuch as the electorate and the public become interested parties acquiring the right to be represented by the elected candidate. The right to challenge that election is a statutory right. What the statute gives can be taken away by statute. The grounds for challenging the election could also be altered. No one, it was urged, could be heard to say that he had any vested or inherent right to challenge an election. It was contended that once the applicability of all law previous to the Thirty-ninth Amendment to the class dealt with by Article 329A(4) was removed retrospectively, the resulting legislative declaration followed automatically even if it had not been inserted. Its inclusion was a superfluity. Article 329A(4) was said to be merely incidental and consequential to what was done by earlier clauses (1) to (3). It is difficult to see how Article 329A(4) which relates to what was past could be incidental or consequential to what was intended to be done in future. Moreover, more serious difficulties, dealt with below, are found here than those which could arise in ordinary cases of retroactive validation.

**620.** Learned Counsel for the election-petitioner relied on *Don John Francis Douglas Liyanage v. Queen*[223], where the Privy Council considered the validity of the Criminal Law Special Amendment Act of 1962, passed by the Parliament of Ceylon, which had purported to legalise ex-post facto the detention of persons for having committed offences against the State, by widening the class of offences for which trial, without jury, by nominated judges could be ordered. The scope of the offence of waging war against the Queen was widened and new powers to deal with offenders were given and additional penalties were prescribed. It was held that, although, no fundamental principles of justice could be said to have been violated by the Act, yet, the Act of 1962 and an amending Act of 1965, were invalid on the ground summarised in the headnote as follows (at p. 260) :

"That the Acts, directed as they were to the trial of particular prisoners charged with particular offences on a particular occasion, involved a usurpation and infringement by the Legislature of judicial powers inconsistent with the written Constitution of Ceylon, which, while not in terms vesting judicial functions in the Judiciary, manifested an intention to secure in the Judiciary a freedom from political, legislative and executive control, and, in effect, left untouched the judicial system established by the Character of Justice, 1833. The silence of the Constitution as to the vesting of judicial power was consistent with its remaining where it was and inconsistent with any intention that it should pass to or be shared by the Executive or the Legislature. The Acts were accordingly ultra vires and void, and the convictions could not stand."

**621.** If the constituent bodies, taken separately or together, could be legally sovereign, in the same way as the British Parliament is, the constitutional validity of no amendment could be called in question before us. But, as it is well established that it is the Constitution and not the constituent power which is supreme here, in the sense that the constitutionality of the Constitution cannot be called in question before us, but the exercise of the

223. (1967)1 AC 259.

SCC Online Web Edition, Copyright © 2021
Page 262      Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------

constituent power can be, we have to judge the validity of exercise of constituent power by testing it on the anvil of constitutional provisions. According to the majority view in *Kesavananda Bharati's case* (supra), we can find the test primarily in the preamble to our Constitution.

**622.** A point emphasized by J. C. Gray (See: *"Nature & Sources of Law"* p. 96) is that unless and until courts have declared and recognised a law as enforcible it is not law at all. Kelsen (See : *"General Theory of Law & State"*, p. 150) finds Gray's views to be extreme. Courts, however, have to test the legality of laws, whether purporting to be ordinary or constitutional, by the norms laid down in the Constitution. This follows from the supremacy of the Constitution. I mention this here in answer to one of the questions set out much earlier : Does the "basic structure" of the Constitution test only the validity of a constitutional amendment or also ordinary laws? I think it does both because ordinary law-making itself cannot go beyond the range of constituent power. At this stage, we are only concerned with a purported constitutional amendment. According to the majority view in *Kesavananda Bharati's case* (supra) the preamble furnishes the yardstick to be applied even to constitutional amendments.

**623.** Learned Counsel for the election-petitioner has strongly relied upon the very first purpose of the Constitution stated in the preamble to be Justice (with a capital "J") which includes "political justice". His contention is that, if a majority party is to virtually act as the judge in an election dispute between itself and minority parties whose cause, according to the learned Counsel, the election-petitioner represents, it would be a plain denial of "political" justice. I do not know why this question should be termed as one of "political justice" and not of plain and simple elementary justice except that the contending parties represent political causes which are, for purposes of plain and simple justice with which we are really concerned, irrelevant. We are not asked to judge a political issue directly as to who should be the Prime Minister of this country. We are only asked to hold that even a constitutional amendment, when made by members of a majority party to enforce their own views of what is politically and legally right, as against the views, on these matters, of minority parties, when the representatives of the minority parties allege a misuse of constitutional powers by a deviation from a constitutionally laid down purpose, such a legal question of fact and law should be capable of trial and decision by an independent authority on such exclusively legal grounds as may be open. That is the simple principle on which learned Counsel for the election-petitioner rests his case, irrespective of the rights and wrongs or the merits of his client's case—and, I have found it impossible to decide it, as I have decided it against the election-petitioner, without going into facts and merits of the appeals—for the submission that our jurisdiction to try this case on merits cannot be taken away without injury to the basic postulates of the rule of law and of justice within a politically democratic constitutional structure. I do not think that we can, consistently with the objects of justice, including what is claimed as "political justice", which are parts of what is called the "basic structure", deny the right to claim an adjudication from this Court on exclusively legal issues (not political ones) between the majority party and the minority groups of parties, however, large and legally right the majority party may be and however small and legally wrong the minority groups or parties may be. Can the legal rights and wrongs, on such an issue, be resolved, in accordance with the objects of the preamble, anywhere other than this Court now? I think that it would be a very dangerous precedent


SCC Online Web Edition, Copyright © 2021
Page 263    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

to lay down that they can be and need be determined nowhere at all. That is what acceptance of total validity of Article 329A(4) may mean if it bars our jurisdiction to hear and decide such a case on merits.

**624.** What was sought to be done by the constitutional amendment may be politically very justifiable. The question before us, however, is whether it is also legally justifiable. Here, we are back again in the realm of basic principles of justice. We are not to decide a political question here at all. But, we have to decide legal questions even if they have, as many legal issues have, political consequences and repercussions which we cannot entirely ignore. Perhaps we have to go back to *Marbury* v. *Madison* (supra), where Chief Justice Marshall said (at p. 162):

> "The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury. One of the first duties of government is to afford that protection. In Great Britain the King himself is sued in the respectful form of a petition, and he never fails to comply with the judgment of his court.
>
> In the 3rd volume of his *Commentaries*, p. 23, Blackstone states two cases in which a remedy is afforded by mere operation of law.
>
> 'In all other cases', he says it is a general and indisputable rule, that where there is a legal right, there is also a legal remedy by suit, or action at law, whenever that right is invaded'."

**625.** It is true that the right which the election-petitioner claims is a purely statutory right. The right to come to this Court under Section 116A of the Act of 1951 is also a creature of statute and can be taken away retrospectively. But, where this taking away also involves the taking away of the right to be heard by this Court on a grievance, whether justifiable or not, that a minority party is being oppressed by the majority, can we deny the spokesman of the minority even a right to be heard on merits? Such an issue is constitutional. Confession of our inability to resolve it judicially would be, according to learned Counsel for the election-petitioner, a denial of "political justice". This issue is extrinsic so far as the Act of 1951 is concerned. The election-petitioner has complained of the taking away of his right to be heard with a view to depriving him of "political" justice with an ulterior object and political motivation. I have dealt with the merits of the case to show that, from the legal aspect, his grievance, on the merits of his case, is misconceived. He has no vested right under a palpably erroneous judgment which was the subject-matter of the two appeals to this Court. Nevertheless, this could only be demonstrated after we had gone into the merits of the case and rendered our decision on the issues in accordance with the law in the 1951 Act. Thus, what is involved is the right of the election-petitioner to be heard on merits and the power of this Court to look into the merits of the case in order to determine whether the election-petitioner's grievances could have any real legal foundations. I think that this is a basic consideration which must compel us, in the light of the principles laid down by us in *Kesavananda Bharati's case* (supra), to hold that we must look into his grievances and determine, for ourselves, where his case stood on the law before it was amended. Our jurisdiction, at any rate, cannot be barred without creating the impression that what the election-petitioner calls "political justice" is being denied to him.

**626.** The question which arises now is: Was clause (4) of Article 329-A, read with clauses (5) and (6), really meant to bar our jurisdiction to

SCC Online Web Edition, Copyright © 2021
Page 264      Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source:  Supreme Court Cases

-----------------------------------------------------------------------------------------------------

consider the grievances of the petitioner and to decide them, or, can they be so interpreted as to preserve this Court's jurisdiction?

627.   Broadly speaking, the election-petitioner has two heads of grievance : firstly, that the election of the original respondent is vitiated by corrupt practices which, as I have indicated, after considering the case set up by him and the evidence tendered and the law applicable, could not possibly succeed even under the law as it stood before the amendment ; and, secondly, that our very jurisdiction to go into these grievances is sought to be debarred by clauses (4), (5) and (6) of Article 329A with the political object of stifling opposition, and, therefore, according to the election-petitioner, we must declare clause (4) and the connected clauses (5) and (6) of Article 329A to be invalid.   Although, the first set of complaints is based upon the provisions of the Act of 1951, the second set arises because of impugned clauses of the Thirty-ninth Amendment.   For the second set of grievances, the action complained of is that of the State itself acting through its law-making organs.   It is because of this interest of the Union of India, acting in its law-making capacity, that we have heard the Attorney General and the Solicitor General.   Although, the second set of grounds may arise as a result of the first set, yet, they are different.   Our jurisdiction to consider these different grounds of complaint does not ordinarily arise at all in the exercise of our jurisdiction under Section 116A of the Act of 1951.   It is for this reason, that the election-petitioner had filed a separate writ petition in the High Court to challenge an amendment of the Act.   But, we decided to hear arguments on constitutional issues also without a separate proceeding.   The causes of action arising out of the amendments have become attached, if I may so put it, to the appeals under Section 116A of the Act because we could not, under the law, hear the appeals unless these obstacles, if any, were overcome.

628.   Indeed, so far as the original respondent is concerned, the effect of clauses (4), (5) and (6) of Article 329A would be, if we were to hold that they bar our jurisdiction to go into the merits of the appeals under Section 116A of the Act, that her grievance against the judgment under appeal also could not be gone into or dealt with.   In other words, the original respondent would also be denied an opportunity of asserting her rights under the 1951 Act and of vindicating her stand in the case by showing that there was really no sustainable ground for the findings given by the learned Judge of the High Court against her.   We would, therefore, be prevented from doing justice to her case as well if we were to accept the contention that the Thirty-ninth Amendment bars our jurisdiction to hear the appeals under Section 116A of the Act on merits.   The total effect would be that justice would appear to be defeated even if, in fact, it is not so as a result of the alleged bar to our jurisdiction if it were held to be there.   Could it be the intention of Parliament that justice should appear to be defeated ? I think not.

629.   It was also contended before us that we should not go at all into the merits of the case before us as it was a political matter.   In other words, the "political question" doctrine was invoked in aid of the submission that we should voluntarily abstain from deciding a question of a "political nature".   It is true that the "political question doctrine" has been sometimes invoked, in the past, by the American Supreme Court to abstain from taking a decision.   In answer to this argument, learned Counsel for the election-petitioner cited before us from comments on the Constitution of the United States of America (*Analysis and Interpretation by the Congressional*


SCC Online Web Edition, Copyright © 2021
Page 265      Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

*Research Service*—1973 Edn., p. 665) that the "political question" doctrine is the result of a "prudential" attitude courts adopt when they find that their judgments may not be enforced. It was described there as "a way of avoiding a principled decision damaging to the Court or an expedient decision damaging to the principle". It was also pointed out there that this doctrine has been rationalized and considerably narrowed down by the American Supreme Court in *Baker* v. *Carr*[224], where it was explained that "non-justiciability of a political question is primarily function of separation of powers". It really means that there are matters about which declarations made or certificates granted by the executive wing of Government would be treated as conclusive so that courts will not go behind them. It was also said there :

> "Deciding whether a matter has in any measure been committed by the Constitution to another branch of government, or whether the action of that branch exceeds whatever authority has been committed, is itself a delicate exercise in constitutional interpretation, and is a responsibility of this Court as ultimate interpreter of the Constitution."

**630.** Learned Counsel for the election-petitioner also relied upon *H. H. Maharajadhiraja Madhav Rao Jiwaji Rao Scindia Bahadur* v. *Union of India*[225], where this Court said : (at p. 75) : (SCC p. 147, para 98)

> "The functions of the State are classified as legislative, judicial and executive : the executive function is the residue which does not fall within the other two functions. Constitutional mechanism in a democratic policy does not contemplate existence of any function which may qua the citizens be designated as political and orders made in exercise whereof are not liable to be tested for their validity before the lawfully constituted courts : *Rai Sahib Ram Jawaya Kapur* v. *State of Punjab*[226], *Jayantilal Amritlal Shodhan* v. *F. N. Rana*[227], and *Halsbury's Laws of England*, 3rd Edn., Vol. 7, Article 409, at p. 192."

**631.** Learned Solicitor General also contended that we were passing through critical times when a state of Emergency had been declared. He submitted that the decision of the constituent authorities, in excluding a particular case from the jurisdiction of this Court, should be treated as an exercise of a very special power under very unusual conditions in which internal and external dangers, with which the country was surrounded, required that the position of the Prime Minister should be declared unequivocally unassailable so that the need for further examination of the question of her election to Parliament may not be raised anywhere else. This seems to be another form in which "political question" argument could be and was addressed to us. Undoubtedly, clause (4) of Article 329A could be said to have a political objective, in the context in which it was introduced, and we could perhaps take judicial notice of this context. Even if it was possible to go beyond the statement of objects and reasons and to hold that clause (4) of Article 329A is there essentially for demonstrating the strong position of the Government and of the Prime Minister of this country to all inside and outside the country so to inspire the necessary confidence in and give the necessary political and legal strength to the Government to enable it to go forward boldly to deal with internal economic and law order problems and international questions, yet, I fail to see why

224. 369 US 186.
225. (1971) 3 SCR 9 : (1971) 1 SCC 85.
226. (1955) 2 SCR 225 : AIR 1955 SC 549.
227. (1964) 5 SCR 294 : AIR 1964 SC 648.


SCC Online Web Edition, Copyright © 2021
Page 266      Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------------

this could make it necessary to exclude the jurisdiction of this Court so as to prevent it from considering a case which would have been over much sooner if we had not been confronted with difficulties, at the very outset, in examining the merits of the case. Speaking for myself, I fail to see what danger to the country could arise or how national interests could be jeopardised by a consideration and a decision by this Court of such a good case as I find that the Prime Minister of this country had on facts and law. Nevertheless I am prepared to concede that there may be and was some very useful political objective to be served by demonstrating the strength and ability of the Government to face the difficulties with which it had been confronted. If that be so, we can certainly say that clause (4) of Article 329A had a political objective and utility which has been served. And, if that was the real object behind its enactment, it could not be really to injure the interests of minority political parties or groups which is what is contended for on behalf of the election-petitioner. I think that the context and the political considerations placed before us could be relevant in understanding the real meaning of clause (4) of Article 329A of the Constitution.

632. It is a well established canon of interpretation that, out of two possible interpretations of a provision, one which prevents it from becoming unconstitutional should be preferred if this is possible—*ut res magis valeat quam pereat*. It is true that the deeming provision seems to stand in the way of our examination of the merits of the case even though there is no direct provision taking away our jurisdiction to consider the merits of the appeals before us. It has, however, been repeatedly laid down that a deeming provision introducing a legal fiction must be confined to the context of it and cannot be given a larger effect : (See : *Radha Kishan v. Durga Prasad*).[228] In *Bengal Immunity Co. Ltd. v. State of Bihar*[229], it was held by this Court that a legal fiction is created for some definite purposes and should not be extended beyond its legitimate field determined by its context. The some view has been expressed by this Court in other cases : *C. I. T. v. James Anderson*[230] ; *C. I. T. v. Express Newspapers Ltd., Madras*[231] ; *Sri Jagadguru Kari Basava Rajendraswami of Gavimutt v. Commissioner of Hindu Religious Charitable Endowments, Hyderabad*[232].

633. In *Ex parte Walton, In Re Levy*[233], James, L.J. said :

"When a statute enacts that something shall be deemed to have been done, which in fact and in truth was not done, then the court is entitled and bound to ascertain for what purposes and between what persons the statutory fiction is to be resorted to?"

In other words, we have to examine the context and the purpose of the legal fiction and confine its effects to these.

634. If the purpose of the clause (4) of Article 329A was purely to meet the political needs of the country and was only partly revealed by the policy underlying the statement of reasons and objects it seems possible to contend that it was not intended at all to oust the jurisdiction of the Court. Hence, Article 329A, clause (5) will not, so understood, bar the jurisdiction of the

228. AIR 1940 PC 167.
229. (1955) 2 SCR 603 : AIR 1955 SC 661 : 6 STC 446.
230. (1964) 5 SCR 590 : AIR 1964 SC 1761 : 51 ITR 345.
231. (1964) 8 SCR 189 : AIR 1965 SC 33 : 53 ITR 250.
232. (1964) 8 SCR 252 : AIR 1965 SC 502.
233. (1881) 17 Ch D 746.


SCC Online Web Edition, Copyright © 2021
Page 267     Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------------

Court to hear and decide the appeals when it says that the appeal shall be disposed of in conformity with the provisions of clause (4).

**635.** In the circumstances of this case, it would seem that conformity with the declaration embodied in Article 329A, clause (4) is possible, if we confine the meaning and effect of the deeming provision to what was needed only for the declaration to be given at the end of clause (4) by the constituent bodies, with a political object, and not for the purposes of affecting our jurisdiction which determines legal effects of what is sought to be done. Of course, the more natural interpretation would appear to be that the deeming provision should apply for "all purposes" including those for consideration of the appeals before us. But, if it is not possible to decide those appeals without giving a different meaning to the deeming provision, on which the final declaration in clause (4) rests, and clause (5) leaves us free to decide how we could conform with clause (4), need our jurisdiction to decide factual and legal issues judicially be said to be affected? If the fiction was only a logical step in the process of the declaration to be made by constituent authorities but not of ours, it would only attach to the declaration contained at the end of clause (4). Perhaps it could be argued, by applying the doctrine of "reading down", that clause (4) was not intended to oust the jurisdiction of this Court altogether to try the case. No such attempts at reading it down have, however, been made by learned Counsel supporting the validity of Article 329A(4). It is not unlikely that Article 329A(4) was based on the misapprehension that the High Court's judgment may be legally correct or that there was a possibility, even for a case so ill founded in fact and in law as the one put forward on behalf of the election-petitioner, to succeed in this Court if it had succeeded in the High Court. We cannot indulge in guess work on these matters. In any case, no useful purpose will be served now by our declaring anything beyond that clause (4) of Article 329A does not so operate as to bar the jurisdiction of this Court to go into and determine the merits of the appeals before us by applying the Act of 1951. Even if we were to consider matters of expediency and national interest, as we should in appropriate cases, it does not appear to me to be either expedient or in conformity with national interests to leave the matter in doubt whether the judgment under appeal before us could or could not legally stand on its own legs under the unamended law.

**636.** For the reasons given above, I declare that Article 329A(4) does not stand in the way of the consideration of the appeals before us on merits under the Act of 1951 or the validity of the amendments of the Act. On a consideration of the merits of Appeals Nos. 887 and 909 of 1975, I have come to the conclusion, as indicated above, that Appeal No. 887 must be allowed and the Cross Appeal No. 909 of 1975 must fail. The result is that the judgment and orders passed by the learned Judge of the Allahabad High Court on the election case are set aside, and, in such conformity with Article 329A, clause (4) as is possible for us I also declare the judgment and the findings contained in it to be void and of no effect whatsoever. It is not necessary for me to add that the order of the learned Judge, holding the original respondent disqualified from occupying her office, disappears ipso facto and it neither has nor will be deemed ever to have had any legal effect whatsoever. In the circumstances of the case, I think the parties should bear their own costs throughout.


SCC Online Web Edition, Copyright © 2021
Page 268    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------------------------

CHANDRACHUD, J. (*concurring*).—The election petition out of which these appeals arise involved the question of the validity of the election of Smt. Indira Nehru Gandhi to the Lok Sabha. In the General Parliamentary Elections of 1971, she was declared as the successful candidate from the Rae Bareli constituency in Uttar Pradesh. She won the election by a margin of 1,11,810 votes over her nearest rival, Shri Raj Narain.

**638.** Shri Raj Narain, who was sponsored by the Samyukta Socialist Party, filed an election petition under Section 80 read with Section 100 of the Representation of the People Act, 1951, to challenge the election of the successful candidate. Originally, the challenge was founded on numerous grounds but during the trial of the petition in the High Court of Allahabad, the challenge was limited to seven grounds.

**639.** A learned Single Judge of the High Court, J. M. L. Sinha, J., upheld the challenge on two grounds, rejecting the other grounds of challenge. That explains the cross-appeals.

**640.** The High Court held that the successful candidate was guilty of having committed two corrupt practices within the meaning of Section 123(7) of the Representation of the People Act : firstly, she obtained the assistance of the gazetted officers of the Government of Uttar Pradesh for furthering her election prospects ; and secondly, she obtained the assistance of Shri Yashpal Kapoor, a gazetted officer in the Government of India holding the post of Officer on Special Duty in the Prime Minister's Secretariat, for furthering the same purpose. Acting under Section 8-A of the Act the learned Judge declared that the successful candidate would stand disqualified for a period of six years from June 12, 1975 being the date of the judgment. Aggrieved by this part of the judgment, Smt. Indira Gandhi has filed Appeal No. 887 of 1975.

**641.** The other five grounds of challenge were : (1) The successful candidate procured the assistance of the armed forces for arranging her flights by Air Force aeroplanes and helicopters ; (2) Her election agent, Shri Yashpal Kapoor, and others distributed clothes and liquor to induce the voters to vote for her ; (3) She and her election agent made appeals to the religious symbol of cow and calf ; (4) Her election agent and others procured vehicles for the free conveyance of voters to the polling stations ; and (5) She and her election agent incurred or authorised expenditure in violation of Section 77(3) of the Act read with Rule 90 of the Conduct of Elections Rules, 1961. These grounds having been rejected by the High Court, the defeated candidate has filed Appeal No. 909 of 1975. The first two grounds were given up in appeal for the reason that the evidence on record was not likely to be accepted by this Court in proof thereof.

**642.** The defeated candidate did not lead evidence in the High Court to show that any part of the expenditure in excess of the permissible limit of Rs. 35,000 was incurred by the successful candidate or her election agent. His contention was that the expenditure incurred for her election by the political party which had sponsored her candidature, the Congress (R), was liable to be included in the expenses incurred or authorised by her. This contention was founded on a decision rendered by a Division Bench of this Court on October 3, 1974, in *Kanwar Lal Gupta* v. *Amarnath Chawla*[234].

234. (1975) 3 SCC 646 : AIR 1975 SC 308.


SCC Online Web Edition, Copyright © 2021
Page 269      Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------------------

INDIRA NEHRU GANDHI *v.* RAJ NARAIN (*Chandrachud, J.*)        243

**643.**  On October 19, 1974, the President of India promulgated "The Representation of the People (Amendment) Ordinance, 1974" providing that :

> "Notwithstanding any judgment, order or decision of any court to the contrary,  any expenditure incurred or authorized in connection with the election of a candidate by a  political party  or  by any other association or body of persons or by any individual (other than the candidate or  his election  agent)  shall not be deemed to be, and shall not ever be deemed to have been, expenditure in connection  with  the  election incurred or authorized by the candidate or by his election agent..........."

This provision was added by the ordinance by way of an explanation to Section 77 (1) of the Representation of the People Act, 1951.  It expressly excepted from its operation decisions of the Supreme Court voiding an election before the commencement of the ordinance.  Shri Amarnath Chawla fell outside the ordinance.  It also excepted similar decisions of High Courts provided that they had become final or unappealable.  The ordinance was replaced by the Representation of the People (Amendment) Act, 58 of 1974, which was brought into force retrospectively from October 19, 1974.

**644.**  The defeated candidate filed Writ Petition No. 3761 of 1975 in the High Court to challenge the constitutional validity of the ordinance and  the Act of 1974.  In view of his finding that the total amount of expenditure incurred or authorized by the successful  candidate or her  election agent, together with  the  amount  proved to have been incurred by the political party or the State Government in connection with her  election did not exceed the prescribed limit, the learned Judge thought it unnecessary to inquire into the constitutionality of  the  ordinance and the Act of 1974.  He, therefore, dismissed the writ petition.  An appeal was filed  to a Division Bench of the High Court from the  aforesaid order but, by consent of parties, this Court decided to hear the points  involved  in  the  writ petition  and in the appeal therefrom.

**645.**  During the pendency of these cross-appeals, the  Parliament passed the Election Laws (Amendment) Act, 40 of 1975, which came into force on August  6, 1975.  This Act, if valid, virtually seals the controversy in the appeal filed in this Court by the successful  candidate from the decision of the Allahabad High Court.  It also takes care of  a  considerable gamut of the appeal filed in this Court by the  defeated candidate.  It substitutes a new Section 8-A in the Representation of the People Act, 1951 empowering the President to decide whether a person found guilty of corrupt practice shall be disqualified and if so, for what period.  By Section 6, it amends Section  77 of the Act of 1951  making  pre-nomination expenses a matter of irrelevant consideration.  It declares  that  the  expenditure  incurred  by a government servant in the discharge of his official duty in connection with any  arrangements or  facilities  and such arrangements or facilities shall not be deemed to be expenditure or assistance incurred or rendered for the  furtherance of  the election prospects of the candidate concerned.  By Section 7,  it re-defines a "candidate"  to mean  a  person  who has been or claims to have been duly nominated as a candidate at any election.  By Section 8, it provides  that  no symbol allotted to a candidate shall be deemed  to be a religious or a national symbol.  And it says,  to the extent relevant, that the publication in the Official Gazette of the resignation of a  government  servant shall  be conclusive proof  of  the  fact  of  resignation.  If the effective date of the resignation is stated in the publication, it shall also be conclusive proof of the fact that the government servant ceased  to  be  in  service  with  effect  from the particular


SCC Online Web Edition, Copyright © 2021
Page 270      Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------------------------

date. The amendments made by Sections 6, 7 and 8 of the Amending Act have retrospective effect and expressly govern election appeals pending in this Court, among other proceedings.

**646.** The amendments brought about by Act 58 of 1974 and Act 40 of 1975 have an incisive impact on the cross-appeals but their edge was blunted by the Constitution (Thirty-ninth Amendment) Act which came into force on August 10, 1975. The Thirty-ninth Amendment introduces two new articles in the Constitution : Articles 71 and 329A ; and it puts in the Ninth Schedule three Acts : (i) The Representation of the People Act, 43 of 1951 ; (ii) The Representation of the People (Amendment) Act, 58 of 1974 ; and (iii) The Election Laws (Amendment) Act, 40 of 1975. The new Article 71 which replaces its precursor empowers the Parliament to pass laws regulating the elections of the President and the Vice-President, including the making of a provision for the decision of disputes relating to their election. Article 329A has six clauses out of which the first three deal with the future election to the Parliament of persons holding the office of Prime Minister or Speaker at the time of the election or who are appointed to these offices after their election to the Parliament. These clauses aim at depriving the courts of their jurisdiction to try election petitions in which the election of the Prime Minister or the Speaker to the Parliament is challenged. Clause 4 frees the disputed election of the Prime Minister and the Speaker to the Parliament from the restraints of all election laws. It declares such election as valid notwithstanding any judgment and Clause 5 ordains that any appeal or cross appeal pending before the Supreme Court shall be disposed of on the assumption that the judgment under appeal is void, that the findings contained in the judgment never had any existence in the eye of law and that the election declared void by the judgment shall continue to be valid in all respects. Clause 6 provides that Article 329A shall have precedence over the rest of the Constitution.

**647.** At first flush, what remains to be decided judicially in face of the Thirty-ninth Amendment? As an exercise of constituent power, the Thirty-ninth Amendment must reign supreme. The political sovereign having reposed its trust in the legal sovereign, the doings of the Constituent Assembly have an aura of sanctity that legal ingenuity may be powerless to penetrate. But that is an uninformed approach to a field strewn with various shades of legal landmarks.

**648.** While repelling the challenge to the First Constitutional Amendment which was passed in June 1951, this Court held in *Sri Sankari Prasad Singh Deo* v. *Union of India and State of Bihar*[235], that the power of amendment conferred by Article 368 was not subject to any limitations, express or implied and that fundamental rights were within the sweep of the amending power. The Seventeenth Constitutional Amendment passed in June 1964 was similarly upheld by a majority decision of this Court in *Sajjan Singh* v. *State of Rajasthan*[236], which took the view that the fundamental rights were not intended by the framers of the Constitution to be finally and immutably settled when the Constitution was passed. But the Seventeenth Amendment came to be challenged once again in *I. C. Golak Nath* v. *State of Punjab*[237]. By a majority of 6 : 5, this Court held that the Seventeenth Amendment was ultra vires the Parliament's power to amend the Constitution. Five out of the six learned Judges held that Article 368 did not confer any power to amend but merely

235.  1952 SCR 89 : AIR 1951 SC 468.        237.  (1967) 2 SCR 762 : AIR 1967 SC
236.  (1965) 1 SCR 933 : AIR 1965 SC 845.              1643.


SCC Online Web Edition, Copyright © 2021
Page 271      Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------------------------------------------

prescribed the procedure for amendment. The sixth learned Judge held that Article 368 did contain the power of amendment but that the Parliament must amend Article 368 to convoke another Constituent Assembly, pass a law under Item 97 of List I of Schedule VII to call a Constituent Assembly and then that assembly may be able to abridge or take away the fundamental rights if desired.

**649.** The decision in *Golak Nath's case* (supra) raised a debate of national dimensions as the Parliament's power to amend the Constitution so as to abridge or take away the fundamental rights virtually became a dead letter. Under the majority judgment, the Constituent Assembly alone, called by virtue of a law to be passed under Entry 97 of List I, could abridge or take away the fundamental rights. The Parliament, in a resolve to re-affirm its powers, passed the Constitution (Twenty-fourth Amendment) Act on November 5, 1971 and the Constitution (Twenty-fifth Amendment) Act on April 20, 1972. By the Twenty-fourth Amendment, the Parliament amended Articles 13 and 368 of the Constitution so as to provide that nothing contained in Article 13 shall apply to any amendment of the Constitution made under Article 368 and that notwithstanding anything in the Constitution, Parliament may, in the exercise of its constituent power, amend by way of addition, variation or repeal any provision of the Constitution in accordance with the procedure laid down in Article 368. As an instance of the amendatory power reacquired under the Twenty-fourth Amendment, Parliament, by the Twenty-fifth Amendment, substituted a new clause (2) in Article 31 and introduced a new Article 31-C in the Constitution. By the Twenty-ninth Amendment, Parliament placed the Kerala Law Reforms (Amendment) Acts of 1969 and 1971 in the Ninth Schedule.

**650.** A Bench of thirteen Judges of this Court sat to consider the constitutionality of the Twenty-fourth, Twenty-fifth and Twenty-ninth Amendments. The eleven judgments delivered in that case are reported in *Kesavananda Bharati* v. *State of Kerala*[238], commonly known as the *Fundamental Rights case*. *Golak Nath's case* (supra) stood overruled as a result of the decision in this case. But six learned Judges out of the thirteen (Sikri, C. J., and Shelat, Grover, Hegde, Jaganmohan Reddy and Mukherjea, JJ.) accepted the contention of the petitioners that though Article 368 conferred the power to amend the Constitution, there were inherent or implied limitations on the power of amendment and therefore, Article 368 did not confer power to amend the Constitution so as to damage or destroy the essential elements or basic features of the Constitution. Fundamental rights, being a part of the essential features of the Constitution, could not therefore be abrogated or emasculated in the exercise of the power conferred by Article 368, though a reasonable abridgement of those rights could be effected in the public interest. Brother Khanna, J. found it difficult, in face of the clear words of Article 368, to exclude from their operation the articles relating to fundamental rights in Part III of the Constitution. But proceeding to consider "the scope of the power of amendment under Article 368", the learned Judge held that the power to amend did not include the power to abrogate the Constitution, that the word "amendment" postulates that the old Constitution must survive without loss of identity, that the old Constitution must accordingly be retained though in the amended form, and therefore the power of amendment does not include the power to destroy or abrogate the basic structure or framework of the Constitution. The remaining six Judges took the view that there were no limitations of any kind on the

**238.** 1973 Supp SCR 1 : (1973) 4 SCC 225.


SCC Online Web Edition, Copyright © 2021
Page 272     Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------------

246                        SUPREME COURT CASES                        1975 Supp SCC

power of amendment, though three of them seemed willing to foresee the limitation that the entire Constitution could not be abrogated, leaving behind a State without a Constitution. Some scholars have clapped and some scholars have scoffed at the decision in the *Fundamental Rights case*. These criticisms, I cannot deny, cause a flutter in the ivory tower. But by Article 141 of the Constitution, the law declared by the Supreme Court is binding on all courts within the territory of India. The law declared by the majority of 7 : 6 in the *Fundamental Rights case* must therefore be accepted by us, dutifully and without reserve, as good law. The history of law courts abounds with memorable decisions based on a thin majority.

651. These appeals have therefore to be decided in the light of the principle emerging from the majority decision in the *Fundamental Rights case* that Article 368 does not confer power on the Parliament to alter the basic structure or framework of the Constitution. Arguments of the learned Counsel appearing on both sides have taken many forms and shapes but they ultimately converge on the central theme of basic structure.

652. I would like first to deal with the constitutional validity of the Thirty-ninth Amendment. On that question, the arguments of Mr. Shanti Bhushan, who appears for Shri Raj Narain, may be summed up thus: (*i*) The Thirty-ninth Amendment affects the basic structure or framework or the institutional pattern adopted by the Constitution and is therefore beyond the amending power conferred by Article 368. It destroys the identity of the Constitution. (*ii*) Separation of powers is a basic feature of the Constitution and therefore every dispute involving the adjudication of legal rights must be left to the decision of the Judiciary. Clause (4) of Article 329-A introduced by the Thirty-ninth Amendment takes away that jurisdiction and is therefore void. (*iii*) The function of the Legislature is to legislate and not decide private disputes. In the instant case the Constituent Assembly has transgressed its constituent function by adjudicating upon a private dispute. (*iv*) Democracy is an essential feature of the Constitution. Free and fair elections are indispensable for the successful working of any democratic government. By providing that the election of the Prime Minister shall not be open to challenge and shall continue to be valid despite the judgment of the Allahabad High Court holding that the election is vitiated by corrupt practices, the Constituent Assembly has destroyed the very core of democracy. (*v*) Equality is an essential feature of a republican Constitution. The Thirty-ninth Amendment puts the Prime Minister and the Speaker above the law and beyond the reach of the equality principle. The classification made by the Thirty-ninth Amendment bears no nexus with the sort of immunity granted to two high personages from the operation of election laws. (*vi*) Rule of law and judicial review are also basic features of the Constitution. To free certain persons from the constraints of law and to place their conduct beyond judicial review is to destroy the identity of the Constitution. No freedom is secure without the court to protect it. The organic balance between the three branches, the Legislature, Executive and the Judiciary, is upset by eroding the authority of the Supreme Court in a vital matter like elections. And the rule of law is abrogated by providing that the election of the Prime Minister shall continue to be valid and will be open to no challenge before any court or any authority whatsoever. (*vii*) The concept of political justice recognized by the preamble is violated by the Thirty-ninth Amendment. The Constitution can always be subverted by revolutionary methods. The question is whether it is permissible to the Parliament to use the legitimacy of constitutional provisions for effecting revolutionary changes. (*viii*) The constituent power partakes of legislative power and can only be


SCC Online Web Edition, Copyright © 2021
Page 273    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------------------

exercised within the highest ambit of the latter power. Therefore, even with a two-third majority, the constituent body cannot exercise executive or judicial power. For example, the power to appoint or dismiss a government servant or the power to declare war which are executive powers cannot be exercised by the Constituent Assembly. Similarly, it cannot, in the guise of amending the Constitution, provide that an accused arraigned before a criminal court shall be acquitted and shall be deemed to be innocent. The constituent body can make changes in the conditions of the exercise of judicial power but it cannot usurp that power; and lastly (*ix*) The question in the *Fundamental Rights case* was whether Parliament can, in the exercise of its power of amendment abridge or take away fundamental rights and whether there are any inherent or implied limitations on the Parliament's power of amendment. In other words, the question was whether the power of amendment can be exercised so as to destroy or mutilate the basic structure of the Constitution. The *Fundamental Rights case* did not involve the consideration of the question as to what the power of amendment comprehends. Promoting and demoting government servants, passing and failing students who have appeared in an examination, granting or withdrawing building contracts and last but not the least, declaring who has won and who has lost an election are matters clearly outside the scope of the amending power under Article 368, which means and implies the power to alter the fundamental instrument of country's governance.

**653.** Learned Counsel appearing for the Union of India and for Smt. Indira Gandhi did not dispute the contention that the appeals before us must be disposed of on the basis of the law laid down by the majority in the *Fundamental Rights case.*

**654.** The learned Attorney General contended that: (*i*) The majority decision in the *Fundamental Rights case* is not an authority for the proposition that there could be no free or fair elections without judicial review. The Constitutions and laws of several countries leave the decision of election disputes to the judgment of the Legislatures themselves. The history of the Representation of the People Act, 1951 as also various articles in our Constitution show that judicial review can be excluded in appropriate cases as a matter of policy. (*ii*) That validation of elections is a process well-known to democratic forms of Government. (*iii*) That a law may be constitutional even if it relates to a single individual if on account of special reasons, the single individual could be treated as a class by himself. (*iv*) That it is clear from Articles 326 and 327 of the Constitution that the Constitution-makers thought that as a matter of high policy elections ought to be dealt with by the Constitution itself and not by ordinary legislation passed within the framework of the Constitution. How much of elections should be dealt with by the Constitution and how much should be relegated to ordinary legislation is not a matter for the courts to decide. If the constituent body thought that the offices of the Prime Minister and the Speaker are important enough to be dealt with by the Constitution itself in the matter of their elections to the Parliament, it cannot be said that the decision is frivolous or without jurisdiction; and that (*v*) The contention that the Thirty-ninth Amendment is not an exercise of constituent power should not be allowed to be taken up because every possible aspect of the matter was argued in *Sankari Prasad's case* (supra), *Sajjan Singh's case* (supra) and the *Fundamental Rights case.* The basic question involved in these cases was as to what is the meaning of the word 'amendment'. The argument now is that there is a further limitation on the amending power. If it is the same question and has been decided, it cannot be reopened by saying that the question has a new aspect which was not

SCC Online Web Edition, Copyright © 2021
Page 274     Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------

considered then.  If the question is new, the principle of the *Fundamental Rights case* cannot be extended any further.  Therefore, the constituent power must be held to be a plenary power on which the only limitation is as regards the inviolability of the basic structure.

**655.** The learned Solicitor-General who continued the unfinished arguments of the learned Attorney-General urged that (*i*) Article 14 is founded on a sound public policy recognised and followed in all civilised States. The exclusion of judicial review does not by itself mean the negation of equality.  Article 31B which on the face of it denied equality to different sections of the community attained the ideal of economic justice by bringing about economic equality.  Article 33 also shows that the demands of public problems may require the adjustment of fundamental rights for ensuring greater equality.  (*ii*) What a Constitution should contain depends on what permanency is intended to be accorded to a particular provision included in the Constitution.  (*iii*) Exclusion of judicial review is at least permissible in those fields where originally the Constitution did not provide for or contemplate judicial review.  (*iv*) If the election law does not apply, as it ceases to apply by virtue of Article 329A(4), it is the function of the Legislature to declare whether or not a particular election is good or bad; and that (*v*) Rule of law is not a part of the basic structure of the Constitution and apart from Article 14, our Constitution recognises neither the doctrine of equality nor the rule of law.

**656.** Shri A. K. Sen who appears for Smt. Indira Gandhi defended the Thirty-ninth Amendment by contending that: (*i*) The amendment follows the well-known pattern of all validation Acts by which the basis of judgments or orders of competent courts and tribunals is changed and the judgments and orders are made ineffective.  (*ii*) The effect of validation is to change the law so as to alter the basis of any judgment, which might have been given on the basis of old law and thus to make the judgment ineffective.  (*iii*) A formal declaration that the judgment rendered under the old Act is void, is not necessary.  If the matter is pending in appeal, the appellate Court has to give effect to the altered law and reverse the judgment. If the matter is not pending in appeal, then the judgment ceases to be operative and binding as res judicata.  (*iv*) The rendering of a judgment ineffective by changing its basis by legislative enactment is not an encroachment on judicial power but a legislation within the competence of the Legislature rendering the basis of the judgment non est.  (*v*) The constituent power has retrospectively changed the law in so far as it relates to election. The constituent authority could have left the application of the changed law either to Parliament or to any other body.  But it has chosen to assume the duty of determination in this particular case for itself.  (*vi*) The determination of election disputes and the validity of elections is not an exercise of judicial power.  This function may be left either to courts, properly so-called or to tribunals or to other bodies including the Legislature itself. (*vii*) The rigid separation of powers as it obtains in the United States or in a lesser degree under the Australian Constitution does not apply to India. Many powers, which are strictly judicial, have been excluded from the purview of the courts.  There is, therefore, no question of any separation of powers being involved in matters concerning elections and election petitions. (*viii*) There is no question of separation of powers when the constituent authority exercises either a power which is allocated to the Legislature, or to the Executive or to the Judiciary under the Constitution.  In the hands of the constituent authority there is no demarcation of powers.  But the demarcation emerges only when it leaves the hands of the constituent


SCC Online Web Edition, Copyright © 2021
Page 275    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------------

INDIRA NEHRU GANDHI *v.* RAJ NARAIN (*Chandrachud, J.*)    249

authority through well-defined channels into demarcated pools. The constituent power is independent of the fetters of limitations imposed by separation of powers in the hands of the organs of the Government, amongst whom the supreme authority of the State is allocated. *(ix)* The constituent power springs as the fountainhead and partakes of sovereignty and is the power which creates the organs and distributes the powers. Therefore, in a sense, the constituent power is all-embracing and is at once judicial, executive and legislative. It is, in a sense, a "super power". *(x)* Even if the preamble lays down as its objective the attainment of equality, the Thirty-ninth Constitution Amendment does not violate the said concept of equality as the same is based on a rational classification and has a reasonable nexus with the object of the amendment. *(xi)* The preamble to the Constitution only refers to securing "equality of status and opportunity". Equality of status and opportunity has got many facets: some of these facets are guaranteed as fundamental rights under Articles 14 to 18 of the Constitution. These facets alone can be considered to be basic features of the Constitution, assuming that equality was a basic feature of the Constitution. *(xii)* "Free and fair election" does not postulate that there must be a constitutional provision for determining election disputes by a separate tribunal or court. *(xiii)* The Thirty-ninth Amendment Act does not affect the structure of a republican democracy, assuming that the same is a basic feature of the Constitution. The validation of one election does not alter the character of the democracy ; and *(xiv)* A constitutional amendment need not necessarily relate to the structural organisation of the State.

**657.** Shri Jagannath Kaushal supported the arguments of Shri Sen by citing pragmatic illustrations. He gave interesting statistics showing that a very small percentage of election petitions succeed eventually which, according to him, is evidence that such petitions are used by defeated candidates as an instrument of oppression against successful candidates. Parliament, therefore, wanted to save high personages from such harassment. A law may benefit a single individual and may still be valid. According to Shri Kaushal, the judgment of the Allahabad High Court became a nullity by reason of that Court ceasing retrospectively to have jurisdiction over the dispute and a judgment which is a nullity need not be set aside. It can (*sic* cannot) even be challenged in a collateral proceeding.

**658.** I thought it only fair to indicate broadly the line of approach adopted by the various learned Counsels to the question as regards the validity of the Thirty-ninth Amendment. It will serve no useful purpose to take up each one of the points for separate consideration and indeed many an argument is interrelated. It would be enough for my purpose to deal with what I consider to be points of fundamental importance, especially as my learned brethren have dealt with the other points.

**659.** This Court has strictly adhered to the view that in constitutional matters one must decide no more than is strictly necessary for an effective adjudication of the points arising in any case. By that test, a numerically substantial part of the Thirty-ninth Amendment has to be deferred for consideration to a future occasion. We are clearly not concerned in these appeals with the new Article 71 introduced by the Thirty-ninth Amendment, which deals with the election of the President and the Vice-President. We are concerned with the new Article 329A but not with the whole of it. Clauses (1) to (3) of that article deal with future events and the validity of those clauses may, perhaps, be examined when those events come to happen. Clauses (4) to (6) of Article 329A are the ones that are



SCC Online Web Edition, Copyright © 202
Page 276      Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-----------------------------------------------------------------------------------------------------------------

relevant for our purpose and I propose to address myself to the validity of those provisions.

**660.** Clause (4) of Article 329A, which is the real focus of controversy, may conveniently be split up as follows for understanding its true nature and effect: (*i*) The laws made by Parliament prior to August 10, 1975 in so far as they relate to election petitions and matters connected therewith cease to apply to the parliamentary election of Smt. Indira Gandhi which took place in 1971. (*ii*) Such laws are repealed retrospectively in so far as they governed the aforesaid election, with the result that they must never be deemed to have applied to that election. (*iii*) Such an election cannot be declared to be void on any of the grounds on which it could have been declared to be void under the laws which were in force prior to August 10, 1975. (*iv*) The election shall not be deemed ever to have become void on any ground on which, prior to August 10, 1975, it was declared to be void. (*v*) The election shall continue to be valid in all respects notwithstanding the judgment of any court, which includes the judgment dated June 12, 1975 of the High Court of Allahabad. (*vi*) The judgment of the Allahabad High Court and any finding on which the judgment and order of that court is based are void and shall be deemed always to have been void.

**661.** Shri Shanti Bhushan has, as it were, a preliminary objection to the Thirty-ninth Amendment that the election of a private individual and the dispute concerning it cannot ever be a matter of constitutional amendment. Whether this contention is sound is another matter but I do not see the force of the argument of the Attorney-General that in view of the decisions in *Sankari Prasad's case* (supra), *Sajjan Singh's case* (supra) and the *Fundamental Rights case* (supra), the contention is not open to be taken. The question raised by Shri Shanti Bhushan was not raised or considered in either of the three aforesaid cases and I do not see how the question can be shelved. The argument is not a new facet of the theory of inherent or implied limitations on the amending power, in which case it might have been plausible to contend that the last word was said on the subject by the Full Court in the *Fundamental Rights case*. The question now raised touches a totally new dimension of the amending power: Can the Constituent Assembly, while amending the Constitution, pronounce upon private disputes or must it only concern itself with what may be termed organisational matters concerning the country's governance? The question has the merit of novelty, but I see no substance in it. But I must clarify that I prefer to examine the point in isolation, that is, divorced from considerations arising from the theory of separation of powers. Whether the amendment constitutes an encroachment on judicial functions and thereby damages one of the basic structures of the Constitution may best be examined separately. The reason why I see no substance in Shri Shanti Bhushan's contention is that what the Constitution ought to contain is not for the courts to decide. The touchstone of the validity of a constitutional amendment is firstly whether the procedure prescribed by Article 368 is strictly complied with and secondly whether the amendment destroys or damages the basic structure of the Constitution. The subject-matter of constitutional amendments is a question of high policy and courts are concerned with the interpretation of laws, not with the wisdom of the policy underlying them. I do not see why the Constitution cannot be amended so as to provide that wagering contracts shall be void or that bigamous marriages shall be unlawful or that economic offenders shall be visited with a higher penalty. The Indian Constitution is not like the American Constitution an instrument of few words. The range of topics it covers would bemuse any student of foreign Constitutions which do not even skirt the problems with which our


SCC Online Web Edition, Copyright © 202
Page 277      Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------------------------------------------------

INDIRA NEHRU GANDHI *v.* RAJ NARAIN (*Chandrachud, J.*)      251

Constitution deals in copious details. In fact, there is hardly any important facet of national life which our Constitution does not touch. Along with matters of high priority like citizenship, fundamental rights, directive principles of State policy and the relations between the Union and the States, it deals with matters not normally considered constitutionally important like the salaries of high dignitaries, the power of the Supreme Court to frame rules for regulating its practice and procedure, official language for communication between one State and another and last but not the least, elections to the Parliament and the State Legislatures. Those to whose wisdom and judgment the constituent power is confided, will evoke scorn and derision if that power is used for granting or withdrawing building contracts, passing or failing students or granting and denying divorces. But the electorate lives in the hope that a sacred power will not so flagrantly be abused and the moving finger of history warns of the consequences that inevitably flow when absolute power has corrupted absolutely. The fear of perversion is no test of power.

**662.** But the comparison is odious between the instances given by Shri Shanti Bhushan and subject-matter of Article 329A(4) of the Constitution. In the first place, elections to Legislatures were considered by Constitution-makers to be a matter of constitutional importance. Secondly, though the powers of the Prime Minister in a cabinet form of democracy are not as unrivalled as those of the President in the American system, it is undeniable that the Prime Minister occupies a unique position. The choice of the subject for constitutional amendment cannot, therefore, be characterized as trifling, frivolous or outside the framework of a copious Constitution. In America, the challenge to the Eighteenth Amendment on the ground that ordinary legislation cannot be embodied in a constitutional amendment was brushed aside as unworthy of serious attention. Rottschaefer endorsed it as consistent with the ultimate political theory on which the American constitutional system is based. "The people, acting through the machinery provided by the existing Constitution, must be accorded the legal power to change their basic law by peaceable means."[239] In fact, it is wrong to think that elections to the country's Legislatures are a private affair of the contestants. They are matters of public interest and of national importance. Every citizen has a stake in legislative elections for, his social and economic well-being depends upon the promises and performance of the legislators. Such elections, and more so the election of the Prime Minister who is at least *primus inter pares*, can legitimately form the subject-matter of a constitutional provision. The validity of what is brought into the Constitution has to be judged by different standards.

**663.** There was some discussion at the Bar as to which features of the Constitution form the basic structure of the Constitution according to the majority decision in the *Fundamental Rights case*. That, to me, is an inquiry both fruitless and irrelevant. The ratio of the majority decision is not that some named features of the Constitution are a part of its basic structure but that the power of amendment cannot be exercised so as to damage or destroy the essential elements or the basic structure of the Constitution, whatever these expressions may comprehend. Sikri, C. J. mentions supremacy of the Constitution, republican and democratic form of the Government, secular character of the Constitution, separation of powers, federalism and dignity and freedom of the individual as essential features of the Constitution. Shelat and Grover, JJ. have added to the list two other features : the mandate

239. Rottschaefer : *Constitutional Law*, (1939 Ed.) p. 397.


SCC Online Web Edition, Copyright © 202
Page 278    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases


to build a welfare State and unity and integrity of the nation. Hegde and Mukherjea, JJ. added sovereignty of India as a fundamental feature of the Constitution. Jaganmohan Reddy, J. thought that a sovereign democratic republic, parliamentary democracy and the three organs of the State form the basic structure of the Constitution. Khanna, J. held that fundamental rights are not a part of the basic structure and therefore they can be abrogated like many other provisions. He observed that basic structure indicates the broad outlines of the Constitution and since the right to property is a matter of detail, it is not a part of that structure. The democratic form of Government, the secular character of the State and possibly judicial review are according to Brother Khanna a part of the basic structure of the Constitution. It is obvious that these are merely illustrations of what constitutes the basic structure and are not intended to be exhaustive. Shelat and Grover, JJ., Hegde and Mukherjea, JJ., and Jaganmohan Reddy, J., say in their judgments that their list of essential features which form the basic structure of the Constitution is illustrative or incomplete. For determining whether a particular feature of the Constitution is a part of its basic structure, one has perforce to examine in each individual case the place of the particular feature in the scheme of our Constitution, its object and purpose, and the consequences of its denial on the integrity of the Constitution as a fundamental instrument of country's governance. But it is needless for the purpose of these appeals to ransack every nook and cranny of the Constitution to discover the bricks of the basic structure. Those that are enumerated in the majority judgments are massive enough to cover the requirements of Shri Shanti Bhushan's case.

664. I consider it beyond the pale of reasonable controversy that if there be any unamendable features of the Constitution on the score that they form a part of the basic structure of the Constitution, they are that: (*i*) India is sovereign democratic republic; (*ii*) Equality of status and opportunity shall be secured to all its citizens; (*iii*) The State shall have no religion of its own and all persons shall be equally entitled to freedom of conscience and the right freely to profess, practise and propagate religion and that (*iv*) the nation shall be governed by a Government of laws, not of men. These, in my opinion, are the pillars of our constitutional philosophy, the pillars, therefore, of the basic structure of the Constitution.

665. I find it impossible to subscribe to the view that the preamble of the Constitution holds the key to its basic structure or that the preamble is too holy to suffer a human touch. Constitutions are written, if they are written, in the rarefied atmosphere of high ideology, whatever be the ideology. Preambles of written Constitutions are intended primarily to reflect the hopes and aspirations of people. They resonate the ideal which the nation seeks to achieve, the target, not the achievement. In parts, therefore, they are metaphysical like slogans. For example, the concept of fraternity which is referred to in our preamble is not carried into any provision of the Constitution and the concept is hardly suitable for encasement in a coercive legal formula. The preamble, generally, uses words of "passion and power" in order to move the hearts of men and to stir them into action.[240] Its own meaning and implication being in doubt, the preamble cannot affect or throw light on the meaning of the enacting words of the Constitution.[241] Therefore, though our preamble was voted upon and is a

---

240. H. M. Seervai: *Constitutional Law of India*, 2nd Ed., (1975) p. 76.
241. See *Attorney-General* v. *Prince Ernest*

*Augustus of Hanover*, 1957 AC 436, 463.


SCC Online Web Edition, Copyright © 2021
Page 279    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------------------------------------------

part of the Constitution, it is really "a preliminary statement of the reasons" which made the passing of the Constitution necessary and desirable.[242] As observed by Gajendragadkar, J. in *In re Berubari Union & Exchange of Enclaves*[243], what Willoughby has said about the preamble to the American Constitution, namely, that it has never been regarded as the source of any substantive power, is equally true about the prohibitions and limitations. The preamble of our Constitution cannot therefore be regarded as a source of any prohibitions or limitations.

666. Judicial review, according to Shri Shanti Bhushan, is a part of the basic structure of the Constitution and since the Thirty-ninth Amendment by Article 329A(4) and (5) deprives the courts, including the Supreme Court, of their power to adjudicate upon the disputed election, the amendment is unconstitutional. The fundamental premise of this argument is too broadly stated because the Constitution, as originally enacted, expressly excluded judicial review in a large variety of important matters. Articles 31(4), 31(6), 136(2), 227(4), 262(2) and 329(*a*) are some of the instances in point. True, that each of these provisions has a purpose behind it but these provisions show that the Constitution did not regard judicial review as an indispensable measure of the legality or propriety of every determination. Article 136(2) expressly took away the power of the Supreme Court to grant special leave to appeal from the decisions of any court or tribunal constituted by a law relating to the armed forces. Article 262(2) authorized the Parliament to make a law providing that the Supreme Court or any other court shall have no jurisdiction over certain river disputes. But what is even more to the point are the provisions contained in Articles 103(1) and 329(*b*). Article 102 prescribes disqualifications for membership of the Parliament. By Article 103(1), any question arising under Article 102 as to whether a member of the Parliament has become subject to any disqualification has to be referred to the President whose decision is final. The President is required by Article 103(2) to obtain the opinion of the Election Commission and act according to its opinion. Thus, in a vital matter pertaining to the election for membership of the Parliament, the framers of the Constitution had left the decision to the judgment of the Executive. Articles 327 and 328 give power to the Parliament and the State Legislatures to provide by law for all matters relating to elections to the respective Legislatures, including the preparation of electoral rolls and the delimitation of constituencies. By Article 329(*a*), the validity of any law relating to the delimitation of constituencies or the allotment of seats to such constituencies cannot be called in question in any court.

667. The provision contained in Article 329(*b*) is decisive on the question under consideration. That article provides that no election to the Parliament or the State Legislature shall be called in question except by an election petition presented to such authority and in such manner as may be provided for by or under any law made by the appropriate Legislature. It was therefore open to the Legislature to leave the adjudication of election disputes to authorities other than those in the hierarchy of our judicial system. In fact, until the passing of the Representation of the People (Amendment) Act, 47 of 1966, by which High Courts were given jurisdiction to try election petitions, that jurisdiction was vested first in a tribunal consisting of three members and later in a tribunal consisting of a single member who was to be a sitting District Judge. The decisions of those tribunals

242. *Halsbury's Laws of England*, 3rd. Ed., p. 370, para 545.

243. (1960) 3 SCR 250, 282 : AIR 1960 SC 845.


SCC Online Web Edition, Copyright © 2021
Page 280    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------------------------

could eventually be brought before the Supreme Court under Article 136(1) of the Constitution but it is at least plausible that were the Legislatures to pass laws leaving the decision of election disputes to themselves, judicial review might have stood excluded. Since the Constitution, as originally enacted, did not consider that judicial power must intervene in the interests of purity of elections, judicial review cannot be considered to be a part of the basic structure in so far as legislative elections are concerned. The theory of basic structure has to be considered in each individual case, not in the abstract, but in the context of the concrete problem. The problem here is whether under our Constitution, judicial review was considered as an indispensable concomitant of elections to country's Legislatures. The answer, plainly, is no.

**668.** In England, prior to 1770, controverted elections were tried by the whole House of Commons as mere party questions but in order "to prevent so notorious a perversion of justice", the House consented to submit the exercise of its privilege to a tribunal composed of its own members.[244] In 1868, the jurisdiction of the House to try election petitions was transferred by statute to the courts of law. A parliamentary election petition is now tried by two judges from out of three puisne judges of the Queen's Bench Division who are put on the rota for trial of such petitions by selection every year by a majority of votes of the judges of that division. At the conclusion of the trial, the Court must forthwith certify the determination to the Speaker. The determination, upon such certification, is final to all intents and purposes. Thus, in England, the election Court is constituted by a special method, it exercises a jurisdiction out of the ordinary jurisdiction which is normally exercised by courts of law and its determination acquires finality upon certification to the Speaker of the House of Commons. No appeal lies against the decision of the election Court save by leave of the Court and if leave is granted, the decision of the court of appeal is final and conclusive.[245]

**669.** Under Article 1, Section 5, Clause 1 of the American Constitution, each House is the judge of the elections, returns and qualifications of its own members. Each House, in judging of elections under this clause, acts as a judicial tribunal.[246] Any further review of the decisions of the two Houses seems impermissible.

**670.** I am therefore unable to accept the contention that Articles 329A(4) and (5) are unconstitutional on the ground that by those provisions, the election of the Prime Minister is placed beyond the purview of the courts.

**671.** Equally, there is no substance in the contention that the relevant clauses of the Thirty-ninth Amendment are in total derogation of 'political justice' and are accordingly unconstitutional. The concept of political justice of which the preamble speaks is too vague and nebulous to permit by its yardstick the invalidation of a constitutional amendment. The preamble, as indicated earlier, is neither a source of power nor of limitation.

**672.** The contention that 'democracy' is an essential feature of the Constitution is unassailable. It is therefore necessary to see whether the impugned provisions of the Thirty-ninth Amendment damage or destroy that

244. See *May's Parliamentary Practice*, 18th Ed., pp.29, 30.
245. See *Halsbury's Laws of England*, 3rd Ed., Vol. 14, p.250 (para 436); p.

311 (para 562); p.324 (para 591).
246. *See* Lester Jayson: *The Constitution of the U.S.A.* (1973).


Case 1:21-cv-00396-RJL    Document 20-11    Filed 08/14/21    Page 282 of 289
SCC Online Web Edition, Copyright © 2021
Page 281      Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

---------------------------------------------------------------------------------------------

INDIRA NEHRU GANDHI v. RAJ NARAIN (*Chandrachud, J.*)      255

feature. The learned Attorney-General saw an unsurmountable impedi-
ment in the existence of various forms of democracies all over the world and
he asked : What kind and form of democracy constitutes a part of our basic
structure? The cabinet system, the Presidential system, the French, the Rus-
sian or any other? This approach seeks to make the issue unrealistically
complex. If the democratic form of government is the cornerstone of our
Constitution, the basic feature is the broad form of democracy that was
known to Our Nation when the Constitution was enacted, with such adjust-
ments and modifications as exigencies may demand but not so as to leave the
mere husk of a popular rule. Democracy is not a dogmatic doctrine and
no one can suggest that a rule is authoritarian because some rights and
safeguards available to the people at the inception of its Constitution have
been abridged or abrogated or because, as the result of a constitutional
amendment, the form of government does not strictly comport with some
classical definition of the concept. The needs of the nation may call for severe
abnegation, though never the needs of the rulers and evolutionary changes
in the fundamental law of the country do not necessarily destroy the basic
structure of its government. What does the law live for, if it is dead to
living needs? We cannot therefore, as lawyers and judges, generalize on
what constitutes 'Democracy' though we all know the highest form of that
idealistic concept—the state of bliss—in political science.

**673.** The question for consideration is whether the provisions contain-
ed in Article 329A(4) and (5) are destructive of the democratic form of
government. The answer does not lie in comparisons with what is happening
in other parts of the world, those that stake their claim to 'democracy',
because we are not concerned to find whether despite the Thirty-ninth
Amendment we are still not better off, democratically, than many others.
The comparison has to be between the pre-Thirty-ninth Amendment period
and the post-Thirty-ninth Amendment period in the context of our Constitu-
tion.

**674.** "Those of us who have learned humility have given over the
attempts to define law." This statement of Max Radin[267] may be used to
express a similar difficulty in defining 'democracy' but just as legal scholars,
not lacking in humility, have attempted to define 'law', so have political
scientists attempted a satisfactory definition of 'democracy'. The expression
is derived from the Greek word 'demos', which was often used by the Greeks
to describe the many, as distinct from the few, rather than the people as a
whole. And Aristotle defined democracy as the rule of the poor, simply
because they formed, always and necessarily, the more numerous class.
But the word is commonly used "in the sense of the rule of the majority of
the community as a whole, including 'classes' and 'masses'............, since
that is the only method yet discovered for determining what is deemed to
be the will of a body politic is not unanimous. This will is expressed
through the election of representatives"[248]. C. F. Strong defines democracy
to mean "that form of government in which the ruling power of a State
is legally vested, not in any particular class or classes, but in the members
of a community as a whole". This may more aptly be called a description
rather than a definition of democracy because it is beyond human ingenuity
to foresee the possible permutations and combinations of circumstances to
which a generalisation may have to be applied.

247. "*A Restatement of Hohfeld*", Harvard
    Law Review (1938), Vol. 51, pp.
    1141, 1145.

248. *Modern Political Constitutions* by C.F.
    Strong; (E.L.B.S. Ed., 2nd Impres-
    sion, 1970) p. 172.



Case 1:21-cv-00396-RJL   Document 20-11   Filed 08/14/21   Page 283 of 289
SCC Online Web Edition, Copyright © 2021
Page 282        Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------

**675.** Forgetting mere words which Tennyson said : 'Like Nature, half reveal and half conceal the Soul within', the substance of the matter is the rule of the majority and the manner of ascertaining the will of the majority is through the process of elections. I find myself unable to accept that the impugned provisions destroy the democratic structure of our government. The rule is still the rule of the majority despite the Thirty-ninth Amendment and no law or amendment of the fundamental instrument has provided for the abrogation of the electoral process. In fact it is through that process that the electorate expressed its preference for Smt. Indira Gandhi over Shri Raj Narain and others. Article 326 of the Constitution by which the elections to the House of the People and to the State Legislative Assemblies shall be on the basis of adult suffrage still stands. Article 79 which provides that "There shall be a Parliament.........which shall consist of.........two Houses", Articles 80 and 81 which prescribe the composition of the two Houses, Article 83 which provides for the duration of the Houses, Article 85 which directs that six months shall not intervene between the two sessions of Parliament, Article 100(1) which provides that all questions shall be determined by a majority of votes of the members present and voting, Article 105 which preserves the powers and privileges of the members of Parliament and the counterparts of these articles in regard to State Legislatures retain their pristine primacy. These articles, unimpaired as they remain even after the Thirty-ninth Amendment, are enough assurance that the Parliament is not leading the country to a totalitarian path.

**676.** This is not to put a seal of approval on the immunity conferred on any election but it is hard to generalize from a single instance that such an isolated act of immunity has destroyed or threatens to destroy the democratic framework of our government. One swallow does not make a summer. The swallow with its pointed wings, forked tail, a curving flight and twittering cry is undoubtedly a harbinger of summer but to see all these in the Thirty-ninth Amendment and to argue that the summer of a totalitarian rule is knocking at the threshold is to take an unduly alarmist view of the political scene as painted by the amendment. Very often, as said by Sir Frederick Pollock, "If there is any real danger it is of the alarmist's own making"[249].

**677.** The Thirty-ninth Amendment is, however, open to grave objection on other grounds, in so far as clauses (4) and (5) of Article 329A are concerned. Generality and equality are two indelible characteristics of justice administered according to law. The preamble to our Constitution by which the people of India resolved solemnly to secure to all its citizens equality of status and opportunity finds its realization in an ampler measure in Article 14 which guarantees equality before the law and the equal protection of laws to all persons, citizens and non-citizens alike. Equality is the faith and creed of our democratic republic and without it, neither the Constitution nor the laws made under it could reflect the common conscience of those who owe allegiance to them. And if they did not, they would fail to command respect and obedience without which any Constitution would be doomed to founder on the rocks of revolution. A Constitution which, without a true nexus, denies equality before the law to its citizens may in a form thinly disguised, contain reprisals directed against private individuals in matters of private rights and wrongs. The English Acts of Attainder beginning with the one passed by the English Parliament in 1459 after the commencement of the wars of Roses or the 'Privilegium' in Rome are only some of the historical instances

249. *Ethics and Morals (Essays in Jurisprudence)* p. 303.


SCC Online Web Edition, Copyright © 202
Page 283      Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases


-----------------------------------------------------------------------------------------------------

in point.  Speaking of Bracton's famous passage which contains the admonition that the King ought to be under the law because the law makes him King, Sir Frederick Pollock says that there you have in a nutshell the great point of constitutional freedom that law is not merely the instrument of Government, but the safeguard of each individual citizen's public rights and liberties.[250]

**678.**  Article 329A(4) makes the existing election laws retrospectively inapplicable, in a very substantial measure, to the parliamentary elections of the Prime Minister and the Speaker.  The inapplicability of such laws creates a legal vacuum because the repeal, so to say, of existing laws is only a step-in-aid to free the election from the restraints and obligations of all election laws, indeed of all laws.  The plain intendment and meaning of clause (4) is that the election of the two personages will be beyond the reach of any law, past or present.  What follows is a neat logical corollary:  The election of the Prime Minister could not be declared void as there was no law to apply to that election; the judgment of the Allahabad High Court declaring the election void is itself void; and the election continues to be valid as it was before the High Court pronounced its judgment.

**679.**  These provisions are an outright negation of the right of equality conferred by Article 14, a right which more than any other is a basic postulate of our Constitution.  It is true that the right, though expressed in an absolute form, is hedged in by a judge-made restriction that it is open to the Legislature to make a reasonable classification so that the same law will not apply to all persons alike or different laws may govern the rights and obligations of different persons falling within distinct classes.  The boast of law that it is no respector of persons is the despair of drawers of waters and hewers of wood who clamour for a differential treatment.  The judge takes that boast to mean that in an egalitarian society no person can be above the law and that justice must be administered with an even hand to those who are situated equally.  In other words, all who are equal are equal in the eye of law and it will not accord a favoured treatment to persons within the same class.  Laws, as Plato said, would operate "like an obstinate and ignorant tyrant if they imposed inflexible rules without allowing for changed circumstances or exceptional cases"[251].

**680.**  This Court, at least since the days of *Anwar Ali Sarkar's case*[252], has consistently taken the view that the classification must be founded on an intelligible differentia which distinguishes those who are grouped together from those who are left out and that the differentia must have a rational relation to the object sought to be achieved by the particular law.  The first test may be assumed to be satisfied since there is no gainsaying that in our system of government, the Prime Minister occupies a unique position.  But what is the nexus of that uniqueness with the law which provides that the election of the Prime Minister and the Speaker to the Parliament will be above all laws, that the election will be governed by no norms or standards applicable to all others who contest that election and that an election declared to be void by a High Court judgment shall be deemed to be valid, the judgment and its findings being themselves required to be deemed to be void?  Such is not the doctrine of classification and no facet of that doctrine can support the favoured treatment accorded by the Thirty-ninth Amendment to two

250.  *Jurisprudence and Legal Essays* (1961) p. 195.
251.  See *"The Sense of Injustice"* by Edmond Cahn (1964) p. 161 in which the reference is made to Plato's *'Politicus'*, p. 294.
252.  1952 SCR 284: AIR 1952 SC 75: 1952 Cri LJ 510.



-------------------------------------------------------------------------------------------------

high personages. It is the common man's sense of justice which sustains democracies and there is a fear that the Thirty-ninth Amendment, by its impugned part, may outrage that sense of justice. Different rules may apply to different conditions and classes of men and even a single individual may, by his uniqueness, form a class by himself. But in the absence of a differentia reasonably related to the object of the law, justice must be administered with an even hand to all.

**681.** It follows that clauses (4) and (5) of Article 329A are arbitrary and are calculated to damage or destroy the rule of law. Imperfections of language hinder a precise definition of the rule of law as of the definition of 'law' itself. And the Constitutional Law of 1975 has undergone many changes since A. V. Dicey, the great expounder of the rule of law, delivered his lectures as Vinerian Professor of English Law at Oxford, which were published in 1885 under the title, *"Introduction to the Study of the Law of the Constitution"*. But so much, I suppose, can be said with reasonable certainty that the rule of law means that the exercise of powers of government shall be conditioned by law and that subject to the exceptions to the doctrine of equality, no one shall be exposed to the arbitrary will of the Government. Dicey gave three meanings to rule of law : Absence of arbitrary power, equality before the law or the equal subjection of all classes to the ordinary law of the land administered by ordinary law courts and that the 'Constitution is not the source but the consequence of the rights of individuals, as defined and enforced by the courts. The second meaning grew out of Dicey's unsound dislike of the French Droit Administratif which he regarded "as a misfortune inflicted upon the benighted folk across the Channel"[253]. Indeed, so great was his influence on the thought of the day that as recently as in 1935 Lord Hewart, the Lord Chief Justice of England, dismissed the term "administrative law" as "continental jargon". The third meaning is hardly apposite in the context of our written Constitution for, in India, the Constitution is the source of all rights and obligations. We may not therefore rely wholly on Dicey's exposition of the rule of law but ever since the second world war, the rule has come to acquire a positive content in all democratic countries.[254] The International Commission of Jurists, which has a consultative status under the United Nations, held its Congress in Delhi in 1959 where lawyers, judges and law teachers representing fifty-three countries affirmed that the rule of law is a dynamic concept which should be employed to safeguard and advance the political and civil rights of the individual in a free society. One of the committees of that Congress emphasised that no law should subject any individual to discriminatory treatment. These principles must vary from country to country depending upon the provisions of its Constitution and indeed upon whether there exists a written Constitution. As it has been said in a lighter vein, to show the supremacy of the Parliament, the charm of the English Constitution is that "it does not exist". Our Constitution exists and must continue to exist. It guarantees equality before law and the equal protection of laws to everyone. The denial of such equality, as modified by the judicially evolved theory of classification, is the very negation of rule of law.

**682.** The argument directed at showing the invalidation of the Thirty-ninth Amendment on the ground that it abrogates the principle of 'separation of powers' is replete with many possibilities since it has several sidelights. But I will be brief since I have already held that clauses (4) and (5) of

---

253. *See* S. A. de Smith : *Judicial Review of Administrative Action*, (1968) p. 5.

254. See Wade and Phillips : *Constitutional Law* (Sixth Ed., pp. 70-73).



SCC Online Web Edition, Copyright © 202
Page 285    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------

Article 329A are unconstitutional. I cannot regard the point as unnecessary for my determination since the point seems to me of great constitutional importance.

**683.** The Indian Constitution was enacted by the Constituent Assembly in the backdrop of the national struggle for independence. The Indian people had gone through a travail and on the attainment of independence, the country had to face unique problems which had not confronted other federations like America, Australia, Canada or Switzerland. These problems had to be solved pragmatically and not by confining the country's political structure within the straitjacket of a known or established formula. The Constituent Assembly, therefore, pursued the policy of pick and choose to see what suited the genius of the nation best.

> "This process produced new modifications of established ideas about the construction of federal governments and their relations with the governments of their constituent units. The Assembly, in fact, produced a new kind of federalism to meet India's peculiar needs."[255]

While introducing the Draft Constitution in the Constituent Assembly, Dr. Ambedkar who was one of the chief architects of the Constitution said that our Constitution avoided the tight mould of federalism in which the American Constitution was caught and could be "both unitary as well as federal according to the requirements of time and circumstances". We have what may perhaps be described by the phrase, 'cooperative federalism', a concept different from the one in vogue when the federations of United States or of Australia were set up.

**684.** The American Constitution provides for a rigid separation of governmental powers into three basic divisions, the executive, legislative and judicial. It is an essential principle of that Constitution that powers entrusted to one department should not be exercised by any other department. The Australian Constitution follows the same pattern of distribution of powers. Unlike these Constitutions, the Indian Constitution does not expressly vest the three kinds of power in three different organs of the State. But the principle of separation of powers is not a magic formula for keeping the three organs of the State within the strict confines of their functions. As observed by Cardozo, J. in his dissenting opinion in *Panama Refining Company* v. *Ryan*[256], the principle of separation of powers "is not a doctrinaire concept to be made use of with pedantic rigour. There must be sensible approximation, there must be elasticity of adjustment in response to the practical necessities of Government which cannot foresee today the developments of tomorrow in their nearly infinite variety". Thus, even in America, despite the theory that the Legislature cannot delegate its power to the Executive, a host of rules and regulation are passed by non-legislative bodies, which have been judicially recognized as valid.[257]

**685.** The truth of the matter is that the existence, and the limitations on the powers of the three departments of government are due to the normal process of specialisation in governmental business which becomes more and more complex as civilization advances. The Legislature must make laws, the Executive enforce them and the Judiciary interpret them because they have in their respective fields acquired an expertise which makes them competent

255. Granville Austin : *The Indian Constitution : Cornerstone of a Nation,* (1972) p. 186.

256. 293 US 388, 440.

257. *See* the judgment of Mukherjea, J. in the *In re Delhi Laws Act case,* 1951 SCR 747, 964 : AIR 1951 SC 332.


SCC Online Web Edition, Copyright © 2021
Page 286      Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------

to discharge their duly appointed functions. The Moghal Emperor, Jehangir, was applauded as a reformist because soon after his accession to the throne in 1605, he got a golden chain with sixty bells hung in his palace so that the common man could pull it and draw the attention of the ruler to his grievances and sufferings. The most despotic monarch in the modern world prefers to be armed, even if formally, with the opinion of his judges on the grievances of his subjects.

**686.** The political usefulness of the doctrine of separation of powers is now widely recognized though a satisfactory definition of the three functions is difficult to evolve. But the function of the Parliament is to make laws, not to decide cases. The British Parliament in its unquestioned supremacy could enact a legislation for the settlement of a dispute or it could, with impunity, legislate for the boiling of the Bishop of Rochestor's cook. The Indian Parliament will not direct that an accused in a pending case shall stand acquitted or that a suit shall stand decreed. Princely India, in some parts, often did it.

**687.** The reason of this restraint is not that the Indian Constitution recognizes any rigid separation of powers. Plainly, it does not. The reason is that the concentration of powers in any one organ may, by upsetting that fine balance between the three organs, destroy the fundamental premises of a democratic government to which we are pledged. Sir Carleton K. Allen says in his '*Law and Orders*' (1965 Ed., p. 8) that neither in Montesquieu's analysis nor in Locke's are the governmental powers conceived as the familiar trinity of legislative, executive aed judicial powers. Montesquieu's "separation" took the form not of impassable barriers and unalterable frontiers, but of mutual restraints, or of what afterwards came to be known as "checks and balances" (p. 10). The three organs must act in concert, not that their respective functions should not ever touch one another. If this limitation is respected and preserved, "it is impossible for that situation to arise which Locke and Montesquieu regarded as the eclipse of liberty—the monopoly, or the disproportionate accumulation, of power in one sphere" (p. 19 ; Allen). In a federal system which distributes powers between three coordinate branches of government, though not rigidly, disputes regarding the limits of constitutional power have to be resolved by courts and therefore, as observed by Paton, "the distinction between judicial and other powers may be vital to the maintenance of the Constitution itself"[258]. Power is of an encroaching nature, wrote Madison in '*The Federalist*'. The encroaching power which the federalists feared most was the legislative power and that, according to Madison, is the danger of all republics. Allen says that the history of both the United States and France has shown on many occasions that the fear was not unjustified.[259]

**688.** I do not suggest that such an encroaching power will be pursued relentlessly or ruthlessly by our Parliament. But no Constitution can survive without a conscious adherence to its fine checks and balances. Just as courts ought not to enter into problems entwined in the "political thicket", Parliament must also respect the preserve of the courts. The principle of separation of powers is a principle of restraint which "has in it the precept, innate in the prudence of self-preservation (even if history has not repeatedly brought it home), that discretion is the better part of valour"[260]. Courts have, by and large, come to check their valorous propensities. In the name

258. *A Text-book of Jurisprudence* (1964) p. 295.

259. Allen : *Law and Orders*, p. 12.

260. Julius Stone : *Social Dimensions of Law and Justice*, (1966) p. 668.


SCC Online Web Edition, Copyright © 202
Page 287    Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source:  Supreme Court Cases


-----------------------------------------------------------------------------------------------------------------------------

of the Constitution, the Parliament may not also turn its attention from the important task of legislation to deciding court cases for which it lacks the expertise and the apparatus.  If it gathers facts, it gathers facts of policy.  If it records findings, it does so without a pleading and without framing any issues.  And worst of all, if it decides a court case, it decides without hearing the parties and in defiance of the fundamental principle of natural justice.

**689.**  The Parliament, by clause (4) of Article 329A, has decided a matter of which the country's courts were lawfully seized.  Neither more nor less.  It is true, as contended by the learned Attorney-General and Shri Sen, that retrospective validation is a well-known legislative process which has received the recognition of this Court in tax cases, pre-emption cases, tenancy cases and variety of other matters.  In fact, such validation was resorted to by the Legislature and upheld by this Court in at least four election cases, the last of them being *Kanta Kathuria* v. *Manak Chand Surana*[261]. But in all of these cases, what the Legislature did was to change the law retrospectively so as to remove the reason of disqualification, leaving it to the courts to apply the amended law to the decision of the particular case. In the instant case the Parliament has withdrawn the application of all laws whatsoever to the disputed election and has taken upon itself to decide that the election is valid.  Clause (5) commands the Supreme Court to dispose of the appeal and the cross-appeal in conformity with the provisions of clause (4) of Article 329A, that is, in conformity with the "judgment" delivered by the Parliament.  The "separation of powers does not mean the equal balance of powers", says Harold Laski, but the exercise by the Legislature of what is purely and indubitably a judicial function is impossible to sustain in the context even of our cooperative federalism which contains no rigid distribution of powers but which provides a system of salutary checks and balances.

**690.**  I find it contrary to the basic tenets of our Constitution to hold that the amending body is an amalgam of all powers—legislative, executive and judicial.  "Whatever pleases the emperor has the force of law" is not an article of democratic faith.  The basis of our Constitution is a well-planned legal order, the presuppositions of which are accepted by the people as determining the methods by which the functions of the government will be discharged and the power of the State shall be used.

**691.**  So much for the Thirty-ninth Amendment.  The argument regarding the invalidity of the Representation of the People (Amendment) Act, 58 of 1974, and of the Election Laws (Amendment) Act, 1975 has, however, no substance.  The constitutional amendments may, on the ratio of the *Fundamental Rights case*, be tested on the anvil of basic structure. But apart from the principle that a case is only an authority for what it decides, it does not logically follow from the majority judgment in the *Fundamental Rights case* that ordinary legislation must also answer the same test as a constitutional amendment.  Ordinary laws have to answer two tests for their validity :  (1) The law must be within the legislative competence of the Legislature as defined and specified in Chapter I, Part XI of the Constitution, and (2) it must not offend against the provisions of Article 13(1) and (2) of the Constitution.  'Basic structure', by the majority judgment, is not a part of the fundamental rights nor indeed a provision of the Constitution.  The theory of basic structure is woven out of the conspectus of the

261. (1970) 2 SCR 835 : (1969) 3 SCC 268.

SCC Online Web Edition, Copyright © 2021
Page 288      Friday, August 13, 2021
Printed For: Mr. Wayne Page
SCC Online Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------------------------------------

Constitution and the amending power is subjected to it because it is a constituent power. 'The power to amend the fundamental instrument cannot carry with it the power to destroy its essential features'—this, in brief, is the arch of the theory of basic structure. It is wholly out of place in matters relating to the validity of ordinary laws made under the Constitution.

692. Shri Shanti Bhushan thought it paradoxical that the higher power should be subject to a limitation which will not operate upon a lower power. There is no paradox, because certain limitations operate upon the higher power for the reason that it is a higher power. A constitutional amendment has to be passed by a special majority and certain such amendments have to be ratified by the Legislatures of not less than one-half of the States as provided by Article 368(2). An ordinary legislation can be passed by a simple majority. The two powers, though species of the same genus, operate in different fields and are therefore subject to different limitations.

693. No objection can accordingly be taken to the constitutional validity of the two impugned Acts on the ground that they damage or destroy the basic structure. The power to pass these Acts could be exercised retrospectively as much as prospectively.

694. These Acts effectively put an end to the two appeals before us for they answer the totality of the objections which were raised by Shri Raj Narain against the election of Smt. Indira Gandhi. The basis of the findings on which the High Court held against the successful candidate is removed by Act 40 of 1975 retrospectively. Were the law as it is under the amendments introduced by that Act, the High Court could not have held that the election is vitiated by the two particular corrupt practices. In regard to the cross-appeal filed by Shri Raj Narain, Shri Shanti Bhushan thought that a part of it escapes through the crevices in the Act but I see no substance in that contention either. I would like to add that the findings recorded by the High Court in favour of Smt. Indira Gandhi are amply borne out by the evidence to which our attention was drawn briefly by the learned Counsel for the parties. The expenses incurred by the political party, together with the expenses incurred by her are not shown to exceed the prescribed ceiling. Apart from that, Act 58 of 1974 makes that issue academic.

695. Finally, there is no merit in the contention that the constitutional amendment is bad because it was passed when some members of the Parliament were in detention. The legality of the detention orders cannot be canvassed in these appeals collaterally. And from a practical point of view, the presence of 21 members of the Lok Sabha and 10 members of the Rajya Sabha who were in detention could not have made a difference to the passing of the amendment.

696. In the result, I hold that clauses (4) and (5) of Article 329A are unconstitutional and therefore void. But for reasons aforesaid I allow Civil Appeal No. 887 of 1975 and dismiss Civil Appeal No. 909 of 1975. There will be no order as to costs throughout.

———————